# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADAM PERRY, on Behalf of Himself and All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>         v.<br><br>WELLS FARGO & COMPANY, CHARLES W. SCHARF, TIMOTHY J. SLOAN, and JOHN R. SHREWSBERRY,<br><br>                              Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Adam Perry ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, hereby brings this Class Action Complaint for Violation of Federal Securities Law ("Complaint") against Wells Fargo & Company ("Company" or "Wells Fargo"); and Charles Scharf, Wells Fargo Chief Executive Officer ("CEO") and President; Timothy J. Sloan, former Wells Fargo Chief Executive Officer and President; and John R. Shrewsberry, Wells Fargo Senior Executive Vice President and Chief Financial Officer, based upon, *inter alia*, the investigation conducted by and under the supervision of Plaintiff's counsel, which included a review of the Company's public documents, conference calls, and announcements, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories abut the Company and readily obtainable information. Plaintiff's counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Company and the Individual Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Wells Fargo stock between February 2, 2018, and March 10, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violation of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Wells Fargo is a Delaware company headquartered in San Francisco, California.  Wells Fargo is a financial services company that provides range of products and services, including banking, consumer finance, credit cards, investments, leasing, and mortgages.  The Company operates through physical stores, the internet and other distribution channels worldwide.

3.      On February 2, 2018, Wells Fargo entered into a Consent Order with the Board of Governors of the Federal Reserve System ("FRS Consent Order"), committing to comply with the Federal Reserve System's ("FRS") directives regarding its governance and risk management policies. The FRS Consent Order was part of an enforcement action brought against the Company in connection with certain of its fraudulent practices.  Soon thereafter, on April 20, 2020, Wells Fargo entered into yet another consent order with the Consumer Fraud Protection Bureau ("CFPB") and the Office of the Comptroller of the Currency ("OCC Consent Order"), which required Wells Fargo to, among other things, develop a comprehensive plan for identifying and remediating present and future consumer harm.

4.      After the execution of the FRS and OCC Consent Orders, Wells Fargo embarked on a years-long public campaign to repair its tarnished reputation, which it sought to do  by widely touting the corporate reforms Wells Fargo purportedly implemented in compliance with the FRS and OCC Consent Orders.  These corporate reforms had several major objectives, including remediation of past

harm done to consumers as well as preventing consumer fraud from happening in the future.  In its effort to convince the market and the investors that its revamped corporate infrastructure was essentially fraud-proof, Wells Fargo's disseminated dozens of public statements in its SEC filings, earnings calls, and presentations, touting the progress and the effectives of its reforms which were purportedly taking place consistent with and in compliance with the FRS and OCC Consent Orders.

5.      In reality, however—and unbeknownst to the investing public—Wells Fargo was far from complying with the regulators' directive, including repeatedly submitting insufficiently developed and inadequate remediation plans, struggling to meet deadlines, and failing to implement meaningful reforms.  The Company's persistent failure to live up to its commitments under the FRS and OCC Consent Orders even moved the regulators to threaten supervisory and/or enforcement actions and additional penalties, a fact that investors were never apprised of in Wells Fargo's public statements.

6.       On March 4, 2020, via the publication of a 113-page report, the market learned that notwithstanding Wells Fargo's representations over the past two years, Wells Fargo "fell woefully" short of implementing meaningful corporate reforms, and that its risk and compliance policies remained dangerously inadequate to prevent another consumer fraud from occurring.  Thus, instead of fixing the broken compliance infrastructures, Wells Fargo engaged in a series of window dressing changes to quench the investors' demands, while remaining non-compliant with the regulatory directives, in violation of the FRS and OCC Consent Orders.

7.      On this news, the common shares of Wells Fargo stock ("Wells Fargo shares") fell more than 10% over two trading days, from $41.40 per share to $37.09 per share.

8.      Following the publication of the report, on March 10, 2020, the U.S. House Financial Services Committee ("Financial Services Committee") Chairwoman Maxine Waters ("Chairwoman Waters") requested that the U.S. Department of Justice ("DOJ") investigate Wells Fargo's former CEO, Defendant Sloan, for providing false statements in the context of his public testimony a year

earlier, in March 2019, which directly related to Wells Fargo's compliance with the FRS and OCC Consent Orders and its progress in developing and implementing effective and meaningful reforms.

9.     On this news, the Company's shares fell more than 20% over two trading days, from $34.63 per share to $27.20 per share.

10.     Throughout the Class Period, Defendants made materially false and misleading statements, and failed to disclose material adverse facts about the Company's business, operational, and compliance policies.  Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) Wells Fargo had inadequate disclosure controls and procedures and internal controls over financial reporting, particularly with respect to its risk and compliance management, policies and programs; (ii) the Company was not compliant with the regulatory consent orders entered into in 2018; (iii) the Company's remedial plans were inadequate, incomplete, and insufficient to prevent from future consumer abuses; (iv) as a result of the continued noncompliance with the regulatory consent orders, the Company was threatened with supervisory and/or enforcement actions and penalties; (v) the Company's remedial measures and risk and compliance management remained inadequate to protect against consumer fraud; (vi) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis and omitted materials facts.

