**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY SECURITIES LITIGATION | Case No. 1:20-CV-04494 (GHW) **CLASS ACTION** **JURY TRIAL DEMANDED** |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

<u>TABLE OF CONTENTS</u>

Page

I.      INTRODUCTION ........................................................................................................ 1

II.     JURISDICTION AND VENUE ................................................................................. 7

III.    THE PARTIES ........................................................................................................... 7

        A.      Lead Plaintiffs ................................................................................................ 7

        B.      Defendants ...................................................................................................... 9

IV.     SUMMARY OF THE FRAUD ................................................................................. 12

        A.      Wells Fargo Commits Massive Consumer Abuses Leading to Record
                Fines and Punitive Consent Orders ............................................................... 12

                1.      The OCC and CFPB Impose Initial Consent Orders and a Record Fine on
                        Wells Fargo .......................................................................................... 14

                2.      The Federal Reserve Imposes a Consent Order on Wells Fargo ............. 16

                3.      The Federal Reserve Limits Wells Fargo's Growth with an Unprecedented
                        Asset Cap .............................................................................................. 21

                4.      The OCC and CFPB Issue Additional Consent Orders and Historic Fines
                        ............................................................................................................... 23

        B.      Defendants Knowingly Misrepresent Their Compliance with the 2018
                Consent Orders ............................................................................................... 26

                1.      Despite Numerous Rejection Letters and Stern Rebukes from the Bank's
                        Regulators, Defendants Falsely and Misleadingly Tell Investors that the
                        Bank has Compliant "Plans In Place" and is Already "Executing" Those
                        Plans ...................................................................................................... 27

                2.      Defendant Sloan Knowingly Lies to Congress About the Bank's
                        Compliance with the 2018 Consent Orders ............................................. 37

                3.      After Defendant Sloan's Departure, the Bank's Interim-CEO, CFO, and
                        Board Chairwoman Continue to Misrepresent the Bank's Compliance with
                        the 2018 Consent Orders ........................................................................ 43

        C.      The House Financial Services Committee Conducts a Thorough
                Investigation and Finds that Wells Fargo Misrepresented its Compliance

with the 2018 Consent Orders............................................................. 45

    1.    Regulatory Officials and Wells Fargo Insiders Testify About the Bank's Repeated Submissions of Deficient Stage 1 Plans.................................... 46

    2.    The House Financial Services Committee Finds that Defendants Made "Inaccurate and Misleading" Statements ................................................. 51

D.    Facing Sharp Criticism, the Bank's New CEO and Long-Time Directors Provide Damning Testimony to Congress ............................................. 53

E.    Wells Fargo's Failure to Satisfy the 2018 Consent Orders' Requirements Significantly Impaired the Bank's Financial Success and Caused Severe Investor Losses.................................................................................... 58

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........................................................................................ 60

A.    Federal Reserve Consent Order Conference Call ................................. 60

B.    May 2018 Deutsche Bank Global Financial Services Conference ....................... 61

C.    June 2018 Morgan Stanley Financials Conference................................ 62

D.    July 2018 Earnings Call ....................................................................... 63

E.    December 2018 Goldman Sachs U.S. Financial Services Conference ................ 64

F.    December 2018 *Squawk on the Street* Appearance ............................. 67

G.    January 2019 Earnings Call .................................................................. 68

H.    January 2019 *Closing Bell* Appearance .............................................. 69

I.    February 2019 Credit Suisse Financial Services Forum........................ 71

J.    March 2019 House Financial Services Committee Testimony............................ 73

K.    April 2019 Earnings Call ...................................................................... 78

L.    April 2019 CNBC Appearance ............................................................. 82

M.    May 2019 Sanford C. Bernstein Strategic Decisions Conference ....................... 84

N.    September 2019 Shareholder Call ........................................................ 85

O.     October 2019 Earnings Call ......................................................................... 87

P.     December 2019 Goldman Sachs U.S. Financial Services Conference ................ 89

VI.    ADDITIONAL ALLEGATIONS OF SCIENTER ........................................... 90

VII.   LOSS CAUSATION .................................................................................... 102

VIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR ........................... 112

IX.    PRESUMPTION OF RELIANCE ............................................................... 114

X.     CLASS ACTION ALLEGATIONS ............................................................. 115

XI.    CLAIMS FOR RELIEF .............................................................................. 116

     COUNT I For Violations of Section 10(b) of the Exchange Act and SEC Rule
     10b-5 Promulgated Thereunder (Against Wells Fargo, Sloan, Parker,
     Duke, Shrewsberry) .............................................................................. 116

     COUNT II For Violations of Section 20(a) of the Exchange Act (Against Insider
     Defendants) ......................................................................................... 119

XII.   PRAYER FOR RELIEF ............................................................................. 124

XIII.  JURY DEMAND ....................................................................................... 125

Lead Plaintiffs Handelsbanken Fonder AB, Public Employees' Retirement System of Mississippi, State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island, and the Louisiana Sheriffs' Pension & Relief Fund (together "Lead Plaintiffs"), by and through their counsel, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and all persons or entities, except Defendants and their affiliates, who purchased or otherwise acquired the securities of Wells Fargo & Company ("Wells Fargo" or the "Bank") between February 2, 2018 and March 12, 2020, inclusive (the "Class Period"), and were damaged thereby.

## I.     <u>INTRODUCTION</u>

1.      In 2018, Wells Fargo's regulators hit the Bank with unprecedented consent orders designed to halt the Bank's decades-long, fraudulent banking practices and rectify the severely deficient corporate oversight that allowed those fraudulent practices to develop and endure (the "2018 Consent Orders").  During the Class Period, Wells Fargo falsely told and misleadingly omitted from investors material information regarding its compliance with the 2018 Consent Orders, claiming that it had regulator approved "plans" and that it was "in compliance" with the 2018 Consent Orders.  In reality, Wells Fargo's compliance and oversight overhaul could not even get off the ground.  Wells Fargo had yet even to submit to regulators an acceptable plan or schedule and was nowhere near meeting the regulators' requirements that were a predicate to lifting the severe measures that had been imposed on the Bank.  A series of revelations, including damming congressional hearings and reports, finally revealed to the market that the Bank had blatantly disregarded the basic requirements set forth in the 2018 Consent Orders and made numerous misrepresentations to the public about its compliance with those orders.  The truth also forced the ousting of the Bank's CEO, Defendant Timothy J. Sloan ("Sloan"), and a number of its Directors.

And, it further forced the Bank and its new Board of Directors to claw back $15 million of Sloan's compensation, and led the Chairwoman of the U.S. House of Representatives Committee on Financial Services (the "House Financial Services Committee") to send a formal letter to the Department of Justice ("DOJ") recommending criminal action against Sloan for his inaccurate and misleading public statements.  The truth also cost investors dearly: Wells Fargo shareholders lost over *$54 billion* in market capitalization as the Bank's stock price plummeted as the market learned about Defendants' fraud.

2.      At the start of the Class Period, Wells Fargo's three primary regulators—the Board of Governors of the Federal Reserve System (the "Federal Reserve"), the Office of the Comptroller of the Currency (the "OCC"), and the Consumer Financial Protection Bureau (the "CFPB") (together, the "Regulators")—found that the Bank engaged in "pervasive and persistent misconduct" and "reckless," "unsafe," and "unsound" banking practices, including opening 3.5 million unauthorized bank accounts and charging hundreds of thousands of borrowers for unnecessary and unrequested auto-protection insurance.  The Regulators imposed the punitive 2018 Consent Orders on the Bank for this wrongdoing, with the OCC and CFPB also levying a historic $1 billion fine on the Bank.  In addition, the Federal Reserve backed its consent order (the "2018 FRB Consent Order") with an unprecedented "asset cap", prohibiting the Bank from growing its assets until it satisfied the 2018 FRB Consent Order's requirements—a punishment that market commentators aptly referred to as the "Fear of God Penalty."

3.      Wells Fargo was required to pass three stages to satisfy the 2018 Consent Orders. First, at Stage 1, the Bank needed to submit a compliant plan to the Regulators detailing the measures it would take to correct its compliance and oversight failures and how and when those measures would be implemented (the "Stage 1 Plan").  Next, at Stage 2, once the Regulators

approved the Bank's proposed Stage 1 Plan, the Bank was required to implement the approved plans. And finally, at Stage 3, the Bank was required to perform an assessment to validate that the approved plans were effectively implemented and then provide that assessment to the Regulators.

4. The market was intently focused on the Bank's compliance with the 2018 Consent Orders, as the asset cap blocked the Bank's ability to take advantage of interest-earning opportunities, which was the Bank's largest source of income. Analysts immediately recognized the asset cap's ramifications: it would result in "hits to growth, earnings, business opportunities and the potential for other painful regulatory action yet to come." Analysts also warned that the penalty was imposed on Wells Fargo because of its pervasive illegal practices, noting that the Federal Reserve's "harsh" and "rare" rebuke was "a strong sign of regulators' frustration about the very wide swath of areas where Wells has had issues." As Defendant Elizabeth "Betsy" Duke ("Duke"), the Bank's former Chairwoman, admitted internally in an email to a fellow member of the Board, the Bank's "credibility and perhaps even viability as a company [wa]s dependent on [it] successfully exiting" the 2018 Consent Orders.

5. With investors watching closely, Wells Fargo and its senior leadership repeatedly claimed throughout the Class Period to be satisfying the 2018 Consent Orders and moving steadily towards being out from under them, affirmatively telling investors during analyst calls, investor conferences, media interviews, and congressional testimony, that the Bank had progressed successfully and was executing approved plans at Stage 2, and thus that it had surmounted Stage 1. In response to persistent questions from analysts, Defendants stated that "we're executing the plan as opposed to designing it," and "we've defined out the work for each individual piece of it, each individual agreement with a regulator." And during testimony before Congress, Defendant Sloan indicated that the Bank was well into Stage 2 of the 2018 Consent Orders' requirements,

stating that the Bank was "in compliance with those plans" required by the 2018 Consent Orders, and that "I can assure you that we have plans in place" in accordance with the 2018 Consent Orders.

6.      Defendants bolstered these misrepresentations with additional false assurances that, because the Bank was "on a fast track" under the 2018 FRB Consent Order, the asset cap would be lifted in the "first part" or "first half" of 2019.  To quell investor concerns, Defendants also trumpeted the Bank's transparency to the market regarding its satisfaction of the 2018 Consent Orders' requirements, stressing that "our investors know everything that's material that we know" and "there's really nothing new to report in terms of the timing or the dialogue with the regulators, whether it's related to the consent order or any other area."

7.      Unknown to investors at the time, however, Defendants were knowingly deceiving the market with false and misleading claims.  At the time of their positive statements, the Bank was not compliant with the 2018 Consent Orders and had not advanced to the "execution" stage of the 2018 Consent Orders—*i.e.*, to Stage 2.  To the contrary, the Bank and its top executives—including Defendants Sloan and Duke—received a steady stream of rejection letters to Wells Fargo's proposed Stage 1 Plans and stern rebukes from each of the Federal Reserve, the OCC, and the CFPB.  The Regulators determined that the Bank's proposed Stage 1 Plans were "materially incomplete," lacked "substance and detail," and were merely a "plan for a plan."  The Regulators also chastised the Bank's proposed Stage 1 Plans for containing "pervasive inaccuracies" and "illogical timeframes."  The Regulators further informed Defendants that the Bank's proposed Stage 1 Plans were "so inadequate as to raise concerns about the company's leadership," including Defendant Sloan, and would lead to further enforcement action.  The Regulators additionally told

Defendants in a series of meetings and reports that the Bank's Stage 1 Plan proposals were of "poor-quality," "unacceptable," and "wholly incomplete."

8.      In response, the Bank's Board of Directors (the "Board") privately admitted to the Regulators that its proposed Stage 1 Plans were not complete, but rather a "work in progress." Wells Fargo admitted these issues internally as well, with the Bank's directors acknowledging in internal emails that the Bank's Stage 1 Plan submissions "totally biffed it" and that investors would find the Bank's failure "completely unacceptable."   In addition, the Chair of the Bank's Risk Committee repeatedly told the other directors and the Bank's management team that the Bank's Stage 1 submissions were "not going far enough" and that, despite her warnings, the Bank's responses to the 2018 Consent Orders were "deficient."

9.      The Bank's highest executives actively concealed the truth from investors. Defendants falsely and misleadingly told investors that the Bank had "plans in place" in accordance with the 2018 Consent Orders and was "executing" those plans.  Then, in March 2019, Defendants Sloan and Duke colluded to falsify the Bank's draft proxy materials to avoid investors learning that the Bank was "not close to lifting of the asset cap."  After reviewing draft disclosures, Defendants Sloan and Duke agreed that it was "better to tone down the actual disclosures" and remove a disclosure that there was a "substantial amount of work remaining" to meet the 2018 Consent Orders' requirements.

10.      The Bank's Regulators, meanwhile, were troubled by Wells Fargo's public misrepresentations, privately condemning the Bank and specifically its then-CEO, Defendant Sloan, for lying to the public.  As a result of this backlash and condemnation, Defendant Sloan was forced to resign from Wells Fargo and, within a matter of months, long-time members of the Bank's Board, including Defendant Duke and Director James Quigley ("Quigley"), were also

forced out of the Bank under congressional scrutiny.  With new management in place, the Bank clawed back $15 million of Sloan's compensation and finally admitted publicly that, even as of 2020, the Bank still had a "great deal" of work left to do under the 2018 Consent Orders and that it "had not yet done what's necessary to address [its] shortcomings."  The extremely premature state of the Bank's satisfaction of the 2018 Consent Orders is starkly demonstrated by the fact that even now, almost three years after the Regulators' imposition of the 2018 Consent Orders, Wells Fargo still has not passed Stage 1 of their requirements and, as a consequence, the asset cap remains firmly intact.

11.     Wells Fargo's wrongdoing and public misrepresentations were the subject of recent, congressional inquiry.  In March 2020, both the majority and minority members of the House Financial Services Committee convened multiple days of congressional hearings and issued damning reports, totaling over 200 pages, that detailed the Bank's "inaccurate," "incomplete," and "misleading" statements to the public that "were unsupported by the facts on the ground."  Based on these extensive findings, Chairwoman Maxine Waters formally recommended to the DOJ that it bring criminal charges against Defendant Sloan for his "inaccurate and misleading" statements about the Bank's compliance with the 2018 Consent Orders and the Bank's progress toward lifting the asset cap.  The House Financial Services Committee members further detailed how the Bank's proposed plans submitted to the Bank's Regulators had been "shoddy" and "incomplete," and that the Bank's Board had "allowed management to repeatedly submit materially deficient plans in response to the consent orders."  Members of the U.S. House of Representatives ridiculed the Bank's Board for having sat idly "throughout the entire germination of this shameful attack on the trust and confidence of the American people in your bank" and called the Bank's dereliction in responding properly to the 2018 Consent Orders "an unpardonable sin."

12. Investors suffered immensely as a result of Wells Fargo's misrepresentations and omissions about its non-compliance with the 2018 Consent Orders. As the truth was revealed over the course of several disclosures throughout 2019 and early 2020, the price of Wells Fargo's stock cratered. All told, investors lost over $54 billion in market capitalization, including a drop in Wells Fargo's share price of over 22.5% after the conclusion of the congressional hearings.

## II.  JURISDICTION AND VENUE

13. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

14. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the acts and conduct that constitute the violation of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in or were issued from this District.

15. In connection with the wrongful acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate and international telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange located in this District.

## III.  THE PARTIES

### A.  Lead Plaintiffs

16. Lead Plaintiff Handelsbanken Fonder AB ("Handelsbanken") is a mutual fund management company based in Stockholm, Sweden that manages approximately $67.5 billion in assets. Handelsbanken, through its investment funds Handelsbanken Global Index Criteria and Handelsbanken USA Index Criteria, purchased a significant amount of Wells Fargo shares during

the Class Period.  As set forth in the certification previously filed with the Court (ECF No. 42-3 ¶2), Handelsbanken purchased shares of Wells Fargo stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws.

17.     Lead Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi") is the retirement system for nearly all non-federal public employees in the State of Mississippi, providing benefits to over 75,000 retirees and future benefits to more than 250,000 current and former employees.  Mississippi manages over $28 billion in assets for its beneficiaries.  As set forth in the certification previously filed with the Court (ECF No. 42-3 ¶4), Mississippi purchased shares of Wells Fargo stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws.

18.     Lead Plaintiff State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island") is a public pension fund that provides benefits to public employees of the State of Rhode Island.  Rhode Island manages approximately $8.9 billion in assets on behalf of its active and retired members.  As set forth in the certification previously filed with the Court (ECF No. 42-3 ¶7), Rhode Island purchased shares of Wells Fargo stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws.

19.     Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") is a public pension fund that provides pension and other benefits for sheriffs, deputy sheriffs, and tax collectors in the State of Louisiana.  Louisiana Sheriffs manages approximately $4 billion in assets for the benefit of its approximately 20,000 active and retired participants as of April 11, 2020.  As set forth in the certification previously filed with the Court (ECF No. 42-3 ¶9), Louisiana Sheriffs

purchased shares of Wells Fargo stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

20.     Handelsbanken, Mississippi, Rhode Island, and Louisiana Sheriffs are referred to herein collectively as "Lead Plaintiffs."

### B.     Defendants

21.     Wells Fargo is a bank that profits from its customers' banking and lending activities.  Wells Fargo common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "WFC."

22.     Defendant Timothy J. Sloan ("Sloan") was Wells Fargo's CEO and President from October 2016 until he was forced to resign in March 2019.  Prior to these roles, Sloan was Wells Fargo's Chief Financial Officer ("CFO") and Chief Operating Officer from November 2015 until October 2016.  Sloan was also a Director of the Bank's Board and sat on the Bank's management-level Operating Committee from November 2015 until he left the Bank, where he was responsible for setting the "tone at the top" of the Bank and establishing and reinforcing the Bank's supposed risk management culture.  During the Class Period, Sloan regularly spoke to investors and securities analysts regarding the Bank and its purported compliance with the 2018 Consent Orders.  Wells Fargo paid Sloan $18.4 million in cash and incentive awards for the 2018 calendar year.  On March 16, 2020, Wells Fargo clawed back $15 million in performance share awards that it had granted to Defendant Sloan for the year of 2018 because of the Bank's failed regulatory compliance, and specifically, Sloan's "role and responsibility" in the lack of "progress in resolving outstanding regulatory matters."[1]  Defendant Sloan did not receive any severance pay when he left the Bank or any annual incentive compensation for 2019 given "the status of the Company's risk

---

[1] Wells Fargo & Co., Definitive Proxy on Schedule 14A (Mar. 16, 2020).

management objectives and outstanding regulatory matters, including the progress that continued to be required on both [risk management objectives and outstanding regulatory matters] at the time of his resignation."

23.     Defendant John R. Shrewsberry ("Shrewsberry") was Wells Fargo's Senior Executive Vice President and CFO from May 2014 until July 2020.  Shrewsberry sat on the Bank's management-level Operating Committee from May 2014 until July 2020, where he was responsible for setting the "tone at the top" of the Bank and establishing and reinforcing the Bank's supposed risk management culture.  Shrewsberry has announced that he will retire from the Bank by the end of the first quarter of 2021.  During the Class Period, Shrewsberry regularly spoke to investors and securities analysts regarding the Bank and its purported compliance with the 2018 Consent Orders.  Wells Fargo paid Shrewsberry $12.5 million and $12.4 million in cash and incentive awards, respectively, during 2018 and 2019.

24.     Defendant Charles W. Scharf ("Scharf") is Wells Fargo's current CEO and President.  He has been the CEO and President of the Bank since October 2019.  Scharf is a director of the Bank and has sat on the Bank's management-level Operating Committee since October 2019, where he is responsible for setting the "tone at the top" of the Bank and establishing and reinforcing the Bank's supposed risk management culture.  During the Class Period, Scharf regularly spoke to investors and securities analysts regarding the Bank and its purported compliance with the 2018 Consent Orders.  Wells Fargo paid Scharf $34.3 million in cash and incentive awards during 2019.

25.     Defendant C. Allen Parker ("Parker") was Wells Fargo's Senior Executive Vice President and General Counsel from March 2017 until March 2019 and then interim CEO until October 2019.  From October 2019 until his resignation in March 2020, Parker returned to the role

of General Counsel.  Parker was also a director from March 2019 until October 2019 and sat on the Bank's management-level Operating Committee throughout his time at the Bank, where he was responsible for setting the "tone at the top" of the Bank and establishing and reinforcing the Bank's supposed risk management culture.  Parker retired from the Bank on March 31, 2020. During the Class Period, Parker regularly spoke to investors and securities analysts regarding the Bank and its purported compliance with the 2018 Consent Orders.  Wells Fargo paid Parker $9.6 million in cash and incentive awards in 2019.

26.     Defendant Elizabeth "Betsy" Duke ("Duke") was a director at Wells Fargo from January 2015 to March 2020 and the Chairwoman of Wells Fargo's Board from January 1, 2018 until she was forced to resign on March 8, 2020, just days after the House Reports were issued and days before she was scheduled to testify to Congress.[2]  In her role as Chairwoman, her prescribed duties within Wells Fargo & Company Corporate Governance Guidelines included "facilitating effective communication between the Board and stockholders, and being available for consultation and direct communication with major stockholders," and "serving as an additional point of contact for the Company's primary regulators."  She sat on the Bank's Risk Committee from March 2015 to March 2019, where she was responsible for assisting the Board in overseeing the Bank's enterprise-wide risk management framework and overseeing risk across the entire Bank.  During the Class Period, Duke regularly spoke to investors and securities analysts regarding the Bank and its purported compliance with the 2018 Consent Orders.  Duke also acted as the point of contact

---

[2] Certain details discussed herein are reported in the House Financial Services Committee's two reports, discussed in further detail in Section IV.C.  *See* The Real Wells Fargo: Board & Management Failures, Consumer Abuses, and Ineffective Regulatory Oversight, H. Comm. on Fin. Services Majority Staff Report (116th Cong. Mar. 4, 2020) (hereinafter, "Majority Report"); Uniquely Flawed: An Overview of Failures and Structural Deficiencies at Wells Fargo, H. Comm. on Fin. Services Minority Staff Report (Mar. 5, 2020) (hereinafter, "Minority Report" and together with Majority Report, the "House Reports").

for the Bank's Regulators.  Wells Fargo paid Duke $631,000 and $635,000 in cash and incentive awards, respectively, during 2018 and 2019.

27.     Sloan, Shrewsberry, Scharf, Parker, and Duke are collectively referred to herein as the "Insider Defendants."  The Insider Defendants, because of their high-ranking positions and direct involvement in both the everyday business of Wells Fargo and its compliance with the 2018 Consent Orders, directly participated in the management of Wells Fargo's operations, including its public reporting functions, had the ability to, and did control, Wells Fargo's conduct, and were privy to confidential information concerning Wells Fargo and its business, operations and statements regarding the 2018 Consent Orders, as alleged herein.

28.     Wells Fargo and the Insider Defendants are sometimes collectively referred to herein as the "Defendants."

## IV.    SUMMARY OF THE FRAUD

### A.     Wells Fargo Commits Massive Consumer Abuses Leading to Record Fines and Punitive Consent Orders

29.     Wells Fargo is a nationally chartered bank.  As such, it is subject to laws designed to prohibit unsafe and unsound banking and lending practices that could harm consumers and threaten the U.S. financial system.

30.     Wells Fargo is also subject to the oversight of three national regulators: (i) the Federal Reserve; (ii) the OCC; and (iii) the CFPB (the "Regulators").  This overlapping regulatory regime is designed to ensure comprehensive oversight of Wells Fargo's compliance with applicable financial and consumer protection laws and the risks associated with its banking and lending activities.

31.     The Federal Reserve and OCC are vested by Congress with broad supervisory and enforcement powers.  These powers include the authority to monitor and enforce corrective action

to ensure banking institutions do not violate the law.  Beginning in 2008, Congress also vested the CFPB with overlapping authority with the Federal Reserve and OCC to supervise, examine, and penalize banks engaged in predatory banking practices.  Each of these three Regulators has at its disposal the power to employ an escalating set of corrective actions to deter and punish unsafe and illegal lending and banking practices.

32.     The first and least severe remedy at the Regulators' disposal is "non-public supervisory findings."  Notices containing such findings—which are confidentially issued to a bank—advise the bank to address identified weaknesses or deficiencies in its banking or lending practices.  Such notices may take the form of either a notice of a "matter requiring attention" or a notice of a "matter requiring immediate attention."

33.     When this type of confidential "call to action" does not result in sufficient reform, the Regulators may impose civil monetary penalties and more formal, public enforcement actions, such as a "consent order."  Public consent orders are "designed to prevent, deter, and correct violations of law and unsafe and unsound banking practices" and may require the bank to take certain steps, including remediating harmed customers.

34.     When this already powerful remedy fails, the Regulators may take even bolder action.  These next-level remedies, which have rarely been utilized in U.S. history, are reserved for instances in which banks most egregiously harm customers and flagrantly break the law.  These drastic remedies include imposing restrictions on the activities and functions a bank can undertake, restricting its growth (*e.g.*, capping the bank's assets), or directing the bank to remove particular officers or directors.

35.     Finally, just as the Regulators may give life to a bank in the form of a charter, they may take it away.  When the Regulators' other remedies fail, they may go so far as to withdraw a bank's charter or seize the bank outright.

36.     Starting in 2015, the Regulators used these extensive powers in escalating fashion in response to the Bank's widespread consumer abuses over the course of a decade and its epic failure to properly rectify its deficient risk management and oversight capabilities.

