KCF6WELC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
IN RE WELLS FARGO & COMPANY
SECURITIES LITIGATION

                                        20CV4494(GHW)

------------------------------x

                                        New York, N.Y.
                                        December 15, 2020
                                        1:00 p.m.

Before:

                    HON. GREGORY H. WOODS,

                                        District Judge

                         APPEARANCES

BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP
     Attorneys for Plaintiffs
BY:  JONATHAN D. USLANER
     LAUREN M. CRUZ
     JOHN C. BROWNE

COHEN MILSTEIN SELLERS & TOLL, PLLC
     Attorneys for Plaintiffs
BY:  STEVEN J. TOLL
     LAURA H. POSNER
     DOUGLAS BUNCH

SULLIVAN & CROMWELL, LLP
     Attorneys for Defendants Wells Fargo & Co., et al.
BY:  RICHARD C. PEPPERMAN II,
     CHRISTOPHER MICHAEL VIAPIANO
     LEONID TRAPS

CLARENCE DYER & COHEN, LLP
     Attorneys for Defendant Sloan
BY:  JOSHUA COHEN

KCF6WELC

(Case called; telephone conference)

THE COURT:  Counsel, before we begin, I would like to take appearances.  If I can, I would like to ask for the principal spokesperson for each side to identify him or herself and the members of his or her team rather than having each lawyer identify him or herself individually.

First, who is on the line on behalf of plaintiffs?

MR. USLANER:  Good afternoon, your Honor.  Jonathan Jonathan D. Uslaner from Bernstein Litowitz Berger & Grossmann on behalf of lead plaintiffs.  Along with me my partner John Browne, Ms. Lauren Cruz.  As well as our co-league counsel at Cohen Milstein Mr. Steven Toll, Laura Posner and Douglas Bunch.

THE COURT:  Thank you very much.

Who is on the line on behalf of defendants?

MR. PEPPERMAN:  Good afternoon.  This is Rick Pepperman from Sullivan & Cromwell, and with me on the line are my colleagues Michael Viapiano and Lenny Traps also from the Sullivan & Cromwell.  Also Josh Cohen from Clarence Dyer & Cohen, who is Mr. Sloan's counsel.

THE COURT:  Good.  Thank you very much.

Let me begin with very brief remarks about the protocol that I hope the parties will follow during this conference.  At the outset let me remind you that this is a public proceeding.  Any member of the public or press is welcome to join the call at any time.  I am not monitoring who

else is on the line so please just be mindful of that.

Second, please keep your phones on mute at all times except when you are speaking to the Court or your adversary. Please do that even if you don't think that there is background noise wherever you may be. That will help us to eliminate unnecessary background noise, which can be distracting and make it difficult for us to keep an accurate record of the conference.

Third, please state your name each time that you speak during the conference. You should do that even if you have spoken previously. It will help our court reporter identify who is speaking each time that you speak.

Next, I am inviting our court reporter to let us know if she has any difficulty hearing or understanding anything that we say here today. If she asks you to do something that will make it easier for her to do her job, please do it to the extent that you can.

Finally, I am ordering that there be no recording or rebroadcasting of all or any portion of today's conference.

So, counsel, with that out of the way, I would like to turn to the substance of today's conference. I scheduled today's conference as a premotion conference with respect to an anticipated motion to dismiss the complaint in this case. I have read the parties' premotion letters. Still, it can be helpful for me to hear from you about the bases for your

KCF6WELC

anticipated motion to the extent that the plaintiffs wish any anticipated arguments in response to those arguments by defendants.  This is not oral argument on the motion itself, but I will invite comment by each side to the extent that you wish to take me up on that.

So let me begin if I can with counsel for defendants.  Counsel, what would you like to tell me about the bases for the proposed motion to dismiss?

MR. PEPPERMAN:  Thank you, your Honor.  This is Rick Pepperman from Sullivan & Cromwell.

As the Court knows from the letter, this is a punitive class action asserting claims for securities fraud under the Federal Securities Law, namely, Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934.  The bases for our motion will be the bases that are are typically raised in motions to dismiss in these kinds of cases as the Court is aware.  We will be challenging:  One, that the complaint fails adequately to plead false or misleading statements; two, that the complaint fails to satisfy the heightened pleading standard for scienter under the PSLRA; and third, that the complaint fails to plead so-called control person claims under Section 20(a).  So that is the overview of our motion, your Honor.

