UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE WELLS FARGO & COMPANY
SECURITIES LITIGATION

No. 20 Civ. 4494 (GHW)

**Oral Argument Requested**

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Nanci L. Clarence (*pro hac vice*)
Josh Cohen (*pro hac vice*)
Adam F. Shearer (*pro hac vice*)
CLARENCE DYER & COHEN LLP
899 Ellis Street
San Francisco, California  94109
Telephone:  (415) 749-1800
Facsimile:  (415) 749-1694
nclarence@clarencedyer.com
jcohen@clarencedyer.com
ashearer@clarencedyer.com

*Counsel for Defendant Timothy J. Sloan*

Richard C. Pepperman II
Leonid Traps
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
peppermanr@sullcrom.com
trapsl@sullcrom.com

Christopher Michael Viapiano
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C.  20006
Telephone:  (202) 956-7500
Facsimile:  (202) 293-6330
viapianoc@sullcrom.com

*Counsel for Defendants Wells Fargo &
Company, John R. Shrewsberry, C. Allen
Parker, Elizabeth Duke, and Charles W.
Scharf*

January 22, 2021

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 5

    A.    The Consent Orders ................................................................................... 5

    B.    Confidential Supervisory Information .................................................. 7

    C.    This Action................................................................................................ 8

ARGUMENT .......................................................................................................................... 10

I.    Plaintiffs Do Not Adequately Plead a Materially False or Misleading Statement .......... 11

    A.    Plaintiffs Fail to Satisfy the More Demanding Pleading Requirements for
           Statements of Opinions and Forward-Looking Statements ................................... 12

    B.    Plaintiffs Misleadingly Quote Snippets of the Challenged Statements,
           Omitting Critical Disclosures, Caveats, and Warnings ......................................... 16

          1.    February 2, 2018 – Investor Conference Call (Sloan) ............................. 17

          2.    May 30, 2018 – Deutsche Bank Conference (Shrewsberry).................... 18

          3.    June 13, 2018 – Morgan Stanley Conference (Shrewsberry) .................. 20

          4.    July 13, 2018 – Earnings Call (Sloan) .................................................... 22

          5.    December 4, 2018 – Goldman Sachs Conference (Sloan)....................... 23

          6.    December 4, 2018 – CNBC Appearance (Sloan) ..................................... 25

          7.    January 15, 2019 – Earnings Call (Sloan) ................................................ 27

          8.    January 15, 2019 – Bloomberg Appearance (Shrewsberry) .................... 29

          9.    February 12, 2019 – Credit Suisse Forum (Shrewsberry) ....................... 30

          10.    March 12, 2019 – HFSC Testimony (Sloan) ........................................... 32

          11.    April 12, 2019 – Earnings Call (Parker).................................................. 39

          12.    April 12, 2019 – CNBC Appearance (Shrewsberry) .............................. 42

          13.    May 30, 2019 – Sanford C. Bernstein Conference (Parker).................... 43

14.     September 27, 2019 – Investor Conference Call (Duke).......................... 45

15.     October 15, 2019 – Earnings Call (Parker)................................. 46

16.     December 10, 2019 – Goldman Sachs Conference (Shrewsberry)........... 48

II.    Plaintiffs Fail to Plead Particularized Facts That Raise a Strong Inference of Scienter for Each Defendant Individually......................................................... 49

    A.    Tim Sloan........................................................................... 51

    B.    John Shrewsberry............................................................... 56

    C.    Allen Parker ..................................................................... 56

    D.    Elizabeth Duke.................................................................. 57

    E.    Wells Fargo ...................................................................... 58

III.    Plaintiffs Also Fail to Plead Section 20(a) Claims ........................................ 59

CONCLUSION................................................................................................ 60

# TABLE OF AUTHORITIES

*Page(s)*

**CASES AND ORDERS**

*Aaron* v. *SEC*,
446 U.S. 680 (1980)..........................................................................................................49

*Alpha Cap. Anstalt* v. *Schwell Wimpfheimer & Assocs. LLP*,
2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018) ........................................................59

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)..........................................................................................................11

*Bd. of Trustees* v. *Mechel OAO*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011)...........................................................................5

*Bratusov* v. *Comscore, Inc.*,
2020 WL 3447989 (S.D.N.Y. June 24, 2020) .......................................................27

*Burkle* v. *OTK Assocs., LLC*,
2 F. Supp. 3d 519 (S.D.N.Y. 2014)............................................................... 3, 37-38

*C.D.T.S.* v. *UBS AG*,
2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013), *aff'd*, 604 F. App'x 5 (2d Cir.
2015) ..................................................................................................................................11

*Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)............................................................... 10-11, 60

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
752 F.3d 173 (2d Cir. 2014)...........................................................................4, 56, 57

*Das* v. *Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018).......................................................................55

*DoubleLine Cap. LP* v. *Construtora Norberto Odebrecht, S.A.*,
413 F. Supp. 3d 187 (S.D.N.Y. 2019).......................................................................60

*ECA & Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)........................................................................................50

*Fait* v. *Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011)........................................................................................50

*Gagnon* v. *Alkermes PLC*,
368 F. Supp. 3d 750 (S.D.N.Y. 2019).......................................................................55

*Ganino* v. *Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000).................................................................38

*Garber* v. *Legg Mason, Inc.*,
  347 F. App'x 665 (2d Cir. 2009) ..........................................................37

*Gray* v. *Wesco Aircraft Holdings, Inc.*,
  454 F. Supp. 3d 366 (S.D.N.Y. 2020).................................................13

*Gregory* v. *ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)...........12, 44

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)....................................13, 17

*In re Anheuser-Busch InBev SA/NV Sec. Litig.*,
  2020 WL 5819558 (S.D.N.Y. Sept. 29, 2020)......................................13

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017)............................................51, 59

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005).................................................55

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004).................................................16

*In re Goldman Sachs Grp., Inc. N.Y.*,
  F.R.B. Order No. 16-011, 2016 WL 4432523 (Aug. 2, 2016)....................8

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  568 F. Supp. 2d 349 (S.D.N.Y. 2008).................................................39

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)................................................................11

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006)............................................ 16-17

*In re PXRE Grp., Ltd., Sec. Litig.*,
  600 F. Supp. 2d 510 (S.D.N.Y. 2009).................................................50

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)......................................51, 52, 56

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ..................................................................11

*In re Vale S.A. Sec. Litig.*,
   2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) .......................................................................60

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)...............................................................................................15

*JBCHoldings NY, LLC* v. *Pakter*,
   931 F. Supp. 2d 514 (S.D.N.Y. 2013)...................................................................................51

*Kalnit* v. *Eichler*,
   264 F.3d 131 (2d Cir. 2001)...........................................................................................50, 51

*Ladmen Partners, Inc.* v. *Globalstar, Inc.*,
   2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)........................................................................13

*Lipow* v. *Net1 UEPS Techs., Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015) ............................................................................. 53-54

*Lopez* v. *CTPartners Exec. Search Inc.*,
   173 F. Supp. 3d 12 (S.D.N.Y. 2016).............................................................................15, 50

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)...................................................................................2, 13, 14, 16

*Perrigo Co. PLC* v. *Mylan N.V.*,
   2015 WL 9916726 (S.D.N.Y. Oct. 29, 2015) .......................................................................38

*Pirnik* v. *Fiat Chrysler Automobiles, N.V.*,
   2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) .............................................................50, 52, 58

*Ressler* v. *Liz Claiborne, Inc.*,
   75 F. Supp. 2d 43 (E.D.N.Y. 1998), *aff'd*, 189 F.3d 460 (2d Cir. 1999)................................11

*Rombach* v. *Chang*,
   355 F.3d 164 (2d Cir. 2004).........................................................................................16, 49

*S. Cherry St., LLC* v. *Hennessee Grp.*,
   573 F.3d 98 (2d Cir. 2009)....................................................................................50, 51, 57

*Sachsenberg* v. *IRSA Inversiones y Representaciones Sociedad Anónima*,
   339 F. Supp. 3d 169 (S.D.N.Y. 2018)...................................................................................55

*Schoenhaut* v. *Am. Sensors, Inc.*,
   986 F. Supp. 785 (S.D.N.Y. 1997)........................................................................................38

*Schreiber* v. *Soc'y for Sav. Bancorp, Inc.*,
   11 F.3d 217 (D.C. Cir. 1993).........................................................................................7, 19

*Shields* v. *Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994)................................................................4, 13, 52

*Shirk* v. *Fifth Third Bancorp*,
   2008 WL 2661955 (S.D. Ohio July 2, 2008)....................................................7, 23

*Singh* v. *Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019)................................................................ *passim*

*Slayton* v. *Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)......................................................................11

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*,
   531 F.3d 190 (2d Cir. 2008)..................................................................58-59

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................... 4, 10, 49-50, 59

*Tongue* v. *Sanofi*,
   816 F.3d 199 (2d Cir. 2016)............................................................. *passim*

*White* v. *H&R Block, Inc.*,
   2004 WL 1698628 (S.D.N.Y. July 28, 2004) ........................................................38

### STATUTES, RULES, AND REGULATIONS

15 U.S.C. § 78u-4 ...................................................................................11, 49

15 U.S.C. § 78u-5 ...................................................................................15, 50

18 U.S.C. § 641 ...........................................................................................8

12 C.F.R. § 4.32 ..........................................................................................7

12 C.F.R. § 4.36 ..........................................................................................7

12 C.F.R. § 261.2 .........................................................................................7

Federal Rule of Civil Procedure 9(b).............................................................1, 10, 11

Federal Rule of Civil Procedure 12(b)(6) ..............................................................1

Defendants Wells Fargo & Company ("Wells Fargo" or the "Company") and Timothy Sloan, John Shrewsberry, C. Allen Parker, Elizabeth Duke, and Charles Scharf (the "Individual Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Class Action Complaint (ECF No. 74) (the "Complaint" or "AC") under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act (the "PSLRA").

## PRELIMINARY STATEMENT

Relying on isolated phrases from Defendants' public statements, Plaintiffs contend that Defendants misrepresented the status of Wells Fargo's compliance with three regulatory consent orders over a nearly two-year period while the Company was engaged in active discussions with those same regulators about its ongoing compliance efforts. According to Plaintiffs, Defendants began misrepresenting the status of Wells Fargo's compliance on the same day that the first consent order was entered (February 2, 2018) and continued until December 10, 2019. In support of this implausible claim, Plaintiffs quote tiny snippets of Defendants' statements, while ignoring surrounding text that undercuts Plaintiffs' claim of a misrepresentation. Plaintiffs' assertion that Defendants falsely assured investors that the Company's regulators already had "approved" its plans and that Wells Fargo thus was well into the next stage of the process under the consent orders is belied by Defendants' actual statements. Defendants never once said that the Company's regulators had approved its plans—only that Wells Fargo had developed internal plans with which it was complying. Nor did Defendants ever offer any assurances about when Wells Fargo would complete the process under the consent orders, as Plaintiffs suggest. Rather, Defendants' statements, read in their entirety, conveyed only their hopes and expectations about the Company's future progress in developing plans that would satisfy its regulators, while expressly warning that progress was uneven, timing was uncertain, and significant work remained. The Complaint's

allegations thus fall far short of satisfying the heightened pleading requirements for securities-fraud claims under Section 10(b) of the Securities Exchange Act of 1934.

*First*, Plaintiffs do not adequately plead a single materially false or misleading statement. The Complaint attempts to premise liability mostly on opinion statements and forward-looking statements, not on statements of objective, verifiable facts.  Defendants' statements that they believed the Company was making progress towards satisfying its regulators and expected further progress in the future are classic opinion statements.  "[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong," and pleading a fraud claim based on an opinion "is no small task."  *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186, 194 (2015).  Similarly, Defendants' forward-looking statements about future expected progress are protected under the PSLRA's safe harbor.  The Complaint does not satisfy the more demanding requirements for pleading securities fraud based on such opinions and forward-looking statements.

Plaintiffs fault Defendants for not supplementing their caveated opinions and forward-looking statements with specific details of their communications with regulators, particularly regulators' feedback on Wells Fargo's plans.  But federal banking law and regulations prohibited Defendants from publicly disclosing their communications with banking regulators because such communications constitute confidential supervisory information ("CSI").  Had they revealed the details of Wells Fargo's communications with its regulators, including the regulators' rejections of Wells Fargo's submissions, Defendants would have been subject to potential criminal and civil penalties.  In their statements, Defendants repeatedly warned investors of this limitation on their ability to discuss the status of Wells Fargo's progress under the consent orders, and they never once said that regulators had "approved" the Company's plans.

Plaintiffs attempt to support their claims by relying heavily on March 2020 reports prepared by the majority and minority staffs of the U.S. House of Representatives Committee on Financial Services ("HFSC").  But those two reports collectively mention only three of the 16 statements challenged by Plaintiffs, all three of which were statements by Wells Fargo's former CEO Tim Sloan.  The reports thus are of no assistance to Plaintiffs in pleading a fraud claim based on 13 of the 16 alleged misstatements and against four of the five Individual Defendants.  Even as to Sloan's three statements, the HFSC reports simply label them "incomplete" or "overly optimistic" with no meaningful analysis—the two reports' collective discussion of the three statements is limited to a handful of pages.  Like the Complaint, the HFSC ignores the full text of Sloan's statements, which made clear that he was not guaranteeing compliance on a particular timetable or reporting that Wells Fargo already had reached a particular stage in the process.

The HFSC reports' discussion of Sloan's statements focuses on snippets of his March 12, 2019 testimony in response to live questioning by HFSC members.  Notwithstanding Sloan's clear statement that he could not "disclose confidential supervisory information in terms of the give-and-take that we have with" regulators, the HFSC Chairwoman pressed Sloan for more information.  When read in its entirety, Sloan's testimony in response to those questions was neither false nor misleading.  Equally important, it could not possibly have misled investors that Wells Fargo had satisfied its regulators' demands.  Only minutes after Sloan finished testifying, one of those regulators, the Office of the Comptroller of the Currency ("OCC"), issued a written statement stressing that "[w]e continue to be disappointed with [Wells Fargo's] performance under our consent orders."  This contemporaneous public statement renders any alleged misstatement by Sloan immaterial.  *See Burkle* v. *OTK Assocs., LLC*, 2 F. Supp. 3d 519, 522 (S.D.N.Y. 2014) ("misrepresentations . . . rendered immaterial" by "contemporaneous publications").

*Second*, Plaintiffs' Section 10(b) claim also fails because the Complaint does not plead particularized facts raising a "strong inference" of scienter—*i.e.*, an inference that is "cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 324 (2007). The Complaint fails to plead facts creating a strong inference that each speaker did not actually believe his or her stated opinions or consciously disregarded facts that made his or her caveated statements materially false or misleading. For example, Plaintiffs challenge three statements by Allen Parker, Wells Fargo's former General Counsel and interim CEO, but ignore that Parker also warned in the very same statements that Wells Fargo's regulators were disappointed with its progress, that the Company still had "a substantial amount of work yet to do," and that no timetable for compliance existed. These express warnings "undercut the inference" that Parker acted with an intent to deceive or defraud. *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 186 & n.62 (2d Cir. 2014). Plaintiffs similarly challenge a single statement by Elizabeth Duke, Wells Fargo's former Chairwoman— that "we're pretty well along in a lot of the work" and "we have a good understanding with our regulators on what they are looking for"—but fail to plead that Duke's unremarkable comment about her beliefs at the time was made with fraudulent intent. Nor do Plaintiffs suggest that any Defendant had a motive to defraud, which would be farfetched given that Wells Fargo was at the time perhaps the country's most scrutinized bank and its regulators were sure to correct any statement about the consent orders they believed to be inaccurate. *See Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning."). Ultimately, the inference of fraud is far less compelling than the opposing inference: that Defendants expressed hopes and expectations about future progress under the consent orders that turned out to have been overly optimistic.

