# EXHIBIT D



# THE REAL WELLS FARGO:
# BOARD & MANAGEMENT FAILURES, CONSUMER ABUSES, AND INEFFECTIVE REGULATORY OVERSIGHT

**REPORT PREPARED BY THE MAJORITY STAFF OF THE
COMMITTEE ON FINANCIAL SERVICES, U.S. HOUSE OF REPRESENTATIVES**

**THE HONORABLE MAXINE WATERS, CHAIRWOMAN
THE HONORABLE AL GREEN, CHAIRMAN, SUBCOMMITTEE ON
OVERSIGHT AND INVESTIGATIONS
116TH CONGRESS, SECOND SESSION
MARCH 2020**

*This report has not been officially adopted by the Committee on Financial
Services and may not necessarily reflect the views of its Members*

# Table of Contents

Executive Summary ........................................................................................................ 4

I.      Introduction ....................................................................................................... 6

II.     Background on Wells Fargo............................................................................... 9

III.    The Committee Staff's Investigation.............................................................14

    A.      Consent Orders...........................................................................................15

        1.   2016 Sales Practices Consent Orders. ...................................................15

        2.   2018 Federal Reserve Consent Order. ...................................................18

        3.   2018 Compliance Risk Management Consent Orders.............................19

    B.      Key Wells Fargo Board Members & Senior Executives ...........................21

IV.     Committee Staff Findings...............................................................................23

    A.      Before the 2016 and 2018 Consent Orders, Financial Regulators Knew About Serious Enterprise-Wide Deficiencies at Wells Fargo for Years Without Alerting the Public ...................................................................................................................23

        1.   From 2009 through 2016, the OCC failed to take serious action to address Bank sales practices that the OCC knew posed danger to consumers. ...................................23

        2.   From 2013 through 2017, the Federal Reserve wrote non-public supervisory letters to Wells Fargo in an unsuccessful effort to compel the Company to fix its pervasive risk management deficiencies. ..........................................................................................25

        3.   For years prior to its 2018 Compliance Risk Management Consent Order, the OCC took ineffective, non-public actions in a failed attempt to require Wells Fargo to correct its weak controls over UDAP risks. ...............................................................................30

    B.      After the Bank's Consumer Abuses Became Public and the Regulators Issued Consent Orders, Wells Fargo's Board Failed to Ensure Management Could Competently Address the Company's Risk Management Deficiencies ....................................................31

        1.   The board failed to ensure the Bank had managers with sufficient compliance expertise..............................................................................................................................31

        2.   Instead of building its compliance risk management system with in-house employees, the Bank outsourced compliance to outside consultants. .............................33

    C.      Wells Fargo and Political Appointees at the CFPB had Backchannel Communications Regarding the CFPB's Compliance Risk Management Consent Order .34

    D.      Wells Fargo's Board Allowed Management to Repeatedly Submit Materially Deficient Plans in Response to the Consent Orders ...........................................................36

        1.   Wells Fargo submitted multiple deficient plans that required board review (and with regards to plans required by the OCC, board approval) in response to the 2016 Sales Practices Consent Orders. ...................................................................................36

2.    Despite repeated and consistent feedback from Federal Reserve staff, Wells Fargo repeatedly submitted materially incomplete plans in response to the 2018 Federal Reserve Consent Order. ..................................................................................37

3.    Wells Fargo submitted multiple deficient plans in response to the 2018 Compliance Risk Management Consent Orders. ...............................................................39

E.    Wells Fargo's Board and Management Prioritized Financial and Other Considerations Above Fixing Issues Identified by Regulators ...........................................41

1.    Wells Fargo's Chief Risk Officer wanted to limit remediation to consumers and manipulate regulators. ................................................................................41

2.    Until 2017, Wells Fargo had a policy allowing the Bank to misuse the attorney-client privilege to hide documents from its regulators and board, and the Bank withheld documents from the independent consultant tasked with evaluating the Bank's sales practices and informing its compliance plan. .............................................42

3.    The board abdicated its responsibility to oversee the Bank's compliance with the 2016 Sales Practices Consent Orders. ..........................................................44

4.    Wells Fargo continued to focus on growth after regulators identified unchecked risks associated with growth and new initiatives. ........................................................46

5.    Key leaders at Wells Fargo were focused on lifting the Federal Reserve's asset cap, rather than addressing the Company's systemic risk management weaknesses...........47

6.    Wells Fargo leaders sought to remove language from the OCC's press release......54

7.    Key Leaders at Wells Fargo were focused on financial considerations, rather than addressing the Bank's compliance failures identified by the OCC. ...............................54

F.    Wells Fargo's Board Did Not Hold Senior Management Accountable for Repeatedly Failing to Meet Regulators' Expectations .........................................................................55

G.    Sloan Gave Inaccurate and Misleading Testimony About Wells Fargo's Progress During the March 12, 2019 Committee Hearing ...............................................................61

H.    The Potential for Widespread Consumer Abuse at Wells Fargo Remains ..............62

1.    Wells Fargo has yet to submit fully satisfactory plans to address the governance and risk management weaknesses identified by the Federal Reserve. ..........................62

2.    In 2019, Wells Fargo's risk management infrastructure remained dangerously broken. ...................................................................................................62

3.    The Bank continues to engage in consumer abuses. ..............................................62

4.    The regulators continue to express dissatisfaction with the Bank's progress.........64

5.    Wells Fargo's employees continue to express concerns about the Company's culture......................................................................................................66

V.    Policy Recommendations ............................................................................................66

1.    Congress should compel regulators to act against recidivist megabanks, like Wells Fargo, that engage in widespread consumer abuses....................................................67

2.    Congress should strengthen the regulators' authorities and enhance bank management and board accountability...........................................................69

3.    Congress should require greater transparency regarding bank supervision and how banks treat consumers. ...................................................................70

4.    Congress should enhance bank compensation practices. .......................................73

5.    Congress should pass a bank workers' bill of rights.................................................73

VI.    Conclusion.........................................................................................................73

VII.    Appendices ......................................................................................................75

### Executive Summary

For at least the past fifteen years, one of America's largest financial institutions, Wells Fargo (i.e., Wells Fargo Bank, N.A. and Wells Fargo & Company, collectively), has failed to correct serious deficiencies in its infrastructure for managing risks to consumers and complying with the law. As a result, Wells Fargo's customers have been exposed to countless abuses, including racial discrimination, wrongful foreclosure, illegal vehicle repossession, and fraudulently opened accounts.

In response to these issues, the Consumer Financial Protection Bureau ("CFPB"), the Office of the Comptroller of the Currency ("OCC"), and Federal Reserve, took public enforcement actions against Wells Fargo in 2016 and 2018. These actions resulted in the agencies entering into five separate consent orders with Wells Fargo: the CFPB's and OCC's September 8, 2016 sales practices consent orders; the Federal Reserve's February 2, 2018 risk management consent order; and the CFPB's and OCC's April 20, 2018 compliance risk management consent orders. Under each of the aforementioned consent orders, Wells Fargo committed to take steps to remediate harmed customers and develop effective internal controls over risks such as employee misconduct. To date, Wells Fargo has yet to fully satisfy any of the aforementioned orders.

In February 2019, Representative Maxine Waters, Chairwoman of the U.S. House of Representatives Committee on Financial Services ("Committee"), initiated an investigation to (1) determine and evaluate the non-public actions taken by Wells Fargo's board, management, and regulators to facilitate improvements at Wells Fargo; and (2) identify policy solutions to ensure consumers are protected from recidivist megabanks like Wells Fargo. This Committee staff report details the results of the Committee staff's investigation.

Part I provides a brief introduction to the Committee staff's investigation, including the key events preceding it. Part II includes a description of Wells Fargo, an institution that, on one hand, boasts a near-ubiquitous presence in the financial dealings of everyday Americans, and on the other hand, has faced widespread criticism for its lengthy record of consumer abuses. Part III describes the Committee staff's investigation, summarizes the five relevant consent orders, and identifies a number of key individuals at Wells Fargo involved in the Company's response to the five consent orders.

Part IV, citing records obtained and witness interviews conducted during the course of this investigation, details Committee staff's findings that:

(A) financial regulators knew about serious, enterprise-wide deficiencies at Wells Fargo for years without taking public enforcement action;

(B) Wells Fargo's board of directors failed to ensure management could competently address the Company's risk management deficiencies;

(C) Wells Fargo and CFPB political appointees had backchannel communications regarding the CFPB's Compliance Risk Management Consent Order;

(D) Wells Fargo's board of directors allowed management to repeatedly submit materially deficient plans to regulators in response to the consent orders;

(E) both Wells Fargo's board and management prioritized financial and other considerations above fixing the issues identified by regulators;

(F) Wells Fargo's board did not hold senior management accountable for repeatedly failing to meet regulators' expectations;

(G) former Wells Fargo CEO Timothy J. Sloan gave inaccurate and misleading testimony to Congress during a March 2019 Committee hearing; and,

(H) the potential for widespread consumer abuse still remains at Wells Fargo.

Part V provides policy recommendations to enhance accountability for recidivist megabanks like Wells Fargo, along with their senior management and board of directors. Additional policy recommendations would promote transparency and market discipline, strengthen consumer protections, and empower responsible bank employees. Part VI concludes this report.

## I. <u>Introduction</u>

In 2016 and 2018, Wells Fargo Bank, N.A., and its holding company, Wells Fargo & Company (collectively, "Wells Fargo") entered into five consent orders with the Consumer Financial Protection Bureau ("CFPB"), Office of the Comptroller of the Currency ("OCC"), and Federal Reserve System ("Federal Reserve") to settle the regulators' allegations of widespread consumer abuses and compliance failures within Wells Fargo. In February 2019, Representative Maxine Waters, Chairwoman of the U.S. House of Representatives Committee on Financial Services ("Committee"), initiated an investigation into Wells Fargo's progress toward designing and implementing the risk management reforms and customer remediation programs required by the five consent orders, which remain open as of the date of this report.

Specifically, the Committee staff's investigation examined Wells Fargo's compliance with the CFPB's and OCC's September 8, 2016 sales practices consent orders (collectively, "2016 Sales Practices Consent Orders"); the Federal Reserve's February 2, 2018 risk management consent order ("2018 Federal Reserve Consent Order"); and the CFPB's and OCC's April 20, 2018 compliance risk management consent orders (collectively, "2018 Compliance Risk Management Consent Orders").

On February 25, 2019, Chairwoman Waters formally scheduled Wells Fargo's then-Chief Executive Officer ("CEO") and President, Timothy J. Sloan, to testify before the Committee on March 12, 2019.[1] Chairwoman Waters specifically requested that Sloan's testimony cover, among other things, "Wells Fargo's efforts to remediate consumers affected by its various instances of wrongdoing," and "Wells Fargo's varied engagements with its regulators, including the bank's compliance with its outstanding consent orders" with the CFPB, OCC, and Federal Reserve.[2]

During the March 12, 2019 Committee hearing, Mr. Sloan made several comments regarding Wells Fargo's efforts to comply with the 2016 and 2018 consent orders. For example, in response to Chairwoman Waters' question about the statuses of the remediation plans that Wells Fargo must submit for the CFPB's and OCC's approval under the 2018 Compliance Risk Management Consent Orders, Mr. Sloan, testified, "**We are in compliance with those plans**" (emphasis added).[3]

Additionally, in response to a question from Representative Nydia Velázquez regarding the status of the Bank's compliance with the 2018 Federal Reserve Consent Order, Sloan suggested that Wells Fargo had completed the governance reforms required by the

---

[1] Letter from Chairwoman Maxine Waters to Timothy Sloan, President & Chief Executive Officer, Wells Fargo (Feb. 25, 2019).

[2] *Id.*

[3] House Financial Services Committee, *Hearing on Holding Megabanks Accountable: An Examination of Wells Fargo's Pattern of Consumer Abuses*, 116th Cong at 6-7 (Mar. 12, 2019) (Serial No. 116-7), *available at* https://www.govinfo.gov/content/pkg/CHRG-116hhrg36462/pdf/CHRG-116hhrg36462.pdf.

Federal Reserve, stating,"[a]s part of the consent order with the Fed, they want us to improve the Board governance and oversight, **which we have done** (emphasis added)."[4]

Immediately following Sloan's testimony, the OCC issued a written statement expressing its dissatisfaction with Wells Fargo's progress towards complying with its consent orders. According to the Wall Street Journal, the OCC wrote:



> WE CONTINUE TO BE DISAPPOINTED WITH [WELLS FARGO'S] PERFORMANCE UNDER OUR CONSENT ORDERS AND ITS INABILITY TO EXECUTE EFFECTIVE CORPORATE GOVERNANCE AND A SUCCESSFUL RISK MANAGEMENT PROGRAM. WE EXPECT NATIONAL BANKS TO TREAT THEIR CUSTOMERS FAIRLY, OPERATE IN A SAFE AND SOUND MANNER, AND FOLLOW THE RULES OF LAW.[5]

On March 13, 2019, the day after Sloan's testimony before the Committee, Wells Fargo announced in its annual proxy statement that the Company's board had awarded Sloan $18.4 million in compensation for 2018, including a $2 million performance bonus.[6] Following Wells Fargo's announcement, the Federal Reserve issued an email statement to the press stating, "[t]he Federal Reserve does not approve pay packages. We expect boards of directors to hold management accountable."[7] Wells Fargo's board's decision to award Sloan a performance bonus for 2018—a year in which the Federal Reserve capped the Company's growth and other federal agencies fined the Company $3 billion collectively—received public rebuke from lawmakers, including Chairwoman Waters, who called for Sloan's resignation.[8]

---

[4] *Id.* at 76.

[5] Rachel Louise Ensign and Andrew Ackerman, *Regulator Slams Wells Fargo After CEO Testifies to Congress,* The Wall Street Journal (Mar. 12, 2019), *available at* https://www.wsj.com/articles/wells-fargo-ceo-faces-aggressive-questions-from-congress-11552408186.

[6] WFC, *Wells Fargo 2019 Proxy Statement* at 82, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2019-proxy-statement.pdf.

[7] Imani Moise, Pete Schroeder, *Wells Fargo CEO's pay raise draws rare Fed response,* Reuters (Mar. 13, 2019), *available at* https://www.reuters.com/article/uk-wells-fargo-compensation/wells-fargo-ceos-pay-raise-draws-rare-fed-response-idUKKCN1QU35B.

[8] House Financial Services Committee, *Waters Blasts Wells Fargo for Bonus to Sloan, Calls for his Removal* (Mar. 14, 2019), *available at* https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=402473.

On March 26, 2019, Sloan announced his decision to step down as Wells Fargo's CEO and President, and from his position on Wells Fargo's board.[9] In a conference call with analysts two days later, Sloan stated, "While I'm confident in my ability to effectively lead Wells Fargo through the work that remains to be done, it has become apparent that the focus on me has become a distraction that impacts our ability to successfully move Wells Fargo forward."[10]

On April 10, 2019, Chairwoman Waters and Representative Al Green, Chairman of the Subcommittee on Oversight and Investigations, sent document request letters to Wells Fargo, the OCC, the CFPB, and the Federal Reserve.[11] In May 2019, Chairwoman Waters and Chairman Green sent document request letters to current and former Wells Fargo board members.[12] The letters requested the production of records relating to the 2016 Sales Practices Consent Orders, the 2018 Federal Reserve Consent Order, and the 2018 Compliance Risk Management Consent Orders. Additionally, the letters to Wells Fargo and its board members requested the production of records relating to former-CEO Sloan's 2018 executive compensation.

The Committee staff's investigation reveals the prolonged failure of Wells Fargo's board and management to satisfy the terms of the consent orders and establish the safeguards necessary to protect consumers from harm. Additionally, the Committee staff's investigation reveals that financial regulators took insufficient and non-public action for

---

[9] WFC, *Wells Fargo CEO and President Tim Sloan to Retire; Board of Directors Elects Allen Parker as Interim CEO and President* (Mar. 28, 2019)*, available at* https://newsroom.wf.com/press-release/corporate-and-financial/wells-fargo-ceo-and-president-tim-sloan-retire-board.

[10] WFC, *Conference Call with Analysts (March 28, 2019) – Transcript, available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2019/conference-call-transcript.pdf.

[11] Letter from Chairwoman Maxine Waters and Chairman Al Green to Jerome Powell, Chairman, Federal Reserve (Apr. 10, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to Joseph Otting, Comptroller of the Currency, OCC (Apr. 10, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to Director Kathleen Kraninger, CFPB (Apr. 10, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to C. Allen Parker, Interim Chief Executive Officer and President, Wells Fargo (Apr. 10, 2019).

[12] Letter from Chairwoman Maxine Waters and Chairman Al Green to Celeste Clark, Director, WFC (May. 1, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to Donald James, Director, WFC (May. 1, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to Elizabeth Duke, Chair of the Board of Directors, WFC (May. 1, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to John Baker II, Director, WFC (May. 1, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to Juan Pujadas, Director, WFC (May. 1, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to James Quigley, Director, WFC (May. 1, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to Maria Morris, Director, WFC (May. 1, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to Ronald Sargent, Director, WFC (May. 1, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to Suzanne Vautrinot, Director, WFC (May. 1, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to Theodore Craver, Jr., Director, WFC (May. 1, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to Wayne Hewett, Director, WFC (May. 1, 2019); Letter from Chairwoman Maxine Waters and Chairman Al Green to Karen Peetz, Director, WFC (May 10, 2019).

years while a high potential for consumer abuse persisted at Wells Fargo. Finally, the Committee staff's investigation reveals that Wells Fargo's board failed to hold senior management accountable for the Bank's lack of progress under the consent orders, despite the performance concerns raised by regulators and certain board members.

## II.  Background on Wells Fargo

Wells Fargo Bank, N.A. ("Bank") is a large, nationally chartered depository bank headquartered in Sioux Falls, South Dakota. The Bank is a subsidiary of Wells Fargo & Company ("WFC" or "Company"), a publicly traded bank holding company headquartered in San Francisco, California. WFC does not manage the Bank's day-to-day operations, but the Company exercises control over the Bank's management team and has the authority to hire and fire the Bank's managers, set company policies, and establish the Bank's business strategy.[13] WFC and its subsidiaries are collectively referred to in this report as "Wells Fargo."



THE COMMITTEE STAFF'S INVESTIGATION REVEALS THE PROLONGED FAILURE OF WELLS FARGO'S BOARD AND MANAGEMENT TO SATISFY THE TERMS OF THE CONSENT ORDERS AND ESTABLISH THE SAFEGUARDS NECESSARY TO PROTECT CONSUMERS FROM HARM.

Wells Fargo was founded in March 18, 1852,[14] and it has grown in part through various mergers and acquisitions, including a 1998 merger with Norwest[15] and an acquisition of Wachovia Corporation during the 2008 financial crisis.[16] Today, Wells Fargo has one of the largest consumer banking footprints in the country, with more domestic branches than any other bank, 70 million customers, and a financial services presence in one in three U.S. households.[17] The Bank is consistently among the three largest financial institutions for

---

[13] WFC, *By-laws of Wells Fargo & Company* (Mar. 1, 2018), *available at* https://www08.wellsfargomedia.com/assets/pdf/about/corporate/governance-by-laws.pdf.

[14] WFC, *History of Wells Fargo, available at* https://www.wellsfargo.com/about/corporate/history/

[15] Timothy L. O'Brien, *Wells Fargo And Norwest Plan Merger*, New York Times (Jun. 9, 1998), available at https://www.nytimes.com/1998/06/09/business/wells-fargo-and-norwest-plan-merger.html.

[16] *See* Testimony of Scott G. Alvarez, General Counsel, Federal Reserve before the Financial Crisis Inquiry Commission, *The Acquisition of Wachovia Corporation by Wells Fargo & Company* (Sep. 1, 2010), available at https://www.federalreserve.gov/newsevents/testimony/alvarez20100901a.htm.

[17] Federal Reserve, Federal Reserve Statistical Release, Large Commercial Banks (Dec. 31, 2019*)* (online at https://www.federalreserve.gov/releases/lbr/current/) (accessed Feb. 26, 2020); WFC Form 10-Q for the Quarterly Period ending September 30, 2019 (Nov. 1, 2019) at 3 (Nov. 1, 2019), *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2019/third-quarter-10q.pdf.

mortgage lending, mortgage servicing, and deposits.[18] With $1.94 trillion in assets, Wells Fargo operates the fourth largest bank in the country.[19] As of the end of 2019, Wells Fargo was also the tenth largest public company in the world based on sales, profits, assets, and market value.[20] Wells Fargo has approximately 260,000 employees across 7,400 locations worldwide.[21] It is the nineteenth largest employer in the United States.[22]

As a large, nationally-chartered bank, Wells Fargo is subject to laws and regulations designed to protect consumers and prohibit unsafe and unsound practices that could undermine the Bank or threaten the U.S. financial system. Along with the CFPB, which oversees compliance with federal consumer protection laws, there are three federal prudential regulators tasked with various duties to ensure that Wells Fargo's board and management operate the Bank and its parent holding company, WFC, in a manner consistent with these laws: the Federal Reserve; the OCC; and the Federal Deposit Insurance Corporation ("FDIC"). Wells Fargo is also subject to regulation by the Securities and Exchange Commission ("SEC"), which oversees its compliance with federal securities laws and the SEC's corporate governance rules.

These federal regulators, particularly the prudential regulators, have a broad set of supervisory, enforcement and other authorities to monitor banks and take corrective action when banks break the law. Prudential regulators provide confidential exam ratings on different elements of a bank's operations. For example, the Uniform Financial Institutions Rating System is the framework prudential regulators utilize to give banks a rating on each of six components – capital adequacy, asset quality, management, earnings, liquidity, and sensitivity to market risk  ("CAMELS") – as well as a composite score on a scale of 1 (strong)

---

[18] CFPB, *Data Point: 2018 Mortgage Market Activity and Trends* (Aug. 2019), *available at* https://files.consumerfinance.gov/f/documents/cfpb_2018-mortgage-market-activity-trends_report.pdf (second in mortgage lending in 2018); Mortgage Bankers Association, MBA releases 2019 Mid-Year Commercial/Multifamily Servicer Rankings (Sept. 10, 2019), *available at* https://www.mba.org/2019-press-releases/september/mba-releases-2019-mid-year-commercial/multifamily-servicer-rankings (first in commercial and multifamily mortgage servicing as of June 30, 2019); WFC, Wells Fargo Today at 2 (4th Quarter 2019) (third largest bank in total deposits), available at https://www08.wellsfargomedia.com/assets/pdf/about/corporate/wells-fargo-today.pdf.

[19] WFC Form 10-Q for the Quarterly Period ending September 30, 2019 at 3 (Nov. 1, 2019), *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2019/third-quarter-10q.pdf.

[20] WFC, *Wells Fargo Today* at 2 (4th Quarter 2019), *available at* https://www08.wellsfargomedia.com/assets/pdf/about/corporate/wells-fargo-today.pdf.

[21] WFC, *Wells Fargo Today* at 2 (4th Quarter 2019), *available at* https://www08.wellsfargomedia.com/assets/pdf/about/corporate/wells-fargo-today.pdf.

[22] *Id* at 2. According to Wells Fargo's 2018 Corporate Responsibility Report, the Company employs about 1 in 600 working Americans. *See* Wells Fargo, *Wells Fargo & Company Corporate Responsibility Report 2018* at 3 and 11*, available at* https://www08.wellsfargomedia.com/assets/pdf/about/corporate-responsibility/2018-corporate-responsibility-report.pdf.

10

to 5 (critically deficient).[23] There are similar rating systems used to assess a bank's consumer compliance[24] and provide consolidated supervision of a bank holding company's operations.[25]

Furthermore, when banks fail to comply with the law, regulators can take a range of actions that are designed to escalate if the regulated entity does not correct its mistakes. Banking regulators can issue non-public supervisory findings to address weaknesses or deficiencies, often in the form of a "matter requiring attention" ("MRA") or, in the case of the Federal Reserve, a "matter requiring immediate attention" ("MRIA") notice.[26] According to the Federal Reserve, an MRA is "a call for action to address weaknesses that could lead to deterioration in a banking organization's soundness."[27] The Federal Reserve describes an MRIA as, "a call for more immediate action to address acute or protracted weaknesses that could lead to further deterioration in a banking organization's soundness, may result in harm to consumers, or have caused, or could lead to, noncompliance with laws and regulations."[28] MRAs and MRIAs are confidential between the banking organization and the regulator, and are among the least severe actions a regulator might take when a company is failing to meet regulatory expectations.[29] Regulators may also issue civil money penalties and enter into a consent order with a bank through a formal enforcement action. A formal enforcement action is public and, according to the Federal Reserve, is "designed to prevent, deter, and correct violations of law and unsafe and unsound banking practices."[30] Additionally, as discussed in a 2017 Committee staff report on Wells Fargo, there are bolder remedies available to prudential regulators that have been rarely used when a bank egregiously harms consumers and repeatedly breaks the law, including: placing limitations on the activities and functions of a bank, requiring the disposition of loans and assets or otherwise restricting a bank's lines of business, restricting a bank's growth, directing a bank to remove senior officers and

---

[23] *See* FDIC, Statement of Policy – Uniform Financial Institutions Rating System (Jan. 1, 1997), *available at* https://www.fdic.gov/regulations/laws/rules/5000-900.html.

[24] The CFPB and prudential regulators utilize the Uniform Consumer Compliance Rating System ("CC Rating System") when examining a bank for consumer compliance and focuses on: board and management oversight; compliance program; and violations of law and consumer harm. Similar to the CAMELS ratings, the bank is rated on a scale between 1 (strong consumer compliance) and 5 (critically deficient consumer compliance). *See* CFPB, CFPB Supervision and Examination Process – Examinations and Targeted Reviews (Feb. 2019), *available at* https://files.consumerfinance.gov/f/documents/cfpb_examination-process-section.pdf.

[25] The Federal Reserve recently deployed a new, large financial institution ("LFI") rating system that examines that is used to provide ratings on a large bank holding company's: capital planning and positions; liquidity risk management and positions; and governance and controls. The Federal Reserve continues to use a RFI rating system for smaller bank holding companies that examines risk management (R), financial condition (F), and the impact of nonbanking activities (I). *See* Federal Reserve, *Federal Reserve Board finalizes new supervisory rating system for large financial institutions* (Nov. 2, 2018), *available at* https://www.federalreserve.gov/newsevents/pressreleases/bcreg20181102a.htm.

[26] *See* Federal Reserve, Supervision and Regulation Report (Nov. 2019), at 21, *available at* https://www.federalreserve.gov/publications/files/201911-supervision-and-regulation-report.pdf.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

directors and permanently banning them from working in the industry, or appointing a receiver to wind down a bank.[31]

The overlapping regulatory regimes under which Wells Fargo operates are intended to facilitate comprehensive oversight of the Company's compliance with applicable financial laws and management of the risks associated with its activities. However, during the 2008 financial crisis, unchecked predatory banking practices at Wells Fargo[32] and other financial institutions and regulators' inability to rein in such practices, harmed millions of consumers and contributed to the near collapse of the global economy.[33] In the wake of the crisis, Congress created the CFPB and provided it and the prudential regulators with new



DESPITE ENHANCED OVERSIGHT OF THE BANKING INDUSTRY FOLLOWING THE CRISIS, WELLS FARGO'S BOARD, MANAGEMENT, AND REGULATORS HAVE EACH FAILED TO ENSURE THAT THE COMPANY'S SAFEGUARDS AGAINST CONSUMER ABUSES ARE SUFFICIENT FOR WELLS FARGO'S MASSIVE FOOTPRINT.

authorities to police the banking industry, particularly with respect to financial institutions' responsibilities to identify and address consumer abuses and other risks associated with their company's banking activities.[34]

Despite enhanced oversight of the banking industry following the crisis, Wells Fargo's board, management, and regulators have each failed to ensure that the Company's safeguards against consumer abuses are sufficient for Wells Fargo's massive footprint. Countless consumers have suffered as a result. The following list of Department of Justice

---

[31] *See*, e.g., 12 USC § 1818 and House Financial Services Committee Democratic Staff Report, *The Case For Holding Wells Fargo Accountable: An Examination of Wells Fargo's Egregious Consumer Abuses* (Sep. 29, 2017), at 21-23 *available at* https://financialservices.house.gov/uploadedfiles/09.29.17_staff_report_final.pdf.

[32] *See*, e.g., DOJ, *Justice Department Reaches Settlement with Wells Fargo Resulting in More Than $175 Million in Relief for Homeowners to Resolve Fair Lending Claims* (July 12, 2012)(resolving allegations that Wells Fargo overcharged borrowers of color for mortgage loans and wrongly steered them into subprime mortgages), *available at* https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief; FRB, *Federal Reserve issues a consent cease and desist order and assesses civil money penalty against Wells Fargo* (July 20, 2011) (resolving allegations that Wells Fargo steered potential prime borrowers into higher-cost subprime loans), *available at* https://www.federalreserve.gov/newsevents/pressreleases/enforcement20110720a.htm.

[33] *See*, e.g., *The Financial Crisis Inquiry Report: Fina Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (Feb. 25, 2011), *available at* https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

[34]  Consumer Financial Protection Act of 2010, 12 U.S.C. § 5481 et seq.

