# EXHIBIT E

 AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

# HOLDING MEGABANKS ACCOUNTABLE: AN EXAMINATION OF WELLS FARGO'S PATTERN OF CONSUMER ABUSES

# HEARING

BEFORE THE

## COMMITTEE ON FINANCIAL SERVICES

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

FIRST SESSION

MARCH 12, 2019

Printed for the use of the Committee on Financial Services

## Serial No. 116–7



U.S. GOVERNMENT PUBLISHING OFFICE

36–462 PDF                    WASHINGTON : 2019

HOUSE COMMITTEE ON FINANCIAL SERVICES

MAXINE WATERS, California, *Chairwoman*

CAROLYN B. MALONEY, New York
NYDIA M. VELÁZQUEZ, New York
BRAD SHERMAN, California
GREGORY W. MEEKS, New York
WM. LACY CLAY, Missouri
DAVID SCOTT, Georgia
AL GREEN, Texas
EMANUEL CLEAVER, Missouri
ED PERLMUTTER, Colorado
JIM A. HIMES, Connecticut
BILL FOSTER, Illinois
JOYCE BEATTY, Ohio
DENNY HECK, Washington
JUAN VARGAS, California
JOSH GOTTHEIMER, New Jersey
VICENTE GONZALEZ, Texas
AL LAWSON, Florida
MICHAEL SAN NICOLAS, Guam
RASHIDA TLAIB, Michigan
KATIE PORTER, California
CINDY AXNE, Iowa
SEAN CASTEN, Illinois
AYANNA PRESSLEY, Massachusetts
BEN McADAMS, Utah
ALEXANDRIA OCASIO-CORTEZ, New York
JENNIFER WEXTON, Virginia
STEPHEN F. LYNCH, Massachusetts
TULSI GABBARD, Hawaii
ALMA ADAMS, North Carolina
MADELEINE DEAN, Pennsylvania
JESÚS "CHUY" GARCIA, Illinois
SYLVIA GARCIA, Texas
DEAN PHILLIPS, Minnesota

PATRICK McHENRY, North Carolina,
  *Ranking Member*
PETER T. KING, New York
FRANK D. LUCAS, Oklahoma
BILL POSEY, Florida
BLAINE LUETKEMEYER, Missouri
BILL HUIZENGA, Michigan
SEAN P. DUFFY, Wisconsin
STEVE STIVERS, Ohio
ANN WAGNER, Missouri
ANDY BARR, Kentucky
SCOTT TIPTON, Colorado
ROGER WILLIAMS, Texas
FRENCH HILL, Arkansas
TOM EMMER, Minnesota
LEE M. ZELDIN, New York
BARRY LOUDERMILK, Georgia
ALEXANDER X. MOONEY, West Virginia
WARREN DAVIDSON, Ohio
TED BUDD, North Carolina
DAVID KUSTOFF, Tennessee
TREY HOLLINGSWORTH, Indiana
ANTHONY GONZALEZ, Ohio
JOHN ROSE, Tennessee
BRYAN STEIL, Wisconsin
LANCE GOODEN, Texas
DENVER RIGGLEMAN, Virginia

CHARLA OUERTATANI, *Staff Director*

# C O N T E N T S

|  | Page |
|---|---|
| Hearing held on: | |
| March 12, 2019 ................................................................................................ | 1 |
| Appendix: | |
| March 12, 2019 ................................................................................................ | 79 |

## WITNESSES

### TUESDAY, MARCH 12, 2019

| | |
|---|---|
| Sloan, Timothy J., President and Chief Executive Officer, Wells Fargo & Company ................................................................................................................ | 5 |

## APPENDIX

| | |
|---|---|
| Prepared statements: | |
| Sloan, Timothy J. ................................................................................................ | 80 |

### ADDITIONAL MATERIAL SUBMITTED FOR THE RECORD

| | |
|---|---|
| Waters. Hon. Maxine: | |
| "The Case for Holding Megabanks Accountable: An Examination of Wells Fargo's Egregious Consumer Abuses," report prepared by the Democratic Staff of the Financial Services Committee, dated September 29, 2017 ...................................................................................................................... | 190 |
| Letter from the National Association of Consumer Advocates, dated March 11, 2019 .......................................................................................... | 228 |
| Article from The New York Times entitled, "Wells Fargo Says Its Culture Has Changed. Some Employees Disagree.", dated March 9, 2019 ........... | 230 |
| Article from The Wall Street Journal entitled, "Wells Fargo Regulators Weigh Executive Shakeup as CEO Heads to Washington," dated March 11, 2019 ...................................................................................................... | 236 |
| Ocasio-Cortez, Hon. Alexandria: | |
| Data Brief by Make the Road New York and the Center for Popular Democracy entitled, "Private Detention Industry Expected to Swell from 'Zero Tolerance' at the Border," dated June 2018 ............................ | 240 |
| Tlaib, Hon. Rashida: | |
| "Riding the Stagecoach to Hell: A Qualitative Analysis of Racial Discrimination in Mortgage Lending" ..................................................................... | 246 |
| Sloan, Timothy J.: | |
| Written responses to questions for the record submitted by Chairwoman Waters and Representatives Beatty, Garcia of Illinois, Perlmutter, Porter, Pressley, and Tlaib ................................................................................. | 265 |

# HOLDING MEGABANKS ACCOUNTABLE: AN EXAMINATION OF WELLS FARGO'S PATTERN OF CONSUMER ABUSES

————

**Tuesday, March 12, 2019**

U.S. HOUSE OF REPRESENTATIVES,
COMMITTEE ON FINANCIAL SERVICES,
*Washington, D.C.*

The committee met, pursuant to notice, at 10:08 a.m., in room 2128, Rayburn House Office Building, Hon. Maxine Waters [chairwoman of the committee] presiding.

Members present: Representatives Waters, Maloney, Velazquez, Sherman, Meeks, Clay, Scott, Green, Cleaver, Perlmutter, Himes, Foster, Beatty, Heck, Vargas, Gottheimer, Gonzalez of Texas, Lawson, Tlaib, Porter, Axne, Casten, Pressley, McAdams, Ocasio-Cortez, Wexton, Lynch, Adams, Gabbard, Dean, Garcia of Illinois, Garcia of Texas; McHenry, Wagner, Lucas, Posey, Luetkemeyer, Huizenga, Duffy, Barr, Tipton, Williams, Hill, Zeldin, Loudermilk, Mooney, Davidson, Kustoff, Hollingsworth, Gonzalez of Ohio, Rose, Steil, Gooden and Riggleman.

Chairwoman WATERS. The Financial Services Committee will come to order. Without objection, the Chair is authorized to declare a recess of the committee at any time.

Today's hearing is entitled, "Holding Megabanks Accountable: An Examination of Wells Fargo's Pattern of Consumer Abuses."

I now recognize myself for 4 minutes to give an opening statement.

Today, we examine Wells Fargo's egregious pattern of consumer abuses. Our witness today is Mr. Timothy Sloan, President and Chief Executive Officer of Wells Fargo & Company. I would like to begin by recounting some of Wells Fargo's recent harmful actions of which we are aware.

Between 2011 and 2016, Wells Fargo fraudulently opened millions of unauthorized accounts, costing their customers millions of dollars. In September 2016, the Consumer Financial Protection Bureau (CFPB), the Office of the Comptroller of the Currency (OCC), and the Los Angeles City Attorney imposed a collective $185 million fine.

From 2006 to 2016, the bank charged servicemembers illegal fees, failed to disclose their active-duty status in eviction proceedings, and unlawfully repossessed their vehicles, resulting in a $20 million fine and $10 million returned to servicemembers.

2

From 2005 to 2016, the bank charged customers for automobile insurance policies they did not need, resulting in some customers going into default and losing their vehicles.

From 2013 to 2017, Wells Fargo inappropriately charged prospective home loan borrowers fees for extending the period for a mortgage interest rate lock. Together, these abuses led to a collective fine of $1 billion by the CFPB and the OCC.

In 2017, the OCC and the SEC, respectively, found that Wells Fargo or its subsidiary failed to comply with anti-money laundering laws. The SEC also found that from 2009 to 2013, Wells Fargo advisers unlawfully sold complex financial products to retail investors, reducing their investment returns. Recently, Wells Fargo self-reported that between 2010 and 2018, the bank erroneously denied or failed to offer modifications to customers, resulting in over 500 people losing their homes.

What this long but impartial list makes clear is that Wells Fargo is a recidivist financial institution that creates widespread harm with a broad range of offenses. What's more, this misconduct appears to persist, with The New York Times reporting Saturday that Wells Fargo's employees continue to see internal rule-breaking to meet aggressive sales goals.

In 2018, the Federal Reserve Board imposed a cap on the bank's growth, which remains in place today. But this punishment and the fines imposed have not changed the bank's behavior, and Wells Fargo continues to rake in huge profits.

Also concerning is that Wells Fargo's regulators seem unwilling to take forceful actions against the bank, but instead are weakening the Dodd-Frank Act safeguards which protect consumers and the economy from large firms like Wells Fargo. This includes diluting big bank capital liquidity, leverage and stress-testing requirements, and the Volcker Rule's ban on gambling with taxpayers' deposits.

This committee will scrutinize what is happening at megabanks like Wells Fargo, and at the regulators who oversee them. Wells Fargo's ongoing lawlessness and failure to right the ship suggests the bank, with approximately $1.9 trillion in assets and serving 1 in 3 U.S. households, is simply too-big-to-manage.

Mr. Sloan, this committee is putting consumers first and holding financial institutions accountable. We will expect you to be forthcoming.

And now, the Chair recognizes the ranking member of the committee, the gentleman from North Carolina, Mr. McHenry, for 4 minutes for an opening statement.

Mr. MCHENRY. I thank the gentlelady for yielding.

For several years now, we have been hearing about all sorts of mismanagement and misconduct with Wells Fargo. In fact, just yesterday we learned the Securities and Exchange Commission is taking due action against your advisory business.

Each time a new scandal breaks, Wells Fargo promises to get to the bottom of it. It promises to make sure it doesn't happen again. But then a few months later, we hear about another case of dishonest sales practices or gross mismanagement, another case of a consumer who has been harmed by the bank's business practices.

3

In fact, since 2016, the bank has entered into settlements with every single one of its Federal regulators: the Consumer Financial Protection Bureau; the Commodity Futures Trading Commission; the Office of the Comptroller of the Currency; the Federal Reserve; and the Securities and Exchange Commission.

The various settlements required the bank to develop plans to identify and remediate customers who were harmed. The orders also require the bank to address internal deficiencies. The bank is still in the process of complying with the terms of those settlements now, 2½ years since the unauthorized account scandal first came to light.

And we know several of the consent orders are still active because of the bank's inability to develop a sufficient customer remediation plan. These are the facts.

In October of last year, Comptroller of the Currency Joseph Otting testified before the Senate Banking Committee that the OCC was "not comfortable with Wells' remediation progress to date." Meanwhile, you announced that the bank is expected to remain under the Fed's unprecedented asset cap, at least until the end of the year.

So obviously, the bank has a ways to go before the Federal Reserve is satisfied. Furthermore, I am concerned that we don't know with certainty how many consumers were affected, what business lines were implicated, and the full extent of the damage. We still don't have a full picture of how many customers were harmed and whether they have been made whole.

Every single member of this committee has constituents in their State who were impacted by Wells Fargo. The bank's behavior has real-world consequences. Our constituents should be able to trust their own bank. Some of them don't have access to an alternative.

We know you have taken steps in the right direction, Mr. Sloan. Some were mandated by regulators, actually, in fact, most were mandated by the regulators, and others were imposed by you in your 2½ years as Chief Executive.

For example, just 3 of the 10 members of the Wells Fargo Operating Committee who were in place in February of 2016 remain there today. You hired a new Chief Risk Officer and a new Chief Compliance Officer. That is progress, but obviously it hasn't been enough to satisfy your regulators.

So I want to use this hearing today to get your commitment as the leader of this corporation that you will do what is necessary to make sure this does not happen again. I want to know more about the internal controls you put in place to address the history of gross mismanagement.

I want to know specifically how you are changing the culture at Wells Fargo. These bad acts don't conform with the strong legacy that I know of Wachovia and First Union in my home State.

Be assured, though, this is not the end of the conversation. This is an important hearing, and you will hear bipartisan criticism of the actions you have taken and the failures that you have overseen under your watch. I yield back.

Chairwoman WATERS. The Chair now recognizes the Chair of our Subcommittee on Oversight and Investigations, Mr. Green, for one minute.

4

Mr. GREEN. Thank you, Madam Chairwoman. I thank the witness, as well.

Mr. Sloan, you became the CEO of Wells on October 12, 2016. We need to know what you know and when did you know it. Here is why: On September 8, 2016, the Consumer Financial Protection Bureau issued a consent order which found that from January 1, 2011, to September 8, 2016, thousands of Wells Fargo employees opened deposit accounts for existing customers without their consent, submitted credit card applications in the names of customers without their consent, enrolled customers in online banking services without their consent, and requested debit cards for customers without their consent.

The question that we need to have answered is, is there a culture of corruption at Wells? I yield back.

Chairwoman WATERS. The Chair now recognizes the subcommittee ranking member, Mr. Barr, for one minute.

Mr. BARR. Thank you, Madam Chairwoman.

Mr. Sloan, thank you for appearing today, and let me be blunt: You are here today because Wells Fargo mistreated and defrauded its customers. As a consequence, your bank is operating under consent orders and a damaged reputation.

But Wells Fargo's reputation is not my chief concern. The bank's actions have given a voice to those who want to unfairly taint the reputation of the entire banking sector, including the community bankers who serve the people of Central and Eastern Kentucky with the highest of integrity.

Your bank's misconduct has fueled the kind of unfair, hyperbolic, and anti-bank rhetoric that you will hear today, which threatens access to capital, job creation, and economic growth.

Today is your chance to convince this committee and our constituents that you are going above and beyond to make things right and bring your bank in line with industry standards to restore not only Wells Fargo's reputation, but the reputations of the vast majority of banks in America who serve their customers with professionalism, integrity, and the highest ethical standards.

While I recognize you have taken significant steps to compensate customers who were harmed, the Fed's asset cap is still in place and several consent orders are still active. So clearly, there is more work to do. I look forward to your testimony, and I yield back.

Chairwoman WATERS. I want to welcome to the committee Timothy J. Sloan, President and Chief Executive Officer of Wells Fargo & Company. Mr. Sloan has been the Chief Executive Officer of Wells Fargo & Company since October 12, 2016, and its President since November 17, 2015. Mr. Sloan also served as the Chief Operating Officer at Wells Fargo from November 17, 2015, to October 12, 2016, where he oversaw the community banking division that we will be discussing today.

Prior to his appointment as President and Chief Executive Officer, Mr. Sloan held a variety of positions at Wells Fargo over his 31-year career at the company, including as Chief Financial Officer, and leading the company's wholesale banking businesses.

Without objection, your written statement will be made a part of the record. Before we begin, I would like to swear the witness in.

[witness sworn]

5

Chairwoman WATERS. Thank you. Let the record show that the witness answered in the affirmative.

Mr. Sloan, you will have 5 minutes to summarize your testimony. When you have 1 minute remaining, a yellow light will appear. At that time, I would ask you to wrap up your testimony so that we can be respectful of the committee members' time.

So, Mr. Sloan, you are now recognized to present your oral testimony.

### TESTIMONY OF TIMOTHY J. SLOAN, PRESIDENT AND CHIEF EXECUTIVE OFFICER, WELLS FARGO & COMPANY

Mr. SLOAN. Thank you. Chairwoman Waters, Ranking Member McHenry, and members of the committee, good morning, and thank you for this opportunity to discuss the transformation at Wells Fargo and the progress we are making to work to become the most customer-focused and innovative Wells Fargo ever.

The past few years have been a very difficult time in Wells Fargo's storied history. When I became CEO more than 2 years ago, our bank was facing unprecedented and well-deserved scrutiny. I pledged to look back years to examine every business at Wells Fargo to ensure that no similar problems existed anywhere else in the company.

We discovered issues that we needed to address. Every one of those was a disappointment to me, but when I stepped into this role, I promised that accountability and transparency would define our efforts, and they have.

Above all, Wells Fargo is committed to making things right for our customers and to earning back the public's trust. We are dedicated to compensating every customer who suffered harm because of our mistakes. We continue to proactively identify customers, contact them, and compensate them appropriately.

For the retail sales practices issue, for example, we looked back more than 15 years, reviewed 165 million accounts, contacted more than 40 million customers via 246 million individual communications, and have provided tens of millions of dollars in compensation to our customers to date. We are taking responsibility for any fees customers should not have been charged, and for related effects, such as impacts on credit scores.

Our guiding principle has been to err on the side of customers and we are taking an overly inclusive approach in doing so. To be sure, getting this right for each customer takes time, longer than I would like, frankly. We make every effort to refund customers for mistakes as soon as we discover them. But mistakes do not affect every customer in the same way, so we developed processes for taking customers' individual circumstances into account to ensure that we fully compensate them.

Solving past problems is not enough; we must also prevent new ones from developing. Our past problems were the product of an old decentralized structure, so we have centralized enterprise controls including risk, finance, and human resources, and have hired impressive new leaders, many from outside the company, to oversee them. We have also added more than 3,000 new risk professionals. Changes like these enable us to avoid errors, identify issues earlier, and address them faster.

6

Our Board of Directors has undergone a similar transformation. In the past 2½ years, we have refreshed the board with seven new independent directors. Our new board Chair, Betsy Duke, is a former Federal Reserve Governor and is the first woman to Chair a major U.S. financial institution.

Our corporate culture has substantially improved. Team members see this improvement in the elimination of product sales goals that contributed to the unauthorized accounts problem. They see it in a performance evaluation system that prioritizes serving customers and managing risk.

They see it in enhanced leave and increased compensation, including a new $15 per hour minimum wage. They see it in restricted stock rights granted to approximately 250,000 team members in 2018 to recognize their commitment to the company's future success. And they see it in a corporate culture that encourages team members to speak up without fear of retaliation when they see a problem.

By the end of 2018, these and other changes helped us bring our team member voluntary attrition down to its lowest level in 6 years. All of this enables us to serve the one-third of American households who bank with Wells Fargo.

I am proud that our customer experience and customer loyalty scores are now at their highest levels in the past 2½ years. And I am especially proud that Wells Fargo is deepening its commitment to underserved communities, including $185 billion in commitments to support African-American and Hispanic homeownership.

We are using the resources of a big bank to make a big difference. The past few years have reinforced to us that our company does well by doing right. And doing right does not stop with simply repairing harm and rebuilding trust. We have more work to do and that is an ongoing commitment by all of Wells Fargo's 260,000 team members, starting with me, to put our customers' needs first, to act with honesty and integrity and accountability, and to strive to be the best bank in America.

Thank you again for this opportunity, and I look forward to your questions.

[The prepared statement of Mr. Sloan can be found on page 80 of the appendix.]

Chairwoman WATERS. Thank you very much.

Wells Fargo's 2018 10-K reports show that, in accordance with the Consumer Bureau's and the OCC's April 2018 auto insurance and mortgage rate lock consent orders, the bank submitted to the regulators an enterprise-wide compliance plan, a plan to enhance the bank's internal audit program, and plans to remediate customers affected by these matters. According to the consent orders, the required plans are subject to the Consumer Bureau's and the OCC's review and determination of non-objection.

Has the OCC indicated its non-objection to the bank's compliance audit on customer remediation plans? Has the Consumer Bureau indicated its non-objection?

Mr. SLOAN. Madam Chairwoman, I can't respond specifically to your question, because that would mean that I would be disclosing confidential supervisory information that has been shared with us

7

by both the OCC and the CFPB. But I can assure you that we are working very constructively with what we have in place and we are executing that plan that reflects the fundamental changes that I have made since I have become the CEO.

Chairwoman WATERS. Thank you very much.

For those who are listening, I am simply asking whether or not the bank is in compliance, based on reviews that are done by the OCC and the Consumer Bureau, and you heard that answer—

Mr. SLOAN. We are in compliance with those plans. Excuse me.

Chairwoman WATERS. Thank you.

During an October 2, 2018, hearing before the Senate Banking Committee, Comptroller of the Currency Joseph Otting testified that the OCC was not comfortable with Wells Fargo's remediation progress to date. Has the bank disclosed to investors the status of the plans that it submitted to the OCC and the Consumer Bureau, including whether the regulators have raised any objections to the bank's submitted plans?

Mr. SLOAN. Again, we cannot disclose confidential supervisory information in terms of the give-and-take that we have with either the OCC or the CFPB. But I can assure you that we have plans in place and we—

Chairwoman WATERS. Thank you very much.

On February 2, 2018, the Federal Reserve, in response to recent and widespread consumer abuses and other compliance breakdowns, issued an order restricting Wells Fargo's asset growth until it sufficiently improves its governance and risk management. In announcing the order, the Federal Reserve stated that in recent years, Wells Fargo pursued a business strategy that prioritized its overall growth without ensuring appropriate management of all key risks.

The firm did not have an effective firm-wide risk-management framework in place that covered all key risks. This prevented the proper escalation of serious compliance breakdowns to the Board of Directors. Mr. Sloan, are you aware of the Federal Reserve restricting the asset growth of any other large bank holding company under its supervision other than Wells Fargo?

Mr. SLOAN. No, I am not.

Chairwoman WATERS. Okay. Given the unprecedented nature of the Federal Reserve growth restriction which remains in place today, is Wells Fargo simply too-big-to-manage?

Mr. SLOAN. No, we are not. And I think that the changes that I described in my opening statement in terms of fundamentally reorganizing the company, centralizing our risk and control functions—

Chairwoman WATERS. Thank you very much.

Mr. SLOAN. —changing leadership—

Chairwoman WATERS. I only have a few minutes here.

In your October 4, 2017, testimony to the Senate Banking Committee, you stated that you have the knowledge, ability, and support to make changes at Wells Fargo; indeed, you testified that you have been making changes at this company for 30 years, including fundamental changes as CEO.

Since you gave that testimony, Federal regulators have announced several enforcement actions relating to customer abuses at

8

Wells Fargo. The Federal Reserve, in February 2018, imposed, again, an unprecedented asset freeze on the bank. On and on and on, with all of this experience and the length of time that you have been there, and the roles that you have played, you have not been able to keep Wells Fargo out of trouble. You keep getting fined. Why should Wells Fargo continue to be the size that it is or should it be downsized? Or what else could be done?

Mr. SLOAN. Well, I believe that Wells Fargo serves our 70 million customers and one out of three U.S. households in a very effective way today. And I think the way in which we serve our customers is reflective of the changes that I have made since I have become CEO, not only in terms of the fundamental changes that I have mentioned in addressing past issues, but also in terms of the new customer capability, customer focus—

Chairwoman WATERS. Thank you very much, Mr. Sloan, I appreciate that. All of the changes that you said that you have made are not evident. And you do not have the kind of customer satisfaction to which you are alluding. Again, is Wells Fargo too-big-to-manage?

With that, I will yield to the gentleman on my right, Mr. McHenry.

Mr. MCHENRY. Mr. Sloan, I mentioned in my opening statement that you have been fined by every one of your Federal regulators. You have entered into consent decrees with every one of these Federal regulators. So how many consent decrees total have you entered into?

Mr. SLOAN. It is my count that we have approximately 14 that are open right now.

Mr. MCHENRY. Fourteen. How many customer accounts are we talking about?

Mr. SLOAN. Related to what?

Mr. MCHENRY. Well, you define it.

Mr. SLOAN. It depends on the underlying issue. For the retail sales practices issue, we engaged an outside third party to look at over 165 million accounts, and what we concluded was that there could have been, but not necessarily were, up to 3.5 million accounts that were opened inappropriately.

Mr. MCHENRY. Okay.

Mr. SLOAN. We have reached out to those customers, and my guess is that once we complete that remediation the number will be smaller than that, but I do not know what the number is.

Mr. MCHENRY. So, when do you plan to complete that remediation on those 3.5 million customers?

Mr. SLOAN. I'm sorry?

Mr. MCHENRY. When do you plan to complete that remediation for those 3.5 million customers?

Mr. SLOAN. We have completed that remediation for those customers. In addition, we have entered into the settlement of a class action suit, and customers have an additional opportunity to be part of that suit. And then once those payments are made, we will have a better idea in terms of numbers.

Mr. MCHENRY. So, 14 separate consent decrees with your regulators. You talk about confidential supervisory information, that means you have ongoing conversations with your regulators that you can't disclose to us in a public setting. We understand the law.

9

We constructed that law, we created these regulators, and so that means you have ongoing conversations.

So let me just ask this broad question: You are the CEO of a major American company, so does the buck stop with you?

Mr. SLOAN. Absolutely.

Mr. MCHENRY. So what are you doing to change your culture? In your 2½ year- reign, I can hold you accountable to the public, and your shareholders and your Board of Directors should hold you accountable, and are, for your actions as CEO. What are you doing to change the culture?

Mr. SLOAN. The first thing that I did when I took the responsibility as CEO is to take responsibility for our past actions.

Mr. MCHENRY. How are you changing that front-line culture, those people that my constituents interact with in a branch bank in North Carolina, how are you changing that culture? Because those are the ones—not North Carolina interestingly, but those broadly across your footprint, established Wells footprint, those are the ones who took the action. How are you changing that culture?