11.     As a result of Wells Fargo's wrongful acts and omissions, and the precipitous decline in the market value of Wells Fargo's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements were entered and the subsequent damages took place in this Judicial District.  Pursuant to Wells Fargo's most recent annual report on Form 10-K, as of June 28, 2019, there were 4,099,887,226 shares of the Company's common stock outstanding.  Wells Fargo's common stock trades on the New York Stock Exchange ("NYSE"). Accordingly, there are presumably hundreds, if not thousands, of investors in Wells Fargo's common stock located with the U.S., some of whom undoubtedly reside in this Judicial District.

15.     In connection with the acts alleged in this Complaint, Wells Fargo, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

**PARTIES**

16.     Plaintiff is a resident of Las Vegas, Nevada.  As set forth in the attached Certification, incorporated by reference herein, Plaintiff acquired Wells Fargo shares during the Class Period, at artificially inflated prices, and was damaged by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Wells Fargo is a Delaware corporation with a principal place of business at 420 Montgomery Street, San Francisco, California 94104.  Wells Fargo shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "WFC."

18.     Defendant Timothy J. Sloan ("Sloan") served as the Company's CEO and President from October 2016 until his resignation in March 2019.

19.     Defendant Charles W. Scharf ("Scharf") has served as the Company's CEO and President since October 2019.

20.     Defendant John R. Shrewsberry ("Shrewsberry") served as Senior Executive Vice President and Chief Financial Officer ("CFO") for Wells Fargo since May 2014.

21.     Defendants Sloan, Scharf and Shrewsberry are sometimes referred to herein as the "Individual Defendants."  The Individual Defendants, together with Wells Fargo, are sometimes referred to herein as the "Defendants."

22.     The Individual Defendants possessed the authority to control the contents of statements made by Wells Fargo in the Company's reports to the SEC, press releases and presentations to securities analysis, money and portfolio managers and institutional investors, *i.e.,* the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Due to their positions with Wells Fargo, and their access to Wells Fargo's material information that was unavailable to the public, the Individual Defendants knew that the adverse facts described herein were not disclosed to and were being concealed from investors. The Individual Defendants are liable for the false statements and omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Wells Fargo is a financial services company that provides a range of products and services, including banking, insurance, investments, mortgage, leasing, credit cards, and consumer finance.  The Company operates through physical stores, the internet, and other distribution channels worldwide.

24.     During the past two decades, Wells Fargo suffered from a complete breakdown of its compliance and risk management infrastructures, which resulted in widespread consumer abuses, including discrimination against minority home loan borrowers, fraudulent bank account opening

6

practices, invalid mortgage fees, unnecessary auto insurance, and erroneous foreclosures and loan modification denials.  In 2016, these and other issues reached their pivotal point and erupted in a series of public scandals, attracting intensive regulatory scrutiny.  In response, numerous state and federal agencies, including, the DOJ and the SEC levied on Wells Fargo historical cash penalties and imposed severe restrictions and requirements on Wells Fargo's continued operations and growth.

**Materially False and Misleading Statements Issued During the Class Period**

25.     The Class Period begins on February 2, 2018.  On that day, the FRS brought an enforcement action against Wells Fargo to address the board's corporate risk oversight failures, which facilitated widespread consumer abuses and compliance breakdowns at Wells Fargo.

26.     On the same day, Wells Fargo announced, via a press release that, as part of that enforcement action, Wells Fargo entered into a Consent Order with the Board of Governors of the FRS.  Pursuant to the FRS Consent Order, Wells Fargo was required to enhance the Company's compliance and operational risk management in order to prevent from occurring future harm to consumers.  Among other things, the FRS Consent Order required Wells Fargo to submit, within a 60-day timeframe, plans to "improve the company's firm-wide compliance and operational risk management program" and to "enhance the board's effectiveness in carrying out its oversight and governance of [the Company.]"  These requirements were put in place after years of regulators' unsuccessful efforts to compel Wells Fargo to fix its pervasive risk management deficiencies which posed a real and imminent threat to its customers.

27.     Immediately following Wells Fargo's entering into the FRS Consent Order, Wells Fargo embarked on an intensive public campaign to improve its smeared brand image and to convince investors that the Company was working hard to implement meaningful corporate reforms.  During a Business Update Call held the same day, February 2, 2018, to discuss the FRS Consent Order, Defendant Sloan confirmed that Wells Fargo will, within the 60-days, "submit plans to the [FRS] that

leverage existing plans and efforts already underway to further enhance the board's effectiveness in carrying out its oversight and governance of the company and further improve the firm-wide compliance and operational risk management program."   As to compliance and operational risk management, Defendant Sloan represented that the Company "centralized all risk management functions and are now implementing a fully integrated operating model for risk management across all businesses and staff groups."

28.     On March 14, 2018, Wells Fargo filed its annual proxy statement with the SEC on form DEF 14A in advance of the 2018 annual meeting of shareholders.  Therein, Wells Fargo updated shareholders on its progress and status of the remediation plans and affirmed its previous "commitment[ ] to satisfying the requirements of the [FRS] [C]onsent [O]rder," and stating in relevant part:

> As part of our transformation, Wells Fargo is committed to a thorough review of the products we offer and the internal procedures we use to get things done. ***When we uncover anything that may be questionable, we address it and remediate any customers who may have been financially harmed***. To strengthen Wells Fargo's corporate culture, we are listening to our team members and inviting outside reviewers to help identify enhancements so we can make sure our culture is consistent across the organization.