### 1.     The OCC and CFPB Impose Initial Consent Orders and a Record Fine on Wells Fargo

37.     On September 8, 2016, the CFPB and the OCC fined Wells Fargo $135 million for the widespread illegal practice of secretly opening deposit and credit card accounts without its customers' authorizations.  In addition, the CFPB and OCC mandated that Wells Fargo enter into coordinated consent orders aimed at preventing such misconduct from occurring in the future (the "2016 OCC/CFPB Consent Orders").[3]

38.     In the 2016 OCC/CFPB Consent Orders, the CFPB and OCC detailed the findings of their extensive investigations into Wells Fargo's illegal and untoward practices.  The CFPB and OCC documented how Wells Fargo employees were improperly (i) transferring funds from consumers' accounts without their knowledge or consent into new accounts, with the customers unknowingly racking up associated fees and charges; (ii) causing customers to apply for credit card accounts without the customers' authorization; (iii) issuing and activating debit cards to customers without the customers' authorization; and (iv) creating phony email addresses to enroll its customers in online-banking services without their consent.

---

[3] *See In the Matter of Wells Fargo Bank, N.A.*, AA-EC-2016-67, Consent Order for a Civil Money Penalty (Sept. 8, 2016); *In the Matter of Wells Fargo Bank, N.A.*, CFPB No. 2016-CFPB-0015, Consent Order (Sept. 6, 2016).

39.     The CFPB emphasized the gravity of Wells Fargo's wrongdoing and its penalties. As the CFPB explained, "[b]ecause of the severity of [its] violations, Wells Fargo is paying the largest penalty the CFPB has ever imposed."[4]  In imposing this record fine, the CFPB cautioned Wells Fargo and the industry that "[t]oday's action should serve notice to the entire industry that financial incentive programs, if not monitored carefully, carry serious risks that can have serious legal consequences."

40.     The OCC also explained that it initiated its enforcement action against Wells Fargo because the Bank suffered from "unsafe" and "unsound sales practices," as well as unsafe and unsound "risk management and oversight."  To address those deficiencies, the 2016 OCC/CFPB Consent Orders required Wells Fargo to develop and implement an effective enterprise risk management program to detect and prevent unsafe and unsound banking practices and to mitigate further risks resulting from such practices.

41.     Investors and the press were justifiably troubled by the OCC and CFPB's 2016 findings.  For example, *The New York Times* wrote on September 8, 2016 that Wells Fargo's "pervasive problems" "stand out given all of the scrutiny that has been heaped on large, systemically important banks since 2008," and concluded that "[i]t is a particularly ugly moment for Wells."  *The New York Times* further noted that the Regulators' findings "undercut" Wells Fargo's previously developed "reputation on Wall Street as a tightly run ship" and "apple-pie approach."  The *San Francisco Chronicle* reiterated the next day that "[t]his is an ugly moment for Wells Fargo."

---

[4] "Consumer Financial Protection Bureau Fines Wells Fargo $100 Million for Widespread Illegal Practice of Secretly Opening Unauthorized Accounts," CFPB: Newsroom (Sept. 8, 2016).

### 2.   The Federal Reserve Imposes a
### Consent Order on Wells Fargo

42.     Wells Fargo ignored its Regulators' 2016 warning shot.  The Bank made minimal progress after the 2016 OCC/CFPB Consent Orders towards improving its oversight and risk management.   In addition, the Bank's illegal banking practices were found to be even more pervasive than originally determined.   Wells Fargo had improperly (i) opened over 3.5 million sham bank accounts without client authorization, which was nearly twice as many as the Regulators initially thought; and (ii) charged hundreds-of-thousands of borrowers for unneeded and unrequested auto-protection insurance, which resulted in tens-of-millions of dollars in overcharges and caused customers to have their vehicles repossessed.

43.     On February 2, 2018, the Federal Reserve voted unanimously to impose its own consent order against Wells Fargo, requiring the Bank to comprehensively overhaul its governance and risk management processes to ensure that these ugly and illegal practices could never run rampant throughout the Bank again (the "2018 FRB Consent Order").[5]  The written terms of the order were the result of weeks of negotiations between the Federal Reserve and Wells Fargo's top executives, including Defendants Sloan, Shrewsberry, Duke, and Parker.

44.     In issuing the 2018 FRB Consent Order, the Federal Reserve explained that it had "previously identified deficiencies in [the Bank's] risk management—including compliance risk management—that the [Bank] has yet to correct fully," necessitating the imposition of the 2018 FRB Consent Order.  Specifically, Wells Fargo "pursued a business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate

---

[5] *In the Matter of Wells Fargo Bank, San Francisco, California*, CFPB No. 18-007-B-HC, Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended (Feb. 2, 2018).

risk management framework commensurate with the size and complexity of the Firm, which resulted in weak compliance practices." The Federal Reserve concluded that "[w]e cannot tolerate pervasive and persistent misconduct at any bank and the consumers harmed by Wells Fargo expect that robust and comprehensive reforms will be put in place to make certain that the abuses do not occur again."[6]

45.     As the financial press explained at the time, the 2018 FRB Consent Order was "the latest blow" against Wells Fargo, marking "the latest chapter in a series of scandals which have rocked the bank in recent years."[7] Lee Reiners, the Executive Director at Global Financial Markets Center at Duke University School of Law, explained that the 2018 FRB Consent Order was the "worst case scenario" for Wells Fargo and its directors, stating on February 6, 2018 that the Federal Reserve had "pointed its long finger directly at Wells Fargo's Board of Directors and placed the blame for pervasive risk management failures squarely on their shoulders." He concluded that the Federal Reserve's action "should send a shiver down the spine of any bank director." *Bloomberg* similarly stated on February 4, 2018 that, "[g]iven the Fed's ongoing oversight," Wells Fargo has "no other choice if it wants to escape the regulator's wrath" than to comply with the 2018 FRB Consent Order.

46.     Securities analysts also recognized the importance of the 2018 FRB Consent Order to the Bank's financial future and issued reports telling investors that they would be closely monitoring the Bank's disclosures concerning its compliance with it. For example, Oppenheimer in a February 4, 2018 analyst report, wrote that one "cannot help but be struck by the searing nature

---

[6] Press Release, "Responding to widespread consumer abuses and compliance breakdowns by Wells Fargo, Federal Reserve restricts Wells' growth until firm improves governance and controls," FRB (Feb. 2, 2018).
[7] Martin Crutsinger and Sarah Skidmore Sell, "Federal Reserve imposes new penalties on Wells Fargo," *The Associated Press* (Feb. 2, 2018).

of this rebuke" and cautioned investors to "remain on the sidelines."  And BMO Capital Markets wrote in its February 4, 2018 analyst report that "we've never seen anything like this before," calling Wells Fargo a "cautionary tale" and downgrading its estimates and target price for Wells Fargo's stock.

47.     In its 2018 FRB Consent Order, the Federal Reserve detailed a specific process through which Wells Fargo's compliance would be measured, including benchmarks and timelines that the Bank would be required to meet before compliance could be claimed.  Specifically, the Federal Reserve imposed three stages, outlined below, with specific, measurable, and time-bound parameters, that Wells Fargo needed to pass to comply with the 2018 FRB Consent Order.



48.     *Stage 1: Approved Plans.*  By no later than April 3, 2018 (within sixty days (60) of the order), Wells Fargo was required to submit to the Federal Reserve "written plans that are acceptable to the Reserve Bank."  The Federal Reserve instructed that the Bank's Stage 1 Plan needed to include "a timeline for full implementation with specific deadlines for the completion of each component of the plans."  The Stage 1 Plan also needed to document what the Bank would eventually implement and validate during the next two stages of the compliance process.  The Stage 1 Plan was required to detail exactly how the Bank would institute an effective compliance and operational risk management program, as well as a program to ensure its Board effectively performed its duties to oversee and govern.

18

49.     The Federal Reserve made clear in its 2018 FRB Consent Order that the Bank could not advance to Stage 2 before submitting a compliant Stage 1 Plan and receiving the Federal Reserve's approval.  The 2018 FRB Consent Order specifically stated that Wells Fargo could advance to Stage 2 only after it was "notified in writing" that its Stage 1 Plan was "acceptable" to the Federal Reserve.

50.     ***Stage 2: Implementation.***  Once Wells Fargo complied with Stage 1, by submitting a compliant Stage 1 Plan that the Federal Reserve approved in writing, Wells Fargo was then required to move into "adopting" and then "implementing" the approved Stage 1 Plans to Federal Reserve's satisfaction.  As stated in the 2018 FRB Consent Order, in this second stage, the Bank "shall adopt the approved plans" from Stage 1 within 10 days of their approval by the Federal Reserve and then, "[u]pon adoption [of the plans], WFC shall implement the approved plans and thereafter fully comply with them."

51.     ***Stage 3: Validation.***  After completing the approved Stage 1 Plan's implementation, Wells Fargo was next required to engage a third party to complete an "independent review" of the effectiveness of the Bank's adoption and implementation of the approved plans.  As stated in the 2018 FRB Consent Order, in a section titled "Third Party Reviews," "[f]ollowing WFC's adoption and implementation of the plans and improvement required under Paragraphs 2 and 3 of this Order WFC shall conduct and complete by an appropriate date no later than September 30, 2018, an independent review of: (i) the Board's improvements in effective oversight and governance of the [Bank], and (ii) enhancements to the [Bank]'s compliance and operational risk management program, each as required in this Order."

52.     On February 2, 2018, the same day the Federal Reserve announced the 2018 FRB Consent Order, Wells Fargo confirmed its understanding of the 2018 FRB Consent Order's three

distinct stages and its commitment to submitting the required plans in a timely fashion and to engage a third party "to confirm adoption and implementation of the plans" under the Federal Reserve's timeline.  The Bank also published an investor presentation the same day, explaining that "[o]nce we adopt and implement these two plans as approved by the Federal Reserve, we will engage independent third parties."  Again, during a March 7, 2018 presentation to investors, when an analyst questioned Wells Fargo's management about the "timeline" for compliance with the 2018 FRB Consent Order, Wells Fargo summarized that first, under Stage 1, "there was a requirement that we file a plan with the Federal Reserve within 60 days of the consent order," and then "the Federal Reserve will make a determination as to whether or not our plan is adequate in the areas of operational risk, compliance and the board's oversight of those activities."  Next, under Stage 2, "[w]e'll then implement, once we've satisfied that they [the plans] are adequate and satisfied the Federal Reserve, we'll implement those plans immediately."  And finally, under Stage 3, "we will engage a third-party to come in, and in effect, validate that we have adequately implemented those plans."

53.    To ensure the Bank's most senior leadership was well aware of the work imposed by the Federal Reserve at each stage, the 2018 FRB Consent Order required Wells Fargo's directors to sign the 2018 FRB Consent Order.  Defendants Sloan and Duke, along with the entire then-current Board, signed the 2018 FRB Consent Order.  The Federal Reserve also sent letters on February 2, 2018 to each current Wells Fargo director, including Defendants Sloan and Duke, reinforcing the need for the Bank to comply with the 2018 FRB Consent Order and reprimanding the Board for its past failures to "meet our supervisory expectations."  In those letters, the Federal Reserve cautioned the members of the Bank's Board that it would "continue to closely monitor the performance of WFC's board in meeting supervisory expectations, including WFC's

compliance with today's enforcement action," and further warned that it expected the Board to "ensure that senior management establishes and maintains an effective risk management structure that has sufficient stature, authority, and resources."

54.     The Federal Reserve also took the extraordinary step of demanding that Wells Fargo replace three current Board members by April 2018 and a fourth Board member by the end of 2018.  To ensure the engagement of the highest leadership of the Bank, the Federal Reserve further required in its 2018 FRB Consent Order that, going forward, Wells Fargo's "Board or an authorized committee thereof shall submit to the [Federal Reserve] written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof."

### 3.     The Federal Reserve Limits Wells Fargo's Growth with an Unprecedented Asset Cap

55.     In addition to demanding sweeping reform, the 2018 FRB Consent Order included an unprecedented remedy: Wells Fargo was prohibited from increasing the size of its assets until it satisfied all three stages of the 2018 FRB Consent Order.  In announcing this "asset cap," the Federal Reserve chastised the Bank for having "pursued a business strategy that prioritized its overall growth without ensuring appropriate management of all key risks."  The Federal Reserve concluded that "[t]he enforcement action we are taking today will ensure that Wells Fargo will not expand until it is able to do so safely and with the protections needed to manage all of its risks and protect its customers."  Until Wells Fargo satisfied the 2018 FRB Consent Order by completing the three stages, the cap on its assets would remain in place and limit Wells Fargo's ability to grow.

56.     The Federal Reserve's imposition of an asset cap was a devastating blow to Wells Fargo.  Wells Fargo's largest source of income is "net interest income," which is the difference between the amount of interest income Wells Fargo generates on interest-earning assets (such as

interest earned on lending activities to its customers) and the interest it pays on interest-bearing liabilities (such as interest paid to customers on their deposits). Wells Fargo's net interest income is adversely impacted by the asset cap. Without being able to increase interest-earnings assets, like loans, Wells Fargo cannot take advantage of interest-earning opportunities. This loss in revenue is exacerbated when, for example, federal interest rates are low, and the spread on the interest paid and interest earned decreases. To make up for the loss of interest revenue under such circumstances, Wells Fargo would need to increase the volume of its lending activities to offset the smaller spread—*i.e.*, provide more loans at lower interest rates. Under the asset cap, however, Wells Fargo was prohibited from generating revenues in this manner because Wells Fargo would be required to increase the size of its assets to increase its loan volume—which is what the "asset cap" precluded.

57. Analysts immediately recognized the adverse impact of the "asset cap" on the Bank's financial strength. For example, Barclays issued an analyst report on February 4, 2018 titled, "In an Unprecedented Move, the Fed Caps WFC's Balance Sheet Growth Until Governance and Controls Are Improved," calling the asset cap "severe and unprecedented" and "a constraint that no bank we have covered during our 22.5 years on the sell-side has experienced." Barclays analysts also described that the required "balance sheet optimization activities" to operate under the asset cap would "clearly keep WFC in the penalty box" and "likely result in a reduction to net interest income." J.P. Morgan echoed these concerns on February 5, 2018, downgrading Wells Fargo's stock because "the harsh Fed consent order is rare and a strong sign of regulators' frustration about the very wide swath of areas where Wells has had issues," and explaining that the "net income impact could be larger than simple loss from shrinking institutional deposits to

accommodate planned loan growth—Wells could lose other revenues, both existing and potential, that it was trying to garner from these clients."

58.     The financial press amplified these concerns.  For example, on February 3, 2018, *CNN Business* noted that "[i]t is the first time the Federal Reserve has imposed a cap on the entire assets of a financial institution," explaining that the asset cap was an "unprecedented punishment." Two days later, *Bloomberg* called the asset cap imposed upon Wells Fargo the "Fed's 'Fear of God' Penalty."  It also reported how "[a]nalysts at firms including JPMorgan, Morgan Stanley and Citi are slashing their ratings on Wells Fargo after the Federal Reserve devised harsh new punishments in the wake of the bank's scandals.  They're pointing to hits to growth, earnings, business opportunities and the potential for other painful regulatory action yet to come."

### 4.     The OCC and CFPB Issue Additional Consent Orders and Historic Fines

59.     Wells Fargo's other two regulators—the OCC and CFPB—imposed additional coordinated consent orders on the Bank on April 20, 2018 (the "2018 OCC/CFPB Consent Orders" and together with the 2018 FRB Consent Order, the "2018 Consent Orders"), and fined the Bank over $1 billion for its continued failure to correct its risk management and oversight.[8]  As the OCC and CFPB explained, the Bank flouted the 2016 OCC/CFPB Consent Orders and continued to operate in a manner that was "reckless, unsafe, or unsound" and that violated federal banking and lending laws.

60.     The 2018 OCC/CFPB Consent Orders required Wells Fargo to fix its compliance risk management and to remediate the harmed consumers.  Like the 2018 FRB Consent Order, the

---

[8] *In the Matter of Wells Fargo Bank, N.A.,* File No. 2018-BCFP-0001, Consent Order (Apr. 20, 2018) (hereinafter, "2018 CFPB Consent Order"); *In the Matter of: Wells Fargo Bank, N.A. Sioux Falls, South Dakota*, AA-EC-2018-16, Consent Order For A Civil Money Penalty (Apr. 20, 2018) (hereinafter, "2018 OCC Consent Order").

OCC and CFPB provided detailed "Action Plans" within the 2018 OCC/CFPB Consent Orders, mandating that Wells Fargo pass through three stages to comply.

61.    ***Stage 1: Approved Plan.***   By no later than June 19, 2018 (within sixty days (60) of the 2018 OCC/CFPB Consent Orders), Wells Fargo was required to submit to the OCC and CFPB a compliant plan acceptable to the OCC and CFPB that documented the Bank's actions to address compliance risk management.   Then, by no later than August 18, 2018 (within one-hundred and twenty days (120) of the 2018 OCC/CFPB Consent Orders), Wells Fargo was required to submit a compliant plan documenting how it would implement a remediation program to identify and redress consumers harmed.   These Stage 1 Plans were required to, among other things, "contain a complete description of the actions necessary to achieve compliance with their stated requirements in this Consent Order" and "specify timelines for completion of the remedial actions" to be implemented.[9]

62.    Much like the 2018 FRB Consent Order, the 2018 OCC/CFPB Consent Orders stated that Wells Fargo could not proceed to the next stages of compliance until Wells Fargo "receiv[ed] a written determination of no supervisory objection from the Examiner-in-Charge" to the Stage 1 Plans.[10]

63.    ***Stage 2: Implementation.***   After completing Stage 1, as evidenced by the OCC's and CFPB's written determination of no objection to the proposed Stage 1 Plans, Wells Fargo was required to "execute" and "implement" the accepted plans.   Specifically, after the Bank received "notification" from the CFPB of its "determination of non-objection" to the Stage 1 Plans, Wells Fargo was then required to "implement and adhere to the steps, recommendations, deadlines, and

---

[9] 2018 OCC Consent Order at 6; 2018 CFPB Consent Order at 32.
[10] 2018 OCC Consent Order at 6.

timeframes outlined in the" compliance and redress plan.[11]   Similarly, the OCC also mandated that "[u]pon receiving a written determination of no supervisory objection" from the OCC, "the Board shall ensure the Bank executes and thereafter adheres to the Plans."[12]   Moreover, the OCC instructed that, "[i]n the course of executing the Plans, the Bank shall not take any action that will cause a significant deviation from, or material change to, the Plans, unless and until the Bank has received a prior written determination of no supervisory objection from the Deputy Comptroller."[13]

64.     ***Stage 3: Validation.***   Once the Bank implemented its plans in Stage 2, the Bank was then required to validate the implementation and execution of the plan and submit a report to the CFPB and OCC summarizing the results of that validation.   The OCC specified that "[t]he Bank shall not be considered to be in compliance with" the remediation requirements "until such time that the OCC has determined that the Bank is in compliance with" the Articles of the 2018 OCC Consent Order that detailed the three stages.[14]

65.     The OCC and CFPB once again ensured that Wells Fargo's highest leadership would be deeply involved in compliance with the 2018 OCC/CFPB Consent Orders, mandating that Wells Fargo's Board "review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order before submission to the Bureau."[15]   The OCC and CFPB also sent a strong message to the Bank's Board that "the ultimate responsibility" for the Bank's compliance with the 2018 OCC/CFPB Consent Orders lay with the directors, including Defendants Sloan and Duke, with the CFPB stating that: "In each instance that this Consent Order requires the Board to ensure adherence to, or perform certain obligations of [the Bank], it is

---

[11] 2018 CFPB Consent Order at 15, 18.
[12] 2018 OCC Consent Order at 6.
[13] *Id*. at 6.
[14] *Id*. at 23.
[15] *Id*. at 16.

intended to mean the Board shall … [r]equire timely reporting by [Bank] management of such actions directed by the Board to be taken under this Order," among other items.[16]

66.     The Defendants understood and acknowledged that compliance with these regulatory directives was critically important to, not only the Bank's operations and financial soundness, but its survival.  For example, Defendant Duke expressed in an internal February 19, 2018 email to the Bank's Chief Risk Officer that Wells Fargo's "credibility and perhaps even viability as a company is dependent on successfully exiting these consent orders along with the new Fed C[onsent] O[rder] in 2019."  Defendant Sloan, in his March 9, 2019 written testimony before the House Financial Services Committee, likewise acknowledged that "fully satisfying the requirements set forth in our regulatory consent orders is critically important."

## B.     Defendants Knowingly Misrepresent Their Compliance with the 2018 Consent Orders

67.     Investors, analysts, and commentators were intently focused on the Bank's compliance with the 2018 Consent Orders throughout the Class Period.  During numerous investor calls, media appearances, and news interviews, Defendants fielded questions about Wells Fargo's satisfaction of the requirements of the 2018 Consent Orders.  In response, they assured investors that they were in "compliance" with the 2018 Consent Orders' requirements, had approved Stage 1 Plans, and were "implementing" those plans in accordance with the 2018 Consent Orders—*i.e.*, the Bank was past Stage 1 of the 2018 Consent Orders.

68.     Unknown to investors at the time, Defendants' representations were knowingly or recklessly false, misleading, and omitted material facts, and were designed to falsely and misleadingly bolster investor confidence in the Bank's compliance.  As discussed further below,

---

[16] *Id*. at 6; 2018 CFPB Consent Order at 17.

Defendants' statements concealed that the Bank's Stage 1 Plan submissions were consistently rejected by the Regulators, Defendants never progressed to the "execution" or "implementation" stage of the 2018 Consent Orders, and Defendants were repeatedly reprimanded for flouting the Regulators' and the 2018 Consent Orders' clear directives.  The Bank's top directors and executives each received in real-time a steady stream of rejection letters and stern rebukes from the Regulators.  Each of these executives knew of the Regulators' rejections of the Bank's Stage 1 Plans and threats of further enforcement action, yet falsely and misleadingly assured worried investors and analysts that the Bank was "in the midst of implementing" or, even worse, had already "implemented" the plans in compliance with the 2018 Consent Orders.

> **1.    Despite Numerous Rejection Letters and Stern Rebukes from the Bank's Regulators, Defendants Falsely and Misleadingly Tell Investors that the Bank has Compliant "Plans In Place" and is Already "Executing" Those Plans**

69.    Under the 2018 FRB Consent Order, as detailed above in Section IV.A.2, Wells Fargo was required to submit a compliant Stage 1 Plan by April 3, 2018.  The Stage 1 Plan, which required the Federal Reserve's approval, was required to detail how the Bank would improve Board oversight and operational risk management and, specifically, to include "a timeline for full implementation with specific deadlines for the completion of each component of the plans." Despite the 2018 FRB Consent Order's plain terms and the Federal Reserve's consistent direction, Wells Fargo submitted to the regulator a proposed Stage 1 Plan that was materially deficient and not compliant with the 2018 FRB Consent Order.

70.    The Federal Reserve promptly notified the Bank of the deficiencies in its submission.  On the very day that Wells Fargo submitted its first proposed Stage 1 Plan on April 3, 2018, the Federal Reserve met with Defendant Duke to discuss the 2018 FRB Consent Order

and the deficiencies in Wells Fargo's proposed Stage 1 Plan.[17]  As FRB officials testified to the House Financial Services Committee, "the Wells Fargo Consent Order Written Plans submitted on April 3, 2018 were missing major components such as plans to address the company's deficiencies in operational and compliance risk management."[18]

71.     On May 7, 2018, the Federal Reserve sent a formal letter to Defendants Sloan and Duke rejecting the Bank's April 3, 2018 Stage 1 Plan submission (the "May 7, 2018 Rejection Letter").  In the May 7, 2018 Rejection Letter, the Federal Reserve formally notified the Bank that its April 3, 2018 Stage 1 Plan submission to address Board effectiveness and risk management was **"materially incomplete"** and **"insufficient."**  The Federal Reserve further explained that the Bank's submission was so **"materially incomplete"** that the plans **"cannot be evaluated by [Federal Reserve] staff for their adequacy."**  The Federal Reserve further stated that Wells Fargo's Stage 1 Plan **"fail[ed] to comprehensively address operational risk"**—a key purpose of the 2018 FRB Consent Order—and was **"missing key elements,"** including **"key implementation details about all self-identified categories of operational risk."**  The May 7, 2018 Rejection Letter reiterated that **"[t]o satisfy the requirements of the Order, [Wells Fargo] must establish operation and compliance risk management programs that can effectively identify, measure, monitor, and control those risks."**

72.     Among its many critical deficiencies, the Bank's proposed Stage 1 Plan "lacked milestones and timelines required under the consent order, which would have made it impossible for the FRB to evaluate the company's progress."[19]  Indeed, according to the Federal Reserve, the

---

[17] Majority Report at 48.
[18] Minority Report at 76.
[19] *Id*. at 75.

28

Bank's Stage 1 Plan was *"so inadequate as to raise concerns about the company's leadership."*[20] In its May 7, 2018 Rejection Letter, the Federal Reserve instructed Wells Fargo to resubmit a compliant Stage 1 Plan within 90 days–*i.e.*, by July 2, 2018.