If I could, I just would like to make some observations about it that might be helpful to the Court.  First, in terms of the statements that the plaintiffs are

KCF6WELC

challenging, I would like to make four observations about them. The first is, as the Court could tell from the plaintiffs' premotion letter, the plaintiffs' theory of the case here is that the defendants falsely assured the market that Wells Fargo had successfully past the so-called first stage under its 2018 regulatory consent orders.  In other words, that the defendant had somehow communicated to the market that Wells Fargo's regulators had approved the plans already that the bank had submitted in accordance with the consent orders.

Your Honor, as you will tell from our motion, the challenged statements simply don't say that.  They nowhere say that the Federal Reserve, the OCC, or CFPB had already approved the plans submitted by Wells Fargo.  What you will see is that the complaint in order to further its narrative really just seizes any reference to the word "plan" or "plans" in any of the defendants' public statements about the consent orders in the over two-year period after which they were entered.  The statements when they are read in their entirety don't support the plaintiffs' claims.

The second observation, your Honor, and it is related, is that the plaintiffs' complaint and their premotion letter really employ the same technique.  What they do is quote isolated phrases from much longer statements by the defendants while ignoring other parts of those same statements that undercut plaintiffs' arguments as to why the statements are

allegedly false and misleading.  We gave three examples of that technique in our premotion letter.  We obviously could not provide more examples in our letter because we were limited to three pages; but I wanted to give the Court another example of this now from plaintiffs' premotion letter.

At the bottom of page 1 and the top of page 2 of plaintiffs' letter, they refer to a June 18th, 2018, statement by Wells Fargo's former CFO, John Shrewsberry.  In response to a question from an analyst about the consent orders, Mr. Shrewsberry gave a one-paragraph answer.  In their letter, however, the plaintiffs quote only part of a single sentence of that letter and ignore the rest of what Mr. Shrewsberry said, and what they quote isn't even an accurate quotation from the statement.  They say at the bottom of their first page of their letter that the defendants told the investors that the bank was "In the last mile knitting all this together."  The actual phrase from the answer is: "It's the last mile of knitting all of this together," but the rest of the answer shows that Mr. Shrewsberry was not saying at all that Wells Fargo was close to be completing its obligations.  He said at one point, "I mean, it's different in different pieces."  In other part of the same answer said, "and so there is different stages of maturity."  He went on to say "and so it won't be done until that is done, but some of this is business as usual.  Some of it is still -- there is still some drawing board activity."  It

KCF6WELC

also says, "You're never actually done, but some parts are further along than others."  In other words, when you look at the full answer, it gives a very different impression than the snippet than plaintiffs quote.

The third observation is that most of the statements challenged by plaintiffs are statements of beliefs, expectations, hopes or opinions; not statements of objective verifiable facts.  The complaint does not clear the high bar for stating a securities fraud claim on those types of statements.  There are no facts plead showing that the speakers of the statements did not in fact believe -- did not in fact hold the expressed beliefs, expectations, hopes or opinions when they spoke.

Fourth, the complaint ignores that the defendants were prohibited by law from disclosing the details of any communications between Wells Fargo and banking regulators like the Federal Reserve and the OCC.  While obviously these rules do not permit executives to lie, they hamstrung the defendants' ability to respond to questions about the status of Wells Fargo's compliance with the consent orders.  To give an example, they put Wells Fargo's former CEO, Tim Sloan, in an impossible position in attempting to respond to pointed questions about the status of Wells Fargo's efforts for members of the House Committee on Financial Services when he testified back in March of 2019.

Your Honor, if I could, I just want to briefly discuss the two House Committee reports issued in March of this year. Those reports, as your Honor can tell from plaintiffs' letter, are the centerpiece of plaintiffs' entire case. Without them the plaintiff never would have filed this matter. In their premotion letter, the plaintiffs criticize us for saying that the House Committee reports challenged only a handful of statements. That, your Honor, I submit is an entirely accurate statement. The House report challenged only three statements -- all statements by Wells Fargo's CEO Tim Sloan.