*Third*, Plaintiffs fail to plead that the Individual Defendants are liable as control persons under Section 20(a).  These claims fail as a threshold matter because the Complaint does not adequately plead a primary violation under Section 10(b).  Plaintiffs' Section 20(a) claim against Charles Scharf, Wells Fargo's current CEO, is so weak that it is frivolous.  Scharf is not accused of making any misstatements himself, and he did not join Wells Fargo until October 21, 2019, *after* all but one of the alleged misstatements were made.  Plaintiffs plead no facts suggesting that Scharf had any responsibility for or actual control over that one alleged misstatement—a statement by Wells Fargo's then-CFO in response to an analyst's question during a December 2019 investor conference.  Scharf cannot be held liable as a control person simply because he was Wells Fargo's CEO when this last alleged misstatement was made.

## BACKGROUND

### A.   The Consent Orders

In 2018, Wells Fargo entered into three consent orders with its regulators.  The first, with the Board of Governors of the Federal Reserve System ("FRB"), was entered on February 2, 2018, the first day of the proposed class period, to address deficiencies in Wells Fargo's "compliance practices" and "risk management."  (Ex. A (FRB Order) at 2.)[1]  The FRB consent order required Wells Fargo to submit "[w]ithin 60 days" two plans to the FRB for its approval, the first "to further enhance the Board's effectiveness in carrying out its oversight and governance," and the second "to further improve [the Company's] firmwide compliance and operational risk management program."  (*Id.* at 4-7; AC ¶ 48.)  According to Plaintiffs, Wells Fargo completes "Stage 1" of compliance under this consent order when it is "notified in writing" that its plans are "acceptable"

---

[1] On a motion to dismiss, the Court may consider documents "incorporated by reference in" or "integral to and relied upon in the complaint."  *Bd. of Trustees* v. *Mechel OAO*, 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011).  All cited exhibits are attached to the Declaration of Richard C. Pepperman II.

to the FRB.  (*Id.* ¶ 49.)  After Wells Fargo receives this approval, the consent order next requires Wells Fargo to implement the plans to the FRB's satisfaction—what Plaintiffs call "Stage 2" of compliance.  (*Id.* ¶ 50.)  Following Wells Fargo's "implementation of the plans," the consent order requires Wells Fargo to "conduct and complete" by September 30, 2018 "an independent review" of (i) the Board's "improvements in effective oversight and governance of the Firm," and (ii) "enhancements to the Firm's compliance and operational risk management program."  (Ex. A at 7; AC ¶ 51.)  Wells Fargo then must "conduct a second independent review to assess the efficacy and sustainability of the improvements."  (Ex. A at 7.)  Both reviews are to be "conducted by third party expert(s) acceptable" to the FRB, and the results must be submitted to the FRB "within 30 days of completion."  (*Id.* at 7-8.)  This is what Plaintiffs call "Stage 3" of compliance.  (AC ¶ 51.)  The process contemplated by the FRB consent order is intensely iterative.  After each calendar quarter, the Board must submit "written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof."  (Ex. A at 10.)  The FRB also may "grant written extensions of time" to "comply with any provision of this Order."  (*Id.* at 11.)  Until all of the order's conditions have been met to the FRB's satisfaction, Wells Fargo may not, without prior approval, take actions to cause its "total consolidated assets" to exceed those reported as of year-end 2017—what is called the "asset cap." (*Id.* at 8-9; AC ¶ 55.)

On April 20, 2018, Wells Fargo's subsidiary, Wells Fargo Bank, N.A., entered into consent orders with two other regulators—the OCC and the Consumer Financial Protection Bureau ("CFPB")—arising out of certain misconduct related to mortgage rate-lock extensions and automobile collateral-protection insurance.  (AC ¶ 59; Ex. B (OCC Order); Ex. C (CFPB Order).) According to Plaintiffs, the OCC and CFPB consent orders likewise "mandat[e] that Wells Fargo

pass through three stages to comply." (AC ¶ 60.) Those stages allegedly consist of (i) OCC and CFPB approval of the plans submitted by Wells Fargo, (ii) Wells Fargo's implementation of the approved plans, and (iii) the submission of a report summarizing the results of a review of the implementation of the plans. (*Id.* ¶¶ 61-64.) The OCC and CFPB consent orders similarly contemplate an iterative process, and the OCC and CFPB also may extend any of the deadlines in their orders. (Ex. B at 7, 22, 25; Ex. C at 31.)

### B.     Confidential Supervisory Information

Wells Fargo's communications with its regulators about the consent orders constitute CSI, which cannot be disclosed without the regulators' permission. *See*, *e.g.*, 12 C.F.R. § 261.2(b)(1) (CSI "includes information that is or was created or obtained in furtherance of the [FRB]'s supervisory, investigatory, or enforcement activities . . . relating to any supervised financial institution, and any information derived from or related to such information."); 12 C.F.R. §§ 4.32(b), 4.36(b), (d) (prohibiting disclosure of "record[s] created or obtained . . . [b]y the OCC in connection with the OCC's performance of its responsibilities," including "supervisory correspondence"). It is well-settled that "plans, reports, and recommendations" that a supervised financial institution is "required to prepare pursuant" to a written agreement with a banking regulator are CSI and thus "protect[ed] from disclosure," as are any "documents which contain 'agency opinions and recommendations and banks' responses thereto.'" *Shirk* v. *Fifth Third Bancorp*, 2008 WL 2661955, at *1 (S.D. Ohio July 2, 2008); *see also Schreiber* v. *Soc'y for Sav. Bancorp, Inc.*, 11 F.3d 217, 222 (D.C. Cir. 1993) ("The reports and records gathered or created by the [banking] agencies in the course of performing their regulatory responsibilities are deemed the records of the agencies; thus the information . . . is available from [the bank] only with the permission of the agencies."). Supervised financial institutions are subject to criminal and civil penalties for any unauthorized disclosure of CSI. *See* Bank Holding Co. Supervision Manual,

F.R.B. § 1065.0.2 ("Any person who discloses or uses CSI except as expressly permitted by the appropriate federal banking agency or as provided by the agency's regulations may be subject to the criminal penalties provided in 18 U.S.C. § 641."); 18 U.S.C. § 641 (providing for fines and up to ten years in prison). These penalties are not just theoretical; substantial ones have been imposed for unauthorized disclosure of CSI. *See*, *e.g.*, *In re Goldman Sachs Grp., Inc. N.Y.*, F.R.B. Order No. 16-011, 2016 WL 4432523 (Aug. 2, 2016) (imposing $36.3 million penalty).

     C.     **This Action**

Plaintiffs challenge 16 statements about the consent orders by four of the Individual Defendants, beginning on the date the FRB consent order was entered and for nearly two years thereafter. (AC ¶¶ 144-210.) With the exception of portions of Sloan's written responses to HFSC questions (*id*. ¶ 185), all of the challenged statements were made orally, at live media appearances, investor conferences, earnings calls, or HFSC hearings, often in response to persistent questioning from analysts or HFSC members. According to Plaintiffs, Defendants misrepresented Wells Fargo's "compliance with the 2018 Consent Orders, claiming that it had regulator approved 'plans' and that it was 'in compliance' with the 2018 Consent Orders." (*Id*. ¶ 1.) Plaintiffs allege that Defendants "affirmatively [told] investors during analyst calls, investor conferences, media interviews, and congressional testimony, that the Bank had progressed successfully and was executing approved plans at Stage 2, and thus that it had surmounted Stage 1." (*Id*. ¶ 5.) Plaintiffs thus contend that Defendants falsely "assured investors that [Wells Fargo was] in 'compliance' with the 2018 Consent Orders' requirements, had approved Stage 1 Plans, and were 'implementing' those plans in accordance with the 2018 Consent Orders—*i.e.*, the Bank was past Stage 1 of the 2018 Consent Orders." (*Id*. ¶ 67.)

In support of their claims, Plaintiffs rely heavily on the two reports released by the HFSC in March 2020 that discuss three of the 16 challenged statements. (*See id*. ¶¶ 11, 109-127, 222.)

The first report, prepared by the majority staff (the "Majority Report"), identifies with minimal analysis only one purportedly "inaccurate" statement by Sloan during his March 12, 2019 live congressional testimony. (Ex. D (Majority Report) at 6-7, 61-62.)  In response to pointed questions from HFSC Chairwoman Maxine Waters, Sloan stated, "Madam Chairwoman, I can't respond specifically to your question, because that would mean that I would be disclosing confidential supervisory information that has been shared with us by both the OCC and the CFPB." (Ex. E (HFSC Hearing) at 6-7.)   Sloan then stated, "I can assure you that we are working very constructively with what we have in place and we are executing that plan that reflects the fundamental changes that I have made since I have become the CEO." (*Id*. at 7.)  In response to a follow-up question from Chairwoman Waters, Sloan said, "We are in compliance with those plans. Excuse me." (*Id*.)  He added:  "Again, we cannot disclose confidential supervisory information in terms of the give-and-take that we have with [regulators]." (*Id*.)  After quoting this testimony (Ex. D at 6), the Majority Report notes that "*[i]mmediately* following Sloan's testimony, the OCC issued a written statement expressing its dissatisfaction with Wells Fargo's progress towards complying with its consent orders" (*id*. at 7 (emphasis added)).  The OCC stated:  "We continue to be disappointed with [Wells Fargo's] performance under our consent orders . . . ." (*Id*.)

The other HFSC report, prepared by the minority staff (the "Minority Report"), also criticizes Sloan's March 12, 2019 testimony and similarly adds, "*Just an hour after Sloan finished testifying*, the OCC issued an unprecedented statement to correct the record." (Ex. F (Minority Report) at 31 (emphasis added).)  The Minority Report also takes issue with Sloan's statement on February 2, 2018—the day the FRB consent order was entered—about a "fast track" and his statement during a December 2018 appearance on CNBC that he expected the FRB "asset cap to be lifted in the first half of 2019," which the report describes as an "optimistic prediction." (*Id*.

at 32.)  In criticizing Sloan's statements, the Minority Report largely ignores what Sloan actually said, relying instead on press accounts of Sloan's congressional testimony and on the staff's own paraphrasing of Sloan's statements.  (*See id*. at 31-32.)  The Minority Report's entire discussion of Sloan's public statements consists of fewer than three pages.  (*See id*. at 30-33.)

Based on these allegations, Plaintiffs assert a Section 10(b) claim against Wells Fargo and four of the Individual Defendants:  (i) former CEO Tim Sloan, (ii) former CFO John Shrewsberry, (iii) former General Counsel and interim CEO Allen Parker, and (iv) former Chairwoman Elizabeth Duke.  (AC ¶¶ 276-288.)  Plaintiffs also assert Section 20(a) "control person" claims against the same four Individual Defendants as well as Wells Fargo's current CEO Charles Scharf.  (*Id*. ¶¶ 289-306.)  Scharf is not alleged to have made any misstatements, and he did not join Wells Fargo until October 21, 2019.  Plaintiffs seek to represent a putative class of all purchasers of Wells Fargo stock between February 2, 2018 (the date of the first alleged misstatement) and March 12, 2020 (the date of the last alleged corrective disclosure).  (*See id*. ¶ 270.)

## ARGUMENT

"To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly allege:  '(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.'"  *Singh* v. *Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019).  Section 10(b) claims are subject to the heightened pleading standards of Rule 9(b) and the PSLRA, which require Plaintiffs to plead "with particularity" both the facts establishing a material misrepresentation and the facts raising a strong inference of scienter as to *each defendant individually*.  *Tellabs*, 551 U.S. at 313.  To state a Section 20(a) claim, Plaintiffs must plead "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *Carpenters*

*Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).  Because Plaintiffs do not adequately allege a material misrepresentation, scienter, or control-person liability, the Complaint should be dismissed in its entirety.

**I.      Plaintiffs Do Not Adequately Plead a Materially False or Misleading Statement.**

Under the PSLRA, a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Rule 9(b) similarly "demands specific factual allegations demonstrating that a statement was false or misleading."  *Ressler* v. *Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 52 (E.D.N.Y. 1998), *aff'd*, 189 F.3d 460 (2d Cir. 1999).  "A violation of Rule 10b-5 cannot occur unless an alleged material misstatement or omission was false at the time it was made."  *C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013), *aff'd*, 604 F. App'x 5 (2d Cir. 2015).  "A statement believed to be true when made, but later shown to be false, is insufficient.  Without contemporaneous falsity there simply is no fraud."  *Id*. (citation omitted).  A complaint "may not plead fraud by hindsight."  *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 776 (2d Cir. 2010).

As to omissions, "[s]ilence, absent a duty to disclose, is not misleading."  *Basic Inc.* v. *Levinson*, 485 U.S. 224, 239 n.17 (1988).  "[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  A duty to disclose arises under the federal securities laws only when particular information is subject to an "affirmative legal disclosure obligation" under a statute or regulation, or when necessary "to prevent existing disclosures from being misleading."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

In a kitchen-sink approach to pleading securities fraud, Plaintiffs assert that four different Defendants made a total of 16 different misstatements between February 2018 and December 2019 concerning the status of Wells Fargo's ongoing efforts to comply with the three consent orders.  A

careful review of each alleged misstatement in its entirety, however, shows that none was materially false or misleading when made.

A.      **Plaintiffs Fail to Satisfy the More Demanding Pleading Requirements for Statements of Opinions and Forward-Looking Statements.**

The Complaint attempts to premise liability primarily on opinion statements and forward-looking statements that include critical caveats such as "I think," "I expect," "our expectation is," "my sense is," and "our goal is," not on statements of present or historical facts. *See Gregory* v. *ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y.) (statements of opinion are "subjective statements that reflect judgments" and that "express 'expectations for the future rather than presently existing, objective facts'" and include "phrases classically indicative of opinion" such as "'I think'"), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).  For example, Plaintiffs challenge:

- Sloan's opinion that the time periods in the FRB consent order put Wells Fargo "on a fast track" and his "expectation" that the FRB asset cap would be lifted "sometime in the first half" of 2019;

- Shrewsberry's "expecta[tion]" that the asset cap "will be gone in the time frames that we've talked about" and his "sense" that compliance with the consent orders "will take all of the amount of time that we've described";

- Parker's "expectation" that "we're going to be focused more on execution" in the future; and

- Duke's statement that "I think we have a good understanding with our regulators on what they are looking for."

(*See infra* at 18, 21-22, 41-42, 46.)

Besides Plaintiffs' manifestly untrue assertion that Defendants assured the market that Wells Fargo's regulators had "approved" its plans (AC ¶¶ 1, 37, 92)—a word no Defendant used—the Complaint's theory appears to be that Defendants should be held liable for securities fraud because they expressed the view that Wells Fargo "was on track to resolve the consent orders" but

that view was not borne out by subsequent events.  (*Id.* ¶ 123; *see id.* ¶ 5 ("Wells Fargo and its senior leadership repeatedly claimed throughout the Class Period to be satisfying the 2018 Consent Orders and moving steadily towards being out from under them . . . .").)  This too is a distortion of what Defendants actually said, but even if it were not, courts in this District have held that statements to the effect that a company is "on track" towards meeting its goals—as to earnings, growth, or anything else—are both opinions and forward-looking statements.  *See, e.g., In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *19 & n.14 (S.D.N.Y. Apr. 2, 2020) (holding that "statements about [company] being 'on track' with respect to its" projections and "goals" are "properly characterized as opinion statements" and as "'forward-looking' statements within the meaning of the PSLRA, and not statements of 'present fact'").[2]

Pleading a securities claim based on such statements "is no small task," *Omnicare*, 575 U.S. at 194, and "[t]he Supreme Court has emphasized that th[e] standard will not be easy to satisfy," *Gray*, 454 F. Supp. 3d at 400.  Courts thus routinely dismiss securities claims based on "expressions of corporate optimism couched in subjective terms of belief, expectation, and intention."  *Ladmen Partners, Inc.* v. *Globalstar, Inc.*, 2008 WL 4449280, at *13 (S.D.N.Y. Sept. 30, 2008).  The Second Circuit has explained that, even if wrong, "misguided optimism is not a cause of action," and "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future."  *Shields*, 25 F.3d at 1129.

"[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong."  *Omnicare*, 575 U.S. at 186.