("DOJ") and financial regulators' findings provides a mere snapshot of the consumer abuses resulting from Wells Fargo's critically deficient compliance and risk management infrastructures:

- **Discrimination against minority home loan borrowers:** From 2004 through 2009, Wells Fargo Bank "engaged in a pattern or practice of discrimination" by "systematically" charging African-American and Hispanic borrowers higher fees and rates than similarly qualified white borrowers.[35]

- **Fraudulent bank accounts:** From January 1, 2011 to September 8, 2016, thousands of Wells Fargo Bank employees enrolled millions of customers in banking products and accounts without their knowledge or consent.[36]

- **Erroneous mortgage fees:** From September 2013 through February 2017, the Bank inappropriately charged prospective home loan borrowers fees for extending the period for a mortgage interest-rate lock, including when the Bank's own delay created the need for an extension.[37]

- **Unnecessary auto insurance:** Between October 2005 and September 2016, the Bank forced hundreds of thousands of auto-loan borrowers to pay for unnecessary insurance coverage for their vehicles. At least 27,000 of the Bank's customers may have had their vehicle repossessed following defaults arising from the added insurance costs.[38]

- **Servicemember abuse:** Between 2006 and 2016, Wells Fargo Bank: (1) charged servicemembers higher interest rates than allowed under federal law; (2) failed to accurately disclose servicemembers' active duty statuses to courts when those servicemembers faced eviction proceedings; and (3) repossessed servicemembers' vehicles without first obtaining a court order.[39]

---

[35] DOJ, *Justice Department Reaches Settlement with Wells Fargo Resulting in More Than $175 Million in Relief for Homeowners to Resolve Fair Lending Claims* (July 12, 2012), *available at* https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

[36] *See* CFPB Consent Order, *In the Matter of Wells Fargo Bank, N.A.* at 4 (Sept. 8, 2016), *available at* https://files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf.

[37] CFPB Consent Order, *In the Matter of Wells Fargo Bank, N.A.* (Apr. 20, 2018), *available at* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank-na_consent-order_2018-04.pdf;

[38] *See* CFPB Consent Order, In the Matter of Wells Fargo Bank, N.A. (Apr. 20, 2018), *available at* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank-na_consent-order_2018-04.pdf; OCC, *OCC Assesses $500 Million Penalty Against Wells Fargo, Orders Restitution for Unsafe or Unsound Practices* (Apr. 20, 2018), *available at* https://www.occ.gov/news-issuances/news-releases/2018/nr-occ-2018-41.html.

[39] OCC, *OCC Assesses Penalty Against Wells Fargo; Orders Restitution for Violations of the Servicemembers Civil Relief Act* at Article I (Sept. 29, 2016), *available at* https://www.occ.gov/static/enforcement-actions/ea2016-081.pdf.

- **Erroneous foreclosures and loan modification denials:** In November 2018, Wells Fargo reported that the Bank erroneously denied, or did not offer, a loan modification to 870 customers due to an underwriting software error. The Bank foreclosed on 545 of these customers based on the error.[40] In recent public filings, Wells Fargo has indicated that the previously disclosed number of affected customers may change based on the Company's ongoing review.[41]

- **Improper sales of complex financial products:** On June 25, 2018, Wells Fargo Advisors LLC ("WFA")[42] settled securities fraud charges with the SEC related to the sale of complex financial products to retail investors.[43] According to the SEC, from at least January 2009 through June 2013, WFA representatives improperly solicited retail customers to actively trade market-linked investments (MLIs) which were intended to be long-term holdings. The SEC found that the trading strategy reduced the customers' investment returns while generating substantial fees for WFA.

These aforementioned consumer abuses highlight only a portion of the misconduct that has occurred across Wells Fargo. More alarmingly, Wells Fargo's failure to date to establish effective mechanisms for identifying and mitigating risks within the Company after reaching settlements with its regulators leaves consumers exposed to countless potential abuses that may be unknown to the firm's management, board, regulators, or the public.

### III. The Committee Staff's Investigation

In response to Chairwoman Waters' and Chairman Green's April and May 2019 letters, Wells Fargo, its board members, and the regulators, collectively produced approximately 330,000 pages of records. In addition to reviewing these records, Committee staff received briefings from the Federal Reserve, OCC, CFPB, SEC, and Wells Fargo. Committee staff conducted interviews with key executives at Wells Fargo and the former Chair of the board's Risk Committee. Additionally, Committee staff interviewed officials at the Federal Reserve, OCC, and CFPB.

Committee staff's review of the records and witness interviews reveal the following:

- financial regulators knew about serious, enterprise-wide deficiencies at Wells Fargo for years without alerting the public;

---

[40] WFC Form 10-Q for the Quarterly Period Ending September 30, 2018 at 6 (Nov. 6, 2018), *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2018/third-quarter-10q.pdf.

[41] WFC Form 10-Q for the Quarterly Period Ending September 30, 2019 at 5 (Nov. 1, 2019), *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2019/third-quarter-10q.pdf.

[42] WFA is wholly owned by Wachovia Securities Financial Holdings, LLC, which is wholly owned by Wells Fargo.

[43] SEC, *Wells Fargo Advisors Settles SEC Charges for Improper Sales of Complex Financial Products* (June 25, 2018), *available at* https://www.sec.gov/news/press-release/2018-112.

- Wells Fargo's board of directors failed to ensure that management could competently address the Company's risk management deficiencies;

- Wells Fargo and political appointees at the CFPB had backchannel communications regarding the CFPB's Compliance Risk Management Consent Order;

- Wells Fargo's board of directors allowed management to repeatedly submit materially deficient plans in response to the consent orders;

- Wells Fargo's board of directors and management prioritized financial and other considerations above fixing issues identified by regulators;

- Wells Fargo's board of directors failed to hold senior management accountable for repeatedly not meeting regulators' expectations under the consent orders;

- during the Committee's March 12, 2019 hearing, Wells Fargo's then-CEO Sloan gave inaccurate and misleading testimony about the status of Wells Fargo's compliance with the requirements of the 2018 Compliance Risk Management consent orders; and

- the potential for widespread consumer abuse at Wells Fargo remains.

Part A of this section summarizes the requirements of five consent orders with respect to which the Committee investigated Wells Fargo's compliance, specifically: the 2016 Sales Practices Consent Orders, the 2018 Federal Reserve Consent Order, and the 2018 Compliance Risk Management Consent Orders. Part B provides brief biographies of certain Wells Fargo directors and senior executives who, during the Committee staff's investigation, Committee staff identified as playing a central role in Wells Fargo's efforts toward complying with the five consent orders. Part C of this section details Committee staff's findings, including with reference to records obtained and witness interviews conducted during the course of the Committee staff's investigation.

## A.    Consent Orders

### 1.    2016 Sales Practices Consent Orders.

On September 8, 2016, the CFPB, OCC, and Office of the Los Angeles City Attorney fined Wells Fargo Bank collective penalties of $185 million for opening millions of deposit and credit-card accounts in customers' names without their consent or knowledge.[44]

According to the CFPB, from January 1, 2011 to September 8, 2016, thousands of Wells Fargo Bank employees engaged in improper sales practices in connection with an

---

[44] *See* CFPB, *Consumer Financial Protection Bureau Fines Wells Fargo $100 Million for Widespread Illegal Practice of Secretly Opening Unauthorized Accounts* (Sept. 8, 2016), *available at* https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-fines-wells-fargo-100-million-widespread-illegal-practice-secretly-opening-unauthorized-accounts/.

aggressive incentive compensation program that encouraged employees to "cross-sell" banking products and services to existing customers.[45] Wells Fargo employees: (1) opened unauthorized deposit accounts for existing customers; (2) submitted credit-card applications in customers' names without their authorization; and (3) enrolled customers in online-banking services and requested debit cards on their behalf without their knowledge or consent.[46] In August 2017, following a third-party review, Wells Fargo announced that its employees opened an estimated 3.5 million unauthorized accounts resulting in approximately $6.1 million in erroneous banking fees.[47]

The OCC found that the Bank lacked an adequate oversight program to prevent and discover sales practices abuses as well as effective processes to monitor customer complaints.[48]

The CFPB's consent order ("CFPB Sales Practices Consent Order"), requires Wells Fargo to submit a plan to provide redress to harmed consumers.[49] Additionally, the CFPB Sales Practices Consent Order directed the Bank to retain an independent consultant to review sales practices at its branches and determine whether adequate policies and procedures exist to ensure compliance with federal consumer financial law.[50] Part of that review included evaluating the adequacy of the Bank's handling of consumer and employee complaints.[51] The CFPB also mandated that Wells Fargo submit a compliance plan to correct any deficiencies identified by, and implement any recommendations of, the independent consultant.[52] Under the terms of the CFPB's Sales Practices Consent Order, the CFPB has to approve both the Bank's compliance and redress plans.[53]

---

[45] *See* CFPB Consent Order, *In the Matter of Wells Fargo Bank, N.A.* at 4 (Sept. 8, 2016), *available at* https://files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf (hereinafter, "CFPB Sales Practices Consent Order").

[46] *Id.*

[47] WFC, *Wells Fargo Reports Completion of Expanded Third-Party Review of Retail Banking Accounts, Paving Way to Complete Remediation Effort* (Aug. 31, 2017), *available at* https://newsroom.wf.com/press-release/wells-fargo-reports-completion-expanded-third-party-review-retail-banking-accounts.

[48] OCC Consent Order, *In the Matter of Wells Fargo Bank, N.A. Sioux Falls, South* Dakota, AA-EC-2016-66 at Article I (Sept. 6, 2016), *available at* https://www.occ.gov/news-issuances/news-releases/2016/nr-occ-2016-106b.pdf.

[49] CFPB, *Consumer Financial Protection Bureau Fines Wells Fargo $100 Million for Widespread Illegal Practice of Secretly Opening Unauthorized Accounts* (Sept. 8, 2016), *available at* https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-fines-wells-fargo-100-million-widespread-illegal-practice-secretly-opening-unauthorized-accounts/.

[50] CFPB Consent Order, *In the Matter of Wells Fargo Bank, N.A.*, 2016-CFPB-0015 at ¶¶39 - 44 (Sept. 8, 2016), *available at* https://files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf.

[51] *Id.* at ¶40.

[52] *Id.* at ¶42.

[53] *Id.* at ¶43.

Similar to the CFPB's order, the OCC's consent order ("OCC Sales Practices Consent Order") also required Wells Fargo to submit a plan to compensate harmed consumers.[54] The OCC also ordered the Bank to obtain an independent review of its sales practices but required a broader analysis than the CFPB's provision requiring independent review of the Bank's retail-branch operations. Specifically, the OCC ordered Wells Fargo to retain an independent consultant to review the Bank's "enterprise-wide governance and risk management of sales practices" across its business lines and analyze what caused employees to open millions of unauthorized accounts.[55]

Additionally, the OCC required the Bank to submit plans that would establish across its business lines: (1) a program to monitor sales practices and (2) policies and procedures for handling customer complaints.[56] Under the OCC Sales Practices Consent Order, the Bank also had to review and revise its internal audit program to include sales practices, corporate investigations, customer complaints, and internal reports of ethics violations.[57] The OCC Sales Practices Consent Order further directed Wells Fargo to submit a Comprehensive Action Plan describing how the Bank intended to satisfy all of the order's requirements.[58] The OCC then had to approve the Bank's submissions as required under the terms of the consent order.

The 2016 Sales Practices Consent Orders contain provisions establishing that the Bank's board is responsible for satisfying the orders' requirements. The OCC Sales Practices Consent Order explicitly states that "[t]he Board shall ensure that the Bank achieves and thereafter maintains compliance with this Order"[59] and "has the ultimate responsibility for proper and sound management of the Bank."[60] The 2016 CFPB Sales Practices Consent Order dictates that "[t]he Board will have the ultimate responsibility for proper and sound management of [the Bank] and for ensuring that [the Bank] complies with Federal consumer financial law and this Consent Order."[61] Both consent orders obligate the board to review (and in the case of the 2016 OCC Sales Practices Consent Order, to approve) all submissions, including compliance and remediation plans required under the terms of the orders.[62]

---

[54] OCC, *OCC Assesses Penalty Against Wells Fargo, Orders Restitution for Unsafe or Unsound Sales Practices* (Sept. 8, 2016), *available at* https://www.occ.gov/news-issuances/news-releases/2016/nr-occ-2016-106.html.

[55] OCC Consent Order, *In the Matter of Wells Fargo Bank, N.A. Sioux Falls, South* Dakota, AA-EC-2016-66 at Article IV (Sept. 6, 2016), *available at* https://www.occ.gov/news-issuances/news-releases/2016/nr-occ-2016-106b.pdf.

[56] *Id.* at Articles V & VI.

[57] *Id.* at Article VII.

[58] *Id.* at Article III.

[59] *Id.* at Article III(4).

[60] *Id.* at Article XI(1).

[61] CFPB Consent Order, *In the Matter of Wells Fargo Bank, N.A.*, 2016-CFPB-0015 (Sept. 8, 2016), at § 46 *available at* https://files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf.

[62] OCC Consent Order, *In the Matter of Wells Fargo Bank, N.A.*, 2016-CFPB-0015 at ¶45 (Sept. 8, 2016), *available at* https://files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf; Consent Order, *In the Matter of Wells Fargo Bank, N.A. Sioux Falls, South* Dakota, AA-EC-2016-66

2.    2018 Federal Reserve Consent Order.

On February 2, 2018, the Federal Reserve announced that it had brought an enforcement action against Wells Fargo to address the board's corporate risk oversight failures, which facilitated "widespread consumer abuses and compliance breakdowns" at WFC.[63] As part of the action, the Federal Reserve entered into a consent order ("2018 Federal Reserve Consent Order") with WFC's board, which required each of WFC's directors at the time to sign. The 2018 Federal Reserve Consent Order requires the WFC board of directors to:

- submit a written plan, subject to Federal Reserve approval, to further enhance the board's effectiveness in carrying out its oversight and governance of WFC (paragraph 2); and

- submit a written plan, subject to Federal Reserve approval, to further improve its firmwide compliance and operational risk management program (paragraph 3).[64]

Once Wells Fargo adopts and implements Federal Reserve-approved plans, the Company must subject its improvements to an independent third-party review.

The 2018 Federal Reserve's Consent Order also restricts Wells Fargo from growing larger than its total asset size as of the end of 2017. The asset cap will remain in place until Wells Fargo:

- submits the plans required under paragraphs 2 and 3;

- is notified in writing of the Federal Reserve's acceptance of its plans;

- adopts and implements the Federal Reserve-approved plans;

- completes the independent third-party review to the satisfaction of the Federal Reserve; and,

- is notified in writing by the Federal Reserve that the above conditions are met.[65]

---

at Article III(1) (Sept. 6, 2016), *available at* https://www.occ.gov/news-issuances/news-releases/2016/nr-occ-2016-106b.pdf.

[63] Federal Reserve, *Responding to widespread consumer abuses and compliance breakdowns by Wells Fargo, Federal Reserve restricts Wells' growth until firm improves governance and controls. Concurrent with Fed action, Wells to replace three directors by April, one by year end* (Feb. 2, 2018), *available at* https://www.federalreserve.gov/newsevents/pressreleases/enforcement20180202a.htm.

[64] Federal Reserve, *In the Matter of Wells Fargo & Company*, Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended (Sept. 29, 2016), *available at* https://www.federalreserve.gov/newsevents/pressreleases/files/enf20180202a1.pdf.

[65] *Id.*

The first plan was due under the 2018 Federal Reserve Consent Order on April 3, 2018. To date, Wells Fargo has failed to submit an acceptable plan to the Federal Reserve.

The 2018 Federal Reserve Consent Order reflects the regulator's dissatisfaction with the board's oversight failures and inability to compel senior management to improve to the firm's risk management infrastructure over the five years since the Federal Reserve first identified weaknesses. In connection with the 2018 Federal Reserve Consent Order, the Federal Reserve also sent a letter on February 2, 2018, to Wells Fargo's board of directors emphasizing that the board's oversight failures and inability to compel senior management to improve to the firm's risk management infrastructure contributed to consumer harm.[66] According to the letter, "[t]he firm's lack of effective oversight and control of compliance and operational risks **contributed in material ways to the substantial harm suffered by WFC's customers**" (emphasis added).[67]

### 3. 2018 Compliance Risk Management Consent Orders.

On April 20, 2018, the CFPB and OCC announced coordinated consent orders (2018 Compliance Risk Management Consent Orders) with Wells Fargo Bank for consumer abuses in two of the Bank's loan-related programs.[68] The CFPB and OCC found that from September 2013 through February 2017, Wells Fargo Bank inappropriately charged prospective mortgage loan borrowers fees for extending the period for a mortgage interest-rate lock.[69] According to the CFPB and OCC, the Bank's loan officers inconsistently applied its extension fee policy and improperly charged borrowers fees, including when the Bank's own delay created the need for an extension.[70]

The CFPB and OCC also found that between October 2005 and September 2016, Wells Fargo Bank purchased unnecessary or duplicative collateral-protection insurance (called "force-placed insurance") for hundreds of thousands of borrowers' vehicles and financed the coverage by adding the costs to borrowers' auto-loan balance.[71] On average, these borrowers

---

[66] Letter from M. Gibson, Director, Division of Supervision and Regulation, FRB, to Board of Directors, WFC (Feb. 2, 2018), *available at* https://www.federalreserve.gov/newsevents/pressreleases/files/enf20180202a2.pdf.

[67] *Id.*

[68] *See* CFPB, *Bureau of Consumer Financial Protection Announces Settlement with Wells Fargo For Auto-Loan Administration and Mortgage Practices* (Apr. 20, 2018), *available at* https://www.consumerfinance.gov/about-us/newsroom/bureau-consumer-financial-protection-announces-settlement-wells-fargo-auto-loan-administration-and-mortgage-practices/; OCC, *OCC Assesses $500 Million Penalty Against Wells Fargo, Orders Restitution for Unsafe or Unsound Practices* (Apr. 20, 2018), *available at* https://www.occ.gov/news-issuances/news-releases/2018/nr-occ-2018-41.html.

[69] CFPB Consent Order, *In the Matter of Wells Fargo Bank, N.A.* at ¶¶7-21 (Apr. 20, 2018), *available at* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank-na_consent-order_2018-04.pdf; OCC Consent Order, *In the Matter of Wells Fargo Bank, N.A. Sioux Falls, South Dakota,* AA-EC-2018-15) at Article I(7)-(8) (Apr. 20, 2018), *available at* https://www.occ.gov/static/enforcement-actions/ea2018-025.pdf.

[70] *Id.*

[71] CFPB Consent Order, *In the Matter of Wells Fargo Bank, N.A.* at ¶¶27-35 (Apr. 20, 2018), *available at* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank-na_consent-

IN RESPONSE TO THESE CONSUMER ABUSES, THE CFPB ASSESSED A RECORD $1 BILLION PENALTY AGAINST THE BANK.

paid over $1,000 per policy for needless insurance coverage.[72] Borrowers who failed to pay the force-placed insurance charges faced additional fees and, in some instances, experienced delinquency, loan default, and even repossession of their vehicles.[73] Wells Fargo Bank acknowledged that at least 27,000 of its customers may have had their vehicle repossessed following defaults arising from the additional costs of force-placed insurance.[74]

In response to these consumer abuses, the CFPB assessed a record $1 billion penalty against the Bank.[75] The OCC found that Wells Fargo Bank's violations resulted from **"deficiencies in the bank's enterprise-wide compliance risk management program that constituted reckless, unsafe, or unsound practices"** (emphasis added).[76] The OCC's order incorporated several prior non-public regulatory actions issued against the Bank for its compliance weaknesses.[77] The OCC imposed a $500 million fine, which the CFPB credited toward its $1 billion penalty.[78]

The 2018 Compliance Risk Management Consent Orders required the Bank to submit a plan to remediate consumers harmed by its defective interest-rate lock policy and collateral protection insurance processes.[79] The 2018 Compliance Risk Management Consent Orders also required the Bank to: (1) develop a comprehensive plan for identifying and remediating future consumer harm; and (2) authorized the OCC and the CFPB to require the Bank to submit a remediation plan for the regulators' approval when a consumer abuse occurs where: (i) more than 50,000 consumers or customer accounts are likely to require remediation; (ii) the anticipated amount of remediation exceeds $10 million; or (iii) the consumer harm

order_2018-04.pdf; OCC Consent Order, *In the Matter of Wells Fargo Bank, N.A. Sioux Falls, South Dakota,* AA-EC-2018-15 at Article I(4)-(5) (Apr. 20, 2018), *available at* https://www.occ.gov/static/enforcement-actions/ea2018-025.pdf.

[72] CFPB Consent Order, *In the Matter of Wells Fargo Bank, N.A.* at ¶34 (Apr. 20, 2018),*available at* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank-na_consent-order_2018-04.pdf.

[73] *Id*. at ¶29.

[74] *Id*. at ¶35.

[75] *Id.* at ¶59.

[76] OCC, *OCC Assesses $500 Million Penalty Against Wells Fargo, Orders Restitution for Unsafe or Unsound Practices* (Apr. 20, 2018),), *available at* https://www.occ.gov/news-issuances/news-releases/2018/nr-occ-2018-41.html.

[77] OCC Memorandum, OCC-HFSC-WF_2019_00001023-55 (Mar. 9, 2018) (on file with the House Financial Services Committee).

[78] *Id.*

[79] CFPB Consent Order, *In the Matter of Wells Fargo Bank, N.A.,* 2018-BCFP-0001 at ¶¶55-56 (Apr. 20, 2018), *available at* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank-na_consent-order_2018-04.pdf; OCC Consent Order, *In the Matter of Wells Fargo Bank, N.A. Sioux Falls, South Dakota,* AA-EC-2018-15 at Article VIII(6) (Apr. 20, 2018), *available at* https://www.occ.gov/static/enforcement-actions/ea2018-025.pdf.

remediated by the Bank presents or had led to significant reputational risk or raises other supervisory concerns.

To address the Bank's longstanding company-wide compliance failures, the 2018 Compliance Risk Management Consent Orders mandated that the Bank develop, for the OCC's and CFPB's approval, a company-wide compliance risk management program (CRMP), a plan for staffing the CRMP, and a plan for enhancing the Bank's internal audit program.[80] The OCC's consent order also required the Bank to submit for approval an action plan for satisfying the order's requirements.[81] Under the terms of the OCC's order, the Bank has to obtain written approval before appointing senior executives and board members.[82] Similar to the 2016 Sales Practices Consent Orders, the 2018 Compliance Risk Management Consent Orders place ultimate responsibility for compliance with the Bank's board.[83]

### B.    Key Wells Fargo Board Members & Senior Executives

**Elizabeth "Betsy" Duke**—Ms. Duke is the current Chair of Wells Fargo's Board of Directors. She has served in the position since January 2018. Previously, she served as Vice Chair of Wells Fargo's Board of Directors from October 2016 to December 2017. Ms. Duke first joined Wells Fargo's board in January 2015.[84] As Chair of Wells Fargo's board, Ms. Duke was responsible for, among other things, approving board meeting materials; presiding over board meetings; serving as a liaison among Wells Fargo's independent directors, between Wells Fargo's CEO and board members, and between the CEO and other senior executives; and serving as a point of contact for the Company's regulators.[85]  Wells Fargo paid Ms. Duke $631,004 in total compensation (cash and stock) for her 2018 service on Wells Fargo's board.[86] Prior to joining Wells Fargo's board, Ms. Duke served as a board member of the Board of

---

[80]  *CFPB Consent Order, In the Matter of Wells Fargo Bank, N.A., 2018-BCFP-0001* at ¶¶42-45 *(Apr. 20, 2018), available at* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank-na_consent-order_2018-04.pdf*; OCC Consent Order, In the Matter of Wells Fargo Bank, N.A. Sioux Falls, South Dakota,* AA-EC-2018-15 at Articles IV-VI (Apr. 20, 2018), *available at* https://www.occ.gov/static/enforcement-actions/ea2018-025.pdf.

[81] OCC Consent Order, *In the Matter of Wells Fargo Bank, N.A. Sioux Falls, South Dakota,* AA-EC-2018-15 at Article III (Apr. 20, 2018), *available at* https://www.occ.gov/static/enforcement-actions/ea2018-025.pdf.

[82] *Id.* at Article X.

[83] CFPB Consent Order, *In the Matter of Wells Fargo Bank, N.A.,* 2018-BCFP-0001(Apr. 20, 2018), *available at* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank-na_consent-order_2018-04.pdf; OCC Consent Order, *In the Matter of Wells Fargo Bank, N.A. Sioux Falls, South Dakota,* AA-EC-2018-15 (Apr. 20, 2018), *available at* https://www.occ.gov/static/enforcement-actions/ea2018-025.pdf.

[84] WFC, *Wells Fargo 2019 Proxy Statement* at 31, available at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2019-proxy-statement.pdf.

[85] WFC, *Wells Fargo & Company Corporate Governance Guidelines*, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/corporate/governance-guidelines.pdf.

[86] WFC, *Wells Fargo 2019 Proxy Statement* at 52.

Governors of the Federal Reserve System from August 2008 to August 2013 and was Chair of the Federal Reserve's Committee on Consumer and Community Affairs.[87]

**James H. Quigley**—Mr. Quigley currently serves as a director of Wells Fargo and Chairman of Wells Fargo Bank.[88] He has served on Wells Fargo's board since October 2013.[89] Wells Fargo paid Mr. Quigley $417,004 in total compensation for his 2018 service on Wells Fargo's boards.[90] In addition to serving as Chairman of Wells Fargo Bank, Mr. Quigley is also Chairman of the board of directors of Hess Corporation and a member of the board of directors of Merrimack Pharmaceuticals, Inc.[91]

**Karen Peetz**—Ms. Peetz served as director of Wells Fargo and Wells Fargo Bank from February 2017 through May 2019. From September 2017[92] through May 2019, she served as Chair of the Risk Committee of Wells Fargo's Board of Directors. As Risk Committee Chair, Ms. Peetz was primarily responsible for overseeing Wells Fargo's enterprise-wide risk management program, including approving reforms required by regulators and monitoring the program's effectiveness.[93] Ms. Peetz was also responsible for overseeing Wells Fargo's Chief Risk Officer.[94] For Ms. Peetz' service on Wells Fargo's boards in 2018, Wells Fargo paid her $395,754 in total compensation.[95]

**Timothy "Tim" Sloan**—Mr. Sloan served as the CEO and a director of Wells Fargo from October 2016 through March 2019 and as Wells Fargo's President from November 2015 through March 2019. He formerly served as Wells Fargo's Chief Operating Officer from November 2015 to October 2016, Senior Executive Vice President (Wholesale Banking) from May 2014 to November 2015, and Senior Executive Vice President and Chief Financial Officer from February 2011 to May 2014.[96] According to Wells Fargo's by-laws, the CEO, "subject to the direction and control of the Board," must "supervise and control the business and affairs of the Company and shall see that all orders and resolutions of the Board are carried into effect."[97] For his performance in 2018, Wells Fargo's board awarded Mr. Sloan

---

[87] WFC, Elizabeth A. Duke, available at
https://www.wellsfargo.com/about/corporate/governance/duke/
[88] WFC, *Wells Fargo 2019 Proxy Statement* at 19 and 34.
[89] *Id* at 34.
[90] *Id.* at 52.
[91] *Id.* at 34.
[92] WFC, *Wells Fargo Announces Board Changes* (Aug. 15, 2017), *available at*
https://newsroom.wf.com/press-release/corporate-and-financial/wells-fargo-announces-board-changes.
[93] WFC, *Wells Fargo & Company 2018 Annual Meeting of Shareholders Proxy Statement* at 39, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2018-proxy-statement.pdf.
[94] *Id.*
[95] WFC, Wells Fargo 2019 Proxy Statement at 19 and 34, *available at* *https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2019-proxy-statement.pdf.*
[96] WFC, *Wells Fargo 2019 Proxy Statement* at 35, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2019-proxy-statement.pdf.
[97] WFC*, By-laws of Wells Fargo & Company* (Mar. 1, 2018), *available at* https://www08.wellsfargomedia.com/assets/pdf/about/corporate/governance-by-laws.pdf.

$18,400,000, including a $2,000,000 bonus. On March 26, 2019, Mr. Sloan resigned from the Company[98] amid pressure from regulators and intense scrutiny from Congress, including Chairwoman Waters, over his failure as CEO to address Wells Fargo's systemic misconduct and compliance weaknesses.

**C. Allen Parker**—Mr. Parker joined Wells Fargo in March 2017 as General Counsel. He served in that position until March 26, 2019, when, following Mr. Sloan's resignation announcement, Wells Fargo's board elected Mr. Parker to serve as interim-CEO and President, and as a director of the Company.[99] Mr. Parker returned to his role as General Counsel on October 21, 2019, when Wells Fargo appointed Charles Scharf as its CEO and President.[100]

**Michael "Mike" Loughlin**—Mr. Loughlin served as Wells Fargo's Chief Risk Officer from 2010 through his retirement in May 2018. Wells Fargo's Chief Risk Officer reports to the Chair of the Risk Committee of Wells Fargo's Board and "is responsible for setting the strategic direction and driving the execution of Wells Fargo's risk management activities."[101] Before retiring, Mr. Loughlin held various roles at Wells Fargo over 36 years, including as a member of the Bank's board from November 2006 through December 2014.[102] In January 2020, the OCC fined Loughlin $1.25 million for breaching his fiduciary duty to the Bank and engaging in misconduct that fostered illegal sales practices and allowed it to continue for years.[103]

## IV.  Committee Staff Findings

### A.    Before the 2016 and 2018 Consent Orders, Financial Regulators Knew About Serious Enterprise-Wide Deficiencies at Wells Fargo for Years Without Alerting the Public

1.    From 2009 through 2016, the OCC failed to take serious action to address Bank sales practices that the OCC knew posed danger to consumers.