Mr. SLOAN. In our retail banking business, this is what we have done. We have changed the leadership. We ended the incentive plan that drove inappropriate behavior, we increased the amount of training that we give to our team members called "Change for the Better." We have improved the products and services that we have been encouraging them to work with their customers over. And we have also delegated more responsibility for them in terms of resolving customer issues. The feedback that we get from—

Mr. MCHENRY. I understand the feedback, we have it in your written statement. So can you give me your personal assurance that this is the end of customer harm?

Mr. SLOAN. I can't promise you perfection, but what I can promise you is that the changes that we have implemented, the substantive changes that we have implemented since I became CEO are going to prevent them from occurring as best we can. Centralizing our risk and control functions is a fundamental change in our company. The way that we get information today is different than we got information before.

Mr. MCHENRY. You have been fined $4 billion.

Mr. SLOAN. I'm sorry?

Mr. MCHENRY. You have been fined by your Federal regulators for $4 billion. Do you think that is sufficient or adequate?

Mr. SLOAN. I think that the reputational damage that our company has endured because of our mistakes has created significant damage to the company and it is my job as CEO to make sure things change, and they are changing.

Mr. MCHENRY. Okay. Your personal assurance?

Mr. SLOAN. Yes.

Mr. MCHENRY. You have entered into 14 consent decrees by what you just said publicly. Can you give this committee and the public assurance that you will comply with all of those consent decrees on a going-forward basis?

Mr. SLOAN. I absolutely will.

Mr. MCHENRY. And you will give your personal attestation that you will follow those consent decrees?

Mr. SLOAN. Our team is working very hard to respond to all—

10

Mr. McHENRY. Will you give us that assurance that you will follow the letter of the regulators' consent decrees entered into with your bank?

Mr. SLOAN. We will do our absolute best to comply with—

Mr. McHENRY. And is this the end of scandal at Wells? Are we going to see more headlines coming up? Are we going to have another hearing about this?

Mr. SLOAN. I can't control the media, but—

Mr. McHENRY. Are your customers going to hear of more bad actions taken by your company?

Mr. SLOAN. There is nothing else that I am aware of that we haven't disclosed, and we changed the standard of disclosure at Wells Fargo after I became CEO. It is not materiality of level of disclosure anymore; it is one of reputation.

Chairwoman WATERS. The gentlewoman from New York, Mrs. Maloney, Chair of our Subcommittee on Investor Protection, Entrepreneurship and Capital Markets, is recognized for 5 minutes.

Mrs. MALONEY. Good morning.

Mr. SLOAN. Good morning.

Mrs. MALONEY. And welcome.

Mr. Sloan, on page five of your testimony under the heading, "Corporate Citizenship," you share, "Our commitment to helping address some of the country's most pressing social and economic issues is only growing."

I would like to talk to you about corporate citizenship. I went to your website and looked up your environmental, social, and governance guide, and it is an impressive list of corporate citizenship policies.

To take one example, Wells Fargo's human rights statement says that your company is committed to respecting human rights and that, "This effort is done with the understanding that in some circumstances, we may go above and beyond what the law and industry standards require." Does that all sound accurate, yes or no?

Mr. SLOAN. It does.

Mrs. MALONEY. Great. Now, I want to take you back to February 14, 2018. That was the day a lone gunman opened fire at a high school in Parkland, Florida, and killed 17 children and staff members with an AR–15-style semi-automatic rifle.

After this horrific massacre, two of your biggest competitors, Citibank and Bank of America, adopted new policies to ensure responsible lending in their businesses with the gun industry. Under the Citi policy, all of the bank's business partners in the gun industry must require a background check before they sell a firearm and they must prohibit the sale of firearms to teenagers. These are commonsense policies that will increase public safety, and they are also smart business decisions.

Yet, when asked about your competitors' new policies, a Wells Fargo spokesman said that progress on these issues had to be made through the legislative process, that your company would not go above and beyond what the law required.

But as we have already seen when I read your human rights statement, in some cases your bank does go above and beyond what the law requires. And to make it worse, last October, Wells Fargo

11

issued a new $40 million line of credit to the manufacturer of the exact gun that was used to kill 17 people in the Parkland shooting.

So, I have two questions for you. First, why does Wells Fargo continue to put profits over people by financing companies that are making weapons that are literally killing our children and our neighbors?

And, second, why are you willing to go above and beyond what the law requires on some issues like human rights, but not go above and beyond the law when it comes to financing the gun industry? How bad does the mass-shooting epidemic have to get before you will adopt commonsense gun safety policies like other banks have done?

Mr. SLOAN. Congresswoman, we don't put profits over people. We bank many industries across this country. We do our best to ensure that all of our customers whom we bank follow the laws and regulations that are in place on a local and a State and a national level.

Mrs. MALONEY. But—

Mr. SLOAN. My view, our view, is that we don't think it is—

Mrs. MALONEY. Reclaiming my time, because my time is almost up, but why are you willing to go above and beyond what the law requires for human rights, but not for gun safety? Why is one more important than the other?

Mr. SLOAN. That isn't the case. We just don't believe that it is a good idea to encourage banks to enforce legislation that doesn't exist.

Mrs. MALONEY. Well, you go—

Mr. SLOAN. I view that as your responsibility and not mine.

Mrs. MALONEY. —above and beyond the law in others.

Second, very quickly, as my time is almost up, as part of a massive scandal uncovered in 2016 where Wells Fargo defrauded millions of customers by opening more than 3.5 million fake accounts, Wells Fargo attempted to force its customers, when they sought justice, into arbitration. If investors deserve to seek justice and accountability through the civil justice system, why do you think that Wells Fargo customers don't deserve the same treatment?

May he answer, Madam Chairwoman?

Mr. SLOAN. I'm sorry, am I able to answer the question?

Chairwoman WATERS. Please, take a minute to answer.

Mr. SLOAN. Sure. Congresswoman Maloney, we took your advice that you gave my predecessor in the last hearing. That is, you asked us in the instance of retail sales practices to go beyond just a couple of years. That is why we went back more than 15 years to make sure that we were able to capture all of the potential customers who were harmed. We thought that was a very good idea.

And as I mentioned in my opening statement, we have looked at more than 165 million accounts, contacted more than 40 million customers through 264 million interactions, to make sure that we have made things right for them, and I believe we have.

Mrs. MALONEY. Okay. Thank you.

Chairwoman WATERS. The gentlewoman from Missouri, Mrs. Wagner, the vice ranking member, is recognized for 5 minutes.

Mrs. WAGNER. I thank the chairwoman for yielding.

Good morning, Mr. Sloan.

Mr. SLOAN. Good morning.

12

Mrs. WAGNER. I want to start by expressing my continued anger and frustration that your company was taking advantage of your customers and our constituents for years. You had a responsibility to your customers. Placing one's money and wealth in the custody of an organization like Wells Fargo is one of the biggest displays of the public's trust.

And your company betrayed that trust and took advantage of customers in order to meet sales performance goals and fraudulently improve earnings and share prices. While you have apologized, paid millions and billions of dollars in fines, and, after reviewing your recently released business standards report, made numerous changes to your corporate structure, I think we can agree there is still more to be done.

Mr. Sloan, there were over 15,000 accounts in Missouri affected by misconduct and scandal since 2012. These include many of my constituents whom I represent. I care deeply about these customers.

Have all of these customers been made whole, sir, and not just for any fees charged, but also for related effects, such as impact on credit scores and such?

Mr. SLOAN. The answer is yes, by us. And the way that we have done that is by the extensive outreach that I mentioned in my opening statement and—

Mrs. WAGNER. Outreach, meaning what?

Mr. SLOAN. Meaning that we looked at 165 million accounts, we had a third—

Mrs. WAGNER. And they have been made whole and their credit scores have not been impacted, you have made sure of that?

Mr. SLOAN. We have corrected any improper information that we provided to the credit bureaus. And in addition to reimbursing customers for fees and expenses, we have asked them to come in and see us to the extent that they felt like there was additional harm.

Mrs. WAGNER. What percentage came in to see you, sir?

Mr. SLOAN. A very small percentage came in to see us, notwithstanding our best efforts to contact everyone. And then to the extent that they weren't satisfied with what our offer was, we hired a mediator at our expense on their behalf, and we have resolved all of those customers who have come in. In addition, those customers have the ability to take part in the class action settlement that we have entered into where we have paid $142 million.

Mrs. WAGNER. Thank you. I have limited time. After the scandals that had been brought to light since 2016, Wells Fargo decided to hire a new Chief Compliance Officer to ensure that the bank is mitigating risk. I would like to know when that new Chief Compliance Officer was in fact hired and has the new Chief Compliance Officer been empowered to make changes throughout the company?

Mr. SLOAN. He has. Mike Roemer was hired and joined us in January of 2018.

Mrs. WAGNER. In January of 2018?

Mr. SLOAN. That is correct.

Mrs. WAGNER. What was going on between 2016 and then? That is a lot of time before you hired a Chief Compliance Officer, sir.

Mr. SLOAN. That is correct. We had a compliance program that was in place. It wasn't working as well as I would have liked. We

13

dismissed our—we asked our prior Chief Compliance Officer to step aside and we went out and I think we have hired the best Chief Compliance Officer in the industry, who has a demonstrated capability of—

Mrs. WAGNER. Did the regulators tell you to get rid of your Chief Compliance Officer?

Mr. SLOAN. No, I made that decision.

Mrs. WAGNER. Yes. In your testimony you mentioned that Wells Fargo has worked to address the root causes that allowed these issues to occur in the first place. Mr. Sloan, in your opinion, what are these root causes? Was there something in your business model, something in your organizational structure that led to this malfeasance?

Mr. SLOAN. Well, I think there were a number of root causes, Congresswoman. First, it was reflective in our decentralized structure where our control functions were part of our businesses as opposed to separate.

I have changed that since I have become CEO. I think it was also reflective in our retail banking business in an incentive plan that was much too focused on selling products as opposed to providing good service and advice.

We have ended that incentive plan and we have a new plan in place that is being received quite well by not only our team members but also by our customers. That is reflective in the improvement in customer service, customer loyalty, and customer experience scores. The feedback that we get from our team is that those fundamental changes like that are being very well received.

Mrs. WAGNER. My time is about to expire. I have more questions about risk management and the board. I hope that some of my other colleagues will get to that. I thank you for your testimony, and I yield back, Madam Chairwoman.

Mr. SLOAN. Thank you.

Chairwoman WATERS. Thank you very much. The gentleman from California, Mr. Sherman, is recognized for 5 minutes.

Mr. SHERMAN. Madam Chairwoman, I thank you for holding this hearing. This hearing is at least a year, maybe 2 years late, and I am glad to see that when 3.5 million consumers are adversely affected, that the Financial Services Committee will take that seriously.

Mr. Sloan, this is not a trick question, because I told you in my office that I would ask it. You have hurt consumers, you have talked about remediation, but now it is time for you to be in the vanguard of consumer protection. One way you could do that is to endorse Representative Carolyn Maloney's bill on overdraft protection.

This bill will make sure that overdrafts are reasonable and proportional, that you do not reorder transactions, and that no other bank reorders transactions in order to increase the amount of fees, that there are notifications at ATMs, et cetera. I asked your senior staff to look at the bill, and to advise you. Can you be on the right side of history and endorse that bill now?

Mr. SLOAN. I think we are already on the right side of history, because when you look at the changes that—

14

Mr. SHERMAN. I am not asking what your practices are, Mr. Sloan, because even your practices only affect your bank. You have a powerful lobbying organization in this City. Will your organization be on the right side of history?

Mr. SLOAN. Again, I can tell you what we do—

Mr. SHERMAN. No, I am asking what your lobbyists will do, not what your banking computers will do.

Mr. SLOAN. We don't have lobbyists who are lobbying on overdraft protection.

Mr. SHERMAN. Your lobbyists don't lobby on bills affecting all of your customers and the bank's relationship with them? Why do you pay them?

Mr. SLOAN. Congressman, what I would like to do is describe the industry leading changes that we—

Mr. SHERMAN. No. Because it is my time, and I asked you whether you would support the bill, and you are trying to filibuster it by talking about your practices. Somebody else may ask you that question. Will your lobbying organization, which you have here to lobby on bills relevant to your bank—nothing could be more relevant—support this legislation?

Mr. SLOAN. Congressman, I have not spoken to our industry trade groups about that bill, but I will speak to them about it.

Mr. SHERMAN. Oh, so you will talk about it behind closed doors?

Mr. SLOAN. I would like to talk to you—

Mr. SHERMAN. Okay. I have to go onto the next question.

Mr. SLOAN. This hearing is about—

Mr. SHERMAN. Sir, I need to go on to the next question. You told the gentlelady from Missouri that you have done full remediation. It occurs to me that some people had a worse FICO score and didn't get a house. They just didn't qualify.

Now, that house is worth several hundred thousand dollars more than when they were denied credit. If somebody is in that circumstance, sure, you will pay for a mediator, but will you enforce the arbitration provision or will you let them go to court if they want to go to court?

Mr. SLOAN. They don't need to go to court.

Mr. SHERMAN. If they want to go to court. You know, the courts were established by the U.S. Constitution, and these other ways of dealing with disputes are fine for those people who want them, but will you force those people into arbitration if they decide that is not what they want?

Mr. SLOAN. Congressman, in the situation of the retail sales practices mistakes that we made, our customers don't need to go to court because—

Mr. SHERMAN. So you are smart, they are dumb, you have their interest at heart, they have lawyers, they want to go to court, and you are telling them they are stupid for wanting to go to court. Let's say they want to go to court. Will you force them out of court by using the arbitration provisions?

Mr. SLOAN. Congressman, I don't think our customers are stupid, in fact, I think—

Mr. SHERMAN. Well, then, some of your customers want to go to court. Are those customers stupid? Or are you going to use your clever arbitration provisions, applicable to accounts they never

15

signed up for, in order to keep them out of court if that is what they decide they want?

Mr. SLOAN. Congressman, our remediation for customers who were impacted by retail sales practices is extensive and comprehensive—

Mr. SHERMAN. And you refuse to let people go to court, and you use your arbitration provision for the account they did sign up for to keep them out of court with regard to the account they didn't sign up for, and then you come before Congress and say, "Oh, but that is wonderful for the consumer. The consumer must be wrong if they want to go to court."

Mr. SLOAN. I didn't say that, Congressman. What I have been trying to—

Mr. SHERMAN. Will you let them go to court if that is what they want? Yes or no?

Mr. SLOAN. We settled 140—

Mr. SHERMAN. I am asking for a yes or no, not a filibuster. That is the Senate side, not here. Yes or no?

Mr. SLOAN. Congressman, I have answered your question in terms of—

Mr. SHERMAN. No, you haven't. I have asked you, yes or no, and you haven't given me an answer.

Mr. SLOAN. Congressman, in certain circumstances, we enforce our arbitration provisions of our customer agreements. In the case—

Mr. SHERMAN. Even for the accounts they didn't sign up for?

Mr. SLOAN. Congressman, in the case of sales practices, as I have mentioned, we have had an extensive remediation effort. Every customer who has come in to see us, we have resolved their issue. They have been taken care of.

Chairwoman WATERS. Mr. Sherman, obviously Mr. Sloan is not going to answer your question. We are going to move on.

Mr. Posey, the gentleman from Florida, is recognized for 5 minutes.

Mr. POSEY. Thank you, Madam Chairwoman.

Mr. Sloan, they have piqued my interest a little bit talking about these overdraft fees. They don't want to have overdraft fees. Does that mean that people who don't bounce checks should share the expense of people who do bounce checks? Am I understanding that right?

Mr. SLOAN. I think that customers who overdraw their accounts should be charged a reasonable fee for that. At Wells Fargo, what we have done is tried to live up to our vision of satisfying our customers' financial needs and helping them to succeed financially by giving them all the information that we have to be able to manage their financial situation the best.

So, for example, in May of 2017, we introduced a new capability called real-time balance alert. It is very simple. You tell us what balance you want to know about. When your account hits that balance, we will push out that information to you. That has saved our customers hundreds of millions of dollars, in the last year and a half since we have introduced that, of overdrafts. We push out 43 million real-time balance alerts a month.

16

In addition, we introduced another capability in November of 2017 called overdraft rewind. We find that more likely than not, some of our customers will overdraw their accounts the day before they get paid.

If you have a direct deposit into Wells Fargo on a Friday, and we know that is happening, and you overdraw your account the night before, we are not going to charge you that overdraft the next day, because you are a customer, and we know you are going to go ahead and get paid. That has saved 2.3 million overdrafts since we introduced that, again, about a year and a half ago.

We are very pro-consumer in terms of our overdraft policies and I think that they are industry-leading. If we have information about our customers that can help them manage their finances better and avoid an overdraft, absolutely. But if a customer decides to overdraw their account on their own, they should have to pay a fee for that.

Mr. POSEY. About how many employees does your bank employ?

Mr. SLOAN. 260,000.

Mr. POSEY. Okay. The topics before us today are somewhat complex and I would like to ask you to simplify some matters and tell the committee the most important lessons that our constituents should draw from the events and violations that brought you before the committee today.

Mr. SLOAN. Well, I think, first and foremost, if you see a problem, deal with it as aggressively and as quickly as you can. And that is a lesson learned by us and it won't be repeated.

I think that when you see a fundamental issue in terms of a company's organization that needs to be dealt with, even if it means making massive change in the company, you need to go ahead and do that. And it also means that if you see leaders who are not living up to the standards that you expect for your company, you need to make changes.

Mr. POSEY. You testified that the sales culture at Wells Fargo and the incentives to sell accounts and credit cards contributed to the violations. Was that a culture unique to Wells Fargo? I mean, have you had experience with others during the enforcement process?

Mr. SLOAN. I can't speak for our competitors. I think many of our competitors have incentive plans. I don't necessarily know whether they were they were the same or different. I think that our incentive plans, though, went off the rails because it focused too much in our retail banking business on selling products as opposed to providing the right advice and service.

In addition, we created a legacy of managers who weren't managing anymore; they were enforcing incentive plans. We have changed all that since I have become CEO. That should have never happened and it won't happen again.

Mr. POSEY. Okay. Looking forward, what are you doing now to protect your customers from cyber theft?

Mr. SLOAN. From cyber? Well, we are doing two things. One is that we have hired a very impressive cyber team and we have cyber threat fusion centers all around the world to monitor cyber risks for the company. We have invested hundreds of millions of

17

dollars, by now billions of dollars in cybersecurity, including having third parties come in and provide us with ideas.

In addition, we are using artificial intelligence to monitor our customers' accounts. So if we see some sort of a transaction that looks odd for that customer, like maybe you sending a million dollars to a bank account in a country that you have never had a relationship with, then we would try to surface that for the customer. There is more to do. I think the biggest risk that American consumers face today is one of imposter fraud.

Mr. POSEY. Thank you.

Chairwoman WATERS. The gentleman from New York, Mr. Meeks, the Chair of our Subcommittee on Consumer Protection and Financial Institutions, is recognized for 5 minutes.

Mr. MEEKS. Thank you, Madam Chairwoman.

Hello, Mr. Sloan.

Mr. SLOAN. Good morning.

Mr. MEEKS. Do you realize how serious this scenario is with Wells Fargo?

Mr. SLOAN. Yes, I do, Congressman.

Mr. MEEKS. Because your predecessor, when he was before us, I took it that he wasn't really serious when we talked about the grievous actions of Wells Fargo and how it affected Main Street. Do you realize that if someone on Main Street caused such hazardous results, whether it was stealing their money or conning them, they would go to jail. That is what they do. They go to jail.

And what you have done, your industry—or I shouldn't say your industry, your bank that you have been a part of for 31 years—no one has paid a punishment at all. People have left. Some still received a bonus. People have stayed, as you have, and got promoted. So when the general public looks at this, they do not see any justice at all, nothing.

You say that there have been changes. I am looking at a news report now that just came out last week that says that maybe the practices that were utilized on these accounts have shifted to your debt collection procedures, where those who are collecting debt, going after individuals, they have incentives. They have to be there for 30 hours and collect X amount—I think it is $45,000—or collect X amount of money, and one person has been fired. Are you aware of that?

Mr. SLOAN. Congressman, I am not necessarily familiar with the news report that you are referring to.

Mr. MEEKS. Well, the news report, and I will refer it to you, is dated March 9th and it talked about as recently as December, there was an employee out of your Iowa facility who said that it is a joke that the climate has changed, and that they have been fired as a result of this incentive package that was placed on these employees. Are you aware of that?

Mr. SLOAN. I am not aware of that specific circumstance. But what I can—we can report to you, Congressman, is that is not—that is inconsistent with the feedback that we get from our team members who survey information, through the interaction that I have with them in our town halls.

Mr. MEEKS. But you do your own debt collections, right?

Mr. SLOAN. I'm sorry?

18

Mr. MEEKS. Wells Fargo does their own debt collection?

Mr. SLOAN. In some circumstances, that is correct.

Mr. MEEKS. And in that case, those that do their own debt collections are exempt from the protections against harassment that is in the Fair Debt Collection Practices Act.

Mr. SLOAN. That is inconsistent. We follow the laws and regulations of this country.

Mr. MEEKS. But I understand that you, as your bank, since you don't hire someone from the outside to collect your debt, you are not subject to the Fair Debt Collection Practices Act, you are not subject to them. And so, therefore, the harassment of individuals to get the debt continues on a regular basis.

Mr. SLOAN. Harassment has no place in Wells Fargo today.

Mr. MEEKS. Well, I am going to refer you to this article on March 9th. It is in The New York Times. I am running out of time, so I want to go one other step with you.

You would agree, if you are serious, that the egregious actions of Wells Fargo violated the Community Reinvestment Act (CRA). Do you agree?

Mr. SLOAN. We have not violated the Community—

Mr. MEEKS. Well, you were downgraded by the OCC from "satisfactory" to "unsatisfactory," basically. Correct?

Mr. SLOAN. The ratings that we received under the lending investment and service test were outstanding, "outstanding" to "unsatisfactory"—

Mr. MEEKS. You went from "outstanding" to "needs improvement."

Mr. SLOAN. And that was because—

Mr. MEEKS. A double downgrade.

Mr. SLOAN. That is correct.

Mr. MEEKS. Wasn't that appropriate?

Mr. SLOAN. Well, I don't believe it was appropriate.

Mr. MEEKS. Well, then you don't get it.

Mr. SLOAN. No, I—

Mr. MEEKS. If you don't believe a double downgrade was appropriate when you clearly have admitted all of the fines that you have had, fraudulent account scandals, and you don't think a double downgrade is appropriate with reference to CRA, you don't get it then.

Chairwoman WATERS. He doesn't get it.

Mr. Luetkemeyer, the gentleman from Missouri, is recognized for 5 minutes.

Mr. LUETKEMEYER. Thank you, Madam Chairwoman.

Mr. Sloan, when your predecessor was here previously—and I want to remind the committee a little bit about history here—the initial problems that were disclosed and found by the regulators were actually reported by the Los Angeles Times. And as a result, the regulators dropped the ball on this whole situation, and after the fact, ran into your bank and found some of the stuff that is going on as a result of these news reports.

The CPPB in particular, even after the other regulators went in, went in even later than that and found out that there was some stuff going on and then slapped you with a fine, which I am not opposing. I think that was appropriate. But my comment at the

19

time, and I think it is still appropriate, is that the CPPB, for their inadequate and lousy regulation, should have been fined, as well.

Because, quite frankly, a lot of the problems that were here, if it would have been regulated properly, would have been found at an earlier time, would not have risen to this problem that it is today and we wouldn't be here if they would have done their job in trying to provide the right oversight. So it is unfortunate that we have a mess on both sides here.

But I guess my question today is, I know in your book here discussing the situation, "Learning from the Past, Transforming for the Future," you identify some root causes. And number two is that you had a decentralized business model that granted too much authority and autonomy to your community bank, senior management teams, and deferred too much authority to those individuals, apparently.

I guess that is part of the culture that needed to be changed. And so I would like for you to describe what you have done differently, how you have changed the culture? Have you looked at other banks' business models and changed it according to them or have you reinvented the wheel and have your own unique business model at this time?

Mr. SLOAN. Congressman, what I have done since I became CEO is that we moved all of the enterprise control functions—so, for example, the finance team, the risk team, the human resources team, the compliance team and so on—that used to be part of our business lines, we moved them out of the business units.

S what we get today is a leadership team. What our board sees is a better check and balance in terms of when there is an issue that occurs in a business line, we also have a review from one of the enterprise risk control functions to be able to provide the right check and balance and to be able to provide information in a much different way. That is a fundamental change in our company.

When I look across the industry, many other firms in the financial services industry have also done similar—have made similar changes. Every financial institution is structured a little bit differently. Most of our business is here in the U.S., so that means we're going to be structured differently than some of our competitors that might have more of an international footprint.

But I think that fundamental change is really making a difference in terms of how we are dealing with issues today and moving Wells Fargo forward, and it gives me confidence that the likelihood that there would ever be something like a retail sales practices issue happening again at Wells Fargo is very low, if not zero.

Mr. LUETKEMEYER. One of the things that I discussed with your predecessor when he was here was that he was telling us that he changed the culture. Yet, he kept firing people every year—about 1,000, 2,000 people every year. And I said at some point, you are not changing the culture if you keep firing people, with regards to the retail sales problem that you had.