29.     On April 13, 2018, the Company filed its Quarterly Supplement for the quarter-ended March 31, 2018, affirming its previous commitment to satisfying the requirements of the FRS Consent Order and providing an update regarding the ongoing compliance with the FRS's directive.  To that effect, Wells Fargo vouched to "take the [FRS] Consent Order seriously and [to] work to fully satisfy all of the [FRS] Consent Order's requirements."

30.     During an Earnings Call held the same day to discuss the Company's financial results and operations, Defendant Shrewsberry committed to "fully satisfy all of the consent order's requirements" while Defendant Sloan touted the extent of Wells Fargo's corporate reforms as follows:

> [O]ver the past 19 months, ***we've taken significant actions to strengthen the way we manage operational and compliance risk*** at Wells Fargo. In March, we

announced a new risk-management organizational design, which is an important step to ensuring that risk-management functions operate independently and **provide improved and effective oversight of our businesses**.

31.     On April 20, 2018, the Company issued a press release filed with the SEC as Exhibit 99.1 to a Form 8-K, announcing that it has entered into consent orders with the CFPB and the OCC, which require the Company to pay an aggregate of $1 billion in civil money penalties to resolve matters relating to the Company's practices involving certain automobile collateral protection insurance policies and certain mortgage interest rate lock extensions. The OCC Consent Order was imposed on Wells Fargo in response to a variety of consumer abuses, some dating back to 2013. These consumer abuses included Wells Fargo's practice of inconsistently applying its extension fee policy and improperly charging borrowers fees, including when the bank's own delay created the need for an extension. Accordingly, an important part of the OCC Consent Order was a requirement that Wells Fargo identifies the root causes of the deficiencies and remedies and corrects all harm done to consumers. In the press release published in connection with the OCC Consent Order, Wells Fargo's then CEO and President, Defendant Sloan, affirmed Wells Fargo "share[s] the same priorities with our regulators and that we are committed to working with them as we deliver our commitments with focus, accountability, and transparency."

32.     On May 4, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018 ("May 4 10-Q"). Therein, the Company provided an update regarding its compliance with the FRS Consent Order, disclosing an anticipated review of Wells Fargo's previously submitted remediation plans to improve the Company's compliance and operational risk management and its intent to adopt and implement the plan along with its enhancements and improvements by September 20, 2018. Specifically, Wells Fargo stated:

> On February 2, 2018, the Company entered into a consent order with the Board of Governors of the Federal Reserve System (FRB). **As required by the consent order, the Board submitted to the FRB a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to**

**the FRB a plan to further improve the Company's compliance and operational risk management program. As part of the review and approval process contemplated by the consent order, the Company will respond to any feedback provided by the FRB regarding the plans, including by making any necessary changes to the plans.** The consent order also requires the Company, following the FRB's acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete by September 30, 2018, third-party reviews of the enhancements and improvements provided for in the plans.

33.     As to its compliance with the OCC Consent Order, the Company similarly stated that, within 60 days, it will be required to submit "**an acceptable enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program** with respect to federal consumer financial law." Additionally, the Company represented that it was engaged in an "effort to identify other areas of instances where customers may have experienced financial harm."

34.     Appended as an exhibit to the May 4 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendant Shrewsberry certified that the "[May 10-Q report] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [May 10-Q report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

35.     On May 7, 2018, Wells Fargo was notified, via a formal Response Letter by the FRS ("FRS Response Letter") that its submission was rejected as "**materially incomplete"** and that the Company's remediation plans "**cannot be evaluated** by [the FRS] staff for their adequacy." The FRS Response Letter detailed the incomplete elements of Wells Fargo's submission, noting, among other things, that Wells Fargo's plan "fail[s] to comprehensively address operational risk." Wells Fargo was subsequently given two time extensions, until October 31, 2018, to revise its submission.

36.     On July 13, 2018, the Company filed its Quarterly Supplement for the quarter ended June 30, 2018, affirming its progress in "making further improvements to [the Company's] compliance and operational risk management programs." During an Earnings Call held the same day to discuss

the Company's results, Defendant Shrewsberry affirmed Wells Fargo's commitment to "satisfying the requirements of the Federal Reserve, OCC and CFPB consent orders." When asked about Wells Fargo's investment in compliance and operational risk, Defendant Sloan highlighted that Wells Fargo added "about 2,000 folks, team members in the risk function year-over-year," which Defendant Shrewsberry characterized as being "disproportionately" invested. With regards to the Company's compliance with the consent orders, Defendant Sloan, commented, in relevant part:

> **[W]e're working very constructively with the Fed.** We've gotten some very thoughtful feedback from them. And our expectation is that sometime in the first half of next year, we'll be able to move through that.
>
> I think the point to emphasize there is that our goal is not to just meet expectations so we can get the asset cap lifted. Our goal is to make the fundamental investments and changes that we need to make in how we manage operational and compliance risk at the company. That's the goal, and that's really where we're focused, but no update from a timing standpoint.