73.     The Federal Reserve's May 7, 2018 Rejection Letter was directed to Wells Fargo's leadership and Board.  On May 8, 2018, after reading the Federal Reserve's May 7, 2018 Rejection Letter, Wells Fargo Board member, Theodore Craver, wrote an email to Defendant Duke admitting that *"we totally biffed it."*  He further stated, *"[s]peaking frankly, this was a big miss that doesn't reflect well on Tim [Sloan].  It would seem that there is little under the very important category of 'clean up the mess' that is bigger than this recent submission to the Fed."*  Director Craver further questioned Defendant Duke as to why the proposed plans *"miss[ed] the mark over so many fronts."*  Director Craver's conclusion: *"I can't help feeling that we just plain missed the mark, and that this one is on us."*

74.     In addition, Director Craver admitted in his May 8, 2018 email to Defendant Duke that the Bank's failure to meet the 2018 FRB Consent Order's requirements and submit a compliant Stage 1 Plan would surely be material to investors and conceded that the information was not otherwise known by the market.  On that subject, he wrote Defendant Duke that, if investors and customers learned about the May 7, 2018 Rejection Letter and the Federal Reserve's feedback to the Bank, *"I imagine that investors and customers would view this feedback from the Fed as completely unacceptable.  I would expect to hear from them something along the lines of, 'is there anything you can get right?'"*

75.     Wells Fargo's Risk Committee also was aware of and recognized the significance of the Federal Reserve's May 7, 2018 Rejection Letter.  After receiving the May 7, 2018 Rejection

---

[20] *Id*. at 11.

Letter, Wells Fargo's Head of Regulatory Relations, Sarah Dahlgren, wrote to Defendants Sloan, Parker, and Shrewsberry in a May 13, 2018 email that "the underlying messages (both in the [May 7, 2018 Rejection Letter] and in our discussions with the Fed) suggest that we need to take a broader and more holistic approach (take a step back and don't simply answer the questions that were asked)."

76.     Defendants concealed and misrepresented these facts when speaking to investors, including concealing that there was material undisclosed information regarding the Bank's compliance with the terms of the 2018 Consent Orders.  During a May 30, 2018 Deutsche Bank Global Financial Services Conference, Defendant Shrewsberry was asked to "frame where you are on some of the [regulatory] issues and where the heavy lifting is still to come" under the 2018 FRB Consent Order.  Despite having the undisclosed May 7, 2018 Rejection Letter in hand, and knowing that the regulator's stern rebuke was material to investors, Defendant Shrewsberry stressed in his response that there was not ***"anything meaningful that we aren't already talking about"*** and that ***"our investors know everything that's material that we know."***  Never once did he disclose that, in truth, the Federal Reserve just weeks earlier rejected and blasted the Bank for its deficient Stage 1 Plan submission, leading the Bank's own Board member to conclude that that the Bank "totally biffed it."

77.     Wells Fargo's failures to develop a compliant Stage 1 Plan continued.  On June 5, 2018, Defendant Sloan sent a letter to the Federal Reserve requesting an extension of time to submit an acceptable Stage 1 Plan.  In the extension request letter, Defendant Sloan conceded that the Bank was still not prepared to submit an acceptable Stage 1 Plan and needed additional time to develop a "response that is acceptable to the Federal Reserve."  Defendant Sloan requested that

Wells Fargo receive an extension until September 19, 2018—over five months after the 2018 FRB Consent Order's original deadline—for the Bank to submit a compliant Stage 1 Plan.[21]

78.     Wells Fargo and its executives persisted in concealing from investors the Regulator's rejections of the Bank's Stage 1 Plan and dismay at the Bank's non-compliance, as well as the Bank's failure to timely submit a compliant Stage 1 Plan.  Indeed, just one week after Defendant Sloan requested an extension to cure the material deficiencies in the Bank's prior Stage 1 Plan submission, Defendants told investors (falsely and misleadingly) that they were already "implementing" and "executing" the Stage 1 Plans.  For example, on June 13, 2018, in response to a question from an analyst during a Morgan Stanley Financial Conference concerning "what's left to do" and whether the Bank was "already executing on the specific requests," Defendant Shrewsberry said, ***"Yes,"*** and emphasized that Wells Fargo was in ***"the last mile of knitting all of this together."***  In truth, as Defendants knew, they had not made it past the first stage of the 2018 FRB Consent Order, and the Bank's Stage 1 Plan proposal had been consistently and emphatically rejected.

79.     Defendants buttressed their false representations about the Bank's purported status in meeting the requirements of the 2018 FRB Consent Order with additional assurances that the asset cap would be lifted in the near-term.  For example, during a July 13, 2018 second quarter 2018 earnings call with investors and analysts, when J.P. Morgan analyst Vivek Juneja asked for an "update" on the timing of full compliance with the 2018 FRB Consent Order and removal of the asset cap, Defendant Sloan reiterated that there had been ***"no change in the update from Investor Day"*** several months before and that ***"our expectation is that sometime in the first half***

---

[21] The Federal Reserve reluctantly granted the Bank's June 5, 2018 extension request on June 20, 2018, allowing Defendants an additional two months to submit a compliant Stage 1 Plan to the Federal Reserve.

*of next year."* In making these assurances, Defendants never once told investors that, in truth, the Bank's Stage 1 Plan to the Federal Reserve had been rejected, that the Bank required additional time to submit a compliant Stage 1 Plan, and that the Federal Reserve had reprimanded the Bank for its failure to satisfy the 2018 FRB Consent Order's requirements.

80.     On July 24, 2018, Wells Fargo and its top executives were formally notified in writing that its other top regulator, the OCC, also rejected Wells Fargo's proposed Stage 1 Plan under the 2018 OCC/CFPB Consent Orders (the "July 24, 2018 Rejection Letter"). In the July 24, 2018 Rejection Letter, the OCC stated that, ***"[d]espite the OCC including detailed requirements and expectations in the [2018 OCC Consent Order] document, the bank's submission response lacks substance and detail in a number of areas."*** The OCC's July 24, 2018 Rejection Letter further told Wells Fargo that, "[a]s written, the plan does not provide full remediation for all impacted customers, and, in some instances, the Bank's initial plan results in the inconsistent and potentially unfair treatment of customers who experienced similar harm." The OCC also found that the Stage 1 Plan submission's proposal for remedying the Bank's deficient internal audit function (Article VI of the 2018 OCC Consent Order) and remediating auto-protection insurance ("CPI") customers (Article VIII of the 2018 OCC Consent Order) were deficient.

81.     The OCC warned Wells Fargo in its July 24, 2018 Rejection Letter that the Bank's failure to submit a compliant plan had severe consequences. As the OCC explained, "[t]he length of time a Bank takes to achieve full compliance with all provisions of an enforcement action is a factor in the OCC's determination of any future supervisory and/or enforcement actions." The OCC further warned Wells Fargo that its new Stage 1 Plan submission must "demonstrate prompt corrective actions that are appropriately designed and will result in effective and sustainable

resolution of the longstanding, uncorrected issues that are included in this [2018 OCC Consent Order]."

82.     The OCC met with the Bank's entire Board, including Defendants Sloan and Duke, on the same day that it sent its July 24, 2018 Rejection Letter.  During that meeting, the OCC emphasized the significance of the Bank's failure to submit a compliant Stage 1 Plan.  The Bank's Board minutes from the meeting reflect that the OCC reprimanded the Bank's leadership for its myopic "focus on earnings" and stressed to the Bank's executives and directors the need for them to begin "similarly focusing on addressing outstanding regulatory issues."  The OCC further voiced concerns about the Board's oversight failures of the Bank's management, emphasizing to the Board the need for it to start "holding senior management accountable."

83.     During the July 24, 2018 meeting, Wells Fargo's Board admitted to the OCC that it knew the Stage 1 Plans that the Bank submitted to the OCC and CFPB did not comply with the 2018 OCC/CFPB Consent Orders.  The Board also admitted to the OCC that their Stage 1 Plan proposal was, in truth, only a *"work in progress."*[22]  As OCC and CFPB officials testified, the proposed Stage 1 Plan that Wells Fargo submitted to the OCC and CFPB as its Stage 1 "plan" was, in fact, not a plan at all; rather, it was a *"plan for a plan."*[23]

84.     On August 11, 2018, Defendants Duke and Sloan, Director James Quigley, and Sarah Dahlgren met with the OCC's Comptroller, Joseph M. Otting, and senior OCC officials in Washington, D.C. to discuss the OCC's continued concerns with the Bank's failure to submit a compliant Stage 1 Plan and to sufficiently progress in its compliance overhaul.  In an email from Defendant Duke summarizing that meeting, she stated that the OCC told Defendants Duke and

---

[22] Minority Report at 86.
[23] *Id*. at 70-71, 86.

Sloan that **"all their [i.e., the OCC's] input had been ignored"** in Wells Fargo's revised Stage 1 Plan submission.   The OCC further told Defendants during the meeting that the Bank's **"[m]anagement and the Board prioritize or over-focus on earnings at the expense of risk management."**   The OCC further expressed concerns during the meeting that Wells Fargo's **"[c]orrective actions take too long, plans submitted are not complete and established deadlines are not met"**; **"[r]emediations are ad hoc, insufficient"**; and **"executive management dismisses or minimizes issues."**

85.     In the face of the Federal Reserve's May 7, 2018 Rejection Letter and the OCC's July 24, 2018 Rejection Letter, as well as the other in-person and written reprimands from the Regulators, Wells Fargo needed even more time to submit a revised Stage 1 Plan proposal to the Federal Reserve under the 2018 FRB Consent Order.   On August 24, 2018, Defendant Sloan sent a letter to the Federal Reserve requesting another extension, this time until October 31, 2018 to submit a revised, proposed Stage 1 Plan—*i.e.*, now over six months after the 2018 FRB Consent Order's original deadline.[24]

86.     Defendants continued, however, to conceal these facts from investors and repeatedly assured them that the Bank had passed Stage 1 of the 2018 Consent Orders, was into the "execution" and "implementation" stage of the 2018 Consent Orders, and that the Federal Reserve was content with the Bank's compliance.   For example, on December 4, 2018, on the subject of the 2018 FRB Consent Order, Defendant Sloan told investors at an analyst conference sponsored by Goldman Sachs that the Bank was now **"executing the plan as opposed to designing it."**   The same day, Defendant Sloan appeared on CNBC's *Squawk on the Street*, and again

---

[24] The Federal Reserve reluctantly granted Wells Fargo's second extension request on September 11, 2018.

squelched investor concern when he assured that, with regard to the 2018 FRB Consent Order, *"we've got plans in place, we're executing on those plans."* The next month, on January 15, 2019, during the Bank's fourth quarter 2018 earnings call, Defendant Sloan again asserted that *"we're in complete agreement with the Fed about what needs to be done, and we're in the midst of implementing that."*

87.     Unknown to investors at the time, the Bank did not have agreements in place with any Regulators approving its Stage 1 Plans under the 2018 Consent Orders and the Regulators had issued stern rebukes of the Bank in the face of its failure to satisfy the requirements of the 2018 Consent Orders. On November 21, 2018, the OCC sent Wells Fargo's senior leaders another letter formally rejecting Wells Fargo's second attempt to submit a compliant Stage 1 Plan (the "November 21, 2018 Rejection Letter"). In the rejection letter, the OCC again stated that it was *"unable to provide a no supervisory objection to the portion of the CPI Remediation Plan specific to Wells Fargo Auto Finance (WFAF) because the plan is not adequately supported."* As CFPB officials explained to Wells Fargo during a November 2018 follow-up meeting, the proposed Stage 1 Plan was again merely *"a plan for a plan."*[25]

88.     Defendants, nevertheless, continued to misrepresent to investors their compliance with the 2018 Consent Orders' requirements and to hide the Regulators' stern rebukes of the Bank. On December 4, 2018, during a presentation at the Goldman Sachs U.S. Financial Services Investor Conference, Defendant Sloan assured investors that *"there's really nothing new to report in terms of the timing or the dialogue with the regulators, whether it's related to the consent order or any other area."* Then, in response to analysts' further inquiries for an update on the Bank's satisfaction of the 2018 FRB Consent Order, Defendant Sloan stressed to investors that the

---

[25] Minority Report at 70.

Bank would satisfy the 2018 FRB Consent Order's requirements and be relieved of the asset cap by *"the first part of next year."*   In making these assurances, Defendant Sloan never once mentioned that the Bank's Regulators each rejected the Bank's Stage 1 Plans and reprimanded the Bank for its delays and failures to comply with the 2018 Consent Orders' plain requirements, that the Bank needed to request two extensions for resubmitting its Stage 1 Plan proposals to the Federal Reserve, or that regulators were threatening further enforcement action.

89.     Meanwhile, the Regulators continued to voice their dissatisfaction with the Bank's resubmitted plans.  During a January 24, 2019 meeting, the Federal Reserve told Wells Fargo's executives that the revised Stage 1 Plan that it had submitted on October 31, 2018 again contained deadlines that were *"improbable and unrealistic."*[26]  And in a February 15, 2019 email, the OCC told Defendant Duke that it was *"deeply concerned* about the continuing (and in some cases worsening) problems in a number of areas, evidenced by large number of extension requests, missed expected completion dates that are not communicated in a timely manner, failed audit validations, and extensions of Consent Order deadlines."   And in a March 4, 2019 Quarterly Management Report to Wells Fargo, the OCC stressed to Defendants that the Bank's *"management and Board oversight remain inadequate,"* chastising the Bank for its *"missed deadlines"* and its submission of *"poor-quality action plans"* and concluding that Wells Fargo's response to the 2018 OCC/CFPB Consent Orders had been *"unacceptable."*

90.     Rather than reveal these troubling facts to investors, Wells Fargo's senior-most executives, including Defendant Sloan, intentionally modified the Bank's disclosures to conceal them further.  On March 4, 2019, Defendant Sloan personally instructed his colleagues to change a statement in Wells Fargo's draft proxy statement filings with the SEC that would have—in its

---

[26] Majority Report at 52.

original drafting before Defendant Sloan's alteration—admitted to investors that there was a "substantial amount of work remaining to meet the expectations outlined" in the 2018 Consent Orders. Defendant Sloan instructed his colleagues to strike the word ***"substantial"*** from the Bank's draft disclosure—notwithstanding that there ***was*** a substantial amount of work left to complete; indeed, the Bank's Stage 1 Plan submissions had been consistently rejected by the Regulators.

91.     As Defendant Sloan explained in his March 4, 2019 internal email to Defendant Duke, if Wells Fargo disclosed the truthful fact that there was a "substantial amount of work remaining to meet the expectations outlined" in the 2018 Consent Orders, it would be poorly received by the Bank's investors. Defendant Sloan expressed concern to Defendant Duke that stakeholders would rightly interpret such a disclosure to mean that ***"we are not close to lifting of the asset cap"***—a fact that Defendants actively sought to conceal. Defendant Duke agreed with Defendant Sloan's assessment and instruction to remove this admission from the Bank's SEC filing, responding to Defendant Sloan, ***"I think you are right.  Probably better to tone down the actual disclosures…"*** In accordance with Defendant Sloan's instruction, agreed to by Defendant Duke, Wells Fargo struck from its draft SEC filings the disclosure that there was a "substantial amount of work remaining to meet the expectations outlined" in the 2018 Consent Orders.

### 2.     Defendant Sloan Knowingly Lies to Congress About the Bank's Compliance with the 2018 Consent Orders

92.     On March 12, 2019, Defendant Sloan testified before Congress. The summons ordering his testimony stated that he would be asked questions by Congress about "Wells Fargo's varied engagements with its regulators, including Wells Fargo's compliance with its outstanding

consent orders."[27]  The hearing was televised and closely watched by investors, analysts, and the financial press.

93.    The day before Defendant Sloan's scheduled testimony before Congress, Defendants Sloan and Duke received the Federal Reserve's private, formal letter rejecting the Bank's second, revised Stage 1 Plan (the "March 11, 2019 Rejection Letter").  As detailed in the March 11, 2019 Rejection Letter, Wells Fargo's revised Stage 1 Plan submission *"remain[ed] materially incomplete,"* continuing to lack basic elements necessary to address the 2018 FRB Consent Order's target issues and failing to comprehensively address Wells Fargo's deficiencies with operational and compliance risk management.  The Federal Reserve emphasized that Wells Fargo's revised Stage 1 Plan submission continued to suffer from basic gaps and again was riddled with errors and discrepancies, including incorrect progress indicators for deliverables and "illogical timeframes" for achieving future milestones.  The Federal Reserve concluded that Wells Fargo's proposed Stage 1 Plan continued to suffer from *"[p]ervasive inaccuracies,"* which *"in aggregate, weaken the plan's credibility and impede clarity."*

94.    In its March 11, 2019 Rejection Letter, the Federal Reserve sternly admonished Defendant Sloan and Wells Fargo's Board for failing—once again—to submit a compliant Stage 1 Plan.  The Federal Reserve cautioned the Bank that it "expects [Wells Fargo] to take the time necessary to develop its next plans and ensure greater quality control," and that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions."  The Federal Reserve concluded that the Bank's *"[c]ontinued failure to submit acceptable plans reflects poorly on the [the Bank], and negatively influences supervisors' view of the board and senior management's capacity to effectively manage and govern the firm."*

---

[27] Majority Report at 6.

95.     Defendant Sloan kept these facts hidden from Congress and the investing public during his March 12, 2019 testimony, even in the face of probing questions by members of Congress.  In response to questioning from Congress during the March 12, 2019 hearing about "why the Fed didn't remove the asset cap," Defendant Sloan testified that the Bank had "done" what the Federal Reserve had required "to improve the Board governance and oversight," adding in his written testimony that the Bank was *"mak[ing] progress against [its] action plans"* in response to all of the 2018 Consent Orders.  And in response to questioning during the hearing about whether the Bank had received a "non-objection" letter from the OCC and CFPB in response to the Bank's Stage 1 Plan submissions, Defendant Sloan responded that *"we are executing that plan"* and *"[w]e are in compliance with those plans."*  When further pressed about whether "the bank disclosed to investors the status of the plans that it submitted to the OCC and the [CFPB], including whether the regulators have raised any objections to the bank's submitted plans," Defendant Sloan again responded, *"I can assure you that we have plans in place."*

96.     Nowhere did Defendant Sloan remotely disclose the truth to Congress or investors. Indeed, Defendant Sloan knew his statements to Congress about the Bank's purported compliance with the 2018 Consent Orders' requirements were false and misleading.  For that reason, shortly after testifying to Congress, he personally—but unbeknownst to investors—"called the Federal Reserve to *apologize* for his mischaracterizations in his statements during the hearings and to the media."[28]  Critically, neither Defendant Sloan nor any other Defendant issued any such apology, correction, or retraction to investors or the public.

97.     With the Regulators' stern rebukes and rejections of the Bank's Stage 1 Plan submissions concealed from investors, securities analysts believed that the Bank was, as Defendant

---

[28] Minority Report at 32.

Sloan assured investors during his testimony, complying with the Regulators' requirements and had already submitted compliant Stage 1 Plans. For example, Jim Cramer told the market the day immediately after Sloan's congressional testimony in a spotlight on *Squawk on the Street*, titled "Wells Fargo CEO Tim Sloan: Customers can still trust us," that the Bank "had done a lot of soul searching" and "I think everything he's [Defendant Sloan] done is right. Everything! And I've really gone over it, I've had him on the show." Cramer concluded, "I think he's [Sloan] done everything that is humanly possible to do, and the Board has too." Likewise, based on the Bank's prior representations, analysts at Susquehanna Financial Group concluded (incorrectly) that the Bank "submitted all of what was asked from them [by the Regulators] in terms of remediation plans."[29] Likewise, Sandler O'Neill + Partners reiterated its buy rating for Wells Fargo's stock and noted positively that there were "no new headline issues" and that "given the past couple of years for WFC, the absence of any new surprising charges or other revelations is a positive, in our view."[30]

98.     Meanwhile, the OCC was stunned by Defendant Sloan's brazenly false and misleading testimony. On March 13, 2019, the day after the congressional hearing, OCC staff shared copies of the transcript of Sloan's testimony and internally chastised Defendant Sloan for his false testimony about the Bank's purported compliance with the provisions of the 2018 OCC/CFPB Consent Orders. In an internal email between members of the OCC, an OCC Senior Deputy Comptroller of Large Bank Supervision stated that, contrary to Defendant Sloan's testimony, Wells Fargo was not in compliance with the 2018 OCC/CFPB Consent Orders, citing

---

[29] "Wells Fargo & Company: 1Q18 Post Conference Call Model Update," Susquehanna Financial Group (Apr. 13, 2018).
[30] "WFC 3Q18 Earnings Review: Reducing EPS Estimates but Reiterate BUY Rating," Sandler O'Neill + Partners (Oct. 15, 2018).

to the OCC's November 21, 2018 Rejection Letter and concluding that Defendant Sloan's testimony was false.[31]  The OCC also informed Wells Fargo's Board members of its disapproval of Defendant Sloan's false statements to Congress, expressly telling them that Defendant Sloan's testimony was "inaccurate."[32]

99.     One day after Defendant Sloan provided his false testimony to Congress, OCC staff also met with the Bank's Board, including Defendant Duke and Director Quigley, as well as Defendant Sloan and Director Peetz, the Chair of the Bank's Risk Committee.  The Talking Points for that March 13, 2019 meeting reflect that its purpose was "to discuss—again—the themes the OCC has presented to the Board and management for some time, namely progress and accountability."  The meeting's Talking Points further reflect that the OCC informed Defendants during the March 13, 2019 meeting that the Wells Fargo "that we see today is *not* stronger than the one that emerged from the Sales Practices mess in 2016."  The OCC further told Defendants in the meeting that, *"in many risk dimensions, the lack of progress in the controls environment … have wasted time and weakened the institution, creating further safety and soundness concerns."*

100.    During the same March 13, 2019 meeting, the OCC also made abundantly clear to the Board and Defendant Sloan that the Bank continued to fail to comply with the 2018 OCC/CFPB Consent Orders.  As the OCC explained during the meeting, "We told you it was essential the bank demonstrate the ability and willingness to remediate known issues and establish an adequate risk management framework under Tim [Sloan]'s leadership.  *You have not done that.*"  The OCC reiterated during the meeting that the Bank's "progress" in satisfying the 2018 OCC/CFPB

---

[31] Majority Report at 62.
[32] Minority Report at 31-32.

Consent Orders' requirements in many respects was ***"simply insufficient,"*** and the OCC "seriously question[ed]" whether the Bank's then-CEO—Defendant Sloan—"can affect the necessary changes given the circumstances."  In an executive session with the Bank's Board that day, excluding Defendant Sloan, the OCC further expressed disappointment to the Board in the Bank's compliance, blaming ***"Tim [Sloan who] has been reluctant to make the necessary changes."***

101.    The Bank's Regulators also personally addressed with Defendant Sloan their dissatisfaction with his actions under the 2018 Consent Orders.  As reflected in an internal email produced by the OCC, members of the OCC met with Defendant Sloan on March 20, 2019 to discuss "the OCC['s] view on the [Bank's] lack of progress" in complying with the 2018 OCC/CFPB Consent Orders.  During the meeting, the OCC reemphasized the concerns identified in its Talking Points from its March 13, 2019 meeting concerning Defendant Sloan.  As reflected in the meeting's Talking Points, the OCC told Defendant Sloan that ***"[t]here are many examples here where [you] ha[ve] failed to show the leadership necessary to move the institution forward when it is clear that there are significant problems,"*** including the areas of risk and compliance. The OCC further told Defendant Sloan that his failures posed ***"serious reputation and safety and soundness risks to the bank if they remain uncorrected."***

102.    Recognizing the validity of the Regulators' findings, Wells Fargo's Board ousted Defendant Sloan from the Bank, announcing his "resignation" just days later, on March 28, 2019. But in announcing Defendant Sloan's resignation, neither the Bank nor Defendants revealed the true reasons for Defendant Sloan's departure.  Indeed, Defendant Sloan told investors, "I want to assure all of our stakeholders that this was my decision and is not related to our first quarter financial performance, the long-term outlook for the company or any newly discovered issues."

At the time of his resignation, Defendants also did not reveal that Defendant Sloan would "resign" without any incentive compensation for 2019.

> **3.     After Defendant Sloan's Departure, the Bank's
> Interim-CEO, CFO, and Board Chairwoman
> Continue to Misrepresent the Bank's
> <u>Compliance with the 2018 Consent Orders</u>**

103.    Wells Fargo's failure to comply with the 2018 Consent Orders—and the Bank's misrepresentations about its satisfaction of the 2018 Consent Orders' requirements—did not end with Defendant Sloan's "resignation."

104.    On April 12, 2019, Defendant Parker—who was named the "interim CEO" after Defendant Sloan's abrupt exit—continued the deception, assuring investors that the Bank was *"way down the road"* in satisfying the 2018 Consent Orders' requirement and was *"pointed toward completion and implementation,"* with the remaining work under the 2018 FRB Consent Order *"consist[ing] of completing and implementing efforts that are substantially underway."* Defendant Shrewsberry stressed these same points during an appearance on CNBC that day, in which he told investors that the Bank was *"later in that cycle"* under the work required by the 2018 FRB Consent Order.  Defendant Shrewsberry further falsely and misleadingly assured investors that Wells Fargo *"isn't just doing the same thing over, or doing the same thing harder"*; rather, according to Defendant Shrewsberry, the Bank was *"further down the maturity curve of the type of work, the nature of the work, that has to be done."*

105.    Meanwhile, unknown to investors, the Bank remained mired in Stage 1's requirements even after Defendant Sloan's departure, as the Regulators continued to reiterate their rejections of Wells Fargo's defective Stage 1 Plan submissions and significant dissatisfaction with the Bank's compliance.  For example, on April 12, 2019, the CFPB wrote to Wells Fargo's Board, echoing the OCC's findings that the Bank was not in compliance with the 2018 OCC/CFPB

Consent Orders and correcting the Bank's false assertion in previous correspondence that the CFPB had approved the Bank's Stage 1 Plan submission.[33]  Next, in its July 2019 Examination Report sent to the Bank's executives, the OCC once again told the Bank's management and Board that *"[i]t is deeply concerning that Board and management were unable to address these concerns with the appropriate resources, escalation, and urgency."*[34]  Indeed, the OCC found, over one year after the issuance of the 2018 OCC/CFPB Consent Orders, *"minimal change"* with respect to the status of the Bank's compliance and the overall number of issues necessary to resolve.  And, again, in its September 9, 2019 report to Wells Fargo's management, the OCC told the Bank's management and Board that Wells Fargo was not in compliance with the 2018 OCC/CFPB Consent Orders, reprimanding the Bank for the fact that *"many plans have been resubmitted multiple times or extended"* without compliance with the 2018 OCC/CFPB Consent Orders and that the Bank's *"remediation efforts remain[] a concern."*

106.    Making matters even worse, on June 10, 2019, Defendants Duke and Parker wrote to the Federal Reserve that Wells Fargo required an additional extension and would not even attempt to resubmit a third attempt at a compliant Stage 1 Plan proposal until April 30, 2020— *over two years after the deadline in the 2018 FRB Consent Order*.