The complaint here by contrast is much, much broader. The plaintiffs' challenge at least 16 different statements by a total of four different individual defendants. The House report, your Honor, is of absolutely no assistance to the plaintiffs in attempting to state a claim based on 13 of the 16 statements challenged in their complaint.

The plaintiffs also say in their letter that the House Committee issued nearly 200 pages of reports. That statement while true, your Honor, is a bit misleading. Only five of those 200 pages address statements alleged to be false or misleading. Whereas one of the reports put it, *Statements that were in the House's view incomplete and overly optimistic.* The other 195 pages of the report said nothing about the defendants' public statements.

The focal point, your Honor, as the House Committee's

KCF6WELC

criticisms of Tim Sloan's statements was his testimony at the March 2019 hearing in response to pointed questions from Chairwoman Maxine Waters when Mr. Sloan stated, "We are executing that plan," and also "We are in compliance with those plans." These, your Honor, are prime examples of plaintiffs seizing on any use of the word "plan" or "plans."

Mr. Sloan's testimony, as we'll show in our motion, when it is read in its entirety was neither false nor misleading.  But equally important -- and I want to stress this -- no investor possibly could have been mislead by Mr. Sloan's testimony into believing that Wells Fargo's regulators were satisfied with the bank's submissions.  Within an hour of when Mr. Sloan finished testifying, the OCC issued a written statement that was quoted in full by the Wall Street Journal that said, and I quote, "We continue to be disappointed with Wells Fargo's performance under our consent orders and its ability to execute effective corporate governance and a successful risk management program."  This statement by the OCC within less than an hour of when Mr. Sloan finished testifying eliminated any possibility that investors were mislead.

So, your Honor, just to wrap up as I said at the beginning our motion is going to make two other points in addition to challenging that the complaint --

THE COURT:  Counsel, before you move on -- and I apologize this is not oral argument on the motion itself -- can

KCF6WELC

you briefly address two other statements that are highlighted in the complaint regarding the March 2019 testimony?  These are both in paragraph 123 of the complaint -- statements by Mr. Sloan that the bank "was fully complying with its regulators" and "that the bank had done everything that regulators asked and was on track to resolve the consent orders."

Do you have any comment that you would like to share at this time regarding those two statements highlighted in the complaint?

MR. PEPPERMAN:  Your Honor, is that paragraph 123 you said?

THE COURT:  Yes.

MR. PEPPERMAN:  Let me turn to it.

So, your Honor, the first thing about what is quoted there, your Honor, in paragraph 123 is those are not quotes of what Mr. Sloan said.  Those are quotes from the House Committee reports.  The actual words that Mr. Sloan said in his testimony are different from what this paragraph shows.  I think this is an example of the testimony not being read in its entirely.

So here is what Mr. Sloan said in response to the question and here is the full statement.  He said, "Madam Chairwoman, I can't respond specifically to your question because that would mean that I would be disclosing confidential supervisory information that has been shared with us by both

KCF6WELC

the OCC and the CFPB; but I can assure you that we are working constructively with what we have in place and we are executing that plan that reflects the fundamental changes that I have made since I became CEO."  Then Chairwoman Waters asked a follow up question, and Mr. Sloan said, "Again, we cannot disclose confidential supervisory information in terms of the give and take that we had with either the OCC or the CFPB; but I can assure you that we have plans in place and we--" and then he was cut off for another question.

So, your Honor, the House majority report, which is quoted in paragraph 123, did conclude that Mr. Sloan had given inaccurate and misleading testimony.  So the quote you see in 123 is an accurate quote from the majority report and those are also the quotes at the bottom part of it.  Your Honor, we submit that when the testimony is read in its entirety, it does not support that conclusion.  Again, equally important because of the statement put out by the OCC within an hour of when Mr. Sloan was finished testifying, no investor reasonably could have been mislead by that statement, which goes again to the materiality of the statement at issue.

THE COURT:  Good.  Thank you.

I am sorry, counsel.  Please go on.