---

[2] *See also, e.g., In re Anheuser-Busch InBev SA/NV Sec. Litig.*, 2020 WL 5819558, at *4-6 (S.D.N.Y. Sept. 29, 2020) ("discussions of projected performance," "even mixed with statements about current progress, are forward-looking statements" and "nonactionable statements of opinion"); *Gray* v. *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 387, 400 (S.D.N.Y. 2020) ("challenged statements" "reflecting a belief in, and adoption of," projections of company's performance are both "classic statements of opinions" and "forward-looking statements").

Liability may lie in only three limited situations:  (i) "the speaker did not hold the belief she professed," (ii) "the supporting facts she supplied were untrue," or (iii) the opinion "omits material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion" and "those facts conflict with what a reasonable investor would take from the statement itself."  *Id*. at 186, 189.  Thus, to plead a misrepresentation based on, for example, Sloan's opinion on the day the FRB consent order was entered that the order put Wells Fargo "on a fast track" (*see infra* at 18), Plaintiffs must plead that Sloan did not actually believe that to be true as of that date, that he supplied untrue supporting facts, or that his opinion omitted material facts about his inquiry or knowledge that would conflict with what a reasonable investor would take from his opinion statement.  Plaintiffs plead none of these facts for any of the challenged opinion statements.

"Reasonable investors understand that opinions sometimes rest on a weighing of competing facts" and expect a speaker to "know[], but fail[] to disclose, some fact cutting the other way." *Omnicare*, 575 U.S. at 189-90.  Investors "recognize[] the import of words like 'I think' or 'I believe,' and grasp[] that they convey some lack of certainty as to the statement's content."  *Id*. at 187.  Investors also read each statement, "whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information," such that "an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame."  *Id*. at 190. Accordingly, Parker's statement of opinion that "*I think* there is a meeting of the minds in terms of what we need to do, *but the task itself is a significant one*" (italicized text omitted by Plaintiffs), is not misleading when considered together with Parker's express warnings (also omitted by Plaintiffs) that regulators had "expressed some frustration with where the company was in terms

of the progress that it made," that the "hard work is going to continue," and that "I can't really put a timetable" on compliance.  (*See infra* at 43-45.)

Forward-looking statements also are protected under the PSLRA's "safe harbor."  15 U.S.C. § 78u-5.  Such a statement is not actionable if it "[i] is identified and accompanied by meaningful cautionary language *or* [ii] is immaterial *or* [iii] the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  *Lopez* v. *CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 25 (S.D.N.Y. 2016).  "[A] forward-looking statement is protected . . . if any of the three prongs applies."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245-46 (2d Cir. 2016).  Thus, to base liability on, for instance, Sloan's July 2018 forward-looking statement in response to a question about the FRB's asset cap that "our expectation is that sometime in the first half of next year, we'll be able to move through that" and that there is "no update from a timing standpoint" (*see infra* at 22-23), Plaintiffs must plead that (i) the warning preceding Sloan's statement that such forward-looking statements were "subject to risks and uncertainties" was not meaningful, *and* (ii) Sloan's "expectation" was material, *and* (iii) Sloan made the statement with actual knowledge that it was false or misleading.  Plaintiffs fail to meet this burden for any of the forward-looking statements they challenge.

These pleading requirements apply with full force to alleged misrepresentations about regulatory compliance.  The Second Circuit has held that ongoing "dialogue" with a regulator does not prevent a speaker from "expressing optimism, even exceptional optimism, about the likelihood of drug approval," even if the regulator previously had articulated "differing views" and "concerns" about the drug.  *Tongue* v. *Sanofi*, 816 F.3d 199, 211-12 (2d Cir. 2016).  The court in *Tongue* concluded that optimistic opinions were not "misleading for failure to include" negative regulator "feedback," regardless of whether that feedback "would have potentially undermined

Defendants' optimistic projections" and whether investors "would have been interested in knowing about [that] feedback, and perhaps would have acted otherwise had the feedback been disclosed." *Id*. at 212.   The court stressed that liability is particularly inappropriate for "generalized statement[s] of subjective optimism," including the CEO's statement that he was "very satisfied with where the progress is going," because such statements "arguably do[] not even 'convey facts about how the speaker has formed the opinion.'" *Id*. at 206, 213.   In a later case, the Second Circuit similarly held that statements about "regulatory compliance" are not "materially misleading" if they are "simple and generic" or "framed by acknowledgments of the complexity" or "uncertainty" of the matter at issue and "suggest[] caution (rather than confidence) regarding the extent of [the company's] compliance."  *Singh*, 918 F.3d at 64.   Plaintiffs base this action on precisely such simple and generic statements about general "progress," surrounded by warnings of potential delays, complexities, and uncertainties.  (*See infra* at 19-48.)

> ### B.   Plaintiffs Misleadingly Quote Snippets of the Challenged Statements, Omitting Critical Disclosures, Caveats, and Warnings.

In an attempt to plead a misrepresentation, Plaintiffs rely on isolated phrases in the 16 challenged statements, ignoring all "surrounding text, including hedges, disclaimers, and apparently conflicting information."  *Omnicare*, 575 U.S. at 190.  But "[t]he test for whether a statement is materially misleading under Section 10(b)" is "'whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor.'"  *Rombach* v. *Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (emphasis added); *see also Singh*, 918 F.3d at 63 ("The statement must also be 'mislead[ing],' evaluated not only by 'literal truth,' but by 'context and manner of presentation.'").  Plaintiffs cannot plead a securities-fraud claim based on "selective quotations" that "distort" Defendants' actual statements.  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 558 (S.D.N.Y. 2004); *see also In re Nokia Oyj (Nokia Corp.) Sec.*

*Litig.*, 423 F. Supp. 2d 364, 370 (S.D.N.Y. 2006) (dismissing securities-fraud claims because, "[i]n a troubling number of instances, Plaintiffs have relied on selective quotations from Defendants' statements").  When considered in their entirety, the challenged statements are *not* assurances of compliance with the consent orders, but rather acknowledge significant "uncertainty."  *Singh*, 918 F.3d at 64.  They also are "inactionable opinions" and "forward-looking statements [that] are precluded from liability under the PSLRA[]."  *Adient*, 2020 WL 1644018, at *21, 23.

The following sections quote the 16 statements at issue in their entirety.  The phrases that the Complaint quotes are ***italicized***, and the important language that Plaintiffs omit is **<u>underlined</u>**.

> **1.    February 2, 2018 – Investor Conference Call (Sloan)**

Plaintiffs allege that Sloan misrepresented Wells Fargo's anticipated compliance with the FRB consent order on the very day that the order was entered by seizing on only four of Sloan's words ("on a fast track") from a lengthy investor conference call.  (AC ¶ 144.)  During a call to discuss the FRB consent order with investors, the following exchange occurred:

> QUESTION:  So you went through very clearly the actions that you've taken over the past several years, 1.5 years or so, **<u>and yet there's still some more work to do</u>**.  Is it -- did the Fed identify very clearly what those remaining steps or next steps are that they're asking you to do?  Or is that a little bit more open-ended?

> SLOAN:  No, I wouldn't describe it [as] open-ended.  I mean, we have a very constructive relationship with the Fed.  **<u>There's a lot of discussion, candidly, every day, as you would imagine.  And we're in the midst of continuing to improve all the areas within risk the Fed's concerned about, that we're concerned about candidly.</u>**  I don't think there's a mystery here.  And candidly, **<u>I think that it was</u>** -- **<u>it's helpful in the consent order that it's clear from a timing standpoint what the deliverables are.  60 days</u>** -- **<u>Fed</u>** -- **<u>we'll put our plans together in 60 days.</u>**  The Fed will look at those plans.  Then we'll -- during that same period, we will continue to make sure that they're implemented across the entire company.  Then we'll bring in an independent third party.  They'll take a look, and they'll opine that, that's happening.  **<u>And then we'll submit that plan to the Fed.</u>**  We're going do that by September 30, 2018, this year.  **<u>I hope we do it sooner.</u>**  And then the Fed will take a look at it and respond.  So we're *on a fast track* here, and we're looking forward to making the improvements that are necessary.

(Ex. G at 5.)

Plaintiffs argue that Sloan's statement was false or misleading because Wells Fargo was not "'on a fast track' to satisfy the 2018 FRB Consent Order" and "had not even submitted a plan to the [FRB] at the time of his statement and, when the Bank did submit a plan months later, it was rejected." (AC ¶ 145.) Wells Fargo could not be expected to have submitted a plan to the FRB on the day the consent order was entered, and Sloan expressly disclosed that Wells Fargo had not yet done so at the time of his statement ("we'll put our plans together in 60 days"). The FRB's subsequent rejection of that plan over three months later cannot render his statement false or misleading *when made*. Reading beyond the four words Plaintiffs quote without any context, it is clear that Sloan was pointing to the timeline set forth in the FRB consent order and expressing his view that this timeline put Wells Fargo "on a fast track." Neither the Complaint nor the Minority Report cited by Plaintiffs (*id.*) suggests that Sloan did not sincerely believe this opinion at the time. Nor do they explain how a reasonable investor could have been misled by Sloan's description of the consent order, which was publicly available.

### 2.    May 30, 2018 – Deutsche Bank Conference (Shrewsberry)

Plaintiffs similarly challenge a small portion of Shrewsberry's remarks (a sentence and a phrase) during a May 2018 Deutsche Bank Global Financial Services Conference. (*Id.* ¶ 146.) Here are the full questions and answers:

> QUESTION:  But I first wanted to start a little bit bigger picture on some of the regulatory issues that are out there.  And at Investor Day, **you talked about the consent order, the related asset cap bleeding into 2019, the early part,** as you framed it.  And I just wondered if you could elaborate a little bit on **why maybe it's taking longer than either you thought or at least investors and analysts thought when it was first announced.**
>
> SHREWSBERRY:  Sure.  **I think it's the nature of the regulatory engagement. There's a lot of back and forth, and it's become clear after the first couple of cycles or exchanges or series of meetings, that it's going to take a little bit longer.  And so we just want to make it clear that getting the work right is the**

**most important thing.  It may take a little bit longer under the asset cap, but that's, as we've described, not really a constraining item for the normal growth of the business.  And so it's prudent to let people know that it could take a little bit longer than was originally envisioned.**

QUESTION:  And just in terms of remediating maybe both what was highlighted in that consent order **and then some of the things that have been in the media with respect to the wealth management investigation, something about the AML/KYC**.  Maybe you can just frame where you are on some of these issues and where the heavy lifting is still to come.

SHREWSBERRY:  Sure.  So there'll be a -- the work under the consent order is around operational risk and compliance.  It's -- the general way to think about it is that, **that set of requirements and the goals that we've set for ourselves are setting us on a path to be as strong in those areas as we believe we are in credit risk.  That's Tim's goal as our CEO.  That's our board's goal.  Some of the items that you've been reading about are items that have been uncovered as a result of the approach of going business-by-business, activity-by-activity and encouraging people to raise their hands and point things out when they're not working exactly right.**  And we've been pretty disclosive, I think, in our 10-Qs and 10-K about which of those things might lead to expenses for investors, so risk factors for the company.  **And each of them has its own cadence, beginning, middle and end.**  *I don't think at this point that there's anything meaningful that we aren't already talking about, certainly, since our last 10-Q, so the inventory is pretty complete.*  **And I think we'll make a lot of progress against each of them this year.  I'm sure there'll be some still to work on going into next year, but** *our investors know everything that's material that we know*.

(Ex. H at 1-2.)

Plaintiffs contend that the italicized language was false or misleading because Shrewsberry omitted that the FRB had rejected Wells Fargo's initial submission three weeks earlier as "incomplete" and "insufficient."  (AC ¶¶ 147-148.)  But the FRB's rejection of Wells Fargo's submission was CSI, which Shrewsberry could not legally disclose.  *See Schreiber*, 11 F.3d at 222 ("reports and records . . . created by the agencies in the course of performing their regulatory responsibilities" are CSI).  Even apart from that restriction, his statement, read as a whole, was not misleading.  In responding to a question about new issues appearing "in the media with respect to the wealth management investigation, something about the AML/KYC," Shrewsberry stated that Wells Fargo's "last 10-Q" is complete and that "investors know everything that's material that we

know."  In this part of his statement, Shrewsberry was explaining that there was nothing new to disclose about "[s]ome of the items that you've been reading about," not describing Wells Fargo's progress under the FRB consent order.  With respect to the consent order, Shrewsberry disclosed that compliance was taking "a little bit longer" than expected—he said that three times.  No reasonable investor would read language like "it's become clear after the first couple of cycles or exchanges or series of meetings, that it's going to take a little bit longer" or "it's prudent to let people know that it could take a little bit longer than was originally envisioned" as a representation that the FRB already had approved Wells Fargo's plans.

### 3.    June 13, 2018 – Morgan Stanley Conference (Shrewsberry)

Plaintiffs quote fragments of Shrewsberry's answers to questions from an analyst at a June 2018 Morgan Stanley Financials Conference.  (AC ¶¶ 149, 152.)  The full text reads:

> QUESTION:  Okay.  And then Tim said a few weeks ago, that you have the ability to shrink more noncore deposit to make room for more core loan growth.  Maybe you could give us a sense as to how much room you have and how much core loan growth you can be generating even with this as the cap that you've got.

> SHREWSBERRY:  So because of the ambient state of deposit growth and loan growth in the markets that we're serving and because of the ability to sort of dial down FI or other institutional deposits with low liquidity value and shrink the balance sheet, the asset cap, in and of itself, is really not much of a constraint in terms of how we run our business.  It's not a constraint on organic loan growth.  We're not having to tell our folks to compete in a different way.  Like that really isn't our issue.  The -- **so item 1, 2 and 3, as it relates to the consent order, is <u>satisfactorily addressing the concerns and delivering the goods under the</u> <u>consent order, which -- if it takes us a short amount of time, which is what we</u> <u>reasonably expect, a medium amount of time and a long amount of time, it's</u> <u>getting it done right, getting it done to the satisfaction of our regulators and</u> <u>other observers is -- matters the most.  And we're not in a hurry because of</u> <u>the asset cap.</u>**  The -- I would -- I'd just (inaudible) we didn't operate with the asset cap, but it's not slowing us down from running our business.  If we were in a high loan growth environment or a high deposit growth environment and with rates ticking up the way they are, you'll see, I think, this quarter, from banks reporting, that, especially maybe in the high net worth category, there are more deposits that are moving into cash equivalents, et cetera, which takes even a little bit more pressure off of this calculus.  So the asset cap is one thing, and it will -- **<u>I expect</u>** that it ***will be gone in the time frames that we've talked about***.  **<u>But more</u>**

**importantly is making sure that we're focused -- all our energy is focused on getting the work done right so that we're not having a debate 6 months from now or 9 months from now about whether it should be lifted or shouldn't be lifted.  The work should stand on its own.**

QUESTION:  And at this stage, maybe give us some color on what's left to do for the consent order.  Just the kind of questions that we have are, what kind of -- what part of the process are you in now?  Is it people, systems?  Are you already executing on the specific requests?  And is it already embedded in business as usual?  Just give us a sense of the trajectory.

SHREWSBERRY:  *Yes.*  **I mean, it's different in different pieces.  If you think about operational risk, there are either 8, 10, 12, 16 different stripes of operational risk.  Each one of them has a different level of business-as-usual maturity or, frankly, just real definition in terms of how that risk gets controlled, how that risk gets -- how that control environment gets overseen, how all of that rolls up together into aggregated risk reporting for management and for the board.  And so there's different stages of maturity.**  *It's the last mile of knitting all of this together*, **so that from the Fed's perspective and from our board's perspective, they can get delivered a real contemporaneous, risk-sensitized understanding of all of the potential risks that exist in the businesses at Wells Fargo.  And so it won't be done until that is done.  But some of it is business as usual, some of it's still some -- there's still some drawing board activity.**  There isn't another firm that we're aware of, from our relationships with other firms, with the regulators, with the consulting community, who has this exactly right.  This is an opportunity for Wells Fargo to get it exactly right, and there's -- **we're getting plenty of feedback along the way.  And so my sense is** *it will take all of the amount of time that we've described before we finish the last piece of it or set ourself on a course to maturity for the last piece of it* **because you're never actually done.  But some parts are further along than others.**

(Ex. I at 3.)