The OCC not only stood by as Wells Fargo Bank repeatedly ignored its directives to address its compliance deficiencies, but the agency also failed to act on significant warning signs of potential sales practice abuses at the Bank. The OCC was aware of the Bank's weak compliance controls as far back as 2009. That year, the OCC directed the Bank to develop a

---

[98] SEC, Form 8-K for Wells Fargo & Company (Mar. 26, 2019), *available at* https://www.sec.gov/Archives/edgar/data/72971/000119312519090633/d727180d8k.htm.
[99] SEC, Form 8-K for Wells Fargo & Company (Mar. 26, 2019), available at https://www.sec.gov/Archives/edgar/data/72971/000119312519090633/d727180d8k.htm.
[100] SEC, Form 8-K for Wells Fargo & Company (Sept. 26, 2019), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/72971/000119312519256649/d813177d8k.htm.
[101] WFC, Wells Fargo 2019 Proxy Statement at 42.
[102] *Id.*
[103] *Id.*

company-wide system for monitoring consumer and employee complaints.[104] Wells Fargo Bank failed to fully address its deficient complaint monitoring for over seven years, and the OCC took no formal action against the Bank until it incorporated the 2009 directive into the 2016 Consent Order.[105] To the contrary, the OCC in its April 2015 supervisory letter concluded that the Community Bank's oversight of complaints was satisfactory.[106] In June 2015, the OCC did issue a supervisory letter with five MRAs, including an MRA on complaints.[107]

An April 19, 2017 report issued by the OCC's Office of Enterprise Governance and the Ombudsman reviewing the OCC's supervision of the Bank's sales practices concluded that, "[t]he OCC did not take timely and effective supervisory actions."[108] As early as 2010, the OCC identified concerns with the Bank's aggressive sales practices (including the Bank's "Going for Gr-Eight" initiative to double the average number of products per customer to eight) and lack of controls. However, the OCC failed to conduct comprehensive reviews and testing of monitoring systems and controls over sales practices between 2011 and 2014.[109] While the OCC planned to examine the Bank's incentive compensation structure in 2013, the agency ultimately performed only a "high-level" review, that included a PowerPoint presentation from the Bank.[110]



IN 2010, THE OCC DISCUSSED WITH SENIOR BANK MANAGEMENT THE APPROXIMATELY 700 EMPLOYEE COMPLAINTS REGARDING THE "GAMING" OF THE BANK'S INCENTIVE COMPENSATION COMPLAINTS BUT DID NOT REQUIRE THE BANK TO CONDUCT ANY FURTHER INVESTIGATION.

In 2010, the OCC discussed with senior bank management the approximately 700 employee complaints regarding the "gaming" of the Bank's incentive compensation

---

[104] OCC Office of Enterprise Governance and the Ombudsman, *Lessons learned Review of Supervision of Sales Practices at Wells Fargo* at 4  (Apr. 19, 2017), *available at* https://www.occ.gov/publications-and-resources/publications/banker-education/files/lessons-learned-review-of-sup-of-sales-practices-at-wells-fargo.html.

[105] *Id.* at 4.

[106] *Id.* at 6.

[107] *Id.* at 11.

[108] *Id.* at 4.

[109] *Id.* at 7.

[110] OCC Office of Enterprise Governance and the Ombudsman, *Lessons learned Review of Supervision of Sales Practices at Wells Fargo* at 8  (Apr. 19, 2017), *available at* https://www.occ.gov/publications-and-resources/publications/banker-education/files/lessons-learned-review-of-sup-of-sales-practices-at-wells-fargo.html.

complaints but did not require the Bank to conduct any further investigation.[111] The ombudsman also found that OCC examiners failed to adhere to internal OCC policy regarding informing the Bank's board of the directives issued to the Bank to improve compliance procedures meant to prevent consumer abuses.[112] An OCC examination of the Community Banking Operational Risk Management began in early 2015 covering management of first line of defense operational risk and cross sell activities. Subsequently, the OCC initiated a review of the Bank's enterprise sales practices in May 2015 after the City of Los Angeles filed a lawsuit alleging illegal sales practices.[113] More than a year before the OCC issued a public enforcement action, the OCC issued a supervisory letter concluding that "Wells Fargo's management and oversight of Enterprise Sales Practices risk is weak and needs to improve."[114]

> 2.    From 2013 through 2017, the Federal Reserve wrote non-public supervisory letters to Wells Fargo in an unsuccessful effort to compel the Company to fix its pervasive risk management deficiencies.

In its December 31, 2012 inspection report for Wells Fargo, the Federal Reserve identified foundational weaknesses in Wells Fargo's compliance risk management. In light of the Federal Reserve's findings, Wells Fargo and the Federal Reserve entered into a Memorandum of Understanding ("MOU") on November 5, 2013 to ensure the firm (1) took steps to maintain risk management practices that meet regulatory expectations and are suitable for Wells Fargo's size and complexity; and (2) timely resolved various internal control deficiencies identified by Federal Reserve staff over multiple years.[115] The MOU required Wells Fargo to remediate identified deficiencies in nine areas, including risk management (Paragraph 2 of the MOU); compliance (Paragraph 4 of the MOU); and corporate governance (Paragraph 9 of the MOU). With respect to the foundational issue of risk management, the MOU gave Wells Fargo's board 60 days to submit a written plan acceptable to the Federal Reserve to strengthen Wells Fargo's corporate risk management function.[116]

From November 2013 through 2017, when several unremedied provisions of the MOU were replaced by a superseding supervisory letter, Federal Reserve staff continued to observe deficiencies in Wells Fargo's ability to develop effective risk management structures that were appropriate for a financial institution of its size and complexity. For example, on March 20, 2014, the Federal Reserve rejected Wells Fargo's initial submission of a corporate risk management plan, citing "fundamental weaknesses" in parts of the plan.[117] Among the

---

[111] *Id.* at 5.

[112] *Id*. at 10-11.

[113] OCC Supervisory Letter WFC 2015-36, OCC-HFSC-WF_2019_00002218-26 at 2218 (Jun. 26, 2015) (on file with the House Financial Services Committee).

[114] OCC Supervisory Letter WFC 2015-36, OCC-HFSC-WF_2019_00002218–26 at 2219 (Jun. 26, 2015) (on file with the House Financial Services Committee).

[115] Memorandum of Understand between WFC and Federal Reserve (Nov. 5, 2013), FRB_HFSC-00018578-83 (on file with the House Financial Services Committee).

[116] *Id.*

[117] Letter from Federal Reserve to J. Stumpf, Chairman and Chief Executive Officer, WFC, FRB_HFSC-00018689 (Mar. 20, 2014) (on file with the House Financial Services Committee).

25

corporate risk management plan's weaknesses, Federal Reserve staff noted the firm's failure to acknowledge certain barriers to ensuring that the firm's 275,000 Wells Fargo employees worldwide operated within the Company's risk tolerances.[118]

The Federal Reserve finally approved Wells Fargo's corporate risk management plan in December 2014, nearly a year after Wells Fargo was required under the MOU to submit an acceptable plan.[119] The MOU continued to remain in effect over three years, during which the Federal Reserve supervised Wells Fargo's efforts toward implementing its risk management plan. While Federal Reserve staff acknowledged progress in some areas, Wells Fargo continued to exhibit serious deficiencies in its ability to manage risk and comply with financial regulations. In December 2015, a full year after approving Wells Fargo's risk management plan, Federal Reserve staff expressed dissatisfaction with Wells Fargo's continued deficiencies in key areas.[120] Additionally, Federal Reserve staff communicated to Wells Fargo concerns about continued deficiencies and compliance failures resulting from Wells Fargo's lack of controls:

> *[T]he [Federal Reserve] remains concerned about selected areas within the firm's risk management organizations, most notably compliance, [REDACTED by Federal Reserve], and financial crimes risk management. Each of these three areas has developed a framework for managing risk, and documented the risk management practices, yet has continued to experience highly visible breakdowns, leading to further supervisory actions from various regulators in the form of Consent Orders and Matters Requiring Attention (MRA). These continued shortcomings raise concerns regarding the stature and Board and senior management support of the independent risk functions covering these Key Risk Types. In particular,* **while the firm has continued to build-out its framework for managing compliance risk, continued weaknesses (i.e. sales practices, improperly denied Federal Housing Association (FHA) modifications, and the recent Consumer Financial Protection Bureau (CFPB) mortgage origination letter) evidence flaws that point to deeper culture and organizational structure issues that further documentation cannot solve** *(emphasis added).*[121]

On October 14, 2016, the Federal Reserve issued a report of inspection covering its supervision of Wells Fargo. The report, which the Federal Reserve shared in a letter addressed to Wells Fargo's board of directors, covered supervisory activities from January 1,

---

[118] *Id.* at FRB_HFSC-00018693.

[119] Letter from Federal Reserve to J. Stumpf, Chairman and Chief Executive Officer, WFC, FRB_HFSC-00019213 (Dec. 18, 2014) (on file with the House Financial Services Committee).

[120] Letter from Federal Reserve to J. Stumpf, Chairman and Chief Executive Officer, WFC, FRB_HFSC-00019813 (Dec. 15, 2015) (on file with the House Financial Services Committee).

[121] *Id.*

2015 to March 31, 2016.[122] In the report, the Federal Reserve downgraded several components of Wells Fargo's risk management functions.[123]

The Federal Reserve made an assessment for each of five risk types: Credit Risk; Market Risk – Trading; Market Risk – Banking Book Interest Rate Risk; Operational Risk; and Legal & Compliance Risk.[124] The Federal Reserve noted that significant issues in compliance and operational risk management persisted, leading the Federal Reserve to downgrade its assessment of these functions.[125]

According to the report, the Federal Reserve downgraded its assessment of Wells Fargo's Operational Risk management because, "[t]he firm's risk management practices generally fail to identify, monitor and control operational risk exposures across broad areas [of its operations]."[126] With respect to Wells Fargo's Legal & Compliance Risk, the Federal Reserve wrote, "[t]he primary reason for the downgrade is the inability of the board to oversee, and senior management to implement, the changes necessary to bring compliance risk management to an acceptable level over the past six years."[127] The Federal Reserve noted the similarities between the root causes of the 2016 sales fraud scandal at Wells Fargo Bank, and other sales practices issues identified in a 2011 Federal



[T]HE PRIMARY REASON FOR THE DOWNGRADE IS THE INABILITY OF THE BOARD TO OVERSEE, AND SENIOR MANAGEMENT TO IMPLEMENT, THE CHANGES NECESSARY TO BRING COMPLIANCE RISK MANAGEMENT TO AN ACCEPTABLE LEVEL OVER THE PAST SIX YEARS.

- FEDERAL RESERVE

---

[122] WFC, *Federal Reserve System's Annual Summary of Supervisory Activities: Wells Fargo & Company*, WF-HFSC-000120244-49 (Oct. 25, 2016) (on file with the House Committee on Financial Services).

[123] Letter from Federal Reserve to Board of Directors, WFC, WF-HFSC-000121028-46 (Oct. 14, 2016) (on file with House Financial Services Committee).

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] *Id.*

Reserve enforcement action[128] against Wells Fargo Financial, a former non-bank subsidiary of WFC:

> ***The root causes of the sales practice issue (poorly administered incentive compensation structures that produce high sales pressure and contribute to inappropriate employee behavior) are extremely similar to the root causes of issues that the [Federal Reserve] identified almost 10 years ago in Wells Fargo Financial, Inc.,*** *which led to the July 2011 consent order (i.e., poorly administered incentive compensation structures that led employees to steer customers into subprime loans and falsify income in order to support unaffordable loans). The fact that a different business line experienced significant compliance and conduct breakdowns due to substantially similar root causes five years later is highly concerning (emphasis added).*[129]

The Federal Reserve explicitly admonished Wells Fargo's board and management for failing to fix compliance risk management deficiencies with similar root causes to those deficiencies identified in the 2011 consent order, writing:

> *The [Federal Reserve] considers the board and senior management's failure to address the sales practice issues over a prolonged period of time (resulting in significant damage to WFC's reputation, public enforcement actions, fines, and additional litigation exposure), as **a significant compliance breakdown and a prime example of the impact that uncontrolled risk can have when compliance issues are not comprehensively dealt with in a timely fashion** (emphasis added).*[130]

The Federal Reserve also downgraded Board and Senior Management Oversight, one of the four subcomponents of the Federal Reserve's risk management component rating at

---

[128] Federal Reserve, *Federal Reserve issues a consent cease and desist order and assesses civil money penalty against Wells Fargo* (July 20, 2011), *available at* https://www.federalreserve.gov/newsevents/pressreleases/enforcement20110720a.htm.

[129] Letter from Federal Reserve to Board of Directors, WFC, WF-HFSC-000121028-46 at 30 (Oct. 14, 2016) (on file with the House Financial Services Committee). The letter reflects the Federal Reserve's assessment of Wells Fargo under the Federal Reserve's RFI rating system, which examines a bank holding company's risk management (R), financial condition (F), and the impact of nonbanking activities (I). The risk management component is based on grades in four subcomponents: Board and Senior Management Oversight; Policies, Procedures, and Limits; Risk Monitoring and Management Information Systems; and Internal Controls. The bank holding company's overall composite score is not a simple average of the component scores, but rather "it reflects examiner judgment with respect to the relative importance of each component to the safe and sound operation of the BHC." *See* Federal Reserve, Bank Holding Company Rating System (2004), *available at* https://www.federalreserve.gov/boarddocs/srletters/2004/SR0418a1.pdf. However, Wells Fargo is now subject to a new rating system for large financial institutions ("LFI rating system"). *See* Federal Reserve, Federal Reserve Board finalizes new supervisory rating system for large financial institutions (Nov. 2, 2018), *available at* https://www.federalreserve.gov/newsevents/pressreleases/bcreg20181102a.htm.

[130] *Id.*

28

that time. According to the Federal Reserve's inspection report, the downgrade was due to multiple years of, **"repeated material breakdowns in compliance risk management that have plagued the firm for numerous supervisory cycles"** (emphasis added).[131] Despite these downgrades, the Federal Reserve did not downgrade Wells Fargo's risk management component rating or overall composite rating because it did not find similar deficiencies in the Company's management of financial risk, such as credit and market risk.[132]

Over the next year, Wells Fargo's management and board of directors again failed to establish an effective corporate risk management infrastructure. This lack of progress led the Federal Reserve on October 3, 2017, to issue a targeted, "matter requiring attention" letter ("2017 Risk MRA").[133] The 2017 Risk MRA superseded a July 15, 2013 MRA supervisory letter underlying the corporate risk management provisions of the MOU. The letter included Federal Reserve's finding that, despite years of development, "WFC's Corporate Risk continues to lack a cohesive, integrated approach to managing enterprise-wide risks in a manner commensurate with the firm's evolving size and complexity."[134] The Federal Reserve particularly criticized Wells Fargo's board for not providing effective oversight of the firm's corporate risk function and failing to ensure senior management developed and implemented an effective risk management program.[135] According to the letter, Wells Fargo's persistent risk management deficiencies over the years since the 2013 MOU, "reflect the board's failure to direct and oversee senior management in addressing corporate risk issues with sufficient urgency."[136]



ACCORDING TO A FEDERAL RESERVE LETTER WELLS FARGO'S PERSISTENT RISK MANAGEMENT DEFICIENCIES OVER THE YEARS SINCE THE 2013 MOU, "REFLECT THE BOARD'S FAILURE TO DIRECT AND OVERSEE SENIOR MANAGEMENT IN ADDRESSING CORPORATE RISK ISSUES WITH SUFFICIENT URGENCY."

Similar to the 2013 MOU, the 2017 Risk MRA requires Wells Fargo to submit a plan to enhance its independent risk function and enterprise-wide risk management program

---

[131] *Id.*

[132] *Id.*

[133] Letter from Federal Reserve to M. Loughlin, WFC, FRB_HFSC-00031515-20 (Oct. 3, 2017) (on file with the House Financial Services Committee).

[134] *Id.*

[135] *Id.* at FRB_HFSC-00031517.

[136] *Id.* at FRB_HFSC-00031518.

within 60 days of the letter. To date, nearly two and a half years later, the firm has not submitted a plan that meets regulatory expectations under the 2017 Risk MRA.

The Committee staff finds that the Federal Reserve was ineffective in its supervisory efforts between its December 2012 identification of foundational risk management issues at Wells Fargo, and its February 2, 2018 enforcement action. The Federal Reserve's reliance on non-public, low severity, supervisory letters allowed Wells Fargo's risk management systems to languish for five years, during which time consumers were exposed to unchecked opportunities for abuse.

> 3. For years prior to its 2018 Compliance Risk Management Consent Order, the OCC took ineffective, non-public actions in a failed attempt to require Wells Fargo to correct its weak controls over UDAP risks.

Other regulators also uncovered compliance weaknesses long before the issuance of the 2018 Compliance Risk Management Consent Orders. In November 2011, the OCC examined for the first time the Bank's unfair, deceptive, acts or practices ("UDAP") compliance risk management practices to gain an understanding of the Bank's UDAP risk profile and controls to mitigate the Bank's UDAP risks.[137] In a January 16, 2014 supervisory letter to the Bank's chief compliance officer, the OCC communicated that the Bank had an elevated UDAP risk and that its "UDAP compliance risk management program has not proven effective at identifying and mitigating risk."[138] As a result, the OCC directed Bank management to establish a company-wide UDAP compliance program.[139] More than four years later, the Bank had still not complied with this directive, which was one of the reasons the OCC took additional supervisory actions.[140]

In July 2015, the OCC issued a non-public enforcement action requiring the Bank to submit a plan to address, "weaknesses in the Bank's compliance risk management program."[141] A December 22, 2016 supervisory letter summarizing the OCC's examination of management's progress on implementing an effective compliance program reported that: **"Management has not yet established an effective and sustainable enterprise-wide compliance program. The bank's overall compliance position is weak and continues to require close supervisory attention"** (emphasis added).[142] Just as the Federal Reserve determined the Bank had failed to correct compliance deficiencies identified in prior regulatory actions, in a supervisory letter dated April 11, 2017, the OCC concluded that the Bank had "not made adequate progress" in effectively implementing its plan to

---

[137] OCC Supervisory Letter, WFC 2011-63, OCC-HFSC-WF_2019_00000859-63 (Jan.16, 2014) (on file with the House Financial Services Committee).

[138] *Id.*

[139] *Id.*

[140] OCC Memorandum, OCC-HFSC-WF_2019_00001023-55 (Mar. 9, 2018) (on file with the House Financial Services Committee).

[141] *Id.*

[142] OCC Supervisory Letter WFC 2016-43, OCC-HFSC-WF_2019_00000871-77 at 71 (Dec. 22, 2016) (on file with the House Financial Services Committee).

address the weakness identified in the 2015 non-public order.[143] In an internal memo dated March 9, 2018, the OCC noted that the retention of an outside consultant to assist the Bank was a "tacit acknowledgment that the Bank did not have the leadership or staff capable of developing an effective Plan in-house."[144] More than three years after the issuance of the non-public order, the OCC again determined that "critical deficiencies remain in the Bank's compliance risk management program."[145] Consistent with the OCC's findings, the CFPB since it began examining Wells Fargo in 2011 uncovered multiple consumer violations in the Bank's product lines resulting from poor board and management oversight and an overall lack of a compliance infrastructure across the Bank.[146] Thus, the OCC identified serious compliance management



THE COMMITTEE STAFF FINDS THAT THE OCC'S REPEATED USE OF CONFIDENTIAL SUPERVISORY LETTERS TO CORRECT DEFICIENCIES WITH WELLS FARGO, EVEN AFTER THE LETTERS PROVED INEFFECTIVE, ALLOWED THE BANK TO OPERATE FOR YEARS IN AN UNSAFE AND UNSOUND MANNER AND LEFT CONSUMER'S UNAWARE OF THE HEIGHTENED RISK OF HARM THEY FACED WHEN DEALING WITH WELLS FARGO.

weaknesses at Wells Fargo and took ineffective non-public action for four years before bringing a public enforcement action in 2018.

The Committee staff finds that the OCC's repeated use of confidential supervisory letters to correct deficiencies with Wells Fargo, even after the letters proved ineffective, allowed the Bank to operate for years in an unsafe and unsound manner and left consumer's unaware of the heightened risk of harm they faced when dealing with Wells Fargo.

**B.    After the Bank's Consumer Abuses Became Public and the Regulators Issued Consent Orders, Wells Fargo's Board Failed to Ensure Management Could Competently Address the Company's Risk Management Deficiencies**

1.    The board failed to ensure the Bank had managers with sufficient compliance expertise.

---

[143] OCC Supervisory Letter WFC 2016-30, OCC-HFSC-WF_2019_00000878-84 at 78 (Apr. 11, 2017) (on file with the House Financial Services Committee).

[144] OCC Memorandum, OCC-HFSC-WF_2019_00001023-55 at 32 (Mar. 9, 2018) (on file with the House Financial Services Committee).

[145] *Id.* at 32.

[146] Interview with CFPB Regional Director for the Western Region (Jan. 30, 2020).

The Committee staff's investigation reveals that Wells Fargo often tasked individuals lacking the requisite knowledge and expertise with responsibility for managing the Bank's compliance with key provisions of the 2016 Consent Orders. The 2016 OCC Sales Practice Consent Order required the Bank to establish a company-wide platform for handling consumer complaints.[147] Wells Fargo, in January 2017, formed the Conduct Management Office ("CMO"), which was responsible for overseeing the handling of customer complaints across the Company.[148] The Bank selected a senior manager in the Wealth and Investment Management ("WIM") division with no apparent consumer compliance background to lead the CMO.[149] Several individuals expressed concerns about the CMO leader's qualifications to serve in that position. According to April 2018 Federal Reserve meeting minutes, Federal Reserve staff noted, **"[c]onsidering [the CMO leader] was the Group Financial Officer for WIM, it's still not clear why she was selected to lead [the CMO],"** and a senior Wells Fargo compliance executive "signaled [the CMO leader] was not suited for that role but now the program is up and running and there was not much that could be done" (emphasis added).[150] The former Chair of the board's Risk Committee, Karen Peetz, revealed in an interview with Committee staff that the CMO leader was hardworking but ultimately unsuccessful in parts of her role.[151] Similarly, the OCC staff communicated to the Committee that historically the Bank lacked individuals who understood how to manage company-wide compliance programs and that the CMO leader herself recognized that she wasn't a good fit to lead the CMO and retired in 2019.[152]

Wells Fargo's selection of a CMO leader who lacked the requisite qualifications impeded the Bank's ability to comply with the 2016 OCC Sales Practices Consent Order. The CMO struggled to establish the company-wide consumer complaints platform required by the 2016 OCC Sales Practices Consent Order. On April 30, 2019, the Bank submitted a revised Comprehensive Action Plan for the Sales Practices Consent Order to address expectations concerning the complaints platform—the final key component of the Sales Practice Consent Order outstanding. The revised plan extended the date for fully implementing and validating the complaints platform until September 30, 2021.[153] In response, the OCC wrote to Wells Fargo on May 21, 2019 that **"this completion date is now five years beyond the execution of the [Sales Practice Consent Order] and any additional extension requests may potentially subject the bank to additional enforcement actions or**

---

[147] OCC Consent Order, *In the Matter of Wells Fargo Bank, N.A. Sioux Falls, South* Dakota, AA-EC-2016-66 (Sept. 6, 2016) at Article V(e), *available at* https://www.occ.gov/news-issuances/news-releases/2016/nr-occ-2016-106b.pdf.

[148]  *Message From Conduct Management Office Organization*, WF-HFSC-000057257-90 at 60-61 (May 30, 2018) (on file with the House Financial Services Committee.)

[149] Wells Fargo Stories, *Sloan: 'We are on the right path'* (Jan. 19, 2017), *available at* https://stories.wf.com/sloan-right-path/.

[150] Meeting Minutes, FRB_HFSC-00021597-601 at 600 (Apr. 2018) (on file with the House Financial Services Committee).

[151] Interview with Karen Peetz (Jan. 31, 2020).

[152] Interview with OCC staff (Feb. 4, 2020).

[153] Letter from  Wells Fargo to OCC staff, WF-HFSC-000081708- 803 at 709 (Apr. 30, 2019) (on file with the House Financial Services Committee).

**penalties"** (emphasis added).[154] The OCC's concerns about the delay echoed prior OCC reviews of the CMO. The OCC examined the CMO in April of 2018 and determined that "[a] significant amount of work still remains to make the CMO fully effective."[155] Specifically, the OCC referenced the timely development of a company-wide platform to track consumer complaints, a requirement under the OCC's 2016 Consent Order.[156]

> 2.    Instead of building its compliance risk management system with in-house employees, the Bank outsourced compliance to outside consultants.

In addition to placing unqualified individuals in key compliance positions, the Committee staff's investigation reveals that Wells Fargo outsourced its efforts to comply with the 2016 Sales Practices Orders to consultants. The consulting firm McKinsey & Company supported the formation of the Consent Order Program Office (COPO), created to coordinate the Bank's response to the 2016 Sales Practices Consent Orders.[157] Additionally, in January 2017 senior Bank executives had internal discussions about hiring Promontory Financial Group (Promontory) as a consultant to the CMO.



I DO THINK BRINGING IN THE EXTERNAL REPUTATION AND EXPERTISE FROM PROMONTORY TO GUIDE IS TREMENDOUS, BECAUSE WE ARE REALLY FIGURING THIS OUT AS WE GO.

- MICHAEL LOUGHLIN
WELLS FARGO CHIEF RISK OFFICER

The head of COPO communicated to Chief Risk Officer Michael Loughlin in a January 6, 2017 email that, "I do think bringing in the external reputation and expertise from Promontory to guide is tremendous, because **we are really figuring this out as we go**" (emphasis added).[158] Subsequently, on January 11, 2017, Loughlin touted the quick hiring of

---

[154] Letter from OCC to Wells Fargo, WF-HFSC-000032344-45 (May 21, 2019) (on file with the House Financial Services Committee).

[155] OCC Supervisory Letter WFC 2018-39, OCC-HFSC-2019_00012044-51 (Aug. 14, 2018) (on file with the House Financial Services Committee).

[156] *Id.*

[157] Email from Wells Fargo to CFPB Senior Examiner, HFSC_CFPB_041019_00016822-23 (Oct. 27, 2016) (on file with the House Financial Services Committee).

[158] *See* Appendix 1: Email from Wells Fargo, to Michael Loughlin, Chief Risk Officer, WFC, WF-HFSC-000111941-42 (Jan. 6, 2017).

Promontory to help establish the CMO.[159] Promontory also drafted a compliance plan for the Bank in response to another OCC regulatory action.[160]

The Bank's reliance on multiple outside consultants illustrated a lack of commitment to implementing the in-house compliance risk management programs required by its regulators. The Bank's July 17, 2018 report of examination from the OCC noted that:

> ***Management struggled throughout the supervisory cycle to develop an Action Plan for an enterprise-wide compliance risk management program*** *and efforts to improve the compliance program largely stalled during this time. There were several failed efforts in 2017 to develop a Plan **and ultimately management had to hire outside assistance to do much of the development of the Plan** (emphasis added).[161]*

OCC staff communicated to Committee staff that the Bank's reliance on outside consultants for regulatory expertise was "unusual" compared to its peer institutions.[162]

### C.    Wells Fargo and Political Appointees at the CFPB had Backchannel Communications Regarding the CFPB's Compliance Risk Management Consent Order

During the course of its investigation, Committee staff learned that career employees and political appointees at times provided the Bank conflicting information regarding the statuses of potential actions the Bureau intended to take against the Bank for its compliance failures. In conjunction with its 2018 Compliance Risk Management Consent Order, the CFPB signed an agreement with Wells Fargo Bank delaying until July 20, 2019 any decision on whether to resolve seven matters requiring the Bank to take corrective action, including remediating consumers through public enforcement actions or through the Office of Supervision.[163] These matters involved potentially thousands of consumers and millions of dollars in consumer harm.[164] Resolving these matters non-publicly through the Office of Supervision prevents consumers from learning the true extent of the Bank's misconduct.

The CFPB extended the July 20, 2019 deadline until June 2020, further delaying any potential disclosure of additional consumer abuses committed by Wells Fargo.[165] During a meeting on July 24, 2019, the CFPB and Wells Fargo disagreed about whether the CFPB had

---

[159] *See* Appendix 2: Email from Michael Loughlin, Chief Risk Officer, WFC, to Tim Sloan, Chief Executive Officer, WFC, WF-HFSC-000060350 (Jan. 11, 2019).

[160] Interview with OCC staff (Feb. 4, 2020).

[161] OCC Report of Examination, OCC-HFSC-WF_2019_00008332-405 at 370 (Jul. 17, 2018) (on file with the House Financial Services Committee).