So I guess, my question at this point is, in order to change the culture, you have to change not only the management, but you also have to change the way that employees act and behave. Have you gone through any sort of educational process with your lower level people who are delivering these services and then the management

20

people over them to understand the relationship they need to have with their customers, how they need to be selling these products, and what kind of oversight you need to be putting over these people?

Mr. SLOAN. We have. We have done that in a number of ways. One is changing the incentive compensation plan that I had mentioned earlier.

But since I became CEO, we have made a number of other changes. One, we have set out uniform standards to all of our 260,000 team members in terms of how they should interact with customers, what our expectations are not only in terms of how they do their jobs every day but also leadership. We have done the same thing—and it is on one sheet of paper—with all of our managers.

We have changed the incentive plans across the entire company and we have retrained hundreds of thousands of team members in Wells Fargo. We started a new—or introduced a new ethics training that actually was required by every one of our team members to be taken by February of this year, and I am pleased to say that 99.98 percent of our team members have taken it.

Unfortunately, they have to sit through a 2 minute and 11 second video of me describing it, but they have taken it and I think that is making a fundamental difference in the culture of the company.

Mr. LUETKEMEYER. Thank you. I yield back.

Chairwoman WATERS. The gentleman from Missouri, Mr. Clay, Chair of our Subcommittee on Housing, Community Development and Insurance, is recognized for 5 minutes.

Mr. CLAY. Thank you, Madam Chairwoman, and thank you, Mr. Sloan, for being here. Are you aware of the Federal Reserve restricting the asset growth of any other large bank holding company under its supervision?

Mr. SLOAN. I am not aware of any public consent order that is similar to ours in which our balance sheet was capped as of the end of 2017.

Mr. CLAY. Okay. And during the October 12, 2018, third quarter earnings call, you indicated that Wells was planning on operating under the asset cap through the first part of next year. Again, in a December 4, 2018, presentation at the Goldman Sachs Financial Services Conference, you indicated that Wells was still planning on operating under the asset cap for the first part of next year.

However, the bank's most recent 10–K, issued on February 27, 2018, states that the company is planning to operate under the asset cap through the end of 2019. Why did the bank's assessment of when the Federal Reserve will lift the asset cap change between December and February?

Mr. SLOAN. Because we received some additional feedback from the Federal Reserve as part of our normal give and take, and based upon that they indicated, and I want to be very careful because I don't want to disclose any confidential supervisory information, but they wanted us to make a little more progress in terms of our improvement, required improvements under the order, and based upon that, we believe it will take us a little bit longer.

We have the same goals and objective as the Federal Reserve does in terms of improving board governance, which is paragraph

21

two of that order, and in improving compliance and operation risk oversight, which is paragraph three. In fact, I want to go beyond that. One of the goals that I have set for our team is that we want to have the best risk management in every one of our risks in the entire industry.

Mr. CLAY. Let me ask you about that, the culture at Wells. Here, in an article yesterday in The Wall Street Journal, whistleblowers had alleged that financial advisers were pushing clients into inappropriate products and were shifting client assets around to generate greater revenue and bonuses. This was reported yesterday. How do you respond to that? Is the culture still the same? Have you all learned anything in the past 2½ years?

Mr. SLOAN. We have learned a lot in the past 2½ years, and I think the changes that I have made since I became CEO are clear in how our team is operating each and every day. The report that you are referring to was one that our board investigated by hiring an outside law firm, and in our 10–K that we just filed, we indicated that that review did not find any substantive issues in that group.

Mr. CLAY. Okay, let me ask you this: Did the OCC previously force out the bank's Chief Administrative Officer, Hope Hardison?

Mr. SLOAN. I can't comment on whether or not Ms. Hardison had any sort of interaction with the OCC. It has been reported that she received a 15-day letter from the OCC.

Mr. CLAY. Okay, what about—did the OCC previously force out the bank's Chief Auditor, David Julian?

Mr. SLOAN. Again, I would give you the same answer. Both of those individuals are on administrative leave.

Mr. CLAY. Are you aware that the OCC is considering whether to force out additional top executives or directors at Wells?

Mr. SLOAN. I have had no conversations about that topic with the OCC.

Mr. CLAY. So you are not aware of it? Do you think they are considering others?

Mr. SLOAN. I have had no conversations with the OCC on that topic.

Mr. CLAY. Okay. In your written testimony you state that fully satisfying the requirements set forth in your regulatory consent orders is critically important. If this is true, then why is the OCC considering the unprecedented step of removing top executives or directors?

Mr. SLOAN. Again, we have had no conversations with the OCC on that topic.

Mr. CLAY. You don't think it is coming?

Mr. SLOAN. I have had no conversations with the OCC on that topic.

Mr. CLAY. Okay. Well, I yield back, Madam Chairwoman.

Chairwoman WATERS. I now recognize Mr. Huizenga.

Mr. HUIZENGA. Yes, thank you, Madam Chairwoman.

Mr. Sloan, I am going to try and plow a little new ground here, but I do need to emphasize publically what I said to you privately, and I think you are hearing echoed here, about the profound disappointment, anger, and frustration that so many of us have.

22

I personally know people who were affected on both ends of this, on the front end with the account scandal and the things that were going on, but then also on the remediation side, where the pendulum has swung back and they have had difficulties potentially having bank deposit boxes being seized and other things.

So, this is a management nightmare, but it is a nightmare for the customers who have been affected by this at every level. And I guess it would be remiss of me not to say, you better check out the March 9th article from The New York Times. It sounded like that was something that you were not familiar with.

There are a number of very specific allegations, but the broad allegation in this is that—I have a quote from a teller in Miami who said that there was "a disconnect between corporate and branch officer workers with what is going on." And I think you are hearing a repeated theme on culture.

And before I head too far down, I do want to talk about your bank board makeup a little bit. You had mentioned Betsy Duke as your new Chair, but prior to that, you have been with the bank for a number of decades. Were you uncomfortable with bank actions at the time that these things were going on? Were you uncomfortable with what the previous administration's decision-making was?

Mr. SLOAN. Congressman, when retail sales—the initial retail sales practice is concerned, for example, the LA Times article was brought to my attention, we had a conversation—I had conversations with the then-head of our community bank and we also discussed it at our operating committee. The then-head of our community bank assured us that—

Mr. HUIZENGA. What were you telling them? Were you telling them about your concern?

Mr. SLOAN. We were asking whether or not the allegations were correct and whether or not there was a significant problem. I think the changes that I have made since I have become CEO are going to prevent a situation like that from developing again because the head of the community bank said, "I have this under control," but we didn't have the risk and control—

Mr. HUIZENGA. Clearly, that wasn't the case.

Mr. SLOAN. —outside of the community bank at that time.

Mr. HUIZENGA. Okay. Because I think there is a legitimate question here. What is the culpability of the entire C-suite in this? And I understand that you are CEO now, and ultimately the decision-making stops with you.

Also, it seems to me with a publicly traded company like this, the culpability of the board, the previous board—I would like you to address what has happened at the board level to change this. Because we have a lot of concerns yet about culture and whether the culture has really changed and whether you are the right person to change that culture, but also your job rises and falls on the decisions of the board.

I would like to know more about what that board makeup looks like to make sure that this is not happening again. Because clearly, Comptroller of the Currency Otting had said in October of 2018, that he was not comfortable, I believe is the quote, not comfortable with Wells Fargo's remediation progress to date. The Federal Reserve, as was pointed out by my colleague, in December of 2018

23

pointed that out, as well. And you had said in your booklet that there is a clear set of behavioral expectations and I want to know what those behavioral expectations are.

Mr. SLOAN. Sure, so let's start with the board if that is okay. When I stepped into this role, we separated the role of Chairman and the CEO. We have a new Chair of our Board, Betsy Duke, who is a former Federal Reserve Governor. Since I have become CEO, we have seven new board members and so more—

Mr. HUIZENGA. Out of how many?

Mr. SLOAN. Pardon me? Out of 13.

Mr. HUIZENGA. Seven out of 15?

Mr. SLOAN. No, no, 13.

Mr. HUIZENGA. 13?

Mr. SLOAN. Yes, so 12 are from outside the company—

Mr. HUIZENGA. Thirteen.

Mr. SLOAN. And I am the only inside board member.

Mr. HUIZENGA. Okay.

Mr. SLOAN. So we have added an impressive new set of Board members, and we have a very diverse Board: five members of our Board are women; and four are diverse. They bring an incredible set of experiences. We went out and looked for Board members who had the experience in things like cybersecurity, risk, reputational issues, and operational organizations that we thought would add value to our Board. And they are doing a terrific job. In terms of the—

Chairwoman WATERS. The gentleman from Georgia, Mr. Scott, is recognized for 5 minutes.

Mr. SCOTT. Thank you, Madam Chairwoman. Mr. Sloan, it is very, very important that we get to the bottom of this. And I want to ask you a series of questions. First of all, it is true that Wells Fargo opened up 1,500,000 fake customer accounts, correct?

Mr. SLOAN. We don't know how many accounts were opened up inappropriately. We believe it could be up to 3.5 million.

Mr. SCOTT. Well, Mr. Sloan, the fact that you answered that you don't know gives us an idea of the size of the problem. But in fact, it has been documented that it was 1.5 million false accounts. Now, Mr. Sloan, Wells Fargo employees routinely falsified customers' signatures, is that correct?

Mr. SLOAN. No, I wouldn't describe it as routinely falsified customers' signatures. In certain circumstances, they did. They violated our code of ethics rules and were dismissed from the company.

Mr. SCOTT. All right, Verisign. They did. Thank you. You were accurate there. And your employees doctored paperwork that was designed to help them meet anti-money laundering rules, correct?

Mr. SLOAN. In certain circumstances, Congressman.

Mr. SCOTT. All right. Now let me ask you this, which gets to the heart of this matter, which is why I am asking this. All of these grievances, these terrible things that were done, the fake accounts, the signing of customers' signatures, were done in the Wells Fargo wholesale banking division, correct? Yes. And this is what is so important, Mr. Sloan. You were the head of this department. The wholesale banking division was led at that time by you, Mr. Sloan.

24

The whole point of my line of questioning is to say this: You are the best person to help us solve this problem. So I want to ask you—The New York Times did an article that I read on Saturday, and here is what it said. It said in a survey of more than 27,000 employees in the bank's information technology department late last year—they did a survey and the top concern in that survey was hearing from your employees that they were concerned that they did not have the ability to raise grievances with managers in whether Wells Fargo conducts its business today with honesty and integrity.

So, Mr. Sloan, we have to get to the bottom of this. You are the best person to do it because all of these abuses happened under your watch as head of that department. Now, you have done this survey. Let me ask you this: Have you are or any member of Wells Fargo's Board of Directors reviewed the results of this survey?

Mr. SLOAN. Of the survey that was referred to in that article?

Mr. SCOTT. Yes, the 27,000 input—

Mr. SLOAN. I have actually reviewed surveys that are much broader than that for each one of the businesses—

Mr. SCOTT. No, but in this survey—

Mr. SLOAN. And I have looked at that survey, that is correct.

Mr. SCOTT. Yes, and what was your determination as a result of that survey?

Mr. SLOAN. My response to that is that was great feedback to receive from our team. We want to receive feedback like that in—

Mr. SCOTT. All right, let me go quickly here before the chairman—if Wells Fargo developed the culture of compliance as you are saying, then why are your employees still concerned about their ability to raise these grievances with managers? And they are themselves doubtful of the bank's honesty and integrity?

Mr. SLOAN. I don't believe that—

Chairwoman WATERS. The gentleman from Wisconsin, Mr. Duffy, is recognized for 5 minutes.

Mr. SLOAN. I don't believe—

Chairwoman WATERS. Mr. Sloan?

Mr. SLOAN. I'm sorry.

Chairwoman WATERS. Your time is up. Mr. Duffy?

Mr. DUFFY. Thank you, Madam Chairwoman. Welcome, Mr. Sloan. You are not denying that Wells Fargo had some problems in the past with regard to fake bank accounts, are you?

Mr. SLOAN. No.

Mr. DUFFY. No. And so since that has been exposed, has Wells Fargo undertaken reforms to fix the problem?

Mr. SLOAN. We have.

Mr. DUFFY. Is the problem fixed?

Mr. SLOAN. It is fixed.

Mr. DUFFY. It is? Okay. I am surprised because as you come in and talk to the Congress, I am shocked that you are not in an orange suit in a little jail cell testifying today. It surprises me, because we can look back and say, we had problems. I was a customer.

When Mr. Stumpf was here, I lit him up, as a customer, that it was absolutely inappropriate. You have a duty to treat your customer well, not cheat them. But I am also not here to say Wells

25

Fargo should be dissolved, because you made some mistakes. We should give you a chance to mediate, improve, and move forward.

I am a little bit frustrated looking at the questions you are getting today where you actually get questions that you can't even answer. You don't even get to respond to the questions that are thrown your way.

So, I guess I am a little bit frustrated. As I watch the big screen, it is scandalous that Wells Fargo made a profit. It seems like some people want you to give interest-free loans. And when people don't pay those loans back, there should be no consequence for it.

Frankly, I don't think they want Wells Fargo to lend. They want some of our post offices actually to lend, socialized banking, which I am absolutely opposed to. I want to just—I am going to get in some questions for you.

But I want to thank you for saying you are going to follow the law in regard to the Second Amendment. I know you have people from New York and some from California who don't appreciate the Second Amendment. But in places in the Midwest where you do a lot of business, we actually appreciate the Second Amendment, and the fact that you will lend consistent with the law where we believe in our Constitutional right to bear arms.

And so, unlike Citi and unlike Bank of America, I want to thank you for serving the customers in my community who actually appreciates the Second Amendment as opposed to I think when the others come in and you will be here—I think this is going to be in April. They will probably get some questions on this side in regard to the Second Amendment.

Can you walk us through the changes that you have made, Mr. Sloan, how you have improved the bank and how these issues have been mitigated and remediated?

Mr. SLOAN. First, we had to start at the top. We have made changes at the Board level. We separated the role of the CEO and the Chair. We have made changes in our leadership team.

If you look at the 10 senior leaders who report to me, the operating committee of the bank, 5 are new to the company and they come with incredible experience in their disciplines. Four are from within the company but are new in their roles, and one is in the same role.

In addition, we have fundamentally reorganized the company to create a better set of checks and balances in terms of creating independent enterprise risk control functions. We have hired thousands of new risk professionals, and spent billions of dollars in improving our risk, as well as investing in technology.

We have also addressed and reinforced to our team, the 260,000 team members who serve our customers every day, we said you are important. How do we measure that? We make sure that everyone received at least a minimum of $15 an hour. We did that, and then we looked at anyone near that same compensation level, so we increased the wages of 86,000 people by over 10 percent.

We made every one of our team members shareholders to make sure that their interests were aligned with our shareholders. And the reason we did that is because when I was out talking in our branches, in our call centers, in our offices, talking to our team, I saw a disconnect.

26

We changed that. We changed incentive plans across the company so no longer would they incent team members to just sell a product. It is about providing the right customer service and advice. That is the number one goal in the six aspirational goals that I introduced to our team in March of 2017.

We want to be the best in customer service and advice. And what we are seeing is a positive reaction. We are seeing our team member voluntary attrition down to its lowest level in 6 years.

Mr. DUFFY. Mr. Sloan, I have been a customer of your bank for over 22 years.

Mr. SLOAN. Thank you.

Mr. DUFFY. And I would note that I have seen a dramatic improvement with the service that the bank provides. I want to thank you for that. I would just make one other note as some of my—

Mr. SLOAN. Would you send me the names of your bankers so I could acknowledge how they are improving your service?

Mr. DUFFY. Absolutely.

Mr. SLOAN. I like doing that.

Mr. DUFFY. And one other point I want to make is, when you are getting questions about mediation in regard to letting people litigate in court, I want to let you know that in regard to one thing, this is about the trial bar, and I then want to go to the other side of the aisle from the trial bar, they make big profits for coming after banks like you. It is about contributions, it is about a lobby, it is about the trial bar. It is not about people. It is not about customers; it is about money.

Chairwoman WATERS. The gentleman from Texas, Mr. Green, the Chair of our Subcommittee on Oversight and Investigations, is recognized for 5 minutes.

Mr. GREEN. Thank you, Madam Chairwoman. Thank you again, Mr. Sloan.

Mr. Sloan, CNN reports that the bank admitted to cheating up to 3.5 million people and that you created 3.5 million fake accounts, forcing customers into unneeded auto insurance and charging mortgage borrowers undue fees. Is it true that this number may be as high as 3.5 million, Mr. Sloan?

Mr. SLOAN. It may be as high as 3.5—

Mr. GREEN. Thank you. And is it also true that Wells Fargo has a clawback provision? You understand what clawback is, you are the CEO.

Mr. SLOAN. In terms of executive compensation?

Mr. GREEN. Yes, long-term—

Mr. SLOAN. Yes, that is correct.

Mr. GREEN. —performance compensation stock.

Mr. SLOAN. That is correct. And our Board has enforced that clawback—

Mr. GREEN. Is it true that the stock prices of Wells went up in some part because of the 3.5 million fake accounts?

Mr. SLOAN. I don't—

Mr. GREEN. Well, let's assume that it did. If it did, and it is true also that 86 percent of your 2017 salary was in stock, is this true? 86 percent?

Mr. SLOAN. Yes, that is correct.

27

Mr. GREEN. 86 percent in stock. As a matter of fact, you made 291 times what the median worker made in 2017, is that correct?

Mr. SLOAN. Yes.

Mr. GREEN. The median worker made a little bit more than $60,000, so you made 291 times $60,000-plus dollars, correct?

Mr. SLOAN. That is correct.

Mr. GREEN. Has any portion of your salary been clawed back?

Mr. SLOAN. No portion of my salary—

Mr. GREEN. Excuse me, I must continue. No portion of your salary has been clawed back. Is it true that you were over this department where these atrocities manifested themselves?

Mr. SLOAN. I am today a CEO, but I wasn't when—

Mr. GREEN. What were you doing when these atrocities were taking place?

Mr. SLOAN. Well, from 2011 to 2014, I was the Chief Financial Officer, and then I became the Head of Wholesale Banking, and then I became the Chief Operating Officer, so there was a period of time before I become CEO that the community bank reported to me, and that is the point in time when I sat down with our head of the community bank and suggested that she was not the right person to continue—

Mr. GREEN. She reported to you?

Mr. SLOAN. She reported to me for approximately 7 months and she stopped—

Mr. GREEN. And she was reporting to you because she was over this department?

Mr. SLOAN. That is correct.

Mr. GREEN. So, let me just ask you this, does the buck stop with her, or does the buck stop with you?

Mr. SLOAN. Well, the buck stopped with her, and she is no longer with us—

Mr. GREEN. Oh, no, no, no. It stopped with her because you eliminated her. But the question is, where were you? Were you above her?

Mr. SLOAN. So for 7 months—

Mr. GREEN. Were you above her?

Mr. SLOAN. For a short period of time—

Mr. GREEN. All right, for a short period of time, and for that short period of time, you took corrective action, is your point?

Mr. SLOAN. That is correct.

Mr. GREEN. Okay, now, again, you made 86 percent of your salary in stock. That was in 2017. Prior to that, you made some portion of your salary in stock, is this true?

Mr. SLOAN. Most of my compensation, since I have become an executive officer has—

Mr. GREEN. It has been in long-term performance stock, agreed?

Mr. SLOAN. That is correct.

Mr. GREEN. So before 2017—in 2016, 2015, 2014, how much has been clawed back?

Mr. SLOAN. About $7.5 million.

Mr. GREEN. How much of this $7.5 million was clawed back at the time of this dastardly deed of some 3.5 million fake accounts being opened, how much of it was clawed back at that time?

28

Mr. SLOAN. It was clawed back, the Board decided to cut the equity vest that I received for 2016—in 2016 for these matters.

Mr. GREEN. 2016?

Mr. SLOAN. Yes, that was the way that the entire—

Mr. GREEN. When did this atrocity start?

Mr. SLOAN. Well, in terms of the retail sales practice issue—

Mr. GREEN. Yes.

Mr. SLOAN. It started before then.

Mr. GREEN. All right. So you did not receive any clawback in years other than the one that you called to my attention?

Mr. SLOAN. I wasn't responsible for those groups—

Mr. GREEN. Well, you were a beneficiary. You see, there are times when responsibility is not the gravamen of the circumstance. Being the beneficiary brings with it some liability, as well. You received benefits that you didn't earn because you inflated the stock. Not you personally, stock prices were inflated by virtue of 3.5 million accounts. People invested because of the belief that there were 3.5 million accounts.

Madam Chairwoman, thank you. I yield back.

Chairwoman WATERS. The gentleman from Kentucky, Mr. Barr, is recognized for 5 minutes.

Mr. BARR. Thank you, Madam Chairwoman. Mr. Sloan, you have blamed the unauthorized account scandal in part on the incentive plan that focused on product sales rather than customer service, is that correct?

Mr. SLOAN. That is correct.

Mr. BARR. And Wells Fargo has discontinued that incentive program, is that correct?

Mr. SLOAN. That is correct. When I stepped into the role as CEO we ended the incentive plan and we introduced a new incentive plan in January of 2017. The important point is that incentive plan was not developed the way prior incentive plans were done. It was done on a team basis among our business, our legal, our risk, and our human resources group.

Mr. BARR. And that was a big part of the problem as you diagnosed it?

Mr. SLOAN. Oh, absolutely.

Mr. BARR. Let me focus, though, on another issue that you have testified about, and that is the bank's decentralized structure, your management structure and the remedial actions you have taken to change that management structure. Can you explain how risk and compliance reporting was previously in a decentralized format?

Mr. SLOAN. Yes, the majority of our risk and compliance team were in each of the business lines. Since I have become CEO, what we have done is we have centralized the risk and compliance team, creating a much larger corporate risk and enterprise group that has I think now almost 10,000 people in it. And so, that has created a much better check and balance—

Mr. BARR. So is it fair to say that now, after these changes have been put into place, all of the compliance, all of the enterprise controls are now reporting directly to the CEO?

Mr. SLOAN. They are reporting to the Chief Risk Officer who reports to me administratively, and then under our structure, the Chief Risk Officer also reports to the Chair of our risk committee.

29

Mr. BARR. Whereas previously during the account scandal, these compliance officers were reporting independently in different business lines, is that—

Mr. SLOAN. Well, it was actually more complicated than that and confusing, and that created some of the issues in that the centralized corporate risk team was very small and most of the risk professionals were in the lines of business.

Mr. BARR. You have now centralized these enterprise controls, and on March 1st, it was reported that you hired a Chief Enterprise Risk Officer to supervise for risk across all business lines.

Mr. SLOAN. That is correct, Mandy Norton.

Mr. BARR. And what is this person's role?

Mr. SLOAN. Mandy is responsible for managing all of our enterprise risk and control function, including compliance.

Mr. BARR. And whom does she report to?

Mr. SLOAN. She reports to me.

Mr. BARR. And is this the industry standard?

Mr. SLOAN. It is.

Mr. BARR. Okay. But you did not have that structure in place during the account scandal?

Mr. SLOAN. That is correct.

Mr. BARR. So now you have made the reforms to live up to the industry standard on this new management structure, is that fair to say?

Mr. SLOAN. I would describe this as very consistent with the industry.

Mr. BARR. Okay. And why did it take more than a year under the Fed's consent order to permanently fill this new Chief Enterprise Risk Officer position?

Mr. SLOAN. Well, we looked to find the best Chief Risk Officer that we could, and Mandy agreed to join us. She had a garden leave with her predecessor and that took some additional months, but she joined us in the summer of last year. She is doing a great job, by the way.

Mr. BARR. Obviously, there is more work to be done, because you are still operating under these consent orders. But you have obviously discontinued the incentive plan, you have changed the management structure, and so compliance reporting is now centralized, now consistent with the industry standard. It appears to me that none of these issues that contributed to the account scandal have anything to do with your institution's size. It has to do with your management structure, your culture, and obviously this incentive program. Do you agree with that?

Mr. SLOAN. Yes.

Mr. BARR. Okay. So the issue in the institution was not a matter of size, it was a matter of culture, it was a matter of having an incentive program that prioritized product sales rather than customer service, and it had to do with a deficient management structure, is that fair to say?

Mr. SLOAN. That is a fair summary.

Mr. BARR. Okay, thank you. I yield back the balance of my time.

Chairwoman WATERS. The gentleman from Missouri, Mr. Cleaver, Chair of our Subcommittee on National Security, Inter-

30

national Development and Monetary Policy, is recognized for 5 minutes.

Mr. CLEAVER. Thank you, Madam Chairwoman.

Thank you, Mr. Sloan, for being here. Missouri, the State from which I come, has an average income of slightly less than $40,000 a year. And we have, according to the Missouri Department of Higher Education, about 250,000 students in 2-year and 4-year universities or schools.

And so my concern is, if Wells Fargo holds one-quarter of all the student checking accounts, and it ends up that about half of all fees assessed to children come from Wells Fargo, what do you think the cause of it is?

I have been here for a long time. I was here when we were doing the Dodd-Frank Act and the aftermath, and dealing with the credit card companies and colleges that gave kids a sandwich and a credit card at enrollment. I think that was dumb. My son was in college, and anybody who gave him a credit card was dumb. And my philosophy is, you give them a credit card, it is the two of you, you had it.

However, I am concerned about what seems to be a disparity in the number of students who receive, for various reasons, some kind of an assessment where fees are assessed for a variety of things, I am sure.