37. As to Wells Fargo's compliance with the OCC Consent Order, Wells Fargo did not fare much better. On July 24, 2018, Wells Fargo was notified, via a formal Response Letter by the OCC ("OCC Response Letter") that its submission "**lacks substance and detail in a number of areas**." The OCC Response Letter instructed Wells Fargo to submit a revised plan and threatened "future supervisory and/or enforcement actions." Via the same OCC Response Letter, Wells Fargo was instructed to submit a revised remediation plan.

38. Notwithstanding the regulators' adverse actions and threats, Wells Fargo continued to mislead investors and failed to apprise them of the truthful status, progress, and effectiveness of the ongoing remediation efforts and the resultant risk of future consumer abuse. For example, on August 3, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018 ("August 3 10-Q"). Therein, the Company reiterated its commitment to further improve the Company's compliance and operational risk management program. In describing the FRS Consent Order, the Company stated:

As required by the consent order, the Board submitted to the FRB a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the FRB a plan to further improve the Company's compliance and operational risk management program. The consent order also requires the Company, following the FRB's acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete third-party reviews of the enhancements and improvements provided for in the plans.

39.     As to the OCC Consent Orders, Wells Fargo stated:

As required by the consent orders, the Company submitted to the CFPB and OCC an enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders. In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral protection insurance and mortgage interest rate lock matters.

40.     Appended as an exhibit to the August 3 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Defendant Sloan and Defendant Shrewsberry certified that the "[August 10-Q report] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [August 10-Q report] fairly presents, in all material respects, the financial condition and results of operations of the Company.

41.     On October 12, 2018, the Company filed its Quarterly Supplement for the quarter ended September 30, 2018.  During an Earnings Call held on the same day to discuss the Quarterly Supplement, Defendant Sloan touted the Company's progress relating to its compliance with the regulatory consent orders, stating in relevant part:

**And we're taking their detailed feedback and making changes across the company**, especially in our operational and compliance risk management structure. A key milestone in this process is our newly enhanced risk management framework which fundamentally transforms how we manage risk throughout the organization in a comprehensive, integrated, and consistent manner.

42.     On November 6, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018 ("November 6 10-Q").    Therein, the Company

reiterated its commitment to improve the Company's compliance and operational risk management program.  In providing an update on Wells Fargo's compliance with the FRS Consent Order, Wells Fargo stated:

> As required by the consent order, the Board submitted to the FRB a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the FRB a plan to further improve the Company's compliance and operational risk management program. The consent order also requires the Company, following the FRB's acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete third-party reviews of the enhancements and improvements provided for in the plans.

43.     As to Wells Fargo's compliance with the OCC Consent Order, Wells Fargo stated:

> As required by the consent orders, the Company submitted to the BCFP and OCC an enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders. In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral protection insurance and mortgage interest rate lock matters, as well as a plan for the management of remediation activities conducted by the Company.

44.     Additionally, Wells Fargo continued to tout its operational and compliance risk management reforms, stating in relevant part:

> At the management level, Wells Fargo Compliance, which is part of Corporate Risk, monitors the implementation of the Company's compliance program. Wells Fargo Compliance reports to the CRO and also provides periodic reporting related to compliance risk to the Board's Risk Committee and Compliance Subcommittee. In addition, the Risk & Control Committee for each business group and enterprise function reports compliance risk matters to the Enterprise Risk & Control Committee. We continue to enhance our oversight of operational and compliance risk management, including as required by the [FRS and OCC Consent Orders].

45.     Appended as an exhibit to the November 6 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendant Sloan and Defendant Shrewsberry certified that the "[November 10-Q report] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [November 10-Q

report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

46.     On March 4, 2019, Wells Fargo was notified, via a formal letter by the OCC that its revised plan "*remain[s] inadequate*."

47.     On March 11, 2019, Wells Fargo was notified, via a formal letter by the FRS that its revised submission was "*riddled with errors and discrepancies, such as incorrect progress indicators for deliverables and illogical timeframes*."

48.     On March 12, 2019 — only days after Wells Fargo was apprised of its non-compliance with the regulatory Consent Orders — the Financial Services Committee held a hearing relating to Wells Fargo's consumer abuses and compliance breakdowns in connection with the series of scandals that Wells Fargo engaged in, including the fraudulent consumer account opening scandal uncovered in 2016, which led to the imposition and signing of the FRS Consent Order. In the opening remarks, Defendant Sloan touted the Company's remedial measures and corporate reforms put into place to prevent future consumer harm. Specifically, Defendant Sloan stated:

> We have discarded our old decentralized structure that allowed prior problems to occur and centralized our enterprise control functions, such as risk, finance, human resources, compliance, and technology. *We have enhanced our three "lines of defense"—front-line risk, independent risk management, and audit—to ensure multiple layers of review and to improve internal oversight. We have added more than 3,000 new risk professionals who work every day to ensure that we are conducting our business in the best interests of our customers, and we plan to hire more.* Now, we have better visibility into issues as they emerge and can respond to them more quickly.

> We have taken a range of other steps to manage and reduce risk. *We have reevaluated our products and services, shed riskier investments, and sold or discontinued non-core businesses and activities.* And we have hired impressive new leaders—many from outside the company—to oversee our Risk, Legal, Human Resources, Technology, and Audit groups.