107.    Nevertheless, the Bank's interim CEO, Defendant Parker, and Defendant Duke continued to keep these facts secret from investors, falsely and misleadingly portraying Wells Fargo as having received approval from its Regulators of the Bank's Stage 1 Plans and omitting to disclose the Regulators' stern rebukes of the Bank's compliance.  For example, on September 27, 2019, when asked about the Bank's satisfaction of the 2018 Consent Orders, Defendant Duke

---

[33] Majority Report at 66.
[34] *Id*. at 65.

falsely and misleadingly replied, *"[W]e're pretty well along in a lot of the work, and we've defined out the work for each individual piece of it, each individual agreement with a regulator."* Similarly, during an October 15, 2019 earnings call, in response to a request for an "update on where you stand on the [2018 FRB Consent Order] and remediating the operational risk and controls" and where the Bank was "in that process," Defendant Parker falsely and misleadingly stated that *"we've designed and implemented … our new risk management framework."*

108.    As Defendants knew, these statements were false, misleading and omitted material facts.  In truth, even as of the end of the Class Period, Wells Fargo had yet to achieve approval from its Regulators to begin implementation under the 2018 Consent Orders and had received stern rebukes from the Regulators for the Bank's failure to satisfy the 2018 Consent Orders' requirements.

### C.    The House Financial Services Committee Conducts a Thorough Investigation and Finds that Wells Fargo Misrepresented its Compliance with the 2018 Consent Orders

109.    In March 2020, the House Financial Services Committee released its findings following its year-long, confidential investigation into Wells Fargo's purported compliance with the 2018 Consent Orders.  The House Financial Services Committee's investigation included a review of internal Wells Fargo and regulator documents; briefings from the Federal Reserve, OCC, CFPB, SEC, and Wells Fargo; and interviews of key executives and directors at Wells Fargo and relevant staff at the Federal Reserve, OCC, and CFPB.

110.    In connection with the investigation, the House Financial Services Committee obtained testimony from numerous Wells Fargo insiders.  These witnesses included Wells Fargo's Head of Regulatory Relations, Sarah Dahlgren; its former director and Chair of the Board's Risk Committee from September 2017 through May 2019, Karen Peetz; its Chief Risk Officer, Amanda Norton, who chaired Wells Fargo's Enterprise Risk Management Committee that reported to the

45

Board's Risk Committee, sat on Wells Fargo's management-level Operating Committee, and reported to the Bank's CEO and President.

111.   Following its lengthy investigation, the minority and majority of the House Financial Services Committee issued detailed reports chronicling Wells Fargo's materially deficient Stage 1 Plan submissions, the continuous rejections and contemporaneous feedback that Defendants received from the Regulators concerning the Bank's materially deficient plans, and Defendants' continued failure to correct the deficiencies in their Stage 1 Plan submissions.  The House Reports cite, quote, and synthesize from over 208,000 documents produced by Wells Fargo and more than 25,000 internal documents and communications produced from the Bank's Board.

112.   As discussed further below, the House Financial Services Committee found that (1) even as of March 2020, the Regulators had not approved Wells Fargo's Stage 1 Plan proposals under the 2018 Consent Orders; and (2) Defendants made numerous false and misleading public statements about the Bank's purported compliance with the 2018 Consent Orders and progress in reforming its compliance and oversight functions.

**1.    Regulatory Officials and Wells Fargo
Insiders Testify About the Bank's Repeated
<u>Submissions of Deficient Stage 1 Plans</u>**

113.   In conducting its investigation, the House Financial Services Committee interviewed members of each of the Regulators involved in overseeing Wells Fargo's compliance with the 2018 Consent Orders.  The Regulators provided critical testimony to the House Financial Services Committee consistent with their contemporaneous feedback to Defendants throughout the Class Period.[35]

---

[35] The testimony from the regulators was provided to the House Financial Services Committee during nonpublic interviews as part of the House Financial Services Committee's investigation.

114.    For example, a CFPB official testified to the House Financial Services Committee that Wells Fargo's proposed Stage 1 Plans were ***"insufficient"*** and ***"incomplete in every meaning of the word."***[36]   Likewise, when asked whether Wells Fargo's proposed Stage 1 Plans were "complete," an OCC official testified, "No.   For example, if the action plan was to include 15 milestones, Wells would not include all 15 milestones.   In order to meet the deadline, they would just submit what they had.   ***They would not address deficiencies – they would just submit it incomplete anyways."***[37]

115.    The OCC official further testified to Congress that Wells Fargo "was in the habit of sending emails last minute when they did not meet deadlines" and that the Bank "would not always send the required official letters of missing a deadline nor take the formal actions necessary to ask for an extension," which was "frustrating because they would often miss requirements in OCC mandated action plans."[38]   CFPB officials shared the OCC's concerns, testifying to Congress that the Bank's "chronic inability to develop comprehensive plans pursuant to the consent orders" caused the Bank to request extensions to deadlines, and "frequently filed extension requests at the last minute."[39]   Even after multiple extensions, the Bank "submitted incomplete submissions [to the CFPB]—the submissions were often superficial and … missing multiple required sections."   As the OCC official testified, the "net effect" of Wells Fargo's non-compliance with the 2018 OCC/CFPB Consent Orders ***"is that we  … still do not have one effective plan in place."***[40]

116.    Not only were the Bank's Stage 1 Plans incomplete, but the CFPB official testified that Wells Fargo's Stage 1 Plan submissions were just ***"plans for plans"*** and fell well short of the

---

[36] Minority Report at 72.
[37] *Id*. at 74.
[38] *Id.* at 79.
[39] *Id*. at 77.
[40] *Id*. at 72.

2018 OCC/CFPB Consent Orders' requirement that the Plan include "completely-developed strategies for reform."[41]  The CFPB official further testified that Wells Fargo submitted these non-compliant proposals, notwithstanding the CFPB's clear directive, which it made "repeatedly," that the CFPB would not accept "plans for plans."[42]  The CFPB representative testified that the regulator had regular "meetings about progress" with Wells Fargo after its first Stage 1 Plan proposal was rejected and while Wells Fargo was attempting to "put[] together its second plan."[43]  The CFPB representative testified: "It was clear what we expected [in the revised Plan].  I think it was the very first progress meeting that they presented a plan for addressing it.  They failed to address the whole second half of expectations we supplied them.  *So, we told them very early. The submission was still wholly incomplete.*"[44]  Officials at the CFPB, likewise, "have not seen progress in the quality of the [Bank's] submissions."[45]

117.    The testimony from the Regulators was consistent with, and corroborated by, the testimony provided to the House Financial Services Committee by the Chair of Wells Fargo's Risk Committee and former president of Bank of New York Mellon, Director Peetz.  As the Chair of the Bank's Risk Committee, Peetz was primarily responsible for overseeing Wells Fargo's enterprise-wide risk management program, including approving reforms required by the Bank's Regulators and monitoring the program's effectiveness.  She was also responsible for overseeing Wells Fargo's Chief Risk Officer, Amanda Norton.[46]  Peetz corroborated that the Bank's Board

---

[41] *Id*. at 69-70.
[42] *Id*. OCC and CFPB officials likewise testified to the House Financial Services Committee that the Bank's plans were just "outlines" and described the submissions as an exercise in "box checking.  *Id.* at 69, 75.
[43] *Id*. at 71.
[44] *Id*.
[45] *Id*. at 72.
[46] Norton joined the Bank in June 2018 and is still employed as the Bank's Chief Risk Officer. During the Class Period, Norton oversaw all aspects of the Bank's independent corporate risk

members, including herself and Defendant Duke, "were regularly in contact with the Bank's regulators, including monthly calls and meetings with the OCC, CFPB, and Federal Reserve," about the status of the Bank's compliance with the 2018 Consent Orders.[47]

118.    Director Peetz testified to Congress that, as the Chair of the Bank's Risk Committee, she (and the Risk Committee, including Defendant Duke) oversaw the Bank's regulatory submissions from "the conceptual nature of the response to editing the final draft." Director Peetz further testified that "[t]he Board and its Risk Committee would routinely hold special meetings to prepare submissions for the regulators" and to discuss feedback received from the Regulators.[48]  During these sessions, Director Peetz "would push back on management because she felt the draft submissions were 'not going far enough'" in addressing the requirements of the 2018 Consent Orders.[49]  Director Peetz testified that she specifically told members of Wells Fargo's Board that risk management at the Bank was ***"insufficient."***[50]  Specifically, Peetz "identified Sloan as a major impediment to the Board's ability to move the company forward in terms of compliance with the consent orders."[51]

119.    Director Peetz testified that she "repeatedly raised management's lack of progress" to the full Board, including Defendants Sloan and Duke.[52]  Director Peetz added that, "[a]s none of the [Bank's] submissions had been approved by any of the regulators," Director Peetz became

---

function and risk oversight activities, including credit risk, market risk, operational risk, compliance risk, information security risk, and conduct risk.  As the leader of the Corporate Risk group, Norton was also on Wells Fargo's management-level Operating Committee.

[47] Minority Report at 83-84.

[48] *Id*. at 81.

[49] *Id*.

[50] *Id*.

[51] *Id*. at 82.

[52] *Id*. at 81-82.

increasingly worried over time.[53]   In the face of the Bank's failure to satisfy the 2018 Consent

Orders' requirements, Director Peetz said she "had to become more 'hands-on' due to the lack of

work being done at the management level."[54]   She further stated that "the Board should have

moved sooner to remove certain members of the management team, including Tim Sloan, who

was standing in the way of the bank's progress under the consent orders."[55]   And, Director Peetz

admitted that the Bank's response to the 2018 Consent Orders, and risk specifically, were

"deficient."[56]   In the end, Director Peetz resigned from the Wells Fargo Board "due to the immense

workload" she took on because of management's mishandling of the 2018 Consent Orders' work.[57]

Notably, however, Defendants never disclosed Director Peetz's concerns or the issues raised by

her relating to the 2018 Consent Orders.   Instead, the Bank specifically denied the connection,

stating her resignation was "not due to any disagreement with the Company on any matter relating

to the Company's operations, policies or practices," and attributed her resignation exclusively to

"her desire to devote more time to other commitments and activities."[58]

120.   Based on its extensive interviews and documentary review, the House Financial

Services Committee concluded in the House Reports that, during the Class Period, the plans

submitted to the Bank's Regulators were "shoddy" and "incomplete."[59]   Both sets of Committee

members also agreed and documented in the House Reports how, even as of March 2020, the

Regulators had not approved Wells Fargo's Stage 1 Plans under the 2018 Consent Orders.

---

[53] *Id*. at 83.

[54] *Id*.

[55] *Id*. at 6.

[56] *Id*. at 83.

[57] *Id*. at 88.

[58] Wells Fargo Current Report on Form 8-K, "Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers" (Jan. 3, 2019).

[59] Minority Report at 69.

>    2.    **The House Financial Services Committee**
>          **Finds that Defendants Made**
>          **"Inaccurate and Misleading" Statements**

121.    Following its extensive review and investigation, the House Financial Services Committee also determined in the House Reports that Defendants made a series of false and misleading statements to the public and Congress during the Class Period.  Although the majority and minority members of the House Financial Services Committee disagreed on what should await the Bank and its top leadership due to their deceit, they unanimously agreed that Defendants made misleading statements to the public, including about the Bank's compliance with the 2018 Consent Orders and the Bank's progress toward lifting the asset cap.

122.    The House Financial Services Committee specifically found that Defendants' public statements about Wells Fargo's purported satisfaction of the 2018 Consent Orders were ***"incomplete"*** and ***"were unsupported by the facts on the ground"*** at the time that Defendants made them.[60]  These findings were based on the House Financial Services Committee's review of mountains of evidence and extensive interviews of Wells Fargo employees and the Regulators' representatives, as documented in the House Reports.

123.    The House Financial Services Committee found, for example, that Defendant Sloan, during his March 12, 2019 testimony before Congress, ***"gave inaccurate and misleading testimony about the status of Wells Fargo's compliance with the requirements of the 2018 [OCC/CFPB Consent Orders]."***[61]    Specifically, the House Financial Services Committee determined that Defendant Sloan gave false testimony that the Bank "was fully complying with its regulators" and that "the bank had done everything the regulators asked, and was on track to

---

[60] *Id.* at 32.
[61] Majority Report at 15; *see also* Minority Report at 32.

resolve the consent orders."[62]  The House Financial Services Committee found these statements were false and misleading because they falsely and misleadingly *"downplayed the bank's status with the regulators and mischaracterized the situation to Congress."*[63]  As the House Financial Services Committee explained, *"Wells Fargo was no closer to complying with the regulators' consent orders when Tim Sloan resigned in March 2019 than when his team took over in 2016."*[64]

124.    The House Financial Services Committee further found that Defendant Sloan also provided false testimony during the March 12, 2019 congressional hearing regarding, among other things, whether the Bank was "in compliance, based on reviews that are done by the OCC and the [CFPB]" of Wells Fargo's Stage 1 Plan submissions.[65]  As the House Financial Services Committee found, Defendant Sloan's response to congressional questioning—including his response that "we are in compliance with those plans"—was false and misleading because neither the CFPB nor the OCC had approved the Bank's submitted Stage 1 Plans at the time of (or after) Sloan's testimony.[66]  In fact, the OCC even contemporaneously informed the Bank's Board shortly after Sloan's testimony that his testimony was *"inaccurate"* and, as officials from the CFPB told the House Financial Services Committee, they *"did not feel comfortable"* with Defendant Sloan's testimony.[67]

125.    The House Financial Services Committee further found that Defendants *"misrepresented the bank's progress toward lifting the FRB's asset cap in a series of public*

---

[62] Minority Report at 31.
[63] *Id.* at 32.
[64] *Id*. at 1.
[65] Majority Report at 61.
[66] *Id.* at 61-62; *see also* Minority Report at 31-32.
[67] Minority Report at 32.

*statements."*[68]    Among other things, the House Financial Services Committee found that Defendant Sloan's February 2018 statement during an investor call that the Bank was "on a fast track" to meeting the Federal Reserve's requirements under the asset cap was false and misleading because, at the time, "Wells Fargo had not even submitted a plan to the [Federal Reserve] to improve its governance and risk management controls."[69]

126.    The House Financial Services Committee also found Defendants' statements to investors that the asset cap would be lifted during the first half of 2019 were false, misleading and omitted material facts.  As the House Financial Services Committee explained, ***"there was no basis for"*** Defendant Sloan's statements assuring investors the asset cap would be lifted in the first half of 2019.[70]  Indeed, "the Federal Reserve had just rejected the company's initial plan for changes to its governance and risk management programs."[71]  In making this finding, the House Financial Services Committee also noted that Wells Fargo's own Chief Risk Officer, Norton, testified to the House Financial Services Committee that she disagreed contemporaneously with Defendant Sloan's statements to investors that the Bank's progress reflected an ability to lift the asset cap in the first half of 2019.[72]

**D.    Facing Sharp Criticism, the Bank's New CEO and Long-Time Directors Provide Damning Testimony to Congress**

127.    The House Reports were issued in connection with pre-scheduled hearings before the House Financial Services Committee for the Bank's new CEO, Defendant Scharf, and the Bank's long-time directors, Defendant Duke and Director Quigley.  These hearings were the first

---

[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.* at 33.

two in a trio of March 2020 hearings set before the House Financial Services Committee specific to Wells Fargo's failures, and what commentators hailed as "an extraordinary level of attention to a single institution."[73]  The first hearing was set to feature Defendant Scharf, the Bank's new CEO, and was entitled, "Holding Wells Fargo Accountable: CEO Perspectives on Next Steps for the Bank that Broke America's Trust."   The second hearing was to feature Defendant Duke and Director Quigley, and was aptly entitled, "Holding Wells Fargo Accountable: Examining the Role of the Board of Directors in the Bank's Egregious Pattern of Consumer Abuses."[74]

128.    In advance of the hearings, the Chairwoman of the House Financial Services Committee, Congresswoman Waters, announced that she would ask Defendant Duke and Director Quigley to resign during the upcoming hearings.  On a call with reporters about the upcoming hearings, Chairwoman Waters said, "I will be calling for the resignation of Duke and Quigley. [They] failed in their responsibility as board members, and I just think they should be shown the door."[75]  Faced with the Bank's well-documented misstatements and the House Financial Services Committee's scathing reports, both Defendant Duke and Director Quigley preemptively resigned just days before they testified.

129.    Analysts took note of Defendant Duke's and Director Quigley's resignations.  For example, on March 9, 2020, Piper Sandler summed up the market's general sentiment, writing, "We typically do not write about [Board] changes. However, we consider today's announcement

---

[73] *See, e.g.*, Victoria Guida, "Wells Fargo, slammed with $3B penalty, admits it broke law," *Politico* (Feb. 21, 2020).
[74] The third hearing was scheduled for March 25, 2020 and was entitled, "Holding Wells Fargo Accountable: Examining the Impact of the Bank's Toxic Culture on Its Employees."  As discussed below at paragraph 262, this hearing never occurred.
[75] *See, e.g.*, Hannah Levitt, "Maxine Waters to Call for Resignation of Wells Fargo Board Members," *Bloomberg* (Mar. 5, 2020).

important insofar as it gets WFC out in front of potentially turbulent upcoming congressional hearings that in the past have resulted in senior management turnover."

130.    To open the first hearing, Chairwoman Waters referenced the "disturbing findings" in the House Reports, and warned, "I'm very concerned that the bank's pattern of harming its consumers appears to persist."  She further specified that the Bank's failure to comply with the 2018 FRB Consent Order had inspired bills for Congress to exercise power to require the Bank's reform, stating that, "[w]hile the Federal Reserve's asset cap was a good start, it didn't seem to change the bank's behavior.  Accordingly, we will discuss a number of bills that would compel further action by regulators and rein in abusive megabanks like Wells Fargo to hold them, including their management and Boards accountable for their actions."  Chairwoman Waters further chastised the Bank's former CEO, Defendant Sloan, for his 2019 testimony to the House Financial Services Committee, stating that *he gave inaccurate testimony and misleading testimony."*

131.    During the first hearing, Defendant Scharf admitted that the House Reports were *"consistent with what I found since I arrived at the Company; [t]hat we have not done what is necessary to be done."*  He further admitted that, even two years after the 2018 Consent Orders and months after he had been brought in to rectify the situation, *"[Wells Fargo] ha[d] not yet done what's necessary to address [its] shortcomings."*

132.    And even after two years of late submissions and extensions, Defendant Scharf admitted to the House Financial Services Committee that he could not assure the Federal Reserve that the Bank's next Stage 1 Plan submission, due April 2020, would be timely or compliant. Defendant Scharf further admitted that the Bank's "financial results may be harmed" by its continued failure to satisfy the 2018 Consent Orders' requirements and, as a result, the cost of the

ongoing compliance work and cap of its assets.  These admissions were consistent with admissions Defendant Scharf made weeks earlier during the Bank's January 14, 2020 earnings call, including that the Bank had a ***"great deal"*** of work to do to meet the 2018 Consent Orders' requirements and that the Bank ***ha[d] not effectively addressed [its] shortcomings."***

133.    Despite their stepping down from the Board, Defendant Duke and Director Quigley were still required to testify to Congress on March 11, 2020.  The House Financial Services Committee harshly criticized both of them, rebuking the Wells Fargo Board for its deficient oversight and failure to address Wells Fargo's non-compliance with the 2018 Consent Orders. Congressman Patrick McHenry, the top Republican on the panel, for example, derided the Bank, stating that "[i]t's clear from the documents that the majority and minority [] have the same findings of facts … [S]evere deficiencies in management practices that were unique to Wells Fargo and [the] unique failures of this Board of Directors."  Chairwoman Waters accused Defendant Duke and Director Quigley of a "dereliction of duty," saying that "their resignations do not absolve them of their failures."   Others were even more harsh, with Congressman David Scott reprimanding the directors, stating that ***"while you were on the Board, you allowed the bank's management to repeatedly submit material that was deficient in response to the consent orders from our regulators.  You did that."***  He further chastised Defendant Duke and Director Quigley for their presence on the Board "throughout the entire germination of this shameful attack on the trust and confidence of the American people in your bank."  Congressman David Scott went even further, calling the Bank's actions in failing to respond to Regulators ***"an unpardonable sin"*** and accusing the directors of ***"not coming with the truth."***  "What a sorry excuse for a Board," he concluded.

134.     Confronted with Congress's findings under questioning from the House Financial Services Committee, Defendant Duke admitted that she knew that the Bank's Stage 1 Plans had been continually rejected.  She further admitted that the Bank's late submissions to the Regulators and the Bank's serial extension requests had raised concerns with her and other Board members and were ***"red flags."***  When pressed, Defendant Duke admitted that the Board had contemporaneous concerns that Wells Fargo could not do the work required by the 2018 Consent Orders, and specifically ***"a great deal of concern by the Board about the speed with which … the orders were being responded to."***  She was also forced to admit that the directors were aware that the management team in place was not capable of getting plans "written in a complete fashion."

135.     During the March 11, 2020 hearings, House Financial Services Committee members also criticized Wells Fargo's Board for not removing Defendant Sloan sooner than March 2019 for his misconduct and public misstatements, with Congressman Al Green stating that the Bank ran a ***"criminal enterprise."***  In response to these criticisms, Defendant Duke ultimately admitted that some former Wells Fargo employees should face criminal charges for the illegal practices that led to the 2016 and 2018 Consent Orders.

136.     Financial commentators noted the significance of Congress's unsubtle rebuke.  For example, on March 11, 2020, the *Charlotte Observer* observed that the Bank's directors had been "savaged by Congress," and reported that Defendant Duke and Director Quigley "faced bipartisan criticism from the members of the House Financial Services Committee in a Tuesday hearing, the latest in a long series of congressional castigation of the bank."

137.     Following these hearings, Wells Fargo clawed back $15 million in performance share awards that it had granted to Defendant Sloan in 2019, in an exercise of the Board's "discretion to forfeit or cancel all or any unpaid portion of the award based on Mr. Sloan's role

and responsibility for the Company's progress in resolving outstanding regulatory matters."[76] The Bank also revealed that Defendant Sloan had received no severance or annual incentive award upon his departure from the Bank due to "the status of the Company's risk management objectives and outstanding regulatory matters, including the progress that continued to be required on both at the time of his resignation." The *Charlotte Observer* reported on March 16, 2020 that, "[i]n canceling the $15 million bonus from last year, awarding him no bonus for last year and no severance on top of that, it's a stark sign that the board apparently came to view Sloan as part of the problem."

E.     **Wells Fargo's Failure to Satisfy the 2018 Consent Orders' Requirements Significantly Impaired the Bank's Financial Success and Caused Severe Investor Losses**

138.    Wells Fargo is haunted by its past even today, over four years after the Bank's abusive banking practices came to light and nearly three years after Regulators instituted the 2018 Consent Orders.

139.    Wells Fargo's chronic failure to comply with the 2018 Consent Orders and to devise a plan satisfying the 2018 Consent Orders' basic requirements caused the ousting of its CEO, as well as the turnover of at least eight directors, including the Chair of the Board and head of the Bank's Risk Committee. The Bank is still subject to intense regulatory oversight and still—nearly three years later—has not satisfied the 2018 Consent Orders' basic requirements.

140.    As a result, the Federal Reserve's asset cap remains in place and continues to have a devastating impact on the Bank. Financial commentators have called the asset cap "one of the costliest punishments ever levied by a single regulator," estimating that "Wells Fargo has missed out on roughly $4 billion in profits—and counting," which does not include "the billions the lender

---

[76] Wells Fargo Definitive Proxy on Schedule 14A (Mar. 16, 2020).

is spending on overhauling operations, in part to get the cap lifted" or "the longer-term impact on Wells Fargo's franchise."[77]   Securities analysts have echoed that "the asset cap has also been a primary driver of lost market share, as evidenced by slower core loan/deposit growth vs. peers."[78] Indeed, during times that Wells Fargo saw its stock price plummet, the Bank's primary peer, J.P. Morgan Chase & Co, which was unfettered by an asset cap, saw its share price soar.

141.   Moreover, criminal investigations and prosecutions continue.  In January 2020, the Bank's former CEO and the head of its Community Bank unit were banned from the banking industry and fined millions of dollars.  Then, on March 10, 2020, following Defendant Scharf's testimony, Chairwoman Waters sent a letter to the DOJ.  In the Chairwoman's letter, she alerted the authorities to the fact that Defendant Sloan had given ***"inaccurate and misleading testimony"*** during his March 12, 2019 testimony to Congress, and directed the DOJ to review the Majority Report, including the Majority Report's finding that Defendant Sloan's statement that the Bank was "in compliance" with the 2018 OCC/CFPB Consent Orders was misleading.  She also requested that the DOJ investigate whether Defendant Sloan violated Title 18, United States Code, Section 1001, by knowingly and willfully making a false statement to Congress.