MR. PEPPERMAN:  Sure, your Honor.

Your Honor, the other two arguments that we are going to make in our motion to dismiss -- and I know the Court is

KCF6WELC

familiar with these -- is first that the complaint fails to satisfy the PSLRA's heightened pleading standard for scienter. It does not plead particularized facts giving rise to the required strong inference that the speakers of the challenged statements acted with an intent to deceive, manipulate or defraud when they spoke.  In our motion to dismiss, your Honor, we're going to go through each of the defendants' who are alleged to have made false or misleading statements individually and show that the scienter allegations are insufficient.

The scienter allegations, your Honor, are particularly weak with respect to Wells Fargo's former chairwoman, Betsy Duke, who is alleged to have made only one misstatement and Wells Fargo's former general counsel and interim CEO, Allen Parker, who is alleged to have made only three misstatements. They are insufficient under the PSLRA for all four of the individual defendants but I would say are particularly weak as to those two.

The last point, your Honor, that the motion will make is that the complaint fails to plead a control person claim under Section 20(a).  This issue, your Honor, is particularly important for Wells Fargo's current CEO, Charles Scharf, who's named as a defendant only in plaintiffs' Section 20(a) claim. Mr. Scharf is not alleged to have made any misstatements, and as a result he is not a defendant in the sections 10(b) claim

KCF6WELC

and none of the complaint's scienter allegations apply to him. That fact, your Honor, defeats the argument in Footnote 1 of plaintiffs' premotion letter that the complaint of scienter allegations suffice the plead of Section 20(a) claim against all the individual defendants.  Not one of those allegations pertain to Mr. Scharf because he is not alleged to have made any false or misleading statements.

The complaint's allegations about Mr. Scharf, the bank's current CEO, are limited to a single paragraph, paragraph 301, that seeks to hold Mr. Scharf liable as a control person simply because he was Wells Fargo's CEO for the last five months of the proposed class period.  The law is clear, your Honor, that in this circuit you cannot state a control person claim based solely on a defendants' corporate position and nothing more.  I submit, your Honor, that Charles Scharf shouldn't even be included as a defendant in this case.

Then, your Honor, I just want to make one last point. It won't be a basis for dismissal in our motion but is, I believe, important for the Court to understand about this case nonetheless.  The plaintiffs say in their premotion letter that Wells Fargo's stock price fell by over 25 percent and investors lost over $54 billion in value when the market learned the supposed truth about the status of Wells Fargo's compliance with the consent orders.  What is significant, your Honor, is that most of that stock price decline occurred in March of this

KCF6WELC

year when the entire stock market was in free fall because of COVID-19 and the related government-ordered lockdowns. The plaintiffs obviously can't hope to recover for these COVID-related declines of Wells Fargo stock price back in March. That more than cuts in half the value of any potential claims in this case. Your Honor, the plaintiffs simply ignore this fact, which I think is indisputable in both their complaint and their premotion letter.

That is all I have, your Honor. Thank you.

THE COURT: Thank you very much.

Let me turn to counsel for plaintiffs.

Counsel, again this is not oral argument; but I have given counsel for defendants the opportunity to speak to a number of their arguments and I am happy to give you the opportunity to respond to the extent that you wish to do so.

MR. USLANER: Thank you, your Honor.

THE COURT: Please, go ahead.

MR. USLANER: Jonathan Uslaner on behalf of lead plaintiffs. Thank you, your Honor, for providing the time for us to speak today.

Your Honor, this case presents straightforward and well documented violations of the securities laws. The complaint is supported by evidentiary hearings, testimony, internal Wells Fargo and regulatory documents and reports, and detailed evidence compiled by both the Democratic and

KCF6WELC

Republican parties of the Financial Services Committee of the United States House of Representatives, which followed their yearlong investigation into Wells Fargo.

To summarize what this case is about, in 2018, after years of egregious banking abuses, Wells Fargo's three primary regulators -- the Federal Reserve, the OCC, and the CFPB -- imposed severe punitive remedial measures on Wells Fargo, including fines of a billion dollars and historic consent orders backed by an unprecedented cap on Wells Fargo's assets. The consent orders provide that the asset cap would be lifted if, and only if, the bank completed a comprehensive three-stage reform process outlined in paragraphs 48 through 51 and 61 through 64 of the complaint.