Plaintiffs contend that the phrase "It's the last mile of knitting all of this together" was false or misleading because the FRB had rejected Wells Fargo's proposed plans and Wells Fargo had requested an extension of time to resubmit its plans.  (AC ¶ 150.)  But Plaintiffs distort Shrewsberry's actual statement:  what was being "knit together," according to Shrewsberry, was a "deliver[y]" to the FRB and the Company's Board of an "understanding of all of the potential risks that exist in the businesses at Wells Fargo."  He did not say that Wells Fargo was nearing the end of the process under the FRB consent order.  Far from stating that the FRB had approved the

Company's plans, Shrewsberry made clear that Wells Fargo was still working on a suitable submission.  He warned that "there's still some drawing board activity," that "we're getting plenty of feedback along the way," and that "some parts are further along than others."

Plaintiffs also fault Shrewsberry for saying that the asset cap "will be gone in the time frames that we've talked about" and that "it will take all of the amount of time that we've described before we finish the last piece of it or set ourself [sic] on a course to maturity for the last piece of it."  (*Id.* ¶ 152.)  But Plaintiffs' allegations omit that the quoted phrases were prefaced with "I expect" and "my sense is," and also caveated with warnings that "getting it done right, getting it done to the satisfaction of our regulators . . . matters the most," "we're not in a hurry," and compliance could take a "long amount of time."  Plaintiffs do not allege that Shrewsberry misstated his actual "expectation" and "sense" at the time, and no reasonable investor would conclude from these statements that Wells Fargo had proceeded past a specific stage in the consent-order process.

### 4.    July 13, 2018 – Earnings Call (Sloan)

Plaintiffs challenge two phrases in Sloan's answer to an analyst's question during Wells Fargo's July 13, 2018 earnings call to discuss its second-quarter 2018 financial results.  (*Id.* ¶ 154.)  After Wells Fargo warned that "we may make forward-looking statements during today's call that are subject to risks and uncertainties" (Ex. J at 2), the following exchange occurred:

> QUESTION:  Couple of questions.  The asset cap, can you give us an update on where -- timing on that, Tim, when, how long?  What are you thinking currently?
>
> SLOAN:  Vivek, ***no change in the update from Investor Day*** and that we're working very constructively with the Fed.  __We've gotten some very thoughtful feedback from them.__  And __our expectation__ is that ***sometime in the first half of next year, we'll be able to move through that***.  I think the __point to emphasize there is that our goal is not to just meet expectations so we can get the asset cap lifted.  Our goal is to make the fundamental investments and changes that we need to make in how we manage operational and compliance risk at the company.  That's the goal, and that's where -- really where we're focused, but no update from a timing standpoint.__

(*Id.* at 17.)

In arguing that Sloan represented that the asset cap would be lifted "sometime in the first half of" 2019 (AC ¶¶ 154, 156), Plaintiffs omit the beginning of the challenged statement:  "And *our expectation is* that sometime in the first half of next year, we'll be able to move through that." (Ex. J at 17 (emphasis added).)   Plaintiffs do not allege that Sloan misstated his actual "expectation" at the time.  The Complaint also omits Sloan's warnings that the Company was focused not on lifting the asset cap quickly but on "fundamental[ly]" transforming "operational and compliance risk" through the consent-order process.  Nor was Sloan's statement that there was "no change in the update from Investor Day" on May 10, 2018 false or misleading because of the FRB's prior rejection of Wells Fargo's plans and Wells Fargo's extension request.  (*See* AC ¶ 155.) The FRB rejected Wells Fargo's initial plans on May 7, 2018, three days before the Company's Investor Day.  (*Id.* ¶ 71.)  Although Wells Fargo requested an extension to resubmit its plans on June 5, 2018 (*id.* ¶ 155), the requested extension was only until September 19, 2018 (*id.* ¶ 77), which was not inconsistent with Sloan's "expectation" that the asset cap could be lifted "sometime in the first half of" 2019.  A June 3, 2018 internal email from Sloan appended to the Majority Report confirms that he believed it was "more likely we will receive an approval on th[at] second submission."  (Ex. D at App. 9.)  Nor do Plaintiffs explain how Sloan could have updated the market about the FRB's rejection or Wells Fargo's extension request given that these communications are considered CSI.  *See Shirk*, 2008 WL 2661955, at *1 ("'agency opinions'" and "banks' responses thereto," as well as "plans, reports, and recommendations" that a bank is "required to prepare pursuant" to a written agreement with banking regulators, are CSI).

## 5.   December 4, 2018 – Goldman Sachs Conference (Sloan)

Plaintiffs challenge parts of Sloan's response to an analyst's question at a December 2018 Goldman Sachs U.S. Financial Services Conference.  (AC ¶¶ 157, 160, 162.)  At the outset of his

presentation, Sloan warned that "[t]he presentation that I'm about to give creates and has certain

forward-looking statements regarding our expectations about the future" and that "[a] number of

the factors, many beyond our control, could cause results to differ materially from management's

current expectations."  (Ex. K at 1.)  At the conclusion of his presentation, Sloan was asked:

> QUESTION:  Okay, great.  So perhaps we can move on to the consent order.
> You've talked about having a good dialogue with the Fed and **you've also talked
> about planning to operate under the cap for at least the first part of next year**.
> Can you update us on the progress in terms of getting it lifted?  And I guess, the
> most important question is, is there anything that you would be doing strategically
> that you cannot do as a result of the consent order?
>
> SLOAN:  Sure.  There's really ***nothing new to report in terms of the timing or the
> dialogue with the regulators, whether it's related to the consent order or any other
> area***.  **We've introduced our new risk management framework, that's up and
> operating.  We've -- are continuing to improve compliance and operational
> risk.  We've got a little bit more work to do,** but ***we're executing the plan as
> opposed to designing it*** and so that reflects a fair amount of progress.  We're ***still
> planning on operating under the asset cap through the first part of next year***.  It's
> really not impacting our ability to serve our customers in any of the businesses
> today.  We've talked about that a lot.  I appreciate why that continues to be a
> question, but it's really not having much impact.  And it's not really impacting what
> else we want to do and we're continuing to innovate, we're continuing to invest,
> we're continuing to hire really high-quality people.  So, so far, so good.

(*Id*. at 5-6.)

Plaintiffs challenge the italicized phrases because the FRB previously rejected Wells

Fargo's plans and Wells Fargo had obtained two extensions to resubmit its plans.  (AC ¶¶ 158-

162.)  But the FRB rejected Wells Fargo's initial plans more than six months earlier on May 7,

2018.  (*Id*. ¶ 71.)  As Plaintiffs acknowledge, Wells Fargo resubmitted its plans to the FRB on

October 31, 2018 (*id*. ¶ 158), a month before the Goldman Sachs conference, and the FRB still

was considering those plans.  Of course, Sloan could not divulge any of these details, including

the content of the FRB's May 7 rejection letter (*id*. ¶¶ 160, 162), due to CSI restrictions.  (*See*

*supra* at 7-8.)  Moreover, Wells Fargo's resubmission of its plans a month before the Goldman

Sachs conference was consistent with Sloan's comments that "[t]here's really nothing new to

report in terms of the timing" and that "[w]e're still planning on operating under the asset cap through the first part of next year."  The Complaint does not allege that Wells Fargo had different plans at the time.  Despite Plaintiffs' parsing of Sloan's remark that "we're executing the plan as opposed to designing it" (AC ¶¶ 157-158), Sloan nowhere stated that the FRB had approved Wells Fargo's plans.  The Company was not prohibited from "executing" its own internal plans while the FRB considered the plans it had submitted.  Indeed, it would have been imprudent for Wells Fargo not to take steps that it believed would improve compliance and risk management while awaiting the FRB's response.  The FRB consent order expressly provides that Wells Fargo "must continue to implement improvements in its governance and risk management" and that the Board must submit quarterly "written progress reports" to the FRB.  (Ex. A at 3, 10.)

###### 6.      December 4, 2018 – CNBC Appearance (Sloan)

Plaintiffs challenge similar comments by Sloan on the same date during an appearance on CNBC's *Squawk on the Street*.  (AC ¶¶ 163-165.)  When asked about his "hope now as to when" the FRB asset cap "might be" lifted, Sloan engaged in the following exchange:

> QUESTION:  I want to talk about the FED asset cap.  Originally the tone that came from the bank is that **you wanted it or hoped for it to be lifted by this fall, which hasn't happened. So, what's the hope now as to when that limit to your growth might be removed from the FED?**
>
> SLOAN:  So **originally we were hoping it would be lifted by the end of this year and what we're – our view today is that we're operating under the asset cap and our expectations are** *sometime in the first half of next year* but, Wilfred, **it's on us to make sure that we're making the improvements that we've talked about with the FED in operational and compliance risk.  To be able to demonstrate that they should be comfortable to lift the asset cap.** *We've got plans in place.  We're executing on those plans.*  We've got a terrific leadership team on the risk side.  So **I'm optimistic that we'll continue to make progress. But we need to demonstrate that we're deserving of the asset cap being lifted.**

(Ex. L at 2.)

Plaintiffs allege that Sloan's comments were false or misleading because of the FRB's May 2018 rejection of Wells Fargo's initial plans and Wells Fargo's extension requests (AC ¶¶ 163-164), but they ignore that Sloan's remarks were framed as statements of opinions: "*our view today* is that we're operating under the asset cap and *our expectations* are sometime in the first half of next year," and "*I'm optimistic* that we'll continue to make progress." (Ex. L at 2 (emphases added).) Sloan also warned that "we need to demonstrate that we're deserving of the asset cap being lifted." That the asset cap ultimately was not lifted in Sloan's expected timeframe is insufficient to plead fraud. Nor can Plaintiffs plead fraud based on Sloan's statement, "We've got plans in place. We're executing on those plans." Plaintiffs admit that Wells Fargo had submitted revised plans to the FRB for approval a month earlier (AC ¶ 163), and they do not allege that Wells Fargo was not "executing on those plans" while it awaited the FRB's response.

Plaintiffs also seek to piggyback (*id.* ¶ 166) on the Minority Report's statement that "there was no basis for [Sloan's] optimistic prediction" that "he expected the asset cap to be lifted in the first half of 2019" (Ex. F at 32). The Minority Report asserts that "[w]hen he spoke to CNBC in December 2018, the Federal Reserve had just rejected the company's initial plan for changes to its governance and risk management programs." (*Id.*) Not so. The FRB had rejected Wells Fargo's initial plans more than six months earlier on May 7, 2018 (AC ¶ 71), and Wells Fargo had submitted revised plans for FRB approval on October 31, 2018 (*id.* ¶ 163). As of the date of Sloan's CNBC appearance, the FRB had *not* rejected Wells Fargo's resubmitted plans. The Minority Report further notes that Wells Fargo's Chief Risk Officer testified a year later on December 11, 2019 that "It was not surprising [that Sloan] made that statement. Did I agree with it? No." (Ex. F at 33.) This disagreement (articulated with the benefit of hindsight) does not demonstrate that Sloan did not believe his opinion statements at the time of his CNBC appearance.

*See Tongue*, 816 F.3d at 214 ("Defendants' statements were not misleading simply because the FDA disagreed with Defendants' interpretation of the data . . . ."); *Bratusov* v. *Comscore, Inc.*, 2020 WL 3447989, at *12 (S.D.N.Y. June 24, 2020) (alleged "internal strategy disagreement" as to how "to achieve a shared goal" did not render statements about that goal misleading).

### 7.    January 15, 2019 – Earnings Call (Sloan)

In announcing its fourth-quarter 2018 earnings on January 15, 2019, Wells Fargo disclosed that it "is now planning to operate under the consent order's asset cap limitation through the end of 2019." (Ex. M (Jan. 15, 2019 8-K) at 2.)  At the outset of the earnings call later that same day, Wells Fargo warned that "we may make forward-looking statements during today's call that are subject to risks and uncertainties." (Ex. N at 2.)  Plaintiffs challenge (AC ¶ 167) certain comments by Sloan during the earnings call in response to an analyst's question:

> QUESTION:  I wanted to ask, first, about the asset cap because that seems to have taken your stock like down, Tim, **when you announced it would be in place at the end of 2019**.  And I guess, this is a two-part question.  One is the extension and expectation for the asset cap, does that reflect progress relative to your expectations towards the consent orders that are slower than you thought you would achieve regardless of the absolute level of progress?  And second, if you could remind investors, especially given the different sales that you've been doing in your Pick-a-Pay book, how the asset cap being in place in 2019, what -- any incremental impact that would have on the revenue outlook if any at all.

> SLOAN:  Sure.  Both really good questions, Erika, and thank you for asking them. **Let me just level set, right, in that a lot of the dialogue that we have with the Fed is covered by confidential supervisory information, so I want to be very careful in the feedback I'm providing.**  But I want to reiterate that we **continue to have very frequent and constructive dialogue with the Fed and we're both working towards the same goal**, which is that we want to have best-in-class risk management, period.  As you'll recall, the consent order has 2 main topics:  one is Corporate Governance and the second is compliance and operational risk management.  **And each of these have multiple work streams behind them.  The plans that we provided are very comprehensive, involve extensive documentation, which takes time to review and to process.  So the feedback that we're getting from the Fed is very detailed, and the outlook we're providing uses the best judgment that we have in terms of how long the process will take.  But at the same time**, *we're continuing to actively work and implement the new risk management framework*, as I mentioned we detailed that in our third

quarter 10-Q, and as well as incorporating the input that we're getting back from the Fed along the way.  **And from my perspective we're making good progress, it's just taking a little bit longer than what we had originally anticipated.**  But to your second question, I think the fourth quarter results reinforce our ability, particularly when you look at loan growth, right, and you net out the impact of the legacy loan portfolios, for example, in Pick-a-Pay from the asset sales or the decline in pre-2009 home equity portfolio.  But when you factor that out, what you saw is our ability to serve our customers by providing them credit.  You saw our deposit growth continue.  And so our view is that **we're going to be able to operate under the asset cap**, meet and exceed the expectations of the Federal Reserve, as it relates to our requirements under the asset cap, and serve our customers.  Because again, ***we're in complete agreement with the Fed about what needs to be done, and we're in the midst of implementing that***.  **So we're making progress.  It's just happening a little bit slower than we had originally anticipated, but we'll get there.**

(Ex. N at 8-9.)

Plaintiffs argue that the italicized comments were false or misleading because of the FRB's May 2018 rejection of Wells Fargo's initial plans and Wells Fargo's 2018 extension requests (AC ¶¶ 168-169), even though Wells Fargo, by this time, had resubmitted its plan to the FRB more than two months earlier on October 31, 2018 (*id*. ¶ 163).  Plaintiffs ignore Sloan's warning at the beginning of his answer that "a lot of the dialogue that we have with the Fed is covered by confidential supervisory information, so I want to be very careful in the feedback I'm providing."  Sloan also stated that Wells Fargo was still waiting for the FRB to complete its review of the Company's plans, noting that "[t]he plans that we provided are very comprehensive, involve extensive documentation, which takes time to review and to process."  And Sloan made clear that "the outlook we're providing uses the best *judgment* that we have in terms of how long the process will take."  (Ex. N at 9 (emphasis added).)  But he acknowledged that "it's just taking a little bit longer than what we had originally anticipated" and that "[i]t's just happening a little bit slower than we had originally anticipated."  (*Id*.)  Given these clear statements and warnings, no reasonable investor would have been misled by Sloan's generic statements that "we're continuing to actively work" and "we're in the midst of implementing that."  *See Singh*, 918 F.3d at 64

(statements about compliance not "materially misleading" if they are "simple and generic" or "framed by acknowledgments of . . . complexity" or "uncertainty" and "suggest[] caution (rather than confidence) regarding the extent of [the company's] compliance").