[162] *Id.*

[163] CFPB Tolled Matters, HFSC_CFPB_041019_00009285-302 (Jan. 2019) (on file with the House Financial Services Committee); Interview with CFPB Regional Director for the Western Region (Jan. 30, 2020).

[164] CFPB Tolled Matters, HFSC_CFPB_041019_00009285-302 (Jan. 2019) (on file with the House Financial Services Committee).

[165] Interview with CFPB Regional Director for the Western Region (Jan. 30, 2020).

already decided to resolve the matters through the Office of Supervision.[166] According to notes from the meeting produced by the CFPB, Wells Fargo's Interim CEO Allen Parker understood from his prior conversations with Eric Blankenstein, a political appointee overseeing the Office of Supervision, that the matters would be resolved non-publicly through the Office of Supervision.[167] The meeting notes further reflect that career CFPB officials informed Wells Fargo during the meeting that, contrary to Parker's understanding, the CFPB had not made any decisions and reserved the right to bring enforcement action if appropriate.[168]

Prior to the July 24, 2019 meeting, Parker spoke to Blankenstein on May 17, 2019 before he departed the Bureau.[169] In an email to Bank Board Chair James Quigley recounting his conversation with Blankenstein, Parker noted that, **"Eric also assured me that there would continue to be 'political' oversight of the engagement with us, although he wasn't yet sure who his successor would be"** (emphasis added).[170] Quigley indicated that he would follow up with Blankenstein.[171] The CFPB's Western regional director in charge of supervising Wells Fargo was not involved in any discussions between the Bank and Blankenstein.[172] Separate lines of communications between political

| | |
|---|---|
| **FROM:** | PARKER, ALLEN |
| **DATE:** | FRIDAY, MAY 17, 2019 4:49 PM |
| **TO:** | JIM QUIGLEY |
| **SUBJECT:** | RE: ERIC BLANKENSTEIN |

> ERIC ALSO ASSURED ME THAT THERE WOULD CONTINUE TO BE 'POLITICAL' OVERSIGHT OF THE ENGAGEMENT WITH US, ALTHOUGH HE WASN'T YET SURE WHO HIS SUCCESSOR WOULD BE.

---

[166] CFPB Meeting Notes, HFSC_CFPB_041019_000021418-20 (Jul. 24, 2019) (on file with the House Financial Services Committee).

[167] *Id.*

[168] *Id.*

[169] According to the Washington Post, an inspector general report found that after media reports surfaced about racist blogposts he authored, Blankenstein "may have abused his authority and misused his position for private gain" in requesting that a subordinate, the head of the Office of Fair Lending and Equal Opportunity, submit a statement to the Washington Post on his behalf. Renae Merle, *Trump's former anti-discrimination official 'may have abused his authority,' inspector general's report finds*, The Washington Post (Jul. 29, 2019), *available at* https://www.washingtonpost.com/business/2019/07/29/trumps-former-anti-discrimination-official-may-have-abused-his-authority-inspector-generals-report-finds/

[170] *See* Appendix 3: Email from C. Allen Parker, Interim Chief Executive Officer, WFC, to Jim Quigley, Director, WFC, WFBOD-HFSC-00018821-22 at 21 (May 17, 2019).

[171] *See* Appendix 3: Email from C. Allen Parker, Interim Chief Executive Officer, WFC, to Jim Quigley, Director, WFC, WFBOD-HFSC-00018821-22 at 21 (May 17, 2019).

[172] Interview with CFPB Regional Director for the Western Region (Jan. 30, 2020).

appointees and the Bank could potentially undermine the authority of career officials in their oversight of the institution.

### D. Wells Fargo's Board Allowed Management to Repeatedly Submit Materially Deficient Plans in Response to the Consent Orders

1.     Wells Fargo submitted multiple deficient plans that required board review (and with regards to plans required by the OCC, board approval) in response to the 2016 Sales Practices Consent Orders.



CFPB'S WESTERN REGIONAL DIRECTOR DESCRIBED TO COMMITTEE STAFF HOW THE BANK WOULD OFTEN SUBMIT A "PLAN FOR A PLAN" INSTEAD OF A COMPLETE SUBMISSION.

The Committee staff's investigation reveals that the CFPB and OCC repeatedly rejected the Bank's compliance and redress plans required under the 2016 Sales Practices Consent Orders as incomplete or otherwise deficient. For example, the CFPB concluded that the Bank's initial compliance plan was, "not specific enough to enable the CFPB to determine whether Wells Fargo Bank . . . will take the necessary actions to correct the deficiencies identified in the Independent Consultant's Report."[173] The OCC determined it could not approve the Bank's initial remediation plan because "key portions of the plan are discussed only generally because they remain under development."[174] CFPB's Western regional director described to Committee staff how the Bank would often submit a "plan for a plan" instead of a complete submission.[175] According to the CFPB's Western regional director's interview testimony and subsequent communications between CFPB staff and Committee staff, as February 24, 2020 Wells Fargo Bank has submitted its remediation plan to the CFPB four times, most recently on January 31, 2020, and its compliance plan three times, most recently on April 30, 2019.[176] The CFPB's Western regional director also indicated that Wells Fargo's repeated submission of unacceptable plans was "unusual" in comparison to other banks.[177] As of January 30, 2020, more than four years after the Consent Order, the CFPB has not approved the Bank's remediation plan or compliance plan.[178] Each plan rejected by CFPB required board review, and each plan rejected by the OCC required board approval.

---

[173] Letter from CFPB Regional Director to Betsy Duke, Chair of the Board of Directors, WFC HFSC_CFPB_041019_00001622-23 (Dec.15, 2017) (on file with the House Financial Services Committee).

[174] Letter from OCC to Wells Fargo, WF-HFSC-000151931-32 at 1931 (Feb. 23, 2017) (on file with the House Financial Services Committee).

[175] Interview with CFPB Regional Director for the Western Region (Jan. 30, 2020).

[176] *Id.*

[177] *Id.*

[178] *Id.*

2.      Despite repeated and consistent feedback from Federal Reserve staff, Wells Fargo repeatedly submitted materially incomplete plans in response to the 2018 Federal Reserve Consent Order.

Following the issuance of the 2018 Federal Reserve Consent Order, Federal Reserve staff held regular meetings with Wells Fargo board members and executives responsible for developing the submissions required under the order. These meetings included weekly discussions between Federal Reserve staff and Wells Fargo personnel on topics selected by the firm, during which Federal Reserve staff answered questions from Wells Fargo personnel and laid out the Federal Reserve's expectations for satisfying the terms of the consent order. Additionally, Wells Fargo personnel provided progress



ACCORDING TO A FEDERAL RESERVE LETTER, FEDERAL RESERVE STAFF INFORMED WELLS FARGO THAT ITS SUBMISSION WAS SO, "MATERIALLY INCOMPLETE" THAT THE PLANS, "CANNOT BE EVALUATED BY [FEDERAL RESERVE] STAFF FOR THEIR ADEQUACY."

updates to Federal Reserve staff and received informal feedback on draft components of Wells Fargo's submissions.

The discussions between Federal Reserve and Wells Fargo personnel during these meetings are memorialized in meeting minutes and notes produced by the Federal Reserve, Wells Fargo, and certain Wells Fargo board members. The meeting records show that Federal Reserve staff consistently emphasized to the Company's directors and management that Wells Fargo's plans under the consent order needed to, among other requirements: identify the root causes of the problems addressed; explain how each required program would operate once Wells Fargo remediated the problems; outline the steps necessary to get from the current state to an operational and effective program; and, clearly define responsibilities and lines of accountability.

In addition to weekly meetings with Wells Fargo's management to discuss consent order progress, Federal Reserve staff held one-on-one sessions with several of Wells Fargo's directors and senior executives to receive candid information about ongoing issues within the firm and the state of the firm's progress toward fixing its systemic risk management and compliance weaknesses.[179]

On April 3, 2018, Wells Fargo made its first submission of plans for board effectiveness and risk management under the 2018 Federal Reserve Consent Order. Despite receiving consistent direction from Federal Reserve staff on what sufficiently detailed plans should include, Wells Fargo's first submission of plans for board effectiveness and risk management,

---

[179] *See* Federal Reserve Meeting Minutes (Feb. 7, 2018 – July 26, 2019) (on file with the House Financial Services Committee).

made on April 3, 2018, fell woefully short of the Federal Reserve's expectations. In a May 7, 2018 response letter, Federal Reserve staff informed Wells Fargo that its submission was so, **"materially incomplete"** that the plans, **"cannot be evaluated by [Federal Reserve] staff for their adequacy"** (emphasis added). [180] The letter reiterated feedback that Federal Reserve staff provided to Wells Fargo personnel in meetings held in February and March of 2018. The letter also provided details about the incomplete elements of Wells Fargo's submission. For example, the Federal Reserve noted that "[b]uilding an effective operational risk management program is a key focus of the Order," yet "…[t]he plans fail to comprehensively address operational risk…."[181] According to the Federal Reserve, Wells Fargo failed to include key implementation details about all self-identified categories of operational risk.[182]

The Federal Reserve rejected Wells Fargo's April 3, 2018 submission and gave the firm 90 days to submit revised plans that addressed the requirements of the consent order and was consistent with the feedback provided by Federal Reserve staff.[183]

After receiving Wells Fargo's April 3, 2018 submission, Federal Reserve staff continued to engage in regular meetings with Wells Fargo directors and management regarding the requirements of the consent order and the Federal Reserve's expectations for Wells Fargo's plans.[184] On October 31, 2018, after the Federal Reserve approved two extension requests from the firm, Wells Fargo submitted revised plans addressing board effectiveness and risk management. While the Federal Reserve considered some aspects of the plans acceptable or partially acceptable, other aspects lacked fundamental elements necessary to address the issues identified in the 2018 Federal Reserve Consent Order. Overall, Wells Fargo's October 31, 2018 submission failed to meet the Federal Reserve's expectations and was rejected. [185]

On March 11, 2019, the day before Sloan testified before the House Financial Services Committee, the Federal Reserve sent a letter to WFC Chair Duke and CEO Sloan in response to Wells Fargo's October 31, 2018 plans. Although the Federal Reserve noted that Wells Fargo had made some progress, it found that, **"the firm's plans to remediate the Order remain materially incomplete,"** with respect to operational risk management and other requirements of the consent order (emphasis added).[186] In addition to identifying fundamental gaps in Wells Fargo's plans, Federal Reserve staff noted that the plan was riddled with errors and discrepancies, such as incorrect progress indicators for deliverables

---

[180] Letter from Federal Reserve to Elizabeth Duke, Chair of the Board of Directors, WFC, and Tim Sloan, Chief Executive Officer, WFC, FRB_HFSC-00003438-43 (May 7, 2018) (on file with the House Financial Services Committee).

[181] *Id.*

[182] *Id.*

[183] *Id.*

[184] *See* Federal Reserve Meeting Minutes (Apr. 10, 2018 – Oct. 26, 2018) (on file with the House Financial Services Committee).

[185] *See* Letter from Federal Reserve to Elizabeth Duke, Chair of the Board of Directors, WFC, and Tim Sloan, Chief Executive Officer, WFC, FRB_HFSC-00018565-75 (Mar. 11, 2019) (on file with the House Financial Services Committee).

[186] *Id.*



"

CONTINUED FAILURE TO SUBMIT ACCEPTABLE PLANS REFLECTS POORLY ON THE FIRM, AND NEGATIVELY INFLUENCES SUPERVISORS' VIEW OF THE BOARD AND SENIOR MANAGEMENT'S CAPACITY TO EFFECTIVELY MANAGE AND GOVERN THE FIRM.

- FEDERAL RESERVE

"

and "illogical timeframes" for achieving future milestones.[187] According to the letter, "[p]ervasive inaccuracies—though immaterial in isolation—in aggregate, weaken the plan's credibility and impede clarity."[188] In the letter, the Federal Reserve admonished Wells Fargo's board and management for the quality of the firm's two submissions to date, writing:

> *Continued failure to submit acceptable plans reflects poorly on the firm, and negatively influences supervisors' view of the board and senior management's capacity to effectively manage and govern the firm. The [Federal Reserve] expects the firm to take the time necessary to develop its next plans and ensure greater quality control. A third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions (emphasis added).[189]*

> 3.   Wells Fargo submitted multiple deficient plans in response to the 2018 Compliance Risk Management Consent Orders.

On June 19, 2018, Wells Fargo made its first submission to the OCC under the OCC's 2018 Compliance Risk Management Consent Order. On July 24, 2018, the OCC rejected Wells Fargo's submission, noting in a response letter that, "[d]espite the OCC including detailed requirements and expectations in the [Consent Order] document, the bank's submission response lacks substance and detail in a number of areas."[190] For example, the OCC requested that the Bank resubmit its plan for remediating customers affected by Wells

---

[187] *Id.*

[188] *Id.*

[189] *Id.*

[190] Letter from OCC to Wells Fargo, OCC-HFSC-WF-2019-00012014-18 at 14 (July 24, 2018) (on file with House Financial Services Committee).

Fargo's force-placed insurance practices because, among other deficiencies, the plan failed to provide for full and consistent remediation of harm. Specifically, the OCC wrote:

> ❝ AS WRITTEN, THE PLAN DOES NOT PROVIDE FULL REMEDIATION FOR ALL IMPACTED CUSTOMERS, AND, IN SOME INSTANCES, THE BANK'S INITIAL PLAN RESULTS IN THE INCONSISTENT AND POTENTIALLY UNFAIR TREATMENT OF CUSTOMERS WHO EXPERIENCED SIMILAR HARM (EMPHASIS ADDED).[192] ❞

The OCC instructed the Bank to resubmit its plans for enhancing Wells Fargo's internal audit function (Article VI of the consent order) and remediating CPI customers (Article VIII).[192] Additionally, the OCC wrote that it would schedule meetings with the Bank's management to discuss deficiencies in other components of the Bank's submission.[193] The OCC further noted that Wells Fargo's continued failure to submit adequate plans could result in future action:

> ***The length of time a Bank takes to achieve full compliance with all provisions of an enforcement action is a factor in the OCC's determination of any future supervisory and/or enforcement actions.*** *Management's action plan and timeframes for completion should demonstrate prompt corrective actions that are appropriately designed and will result in effective and sustainable resolution of the longstanding, uncorrected issues that are included in this [consent order] (emphasis added).*[194]

The OCC's vague warning that prolonged efforts could expose the Bank to "future supervisory and/or enforcement actions" proved empty as the quality of Wells Fargo's submissions improved little over the next several months. In March 4, 2019, days before Sloan's testimony before the Committee, the OCC acknowledged Wells Fargo's limited progress in a Quarterly Management Report covering the 4th Quarter of 2018.[195] In the report, the OCC expressed its view that Wells Fargo's "management and Board oversight remain inadequate."[196] The OCC further wrote:

---

[191] *Id.* at OCC-HFSC-WF-2019-00012017.

[192] *Id.* at OCC-HFSC-WF-2019-00012014.

[193] *Id.*

[194] *Id.* at OCC-HFSC-WF-2019-00012015.

[195] OCC Quarterly Management Report, Wells Fargo & Company, OCC-HFSC-WF-2019-00002621-49 (Mar. 4, 2019) (on file with House Financial Services Committee).

[196] *Id.* at 23.

*Although the bank is making progress in certain areas, significant time elapsed before the bank began demonstrating progress, and overall, progress is very slow. Additionally, **the vast majority of progress appears to come after repeated pressure by the regulators, calling out missed deadlines, failed validations, and poor quality [sic] action plans.** The Board and executive management must demonstrate the willingness and ability to implement and maintain effective corporate governance and risk management programs that span the enterprise (emphasis added).*[197]

### E.    Wells Fargo's Board and Management Prioritized Financial and Other Considerations Above Fixing Issues Identified by Regulators

1.    Wells Fargo's Chief Risk Officer wanted to limit remediation to consumers and manipulate regulators.

The Committee staff's investigation uncovered an April 1, 2017 email exchange between Chief Risk Officer Michael Loughlin and Chief Executive Officer Tim Sloan that reflects an unwillingness to take seriously the Bank's obligations under the 2016 Sales Practices Consent Orders to fully compensate harmed consumers and fix its internal controls.[198]

```
Message

From:      Sloan, Tim  Redacted by Committee
Sent:      4/1/2017 5:45:34 PM
To:        Loughlin, Michael J.  Redacted by Committee
Subject:   Re: New Sales Practices Concept


Let's discuss on Monday.

  Original Message
From: Loughlin, Michael J.
Sent: Saturday, April 1, 2017 2:41 PM
To: Sloan, Tim
Subject: New Sales Practices Concept


I brought this up with a small group yesterday (Shrewsberry, Heidi, Justin) and I had a chance to run it
by Allen.  Everyone seems to think we should discuss further.  Perhaps we could discuss Monday at the OC.

We go to the OCC and the CFPB and tell them we will spend $200MM to repay customers who were injured due
to unauthorized accounts.  We already have the $110MM class action, so by adding $90MM we show just how
serious we are.

We do a major outreach effort.

We hire someone like Kenneth Feinberg to oversee the remediation.  He hires people to manage the claims.
They work for him.  Not us.  We just pay.

We make it easy.  Someone calls, says they were damaged, Feinberg's people do what they think is fair.
We then avoid the whole mediation/arbitration issue by bringing in this outsider.

At the end of the program (six month--or maybe September 8) we cut the program off.  We can take any
people who come to us in the normal course.

If any of the $200MM is left over, we promise to give it to charity---only after the CFPB and the OCC let
us out of the consent orders.  If they do not, no donation.  Put the onus back on them.

It's bold.  It's fair.  It's fast.  You could personally negotiate this with the new Comptroller.  Big
win for him.

Be a change agent and get us back on track.
```

---

[197] *Id.*

[198] *See* Appendix 4: Email from Michael Loughlin, Chief Risk Officer, WFC to Tim Sloan, Chief Executive Officer, WFC, WF-HFSC-000051295 (Apr. 1, 2017).

41

According to his email, Loughlin wanted to establish a process that placed the burden on consumers victimized by Wells Fargo's opening of fraudulent accounts to make a claim for compensation. Under Loughlin's proposal, Wells Fargo would limit the amount of time for consumers to come forward to only five or six months. Moreover, he wanted to use a potential charitable donation as leverage to compel the OCC and CFPB to lift the 2016 Sales Practices Orders.



If any of the $200MM [for customers injured due to unauthorized accounts] is left over, we promise to give it to charity---only after the CFPB and the OCC let us out of the consent orders. If they do not, no donation. Put the onus back on them.

- Michael Loughlin
Wells Fargo Chief Risk Officer

Mere weeks after Loughlin sent this email, former Company Board Chair Stephen Sanger represented to shareholders at Wells Fargo's annual meeting that "[t]he Board has complete confidence in Tim Sloan and in the rest of the company's senior leadership team. The Board believes that the company has a strong foundation to serve our customers and earn back the trust of all our key stakeholders."[199] It strains credulity that the Board could profess its commitment to serving the Bank's customers while at the same time expressing support for senior leaders such as Loughlin.

> 2.    Until 2017, Wells Fargo had a policy allowing the Bank to misuse the attorney-client privilege to hide documents from its regulators and board, and the Bank withheld documents from the independent consultant tasked with evaluating the Bank's sales practices and informing its compliance plan.

Committee staff discovered during its investigation that in 2017 the OCC uncovered a previously undisclosed Wells Fargo policy allowing the Bank to use attorney-client privilege to withhold information from regulators and the Company's board.[200] The Bank rescinded the policy only after the OCC discovered it. [201]Additionally, there were other instances where the bank did not timely inform the OCC about important issues within the Company.[202]

---

[199] Wells Fargo Stories, *Stockholders re-elect Board* (Apr. 26, 2017)*, available at* https://stories.wf.com/stockholders-re-elect-board/.
[200] *Id.*
[201] *Id.*
[202] *Id.*



Committee staff discovered during its investigation that in 2017 the OCC uncovered a previously undisclosed Wells Fargo policy allowing the Bank to use attorney-client privilege to withhold information from regulators and the Company's board.

The Bank demonstrated a similar lack of transparency in meeting its obligations under the CFPB Sales Practices Consent Order. Wells Fargo Bank selected professional services firm Grant Thornton as the independent consultant tasked under the terms of the 2016 Sales Practices Consent Orders with reviewing the Bank's sales practices.[203] During the required sales practices review, the Bank withheld certain documents and information from Grant Thornton, including board minutes and emails from CEO Tim Sloan.[204] Grant Thornton communicated to regulators that the Bank's withholding of documents could impede its review. Notes from a February 10, 2017 meeting between Grant Thornton, the CFPB, and the OCC reveal that a Grant Thornton representative indicated he "would be uncomfortable not getting these documents and having to give an opinion on whether or not the Bank is in compliance with the Consent Order . . . [and] issuing a report with all kinds of disclaimers about information that was withheld from them."[205] The CFPB shared Grant Thornton's concerns. The CFPB's Western regional director in a February 28, 2017 letter copied to the chair and vice chair of Wells Fargo's board described the withheld documents as, "critical to Grant Thornton's work to conduct an independent review of the Bank's sales practices."[206]

The Bank disregarded the views of Grant Thornton and the CFPB, asserting in a March 13, 2017 letter that, "after careful deliberations, the Bank decided not to release to Grant Thornton documents and information that is protected by the attorney-client privilege because of the potential legal risk that would result from such a disclosure."[207] After Grant Thornton submitted its report, the CFPB Western regional director communicated to the chair and vice chair of the Wells Fargo board in a September 29, 2017 letter that withholding documents from Grant Thornton, "impacted Grant Thornton's transaction testing as well as

---

[203] Letter from OCC to Wells Fargo, WF-HFSC-0000060326- 27 (Dec. 6, 2016) (on file with the House Financial Services Committee); Letter from CFPB Regional Director to Wells Fargo, HFSC_CFPB_041019_00001583 (Nov. 23, 2016) (on file with the House Financial Services Committee).

[204] CFPB Memo Meeting with Grant Thornton, HFSC_CFPB_041019_00021344 (Aug. 29, 2017) (on file with the House Financial Services Committee).

[205] Email from CFPB Senior Exam Advisor, HFSC_CFPB_041019_00021299-300 (Feb. 10, 2017) (on file with the House Financial Services Committee).

[206] Letter from CFPB Regional Director to Wells Fargo, HFSC_CFPB_041019_00002773-74 (Feb. 28, 2017) (on file with the House Financial Services Committee).

[207] Letter from Wells Fargo to CFPB Regional Director, HFSC_CFPB_041019_00001586-93 at 88 (Mar. 13, 2017) (on file with the House Financial Services Committee).

its ability to get a more complete picture of the Bank's sales practices problems and their potential causes."[208]

The issue of Wells Fargo withholding documents from Grant Thornton arose during an August 29, 2017 meeting between the CFPB and Grant Thornton. Notes from the meeting reflect that the CFPB Western regional director stated that he had discussions with Wells Fargo board members about this issue, and that Grant Thornton had told the board, "that they had received all the information they needed and that the privileged information had not affected their work or conclusions."[209] One Grant Thornton representative at the meeting responded that this was an "over-generalization," and another replied that "we never would have stated that the documents were unimportant since we do not know what we do not know."[210] This exchange raised significant concerns to Committee staff about whether Wells Fargo's board was fully aware of the significance of withholding documents from Grant Thornton.

> 3.    The board abdicated its responsibility to oversee the Bank's compliance with the 2016 Sales Practices Consent Orders.

Despite the 2016 Sales Practices Consent Orders' explicit language holding Wells Fargo's board ultimately responsible, the Committee staff's investigation reveals that board members at times demonstrated a lack of urgency in their interactions with the regulators. A July 28, 2017 correspondence from the CFPB's Western regional director to Board Chair Stephen Sanger and Vice Chair Betsy Duke expressed disappointment that Duke and Sanger, "did not have the flexibility to meet us in connection with your July 2017 or August 2017 Wells Fargo Board of Directors meetings."[211]

Board members also appeared reluctant to engage in oversight of the Bank's efforts to comply with the 2016 Sales Practices Consent Orders. Notes from a November 28, 2017 meeting between the CFPB and then-vice chair of Wells Fargo's board, Betsy Duke, CEO Tim Sloan, and General Counsel C. Allen Parker reflect that Duke questioned the CFPB's practice of including her on letters requesting the Bank take certain actions: **"Why are you sending it to me, the board, rather than the department manager?"** (emphasis added).[212] An internal CFPB email summarizing that same meeting between the CFPB and the Bank similarly referenced that, "Duke expressed that she wondered why the CFPB was sending her letters regarding the Bank. This is reflective of [a] previous comment [Duke] made in early 2017" that she couldn't get between the regulators and the bank attorneys when the

---

[208] Letter from CFPB Regional Director to Stephen Sanger, Former Chair of the Board of Directors, WFC, and Betsy Duke, Chair of the Board of Directors, WFC, HFSC_CFPB_041019_00001612-14 (Sept. 29, 2017) (on file with the House Financial Services Committee).

[209] CFPB Memo re Meeting with Grant Thornton, HFSC_CFPB_041019_00021344 (Aug. 29, 2017) (on file with the House Financial Services Committee).

[210] *Id.*

[211] Letter from CFPB Regional Director to Stephen Sanger, Former Chair of the Board of Directors, WFC, and Betsy Duke, Chair of the Board of Directors, HFSC_CFPB_041019_00001599-600 (July 28, 2017) (on file with the House Financial Services Committee).

[212] Memo from CFPB Examiner, HFSC_CFPB_041019_00021582-86 (Nov. 28, 2017) (on file with the House Financial Services Committee).

44

CFPB experienced difficulties with the Bank's outside counsel.[213] During an interview with Committee staff, the CFPB's Western regional director said that Duke's email came as a surprise as, in the regional director's view, a board member would not typically object to receiving communication from a regulator.[214] Committee staff's review of these documents revealed that Duke was not fulfilling her obligation to oversee management's compliance with the 2016 Sales Practices Consent orders.

James Quigley, chairman of Wells Fargo Bank's board, exhibited a similar lack of urgency in his engagement with the Bank's regulators and a reluctance to oversee the Bank's efforts to meet its obligations under the 2016 Sales Practices Consent Orders. On February 22, 2019, the Company's



> Why are you sending it to me, the board, rather than the department manager?
>
> - Betsy Duke
> Then-Vice Chair of Wells Fargo's Board

corporate secretary sent an e-mail to Quigley, Board Chair Betsy Duke, and CEO Tim Sloan indicating that the OCC wanted to meet with the Bank's independent directors to discuss "progress and accountability."[215] The OCC proposed to schedule the meeting on March 7 or 8, which was four to five days before CEO Tim Sloan was scheduled to testify before the Committee. Quigley, wanting to postpone the meeting, responded:

> *I am currently scheduled to be in the Galapagos Islands on these dates. I have made arrangements to have a satellite phone available during these days. I will do my best to participate, but I am not certain on the stability of communications in that part of the world. My strong preference is to do this the following week, we have our regular quarterly meeting that following week. Why not have our meeting and discussion and follow with a WFBNA board discussion. **The sense of urgency is surprising,** are they politically trying to put an enforcement action in place in front of the hearing? **Do we have any options? Or is our only response we are happy to meet whenever requested**? (emphasis added).*[216]

---

[213] Email from CFPB Examiner, HFSC_CFPB_041019_00021580 (Mar.11 2018) (on file with the House Financial Services Committee).

[214] Interview with CFPB Regional Director for the Western Region (Jan. 30, 2020).

[215] *See* Appendix 5: Email from Anthony Augliera to James Quigley, et al, WFBOD-HFSC-00018782-83 (Feb. 22, 2019).

[216] *See* Appendix 5: Email from James Quigley, Betsy Duke et al., WFBOD-HFSC-00018782-83 at 82 (Feb. 22, 2019).

Notes regarding a November 21, 2016 meeting between Quigley and the CFPB reflected his complaint that, **"the Board was spending too much time on Sales Practices and that he was looking to reduce the level of detail with a 'Less is More' comment in regards to Board materials on Sales Practices"** (emphasis added).[217] In an interview with Committee staff, OCC staff expressed concerns about Quigley's leadership. OCC staff recounted that Quigley did not pose "hard questions" to management.[218] Additionally, OCC staff explained that Quigley believed management was performing well and that the Bank's condition was acceptable despite its ongoing regulatory issues. [219]

The Bank board's responsibility under the 2016 Sales Practices Consent Orders for addressing the compliance breakdowns that led to the opening of millions of fraudulent accounts is consistent with Wells Fargo's own corporate governance guidelines, which state "the business of the Company is managed under the direction and oversight of its Board."[220] Under those guidelines, the board bears the responsibility for "holding senior management accountable for implementing the Company's strategic plans and risk tolerance and maintaining the Company's risk management and control framework."[221]

Wells Fargo board members are highly compensated for taking on these responsibilities. For example, Wells Fargo paid Duke $631,004 in total compensation ($451,000 in cash and Company stock valued at $180,004) for serving as the chair of the Wells Fargo's board in 2018.[222] As a board member of WFC and chair of the Bank board in 2018, Quigley received $417,004 in total compensation ($237,000 cash and Company stock valued at $180,004).[223] Committee staff's investigation uncovered that Duke and Quigley failed to satisfy their obligations as board members.