Is there an explanation to that or is that out there in the—

Mr. SLOAN. Congressman, are you referring to our campus card program?

Mr. CLEAVER. No, no, forget that, I should have left my son out of it. But I am still upset about it, and it is hard for me to get it out, so I took advantage of this. However, my point was that Wells Fargo holds one-quarter of all student checking accounts.

Mr. SLOAN. Right.

Mr. CLEAVER. But then half of all of the assessments come from Wells Fargo.

Mr. SLOAN. We provide a free student checking account to students today, and there are some students who, because of the broad set of products and services that we provide to students that are generally broader than many of our competitors, some of those capabilities, some of those choices have a cost to them. Those are disclosed and students have the option to use those services or not. And I will promise to leave our my sons and my daughter out of my answer, too.

Mr. CLEAVER. Thank you. I do think we have made some repairs on that. But I have a little different take on culture than many people of my background.

I think people corrupt culture. I think we create a picture of it that culture is something that comes and grabs people but people create culture and culture is what is developed by people. So I am wondering what the bank is doing in terms of bringing in people who possess the skills, the character, the morality to work in an institution like this? Has the human resources process been reshaped at the executive hiring level? What has changed there?

Mr. SLOAN. Sure. When we centralized our human resources group, meaning taking it out of all of our business lines or enterprise functions, we created a much—and we hired a new head of

31

human resources from outside the company, David Galloreese, who also is doing a terrific job.

What he has done is revamped his leadership team and created a much more standard set of processes in terms of expectations for team members, which I mentioned earlier, leadership expectations, management expectations. We have changed our training in terms of including our code of ethics training that I mentioned earlier.

So there are significant changes that are going on in our human resources group to make sure that we hire the right folks not only at an entry-level, where we hire a very diverse set of team members, but also at a senior leadership level.

Mr. CLEAVER. Thank you.

Chairwoman WATERS. The gentleman from Colorado, Mr. Tipton, is recognized for 5 minutes.

Mr. TIPTON. Thank you, Madam Chairwoman.

Mr. Sloan, you just commented to my colleague, Mr. Barr, that you have changed how the incentive plan works. Obviously, it was a perverse incentive plan that was driving your employees to sign up people for programs that they did not want to have.

The New York Times article, which has been referenced several times, noted that some of your employees have said you simply changed the incentive plan. How do we come to a conclusion on that discrepancy? Have things really changed in terms of how incentives to be able to drive businesses are not going to be impacting employees' decisions maybe in terms of opening new accounts, moving funds for the customers that Wells Fargo has?

Mr. SLOAN. Now that I appreciate that the reference was from The New York Times article, we disagree with almost every statement that was made in that New York Times article. That is patently not true.

The new head of our consumer banking group, Mary Mack, has fundamentally changed how folks are incented in a retail banking business. We have a new plan in place. That plan is overseen not only by the business but by a risk team. It incents our team to provide customer service and advice, there is risk oversight, the focus is about growing relationships over time and it is about working better as a team.

When we survey our team, and we do that every quarter in terms of getting their feedback as to how—which we hadn't done historically—they appreciate and like that new incentive plan, they love it. And they not only say that, that is how they act in terms of how they think about Wells Fargo because the team member turnover, which was a significant issue in our retail bank before the changes that I have made since I have become CEO have been made, was very high.

Now, it is down to its lowest level that we can remember. It has gone from the low 30s to the low 20s, which I think is leading in the industry. Mary and her team have done incredible work. The statements in The New York Times are just wrong.

Mr. TIPTON. I appreciate your comments. You know, Comptroller of the Currency Joseph Otting had suggested before Congress that he is uncomfortable with the management of the bank at Wells Fargo. I know from my experience in small business that typically

32

it is from the top down is going to achieve some of the outcomes or some of the impacts that any business will have.

What education efforts are you making at Wells Fargo for your managers who oversee the sales and other departments to be able to implement the changes that you see the bank needing to make?

Mr. SLOAN. We have an extensive team member training program that applies to everybody in the company, not just entry-level team members. Generally, even senior leaders including myself, are required to take anywhere from 10 to 15 different training classes a year.

In addition to that, we have changed the number of layers that we have by reducing them so that we have our senior leaders closer to our customers and to our customer-facing team members. I encourage our team to be out with our customers, with our customer-facing team members. I love doing that. That is how I get a lot of the information that I use to manage the company, by talking to our team, by taking their feedback.

Mr. TIPTON. And just to clarify, do you believe that you have a fiduciary responsibility to your customers, to your small business clients as well as a bank? Do you have that fiduciary responsibility?

Mr. SLOAN. I have a responsibility to serve our customers according to the rules and regulations of this country and to provide them with the best service and advice that we can. And I take responsibility for that as CEO.

Mr. TIPTON. In terms of some of the remediation that you are trying to do, you have said that you pledge to contact all 110,000 customers who were incorrectly charged with the rate lock extension fee for a mortgage. How many have you actually contacted, and how many of them have been made whole?

Mr. SLOAN. All of them, and all of them. And when we contacted them, we gave them two choices. If they felt based on their experience that they were inappropriately charged for a rate lock, they would check a box and we would send them a check. If they felt on their—and it is their own decision—that they were improperly charged for the rate lock, they would check the other box. All of those customers have been remediated.

Mr. TIPTON. And how about the 450 servicemembers who were affected by the illegal car repossessions? How many of them have been remediated and contacted?

Mr. SLOAN. That should have never happened to our servicemen and women, I feel horrible about that. We have remediated all of the servicemen and women and we fundamentally changed our SCRA oversight. We have created an SCRA Center of Excellence. And the consent order that was introduced by the OCC has now been lifted on that matter.

Mr. TIPTON. Okay. Thank you.

Chairwoman WATERS. The gentleman from Colorado, Mr. Perlmutter, is recognized for 5 minutes.

Mr. PERLMUTTER. Mr. Sloan, good morning.

Mr. SLOAN. Good morning.

Mr. PERLMUTTER. Thank you for your testimony today. And I can say, I have been a customer of the bank for 40 years. And in—

Mr. SLOAN. Thank you.

33

Mr. PERLMUTTER. —Applewood, Colorado, the people at that branch have just really been excellent, so I am happy about that.

I am not happy about the 14 consent decrees or the $14 billion or so of settlements that you have that the bank has entered into. And I want to ask about a specific area where I think there is a lot that can be done to continue to remediate your reputation and your customers' harms, and that is on guaranteed auto protection, guaranteed asset protection. And that is the insurance, the add-on insurance that people had to get to cover the difference between whatever the loan amount was and a collision or something like that, to cover the bank.

You say you are dedicated to compensating every customer who suffered harm because of your mistakes. That is your testimony today.

Mr. SLOAN. That is correct.

Mr. PERLMUTTER. I looked at the settlement that you entered into with the attorneys general—

Mr. SLOAN. Yes.

Mr. PERLMUTTER. —and in paragraph 22, it says, "Wells Fargo has agreed to provide refunds of the unearned portion of the cost of GAP, guaranteed auto insurance, to auto finance customers in certain states whose laws impose refund-related obligations through statutory provisions." That is only 11 States.

Mr. SLOAN. That is correct.

Mr. PERLMUTTER. Okay. So for the other 39 States, and the District of Columbia, and the Territories, what are you doing?

Mr. SLOAN. We are not going to be refunding those customers because that transaction was actually a transaction between the customer and the auto dealer. We were not involved in the customer's decision to buy that insurance. In those, it was originally 9 States and now 11 States, there was a requirement. And we should have had better operational oversight to ensure that when the auto loan was paid off, that the GAP refunds were received by the customer. And those are the customers that we will be remediating.

Mr. PERLMUTTER. So if there is a GAP, if there is a refund due, you are paying it?

Mr. SLOAN. That is correct.

Mr. PERLMUTTER. Okay. And you paid at least that in 11 States to these attorneys general?

Mr. SLOAN. No, we are paying it directly to the customer.

Mr. PERLMUTTER. Paying it directly to the customer. But you are saying in the other 39 States, that wasn't the case?

Mr. SLOAN. That is correct.

Mr. PERLMUTTER. I understand there is litigation as to this particular issue in California. And you know, just listening to your testimony today, I do want to believe that the bank is looking to correct the wrongs of the past and move forward in a positive way with its customers in the future.

But as I understand it, in that litigation in California, which is a class action, you have demanded arbitration so that each individual person has to bring a claim for $100 or $200 against Wells Fargo. Now, how do you square that with, you are dedicated to compensating every customer who suffered harm because of your mistakes?

34

Mr. SLOAN. Congressman, again, the transaction that you are describing, which is when an auto customer in dealing with a dealer buys that GAP insurance, is a transaction between the auto customer and the dealer. In 11 States, our responsibility was not to impact that decision; our responsibility was to make sure that when the auto loan was paid off, the dealer paid the customer back.

Mr. PERLMUTTER. So you are saying the transaction was different in those 11 States than in the other 39 States?

Mr. SLOAN. No. The transaction was the same. Our responsibility in those States was different. Had our responsibility been similar—

Mr. PERLMUTTER. Okay. Now, we are getting to the real point. You really, in a kind of magnanimous gesture, have said you were going to take care of anybody who was harmed.

And here, you say, okay, in 11 States, you have a certain law, and we are going to treat you differently than the other 39 States and the District of Columbia because we are going to force you into arbitration. I hope that is not your testimony today.

Mr. SLOAN. What we are doing is my testimony, and, Congressman, again—

Mr. PERLMUTTER. So, you are demanding the arbitration?

Mr. SLOAN. In California, we are.

Mr. PERLMUTTER. And what about the other 38 States?

Mr. SLOAN. I don't believe we are responsible.

Mr. PERLMUTTER. You have really been taking some positive steps, but now you are backing up and saying, you know what, if you want that $100, sue me individually or demand arbitration.

I yield back.

Chairwoman WATERS. Thank you. The gentleman from Texas, Mr. Williams, is recognized for 5 minutes.

Mr. WILLIAMS. Thank you, Madam Chairwoman.

When your predecessor testified before this committee in 2016, I was very concerned. Companies must be held accountable when they are caught scamming hardworking Americans. It seemed as if the only answer that he had to the questions from the members of this committee was, "I don't know."

Well, this is unacceptable for the head of one of the largest financial institutions in the world to have such little knowledge of how his bank was functioning. And I know that Wells Fargo is still dealing with regulations, as we talked about, to try to make up for this massive mistake, and in this process of fixing, other issues have been found during this process. And we heard you say today that you have begun to err on the side of the consumer, well, that is not a new concept, but I am glad that you are beginning to do that.

With that being said, my colleagues have addressed some of the issues I was interested in hearing from you about, and I am glad that you have better answers for us today than simply, "I don't know," because that is not acceptable from a person in your position, or his either.

So, let me start off with the first question that I ask everybody when they come before this committee and the question is this, are you a capitalist or a socialist?

Mr. SLOAN. I would put myself in the capitalist camp.

35

Mr. WILLIAMS. Okay. Thank you for that answer. I would like to read you a quote from former President Obama, when he was questioned about breaking up the big banks in a New York Times interview.

One of the things that he says is, "I have consistently tried to remind myself during the course of my presidency that the economy is not an obstruction. It is not something that you can just redesign and break up and put back together again without consequences." So, my question to you, sir, is, do you agree with the sentiment from former President Obama, that breaking up the biggest banks is unrealistic?

Mr. SLOAN. I don't think it makes sense to break up the big banks, but I also believe that no bank is too-big-to-fail if they don't operate in an appropriate way.

Mr. WILLIAMS. Okay. Wells Fargo and some of your competitors have been criticized for being too big by members of this committee. Some individuals across the aisle think that institutions of your size should be broken up into smaller entities. If your bank were to be broken up into a government-mandated size, what would the effect be on innovation, efficiency, and access to capital for everyday Americans?

Mr. SLOAN. I think overall, it would deteriorate. I think there is a place in this country, and we see that today, for community banks, for medium-sized banks, and for large banks.

I think the value that larger banks can bring today is that because of our economies of scale, we can invest billion of dollars in technology and innovation and services that sometimes our medium-sized and smaller competitors can't.

A good example of that would be real-time balance alert or overdraft rewind or control tower. There are a number of products and services that we have been able to introduce because of our economies of scale and the $10 billion that we can spend on technology and innovation each year.

Mr. WILLIAMS. Okay. I came to Congress as a small-business owner, a Main Street guy. I am a car dealer, and I know firsthand how access to capital works.

Mr. SLOAN. I hope you didn't take offense to my comments about GAP insurance.

Mr. WILLIAMS. I know about raising capital, I know about taking risks and reaping the rewards, and that is crucial for growing the economy. When some of my colleagues consider making this drastic intervention in such a large portion of the economy, it sounds like a step towards socialism to me. And we don't need to look any further than Venezuela to see how that would work out.

But also, some of my colleagues on the other side of the aisle think bank profits are bad, as we have heard today. I completely disagree, I think profits are great, and I want you to be profitable, and you are and that is a good thing. With that being said, I want profits to be invested back in the community. I want to see Wells Fargo increasing small-business lending.

I want to see Wells Fargo charitable giving going to nonprofits and little league teams and putting money back into the communities they serve. I do not want to see this money going to attorney's fees and fines that are issued by the regulators because of

36

your actions. So, my final question is, can you elaborate on how you are investing your profits back into the communities all across this country?

Mr. SLOAN. Well, first, I am pro-little leagues, I used to be a little league coach, and we are very focused in Wells Fargo in reinvesting back in our communities. The way that we talk about it is, we don't believe we can be successful as a company unless the communities that we do business in are successful.

That is why I have set a goal for our company to be the most generous company in the industry, and if you look at the results from 2017, we were the second most philanthropic company in this country. In addition, I have set a new goal for our team, and that is 2 percent of our after-tax profits are going to be reinvested through our foundation.

Chairwoman WATERS. The gentleman from Illinois, Mr. Foster, is recognized for 5 minutes.

Mr. WILLIAMS. Thank you for your testimony.

Chairwoman WATERS. Mr. Williams, if you want to describe what the other side of the aisle is saying, you need to get it right. Mr. Foster, you are recognized for 5 minutes.

Mr. FOSTER. Thank you, Madam Chairwoman.

In your very nice brochure that you provided us with, I have to say that there are very high production values. You have a section on promoting diversity and inclusion that includes a little box indicating that 44 percent of the U.S. workforce is ethnically and racially diverse, 57 percent is women and so on, military veterans.

And I was wondering, can you provide either approximately right now or in detail for the record, what that breakdown would look like as a function of job classification and salary?

Mr. SLOAN. I don't have the details in the front of me in terms of job classification at the company, but I can tell you—or I can provide you with an indication of what it looks like in our leadership team. So, in our current senior leadership team, over 40 percent are women and over 20 percent are diverse.

Mr. FOSTER. Yes, but I would be interested in the range of job ranks. Because if the bulk of the employees are in sort of intermediate levels, it would be interesting to see how the diversity plays out. And do you normally report that sort of information to any of your regulators?

Mr. SLOAN. We do.

Mr. FOSTER. You do? Okay, so that the regulators at least have a uniform view of that?

Mr. SLOAN. Yes, we report it internally, we report it to our Board, and we report it to our regulators.

Mr. FOSTER. All right. So I would be very interested in seeing— if you can just give us a copy of what you report so that we can actually understand it, I would appreciate that.

Similarly, you have been talking a lot about how you changed the compensation of things to hopefully avoid the sort of problems you have been facing. And can you give us rough numbers of what fraction of the compensation today is purely hourly and salary-based? What is based on both sales and indirect sales, for example, if your unit sold a lot, then everyone in the unit gets a bonus, what frac-

37

tion is based on customer experience or customer satisfaction and what that metric might be?

Mr. SLOAN. Sure. We have a number of different incentive plans across the company but maybe what I could do is focus on our retail banking business, which has been the topic of a lot of the conversation today. So if you look at the changes that we made in our retail banking business, and you look at that entire group, which is about 100,000 people—that would also include phone bankers and phone centers and the like—about 92 percent of their compensation is in the form of salary and the remainder is in the form of bonuses. About half of that bonus would be related to risk, and then the other half would be a mix of customer service and advice—loyalty, customer experience, things like that.

And then another portion would be related to growing relationships over time, not selling products.

Mr. FOSTER. And by risk, you mean risk in the sense of having your capital position blow up or risk in the—

Mr. SLOAN. Oh no, I'm sorry, no—

Mr. FOSTER. —form of getting caught doing something else?

Mr. SLOAN. No, that is where my oversight comes in or that affects me. In terms of folks in business, it is a risk that they control. So for example, it would be making sure that they disclose products and services—

Mr. FOSTER. So it is the risk of getting—

Mr. SLOAN. —that they are responsible for, that is correct.

Mr. FOSTER. At the retail banking level. Okay. Well, I guess that was my main questions here. I yield back the balance of my time.

Chairwoman WATERS. Thank you. The gentleman from Arizona, Mr. Hill, is recognized for 5 minutes.

Mr. HILL. Arkansas, Madam Chairwoman. Thank you, Madam Chairwoman. Thank you, Mr. Sloan, for appearing before the committee today.

I want to start out by just commenting that when your predecessor was here in 2016, as somebody who has spent my career on and off for 35 years in the community banking business, I just want to express to you the same thing I expressed to your predecessor, which is just severe disappointment in the disconnect that Mr. Stumpf appeared to have at the committee. I really agree with my friend, Mr. Williams, who is a former business guy as well, that that lack of engagement that he demonstrated was severely disappointing.

And that comes from the fact that in the 1990s, when it came to Dick Kovacevich and Norwest, that was a company that all of us in community banking benchmarked against, including standards of customer service and success. And so, it was personally disappointing, and then professionally, as well.

When he was here, it was said that 900 Arkansas accounts were affected. We don't have a big retail presence by Wells Fargo in Arkansas, but in the materials you sent out before the committee hearing, it is 60 percent higher, 1,445 accounts. So it is surprising that it is up that much, and I hope that all these issues are resolved and that people are treated fairly in all of these settlements.

I was looking at some comments made by your largest shareholder, Warren Buffett, and he made a comment about Wells

38

Fargo. Talking about the long-run earning power of Wells Fargo, Mr. Buffett said, "You can't take Wells Fargo's customer base, it grows quarter by quarter and you make money off of its customers, and you make money on customers by having a hell of a spread on assets and not doing anything really dumb. And that is what Wells Fargo does."

But when asked as a follow-up, he said a couple of years later, "They made one mistake, incentives work, and they came up with improper incentives that rewarded bad behavior."

So what I want to talk about is that. You say you have changed your incentive system which is at the heart of this issue, whether we are talking about the mortgage bank or the wealth management group or the consumer bank. What is your use of independent secret shoppers at all your locations nationwide? How much money do you spend on it? You have an independent third party doing that, I presume in addition to any internal audit things you—tell me about that.

Mr. SLOAN. Yes, we do two things in our retail bank to check how our team is responding to customer needs and desires. One is we have independently collected customer service and customer loyalty scores and we do that on a weekly basis—

Mr. HILL. I don't mean to interrupt you but I want to—

Mr. SLOAN. We have a mystery shopper—

Mr. HILL. Yes. I want to know about the mystery shopper program. How often are they in your branches monthly? How big is that? How much money do you spend on that?

Mr. SLOAN. Well, we do have tens of thousands of mystery shopper visits on an annual basis. I do not know how much we spend on it, but I know that we have—

Mr. HILL. Is that a big change from prior management?

Mr. SLOAN. It is.

Mr. HILL. Like on an order of magnitude of 100 percent better or 10 percent better—

Mr. SLOAN. It didn't exist before, and now it exists.

Mr. HILL. It didn't exist. So you didn't use mystery shopping as a standard banking practice?

Mr. SLOAN. We may have used it from time to time.

Mr. HILL. Periodically.

Mr. SLOAN. But not on a consistent basis, and not to the extent that we do today.

Mr. HILL. Well, that is a major change. I know Mr. Green has mentioned that before in this committee, and really, I don't know a bank of any size that doesn't mystery shop its consumers. And I also was pleased you said that—

Mr. SLOAN. By the way, I personally mystery shop at our branches, too. When I visit one of our branches, I don't let them know I am coming. And sometimes, I don't dress like this; I dress like a normal customer. Sometimes they recognize me and sometimes they don't. It is better when they don't because I really get an understanding of how our team is interacting with our customers. I call our phone centers and don't announce—

Mr. HILL. Would you please follow up with me and give me more description of the scope of your mystery shopping program? And I will just conclude, Madam Chairwoman, with Mr. Buffett's testi-

39

mony before the Congress in 1991, "If you lose money for the firm by bad decisions, I will be very understanding. If you lose reputation for the firm, I will be ruthless." I urge you to be ruthless, Mr. Sloan.

I yield back.

Mr. SLOAN. I have had that conversation with Mr. Buffett.

Chairwoman WATERS. Thank you, Mr. Hill, and I apologize for assigning you to the wrong State.

Mr. HILL. I have no interest in Arizona, Madam Chairwoman.

Chairwoman WATERS. Thank you. The gentleman from Washington, Mr. Heck, is recognized for 5 minutes.

Mr. HECK. Thank you, Madam Chairwoman.

Mr. Sloan, thank you for being here today. Others have already pointed out the most recent CRA exam, the result of which was, frankly—there's no other way to put it—terrible. And by my count, there were at least 10 separate consumer protection violations called out. I would like to mention them.

Violations of the Fair Housing Act and the Equal Credit Opportunity Act in mortgage lending, violations of the FTC Act in mortgage lending, violation of the Consumer Financial Protection Act in the retail banking division, violations of the Servicemembers Civil Relief Act in the mortgage servicing division, violations of the Servicemembers Civil Relief Act in auto lending, violations of the FTC Act in credit cards, violations of the Consumer Financial Protection Act in student loans, violations of the Real Estate Settlement Procedures Act in mortgage lending, violations of the Fair Housing Act in mortgage lending, violations of the National Housing Act in mortgage servicing.

In addition, there were two other long-running abuses that Wells has entered into a consent order for since the report citing these violations was completed. And those include violations of the Consumer Financial Protection Act in mortgage lending, and violations of the Consumer Financial Protection Act in auto lending.

That constitutes a major consumer protection violation of a major consumer protection law in nearly every consumer-facing division of the company.

And in explaining the failing grade that you got on the CRA exam, the OCC called this, "an extensive and pervasive pattern and practice of violations across multiple lines of business within the bank." Some of your large competitors were also downgraded, sir, on their CRA exams for consumer protection violations.

But I couldn't find one, not one, with more than three compared to your twelve. So, if I am understanding correctly what you have attempted to do to remediate this, was to start at the top, reorganize by making changes. You mentioned changes in the Board, changes in the 10 direct reports.

You have created incentive systems, might I just affirm that what you incentivize, you get more of. And you have created more of a centralized reporting structure so that senior management could have eyes on these potential abuses. It seems to me, however, sir, that you are essentially trained to have it both ways.

What I mean by that is the very argument that centralizing this reporting does imply that all those changes at the top may in and of themselves have been good, but these weren't the people respon-

40

sible, because they didn't have eyes on this activity. So we have to change the reporting system.

And at the end of the day, given the pervasiveness of this, it seems to me that a couple of things are obvious. Either there was unbelievable corruption, or unbelievable incompetence, or both. It is corrupt if people saw it and didn't do anything about it. It is incompetent if they didn't know it was going on.

And yet what you have offered today is that the changes that have been made mostly affected the people who didn't have eyes on it. So, perhaps that was a structural systemic practice that needed to be changed now and brought more into line with industry practices, so good on you for that.

But the fact of the matter is that at a lower level among your approximately 60 community banking—regional banking people, for example, not all of whom have been changed by a long shot, they either knew it and didn't speak up, or didn't know it and it was their job to know it.

At the end of the day, as well, I guess I would suggest to you frankly that these structural changes and this evolution of Wells Fargo isn't what needs to occur. You don't need to evolve. You need to be reborn. And that rebirth, I respectfully suggest to you, has to reach into the ranks of those who either didn't know it and should have, or knew it and were corrupt.

And in either case, a deeper pattern of change among the people that my esteemed colleague, Mr. Cleaver, suggested to you, are the ones who bring values and integrity and character to your culture. I guess I am out of time.

I yield back, Madam Chairwoman.

Chairwoman WATERS. Thank you. The gentleman from New York, Mr. Zeldin, is recognized for 5 minutes.

Mr. ZELDIN. Thank you, Madam Chairwoman. Mr. Sloan, I want to follow up on an exchange you had with Mr. Tipton with regards to The New York Times story. Is it your position that nothing in that story is accurate?

Mr. SLOAN. Oh, it may be that some of the individual team members said those things. And I can't say that every one of our 260,000 team members—

Mr. ZELDIN. Thank you.

Mr. SLOAN. But I think in terms—

Mr. ZELDIN. Okay, I—

Mr. SLOAN. We disagree with every one of those.

Mr. ZELDIN. Okay. So, let's follow them up in more specifics. Melissa Canard, she worked for Wells Fargo and she quit in January.

Mr. SLOAN. She may have. I am not familiar with that former team member.

Mr. ZELDIN. The story states—and it has been reported that Wells Fargo would steer clients toward investments that would generate recurring fees for the bank, including in a case where it was not in the client's best interest.

After she quit, Wells Fargo sent a letter to her clients in her name announcing that she would be teaming with another Wells Fargo employee to handle their accounts. The letter stated that Ms. Canard was still at Wells Fargo and that she endorsed the employee. Is that true?