> Our Board of Directors has undergone a similar transformation. In the past two-and-a-half years, *we have added seven new independent directors, who bring expertise in financial services, risk management, human capital management, technology, operations, and reputational risk.* We have

separated the roles of Chair and CEO, and our new Board Chair Betsy Duke is the first woman to chair a major United States financial institution. We also improved the reporting and analysis our directors receive, maintained our commitment to the Board's diversity, and further empowered our Board committees to oversee improvements in risk management and corporate culture.

49.     As to Wells Fargo's compliance with the OCC Consent Orders, Defendant Sloan assured the Financial Services Committee that Wells Fargo was "***working very constructively***" with the regulators.  In response to Chairwoman Waters' direct question about whether Wells Fargo was "in compliance, based on reviews that are done by the OCC and the [CFPB]," Defendant Sloan testified, ***"We are in compliance with those plans."***  Additionally, in response to a question from Representative Nydia Velázquez regarding the status of the Company's compliance with the FRS Consent Order, Defendant Sloan implied that Wells Fargo had completed the governance reforms required by the FRS, stating, "[a]s part of the consent order with the Fed, they want us to improve the Board governance and oversight, ***which we have done.***"

50.     When questioned regarding the possibility of additional scandals emerging in the future, Defendant Sloan repeatedly characterized the Company's compliance issues as a problem of the past, stating:  "***[t]here is nothing else that I am aware of that we haven't disclosed[.]***"  He further assured the Financial Services Committee that "***the changes that we have implemented, the substantive changes that we have implemented since I've became CEO are going to prevent [scandals] from occurring*** as best we can." Finally, Defendant Sloan testified that the Company now had "checks and balances" in place that made the "likelihood that there would ever be something like a retail sales practices issue happening again at Wells Fargo is very low, ***if not zero.***"

51.     Shortly thereafter, on March 26, 2019, Wells Fargo announced the retirement of Defendant Sloan and the appointment of Allan Parker ("Parker") as Wells Fargo's Interim CEO and President.  In a conference call with analysts two days later, Defendant Sloan stated, "[w]hile I'm confident in my ability to effectively lead Wells Fargo through the work that remains to be done, it

has become apparent that the focus on me has become a distraction that impacts our ability to successfully move Wells Fargo forward."

52.     After the departure of Defendant Sloan, Wells Fargo continued to tout the remedial measures and the purportedly robust corporate reforms put in place that were intended to make the Company essentially fraud-proof.  For example, on April 12, 2019, the Company issued a press release regarding its results of operations and financial condition for the quarter ended March 31, 2019.  The Company's Quarterly Supplement was filed with the SEC as exhibit 99.2 to Form 8-K.  On the same day, the Company executives hosted an earnings call with analysts and investors to discuss the Company's first quarter 2019 financial results.  On that call, Parker continued Wells Fargo's misleading narrative, outlining the steps Wells Fargo has purportedly taken to comply with the requirements of the Federal Reserve System:

> I think that it's appropriate to say that there was always a sufficient level of seriousness on the part of our Senior Management in terms of approaching the Fed consent order. **We early on marshaled what we thought were the necessary resources to get everything done and in a manner of appropriate urgency and thoroughness.** As time has gone on and there's been greater clarity about all the work that's been done and the expectations of the regulators, we've continued to focus on everything that needs to be done.
>
> **[T]he effort that we're talking about, which is enhancing corporate governance protocols, establishing an even stronger risk management framework and achieving true operational excellence** just takes a certain amount of time and we're doing that methodically, but we're also doing it in conjunction with our regulators as they provide us with constant feedback and the other thing that I will say is that when we're going forward with respect to the asset cap now, one of the things that we feel is critical to do is to get the input of our new Chief Technology Officer and our new Chief Auditor who are going to be -- one of whom, our Chief Technology Officer, has just arrived and our Chief Auditor will arrive soon.

53.     On May 3, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019 ("May 3 10-Q").  Therein, the Company reiterated its commitment to improve the Company's compliance and operational risk management program.  In providing an update on Wells Fargo's compliance with the FRS Consent Order, the Company stated:

As required by the consent order, the Board submitted to the FRB a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the FRB a plan to further improve the Company's compliance and operational risk management program. The consent order also requires the Company, following the FRB's acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete an initial third-party review of the enhancements and improvements provided for in the plans.

54.     As to Wells Fargo's compliance with the OCC Consent Order, Wells Fargo stated:

As required by the consent orders, the Company submitted to the CFPB and OCC an enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders. In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral protection insurance and mortgage interest rate lock matters, as well as a plan for the management of remediation activities conducted by the Company.