142.   Defendants' misrepresentations and concealment of the Regulators' repeated rejections of their Stage 1 Plans and stern rebukes not only exposed the Bank to financial distress and consumers to additional harms and delayed remediation, but also cost the Bank's shareholders greatly.  As discussed further in Section VII, during the Class Period, investors lost over ***$54 billion*** in market capitalization when shareholders gradually learned that the Bank had, contrary to Defendants' representations, not satisfied the 2018 Consent Orders' requirements and that, nearly

---

[77] Hannah Levitt, "Wells Fargo Asset Cap Is Now One of the Costliest Bank Penalties," *Bloomberg* (Aug. 24, 2020).
[78] "Banks: Taking News Inventory (as of 3/22)," *Jefferies* (Mar. 22, 2020).

three years after Regulators imposed their historic 2018 Consent Orders, the Bank had yet to submit compliant Stage 1 Plans.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

143.    Defendants numerous false and misleading statements and material omissions during the Class Period, as discussed above, were made in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.   These materially false and misleading statements and omissions are further detailed below in chronological order.

### A.    Federal Reserve Consent Order Conference Call

144.    On February 2, 2018, Wells Fargo held an investor conference to discuss the 2018 FRB Consent Order.  Defendants Sloan and Shrewsberry spoke at the conference on behalf of the Bank.  During the investor conference, Defendant Sloan represented that the Bank was "on a fast track" to resolving the 2018 FRB Consent Order.

145.    Defendant Sloan's statement identified in paragraph 144 was materially false and misleading, and omitted material information.  Contrary to Defendant Sloan's assertion, Wells Fargo was not given "fast track" status by the Federal Reserve or otherwise "on a fast track" to satisfy the 2018 FRB Consent Order's requirements.  In truth, Wells Fargo had not even submitted a plan to the Federal Reserve at the time of his statement and, when the Bank did submit a plan months later, it was rejected as "materially incomplete" and "insufficient."  *See* ¶¶69-72.  Indeed, the House Financial Services Committee specifically found that Sloan's statement to investors that the Bank was "on a fast track" to meeting the Federal Reserve's requirements under the asset cap was false and misleading because, at the time, "Wells Fargo had not even submitted a plan to the [Federal Reserve] to improve its governance and risk management controls."  *See* ¶¶125-26.

**B.      May 2018 Deutsche Bank Global**
**          Financial Services Conference**

146.    On May 30, 2018, Defendant Shrewsberry presented at the 2018 Deutsche Bank

Global Financial Services Conference.  In response to an analyst's request to "frame where you

are on some of these issues and where the heavy lifting is still to come" under the 2018 FRB

Consent Order and other investigations, Defendant Shrewsberry stated, "I don't think at this point

that there's anything meaningful that we aren't already talking about, certainly, since our last 10-Q,

so the inventory is pretty complete."  Defendant Shrewsberry added, "[O]ur investors know

everything that's material that we know."

147.    Defendant Shrewsberry's statements identified in paragraph 146 were materially

false and misleading.  Contrary to Shrewsberry's assertions, Wells Fargo's investors did not "know

everything that's material" and "anything meaningful" about the status of Wells Fargo's

compliance with the 2018 FRB Consent Order.  Indeed, just three weeks before Defendant

Shrewsberry's statements in paragraph 146, on May 7, 2018, the Federal Reserve formally rejected

Wells Fargo's Stage 1 Plan proposal under the 2018 FRB Consent Order.  *See* ¶¶69-72.  The

Federal Reserve determined that the Stage 1 Plan was "materially incomplete" and "insufficient."

*See* ¶¶71-72.  This Rejection Letter was followed by the Bank's directors admitting, in an internal

email dated just weeks before Defendant Shrewsberry's statements in paragraph 146, that investors

would view the Federal Reserve's rejection "as completely unacceptable."  *See* ¶¶73-74.

148.    In addition, Defendant Shrewsberry's statements identified in paragraph 146 were

misleading because they omitted material information, including that (i) the Federal Reserve had

rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72); and (ii) the Federal Reserve had

rebuked the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see*

¶¶69-72, 75).

C.    **June 2018 Morgan Stanley Financials Conference**

149.    On June 13, 2018, Defendant Shrewsberry presented at the 2018 Morgan Stanley Financials Conference on behalf of the Bank.  During the conference, when an analyst asked Defendant Shrewsberry to "at this stage, maybe give us some color on what's left to do for the consent order" and "what part of the process are you in now," like whether the Bank was "already executing on the specific requests," Defendant Shrewsberry answered, "It's the last mile of knitting all of this together."

150.    Defendant Shrewsberry's statement identified in paragraph 149 was materially false and misleading.  Contrary to Defendant Shrewsberry's assertion, the Bank was not "executing" and was not in "the last mile of knitting all of this together."  In truth, the Federal Reserve had formally rejected Wells Fargo's Stage 1 Plan proposal under the 2018 FRB Consent Order, finding it "materially incomplete" and "insufficient."  *See* ¶¶69-72.  And just one week before Defendant Shrewsberry's statements in paragraph 149, the Bank had requested an extension for resubmitting its Stage 1 Plans, which meant that the Bank still needed to further revise and resubmit its Stage 1 Plan proposal, and that the Bank would not even attempt to obtain the Federal Reserve's approval to start implementing the revised plan for many months.  *See* ¶77.

151.    In addition, Defendant Shrewsberry's statement identified in paragraph 149 was misleading because it omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72) and (ii) the Federal Reserve had rebuked the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75).

152.    During the same investor conference, an analyst asked Defendant Shrewsberry, "On the consent order, you indicated that you expect to operate under the asset cap through the first part of 2019?"  Defendant Shrewsberry responded, "Yes."  Defendant Shrewsberry also stated

that "[the asset cap] will be gone in the time frames that we've talked about" and that "it will take all of the amount of time that we've described before we finish the last piece of it or set ourself on a course to maturity for the last piece of it."

153.    Defendant Shrewsberry's statements identified in paragraph 152 were misleading because they omitted material information.  The Federal Reserve had formally rejected Wells Fargo's Stage 1 Plan proposal under the 2018 FRB Consent Order, finding it "materially incomplete" and "insufficient."  *See* ¶¶69-72.  The Federal Reserve had also told Wells Fargo on April 3, 2018 that the dates and deadlines that the Board had included in the Stage 1 Plan proposal for completing the requirements of the 2018 FRB Consent Order were not realistic or sound.  *See* ¶¶69-72.  Moreover, following the Rejection Letter, the Bank had requested an extension for resubmitting its Stage 1 Plans, meaning that the Bank would not even attempt to obtain the Federal Reserve's approval to start implementing under Stage 2 until over five months after the 2018 FRB Consent Order's original submission deadline.  *See* ¶77.  In addition, Defendant Shrewsberry's statements identified in paragraph 152 omitted that the Federal Reserve had rebuked the Bank for its failure to comply with the 2018 FRB Consent Order's requirements.  *See* ¶¶69-72, 75.

### D.    July 2018 Earnings Call

154.    On July 13, 2018, the Bank held an earnings call to discuss its second quarter 2018 financial results.  Defendants Sloan and Shrewsberry spoke on behalf of the Bank.  During the earnings call, in response to an analyst's question regarding an "update" on the "timing" of the "asset cap," Defendant Sloan stated, "[N]o change in the update from Investor Day" and that "sometime in the first half of next year, we'll be able to move through that [the asset cap]."

155.    Defendant Sloan's statements identified in paragraph 154 were materially false and misleading.  Contrary to Defendant Sloan's statements, there was a material "change in the update from the Investor Day" conference, which happened months earlier.  Indeed, following the

Case 1:20-cv-04494-GHW   Document 74   Filed 11/09/20   Page 68 of 130


Investor Day, on June 5, 2018, the Bank had requested an extension for resubmitting its Stage 1 Plans, pushing the deadline for resubmitting those plans to over five months after the 2018 FRB Consent Order's original deadline. *See* ¶77. Defendant Sloan's statements identified in paragraph 154 were also misleading because they omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72) and (ii) the Federal Reserve had rebuked the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75).

156.    Defendant Sloan's statements in paragraph 154 about the Bank's lifting the asset cap "sometime in the first half of" 2019 were misleading because they omitted material information. The Federal Reserve had formally rejected Wells Fargo's Stage 1 Plan proposal under the 2018 FRB Consent Order, finding it "materially incomplete" and "insufficient." *See* ¶¶69-72. The Federal Reserve had also told Wells Fargo on April 3, 2018 that the dates and deadlines that the Board had included in the Stage 1 Plan proposal for completing the requirements of the 2018 FRB Consent Order were not realistic or sound. *See* ¶¶69-72. Moreover, following the Rejection Letter, the Bank had requested an extension for resubmitting its Stage 1 Plans, meaning that the Bank would not be ready even to attempt to obtain the Federal Reserve's approval to start implementing under Stage 2 until September 19, 2018. *See* ¶77. Defendant Sloan's statements identified in paragraph 154 also omitted that the Federal Reserve had rebuked the Bank for its failure to comply with the 2018 FRB Consent Order's requirements. *See* ¶¶69-72, 75.

E.    **December 2018 Goldman Sachs**
      **U.S. Financial Services Conference**

157.    On December 4, 2018, Defendant Sloan presented on behalf of the Bank at a Goldman Sachs U.S. Financial Services Conference. During the conference, Defendant Sloan was

asked for an "update … on the progress in terms of getting [the 2018 FRB Consent Order] lifted." Defendant Sloan responded, "we're executing the plan as opposed to designing it."

158.   Defendant Sloan's statement identified in paragraph 157 was materially false and misleading.  Contrary to Defendant Sloan's statement, the Bank was not "executing the plan as opposed to designing it."  In truth, the Federal Reserve rejected Wells Fargo's proposed Stage 1 Plan and, accordingly, the Bank could not begin "executing the plan."  *See* ¶¶69-72.  The Federal Reserve had formally rejected Wells Fargo's Stage 1 Plan proposal under the 2018 FRB Consent Order, finding it "materially incomplete" and "insufficient."  *See* ¶¶71-72.  And the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans, meaning the Bank had only resubmitted its Stage 1 Plan proposal to the Federal Reserve for approval to implement on October 31, 2018—just one month before Defendant Sloan's statement in paragraph 157.  *See* ¶¶77, 85.

159.   In addition, Defendant Sloan's statement identified in paragraph 157 was misleading because it omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72); (ii) the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶81).

160.   During the same investor conference, Defendant Sloan represented that there was "nothing new to report in terms of the timing or the dialogue with the regulators, whether it's related to the consent order or any other area."  Defendant Sloan's statement was materially false and misleading.  Contrary to Defendant Sloan's statement, there were material "new [items] to report in terms of timing or the dialogue with the regulators" that specifically "related to the

consent order." Indeed, the Federal Reserve had formally rejected Wells Fargo's Stage 1 Plan proposal under the 2018 FRB Consent Order, finding it "materially incomplete" and "insufficient." *See* ¶¶69-72. The Federal Reserve also communicated to Wells Fargo in its Rejection Letter that the Bank's Stage 1 Plan proposal was "so inadequate as to raise concerns about the company's leadership." *See* ¶¶71-72. The Federal Reserve's Rejection Letter was followed by the Bank's directors admitting that investors would view the Federal Reserve's rejection "as completely unacceptable." *See* ¶¶73-74. The Bank had also requested (and been granted) two extensions for resubmitting its Stage 1 Plans, meaning the Bank had only resubmitted its Stage 1 Plan proposal to the Federal Reserve for approval to implement on October 31, 2018, *i.e.*, six months after the original deadline, and just a week before Defendant Sloan's statement. *See* ¶¶77, 85.

161. In addition, Defendant Sloan's statement identified in paragraph 160 was misleading because it omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72); (ii) the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶81).

162. In addition, Defendant Sloan also represented during the December 4, 2018 investor conference that the Bank was "still planning on operating under the asset cap through the first part of next year." Defendant Sloan's statement was misleading because it omitted material information. The Federal Reserve had formally rejected Wells Fargo's Stage 1 Plan proposal under the 2018 FRB Consent Order, finding it "materially incomplete" and "insufficient." *See* ¶¶69-72. Moreover, following the Rejection Letter, the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans, meaning that the Bank had only resubmitted its

revised Stage 1 Plan proposal on October 31, 2018.  *See* ¶¶77-85.  The Bank did not yet even have the Federal Reserve's approval to begin implementation under Stage 2 of the 2018 FRB Consent Order.  *See* ¶¶47-51, 69-88.  Defendant Sloan's statement also omitted that the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75) and that the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶81).

F.      **December 2018 *Squawk on the Street* Appearance**

163.    On December 4, 2018, Defendant Sloan appeared on the CNBC televised segment, *Squawk on the Street*.  When asked about the asset cap, Defendant Sloan stated, "[W]e've got plans in place we're executing on those plans."  Defendant Sloan's statement was materially false and misleading.  Contrary to Defendant Sloan's statement, the Bank did not have "plans in place" and was not "executing on those plans."  In truth, the Federal Reserve rejected Wells Fargo's proposed Stage 1 Plan under the 2018 FRB Consent Order, finding it "materially incomplete" and "insufficient."  *See* ¶¶69-72.  Accordingly, the Bank could not begin "executing on those plans." *See* ¶¶47-51, 69-88.   And the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans, meaning the Bank had only resubmitted its Stage 1 Plan proposal to the Federal Reserve for approval to implement on October 31, 2018—just one month before Defendant Sloan's statement.  *See* ¶¶77, 85.

164.    In addition, Defendant Sloan's statement identified in paragraph 163 was misleading because it omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72); (ii) the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶81).

165.    During the same interview on December 4, 2018, when asked about the timing of lifting the asset cap, Defendant Sloan stated that it would be "sometime in the first half of next year." Defendant Sloan's statement was misleading because it omitted material information. The Federal Reserve had formally rejected Wells Fargo's Stage 1 Plan proposal under the 2018 FRB Consent Order, finding it "materially incomplete" and "insufficient." *See* ¶¶69-72. Moreover, following the Rejection Letter, the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans, meaning that the Bank had only resubmitted its revised Stage 1 Plan proposal on October 31, 2018, and did not yet have the Federal Reserve's approval to begin implementing that plan under Stage 2 of the 2018 FRB Consent Order. *See* ¶¶77, 85. Defendant Sloan's statement also omitted that the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75) and that the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶81).

166.    For all of the above reasons, among others, the House Financial Services Committee found that Defendant Sloan's statement in paragraph 165 "misrepresented the bank's progress toward lifting the FRB's asset cap," had "no basis," and was "unsupported by the facts on the ground." *See* ¶¶121-22, 125-126.

**G.    January 2019 Earnings Call**

167.    On January 15, 2019, Wells Fargo held an earnings call to announce its fourth quarter 2019 financial results, during which Defendants Sloan and Shrewsberry spoke on behalf of the Bank. During the call, Defendant Sloan said, "we're in complete agreement with the Fed about what needs to be done, and we're in the midst of implementing that." Defendant Sloan further assured investors that "we're continuing to actively work and implement the new risk management framework."

168.    Defendant Sloan's statements identified in paragraph 167 were materially false and misleading.  Contrary to Defendant Sloan's statements, the Bank was not "in the midst of implementing" its Stage 1 Plans, nor was the Bank "in complete agreement with the Fed about what needs to be done," or "continuing to actively work and implement the new risk management framework."  In truth, the Federal Reserve rejected Wells Fargo's proposed Stage 1 Plan under the 2018 FRB Consent Order, finding it "materially incomplete" and "insufficient.  *See* ¶¶69-72.  Accordingly, the Bank could not be "in the midst of implementing" the plans.  *See* ¶¶47-51, 69-72.  The Federal Reserve had formally rejected Wells Fargo's Stage 1 Plan proposal.  *See* ¶¶69-72.  And the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans, meaning the Bank had only resubmitted its Stage 1 Plan proposal to the Federal Reserve for approval to implement on October 31, 2018.  *See* ¶¶77, 85.

169.    In addition, Defendant Sloan's statements identified in paragraph 167 were misleading because they omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72); (ii) the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶81).

**H.    <u>January 2019 *Closing Bell* Appearance</u>**

170.    On January 15, 2019, Defendant Shrewsberry spoke with *Bloomberg*'s Scarlet Fu, Joe Weisenthal and Caroline Hyde on "Bloomberg Markets: What'd You Miss?"  In discussing Defendant Sloan's January 15, 2019 announcement that the Bank would operate under the asset cap until the end of 2019, Defendant Shrewsberry stated that "there's nothing more to read into [the announcement] other than it's a big body of work and it takes time to execute on."

171.    Defendant Shrewsberry's statements identified in paragraph 170 were materially false and misleading.  Contrary to Defendant Shrewsberry's statements, there was "more to read into" the announcement and the delay was not just due to being "a big body of work" or needing "time to execute" the Federal Reserve's requirements.  In truth, the delay had been caused by the Bank's failure to submit a compliant Stage 1 Plan proposal under the 2018 FRB Consent Order. Indeed, the Federal Reserve had formally rejected Wells Fargo's Stage 1 Plan proposal, finding it "materially incomplete" and "insufficient."  *See* ¶¶69-72.  The Federal Reserve had found the Bank's Stage 1 Plan proposal "so inadequate as to raise concerns about the company's leadership." *See* ¶¶71-72.  The Federal Reserve had also informed Wells Fargo that the dates and deadlines that the Board had included in the Stage 1 Plan proposal for completing the requirements of the 2018 FRB Consent Order were not realistic or sound.  *See* ¶¶69-72.  And the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans, meaning the Bank had spent months revising its Stage 1 Plan proposal and had only resubmitted that proposal to the Federal Reserve on October 31, 2018.  *See* ¶¶77, 85.  As of the date of Defendant Shrewsberry's statements in paragraph 170, the Bank did not have the Federal Reserve's approval to begin executing its Stage 1 Plan under the 2018 FRB Consent Order's requirements.  *See* ¶¶47-51, 69-88.

172.    In addition, Defendant Shrewsberry's statements identified in paragraph 170 were misleading because they omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72); (ii) the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶81).

I.     **February 2019 Credit Suisse Financial Services Forum**

173.    On February 12, 2019, Defendant Shrewsberry presented on behalf of Wells Fargo at the 2019 Credit Suisse Financial Services Forum.  During the forum, when asked for "any updates" on the 2018 FRB Consent Order and "why [the consent order] might be taking a little bit longer," Defendant Shrewsberry stated, "it's taking a little bit longer because it's the first of its kind, and it is sort of an expanding body of work in terms of detail."  Defendant Shrewsberry added that "we're making great progress."

174.    Defendant Shrewsberry's statements identified in paragraph 173 were materially false and misleading.  Contrary to Defendant Shrewsberry's statements, the Bank was not "making great progress" toward complying with the 2018 FRB Consent Order and its progress did not reflect an ability to lift the asset cap by the "end of the year."  In truth, the Federal Reserve had formally rejected Wells Fargo's Stage 1 Plan proposal under the 2018 FRB Consent Order, finding it "materially incomplete" and "insufficient."  *See* ¶¶69-72.  Moreover, following the Rejection Letter, the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans, meaning the Bank had spent months revising its Stage 1 Plan proposal and had only resubmitted that proposal to the Federal Reserve on October 31, 2018.  *See* ¶¶77-85.  As of the date of Defendant Shrewsberry's statements in paragraph 173, the Bank had not satisfied Stage 1 under the 2018 FRB Consent Order and did not have the Federal Reserve's approval to begin executing its plan under Stage 2 of the 2018 FRB Consent Order's requirements.  *See* ¶¶47-51, 69-89.

175.    Moreover, contrary to Defendant Shrewsberry's statements in paragraph 173, the delay in lifting the asset cap was not owed to it being "first of its kind" or "an expanding body of work."  In truth, the delay had been caused by the Bank's failure to submit a compliant Stage 1 Plan proposal under the 2018 FRB Consent Order.  *See* ¶¶69-72.  Indeed, the Federal Reserve had

formally rejected Wells Fargo's Stage 1 Plan proposal, finding it "materially incomplete" and "so inadequate as to raise concerns about the company's leadership." *See* ¶¶71-72. The Federal Reserve also found that the dates and deadlines that the Board had included in the Stage 1 Plan proposal for completing the requirements of the 2018 FRB Consent Order were not realistic or sound. *See* ¶¶70-72, 89. Moreover, following the Rejection Letter, the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans, meaning the Bank had spent months revising its Stage 1 Plan proposal and had only resubmitted that proposal to the Federal Reserve on October 31, 2018. *See* ¶¶77, 85.

176.    In addition, Defendant Shrewsberry's statements identified in paragraph 173 were misleading because they omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72); (ii) the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75, 89); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶81).

177.    During the same interview on February 12, 2019, Defendant Shrewsberry stated that the "end of the year" to lift the asset cap was "reasonable." Defendant Shrewsberry's statement was misleading because it omitted material information. The Federal Reserve had formally rejected Wells Fargo's Stage 1 Plan proposal under the 2018 FRB Consent Order, finding it "materially incomplete" and "insufficient." *See* ¶¶69-72. Moreover, following the Rejection Letter, the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans, meaning that the Bank had only resubmitted its revised Stage 1 Plan proposal on October 31, 2018, and did not yet have the Federal Reserve's approval to begin implementing that plan under Stage 2 of the 2018 FRB Consent Order. *See* ¶¶47-51, 77, 85. Defendant Shrewsberry's

statement also omitted that the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75, 89) and the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶81).

### J.   March 2019 House Financial Services Committee Testimony

178.   On March 12, 2019, Defendant Sloan testified before the U.S. House of Representatives Financial Services Committee regarding the Bank's purported satisfaction of the 2018 OCC/CFPB Consent Orders' requirements.  Chairwoman Maxine Waters asked Sloan, "Has the OCC indicated its non-objection to the bank's compliance audit on customer remediation plans?  Has the Consumer Bureau indicated its non-objection?"  Defendant Sloan responded that both had not objected to the plans, stating, "I can assure you that we are working very constructively with what we have in place and we are executing that plan."  Chairwoman Waters confirmed, "For those who are listening, I am simply asking whether or not the bank is in compliance, based on reviews that are done by the OCC and the [CFPB], and you heard that answer."  Defendant Sloan repeated, "We are in compliance with those plans."  Chairwoman Waters asked once more whether "the bank disclosed to investors the status of the plans that it submitted to the OCC and the Consumer Bureau, including whether the regulators have raised any objections to the bank's submitted plans?"  Defendant Sloan stated once more, "I can assure you that we have plans in place."

179.   Defendant Sloan's statements identified in paragraph 178 were materially false and misleading.  Contrary to Defendant Sloan's statements, the Bank did not have plans "in place," was not "executing that plan," and was not "in compliance with those plans."  In truth, at the time of his testimony, Wells Fargo had received a series of rejections from the Regulators of its Stage

1 Plan proposals as well as repeated admonishments about the compliance of those submissions. *See* ¶¶69-72, 75, 80-84, 87, 89, 93-94.  On July 24, 2018, the OCC had formally refused to provide Wells Fargo a "no supervisory objection" to the Bank's Stage 1 Plan proposal under the 2018 OCC/CFPB Consent Orders.  *See* ¶¶80-84.  The OCC found that the Bank's plan "lack[ed] substance and detail."  *See id*.  Indeed, on the same day that the OCC formally rejected the Bank's Stage 1 Plan proposal, Wells Fargo's Board admitted to the OCC that it knew the Stage 1 Plan that the Bank had submitted did not comply with the 2018 OCC/CFPB Consent Orders but was merely a "work in progress."  *See* ¶¶82-83.  Again, on November 21, 2018, the OCC formally rejected Wells Fargo's further Stage 1 Plan proposal as merely "a plan for a plan" and "not adequately supported."  *See* ¶87.  Following each rejection, the CFPB and OCC communicated during in-person meetings and in writing to the Bank's directors and executives that the revised plans were "wholly incomplete," "inadequate," "poor-quality," and "a plan for a plan."  *See* ¶¶80-84, 87, 89, 93-94, 116.  In fact, just weeks before Defendant Sloan's statements in paragraph 178, the Bank's directors and executives received the OCC's March 4, 2019 Quarterly Management Report stating that the Bank's response to the 2018 OCC/CFPB Consent Orders had been "unacceptable" and admonished the Bank for its "missed deadlines" and submission of "poor-quality action plans." *See* ¶89.

180.   In addition, Defendant Sloan's statements identified in paragraph 178 were misleading because they omitted material information, including that (i) the OCC and CFPB had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶80, 87); (ii) the OCC and CFPB had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 OCC/CFPB Consent Orders' requirements (*see* ¶¶80-84, 87, 89, 116); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶¶81, 94).

181.   For all of the above reasons, among others, the House Financial Services Committee found that Defendant Sloan's statements in paragraph 178 were "inaccurate and misleading."  *See* ¶¶121-24.

182.   During the same March 12, 2019 hearing, Defendant Sloan answered questions from Congresswoman Velázquez.  Congresswoman Velázquez asked, "why the Fed didn't remove the asset cap?"  Defendant Sloan responded, stating that, "[a]s part of the consent order with the Fed, they want us to improve the Board governance and oversight, which we have done."