The first stage in the three-stage reform process required that Wells Fargo develop and receive regulatory approval of the bank's proposed reform plan, which Wells Fargo then could, according to the very terms of the orders "implement," "execute," and "validate" in the subsequent stages of the three-stage process. Now, throughout the class period defendants misrepresented their progress in satisfying this three-stage process misleading investors into believing that it had past the first stage of the process, that it had compliant approved plans in place, and that it had advanced to the implementation and execution stages of the three-stage process.

In the end the House Financial Services Committee

KCF6WELC

published earlier this year two scathing detailed reports choked full of evidence finding that defendants had mislead the public and had never achieved approval of the required stage one reform plan.  Defendants themselves also admitted during subsequent hearings in March 2020 to knowing of the very underlying facts at issue in this case.  The complaint at paragraphs 123 to 210 details defendants' misstatements, including when they were made, who made them, where they were made, and why they were false or misleading.  The complaint also includes a mountain of evidence, including internal Wells Fargo emails, excerpts of interviews of the regulators and insiders, and detailed congressional findings evidencing the individual defendants involvement and knowledge of the misrepresented and omitted facts.

Now, as near routine in these security cases, defendants intend on moving to dismiss.  The defendants challenges here are limited to falsity and scienter and their challenges respectively fail.  First as falsity.  Defendants' forthcoming motion is based on fact intensive assertions that are factually flawed and in any event inappropriate for resolution as a matter of law at the pleading stage.

Mr. Pepperman argued, and they argued in their letter, that both plaintiffs and Congress have taken their misstatements "out of context" and that properly understood the Court should find at the pleading stage that none of their

KCF6WELC

statements misled anyone; but neither plaintiffs nor Congress took defendants' statement out of context. The allegations in this case are consistent with the plain meaning of defendants' words and the regulators' contemporaneous understanding of defendants' public statements, which the regulators themselves found at the time and told defendants at the time were misleading. The allegations are consistent with Congress's evidentiary findings as well as securities analysts' realtime understanding reflected in the analysts' reports that they issued at the time all of which is documented in the complaint.

Of course defendants are free at summary judgment or at trial to advance their litigation interpretation of their past statements. On this record however, your Honor, we respectfully submit the defendants' fact intensive and disputed fact contentions about how investors supposedly understood their statements quote/unquote in context are not fit for resolution at the pleadings as a matter of law.

Now, as to defendants' argument with respect to confidential supervisory information, defendants contend that the regulatory rules around CSI allow them to misrepresent the facts, to lead investors to believe that they have the requisite plans in place to satisfy the first stage of the consent order when they did not. This argument misstatements the CSI rules and is entirely inconsistent with the Federal Securities Laws and Second Circuit precedent, which plainly

KCF6WELC

states that once a corporate executive goes public and chooses to speak publicly on a subject, they must do to truthfully in a non-misleading manner.  Nothing in the rules governing CSI overrides this basic duty or permits a bank executive to make false statements and omit material facts about their progress in satisfying a critical consent order.

Simply put in the CSI rules permitted defendants to tell investors that they did, that they had plans in place and were executing on the plans as required by the consent orders, the CSI rules surely allow defendants to tell the opposite, the truth, that they did not have compliant plans in place and were not yet executing on those plans.  And tellingly the regulators at the Federal Reserve as well as OCC and members of the House Financial Services Committee, all of whom are very well versed on the rules of CSI, all found that Wells Fargo made misleading statements to the public and to Congress about its supposed progress under the consent orders.

In addition, Defendant Sloan, Wells Fargo's former CEO, himself admitted he made false and misleading statements to Congress and the media notwithstanding any supposed rules on CSI.  Indeed, shortly before he was forced to resign as Wells Fargo's CEO, he personally called the Federal Reserve to apologize for his mischaracterizations in his statements during the hearings and to the media as set forth in the complaint at paragraph 96.