### 8.   January 15, 2019 – Bloomberg Appearance (Shrewsberry)

When Shrewsberry appeared on Bloomberg's *Closing Bell* later that same day, he was asked about Wells Fargo's earlier announcement that it now expected to operate "under the Fed's asset cap through the end of the year instead of just the first half of 2019." (Ex. O at 1.) Plaintiffs challenge Shrewsberry's statement that "there's nothing more to read into [the announcement] other than that it's a big body of work and it takes long, it takes time to execute on." (AC ¶ 170.) Here is the full text of the question and Shrewsberry's answer:

> QUESTION:  We're speaking with John Shrewsberry to give us some more and John, I want to look ahead here for Wells Fargo, as I'm sure your management is keen to do as well.  One of the things that the firm announced along with the results is that **you will be operating under the Fed's asset cap through the end of the year instead of just the first half of 2019**.  Talk to us about what that means for the bottom line and what that means for specific growth initiatives that Wells was perhaps looking to unfold but perhaps now put on hold.

> SHREWSBERRY:  Sure, so just to reflect on where we are just as a stepping off point for that[,] just point out what the numbers are for the fourth quarter.  We generated 6.1 billion dollars of net income, a 13-ish percent return on equity, revenue is down a little bit but we hit our expense target, credit is very much in shape, we grew loans, we grew deposits, we had big loan origination growth – double-digit as a matter of fact in student loans and small business loans and home equity loans, and 9 percent growth in auto origination so, there's a lot happening in the business.  **With respect to, to the expectation that the asset cap will be around a little bit longer, it reflects a very large complex body of work that we're working on with the Fed to, to satisfy the terms of the consent order that we entered into a year ago and it will take longer.**  There's no, ***there's nothing more to read into that other than that it's a big body of work and it takes long, it takes time to execute on***.  It doesn't really impact our day to day strategic activities or the way we serve our either consumer or commercial customers.  When the asset cap went into place a year ago there were a couple of things we described and curtailed at the time to make sure there was plenty of headroom under the asset cap.  Those were some institutional deposit-taking businesses which were inefficient users of balance sheet and so we took down our balance sheet to a little bit below where it was at the end of 17 and that plus what's happened in the market for

deposits this year as more deposits have flown into, or flowed into ah, into money market mutual funds and cash equivalents, has created, frankly, plenty of headroom to operate under.  **So, it ah the, there's nothing more important than getting the work right to deliver against the requirements of the consent order.  It's what we're all focused on but it isn't really having an impact on how we deal with the lion's share of our 70 million customers every day.**  Hope that's helpful.

(Ex. O at 1.)

Plaintiffs again contend that Shrewsberry's answer was false or misleading because of the FRB's May 2018 rejection of Wells Fargo's initial plans and Wells Fargo's 2018 extension requests.  (AC ¶¶ 171-172.)  But Plaintiffs do not explain why the then-existing status quo—Wells Fargo had resubmitted its plans on October 31, 2018—was inconsistent with Shrewsberry's statement that "it's a big body of work and it takes long, it takes time to execute on."  Nor did Shrewsberry suggest that the FRB had approved Wells Fargo's plans, stating instead that it is "a very large complex body of work that we're working on with the Fed to, to satisfy the terms of the consent order that we entered into a year ago and it will take longer" than expected.

### 9.   February 12, 2019 – Credit Suisse Forum (Shrewsberry)

Plaintiffs take issue with three snippets of Shrewsberry's response to an analyst's question during a February 12, 2019 Credit Suisse Financial Services Forum when he was asked for his "thoughts on why this might be taking a little longer."  (*Id*. ¶¶ 173, 177.)  The Complaint ignores the full text of Shrewsberry's answer:

QUESTION:  Okay, good.  So let's spend 1 minute touching on the consent order. And any updates that you have and your **thoughts on why this might be taking a little bit longer**?

SHREWSBERRY:  Yes.  **I think** it's *taking a little bit longer because it's the first of its kind, and it is sort of an expanding body of work in terms of detail.*  And we're working -- it's very constructive, **a lot of back and forth**, no disagreement on the general direction we're heading in.  **But there isn't sort of a clear cut case for, first, this happens, then this happens, then that happens.  Even though you might have read it that way, we all might've read it that way in the original letter, it's just a little bit more vague in terms of when completion exists.**  But *we're making great progress*, and **I think the current sense** of *end of the year* is

-- **seems like** a ***reasonable*** one while that's happening.  And there are a lot of resources, a lot of bandwidth devoted toward getting it exactly right because we do agree that it's the right thing for Wells Fargo.  But because of what's happened in the deposit market and with the demand for loans, our ability to operate under $2 trillion, which is a really big number, isn't really impacting our everyday business with customers.  We curtailed a couple of things, from securities finance activity and some institutional deposit taking activity right out of the gate a year ago, to sort of just bring the size of the balance sheet down.  But then with deposit, so many deposits moving outside of banking from corporate and from high net worth, it's created this incremental buffer.  So our regular business is running the way our regular business would run, which is good because it **allows us to make sure we're focused on doing the right thing, satisfying the terms of that consent order and not creating a pressure-filled environment, where we're trying to convince -- things happen faster than they could or to negotiate to try and get relief more quickly.  It's just important that we get it done right and to the satisfaction of the regulators.**

(Ex. P at 5-6.)

Plaintiffs assert that "Shrewsberry stated that the 'end of the year' to lift the asset cap was 'reasonable.'" (AC ¶ 177.)  In fact, Shrewsberry said:  "*I think the current sense* of end of the year is -- *seems like* a reasonable one."  (Ex. P at 5 (emphases added).)  The Complaint does not adequately allege that this heavily caveated opinion statement ("I think the current sense" and "seems like") was false or misleading.  *See Singh*, 918 F.3d at 64 (statements "framed by acknowledgments of the complexity" or "uncertainty" of relevant legal framework "suggest[] caution (rather than confidence) regarding the extent of [company's] compliance"); *Tongue*, 816 F.3d at 206, 213 (CEO's statement that he was "actually very satisfied with where the progress is going" as to regulatory approval was "generalized statement of subjective optimism").  Plaintiffs similarly omit (AC ¶¶ 173, 175) the caveat "I think" from another challenged snippet:  "*I think* it's taking a little bit longer because it's the first of its kind, and it is sort of an expanding body of work in terms of detail."  (Ex. P at 5 (emphasis added).)  Nor is there anything inconsistent between Shrewsberry's comment that "we're making great progress" and the FRB's rejection of Wells

Fargo's initial plans in May 2018 and the Company's resubmission of the plans five months later in October 2018.  (*See* AC ¶ 174.)

### 10.    March 12, 2019 – HFSC Testimony (Sloan)

On March 12, 2019, Sloan testified before the HFSC.  (*Id*. ¶ 178.)  Plaintiffs challenge (*id*. ¶ 185) two comments by Sloan in his lengthy written responses to HFSC members' questions:

> QUESTION:  What steps have you taken in the past, and what additional steps are you taking to execute effective corporate governance and run a successful risk-management program?

> SLOAN:  Wells Fargo is dedicated to continuing to transform our risk management practices, and meeting and exceeding the expectations of our regulators.  **While we have more work to do to meet regulatory expectations**, *Wells Fargo continues to make progress against our action plans in response to our consent orders*.  Becoming the financial services leader in risk management is **one of our six aspirational goals**.  **We have made meaningful progress to enhance our governance and risk management, including in the following ways:**

> - Risk Management Framework:  We have enhanced our Risk Management Framework, which transforms how we manage risk throughout the organization in a comprehensive, integrated, and consistent manner.  Our risk management framework consists of our three lines of defense—(1) the front line which consists of Wells Fargo's risk-generating activities, including all activities of its four primary business groups and certain activities of its enterprise functions, (2) independent risk management, which consists of our Corporate Risk function, and (3) internal audit, which is Wells Fargo Audit Services.

> - Hiring:  We have hired new leaders from outside the Company in key roles, including a new Chief Risk Officer, Chief Compliance Officer, Head of Regulatory Relations, Head of Human Resources, Head of Technology, and Chief Auditor.  Additionally, we continued to enhance the skills and expertise of our Corporate risk team by hiring 3,200 additional risk management professionals externally since 2016.

> - Board:  The Board has made significant changes to its leadership, composition, and governance practices.  The Board has undergone significant Board refreshment and enhanced the skills and experience represented on the Board.  A majority of the Board's independent directors having joined the Board since January 2017.  The Board also has reconstituted the membership of several Board committees.  Since September 2017, six of seven standing Board committees have new committee chairs.  The Board also has reviewed committee responsibilities

and amended committee charters to sharpen focus and reduce duplication in risk oversight.  With respect to the Risk Committee in particular, the Board enhanced the Risk Committee's membership to include additional members with experience identifying, assessing, and managing risk exposure of large financial firms; consolidated oversight of the Company's Corporate Risk function and Company-wide risk management activities under the Risk Committee; and formed two subcommittees to assist the Risk Committee in connection with its oversight of compliance and technology risks.  The Company has also enhanced reporting to the Operating Committee and the Board more generally.  For example, members of the Operating Committee receive weekly reporting on concerns team members bring to the attention of executives and Board members, as well as a monthly dashboard that includes analysis and commentary related to customer complaints.  The Company also enhanced oversight of conduct risk by centralizing the handling of internal investigations, complaints oversight, and sales practice oversight.

- Culture:  We have taken significant steps to promote a workplace culture where team members are encouraged to raise concerns without fear of retaliation.  All team members are accountable for risk management, we reinforce that expectation through ongoing communications and training. including our Code of Ethics and Business Conduct training that all team members are required to complete annually.

QUESTION:  How long have you been working to improve corporate governance and risk management at the bank, and how much longer will it take to implement further reforms to address the concerns of the bank's regulators?

SLOAN:  We have been continuously working to improve corporate governance and risk management at the Bank, and ***we continue to make progress against our action plans to address issues under our consent orders with our regulators and meet regulatory expectations***.  We have made, and continue to make, fundamental changes as we transform the Company.  We have centralized many aspects of our organizational structure, strengthened risk management, and improved governance practices and oversight.  **While we have more work to do, we believe we are on the right path and making real progress.**

(Ex. Q at 8-10.)  Plaintiffs contend that Sloan's comment about "progress against our action plans" was fraudulent because Wells Fargo's regulators had rejected its submissions.  (AC ¶¶ 185-188.) The Complaint ignores, however, that Sloan could not legally reveal those rejections and that he acknowledged that "we have more work to do to meet regulatory expectations" and stated only that "we *believe* we are on the right path and making real progress."  (Ex. Q at 10 (emphasis

added).)  Plaintiffs also omit the list of specific corporate reforms Sloan provided as evidence of Wells Fargo's "progress" against its "action plans."  Even the Majority Report recognizes that the FRB, in rejecting Wells Fargo's resubmitted plans, acknowledged that "Wells Fargo had made some progress."  (Ex. D at 38.)  The OCC similarly acknowledged before Sloan's testimony that "the bank is making progress in certain areas."  (*Id*. at 41.)

Plaintiffs further take issue (AC ¶¶ 178, 182) with the following oral testimony by Sloan in response to insistent questions from two HFSC members:

> CHAIRWOMAN WATERS:  Wells Fargo's 2018 10-K reports show that, in accordance with the Consumer Bureau's and the OCC's April 2018 auto insurance and mortgage rate lock consent orders, the bank submitted to the regulators an enterprise-wide compliance plan, a plan to enhance the bank's internal audit program, and plans to remediate customers affected by these matters.  According to the consent orders, the required plans are subject to the Consumer Bureau's and the OCC's review and determination of non-objection.  **Has the OCC indicated its non-objection to the bank's compliance audit on customer remediation plans?  Has the Consumer Bureau indicated its non-objection?**

> SLOAN:  Madam Chairwoman, **I can't respond specifically to your question, because that would mean that I would be disclosing confidential supervisory information that has been shared with us by both the OCC and the CFPB.**  But *I can assure you that we are working very constructively with what we have in place and we are executing that plan* **that reflects the fundamental changes that I have made since I have become the CEO**.

> CHAIRWOMAN WATERS:  Thank you very much.  For those who are listening, I am simply asking whether or not the bank is in compliance, based on reviews that are done by the OCC and the Consumer Bureau, and you heard that answer—

> SLOAN:  *We are in compliance with those plans.*  Excuse me.

> CHAIRWOMAN WATERS:  Thank you.  During an October 2, 2018, hearing before the Senate Banking Committee, Comptroller of the Currency Joseph Otting testified that the OCC was not comfortable with Wells Fargo's remediation progress to date.  **Has the bank disclosed to investors the status of the plans that it submitted to the OCC and the Consumer Bureau, including whether the regulators have raised any objections to the bank's submitted plans?**

> SLOAN:  **Again, we cannot disclose confidential supervisory information in terms of the give-and-take that we have with either the OCC or the CFPB.**  But *I can assure you that we have plans in place* and we—

-34-

CHAIRWOMAN WATERS:  Thank you very much.

*     *     *

REP. VELAZQUEZ:  Mr. Sloan, I have to repeat what you have heard before. Since 2016, Wells Fargo has been cited and fined for fraudulently opening millions of deposit and credit card accounts, abuses involving service members[,] violation with its mortgage and auto lending businesses, and security fraud charges associated with the sale of complex financial products to retail investors.  Your bank also continues to be the subject of a number of ongoing investigations. Mr. Sloan, you cannot sit there with a straight face and claim to not be responsible for all of these abuses that have been committed against consumers.  So my question to you is, do you believe that consumer abuses as well as fraudulent and deceptive actions practiced by large financial institutions could pose a threat to financial stability?

SLOAN:  I think that banks and banks like ours should follow the rules and regulations that are set forth in this country.  I completely agree with that, Congresswoman.  We have a duty to provide products and services to our customers in an appropriate way.  And if we don't provide that, that there is both financial and reputational harm that is done to the institution, and that could have an impact on the economy.

REP. VELAZQUEZ:  **So can you tell me why the Fed didn't remove the asset cap?**

SLOAN:  *As part of the consent order with the Fed, they want us to improve the Board governance and oversight, which we have done.*

REP. VELAZQUEZ:  Isn't the answer because you focus on growth and profits not risk management?  Is that the transformation that is happening at your institution?

SLOAN:  We are significantly improving our compliance and operational risk management, which is paragraph three of the consent order with the Fed.

REP. VELAZQUEZ:  **Well, the Fed does not agree with you and that is exactly why they didn't remove the cap.**  And you know it.  Sir, all Americans deserve honesty, integrity, and trust when it comes to placing their money in the banking system.  A culture of deception and deceit erodes that trust and leads depositors to lose faith in our financial institutions.  And to me, I believe that represents a threat to financial stability.

(Ex. E at 6-7, 75-76.)

Plaintiffs fault Sloan for not disclosing the details of banking regulators' communications with Wells Fargo (AC ¶¶ 179-180, 183-184), but they ignore that Sloan expressly testified, not

once but twice, that he could not provide such details because of CSI restrictions.  (*See supra* at 34-35.)[3]  Plaintiffs focus on Sloan's use of the words "plan" and "plans" in response to pointed questions pressing him to disclose more details, and they assume without basis that Sloan meant that the regulators had "approved" the plans submitted by Wells Fargo and that the Company therefore had passed "Stage 1" under the consent orders.  (AC ¶¶ 5, 186.)  In fact, Sloan nowhere said anything about regulatory approval and instead simply stated that Wells Fargo had internal plans in place to address the misconduct that resulted in the consent orders and that it was complying with those plans.

Plaintiffs allege that the HFSC later found in its March 2020 reports that Sloan's references to a "plan" or "plans" were "inaccurate and misleading."  (*Id*. ¶ 181.)  But the entirety of the Majority Report's analysis on this issue is the observation that "OCC staff stated" internally after Sloan's testimony "that Wells Fargo was not in compliance with one of two portions of their remediation plans and was still working to address issues."  (Ex. D at 61-62.)  That internal OCC discussion does not render Sloan's statements about Wells Fargo's compliance with its own plans false or misleading.  To the contrary, Sloan acknowledged in his written statement—twice—that "we have more work to do."  (Ex. Q at 8, 10.)  Similarly, the Minority Report's finding that "Sloan made a series of incomplete and overly optimistic public statements" (Ex. F at 32) distorts what he actually said.  Citing an NPR article, the Minority Report asserts that Sloan "stated the bank had transformed and was fully complying with its regulators" and "had done everything the regulators asked, and was on track to resolve the consent orders."  (*Id*. at 31 & nn.102-03.)  Although the Complaint repeats this language (AC ¶ 123), that is *not* what Sloan actually said.