> 4.    Wells Fargo continued to focus on growth after regulators identified unchecked risks associated with growth and new initiatives.

In its 2016 inspection report, the Federal Reserve communicated its assessment of Wells Fargo's processes for managing strategic risk, which includes risks associated with new products and growth initiatives. In the report, the Federal Reserve emphasized that effective risk management was particularly important in this area given Wells Fargo's growth strategy.[224] The Federal Reserve found, among other issues, that Wells Fargo's, "build out of risk control functions, particularly operational risk, has not kept pace with growth initiatives

---

[217] Email from CFPB Examiner, HFSC_CFPB_041019_00021580 (Mar.11 2018) (on file with the House Financial Services Committee).

[218]  Interview with OCC staff (Feb. 4, 2020).

[219] *Id.*

[220] WFC, *Wells Fargo & Company Corporate Governance Guidelines*, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/corporate/governance-guidelines.pdf.

[221] *Id.*

[222] WFC, *Wells Fargo 2019 Proxy Statement* at 52, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2019-proxy-statement.pdf.

[223] *Id.*

[224] Letter from Federal Reserve to Board of Directors, WFC, WF-HFSC-000121028 (Oct. 14, 2016).

in key areas."[225] Further, the Federal Reserve found that Wells Fargo had not fully implemented an effective process for managing strategic risk and was consequently ill-equipped to introduce new products and initiatives.[226]

According to an internal Wells Fargo memo, Federal Reserve staff met with senior Wells Fargo executives, including then-Chief Risk Officer, Michael Loughlin, following the issuance of the 2016 report of inspection to discuss the Federal Reserve's findings. In an October 25, 2016 memo to the WFC board of directors, Loughlin noted that one of the key takeaways from the meeting was that the firm needed to focus its resources on remediating systemic weaknesses, rather than growth:

> ***Growing the company via new products, mergers & acquisitions, and/or significant strategic business initiatives should not be a current area of focus*** *given the significant weaknesses identified. Already complicated compliance, data, and operational risk issues should not be further complicated, and company resources need to remain focused on addressing company weaknesses, including strategic risk management (emphasis in original).*[227]

Wells Fargo's 2017 Investor Day materials demonstrate that, despite the deficiencies identified by the Federal Reserve, the Company continued to focus on growth, including with respect to new products.[228] For example, the Investor Day presentation from Wells Fargo's wholesale banking operation, which provides financial services to other businesses, lists five "strategic priorities," the second of which is "[d]rive growth – [f]ocus on accelerating top and bottom-line growth through a number of key opportunities across Wholesale Banking while divesting non-core capabilities."[229]

> 5.     Key leaders at Wells Fargo were focused on lifting the Federal Reserve's asset cap, rather than addressing the Company's systemic risk management weaknesses.

Wells Fargo's repeated submission of materially incomplete and unacceptable plans to the Federal Reserve appears to have been driven, in part, by the desire of key leaders within the Company to quickly exit the public consent order and lift the asset cap, rather than fully remediate the systemic problems that necessitated the order.

Records of meetings between Federal Reserve staff and Wells Fargo personnel indicate that Wells Fargo's board expected management to develop and implement the plans

---

[225] *Id.*

[226] *Id.*

[227] WFC, Federal Reserve System's Annual Summary of Supervisory Activities: Wells Fargo & Company, WF-HFSC-000120244-49 at 49 (Oct. 25, 2016)) (on file with the House Financial Services Committee).

[228] WFC, Wholesale Banking Presentation (May 11, 2017), *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2017/wholesale-banking-presentation.pdf.

[229] *Id.* at 18.

required under the 2018 Federal Reserve Consent Order by July 31, 2018, so that the firm could meet the "public" September 30, 2018 deadline for third-party review under the order.[230] According to the Federal Reserve's communications with Committee Staff during the course of this investigation, Wells Fargo specifically requested the September 30, 2018 deadline for third-party review during consent order negotiations between the Company and the Federal Reserve. Under the terms of the 2018 Federal Reserve Consent Order, the asset cap would remain in effect until the completion of this review. A senior Wells Fargo executive communicated this expectation of Wells Fargo's board to Federal Reserve staff in a March 29, 2018 meeting.[231]

Federal Reserve staff expressed concerns about whether Wells Fargo's internal implementation deadline of July 31, 2018 was reasonable, and suggested that there was some flexibility with respect to the timelines in the 2018 Federal Reserve Consent Order, noting that the Federal Reserve prioritized ensuring that Wells Fargo was operating in a safe and sound manner over lifting the asset cap.[232]

Additionally, Wells Fargo's own internal audit representative communicated during the meeting that the internal July 31, 2018 implementation deadline would not provide sufficient time to validate the effectiveness of the corrective actions taken. According to Federal Reserve meeting minutes, a senior Wells Fargo executive expressed that "they wish they had more time," but, given the timelines in the consent order, Wells Fargo's board of directors was pressing to meet the July 31 deadline and expected that it was achievable.[233]

On April 3, 2018, the day of Wells Fargo's first submission, Federal Reserve staff met with Betsy Duke, chair of the Company's board of directors, for an introductory meeting and to discuss the 2018 Federal Reserve Consent Order. During the meeting, Federal Reserve staff questioned Wells Fargo's internally-imposed implementation date of July 31, 2018 and the Company's self-selected September 30, 2018 deadline for third-party review.[234] Duke's response, as reflected in meeting minutes prepared by the Federal Reserve staff, suggests that she was concerned about the asset cap, even though she was unable to evaluate the degree of actual progress made by the firm. The Federal Reserve's meeting minutes include the following account of Duke's comments:

> *In response, Duke made the following remarks:*
>
> o   *The asset cap is outside of the Fed's 'objectives' and Duke remarked that she could not think of any other time when an asset cap had been used. (There appeared to be some disconnect regarding the degree of implementation that needs to occur before the asset cap can be lifted.)*

---

[230] Meeting Minutes, FRB_HFSC-00021458-64 (Mar. 29, 2018) (on file with the House Financial Services Committee).

[231] *Id.*

[232] *Id.*

[233] *Id.* at FRB_HFSC-00021461.

[234] Meeting Minutes, FRB_HFSC-00020437-41 (Apr. 3, 2018) (on file with the House Financial Services Committee).

o  *There has been some progress on risk identification, testing and validation—though she is not sure how to assess progress in this area.*[235]

As the meeting progressed, Federal Reserve staff again raised concerns about the September 30, 2018 deadline in light of the remaining work Wells Fargo still needed to accomplish and the Federal Reserve's pending review of Wells Fargo's plans. According to the meeting minutes, Federal Reserve staff particularly expressed concern that the focus of Wells Fargo's CEO's focus on quickly lifting the asset cap could be inconsistent with the Federal Reserve's objectives in imposing the consent order, which focused on ensuring that Wells Fargo operated in a safe and sound manner.[236]

Internal Wells Fargo communications also reflect an undue focus among Wells Fargo's management and board members on quickly exiting the Federal Reserve's consent order instead of taking the necessary time to address the weaknesses within the Company. For example, in a February 19, 2018 email to Loughlin, fewer than three weeks after the asset cap was imposed, Duke expressed a view that Wells Fargo's **"credibility and perhaps even viability as a company is**



DUKE EXPRESSED A VIEW THAT WELLS FARGO'S "CREDIBILITY AND PERHAPS EVEN VIABILITY AS A COMPANY IS DEPENDENT ON SUCCESSFULLY EXITING THESE CONSENT ORDERS ALONG WITH THE NEW FED CO IN 2019."

**dependent on successfully exiting these consent orders along with the new Fed CO in 2019"** (emphasis added).[237] Additionally, after the Federal Reserve rejected Wells Fargo's April 3, 2018 plans as "materially incomplete," Ted Craver, a director of Wells Fargo and Wells Fargo Bank who sits on Wells Fargo board's audit and examination committee, questioned in an email to Duke whether the plans "miss[ed] the mark" because Wells Fargo "perhaps rushed the job in our zeal to clear this hurdle quickly."[238]

Sloan's communications reflect that he, too, prioritized lifting the asset cap over taking the steps necessary to fix Wells Fargo. For example, in a May 13, 2018 email to Sloan and other senior Wells Fargo executives, a senior Wells Fargo executive proposed an integrated approach to addressing similar risk management reforms required by three consent orders: the 2018 Federal Reserve Consent Order, and April 20, 2018 orders issued

---

[235] *Id.* at FRB_HFSC-00020439.

[236] *Id.* at FRB_HFSC-00020440.

[237] *See* Appendix 6: Email from Elizabeth Duke, Chair of the Board of Directors, WFC, to Michael Loughlin, Chief Risk Officer, WFC, WFBOD-HFSC-00015523 (Feb. 19, 2018).

[238] *See* Appendix 7: Email from Theodore Craver, Jr., Director, WFC, to Elizabeth Duke, Chair of the Board of Directors, WFC, WFBOD-HFSC-00000522 (May 8, 2018).

by the OCC and CFPB.[239] The senior executive indicated that Karen Peetz, Wells Fargo board's Risk Committee Chair, and Juan Pujadas, another Wells Fargo director on the board's Risk Committee, were "supportive of developing an integrated plan that captures work across the three Consent Orders."[240] The senior executive also noted that the Federal Reserve and OCC were open to an integrated response to their consent orders and that the CFPB was potentially supportive as well. In response, Sloan expressed that he wanted to avoid complicating the Federal Reserve's decision on lifting the asset cap: "I am very concerned with melding of three regulatory [consent orders] as **we do not want each agency to effectively have veto rights over the Asset Cap review"** (emphasis added).[241] The senior executive, in reply, committed to "work to ensure that whatever we do to reduce overlap/bring consistency that we don't implicate the asset cap review."[242]

Sloan's communications also show that some of his actions were meant to give the Federal Reserve the appearance that he was not overly focused on lifting the asset cap. On June 5, 2018, Sloan, on behalf of Wells Fargo, sent a letter to the Federal Reserve formally requesting an extension to the deadline for submitting revised plans pursuant to the Federal Reserve's feedback. Sloan wrote in the letter that, "[t]he requested extension would provide additional time for the Company to develop a robust response that is acceptable to the Federal Reserve by September 19, 2018."[243] However, in a June 3, 2018 email to WFC Chair Duke, Director Peetz, and Wells Fargo Bank Chair Quigley, Sloan expressed contrary motives for requesting an extension and made no mention of the need for additional time "to develop a robust response."[244] According to the email, Sloan thought an extension was unnecessary, but should nevertheless be requested to (1) reduce the chance that Wells Fargo's new Chief Risk Officer, Amanda ("Mandy") Norton, would recommend fundamental changes to the draft plans; (2) increase the likelihood that Federal Reserve staff would approve the

---

[239] *See* Appendix 8: Email between Head of Regulatory Relations, WFC, and Tim Sloan, et al., WF-HFSC-000083955-57 at 56 (May 13, 2018).

[240] *Id.*

[241] *Id.*

[242] *Id.*

[243] The Federal Reserve granted WFC's extension request on June 20, 2018. *See* Letter from Dedicated Supervisory Team Lead, Federal Reserve, to Elizabeth Duke, Chair of the Board of Directors, WFC and Tim Sloan, Chief Executive Officer, WFC, FRB_HFSC-0003445-46 (June 20, 2018) (on file with the House Financial Services Committee). On August 24, 2018, WFC requested to extend the September 19, 2018 submission deadline to October 31, 2018. *See* Letter from Tim Sloan, Chief Executive Officer, WFC, to Federal Reserve, WF-HFSC-000064263 (Aug. 24, 2018) (incorrectly dated "August 24, 2017," as evidenced by the letter's content) (on file with the House Financial Services Committee). The Federal Reserve granted WFC's second extension request on September 11, 2018. *See* Letter from Dedicated Supervisory Team Lead Federal Reserve, to Elizabeth Duke, Chair of the Board of Directors, WFC and Tim Sloan, Chief Executive Officer, WFC, FRB_HFSC-0003450-51 (on file with the House Financial Services Committee).

[244] *See* Appendix 9: Email between T. Sloan, Chief Executive Officer, WFC, B. Duke, Chair of the Board of Directors, K. Peetz, Director, WFC, and J. Quigley, Director, WFC, WFBOD-HFSC-00020082 (June 3 - 4, 2018).

50

plan; and (3) shape the Federal Reserve's view that the Company was solely focused on lifting the asset cap.[245] Specifically, Sloan wrote:

> *Even though* **the team feels confident in our ability to resubmit our plans on time**, *we have concluded we should ask the Fed for a 30-45 day [extension] for the following reasons.*
>
> *First, given [Norton's] shortened Garden Leave,[246] we believe it is prudent to allow her a few weeks to review our plan and our risk model to* **reduce the chance she will recommend any fundamental changes**. *Recall her original Garden Leave was to last until after our resubmission date.*
>
> *Second, we believe it is prudent to be further along in our adoption and implementation as it is clear the Fed staff has accelerated that standard to approve the plans as opposed to leaving that to a third party as was the agreement in the Consent Order. Seeing our [risk target-operating-state] in action further down in the organization will mean it is* **more likely we will receive an approval on this second submission.**
>
> *Third, we believe this action will* **reduce the tension with the Fed regarding this Asset Cap** *and reinforce to them that we are most focused on getting this right rather than a singular goal of lifting the cap (emphasis added).*[247]

Rather than question Sloan's motives or seek to determine whether the extension request had any relation to the time necessary to develop effective plans for addressing the issues underlying the 2018 Federal Reserve Consent Order, Quigley and Duke responded approvingly to Sloan's email and agreed that his "logic is sound."[248]

The pressure to quickly lift the asset cap appears to have been partly motivated by Sloan's interest in assuring investors that Wells Fargo was making significant progress. On May 10, 2018, Sloan told investors and analysts at a Wells Fargo investor conference that, "in order to have enough time to incorporate [the Federal Reserve's] feedback" regarding Wells Fargo's board governance and risk management plans under the 2018 Federal Reserve Consent Order, "the Company is making plans to operate under the consent order's asset cap

---

[245] *Id.*

[246] "Garden" or "gardening" leave refers to the time period after an employee departs her job when she is not allowed to start of new job and continues to be paid by her prior employer. *Gardening Leave,* Cambridge Advanced Learner's Dictionary & Thesaurus (online at https://dictionary.cambridge.org/dictionary/english/gardening-leave) (accessed Mar. 1, 2010).

[247] *See* Appendix 9: Email between T. Sloan, Chief Executive Officer, WFC, B. Duke, Chair of the Board of Directors, K. Peetz, Director, WFC, and J. Quigley, Director, WFC, WFBOD-HFSC-00020082 (June 3 - 4, 2018).

[248] *Id.*

limitation through the first part of 2019."[249] Wells Fargo and Sloan repeated this expectation in updates to investors through the end of 2018.[250] Sloan's prediction changed only after it was reported, on December 10, 2018, that Federal Reserve Chairman Jerome Powell wrote in a letter to Sen. Elizabeth Warren that the Federal Reserve "does not intend to lift the asset cap until remedies to these issues have been adopted and implemented to our satisfaction."[251] According to reporting, Chairman Powell further wrote in the letter that "[t]he decision about terminating the asset growth restriction imposed on Wells Fargo will be made by a vote of the Board [of Governors of the Federal Reserve System]."[252] On January 15, 2019, Sloan told investors during an earnings call that Wells Fargo was "now planning to operate under the asset cap through the end of 2019."[253]

The obsession of Wells Fargo's key leadership with lifting the asset cap had a counterproductive effect on the Company's ability to address the issues underlying the 2018 Federal Reserve Consent Order. In September 2018, Federal Reserve staff met with a senior executive at Wells Fargo to receive an update on the Company's operational risk management program. According to meeting notes produced by the Federal Reserve, the senior executive expressed concern that the firm was busy building its risk management programs rather than managing ongoing risk.[254] In notes from a January 24, 2019 meeting with senior Wells Fargo executives, Federal Reserve staff continued to express concerns that, **"[Wells Fargo] leadership seems to remain focused on lifting the asset cap by the end of the year as the primary goal, and is shaping remediation plans around that. This is affecting the way management is thinking (or being asked to think) about how remediation should be shaped and accomplished"** (emphasis added).[255] According to the Federal Reserve staff's meeting notes, Wells Fargo presented an implementation

---

[249] SEC, Form 8-K for Wells Fargo & Company at Item 8.01 (May 10, 2018)., available at https://www.sec.gov/Archives/edgar/data/72971/000007297118000326/wfc-05102018xform8k.htm.
[250] WFC Form 10-Q for the Quarterly Period Ending June 30, 2018 at 58 (Aug. 3, 2018), *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2018/second-quarter-10q.pdf; WFC Form 10-Q for the Quarterly Period Ending September 30, 2018 at 3 (Nov. 6, 2018), *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2018/third-quarter-10q.pdf; Patrick Rucker, *Wells Fargo reform plans fail to satisfy Fed after scandals: sources, Reuters* (Dec. 6, 2018), *available at* https://www.reuters.com/article/us-wells-fargo-fed-balance/wells-fargo-reform-plans-fail-to-satisfy-fed-after-scandals-sources-idUSKBN1O513O).
[251] CNBC, *Wells Fargo won't be allowed to grow its assets until its problems are fixed, Fed's Powell says* (Dec. 10, 2018), *available at* https://www.cnbc.com/2018/12/10/wells-fargo-wont-be-allowed-to-grow-its-assets-until-its-problems-are-fixed-feds-powell-says.html.
[252] *Id.*
[253] The Motley Fool, *Wells Fargo & Co (WFC) Q4 2018 Earnings Conference Call Transcript* (Jan. 15 2019), *available at* https://www.fool.com/earnings/call-transcripts/2019/01/15/wells-fargo-co-wfc-q4-2018-earnings-conference-cal.aspx.
[254] Federal Reserve Meeting Minutes, FRB_HFSC-00020586-88 (September 2019) (on file with the House Financial Services Committee).
[255] FRB, *Wells Fargo – Notes from Q&A Meeting*, FRB_HFSC-00021564 (Jan. 24, 2019)(on file with House Financial Services Committee).

timeline ending in September 2019 (a date selected by Wells Fargo). Federal Reserve staff perceived the firm's view that it could implement plans incorporating the Federal Reserve's feedback by September 2019 as improbable and unrealistic.[256]



[WELLS FARGO] LEADERSHIP SEEMS TO REMAIN FOCUSED ON LIFTING THE ASSET CAP BY THE END OF THE YEAR AS THE PRIMARY GOAL, AND IS SHAPING REMEDIATION PLANS AROUND THAT.

- FEDERAL RESERVE

On April 2, 2019, Wells Fargo's Chief Risk Officer, Amanda Norton, sent an email to several of Wells Fargo's senior executives, including interim-CEO Allen Parker, expressing her concerns about management's priorities in connection with the risk management reforms required by regulators.[257] Among her concerns, Norton wrote that Wells Fargo employees were cutting corners on a key requirement of the 2018 Federal Reserve Consent Order "due to time and resource constraints":

> *I have a Business Process Management deep-dive for two hours on Friday as I had received a number of concerns re our progress against that program (a couple of these concerns also map to feedback we have heard from the Fed).* **This morning I received more feedback that "corners are being cut" in the prioritization of the process mapping due to time and resource constraints.** *We will add this issue to the Friday meeting agenda but* **short cuts cannot be the success path for this foundational work** *(emphasis added).*[258]

In April 2019, Allen Parker, who took over as interim-CEO following Sloan's departure, told an analyst that Wells Fargo would discontinue the practice of reporting a timetable for lifting the asset cap.[259]

---

[256] *Id.*

[257] *See* Appendix 10: Email from A. Norton to Senior Wells Fargo executives, WF-HFSC-000052817 (Apr. 2, 2019.)

[258] *Id.*

[259] The Motley Fool, *Wells Fargo & Co (WFC) Q1 2019 Earnings Call Transcript* (Mar. 31, 2019), *available at* https://www.fool.com/earnings/call-transcripts/2019/04/12/wells-fargo-co-wfc-q1-2019-earnings-call-transcrip.aspx.

6. Wells Fargo leaders sought to remove language from the OCC's press release.

The committee staff's investigation reveals that, prior to OCC's announcement of its 2018 Compliance Risk Management Consent Order, key leaders at Wells Fargo urged the OCC to remove language in its press release and consent order referring to the OCC's authority to replace senior executive officers or board members of Wells Fargo Bank.

According to witness testimony and documents obtained by Committee staff, Karen Peetz, Chair of Wells Fargo's Risk Committee, called senior OCC examiners on April 17, 2018 to discuss language in the OCC's draft press release announcing the 2018 OCC Compliance Risk Management Consent Order. Peetz further urged the OCC to consider non-public alternatives, such as a side letter or a call with Comptroller Joseph Otting. Peetz stated in an interview with Committee staff that, in her view, "there is a clear understanding that [removal of directors and management] is within their power, but it doesn't have to be in the Wall Street Journal."[260]

According to Peetz' meeting notes, OCC staff commented that the OCC included the removal authority language in the press release due to concerns about specific executives at Wells Fargo, including Wells Fargo's CEO Tim Sloan.[261] Peetz' notes indicated that the OCC staff viewed Sloan as, **"a person who was there all along and was part of the problem"** (emphasis added).[262]

Wells Fargo's attempt to influence the OCC's press release strained the relationship between the Bank and OCC staff. In May 2018, Wells Fargo Bank board chair Jim Quigley, Chair of Wells Fargo Bank's board of directors, met with senior OCC staff at his request in an attempt to "make progress on [his] desire to 'turn the page' on [Wells Fargo's] relationship with the OCC."[263] In an email to Sloan, Duke, and Peetz, summarizing the meeting, Quigley wrote that, the "effort by Tim [Sloan] and Allen [Parker] to edit their press release was not appreciated, and damaged [Wells Fargo's] relationship with [OCC staff]."[264]

7. Key Leaders at Wells Fargo were focused on financial considerations, rather than addressing the Bank's compliance failures identified by the OCC.

In a May 23, 2018 email summarizing a meeting with senior OCC staff, Quigley informed Duke, Peetz, and Sloan about several concerns raised by OCC staff, including that Duke, Sloan, and Parker had demonstrated an "excessive focus on earnings impact" rather than fixing Wells Fargo's broken compliance infrastructure:

---

[260] Interview with Karen Peetz (Jan. 31, 2020).
[261] Handwritten Notes of K. Peetz, WFBOD-HFSC-00024877-85 at 77 (on file with the House Committee on Financial Services).
[262] Handwritten Notes, WFBOD-HFSC-00024877-85 at 79 (on file with House Financial Services Committee).
[263] *See* Appendix 11: Email from Quigley to Duke, Peetz, Sloan, et al., WFBOD-HFSC-00018518 -20 at 18 (May 23, 2018).
[264] *Id* at 20.

> *[The senior OCC official] has a growing issue in [their] head that we are too focused on financial performance, and that focus impairs progress in some other areas. . . In advancing proof points for this growing perception, [the OCC official] indicated that discussions* **in negotiating the recent consent order from the OCC, [the OCC official] was surprised that both Allen [Parker] and Betsy [Duke] commented on the 'earnings' impact of some matters included***, and that he did not expect that from the GC or Chair (emphasis added).*[265]

Other senior OCC officials voiced concerns about Wells Fargo's leaders' outsized focus of Wells Fargo's leaders on earnings to the entire board during a July 24, 2018 board meeting.[266] According to board meeting minutes produced by Wells Fargo, a senior OCC official commented during the meeting on "management's focus on earnings, and . . . noted the importance of similarly focusing on addressing outstanding regulatory issues."[267]

OCC staff again expressed concerns about management's focus during a meeting an August 2018 meeting with key Wells Fargo leaders. On or about August 11, 2018, WFC Board Chair Duke, Wells Fargo Bank Chair Quigley, CEO Sloan, and a senior Wells Fargo executive met with Comptroller Otting and senior OCC officials in Washington, DC to discuss the OCC's concerns with the Bank's progress.[268] According to an email from Duke summarizing the meeting, OCC staff raised six issues, including the OCC's concern that, "**[m]anagement and the Board prioritize or over-focus on earnings at the expense of risk management**" (emphasis added).[269]

## F. Wells Fargo's Board Did Not Hold Senior Management Accountable for Repeatedly Failing to Meet Regulators' Expectations

Despite repeated regulatory failures, the Bank resisted holding senior management accountable. In November 2017, the OCC downgraded the Bank's management rating, a relatively infrequent action.[270] The OCC communicated to Committee staff that the management downgrade was driven by three primary themes: (1) an overall failure to

---

[265] *Id.* at WFBOD-HFSC-00018518.

[266] Minutes of the Regular Meetings of the Boards of Directors of Wells Fargo & Company and Wells Fargo Bank, National Association, WF-HFSC-00036359-84 (July 23 - 24, 2018) (on file with the House Committee on Financial Services).

[267] *Id.* at WF-HFSC-000036362.

[268] *See* Appendix 12: Email from Duke to Wells Fargo Board, WFBOD-HFSC-00021759-60 at 59 (Aug. 11, 2018).

[269] *Id.* at WFBOD-HFSC-0001759.

[270] Email from OCC to Tim Sloan, OCC-HFSC-WF-2019-00019847-48 (Nov. 1, 2017) (on file with the Committee) Interview with OCC staff (Feb.4, 2020). A bank's management rating "reflects the capability of the board and management, in their respective roles, to identify, measure, monitor, and control the risks of a bank's activities and to ensure a bank's safe, sound, and efficient operation in compliance with applicable laws and regulations." OCC, *Comptroller's Handbook – Bank Supervision Process* at 74 (June 2018), *available at* https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/bank-supervision-process/pub-ch-bank-supervision-process.pdf.

implement Heightened Standards across the organization, including ensuring an effective risk management program; (2) management's lack of transparency with the board and with the OCC; and (3) a management team that lacked responsiveness in addressing issues. As Chief Risk Officer, Michael Loughlin was directly responsible for the bank's failure to ensure an effective risk management program, a major factor in the downgrade.[271] The Chair of the Company's Risk Committee, Karen Peetz, identified similar issues with Loughlin. [272] OCC staff first communicated concerns about Loughlin to the Bank in June of 2017,[273] but the Bank did not replace him until a year later, in June of 2018, when Amanda Norton assumed the role of Chief Risk Officer.[274] During an interview with Committee staff, OCC staff described the Bank's efforts to replace Loughlin as too slow.[275]

On July 24, 2018, OCC staff attended a meeting of Wells Fargo's board to discuss Wells Fargo's progress toward addressing a number of regulatory issues, including the OCC's open consent orders and supervisory letters.[276] Meeting minutes produced by Wells Fargo reflect that, among other issues, OCC's Senior Deputy Comptroller for Large Bank Supervision emphasized that Wells Fargo needed "to examine its approach in remediating customers, including the importance of keeping the interests of customers top of mind and taking a broad view when remedying customer harm."[277] OCC staff also raised concerns about the board's oversight of Wells Fargo's management. According to the meeting minutes, a senior OCC official discussed "the importance of performance management, succession planning, **and holding senior management accountable**" (emphasis added).[278] This point was echoed by another OCC official who stressed that "**escalation, transparency, and accountability remain critical areas of focus**" (emphasis added).[279] In discussing the OCC's concerns, Duke pointed to board initiatives focused on holding management accountable, "including through the introduction of performance objectives relating to risk management."[280]

The board, however, appears to have been unable to follow through on Duke's professed commitment to accountability. From at least mid-2018 through Sloan's resignation in March 2019, concerns about Sloan's performance were repeatedly raised by and to Wells Fargo's board members. For example, in May 2018, after the Federal Reserve rejected Wells Fargo's first submissions under the 2018 order as "materially incomplete," WFC board

---

[271] Interview with OCC staff (Feb.4, 2020).

[272] Interview of Karen Peetz (Jan. 31, 2020).

[273] Interview with OCC staff (Feb.4, 2020).

[274] WFC, Corporate Biography of  Amanda Norton (online at https://www.wellsfargo.com/about/corporate/governance/norton/) (accessed Feb. 19, 2020).

[275] Interview with OCC staff (Feb.4, 2020).

[276] Minutes of the Regular Meetings of the Boards of Directors of Wells Fargo & Company and Wells Fargo Bank, National Association, WF-HFSC-00036359-84 (July 23-24, 2018) (on file with the House Committee on Financial Services).

[277] *Id.* at WF-HFSC-000036361.

[278] *Id.* at WF-HFSC-000036362.

[279] *Id.* at WF-HFSC-000036379.

[280] *Id.* at WF-HFSC-000036361.