41

Mr. SLOAN. I am not familiar with that situation.

Mr. ZELDIN. Okay, it has been reported that Wells Fargo spokesmen have confirmed that that has, in fact, happened. Are you aware of this being a larger problem?

Mr. SLOAN. No, I am not. And we have looked at that issue as part in separate from that situation very closely.

Mr. ZELDIN. You can assure us that this is a unique occurrence of a former employee having a letter like this that sent on behalf of Wells Fargo?

Mr. SLOAN. I can assure you that our team who works with our clients and Wells Fargo advisors and any of our wealth management or retail banking business that provides investment products works very hard to follow the rules and regulations that they are supposed to follow.

Mr. ZELDIN. But you can't—

Mr. SLOAN. That is the feedback that we have from our risk teams that oversee that unit.

Mr. ZELDIN. Okay, but you can't assure us that there haven't been other letters like this that have been sent out?

Mr. SLOAN. There may have been. I am not aware of any.

Mr. ZELDIN. Okay, Mr. Tipton also asked you if you have a fiduciary duty to your clients. You did not answer "yes," you gave a different answer. Do you have a fiduciary duty to your clients?

Mr. SLOAN. Well, in certain businesses—fiduciary is a legal term. In certain businesses, there is a fiduciary requirement, for example in some of our wealth businesses and our Wells Fargo's financial advisor business.

In other businesses, there is not a fiduciary standard. And in those businesses, we use a standard of doing the right thing for our customers, and making sure we are providing them with the right services and products.

Mr. ZELDIN. Thank you for adding additional context to Mr. Tipton's question. I want to get specifically though into the situation with veterans. I was actually deployed myself to Iraq during this window. I am a Wells Fargo customer myself.

Mr. SLOAN. Thank you.

Mr. ZELDIN. And can you just briefly sum up—not generally, but briefly sum up specifically what Wells Fargo did to wrong our veterans?

Mr. SLOAN. Sure. We had a system in place that we have changed since I have become CEO, in which each one of our business lines was responsible for complying with the SCRA responsibilities, which we take very seriously. But unfortunately, we didn't have a standard set of rules and oversight in places. The changes that we have made, it is that we have centralized—

Mr. ZELDIN. But I am not asking about the changes. What did you do to wrong the veterans specifically?

Mr. SLOAN. In circumstances—

Mr. ZELDIN. And really quick. We are short on time.

Mr. SLOAN. Yes. In circumstances where we did not know they had been deployed, we had not given them their full rights under the SCRA Act.

Mr. ZELDIN. Okay. Then I will just sum up that you were charging servicemembers higher rates on certain loans than were al-

42

lowed. You weren't disclosing that servicemembers were on active-duty status to courts when they were facing eviction proceedings, repossessing servicemembers' vehicles without first obtaining a court order. These are some of those specifics.

I would assume you would say that Wells Fargo knew that it was doing these things as it was doing them, correct?

Mr. SLOAN. I don't think we always knew that, and part of the reason was we didn't necessarily have updated information from the Department of Defense.

Mr. ZELDIN. Well, I mean, you were repossessing a servicemember's vehicle without a court order, you didn't know that you didn't have a court order?

Mr. SLOAN. We may not have known at that time that they were deployed. And so that is why we have created this SCRA Center of Excellence so that we get up-to-date multiple times a day updates from the Department of Defense. We then have that group take a look at it before any sort of action. And it is done on a very frequent basis. And our defect rate today is zero.

Mr. ZELDIN. And I appreciate you doing what you can to address this, it is very important. But I am concerned that your regret was that—

Mr. SLOAN. It should have never happened.

Mr. ZELDIN. —you got caught, and not that you were doing it in the first place. There should have been better systems in place as our veterans were deployed.

I yield back.

Mr. SLOAN. I completely agree with you.

Chairwoman WATERS. The gentleman from Florida, Mr. Lawson, is recognized for 5 minutes.

Mr. LAWSON. Thank you. And good afternoon, Mr. Sloan.

Mr. SLOAN. Good afternoon.

Mr. LAWSON. Thanks for coming before this committee. The chairwoman and the ranking member from the minority party have really set protocol and I would like to commend you for all of the questions that you have answered here today.

And walking away from this committee, I would like for you to just tell me for—we know what the situation is, based on what we have heard here. What other five or six things that need to be re-capped again that Wells Fargo under your leadership has done to correct the financial crisis that was taking place over the last 2 years?

Mr. SLOAN. So, first, we have changed the leadership team. Second, we have changed and reorganized the company. And third, we have changed our incentive programs, not only in our retail banking business but we have had a look across the entire company related to that. So this is still part of number three. We have created a better check and balance in terms of the oversight of those incentive plans by our risk and human resources group.

I think, fourth, we have changed the way the way that we compensate team members, including raising the minimum wage, as well as making sure that they had the right benefits and we have made them all shareholders. And then, fifth, we have changed the way that we communicate to our team members, including to en-

43

courage them to raise their hand if there is any concerns that they have that they see that are going about in the company.

Mr. LAWSON. Okay. And thank you. And in reference to, which I had the opportunity to look at, The New York Times article and I heard your statement in relation to it, and oftentimes, it could be considered as fake news, you know, some of the things that were reported—

Mr. SLOAN. I just said it was inaccurate.

Mr. LAWSON. Yes, okay. Well, it was inaccurate from your standpoint.

The other thing I would ask you, which is extremely important to me because I have a lot of students in my district, is that the student debt crisis has impacted more Americans than any other consumer issue. Private lenders have placed skyrocketing interest rates on student loans, with loan conditions buried in pages of the legalistic language.

What is your company doing to lower rates in the private market when it is appropriate and to provide more transparency in terms of conditions of the loans?

Mr. SLOAN. Our student loan business is relatively small. And we generally do not make a loan to a student unless there is a co-signer or a guarantor. However, we are working on a program that we are going to be introducing this year to allow non-Wells Fargo customers or Wells Fargo customers with other student loans to consolidate those loans and then receive a lower rate.

Mr. LAWSON. Okay. And one other thing you mentioned is about the diversity that you have. And you said that a lot of women have been added to the staff. Has any African American been involved in that diversity issue?

Mr. SLOAN. Yes. I don't have any African Americans who report to me directly, but if you look at the next level of leadership in the company, that is about 100 people, there are a significant number of African Americans, including Bev Anderson who runs our credit card business, and including Titi Cole who runs the operations for our retail business.

Mr. LAWSON. Okay. Thank you.

And just before my time runs out, you mentioned about the veterans, I have a large number of veterans—retired veterans in the Jacksonville area, the largest in the State of Florida. And you all are continuing to work on that issue in reference to the problem that they had with the crisis, right?

Mr. SLOAN. Correct.

Mr. LAWSON. Okay.

With that, Madam Chairwoman, I yield back.

Chairwoman WATERS. Thank you.

Mr. Davidson, the gentleman from Ohio, is recognized for 5 minutes.

Mr. DAVIDSON. Thank you, Madam Chairwoman.

And thank you, Mr. Sloan, for your presence and clearly some thorough preparation. I have a question: Do you consider any crimes to have been committed?

Mr. SLOAN. No.

Mr. DAVIDSON. No crimes? So that would explain why no one has been charged with criminal fraud?

44

Mr. SLOAN. That is correct.

Mr. DAVIDSON. So when tellers from time to time or other people who are employed—literally hundreds of thousands of people employed by Wells Fargo commit crimes of theft, whether that is from Wells Fargo or from Wells Fargo customers, have any of them ever been charged with theft?

Mr. SLOAN. They may have been. To the extent that we find anyone has violated the code of ethics in a situation like that, our responsibilities are, one, to fire them, which we do, and then two, to file a suspicious activity report with the Federal authorities.

Mr. DAVIDSON. So in fact, there have been prosecutions and convictions of people who have stolen money from Wells Fargo and from Wells Fargo clients, in one case, $185,000 from a homeless man. And so, it is curious to me that as these acts of fraud were perpetrated that none of them violated a criminal statute in any of the States.

Mr. SLOAN. Again, I misunderstood your initial question as it relates to individual circumstances like that that may have occurred.

Mr. DAVIDSON. Okay, right. And so, in this case, aside from some of these folks no longer working for the company, are you aware of any ongoing investigations involving criminal conduct by employees at Wells Fargo in these scandals?

Mr. SLOAN. There are a number of investigations that are going on in terms of, by Federal agencies regarding Wells Fargo. I can't comment on anything beyond what we have disclosed in our 10-K and 10-Q.

Mr. DAVIDSON. So as encouraging as it is to hear some of the progress that has been made with the change of leadership, with the change in the organizational chart, many changes in terms of initiatives to try to impact and steer the culture in a different way, I think for a lot of people, they are going to feel like justice hasn't really been served, that there really are two standards, where employees of a big bank like Wells Fargo who steal in one case are held criminally responsible, and in another case, where it clearly was designed to meet performance criteria or to help the firm, well, there is no accountability.

Maybe they lost their job, maybe they didn't get their bonus, but there is no one in jail. And customers truly do have a property right in their credit score, you are reimbursing them because they have had financial harm and financial impact. They have had something taken from them and Wells Fargo is making them whole.

But the person who took it from them is not being prosecuted. And so, I feel like that is a highlight, not just for us here, but it is also something that might merit some attention by States and municipalities around the country. As you have highlighted, State law is important because you are handling cases differently with respect to GAP insurance, for example.

So, I hope we move forward on that. I am encouraged, not just by the structural changes but by the investments that even predate this in innovation. So in 2015, Wells Fargo launched an innovation center, and I wonder if you can tell me, without divulging company secrets, some of the promising things that might help with finan-

45

cial technology, better position in Wells Fargo, but also better protect Wells Fargo customers.

Mr. SLOAN. I will give you two examples. One is that in and around our innovation group, we have developed artificial intelligence capabilities to be able to scan various transactions, particularly for small businesses and commercial customers, to look for anomalies in terms of transactions and if something doesn't look right, then we will notify the customer.

On the consumer side, it would be our new Greenhouse account in relationship, it is an all mobile relationship that is focused on students and customers that—potential customers that haven't— the underbank who haven't been able to be customers, and what that allows them to do is have an all mobile relationship—

Mr. DAVIDSON. Yes, thank you for that highlight on the all mobile. And as we look at stable coins, JPMorgan just launched a token economy, and I perhaps look forward to more information on that going public if you have one in the offering. My time has expired and I yield back.

Chairwoman WATERS. Thank you. The gentlewoman from Michigan, Ms. Tlaib, is recognized for 5 minutes.

Ms. TLAIB. Thank you, Madam Chairwoman.

My 13-year-old boy the other day, asked, why say socialism or capitalism? Why not people-ism? And I thought that was genius. And in that spirit, Mr. Sloan, I want to address some of the scams that your bank launched on our people.

You know, so many people are using the words consumer abuses, scandals, but if you look at the definition of scams, they are fraudulent acts, intentional fraudulent acts. Only 5 months ago, Mr. Sloan, Wells Fargo reported that an internal investigation had thus far revealed that it erroneously denied or did not offer a loan modification to 870 customers due to an underwriting software error. Are you familiar with that?

Mr. SLOAN. I am.

Ms. TLAIB. According to Wells Fargo, your bank, the bank foreclosed on 545 of these customers based on that error. Who is held accountable for that?

Mr. SLOAN. The issue that occurred, as you described, Congresswoman—

Ms. TLAIB. No, no, we don't need to know, we know it is an error, right, Mr. Sloan? You are the boss. How do we—I mean, these 545 people didn't lose a boat; they lost their home. What are we doing? What are you doing to help them?

Mr. SLOAN. The first thing we have done is we have reached out to each one of them, we sent them a $15,000 check, which is 2 ½ times the standard that was set in the mortgage servicing settlement, and then we are asking them to come to see us and if there was additional harm that was done to them, we will make it right.

Ms. TLAIB. Mr. Sloan, the additional harm, and I can tell you this from my district, is to their credit scores, their consumer report. It is the access now to not only housing and loans, you know this, but to employment. I have young people who can't even get into the military—I mean, there are all of these things that are tied to it. Car insurance, everything is tied to consumer reports.

46

How do you address that? Those are things that are really important and I just want to mention that. I have other questions that are really important.

Mr. SLOAN. So, if I could answer that question—

Ms. TLAIB. Yes. Go ahead—

Mr. SLOAN. —because I think it is a very important one, and that is why we are working very closely in terms of remediating those customers. So we have sent those customers a check for $15,000, which is I mentioned is 2 ½ times the standard that was set in the mortgage servicing center.

Ms. TLAIB. I think the credit bureau needs to know it was your mistake, as well.

Mr. SLOAN. And then what we are also doing is ask them to come in and see us and tell us what additional harm, if any, we caused.

Ms. TLAIB. But Mr. Sloan, they might not know what those additional harms are. I just want you to know.

Mr. SLOAN. We have centralized the team that is interacting with those customers, that has experience in dealing with the issues that you just described, because I agree, there could have been additional hardship that could have affected credit scores and we are making—

Ms. TLAIB. No offense, I know this is an internal investigation that you did, but I doubt it is only 545.

Now, Mr. Sloan, last week the Michigan attorney general, our attorney general, Dana Nessel, announced that debt collection was one of the top consumer complaints that her office received in 2018 so far. Neither half of the complaints were for credit reporting and debt collection. In that context, if Wells Fargo's debt collectors are required required to place 375 calls per day, how can those consumers expect to receive a good experience, but also enough time to help solve their problem?

Mr. SLOAN. I can't confirm that we have a minimum standard of 375 a day—

Ms. TLAIB. Yes, it is a quota. Okay. I would love to follow—if he can follow up and find out if that is accurate, that you have some sort of quota—

Mr. SLOAN. We have expectations for everybody at Wells Fargo.

Ms. TLAIB. No, no, no—I think—is it within—Madam, Chairwoman, I know I am—

Chairwoman WATERS. You still have additional time.

Ms. TLAIB. Yes. I know I am new here. But, Madam Chairwoman, if later on, I am pretty sure, Mr. Sloan, you will have a certain period of time to answer that question in writing, so go back, talk to your team, and I would love the answer to that.

Really quickly, there have been a number of claims as a person who is a civil rights attorney in Detroit, I can tell you one of the things that claims of targeting black and Latino communities, and a number of lawsuits, not only in California, and Madam Chairwoman's State, as well as in Philadelphia and others, some of the things were really disturbing.

A former Wells Fargo employee said that they were instructed to offer lender credits to borrowers in minority neighborhoods. Another Wells Fargo loan officer said they were likely to charge, and this was intentional, a higher rate to borrowers with Mexican

47

names. Was that some sort of internal memo that was going around saying, if somebody is black or Latino, this is how you approach them, with higher rates and higher—

Mr. SLOAN. None of that is true.

Ms. TLAIB. Okay.

Mr. SLOAN. And no institution in this country has done more for diverse communities than Wells Fargo.

Ms. TLAIB. Yes.

Mr. SLOAN. We have a $185 billion commitment to Hispanic and—

Ms. TLAIB. Yes, I saw that. And just—I know, Mr. Sloan, but the data is there. And I don't think these Wells Fargo employees are—but lastly, Madam Chairwoman, I would like—and I don't have time—to insert in the record this study that reveals the way racial discrimination is embedded within the structure of mortgage lending.

Chairwoman WATERS. Without objection, it is so ordered.

Ms. TLAIB. Thank you so much, Madam Chairwoman.

Chairwoman WATERS. The gentleman from North Carolina, Mr. Budd, is recognized for 5 minutes.

Mr. BUDD. Thank you, Madam Chairwoman.

And thank you, Mr. Sloan, for joining us, for your time here today. Look, I think you know better than anyone that mistakes were made and you have sought to remedy them. You have acknowledged that and you have owned up to that, and I commend you for that.

You have also said that these mistakes require fundamental and structural changes at your bank. And I know that you have been committed to this in your tenure as a CEO. But in that vein, can you highlight for this committee the most—and this is really a question of priority—important changes, in your view, that have been made at Wells under your leadership?

Maybe that is something you have not been able to highlight yet. But what changes have you made and how will those changes prevent these problems from recurring?

Mr. SLOAN. I think the fundamental change of centralizing our enterprise risk and control functions is probably the most important change that we have made from an enterprise standpoint because what it does, regardless of leadership, is create an appropriate check and balance in terms of ensuring that we are providing the right products and services to our customers and managing our risks in an appropriate way, check and balance between those frontline team members across the company who are making those decisions each day, and then having the oversight to make sure that they are following all of our policies and procedures.

And then as part of that, the way that information and data is being shared today is completely different. We connect data in a different way to spot problems across the entire company. And that is fundamental to the changes that we have made since I became CEO.

Mr. BUDD. You addressed some of those problem-spotting advances that you have made with Mr. Davidson's questions. But I want to go back to some of the small business—as most folks know,

48

you are one of the largest lenders for small businesses in the United States.

Mr. SLOAN. That is correct.

Mr. BUDD. The protection of growth of small businesses is one of our top priorities, as Republicans on this committee, and also for Ranking Member McHenry. Can you tell this committee what infrastructure and controls are in place to protect these small business clients?

Mr. SLOAN. Sure. The small business group and business banking group were moved out of our retail banking business and moved into our wholesale business. So there is a different team of folks who lead those businesses today.

In addition, the oversight for those—or the check and balance in terms of enterprise control functions is outside of the business line. So that the changes that I talked about that are enterprise-wide also apply to a small business lending, both in terms of our obligations under following the SBA rules and regulations as well as non-SBA type of small business lending.

Mr. BUDD. So what additionally would you say in regards to small businesses? You addressed it a little bit, but to make sure they are being treated fairly. I mean, these people are coming out and they are operating no longer as an individual, but now as an entity in small businesses. So how are you making sure that they are treated fairly?

Mr. SLOAN. Well, we are making sure that we have the same checks and balances in place for those customers that we do for customers outside small business.

Mr. BUDD. Very good. I know it has been a tough day, and it is probably even tougher knowing that you are talking to an App State grad and that you went to Michigan, but I appreciate your time today.

And Madam Chairwoman, I yield back.

Chairwoman WATERS. Thank you.

The gentlewoman from California, Ms. Porter, is recognized for 5 minutes.

Ms. PORTER. Mr. Sloan, thank you for your patience during this hearing.

In November 2016, you said, "I am fully committed to taking the necessary steps to restore our customers' trust." You also said on a call in January 2017, "We have already made progress in restoring customers' trust and we have remained committed to being transparent with investors." In your 2017 proxy statement to investors, you said, "Restoring your trust and the trust of all key stakeholders is our top priority."

Those statements, to me, are pretty vague. They sound like they might be obscure, empty promises. Do those statements really mean something to you, Mr. Sloan?

Mr. SLOAN. They do.

Ms. PORTER. Why should we have confidence in those promises, in those statements you have made?

Mr. SLOAN. Well, when you look at the changes that I have made since I have become CEO, you see that team members are much more excited about working at Wells Fargo. They like what they do. Team member voluntary turnover is down to its lowest level in

49

6 years. The feedback we get from our team in terms of the changes that we have made is positive.

We still have more work to do, I don't mean to suggest that we are done. I don't think we should ever be done. Likewise, our customers are feeling the same way.

Ms. PORTER. Okay. So it is safe to say that the statements you have made mean something to you and that customers and investors can rely on those statements?

Mr. SLOAN. That is correct.

Ms. PORTER. Okay. Then why—Mr. Sloan, if you don't mind my asking—are your lawyers in Federal court arguing that those exact statements that I read are "paradigmatic examples of non-actionable corporate puffery on which no reasonable investor could rely?"

Mr. SLOAN. I don't know why our lawyers are arguing that. You asked me a direct question in terms of, do I believe in the statements that I have made—

Ms. PORTER. Well, I understand that is convenient—

Mr. SLOAN. —and the answer was absolutely correct.

Ms. PORTER. Mr. Sloan, you are a personally named defendant in Purple Mountain Trust v. Wells Fargo and Timothy J. Sloan. Are you lying to a Federal judge or are you lying to me and this Congress right now about whether we can rely on those statements?

Mr. SLOAN. Neither.

Ms PORTER. It is convenient for your lawyers to deflect blame in court and say that your rebranding campaign can be ignored as hyperbolic marketing. But then, you come to Congress, and you want us to take you at your word. And I think that is the disconnect, that is why the American public is having trouble trusting Wells Fargo.

Mr. Sloan, I also want to ask you about—when we met, you said that Wells Fargo is taking an "expansive view of remediating its customers who have been harmed." Why then are you fighting tooth and nail in Federal court to avoid returning about $350 to each of 50 auto loan customers in Southern California? And the money I am talking about, to be clear, is loans these customers paid off early, meaning they are now entitled to a partial refund of their GAP insurance.

Mr. SLOAN. Because it is not our responsibility to ensure that customers receive those refunds from the dealers who receive that money. It never went through Wells Fargo.

Ms. PORTER. Your salespeople sold them that GAP insurance. It was part of the transaction when those customers took out the automobile loans.

Mr. SLOAN. That is incorrect. The transaction occurred between the auto dealer and the customer. Wells Fargo was not involved. We never sold GAP insurance.

Ms. PORTER. You never sold GAP insurance. Do you profit from the sale of GAP insurance?

Mr. SLOAN. No.

Ms. PORTER. Okay. Because the situation that I am understanding for these customers, is that they are being told that if they want a refund of their own money to which they are entitled because they paid off their loans early, they have to write a formal

50

letter and mail it to American Heritage Insurance servicers. Why is this money just not being automatically refunded?

Mr. SLOAN. Because it would—in that circumstance, and I will take that circumstance as being correct, Wells Fargo did not receive that money. That is a transaction between the customer, the auto buyer, the dealer, and the GAP insurance company.

Ms. PORTER. So, the GAP insurer would be the one who should be doing these refunds in your view?

Mr. SLOAN. That is correct.

Ms. PORTER. Okay. My last question relates to what Ms. Tlaib, my colleague, was asking you about. As you know, I was very involved with the national mortgage settlement—I was the California monitor for the settlement. In your brochure, you said that attempts to contact the remaining affected customers are ongoing. This is the 870 people that you failed to give a modification to and the 545 that you wrongly foreclosed on. I think this means there are more problems there. Is that correct?

Mr. SLOAN. We don't believe so. What we have done in that circumstance is we have asked our audit team to review the internal review that the business and the independent risk function did. And we don't believe that is the case.

Ms. PORTER. Okay.

Chairwoman WATERS. The gentleman from Tennessee, Mr. Kustoff, is recognized for 5 minutes.

Mr. KUSTOFF. Thank you, Madam Chairwoman. And I appreciate Chairwoman Waters scheduling this very important hearing today. Mr. Sloan, I appreciate you appearing today.

You have answered a lot of questions, frankly, a lot of tough questions about the problems that have existed at Wells Fargo that have led to several cases, a number of cases being brought against the company by Federal regulators as well by affected customers.

For the record, I want to state that I clearly believe it is critical to our entire financial system that Wells Fargo continue to do everything that it possibly can to identify the customers affected, to compensate them accordingly, and most importantly to make sure that this never happens again.

I also think it is very important that Wells Fargo continue to cooperate with Federal regulators and with Federal authorities. And I think it is your testimony today that you are doing that.

Given the number of scandals and admissions by Wells Fargo that there are customers who have been affected that you can't identify, what are you doing? What is Wells Fargo doing in order to try to identify these people who when their accounts when opened by your employees, they have been opened with incorrect and frankly fraudulent contact information?

Mr. SLOAN. So for example on the retail sales practices matter, when we contacted over 40 million customers through 264 million different interactions, we sent them all their accounts and said, let us know if any one of those accounts was opened inappropriately. And if that is the case, then we will make it right by you.

And we have had multiple interactions with those customers. And so, we have done our best to try to ensure that any customer who feels that an account was opened inappropriately, that we make it right by them.

51

Mr. KUSTOFF. Some of these customers may find out on their credit reports obviously, that accounts have been opened without their authorization. Their credit history therefore would have been impacted.

I have two simple questions that, frankly, require simple answers. Is Wells Fargo working with these customers to help repair their credit scores?

Mr. SLOAN. Oh, absolutely. What we found—and generally when we opened up a deposit account, we didn't run a credit check. The instances that we were most concerned about would be in a situation where there was a credit card that was opened up inappropriately.

And in those circumstances, about—and 40 percent of the time when we did a credit pull there was no impact on the credit score, in the other—in roughly half, the credit score actually went up. What we are concerned about are the situations in which the credit score went down.

Where it went down, it generally went down between four and nine points. That is a range that can have a bigger impact on some people because it generally impacted customers with higher credit scores more than customers with lower credit scores.

But we are asking any of those customers to come in to see us so that if there was any impact, that we would make it right by them. In addition, those customers can also take part in the class action settlement.

Mr. KUSTOFF. Right. Let me ask it another way, because as you know, dealing with credit bureaus is not easy for the consumer. Is Wells Fargo working with the credit bureaus to try to help those customers?

Mr. SLOAN. Oh, yes. In any situation in which we found that by our error, we provided inaccurate information to the credit bureaus, we are correcting that information.

And again, we are asking our customers to contact us if they believe that is not correct. We believe that once we do that, it is correct. And to ensure that if there is any impact.