55.     Appended as an exhibit to the May 3 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Mr. Parker and Defendant Shrewsberry certified that the "[May 10-Q report] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [May 10-Q report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

56.     Then again, on July 16, 2019, the Company issued a press release regarding its results of operations and financial condition for the quarter ended June 30, 2019 and posted its 2Q19 Quarterly Supplement, which was also filed with the SEC as exhibit 99.2 to Form 8-K.   On the same day, the Company held an earnings call with analysts and investors, during which Defendant Shrewsberry highlighted management's focus on compliance and risk management, stating, in relevant part that "[t]here is a very long list of ways to make Wells Fargo continually more efficient, and ***getting that prioritize along with some of these very urgent requirements in our risk and control environment is really, what the management team is most highly focused on.***" With regards to the Company's risk department, Defendant Shrewsberry portrayed Wells Fargo's revamped risk department in exaggerated terms:

So the risk department is setting policy and looking into businesses and setting expectations for businesses and testing the businesses, but the businesses are controlling their own risks. . . . I think our credit risks, our market risk, etc. have been historically very strong and continue to be today. **So the newer muscle that's being developed in all of the businesses are these control teams, who go process by process, product by product and transaction flow by transaction flow** to as Allen said, try and ensure excellence in what we do. So that we're not generating unexpected operational risk or compliance failures.

57.     With regards to the Company's expenditures with risk and compliance, Defendant Shrewsberry stated that "the majority of [the investment spend] is really more on . . . compliance and risk management.  But having said that, **the downside of not being excellent in those areas was produced it's more than a share of cost over the last few years**. So from an economic perspective, it's probably got as high an NPV is [sic] anything else that we're doing."

58.     On October 15, 2019, the Company filed its Quarterly Supplement for the quarter ended September 30, 2019.  During an Earnings Call held on the same day, Mr. Parker provided an update on the Company's compliance with the regulatory consent orders, stating: "With regard to the issues raised in the Fed consent order, the feedback that we are getting from the Fed on a constant basis is enabling us to continue to make progress in terms of responding to their expectations."

59.     On November 1, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2019 ("November 1 10-Q").   Therein, the Company reiterated its commitment to improve the Company's compliance and operational risk management program.  In providing an update on Wells Fargo's compliance with the FRS Consent Order, Wells Fargo stated:

As required by the consent order, the Board submitted to the FRB a plan to further enhance the Board's governance and oversight of the Company, and the Company submitted to the FRB a plan to further improve the Company's compliance and operational risk management program. The Company continues to engage with the FRB as the Company works to address the consent order provisions. The consent order also requires the Company, following the FRB's acceptance and approval of the plans and the Company's adoption and implementation of the plans, to complete an initial third-party review of the enhancements and improvements provided for in the plans.

60.     As to Wells Fargo's compliance with the OCC Consent Order, Wells Fargo stated:

> As required by the consent orders, the Company submitted to the CFPB and OCC an enterprise-wide compliance risk management plan and a plan to enhance the Company's internal audit program with respect to federal consumer financial law and the terms of the consent orders. In addition, as required by the consent orders, the Company submitted for non-objection plans to remediate customers affected by the automobile collateral protection insurance and mortgage interest rate lock matters, as well as a plan for the management of remediation activities conducted by the Company.

61.     Appended as an exhibit to the November 1 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Scharf and Shrewsberry certified that the "[November 10-Q report] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [November 10-Q report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

62.     The above statements identified in ¶¶ 23-61 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) Wells Fargo had inadequate disclosure controls and procedures and internal controls over financial reporting, particularly with respect to its risk and compliance policies and programs; (ii) the Company was not compliant with the regulatory FRS and OCC Consent Orders;  (iii) the Company's remedial plans were inadequate, incomplete, and insufficient to prevent from future consumer abuses; (iv) the Company was threatened with supervisory and/or enforcement actions and penalties; (v) the Company's remedial measures and risk and compliance management remained inadequate to protect against consumer fraud; (vi) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis and omitted materials facts.

## The Truth Begins to Emerge

63.     On March 4, 2020, after a year-long campaign to improve its brand image, the Financial Services Committee released a 113-page staff report ("Report"), titled *The Real Wells Fargo: Board & Management Failures, Consumer Abuses, and Ineffective Regulatory Oversight.*  The Report presented the results of a year-long investigation into Wells Fargo's compliance with five regulatory consent orders, including the FRS and OCC Consent Orders.  The Report revealed Wells Fargo's prolonged failure to satisfy the terms of the FRS and OCC Consent Orders and establish the safeguards necessary to protect consumers from harm.

64.     With respect to the FRS Consent Order, the Report revealed that the risk management plans that Wells Fargo submitted to the FRS in April 2018 were "***materially incomplete***" and fell "***woefully short***" of the FRS's expectations, despite that Wells Fargo received constant feedback and detailed guidance from the FRS.  Wells Fargo's revised submission on October 31, 2018 still "lacked fundamental elements necessary to address the issues identified in the 2018 [FRS] Consent Order" and was rejected by the FRS.  Additionally, FRS threatened future supervisory and/or enforcement actions.  Notably, on March 11, 2019, the day before Defendant Sloan testified before the House Financial Services Committee, the FRS sent a letter to Defendant Sloan and the Company's Chair of the Board of Directors, Betsy Duke, informing them that the Company's remediation plans "***remain materially incomplete.***"  According to the Report, Wells Fargo was informed that the plan was "riddled with errors and discrepancies, such as incorrect progress indicators for deliverables and 'illogical timeframes' for achieving future milestones."