183.   Defendant Sloan's statement identified in paragraph 182 was materially false and misleading.  Contrary to Defendant Sloan's representation, the Bank was not "done" with the improvements that the Federal Reserve had requested in its 2018 FRB Consent Order and was not in compliance with that Order.  In truth, just the day before Defendant Sloan's statements in paragraph 182, on March 11, 2019, the Federal Reserve had formally rejected the Bank's Stage 1 Plan proposal for the second time.  *See* ¶93.  The Federal Reserve found that the plan "remain[ed] materially incomplete."  *See id*.  This finding had been preceded by the Federal Reserve's formal rejection of Wells Fargo's Stage 1 Plan proposal on May 7, 2018, when the Federal Reserve had found that the Bank's proposal was "materially incomplete" and "insufficient."  *See* ¶¶69-72.  Following the May 7, 2018 Rejection Letter, the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans.  *See* ¶¶77, 85.  Despite the allowance of additional time, the Federal Reserve found in its March 11, 2019 Rejection Letter that Wells Fargo's revised Stage 1 Plan proposal continued to suffer from basic gaps and again included "illogical timeframes" and "[p]ervasive inaccuracies."  *See* ¶93.  The Federal Reserve also specifically instructed the Bank to "develop its next plans," and warned that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions."  *See id*.  The

Federal Reserve further admonished the Bank for its non-compliance, stating that the Bank's "[c]ontinued failure to submit acceptable plans reflects poorly on the [the Bank], and negatively influences supervisors' view of the board and senior management's capacity to effectively manage and govern the firm."  *See* ¶94.  Indeed, the same day that Defendant Sloan made the statements in paragraph 182, he personally (and privately) "called the Federal Reserve to apologize for his mischaracterizations in his statements."  *See* ¶96.

184.    In addition, Defendant Sloan's statement identified in paragraph 182 was misleading because it omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72, 93-94); (ii) the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75, 89, 93-94); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶¶81, 94).  For all of the above reasons, among others, the House Financial Services Committee members found that Defendant Sloan's statements in paragraph 182 were "inaccurate and misleading" and "downplayed the bank's status with the regulators and mischaracterized the situation to Congress."  *See* ¶¶121-24.

185.    Defendant Sloan also submitted written testimony to the House Financial Services Committee.  In his written testimony, in response to the question, "what additional steps are you taking to execute effective corporate governance and run a successful risk-management program," Defendant Sloan wrote, "Wells Fargo continues to make progress against our action plans in response to our consent orders."  Defendant Sloan further stated in writing that "we continue to make progress against our action plans to address issues under our consent orders with our regulators and meet regulatory expectations."

186.    Defendant Sloan's statements identified in paragraph 185 were materially false and misleading.  Contrary to Defendant Sloan's statements, the Bank was not "mak[ing] progress against our action plans to address issues under our consent orders."  In truth, its Regulators rejected Wells Fargo's proposed Stage 1 Plans and, accordingly, the Bank could not be "mak[ing] progress against our action plans in response to our consent orders."  *See* ¶¶69-72, 69-95.  Just the day before Defendant Sloan's statements in paragraph 185, on March 11, 2019, the Federal Reserve had formally rejected the Bank's Stage 1 Plan proposal for the second time.  *See* ¶93.  The Federal Reserve found that the plan "remain[ed] materially incomplete."  *See id*.  This finding had been preceded by the Federal Reserve's May 7, 2018 Rejection Letter, when the Federal Reserve had found that the Bank's proposal was "materially incomplete" and "insufficient."  *See* ¶¶69-72.  Following the May 7, 2018 Rejection Letter, the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans.  *See* ¶¶77, 85.  Despite the allowance of additional time, the Federal Reserve found in its March 11, 2019 Rejection Letter that Wells Fargo's revised Stage 1 Plan proposal continued to suffer from basic gaps and again included "illogical timeframes" and "[p]ervasive inaccuracies."  *See* ¶93.  The Federal Reserve also specifically instructed the Bank to "develop its next plans," and warned that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions."  *See* ¶94.  The Federal Reserve further admonished the Bank for its non-compliance, stating that the Bank's "[c]ontinued failure to submit acceptable plans reflects poorly on the [the Bank], and negatively influences supervisors' view of the board and senior management's capacity to effectively manage and govern the firm."  *See id*.  Indeed, the same day that Defendant Sloan made the statements in paragraph 185, he personally (and privately) "called the Federal Reserve to apologize for his mischaracterizations in his statements."  *See* ¶96.

187.    Moreover, at the time of Defendant Sloan's statements in paragraph 185, the OCC and CFPB had repeatedly rejected the Bank's Stage 1 Plan proposals as well as repeatedly admonished the Bank for its lack of compliance. *See* ¶¶80-84, 87, 89.  Indeed, just weeks before Defendant Sloan's statements in paragraph 185, the Bank's directors and executives received the OCC's March 4, 2019 Quarterly Management Report stating that the Bank's response to the 2018 OCC/CFPB Consent Orders had been "unacceptable" and admonished the Bank for its "missed deadlines" and submission of "poor-quality action plans." *See* ¶89.  This newest rejection was preceded by several additional rejections, including on July 24, 2018, when the OCC had formally refused to provide Wells Fargo a "no supervisory objection" to the Bank's Stage 1 Plan proposal under the 2018 OCC/CFPB Consent Orders because the Bank's plan "lack[ed] substance and detail." *See* ¶¶80-84.  Again, on November 21, 2018, the OCC had formally rejected Wells Fargo's further Stage 1 Plan proposal as merely "a plan for a plan" and "not adequately supported." *See* ¶87.  Following each rejection, the CFPB and OCC communicated during in-person meetings and in writing to the Bank's directors and executives that the revised plans were "wholly incomplete," "inadequate," "poor-quality," and "a plan for a plan." *See* ¶¶80-84, 87, 89, 116.

188.    In addition, Defendant Sloan's statements identified in paragraph 185 were misleading because they omitted material information, including that (i) the Regulators had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72, 80-84, 87, 93-94); (ii) the Regulators had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 Consent Orders' requirements (*see* ¶¶69-72, 75, 80-84, 87, 89, 93-94, 116); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶¶81, 84).

### K.    <u>April 2019 Earnings Call</u>

189.    On April 12, 2019, the Bank held its first quarter earnings call, during which Defendants Parker and Shrewsberry spoke on behalf of Wells Fargo.  During the earnings call,

Defendant Parker stated that work under the 2018 FRB Consent Order "consists of completing and implementing efforts that are substantially underway." And when asked by a Deutsche Bank analyst, "what are you either doing differently now, say, versus 6 months ago or plan to do differently to address these things," Defendant Parker said, "we're going to be focused more on execution."

190. Defendant Parker's statements identified in paragraph 189 were materially false and misleading. Contrary to Defendant Parker's statements, the Bank was not "completing and implementing" or "focused more on execution." In truth, the Bank had no approved Stage 1 Plan and, just like six months earlier, was still submitting noncompliant Stage 1 Plans to its Regulators. Indeed, just weeks before Defendant Parker's statement in paragraph 189, on March 11, 2019, the Federal Reserve had formally rejected the Bank's Stage 1 Plan proposal for the second time. *See* ¶93. The Federal Reserve found that the plan "remain[ed] materially incomplete." *See id*. This finding had been preceded by the Federal Reserve's May 7, 2018 Rejection Letter, when the Federal Reserve had found that the Bank's proposal was "materially incomplete" and "insufficient." *See* ¶¶69-72. Following the May 7, 2018 Rejection Letter, the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans. *See* ¶¶77, 85. Despite the allowance of additional time, the Federal Reserve found in its March 11, 2019 Rejection Letter that Wells Fargo's revised Stage 1 Plan proposal continued to suffer from basic gaps and again included "illogical timeframes" and "[p]ervasive inaccuracies." *See* ¶93. The Federal Reserve also specifically instructed the Bank to "develop its next plans," and warned that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions." *See* ¶94. As of the end of the Class Period, the Bank had yet to resubmit its Stage 1 Plan for approval to the Federal Reserve. *See* ¶106. Indeed, Defendant Duke admitted during her testimony under

oath to Congress that vast portions of the Bank's Stage 1 Plans submitted to the Federal Reserve required "resubmission."  *See* ¶260.

191.    In addition, Defendant Parker's statements identified in paragraph 189 were misleading because they omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72, 93-94); (ii) the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75, 89, 93-94); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶¶81, 94).

192.    During the same earnings call, Defendant Parker also responded to questions from analysts.  During that questioning, Defendant Parker stated that work under the 2018 Consent Orders was "way down the road and is really pointed toward completion and implementation." Defendant Parker's statement was materially false and misleading.  Contrary to Defendant Parker's statement, the Bank was not "way down the road" or "pointed toward completion and implementation," under its 2018 Consent Orders.  Indeed, just weeks before Defendant Parker's statement, on March 11, 2019, the Federal Reserve had formally rejected the Bank's Stage 1 Plan proposal for the second time and, accordingly, it had no plans to implement.  *See* ¶93.  The Federal Reserve found that the plan "remain[ed] materially incomplete."  *See id*.  This finding had been preceded by the Federal Reserve's May 7, 2018 Rejection Letter, when the Federal Reserve had found that the Bank's proposal was "materially incomplete" and "insufficient."  *See* ¶¶69-72. Following the May 7, 2018 Rejection Letter, the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans.  *See* ¶¶77, 85.  Despite the allowance of additional time, the Federal Reserve found in its March 11, 2019 Rejection Letter that Wells Fargo's revised Stage 1 Plan proposal continued to suffer from basic gaps and again included "illogical

timeframes" and "[p]ervasive inaccuracies." *See* ¶93.  The Federal Reserve also specifically instructed the Bank to "develop its next plans," and warned that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions." *See* ¶94.  As of the end of the Class Period, the Bank had yet to resubmit its Stage 1 Plan for approval to the Federal Reserve.  *See* ¶106.  Indeed, Defendant Duke admitted during her testimony under oath to Congress that vast portions of the Bank's Stage 1 Plans submitted to the Federal Reserve required "resubmission." *See* ¶260.

193.   Moreover, just weeks before Defendant Parker's statements in paragraph 192, the Bank's directors and executives received the OCC's March 4, 2019 Quarterly Management Report stating that the Bank's response to the 2018 OCC/CFPB Consent Orders had been "unacceptable" and admonished the Bank for its "missed deadlines" and submission of "poor-quality action plans." *See* ¶89.  In addition, on March 13, 2019, the OCC further informed the Board that the Bank had not "demonstrate[ed] the ability and willingness to remediate known issues and establish an adequate risk management framework under Tim [Sloan]'s leadership" and that the Bank's progress had been "simply insufficient." *See* ¶¶98-100.  Much like the Federal Reserve's most recent rejection letter, the OCC's rejection of the Bank's Stage 1 Plan had also been preceded by a series of rejections.  *See* ¶¶80-84, 87, 89.  On July 24, 2018, the OCC had formally refused to provide Wells Fargo a "no supervisory objection" to the Bank's Stage 1 Plan proposal under the 2018 OCC/CFPB Consent Orders as it "lack[ed] substance and detail." *See* ¶¶80-84.  On the same day, Wells Fargo's Board admitted to the OCC that it knew the Stage 1 Plan proposal that the Bank had submitted did not comply with the 2018 OCC/CFPB Consent Orders but was merely a "work in progress." *See* ¶¶82-83.  Again, on November 21, 2018, the OCC formally rejected Wells Fargo's further Stage 1 Plan proposal as merely "a plan for a plan" and "not adequately supported."

*See* ¶87.  Following each rejection, the CFPB and OCC also communicated during in-person meetings and in writing to the Bank's directors and executives that the revised plans were "wholly incomplete," "inadequate," "poor-quality," and "a plan for a plan."  *See* ¶¶80-84, 87, 89, 105, 116.

194.    In addition, Defendant Parker's statement identified in paragraph 192 was misleading because it omitted material information, including that (i) the Regulators had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72, 80-84, 87, 93-94, 105); (ii) the Regulators had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 Consent Orders' requirements (*see* ¶¶69-72, 75, 80-84, 87, 89, 93-94, 105, 116); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶¶81, 94).

### L.    April 2019 CNBC Appearance

195.    On April 12, 2019, Defendant Shrewsberry appeared on the CNBC television program *First on CNBC*.  During the interview, when asked about the asset cap, Defendant Shrewsberry described the "different streams of work" under the 2018 FRB Consent Order, including "planning the work," "executing the work," and "assessing the maturity of the work." He said that this work "began when the asset cap or the Fed Consent was put in place" and that the Bank was "later in that cycle today."  He added that, "it isn't just doing the same thing over, or doing the same thing harder … it's being further down the maturity curve of the type of work, the nature of the work, that has to be done."

196.    Defendant Shrewsberry's statements identified in paragraph 195 were materially false and misleading.  Contrary to Defendant Shrewsberry's statements, the Bank was not "later in that cycle today" or "further down the maturity curve of the type of work, the nature of the work, that has to be done" under the stages of the 2018 FRB Consent Order, and was in fact still "doing the same thing over."  The Bank was still at the first stage of the cycle of work—submitting a compliant Stage 1 Plan to the Federal Reserve—as it had been since the 2018 FRB Consent Order

was issued on February 2, 2018.  Indeed, just weeks before Defendant Shrewsberry's statement in paragraph 195, on March 11, 2019, the Federal Reserve had formally rejected the Bank's Stage 1 Plan proposal for the second time.  *See* ¶93.  The Federal Reserve found that the plan "remain[ed] materially incomplete."  *See id*.  This finding had been preceded by the Federal Reserve's May 7, 2018 Rejection Letter, when the Federal Reserve had found that the Bank's proposal was "materially incomplete" and "insufficient."  *See* ¶¶69-72.  Following the May 7, 2018 Rejection Letter, the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans.  *See* ¶¶77, 85.  Despite the allowance of additional time, the Federal Reserve found in its March 11, 2019 Rejection Letter that Wells Fargo's revised Stage 1 Plan proposal continued to suffer from basic gaps and again included "illogical timeframes" and "[p]ervasive inaccuracies." *See* ¶93.  The Federal Reserve also specifically instructed the Bank to "develop its next plans," and warned that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions."  *See* ¶94.  As of the end of the Class Period, the Bank had yet to resubmit its Stage 1 Plan for approval to the Federal Reserve.  *See* ¶106.  Indeed, Defendant Duke admitted during her testimony under oath to Congress that vast portions of the Bank's Stage 1 Plans submitted to the Federal Reserve required "resubmission."  *See* ¶260.

197.    In addition, Defendant Shrewsberry's statements identified in paragraph 195 were misleading because they omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72, 93-94); (ii) the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75, 89, 93-94); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶¶81, 94).

M.    **May 2019 Sanford C. Bernstein**
      **Strategic Decisions Conference**

198.    On May 30, 2019, Defendant Parker participated in the 2019 Sanford C. Bernstein Strategic Decisions Conference on behalf of the Bank.  When asked, "what still needs to be done to get the asset cap lifted," Defendant Parker said that, with respect to the corporate governance component of the 2018 FRB Consent Order, "we're largely there" and that, with respect to the operational risk and compliance component of the 2018 FRB Consent Order, "there is a meeting of the minds in terms of what we need to do."

199.    Defendant Parker's statements identified in paragraph 198 were materially false and misleading.  Contrary to Defendant Parker's statements, the Bank was not "largely there" and there was no "meeting of the minds" between the Bank and the Federal Reserve.  In truth, on March 11, 2019, the Federal Reserve had formally rejected the Bank's Stage 1 Plan proposal for the second time, finding that the plan "remain[ed] materially incomplete."  *See* ¶93.  The Federal Reserve's second rejection had been preceded by the Federal Reserve's May 7, 2018 Rejection Letter, when the Federal Reserve had found that the Bank's proposal was "materially incomplete" and "insufficient."  *See* ¶¶69-72.  Despite the Bank requesting (and the Federal Reserve granting) two extensions for resubmitting its Stage 1 Plans, the Federal Reserve found in its March 11, 2019 Rejection Letter that the Bank's revised Stage 1 Plan proposal continued to suffer from basic gaps and again included "illogical timeframes" and "[p]ervasive inaccuracies."  *See* ¶¶77, 85, 93.  The Federal Reserve sent the Bank back to the drawing board, specifically instructed the Bank to "develop its next plans" and warned that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions."  *See* ¶94.  As of the end of the Class Period, the Bank had yet to resubmit its Stage 1 Plan for approval to the Federal Reserve.  *See* ¶106.  Indeed, Defendant Duke admitted during her testimony under oath to Congress that vast portions

of the Bank's Stage 1 Plans submitted to the Federal Reserve, including regarding "board effectiveness" and "compliance and operational risk management," required "resubmission." *See* ¶260.

200.     In addition, Defendant Parker's statements identified in paragraph 198 were misleading because they omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72, 93-94); (ii) the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75, 89, 93-94); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶¶81, 94).

### N.     September 2019 Shareholder Call

201.     On September 27, 2019, the Bank held a conference call with investors and analysts.  Defendants Duke and Scharf spoke on behalf of the Bank.  During the investor conference call, an analyst asked Defendant Duke, "And do you expect that the majority of [Defendant Scharf's] position is, at least initially, regulatorily-driven?  That there's a lot that has to do with regulators?  Or is that piece of it is down the path very significantly and it's just – keep moving on the same path?" Defendant Duke replied, in part, "[W]e're pretty well along in a lot of the work, and we've defined out the work for each individual piece of it, each individual agreement with a regulator."  Defendant Duke added that "we have a good understanding with our regulators on what they are looking for."

202.     Defendant Duke's statements identified in paragraph 201 were materially false and misleading.  Contrary to Defendant Duke's statements, the Bank was not "pretty well along in a lot of work," had not "defined out the work for each individual piece of it, each individual agreement with a regulator," and did not have "a good understanding with our regulators on what they are looking for."  In truth, the Bank was still submitting noncompliant Stage 1 Plan proposals

to its Regulators and had received a series of rejections.  Indeed, on March 11, 2019, the Federal Reserve had formally rejected the Bank's Stage 1 Plan proposal for the second time.  *See* ¶93.  The Federal Reserve found that the plan "remain[ed] materially incomplete."  *See id*.  This finding had been preceded by the Federal Reserve's May 7, 2018 Rejection Letter, when the Federal Reserve had found that the Bank's proposal was "materially incomplete" and "insufficient."  *See* ¶¶69-72.  Following the May 7, 2018 Rejection Letter, the Bank had requested (and been granted) two extensions for resubmitting its Stage 1 Plans.  *See* ¶¶77, 85.  Despite the extensions, the Federal Reserve found in its March 11, 2019 Rejection Letter that Wells Fargo's revised Stage 1 Plan proposal continued to suffer from basic gaps and again included "illogical timeframes" and "[p]ervasive inaccuracies."  *See* ¶93.  The Federal Reserve also sent the Bank back to the drawing board, specifically instructed the Bank to "develop its next plans," and warned that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions."  *See* ¶94.  As of the end of the Class Period, the Bank had yet to resubmit its Stage 1 Plan for approval to the Federal Reserve.  *See* ¶106.  Indeed, Defendant Duke admitted during her testimony under oath to Congress that vast portions of the Bank's Stage 1 Plans submitted to the Federal Reserve required "resubmission."  *See* ¶260.

203.    Moreover, on March 4, 2019, the Bank's directors and executives received the OCC's Quarterly Management Report stating that the Bank's response to the 2018 OCC/CFPB Consent Orders was "unacceptable."  *See* ¶89.  The OCC also admonished the Bank for its "missed deadlines" and submission of "poor-quality action plans."  *See id*.  In addition, on March 13, 2019, the OCC further informed the Board that the Bank had not "demonstrate[ed] the ability and willingness to remediate known issues and establish an adequate risk management framework under Tim [Sloan]'s leadership" and that the Bank's progress had been "simply insufficient."  *See*

¶¶98-100.  Much like the Federal Reserve's most recent rejection letter, the OCC's rejection of the Bank's Stage 1 Plan proposal had also been preceded by a series of rejections.  *See* ¶¶80-84, 87, 89.  On July 24, 2018, the OCC had formally refused to provide Wells Fargo a "no supervisory objection" to the Bank's Stage 1 Plan proposal under the 2018 OCC/CFPB Consent Orders as it "lack[ed] substance and detail."  *See* ¶¶80-84.  On the same day, Wells Fargo's Board admitted to the OCC that it knew the Stage 1 Plan proposal that the Bank had submitted did not comply with the 2018 OCC/CFPB Consent Orders but was merely a "work in progress."  *See* ¶¶82-83.  Again, on November 21, 2018, the OCC formally rejected Wells Fargo's further Stage 1 Plan proposal as merely "a plan for a plan" and "not adequately supported."  *See* ¶87.  Following each rejection, the CFPB and OCC also communicated during in-person meetings and in writing to the Bank's directors and executives that the revised plans were "wholly incomplete," "inadequate," "poor-quality," and "a plan for a plan."  *See* ¶¶80-84, 87, 89, 105, 116.

204.    In addition, Defendant Duke's statements identified in paragraph 201 were misleading because they omitted material information, including that (i) the Regulators had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72, 80-84, 87, 93-94, 105); (ii) the Regulators had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 Consent Orders' requirements (*see* ¶¶69-72, 75, 80-84, 87, 89, 93-94, 105, 116); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶¶81, 94).

### O.    <u>October 2019 Earnings Call</u>

205.    On October 15, 2019, the Bank held its earnings call to announce its third quarter 2019 financial results.  Defendants Parker and Shrewsberry spoke on behalf of the Bank.  During the earnings call, when Defendant Parker was asked for "any update on where you stand on the [2018 FRB Consent Order] and remediating the operational risk and controls" and where the Bank

was "in that process," Defendant Parker stated in part that "we've designed and implemented and we're constantly working to enhance our new risk management framework."

206.    Defendant Parker's statement identified in paragraph 205 was materially false and misleading.   Contrary to Defendant Parker's statement, the Bank had not "designed and implemented" a remediated risk management framework under the 2018 FRB Consent Order.   In truth, the Federal Reserve had never approved the Bank's Stage 1 Plan proposals to be implemented and, accordingly, the Bank could not be "implement[ing]" the plans.  *See* ¶¶69-72, 69-108.  Indeed, on March 11, 2019, the Federal Reserve had formally rejected the Bank's Stage 1 Plan proposal for the second time.  *See* ¶93.  The Federal Reserve found that the plan "remain[ed] materially incomplete."  *See id*.  This finding had been preceded by the Federal Reserve's May 7, 2018 Rejection Letter, when the Federal Reserve had found that the Bank's proposal was "materially incomplete" and "insufficient."  *See* ¶¶69-72.  Despite two extensions for resubmitting the Stage 1 Plan proposal, the Federal Reserve found in its March 11, 2019 Rejection Letter that Wells Fargo's revised Stage 1 Plan proposal continued to suffer from basic gaps and again included "illogical timeframes" and "[p]ervasive inaccuracies."  *See* ¶¶77, 85, 93.  The Federal Reserve also sent the Bank back to the drawing board, specifically instructing the Bank to "develop its next plans," and warned that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions."  *See* ¶94.  As of the end of the Class Period, the Bank had yet to resubmit its Stage 1 Plan to the Federal Reserve for approval to implement.  *See* ¶106.  On the last day of the Class Period, Defendant Duke admitted under oath to Congress that the Bank's Stage 1 Plans, specifically with respect to "compliance and operational risk management," required "resubmission."  *See* ¶260.

207.   In addition, Defendant Parker's statement identified in paragraph 205 was misleading because it omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72, 93-94); (ii) the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75, 89, 93-94); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶¶81, 94).

## P.   December 2019 Goldman Sachs U.S. Financial Services Conference

208.   On December 10, 2019, Defendant Shrewsberry made a presentation on behalf of the Bank at a financial services conference sponsored by Goldman Sachs.  During his presentation, Defendant Shrewsberry told investors that "the work that's underway to prepare for that [*i.e.*, the third-party review under Stage 3 of the 2018 FRB Consent Order] is what's happening."  He further stated that "the beauty of the amount of work that's been done behind the scenes in preparation for that [*i.e.*, the third-party review] is that we'll do everything in our power to make it as easy as possible for people to understand what the program is and how we've implemented it to make it as seamless as possible."

209.   Defendant Shrewsberry's statements identified in paragraph 208 were materially false and misleading.  Contrary to Defendant Shrewsberry's statements, the Bank's Stage 1 Plans had not been "implemented."  As detailed above, under the 2018 FRB Consent Order, a third party was required to review the implementation of the approved Stage 1 Plans.  *See* ¶¶51-52.  This implementation was not "underway" or "happening" for the third party to review because the Bank did not have the Federal Reserve's approval for its Stage 1 Plans.  Indeed, on March 11, 2019, the Federal Reserve had formally rejected the Bank's Stage 1 Plan proposal for the second time.  *See* ¶93.  The Federal Reserve found that the plan "remain[ed] materially incomplete."  *See id*.  This

finding had been preceded by the Federal Reserve's May 7, 2018 Rejection Letter, when the Federal Reserve had found that the Bank's proposal was "materially incomplete" and "insufficient." *See* ¶¶69-72. Despite two extensions for resubmitting the Stage 1 Plan proposal, the Federal Reserve found in its March 11, 2019 Rejection Letter that Wells Fargo's revised Stage 1 Plan proposal continued to suffer from basic gaps and again included "illogical timeframes" and "[p]ervasive inaccuracies." *See* ¶¶77, 85, 93. The Federal Reserve also sent the Bank back to the drawing board, specifically instructed the Bank to "develop its next plans," and warned that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions." *See* ¶94. As of the end of the Class Period, the Bank had yet to resubmit its Stage 1 Plan to the Federal Reserve for approval to implement. *See* ¶106. On the last day of the Class Period, Defendant Duke admitted under oath to Congress that the Bank's Stage 1 Plans submitted under the 2018 FRB Consent Order required "resubmission." *See* ¶260.