Defendants in their letter and today indicate also that they will be asserting what amounts to a truth-on-the-market defense at the pleading stage. They apparently will be arguing that their years of misrepresentations were corrected by an isolated comment by the regulators in March 2019 criticizing the bank's progress; but whether these statements not made by Wells Fargo and effectively denied by Wells Fargo in prior and later statements fully corrected Wells Fargo's misrepresentations raises a purely fact-intensive defense unfit for resolution on the pleadings. As the Second Circuit has explained, a truth-on-the-market defense, such as the one defendants are relying upon here, is intentionally fact specific and "is rarely an inappropriate basis for dismissing a 10(b) complaint." I refer your Honor to *Ganino v. Citizens*, 228 F.3d 154. As evidenced by analyst reports, including those at paragraph 97 of our complaint, the press and the market responses when the truth was fully revealed investors never understood that the bank did not have the required stage one plans in place.

Finally, defendants in their letter and Mr. Pepperman--

THE COURT: Counsel, can I ask a quick question about that?

MR. USLANER: Of course, your Honor.

KCF6WELC

THE COURT:  I apologize for interrupting you.

MR. USLANER:  No, please.

THE COURT:  This is a statement that you identify in the middle of page 2 of your letter, *We have plans in place*. Why is that to be read to mean that they have plans in place that have been approved by the regulator?  In other words, written plans that are acceptable to the reserve bank as opposed to plans that they are working on for approval.  Why does one read that statement to mean that the plans are not only, I will call it, working plans but plans that have been approved?

MR. USLANER:  Your Honor, the questions that Mr. Sloan responded to in which he referenced how they have plans in place and that they were compliant with those plans were in response to questions specifically about the status of their progress in meeting the requirements of the consent orders.  So if an executive is asked about their progress in meeting the consent orders requirements and they say*, We have plans in place* and *We have compliant plans in place* and *we're executing on the plans* and the only way to get to the execution phase is to have the regulators approve those plans, then it is clearly misleading and false for the executive to say we have plans in place and we're executing on those plans when they don't yet have approved plans and they cannot be executing because the plans are a not approved.  It certainly is misleading for them

KCF6WELC

to say so.

THE COURT:  Thank you.

MR. USLANER:  Your Honor, defendants also in their letter and today attempt to minimize the Financial Services Committee's investigation.  The Financial Services Committee found that defendants made a series of false and misleading statements, including some of the very statements at issue in the case, including the testimony of Mr. Sloan to Congress.

In addition to that and as detailed in our complaint, Chairman Waters has recommended to the Department of Justice that criminal action be taken against Mr. Sloan in light of his false statements to Congress about the bank's purported progress in meeting the consent orders and its supposed compliant plan.

Defendants apparently are taking issue with the fact that our complaint includes additional statements beyond those specifically detailed in the Financial Services Committee reports.  The Financial Services Committee obviously nowhere found that any of the statements challenged in the complaint were not false, were not misleading.  The additional statements in the complaint are false and misleading for the very reasons the misstatements Congress specifically identified in the House reports.  Some of them are virtually verbatim to those that the House reports identified as misleading and false.

Turning to scienter.  For two defendants -- Defendant

KCF6WELC

Sloan, Wells Fargo former CEO, and Defendant Shrewsberry, its form CFO -- defendants' challenges are based on the conclusory assertion that it is somehow farfetched to believe that Wells Fargo's executive would violate the securities laws since they would likely get caught if they did given the highly regulated nature of their industry.  This argument could be made in virtually any securities action and it fails.  This argument ignores Supreme Court and Second Circuit jurisprudence.  To state a claim under 10(b), plaintiff needs to show that the defendant knew of the misrepresented fact or was reckless in not knowing it.  Plaintiff does not need to demonstrate motive or that defendant intentionally lied.

The complaint here raises a strong inference of scienter as to each defendant.  It details:  One, when the defendants received the regulators' letters rejecting their proposed consent order plans; two, how they were also told in realtime of the regulators' rejections in strong rebukes; three, how they were each individually responsible for monitoring the bank's purported compliance with the consent orders.