---

[3] Between the exchanges with Chairwoman Waters and Representative Velazquez, Sloan again stressed in response to another Congressman's question, "I want to be very careful because I don't want to disclose any confidential supervisory information."  (Ex. E at 20.)

In any event, Sloan's oral testimony could not possibly have misled a reasonable investor into believing that Wells Fargo's regulators were satisfied with its progress under the consent orders at the time.  As the Majority Report explains, "*[i]mmediately following Sloan's testimony*, the OCC issued a written statement expressing its dissatisfaction with Wells Fargo's progress towards complying with its consent orders." (Ex. D at 7 (emphasis added).)  The OCC stated in clear and unmistakable terms:  "We continue to be disappointed with [Wells Fargo's] performance under our consent order . . . ." (*Id.* (quoting Rachel Louise Ensign & Andrew Ackerman, *Regulator Slams Wells Fargo After CEO Testifies to Congress*, THE WALL STREET JOURNAL (Mar. 12, 2019)).)  Quoting the same statement by the OCC, the Minority Report similarly emphasizes:  "*Just an hour after Sloan finished testifying*, the OCC issued an unprecedented statement to correct the record." (Ex. F at 31 (citing same *Wall Street Journal* article).)  And the *Wall Street Journal* article cited by both reports, referring to the OCC's public statements, states that Wells Fargo "received a rare rebuke from a top regulator on Tuesday, *minutes after its chief executive finished testifying* before a combative House panel." (Ex. R at 1 (emphasis added).)

Because the OCC "correct[ed] the record" just "minutes after" Sloan finished testifying, no reasonable investor could have been misled by Sloan's statements.  This immediate "correction" rendered any misstatement by Sloan immaterial.  Materiality depends on whether there is a "substantial likelihood" that Sloan's testimony "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available," and the "total mix of information may include . . . facts known or reasonably available to the shareholders."  *Garber* v. *Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) (internal quotation marks omitted).  Applying this standard, "contemporaneous publication[]" of the truth "render[s] immaterial" any alleged "misrepresentations and omissions."  *Burkle*, 2 F. Supp. 3d at

522.[4]  The decision in *Perrigo Co. PLC* v. *Mylan N.V.*, 2015 WL 9916726 (S.D.N.Y. Oct. 29, 2015), is illustrative.  There, the CEO misstated in a television interview a transaction's effect on the company's earnings per share, but "on the same day," the company issued a public filing that correctly stated the matter.  *Id*. at *17.  "Viewing [the CEO's] statement in its proper context, *i.e.*, as a remark made during an interview on live television, and considering [the] contemporaneous statements in [the company's] filing," the court was "not persuaded as to the materiality of [the CEO]'s misstatement."  *Id*.; *see also Schoenhaut* v. *Am. Sensors, Inc.*, 986 F. Supp. 785, 795 (S.D.N.Y. 1997) ("[P]laintiffs cannot now complain about road show[] statements that were subsequently contradicted by specific disclosures in the Prospectus.").

These decisions do not rely on a so-called "'truth-on-the-market' defense,"[5] which is "rarely an appropriate basis for dismissing a § 10(b) complaint."  *White* v. *H&R Block, Inc.*, 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004).  Even as to that defense, however, "'rarely appropriate' is not the same as 'never appropriate,'" and where it is clear based on judicially noticeable documents that "all the information plaintiffs claim was concealed by defendants was publicly available," and where that "truth was available in the market with more intensity and credibility than was any purported misstatement from defendants," dismissal for failure to plead materiality is appropriate.  *Id*. at *12-13.  Given the OCC's credibility on the status of Wells Fargo's compliance efforts and the clarity of the OCC's "unprecedented statement to correct the

---

[4] In *Burkle*, the court ultimately converted the motion to dismiss to a motion for summary judgment and gave the parties 30 days to submit any additional facts, but the articles there, unlike the congressional reports here, were not incorporated by reference in the complaint and thus not judicially noticeable.  2 F. Supp. 3d at 524.

[5] The "truth-on-the-market" defense is a means to "rebut the presumption that [a] misrepresentation . . . affected the market price of [a] stock by showing that the truth of the matter was *already known*" to the market.  *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (emphasis added).  Cases like *Burkle* and *Perrigo* do not rely on the claim that the truth was "already known to the market" (*id*.) by virtue of historical disclosures, but rather on *contemporaneous* publications of the truth.

record" (Ex. F at 31), that standard is easily met here.  For the same reasons, any misstatement by Sloan could not have caused Plaintiffs' losses.  *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 360 (S.D.N.Y. 2008) (no loss causation because "the risk that [plaintiff] claims was concealed" "in fact was plainly revealed").

### 11.      April 12, 2019 – Earnings Call (Parker)

Plaintiffs challenge statements made by Parker on Wells Fargo's first-quarter 2019 earnings call, Parker's first earnings call after becoming interim CEO less than three weeks earlier on March 26, 2019.  Plaintiffs start (AC ¶ 189) by challenging one tiny snippet of Parker's opening remarks, while ignoring the surrounding context:

> PARKER:  While we're aggressively addressing our risk and control issues and building a better bank, **I want to acknowledge clearly that we have a substantial amount of work yet to do, both to satisfy the expectations of our regulators and, even more important, to create the financial institution we aspire to be. Recent public statements on the part of our regulators have indicated their disappointment with our progress to date.  We understand and appreciate their criticism, and we are now redoubling our efforts to satisfy their expectations of us and our expectations of ourselves.**  We're focused on not only satisfying, but also exceeding, the expectation of all our regulators.  I take this responsibility very seriously, and the Operating Committee and I have made clear that the entire Wells Fargo team must act assertively and decisively to meet our regulators' expectations as we go forward.
>
> **Specifically, we agreed with Chairman Powell's recent public comments that we have more work to do under the February 2018 Federal Reserve consent order.  That necessary work is at varying stages of progress, and much of the work** *consists of completing and implementing efforts that are substantially underway*.  But regardless of the status of the progress of any particular part of the necessary work, I want to make clear that the most important thing for our company is that in our ongoing constructive engagement with the Federal Reserve, **we focus on getting that work done in a first rate and sustainable way and not focus unduly on when we believe that process will be completed**.
>
> **Accordingly, we do not feel it's appropriate to provide guidance as to the timing of the lifting of the asset cap.**  We understand the seriousness of getting our work with the Federal Reserve right, and we are therefore making and will be willing to make the investments that are necessary to complete the work that's needed to improve our compliance and operational risk capabilities.  This work is fundamentally an evolution of our business model, and this evolution will both

change how we manage compliance and operational risk and, by simplifying and strengthening our business processes, help us serve our customers better and become more efficient, all of which will benefit our shareholders over the long term.  As you know, we're currently operating well below the asset cap, and we have had and will continue to have the ability to serve the needs of all our 700 million customers—excuse me, 70 million customers while we work to satisfy the requirements of the Federal Reserve consent order.

(Ex. S at 4.)[6]  Plaintiffs also challenge (AC ¶¶ 189, 192) the following exchange later in the call:

QUESTION:  There's a lot of focus on the fundamentals here, but I want to kind of back up to what I think is the biggest issue for the company.  You said in your prepared remarks at the very beginning, you understand what the regulators are disappointed in.  And maybe you could shed some light, what is it that they're disappointed in?  And what are you either doing differently now, say, versus 6 months ago or plan to do differently to address these things?

PARKER:  Well, let me start by saying something that's rarely said, but I think should be said, and that's the [p]rudential bank regulators play a really critical role in our system.  They're there to ensure the safety and soundness of financial institutions like ours, but they're also there to ensure the safety and security of the financial system more generally.  We get their feedback constantly, and we take it very seriously and we take it into account in terms of everything that we do.  **As you know, Matt, the recent public statements on the part of the regulators have indicated their disappointment with our progress today.  The Fed, the OCC, the CFPB have all gone on public record in terms of saying that.  We understand and accept their criticism.**  And as I said before, we're going to be redoubling our efforts to satisfy their expectations of us.  I met with all the regulators in Washington earlier this week, and one of the things that I tried to convey to them was that we're going to try to bring to our relationship with them going forward a greater level of urgency and seriousness, understanding again, that the single most important thing for us to do is to execute on our priorities and satisfy our commitments to them.  And we're doing a lot of things to help us do that.  We've hired a number of key leaders in new roles from outside the company, and they've had a significant impact in terms of what we're doing.  Now, as I mentioned before, we're engaged in a thorough reshaping of our risk management framework, and that's going to fundamentally change how we manage risk within the company.  And then finally, we're really going to be focused intently on operational excellence in all we do.  And a big part of that, as I've mentioned before, is our work on business process management.  I would emphasize, **when you take all this as a**

---

[6] On March 20, 2019, FRB Chairman Jerome Powell stated at a press conference:  "We put in place an unprecedented sanction in the form of an asset growth cap, and we will not lift that until Wells Fargo gets their arms around this, comes forward with plans, implements those plans and we're satisfied with what they've done.  That's not where we are right now."  (John Heltman, *Fed chief hints Wells Fargo's regulatory issues are far from over*, AMERICAN BANKER (Mar. 20, 2019).)  These are the "recent public comments" by Chairman Powell to which Parker refers.

**whole, the basic answer to your question is that we're going to be working harder and smarter, and** *we're going to be focused more on execution*.  And we're going to do all that with an appropriate sense of urgency.

We believe that we can complete all the work we need to do in a timely manner.  But much more important than that, I believe that we can do this all to the highest standards of professionalism and long-term durability for the company.  We want to not only meet their expectations, but also exceed them.

QUESTION: Just as a follow-up, like, I mean, where is the disconnect?  Like I would've thought a little over a year ago when the asset cap was implemented that that's when the communication would have been improved.  That's when you would have gotten the same page.  I mean, I don't know if it's just that the regulators don't appreciate how big, how granular, how diverse of a company you are, so how long it takes or if it's just been maybe bigger issues than you appreciate a year ago.  I just think a lot of us don't understand, when we look at Wells long term, you have a great track record from a risk management perspective, again, on all facets.  And a lot of the people that have executed on that strategy have been—they're trying to kind of clean up these issues.  And it's just so rare for a regulator to go public.  So again, I don't know if it's just that you're so big and so granular that there's just so much to do and maybe they don't appreciate that.  Or was there something that you didn't appreciate as a company a little over a year ago.

PARKER:  I mean, it's a good follow-up.  I think one of the most important things to understand is that what we're talking about, as I said earlier, is essentially an evolution of our business model.  **We have, in essence, picked out with our regulators a point on the horizon in terms of creating a truly extraordinary company, not only in terms of business performance and operational excellence, but also risk management.  Our engagement with the regulators, and this goes for all of them, particularly the OCC and the Fed, is an ongoing engagement.  We get their feedback constantly, and we, therefore, are called upon to respond to it constantly.  And that sometimes means that we have to work hard to understand exactly what their expectations are for us.**  I have really had an opportunity through my meetings earlier this week to understand exactly what their expectations are.  **And although our work is in various stages of progress, some of it is** *way down the road and is really pointed toward completion and implementation*.  **Other parts of it are a little bit earlier in the process.**  I think I have a very good handle on where we want to go with them, and I think that they've been very clear with us.  The single most important thing, I think to note, is that we have really done a good job of restructuring our balance sheet so as to be able to operate under the asset cap for over a year.  **And we're going to do whatever is necessary to ensure that we can continue to serve our customers for as long as the asset cap is in place.**

(Ex. S at 14-15.)

As is evident from Parker's full statement, Plaintiffs seek to hold him liable for fraud by isolating certain portions of his remarks and ignoring the rest. Far from assuring investors that regulators had approved Wells Fargo's plans and that the Company had completed "Stage 1" under the consent orders, Parker emphasized that Wells Fargo had "a substantial amount of work yet to do," that "regulators have indicated their disappointment with our progress to date," that "[w]e understand and accept their criticism," that "our work is in various stages of progress," that "parts of it are a little bit earlier in the process," and that "we do not feel it's appropriate to provide guidance as to the timing of the lifting of the asset cap." Parker's comments that "we're going to be working harder and smarter, and we're going to be focused more on execution" and that "*some of it* is way down the road" (*id*. at 15 (emphasis added)) could not have misled a reasonable investor when taken together with the rest of Parker's remarks.

### 12.   April 12, 2019 – CNBC Appearance (Shrewsberry)

Plaintiffs further criticize two remarks by Shrewsberry during an interview on CNBC's *First on CNBC* later that same day. (AC ¶¶ 195-196.) The full text of the question and Shrewsberry's answer is quoted below:

> QUESTION:  John, I wanted to ask about the Fed asset cap. Of course it's not being lifted was one of the big blows, I guess, of Tim's most recent year or so in charge. Your new CEO, interim CEO, [Allen] Parker was asked by Matt Connor of DB on the call what you're now going to be doing differently compared to the last six or twelve months to get that lifted. He said "The basic answer to your questions is we're going to be working harder and smarter and we're going to be focused on execution and doing that with a sense of urgency." I'm sure that you wouldn't say under Tim the work was not hard or smart or urgent. So what actually is changing and what prospect is there that this asset cap gets lifted anytime soon?

> SHREWSBERRY:  Sure, it's a great question. You know, I think what was missing in that summary and we could've done a better job, I think, conveying it earlier, is that **there's an approach to planning the work, to hiring the necessary people to execute the work, then to executing the work, then to assessing the maturity of the work and then to sort of cycling back around and continually improving it. All of those things happen in a particular cadence. They began when the asset cap, or when the Fed consent order was put in place. There's a variety**

**of different streams of work but each of them have that structure to them in terms of planning it out, putting the right people in, planning further at a more detailed level, executing, testing the execution and understanding the maturity.** So, we're *later in that cycle today*, which is good.  **Later in some streams of work, I'm sure, than in others.**  But *it isn't just doing the same thing over or doing the same thing harder, it's being further down the maturity curve of the type of work, the nature of work, that has to be done*.  And as I said on the call this morning, **it's really business process by business process**, thorough mapping and understanding, identification of risks and controls, and so that the aggregation of all that we do, and how we do it at Wells Fargo, is very well understood, well controlled and well governed.

(Ex. T at 4.)

Plaintiffs contend that Shrewsberry's comments that "we're later in that cycle today" and "further down the maturity curve" suggested that regulators already had approved Wells Fargo's plans.  (AC ¶¶ 196-197.)  But that is not what Shrewsberry said.  Nowhere did he say anything about regulatory approval.  Like Parker earlier that same day, Shrewsberry stated only that the Company was working through an iterative, task-by-task process, not "just doing the same thing over or doing the same thing harder."  He also warned that "[t]here's a variety of different streams of work" and that Wells Fargo was "[l]ater in some streams of work, I'm sure, than in others."

### 13.    May 30, 2019 – Sanford C. Bernstein Conference (Parker)

Plaintiffs challenge two small snippets ("we're largely there" and "there is a meeting of the minds in terms of what we need to do") of Parker's response to an analyst's question at the 2019 Sanford C. Bernstein Strategic Decisions Conference.  (AC ¶ 198.)  Here is the full text:

QUESTION:  So in your view, how would you describe the current state of Wells Fargo's relationship with the regulators?

PARKER:  I think if you go back, it's probably been now 6 weeks or so, I think everyone in the room knows that **after Tim Sloan gave his house financial services committee testimony, the 3 of the regulators, the Fed, the OCC, and the CFPB put out press releases, which in and of itself was unusual, but they all 3 in various ways expressed some frustration with where the company was in terms of the progress that it made**.  So I think that gives you an idea about how they were looking at the relationship at least at that point.

* * *

QUESTION: Regarding the asset cap, where do you think there's been a disconnect with the regulators?  And what still needs to be done to get the asset cap lifted?