> " SPEAKING FRANKLY, THIS WAS A BIG MISS THAT DOESN'T
> REFLECT WELL ON TIM… I IMAGINE THAT INVESTORS AND
> CUSTOMERS WOULD VIEW THIS FEEDBACK FROM THE FED AS
> COMPLETELY UNACCEPTABLE. I WOULD EXPECT TO HEAR
> FROM THEM SOMETHING ALONG THE LINES OF, 'IS THERE
> ANYTHING YOU CAN GET RIGHT?"
>
> - TED CRAVER
> WELLS FARGO BOARD MEMBER "

member Ted Craver wrote to Duke to express concern about Sloan's performance and how the public would react if it knew of the Federal Reserve's feedback:

> *Speaking frankly, this was a big miss that doesn't reflect well on Tim.* *It would seem that there is little under the very important category of "clean up the mess" that is bigger than this recent submission to the Fed.*
>
> *We shouldn't have to take a Mulligan.* ***I imagine that investors and customers would view this feedback from the Fed as completely unacceptable.*** *I would expect to hear from them something along the lines of, 'is there anything you can get right?' (emphasis added).*[281]

Additionally, the OCC repeatedly admonished Wells Fargo's board and Sloan to hold individuals accountable for the Company's regulatory failures. Around August 11, 2018, WFC board chair Betsy Duke, Bank board chair of Wells Fargo Bank's board James Quigley, CEO Tim Sloan, and Wells Fargo's head of regulatory relations, attended a meeting with OCC staff and Comptroller Otting.[282] An August 11, 2018 email from Duke to board members summarizing the meeting revealed that the OCC raised the issue of the Bank "not holding people accountable."[283]

Despite concerns about Sloan's leadership of Wells Fargo raised by and to multiple board members in 2018, the board decided to award Sloan a bonus of $2 million for his performance in 2018. In a March 3, 2019 email to Sloan, Duke—apparently sensing that the

---

[281] *Id.*

[282] *See* Appendix 12: Email from Betsy Duke, Chair of the Board of Directors, WFC, WFBOD-HFSC-00021759 -60 (Aug. 11, 2018).

[283] *Id.*

board's decision to award Sloan a bonus would receive public criticism—wrote: "I think the way we set up our discussion of your compensation in the proxy and accompanying press materials will be critical to how it is covered in the early press and therefore investor and proxy firm predispositions."[284]

Duke included in her email the following draft proxy statement related to Sloan's compensation:

> *In recognition of the **substantial amount of work remaining** to meet the expectations outlined in the OCC and CFPB Sales Practices Consent Orders, the OCC and CFPB Compliance Consent Order and the Fed Board Effectiveness and Risk Management Consent Order, the board added a vesting condition requiring acceptable progress under the orders to the performance shares issued in 2019. As a reminder, the company's pay structure is weighted so that 75-85% of annual compensation is in the form of performance shares. In 2018, the board added a vesting condition tied to total shareholder concern to address investor feedback.*

> *The board decided to award Tim a cash bonus for 2018 as recognition of substantial progress in changing the culture and business practices of WF and of building out a strong management team to focus on remaining work to strengthen compliance and operational risk (emphasis added).*[285]

In reply, Sloan, again demonstrating his obsession with the Federal Reserve's asset cap, recommended removing language in the first paragraph of the draft relating to the work remaining under the various consent orders:

> *Two suggestions. **I would delete the word 'substantial' below as stakeholders could jump to the conclusion it means we are not close to lifting of the asset cap** and it may give regulators even more confidence in criticizing us. Second, I would not list all of the orders but rather focus on a general regulatory matters phrasing (emphasis added).*[286]

Duke agreed, writing in reply: "I think you are right. Probably better to tone down the actual disclosures and use conversations with reporters and opinion formers to point to the condition in the equity as a new (and effective!) approach."[287]

On March 13, 2019, the day Wells Fargo announced Sloan's compensation in its annual proxy statement and one day after Sloan's testimony before the Committee, OCC staff met with the Bank's board of directors. According to records of the meeting, Sloan also attended, but left part way through, at which time the OCC held an executive session that included at least Quigley, Duke, and Peetz (who joined by phone). OCC talking points from

---

[284] *See* Appendix 13: Email between Betsy Duke and Tim Sloan, et al., WF-HFSC-000063474-75 at 75 (Mar. 3, 2019).

[285] *Id.*

[286] *Id.*

[287] *Id.*

the executive session portion of the meeting included the statement that "[w]e are also concerned that the Board has not held management appropriately accountable and driven more change . . . **Tim [Sloan] has been reluctant to make the necessary changes and he has very clearly been reluctant to hold senior executives accountable"** (emphasis added).[288] The OCC's talking points emphasized the lack of accountability at the Bank:

> *Finally, efforts to hold people accountable are too slow and often questionable in approach. There are many examples here where Tim has failed to show the leadership necessary to move the institution forward when it is clear that there are significant problems. We've seen this in compliance, in risk . . . to name a few areas where the unwillingness to hold people accountable has been very costly to the institution in terms of both money and time lost and pose serious reputation and safety and soundness risks to the bank if they remain uncorrected.*[289]

Despite the OCC's concerns, the agency did not appear determined to use its authority to remove Sloan. Peetz' notes reflect that, while Sloan was still in attendance, OCC staff expressed that, "[t]hey were not exercising their discretion to remove [Sloan] or any members of the Board."[290]



TIM [SLOAN] HAS BEEN RELUCTANT TO MAKE THE NECESSARY CHANGES AND HE HAS VERY CLEARLY BEEN RELUCTANT TO HOLD SENIOR EXECUTIVES ACCOUNTABLE.

- OCC

Other call notes produced by Peetz reveal a March 15, 2019 meeting between Peetz and a senior Federal Reserve official, during which the senior Federal Reserve official inquired about the March 13, 2019 meeting between the OCC and Wells Fargo's board.[291] According to Peetz' notes, the senior official "asked me if it was clear that the OCC is shortening the runway for [Sloan's] succession."[292] Peetz' notes reflect that the senior Federal Reserve official asked a version of this question three times during the call.[293] Peetz responded that the

---

[288] OCC WFBNA Board Meeting - Talking Points, OCC-HFSC-WF_2019_00039641-46 at 42-43 (Mar. 13, 2019) (on file with the House Financial Services Committee).
[289] *Id.*
[290] Notes of K. Peetz from March 13, 2019 meeting between Wells Fargo board members and OCC staff, WFBOD-HFSC-00025027-31.
[291] Notes of K. Peetz from March 15, 2019 call with Federal Reserve official, WFBOD-HFSC-00025084 - 85.
[292] *Id.* at 85.
[293] *Id.*

OCC's message was clear to her.[294] In an interview with Committee staff, Peetz stated that she was surprised to hear such comments from a senior Federal Reserve official.[295] She explained that she immediately informed Duke of the meeting, who asked her to relay the exchange "word-for-word" to the full board.[296] Peetz further explained during an interview with Committee staff that the board met to discuss regulators' feedback about Sloan and what steps to take on or about March 19.[297]

According to an internal email produced by the OCC, OCC staff met with Sloan on March 20, 2019, to discuss "the OCC['s] view on the lack of progress and failure to hold people accountable."[298] During the meeting, OCC staff raised the concerns outlined in the talking points for the OCC's March 13, 2019 meeting with the Bank's board members, including the OCC's dissatisfaction with Sloan's performance as CEO.[299]

On March 26, 2019, Mr. Sloan announced his resignation from the Company amidst highly publicized criticism from lawmakers and regulators regarding his performance as Wells Fargo's CEO.[300] In a conference call with analysts on March 28, 2019, Sloan expressed that stepping down was his decision because the increased focus on him had "become a distraction."[301] He further stated that his resignation was, "[his] decision and is not related to [Wells Fargo's] first quarter financial performance, the long-term outlook for the company or any newly discovered issues."[302] Notwithstanding the performance concerns that had been raised to her, including by other board members, Duke told analysts during the call, "Tim has had the full support of the board throughout his tenure as CEO."[303]

Even after Mr. Sloan's resignation as CEO in March 2019, failure to hold senior management accountable remained a concern for the OCC. A September 9, 2019 OCC quarterly management report reiterated the message the OCC had presented to the board and senior management in July of that year: "When you are unable to meet your commitments, understand why and address the root cause. **That includes holding people accountable**" (emphasis added).[304]

---

[294] *Id.*

[295] Interview with K. Peetz (Jan. 31, 2020).

[296] *Id.*

[297] *Id.*

[298] Email between OCC staff, OCC-HFSC-WF-2019-00039961 (Mar. 20, 2019) (on file with the House Committee on Financial Services).

[299] *Id.*

[300] SEC, Form 8-K for Wells Fargo & Company (Mar. 26, 2019), https://www.sec.gov/Archives/edgar/data/72971/000119312519090633/d727180d8k.htm.

[301] WFC, *Conference Call with Analysts (March 28, 2019) – Transcript*, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2019/conference-call-transcript.pdf.

[302] *Id.*

[303] *Id.*

[304] OCC Quarterly Management Report, OCC-HFSC-WF_2019_00038447-71 (Sept. 9, 2019) (on file with the House Financial Services Committee).

### G.    Sloan Gave Inaccurate and Misleading Testimony About Wells Fargo's Progress During the March 12, 2019 Committee Hearing

During the March 12, 2019 Committee hearing, in response to a question from Chairwoman Waters regarding Wells Fargo's submission plans pursuant to the 2018 Unfair Practices Consent Orders, Mr. Sloan, testified that Wells Fargo was "in compliance":

*Chairwoman WATERS. Wells Fargo's 2018 10-K reports show that, in accordance with the Consumer Bureau's and the OCC's April 2018 auto insurance and mortgage rate lock consent orders, the bank submitted to the regulators an enterprise-wide compliance plan, a plan to enhance the bank's internal audit program, and plans to remediate customers affected by these matters. According to the consent orders, the required plans are subject to the Consumer Bureau's and the OCC's review and determination of non-objection.*

***Has the OCC indicated its non-objection to the bank's compliance[,] audit[,] o[r] customer remediation plans? Has the Consumer Bureau indicated its non-objection?***

*Mr. SLOAN. Madam Chairwoman, I can't respond specifically to your question, because that would mean that I would be disclosing confidential supervisory information that has been shared with us by both the OCC and the CFPB. But I can assure you that we are working very constructively with what we have in place and we are executing that plan that reflects the fundamental changes that I have made since I have become the CEO.*

*Chairwoman WATERS. Thank you very much.*

*For those who are listening, **I am simply asking whether or not the bank is in compliance, based on reviews that are done by the OCC and the Consumer Bureau**, and you heard that answer—*

*Mr. SLOAN. **We are in compliance with those plans**. Excuse me. (emphasis added)*[305]

On March 13, 2019, the day after the hearing, OCC staff shared copies of the hearing transcript and questioned the accuracy of Sloan's testimony that the Bank was "in compliance with" the provisions of the 2018 Compliance Risk Management Consent Order relating to customer remediation plans.[306] In an internal email to OCC staff, a senior OCC official wrote, "the initial questions were around the auto remediation plans. [Sloan] said they are in

---

[305] House Financial Services Committee, *Hearing on Holding Megabanks Accountable: An Examination of Wells Fargo's Pattern of Consumer Abuses*, 116th Cong at 6-7 (Mar. 12, 2019) (Serial No. 116-7), *available at* https://www.govinfo.gov/content/pkg/CHRG-116hhrg36462/pdf/CHRG-116hhrg36462.pdf.

[306] Email between OCC Senior Deputy Comptroller of Large Bank Supervision and Staff, OCC-HFSC-WF-2019-00039888-940 at 888 (Mar. 13, 2019) (on file with the House Financial Services Committee).

compliance. Have we told them they are in compliance?"[307] In reply, OCC staff stated that Wells Fargo was not in compliance with one of two portions of their remediation plans and was still working to address issues.[308] An OCC senior official concluded in response that this meant Sloan gave inaccurate testimony to the Committee. The OCC staff member confirmed that Sloan's testimony was inaccurate and pointed to language in the OCC's November 21, 2018 letter stating, "The OCC is unable to provide a no supervisory objection to the portion of the CPI Remediation Plan specific to Wells Fargo Auto Finance (WFAF) because the plan is not adequately supported."[309]

### H.    The Potential for Widespread Consumer Abuse at Wells Fargo Remains

1.    Wells Fargo has yet to submit fully satisfactory plans to address the governance and risk management weaknesses identified by the Federal Reserve.

In its March 11, 2019 letter, the Federal Reserve instructed Wells Fargo to respond within 90 days of the letter with an estimated timeline for submitting complete, revised plans that have undergone internal review consistent with the expectations laid out in the letter.

On June 10, 2019, precisely 90 days later, Chair Duke and Wells Fargo's Interim CEO, Allen Parker, sent a letter to Federal Reserve staff stating that Wells Fargo will resubmit the plans required under the 2018 Federal Reserve Consent Order by April 30, 2020.[310] To date, Wells Fargo has not submitted this set of revised plans.

2.    In 2019, Wells Fargo's risk management infrastructure remained dangerously broken.

Wells Fargo's own executives questioned the Company's ability to manage risks and protect consumers. For example, in May 2019, Federal Reserve staff met with a senior compliance executive at Wells Fargo, and discussed, among other things, the Company's challenges with putting its compliance plans into action.[311] According to meeting notes produced by the Federal Reserve, the Wells Fargo executive expressed to Federal Reserve staff that, "if he were CEO, **he would not allow the addition of any new customers to the company** since the firm is operating in this environment" (emphasis added).[312]

3.    The Bank continues to engage in consumer abuses.

---

[307] *Id.* at 888.

[308] *Id.*

[309] *Id.*

[310] Letter from Elizabeth Duke, Chair of the Board of Directors, WFC, and C. Allen Parker, Interim Chief Executive Officer and President, WFC to Federal Reserve, FRB_HFSC-00029138 (June 10, 2019) (on file with the House Financial Services Committee).

[311] Federal Reserve Meeting Notes, FRB_HFSC-00021675-79 (May 2019) (on file with the House Financial Services Committee).

[312] *Id.* FRB_HFSC-00021678).

More than four years after the revelation that Wells Fargo opened millions of fraudulent accounts, the Committee staff's investigation reveals that the Bank continues to engage in consumer abuses. Under the criteria in Article VIII of the 2018 OCC Consent Order and Paragraph 53 of the 2018 CFPB Consent Order, the OCC or CFPB can require the Bank to submit a remediation plan if the number of consumers or customer accounts requiring remediation for a consumer abuse exceeds 50,000 or the amount of anticipated remediation to consumers exceeds $10 million.[313] A January 2, 2019 letter from the CFPB to Sloan referred to one remediation plan already submitted pursuant to Paragraph 53 and requested the submission of four additional remediation plans for matters that met the threshold.[314] The OCC's September 9, 2019 quarterly management report revealed that **"[t]here are currently [dozens of] remediations that meet the criteria of Article VIII of the Compliance Consent Order"** (emphasis added).[315] Accordingly, the Bank could have engaged in practices that could have harmed untold numbers of consumers.

The Bank has also demonstrated an inability to effectively remediate consumers when abuses occur. On November 21, 2017, the Bank announced the creation of the Commitment to Customer Center of Excellence to centralize responsibility for consumer remediation into one office.[316] However, a year later, the OCC in its December 7, 2018 quarterly management report emphasized that the Bank's "Remediation Program is critical to the organization, as the current approach to remediation is inefficient, inconsistent, often lacks appropriate accountability, and takes far too long."[317]



[T]he current approach to remediation is inefficient, inconsistent, often lacks appropriate accountability, and takes far too long.

- OCC

---

[313] CFPB Consent Order, *In the Matter of Wells Fargo Bank, N.A.,* 2018-BCFP-0001 at Article VIII (Apr. 20, 2018), *available at* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank-na_consent-order_2018-04.pdf; OCC Consent Order, *In the Matter of Wells Fargo Bank, N.A. Sioux Falls, South Dakota,* AA-EC-2018-15 at *¶53* (Apr. 20, 2018), *available at* https://www.occ.gov/static/enforcement-actions/ea2018-025.pdf.

[314] Letter from CFPB Regional Director to Tim Sloan, Chief Executive Officer, WFC, WF-HFSC-000102157-58 (Jan. 2, 2019) (on file with the House Financial Services Committee).

[315] OCC Quarterly Management Report, OCC-HFSC-WF_2019_00038447-71 at 461 (Sept. 9, 2019) (on file with the House Financial Services Committee).

[316] Wells Fargo, *Wells Fargo creates Commitment to Customer team to lead consumer issues, remediation efforts* (Nov. 29, 2017), *available at* https://stories.wf.com/wells-fargo-creates-commitment-customers-team-lead-consumer-issues-remediation-efforts/.

[317] OCC Quarterly Management Report, OCC-HFSC-WF_2019_00002595-620 at 598 (Dec. 7, 2018) (on file with the House Financial Services Committee).

The OCC's July 16, 2019 report of examination on the Bank noted that:

> *The OCC had challenges with the work of the Commitment to Customer Center of Excellence this year.* ***The OCC has not observed a drive towards greater consistency and a large number of plans had to be resubmitted multiple times. Overall, the OCC remains concerned about the overarching vision around remediation.*** *We have understood the general premise of remediations to be that if the bank has made an error that caused harm to a customer, such harm will be remediated. However, OCC examiners are increasingly hearing discussions of whether an issue meets the internal definition of a remediation, without consideration of possible harm. That focus, on the definition in the absence of consideration of customer harm, will not be helpful to the bank's efforts to restore its reputation (emphasis added).*[318]

Furthermore, the OCC's September 9, 2019 quarterly management report asserted that "**remediation efforts remains [sic] a concern. The OCC has not observed a drive towards greater consistency and many plans have been resubmitted multiple times or extended**" (emphasis added).[319] Consistent with the supervisory reports, the OCC staff articulated that the Bank lacked a uniform approach to compensating harmed consumers and described the Bank's remediation efforts as "ad-hoc."[320] The CFPB's Western regional director noted that the Bank's remediation plans submitted in response to Paragraph 53 failed to capture all consumers.[321] Wells Fargo's lack of an effective remediation program compounds the harm to its customers from its continued compliance breakdowns.

      4.      The regulators continue to express dissatisfaction with the Bank's progress.

The Committee staff's investigation reveals that the Bank's regulators continue to express dissatisfaction with the Bank's progress in addressing its regulatory failures. OCC staff wrote in a February 15, 2019 email to the chair of the Company's board that, "[t]he OCC is deeply concerned about the continuing (and in some cases worsening) problems in a number of areas, evidenced by large number of extension requests, missed expected completion dates that are not communicated in a timely manner, failed audit validations, and extensions of Consent Order deadlines."[322] OCC talking points for a March 13, 2019 meeting with the Bank's board included:

---

[318] OCC Report of Examination, OCC-HFSC-WF_2019_00008480-852 at 843 (Jul. 16, 2019) (on file with the House Financial Services Committee).

[319] OCC Quarterly Management Report, OCC-HFSC-WF_2019_00038447-71 at 61 (Sept. 9, 2019) (on file with the House Financial Services Committee).

[320] Interview with OCC staff (Feb. 4, 2020).

[321] Interview with CFPB Regional Director for the Western Region (Jan. 30, 2020).

[322] Email from OCC staff to Betsy Duke, Chair of the Board of Directors, OCC-HFSC-WF_2019-00039260-66 at 61 (Feb. 15, 2019) (on file with the House Financial Services Committee).

> ***The institution that we see today is not stronger than the one that emerged from the Sales Practices mess in 2016.*** *Financially the Bank remains solid. But in many risk dimensions, the lack of progress in the controls environment and the lack of sufficient investment in technology across the enterprise over the long term have wasted time and weakened the institution, creating further safety and soundness concerns (emphasis added).*[323]

The OCC's most recent July 2019 report of examination[324] concluded that "[a] review of the status of the existing Enforcement Actions (EAs) . . . reveal[s] minimal change from last year, with all elements continuing at unacceptably high levels."[325] The July 2019 Examination Report also noted that despite the OCC repeatedly apprising the Bank's management and board of its lack of progress, **"[i]t is deeply concerning that Board and management were unable to address these concerns with the appropriate resources, escalation, and urgency"** (emphasis added).[326]



[I]T IS DEEPLY CONCERNING THAT BOARD AND MANAGEMENT WERE UNABLE TO ADDRESS THESE CONCERNS WITH THE APPROPRIATE RESOURCES, ESCALATION, AND URGENCY.

- OCC

The most recent OCC quarterly management report dated December 19, 2019 found that the Bank's "progress continues to lag expectations on . . . EAs."[327] The OCC made this same comment in its prior quarterly management report.[328] The Bank estimates that it will not achieve full compliance with the 2016 OCC Sales Practice Order until September 30, 2021, and has not provided an estimated date for when it will be fully compliant with the 2018 OCC order.[329]

The Bank also has not satisfied all of its obligations under the 2016 and 2018 CFPB Consent Orders as of January 30, 2020.[330] On April 12, 2019,

---

[323] OCC WFBNA Board Meeting -Talking Points, OCC-HFSC-WF_2019_00039641-46 at 42-43 (Mar. 13, 2019) (on file with the House Financial Services Committee).

[324] The OCC issues an annual Report of Examination to Wells Fargo Bank.

[325] OCC Report of Examination, OCC-HFSC-WF_2019_00008480-532 (Jul. 16, 2019) (on file with the House Financial Services Committee).

[326] *Id.*

[327] OCC Quarterly Management Report (Dec. 19, 2019) (on file with the House Financial Services Committee).

[328] OCC Quarterly Management Report, OCC-HFSC-WF_2019_00038447-71 (Sept. 9, 2019) (on file with the House Financial Services Committee).

[329] OCC Quarterly Management Report (Dec. 19, 2019) (on file with the House Financial Services Committee).

[330] Interview with CFPB Regional Director for the Western Region (Jan. 30, 2020).

the CFPB wrote to Wells Fargo to correct the Bank's erroneous assertion in a prior correspondence that the CFPB had approved certain plans required by the 2018 CFPB Consent Order.[331] In addition to the 2016 and 2018 Compliance Consent Orders, Wells Fargo had over 215 open issues resulting from the CFPB's twenty-eight supervisory reviews as of February 28, 2019 according to a document created by the Bank.[332] The Bank had only resolved all the issues related to two of the supervisory reviews.[333] The CFPB's Western regional director communicated that she has not witnessed a noticeable improvement in the Bank's ability to address their its regulatory issues and does not believe the Bank has established a satisfactory compliance program.[334]

> 5.    Wells Fargo's employees continue to express concerns about the Company's culture.

Since 2017, evidence of a toxic culture adversely affecting bank employees has persisted. Last year, four bank employees met with senior Federal Reserve officials asserting that little had changed with the Bank's culture since the Bank's misconduct had first come to light.[335] Furthermore, according to a *New York Times* investigation, Wells Fargo employees in a Des Moines debt collection office were expected to handle 33 calls an hour and recover $40,000 in unpaid credit-card and other debts in a single month.[336] Mortgage-processing employees in Minneapolis were allegedly pressured by management to knowingly send documents with inaccurate information to meet internal deadlines.[337] An employee in the Des Moines office told the newspaper, "[f]or us front-line workers, there's an overwhelming sense of frustration . . . . [and] a general fear of retaliation for speaking out."[338] A bank employee in Minneapolis said, "[t]here's a sense among the workers that most of the reforms the Bank has made are very superficial and only being done for [public relations] reasons."[339]

## V.    Policy Recommendations

In consideration of Committee staff's findings and prior legislative proposals of Committee members, including Chairwoman Waters' Megabank Accountability and Consequences Act of 2017,[340] below are a series of policy recommendations intended to

---

[331] Letter from CFPB Regional Director to Wells Fargo, HFSC_CFPB_041019_00001548-49 (Apr. 12, 2019) (on file with the House Financial Services Committee).

[332] CFPB Back Book and Look Forward, HFSC_CFPB_041019_00009282-84 (Feb.28, 2019) (on file with the House Financial Services Committee).

[333] *Id.*

[334] Interview with CFPB Regional Director for the Western Region (Jan. 30, 2020).

[335] *See, e.g.,* Imani Moise and Pete Schroeder, *How Wells Fargo's regulators and employees drove out its CEO*, Reuters (Apr. 9, 2019), *available at* https://www.reuters.com/article/us-wells-fargo-fed-insight/how-wells-fargos-regulators-and-employees-drove-out-its-ceo-idUSKCN1RL0EA.

[336] Emily Flitter and Stacy Cowley, *Wells Fargo Says Its Culture Has Changed. Some Employees Disagree*, The New York Times (Mar. 9, 2019), *available at* https://www.nytimes.com/2019/03/09/business/wells-fargo-sales-culture.html.

[337] *Id.*

[338] *Id.*

[339] *Id.*

[340] H.R.3937, 115th Congress, *available* at: https://www.congress.gov/115/bills/hr3937/BILLS-115hr3937ih.pdf. Also see House Committee on Financial Services, *Waters Introduces*

66

enhance accountability in the banking industry, promote transparency and market discipline, strengthen consumer protections, and empower responsible workers:

1.          Congress should compel regulators to act against recidivist megabanks, like Wells Fargo, that engage in widespread consumer abuses.

The regulators repeatedly expressed their dissatisfaction with Wells Fargo's progress towards remediating its regulatory issues for years, but have been slow and reluctant to impose additional penalties available to them under existing law.[341] Beyond a list of monetary penalties assessed by the regulators,[342] the Federal Reserve decided to cap the asset growth of the Company on the last day of Chair Janet Yellen's time in office, and in January 2020, the OCC took action to prohibit a few former executives from working in the banking industry.[343] However, as this report demonstrates, these actions come after many years of continued non-compliance by the Company and after the Committee announced and convened public hearings, and there remain stronger penalties available to prudential regulators.

The Committee staff also noted that regulators often engaged the Bank and Company just prior to and after Committee action. For example, one day before Sloan's testimony before the Committee, the Federal Reserve rejected the Company's second submission made in response the 2018 Federal Reserve Consent Order. Committee staff conclude that the regulators appear unwilling or unable to exercise their more severe authorities in their normal course of supervision. The time has come for Congress to compel regulators to be more aggressive with regard to megabanks like Wells Fargo in using the supervisory tools and sanctions available to them.

Congress should consider legislation mandating that regulators immediately direct a recidivist megabank like Wells Fargo to remove complacent and ineffective directors and bar them from working at another bank, and compel regulators to either (a) downsize Wells

---

*Groundbreaking Legislation to Shut Down Abusive Megabanks Like Wells Fargo* (Oct. 4, 2017), *available* at: https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=400815.

[341] In a previous report, Committee staff outlined the tools currently available to various federal regulators. For example, the CFPB can impose civil money penalties and issue consent orders, under which restitution, refunds, rescission or reformation of contracts, or claw-back of compensation is required. However, prudential regulators can take additional actions, such as restricting a bank's growth, restricting a bank's line of business, or revoking the bank's charter. See Democratic Staff, House Committee on Financial Services, *The Case for Holding Megabanks Accountable: An Examination of Wells Fargo's Egregious Consumer Abuses* (Sept. 27, 2017), *available at* https://financialservices.house.gov/uploadedfiles/09.29.17_staff_report_final.pdf.

[342] Most recently, Wells Fargo entered into an agreement with DOJ and SEC to pay $3 billion to resolve criminal and civil investigations related to the bank's fraudulent sales practices. See DOJ, *Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization* (Feb. 21, 2020), available at https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices.

[343] OCC, *OCC Issues Notice of Charges Against Five Former Senior Wells Fargo Bank Executives, Announces Settlement With Others* (Jan. 23, 2020), *available at* https://www.occ.gov/news-issuances/news-releases/2020/nr-occ-2020-6.html.

Fargo by reducing the current total asset cap, imposing asset caps on specific lines of business, requiring the disposition of certain business lines and/or prohibiting new business lines or products, or (b) wind down the bank in an orderly fashion by revoking the bank's national charter, terminating the bank's deposit insurance, and appointing a receiver to dispose of various components of the bank's business to smaller, well-managed banks.[344]

Congress should also consider legislation that would require publicly disclosed remediation for all identified consumer abuses by Wells Fargo and other megabanks affecting more than 50,000 consumers or consumer accounts, or where the amount of anticipated consumer remediation exceeds $10 million.

In addition, Congress should consider establishing a new legal framework that would compel recalcitrant regulators to utilize their most severe authorities to address any future recidivist megabank that extensively harms consumers. Congress should direct prudential regulators to establish, by rule and in consultation with the CFPB, an escalating list of penalties for recidivist megabanks that harm consumers that are triggered after certain criteria is met, such as after a certain number of consumers are harmed, or if a timeline is not met to remediate harmed consumers subject to a consent order. One of the initial penalties in the list should be the automatic imposition of a total asset cap when a megabank engages in widespread consumer abuses and compliance breakdowns.

While prudential regulators possess arguably the most severe corrective tools, the CFPB should be given a role in this process, given its primary role to protect consumers. This should include directing the CFPB to issue regulations to further define what constitutes a pattern or practice of violations of laws or regulations by megabanks that result in extensive consumer abuse. Another statutory trigger for more severe penalties should include the combined list of known violations by Wells Fargo to ensure history does not repeat itself. The CFPB and state and local government agencies should be able to publicly petition prudential regulators to take action, and request a public hearing, regarding a megabank found to have engaged or be engaging in a pattern or practice of violations resulting in considerable consumer harm.

---

[344] As required by §165(d) of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Wells Fargo submits a resolution plan (also referred to as a "living will") to the Federal Reserve and FDIC for its rapid and orderly resolution in the event of material financial distress or failure. This plan could be helpful in any resolution of the bank. The regulators have the authority under the statute to deem a resolution plan to be "not credible or would not facilitate an orderly resolution of the company under Title 11, United States Code." While the agencies identified one shortcoming and noted areas in which there could be improvements made in Wells Fargo's 2019 plan, the plan was not rejected. *See* Letter from Federal Reserve and FDIC to Wells Fargo & Company (Dec. 16, 2019), *available at* https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20191217a8.pdf. Also see *Wells Fargo 2019 165(d) Plan – Public Section (Jun. 27, 2019)*, available at https://www.federalreserve.gov/supervisionreg/resolution-plans/wells-fargo-2g-20190701.pdf.