Mr. KUSTOFF. On your website, on the frequently asked questions portion of your website, you acknowledge about the consent order being in effect, that you are aiming to meet the requirements of the consent order by 2019. We are now in March of 2019. Have you had conversations with the Fed or any other Federal regulator about lifting the consent order or consent orders?

Mr. SLOAN. We have a very constructive relationship with all of our regulators. And by the way, I don't think I have said enough today that the feedback that we have received from our regulators on all of these issues has been very helpful in terms of us making progress and improving risk operational oversight customer compliance across the board, every regulator, the Fed, the OCC, the CFPB and so on. But in terms of our—

Chairwoman WATERS. Time has expired—

Mr. KUSTOFF. I yield back my time.

Chairwoman WATERS. The gentlelady from Iowa, Mrs. Axne, is recognized for 5 minutes.

Mrs. AXNE. Thank you, Madam Chairwoman. And thank you, Mr. Sloan, for being here, I appreciate it. I value the employers in

52

my district. And as I know you are aware, Wells Fargo employs almost 15,000 Iowans in my district.

But when The New York Times quotes Mark Willie, one of those Des Moines employees who graciously is here today, saying that there is an overwhelming sense of frustration, I will take notice.

That article describes that in Des Moines, workers are expected to handle 33 calls an hour and recoup $40,000 per month. So, let me clarify that, that is 1.8 minutes per call. Can you confirm that you use these targets to evaluate your debt collection employees?

Mr. SLOAN. I am not familiar with those specific targets, Congresswoman.

Mrs. AXNE. Well, I am told you use a four point scale, and that completing a call every 1.8 minutes only gets you a three, so it doesn't even get you to the top of that scale. Can you confirm that Wells Fargo has terminated employees for not meeting these targets?

Mr. SLOAN. I am not aware of that, no.

Mrs. AXNE. Well, I spoke to an employee who said that people—

Mr. SLOAN. I am not saying that we didn't. I am just saying I am not aware of terminating any team members related to that incentive plan.

Mrs. AXNE. Thank you. I spoke to an employee who said that people have been fired for not reaching these goals, and I want to add that hitting these goals is far more based on random luck of who picks up the phone than anything that they can control.

I actually spoke to one of your account retention specialists and he described a system where if he fell below 90 percent of his target in any key performance indicator, then he would receive an informal warning. If he fell below an A, essentially, he would receive an informal warning. If that persisted for 3 more months, then he would get a formal warning and then be reviewed for termination.

This sounds to me like those cash bonuses that were used for hitting targets previously, that caused all of these issues at Wells Fargo, are now being switched out for an incentive just to keep people's jobs, and I would argue that is even worse.

My entire career has been focused on organizational development and helping people perform better so organizations reach their goals, and when I hear that people are afraid to use your ethics line because of fear of retaliation, I fail to see how you have changed your culture.

Mr. SLOAN. Congresswoman, retaliation has no place in Wells Fargo today. We have fundamentally reorganized our ethics line since I have become CEO. I brought in an independent third party to look at our ethics line in conjunction with our human resources and risk team. All of the calls that go to our ethics line go first to an outside third party.

Mrs. AXNE. I appreciate that, thank you. Reclaiming my time. I appreciate that. Certainly, we know that people have said they don't feel comfortable in doing that because they have actually seen the retaliation, but moving on.

In September 2018, Wells Fargo announced it planned to reduce its workforce by laying off as many as 26,000 workers, and then in November of 2018, Wells announced it was laying off 1,000 employees, and 400 of those were in Des Moines, is that correct?

53

Mr. SLOAN. We never announced that we were going to lay off up to 26,000 employees. What is said at a town hall where I—

Mrs. AXNE. Did you lay off 400 employees in Des Moines?

Mr. SLOAN. I was just referring to the first part of your question.

Mrs. AXNE. I appreciate that. But—

Mr. SLOAN. And that is not an accurate statement.

Mrs. AXNE. Okay.

Mr. SLOAN. Generally, what I said was that that over the next 3 years, we expect our total employment to reduce by between 5 and 10 percent.

Mrs. AXNE. Thank you.

Mr. SLOAN. And most of that is—

Mrs. AXNE. I appreciate that, but I am concerned about the people in my district. Were 400 of those people in Des Moines?

Mr. SLOAN. Four hundred folks were displaced in Des Moines. And—

Mrs. AXNE. And what was the reason for that layoff in Des Moines?

Mr. SLOAN. It depended upon their job. Some of those folks were displaced because of the fact that the amount of servicing demand that we had in the mortgage servicing business had declined. There were other reasons. Somewhere between—

Mrs. AXNE. I have a signed affidavit here saying that an employee in Des Moines was told her job was being moved to India, and that employees in that area have gone to India to train those replacements.

And then, I have also heard from employees who are using your virtual classrooms for that same purpose, to train people in other countries. Are these most recent layoffs really just you moving jobs overseas?

Mr. SLOAN. No, that is incorrect.

Mrs. AXNE. Okay, well, you have added more than 10,000 employees between India and the Philippines in the last 5 years, and I know you are building a new facility in the Philippines for another 7,000 employees, I believe. Can we expect that more of your planned layoffs are just going to be jobs moved overseas?

Mr. SLOAN. No, I don't think that is going to be the case. We have 20,000 job openings in Wells Fargo today. Ninety percent of those are here in the U.S., probably more than that. We hire between 40,000 and 50,000—

Mrs. AXNE. I appreciate that. I fail to understand, though, how we are laying people off in this country and building jobs overseas. Thank you.

Chairwoman WATERS. Thank you. The gentleman from Wisconsin, Mr. Steil, is recognized for 5 minutes.

Mr. STEIL. Thank you. I want to start by thanking Chairwoman Waters for calling today's hearing. I think it is important that we understand what went wrong at Wells Fargo and ensure that the meaningful remedial actions have been taken.

We have heard a lot of discussion today about the bank scandal and I think Members on both sides of the aisle are committed to holding Wells Fargo accountable and preventing future abuses. I also recognize that we are having a valuable discussion today about the role that big banks play in our financial system.

54

Mr. Sloan, according to the figures your company has released over the past few years, a significant number of Wisconsinites have been harmed by Wells Fargo's practices. Almost 9,000 customers have been impacted by unauthorized accounts, 9,500 were harmed with the auto insurance scandal, and the bank's mortgage rate lock scheme affected over 900 people.

My concern is that the reputational damages that have occurred to Wells Fargo are bleeding over into other banks that are by and large acting and abiding in a legal and ethical manner.

And so, I am looking at this reputational damage and I am nervous that we are going to walk away with a view that having a strong, healthy financial services in our country is important.

And so, I hope that we can come away from this hearing with an understanding that in order to have a healthy, vibrant economy that provides opportunities for all Americans, we need to have a financial services sector that includes big and small institutions and operates with customers in mind.

I would like to dig down—we have heard today a little bit about the size of the operation. Do you think the size of the bank caused the problems? Or was it an issue with the culture and incentives that were in place at Wells Fargo?

Mr. SLOAN. I think it was driven by our organizational structure, some of our incentive plans, and leadership.

Mr. STEIL. So, it's fair to say that you don't think it was too-big-to-manage?

Mr. SLOAN. No, I don't.

Mr. STEIL. I would like to jump over—you mentioned that you now have a starting wage at $15 an hour.

Mr. SLOAN. That is correct.

Mr. STEIL. Is that because you felt that you needed to bring in people of high quality, high talent, to come in and alter some of the problems that were existing before?

Mr. SLOAN. Well, I think our team before we changed our minimum wage was high quality and was doing a good job in meeting their customer needs. What I was concerned about is that the turnover at many of those entry level roles was too high, and so what that could create would be an inconsistent experience with our customers.

So, while the expense of increasing our minimum wage was high initially, I thought it was the right long-term decision in terms of reducing our turnover, and that is exactly what we have seen.

And that has created a better experience because our customer experience and loyalty scores in those areas that were most impacted by the increase in the minimum wage have actually gone up. So, I think it was the right decision to make.

Mr. STEIL. I am supportive of driving up those wages caused by market forces, that is how you are recruiting individuals to come into the bank, not by socialism or "people-ism," but by a free market approach that is moving wages up and then ultimately improving the customer experience at Wells Fargo?

Let me shift slightly and go over to the oversight role. Your Chief Enterprise Risk Officer is now a direct report to you?

Mr. SLOAN. That is correct, Mandy Norton.

55

Mr. STEIL. And that has been an effective way—that conversations continue ongoing between you and your Chief Compliance Officer?

Mr. SLOAN. Oh, absolutely, I interact with Mandy every day, and we talk about a variety of things. In fact, one of the changes that we have made since Mandy has joined the company is that we have a new Enterprise Risk and Control Oversight Committee that she and I both Chair.

We hold that meeting on a monthly basis. Those meetings are ways—and we have that kind of structure in each one of our business lines, and enterprise control functions, that is where key risks in the company are determined and discussed. And those meetings have been very helpful. Anything that comes out of those meetings is then escalated to our Board and our Board risk committee.

Mr. STEIL. I appreciate that, thank you for your time. I yield back the balance of my time.

Chairwoman WATERS. Thank you. The gentleman from Illinois, Mr. Casten, is recognized for 5 minutes.

Mr. CASTEN. Thank you, Madam Chairwoman. Thank you, Mr. Sloan, for coming here today.

I have some math questions, and these are I think straightforward, but I am scratching my head. If I am following the math right, last year you had about $3.5 billion in fines.

Mr. SLOAN. I'm sorry, can you repeat that?

Mr. CASTEN. You had about $3.5 billion in fines last year, if I add up the two point one, and the one, and some of the smaller ones just looking at the handouts we have here.

Mr. SLOAN. I think because that included the settlement of the RMBS matter from about a decade ago, that is correct.

Mr. CASTEN. Okay. Now, the tax cut last year saved you about the same amount. If I look at the falling tax rate, from an after-tax earnings perspective, it was about a wash for you.

Mr. SLOAN. No, I wouldn't—I would say it is a bit less than that. But it was—but there is no question that Wells Fargo—

Mr. CASTEN. Squint your eyes, it was pretty close.

Mr. SLOAN. On the reduction in the tax rate, that is correct.

Mr. CASTEN. And certainly if I look at your share price, assuming constant earnings multiples, your share price today is about where it was in 2017, so the market seems to have said, plus one, minus another, you are about even. The first question is, given that a lot of your senior executives, your compensation is tied to share price in some fashion, is that about a wash for you personally, for the senior leadership team?

Mr. SLOAN. I'm sorry, I am not following in terms of wash—

Mr. CASTEN. You are down $3.5 billion worth of fines, you are up $3.4 billion dollars in terms of avoided tax revenue, so your earnings are about constant. Your price earnings ratio looks to be about constant because your share price is about where it was in 2017.

Mr. SLOAN. That is correct, but I would say there were a number of other variables that had an impact in terms of our results.

Mr. CASTEN. Okay, so here is where I start to answer my question. If this was a one-time event, you would say that market shouldn't factor it in. You know, in actual fact, 2018 wasn't an anomaly, you had $1.4 billion in penalties in 2016, $3.4 billion in

56

2013, and if I assumed the market is discounting that back, that is like your 11 price earnings ratio where you are, 15, you have been at a high. That is like 17 percent to 25 percent of your market cap that has taken a hit on these funds.

And I am scratching my head at how your investors possibly tolerate that. When I got my—I was a CEO of an energy company for a long time and one of my Board members was fond of telling the three envelopes joke that you may have heard, that when you come in as a new CEO, the old CEO says, here are three envelopes, if you hit a problem, open them in order. First one says blame the last CEO, works great. Hits a second problem, opens the second envelope, blame the last CEO, works great. Hits a third problem, opens a third envelope, and it says prepare three envelopes.

Mr. SLOAN. I only got one when I became CEO. And that was to fix problems that existed at the company, and I think the changes that I have made since I have become CEO, some of which have been easy, some of which have been hard, are the changes that are needed to satisfy our shareholders.

Mr. CASTEN. Okay.

Mr. SLOAN. Our shareholders are generally longer-term shareholders and they see the future of Wells Fargo.

Mr. CASTEN. So one would hope, but here is the problem, in 2016 you guys laid off 53,000 employees, that was supposed to address the prior change and it was structured for a lot of the reasons that you described today. A year later, you got a record-breaking fine.

You have talked a lot about the compensation changes among tellers and among junior staff. If those changes in the past haven't made a difference, what are the incentives at the senior level, and particularly what if anything has been done to the basis of short-term cash compensation in the C-Suite, and in clearly, if your equity price is basically flat after all these fines, how much do you really care if you are getting a bunch of equity compensation, because it would seem to me that the markets are kind of writing this one off?

Mr. SLOAN. We care about it a lot because most of the compensation for senior leaders at Wells Fargo, including me, is in the form of long-term equity performance. That performance—the vesting of those shares is based upon our relative performance and our return on equity measure, the total shareholder return measure, which would address the issue that you just described, as well as the achievement of certain risk requirements that have been set by us. So there is a multitude of reasons in which we would—that equity would ultimately vest in the dollar amount—

Mr. CASTEN. But you still have a one-way hedge, right? If I am sitting there and saying your share price is 25 percent lower—

Mr. SLOAN. No, because it could go down to zero.

Mr. CASTEN. Your share price is 25 percent lower than it would be if your earnings were $3.5 billion higher.

Mr. SLOAN. No, because—I'm sorry, I don't mean to interrupt, but the way that the return on equity measure would work is if we don't achieve certain hurdles relative to our peers then the equity vesting actually can be less than what the original grant would be.

57

Mr. CASTEN. But in another case, you are getting equity. If I was an owner of Wells Fargo stock, I would be much more scrupulous than it appears your owners have been. I yield back my time.

Chairwoman WATERS. Thank you. The gentleman from Texas, Mr. Gooden, is recognized for 5 minutes.

Mr. GOODEN. Thank you, Madam Chairwoman, and thank you, Mr. Sloan. Would you explain to me the forced collateral protection insurance issue, what happened, what that is, where it went wrong?

Mr. SLOAN. Yes. So, we had a business and have a business that makes auto loans. And frequently when we make an auto loan, we buy it from a dealer. When a customer takes out an auto loan they are responsible for having some level of insurance in place to protect the underlying collateral of the vehicle.

There is nothing wrong with that, that is very standard anytime somebody buys a car and takes out an auto loan—where we made a mistake was our operational oversight of what would happen if, for whatever reason, that insurance would lapse, and the customer didn't have insurance, we had contracted with a vendor to provide that insurance to our customer, the borrower, and we didn't have the appropriate oversight in those situations to ensure that the information that the vendor was using was correct.

And so in some circumstances, our vendor provided insurance to customers who already had insurance. We should have done a better job. When that issue was escalated to me when I was in my prior role as Chief Operating Officer of the company, I instructed our team, because we couldn't assure ourselves that we have proper oversight, that we should end that process and we did as of September 30, 2016.

Mr. GOODEN. Very helpful, and thank you. To that end, there was a settlement to many of the States to the tune, I believe, of about $385 million. Does that number sound correct, to pay these loan recipients back who didn't need that insurance?

Mr. SLOAN. No, they are—that is our estimation of what our remediation to customers is going to be for the collateral protection insurance. There was a separate settlement with 50 State attorneys general as well as the District of Columbia related to CPI and other consumer matters that was $575 million. And that went directly to the States.

Mr. GOODEN. Has all that been paid out so far?

Mr. SLOAN. I believe that all of it has been paid out to the States. We are in the midst of remediating customers. That is taking longer than I would like. We are about a third to 40 percent through right now. We believe that we will have all of the customers remediated by the beginning of next year.

Mr. GOODEN. Okay. Do you know what the delay is for repayment? I understand about 10 percent of the customers who are awaiting payment are in Texas. And I would just like some kind of estimation on when we can expect that.

Mr. SLOAN. Well, I think that is an example of where the relationship with our regulators has been very helpful, in particular with the OCC, where we have had a lot of give-and-take in terms of how extensive the remediation should be. We have taken a lot of really good feedback from them.

58

We now have the remediation plan in place. It has taken longer than I would have liked, and I apologize for that, but we want to make sure that it is done right. But the pace of that remediation has increased and, again, we will have everyone remediated by the beginning of next year.

Mr. GOODEN. Thank you.

I yield back.

Chairwoman WATERS. The gentlewoman from Massachusetts, Ms. Pressley, is recognized for 5 minutes.

Ms. PRESSLEY. Thank you, Madam Chairwoman.

Mr. Sloan, I wanted to follow up on a few questions that my colleagues had touched on earlier related to the corporate culture at Wells Fargo. In your testimony, you specifically referenced Wells Fargo's commitment to address some of the country's most pressing social and economic issues.

Picking up on some of what my colleague, Representative Porter, was getting at, I am encouraged by this pledge, but skeptical. Last year, Bloomberg News reported on the long relationship between Wells Fargo and the National Rifle Association. Since 2012, Wells Fargo issued approximately $431 million in loans to some of the largest firearms and ammunition companies.

Additionally, according to financial filings last year, Wells provided $40 million worth of lines of credit to Sturm, Ruger & Company. As I am sure you are aware, Mr. Sloan, Sturm, Ruger is one of the largest firearm manufacturers in the country and their products have been used in the last nine mass shootings. This company has also donated significantly to the NRA.

I bring this up because gun violence is an issue that is particularly rampant in the Massachusetts 7th Congressional District. There have been nearly 2,200 gun violence incidents in my district over the last 5 years alone.

So given your pledge and your commitment to help address some of the county's most pressing social and economic issues, yes or no, because I only have 5 minutes, do you think that stemming the epidemic of gun violence is a pressing social and economic issue?

Mr. SLOAN. I do.

Ms. PRESSLEY. Okay. So could you tell me why, when Bank of America has stopped lending to Sturm, Ruger and other companies who make assault style rifles, Citigroup announced it would cut ties, and JPMorgan announced that they are significantly cutting exposure to the gun industry—so, Mr. Sloan, what is Wells Fargo waiting on?

Mr. SLOAN. We are not waiting on anything. We want to continue to bank industries across this country that follow the laws and regulations on a local, State, and national basis, and we will continue to do that.

In addition, what we are doing is we are going to be partnering with a number of nonprofits to donate $10 million for nonpartisan research in terms of how we can reduce—

Ms. PRESSLEY. Sorry, reclaiming my time, I only have 5 minutes here.

Your website specifically states that you are committed to the highest standards of integrity, transparency, and principles performance and that you do the right thing in the right way and hold

59

yourselves accountable. And yet, you are providing millions of dollars to an industry lobby that is determined to manufacture firearms of ever-increasing lethality, firearms that have been used to murder tens of thousands of Americans each year.

So my question was actually a rhetorical question, because I already know why you have not divested from the NRA. According to IRS filings, the NRA paid nearly $10 million in banking fees between 2015 and 2016 alone to Wells Fargo. They also held up to $13.2 million in cash and cash equivalents in Wells Fargo accounts.

According to recent SEC filings, the Political Victory Fund, NRA's PAC, paid Wells Fargo nearly $71,000 in various banking fees over the last 3 years. Does this sound right, Mr. Sloan?

Mr. SLOAN. That is old data—

Ms. PRESSLEY. Well, it is not right, but does it sound like what you are doing?

Mr. SLOAN. It is not what we are doing, because we do not—the only banking relationship that we currently have with the NRA is that we have a loan which is amortizing on their building. They have moved their banking relationship outside of Wells Fargo.

Ms. PRESSLEY. Mr. Sloan, one of our first hearings on the Financial Services Committee was focused on the ways in which one's credit score can either make or break a consumer's ability to get ahead in life. For the consumers who were harmed as a result of Wells Fargo's egregious breach of trust, many are still suffering consequences from the systemic fraud that took place at your bank through hits on their credit scores.

In October 2017, you testified before the Senate Banking Committee that of the 3.5 million potentially unauthorized accounts, about 190,000 incurred $6 million in fees and charges, and that Wells Fargo was working on refunding every nickel. But in your testimony today, you did not provide much detail on your progress in making these harmed consumers whole. Could you elaborate?

Mr. SLOAN. Sure. So in addition to the outreach that I described in my testimony, what we have been able to do is continue to remediate customers. That has totaled now, as relates to retail banking sales practices, about $31 million. We are not seeing any additional customers are coming in to indicate that we haven't made things right. They can still, obviously, do that.

We are also working with the class action to make sure that they have all the data that we have, we have all the data that they have—

Ms. PRESSLEY. Excuse me. Are you removing harmful or erroneous data from peoples' credit files?

Mr. SLOAN. Oh, we have done that. To the extent that there has been anything reported that has been incorrect, we have corrected it. And to the extent that there has been an impact on them, we have asked them to let us know what it is. We have worked with them and we have remediated them.

Chairwoman WATERS. The gentleman from Indiana, Mr. Hollingsworth, is recognized for 5 minutes.

Mr. HOLLINGSWORTH. Good afternoon.

Mr. SLOAN. Good afternoon.

Mr. HOLLINGSWORTH. I want to transition some of the conversation away from the dialogue about Wells Fargo, specifically, and I

60

just want to talk a little bit more about the architecture of the financial system, especially post-crisis.

You obviously have worked in the field for very long time, and have a great deal of experience in the field. And I am curious, as an observer, about what has happened over the last 10 years; I am curious as to some of your observations. There are a couple of things I wanted to set the stage with, though.

It seems to an outsider that we have an arms race going on, an arms race between regulators and banks. Banks are getting larger and more concentrated on account of some of the regulatory efforts that have been undertaken, especially during the crisis. Some statistics, pre-crisis, about 36 percent of deposits were in institutions that have greater than $250 billion in assets; now it is 49 percent, correct? There used to be six of these institutions, and now there are nine of these institutions.

On the same side, regulators have grown dramatically. The Federal Reserve operating budget is double what it was, the FDIC is quadruple what it was, the OCC is quadruple what it was. The CFPB, obviously, didn't exist beforehand, and has a $300 million operating budget, at least prior to Mick Mulvaney being over there.

What we haven't seen are a lot of new bank entrants. Prior to the crisis, over the last 20 years 137 new banks were started every single year. Since the crisis, there have been 1.5 banks, on average, that have started every year.

So, what my friends across the new aisle continue to talk about is consumer empowerment, but what they really mean is regulator empowerment, in the hopes that that will help the consumer.

But to Hoosiers back home who are seeing their banking choices decline dramatically, who feel like they can't get a mortgage in their local community, that they can't reach out to a financial institution, that they don't have control of their financial future, they are saying, "Where is the empowerment, where is the real help?"

So, I wondered if you might be able to talk a little bit about how the regulatory environment has constrained new entrants into the banking industry and what that might mean for the significant portion of the population, around 6.5 percent, who are totally unbanked in this country.

Mr. SLOAN. Well, I don't think the regulatory environment post-crisis has fundamentally impacted our ability to serve any of our customers, with a few exceptions.

I think that, in fact, there is a place for every size of bank in this country—small, medium, and large—and I think what you are seeing today is that larger banks have the ability to use the economies of scale and technology to invest in different products and services that customers really like.

Likewise, I think you are seeing new entrants, non-banks, Fintechs, as they are sometimes described, come up with new products and services that are very interesting. Sometimes, they are offering those products and services directly to consumers, and sometimes, they partner with firms like Wells Fargo or others.

Mr. HOLLINGSWORTH. Yes, so to break apart your first point, the economies of scale, one of the things we have seen is that regulators have ramped up the number of regulations that are being promulgated and the cost of doing business has gone up.

61

Banks, just like every other industry, have to respond to that and they have gotten larger, because they have to amortize those fixed costs over more and more people, more and more loans, more and more accounts, et cetera. And we have seen the number of community banks, the number of small banks in the country, fall precipitously over the last 10 years. Is that something that you would agree with generally?

Mr. SLOAN. I think generally, but I would also support—and there has been legislation that has been passed recently that there should be different standards. I think as a large bank in this country, that has a bigger impact on this country, we should be held to a higher standard, and clearly, we are.

Mr. HOLLINGSWORTH. Right.

Mr. SLOAN. I think that in terms of medium-sized banks and smaller banks, it should be graduated down so it doesn't have as much impact on their ability to serve their customers.

Mr. HOLLINGSWORTH. I think that is exactly right. I think ensuring that we have a runway, we want to watch larger institutions more carefully, they are more integral to the global financial system, but we need to empower small institutions, as well. And I, like you, firmly and fundamentally believe that big does not necessarily equal bad and that there is a place for every institution in the ecosystem.

But I am firmly worried that the regulatory policies that are being pushed, enacted, and now called for, might meaningfully ensure that only big institutions can survive, and for my rural district, those institutions aren't frequently serving Salem, Indiana, aren't frequently serving Jeffersonville, Indiana, and aren't frequently serving Bedford, Indiana.

And I wondered if you might talk in the last 30 seconds about some products that you are pushing that might help reached those unbanked people? How can we further the reach of the banking system to empower Americans?

Mr. SLOAN. Well, we are not pushing products anymore.

Mr. HOLLINGSWORTH. Poorly worded, my fault.

Mr. SLOAN. Yes, I can understand. But one would be a new account that we are piloting right now in seven States called "Greenhouse," which is a new checking relationship that is focused on the underbanked and students.

Mr. HOLLINGSWORTH. Great.

Mr. SLOAN. And the focus there is to provide a product that can be completely mobile so you don't need a local branch to go into, that doesn't allow overdrafts, that has a debit card, that also has a budgeting system set up—

Mr. HOLLINGSWORTH. I love that.