65.     The Report further revealed that Wells Fargo likewise failed to comply with the OCC Consent Orders.  According to the Report, Wells Fargo's original submission on June 19, 2018 was rejected by the OCC, noting in a response that the Company's remediation plan "lacks substance and detail in a number of areas," including the Company's plan to "remediat[e] customers affected by

Wells Fargo's force-placed insurance practices." The OCC instructed Wells Fargo to resubmit its plan for enhancing its internal audit functions and threatened future enforcement actions. Further, the OCC admonished the Company's sluggishness in making any meaningful progress:

> Although the bank is making progress in certain areas, significant time elapsed before the bank began demonstrating progress, and overall, progress is very slow. Additionally, *the vast majority of progress appears to come after repeated pressure by the regulators, calling out missed deadlines, failed validations, and poor quality [sic] action plans.* The Board and executive management must demonstrate the willingness and ability to implement and maintain effective corporate governance and risk management programs that span the enterprise.

66.    The Report concluded that Wells Fargo's risk management infrastructure remains dangerously broken and inadequate to manage risks and protect consumers. Accordingly, the Report recommended that Congress uses sanctions against recidivist megabanks like Wells Fargo, including compelling Wells Fargo to either downsize or break up the bank to smaller, well-managed banks.

67.    On this news, the price of Wells Fargo shares fell more than 10% over two trading days, from $41.40 per share to $37.09 per share.

68.    Three days after the release of the Report, on March 10, 2020, Defendant Scharf testified before the Financial Services Committee. In his opening remarks, Defendant Scharf admitted that "*[Wells Fargo] ha[s] not yet done what is necessary to address [its] shortcomings.*" Defendant Scharf stated:

> [W]e had a flawed business model in how the company was managed. Our structure was problematic, and the company's leadership failed its stakeholders. Our culture was broken, and we did not have the appropriate controls in place across the company.

69.    As to the Report, Defendant Scharf admitted its findings were "beyond disappointing."

70.    Following Defendant Scharf's testimony, on March 10, 2020, House Financial Services Committee Chairwoman Waters, via a letter to the Attorney General William Barr, requested that the DOJ review Defendant Sloan's testimony during the Committee hearing a year earlier, on March 12,

2019, for potential violation of the federal law prohibiting knowingly and willfully making a false statement to Congress.

71.     On this news, the price of Wells Fargo shares fell more than 20% over two trading days, from $34.63 per share to $27.20 per share.

72.     As a result of Wells Fargo's wrongful acts and omissions, and the related precipitous drop in the market value of Wells Fargo shares, Plaintiff and Class members have suffered significant damages and losses.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on its own behalf and as representative of a Class, consisting of all those who purchased or otherwise acquired Wells Fargo shares during the Class Period ("Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

74.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.  Throughout the Class Period, Wells Fargo shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

75.     Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff

and members of the Class sustained damages from the same wrongful conduct of Defendants. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

76.    Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff is an adequate representative of the Class and has no interest which is adverse to the interests of absent Class members.  Plaintiff has retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

77.    Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class. These common questions of law include, without limitation:

- whether statements made by Wells Fargo and Individual Defendants to investors during the Class Period included misrepresentations of material facts about the financial condition, operations and oversight of operations at Wells Fargo;

- whether Wells Fargo and Individual Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

- whether Wells Fargo's and Individual Defendants' acts as alleged herein constituted violations of the federal securities laws;

- whether the prices of Wells Fargo shares during the Class Period were artificially inflated due to Wells Fargo's and Individual Defendants' conduct described herein;

- injury suffered by Plaintiff and Class members; and

- the appropriate measure of damages suffered by Plaintiff and Class members.

78.    A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

79.     Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Wells Fargo and the Individual Defendants.

80.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD ON THE MARKET DOCTRINE

81.     The market for Wells Fargo shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Wells Fargo's shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Wells Fargo shares and market information relating to Wells Fargo, and have been damaged thereby.

82.     During the Class Period, the artificial inflation of Wells Fargo's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Wells Fargo's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Wells Fargo financial and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Wells Fargo shares. Defendants' materially false and/or misleading statements during the Class Period resulted in

24

Plaintiff and other members of the Class purchasing Wells Fargo shares at such artificially inflated prices, and each of them has been damaged as a result.

83.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as:

- Wells Fargo and Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- these misrepresentations and omissions were material to Plaintiff and the Class;

- Wells Fargo shares were traded on the NYSE and were covered by numerous analysts;

- Wells Fargo shares were liquid and traded with significant volume during the Class Period;

- the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of the Wells Fargo shares; and

- Plaintiff and Class members purchased and/or sold Wells Fargo shares between the time Wells Fargo and Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

84.     As a result of the foregoing, the market for Wells Fargo shares promptly digested current information regarding Wells Fargo from all publicly available sources and reflected such information in Wells Fargo's share price. Under these circumstances, all purchasers of Wells Fargo's shares during the Class Period suffered similar injury through their purchase of Wells Fargo's shares at artificially inflated prices. Thus, a presumption of reliance applies.

85.     Accordingly, Plaintiff and Class members are entitled to a presumption of reliance upon the integrity of the market.