210. In addition, Defendant Shrewsberry's statements identified in paragraph 208 were misleading because they omitted material information, including that (i) the Federal Reserve had rejected the Bank's Stage 1 Plan submissions (*see* ¶¶69-72, 93-94); (ii) the Federal Reserve had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements (*see* ¶¶69-72, 75, 89, 93-94); and (iii) the Bank's continued non-compliance would lead to further regulatory enforcement action (*see* ¶¶81, 94).

## VI.   ADDITIONAL ALLEGATIONS OF SCIENTER

211. A host of facts, including and in addition to those discussed above, support a strong inference that Defendants knew, or, at minimum, were severely reckless in not knowing, the true undisclosed facts when they made their false or misleading representations to investors.

212.     ***The Federal Reserve notified Defendants in writing that the Bank failed to satisfy Stage 1 of the 2018 FRB Consent Order and that its non-compliance would lead to further enforcement action.***     On May 7, 2018, the Federal Reserve sent Wells Fargo a rejection letter addressed to Defendants Sloan and Duke, which stated that Wells Fargo's proposed Stage 1 Plan was not compliant because it was "materially incomplete" and failed to address "operational risk" and "compliance risk management."  *See* ¶¶69-72.  Then, on March 11, 2019, the Federal Reserve sent Wells Fargo a second rejection letter addressed to Defendants Sloan and Duke, which stated that Wells Fargo's proposed Stage 1 Plan was not compliant because it "remain[ed] materially incomplete," contained "pervasive inaccuracies" and "illogical timeframes," and fell woefully short of the regulator's express expectations.  *See* ¶¶93-94.  The Federal Reserve also informed Defendants in the March 11, 2019 Rejection Letter that a "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions."  *See* ¶94.  That Defendants were specifically informed that the Bank's proposed Stage 1 Plans were noncompliant with the 2018 FRB Consent Order—contradicting their positive public statements to the market, including that "we've got plans in place, we're executing on those plans" and "we're executing the plan as opposed to designing it"—supports a strong inference of scienter.

213.     ***The OCC and CFPB notified Defendants in writing that the Bank failed to satisfy Stage 1 of the 2018 OCC/CFPB Consent Orders and that its non-compliance would lead to further enforcement action.***     On July 24, 2018, the OCC sent Wells Fargo a letter rejecting the Bank's Stage 1 Plan, stating that the plan was noncompliant because "the bank's submission response lacks substance and detail in a number of areas."  *See* ¶80.  The OCC also warned Wells Fargo in its July 24, 2018 Rejection Letter that the Bank's failure to submit a compliant plan would lead to "future supervisory and/or enforcement actions."  *See* ¶81.  On November 21, 2018, the

OCC sent Defendants Duke and Parker another letter rejecting the Bank's Stage 1 Plan, which stated that "[t]he OCC is unable to provide a no supervisory objection to the portion of the CPI Remediation Plan specific to Wells Fargo Auto Finance (WFAF) because the plan is not adequately supported." *See* ¶87.  The OCC wrote again to Defendant Duke on February 15, 2019 that "[t]he OCC is deeply concerned about the continuing (and in some cases worsening) problems in a number of areas, evidenced by large number of extension requests, missed expected completion dates that are not communicated in a timely manner, failed audit validations, and extensions of Consent Order deadlines." *See* ¶89.  And again, in a March 4, 2019 Quarterly Management Report, the OCC admonished the Bank's "poor-quality action plans" and concluded that the Bank's response had been "unacceptable." *See id*.

214.   The CFPB provided Defendants with matching rejections.  For example, on April 12, 2019, the CFPB wrote to Wells Fargo's Board, echoing the OCC's findings that the Bank was not in compliance with the 2018 OCC/CFPB Consent Orders and correcting the Bank's false assertion that the CFPB had approved the Bank's Stage 1 Plan.  *See* ¶105.  That Defendants were specifically informed by the OCC and CFPB that the Bank's Stage 1 Plans were noncompliant with the 2018 OCC/CFPB Consent Orders—directly contradicting their positive public statements, including that "we are in compliance with those plans" and "we've defined out the work for each individual piece of it, each individual agreement with a regulator"—supports a strong inference of scienter.

215.   ***The Regulators notified Defendants during in-person meetings that they failed to satisfy Stage 1 of the 2018 Consent Orders and were significantly deficient in satisfying the 2018 Consent Orders.***  All three Regulators provided constant and contemporaneous feedback to Wells Fargo and its directors and executives about the Bank's noncompliant Stage 1 Plan submissions

and failure to satisfy the 2018 Consent Orders.  Indeed, Defendant Duke provided written testimony to Congress that Wells Fargo's Board interacted frequently with the Regulators: "Over the past few years, there were times that each of us spoke to regulators every single day."  The Federal Reserve met regularly with Wells Fargo Board members and executives responsible for developing the Stage 1 Plan submissions, including Defendant Sloan, Defendant Duke, and Director Peetz, among others, to discuss how Wells Fargo's Stage 1 Plans were noncompliant. *See, e.g.*, ¶¶117-118.  These meetings included weekly meetings and one-on-one sessions between February 7, 2018 and July 26, 2019, and weekly meetings between April 10, 2018 and October 26, 2018.[79]  The Federal Reserve further informed Wells Fargo that the proposed timelines within the Stage 1 Plans were not realistic or sound during their meetings, including on March 29, 2018, April 3, 2018 (when Defendant Duke was in attendance), and January 24, 2019, and that the Bank's compliance with the 2018 Consent Orders was unacceptable.  *See, e.g.*, ¶89.[80]

216.    OCC staff met with Wells Fargo's Board on July 24, 2018, the same day it sent the formal July 24, 2018 Rejection Letter rejecting Wells Fargo's Stage 1 Plan.  *See* ¶¶82-83.  During that meeting, the Board admitted that they knew the Stage 1 Plans that the Bank submitted were not complete, but rather a "work in progress."  *See id*.  Again, on August 11, 2018, Defendants Duke and Sloan, Director Quigley, and Sarah Dahlgren met with the OCC's Comptroller, Joseph M. Otting, and other senior OCC officials to discuss the Bank's noncompliant Stage 1 Plans.  *See* ¶84.  Once again, on March 13, 2019, the OCC held a meeting with the Board, including Defendant Duke, during which the OCC stressed to Wells Fargo that the Bank was not in compliance with the 2018 OCC/CFPB Consent Orders.  *See* ¶¶98-100.

---

[79] Majority Report at 37.
[80] *See also* Majority Report at 48-52.

217.    That Defendants were repeatedly told by the Regulators during in-person meetings that the Bank's Stage 1 Plans were noncompliant and that they were not satisfying the 2018 Consent Orders' requirements—yet continued thereafter to positively tout their compliance and conceal the truth—further bolsters the scienter inference.

218.    ***Defendants repeatedly requested extensions to the deadlines to submit a Stage 1 Plan that complied with the 2018 Consent Orders.***  On June 5, 2018, Defendant Sloan requested an extension of the deadline to submit Wells Fargo's proposed Stage 1 Plan to the Federal Reserve from July 2, 2018 until September 19, 2018.  *See* ¶77.  Defendant Sloan sent a second extension request on August 24, 2018, requesting an extension of the deadline again until October 31, 2018.  *See* ¶85.  Then, once more, on June 10, 2019, Defendants Duke and Parker wrote to the Federal Reserve that Wells Fargo required an additional extension until April 30, 2020.  *See* ¶106.  Wells Fargo made similar repeated extension requests to the OCC and CFPB.  *See* ¶115.  As an OCC official testified, Wells Fargo "was in the habit of sending emails last minute when they did not meet deadlines" and "frequently filed extension requests at the last minute."  *See id*.  That Defendants knew the Bank's Stage 1 Plan submissions were not compliant and, thus, required additional time to prepare Stage 1 Plans further strengthens the inference of scienter.

219.    ***Defendant Sloan admitted that he made false and misleading public statements about the Bank's purported compliance with the 2018 Consent Orders and apologized to the Federal Reserve for making them.***  Following his March 12, 2019 congressional testimony, Defendant Sloan called the Federal Reserve and apologized for his public mischaracterizations of the Bank's purported compliance with the 2018 FRB Consent Order.  *See* ¶96.  Nevertheless, Defendant Sloan did not apologize to investors or the public; nor did he issue a retraction or a correction of any of his statements.  Defendant Sloan's private admission that he made false and

misleading statements—and his failure to issue any public correction of them—further bolsters the scienter inference.

220.     ***Defendant Sloan was abruptly forced to "resign" within days of providing his false testimony.***   Defendant Sloan was forced to resign on March 28, 2019, just weeks after his congressional testimony and his apology to the Federal Reserve for mischaracterizing the Bank's compliance with the 2018 Consent Orders.  He resigned without any prior notice and without a permanent successor in place, and only after he was told by the OCC that they were dissatisfied with his performance, and that there were "serious reputation and safety and soundness risks to the bank" if he remained at its helm.  *See* ¶¶101-102.  Defendant Sloan's highly unusual and suspiciously timed departure is strong evidence of scienter.

221.     ***Defendant Duke and Director Quigley were abruptly forced to resign within days of the House Reports' findings and ahead of their pre-scheduled congressional testimony.***  Defendant Duke and Director Quigley were forced to resign on March 9, 2020, when Chairwoman Waters called for their resignations after the scathing House Reports identified them as Board members responsible for the Bank's failures to comply with the 2018 Consent Orders.  Their forced resignations came just days ahead of their pre-scheduled testimony before the House Financial Services Committee concerning their role in the Bank's non-compliance with the 2018 Consent Orders and misrepresentations to the public.  *See* ¶¶127-28.

222.     ***The House Financial Services Committee found that Defendants knew their statements about their purported compliance with the 2018 Consent Orders were false or misleading.***  Both the majority and minority members of the House Financial Services Committee concluded, following their extensive investigation, that Defendants provided "incomplete," "inaccurate," and "misleading" statements to the public and to Congress about the Bank's

compliance with the 2018 Consent Orders.   *See* ¶¶122-126.   The House Financial Services Committee further concluded based on its thorough review of the evidence that the Defendants' statements "downplayed the bank's status with the regulators," "were unsupported by the facts on the ground," and had "no basis."   *See* ¶¶123, 126.

223.   ***The Chairwoman of the House Financial Services Committee referred Defendant Sloan to the DOJ for potential criminal charges.***   Upon learning the true facts about the Bank's failure to comply with the Consent Orders, Chairwoman Waters recommended that the DOJ investigate Defendant Sloan's knowingly and willful "inaccurate and misleading testimony" during the March 12, 2019 congressional hearing.   *See* ¶141.

224.   ***Defendant Sloan personally instructed his colleagues to delete a disclosure from the Bank's SEC filings that there was a "substantial amount of work remaining to meet the expectations outlined" in the 2018 Consent Orders, and Defendant Duke agreed***.   On March 3, 2019, Defendant Sloan instructed his colleagues to revise a proxy filing to avoid admitting that "substantial" work remained under the 2018 Consent Orders.   *See* ¶¶90-91.   Defendants Sloan and Duke agreed it was "better to tone down the actual disclosures" in proxy materials to investors, with Defendant Sloan concerned that investors would learn the Bank was "not close to lifting of the asset cap."   *See id*.   Defendants' active concealment of the true facts and personal involvement in "ton[ing] down the actual disclosures" further supports a strong inference of scienter.

225.   ***Wells Fargo's new CEO admitted the accuracy of the House Financial Services Committee's findings.***   On March 10, 2020, Defendant Scharf admitted that the House Reports were "consistent with what I found since I arrived at the Company; [t]hat we have not done what is necessary to be done."   *See* ¶131.   He further admitted that there remained a "great deal" of work to do to meet the 2018 Consent Orders' requirements and that "[Wells Fargo] ha[d] not yet done

what's necessary to address [its] shortcomings." *See* ¶¶131-32.  Defendant Scharf's admissions, adopting the findings of the House Reports, further supports the scienter inference.

226.    ***Defendant Duke admitted that the Board had concerns about the Bank's failure to comply with the 2018 Consent Orders.***  During her March 11, 2020 congressional testimony, Defendant Duke admitted that she was aware that the Bank's Stage 1 Plan proposals had been continually rejected, that the Bank's late submissions to the Regulators and the serial extensions raised concerns and were "red flags," that the Board had concerns contemporaneously that Wells Fargo could not do the work required by the 2018 Consent Orders, and that the Bank's directors were aware that the management team in place was not capable of getting plans "written in a complete fashion." *See* ¶134.  Defendant Duke further admitted in her March 11, 2020 testimony that "the Board was aware of any change in [] the plans for the consent orders themselves." Defendant Duke's admissions provide additional support of a strong inference of scienter.

227.    ***Director Peetz testified that she also expressed concerns about the Bank's failure to comply with the 2018 Consent Orders, which the Bank concealed when she resigned.***  Director Peetz testified to the House Financial Services Committee that the reason she resigned from the Board was because of the work that she was required to perform in the face of the Bank's repeated failures to comply with the 2018 Consent Orders, even after she continually raised concerns to the Board and management.  *See* ¶¶117-119.  Instead of disclosing Director Peetz's concerns, the Defendants falsely and misleadingly attributed her resignation to "her desire to devote more time to other commitments and activities." *See* ¶119.  That the Bank actively concealed Director Peetz's express concerns and the true reasons for her resignation adds further support to the scienter inference.

228.     ***After the House Financial Services Committee's issuance of the House Reports and the congressional hearings in the first weeks of March 2020, Wells Fargo clawed-back Defendant Sloan's compensation.***   On March 16, 2020, just days after the House Reports and Defendant Duke's testimony, Wells Fargo clawed back $15 million in Defendant Sloan's 2018 performance share award, in an exercise of the Board's "discretion to forfeit or cancel all or any unpaid portion of the award based on Mr. Sloan's role and responsibility for the Company's progress in resolving outstanding regulatory matters."  *See* ¶137.

229.     ***Defendants' misstatements and omissions concerned the biggest threats facing the Bank.***   The most important threat facing Wells Fargo during the Class Period was the Bank's failure to comply with the 2018 Consent Orders, which resulted in the continuation of the asset cap and the impending threat of further sanctions.  Defendant Duke acknowledged in a February 19, 2018 internal email that Wells Fargo's "credibility and perhaps even viability as a company is dependent on successfully exiting these consent orders along with the new Fed C[onsent] O[rder] in 2019."  *See* ¶66.  This sentiment was also reflected in Director Craver's May 8, 2018 internal email to Defendant Duke, when he stated, "It would seem that there is little under the very important category of 'clean up the mess' that is bigger than this recent submission to the Fed."  *See* ¶73.  Defendant Sloan also told the House Financial Services Committee that "[f]ully satisfying the requirements set forth in our regulatory consent orders is critically important."  *See* ¶66.  Likewise, Defendant Duke testified to the House Financial Services Committee on March 11, 2020 that the "Board meetings" were "consumed with regulatory issues" and that "there [we]re no agenda items about the business, they [we]re all about the regulatory situation."  And Defendant Shrewsberry admitted to investors on June 13, 2018 that "in terms of the overall strategy of what's

most important and what to do now … satisfying the terms of the consent order that we're operating under, strategically, is at the front of the line."[81]

230.  ***Defendants knew that investors were highly focused on the 2018 FRB Consent Order and asset cap.***  On the first day that the 2018 FRB Consent Order was announced, Wells Fargo issued a press release and held a call with investors and analysts.  *See* ¶52.  Analysts and investors asked Defendants questions about the 2018 FRB Consent Order and the asset cap during numerous investor calls, media appearances, and news interviews.  *See, e.g.*, Section V.  The Bank's directors also acknowledged the importance to investors of the Bank's compliance with the 2018 FRB Consent Order in internal emails.  *See, e.g.*, ¶¶66, 74-75, 91.  For example, in May 2018, after the Federal Reserve rejected Wells Fargo's first Stage 1 Plan submission as "materially incomplete," Wells Fargo' Board member, Director Craver, wrote to Defendant Duke, "I imagined that investors and customers would view this feedback from the Fed as completely unacceptable. I would expect to hear from them something along the lines of, 'is there anything you can get right?'"  *See* ¶¶73-74.

231.  In addition, Defendants made many of their false and misleading statements in the face of third-party news sources that circulated rumors from unnamed sources that the Federal Reserve had rejected the Bank's Stage 1 Plans.  Moreover, Defendants Sloan and Duke actively concealed that "substantial" work remained under the 2018 Consent Orders, agreeing that it was "better to tone down the actual disclosures" in proxy materials to investors.  *See* ¶¶90-91.

232.  ***Defendants made many of the false and misleading statements at issue in this case in direct response to probing questions from analysts and investors.***  For example, during the December 4, 2018 Goldman Sachs U.S. Financial Services Conference, Defendant Sloan was

---

[81] June 13, 2018 Morgan Stanley Financials Conference.

asked specifically by analysts to "update us on the progress in terms of getting [the asset cap] lifted?"  In response to these and similarly pointed questions about the Bank's compliance with and progress under the 2018 FRB Consent Order, Defendant Sloan falsely and misleadingly assured investors that "we're executing the plan as opposed to designing it," and added that "[t]here's really nothing new to report in terms of the timing or the dialogue with the regulators, whether it's related to the consent order or any other area."

233.    Defendants were also specifically questioned for timing updates on the Bank's process of complying with the 2018 FRB Consent Order.  For example, during the May 30, 2018 Deutsche Bank Global Financial Services Conference, Defendant Shrewsberry was asked to "frame where you are on some of these issues and where the heavy lifting is still to come."  In response, Defendant Shrewsberry stated that there was not "anything meaningful that we aren't already talking about" and that "our investors know everything that's material that we know."

234.    ***Defendants were personally responsible for ensuring the Bank complied with the 2018 Consent Orders.***  As Board members, Defendants Sloan, Parker, Duke, and Scharf were required to provide "written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of" the 2018 FRB Consent Order (*see* ¶54), and also "review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order before submission to the Bureau" (*see* ¶65).  The Federal Reserve explicitly informed the Directors that they were to "ensure that senior management establishes and maintains an effective risk management structure which has sufficient stature, authority, and resources."  *See* ¶53.  Likewise, the CFPB told the Directors that the Board had "the ultimate responsibility" for the Bank's compliance with the 2018 OCC/CFPB Consent Orders.  *See* ¶65.  The House Financial Services Committee also held the Bank's Board responsible, finding that "Wells Fargo's Board

allowed management to repeatedly submit materially deficient plans in response to the consent orders."[82]

235.    Defendant Duke was the Chairwoman of the Bank's Board, and in this role, was a point of contact for the Bank's Regulators.  *See* ¶26.  In addition, she also sat on the Board's Risk Committee, which was responsible for overseeing the Bank's enterprise-wide risk management framework and overseeing risk across the entire Bank.  *See id*.  Defendant Duke also admitted during her testimony on March 11, 2020 that she and the Board had significant responsibilities under the 2018 Consent Orders.  She admitted to Congress that "[t]he Board's responsibility under the consent orders was to review and make sure that the submissions were submitted, and to review quarterly progress reports for submission to the regulators for the OCC and for the Fed.  For the CFPB, the frequency was a little bit different, but it was the same responsibility."  When asked what the Board did to "remedy the deficient submissions," Defendant Duke admitted that the Board "reviewed the submissions," "discussed with the regulators what the deficiencies were," and then "reviewed those resubmissions."  She further admitted her knowledge of the Federal Reserve's rejection letters, which included discussing vast sections that required "resubmission."

236.    Defendant Duke also admitted in written testimony to Congress that, "[i]n recognition of the unusual circumstances facing Wells Fargo," the "direct Board communication with regulators was more frequent, frank and continuous" and that during the Class Period, "there were times that each of us spoke to regulators every single day."  She contrasted this to "normal circumstances," when "the Board's direct contact with the Bank's regulators is limited to a single annual meeting between the regulators and the full Board, and periodic meetings between select directors and the senior examiner."  Director Quigley echoed this admission during his March 11,

---

[82] Majority Report at 36-40.

2020 testimony before Congress, stating that his role included "daily communications with our regulators." He likewise said his interaction with the Regulators had been drastically different before the 2018 Consent Orders, testifying that "a quarterly kind of touch would have been much more to what might have been expected" and that after the 2018 Consent Orders, "that interaction with the regulators then simply became much more frequent and of much greater substance." Indeed, Defendant Sloan, in his written testimony to Congress on March 12, 2019, admitted that "[m]embers of our Board of Directors and senior executives are meeting regularly with the Federal Reserve, the OCC …. [and] the CFPB … to address their concerns and seek their input." As a result, these Defendants knew—or were severely reckless in not knowing—that the Bank's Regulators repeatedly rejected its proposed Stage 1 Plans.

## VII. <u>LOSS CAUSATION</u>

237. Defendants' misstatements and omissions concerning the Bank's satisfaction of the 2018 Consent Orders' requirements artificially inflated the price of Wells Fargo stock. The artificial inflation in Wells Fargo's stock price was removed when the conditions and risks misstated and omitted by Defendants and/or the materialization of the risks concealed by Defendants' material misstatements and omissions were revealed to the market. These disclosures and/or materializations divulged or revealed information through a series of partial disclosing events, which slowly corrected Defendants' prior misrepresentations and omissions and/or revealed facts about the nature and extent of Wells Fargo's deficiency in meeting the 2018 Consent Orders' requirements. The disclosures and/or materializations of the risk, more particularly described below, reduced the amount of artificial inflation in the price of Wells Fargo's publicly traded stock, causing economic injury to Lead Plaintiffs and other members of the Class.

238.     On January 15, 2019, during an earnings call with investors and analysts to discuss Wells Fargo's fourth quarter 2018 results, Defendant Sloan stunned the market by announcing the asset cap imposed by the Federal Reserve under their 2018 FRB Consent Order was likely to remain "through the end of 2019"—more than a year longer than originally represented.  This meant that Wells Fargo would operate under the asset cap for nearly two entire years.

239.     Following this revelation, the price of Wells Fargo common stock tumbled from $48.42 on January 14, 2019 to $47.67 on January 15, 2019, representing over a 2.4% drop from the market and banking index returns which jumped on January 15, 2019, erasing over $3.4 billion in market capitalization.  *Bloomberg* immediately tied Defendant Sloan's comments to the stock slide in an article titled, "Wells Fargo Now Plans to Operate Under Growth Ban Through 2019," which reported that "[t]he bank's shares extended their decline after Sloan's comments [that Wells Fargo was 'now planning to operate under the asset cap through the end of 2019'] and were down 2.7 percent at 10:53 a.m. in New York."

240.     The market was surprised and dismayed by Defendants' announcement.  For example, an Oppenheimer analyst stated in a January 15, 2019 report that the change of the timeline for Wells Fargo's compliance with the 2018 FRB Consent Order is "unsettling."  The same Oppenheimer analysts also noted that the "main event" of the quarter "was CEO Sloan's statement that the company would likely operate under the Fed's asset cap throughout the year." Likewise, Morgan Stanley issued an analyst report the next day titled, "4Q18 Earnings Day 2: JPM & WFC," reporting, "Asset cap delay is a negative."

241.     Defendants, however, did not admit the reasons why the Bank was now unable to satisfy the 2018 Consent Orders' requirements by the first half of 2019, including that the Regulators had rejected the Bank's Stage 1 Plan submissions.  Indeed, the Bank continued to push

back against third-party, unsubstantiated rumors regarding Wells Fargo's satisfaction of the 2018 FRB Consent Order's requirements, concealing that the Federal Reserve had rejected Wells Fargo's first Stage 1 Plan submission and had sternly reprimanded the Bank for its failure to comply with the 2018 FRB Consent Order's requirements.  Indeed, Defendant Sloan buttressed his prior misrepresentations by impressing upon investors that Wells Fargo and the Federal Reserve were *"in complete agreement"* about the requirements and that Wells Fargo was *"in the midst of implementing"* those requirements.  He further asserted that Wells Fargo was *"continuing to actively work and implement the new risk management framework."*  These misrepresentations and omissions prevented the Bank's stock from falling further.

242.    Defendants also continued to issue positive misstatements to conceal from investors the true timing and state of Wells Fargo's compliance with the 2018 FRB Consent Order.  For example, during an interview with *Bloomberg*'s Scarlet Fu, Joe Weisenthal and Caroline Hyde on "Bloomberg Markets: What'd You Miss?" on January 15, 2019, Defendant Shrewsberry fielded a question about the extension of timing for lifting the asset cap, assuring investors that "it reflects a very large, complex body of work" and that *"there's nothing more to read into that other than it's a big body of work and it takes time to execute on."*

243.    Likewise, during Defendant Sloan's March 12, 2019 testimony before the House Financial Services Committee during its first megabank oversight hearing, in response to Chairwoman Waters's direct question about whether Wells Fargo was "in compliance, based on reviews that are done by the OCC and the [CFPB]," Defendant Sloan testified, *"We are in compliance with those plans."*  Moreover, in response to a question from Congresswoman Nydia Velázquez regarding the status of the Bank's compliance with the 2018 FRB Consent Order, Defendant Sloan indicated that Wells Fargo had completed the governance reforms required by

the Federal Reserve, stating, "as part of the consent order with the Fed, they want us to improve the Board governance and oversight, **which we have done."**

244.    On April 12, 2019, Defendants shocked investors and the market again when Wells Fargo's new CEO, Defendant Parker, announced that the Bank would no longer meet the 2018 FRB Consent Order's requirements and have the asset cap lifted by the end of 2019.  In addition, Defendant Parker refused to provide any further guidance on the timing of the Bank's satisfying the 2018 FRB Consent Order's requirements and having the asset cap lifted.  Defendant Parker announced in a Wells Fargo press release filed with the SEC on Form 8-K that day and also during an earnings call with investors and analysts to discuss Wells Fargo's first quarter 2019 financial results that "we do not feel it's appropriate to provide guidance as to the timing of the lifting of the asset cap."  With respect to the 2018 Consent Orders, Defendant Parker further disclosed that the Bank had "a substantial amount of work yet to do, to satisfy the expectations of our regulators."

245.    In response to this news, Wells Fargo's stock price fell 2.62% from a closing price of $47.74 per share on April 11, 2019 to a closing price of $46.49 per share on April 12, 2019, erasing over $5.6 billion in market capitalization, on trading volume of more than 70.2 million shares, up over 108% from the prior trading day.  Meanwhile, stocks in the banking index jumped 2.40% on April 12, 2019, making Wells Fargo's drop even more pronounced, as its share price plummet reflected a 5% spread from the banking index returns.

246.    The decline in Wells Fargo's share price following Defendant Parker's revelations occurred despite the Bank's stock price having risen in early morning hours after Wells Fargo reported its best first quarter in five years financially, beating both earnings per share and revenue expectations.  By end of the day on April 12, however, investors had ingested the startling news revealed on the 2:00pm GMT earnings call, and the stock price tumbled as much as 3.5%.  As

*Bloomberg Intelligence* explained the same day, "Wells Fargo's solid 1Q return on tangible equity of 15% took a back seat to disappointing outlooks on its asset-cap exit and net interest income (NII) growth."

247.     Analysts and financial commentators once again responded swiftly to the Bank's revelations about the status of their lack of compliance with the 2018 Consent Orders.  For example, *Bloomberg* announced that "analyst downgrades pile on" and "Wells Fargo Clouds Intensif[ied]," as "a lack of timing over when the Federal Reserve might lift asset-cap restrictions" "add[ed] more uncertainty."[83]  Deutsche Bank analysts also issued an earnings summary note on April 12, 2019, noting "[n]o visibility on lifting of asset cap" and stating that "there was no time frame to when the asset cap would be lifted (vs. previously assuming it would remain in place through year end)," which "remains a distraction" and "suggest[s] the asset cap could again linger for longer than expected."  Sandler O'Neill + Partners also slashed Wells Fargo's price target on the same day, pointing to "regulatory issues" as one of the "moving parts in this fluid story," including that "we did not necessarily find any real clarity in the call regarding exactly what is generating such unique and negative responses from WFC's regulators."  And, on April 15, 2019, Piper Jaffray analysts told investors to "remain on the sidelines" and that with the extended time period for the asset cap, "we don't see a reason to own WFC."

248.     Defendants rebuked this analyst concern by falsely and misleadingly reassuring investors that Wells Fargo was already in the implementation stage of the 2018 Consent Orders' requirements.  For example, Defendant Parker again impressed upon investors during the April 12, 2019 earnings call that the remaining work under the 2018 FRB Consent Order merely

---

[83] Felice Maranz, "Wells Fargo Shares Keep Sliding as Analysts See 'Dead Money,'" *Bloomberg* (Apr. 15, 2019); Alison Williams and Neil Sipes, "Wells Fargo Clouds Intensify, CEO Still Key: Earnings Outlook," *Bloomberg Intelligence* (Apr. 12, 2019).

consisted of **"completing and implementing efforts that are substantially underway."**  In addition, in direct response to analysts' questions on the same call about the asset cap and recent comments from the Federal Reserve Chair, Defendant Parker allayed investor concerns, highlighting that he and the Bank "underst[ood] exactly what [the Regulators'] expectations [were]," and that the Bank had made progress under the 2018 Consent Orders that was **"way down the road and is really pointed toward completion and implementation."**

249.    After the April 12, 2019 disclosures, Defendants continued to make positive statements concerning Wells Fargo's satisfaction of the 2018 Consent Orders' requirements and downplayed Wells Fargo's materially deficient compliance.  For example, during Wells Fargo's September 27, 2019 corporate call to announce that the Bank had named Defendant Scharf as the new CEO and President, a Morgan Stanley analyst asked Defendant Duke about Defendant Scharf's role with Regulators and whether Wells Fargo was "down the path very significantly" and therefore going to "keep moving on the same path."  Defendant Duke assured investors and analysts that **"we're pretty well along in a lot of the work, and we've defined out the work for each individual piece of it, each individual agreement with a regulator."**  She again reiterated that "we have a good understanding with our regulators on what they are looking for" and that Defendant Scharf would "accelerate that work."

250.    The market believed that Wells Fargo was in the implementation stage of the 2018 Consent Orders, which would quickly be accelerated with its new CEO at the helm.  For example, on September 30, 2019, Morgan Stanley called Defendant Scharf's appointment a "Fresh Start" and assured investors that "[w]ith a new CEO in place and work on the consent order well underway, we now expect WFC could be able to exit the consent order with the Federal Reserve sometime around 4Q20, roughly three years after getting put in place."

251.    On January 14, 2020, however, during Wells Fargo's earnings call to announce the Bank's fourth quarter 2019 financial results, Defendant Scharf was forced to reveal that the Bank was still at the **"first step"** with respect to recognizing the importance and severity of addressing the significant changes still ahead to meet the 2018 Consent Orders' requirements and still had a **"great deal"** of work to do to comply with the 2018 Consent Orders.  He candidly admitted, **"we made some terrible mistakes and have not effectively addressed our shortcomings."**  He further announced that the Bank's failure to address these shortcomings had "led to financial underperformance" and that "a series of legacy issues meaningfully impacted our results in the quarter."

252.    During the January 14, 2020 investor conference, Defendant Scharf also disclosed that "[w]e still have much more work to do to put these issues behind us, and our future depends on us doing this successfully so we can regain trust with all stakeholders, including our clients, regulators, lawmakers as well as the broader American population."  He further admitted that he had **"given a clear message inside the company that we have not yet met our own expectations or the expectations of others [i.e., Regulators.]"**  When pressed by analysts for how to measure the Bank's progress, Defendant Scharf said, **"I just want to be clear.  I'm not suggesting here that any of these public issues will be closed this year."**

253.    In addition, Defendant Scharf admitted that "an opportunity cost" of the Bank's prolonged failure to meet the Federal Reserve's expectations and lift the asset cap was low "rate of customer and revenue growth."  As a result, Defendant Shrewsberry announced net interest income, Wells Fargo's biggest source of revenue, had fallen 11.4% to $11.2 billion in the quarter, and that "we continue to expect net interest income to decline in the low to mid-single digits in 2020."

254.    Following these revelations, the price of Wells Fargo common stock tumbled an additional 5.4%, falling from a closing price of $52.11 per share on January 13, 2020 to a closing price of $49.30 per share on January 14, 2020, erasing over $12.9 billion in market capitalization, on trading volume of more than 56.6 million shares, up over 124% from the prior trading day.

255.    The market drop reflected the market's shock at the Bank's sobering news that the Bank was far from meeting the 2018 Consent Orders' requirements.  For example, Wolfe Research issued an analyst report on the day of the earnings call reflecting this sentiment, stating that "until he [Scharf] is ready to help frame the timeline … we expect shares will remain in purgatory. Maintain Peer Underperform."   BMO Capital Markets likewise reported on the same day: "Sobering Outlook … Management could not have been clearer: the road to recovery will be longer than most investors had hoped" before lowering its price target and warning investors from buying the stock "at least until we have greater clarity with respect to the timing of ... lifting of the Fed's asset cap, along with revised (or confirmed) guidance from the new CEO."  The next day, Piper Sandler downgraded the stock and lowered its earnings per share estimates, noting, that the asset cap "remains a significant talking point among investors, resolving it is of course costly, and the CEO acknowledged on the call that WFC still has much work to do to satisfy regulatory expectations on numerous open issues.  As such, a lifting of the cap does not strike us as a near-term event."

256.    Once more, however, Defendants prevented Wells Fargo's stock price from declining further.  Among other things, Defendant Scharf reassured investors that for the 2018 Consent Orders to which Wells Fargo was subject, "what's required of us is clear" and "there's a clear road map for what we need to achieve."  In addition, Wells Fargo continued to omit from its disclosures, among other things, that the Regulators had rejected the Bank's Stage 1 Plan

proposals, issued stern rebukes to the Bank for its failure to comply with the 2018 Consent Orders, and had threatened further regulatory enforcement action.

257. Analysts once again accepted the Bank's assurances. For example, Barclays echoed Defendant Scharf's assurances in a January 14, 2020 analyst report, stating, "WFC believes what's required of it to resolve these actions is clear, and is actively working to get this work done. It believes this is work that other banks have done already, so it sees a clear road map for what it needs to achieve."

258. Over the course of seven business days, concluding on March 12, 2020, Congress issued reports in connection with and held pre-scheduled hearings relating to Wells Fargo's satisfaction of the 2018 Consent Orders' requirements. First, on March 4 and 5, 2020, the House Financial Services Committee issued scathing reports that added detail regarding how much more work Wells Fargo had left in the regulatory process, the Bank's chronic failure to submit compliant Stage 1 Plans to its Regulators, and the Regulators' repeated warnings of future enforcement actions because of the Bank's non-compliance. Then, on March 5, 2020, Chairwoman Waters called for the resignations of Defendant Duke and Director Quigley for their failures in response to the 2018 Consent Orders, both of whom stepped down on the eve of their pre-scheduled testimony. On this news, Wells Fargo's stock price dropped 6% from a price of $41.40 on March 4, 2020 to a price of $38.90 on March 5, 2020.

259. On March 10, 2020, Chairwoman Waters also published a letter requesting that the DOJ investigate Defendant Sloan for knowingly providing false and misleading statements during his public testimony on March 12, 2019, when he said the Bank was in compliance with the 2018 Consent Orders.

260.    On March 10 and March 11, 2020, Defendant Scharf, Defendant Duke, and Director Quigley testified before Congress in public sessions closely watched by investors and analysts.  During those sessions, Defendant Duke revealed for the first time that the extensions and missed deadlines for the Stage 1 Plan submissions had raised "concerns for the Board," of which Defendants Duke and Sloan were members, and were a "red flag."  Defendant Duke also revealed that the Wells Fargo Board was also aware that the management team in place at the time was not capable of getting plans "written in a complete fashion."   In addition, she admitted that vast portions of the Stage 1 Plan proposal for the 2018 FRB Consent Order were "currently under resubmission."  And when pressed by Congressman Warren Davidson, Defendant Duke testified how she agreed that—despite the years of regulatory fines and forced oversight changes, DOJ and SEC investigation and fines, and litigation—some of the criminal actions taken by employees at Wells Fargo should be prosecuted by federal officials.

261.    Analysts took note that the hearings were evidence that the Bank's regulatory woes were far from what Defendants had represented.  For example, on March 11, 2020, a J.P. Morgan analyst issued a report explaining that "[o]ne of Wells Fargo's challenges is that it is still trying to submit plans for how it will resolve some of the consent orders.  Once the plans are approved by Regulators, Wells must execute the plans, and have a third party confirm that Wells executed them appropriately."  Keeping Wells Fargo's stock rated "underweight," J.P. Morgan noted that the House Financial Services Committee's comments during the hearing "should keep regulators looking very closely at the next steps, which puts more pressure on Wells' CEO and Board to make sure they are fully buttoned up, in addition to delivering on time."  And J.P. Morgan also reported that "[t]he hearings with the Board chairs were extremely harsh from both sides of the aisle" and

that "expectations are extremely high for the new CEO and incoming Board chairs, along with the rest of the Board, given the reports produced by both sides of the House."

262.   On March 11, 2020, following the conclusion of Defendant Duke and Director Quigley's testimony and the conclusion of all of the hearings on Wells Fargo to discuss the Bank's failures, the Bank's shares fell an additional 7.8%, from $35.08 per share at the close of trading on March 10, 2020 to $32.33 at the close of trading on March 11, 2020, eliminating over $11.3 billion in market capitalization.   On the following day, March 12, the House Financial Services Committee determined there would be no additional Wells Fargo hearings.   As the market continued to digest the prior revelations, the Bank's shares fell an additional 15.9%, from $32.33 at the close of trading on March 11, 2020 to $27.20 at the close of trading on March 12, 2020, erasing almost $21.0 billion in market capitalization.

263.   It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Wells Fargo securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Wells Fargo's securities to decline.   The decline in Wells Fargo's stock price was a direct and proximate result of the truth being revealed to investors and to the market.

## VIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR

264.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.   The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.   Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the

statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

265. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Wells Fargo who knew that the statement was materially false or misleading when made.

266. The risk disclosures included in Wells Fargo's public filings were also inadequate and did not inform investors of the true facts and actual risks already occurring. Indeed, they continued to obfuscate the truth. Among other things, the Bank's disclosures did not disclose that Wells Fargo's Regulators rejected the Bank's proposed Stage 1 Plans; that the Regulators found that the Bank did not comply with the 2018 Consent Orders; that the Regulators had repeatedly rebuked and reprimanded the Bank for its failure to comply with the 2018 Consent Order's requirements; that these failures caused and would reasonably likely continue to cause skyrocketing costs as the Bank continued to dedicate resources to revising its Stage 1 Plan proposals; that the continued implication of the asset cap and the costs associated with compliance were having and would continue to have a material negative effect on the Bank's financial condition, including continued harm to the Bank's reputation; and that the Bank's continued non-compliance with the 2018 Consent Orders would subject the Bank and Defendants to further regulatory enforcement action and legal ramifications.

## IX.   PRESUMPTION OF RELIANCE

267.   Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omission of material fact that there was a duty to disclose.

268.   Lead Plaintiffs are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

> a.   Wells Fargo's common stock was actively traded in an efficient market on the NYSE;
>
> b.   Wells Fargo's common stock traded at high weekly volumes;
>
> c.   As a regulated issuer, Wells Fargo filed periodic public reports with the SEC;
>
> d.   Wells Fargo was eligible to file registration statements with the SEC on Form S-3;
>
> e.   Wells Fargo regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;
>
> f.   The market reacted promptly to public information disseminated by Wells Fargo;
>
> g.   Wells Fargo securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace;
>
> h.   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Wells Fargo securities; and
>
> i.   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or acquired Wells Fargo common stock between the time Defendants misrepresented or omitted material facts and the time the true facts were disclosed.

269.     Accordingly, Lead Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Wells Fargo's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## X.     CLASS ACTION ALLEGATIONS

270.     Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired securities issued by Wells Fargo during the period from February 2, 2018 to March 12, 2020, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants; Wells Fargo's affiliates and subsidiaries; the officers and directors of Wells Fargo and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

271.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Wells Fargo common shares were actively traded on the New York Stock Exchange.  As of August 4, 2020, Wells Fargo had approximately 4.1 billion shares of common stock issued and outstanding.  Although the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class.  Members of the Class can be identified from records maintained by Wells Fargo or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

272.     Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

273.     Common questions of law and fact exist to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of fact and law common to the Class are:

    a.     whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

    b.     whether the Insider Defendants are personally liable for the alleged misrepresentations and omissions described herein;

    c.     whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

    d.     whether the members of the Class have sustained damages, and the proper measure of damages.

274.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Lead Plaintiffs have no interest that conflicts with the interests of the Class.

275.     A class action is superior to all other available methods for the fair and efficient adjudication of this action.  Joinder of all Class members is impracticable.  Additionally, the damages suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.     CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and
### SEC Rule 10b-5 Promulgated Thereunder
### (Against Wells Fargo, Sloan, Parker, Duke, Shrewsberry)

276.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

277.     This Count is asserted on behalf of all members of the Class against Defendants Wells Fargo, Sloan, Parker, Duke, and Shrewsberry for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

278.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

279.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Wells Fargo common stock at artificially inflated prices.

280.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Bank's common stock in an effort to maintain artificially high market prices for Wells Fargo common stock.

281.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which

they were made, not misleading; made the above statements intentionally or with deliberate recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Wells Fargo common stock, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Wells Fargo's satisfaction of the 2018 Consent Orders' requirements; (ii) artificially inflate and maintain the market price of Wells Fargo common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase Wells Fargo common stock at artificially inflated prices and suffer losses when the true facts became known.

282.    Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

283.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Wells Fargo stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

284.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Wells Fargo's common stock, which inflation was removed from its price when the true facts became known.

285.    Defendants' wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired Wells Fargo's securities or would not have purchased or otherwise acquired these securities at the

artificially inflated prices that they paid.  It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Wells Fargo's securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Wells Fargo's securities to decline.

286.    Accordingly, as a result of their purchases of Wells Fargo common stock during the Class Period, Lead Plaintiffs and the Class suffered economic loss and damages under the federal securities laws.

287.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

288.    This claim is brought within the applicable statute of limitations.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**(Against Insider Defendants)**

289.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

290.    This count is asserted on behalf of all members of the Class against the Insider Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

291.    As alleged herein, the Insider Defendants (including Sloan, Parker, Duke, and Shrewsberry) caused Wells Fargo to violate Section 10(b) and Rule 10b-5 promulgated thereunder by making material misstatements and omissions in connection with the purchase and sale of securities throughout the Class Period.  This conduct was undertaken with the scienter of the Insider Defendants who knew of or recklessly disregarded the falsity of the Bank's statements during the Class Period.

292.    During their tenures as officers and/or directors of Wells Fargo, the Insider Defendants were controlling persons of Wells Fargo within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and directors of Wells Fargo, the Insider Defendants had the power and authority to cause Wells Fargo to engage in the wrongful conduct complained of herein.  The Insider Defendants were able to, and did, control, directly and indirectly, the decision-making of Wells Fargo, including the content and dissemination of Wells Fargo's public statements described in this Complaint, and they caused the dissemination of the materially false or misleading statements and omissions as alleged in this Complaint.  As such, the Insider Defendants had the opportunity to prevent the issuance of the false and misleading statements and omissions or cause them to be corrected.

293.    As officers and/or directors of a publicly owned company, the Insider Defendants had a duty to disseminate accurate and truthful information with respect to Wells Fargo's actual satisfaction of and compliance with the 2018 Consent Orders, and to correct promptly any public statements issued by Wells Fargo which had become materially false or misleading.

294.    In their capacities as senior corporate officers and directors of Wells Fargo, and as more fully described above, the Insider Defendants participated in the misstatements and omissions alleged above.  Indeed, each of the Insider Defendants had direct and supervisory involvement in the day-to-day operations of the Bank, exercised control over the general operations of the Bank, and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.  The Insider Defendants also had access to non-public information regarding Wells Fargo's satisfaction of and compliance with the 2018 Consent Orders.  Thus, each Insider Defendant knew

or should have known that Wells Fargo and its employees were engaged in the fraudulent conduct alleged.

295.    The Insider Defendants had the ability to influence and direct and did influence and direct the activities of Wells Fargo and its employees in their violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

296.    The Insider Defendants were also culpable participants in the preparation and dissemination of the Bank's communications and controlled the Bank's business strategy and activities.  By reason of their control of Wells Fargo, the Insider Defendants were able to, and did, control the contents of the Bank's disclosures during the Class Period, which contained materially untrue and misleading information and omitted material facts.

297.    In addition, as alleged above, as Wells Fargo's Chief Executive Officer and a member of the Board and Operating Committee, Defendant Sloan issued the false and misleading statements and omissions alleged herein with scienter and therefore caused Wells Fargo to violate Section 10(b) and Rule 10b-5 promulgated thereunder.  Defendant Sloan had the power and authority to cause Wells Fargo and its employees to engage in the wrongful conduct alleged herein, including reviewing and revising statements disseminated to the public.  Defendant Sloan was involved in the day-to-day operations of the Bank, interacted with Regulators in negotiating and responding to the 2018 Consent Orders, and had primary responsibility for ensuring the Bank's compliance with the 2018 Consent Orders.  Defendant Sloan also had access to adverse nonpublic information about the Bank, including the rejections from the Regulators, and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

298.    In addition, as alleged above, as CFO and member of the Operating Committee, Defendant Shrewsberry issued the false and misleading statements and omissions alleged herein

with scienter and therefore caused Wells Fargo to violate Section 10(b) and Rule 10b-5 promulgated thereunder. Defendant Shrewsberry had the power and authority to cause Wells Fargo and its employees to engage in the wrongful conduct alleged herein. Defendant Shrewsberry was involved in the day-to-day operations of the Bank, interacted with Regulators in negotiating and responding to the 2018 Consent Orders, and had primary responsibility for ensuring the Bank's compliance with the 2018 Consent Orders. Defendant Shrewsberry also had access to adverse nonpublic information about the Bank, including the rejections from the Regulators, and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

299. In addition, as alleged above, during his tenure as interim-Chief Executive Officer and a member of the Board and Operating Committee, Defendant Parker issued the false and misleading statements and omissions alleged herein with scienter and therefore caused Wells Fargo to violate Section 10(b) and Rule 10b-5 promulgated thereunder. Defendant Parker had the power and authority to cause Wells Fargo and its employees to engage in the wrongful conduct alleged herein. Before and during his tenure as interim-Chief Executive Officer, Defendant Parker was involved in the day-to-day operations of the Bank, interacted with Regulators in negotiating and responding to the 2018 Consent Orders, had primary responsibility for ensuring the Bank's compliance with the 2018 Consent Orders and had access to adverse nonpublic information about the Bank including the rejections from the Regulators, and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

300. In addition, as alleged above, as Chairwoman of the Board and member of the Risk Committee, Defendant Duke issued the false and misleading statements and omissions alleged herein with scienter and therefore caused Wells Fargo to violate Section 10(b) and Rule 10b-5

promulgated thereunder.  Defendant Duke had the power and authority to cause Wells Fargo and its employees to engage in the wrongful conduct alleged herein, including reviewing and revising statements disseminated to the public.  Defendant Duke interacted with Regulators in negotiating and responding to the 2018 Consent Orders and had primary responsibility for ensuring the Bank's compliance with the 2018 Consent Orders.  Indeed, she was a primary point of contact for the Regulators and sat on the Risk Committee, where she was responsible for assisting the Board in overseeing the Bank's enterprise-wide risk management framework, overseeing risk across the entire Bank, and reviewing the Stage 1 Plan submissions.  Defendant Duke also had access to adverse nonpublic information about the Bank, including the rejections from the Regulators, and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

301.    In addition, as alleged above, Defendant Scharf was hired as Wells Fargo's Chief Executive Officer and made a member of the Board and Operating Committee for the specific purpose of bringing the Bank within compliance of the 2018 Consent Orders.  During his tenure, Wells Fargo and its employees issued certain of the false and misleading statements and omissions alleged herein with scienter and therefore caused Wells Fargo to violate Section 10(b) and Rule 10b-5 promulgated thereunder.  Defendant Scharf had the power and authority to cause Wells Fargo and its employees to engage in the wrongful conduct alleged herein during his tenure with the Bank.  Defendant Scharf was involved in the day-to-day operations of the Bank, interacted with the Bank's Regulators, and had primary responsibility for ensuring the Bank's compliance with the 2018 Consent Orders.  Defendant Scharf also had access to adverse nonpublic information about the Bank, including the rejections from the Regulators, and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

302.    The Insider Defendants, therefore, individually and as a group, were "controlling persons" of Wells Fargo within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Wells Fargo securities.

303.    The Insider Defendants acted as controlling persons of Wells Fargo within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Bank's operations and specifically its submissions and responses to the Regulators under the 2018 Consent Orders, direct involvement in the day-to-day operations of the Bank, and/or intimate knowledge of the Bank's actual compliance with the 2018 Consent Orders, and their power to control public statements about Wells Fargo, the Insider Defendants had the power and ability to control the actions of Wells Fargo and its employees.

304.    Wells Fargo and the Insider Defendants violated Section 10(b) and Rule 10b-5 of the Exchange Act by their acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Wells Fargo's common stock during the Class Period.

305.    By reason of their control of Wells Fargo, the Insider Defendants are liable pursuant to Section 20(a) of the Exchange Act for Wells Fargo's violations of Section 10(b), and Rule 10b-5, to the same extent as Wells Fargo.

306.    This claim is brought within the applicable statute of limitations.

## XII.  **PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiffs pray for judgment against Defendants as follows:

A.      Declaring that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

E.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIII. <u>JURY DEMAND</u>

Lead Plaintiffs demand a trial by jury.

Dated: November 9, 2020                          Respectfully submitted,

| | |
|---|---|
| /s/    *Steven J. Toll* | /s/    *John C. Browne* |

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Steven J. Toll (admitted *pro hac vice*)
S. Douglas Bunch (SB-3028)
Molly J. Bowen (admitted *pro hac vice*)
1100 New York Avenue, N.W., Suite 500
Washington, DC  20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com
mbowen@cohenmilstein.com

Laura H. Posner (LP-8612)
88 Pine Street, Fourteenth Floor
New York, NY  10005
Telephone: (212) 220-2925
Facsimile: (212) 838-7745
lposner@cohenmilstein.com

*Counsel for Lead Plaintiffs Mississippi and Rhode Island, and Proposed co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

John C. Browne (JB-0391)
Jeroen van Kwawegen (JV-1010)
Benjamin W. Horowitz (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York  10020
Tel: (212) 554-1400
Fax: (212) 554-1444
johnb@blbglaw.com
jeroen@blbglaw.com
will.horowitz@blbglaw.com

Jonathan D. Uslaner (JU-1942)
Lauren M. Cruz (admitted *pro hac vice*)
2121 Avenue of the Stars
Los Angeles, California  90067
Tel: (310) 819-3470
jonathanu@blbglaw.com
lauren.cruz@blbglaw.com

*Counsel for Lead Plaintiffs Handelsbanken and Louisiana Sheriffs, and co-Lead Counsel for the Class*

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**

Robert D. Klausner (admitted *pro hac vice*)
7080 NW 4th Street
Plantation, Florida  33317
Tel: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Louisiana Sheriffs*