The complaint also discusses internal emails that support the scienter inference, including and email exchange between Defendants Sloan and Defendant Duke agreeing to "tone down disclosures about the bank's lack of progress in satisfying the consent orders" for fear investors would learn

KCF6WELC

correctly that the bank was "not close to lifting the asset cap."  It also includes an email from Wells Fargo's board member Theodore Craver that Wells Fargo "totally biffed it with its stage-one plan submission" and that investors would find the regulators' rejection of Wells Fargo's stage-one plans "completely unacceptable."  I direct your Honor to paragraphs 73 to 74 of the complaint for the discussion of that email. The complaint also includes admissions from the bank's new CEO, Mr. Scharf, that the House reports are accurate.  He said to Congress they were "consistent with what I found when I arrived at the company."  The complaint also includes admissions from Defendant Duke that she and the board knew the bank was incapable of getting plans written in a compliant fashion.

Defendants challenges as to the other two Section B defendants -- interim CEO Parker and Board Chair Duke -- are similarly fought.  As to Defendant Parker, the defendants rehash their argument that his statements were not misleading, that he made one statement, and that in the context it would not mislead anyone.  That argument fails.  To begin with, it is obviously irrelevant how many misstatements the defendant makes.  Putting that aside, the meaning of his statements are plain, and the context of his words support plaintiffs' interpretation.

As to Defendant Duke, defendants challenge for scienter two, but the House Financial Committee asked Defendant

KCF6WELC

Duke to resign in March 2020, which she did, precisely because she knowingly allowed the bank management to repeatedly submit materially deficient plans in response to the consent orders as they found and as discussed in paragraph 234 of the complaint. The inference of scienter we respectfully submit is likewise strong for Defendant Duke.

Now, as to defendants' argument with respect to Mr. Scharf and the control person claim, the complaint's allegations with regard to Mr. Scharf are not limited to paragraph 301.  We have additional allegations with regard to his responsibilities.  As the incoming CEO, he was appointed CEO for the precise reason that he needed to get the bank to satisfy the consent orders, three-stage requirements and he knew at the time that his colleagues made statements that they had failed to do so and we respectfully submit that we have sufficient allegations under Section 20(a) for Mr. Scharf.

THE COURT:  Counsel, before you go on, can I just ask you a little more about the allegations regarding Mr. Scharf?

MR. USLANER:  Yes.

THE COURT:  He was brought in in order to address these concerns.  What are the allegations that you expect to point to that support that he is liable for the misstatements that are described in the complaint?  I ask because I am curious about the timing.  At what point did he have control such that he should have control person liability with respect

KCF6WELC

to those statements?

Counsel.

MR. USLANER:  That's a good question, your Honor.

He becomes CEO in October of 2019.  He testified to Congress that the House reports were "consistent with what I found when I arrived at the company."  So we believe at that time he had knowledge -- and of course he had knowledge -- that the regulators consistently rejected Wells Fargo's stage-one plan submissions.  And his role, as set forth in the consent orders and as indicated by him to Congress as well as Ms. Duke, was to monitor the bank's discussions with the regulators and get the bank in compliance with the consent orders.  So given that role and the fact that he clearly knew at the time he joined the company, we believe that there is sufficient evidence to support his scienter under the requirements of 20(a).

THE COURT:  Thank you.

Can you extend on that a little bit more?  It is your view that any senior executive of a company who comes in after misrepresentations are made becomes liable -- or I should say any CEO who comes into a public company after material misstatements are made by, for example, his or her predecessor that he becomes liable for them as a control person?

MR. USLANER:  Well, your Honor, I did not mean to imply that.  That is not the case.  Mr. Scharf is not liable

KCF6WELC

for prior misrepresentations made before he joined the company. Mr. Scharf's control person liability extends solely to statements made subsequent to his becoming CEO.  After he became CEO, there are instances where his colleagues continued to make assertions to investors indicating that the company was past the planning stage and into the execution and implementation stage; and for those statements we contend that Mr. Scharf is liable in a 20(a) capacity.

THE COURT:  Thank you.

So, you are referring to statements made after the date upon which he became CEO?

MR. USLANER:  Yes, your Honor.

THE COURT:  Understood.

I am sorry for interrupting you.  Please go on.

MR. USLANER:  No problem, your Honor.

Last, your Honor, Mr. Pepperman made remarks with respect to stock drops and whether the extent of the damages here are 54 billion or 27 and a half billion.  Those are pure loss causation issues and of course will be ironed out at subsequent stages of the litigation and we'll reserve arguments about that at that time.

Thank you so much, your Honor.  Unless you have any questions, we look forward to more fully addressing defendants' argument in our opposition.

THE COURT:  Thank you very much.

KCF6WELC

I look forward to seeing the parties' briefing on these topics. I appreciate your thoughtful review of the issues.

It is to scheduling that I would like to turn now. I have in front of me the parties' initial proposal regarding the briefing schedule. Under that proposal, defendants would file the motion to dismiss by January 11th and there is a proposal that opposition would be due two months after that motion and a reply or replies 30 days thereafter.

I would like to hear from counsel for defendants about your proposed timing for submission of the motion. I have some concerns about the briefing schedule after the initial filing date. I am concerned that it is too long. In particular, the 60-day window between the filing of the motion and the opposition strikes me as too long. So, I just note that to let you begin contemplating the position that you want to take when we get to that point.

At the outset let's establish a deadline for submission of the motion itself.

Counsel for defendants, when would you propose to file your motion?

MR. PEPPERMAN: Well, your Honor, I am going to answer that question; but we also spoke with plaintiffs' counsel yesterday and have a joint proposal on the briefing schedule. Just to relay that to your Honor and then obviously I will

KCF6WELC

answer any questions.

We proposed to file our motion to dismiss on January 22nd. That's 38 days from today. It's a little bit longer than the date that we had initially contemplated in the original scheduling stipulation, which as the Court pointed out was January 11th. We think the additional 11 days will be helpful here in enabling us to put together a motion that carefully goes through all of the statements and also to get a sign-off from all of the individuals who are named as defendants. The plaintiffs agreed to have their opposition be due 45 days after that, which is I think March 8th. So that is cut down from 60 days to 40 days. And for our reply we were going to ask for 25 days, which would be April 2nd, and that is down from the the 30 days I think that was in our original scheduling stipulation.

THE COURT: Good.

That's fine. I am happy to embrace that, counsel for plaintiffs, assuming that the description of the proposed briefing schedule is accurate.

Counsel for plaintiffs.

MR. USLANER: That is accurate, your Honor.

THE COURT: Thank you.

Let's talk about the length of the parties' briefs. I don't want you to be confined by my default page limit given the number of statements at issue here.

KCF6WELC

            Do the parties have a proposal regarding the length of your moving and opposition briefs here?

            MR. PEPPERMAN:  Your Honor, we do not.  At this point, your Honor, I am a bit concerned that if I requested a certain number of pages, I might over-ask.  The Court is correct that what we need to do in our motion is go through each of the 16 statements.  And what we'll do as part of that is set forth the full statement and we think show that the three- or four- or five-word snippet from the statement excerpted in the complaint does not create an accurate depiction of the statement.  That, your Honor, is going to take pages.  What my hope would be is to touch base with counsel for the plaintiffs at the first part of next year at the beginning of January when we'll have a more informed estimate of how long our motion will be and then present agreed upon page limitations to the Court if that would be acceptable to your Honor.

            THE COURT:  Yes.  That's fine.  Good.

            I will enter an order establishing the briefing schedule that we've just described.  I look for the parties to make a proposal regarding the appropriate page limit.  I simply leave you with the thought that it is evident that 25 pages is far from sufficient to permit the parties to adequately brief these issues.  I would rather see full briefing that adequately addresses the issues rather than an unnecessarily cramped analysis.  So please write me in early January.  I am not going

KCF6WELC

to set a deadline for that, but I expect you will look for leave from the Court to file a brief in excess of the default limit.  So, I expect I will see an application prior to the deadline for submission of the motion itself.

Anything else that we need to talk about here?

First counsel for plaintiffs.

MR. USLANER:  No.  Thank you for your time, your Honor.

THE COURT:  Thank you.

Counsel for defendants.

MR. PEPPERMAN:  Nothing, your Honor.  Thank you for your time.

THE COURT:  Thank you all very much.

This proceeding is adjourned.

o0o