PARKER:  Well, I guess I would start by saying that I don't think that there is a disconnect, certainly not today.  **I think in terms of the larger notions of what we want to achieve in terms of the Fed consent order, I think we are in agreement with the Fed.**  And just to refresh everybody's recollection, there are 2 parts to the Fed consent order: One is Corporate Governance, and dramatic changes have been made there over the last year.  **The goal is to really be a Corporate Governance environment that is best-in-class, and I think** *we're largely there*.  We've seen a real evolution in terms of the way that we analyze risk internally, and we've also seen a lot of changes in the way our board operates, the transparency to our Board, the deliberation by our Board and the Board committees, and we've seen a refreshment in the Board, the adding of a number of outstanding people, including, announced yesterday, the addition of Chuck Noski to the Board.  The second piece of the Fed consent order is operational risk and compliance.  And there, **I think** ***there is a meeting of the minds in terms of what we need to do***, **but the task itself is a significant one.**  A lot of hard work has gone on already and **that hard work is going to continue.  As I said at first quarter earnings, I can't really put a timetable on that.**  The single most important thing to know is, it's going to get done, and it's going to get done in a first-rate way.  Because to my mind, that's what we need to accomplish to have the company be what it can be.  We want to satisfy the regulators, we want to have the asset cap lifted, but reaching a state of optimal operational risk management and compliance is something we need to do foundationally to have the company grow in a safe and sound way.  Now everyone knows that we have managed our balance sheet, restructured our balance sheet to be under the asset cap, I think we're $70 billion under it now.  So we can serve our customers but obviously we would prefer not to be there, and we're going to do everything we can to get past the asset cap and ultimately the Fed order in a manner that's urgent but high quality.

(Ex. U at 2, 4-5.)

In challenging these small fragments (AC ¶¶ 198-200), Plaintiffs ignore that Parker prefaced both with "I think"—"*I think* we're largely there" on one part of the consent order, and "*I think* there is a meeting of the minds in terms of what we need to do" on the other part.  (Ex. U at 4 (emphases added).)  The phrase "I think" is "classically indicative of opinion."  *Gregory*, 297 F. Supp. 3d at 406.  Parker also warned that the Company's "hard work is going to continue," that "the task itself is a significant one," and that "I can't really put a timetable on that."  Although

Plaintiffs criticize Parker for not disclosing the FRB's March 2019 rejection of Wells Fargo's resubmitted plans (AC ¶ 199)—which he could not divulge due to CSI restrictions—Parker acknowledged that after Sloan's March 2019 testimony, all three regulators had publicly "expressed some frustration with where the company was in terms of the progress that it made."

### 14.    September 27, 2019 – Investor Conference Call (Duke)

On September 27, 2019, Wells Fargo held a conference call with investors and analysts to announce that Scharf would become the Company's new CEO on October 21, 2019.  Plaintiffs challenge (AC ¶ 201) part of one of Duke's answers to an analyst's question about whether "the majority of [Scharf's] position is, at least initially, regulatorily-driven."  Here is the full context for Duke's answer:

> QUESTION:  A question for Betsy first.  Betsy, could you give us a sense of how the Board is thinking about the strategy that Wells Fargo has in place right now today and if you're expecting Charlie to deliver an update to that strategy at any point?  Or is it just the keys are locked and loaded and the vehicle is moving forward?

> DUKE:  Well, I think he's definitely going to have a point of view on that.  We would have made a bad choice if he didn't have a point of view on the strategy.  But I think our overall strategy is pretty well laid out that **I think Charlie is exactly right when he talks about the work we need to do for our regulators**; the work we need to do to make the company easier to operate in for our team members, for our customers; to integrate new technology solutions; to move things from a distributed model into an enterprise model in the way we run things.  All of that work is part and parcel of the same thing.  So I don't think it's going to be a huge difference in the company.  I mean this company at its core is a Main Street top bank in America, top position in many, many markets, so that part will continue.  But we will always be refining.

> And there are a lot of decisions, just individual decisions that need to get made every single day.  **And a lot of those decisions need to be made with a single eye toward a vision for the future, and that's what we will be looking for Charlie to begin to synthesize and express.**

> QUESTION:  **And do you expect that the majority of the position is, at least initially, regulatorily-driven?**  That there's a lot that has to do with regulators?  Or is it that piece of it is down the path very significantly and it's just -- keep moving on the same path?  Just wondering your thoughts on that, Betsy.

DUKE:  Well, *we're pretty well along in a lot of the work, and we've defined out* **the work for each individual piece of it, each individual agreement with a** **regulator.**  **And those are all on somewhat different tracks, although a lot of** **the themes are parallel.  And so that work will continue to the extent that** **Charlie can use his experience and his insights to get through some of the** **pieces and accelerate that work, that will be terrific.**  But **I think** *we have a* **good understanding with our regulators on what they are looking for**, and that's the conversation that we had quite a bit with Charlie when we were talking about him coming here because **he wants to understand what the work was that we** **needed to do and how far along it was and what else was left to be done**.

(Ex. V at 5-6.)

The italicized text is the only statement by Duke challenged in the Complaint.  Plaintiffs

attempt to transform her comments into an assurance that Wells Fargo's regulators already had

approved its plans.  (AC ¶¶ 202-204.)  As her full answer makes clear, however, Duke made only

the unremarkable, and entirely true, observations that Wells Fargo's work streams "are all on

somewhat different tracks" and that "we're pretty well along in a lot of the work," and she

expressed her view as Board Chair that, "to the extent that Charlie can use his experience and his

insights to get through some of the pieces and accelerate that work, that will be terrific."  Duke

then added, "*I think* we have a good understanding with our regulators on what they are looking

for" (Ex. V at 6 (emphasis added))—a classic opinion statement.  Those remarks were not an

assurance that Wells Fargo already had received regulatory approval for its plans.

### 15.    October 15, 2019 – Earnings Call (Parker)

Plaintiffs challenge (AC ¶ 205) Parker's answer to a question during Wells Fargo's third-

quarter 2019 earnings call on October 15, 2019 about where Wells Fargo stood "on the consent

order and remediating the operational risk and controls."  The full text is below:

QUESTION:  Okay.  All right.  I just wanted to be clear.  So wanted to just maybe ask about a different topic.  And I apologize I was on a little bit late, I don't know if you addressed it.  But any update on where you stand on the consent order and remediating the operational risk and controls?  And **it seems like there's a lot of** **blocking and tackling there in terms of all of the processes that you're looking** **at, identifying risk and controls and where appropriate, remediating those**.

**Can you just give us a sense regardless of what the Fed does and when they lift it, where you feel like you are in that process?**  And do you feel like you need to get past that before you can really attack the cost structure in a meaningful way?

PARKER:  Yes.  Thanks.  So let me start on that, and I'll turn it over to John.  **I mean our conversation with our regulators are, of course, confidential supervisory information.  But I can say that our engagement with the regulators has been very constructive and we're in constant dialogue with them on a number of fronts.  As everybody recalls, several of the regulators made public statements earlier in the year in which they expressed their disappointment with the progress we made up until that time.**  In response to that criticism, **which, of course, we accepted**, over the last 6 months, we've redoubled our efforts with regard to trying to satisfy their expectations.  And I've made clear, I know Charlie will as well, that the entire Wells Fargo team must continue to act assertively and decisively to meet the regulators' expectations going forward.  With regard to the issues raised in the Fed consent order, the feedback that we are getting from the Fed on a constant basis is enabling us to continue to make progress in terms of responding to their expectations.  **We're good ways down the road, but I think it's fair to say that we have a substantial amount of additional work to do.**  And of course, at the same time, *we've designed and implemented and we're constantly working to enhance our new risk management framework*.  And that's fundamentally transforming how we manage risk every day throughout the organization in a way that I would describe as much more comprehensive, integrated and consistent.  And at the same time, we're enhancing frontline risk, independent risk management and the audit functions so that we can ensure multiple layers of review and better visibility into issues as they emerge.  And obviously, the goal of all this is to prevent the occurrence of kind of the kinds of issues that we had in the past. And as John alluded to before, we're also emphasizing operational excellence throughout the company.  Our biggest focus area is on business process management in an effort to try to deliver greater consistency.  **So I guess what I will say, and I'll turn it over to John to talk about some of the financial impacts, is that there's a great deal of work to do to meet the expectations of our regulators.  They're appropriately high.**  But we're committed to completing that work.  We're working very hard, and we're confident that we'll be able to complete the work in a manner that's timely and, just as important, up to the highest standards of professionalism and durability going forward.

(Ex. W at 15.)

Plaintiffs ignore Parker's warning that "our conversation[s] with our regulators are, of course, confidential supervisory information."  In arguing that his reference to a "new risk management framework" suggested that Wells Fargo's regulators already had approved its plans (AC ¶¶ 205-207), Plaintiffs also disregard Parker's reminder that "several of the regulators made

public statements earlier in the year in which they expressed their disappointment with the progress

we made up until that time," as well as his comments that "I think it's fair to say that we have a

substantial amount of additional work to do" and that "there's a great deal of work to do to meet

the expectations of our regulators."  Those statements belie Plaintiffs' contention that Parker's use

of the phrase "designed and implemented" somehow suggested that the FRB had "approved the

Bank's Stage 1 Plan proposals."  (*Id*. ¶ 206.)

### 16.    December 10, 2019 – Goldman Sachs Conference (Shrewsberry)

Lastly, Plaintiffs challenge (AC ¶ 208) Shrewsberry's response to an analyst's question

about the consent orders at a conference sponsored by Goldman Sachs on December 10, 2019:

> QUESTION:  **So perhaps we can talk a little bit about the consent order.  And I appreciate there's probably not a lot of new you can say**, but can you just update us on the progress that you're making?  **And just perhaps remind us on what the process looks like from here.**

> SHREWSBERRY:  Sure.  The way the process look like is we -- actually, I say process, you say process?  **The way the process looks like is we get to a certain point of this body of work that I mentioned process by process and risk by risk.  And once we reach a certain point, we will have a third-party come in** and demonstrate that, that has been adopted and implemented in theory to the satisfaction, in that case, the Federal [R]eserve, and then it's up to them to determine what to do with that information.  **That isn't scheduled at the moment. It's in the relatively near future.**  But importantly, *the work that's underway to prepare for that is what's happening*, what that means.

> QUESTION:  And I appreciate you may not have the exact answer, but how long do you think the third-party review would take? Is that . . .

> SHREWSBERRY:  No idea.

> QUESTION:  No idea?

> SHREWSBERRY:  I mean it's -- *the beauty of the amount of work that's been done behind the scenes in preparation for that is that we'll do everything in our power to make it as easy as possible for people to understand what the program is and how we've implemented it to make it as seamless as possible*.

(Ex. X at 3.)

Plaintiffs contend that Shrewsberry's description of "what the process looks like from here" was false or misleading because it suggested that "the Bank's Stage 1 Plans" had been "implemented."  (AC ¶ 209.)  Not true.  Shrewsberry simply described "[t]he way the process looks" and correctly stated that "*once we reach a certain point*, we will have a third-party come in" to review Wells Fargo's implementation of its plans.   (Ex. X at 3 (emphasis added).) Shrewsberry disclosed that this later stage of the process "isn't scheduled at the moment" and offered the view that "[i]t's in the relatively near future."  Although Plaintiffs seek to transform these comments into an assurance that the Company had completed "Stage 1" (AC ¶ 209), Shrewsberry never said that—he merely noted that a lot of work already had been done in preparation for the independent-review stage and that such work was ongoing.

*          *          *

Plaintiffs cannot plead a misrepresentation by relying on incomplete and selective quotations of Defendants' actual statements.  They instead "must demonstrate with specificity why and how" Defendants' statements, read in their entirety, were false or misleading.  *Rombach*, 355 F.3d at 174.  The Complaint fails to do that.

## II.     Plaintiffs Fail to Plead Particularized Facts That Raise a Strong Inference of Scienter for Each Defendant Individually.

"[W]ith respect to each act or omission alleged to violate" Section 10(b), Plaintiffs also must plead "with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind"—*i.e.*, scienter.  15 U.S.C. § 78u-4(b)(2)(A).  "The term 'scienter' . . . refer[s] to a mental state embracing intent to deceive, manipulate, or defraud."  *Aaron* v. *SEC*, 446 U.S. 680, 686 n.5 (1980) (internal quotation marks omitted).  For an inference of scienter to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  "[I]n determining

-49-

whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id*. at 323.  If a "plausible, nonculpable explanation[]" is more likely than fraud, the complaint does not adequately plead scienter.  *Id*. at 324.

To plead scienter for a forward-looking statement, a plaintiff must allege that the statement was made "with actual knowledge" of its falsity.  15 U.S.C. § 78u-5(c)(1)(B); *see Lopez*, 173 F. Supp. 3d at 25 ("scienter requirement for forward-looking statements" is "actual knowledge").  For opinions, the complaint must plead particularized facts showing that the opinion statements were "'not honestly believed when they were made.'"  *Pirnik* v. *Fiat Chrysler Automobiles, N.V.*, 2016 WL 5818590, at *8 (S.D.N.Y. Oct. 5, 2016) (quoting *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011)).

For all other statements, the minimum required mental state is "conscious recklessness"—"a state of mind *approximating actual intent*."  *S. Cherry St., LLC* v. *Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009).  The complaint must plead facts "show[ing] either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA & Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  To plead the former, the Second Circuit requires particularized allegations of a "concrete and personal benefit to the individual defendants resulting from the fraud."  *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  If "motive is not apparent," the complaint must "identify[] circumstances indicating conscious behavior by the defendant," and "the strength of the circumstantial allegations must be correspondingly greater."  *Id*. at 142.  The complaint must contain "allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements."  *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (internal quotation marks omitted).

Moreover, "'[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible.'" *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 664 (S.D.N.Y. 2017).

Plaintiffs fail to plead particularized facts giving rise to the required strong inference that each of Sloan, Shrewsberry, Parker, and Duke—the four Individual Defendants accused of fraud— individually made a false or misleading statement with an intent to deceive, manipulate, or defraud. That failure is also fatal to Plaintiffs' Section 10(b) claim against Wells Fargo.

### A.   Tim Sloan

Plaintiffs contend that former CEO Sloan made six misstatements between February 2, 2018, when the FRB consent order was entered, and March 12, 2019, when he testified before the HFSC.  Plaintiffs do not plead any "concrete and personal benefit" to Sloan "resulting from the fraud" beyond the generic "[m]otives that are generally possessed by most corporate directors and officers." *Kalnit*, 264 F.3d at 139.  The Complaint makes no allegations of the sort of financial self-interest that courts consider probative of motive, such as suspicious stock trading or contingent compensation. *See*, *e.g.*, *S. Cherry St.*, 573 F.3d at 108-09.

What is more, any suggestion that Sloan intentionally misrepresented the status of Wells Fargo's compliance with the consent orders to "secure" some undefined and "ephemeral benefit" would be "farfetched."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 270 n.12 (S.D.N.Y. 2008).  As one court noted, a theory predicated on "an audacious and frankly unrealistic plan" to lie and "get away scot free" makes a non-fraudulent explanation for alleged misstatements "far more likely." *JBCHoldings NY, LLC* v. *Pakter*, 931 F. Supp. 2d 514, 534 (S.D.N.Y. 2013). If a defendant "stood to gain very little from the fraud alleged by Lead Plaintiffs, other than the postponement of 'an inevitable day of reckoning' when the [truth] became public," a defendant's "statement that it complied with [a regulator's] rules is most naturally interpreted as a reasonable

resolution of ambiguous regulatory language, not as a reckless or knowing falsehood." *Take-Two*, 551 F. Supp. 2d at 281 (quoting *Shields*, 25 F.3d at 1130).

That is certainly the case here. At the time of Sloan's statements, Wells Fargo was under intense regulatory "scrutiny" because of its prior legal issues. (AC ¶ 41.) The Company's regulators obviously were well aware of the status of Wells Fargo's efforts to comply with the consent orders. As their public statements immediately after Sloan's March 2019 HFSC testimony demonstrate, Wells Fargo's regulators were not at all shy to express, both to Congress and the public, their dissatisfaction with the Company's progress under the consent orders. Because Wells Fargo was operating in a regulatory, political, and media fish bowl, it made zero sense for Sloan to lie in his public statements and congressional testimony about the status of Wells Fargo's efforts to satisfy the consent orders' requirements or whether regulators had approved Wells Fargo's plans. He had to know that Wells Fargo's regulators, which knew exactly where the Company stood in the process mandated by the consent orders and whether they had approved Wells Fargo's submissions, would immediately correct any statement on those subjects they believed to be false.

Beyond the absence of any rational motive to lie, Plaintiffs fail to plead particularized facts demonstrating that Sloan did not believe his opinion statements or had actual knowledge of the alleged falsity of his forward-looking statements—for instance, that he did not believe on the day the FRB consent order was entered that the order's timeline put Wells Fargo "on a fast track" or that he did not hold the expectation in mid-2018 that the FRB's asset cap would be lifted the following year. *See Pirnik*, 2016 WL 5818590, at *8 ("Plaintiffs must show that [company's] 'opinions' . . . were not only 'false' (*i.e.*, inaccurate) but also 'not honestly believed when they were made.'"). Sloan's repeated warnings about potential delays in lifting the asset cap, the work Wells Fargo still needed to complete under the consent orders, the iterative nature of the process

under those orders, and his inability to reveal regulators' communications with Wells Fargo because of CSI restrictions are inconsistent with an intent to mislead investors that regulators already had "approved" Wells Fargo's plans (AC ¶ 5), a word Sloan never once used.

Moreover, with the exception of his HFSC testimony on March 12, 2019, all of Sloan's statements predated the FRB's March 11, 2019 rejection of Wells Fargo's resubmitted plans. (*See id*. ¶ 93.)  The Complaint does not allege any facts demonstrating that Sloan, before that second rejection, was not, in fact, optimistic that Wells Fargo was making progress under the FRB consent order and that the asset cap might be lifted sometime in 2019.  *See Tongue*, 816 F.3d at 211 ("even exceptional optimism" is not actionable).

In his March 2019 HFSC testimony, Sloan clearly attempted to walk a tightrope between not unlawfully disclosing CSI and potentially subjecting himself and Wells Fargo to criminal penalties, on the one hand, and answering HFSC members' insistent questions, on the other.  He also wanted to assure Congress and the public that Wells Fargo had put internal plans in place during his tenure as CEO to remedy harm suffered by customers and help avoid any recurrence of the misconduct that led to the consent orders.  None of this raises a strong inference that Sloan intended to mislead anyone about the status of the Company's efforts to satisfy the consent orders.

While Plaintiffs emphasize the HFSC reports' harsh critique of small portions of Sloan's testimony and the HFSC Chairwoman's referral of Sloan to the Department of Justice (*id*. ¶¶ 222-223), the HFSC's criticisms of Sloan, like Plaintiffs' allegations, twist his actual testimony into something it was not—an unqualified assurance that Wells Fargo "was fully complying with its regulators" and that "the bank had done everything the regulators asked, and was on track to resolve the consent orders."  (*Id*. ¶ 123.)  That is not what Sloan said.  *See Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015) ("government investigations cannot bolster

allegations of scienter that do not exist").  Plaintiffs also point to Sloan's alleged apology to the FRB after he finished testifying as supposed evidence of scienter.  (AC ¶ 219.)  But this apology does not create a strong inference that Sloan acted with an intent to defraud or deceive in testifying. At most, it suggests that Sloan felt compelled, in light of the OCC's public condemnation of Wells Fargo within minutes of when he finished testifying, to reach out to the FRB in an effort to allay any concerns the FRB might have had.  That effort was by no means an admission of scienter.

Plaintiffs contend that over a week before his HFSC testimony, "Sloan instructed his colleagues to revise a proxy filing to avoid admitting that 'substantial' work remained under the 2018 Consent Orders."  (*Id*. ¶ 224.)  The referenced March 3, 2019 emails between Sloan and Duke, which are appended to the Majority Report, were sent *before* the FRB's March 11, 2019 rejection of Wells Fargo's resubmitted plans.  The emails discussed a paragraph in the proxy statement about executive compensation and noted that Wells Fargo had "condition[ed] vesting of" Sloan's "long term performance shares" on progress against regulatory expectations, and that Duke and Sloan considered this an "important and impactful decision."  (Ex. D at App. 13.)  This conditioning confirms that Sloan's financial incentives were aligned with Wells Fargo's long-term performance under the consent orders, undercutting any inference that Sloan had a motive to lie for some short-term benefit.  Although Sloan suggested deleting the word "substantial" in the phrase "substantial amount of work remaining to meet the expectations outlined in" the consent orders, he did so because he thought otherwise "stakeholders could *jump to the conclusion* it means we are not close to lifting of the asset cap and it may give regulators even more confidence in criticizing us."  (*Id*. (emphasis added).)  That phrasing is significant:  it shows that Sloan honestly believed at the time (eight days *before* the FRB rejected Wells Fargo's resubmitted plans) that there was *not* a "substantial" amount of work left under the consent orders and that the asset cap

would be lifted in 2019, and that he did not want others to "jump" to a "conclusion" he believed to be erroneous.

Plaintiffs' remaining scienter allegations are unavailing. Plaintiffs assert without any factual basis that Sloan "was abruptly forced to 'resign' within days" of his HFSC testimony. (AC ¶ 220.) But even assuming that allegation is true, "terminations alone are insufficient" to plead scienter. *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 815 (S.D.N.Y. 2018). "In reality, there are any number of reasons that an executive might resign, most of which are not related to fraud." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005). Likewise, the Board's decision in 2020 about Sloan's performance share award (AC ¶ 228) says nothing about his state of mind in making properly caveated statements in 2018 and 2019. Although Plaintiffs cite former director Karen Peetz's HFSC testimony (*id.* ¶ 227), Peetz testified that Sloan actually "believed he as CEO could handle everything. He had confidence, maybe overconfidence, in people collaborating." (Ex. F at 28.) Overconfidence is not evidence of fraud.

Finally, the importance of consent-order compliance and the FRB asset cap to Wells Fargo's business (AC ¶¶ 229-233) does not, without more, establish scienter. "[T]he overwhelming consensus in this district is that such 'core operations' allegations are insufficient—standing alone—to establish scienter," *Gagnon* v. *Alkermes PLC*, 368 F. Supp. 3d 750, 755 (S.D.N.Y. 2019), if they are permissible at all, *see Sachsenberg* v. *IRSA Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 183-84 (S.D.N.Y. 2018) ("[T]he Second Circuit has expressed doubt as to the continued independent viability of the core operations doctrine."). That is especially so here, where Sloan and others were hamstrung in their ability to answer questions about the status of Wells Fargo's efforts to comply with the consent orders because of stringent CSI regulations.

### B.     John Shrewsberry

Plaintiffs assert that former CFO Shrewsberry made six misstatements between May 30, 2018 and December 10, 2019, even though neither HFSC report accuses him of making a single false or misleading statement.  As with Sloan, Plaintiffs fail to allege that Shrewsberry had any motive to lie about Wells Fargo's progress under the consent orders or that he did not honestly believe his opinion statements and forward-looking statements about the expected timing for compliance, much less that he had actual knowledge that those statements were false.  Plaintiffs also distort what Shrewsberry actually said, omitting his warnings that, among other things, lifting the asset cap could take "a long amount of time," some of the work streams "are further along than others," and some are still at the "drawing board" stage.  (*See supra* at 20-21.)  These disclosures "undercut the inference that" Shrewsberry "was attempting to conceal th[e] truth." *City of Pontiac*, 752 F.3d at 186 & n.62 ("specific disclosures" about true state of affairs "undercut the inference that defendants knew or recklessly disregarded that" the truth "was inconsistent with their representations," "much less that they intended to conceal or recklessly concealed" the truth).

### C.     Allen Parker

Plaintiffs challenge three statements by Parker between April 12, 2019 and October 15, 2019, when he was Wells Fargo's interim CEO.  None of Parker's statements is mentioned anywhere in the HFSC reports.  The notion that Parker would have knowingly or recklessly misrepresented Wells Fargo's progress under the consent orders is "farfetched." *Take-Two*, 551 F. Supp. 2d at 270 n.12.  Parker is an accomplished lawyer who was Wells Fargo's General Counsel from March 2017 to March 2019 and, before that, a partner at Cravath, Swaine & Moore LLP, where he was the Presiding Partner from 2013 to 2016.  Less than a month before his first alleged misstatement, the Wells Fargo Board asked Parker to serve as interim CEO following Sloan's retirement in the wake of regulators' public statements that, as Parker put it, "indicated

their disappointment with our progress to date." (*See supra* at 39.)  It is inconceivable that Parker would lie in his public statements about issues he knew were the subject of intense governmental scrutiny throughout his tenure as interim CEO.  Nor do Plaintiffs offer any explanation for why Parker would have a motive to lie—the Complaint does not point to a single fact that courts consider probative of motive to defraud.  *See*, *e.g.*, *S. Cherry St.*, 573 F.3d at 108-09.

In addition, the Complaint's description of Parker's three statements is an egregious case of selective quoting that intentionally omits warnings that "undercut" any inference of scienter. *See City of Pontiac*, 752 F.3d at 186 & n.62.  Plaintiffs ignore, among many other warnings, Parker's statements that "we have a substantial amount of work yet to do," that "our regulators have indicated their disappointment with our progress to date," that "we do not feel it's appropriate to provide guidance as to the timing of the lifting of the asset cap," and that "there's a great deal of work to do to meet the expectations of our regulators."  (*See supra* at 39, 47-48.)

Nor do (or could) Plaintiffs plead that Parker did not subjectively believe his stated opinions and forward-looking statements that "some" of the work "is way down the road," that "we're going to be focused more on execution" in the future, or that "I think there is a meeting of the minds in terms of what we need to do, but the task itself is a significant one."  (*See supra* at 41-42, 44.)  The Complaint pleads no particularized facts suggesting that Parker made those statements with actual knowledge of their alleged falsity or that he did not honestly believe the statements when they were made.

### D.     Elizabeth Duke

Plaintiffs challenge only one statement by former Board Chair Duke—her remarks during the September 27, 2019 investor conference introducing Scharf as Wells Fargo's next CEO that "we're pretty well along in a lot of the work, and we've defined out the work for each individual piece of it, each individual agreement with a regulator," and that "we have a good understanding

with our regulators on what they are looking for." (AC ¶ 201.) Those unexceptional remarks are mentioned nowhere in either HFSC report. In accusing Duke of fraud, Plaintiffs omit the words "I think" before her description of Wells Fargo's "understanding" and ignore that Duke warned that the various work streams "are all on somewhat different tracks." (*See supra* at 46.) The Complaint fails to plead particularized facts that give rise to a strong inference that Duke did not honestly believe her statements of opinion at the time she made them.

As with Sloan, Plaintiffs cannot rely on Duke's March 9, 2020 resignation as Board Chair (AC ¶ 221) to create a strong inference of scienter. (*See supra* at 55.) Nor does her March 11, 2020 HFSC testimony about her awareness of previous rejection letters and extension requests and about the Board's concerns (AC ¶¶ 134, 226) raise an inference that she made her one challenged statement six months earlier with an intent to deceive or defraud. In fact, Duke's March 2020 testimony that the FRB had found portions of Wells Fargo's resubmitted plans to be generally acceptable and other portions to be partially acceptable (Ex. Y (HFSC Hearing) at 11) was entirely consistent with her September 2019 statement that she believed the Company was "pretty well along in a lot of work" but that the work was on "different tracks." *See Pirnik*, 2016 WL 5818590, at *8 ("Plaintiffs must show that [company's] 'opinions' . . . were not only 'false' (*i.e.*, inaccurate) but also 'not honestly believed when they were made.'"). Lastly, Duke's agreement in her March 3, 2019 email exchange with Sloan to delete the word "substantial" from Wells Fargo's proxy filing (AC ¶ 224) to avoid stakeholders "jump[ing]" to unwarranted conclusions has no bearing on Duke's state of mind six months later when she made the challenged remarks while introducing Scharf as Wells Fargo's new CEO. (*See supra* at 54-55.)

### E.   Wells Fargo

To allege corporate scienter, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters*

*Local 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  "In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant."  *Id*.  Plaintiffs do not suggest, much less plead, a basis for imputing scienter to Wells Fargo other than through the four Individual Defendants accused of fraud.  Because Plaintiffs do not adequately plead scienter as to any Individual Defendant, they fail to plead corporate scienter as well.

*        *        *

Viewed holistically, the "inference of scienter" here is less cogent and compelling than the "opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  When the factual allegations are considered as a whole, the more compelling inference is that the Individual Defendants at times expressed good-faith optimism about Wells Fargo's expected progress under the consent orders, but endeavored, within the limitations imposed by the CSI restrictions, to warn investors of remaining challenges and uncertainties.  That is not securities fraud.

## III.   Plaintiffs Also Fail to Plead Section 20(a) Claims.

Plaintiffs fail to plead control-person claims under Section 20(a) against the Individual Defendants for multiple reasons.

*First*, "Plaintiffs' Section 20(a) claims fail necessarily" because the Complaint "does not state a claim for a primary violation" under Section 10(b) and "[t]hat failure is by itself dispositive."  *Alpha Cap. Anstalt* v. *Schwell Wimpfheimer & Assocs. LLP*, 2018 WL 1627266, at *19 (S.D.N.Y. Mar. 30, 2018).

*Second*, Plaintiffs also must plead that the alleged control person "actually controlled a primary violator in connection with the alleged misstatements."  *Id*.  The Complaint does not allege that any Individual Defendant "exercised *actual control* over the dissemination of the alleged misstatements that he did not himself make."  *Banco Bradesco*, 277 F. Supp. 3d at 670.

-59-

*Third*, Plaintiffs do not adequately allege that each "defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters*, 750 F.3d at 236.  The PSLRA's "heightened pleading standards" apply to this requirement.  *DoubleLine Cap. LP* v. *Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 220 (S.D.N.Y. 2019).  To plead culpable participation, a plaintiff must allege "actual involvement in the making of the fraudulent statements by the putatively controlled" person.  *Id*. (internal quotation marks omitted).  "[E]ven assuming that 'culpable participation' is a less stringent standard than scienter," Section 20(a) claims should be dismissed where plaintiffs "do not allege facts showing that [the defendant] acted with any culpability in connection with the dissemination of the statements that survive, on a primary violation basis, [the] motion to dismiss."  *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *34 (S.D.N.Y. Mar. 23, 2017).  Plaintiffs do not allege those facts here.

*Lastly*, Plaintiffs' Section 20(a) claim against Wells Fargo's current CEO Scharf, who is not accused of making any misstatements, is baseless.  Scharf did not join the Company until October 21, 2019, more than 20 months after the first alleged misstatement was made.  Plaintiffs do not allege that Scharf was involved in, much less that he exercised actual control over, Shrewsberry's challenged statement during the December 10, 2019 investor conference—the *only* alleged misstatement that was made *after* Scharf's arrival at Wells Fargo.  The Complaint instead offers only the generic (and inadequate) allegation that "Scharf had the power and authority to cause Wells Fargo and its employees to engage in the wrongful conduct alleged herein."  (AC ¶ 301.)  The Complaint further belies any suggestion that Sloan was a culpable participant in securities fraud by alleging that he disclosed the "truth" to the market about the consent orders on multiple occasions.  (*See id*. ¶¶ 131-132, 225, 251-253.)

## CONCLUSION

The Court should dismiss the Complaint in its entirety and with prejudice.

Dated:      New York, New York
            January 22, 2021

Nanci L. Clarence (*pro hac vice*)
Josh Cohen (*pro hac vice*)
Adam F. Shearer (*pro hac vice*)
CLARENCE DYER & COHEN LLP
899 Ellis Street
San Francisco, California 94109
Telephone:  (415) 749-1800
Facsimile:  (415) 749-1694
nclarence@clarencedyer.com
jcohen@clarencedyer.com
ashearer@clarencedyer.com

*Counsel for Defendant Timothy J. Sloan*

/s/ Richard C. Pepperman II
Richard C. Pepperman II
Leonid Traps
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
peppermanr@sullcrom.com
trapsl@sullcrom.com

Christopher Michael Viapiano
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
Telephone:  (202) 956-7500
Facsimile:  (202) 293-6330
viapianoc@sullcrom.com

*Counsel for Defendants Wells Fargo &
Company, John R. Shrewsberry, C. Allen
Parker, Elizabeth Duke, and Charles W.
Scharf*