2.      Congress should strengthen the regulators' authorities and enhance bank management and board accountability.

While prudential regulators have strong tools in their arsenal,[345] Congress should consider refining and expanding these authorities against a recidivist megabank that repeatedly harms consumers, including when circumstances warrant appointing a receiver. For example, authority to appoint a receiver to wind down a bank for violations of law or regulation appears presently to be tied to the financial condition of the bank,[346] and could be clarified to also explicitly include violations that result in extensive consumer abuses.

Whereas the FDIC is generally required to resolve a bank with the least costly available option to the Deposit Insurance Fund, there is flexibility when resolutions would have serious adverse effects on economic conditions or financial stability.[347] Congress should consider clarifying that when the FDIC is deciding between different resolution options, that the FDIC should consider what a resolution option's impact may have on a bank's employees and customers.

To enhance the accountability of boards and senior management, Congress should consider legislation that would require hold the board of directors and senior officers of megabanks to be more involved in oversight of their banks and be informed about supervisory matters identified by bank examiners, regardless of the organizational structure chosen by the bank. This should include a regular written attestation by senior officers and directors that the megabank is complying with the law.[348] Congress should also consider strengthening penalties against culpable senior officers and directors and clarify that they apply when a bank engages in repeated or egregious violations of federal consumer protection laws. Additionally, while some proposals have been made to enhance supervisory expectations for boards of directors of large financial institutions,[349] Congress should consider enhancing expectations for megabank board of directors, including limiting outside commitments.[350]

---

[345] *Id.*

[346] For example, the grounds for appointing a conservator or receiver for any insured depository institution under the Federal Deposit Insurance Act includes violations of any law or regulation, but those violations are conditioned on those that are "likely to (i) cause insolvency or substantial dissipation of assets or earnings; (ii) weaken the institution's condition; or (iii) otherwise seriously prejudice the interests of the institution's depositors or the deposit insurance fund." *See* 12 USC § 1821(c)(5)(H).

[347] *See* 12 USC §1823(c).

[348] The Special Inspector General for the Troubled Asset Relief Program (SIGTARP) made such a proposal in its *Quarterly Report to Congress* (Oct. 26, 2016), *available at* https://www.sigtarp.gov/Quarterly%20Reports/October_26_2016_Report_To_Congress.pdf.

[349] *See* Federal Reserve, *Federal Reserve Board invites public comment on two proposals; corporate governance and rating system for large financial institutions* (Aug. 3, 2017), available at https://www.federalreserve.gov/newsevents/pressreleases/bcreg20170803a.htm.

[350] According to a February 14, 2018, comment letter to the Federal Reserve from Jeremy Kress, Assistant Professor of Business Law, Stephen M. Ross School of Business, University of Michigan, available at https://www.federalreserve.gov/SECRS/2018/April/20180424/OP-1570/OP-1570_021418_131961_287654236656_1.pdf, a number of Wells Fargo's independent directors served on other corporate boards and he observed from 2012 to 2015, the Bank held fewer board meetings

69

In light of how past mergers involving Wells Fargo may have contributed to the toxic sales culture identified by an internal investigation,[351] Congress should consider strengthening the merger and acquisition review process for megabanks, such as by requiring CFPB's approval if it involves an institution offering consumer financial products.[352] This is especially important in light of the rubber-stamping prudential regulators have engaged in approving bank mergers and acquisitions in recent years.[353]

> 3. Congress should require greater transparency regarding bank supervision and how banks treat consumers.

This investigation reveals a need to ensure greater transparency regarding consumer abuses by large banks and stronger oversight of prudential regulators. Wells Fargo, like other banks, receives a non-public Consumer Compliance rating as part of its exams that incorporates a regulator's assessment of the Bank's board and management oversight, compliance program, violations of law, and consumer harm.[354] Congress should consider establishing a threshold for when a practice that results in significant consumer harm should automatically result in a public enforcement action.

Operating a federally insured bank is a privilege and not a right. Given that U.S. megabanks collectively hold about half of all domestic banking assets and have committed a

---

than its peer banks. The letter explains the European Union adopted regulations in 2013 that limits outside employment for financial institution directors, and recommends the United States adopt meaningful restrictions on outside commitments of board directors.

[351] *See* Independent Directors of the Board of Wells Fargo & Company, *Sales Practices Investigation Report* (Apr. 10, 2017), at 54 ("Much like his predecessor, Richard Kovacevich, Stumpf was also a proponent of cross-sell and product sales. Kovacevich had initiated the "GR-8" program to pursue cross-sell at Norwest and brought that focus to Wells Fargo, which had not measured cross-sell in a programmatic way before the Norwest merger. Wells Fargo's sales-oriented culture was transferred to former Wachovia branches and retail bank operations following the merger with Wachovia…. Stumpf was aware that Wells Fargo's focus on cross-sell, combined with aggressive sales goals and associated incentive compensation plans, could encourage employee 'gaming' and sales practice issues."), *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2017/board-report.pdf.

[352] A proposal that includes such reforms is H.R. 5318, the Bank Merger Review Modernization Act of 2019, sponsored by Rep. Jesus G. "Chuy" Garcia (D-IL), *available at* https://www.congress.gov/116/bills/hr5318/BILLS-116hr5318ih.pdf.

[353] *See* Majority Staff, House Committee on Financial Services, Hearing Memorandum for *The Next Megabank? Examining the Proposed Merger of SunTrust and BB&T* (July 24, 2019), *available at* https://financialservices.house.gov/uploadedfiles/hhrg-116-ba00-20190724-sd002_-_memo.pdf.

[354] *See* OCC, *Comptroller's Handbook – Consumer Compliance – Compliance Management Systems, Version 1.0* (June 2018), *available at* https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/compliance-mgmt-systems/index-compliance-management-systems.html. *See also* Federal Financial Institutions Examinations Council (FFIEC), *FFIEC Issues Uniform Interagency Consumer Compliance Rating System* (Nov. 7, 2016), *available at* https://www.ffiec.gov/press/pr110716.htm.

long list of violations in recent years,[355] Congress should consider enhancing public reporting obligations for megabanks regarding their activities.[356]

Under the terms of the 2018 Compliance Consent Orders, the OCC and the CFPB can require the Bank to submit remediation plans if the number of consumer accounts impacted is more than 50,000 or the estimated amount of remediation exceeds $10 million. A September 19, 2019 supervisory report from the OCC indicated the existence of [dozens of] remediations potentially satisfying these criteria, none of which appear to be the subject of a current public enforcement action. Congress should consider requiring the Consumer Compliance rating and key findings for large banks be made public, similar to how Community Reinvestment Act exams and ratings are made public, to better inform consumers about how a bank treats its customers.

Congress should also consider requiring the public disclosure, perhaps after a specific period of time,[357] of exam ratings provided to megabanks through various rating systems, such as CAMELS for banks and LFI and RFI ratings for bank holding companies. the Uniform Financial Institutions Rating System. Under the system, banks receive a rating on six CAMELS components – capital, asset quality, management, earnings, liquidity and sensitivity to market risk – and a composite rating.  There are other exam systems that apply to bank holding companies, such as the Federal Reserve's RFI rating system that examines risk management, financial condition, and the impact of nonbanking activities, or the Federal Reserve's new large financial institution (LFI) rating system.[358] Making these ratings transparent, particularly those regarding the adequacy of a bank's management, will help Congress hold regulators accountable for the quality of their bank supervision and promote market discipline.[359]

---

[355] See Committee hearing: House Committee on Financial Services, *Holding Megabanks Accountable: A Review of Global Systemically Important Banks 10 years after the Financial Crisis* (Apr. 10, 2019), *available at*
https://financialservices.house.gov/calendar/eventsingle.aspx?EventID=402507.

[356] One proposal along these lines is H.R. 4966, the Greater Supervision In Banking Act ("G-SIB Act"), sponsored by Rep. Ayanna Pressley (D-MA), which would require megabanks to provide annual testimony to Congress by their CEOs and an annual public report, including information about their size and complexity and enforcement actions taken against the bank over the past year. *See* H.R.4966, the GSIB Act of 2019, *available at* https://www.congress.gov/116/bills/hr4966/BILLS-116hr4966ih.pdf.

[357] One example in statute of delayed reporting of sensitive bank information can be found in §1103(b) of the Dodd-Frank Act, which requires the Federal Reserve to disclose loans through the discount window on a delay of about two years, though it can be disclosed earlier if such disclosure would be in the public interest and would not harm the effectiveness or purpose of the loan.

[358] Federal Reserve, *Federal Reserve Board finalizes new supervisory rating system for large financial institutions* (Nov. 2, 2018), *available at*
https://www.federalreserve.gov/newsevents/pressreleases/bcreg20181102a.htm.

[359] For example, *see* Aaron Klein, *Why bank regulators should make their secret ratings public*, Brookings (Feb. 27, 2020), available at https://www.brookings.edu/research/why-bank-regulators-should-make-their-secret-ratings-public/; and Karen Petrou, *Make Camels Ratings Public Already*, American Banker (May 17, 2016), *available at* https://www.americanbanker.com/opinion/make-camels-ratings-public-already.

The regulators are not required to disclose, even on an anonymous basis, the types of ongoing consumer abuse this investigation uncovered at Wells Fargo. Congress should consider requiring a form of the CFPB's supervisory highlights for all prudential regulators specifically focused on large banks, as well as regular testimony by prudential regulators.[360] Further, to help ensure a professional approach to enforcement, Congress should consider limiting the use of political appointees at independent regulatory agencies, as they have been utilized by Trump Administration appointees at the CFPB.[361]

---

[360] On January 13, 2020, the House passed by voice vote H.R. 4841, the Prudential Regulators Oversight Act, a bipartisan bill sponsored by Rep. Dean Phillips (D-MN), which would require semiannual reports to Congress and annual testimony from the OCC, FDIC, Federal Reserve, and National Credit Union Administration (NCUA) on their regulatory and supervisory activities, including "supervisory observations by the regulator on particular areas and topics of concern identified through the examination and supervisory process." See H.R. 4841, 116th Congress at §2, *available at* https://www.congress.gov/116/bills/hr4841/BILLS-116hr4841rfs.pdf. The bill is pending in the Senate.

[361] On May 22, 2019, the House passed H.R. the Consumers First Act, a bill sponsored by Chairwoman Waters, which would, among other things, limit the use of political appointees by the CFPB to bring it in line with how other independent financial regulators are staffed. See H.R. 1500, 116th Congress at §5(c), *available at* https://www.congress.gov/116/bills/hr1500/BILLS-116hr1500rfs.pdf. The bill is pending in the Senate.

4.    Congress should enhance bank compensation practices.

Bank compensation practices warrant scrutiny and improvements.[362] In 2017 and 2018, Wells Fargo had a ratio of CEO to median worker pay of 291 to 1 and 283 to 1, respectively.[363] Congress should consider requiring a portion of senior executive and board compensation be set aside in a deferment fund that would be used to pay any civil or criminal penalties for violations occurring during their tenure.[364] Congress should also consider legislation to ensure every bank employee earns a living wage to meet at least their basic needs, including food, housing, and clothing for them and their families. Further, while the Dodd-Frank Act required financial regulators to issue rules regarding whether incentive-based compensation arrangements are excessive within 9 months of the law's enactment, it has been more than 9 years and rules have yet to be finalized.[365] Regulators should immediately finalize meaningful rules to implement the law's compensation mandates.

5.    Congress should pass a bank workers' bill of rights.

In addition to addressing compensation practices, Congress should further empower bank workers to ensure megabanks are protecting consumers and complying with the law through the creation of a Bank Worker Bill of Rights.[366] Such a package could, among other things, protect workers' rights to unionize, strengthen whistleblower protections, curb forced arbitration and non-disclosure agreements to encourage current and former employees to speak out when they witness actions that harm consumers, ensure adequate staff training for compliance with consumer protection laws, and incorporate feedback from a wider range of employees as part of the examination process.

## VI.  **Conclusion**

While much ink has been spilled about Wells Fargo's unprecedented opening of millions of fraudulent accounts, little has been written about the Bank's progress towards ameliorating its underlying compliance deficiencies, remediating harmed consumers, and,

---

[362] House Financial Services Committee, *Committee Finds Megabanks Coming up Short in Closing the CEO-to-Worker Pay Gap* (Aug. 27, 2019), *available at* https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=404228.

[363] *See* Majority Staff, House Committee on Financial Services, Hearing Memorandum for *Holding Megabanks Accountable: A Review of Global Systemically Important Banks 10 Years After the Financial Crisis* at 4 (April 10, 2019), *available at* https://financialservices.house.gov/uploadedfiles/hhrg-116-ba00-20190410-sd003_-_memo.pdf.

[364] One proposal to create a compensation deferment fund is H.R. 3885, the Wall Street Banker Accountability for Misconduct Act, sponsored by Rep. Tulsi Gabbard (D-HI), available at https://www.congress.gov/116/bills/hr3885/BILLS-116hr3885ih.pdf.

[365] *See* §956 of Dodd-Frank Act.

[366] *See* Kalmanovitz Initiative for Labor and the Working Poor Georgetown University, *Financial Exploitation, Bank Workers' Rights, and the Prevention of the Next Crisis: The Case for a Bank Workers' Bill of Rights* (Feb. 19, 2020), *available at* http://lwp.georgetown.edu/wp-content/uploads/The-Case-for-a-Bank-Workers-Bill-of-Rights.pdf.

ensuring that the Company and Bank have systems and a culture in place to ensure such harms never happen again.

The Committee staff's investigation uncovered that the Bank continues to struggle to implement effective risk management and remediation programs when compliance breakdowns occur, that Wells Fargo's board and management repeatedly have failed to demonstrate that the Bank can establish a compliance management infrastructure capable of preventing consumer abuses, and that Wells Fargo's leadership has been unable to change the Bank's culture.

Committee staff's review of internal documents reveals that too often the Bank focused on profits and exiting the regulators' consent orders rather than on fixing the Bank's long-standing compliance management weaknesses. Rather than developing adequate plans in response to the 2018 Federal Reserve Consent Order, Wells Fargo's board and senior management concentrated their efforts on lifting the asset cap.

The board and senior management also resisted the regulators' admonishment to hold executives accountable for the Bank's poor performance in terms of resolving outstanding regulatory issues. Compounding the Bank's missteps, the regulators did not exercise their full authority to compel Wells Fargo's timely compliance with the requirements of the consent orders and other supervisory actions.

Committee staff's investigation also found that Wells Fargo's inadequate controls have resulted in ongoing consumer abuses potentially affecting millions of customers. Moreover, the regulators have repeatedly criticized the Bank's processes for remediating harmed consumers.

The 2008 financial crisis exposed how the inability of some of the largest banks to manage their financial risk effectively could destabilize the economy and cause untold harm to millions of consumers. Committee staff's investigation has exposed how an institution the size of Wells Fargo can pose a risk to the financial well-being of millions of consumers because of its lack of an adequate compliance management infrastructure and inability to hold itself accountable.

# VII. Appendices

# APPENDIX 1

Message

| | |
|---|---|
| **From:** | Redacted by Committee |
| **Sent:** | 1/9/2017 6:57:14 PM |
| **To:** | Loughlin, Michael J. |
| **Subject:** | RE: RE: follow up on your question on conduct office |

Yes, I will be there

---

**From:** Loughlin, Michael J.
**Sent:** Monday, January 09, 2017 2:04 PM
**To:** Redacted by Committee
**Subject:** RE: follow up on your question on conduct office

We have a call with Redacted by Committee tomorrow. Are you coming to my office?

-----Original Message-----
**From:**
**Sent:** Friday, January 06, 2017 04:03 PM Eastern Standard Time
**To:** Loughlin, Michael J.
**Subject:** follow up on your question on conduct office

Mike

I wanted to follow up on our conversation on the conduct office from last week, and your question to me about whether I thought a leader from promontory would help, and if part-time would work. I wanted to come back to you now that I have more info and some additional thoughts.

We reviewed the next draft of the sales practices submission document for the OCC with the GROs, HR, and ███ this morning. The general focus of the discussion was the tremendous amount of change work necessary to implement in the coming months. The group believes we have a good plan - the key risk here is implementation over the next year, and thus the effectiveness of the conduct office where most of it will sit.

As such, I do think bringing in the external reputation and expertise from Promontory to guide is tremendous, because we are really figuring this out as we go. If the assignment were full time, that would seem to be preferable given the level of change. However, given that the change will require a lot of internal change - new people roles to be designed and filled, systems and IT investments to be specified and begun, policy change, etc. – I think you could also consider an internal leader who can effect this level of change, and/or who could partner with Promontory person (esp if Promontory can only be part-time).

Of course, the pgm office will continue to use mckinsey to design and support the planning and program change plan, but the accountable owner role will be critical for success here.

Let me know if helpful to speak further, or if you want to get time with ███ and I following our meeting this morning.

Thanks much

Redacted by Committee
Wells Fargo & Co.

WF-HFSC-000111941

WF-HFSC-000111942

# APPENDIX 2

Message
_____

**From:** Loughlin, Michael J. ███████████████████████████

**Sent:** ███████████

**To:** Sloan, Tim ████████████████████████ Shrewsberry, John R. ████████████
███████████████████████████████

**CC:** ████████████████████████████████
████████████████████████████████
████████████████████████████
<span style="background:black">Redacted by Committee</span> ████████████
████████████████████

**Subject:** Promontory and ████████████

I wanted you to know that John Shrewsberry and ████████ approved our SOW with Promontory today.  Promontory will help us stand up the new Conduct Risk Management Group.

Promontory will "second" ████████████, former General Counsel of the OCC, to Wells Fargo for at least 50% of her time over the next 120 days.  She will bring with her other Promontory people to assist such as ████████ formerly of the Federal Reserve.

Over the next 120 days they will help us:

1.      Write a Conduct Risk Governance Framework
2.      Create a Risk Appetite Statement with triggers, metrics and escalation procedures---this will include forward looking metrics
3.      Create action plans for any "gaps" identified in the conduct Risk Governance Framework
4.      Create management and Board reporting templates
5.      Conduct an assessment of sources of conduct risk information and current analytics
6.      Perform an evaluation of current policies and procedures in Ethics, Complaints, Sales Practices, and Internal Investigations

They have gotten a jump start by providing edits/comments  to ████████Enterprise Sales Practices Risk Management Program document, which is required under the terms of the OCC Consent Order, and must be approved by the Board.

The Conduct Risk Management Group will combine Ethics, Complaints, Sales Practices Oversight, and Internal Investigations into one Conduct Group.

Next steps:

1.      Inform the managers of Ethics, Complaints, Sales Practices Oversight, and Internal Investigations of this development.
2.      Those managers inform their people.
3.      Inform the regulators.
4.      Post for a "permanent" leader of this function.
5.      ████████ team has already prepared an internal announcement, and a press release if we feel it is necessary.  Not my call.
6.      I have asked ████ to be here January 23 and 24 to meet our management team and a few Board members if we think that is a good idea.
7.      All of this must be well coordinated with ████████work.

You should know the concept of having ████ "seconded" to us went from discussion to signed SOW in 13 working days.  Outstanding team effort. ████████████ and ████████████ in Supply Chain, and ████████████ and ████████ in Communications were stellar.

CONFIDENTIAL                                    WF-HFSC-000060350

# APPENDIX 3

**Message**

| | |
|---|---|
| **From:** | Jim Quigley ███████████ |
| **Sent:** | 5/18/2019 1:17:06 AM |
| **To:** | Allen ████████████ |
| **Subject:** | Re: Eric Blankenstein |

Thank you for this update, I will provide a note to Eric tomorrow

> On May 17, 2019, at 11:01 AM, <Allen ████████████████████████ wrote:
>
> That makes good sense.
>
>
>
>
> From: ████████████ Redacted by Committee ████████████
> Date: Friday, May 17, 2019, 9:59 AM
> To: Parker, Allen ██████ Redacted by Committee ██████, Jim Quigley
██████ Redacted by Committee ████████████
> Subject: RE: Eric Blankenstein
>
> Thank you for the update. I think it best for ██ to reach out with well wishes and a request for any
advice or guidance, best, ██
>
>
>
>
> From: Parker, Allen ████████ Redacted by Committee ████████
> Date: Friday, May 17, 2019, 4:49 PM
> To: Jim Quigley ████████████████
> Cc: ████████ Redacted by Committee ████████
> Subject: RE: Eric Blankenstein
>
> Jim and ██ ,
>
> I had a very cordial conversation with Eric early this morning, and he and I will likely speak again
soon. I'm sure he would enjoy hearing from either or both of you.
>
> Eric mentioned that the CFPB will be responding in writing to my email today or Monday. The sense I
got was that they will agree to have a meeting, but that they want to lower our expectations as to just
how "commercial" they will be in the meeting. That kind of response from a regulator is not something
that surprises me.
>
> Eric also assured me that there would continue to be "political" oversight of the engagement with us,
although he wasn't yet sure who his successor would be. He also told me that he will be staying in
government service, but I left a discussion of his CFPB departure date to our next call.
>
> I will let you know when I hear anything more. Thanks to you both.
>
> Allen
>
>
> From: Jim Quigley ████████████████████
> Date: Thursday, May 16, 2019, 2:03 PM
> To: Parker, Allen ████████ Redacted by Committee ████████
> Cc: ████████████████████
> Subject: Re: Eric Blankenstein
>
> Allen, Thank you for this information, and the focused discussion you are attempting with Eric. I
will wait a couple of days and see if he responds to you. If we do not hear from him I will send him a
note asking re his successor. I have in his calendar and mine, a meeting on June 12, which I had planned
to have ██████ join me as we had the intent of continuing to deepen his understanding, and influence his
tone when he comes to the Board in July.
>
> Obviously we need to replan, and your letter is a perfect vehicle to start with his successor. Let us
know when and how he responds. Thanks. Jim
>
> On Thu, May 16, 2019 at 8:36 AM ████████ Redacted by Committee ████████████
wrote:

                                                                    WFBOD-HFSC-00018821

> This is the email I mentioned on the call.  The email was a follow-up to a meeting I had with Eric a couple of weeks ago.
>
>
> From: Parker, Allen
> Sent: Tuesday, May 14, 2019 6:08 AM
> To: 'Blankenstein, Eric (CFPB)'

> Subject: Follow-Up
>
> Dear Eric,
>
> As you and I discussed by telephone yesterday morning, Wells Fargo believes it would be productive to schedule a meeting in Washington, attended by an appropriate CFPB team and an appropriate Wells Fargo team, to discuss and resolve a number of matters that currently remain open between us.  Ideally, this meeting would be later this month or in early June.
>
> I know that you and we share a commitment to moving expeditiously towards closure on the outstanding Consent Orders. REDACTED-NONRESPONSIVE BEP  We believe that a face-to-face meeting would be a great opportunity for us to share perspectives on progress, obtain CFPB feedback on certain matters, work through and agree upon key outstanding issues, and discuss specific paths to closure on all open matters.  Significant progress has been made on nearly all open matters, but we believe that such a meeting at this juncture would serve as an important catalyst to achieving our mutual goal of successfully resolving these matters.
>
> As to the logistics, we would propose an opening session (which perhaps you and I could attend briefly to make introductory comments), followed by a working-team session (or series of sessions) attended by designated subject-matter experts.  We also would suggest that we each designate a few key leaders to work together prior to the meeting to structure the meeting and share relevant information in order to make the meeting as productive as possible.  Perhaps most important, we believe it would be critical to include in the meeting persons from the CFPB and Wells Fargo who are empowered to make decisions and resolve outstanding issues.
>
> Although pre-meetings and further conversations may identify additional topics, we would initially propose a discussion of the following matters:
>
>
> ·        The interpretations by the CFPB and Wells Fargo of the scope of products and issues covered under the 2016 Sales Practices Consent Order, with a view toward identifying and resolving any remaining differences.
>

# REDACTED-NONRESPONSIVE BEP

REDACTED-NONRESPONSIVE BEP  We would also like to discuss how the Bank should address  REDACTED-NONRESPONSIVE BEP
REDACTED-NONRESPONSIVE BEP the Sales Practices Consent Order.
>

# REDACTED-NONRESPONSIVE BEP

> Please let me know if you agree with me that the approach described above would be productive — or if you have any questions.  If the CFPB is amenable to our suggested approach, we will make ourselves available in Washington at the earliest possible time that's workable for you.
>
> Many thanks.
>
> Allen
>
>

                                                    WFBOD-HFSC-00018822

# APPENDIX 4

Message

| | |
|---|---|
| **From:** | Sloan, Tim █████████████████ |
| **Sent:** | 4/1/2017 5:45:34 PM |
| **To:** | Loughlin, Michael J. `Redacted by Committee` |
| **Subject:** | Re: New Sales Practices Concept |

Let's discuss on Monday.

Original Message
From: Loughlin, Michael J.
Sent: Saturday, April 1, 2017 2:41 PM
To: Sloan, Tim
Subject: New Sales Practices Concept

I brought this up with a small group yesterday (Shrewsberry, ████, ████) and I had a chance to run it by Allen. Everyone seems to think we should discuss further. Perhaps we could discuss Monday at the OC.

We go to the OCC and the CFPB and tell them we will spend $200MM to repay customers who were injured due to unauthorized accounts. We already have the $110MM class action, so by adding $90MM we show just how serious we are.

We do a major outreach effort.

We hire someone like Kenneth Feinberg to oversee the remediation. He hires people to manage the claims. They work for him. Not us. We just pay.

We make it easy. Someone calls, says they were damaged, Feinberg's people do what they think is fair. We then avoid the whole mediation/arbitration issue by bringing in this outsider.

At the end of the program (six month--or maybe September 8) we cut the program off. We can take any people who come to us in the normal course.

If any of the $200MM is left over, we promise to give it to charity---only after the CFPB and the OCC let us out of the consent orders. If they do not, no donation. Put the onus back on them.

It's bold. It's fair. It's fast. You could personally negotiate this with the new Comptroller. Big win for him.

Be a change agent and get us back on track.

CONFIDENTIAL

# APPENDIX 5

**Message**

| | |
|---|---|
| **From:** | sloan███████████████████ |
| **Sent:** | 2/22/2019 7:02:14 PM |
| **To:** | james███████████████ ; betsy████████████████ |
| **CC:** | ████████████████████████ |
| **Subject:** | RE: WFBNA Board |

This is a good suggestion Jim.

From: Jim Quigley ███████████████████
Date: Friday, Feb 22, 2019, 4:58 PM
To: Betsy Duke
Cc: ████████████████████████████████
████████████████████████████████  Sloan, Tim
████████████████████████████
Subject: Re: WFBNA Board

I am currently scheduled to be in the Galápagos Islands on these dates.  I have made arrangements to have a satellite phone available during these days.  I will do my best to participate, but I am not certain on the stability of communications in that part of the world.  My strong preference is to do this the following week, we have our regular quarterly meeting that following week.  Why not have our meeting and discussion and follow with a WFBNA Board discussion.  The sense of urgency is surprising, are they politically trying to put an enforcement action in place in front of the hearing?  Do we have any options? Or is our only response we are happy to meet whenever requested?

On Feb 22, 2019, at 3:22 PM, Betsy Duke ██████████████████████████████wrote:

I just got off the phone with ████

REDACTED-NONRESPONSIVE BEP                **REDACTED-NONRESPONSIVE BEP**

**REDACTED-NONRESPONSIVE BEP**

Given that the meeting will include no management or legal representation,  it might make sense to have a prep call with directors, Tim and Allen.

From: sloan██████████████████████
Sent: Friday, February 22, 2019 4:40:54 PM
To: ████████████████████████
betsy.█████████████
james███████████████████████████
Subject: RE: WFBNA Board

I met with ██████ and ████ today in WDC and they asked to have a call with the NA Board to discuss the last qtrly report.  We agreed that I would have ████ work with ████ to schedule the call.  In any case, their view is that we are not making enough progress.  However, when I provided both with examples of progress this quarter such as the sales practices consent order, compliance plan, [REDACTED-NONRESPONSIVE BEP] Part 30, ██████ and I agreed a call led by ██████ and others from mgmt and ████ and ████ might be helpful in advance of this call with the NA Board.  It was clear some of the items I mentioned were news to both of them.

I spoke with ████ on the way to the airport and she will work with ████ to schedule the initial pre Board call and also to provide material regarding our Q1 progress.

Originally, this meeting was supposed to be with Comptroller Otting██████ and me to discuss our director search. [REDACTED-CONFIDENTIAL PII] In turn, ████ and ████ attended today.  The director discussion was productive. [REDACTED-CONFIDENTIAL]

████was unusually aggressive today which I continue to believe reflects the tension created by the fact ████ has not yet named a new head of supervision.

Tim



From: ██████████████

Date: Friday, Feb 22, 2019, 2:36 PM
To: 'betsy██████████████

james██████

████████████████████  Sloan, Tim

Subject: WFBNA Board

Betsy, Jim, and Tim, ██████ just called me and asked if I could set up call/meeting with the outside WFBNA directors, preferably on March 7 or 8, to discuss progress and accountability.  She said the other outside WFC directors also would be welcome to join to call.  I tried to get more information about the call but other than saying that it was to expand on your last meeting with her about the bank board she said she couldn't go into more detail about it.

Wells Fargo & Company  |  Legal Department  |  Office of the Corporate Secretary

████████████████████████████████████████

Licensed in New York and New Jersey.  Not licensed in North Carolina
CONFIDENTIALITY NOTE:  The contents of this message may be confidential attorney/client communication; confidential attorney work product; or a confidential communication of proprietary information.  If you are not the intended recipient, please destroy and notify the sender.

  WFBOD-HFSC-00018783

# APPENDIX 6

Message

| | |
|---|---|
| **From:** | loughlin███████████████████████████████ |
| **Sent:** | 2/19/2018 5:44:02 PM |
| **To:** | betsy████████████████ |
| **Subject:** | RE: RCOC reporting |

Betsy, would you mind a call with Tim, ███ and me tomorrow so we can address all your issues? Can I ask ██████ to reach out to you tomorrow to check your schedule?

Sorry we intruded on your holiday.

From: Betsy Duke ████████████████████████████████
Date: Monday, Feb 19, 2018, 12:24 PM
To: Loughlin, Michael J. ████████████████████████████
Subject: RE: RCOC reporting

Thanks, Mike.

I am concerned that the HPPO reporting is turning into just another paper chase and bureaucracy. For example, who are the OC leads on the three major consent orders going to the RCOC? Are you able to get the answers to the questions you have regarding progress from these reports? What do they tell you about the quality of the work or the nature of the delay? And why didn't you notice the change in reporting?

I know you get different marching orders from different committee chairs. But I felt like we were finally getting good information on all three of the major projects in RCOC (BSA. Add-On and Sales Practices). And I don't get the same quality of information from the HPPO format.

I am really not trying to pull rank here. But after what I have seen in the last month I believe our credibility and perhaps even viability as a company is dependent on successfully exiting these consent orders along with the new Fed CO in 2019.

This is what I wrote to ████████ and ████████ when I was responding to them about a change in time for a pre-meeting prep call:

As a heads up I was planning to ask you for your current target date to turn your individual consent order work over to the respective regulator to validate. I realize you are still waiting for non-objections and in some cases, the scope of work is expanding. But we still need to make some delivery commitments so we know when delays in completion of milestones or receipt of non-objectives puts our exit date in jeopardy. And when that happens we need to do everything possible to make up the time. In fact an early finish would be even better. A yellow or red indicator doesn't mean much without understanding the interdependencies or the extent of the miss and its effect on the final due date.

We also need measurements or monitors of the quality of the work being completed. One of the problems we run into is finishing everything only to find out that we didn't do it right and have to start over. Or we think we are complete but keep finding populations that we missed. This rework costs time, money and credibility. We need to know sooner. Finally we need to keep abreast of the data and technology dependencies in each of these products. Some of them require development of complete systems to finish and we need to monitor those developments closely.

I know everyone is working really hard and I don't want to dismiss the progress that has been achieved. But we really have reached the point where our company credibility is dependent on the urgency with which we finish these projects and exit the COs while demonstrating our ability to maintain quality control. This is too good a company to have to operate under the restrictions of a troubled one.

I'm happy to discuss further if you want to.

-----Original Message-----
From: loughli████████████████████████████████
Sent: Monday, February 19, 2018 2:17 PM
To: betsy████████████
Cc: ████████████████████
Subject: RE: RCOC reporting

Betsy, first my apologies. Committee chairs should get what they want. Full stop and we did deliver that here.

CONFIDENTIAL

█████████ apparently given instructions to use the High Priority Program reporting format we have shared with the Board for a month or two.

He will provide the report he says you like and will get it to you Wednesday.

████ can you confirm?

Betsy, what else would you like? And again, apologies.


From: Betsy Duke █████████████████████████████████████████
Date: Monday, Feb 19, 2018, 8:13 AM
To: Loughlin, Michael J. █████████████████████████████████████
Subject: RCOC reporting

Mike,

I have been working long and hard with the owners of consent orders to get good information to be sure we understand the status of consent order completions. The reporting has all been changed this month and frankly provides very little information other than a lot of stuff is falling behind. I asked ████ and █████████ about the BSA/AML reporting and he tells me he was told by Risk that there were no exceptions. I don't understand why, as Chair of the committee, I wasn't consulted before making these changes.

This is a huge step backward for oversight of these consent orders. In fact, it feels like this could be a wasted meeting. I want to return to the reporting I have requested and worked on for two years for this committee. What do I need to do to make that happen?

Betsy

CONFIDENTIAL                                          WFBOD-HFSC-00015524

# APPENDIX 7

CONFIDENTIAL AND PRIVILEGED PURSUANT to 12 C.F.R. §§ 4.36, 261.20, and/or 1070 et seq.

Case 1:20-cv-04494-JLR-SN    Document 91-4    Filed 01/22/21    Page 95 of 114

Message

| | |
|---|---|
| **From:** | Betsy Duke ███████████████ |
| **Sent:** | 5/8/2018 4:41:28 PM |
| **To:** | Ted Craver ███████████ |
| **Subject:** | Re: Fed response |

Do you have time to discuss now?

---

**From:** Ted Craver ███████████
**Sent:** Tuesday, May 8, 2018 4:32:24 PM
**To:** Betsy Duke
**Subject:** Fed response

Betsy,

I just read ███████████ letter. I must say that I was dismayed and concerned by the points made and the words and tone they used, which I presume was the Fed's intention. It seems given the importance of clearing the Consent Order, we needed to "nail" this assignment. Instead, it looks like we totally biffed it.

Some specific observations and reactions I had to the letter were:

1.     The tone of the letter and the specific shortcomings cited indicate we missed the mark substantially on several components.

2.     Did we miss the mark over so many fronts because the Fed moved the goal post on us, or because they didn't give us much guidance about what they expected from us?

3.     Or, did we miss the mark because we didn't ask for guidance or examples of responses from ourselves and others that they considered good? Or, we should have known what was expected of us and simply didn't do a very good job (or perhaps rushed the job in our zeal to clear this hurdle quickly)?

4.     I can't help feeling that we just plain missed the mark, and that this one is on us.

5.     Did the Board review the homework before it was submitted? Is that our role, or is it the Board's role to set clear expectations with Tim and his team about the quality of the work we expect and the result (i.e., acceptance by the Fed)? Did we, the Board, miss the mark by either not reviewing the work, or not setting clear expectations?

6.     Speaking frankly, this was a big miss that doesn't reflect well on Tim. It would seem that there is little under the very important category of "clean up the mess" that is bigger than this recent submission to the Fed. We shouldn't have to take a Mulligan. I imagine that investors and customers would view this feedback from the Fed as completely unacceptable. I would expect to hear from them something along the lines of, "is there anything you can get right?"

7.     To be very clear, I am not looking for Tim's scalp. However, I believe we have a responsibility to be clear with Tim about our expectations and what the results MUST be. We do him a disservice if we are not clear in our expectations and apply them consistently. And, we have a responsibility to help him work through what he needs to do to be successful. For instance, perhaps we should ask Tim if he needs to consider creating a COO type of role and give that person day-to-day responsibility and accountability for addressing all our regulatory issues with the power to reach into the various organizations as required. Or alternatively, is this the job of the Chief Risk Officer who is also empowered to reach into HR, IT/IS, etc.?

As I said, these are my initial impressions and observations from reading the Fed letter. I may be dead wrong on some of them, but they are offered in the spirit of letting you know what is on my mind and intended constructively. Happy to discuss further if helpful.

Ted.

CONFIDENTIAL

WFBOD-HFSC-00000523

# APPENDIX 8



Message

**From:**

**Sent:** 5/13/2018 10:12:16 PM

**To:** Sloan, Tim                                    Shrewsberry, John R.

Loughlin, Michael J.

Parker, Allen (General Counsel)

**CC:**

**Subject:** RE: RE: Risk Committee Discussion 5/15 Conference Call

Hi Tim – yes, completely agree about melding orders and confusing the review for the Asset Cap. We will work to ensure that whatever we do to reduce overlap/bring consistency that we don't implicate the asset cap review.

Best,

---

**From:** Sloan, Tim
**Sent:** Sunday, May 13, 2018 5:09 PM
**To:**                                    ; Shrewsberry, John R. <shrewsjr@wellsfargo.com>; Loughlin, Michael J.                        Parker, Allen (General Counsel)

**Subject:** Re: Risk Committee Discussion 5/15 Conference Call

Your approach below is comprehensive and responsive to questions asked and next steps. We need to develop a detailed calendar for completion of the plans. I am very concerned with melding of three regulatory C/O's as we do not want each agency to effectively have veto rights over the Asset Cap review.

Happy Mother's Day!

Tim

**From:** ▮▮▮▮▮▮
**Sent:** Sunday, May 13, 2018 12:11 PM
**To:** Sloan, Tim; Shrewsberry, John R.; Loughlin, Michael J.; Parker, Allen (General Counsel) ▮▮▮▮▮▮
▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮
▮▮▮▮▮▮
**Subject:** Risk Committee Discussion 5/15 Conference Call

Hi – Karen Peetz reached out to get an update on the Consent Order(s) and to ask that I provide an update to the Risk Committee at the beginning of the call on Tuesday. She also asked that I talk with Juan to hear his perspectives on the feedback letter and next steps. I wanted to share with you what I was planning to say – any input/comments would be most appreciated! I will also summarize at the end the feedback from Karen and Juan.

I would plan to discuss in four buckets:

1. The Feedback Letter
a. Quick overview of the buckets of feedback
b. Indicate that the substance of the letter is relatively easy to address, but the underlying messages (both in the letter and in our discussions with the Fed) suggest that we need to take a broader and more holistic approach (take a step back and don't simply answer the questions that were asked)
c. We will have to work with the Fed on our go-forward engagement model; while they have indicated a willingness to provide answers to questions, they don't want to engage substantively in providing feedback (they want to maintain independence so are concerned about too much interaction along the way) – we will work with them to reach the right balance

2. Our Proposed Approach
a. Holistic response that takes a step back and provides an integrated view of the body of work across Risk that we are currently undertaking (FRB CO ⟦REDACTED-NONRESPONSIVE BEP⟧ OCC/CFPB CO, other MRAs, etc...)
b. Leverage the outline of the plan the FRB likes for the integrated response (no longer two separate paragraph responses); we will still have to provide the Fed with the "mapping" to what pieces are responsive to the Feb 3 CO, but that will be done in the background/separately so the overall response reads as an overall strategy/approach
c. Start with the broader Risk story (what we want to change and why, where we want to go, where we are now (including what is working and we don't have to change) and what we still have to fix) – with deep dives on Compliance, Ops Risk, Testing/Validation and Remediation (and likely IS and IT, in some fashion, given the call-outs in the letter)
d. The Fed/OCC are open to having an integrated response to the Consent Orders – so we will have one response/approach where it is appropriate (e.g., Remediation, Compliance) rather than three separate or disconnected responses (we have been led to believe that the CFPB is also supportive – we will be talking directly with them this week)

3. Progress to Date
a. Meetings with Accountable Executives have begun to understand progress on the current Action Plan where there are near-term deliverables (that are unlikely to change in our resubmission); most are making progress and meeting milestones (as currently drafted...but some of the milestone dates may be adjusted in the new submission)
b. Work on reframing our approach to Operational Risk – which is necessary to meet the expectations of the Consent Order – has been progressing and will inform our overall resubmission
c. We have begun the work necessary to integrate across the Fed Consent Order and the Risk TOS (a significant piece of the Fed feedback) to develop one plan for the company (an integrated plan); we will do similar integration across the two additional Consent Orders and have begun discussions among Accountable Executives to align work across the two new Consent Orders
d. We are standing up a combined Program Management Office to align the work across the three most recent Consent Orders (Fed, OCC, CFPB) ⟦REDACTED-NONRESPONSIVE BEP⟧

                                              WF-HFSC-000083956

4.  Next Steps
a.  Continue to outline response approach and syndicate with stakeholders; begin building/fleshing out the outline
b.  Work with workstream owners to ensure alignment on content and forward calendar
c.  Develop calendar for stakeholder engagement, including outlining proposed path forward for Board engagement
d.  Continue work to develop the integrated plan and approach going forward (and develop communication plan, etc.)

Feedback/Comments from Karen and Juan:
++ Very encouraging of proposed path to provide integrated response (note:  we will need to ensure that other directors are also supportive of the one response – no longer a separate paragraph for the board effectiveness piece)
++ Have been concerned about what appears to be separate responses/efforts across ⌐REDACTED-NONRESPONSIVE BEP¬ other efforts; are supportive of developing an integrated plan that captures work across the three Consent Orders ⌐REDACTED-NONRESPONSIVE BEP¬
++ Juan would be interested and willing to be a sounding board on our Operational Risk framework/approach
(███████████ – we should talk about this)
++ Karen would like to try to use the currently scheduled set of Board meetings to get updates and provide feedback on current status/documents, but she realizes that we may need to use email/conference calls to augment the current schedule; I agreed to provide a proposed calendar to her once we had a better sense of our forward path and also emphasized that the Fed has been hyper focused on the level of board engagement, so we will want to be sure to solve appropriately for that….

Please let me know if you have questions/input/etc.

Thanks!  And Happy Mother's Day!

███████

███████████
Head of Regulatory Relations
Wells Fargo Corporate Risk I 150 E. 42ⁿᵈ Street, 42ⁿᵈ Floor I New York, NY 10017 MAC J0161-420

████████████████████████████

███████████████████████

                                                                WF-HFSC-000083957

# APPENDIX 9

Message
_____

**From:**    Betsy Duke █████████████████
**Sent:**    6/4/2018 8:48:18 AM
**To:**      sloan████████        Jim Quigley █████████████
**CC:**      karen███████████████
**Subject:**  Re: Fed Consent Order Resubmission

Agree. Will be interested in the reaction you get from ████████.

_____

**From:** Jim Quigley █████████████████
**Sent:** Monday, June 4, 2018 2:46:52 PM
**To:** sloan████████████
**Cc:** betsy██████████████     karen██████████
**Subject:** Re: Fed Consent Order Resubmission

Tim,  thank you for the update on your thinking in timing of resubmission.  The logic is sound in my view.  I particularly like giving Mandy an opportunity to obtain ownership of a plan we will hold her accountable for driving implementation.

---

## REDACTED-NONRESPONSIVE BEP

---

Sent from my iPad

> On Jun 3, 2018, at 2:58 PM, <sloan████████████████████████████> wrote:
>
> Betsy/Karen/Jim-
>
>    Even though the team feels confident in our ability to resubmit our plans on time, we have concluded we should ask the Fed for a 30-45 day for the following reasons.
>
> First, given Mandy's shortened Garden Leave, we believe it is prudent to allow her a few weeks to review our plan and our risk model to reduce the chance she will recommend any fundamental changes. Recall her original Garden Leave was to last until after our resubmission date.
>
> Second, we believe it is prudent to be further along in our adoption and implementation as it is clear the Fed staff has accelerated that standard to approve the plans as opposed to leaving that to a third party as was the agreement in the Consent Order. Seeing our TOS state in action further down in the organization will mean it is more likely we will receive an approval on this second submission.
>
> Third, we believe this action will reduce the tension with the Fed regarding this Asset Cap and reinforce to them that we are most focused on getting this right rather than a singular goal of lifting the cap.
>
>  I asked ████ to discuss with ██████████ this weekend and that conversation was productive as ██████ appreciated the logic and was quite comfortable with the request. I will call █████████ in the morning as a courtesy. We will also check off with ██████████ tomorrow too.
>

---

### REDACTED-NONRESPONSIVE BEP

---

>
> Best-
>
> Tim

                                                    WFBOD-HFSC-00020082

# APPENDIX 10

Message
<hr>



**From:** Norton, Mandy (CRO) Redacted by Committee

**Sent:** 4/2/2019 10:53:17 AM

**To:** Redacted by Committee Mack, Mary T. Redacted by Committee
Modjtabai, Avid Redacted by Comm
Redacted by Committee Parker, Allen Redacted by Committee
Redacted by Committee Pelos, Perry Redacted by Committee
Shrewsberry, John R. Redacted by Committee

**Subject:** Prioritization

All,

Over the last couple of days a few issues have been brought to my attention or "bubbled up"...

1.    I had asked for a deep-dive on Complaints with Redacted by Committee and team following an escalation last week. Redacted by Redacted by C is not getting the help (and in some cases) the focus and attention needed to meet the commitments of the consent order. We have asked Redacted by C to come back with exactly what she needs to resolve and hope to receive that in a few days.

2.    I have a Business Process Management deep-dive for two hours on Friday as I had received a number of concerns re our progress against that program (a couple of these concerns also map to feedback we have heard from the Fed). This morning I received more feedback that "corners are being cut" in the prioritization of the process mapping due to time and resource constraints. We will add this issue to the Friday meeting agenda but short cuts cannot be the success path for this foundational work.

3.    As you know I had asked the CEs to work with the business leads on a review of "material" NBIs. I received the list back last week and we are in much the same place (~90 material NBIs)!

We met a couple of weeks ago and one of the biggest pain points was prioritization – the challenges above are symptomatic of team members working extremely hard on too many "priorities".
In addition, we had our senior leaders bring great candor and feedback and I think we should respond soon with some actions.

I would recommend that we carve out some dedicated time (this week or early next week) to decide what we should prioritize in 2019 and what we should stop or put on pause.

We received the Fed Consent Order feedback a few weeks ago and the Fed annual assessment last week both of which need a response within the next few weeks. In my view, we have to demonstrate that we changed the operating model on how we are going to deliver in these responses.

Thank you for listening.

Mandy

# APPENDIX 11

Message
_____

**From:**     Jim Quigley [Redacted by Committee]
**Sent:**     5/23/2018 1:13:10 PM
**To:**       <betsy. [Redacted by Committee]   Karen Peetz [Redacted by Committee] ; [Redacted by Committee]
              [Redacted by Committee]
**CC:**       Timothy J. Sloan [Redacted by Committee]
**Subject:**  Fwd: OCC discussions. DRAFT


My effort at a brief note to summarize my discussions with [Redacted by Committee] and [Redacted by]. Tim's brief reactions included. I am happy to clarify or amplify any of these points. I know we do not have a meeting for a while, thus this note.

On Tim's one unanswered question on my item 8. [Redacted by Committee] has a growing issue in his head that we are too focused on financial performance, and that focus impairs progress in some other areas. He has not yet discussed that point with Tim, and he was thus cautious in his comments to me. In advancing proof points for this growing perception, he indicated that discussions in negotiating the recent consent order from the OCC, he was surprised that both Allen and Betsy commented on the "earnings" impact of some matters included, and that he did not expect that from the GC or Chair.


---------- Forwarded message ----------
From: <sloan [Redacted by Committee]
Date: Wed, May 23, 2018 at 8:52 AM
Subject: RE: OCC discussions. DRAFT
To: james [Redacted by Committee]


See below for color commentary. No issues on sending your draft.


**From:** Jim Quigley [Redacted by Committee]
**Sent:** Wednesday, May 23, 2018 7:36 AM
**To:** Sloan, Tim [Redacted by Committee]
**Subject:** Fwd: OCC discussions. DRAFT


---------- Forwarded message ----------
From: **Jim Quigley** [Redacted by Committee]
Date: Tue, May 22, 2018 at 7:34 PM
Subject: OCC discussions. DRAFT
To: james [Redacted by Committee]


The purpose of this note is a brief summary of my discussions with [Redacted by Committee] and [Redacted by Committee]  We spent 90 minutes together. A brief outline below, I am happy to fill in the paragraph on any item.

1. [Redacted by Committee] asked me to open since I had requested the mtg. I confirmed my agenda was fundamentally to attempt to make progress on my desire to "turn the page" on our relationship with the OCC, and continue to work to a more constructive, trusting platform. I emphasized that in our earlier discussions seeking to edit one sentence out of the consent order and press release, that I concluded that his strongly held position on the matter must have additional context that I wanted to understand.

## REDACTED-NONRESPONSIVE BEP

3. [Redacted by Committee] then responded to my first point with items 4-8 below. He emphasized he had discussed these matters individually with Tim, (except 8) but he had not pulled it together in this fashion in a conversation with Tim, which he intended to do. He also said these were preliminary perspectives they had assembled in preparing to speak with me, not hard, final conclusions. But he, [Redacted by] and [Redacted by Com] had consulted and these are their perceptions / questions.

4. WF has either an inability or unwillingness to prepare high quality remediation plans. Why is so much back and forth, resubmission required before a quality plan is produced? It is frustrating that he does not recognize how slow and sometimes confusing their input.

5. Customer remediation plans consistently fall short, not as inclusive of harmed consumers, harm not computed to make the customer whole. Worried about financial impact? Making it right with a customer is not a priority? We wil

6. Conflicting messages, at times messages are spun for investors, and not consistent with discussions with regulators. Is potential impact minimized or down played because SR. Mgmt is not informed? We go to a great length to balance message. I will send him a copy of the investor day deck with a count of how many times we mentioned risk mgmt. as well as my recent interview with Bloomberg.

7. Holding individuals accountable, action is simply too slow and hesitating, when the facts look clear to others.   (CRO change) [Redacted by Committee]?

8. He has not shared this with Tim yet ... in discussions with Tim, Betsy and Allen on the Consent Order, excessive focus on earnings impact from all three. Surprised the GC and Chair would focus on earnings, vs. a deep focus to make it right and fix these gaps in risk mgmt and compliance. (my interpretation, we need to earn the right to grow and focus on earnings. In their thinking, we need to complete the significant remediation, and only then financial performance can be a top priority.) [Redacted by Comm] acknowledged that the root cause analysis in his thinking of why a long and continuing list of unresolved issues, is management too focused on financial performance, and was that the driving force of the matters we are seeking to recover from? I do not understand this comment. Was he talking about Fed Consent Order? We have discussed the financial impact of OCC Consent Order.

9. Composition of Bank Board ... they would like to see more banking experience. Delighted with Karen, asked me to keep in mind on future additions to the Board.

## REDACTED-NONRESPONSIVE BEP

11. Our effort by Tim and Allen to edit their press release was not appreciated, and damaged relationship with ▌. Their practice is to provide the press release 2 hrs ahead of release, he agreed to provide the draft days ahead of release in return for a promise there would be no effort to edit same. We did not honor that commitment. I will check with Allen. I did not request any changes to the press release and they did not provide it as only read it. We provided them a hard copy.

Let me know if any concerns on above and I will edit as appropriate. Jim

I hope the St. Louis Town hall went well.

Sent from my iPad

WFBOD-HFSC-00018520

# APPENDIX 12

## Message

| | |
|---|---|
| **From:** | Betsy Duke [ Redacted by Committee ] |
| **Sent:** | 8/11/2018 9:57:20 AM |
| **To:** | Celeste Clark [Redacted by Committee]; Jim Quigley [Redacted by Committee]; John Baker [Redacted by Committee] Juan Pujadas ([Redacted by Committee] [Redacted by Committee]; Karen Peetz [Redacted by Committee]; [Redacted by Committee] Maria Morris [Redacted by Committee] sloan [Redacted by Committee] Ted Craver [Redacted by Committee] [Redacted by Committee]; Zan Vautrinot [Redacted by Committee] |
| **CC:** | [Redacted by Committee] |
| **Subject:** | OCC meeting |

Dear Board Members,

I wanted to update you on our recent meeting with the OCC. We met in DC with [Redacted by Committee] (both in person) and [Redacted by Committee] (by phone). Tim, Jim Quigley, [Redacted by Committee] and I were there for Wells Fargo. The tone of the meeting was constructive and serious. Comptroller Otting joined the meeting toward the end and both sides confirmed an assessment of our conversation as constructive. We have already scheduled four future quarterly meetings.

We talked about the six items they raised as concerns [REDACTED-NONRESPONSIVE BEP] and agreed to review progress or new concerns in these areas as a standard agenda item at all upcoming quarterly meetings. As a reminder the six issues raised were:

(1)    Corrective actions take too long, plans submitted are not complete and established deadlines are not met.

(2)    Remediations are ad hoc, insufficient

(3)    Executive management dismisses or minimizes issues

(4)    Management and the Board prioritize or over-focus on earnings at the expense of risk management

(5)    Not holding people accountable

(6)    Succession planning

We also discussed the following specific items:

(1)    Our plans for holding people accountable through our approach to 2018 incentive compensation. We are going to continue to engage with them on the quality of submissions, priority corrective actions and key quarterly milestones. We committed to include their feedback in determining incentive compensation and individual performance assessments.

(2)    Our current search for new directors and board succession planning.

(3)    Management succession planning and the degree of change in management over the last year. They are concerned about depletion of our "bench strength". We promised an update following our talent management review in November.

(4)    Their view of our progress so far in the exam year. (Exam reports run March 31 to March 31).

# REDACTED-NONRESPONSIVE BEP

f.    They have reviewed the Compliance Consent Order plan. The compliance plan was "pretty good". They have requested resubmission of the Audit Article and the CPI portion of the Remediation Article. [Redacted by C] expressed concern that they had done 4 deep dives on the CPI remediation plan and all their input had been ignored. It sounded like some

WFBOD-HFSC-00021759

of the feedback the OCC felt was ignored actually represented disagreements about the approach or amounts offered in the remediations. ▮▮▮▮ stated that there was nothing inherently wrong with disagreement but suggested that we highlight for discussion any areas that represent disagreements. I'll continue to follow up with ▮▮▮ on this.

(5)  We also responded to a specific list of agenda topics which had been provided by ▮Redacted by Committee▮ in advance of the meeting which included separate updates regarding the ▮REDACTED-NONRESPONSIVE BEP▮d Compliance Plans, ▮REDACTED-NONRESPONSIVE BEP▮

# REDACTED-NONRESPONSIVE BEP

I feel like this meeting was an important step in our journey to reset our relationship with the OCC. Happy to answer questions if anyone has them. We meet with the Fed in DC on September 10.

Betsy

# APPENDIX 13

Message

**From:**      Redacted by Committee

**Sent:**      3/4/2019 5:55:13 PM

**To:**        Betsy Duke                    Redacted by Committee

**CC:**        Redacted by Committee

**Subject:**   FW: Proxy discussion of compensation

Betsy and Ron, I have sent an email and a revised draft of the proxy summary to your Wells Fargo email addresses for your review.  Thanks, Kathryn

Redacted by Committee

Assistant General Counsel and Assistant Corporate Secretary
Wells Fargo Legal Department

Redacted by Committee

CONFIDENTIALITY NOTE: The contents of this message may be a confidential attorney-client communication, confidential attorney work product, or a confidential communication of proprietary information. If you are not the intended recipient, please destroy and notify the sender immediately. Thank you.

-----Original Message-----
From: Betsy Duke  Redacted by Committee
Sent: Monday, March 04, 2019 9:33 AM
To: Sloan, Tim  Redacted by Committee

Redacted by Committee

Subject: RE: Proxy discussion of compensation

I think you are right. Probably better to tone down the actual disclosures and use conversations with reporters and opinion formers to point to the condition in the equity as a new (and effective!) approach. Maybe even have a quote from the board ready to go in response to questions about the condition??

-----Original Message-----
From: sloan  Redacted by Committee
Sent: Sunday, March 3, 2019 2:54 PM
To: betsy                  Redacted by Committee
Cc:                        Redacted by Committee
Subject: RE: Proxy discussion of compensation

Betsy-

  Two suggestions.  I would delete the word "substantial" below as stakeholders could jump to the conclusion it means we are not close to lifting of the asset cap and it may give regulators even more confidence in criticizing us. Second, I would not list all of the orders but rather focus on a general regulatory matters phrasing.

Tim

From: Betsy Duke        Redacted by Committee
Date: Sunday, Mar 03, 2019, 11:14 AM
To: Sloan, Tim          Redacted by Committee

Redacted by Committee  Redacted by Committee
'Ron Sargent'

Subject: Proxy discussion of compensation

Tim,

I think the way we set up our discussion of your compensation in the proxy and accompanying press materials will be critical to how it is covered in the early press and therefore investor and proxy firm predispositions. I view the decision to condition vesting of the long term performance shares on progress against regulatory expectations as the most important and impactful decision that we made. I certainly think it makes an even stronger statement than the decision by Goldman to hold bonuses on top execs until they finish investigating the 1MDB matter. But we are going to have to lead reporters to that understanding. The traditional tables for disclosing compensation will not highlight this change. Two messages that make sense to me:

1.  In recognition of the substantial amount of work remaining to meet the expectations outlined in the OCC and CFPB Sales Practices Consent Orders, the OCC and CFPB Compliance Consent Order and the Fed Board Effectiveness and Risk Management Consent Order, the board added a vesting condition requiring acceptable progress under the orders to the performance shares issued in 2019. As a reminder, the company's pay structure is weighted so that  75-85% of annual compensation is in the form of performance shares. In 2018, the board added a vesting condition tied to total shareholder concern to address investor feedback.

1.  The board decided to award Tim a cash bonus for 2018 as recognition of substantial progress in changing the culture and business practices of WF and of building out a strong management team to focus on remaining work to strengthen compliance and operational risk.

I discussed this view with Anthony and Kathryn this morning.

I'd welcome your perspective.

Betsy