Mr. SLOAN. —to help with financial education.

Mr. HOLLINGSWORTH. Well, I appreciate that work. Hoosiers back home will appreciate that. Thank you.

Mr. SLOAN. Thank you.

Chairwoman WATERS. The gentlewoman from New York, Ms. Ocasio-Cortez, is recognized for 5 minutes.

Ms. OCASIO-CORTEZ. Thank you, Madam Chairwoman. Mr. Sloan, earlier today you said that Wells Fargo does not put profits over people, correct?

62

Mr. SLOAN. That is correct.

Ms. OCASIO-CORTEZ. I am interested in the human rights abuses and environmental disasters that some say are financed by your bank, Wells Fargo. In a recent Guardian article by Krystal Two Bulls and Matt Remle, they stated, "Wells Fargo has pursued profits without principles by investing in private prisons, for-profit immigration detention centers, loan shark-like payday lending, and holding much of the bond debt strangling Puerto Rico's efforts to lift itself out of its financial crisis." Is it true that Wells Fargo has invested or financed in some of these industries?

Mr. SLOAN. We made a decision 2 years ago to exit the two relationships that we had with two public private—or public prisons—private prisons firms. One has been exited, and then when the credit agreement with the other one amortizes and matures, we will no longer have that relationship.

Ms. OCASIO-CORTEZ. Are those two companies GEO Group and CoreCivic?

Mr. SLOAN. Correct.

Ms. OCASIO-CORTEZ. And which one has been exited, GEO Group or CoreCivic?

Mr. SLOAN. I can't recall exactly which one.

Ms. OCASIO-CORTEZ. Okay. And, Madam Chairwoman, I would like to seek unanimous consent to submit three reports highlighting the bank's role in debt financing these groups, the for-profit prison companies running ICE detention facilities.

Chairwoman WATERS. Without objection, it is so ordered.

Ms. OCASIO-CORTEZ. Mr. Sloan, why was the bank involved in the caging of children and financing the caging of children to begin with?

Mr. SLOAN. I don't know how to answer that question, because we weren't.

Ms. OCASIO-CORTEZ. You were financing and involved in debt financing of CoreCivic and GEO Group, correct?

Mr. SLOAN. For a period of time, we were involved in financing one of the firms. We are not anymore, and the other—I am not familiar with the specific assertion that you are making, but we weren't directly involved in that.

Ms. OCASIO-CORTEZ. Okay, so these companies run private detention facilities run by ICE, which is involved in caging children, but I will move on.

Mr. Sloan, Wells Fargo was also an investor, a major investor in the Dakota Access pipeline and the Keystone XL pipelines. They were prime investors and lenders to companies building these pipelines in defiance of Standing Rock Sioux's treaty rights to protect its water and sacred lands.

The Lakota Sioux warned early on that the pipeline was unstable and bound to leak. Despite that, it was built anyway, and it has leaked at least 5 times. And the Keystone XL in particular had one leak that leaked 210,000 gallons across South Dakota.

Since Wells Fargo financed the building of this pipeline in an environmentally unstable way, why shouldn't the bank be held responsible for financing the clean-up of the disasters from these projects?

Mr. SLOAN. Which pipeline are you referring to?

63

Ms. OCASIO-CORTEZ. Either. We know—

Mr. SLOAN. We were not involved in the financing of the XL Pipeline. We were one of the 17 or 19 banks that was involved in the financing of the Dakota Access Pipeline.

Ms. OCASIO-CORTEZ. Okay. So Wells Fargo hasn't financed any company associated with the Keystone XL pipeline?

Mr. SLOAN. No, I didn't say that.

Ms. OCASIO-CORTEZ. Okay.

Mr. SLOAN. I said we are not involved in financing that pipeline specifically.

Ms. OCASIO-CORTEZ. Okay. So let's focus on the Dakota Access Pipeline. Should Wells Fargo be held responsible for the damages incurred by climate change due to the financing of fossil fuels and these projects?

Mr. SLOAN. I don't know how you would calculate that, Congress-woman.

Ms. OCASIO-CORTEZ. Say from spills or when we have to reinvest in infrastructure, building seawalls from the erosion of infrastruc-ture, or cleanups, wildfires, et cetera?

Mr. SLOAN. Related to that pipeline? I am not aware that there has been any of what you described that has occurred related to that pipeline.

Ms. OCASIO-CORTEZ. How about the cleanups from the leaks of the Dakota Access Pipeline?

Mr. SLOAN. I am not aware of the leaks associated with the Da-kota Access Pipeline that you are describing.

Ms. OCASIO-CORTEZ. So, hypothetically, if there was a leak from the Dakota Access Pipeline, why shouldn't Wells Fargo pay for the clean-up of it, since it paid for the construction of the pipeline itself?

Mr. SLOAN. Because we don't operate the pipeline. We provide fi-nancing to the company that is operating the pipeline. Our respon-sibility is to ensure that at the time we make that loan, that that customer—and we have a group of people in Wells Fargo, including an environmental oversight group headed by my colleagues who used to be at the EPA to ensure that our—

Ms. OCASIO-CORTEZ. One question: Why did Wells Fargo finance this pipeline, when it was widely seen to be environmentally unsta-ble?

Mr. SLOAN. Again, the reason that we were one of the 17 or 19 banks that financed that is because our team reviewed the environ-mental impact and we concluded that it was a risk that we were willing to take.

Ms. OCASIO-CORTEZ. Thank you.

Chairwoman WATERS. The gentleman from Ohio, Mr. Gonzalez, is recognized for 5 minutes.

Mr. GONZALEZ OF OHIO. Thank you, Madam Chairwoman.

Thank you, Mr. Sloan, for being here. From the questions and answers that we have heard so far today, it does seem clear that there is still a significant amount of concern regarding the steps Wells Fargo has taken since 2016, regarding some of the mis-conduct.

I think it is important for us to remember that these actions hit real families. They hit them in Ohio, my home State. Misconduct

64

resulted in more than 1,500 Ohioans having unauthorized accounts, 3,200 being improperly charged for collateral protection insurance, and nearly 1,500 impacted by being improperly charged a rate lock extension fee. Our constituents rightfully have to ask themselves what should they do as a result.

For my first question, I want to go back to what Mr. McHenry was talking about earlier. He mentioned that in the last few months, there have been reports of ongoing investigations into excessive fees in the wealth management division, deficiencies in the bank's anti-money laundering compliance program, an underwriting software issue, and just last month, violations related to the sale of add-on products and the freezing or closing of accounts.

I know that is a lot that we just talked about. But from your perspective, can you give the committee a sense of which issues you are tracking right now and give us a sense of whether we are out of the woods? Because candidly, it does feel like there is a lot still up in the air here.

Mr. SLOAN. Well, there is, and I am tracking all of those issues, not just one of them. All of those issues occurred prior to my stepping into this role as CEO, but now that I am CEO, I take responsibility for resolving them.

I think the changes that I have implemented since I have become CEO are addressing those issues. And one of the promises I made to all of our stakeholders when I stepped into this role is that we would look far and wide within the company to make sure that there were no other issues.

That is why some new issues have occurred. They are not necessarily new errors that we have made. It is just that we have encouraged the team to look very hard so that we can get through this very challenging part of our history and make sure that any customers who were impacted, that we treat them appropriately.

Mr. GONZALEZ OF OHIO. Got it. So if I am understanding this correctly, what you are basically saying is we did have a lot of issues. That is obvious.

Mr. SLOAN. There is no question about that.

Mr. GONZALEZ OF OHIO. Nobody is denying that. But since you took over as CEO, you feel like you have kind of put a stop to that. You are still investigating the things that went on prior to your arrival. And that going forward, since your time as CEO, you feel very comfortable with how the bank has performed on these issues?

Mr. SLOAN. Well, I can't promise you perfection.

Mr. GONZALEZ OF OHIO. Right, but—

Mr. SLOAN. But what I can promise you is I believe that the organization we have put in place, the investment in thousands more risk professionals, as well as technology, as well as investment in risk, is putting us in a place where the chance of these types of issues occurring again is much, much less.

Mr. GONZALEZ OF OHIO. Okay, great.

My next question shifts to the culture. I know The New York Times just wrote an article suggesting maybe the cultural changes haven't been as effective. Can you talk about specifically what you are doing at the executive level, at your level, to make sure that the culture does in fact turn over? It is a big organization; it is hard to turn around a culture in just a few short years, so—

65

Mr. SLOAN. Yes. So one of the key changes that we made is encouraging team members that if they see something that they are concerned about, or if they have a good idea, that they should raise their hand and let us know.

Mr. GONZALEZ OF OHIO. Has that resulted in proactive communication?

Mr. SLOAN. Oh, absolutely, yes. And the way that we track that kind of information is much different. We have also encouraged our team to the extent that they are uncomfortable, raising something to their manager or human resources group, to call our ethics line. And calls into the ethics line now go outside the company and they are dispositioned in a much more independent way to ensure that there is no retaliation in the company.

Mr. GONZALEZ OF OHIO. Great. And then for my final question, some of my colleagues on the other side of the aisle are what I would call attacking Wells Fargo for conducting business that is perfectly legal with customers. So the groups that were just mentioned, were any one of them breaking Federal law when you were banking them?

Mr. SLOAN. Not that I am aware of. And one of the standards that we set in banking any sort of industry that has various reputational issues is to make sure that there is a double-check beyond just a normal credit underwriting that we would do for on a reputational basis, so that we don't run into those kinds of issues.

Mr. GONZALEZ OF OHIO. Thank you.

And I yield back.

Chairwoman WATERS. The gentleman from Utah, Mr. McAdams, is recognized for 5 minutes.

Mr. MCADAMS. Thank you, Madam Chairwoman.

Mr. Sloan, I think without question, Wells Fargo and its various actions have caused harm to hundreds of thousands and possibly millions of customers. Your violations have stretched from egregious sales practices, whereby the company opened millions of accounts in customers' names without their consent or knowledge, to violations of the Servicemembers Civil Relief Act.

And just in November of this past year, it was reported that you foreclosed on 545 customers based on a computer error: 545 families kicked out of their homes when they shouldn't have been, 545 families with their stability uprooted. All the consent orders and fines in the world can't repair that damage.

In your written testimony, you discussed the transformation of the company and I believe that you do want to improve the company. And we want to improve the company because we also want these practices to cease. Wells has over 3,000 employees in my State, and I know these employees, and I want them to be proud of where they work and not have a workplace that pushes them to act unethically or illegally.

So, Mr. Sloan, I wanted to go back to your comments about The New York Times article. And I am paraphrasing, but I think in a previous question that was asked, you basically said that you disagreed with the content of that story. But if these employees feel this way, then that, I think, is a concern for us. You can disagree with the article, but those employees matter and their concerns matter.

66

And the article says, "In a survey of more than 27,000 employees in the bank's information technology department late last year, top concerns included their ability to raise grievances with managers and whether Wells Fargo conducts its business activities with honesty and integrity."

The article goes on to report that the workers at Wells Fargo recently flooded the bank's internal logs with hundreds of angry comments about Wells Fargo's sales incentives and pay and ethics leaders' doublespeak. So if employees feel like they can't raise grievances with managers, whether or not you believe that to be the case, then that is a concern and it raises questions about the culture at Wells Fargo.

What do you think are the root causes of these employees' concerns? And do you believe these employees when they say that they feel this is a problem?

Mr. SLOAN. I don't mean to question how any of our team members feel. And there is no question that improving culture is a journey. I don't mean to sit here and suggest today to you that we solved the culture issue, because it requires leadership and managers and communication and an open relationship with our team members.

One way I deal with it, and I will just give you my example, is that I hold town halls every other month. In those town halls, I provide an update for about half-an-hour for our team members. There are generally 500 to 2,000 team members in attendance. The town halls are broadcast to the entire company live, and then we take unscripted questions from team members in whatever they would want.

And at the end of every one of those town halls, I say the following, "If there is any concern that you feel about this company, that you feel hasn't been raised, call me or send me an e-mail." I get communications from our team all the time, and I make sure that we follow-up.

Congressman, I can't promise you that every one of our 260,000 team members jumps out of bed, runs into work at Wells Fargo, and it is the happiest place on Earth, right?

But what I can promise you is when we survey our team members across the entire company, that is not the results we get. That doesn't mean that everybody feels the way I would like them to, and that is why this changing culture is a journey and we are not done yet.

Mr. McADAMS. I just want to make the point that I don't think it is about morale or how people feel about the workplace, but it is, do people feel comfortable they can report concerns or grievances up the food chain without retribution? Do you think it is alarming? And so, the reports are that many employees still feel this way, that they feel that the culture is not one where they can raise red flags up the food chain without consequences.

Mr. SLOAN. I think it is disappointing, based upon the progress that we have made and the changes that we made that any of our team members feel that way. And to the extent that that is how our team members feel, we will redouble our efforts to make sure that we have communicated to them all the changes that we have made and that there is no place for retaliation in Wells Fargo.

67

Mr. MCADAMS. It is alarming to me that employees are still feeling this way because if employees don't believe you when you say that the culture has changed, then I don't know that we can conclude that the culture has changed.

Mr. SLOAN. Well, again, Congressman, we have 260,000 team members and most of them when we survey, an overwhelming percentage of them feel that the changes we have made are making a difference. And again, that is not to say we are done yet. I am not going to be satisfied until every one of them—I don't know if we will ever reach that, but that is my goal.

Mr. MCADAMS. Thank you, Mr. Sloan.

And I yield back.

Chairwoman WATERS. The gentleman from Georgia, Mr. Loudermilk, is recognized for 5 minutes.

Mr. LOUDERMILK. Thank you, Madam Chairwoman.

Mr. Sloan, it has been a long day. I know it has been a long day for you. And quite frankly, some of the actions by Wells Fargo have been very egregious and it is probably worthwhile for you to be here. I have a couple of questions before I—the core question I want to ask you is going to deal with the OCC's consent order and beneficial ownership, just so you know where I am eventually going to go with this.

Mr. SLOAN. Okay.

Mr. LOUDERMILK. But I want to address a couple of things that I think are maybe overlooked or is unfortunate in the direction some of my colleagues have taken today's hearing. What was your customer base prior to the investigation or scandal from the consumer standpoint? How many customers did you have?

Mr. SLOAN. Approximately 70 million.

Mr. LOUDERMILK. How many do you have today?

Mr. SLOAN. A little bit more than that.

Mr. LOUDERMILK. So you experienced some loss, I would imagine, during that time?

Mr. SLOAN. Well, actually no. What we experienced is, I mean, we are always gaining and losing customers every day—

Mr. LOUDERMILK. Right.

Mr. SLOAN. People move and so on and so forth. We compete for business with other banks and we win and lose it every day. But overall, since the fourth quarter of 2016, what we have seen is our customer base grow. It is not growing as much as I would like, but it is going in the right direction now.

Mr. LOUDERMILK. So I would take it then that your customers are pretty satisfied with the service you are giving, some of the corrective actions you are making?

Mr. SLOAN. That is the feedback that we get from them. We survey our customers—in addition to on a specific basis in our retail business where we survey customer experience and loyalty scores, we also separately have a survey that we do monthly. And we are going in the right direction. Again, we have more work to do, but your statement is correct.

Mr. LOUDERMILK. Okay. One other issue I want to address is, do you make auto loans?

Mr. SLOAN. We do.

Mr. LOUDERMILK. Are you going to continue to make auto loans?

68

Mr. SLOAN. We are.

Mr. LOUDERMILK. The reason I am asking you this is because, according to the CDC, more people were killed by auto accidents than by guns in the past several years. Using the logic of some of my colleagues, I am not going to sit here and ask you to quit making auto loans.

Mr. SLOAN. Thank you.

Mr. LOUDERMILK. I am one of the few on this committee who has been a victim of both gun violence, and of what should have been a fatal auto accident. You very well may have made the loan to the rental car company to buy that car in which I was a victim of a triple flip-over accident on an interstate. My wife and I were fortunate to survive. On two occasions, I have been shot at: once on the baseball field; and once back at home.

I don't want you—I am not expecting to use your business as a tool to shape culture, or do a cultural experiment or make it a lab to do something that wouldn't be done otherwise. And I think that it is unfair to put you in that position. Both of those are legal in the United States and those businesses that operate—whether they sell automobiles or manufacture automobiles, or sell guns—that is something that shouldn't be laid at your table. I just wanted to address that.

Now, onto the core question I have. The Office of the Comptroller of the Currency, as has been mentioned already, has given you a consent order regarding beneficial ownership. And during your second quarter 2018 10–Q filing, you stated that some Federal agencies have been making inquiries into the bank regarding potentially inappropriate conduct related to the collection of beneficial ownership information.

Mr. Sloan, what is the potentially inappropriate conduct that took place?

Mr. SLOAN. The consent order that we have in place with the OCC actually covers our BSA/AML program and our wholesale banking business. I will be quick.

And what the focus there is, is not that we are not following BSA/AML laws, but that we were not doing a good enough job of documenting how we make decisions. By the way, the OCC is completely correct, and we are reforming and improving our capabilities.

One of the requirements that was introduced about a year ago is a beneficial ownership forms. And what we found, because of a call to the ethics line that we put into place after I became CEO, was that some of our team members were not following our policies and procedures in completing those beneficial ownership forms, and that is unacceptable.

Mr. LOUDERMILK. So you are complying with the consent order at this point?

Mr. SLOAN. We are. We have more work to do because the consent order hasn't been lifted, and we take our responsibilities to the OCC seriously, but we are making progress.

Mr. LOUDERMILK. I know there is a lot of confusion with the FinCEN customer due diligence rule regarding this, and so I applaud your efforts. What has taken place is egregious. I don't think

69

anybody on this committee would depart from that. But I do appreciate the effort you are making to move forward.

Mr. SLOAN. Thank you.

Mr. LOUDERMILK. I yield back.

Chairwoman WATERS. The gentlewoman from Virginia, Ms. Wexton, is recognized for 5 minutes.

Ms. WEXTON. Thank you, Madam Chairwoman, and thank you, Mr. Sloan, for joining us here today. As I was going through the materials to prepare for today's hearing, I was just so struck by really the scope and the breadth and the depth of fraudulent activities throughout basically every one of Wells Fargo's subsidiary businesses.

And I know we have been through these before and time is short, but I do think it is important to tick off some of them: in consumer banking, with the opening of fraudulent accounts; opening credit cards without customers' consent; debit cards on auto loans. I know that you dispute the actual selling of the force-placed insurance, but you did repossess a number of cars that you shouldn't have as a result of that.

On Wells Fargo wealth advisers, on the wealth management side, there was some churning of investments that were supposed to be long-term investments, and selling those to receive commissions and fees.

On the mortgage side, there were inappropriate fees charged for interest rate locks even when the delay was due to Wells Fargo's own actions, and the violations of the Servicemembers Civil Relief Act are pretty egregious, including repossessing cars from servicemembers who were deployed abroad. Wells Fargo is now subject to, I think you said, 14 separate consent decrees, is that correct?

Mr. SLOAN. Correct, yes.

Ms. WEXTON. And so, you would agree with Chair Yellen's assessment that there was pervasive and persistent misconduct at Wells Fargo?

Mr. SLOAN. I think we made a significant number of mistakes that we shouldn't have made. We have taken responsibility for those errors and since I have become CEO, we have made fundamental changes in the company to address those shortcomings.

Ms. WEXTON. Now, you had said that one of the causes or what you perceived to be a potential cause of all of these offenses was that you had a decentralized sort of management system at Wells Fargo, is that correct?

Mr. SLOAN. That is correct.

Ms. WEXTON. In other words, each subsidiary was kind of going rogue on their own, is that correct?

Mr. SLOAN. Well, I didn't say they were going rogue on their own, but I think that the way that they were organized is, they had the enterprise risk and control functions within the business line that didn't create enough—the check and balance that we have today.

Ms. WEXTON. Okay. But I just find it so interesting that each one of these businesses was engaging in the same kind of pattern of fraudulent misconduct, even though they were each operating in their own little spheres. So now you say that management and ev-

70

erything is centralized and that is going to solve this problem, or at least help ensure that it is not going to happen again. Is that correct?

Mr. SLOAN. I think that is one of the fundamental changes that we have made since I have become CEO to address it, but it is not the only one.

Ms. WEXTON. Okay. I can't wrap my head around why and how every single subsidiary of Wells Fargo was engaging in some sort of fraudulent activity if it wasn't coming from the top. Would it be your position that all banks do this sort of thing and Wells Fargo is just the one that got caught?

Mr. SLOAN. No, of course not. But I wouldn't agree with the statement that every one of our operations was engaging in inappropriate activity. There is no question that it happened.

Ms. WEXTON. Well, just the ones that I listed, the auto, mortgage, and consumer deposit accounts, all of those were, right?

Mr. SLOAN. There is no question we made errors in those businesses.

Ms. WEXTON. You have been employed at Wells Fargo for about 30 years or thereabouts?

Mr. SLOAN. 31½.

Ms. WEXTON. Okay. And most recently as Chief Operating Officer before you became CEO, right?

Mr. SLOAN. Yes, I was Chief Operating Officer for about 10 months.

Ms. WEXTON. Okay. And so to the consumers who were wronged by Wells Fargo during this long pattern of misconduct, how do we assure them that you are the best person to change the culture when you have been a part of the culture for the last 3 decades?

Mr. SLOAN. Because having knowledge of the company allows me to make the difficult decisions to reorganize the company more quickly, and that is what I have done. This company is going through fundamental change. It is more fundamental change than it has ever gone through in its history.

Ms. WEXTON. Is that because of your leadership or because of the oversight of the various Federal agencies who have consent decrees with—

Mr. SLOAN. I have made all the decisions, so I take responsibility for those decisions and whether they work or they don't.

Ms. WEXTON. Thank you. I see my time is up. Madam Chairwoman, I yield back.

Chairwoman WATERS. Thank you. They have called the votes on the Floor, and we are going to try and avoid having to return so that we don't have to keep Mr. Sloan here. So, Mr. Lynch, you are recognized for 5 minutes, and I am going to be very strict on the number of minutes so we can all get to vote.

Mr. LYNCH. Thank you, Madam Chairwoman. I will try to be quick. Mr. Sloan, I have to say, I am amazed. I have been here for a while, I was here during the financial crisis, and I am amazed at the willful and disgraceful conduct of Wells Fargo. I really am.

I mean, AIG made mistakes, they mispriced some products, and there were mistakes, real mistakes made there. But in your case, you robbed your customers. You robbed your customers.

71

We deal a lot on this committee with the Financial Crimes Enforcement Network and a lot of those cases are people hacking or cyber criminals stealing funds from strangers.

But in your case, you robbed your customers, the people who came to you and trusted you. So when you say, "We made a mistake," robbing your customers is not a mistake. There is something deeper going wrong there. You said that, "We had errors in those businesses." Robbing your customers is not an error in business in the deepest sense. There is something more sinister in that.

When people come to you, they deposit money into your bank and you rob them, 3.5 million— 3.5 million—fake accounts and fake credit cards. And I am just stunned—I don't know if I am madder at Wells Fargo or madder at our regulators that they did not just step in, remove Mr. Stumpf, and appoint a receiver for Wells Fargo and break you up.

You are still like the 12th biggest bank in the world, with $2 trillion in assets. And I think your conduct over the past decade has proven that you are way too big to even manage what you have going on right now. You say that, "We are going to make a difference now because everything is centralized." The robbing of your customers was centralized, 3.5 million. This was not an outlier. You fired 5,300 employees, and they were fired for following company policy.

Make no mistake, 5,300 people don't go rogue together. These were employees who were following company policy. It is disgraceful.

You know, the FDIC, one of your regulators, has grounds for removal and taking over the back and breaking it up. One of the standards is if there was a willful violation and concealment of the institution's books, papers, records or assets—opening up fake accounts, taking the information that you got, Social Security numbers, all of that stuff that your customers gave you, and filling out fake credit cards and charging them for that, opening up fake accounts with people's names on them that they gave to you as a fiduciary, that would seem to qualify.

If there was a violation of law or regulation of any unsound practice or condition that weakens the bank's condition, that is you. That is you all over in terms of your bank. If the bank was found guilty of any Federal criminal money-laundering offense, so you got a violation of the Bank Secrecy Act and then you have one of your employees doing deals with the Sinaloa cartel, allowing them to buy an aircraft. You funded it through Wells Fargo.

So, you basically qualify with all of the things that would lead the FDIC and the regulators to remove the CEO and take over that bank. And I don't know why they haven't. They are going to be up before this committee eventually, in a couple of weeks, and I am going to ask them the same question.

But if I were you, and you really wanted to do the right thing, put this bank on the right path, then break it up. Decide how you would dismantle it so we don't lose all the jobs, but you are way too big. Your conduct has been disgraceful. And I think you would serve your customers and you would serve the financial system and our country much better if you agreed to just break up the bank

72

in functioning pieces that are able to be accountable to their customers and to the general public.

Madam Chairwoman, I yield back.

Chairwoman WATERS. Thank you very much. The gentlewoman from Pennsylvania, Ms. Dean, is recognized for 5 minutes. They are holding the Floor open for the vote. We are going to see—

Ms. DEAN. Okay, I am going to talk really fast.

Chairwoman WATERS. —if we can make it. Thank you.

Ms. DEAN. Thank you. Thank you, Madam Chairwoman.

Thank you, Mr. Sloan, for being here. I wanted to say to you that I was eager to read your testimony before coming to this hearing today. And I will preface it by saying that I am a Wells Fargo customer, I have an account or two at Wells Fargo in addition to other places. My local branch couldn't be nicer.

Mr. SLOAN. Thank you.

Ms. DEAN. But that is neither here nor there. I was eager to read your testimony. I come from a background of teaching writing at a university for 10 years, and I have always taught my students avoid euphemism, because euphemism just fogs over the real meaning of what is going on.

I was gravely disappointed at the testimony that I read, and here is why. In your first paragraph, you said that you are looking forward to the opportunity to discuss the transformation at Wells Fargo over the past 2 years under your leadership. You were determined to address the retail sales practice issues that occurred in community banks. You pledged to look back years.

"We discovered issues that we need to address, every one of which was a disappointment to me. I want to be accountable and transparent." These are your words; I am taking them in pieces, of course. "And we have," that is what you said. "We have been accountable and transparent. We have gone above and beyond what is required in disclosing these issues."

If you can hear the theme here, I was struck by the lack of transparency. I was struck by language that didn't at all reveal the grave fraudulent things going on at Wells Fargo, not just in the past 2 years, but maybe as far back as 2002.

So what struck me was that the first step in solving a problem is recognizing there is one. And I have seen here in the last 4 hours an absence of a recognition of the real problem and the real grievous harm you caused people. There is a draining of humanity in this whole conversation that I can't believe.

I was a State representative before I came here. I sat with people trying to go through the tangled web of mortgage modifications. And when we take a look at your mortgage modifications, and what you revealed, that 870 customers were incorrectly denied loan modifications because of a computer glitch—again, there is no humanity in that, some computer ran for 5 or 6 years and denied people modifications, and 545 of those customers lost their homes.

What did you do? How did you calculate the exact harm to each and every single one of those 545, not to mention the 325 who were wrongly denied?

Mr. SLOAN. So what we are doing—

Ms. DEAN. And I want an exact calculation. Give me an example of one human being.

73

Mr. SLOAN. Well, for some of the customers that we foreclosed inappropriately on, because they didn't receive a modification, we have sent them a $15,000 check, and they have been satisfied with that remediation.

Ms. DEAN. I have to stop you there. I went on your website and I looked at different places where a customer like me could go in, and the things you have said today—you sent $15,000, and because you didn't hear back from them, you consider them satisfied.

Mr. SLOAN. No, not at all.

Ms. DEAN. Imagine losing your home.

Mr. SLOAN. No. No.

Ms. DEAN. You don't know what equity they might have lost in that, the stresses, the human toll. Have you seen families sit and go through what they think is a shameful experience? "I can't keep a home over my children's heads." It is a shameful feeling, a horrible feeling. Not to mention the uncertainty of it. And you thought a $15,000 check satisfies it? Shouldn't there be an exact calculation of harm per individual, yes or no? Yes or no? Should you calculate per individual?

Mr. SLOAN. And that is what we are doing—

Ms. DEAN. No, you put the burden back on the borrower.

Mr. SLOAN. I want to take this specific situation you described— to the extent that there was a foreclosure and there was any equity in the home, that was returned to the customer already. Okay? We have said to those customers, if $15,000, which is 2.5 times the amount, please—

Ms. DEAN. I am going to stop you there.

Mr. SLOAN. Please.

Ms. DEAN. We have heard you say the $15,000 fee, 2½ times. Here is what is dissatisfying to me. As the commander, as the captain of this ship, what I think you should have instructed your subordinates to do was to say, don't offer them $15,000 and see if that will satisfy them. Find out the exact harm that we caused—

Mr. SLOAN. And that is what we have done.

Ms. DEAN. Just like a recall of a bad drug.

Mr. SLOAN. No, no, no. That is what we have done.

Ms. DEAN. Find out the exact—no, you have put it back on the customer, just like the customers who might have had too much of a fee taken from them for holding on to an interest lock. You put it back on the customer. Get back to us if you think you were wrongly charged. How are they to know they are wrongly charged?

I am going to end with this, Madam Chairwoman, because I know I am out of time. I would ask you to—

Mr. SLOAN. I would love to be able to answer your question.

Ms. DEAN. I would ask you to take a look at your overall language, because your language reveals that you don't get it, that you are fogging over the problem. In this beautifully printed book, "Our Culture", chapter 3, listen to this and tell me what in God's name it means. "After extensive internal research—

Chairwoman WATERS. The gentleman from Illinois, Mr. Garcia, is recognized for 5 minutes.

Mr. GARCIA OF ILLINOIS. Thank you, Madam President—or Madam Chairwoman.

[laughter]

74

Chairwoman WATERS. I like that.

Mr. GARCIA OF ILLINOIS. Mr. Sloan, with respect to the review of the scandals that Wells Fargo has been involved in over the past several years, including the fraudulent customer accounts that were probably the greatest of scandals, the illegal student loan servicing practices, the checking account overdraft fees, the mortgage lending abuses, the auto lending abuses, that we have learned about in this hearing and prior to the hearing, is it fair to characterize these scandals as the largest scandal that has occurred among the big four banks in this country in modern history?

Mr. SLOAN. I am not familiar with the impact on other banks, so I can't answer your question. There is no question that—

Mr. GARCIA OF ILLINOIS. But you are familiar with banking in this country—

Mr. SLOAN. I am.

Mr. GARCIA OF ILLINOIS. And the scale that has occurred and the penalties that have been imposed. Does that make it the largest scandal in terms of consumer abuse?

Mr. SLOAN. Based on the penalties that have been imposed, the answer—

Mr. GARCIA OF ILLINOIS. Based on everything, the scale, the number of fraudulent accounts, and the other enumeration of incidents that have been documented and litigated, et cetera, do you believe it is the largest scandal in U.S. banking history?

Mr. SLOAN. Congressman, I am not trying to be difficult. It may be; I just don't know the impact of—

Mr. GARCIA OF ILLINOIS. Okay. I will take your answer, "It may be." Two, in the interest of time, Wells Fargo has engaged the immigrant community, profited from the immigrant community as customers, as a market share. And last January, you released a video message urging Congress to adopt a legislative solution for the young people known as the DACA class of immigrants who are seeking a pathway to citizenship.

And you said, "What happens with DREAMers is important to Wells Fargo because it affects our customers and their families. It also affects our own team since some DREAMers already work for Wells Fargo." And that is fine. That is to be applauded.

But Wells Fargo has a dubious record when it comes to its treatment of immigrants and Latino customers. Because in April of 2017, per a New York Times report which said that Wells Fargo employees were "instructed to round up immigrants, corral them into a branch office, and cajole them into opening bank accounts."

Wells Fargo employees allege in sworn statements that they were ordered to target undocumented workers at construction sites, factories, and 7-Elevens. You have called these allegations nonsensical because you "can't do business with undocumented immigrants by Federal law." If these charges were false, why were employees willing to sign sworn statements that Wells Fargo's aggressive practices targeted undocumented immigrants?

Mr. SLOAN. Congressman, I saw the same report that you did. We investigated that and we found no incidence of that.

Mr. GARCIA OF ILLINOIS. But there is a pending Federal lawsuit pertaining to the DACA class of immigrants, pending in San Francisco, correct?

75

Mr. SLOAN. That is correct. But again, we have investigated that, and we haven't found any incidents.

Mr. GARCIA OF ILLINOIS. But a Federal judge has found that it has standing and it remains an active lawsuit, correct?

Mr. SLOAN. That is my understanding.

Mr. GARCIA OF ILLINOIS. Yes, okay. With respect to—and this is my final question, Madam Chairwoman. Your head of consumer banking is quoted in a Times article describing how the firm's entire system of how you pay, coach, and develop team members is designed to focus on customer experience and customer outcomes. And you testified this morning that your performance evaluation system prioritizes customers.

Yet, according to a report released this morning by the Committee for Better Banks, the maximum quarterly bonus for employees under the "customer experience," metric dropped from $1,425 in 2017 to $875 for 2019. If you are truly prioritizing the customer experience under your new performance evaluation, why have these bonuses under the metric declined?

Mr. SLOAN. I have asked our team, I saw that same report that came out yesterday, and I asked our team to take a look at it yesterday. And other than spelling Wells Fargo correctly and acknowledging that our—

Chairwoman WATERS. The gentlelady from New York, Ms. Velazquez, is recognized for 5 minutes.

Mr. SLOAN. We have raised our $15 minimum wage, and we disagree with everything in that report.

Chairwoman WATERS. Your time has expired.

Mr. GARCIA OF ILLINOIS. Thank you.

Thank you, Madam Chairwoman.

Chairwoman WATERS. Please, Ms. Velazquez.

Ms. VELAZQUEZ. Thank you, Madam Chairwoman.

Chairwoman WATERS. Four votes are holding on the Floor.

Ms. VELAZQUEZ. Sure.

Chairwoman WATERS. Please.

Ms. VELAZQUEZ. Mr. Sloan, I have to repeat what you have heard before. Since 2016, Wells Fargo has been cited and fined for fraudulently opening millions of deposit and credit card accounts, abuses involving servicemembers violation with its mortgage and auto lending businesses, and security fraud charges associated with the sale of complex financial products to retail investors.

Your bank also continues to be the subject of a number of ongoing investigations. Mr. Sloan, you cannot sit there with a straight face and claim to not be responsible for all of these abuses that have been committed against consumers. So my question to you is, do you believe that consumer abuses as well as fraudulent and deceptive actions practiced by large financial institutions could pose a threat to financial stability?

Mr. SLOAN. I think that banks and banks like ours should follow the rules and regulations that are set forth in this country. I completely agree with that, Congresswoman. We have a duty to provide products and services to our customers in an appropriate way. And if we don't provide that, that there is both financial and reputational harm that is done to the institution, and that could have an impact on the economy.

76

Ms. VELAZQUEZ. So can you tell me why the Fed didn't remove the asset cap?

Mr. SLOAN. As part of the consent order with the Fed, they want us to improve the Board governance and oversight, which we have done.

Ms. VELAZQUEZ. Isn't the answer because you focus on growth and profits not risk management? Is that the transformation that is happening at your institution?

Mr. SLOAN. We are significantly improving our compliance and operational risk management, which is paragraph three of the consent order with the Fed.

Ms. VELAZQUEZ. Well, the Fed does not agree with you and that is exactly why they didn't remove the cap. And you know it. Sir, all Americans deserve honesty, integrity, and trust when it comes to placing their money in the banking system. A culture of deception and deceit erodes that trust and leads depositors to lose faith in our financial institutions. And to me, I believe that represents a threat to financial stability.

I yield back.

Chairwoman WATERS. Thank you. The gentlewoman from North Carolina, Ms. Adams, is recognized for 5 minutes.

Ms. ADAMS. Thank you, Madam Chairwoman, for convening today's hearing, and thank you, Mr. Sloan, for coming before us today with your testimony. The last time we spoke, you assured me that Wells Fargo was making a number of changes, including changing the competitive and toxic sales culture, increasing Board diversity, and developing an inclusive culture, among other things.

Now, my colleagues have covered a lot of ground today, so let me just shift gears a minute and ask a question or two about diversity. As you know, the financial industry continues to be plagued by lack of diversity and complaints about harassment and discrimination.

I believe that if employers are serious about diversity that they will link their end-of- year bonuses to their diversity goals. So my question to you is, does Wells Fargo currently link its diversity goals to corporate bonuses?

Mr. SLOAN. Yes. In the incentive compensation for our senior leadership team, one of the measures of the management portion of that calculation is based upon not only their commitment, but also their progress in meeting our policies and procedures related to diversity and inclusion.

Ms. ADAMS. So do you believe that Wells Fargo, under your leadership, has done everything that it can do to make the company truly reflective—

Mr. SLOAN. I think—

Ms. ADAMS. —of America's diversity?

Mr. SLOAN. I think we have done a lot but we have more work to do. Congresswoman, one example I would give you is that when I stepped in the role of the Chief Operating Officer, I instituted the Wells Fargo equivalent of the Rooney Rule, which means that whenever we have a senior leadership role that is open in the company, we need to ensure that we have a diverse slate of candidates for that role and a diverse panel of interviewers.

Ms. ADAMS. Okay. Let me move on.

77

Mr. SLOAN. And that has made progress both in terms in the number of women and diverse leaders in the company.

Ms. ADAMS. All right. We want to make sure we have some African Americans in there, as well. You know, when we talk about diversity, sometimes we forget that, because you can also say minorities are women, as well, and I mean, I support that, being an African-American woman.

Mr. SLOAN. I don't mean to interrupt you, but to that point, Michelle Lee, who runs half of our retail banking business, who lives in Charlotte, is African American.

Ms. ADAMS. Okay. Let me move on to an issue that we are having in Charlotte, as I am sure you aware of, and that is affordable housing. According to your business standard report, Wells Fargo home lending is the largest home mortgage lender and servicer in the U.S., funding one of every nine loans and servicing one of every seven loans. First of all, do you believe that America is in the midst of an affordable housing crisis?

Mr. SLOAN. I absolutely do.

Ms. ADAMS. Okay. And given the dominance in the housing sector by Wells Fargo, what are you doing to tackle and combat the housing affordability predicament that many of our communities are facing, particularly in the City of Charlotte?

Mr. SLOAN. We are doing a number of things. I will give you two quick examples. One is our neighborhood lift program, where we are providing down payments in the form of grants to low- to moderate-income folks.

For example, I was just at our neighborhood lift program in Los Angeles and I was there when we provided the down payment for the Ramirez Valenzuela family to afford their first home in Palmdale, California.

In addition, we provided enough grants so 20,000 low- to moderate-income homeowners, mostly diverse, have been able to afford a home in the last 6 years, and that program has distributed about $449 million and we are continuing on that program.

Ms. ADAMS. Okay. You spoke earlier about the $15 minimum wage or more. How did raising that wage to $15—how much did it really cost Wells Fargo to do that?

Mr. SLOAN. On an annual basis, it cost us about $200 million.

Ms. ADAMS. And what was the median annual salary that the bank paid in 2018?

Mr. SLOAN. It is about $60,000.

Ms. ADAMS. Okay. Are you going to increase it more? I mean, $15 is good, but it is still very difficult, and we have a lot of poverty in our community and communities all over this country. So I am just curious about that. Will you have plans for doing more?

Mr. SLOAN. I want everybody who makes $15 an hour—

Ms. ADAMS. But are you all going to do more?

Mr. SLOAN. We look at compensation every year in Wells Fargo to make sure that we are paying competitively. I think we have been a leader in the industry in terms of how we pay our entry-level team members. That is how I started in banking, working my way through college as a teller.

Ms. ADAMS. Okay. Thank you very much. Thank you very much, Madam Chairwoman. I yield back.

78

Chairwoman WATERS. Thank you. I would like to thank our witness for his testimony today.

The Chair notes that some Members may have additional questions for this witness, which they may wish to submit in writing. Without objection, the hearing record will remain open for 5 legislative days for Members to submit written questions to this witness and to place his responses in the record. Also, without objection, Members will have 5 legislative days to submit extraneous materials to the Chair for inclusion in the record.

I ask our witness to please respond as promptly as you are able.

This hearing has revealed that Wells Fargo has failed to clean up its act, that it is too-big-to-manage, and that the steps regulators have taken to date are wholly inadequate. As was discussed today, The Wall Street Journal reported yesterday that the Office of the Comptroller of the Currency (OCC), Wells Fargo's chief regulator, is considering forcing out several executives and Board directors.

I think the OCC should take this important step, and the regulators should also consider it with you, Mr. Sloan. It is also time for Congress to take bold action to protect our constituents.

I intend to reintroduce the Megabank Accountability and Consequences Act, a bill I first introduced in 2017, to address rampant violations of consumer protection laws by megabanks, and to hold them and their executives fully accountable for their actions.

With that, this hearing is now adjourned.

[Whereupon, at 2:15 p.m., the hearing was adjourned.]

# **A P P E N D I X**

March 12, 2019

80

## HEARING BEFORE THE UNITED STATES HOUSE OF REPRESENTATIVES COMMITTEE ON FINANCIAL SERVICES

March 12, 2019

Testimony of Timothy J. Sloan
President and CEO, Wells Fargo & Co.

Chairwoman Waters, Ranking Member McHenry, and members of the Committee, good morning and thank you for your invitation to today's hearing. I appreciate this opportunity to discuss the transformation at Wells Fargo over the last few years and the progress we are making as we work to become the most customer-focused, efficient, and innovative Wells Fargo ever.

Wells Fargo has served the American people for 166 years, and I am proud to lead an institution that today is the largest lender to individuals and to businesses, big and small, in this country. But the past few years have represented a difficult chapter in Wells Fargo's storied history. When I became CEO more than two years ago, our bank was facing unprecedented and well-deserved scrutiny.

I was determined to address the retail sales practice issues that occurred in our Community Bank, and I pledged to look back years, sometimes decades, to examine every business at Wells Fargo to ensure that no similar problems existed anywhere else in the company. We discovered issues that we needed to address, every one of which was a disappointment to me. But when I stepped into this role, I assured customers, team members, shareholders, regulators, and elected officials that accountability and transparency would define our efforts.

And they have. We have gone above and beyond what is required in disclosing these issues in our public filings, we have worked to remedy these issues, and, most importantly, we have worked to address root causes that allowed them to occur in the first place. As a result, Wells Fargo is a better bank than it was three years ago, and we are working every day to become even better.

I would like to discuss several aspects of our transformation with the Committee today:

- how we are making things right for customers who were harmed;

- how we have strengthened, and are continuing to strengthen, our risk management and controls;

1

81

- how we are improving our culture;

- how we are innovating to provide customers with more convenience and simplicity in how they bank with us; and

- how we have deepened our commitment to the communities we serve.

Working with external stakeholders, team members, and customers, we developed a Business Standards Report entitled *Learning from the Past, Transforming for the Future* (attached), which details these changes.

**Making Things Right for Customers**

We are dedicated to compensating every customer who suffered harm because of our mistakes. We continue to proactively identify customers, contact them, and compensate them where appropriate. For the sales practices issue, for example, we looked back more than 15 years, reviewed 165 million accounts, contacted more than 40 million customers—both individuals and small businesses—via 246 million individual communications, and have provided millions of dollars in compensation to our customers to date.

We are taking responsibility not just for any fees customers should not have been charged, but also for related effects such as impacts on credit scores. Our guiding principle has been to err on the side of our customers, and we are taking an over-inclusive approach in doing so.

To be sure, getting this right for each customer takes time—longer than I would like, frankly. But mistakes do not affect every customer the same way, so we have had to develop processes for taking customers' individual circumstances into account. We make every effort to refund customers for mistakes as soon as we discover them. We also offer mediation to customers at no cost to them.

Above all, Wells Fargo is committed to making things right for our customers and earning back the public's trust.

**Enhancing Risk Management**

Fully satisfying the requirements set forth in our regulatory consent orders is critically important. We have thousands of employees dedicated to carrying out our obligations under those consent orders, and we engage in frequent and open communication with our regulators. Members of our Board of Directors and senior

2

82

executives are meeting regularly with the Federal Reserve, the OCC, the FDIC, the CFPB, and other agencies to address their concerns and seek their input.

Solving past problems is not enough. We are equally committed to preventing new problems from developing. To do that, we have transformed our approach to risk management by fundamentally changing the organization of Wells Fargo. We have discarded our old decentralized structure that allowed prior problems to occur and centralized our enterprise control functions, such as risk, finance, human resources, compliance, and technology. We have enhanced our three "lines of defense"—front-line risk, independent risk management, and audit—to ensure multiple layers of review and to improve internal oversight. We have added more than 3,000 new risk professionals who work every day to ensure that we are conducting our business in the best interests of our customers, and we plan to hire more. Now, we have better visibility into issues as they emerge and can respond to them more quickly.

We have taken a range of other steps to manage and reduce risk. We have reevaluated our products and services, shed riskier investments, and sold or discontinued non-core businesses and activities. And we have hired impressive new leaders—many from outside the company—to oversee our Risk, Legal, Human Resources, Technology, and Audit groups.

Our Board of Directors has undergone a similar transformation. In the past two-and-a-half years, we have added seven new independent directors, who bring expertise in financial services, risk management, human capital management, technology, operations, and reputational risk. We have separated the roles of Chair and CEO, and our new Board Chair Betsy Duke is the first woman to chair a major United States financial institution. We also improved the reporting and analysis our directors receive, maintained our commitment to the Board's diversity, and further empowered our Board committees to oversee improvements in risk management and corporate culture.

**Strengthening Wells Fargo's Culture**

Our corporate culture is another area that has undergone substantial transformation in recent years. Team members see this change in the elimination of the product sales goals that contributed to the unauthorized accounts problem. They see it in a performance evaluation system that prioritizes serving customers and managing risk. They see it in increased compensation, including a new hourly minimum wage of $15 and pay increases for tens of thousands of employees who were already at that level or higher. They see it in restricted share rights granted to

3

83

approximately 250,000 team members in 2018 to recognize their commitment to the company's future success. And they see it in a corporate culture that encourages team members to speak up without fear of retaliation when they see a problem.

We also provide new benefits for team members, including four additional paid holidays per year, up to sixteen weeks of paid parental leave available to both parents, and paid leave to care for a family member. We now offer backup adult and childcare programs to support the diverse needs of our team members, and we offer U.S.-based team members up to 16 hours of paid community service time to support volunteer involvement in their communities. By the end of 2018, these changes helped bring our team member voluntary attrition, a key measurement of team member satisfaction, to its lowest level since 2013.

Our customers are also seeing the difference. Our customer experience and loyalty survey results are now at their highest levels in the past two-and-a-half years.

**Customer-Focused Innovation**

Wells Fargo serves one-third of America's households, including customers of every income level, age, race, and ethnicity. Our goal is to help them all succeed financially, so another focus of our transformation has been better serving our customers by introducing several tools to help meet their financial needs more fully, conveniently, and economically.

These tools include (1) Overdraft Rewind; (2) Real-Time Balance Alerts; (3) Greenhouse, a personal financial management tool designed for students and others who are new to banking; and (4) Control Tower, a mobile tool that helps customers easily manage the usage of all of their accounts.

*Overdraft Rewind.* In November 2017, we introduced Overdraft Rewind, which automatically reverses overdraft or insufficient-funds fees that would otherwise be assessed on customers the day before a direct deposit is received, when their account balances may be low. We did this because we recognized that this can be a vulnerable time for many customers. In 2018, Overdraft Rewind helped more than 2.3 million customers avoid overdraft fees.

*Real-Time Balance Alerts.* We also rolled out automatic real-time balance alerts to electronically notify checking account customers when their account balances drop to a level they select. These alerts build on the text and email alerts Wells Fargo has offered for a number of years, and they are having a big impact.

4

84

In 2018, we sent an average of more than 37 million alerts a month—meaning 37 million opportunities for customers to avoid a negative outcome or an overdraft.

*Greenhouse.* Late last year, we announced "Greenhouse by Wells Fargo." Greenhouse is for consumers who are new to banking or who need help with personal finance management. Greenhouse provides tools to help customers allocate or set aside money for bills and day-to-day spending. It also provides notifications when bills are due, and enables customers to pay bills directly within the application. Greenhouse and the accompanying debit card are also designed to not allow overdrafts, so customers cannot spend more than they have. Greenhouse is currently in a customer and team member pilot program and will be expanded across the country later this year.

*Control Tower.* In October 2018, we launched Control Tower, a first-of-its-kind digital service for all Wells Fargo consumer and small business customers. Control Tower provides a single view of a customer's "digital financial footprint," including places their Wells Fargo card or account information is connected, such as recurring payments, third parties, and mobile wallets. With this tool, it will be much easier for customers to manage their money and turn debit and credit cards on or off as needed.

**Corporate Citizenship**

Since 2016, Wells Fargo has deepened its already strong commitment to good corporate citizenship. Wells Fargo has always had a history of community involvement and has consistently been ranked as one of America's leading corporate philanthropists. Our commitment to helping address some of the country's most pressing social and economic issues is only growing. In 2018, Wells Fargo expanded its philanthropic giving by more than 50 percent, donating more than $444 million to nearly 11,000 non-profits nationwide. Beginning this year, we will target 2 percent of our after-tax profits for corporate philanthropy. As part of this expanded philanthropy, our goal is to contribute $100 million in capital and other resources over the next three years to support the growth of diverse small businesses.

We believe that owning a home is a primary driver of the health of the communities where we do business and a cornerstone of the American dream, yet access to affordable housing remains a significant challenge in communities across the country. We have developed initiatives and programs to increase homeownership for low-income individuals and minority communities, including $185 billion in multi-year commitments in support of African American and

5

85

Hispanic homeownership. We have also continued to expand our Neighborhood LIFT program, which we started in 2012 together with NeighborWorks America, to help consumers realize their dream of home ownership. Since it began, the Neighborhood LIFT program has provided more than $449 million in down-payment grants to more than 20,000 families in 69 communities across the country.

*     *     *

The past few years have taught us that our company does well by doing right. But doing right does not stop with simply repairing harm and rebuilding trust. It is an ongoing commitment by all of Wells Fargo's 260,000 team members—starting with me—to put our customers' needs first; to act with honesty, integrity, and accountability; and to strive to be the best bank in America.

Thank you again for the opportunity to address this Committee and discuss with you our progress towards becoming the best bank we can be. I am confident that Wells Fargo is well positioned for the future, and I look forward to your questions.

6