86.     In the alternative, Plaintiff and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456 (1972), because Defendants omitted material information during the Class Period violating a duty to disclose such information as described above.  Because this action involves

Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION

87.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

88.     During the Class Period, Plaintiffs and the Class purchased Wells Fargo's shares at artificially inflated prices and were damaged thereby. The price of Wells Fargo shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## NO SAFE HARBOR

89.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Wells Fargo and the Individual Defendants are liable for

those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Wells Fargo who knew that those statements were false and misleading when made.

## SCIENTER ALLEGATIONS

90.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Wells Fargo, their control over, and/or receipt and/or modification of Wells Fargo's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Wells Fargo, participated in the fraudulent scheme alleged herein.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)
Against All Defendants**

91.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

92.     During the Class Period, Wells Fargo and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved false statements which they knew or deliberately disregarded in that they contained misrepresentations and failed to disclose material facts

27

to make the statements made not misleading.

93.     Wells Fargo and the Individual Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 by: (a) making false statements of material facts or omitted to state material facts needed to make the statements not misleading; or (b) engaging in acts and practices that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with purchases of Wells Fargo shares during the Class Period.

94.     Wells Fargo and the Individual Defendants acted with scienter because they knew that the statements issued in the name of Wells Fargo were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of these statements as primary violations of securities laws. Wells Fargo and Individual Defendants, through receipt of information reflecting true facts about Wells Fargo, their control over, and/or receipt of or modification to Wells Fargo's allegedly materially misleading statements, which made them aware of Wells Fargo's confidential proprietary information, participated in the fraudulent scheme complained of herein.

95.     Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by Wells Fargo, and intended to deceive Plaintiff and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other Wells Fargo employees to investors, including Plaintiff and Class members.

96.     Pursuant to the foregoing, the price of Wells Fargo shares were artificially inflated during the Class Period. Due to their lack of knowledge of the false nature of statements made by Wells Fargo and the Individual Defendants, Plaintiff and Class members relied on the statements made by Wells Fargo and the Individual Defendants and/or the integrity of the market price of Wells Fargo shares during the Class Period in purchasing Wells Fargo shares at prices that were artificially

inflated due to false and misleading statements made by Wells Fargo and the Individual Defendants.

97.     Were Plaintiff and Class members made aware that the market price of Wells Fargo shares were artificially and falsely inflated by misleading statements made by Wells Fargo and the Individual Defendants, and by material adverse information that Wells Fargo and the Individual Defendants failed to disclose, they would not have purchased Wells Fargo shares at artificially inflated prices, or purchased them at any price.

98.     Based on the wrongful conducted alleged herein, Plaintiff and Class members have suffered damages in an amount to be determined at trial.

99.     Wells Fargo and the Individual Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and Class members for significant damages suffered via their purchases of Wells Fargo shares during the Class Period.

## SECOND CLAIM FOR RELIEF

### (Violation of Section 20(a) of the Exchange Act)
### Against the Individual Defendants

100.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

101.    During the Class Period, the Individual Defendants were involved in the management and operation of Wells Fargo's business affairs. Due to their senior positions, they had knowledge of adverse non-public information regarding Wells Fargo's non-compliance with the regulatory consent orders and false representations in connection therewith.

102.    As directors and/or officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding Wells Fargo's financial condition and results of operations, and to correct any public statements issued by Wells Fargo which were materially false or misleading.

103.    Due to their positions of authority at Wells Fargo, the Individual Defendants

controlled the contents of various public filings, press releases and reports which Wells Fargo disseminated in the market during the Class Period.  During the Class Period, the Individual Defendants utilized their authority to cause Wells Fargo to execute the wrongful acts alleged herein. The Individual Defendants were therefore "controlling persons" at Wells Fargo pursuant to Section 20(a) of the Exchange Act. On this basis, they were participants in the unlawful conduct alleged which caused the prices of Wells Fargo shares to be artificially inflated.

104.    Based on the conduct described above, Individual Defendants are liable for the violations committed by Wells Fargo pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands relief as follows:

A.    Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class Representative;

B.    Awarding damages in favor of Plaintiff and members of the Class against Wells Fargo and Individual Defendants, jointly and severally, for all damages sustained as a result of Wells Fargo's wrongdoing, in an amount to be proven at trial;

C.    Awarding Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

D.    Awarding Plaintiff and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

E.    Directing such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated June 11, 2020

LOWEY DANNENBERG, P.C.

*/s/ Christian Levis*
Christian Levis
Frank Strangeman
Andrea Farah
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: 914-997-0500
clevis@lowey.com
fstrangeman@lowey.com
afarah@lowey.com

*Counsel for Plaintiff*

# CERTIFICATION

**SWORN CERTIFICATION OF PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS**

I, Adam G. Perry certify that:

1. I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2. I am duly authorized to institute legal action against Wells Fargo & Co. and other defendants.

3. I did not purchase the Wells Fargo & Co. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

4. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

5. My transactions in Wells Fargo & Co. securities during the Class Period are set forth below.

6. I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years.

7. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

_June 9 2020_
Date

_Adam G. Perry_
Adam G. Perry

Adam G. Perry's Transactions in Wells Fargo & Co. securities:

| Date | Transaction Type | Quantity | Unit Price |
|------|-----------------|----------|------------|
| 2/5/2020 | Buy | 37 | $48.31 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |