# EXHIBIT F

**HOUSE COMMITTEE ON FINANCIAL SERVICES** | **REPUBLICAN STAFF REPORT**
MARCH 5, 2020

# Interim Report III

*Uniquely Flawed: An Overview of Failures and Structural Deficiencies at Wells Fargo*

**Hon. Patrick McHenry | Ranking Member**
Committee on Financial Services

**Hon. Andy Barr | Ranking Member**
Subcommittee on Oversight and Investigations

Case 1:20-cv-02439-JPC   Document 91-5   Filed 01/22/21   Page 3 of 149

## EXECUTIVE SUMMARY

The following report is the third in a series of reports by the House Financial Services Committee Republicans regarding Wells Fargo.  Previous reports detailed how the Obama administration and Consumer Financial Protection Bureau Director Richard Cordray obstructed the Committee's multi-year investigation.  Nevertheless, Committee Republicans found numerous failings by Director Cordray and the CFPB in detecting and remedying Wells Fargo's fraudulent sales practices.

Thanks to greater transparency and more engaged oversight by financial regulators under President Trump, the Committee finally gained access to evidence that was withheld by the prior administration.  The new evidence will allow the public to see how and why Wells Fargo's previous management and Board of Directors failed to repair the damage from the sales practices scandal that came to light in 2016.

The evidence shows how Wells Fargo failed to adopt even the most common industry practices in risk management and protocols.  What is more, even after Wells Fargo's fraudulent sales practices came to light and the resignation of John Stumpf as CEO was finalized, Wells Fargo's Board of Directors seemed to double down on its status as an outlier by selecting a company-insider as its new CEO.

For years, Wells Fargo got away with ignoring standard practices for a bank of its size, but beginning in 2017, financial regulators began making up for lost time.

* * *

On October 12, 2016, the Wells Fargo Board of Directors elected Timothy Sloan to serve as Chief Executive Officer.  Sloan, a 29-year company veteran, was tasked with leading the bank's response to scrutiny from lawmakers, regulators, and investors in the wake of a scandal in which bank employees opened credit card and deposit accounts without customers' permission.

On his first day as CEO, Sloan declared he would "pursue largely the same strategy in restoring the bank's reputation that his predecessor had begun."[1]  Sloan also shared "good news"—he would be surrounded by an experienced team that could help move the company forward.[2]

Sloan's strategy failed.  In fact, evidence shows Sloan and his team provided incomplete and exceedingly optimistic information to Congress, the public, and the Board of Directors.  Wells Fargo was no closer to complying with the regulators' consent orders when Tim Sloan resigned in March 2019 than when his team took over in 2016.

> *Wells Fargo was no closer to complying with the regulators' consent orders when Tim Sloan resigned in March 2019 than when his team took over in 2016.*

Contrary to Sloan's day one assessment, the management team of company insiders failed to understand the scope of the company's problems.  A deficit of in-house risk management expertise stalled the company's efforts to remediate customers and develop a risk management plan.  Between 2016 and 2019, the company routinely

---

1 Michael Corkery and Stacy Cowley, *Wells Fargo's New Boss Is Same as the Old Boss to Congress*, N.Y. TIMES, Oct. 13, 2016.
2 Jonnelle Marte, *What we know about Tim Sloan, the new CEO of Wells Fargo*, WASH. POST, Oct. 13, 2016.

Case 1:20-cv-04494-JLR-SN    Document 91-6    Filed 11/21/21    Page 4 of 149

submitted incomplete plans to the regulators and missed deadlines. Documents and testimony show Sloan's team paid third party consultants to develop key aspects of the company's plans.

The evidence also shows the Board of Directors failed to hold management accountable. Consent orders require the Board of Directors to review the company's plans before they are submitted to the regulators. According to regulators who provided information to the Committee, under Sloan, the bank's submissions under the consent orders typically amounted to "a plan for a plan." The submissions were frequently late or incomplete, or both.

The bank's prudential regulators expected the Board to "provide a credible challenge to management," among other things.[3] The documents show the Board continued to support management despite warnings that the consent order compliance program was inadequate.

However, Wells Fargo's unprecedented compliance challenges trace back to conditions that pre-date Sloan. The company's obsolete structure and extreme sales culture metastasized because Obama-era regulators were slow to recognize risk at the bank and congressional Democrats rushed to the wrong conclusion that the bank is too big to manage.

## WELLS FARGO DID NOT ADAPT WITH THE INDUSTRY

On October 13, 2008, the chief executives of the country's nine largest banks met at the Treasury Department to discuss the terms of a government bailout. Treasury Secretary Henry Paulson Jr. laid out the government's plan to inject $250 billion of capital into the American banking system.[4] The chairman of Wells Fargo, Richard M. Kovacevich, "protested strongly that, unlike his New York rivals, his bank was not in trouble because of investments in exotic mortgages, and did not need a bailout."[5]

Kovacevich's reluctance to participate in the Troubled Asset Relief Program (TARP) was rooted in the fact that prior to 2008, Wells Fargo had avoided the industry's riskiest products, including structured investment vehicles and no-documentation loans.[6] While the Obama administration's focus was on expanding the TARP program beyond large banks, it ignored signs that Wells Fargo's business model was deeply flawed. Trump administration regulators are still picking up the pieces.

> *Unlike the rest of the industry, Wells Fargo maintained its fragmented model, which relied on "strong deference" to the leaders of the company's siloed business lines, who were told to "run it like you own it."*

In the wake of the financial crisis, Wells Fargo "emerg[ed] as one of the best banking franchises in the country."[7] Wells Fargo's perceived core strength—retail banking—and reputation for responsible lending established the company as "the darlings of the financial crisis," according to a former member of the bank's Board of Directors.[8]

---

3 Comptroller's Handbook, *available at:* https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/corporate-risk-governance/pub-ch-corporate-risk.pdf
4  Mark Landler and Eric Dash, *Drama Behind a $250 Billion Banking Deal*, N.Y. TIMES, Oct. 14, 2008.
5 *Id.*
6  Adam Lashinksy, *Riders on the Storm*, FORTUNE, Apr. 20, 2009.
7 *Id.*
8 Interview of Amanda Peetz, former member, Wells Fargo Board of Directors (Jan. 31, 2020). [hereinafter Peetz]

Case 1:20-cv-01491-RDM    Document 91-6    Filed 02/21    Page 5 of 149

But there were red flags everywhere. In 2004, an internal investigation found an increase in sales misrepresentation and manipulation cases in the company's Community Bank.[9] In 2009, customer satisfaction surveys showed Wells Fargo customers chafed at constantly being asked to buy additional products.[10] But the Community Bank division did not change its strategy of relentless cross-selling. There was "no appetite to change the model."[11] Each retail customer was persuaded to buy an average of almost six products.[12]

Following the financial crisis, large banks that engaged in risky lending practices prior to 2008 recognized that management needed visibility throughout the entire firm, to detect and prevent financial and other forms of risk. Unlike the rest of the industry, Wells Fargo maintained its fragmented model, which relied on "strong deference" to the leaders of the company's siloed business lines, who were told to "run it like you own it."[13] Wells Fargo's lack of a fully integrated compliance and risk management program allowed the individual business lines to pursue aggressive sales strategies.

OBAMA-ERA REGULATORS WERE SLOW TO ACT

Wells Fargo's systemic problems were ignored by federal regulators for years. The firm's regulators—the CFPB, the Office of the Comptroller of the Currency (OCC), and the Federal Reserve—are making up for lost time under new leadership.

Federal regulators identified issues related to Wells Fargo's sales practices as early as 2009, when the OCC issued a Supervisory Letter requiring an enterprise-wide system for complaint management.[14] The OCC's Wells Fargo team received information indicating "the highest level of EthicsLine internal complaint cases [and] employee terminations . . . were related to sales integrity violations."[15] But the OCC did not take any meaningful action.

The CFPB entered the bank's regulatory complex on July 21, 2011 under Director Richard Cordray. At that time, Wells Fargo employees who missed their sales targets started filing wrongful termination lawsuits, alleging they were fired for refusing to open fraudulent accounts and engage in improper sales tactics. Approximately 5,300 Wells Fargo employees were fired over a five-year period between 2011 and 2016.[16] The CFPB, like the OCC, failed to notice.

In December 2013, the *Los Angeles Times* reported that "relentless pressure to sell has battered employee morale and led to ethical breaches" at Wells Fargo.[17] According to the story, "To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission, and forged client signatures on paperwork."[18]

After the *Los Angeles Times* broke the story, CFPB supervisory staff were embedded at Wells Fargo in early

---

9 Board Report at 31.
10 Adam Lashinksy, *Riders on the Storm*, FORTUNE, Apr. 20, 2009.
11 Board Report at 31.
12 *Id.*
13 Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report (Apr. 10, 2017), *available at:* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2017/Board-report.pdf. [hereinafter Board Report]
14 OCC Supervisory Letter SL 2009-46 – Compliance and Enterprise Risk Management (2009).
15 OCC Office of Enterprise Governance and the Ombudsman, "Lessons Learned Review of Supervision of Sales Practices at Wells Fargo," Apr. 19, 2017.
16 *Id.* at 109.
17 E. Scott Reckard, *Wells Fargo's pressure-cooker sales culture comes at a cost*, L.A. TIMES, Dec. 21, 2013.
18 *Id.*

Case 1:20-cv-04494-JLR-SN   Document 91-6   Filed 01/22/24   Page 6 of 149

2014.[19]  The bank's aggressive cross-selling strategy and customer abuse continued, unabated, until May 4, 2015, when Wells Fargo notified the CFPB that the Los Angeles City Attorney's office filed a civil complaint related to the company's sales practices.  The Los Angeles Times reported on the complaint the following day.  Committee Republicans found that days later, on May 8, 2015, the CFPB finally initiated a supervisory review.

The documents also show that under Director Cordray, the CFPB sought to substitute the bank's internal investigation for its own.  In May 2016, the CFPB asked the L.A. City Attorney's Office "to slow down its settlement/action a little" until "the CFPB is satisfied that it has sufficient information from the Bank that there is no need for a full investigation."[20]

On September 8, 2016—nearly three years after Wells Fargo's sales practices came to light—the CFPB announced a $100 million fine against Wells Fargo for "widespread unlawful sales practices."[21]  On the same day, the L.A. City Attorney and the OCC announced related settlements with Wells Fargo totaling $85 million.[22]

TRUMP ADMINISTRATION REGULATORS ARE MAKING UP FOR LOST TIME

The evidence shows federal regulators have adopted a more aggressive posture with respect to Wells Fargo during the Trump administration.  In 2018, the OCC, CFPB, and Federal Reserve issued new consent orders limiting the bank's growth and requiring it to make changes to the company's consumer protection and corporate governance practices.

The consent orders covered a litany of transgressions unrelated to the original sales practices scandal, including: illegally repossessing service members' cars (September 2016); charging customers for unneeded auto insurance (July 2017); unjustifiable fines for mortgage customers (October 2017); and pushing investment products that were likely to lose money (October 2017), among others.

*The evidence shows federal regulators have adopted a more aggressive posture with respect to Wells Fargo during the Trump administration.*

The evidence shows under current leadership, federal regulators are engaged with Wells Fargo's management and the Board of Directors regarding the consent orders, which remain in effect.  To date, Wells Fargo has paid more than $4 billion in fines and settlements with federal regulators and the Department of Justice during the Trump administration.

---

19  *The Semi-Annual Report of the Bureau of Consumer Financial Protection, Hearing Before the H. Comm. on Fin. Services*, 115th Cong. (2016) (testimony of Hon. Richard Cordray, Director, CFPB).

20  Email from Jennifer LaRoche to Gerard Sexton *et al.* (May 26, 2016) (OCC-LD-00002794).

21  Consumer Fin. Protection Bureau Blog, "Hundreds of thousands of accounts secretly created by Wells Fargo Bank employees leads to historic $100 million fine from the CFPB" (Sept. 8, 2016), *available at:* https://www.consumerfinance.gov/about-us/blog/hundreds-thousands-accounts-se-cretly-created-wells-fargo-bank-employees-leads-historic-100-million-fine-cfpb/

22  Office of the L.A. City Attorney Press Release (Sept 8, 2016), *available at:* https://www.lacityattorney.org/post/2016/09/08/los-angeles-city-attor-ney-mike-feuer-achieves-historic-result-in-consumer-action-against

## CONGRESSIONAL DEMOCRATS RUSHED TO THE WRONG CONCLUSION

In September 2016, Financial Services Committee Republicans opened an investigation of the bank's sales and incentive plans and the role of the bank's regulators in detecting and preventing the conduct in question. Then-CEO John Stumpf appeared before the Committee on September 29, 2016 at a public hearing, entitled "Holding Wall Street Accountable: Investigating Wells Fargo's Opening of Unauthorized Customer Accounts."

> *Before the Committee had obtained a single document, Maxine Waters stated: "I have come to the conclusion that Wells Fargo should be broken up; it's too big to manage."*

At the hearing, when the Committee's investigation was just days old and before the Committee had obtained a single document, Maxine Waters stated: "I have come to the conclusion that Wells Fargo should be broken up; it's too big to manage."[23] Waters urged Congress to require the company's regulators to revoke the bank's charter and "put them out of business."[24] Waters repeated that Wells Fargo is "too big to manage" when Tim Sloan appeared before the Committee in March 2019.[25]

Other Democrats in the House and Senate rushed to the same conclusion. In 2016, Rep. Brad Sherman concluded Wells Fargo and other large banks are "too big to manage, too big to regulate. It's time to break them up."[26] Sen. Elizabeth Warren similarly wondered whether Wells Fargo "is simply a bank that is too big to manage."[27]

The evidence tells a different story. The documents and testimony obtained since 2016 show Wells Fargo's ongoing inability to address the root causes of widespread sales practice abuses and other consumer-facing scandals are attributable to acute deficiencies in the firm's structure and leadership that made Wells Fargo an outlier among large banks. Simply, the evidence shows Wells Fargo was not "too big to manage," it was grossly mismanaged.

> *The evidence tells a different story. The evidence shows Wells Fargo was not "too big to manage," it was grossly mismanaged.*

The company's Chief Risk Officer, who joined Wells Fargo in 2018 from JPMorgan Chase, said the company's size is "less important" than its capacity to detect and fix problems. Documents and testimony show Wells Fargo lacked that capacity, compared to its competitors. The evidence shows new management is focused on implementing that capacity by importing the industry's best practices related to risk management.

---

23 *Holding Wall Street Accountable: Investigating Wells Fargo's Opening of Unauthorized Customer Accounts, Hearing Before the H. Comm. on Fin. Services*, 115th Cong. (2016) (statement of Hon. Maxine Waters, Ranking Member).
24 *The Case for Holding Megabanks Accountable: An Examination of Wells Fargo's Egregious Consumer Abuses, H. Comm. on Fin. Services Minority Staff Report*, 115th Cong. (2017).
25 *Holding Megabanks Accountable: An Examination of Wells Fargo's Pattern of Consumer Abuses, Hearing Before the H. Comm. on Fin. Services*, 115th Cong. (2019) (statement of Hon. Maxine Waters, Chairwoman).
26 *Holding Wall Street Accountable: Investigating Wells Fargo's Opening of Unauthorized Customer Accounts, Hearing Before the H. Comm. on Fin. Services*, 115th Cong. (2016) (statement of Rep. Brad Sherman).
27 Matt Egan, *Wells Fargo scandal: Elizabeth Warren wants answers*, CNN, Sept. 12, 2016.

The evidence also shows the Board of Directors was slow to recognize the scope of the firm's problems and management's inability to solve them. In fact, Karen Peetz, who was named to the board in February of 2017 and chaired the Board's risk committee, resigned in January 2019 amidst her colleagues' unwillingness to hold management accountable, among other reasons. Peetz told the Committee the Board should have moved sooner to remove certain members of the management team, including Tim Sloan, who was standing in the way of the bank's progress under the consent orders.

GOING FORWARD

The new CEO's emphasis on regulatory compliance above all else gives the bank its best chance to move beyond the sales practices scandal and other consumer abuses that have plagued the bank for nearly 20 years. Wells Fargo's inability to implement an enterprise-wide risk management framework is putting the bank's customers at risk.

The evidence is clear that federal regulators were slow to take action that could have prevented further consumer abuses by Wells Fargo. The Committee and Congress must continue to provide oversight of federal regulators to ensure they are enforcing existing laws and regulations that apply to Wells Fargo. Those laws are in place to protect consumers and require leadership at large financial institutions to manage risk.

## METHODOLOGY

In the 115th Congress, Committee Republicans obtained approximately 140,000 documents from the banks and the regulators that showed the origins of the bank's sales practices scandal and how lax oversight allowed the bank's problems to affect hundreds of thousands of consumers. On June 6, 2017 and September 19, 2017, the Committee's Republican staff issued two interim reports that covered how and why Wells Fargo's fraudulent sales practices occurred across the Community Bank for well over a decade; and how federal regulators were ineffective in detecting and remedying Wells Fargo's extreme sales culture.

The Republican staff reports also detailed how CFPB Director Richard Cordray withheld key evidence and obstructed the Committee's investigation. The June 6, 2017 report stated, "Due to CFPB Director Richard Cordray's failure to honor his legal obligation to produce all records responsive to the committee's subpoena, the committee's Wells Fargo investigation is at an impasse. Key questions remain unanswered."[1] The second Republican staff report stated, "the Committee is regrettably still unable to complete its investigation because Director Cordray remains in default of the Committee's April 4, 2017 Subpoena."[2]

By contrast, during the 116th Congress, Director Kathleen Kraninger produced 21,647 documents on a voluntary basis. The Committee also obtained 19,662 documents from the OCC and 31,514 documents from the Federal Reserve. Wells Fargo produced more than 208,000 documents and the company's Board of Directors provided more than 25,000 internal documents and communications. Committee staff interviewed current and former company officials, Board members, and regulatory staff.

This—the third staff report by Committee Republicans related to Wells Fargo—is based on the documents and testimony described above, and additional publicly-available information. Interviews with Wells Fargo employees were transcribed, and excerpts from those transcripts are included herein. Interviews with regulatory officials were not transcribed based on an agreement between Committee Democrats and agency staff. Therefore, references to their testimony are based on interview notes by Republican staff. Those references were reviewed by agency staff and in some cases, amended for the sake of accuracy.

---

[1] *Was the Cop on the Beat?: Interim Majority Staff Report on the Wells Fargo Fraudulent Accounts Scandal, H. Comm. on Fin. Services Majority Staff*, 115th Cong. (June 6, 2017).

[2] *Did the CFPB Let Wells Fargo "Beat the Rap?": Second Interim Majority Staff Report on the Wells Fargo Fraudulent Accounts Scandal, H. Comm. on Fin. Services Majority Staff*, 115th Cong. (Sept. 19, 2017).

## TABLE OF CONTENTS

**Executive Summary**……………………………………………………………………………………………1

**Methodology**……………………………………………………………………………………………………7

**Key Findings** ………………………………………………………………………………………………… 10

**Background** ………………………………………………………………………………………………… 12

    A.   An Overview of Misconduct at Wells Fargo………………………………………………… 12

        1.   Sales Practices Scandal…………………………………………………………………12

            a.   The Full Scope of the Sales Practices Scandal………………………………… 13

            b.   Civil and Criminal Actions………………………………………………………… 14

        2.   Force-Placed Auto Insurance Scandal……………………………………………17

        3.   Mortgage Rate Lock Scandal……………………………………………………………18

        4.   Military Car Repossessions Scandal …………………………………………………19

        5.   Market-Linked Investments (MLIs) Scandal………………………………………19

    B.   An Overview of the Company's Major Outstanding Regulatory Requirements …………… 20

        1.   2016 CFPB and OCC Consent Orders ……………………………………………… 20

        2.   2018 CFPB and OCC Consent Orders ……………………………………………… 21

        3.   2018 FRB Consent Order ……………………………………………………………… 21

**The Root Causes of the Bank's Ongoing Compliance Challenges** ……………………………… 22

    A.   Leadership Failures …………………………………………………………………………… 23

        1.   Tim Sloan……………………………………………………………………………………24

            a.   Failure to Hold Employees Accountable ………………………………………… 26

            b.   Refusal to Hire a Chief Operating Officer………………………………………… 27

            c.   Misplaced Focus on Growth……………………………………………………… 29

            d.   Misleading Public Statements…………………………………………………… 30

        2.   Mike Loughlin……………………………………………………………………………… 33

    B.   Structural Deficiencies ……………………………………………………………………… 39

        1.   Federated Structure…………………………………………………………………… 39

        2.   Lack of an Enterprise-Wide Risk Management System ……………………………… 47

        3.   An Immature Risk and Compliance Culture ……………………………………………51

    C.   Deficit of In-House Expertise ……………………………………………………………… 53

        1.   Justin Thornton ………………………………………………………………………… 53

        2.   Theresa LaPlaca……………………………………………………………………… 59

    3.    Mark D'Arcy ................................................................................. 62

    4.    Reliance on Third-Party Consultants.......................................... 64

**The Role of the Board of Directors** ............................................................. **68**

    A.   Incomplete Submissions ..................................................................... 69

    B.   Missed Deadlines ................................................................................ 77

    C.   Ineffective Oversight.......................................................................... 80

**Snapshot of the Bank's Ongoing Transformation**..................................... **88**

    A.   Some Signs of Progress ....................................................................... 89

    B.   New Leadership ................................................................................... 91

        1.    CEO Charles Scharf ...................................................................... 92

        2.    Scott Powell ................................................................................. 93

    C.   Reorganization .................................................................................... 94

    D.   Reforms to the Board of Directors...................................................... 94

**Conclusion**....................................................................................................... **98**

**Exhibits** .......................................................................................................... **100**

## KEY FINDINGS

**FINDING 1:**

Documents and testimony show Sloan undermined the company's efforts to comply with the terms of the consent orders by failing to create a culture of accountability, resisting recommendations from risk management experts, and focusing on the company's growth and business reputation at the expense of regulatory compliance.

**FINDING 2:**

The OCC downgraded Wells Fargo's CAMELS score for management in 2017 in part because of Tim Sloan's unwillingness to hold managers accountable and an overall lack of urgency with respect to regulatory compliance.

**FINDING 3:**

Tim Sloan made a series of incomplete and overly optimistic public statements about the bank's progress toward complying with the CFPB and OCC consent orders, and the FRB's asset cap. Sloan's predictions related to the timeline for satisfying regulatory requirements were overly optimistic and were unsupported by the facts on the ground.

**FINDING 4:**

Wells Fargo's risk management program is deficient because it largely pre-dates the financial crisis. The company's Chief Risk Officer from 2008 – 2018 was a credit risk expert but lacked experience and expertise to overhaul the company's nonfinancial risk management program, which remains immature compared to other large banks that developed new risk frameworks after the financial crisis.

**FINDING 5:**

Documents and testimony show the company's federated structure also undermined the effort to create an enterprise-wide risk management system and otherwise comply with requirements in the consent orders to make systemic changes. The evidence also shows Wells Fargo's structure was unusual among large banks.

**FINDING 6:**

In 2016, the company's individual lines of business were responsible for creating their respective risk management plans. The Wells Fargo consent order response team was relegated to a support role. This arrangement undermined the company's effort to create an enterprise-wide risk management program like those at other large banks.

**FINDING 7:**

Wells Fargo relied extensively on consultants and contractors, including to draft the plans the bank submitted to the CFPB and OCC under the consent orders. The bank's over-reliance on consultants reflected a lack of in-house expertise.

**FINDING 8:**

The CFPB objected that Wells Fargo routinely submits "a plan for a plan," rather than fully developed strategies as required by the consent orders.

**FINDING 9:**

Wells Fargo expected its regulators to effectively create a redress plan for the company. This fundamental misunderstanding of the supervisory relationship revealed that the bank lacked the expertise to develop a complete plan to remediate customers who were harmed. To date, the bank has not received a supervisory non-objection for a complete redress plan.

**FINDING 10:**

The Federal Reserve Board had concerns about the "safety and soundness" of Wells Fargo after the company submitted its initial plan in response to the February 2, 2018 Consent Order. The plans were so inadequate as to raise concerns about the company's leadership.

**FINDING 11:**

Wells Fargo routinely requests extensions to deadlines for submitting remediation and reform plans. The bank's regulators typically grant those requests, but the company's plans remain deficient, even with the extra time. Wells Fargo's inability to submit plans that meet regulatory standards exposes the bank's customers to additional harm, according to the bank's regulators.

**FINDING 12:**

The OCC and CFPB expect a bank's board to ensure compliance with bank enforcement actions within required time frames by holding management accountable, among other things. The documents show the Board continued to support the company's management despite overwhelming evidence that the consent order compliance program was inadequate.

## BACKGROUND

Wells Fargo's consumer-facing misconduct affected millions of consumers in all fifty states, resulted in the firing of thousands of employees, the replacement of two CEOs and several members of upper level management, and fines and restitution payments totaling over four billion dollars and counting.

## A. An Overview of Misconduct at Wells Fargo

Sales employees at Wells Fargo's Community Bank—the company's retail arm responsible for products such as consumer savings and checking accounts and credit and debit cards—opened millions of unauthorized accounts and issued millions of unauthorized cards to meet aggressive sales goals. Thousands of employees who were unable or unwilling to meet those goals were terminated. The sales practices in question began as early as 2002. Documents and communications show top executives, including former CEO John Stumpf, were aware of the Community Bank's sales practices.

The so-called "sales practices scandal" is the company's best-known instance of consumer abuse, but there are several others. The company was also found to have illegally repossessed service members' cars; charged customers for unneeded auto insurance; levied unjustifiable fines against mortgage customers; and pushed investment products that were likely to lose money, among other misconduct.

### 1. Sales Practices Scandal

As early as May 1, 2002, Wells Fargo employees opened financial accounts and took other actions without customers' knowledge or consent. This conduct was spurred by "aggressive" sales goal targets, a compensation structure that incentivized employees to engage in these practices for financial rewards,[1] and an oversight environment that not only lacked effective supervisory control but was characterized by managers who would "berate, demean and threaten employees" who failed to meet quotas.[2] To meet the company's aggressive goals, Wells Fargo sales employees:

- Opened roughly 1.5 million deposit accounts and temporarily transferred funds between customers' accounts to fund them.[3] Consumers were charged about $2

---

[1] Michael Corkery, *Wells Fargo Fined $185 Million for Fraudulently Opening Accounts*, N.Y. TIMES, Sept. 8, 2016.
[2] Matt Levine, *Wells Fargo Opened a Couple Million Fake Accounts*, BLOOMBERG, Sept. 9, 2016.
[3] Consumer Fin. Protection Bureau Press Release, "Consumer Financial Protection Bureau Fines Wells Fargo $100 Million for Widespread Illegal Practice of Secretly Opening Unauthorized Accounts" (Sept. 8, 2016), *available at*: https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-fines-wells-fargo-100-million-widespread-illegal-practice-secretly-opening-unauthorized-accounts/.

million in penalties for failing to maintain minimum balances and insufficient funds, and over-draft fees.[4]

- Applied for roughly 565,000 credit card accounts that may not have been authorized by consumers and which resulted in $403,145 in fees.[5]

- Obtained debit cards without consumers' knowledge or consent, even going so far as to create PINs without telling consumers and with fabricated information.[6]

- Enrolled customers in online bill pay plans that led to over 528,000 payments based on deceptive and fraudulent activities, such as creating fake email addresses.[7]

### a.     The Full Scope of the Sales Practices Scandal

The scope of the unauthorized accounts scandal, however, was not limited to bank accounts.  Wells Fargo employees also signed customers up for renters and life insurance products without their knowledge.  As of August 31, 2018, Wells Fargo identified over 5,500 questionable renters and simplified term life insurance policies opened between the period of January 1, 2008 and December 1, 2016 and over 1,000 questionable simplified term life insurance policies opened between the period of October 15, 2009 and December 12, 2016.[8] These policies were either opened without a customer's consent, involved an employee gaming the incentive compensation system, or involved a customer complaint based on a lack of consent that could be neither corroborated nor rebutted.[9]  Wells Fargo employees also engaged in:

- Signing up family members and friends for accounts. Employees "report that they spend holiday dinners trying to convince family members to sign up for accounts."

- "Bundling," where employees falsely tell customers they cannot get the service they want unless they sign up for other services they do not want.

- "Sandbagging," where employees wait to open requested accounts until the beginning of the next reporting period.

- Lying about monthly fees, either by saying a new account does not have monthly fees when it does; or by requiring the customer to sign up for an additional account to avoid fees for a new account that does not have monthly fees in the first place.

---

[4] Levine, *supra* note 2.

[5] *Id.*

[6] Consumer Fin. Protection Bureau Press Release, "Consumer Financial Protection Bureau Fines Wells Fargo $100 Million for Widespread Illegal Practice of Secretly Opening Unauthorized Accounts" (Sept. 8, 2016), *available at*: https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-fines-wells-fargo-100-million-widespread-illegal-practice-secretly-opening-unauthorized-accounts/.

[7] *Id.*

[8] WELLS FARGO FINAL EXECUTED SETTLEMENT AGREEMENT (Dec. 28, 2018*)*.

[9] *Id.*

- Advising customers who do not want credit cards that they will be sent a credit card anyway, and to just tear it up when it arrives.[10]

### b.    Civil and Criminal Actions

Regulators attributed the sales practices misconduct to an extreme sales culture.  Wells Fargo terminated the employee sales goals program to ensure "customers have full confidence that our retail bankers are always focused on the best interests of customers."[11]  As of August 31, 2018, Wells Fargo has remediated or agreed to remediate over $1.1 million to customers and paid more than $3 billion in fines and settlements with federal regulators and the Department of Justice related to the sales practices scandal.[12]

### CONSENT ORDERS

Wells Fargo accepted a $100 million fine and entered into a consent order with the CFPB[13] and reached settlements with the OCC for $35 million, and the County and City of Los Angeles another $50 million.[14]  The consent orders also required the bank to pay back customers who were harmed.[15]  Both the CFPB and OCC orders are still active.  Those orders are discussed in greater detail in section III.B.1.

### OCC CHARGES AND SETTLEMENTS

On January 23, 2020, the OCC issued a notice of charges against five former senior Wells Fargo executives.  The OCC's notice of charges alleged those executives "failed to adequately perform their duties and responsibilities, which contributed to the bank's systemic problems with sales practices misconduct from 2002 until October 2016.  The misconduct of these individuals allowed the practices to continue for years, affecting millions of bank customers and thousands of lower level bank employees."[16]

---

[10] Levine, *supra* note 2.

[11] Paul Blake, *Wells Fargo to End Product Sales Goals After Accounts Scandal*, ABC NEWS, Sept. 13, 2016.

[12] *Id.*

[13] CONSENT ORDER, *In the Matter of Wells Fargo Bank, N.A.*, Consumer Fin. Protection Bureau, Administrative Proceeding 2016 CFPB-0015 (Sept. 8, 2016).

[14] CONSENT ORDER, *In the Matter of Wells Fargo Bank, N.A. Sioux Falls, South Dakota*, Dep't of Treasury Office of the Comptroller of the Currency, AA-EC-2016-67 (Sept. 2016).

[15] Paul Blake, *Timeline of the Wells Fargo Accounts Scandal*, ABC NEWS, Nov. 3, 2016.

[16] Office of the Comptroller of Currency News Release 2020-6, "OCC Issues Notice of Charges Against Five Former Senior Wells Fargo Bank Executives, Announces Settlement With Others" (Jan. 23, 2020), *available at:* https://www.occ.gov/news-issuances/news-releases/2020/nr-occ-2020-6.html.

**UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| **In the Matter of:** | ) |
| | ) |
| Carrie Tolstedt | ) AA-EC-2019-82 |
| Former Head of the Community Bank | ) |
| | ) |
| Claudia Russ Anderson | ) AA-EC-2019-81 |
| Former Community Bank Group Risk Officer | ) |
| | ) |
| James Strother | ) AA-EC-2019-70 |
| Former General Counsel | ) |
| | ) |
| David Julian | ) AA-EC-2019-71 |
| Former Chief Auditor | ) |
| | ) |
| Paul McLinko | ) AA-EC-2019-72 |
| Former Executive Audit Director | ) |
| | ) |
| Wells Fargo Bank, N.A. | ) |
| Sioux Falls, South Dakota | ) |
| | ) |

**NOTICE OF CHARGES FOR ORDERS OF PROHIBITION AND ORDERS TO CEASE
AND DESIST AND NOTICE OF ASSESSMENTS OF A CIVIL MONEY PENALTY**

Take notice that on a date to be determined by the Administrative Law Judge ("ALJ"), a hearing will commence in the District of South Dakota, unless the parties consent to another place, pursuant to 12 U.S.C. § 1818, concerning the charges set forth herein to determine whether the Comptroller of the Currency ("Comptroller") should issue: Orders of Prohibition pursuant to 12 U.S.C. § 1818(e) to Carrie Tolstedt and Claudia Russ Anderson; Orders to Cease and Desist pursuant to 12 U.S.C. § 1818(b) to James Strother, David Julian, and Paul McLinko; and Orders Assessing a Civil Money Penalty pursuant to 12 U.S.C. § 1818(i) to each of the Respondents, individually.

The OCC also announced settlements with former CEO John Stumpf and other members of the bank's operating committee.[17]  The settlements included:

- A prohibition order and a $17,500,000 civil money penalty (CMP) against Stumpf.

- A personal cease and desist order and a $2,250,000 CMP against the bank's former Chief Administrative Officer and Director of Corporate Human Resources Hope Hardison.

- A personal cease and desist order and assessment of a $1,250,000 CMP against former Chief Risk Officer Michael Loughlin.

---

[17] *Id.*

SEC AND DOJ CHARGES AND SETTLEMENTS

On February 21, 2020, Wells Fargo agreed to a $3 billion settlement with the Securities and Exchange Commission (SEC) and the Department of Justice (DOJ). The payment resolved the company's potential criminal and civil liability related to the sales practices scandal.

The SEC charged Wells Fargo for misleading investors about "the success of its core business strategy" which relied on opening fake accounts for and selling unnecessary products.[18] Wells Fargo agreed to pay $500 million to settle the charges, which will be returned to investors, according to the SEC.[19] The $500 million payment is part of a combined $3 billion settlement with the SEC and the Department of Justice.

According to the SEC's order, between 2012 and 2016, "Wells Fargo publicly touted to investors the success of its Community Bank's 'cross-sell' strategy – selling additional financial products to its existing customers – which it characterized as a key component of its financial success."[20] The SEC's order also found "these accounts were opened through sales practices inconsistent with Wells Fargo's investor disclosures regarding its purported needs-based selling model."[21]

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 88257 / February 21, 2020

**ADMINISTRATIVE PROCEEDING**
File No. 3-19704

| | |
|---|---|
| **In the Matter of**<br><br>**WELLS FARGO & COMPANY,**<br><br>Respondent. | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

---

[18] Securities and Exchange Commission Press Release, "Wells Fargo to Pay $500 Million for Misleading Investors About the Success of Its Largest Business Unit" (Feb. 21, 2020), *available at:* https://www.sec.gov/news/press-release/2020-38.
[19] *Id.*
[20] *Id.*
[21] *Id.*

The company's criminal liability stemmed from the fact that thousands of employees provided millions of accounts or products to customers "under false pretenses or without consent, often by creating false records or misusing customers' identities."[22]

Under the terms of the settlement, the Justice Department will not pursue criminal charges against the bank if it cooperates with other investigations and complies with relevant laws for three years.  The agreement does not cover the bank's force-placed auto insurance and mortgage rate lock scandals, covered in sections III.A.2-3, below.  The agreement does not preclude criminal charges against individuals in connection with the sales practices scandal.

## 2.  Force-Placed Auto Insurance Scandal

The Wells Fargo Auto division financed auto loans and leases.  These financing agreements required borrowers to have comprehensive and collision insurance for the duration of the agreement, as the motor vehicle served as collateral.[23]  To verify coverage, Wells Fargo used a third-party vendor to monitor borrowers' insurance.[24]  If the vendor was unable to verify that a borrower maintained the required insurance through information obtained directly from insurance companies and from other data aggregators, the vendor was required to send multiple written notices to the borrower and call both the borrower and the borrower's previous insurance provider to request evidence of insurance.[25]

If these insurance requirements were still not verified, Wells Fargo could protect its loan by acquiring force-placed insurance on the borrower's behalf.  These affected customers would then have the insurance premium from the force-placed insurance plus interest added to their existing loan or lease.  If borrowers failed to pay the amounts, Wells Fargo charged additional fees, which, in some instances, resulted in delinquency, loan default, and even repossession.[26]

Since 2005, Wells Fargo force-placed insurance on the vehicles of about two million borrowers who secured auto loans with the bank.  By the end of 2018, Wells Fargo's own analyses found the Auto division force-placed duplicative or unnecessary insurance on roughly 850,000 accounts.[27]  In effect, those customers were being charged for auto insurance they did not need, typically over $1,000 a policy.[28]

Wells Fargo was aware, by virtue of vendor-reported force-placed insurance cancelation rates, that it had improperly maintained force-placed insurance policies on the borrowers'

---

[22] Dep't of Justice Press Release, "Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization" (Feb. 21, 2020), *available at:* https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices.

[23] CONSENT ORDER, *In the Matter of Wells Fargo Bank, N.A.*, Consumer Fin. Protection Bureau, Administrative Proceeding File No. 2018-BCFP-0001, 3 (Apr. 20, 2018).

[24] *Id.*

[25] *Id*.

[26] *Id.* at 10.

[27] *Id.*

[28] Matt Egan, *Wells Fargo may have forced 570,000 customers into unneeded auto insurance*, CNN BUSINESS, July 28, 2017.

accounts even after the borrowers had provided adequate proof of insurance. Unnecessary force-placed insurance charges could have contributed to defaults that resulted in over 51,000 repossessions between 2005 and 2016.[29]

In April 2018, the OCC and CFPB fined Wells Fargo $1 billion in part for the bank's force-placed insurance issue practices and a separate scandal involving the company's mortgage business—the mortgage rate lock scandal, discussed below.

### 3. Mortgage Rate Lock Scandal

Wells Fargo offers mortgages through its Home Mortgage division. During the loan process, the company offered prospective borrowers the ability to lock a fixed interest rate for a period while their mortgage loan application was pending. Depending on the circumstances, if a residential-mortgage loan did not close during the defined rate-lock period, Wells Fargo could charge the prospective borrower a "Rate Lock Extension Fee."[30]

Wells Fargo trained its loan officers to inform prospective borrowers they could be responsible for paying extension fees under circumstances where the delay was caused by the borrower or related to the property itself.[31] However, within days of advising their loan officers, Wells Fargo internally acknowledged that its guidelines and training were inadequate.[32]

In October 2016, three years after these inadequacies were first highlighted, a Wells Fargo internal audit found that the bank had inconsistently applied its policy and continually charged borrowers Extension Fees in situations where Wells Fargo was responsible for the delay in the loan's closing.[33] These fees varied depending on the size of the loan but some were as high as $4,500.

Additionally, these systemic failures were punctuated with claims of outright fraud. One such lawsuit, filed by a Wells Fargo mortgage banker who worked in a Beverly Hills branch, alleged that the bank falsified processing records, so it could blame the delay up on borrowers, and fired him for trying to report the practice.[34] This employee estimated that the overcharge from his branch alone amounted to "millions in improper fees."[35]

In October 2017, Wells Fargo admitted that it charged roughly 110,000 customers a Rate Lock Extension Fee, even though the missed deadline was due to a delay on the part of the

---

[29] WELLS FARGO FINAL EXECUTED SETTLEMENT AGREEMENT (Dec. 28, 2018).

[30] CONSENT ORDER, *In the Matter of Wells Fargo Bank, N.A.*, Consumer Fin. Protection Bureau, Administrative Proceeding File No. 2018-BCFP-0001, 5-6, (Apr. 20, 2018).

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] James Rufus Koren, *Wells Fargo stuck mortgage borrowers with extra fees, whistle-blower's lawsuit says*, L.A. TIMES, July 14, 2017.

[35] *Id.*

bank.[36]  The 110,000 instances added up to more than $100 million in fees.[37]  Wells Fargo committed to contact all 110,000 customers that were charged with "mortgage rate lock extension fees."

### 4. Military Car Repossessions Scandal

In September 2016, the Justice Department charged that Wells Fargo had, from 2008 to 2015, illegally seized 413 cars owned by service members without a court order, in violation of the Servicemembers Civil Relief Act.[38]  The first complaint came from an Army National Guardsman in North Carolina who said the bank seized his car while he was preparing to deploy to Afghanistan.  Wells Fargo then auctioned his car and tried to collect a balance of $10,000 from his family.[39]

While in the process of settling the complaints, Wells Fargo found an additional 450 service members were affected in the relevant time period.[40]  Subsequently, Wells Fargo agreed to repair the credit of the service members and to pay each $10,000, plus any lost equity in the vehicle, with interest.

### 5. Market-Linked Investments (MLIs) Scandal

In 2002, Wells Fargo Investments began offering market-linked investments (MLIs) to customers.  An MLI is a fixed maturity financial product for which interest payments are determined by the performance of a reference asset or market measure such as a commodity index over the term of the product.  MLIs involve significant upfront fees and are generally meant to be held by the investor until maturity.

In October 2017, regulators revealed Wells Fargo employees recommended that customers sell their MLIs before maturity, in order to realize gains, and then reinvest those gains in new MLIs.  These reinvestments, resulting from employee recommendations, would generate such substantial fees for the customer that it entirely undermined the investment strategy, resulting in either unnecessarily diminished gains or outright losses.

Regulators found bank employees provided this investment advice while not adequately understanding the fees and that the instruments were likely to lose value over time.[41]  Further,

---

[36] Matt Egan, *Wells Fargo wrongly hit homebuyers with fees to lock in mortgage rates*, CNN BUSINESS, Oct. 4, 2017.

[37] *Id.*

[38] Dep't of Justice Press Release, "Justice Department Reaches $4 Million Settlement with Wells Fargo Dealer Services For Illegally Repossessing Servicemembers' Cars" (Sept. 29, 2016), *available at*: https://www.justice.gov/opa/pr/justice-department-reaches-4-million-settlement-wells-fargo-dealer-services-illegally.

[39] *Id.*

[40] Matt Egan, *Wells Fargo illegally repossessed another 450 service members' cars*, CNN BUSINESS, Nov. 14, 2017.

[41] Securities and Exchange Commission Press Release, "Wells Fargo Advisors Settles SEC Charges for Improper Sales of Complex Financial Products" (June 25, 2018), *available at*: https://www.sec.gov/news/press-release/2018-112.

Wells Fargo supervisors routinely approved these transactions despite internal policies prohibiting short-term trading or "flipping" of these products.[42]

In June 2018, Wells Fargo, without admitting wrong-doing, and the SEC agreed to a consent order in which Wells Fargo would remit the fees and commissions plus interest, $930,377 in total, for those investments and pay a $4 million penalty.[43]  Wells Fargo stated it "previously made policy and supervision changes related to this matter to improve internal controls" and claimed that just two of its financial advisers were identified by the SEC as having "engaged in a systematic practice of soliciting customers."[44]  The SEC's order is still active.

## B. An Overview of the Company's Major Outstanding Regulatory Requirements

From September 2016 to April 2018, the Consumer Finance Protection Bureau, the Office of the Comptroller of Currency, and the Federal Reserve Board entered into consent orders with Wells Fargo to address unfair and deceptive practices, and governance failures within the bank.  To date, Wells Fargo is still working to address the requirements pursuant to those agreements.  Wells Fargo's inability to meet those requirements is the focus of this report.

### 1. 2016 CFPB and OCC Consent Orders

On September 8, 2016, CFPB and OCC issued consent orders and assessed civil penalties totaling $135 million against Wells Fargo Bank.  According to the consent order, between May 2011 and July 2015, CFPB determined that Wells Fargo opened unauthorized deposit accounts for existing customers and transferred funds to those accounts, without customers' knowledge or consent.  The bank submitted applications for credit cards in consumers' names using consumers' information without their knowledge or consent, and enrolled consumers in online banking services that they did not request.  Furthermore, bank employees ordered and activated debit cards using consumers' information.[45]

The 2016 CFPB Consent Order required the bank to hire an independent consultant to conduct an independent review of the sales practices within the company's Community Bank. The Consent Order listed practices that must be included in the review such as employee training, monitoring policies and procedures, and performance management.  Based on the review, Wells Fargo must then develop a compliance plan to address and correct the deficiencies and implement recommendations.

The OCC issued a Consent Order with similar requirements.[46]  The Comptroller found Wells Fargo lacked an enterprise-wide sales practice oversight program that could have detected

---

[42] *Id.*

[43] *Id.*

[44] Matt Egan, *Wells Fargo accused of misconduct again,* CNN BUSINESS, Jun. 25, 2018.

[45] Consumer Fin. Protection Bureau, 2016-CFPB-0015, *Wells Fargo Bank, N.A. Consent Order* (2016).

[46] Office of the Comptroller of the Currency, AA-EC-2016-67, *Wells Fargo Bank N.A. Consent Order* (2016).

and prevented risk within the company. The OCC required the company to pay $35 million in civil money penalties.

### 2. 2018 CFPB and OCC Consent Orders

In April 2018, the OCC and CFPB fined Wells Fargo bank $1 billion, in part, in connection with the force-placed insurance and the mortgage rate lock scandals. The OCC and CFPB also issued consent orders that required Wells Fargo to develop a "satisfactory compliance risk management program," among other things.[47]

The regulators broadly found Wells Fargo "failed to implement and maintain a compliance risk management program commensurate with its size, complexity and risk profile."[48] The regulators identified inadequate reporting to the Board of Directors regarding the bank's efforts to correct problems. Wells Fargo was required to develop a plan for compliance risk management. The orders also laid out specific timelines for actions to be completed.

For example, the orders stated that Wells Fargo Bank had to submit its compliance risk management plan by late June 2018. Assuming the plan was accepted, the bank's internal audit department would have 120 days to complete an assessment of the bank's progress.

The 2018 consent orders required the bank to create and submit a Compliance Risk Management Plan (CRMP) that prioritizes oversight and a commitment to an effective compliance management system, and an enhanced the Internal Audit program.

To ensure the viability of the programs, the company's Board of Directors must review all submissions. The Bank must also implement a Rate-Lock Remediation Plan and a Force-Place Insurance Remediation plan to provide redress for consumers affected by the two programs.

### 3. 2018 FRB Consent Order

In February 2018, the Federal Reserve Board of Governors responded to Wells Fargo & Company's deficiencies by issuing a cease and desist order.[49] The order restricted Wells Fargo's total asset size to the levels at the end of 2017, until the firm sufficiently improves its governance and controls.[50]

---

[47] Office of the Comptroller of the Currency, AA-EC-2018-15, *Wells Fargo Bank, N.A. Consent Order* (2018).
[48] *Id.*
[49] ORDER TO CEASE AND DESIST, *In the Matter of Wells Fargo & Company San Francisco, California,* Board of Governors of the Federal Reserve System, Docket No. 18-007-B-HC (2018).
[50] *Id.* at 8.

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

Docket No. 18-007-B-HC

In the matter of

**WELLS FARGO & COMPANY**
San Francisco, California

Order to Cease and Desist
Issued Upon Consent Pursuant to
the Federal Deposit Insurance Act,
as Amended

The FRB required the company to create a Risk Management Program to improve firmwide compliance and operational risk management programs.  The plan must include specific measures that the Bank will take to ensure business lines follow regulations and policies.[51]  Until the company accomplishes those requirements, and several others, it is prevented from growing past approximately $1.95 trillion in assets.

## THE ROOT CAUSES OF THE BANK'S ONGOING COMPLIANCE CHALLENGES

Wells Fargo experienced difficulties unlike any other major financial institution. Following the financial crisis, large banks that engaged in risky lending practices prior to 2008 recognized that management needed visibility throughout the entire firm, to detect and prevent financial and other forms of risk.  Unlike the rest of the industry, Wells Fargo maintained its fragmented model, which relied on "strong deference" to the leaders of the company's siloed business lines, who were told to "run it like you own it."[52]  Under Wells Fargo's fragmented structure, risk officers reported to individual business line leaders, which positioned managers to choose between risk management and their bottom lines.

Documents show Tim Sloan and his management team were unable to transform the company.  A deficit of in-house risk management expertise stalled the company's efforts to remediate customers and develop a risk management plan.  The evidence also shows the Board of Directors was slow to recognize the scope of the firm's problems and management's inability to solve them.

---

[51] *Id*. at 6.

[52] Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report (Apr. 10, 2017), *available at:* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2017/Board-report.pdf. [hereinafter Board Report]

The bank's regulators identified numerous problems unique to Wells Fargo, including the absence of an enterprise-wide compliance risk management program. According to the OCC, that deficiency constituted "reckless, unsafe, and unsound practices and resulted in violation of unfair practices prong of Section 5 of the Federal Trade Commission Act."[53] The consent orders require the company to create an enterprise-wide compliance risk management program for the bank, among other things.[54] That effort is ongoing.

In a March 2019 Quarterly Management Report, the OCC addressed some of the company's outstanding major issues.[55] The OCC identified that "management and board oversight remain inadequate" to efficiently implement the needed changes under the consent order.[56] The report stated that "although the bank is making progress in certain areas, significant time elapsed before the bank began demonstrating progress, and overall, progress is very slow."[57] The OCC expressed frustration with the lack of progress and continued incomplete submissions to the regulators.[58] The report continues that "the vast majority of progress appears to come after repeated pressure by regulators, calling out missed deadlines, failed validations, and poor-quality action plans."[59] The OCC states that the response from the bank has been "unacceptable."[60]

As recently as July 2019, the OCC found "minimal change" with respect to the status of the Enforcement Actions and the overall number of issues to resolve, among other things.[61]

## A. Leadership Failures

In March 2019, Wells Fargo Chief Executive Officer Timothy Sloan's 31-year career at the bank ended when he announced his retirement. Sloan issued a statement: "It has become apparent to me that our ability to successfully move Wells Fargo forward from here will benefit from a new CEO and fresh perspectives."[62] The documents and testimony show Sloan was right—new leaders from outside the company are needed to modernize the company and change its culture.

During the period from 2016, when Wells Fargo entered into consent orders with the CFPB and OCC, until March 2019, when Sloan resigned, Wells Fargo was beset by leadership failures on several fronts that undermined the bank's efforts to reform.

---

[53] Office of the Comptroller of Currency News Release, "OCC Assesses $500 Million Penalty Against Wells Fargo, Orders Restitution for Unsafe or Unsound Practices" (Apr. 20, 2018), *available at*: https://www.occ.gov/news-issuances/news-releases/2018/nr-occ-2018-41.html.

[54] *Id.*

[55] OCC-HFSC-WF-2019-00002623 (On file with Committee).

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] OCC-HFSC-EF-2019-00008481 (On file with Committee).

[62] Ethan Wolff-Mann, *19 Wells Fargo scandals that surfaced during the Tim Sloan era*, YAHOO! FINANCE, Mar. 29, 2019.

Chief Risk Officer Mike Loughlin, a 36-year veteran of the bank and its predecessors, served in that role from 2008 until he retired in January 2018. Loughlin reported directly to Sloan. Under their leadership, the company's development of an enterprise-wide risk management program stagnated.

Meanwhile, the company's Board of Directors was not sufficiently engaged in developing a plan due to a lack of reliable information and a failure to grasp the extent of the company's shortcomings.

### 1.  Tim Sloan

Tim Sloan was CEO of Wells Fargo from October 2016 until March 2019. Sloan resigned amid criticism of the bank's failure to make progress pursuant to requirements in various regulatory consent orders.[63] Documents and testimony show Sloan prioritized the bank's reputation and performance ahead of reforming the bank's culture, among other things.

When Sloan was named CEO, the company touted his deep knowledge of the company's operations.[64] At the time, Sloan was a 29-year veteran of Wells Fargo.[65] His career at the company included numerous leadership roles across the wholesale and commercial banking operations, including as head of Commercial Banking, Real Estate and Specialized Financial Services.[66] Sloan became president and Chief Operating Officer in November 2015, which placed him in charge of the company's four main business groups, including the Community Banking division—where the sales practices scandal originated.[67] Sloan also served as Chief Financial Officer and, prior to that, as the company's Chief Administrative Officer.[68]

After Sloan resigned, the Board of Directors issued a statement that it was best to seek an outside candidate to replace Sloan.[69] The public perception of the Board's statement was that it "amounted to an admission that the board erred three years ago by appointing another insider after the previous CEO, John Stumpf, resigned following revelations that Wells Fargo had opened potentially millions of unauthorized consumer accounts."[70]

While Sloan was CEO, Wells Fargo remained under the 2016 consent orders with the CFPB and OCC, related to the company's sales practices. In April 2018, Wells Fargo Bank entered into new consent orders with the CFPB and OCC pertaining to the bank's compliance

---

[63] Imani Moise and David Henry, *Wells Fargo CEO Tim Sloan steps down*, REUTERS, Mar. 28, 2019.

[64] Wells Fargo Press Release, "Wells Fargo Chairman, CEO John Stumpf Retires; Board of Directors Elects Tim Sloan CEO, Director; Appoints Lead Director Stephen Sanger Chairman, Director Elizabeth Duke Vice Chair" (Oct. 12, 2016), *available at:* https://newsroom.wf.com/press-release/corporate-and-financial/wells-fargo-chairman-ceo-john-stumpf-retires-Board-directors.

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] Moise and Henry, *supra* note 60.

[70] *Id.*

risk management program and issues regarding certain interest rate-lock extensions on home mortgages and collateral protection insurance (CPI) that was force-placed on certain auto loans.[71]

Additionally, the Federal Reserve restricted the company's total asset size to the levels at the end of 2017.[72]  This unprecedented asset cap was in response to the "widespread consumer abuses and compliance breakdowns."[73]  Specifically, the FRB cited a business strategy that "prioritized its overall growth without ensuring appropriate management of all key risks.  The firm did not have an effective firm-wide risk management framework in place that covered all key risks."[74]

In addition to the growth restriction, the consent order required Wells Fargo to improve its governance and risk management processes, including strengthening the effectiveness of oversight by its Board of Directors.  The FRB stated that until the company makes "sufficient improvements," it will be restricted from growing any larger than its total asset size as of the end of 2017.[75]

> **FINDING:**
>
> Documents and testimony show Sloan undermined the company's efforts to comply with the terms of the consent orders by failing to create a culture of accountability, resisting recommendations from risk management experts, and focusing on the company's growth and business reputation at the expense of regulatory compliance.

Documents show there were concerns whether Sloan did not prioritize addressing the extensive regulatory issues at Wells Fargo and instead focused on coming out from under the FRB's asset cap to grow the company.  For instance, according to notes from a January 24, 2019 meeting between FRB officials and Wells Fargo leadership, the FRB had concerns that Sloan's leadership team "seems to remain focused on lifting the asset cap by the end of the year as the primary goal, and is shaping remediation plans around that."[76]  Indeed, Sloan made a series of statements predicting that the FRB's asset cap would be lifted imminently, including in December 2018 when he predicted the cap would be lifted in the first half of 2019.[77]

Sloan's failure to hold company employees accountable, and several overly optimistic assessments of the bank's progress, caused Sloan to lose the confidence of key stakeholders, including the company's regulators, and eventually, the Board of Directors.

---

[71] Wells Fargo Press Release, "Wells Fargo Enters into Consent Orders with OCC and CFPB" (Apr. 20, 2018), *available at:* https://newsroom.wf.com/press-release/corporate-and-financial/wells-fargo-enters-consent-orders-occ-and-cfpb.

[72] Kevin Wack, Wells Fargo's latest troubles suggest tougher stance by OCC, AMERICAN BANKER, Dec. 6, 2018.

[73] Board of Governors of the Federal Reserve System Press Release, "Responding to widespread consumer abuses and compliance breakdowns by Wells Fargo, Federal Reserve restricts Wells' growth until firm improves governance and controls. Concurrent with Fed action, Wells to replace three directors by April, one by year end" (Feb. 2, 2018), *available at*: https://www.federalreserve.gov/newsevents/pressreleases/enforcement20180202a.htm.

[74] *Id.*

[75] *Id.*

[76] FRB_HFSC-00021564 (Jan. 24, 2019) (On file with Committee).

[77] Emily Glazer, *Wells Fargo Expects Asset Cap to Last Longer Than Expected*, WALL ST. J., Jan. 15, 2019.

### a.  Failure to Hold Employees Accountable

Wells Fargo's Chief Risk Officer, Amanda Norton, who was hired from outside the bank in June of 2018, testified about internal concerns related to progress toward meeting the remediation requirements in the various consent orders under Sloan's leadership.  Norton also raised concerns about whether Sloan was "setting the right tone, whether we were holding people accountable."[78]  Norton stated:

> Q    Okay.  Moving on to Mr. Sloan.  Have you ever had any conversations with anyone at Wells Fargo regarding concerns about Mr. Sloan's performance as CEO?
>
> A    I don't know that I've had direct conversations around his performance, but more conversation around the progress of our remediation under his leadership.
>
> Q    And what was the nature of those conversations, specifically?
>
> A    It would have been largely around whether or not we were putting all the right things in place, whether we were setting the right tone, whether we were holding people accountable, those sort of -- you know, some of the general things we've discussed this morning as some of the challenges that the company has faced in remediating some of this.[79]

## FINDING:

The OCC downgraded Wells Fargo's CAMELS score for management in 2017 in part because of Tim Sloan's unwillingness to hold managers accountable and an overall lack of urgency with respect to regulatory compliance.

In 2017, the OCC downgraded one component of Wells Fargo's CAMELS score. CAMELS stands for capital adequacy, asset quality, management, earnings, liquidity and sensitivity to market risk.  The documents show Sloan's unwillingness to hold managers accountable and a lack of urgency with respect to compliance drove the OCC's decision to downgrade the bank's management.[80]  An OCC official explained that such downgrades do not happen often because management usually does what is necessary to avoid a downgrade.[81]  The OCC official also stated, "Accountability has been a long-standing challenge."[82]

---

[78] Transcribed Interview of Amanda Norton, Chief Risk Officer, Wells Fargo (Dec. 11, 2019), Transcript at 91. [hereinafter Norton Tr.]

[79] *Id.*

[80] OCC.

[81] *Id.*

[82] *Id.*

The OCC presented the management downgrade to Sloan and the Board of Directors.[83] The downgrade had been a topic of conversation for months before the OCC had to finally take official action.[84]

An OCC official specifically raised concerns about Sloan's commitment to accountability and progress on remediation at a March 2019 meeting with the Board.[85] Documents show the OCC advised the Board: "The purpose of today's meeting is to discuss—again—the themes the OCC has presented to the Board and management for some time, namely progress and accountability."[86] The OCC's talking points for the meeting show OCC officials voiced their concerns to the Board regarding Sloan's leadership. The document states:

- [W]e told you it was essential the bank demonstrate the ability and willingness to remediate known issues and establish an adequate risk management framework under Tim's leadership. You have not done that. Progress has been very slow at best, and in many cases simply insufficient. We seriously question whether the CEO can affect the necessary changes given the circumstances.

In the March 2019 Board of Directors meeting, OCC staff delivered a stark assessment of Sloan's leadership.[87] Sloan was asked to leave the room as the board moved into Executive Session so regulators could speak freely about the CEO.[88] The evidence shows OCC staff told the Board: "We believe accountability starts at the top of the institution. In this case, Tim has had over two years to demonstrate his leadership over Wells Fargo and the results – in risk, technology, and compliance to name of the most significant areas where the bank has struggled – are clear."[89]

### b. Refusal to Hire a Chief Operating Officer

Karen Peetz, who served as Chair of Wells Fargo's Board's Risk Committee, testified that she had numerous meetings with Sloan about hiring a COO to handle areas where Sloan lacked expertise.[90] According to Peetz, Sloan believed he could perform the responsibilities of a COO.

Peetz stated Sloan was "not able" to make the required changes and needed a strong COO who would be sufficiently high ranking to impose the shift towards an enterprise wide risk program.[91] Peetz testified:

---

[83] *Id.*

[84] *Id.*

[85] OCC-HFSC-WF-2019-00039642. (On file with Committee).

[86] *Id.*

[87] OCC.

[88] OCC.

[89] OCC-HFSC-WF-2019-00039642

[90] Peetz.

[91] *Id.*

Q     Where did the conversation about a COO come from?

A     Many of our peer banks had gone to the model to have a person that could run technology and risk integration. It is standard for HR to come under the COO.

Q     How was the recommendation of hiring a COO presented to Tim Sloan?

A     OCC indicated that it was standard procedure and I felt strongly that he [Sloan] needed it. A person to oversee the functions of a COO was one of these big deficiencies, and eventually the whole Board agreed.

Q     What was Sloan's view on hiring a COO?

A     I can't get in his head, but it seemed to me he was focused on what it used to mean at Wells Fargo and not what it could do for the company with needing to work with the consent orders. The whole Board believed Sloan should hire a COO.  Betsy requested that Sloan speak with the Board, and he met with every Director separately.  Although everyone wanted a COO, their views of what the role would consist of was different. After Sloan spoke with every director, he came to the decision that he would not hire a COO.  I brought this up to him every time we would talk because I believed it would fill the deficiencies that the company was experiencing. I know Juan made a special trip to speak with Tim in person about needing a COO.  The Board wanted this position filled.

Q     Did Mr. Sloan ever articulate his basis for rejecting a COO?

A     I think he believed he as CEO could handle everything. He had confidence, maybe overconfidence, in people collaborating.

Q     You characterized Sloan as willing but unable?

A     Yes.

Q     Did you express this to other Board members?

A     Everyone was on their own journey as he retired. I was a banker, and I like structure; I was probably on early side of having real concerns about whether he could do it.

Q     Was your response to seeing his unable-ness to suggest hiring a COO who could fill the gaps?

> A    I think it would have helped structurally and I think enhancing the effective of the firm.
>
> Q    Did you express your view of Tim Sloan to him?
>
> A    Yes.  He knew I went from friend to foe.[92]

Amanda Norton similarly advised Sloan to hire a COO, to no avail.  Norton first made the recommendation by email and followed up several times.  Sloan did not hire a COO, and never explained his reasons to Norton.[93]  She testified:

> Q    You mentioned that you had made a recommendation to Mr. Sloan regarding hiring a COO and noting that it's a common practice to at least have an equivalent function at other financial institutions. What was his response to that recommendation?
>
> A    On the -- on the initial recommendation I made through an email where I had put a couple of things in writing, I did not get a response, other than, okay, thanks.
>
> Q    Did you follow up with Mr. Sloan after sending that email?
>
> A    Yes.  We had a number of conversations where other matters might come up.  And I would say something like, you know, this would normally be a COO type role or I think we should get a COO.  I can't recall the specific conversations, but they were, you know, general conversations about other matters that I raised it.
>
> Q    So based on your experience raising this issue, did you get the impression that Mr. Sloan wasn't taking the recommendation seriously?
>
> A    I can't comment on whether he was taking it seriously.  I mean, I think my sense of the matter was he had reasons for thinking that one wasn't appropriate at this time.  And, you know, that was his decision to make as the CEO.
>
> Q    Did he ever articulate those reasons to you?
>
> A    No, I don't recall him ever being specific about the actual reasons to me directly.

c.  Misplaced Focus on Growth

---

[92] Peetz.

[93] Norton Tr. At 125.

An OCC official explained that Sloan did not prioritize compliance until the FRB placed the company under an asset cap in February of 2018.[94]  Sloan's top priority was to grow the business and the cap would stunt that progress.[95]  The OCC staff believed Sloan's top priority was to lift the Fed's asset cap.[96]  The OCC official testified:

> Q:    What was Tim Sloan's highest priority?
>
> A:    The asset cap was Sloan's highest priority in 2018, no question.[97]

Norton discussed with Board members that under Sloan's direction, management teams needed to be free to focus on remediation work and not worry about growing the business.[98]  Norton stated that Sloan, however, was focused on lifting the Fed cap, among other priorities.[99]  Norton told the Committee:

> Q    Have you ever heard from anyone at Wells Fargo that Mr. Sloan was overly focused on lifting the asset cap with respect to the Fed consent order versus remediating the issues that the consent order identified?
>
> A    I think Tim had focus on lifting the asset cap, yes.[100]

Karen Peetz testified to the Committee that the bank's regulators raised concerns about Sloan's misplaced focus on the asset cap.  Peetz stated:

> We got feedback from regulators and we told Tim that the asset cap was not to be his motivation.  But he got impatient about how to move forward and inappropriately mentioned that the Fed would remove the cap and was reproved by the Board.  He was told this was not a good impression to leave with the regulators.[101]

Shortly after the Board advised Sloan of the FRB's concerns, he resigned.

### d.  Misleading Public Statements

---

[94] OCC.
[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] Norton Tr. at 156.
[99] *Id.*
[100] *Id.*
[101] Peetz.

Sloan downplayed the bank's deficiencies in statements to the press and to congressional questioners. When Sloan testified in front of the Committee on March 12, 2019, he stated the bank had transformed and was fully complying with its regulators.[102] Sloan stated the bank had done everything the regulators asked, and was on track to resolve the consent orders.[103] These comments were met with great skepticism during the hearing.[104]



**BUSINESS**

## CEO Says Wells Fargo Has Transformed After Scandals; Lawmakers Are Skeptical

March 12, 2019 · 5:52 PM ET

Just an hour after Sloan finished testifying, the OCC issued an unprecedented statement to correct the record.[105] An OCC spokesman stated: "We continue to be disappointed by Wells Fargo's performance under our consent orders and its inability to execute effective corporate governance."[106]

**THE WALL STREET JOURNAL.**

WEDNESDAY, MARCH 13, 2019 · VOL. CCLXXIII NO. 59    WSJ.com    ★★★★ $4.00

DJIA 25954.66 ▼ 96.22 0.4%   NASDAQ 7591.03 ▲ 0.4%   STOXX 600 373.25 ▼ 0.1%   10-YR. TREAS. ▲ 11/32, yield 2.605%   OIL $56.87 ▲ $0.08   GOLD $1,296.30 ▲ $7.50   EURO $1.1289   YEN 111.35

## Regulator Slams Wells Fargo After CEO Testifies to Congress

Democrats and Republicans confront Timothy Sloan on bank's continued problems

An OCC official described that Sloan's depiction of the situation with Wells Fargo was too optimistic.[107] That official did not agree with his assessment because the OCC had not approved all of the bank's submitted plans.[108] The official described Sloan's testimony as

---

[102] Daniella Cheslow, *CEO Says Wells Fargo Has Transformed After Scandals; Lawmakers Are Skeptical*, NPR, Mar. 12, 2019.
[103] *Id.*
[104] *Id.*
[105] Rachel Louise Ensign and Andrew Ackerman, *Regulator Slams Wells Fargo After CEO Testifies to Congress*, THE WALL STREET JOURNAL, Mar. 12, 2019.
[106] *Id.*
[107] OCC.
[108] *Id.*

"inaccurate" and sent messages to members of the company's Board of Directors to share those concerns.[109]

Other officials at the bank's regulators took issues with Sloan's public statements in March of 2019. A CFPB official "did not feel comfortable" with Sloan's testimony.

---

**FINDING:**

Tim Sloan made a series of incomplete and overly optimistic public statements about the bank's progress toward complying with the CFPB and OCC consent orders, and the FRB's asset cap. Sloan's predictions related to the timeline for satisfying regulatory requirements were overly optimistic and were unsupported by the facts on the ground.

---

An FRB official stated Sloan's statements about exceeding the FRB's expectations were false.[110] Sloan called the Federal Reserve to apologize for his mischaracterizations in statements during the hearing and to the media.[111] Sloan's comments downplayed the bank's status with the regulators and mischaracterized the situation to Congress.

Sloan also misrepresented the bank's progress toward lifting the FRB's asset cap in a series of public statements. In February 2018, Sloan said the company was "on the fast track" to meeting the FRB's requirements under the asset cap. At the time, Wells Fargo had not even submitted a plan to the FRB to improve its governance and risk management controls. Officials from the FRB stated to the Committee that Sloan knew or should have known at the time it was unrealistic to expect the cap to be lifted in early 2018.

When he spoke to CNBC in December 2018, the Federal Reserve had just rejected the company's initial plan for changes to its governance and risk management programs. Sloan told CNBC that he expected the asset cap to be lifted in the first half of 2019.[112] As in February, there was no basis for such an optimistic prediction. Amanda Norton did not agree with Sloan's assessment. She stated:

> Q    My understanding is that in early December, Tim Sloan made some
>      sort of public statement, perhaps at a conference, that he expected
>      the asset cap to be lifted relatively soon. Do you recall that?
>
> A    I don't recall the exact conference that you're referencing, but I do
>      recall that a statement like that was made, yes.
>
> Q    Was that surprising to you, having been, to some extent, familiar
>      with the October 31 submission and the status of the Fed's feedback

---

[109] *Id.*
[110] Interview of FRB officials (Feb. 7, 2020) [hereinafter FRB]
[111] FRB.
[112] Statement of Tim Sloan, *Squawk On The Street*, CNBC, Dec. 4, 2018, *transcript available at:*
https://www.valuewalk.com/2018/12/wells-fargo-ceo-tim-sloan-cnbc/.

Q    up to and after that point?  Did it surprise you that Tim Sloan would make that prediction?

A    It was not surprising he made that statement.  Did I agree with it? No.[113]

## 2. Mike Loughlin

Mike Loughlin joined Wells Fargo in 1986.[114]  Loughlin served as the company's Chief Risk Officer (CRO) from 2008 until his retirement in January of 2018.[115]  Loughlin was responsible for mitigating financial and nonfinancial risk throughout the company.[116]

Amanda Norton, who replaced Loughlin as Chief Risk Officer at Wells Fargo in June 2018, testified that the company's non-financial risk management programs were inadequate when she joined the company.[117]  Norton stated it was "fair to say that the primary cause – primary root cause – of the issues were operational – operational breakdowns."[118]

Norton stated that the company's financial risk program seemed to meet industry standards, but compliance and operational risk were "immature" compared to other large financial institutions.[119]  The firm's metrics for measuring non-financial risk "were built out" over time.[120]  Norton told the Committee:

Q    Okay.  I'd like to speak with you about some of the specific roles that are reflected in this document, and I understand that some of the structure has changed, but I'd like to talk about some of the folks who were in these roles at the time that you started.  But first I'd like to speak with you about Mr. Loughlin.  Do you know what -- what was Mr. Loughlin's reason for leaving the firm?

A    I understand he retired.

Q    Do you know whether his departure was voluntary -- his retirement was voluntary?

A    I do not know that for sure.

Q    Have you had any conversations that would lead you to believe that his departure may have been involuntary?

---

[113] Norton Tr. at 174.
[114] *Wells Fargo's Chief Risk Officer Mike Loughlin to Retire*, BUSINESS WIRE, Jan. 17, 2018.
[115] *Id.*
[116] *Id.*
[117] Norton Tr.
[118] *Id.*
[119] *Id.*
[120] *Id.* at 36.

A    I think what I know is, Mike Loughlin was a very strong credit risk manager. He had neither experience or expertise in building or running what today is the expectation of a CRO around the nonfinancial risks. So I'm sure that -- you know, I'm sure there were challenges around, you know, his experience and expertise as CRO. But I don't know how that was connected. That all happened obviously before I joined.

Q    You just said that he had -- to your knowledge, little experience with respect to nonfinancial risks. Based on your understanding, does the 2016 sales practice consent order issued by the CFPB and OCC, do they relate to nonfinancial risks?

A    Yes, they do.

Q    Would you say that the primary focus of those consent orders are on nonfinancial risk?

A    Yes, primarily, they would be nonfinancial risks, yes.

Q    And how about the Federal Reserve's 2018 consent order, does that primarily in your view relate to nonfinancial risks?

A    The Fed consent order is primarily focused on the management of nonfinancial risks.

Q    And how about the April 2018 consent orders issued by the OCC and CFPB?

A    Those two consent orders would also be primarily focused on nonfinancial risk management.

Q    Prior to your arrival, can you remind us who was responsible for managing nonfinancial risk at Wells Fargo?

A    The entire company is responsible for managing nonfinancial risks, but you do need -- as the CRO, you're obviously responsible for defining, you know, the policies and the standards and the frameworks by which you manage those risks. But as a matter of risk management, it's in everybody's responsibility.

Q    Right. However, as you said, the CRO has the primary role, and that was Mike Loughlin prior to your arrival?

A    Mike Loughlin was the CRO prior to my arrival, yeah.[121]

---

[121] *Id.*

Norton stated that her conversations with other executives at the bank made clear that they believed Loughlin did not have sufficient expertise to build out the company's risk management program.[122]  Norton spoke to members of the company's operating committee about Loughlin's work as CRO.[123]  These executives advised Norton that Loughlin was lacking experience and expertise in the management of nonfinancial risks.[124]  Norton stated:

> Q    Do you remember any of the operating committee members that you spoke with about Mr. Loughlin's performance?
>
> A    Yes, Hope Hardison, who was the chief administrative officer at the time.  John Shrewsberry, he was the CFO.  And I couldn't -- I couldn't tell you for sure beyond that.
>
> Q    Did you speak with Mr. Sloan about Mr. Loughlin's performance as CRO?
>
> A    Not specifically, no.
>
> Q    What was the nature of your conversations with Ms. Hardison about Mr. Loughlin?
>
> A    So they were largely general in nature around the topics that we've already discussed.  So that very, very strong credit background, but, you know, did not have experience and expertise in the management of nonfinancial risks.
>
> Q    Did Ms. Hardison raise any concerns related specifically to Mr. Loughlin's performance in making progress under the consent orders?
>
> A    I don't recall.  I do recall having one other conversation, actually, with another operating committee member.  That's Allen Parker.
>
> Q    Did Mr. Parker express any concerns regarding Mr. Loughlin's performance?
>
> A    Yeah.  I think, again, very -- very consistent with the other conversations in that, you know, Mike was a very strong credit risk manager, but was not equipped for the challenges and the remediations that were required at the company and, you know, conversation around that -- that issue and same themes.

---

[122] *Id*. at 27.
[123] *Id*. at 39.
[124] *Id*.

Q       You know, besides just comments about his experience, did you ever receive any feedback on communications raising concerns about his actual conduct or actions that he took as CRO?

A       There were some -- we've had some conversations around some of the people that were in -- you know, that were put in some of the -- some of the roles and whether or not they were -- you know, they were appropriate assignments.  But no conduct issues.  I've not had any -- any -- I don't recall having any conversations about Mike's conduct.

### FINDING:

Wells Fargo's risk management program is deficient because it largely pre-dates the financial crisis.  The company's Chief Risk Officer from 2008 – 2018 was a credit risk expert but lacked experience and expertise to overhaul the company's nonfinancial risk management program, which remains immature compared to other large bank that developed new risk frameworks after the financial crisis.

Wells Fargo's risk management program was deficient because it largely pre-dated the financial crisis.  Loughlin began serving as the company's CRO in 2008.  Norton told the Committee that other large banks developed their programs to manage nonfinancial risk in the years following the financial crisis in response to operational issues that were exposed in the wake of the crisis.  Wells Fargo, on the other hand, did not experience the same issues in that period due to a business strategy that relied on retail banking and avoided exotic mortgage products and other risky financial instruments.  Wells Fargo's "issued happened later in the cycle that with other banks," according to Norton.[125]  Wells Fargo's risk management program remained under-developed.  Norton stated:

Q       Okay.  And Mr. Shrewsberry, we didn't speak about him yet.  But what were the -- in general, the comments that he had about Mr. Loughlin?

A       Very similar.  Again, very well respected as a person and as a credit risk manager but not equipped to tackle the challenges.  And, you know, as context for that, the management of nonfinancial risks is a relatively new discipline in the industry.  Many of the banks have built and developed that over the last 7 or 8 years, over that period of time, of course, following the financial crisis.

        And so these are new -- these are new disciplines and new frameworks and policies that all of the banks have built out over the last, you know, 5 to 8 years.  And, you know, in order to do that, you need to -- you need to have the right -- the right people.[126]

---

[125] Norton Tr. at 49.
[126] *Id*. at 40.

A former member of the Board of Directors echoed Norton's assessment of Loughlin.[127] Karen Peetz, who previously served as Chair of the Board's Risk Committee, believed that Loughlin's strengths were related his management of credit risk.[128] The CRO reports directly to the Chair of the Board's Risk Committee, which positioned Peetz to understand Loughlin's deficiencies.

Peetz stated that Loughlin lacked any operational risk experience and that was apparent from how he prioritized risk.[129] Peetz stated that when she took over as Chair of the Risk Committee, she had negative interactions with Loughlin.[130] After Loughlin failed to prioritize changes that would allow the bank to move toward compliance with the consent orders, Peetz notified Sloan she would no longer work with Loughlin.[131] Peetz testified:

Q    What were your thoughts on some of management changes, like Mike Loughlin?

A    There are so many types of risk. His strength is credit risk. That is a big deal, since a lot of Wells Fargo's risk is credit risk. Wells Fargo does a lot of wholesale and consumer lending; something Wells Fargo lends to something like one in three households. Mike Loughlin was not as strong on some more recent issues, like operations risk or compliance risk.

Q    When did you find out he wasn't as experienced in nonfinancial risk?

A    When I took over as chair. I could tell immediately as we worked on materials.

Q    What conversations did you have with Loughlin after you came to this conclusion?

A    I was very direct about what needed to be done versus what was actually occurring at the bank. It was not getting done. By January, I called Tim to tell him that I was no longer working with Mike. I informed Betsy and she supported that.

Q    What led to this drastic conclusion?

A    There were too many gaps in his knowledge of nonfinancial risk and he was unwilling to learn in these areas or hire the right people.

Q    Nonfinancial risks were covered in the consent orders?

---

[127] Peetz.
[128] Id.
[129] Id.
[130] Id.
[131] Id.

A    Yes and that was what we were least skilled in.

Q    Did others raise concerns about Mr. Laughlin?

A    I don't think so.

Q    When did Mr. Loughlin become CRO?

A    I do not remember exactly but has been in place for a long time.

Q    Did Mr. Loughlin purposefully not do things you had specifically recommended?

A    Yes, parts of the strategic framework. He was not familiar with operational risk and did nothing for it in the new strategic framework.

Q    How did you get impression of his unwillingness?

A    We would not get answers for items that the Board was asking for.

Q    What are some examples?

A    Operational risk - simple questions were not answered adequately. Progress on the consent orders depended on plans for this type of risk.

Q    You said that Mr. Loughlin would not hire people to remedy his knowledge gaps. Were there discussions to go outside the bank to remedy this?

A    My preference was to go outside the bank. We needed expertise. But management was not willing.[132]

Officials at the bank's regulators also had issues with Loughlin.[133]  An OCC official stated that the OCC's official management downgrade was partly due to Loughlin's inability to make changes to the risk structure at the company.[134]  The OCC official stated that the OCC had extensive concerns about Loughlin's ability to implement the extensive changes required by the consent orders.[135]  Loughlin did not impress the OCC official during meetings and did not seem to comprehend nonfinancial risk.[136]  The OCC official testified:

Loughlin played a big role at the company and had been there for a while. He understood the intricacies of credit but lacked operational risk and

---

[132] *Id.*
[133] OCC.
[134] *Id.*
[135] *Id.*
[136] *Id.*

compliance skills - two of the most crucial components of the consent orders. His solution was to move risk first line people into risk second line positions. This was his attempt to improve oversight and controls. This was not an appropriate solution. These employees lacked the proper expertise. He did not understand the program and it did not go well. There was a lack of understanding from staff who undertook new roles, but Loughlin thought this was an adequate fix despite concerns vocalized by the staff.[137]

Peetz testified that she advised Sloan to replace Loughlin.[138] Loughlin resigned as CRO soon after.[139] Sloan and the Board supported the decision to remove Loughlin. Peetz stated that other members of the Board were aware of Loughlin's deficiencies, and did not know whether other members of the Board had previously proposed action with respect to replacing Loughlin.[140]

## B. Structural Deficiencies

Following the financial crisis, large banks that engaged in risky lending practices prior to 2008 recognized that management needed visibility throughout the entire firm, to detect and prevent financial and other forms of risk. Unlike the rest of the industry, Wells Fargo maintained its fragmented model, which relied on "strong deference" to the leaders of the company's siloed business lines, who were told to "run it like you own it."[141] Wells Fargo's lack of a fully integrated compliance and risk management program allowed the individual business lines to pursue aggressive sales strategies.

### 1. Federated Structure

In 2017, the Board commissioned a third-party investigation into the "root causes of improper sales practices" at the company.[142] In April of that year, the Board publicly released a report of its findings.[143] The Board hoped to better gain "insights into the causes of problematic sales practices and, more broadly, insights into how Boards and senior management can improve their identification of and response to red flags."[144]

The report placed significant "blame" on the bank's "decentralized corporate structure." The federated nature of the company gave too much autonomy to individual business lines.[145]

---

[137] *Id*.
[138] Peetz.
[139] *Id*.
[140] *Id*.
[141] Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report (Apr. 10, 2017), *available at:* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2017/Board-report.pdf. [hereinafter Board Report]
[142] Board Report.
[143] Paul Weiss Client Memorandum, Lessons Learned from the Wells Fargo Sales Practices Investigation Report (Apr. 18, 2017), *available at*: https://www.paulweiss.com/media/3977064/18apr17fargo.pdf.
[144] *Id*.
[145] Board Report.

This factor allowed for competition and aggressive sales management to go unchecked.[146]  Each line of business housed their own risk and compliance management which reported up the chain to individual heads of business.[147]  The ability for managers to make a decision between compliance and their bottom lines allowed for rampant sales practices violations.[148]  The report found:

> The bank's decentralized corporate structure gave too much autonomy to the Community Bank's senior leadership, which was "unwilling to change the sales model or even recognize it as the root cause of the problem." This report paints the picture of a decentralized company in which a strong business unit could operate as a fiefdom that stifled internal dissent and kept full information from corporate-level management.

The report concluded that a enterprise-wide structure is a key component for proper oversight.[149] Wells' federated structure did not provide the needed "transparency" to conduct required oversight.[150]  This structure is abnormal for such a large bank.[151]  The report found that without enterprise oversight, "individual business units can strong-arm control functions."[152] Wells Fargo's federated structure allowed for customer abuse and sales practices scandals.[153]

**FINDING:**

Documents and testimony show the company's federated structure also undermined the effort to create an enterprise-wide risk management system and otherwise comply with requirements in the consent orders to make systemic changes.  The evidence also shows Wells Fargo's structure was unusual among large banks.

Amanda Norton, who serves as Chief Risk Officer at Wells, testified that when she joined the company in June of 2018, the company's effort to fully integrate its risk program was underway.[154]  The firm had integrated its IT and Human Resources programs prior to Norton's arrival.[155]  Norton stated that it was unusual for a large bank's business lines to manage their own risk and compliance.[156]

Individual business lines are not well-suited to manage compliance alone—independent oversight is necessary.[157]  Norton stated that a system where managers are responsible for their own risk lacks checks and balances without independent

---

[146] *Id*.
[147] Paul Weiss, *supra* note 133.
[148] Board Report.
[149] Paul Weiss, *supra* note 133.
[150] Board Report.
[151] Paul Weiss, *supra* note 133.
[152] *Id*.
[153] *Id*.
[154] Norton Tr.
[155] *Id.* at 62.
[156] *Id*.
[157] *Id*.

oversight.[158]  Norton stated the compliance function should be independent from a company's profit centers to create policies.[159]  Norton stated this structure is the industry standard, based on her experience at other banks.  Norton stated:

> Q      What was your assessment of whether this structure provided an appropriate degree of independence from the related business lines?
>
> A      Again, I think in the disciplines around the financial risks, like credit risk and market risk, I think it was, you know, was very strong.  We demonstrated strong outcomes whereas I think if I were to step back -- and this is some -- this is just history that I have learned, but a lot of this was -- a lot of these team members actually sat in the businesses at one time.  These people were pulled out and put into risk as part of a -- you know, in response to some of the issues, and they were in the -- you know, when I came along, we, you know, we needed to reset where the accountabilities and responsibilities lie.
>
> So I generally felt that for the management of the nonfinancial risks, like compliance and like operation risk, there was too much abdication of risk management to my team as opposed to owning it in the business, and therefore, you know, a general inability to be independent or provide challenge -- appropriate challenge.  There was just a lot of confusion about roles and responsibilities.[160]

Norton told the Committee that the federated structure allowed some of the risk teams at certain business lines to fall short of industry standards.[161]  Norton stated that financial risk programs were up to standards, but non-financial risk programs such as compliance, operational risk, and conduct management were immature and inadequate.[162]  Both the 2016 and 2018 consent orders dealt with nonfinancial risk.[163]

Norton told the Committee that prior to her arrival, Wells Fargo did not have the proper infrastructure in place to monitor and assess nonfinancial risk, including operational risk.[164]  Norton stated:

> Q      At the time that you began at Wells Fargo and I guess during your initial few months at the organization, what was your assessment of the adequacy of the structure in terms of promoting effective oversight and control of compliance and operational risk?
>
> A      So for functions like credit risk and market risk, very, very mature, very well run, the right experience and the right expertise, and has

---

[158] *Id.*
[159] *Id.* at 94.
[160] *Id.*
[161] *Id.* at 30.
[162] *Id.*
[163] *Id.*
[164] *Id.*

> remained so. With the compliance under Mike [Roemer], he was brand-new in January, so he'd been at the company just a couple months by then, so very immature compliance function, but building, had a plan and was building.
>
> And the operational risk function was really, really inadequate. I think the oversight of the international risk, a lot of that is operational. So international risk will cover all the risks, so from a credit and market risk perspective very strong, but again from a compliance and operational risk, you know, was immature and generally inadequate.
>
> And the conduct management office was still very -- was a brand-new team. I think it was formed a year or so before I joined, 18 months or so before I joined, and still was being built out.[165]

The federated structure was ingrained in the culture at Wells Fargo.[166] Norton stated she had a difficult time trying to change the company's thinking surrounding risk management.[167] Norton told the Committee that when she joined the company in June 2018, most of the operating committee had been at the company for over ten years.[168] Norton stated it was a challenge to get managers to understand that compliance is not just a "check the box" exercise.[169]

Most other large banks have an enterprise-wide view of risk.[170] Wells Fargo's federated structure made the company susceptible to sales practice abuses and other localized scandals because there was not an enterprise-wide risk management team to oversee risk.[171] Norton set out to track risk on an enterprise-wide basis once the risk management team was integrated.[172] Norton said this was a challenge because it required all lines of business to buy into the new structure.[173] Norton further testified this cultural shift continues to be difficult.[174]

Ensuring that operational risk is being handled responsibly at the enterprise level is one of Norton's top priorities. Norton stated that Wells Fargo is behind other banks in terms of tracking nonfinancial risk—a key aspect of complying with the 2018 consent

---

[165] *Id.* at 30.
[166] *Id.*
[167] *Id.*
[168] *Id.*
[169] *Id.*
[170] *Id.*
[171] *Id.*
[172] *Id.*
[173] *Id.*
[174] *Id.*

orders.[175]  For the bank to comply with the regulators' consent orders, it must completely transform the process for assessing nonfinancial risk.[176]  Norton stated:

Q    [R]eports have shown that at the root of this first sales practices scandal was that the business lines were kind of getting in the way of risk management.

So could you kind of talk about how you perceived the structure then and then how you perceive the structure now and the differences between the two?

A    So you referenced the sales practice.  Obviously, I wasn't around at the time of sales practices, but I have some insights into how we were organized and structured.

I think there were some key differences today in how we manage our risk.  First of all, we have -- back in the time of the sales practices, all the businesses had their own risks, their own HR, it was a very federated model.  So there was no clear independence for risk management.  It did not report to -- it did not have an independent reporting line.

So it's -- you know, we're humans.  It's difficult to challenge and oversee somebody if you're actually being compensated by that person.

So I think the one big step was bringing together an independent risk management, which as we've talked about fairly extensively, setting the policies and frameworks, and then being in that oversight role.  I think that's the first thing.

I think the second thing is reinforcing the notion that as a business leader, or process owner, whatever your job is, if you generate risk, you are the primary -- you have the primary accountability for making sure that that risk is well managed.

We've embedded that today in our management business objectives and in the performance management process.  So if you don't meet those expectations, then you will -- you know, your performance management rating will be impacted as will your comp.

So I think that's another piece.  So that's sort of the accountability piece.

---

[175] *Id.* at 107.
[176] *Id.* at 107.

I think we've also delivered a lot of transparency into the system. So we have a lot more reporting and metrics on how things are being done and how processes are working. And we have a pretty robust governance structure where you have a combination of business leaders and control partners, including risk and including audit, at those governance meetings to discuss issues, look at the reporting, challenge the business, and drive the right outcomes.

And then finally, overarching all of that, at the core of the sales practices, too, was the incentive programs themselves, and we talked about that earlier in that we have governance and approval process over all of our incentive programs today. We have discussions and we review metrics and outputs and that. We listen to customer complaints, employee complaints, et cetera, to make sure that there aren't any unintended consequences of any of those programs that are in place.[177]

The company's federated structure also allowed the Community Bank to create the highly problematic sales incentives that led to the sales practices scandal. Norton stated that risk managers should monitor individual business lines goals with metrics.[178] Norton told the Committee that sales incentives may be "appropriate with the right governance and the right risk balancing.[179] Of course, Wells Fargo's governance and risk management structures were obsolete during the sales practices scandal, and remained so when the consent orders went into effect.

Justin Thornton, who ran the consent order compliance teams at Wells Fargo, testified "the organizational model of Wells Fargo with an historically decentralized structure was a theme that presented challenges to execution of enterprise-wide work."[180]

---

[177] *Id.*
[178] *Id.*
[179] *Id.* at 144.
[180] Thornton Tr.

Thornton raised concerns about the company's federated structure to the Chief Risk Officer in September 2016, when the company was in the early stages of addressing the initial CFPB and OCC consent orders.  In an email, Thornton wrote to then-Chief Risk Officer Mike Loughlin about how the federated structure can "slow or impede

> **From:** Thornton, Justin
> **Sent:** Thursday, September 29, 2016 1:12 PM
> **To:** Loughlin, Michael J.; Hardison, Hope A.
> **Subject:** sales practices role
>
> I have some follow up thoughts and questions – are you available to discuss today?
>
> Obviously this role will need to partner and work closely with the businesses and control functions to be successful.  However, there is the reality that our typical approach to enterprise work in our federated environment can slow or impede effective end-to-end design and quick execution. Having read the consent orders, there is a lot here and we are 3 weeks into deadlines that range 30, 45 and 90 days post settlement on 9/6.
>
> So I have a few thoughts about what would make this role successful:
> ·        Scope of authority should be more than a program management office. Should include the ability to direct work and business practices (current and future plans) in both LOBs and control functions, in effect delegated authority from each of you and Tim.
> ·        Real-time access to each of you (and Tim and other leaders) as needed to support major decisions and course of action
> ·        Immediate support to put together a team, incl pulling good people from existing teams
>
> Also,
> ·        Will this position play a large role on overall approach to fixing the problem, beyond just Consent Order requirements – eg broader actions around customer initiatives, communications, and marketing -- that are part of rebuilding trust? I think an overall coordinated, integrated response may be more effective for the Company.
> ·        Finally, a lot of the Consent Order requirements include Board or Board Cmte oversight and approvals of all Plans
> ○        Where is the Board with this position/ effort? With me as a candidate they would support?

effective end-to-end design and quick execution."[181]  Thornton stated to the Committee, however, that he did "not believe [the federated structure] impeded the ability for the company to comply with the orders."[182]  He testified to the Committee about the company's legacy structure and its connection to regulatory compliance.  Thornton stated:

> Q        What did you mean when you referred to "our federated environment"?
>
> A        The company had -- the company was historically run in what I would characterize as a decentralized model, with business decisions and authority being held in individual business units, and a less mature set of corporate functions to oversee those business units.
>
> Q        What do you mean by less mature corporate functions to oversee the business?
>
> A        The business model, in my view, had historically been decentralized, with most of the resources of the company embedded

---

[181] WF-HFSC-000110750
[182] Thornton Tr. at 23.

in business units reporting to general managers with the profit and loss responsibility, and the size of corporate functions to provide independent oversight of those businesses. And the length of time that those corporate functions had been in place was -- the size of those functions were smaller and the length of time they had been maturing was only a few years, in my estimation.

Q    So is it fair to say there was some weak independent oversight of the different lines of businesses when you took over this position in 2016?

A    At the time that I wrote this e-mail, and in reading it now, what I was concerned that I believe I was raising with the phrase "federated environment," which was an issue that persisted through the work over the following three years, is that resources and decision-making authority spread across many businesses could make it challenging to get holistic plans and consistent decisions and timely execution for work that needed to span multiple businesses.

Q    And did that play out? Did the federated environment that you were concerned about here impede the company's ability to do the work necessary to comply with not only the 2016 orders but then the 2018 orders?

A    I believe that the organizational model of a company has a significant impact on how it executes work both through decision-making and resource allocation. And I believe the organizational model of Wells Fargo with an historically decentralized structure was a theme that presented challenges to execution of enterprise-wide work.

Q    But my question was, did that historically decentralized environment impede the company's efforts to comply with the 2016 and 2018 Consent Orders?

A    With respect to --

Q    Specifically complying with the Consent Orders.

A    With respect to the 2016 Sales Practices Consent Orders, I believe the federated model presented challenges to organizing teams for getting decisions that holistic plans and decisions made. But I do not believe that it impeded the ability for the company to comply with the orders.[183]

---

[183] Thornton Tr. at 23.

> **FINDING:**
>
> In 2016, the company's individual lines of business were responsible for creating their respective risk management plans. The Wells Fargo consent order response team was relegated to a support role. This arrangement undermined the company's effort to create an enterprise-wide risk management program like those at other large banks.

Under the federated structure, the team in charge of consolidating and coordinating the consent order work was marginalized.[184] Thornton testified his team was originally in a support role as the individual lines of business created new risk management plans.[185] Thornton testified:

> Q     And how would the federated environment slow or impede a policy -- an effective policy that would apply to all businesses?
>
> A     I believe the federated environment could affect, plan, design, and execution for different reasons, and it may vary by topic. In general, those reasons could be alignment of executives across the businesses to agree to a plan. And, more importantly, in most cases, the operations of businesses may look different, and, therefore, the change is necessary to comply consistently with a single corporate policy, could be -- could vary significantly and affect the overall timing of the work.[186]

The consent orders required companywide changes. Thornton stated there was "a lot of problem solving" related to aligning the priorities of multiple business lines with different views about compliance.[187] The effort to fully integrate risk and compliance practices throughout the company was at odds with Wells Fargo's federated structure.

## 2.  Lack of an Enterprise-Wide Risk Management System

The Board's 2017 investigative report found the lack of an enterprise risk, compliance, and human resources infrastructure allowed for the sales practices violations to go undetected. Enterprise-wide programs are standard at large financial institutions.[188] Individual lines of business had their own compliance managers, who reported to the head of business.[189] This structure created an obvious conflict of interest—business leaders were positioned to decide between risk compliance and profits.[190] The Board's internal report stated:

---

[184] *Id.* at 32.
[185] *Id.* at 34.
[186] *Id.* at 29.
[187] *Id.*
[188] Paul Weiss, *supra* note 133.
[189] *Id.*
[190] *Id.*

The bank's risk (compliance) and human resources functions were too decentralized, which impeded corporate-level insight into and influence over the Community Bank.' While there was progress to centralize and strengthen these functions at the corporate level, that progress was too slow and the company's Chief Risk Officer was 'essentially confined to attempting to cajole and persuade' the Community Bank's leadership to be more responsive to sales practices related risks. With respect to the risk function that resided within the Community Bank, these risk managers were 'answerable principally to the heads of their businesses and yet took the lead in assessing and addressing risk within their business units' and were ultimately ineffective.[191]

The report concluded that enterprise-wide structures for compliance and audit are critical to effective risk management.[192] Control functions, like risk, need to be independent.[193] An enterprise structure allows for "meaningful support of senior management and Board efforts to oversee a company's business units."[194] This structure represents the industry standard for control groups within a large company like Wells Fargo.[195]

The report also found that "a more centralized structure can improve transparency and oversight, reducing the chances that problems can fester and that individual business units can strong-arm control functions."[196] Following the 2016 consent orders, Wells Fargo reorganized how control groups are structured at the company.[197] Wells Fargo created an enterprise risk and compliance structure while also integrating HR and audit.[198] The centralization of these groups allows for independent reviews of all lines of business at the bank.[199]

Amanda Norton, who serves as Chief Risk Officer at Wells Fargo, testified that this new enterprise structure was finalized shortly before she joined the company in 2018.[200] When she joined the company, Norton continued to reorganize the risk management structure.[201] Norton told the Committee that the bank lacked an understanding of other non-financial risks. Her predecessors focused primarily on credit risk, which was their area of expertise.[202]

Norton stated the consent orders required Wells Fargo to transform its approach to nonfinancial risk.[203] By integrating all risk functions, Norton was able to develop new metrics for enterprise risk, which encompassed both financial and nonfinancial risk.[204] Enterprise

---

[191] *Id.*
[192] *Id.*
[193] *Id.*
[194] *Id.*
[195] *Id.*
[196] *Id.*
[197] Norton Tr.
[198] *Id.*
[199] *Id.*
[200] *Id.*
[201] *Id.*
[202] *Id.*
[203] *Id.*
[204] *Id.*

metrics allow the risk team to target and track issues throughout the firm.[205]  This approach is an industry standard.[206]

Justin Thornton ran the company's "Sales Practices Consent Order Program Office" and managed about 20 people as of December 2016.[207]  Thornton's office was responsible for collating and submitting the company's responses to the regulators' consent orders.  Thornton stated the autonomy of each business line "made it challenging."[208]  Thornton tried to align the different priorities of the various lines of business.[209]  He stated the rollout of the changes to the risk organization was disruptive.[210]  Thornton testified:

> Q    Would you say there was confusion about the reorganization of how risk was being managed?
>
> A    Confusion by whom?
>
> Q    From other risk leaders who would report to the CRO as they kind of revamped how risk was being handled at the bank and what the offices would look like.
>
> A    I can't speak for others to know if they were confused or not.  My perspective on the changes to the risk organization, both at corporate risk and the lines of business, was that it was a significant amount of change that was disruptive.  And I say that, because my guess is more than 10,000 or more team members had their reporting lines changed twice in the span of a couple of years and then had new leaders in 2018; and until those leaders could reclarify their organization's mandate and processes, and until people could get to know each other, it would impede work.
>
> As an example of that -- now, I believe the organization -- especially under Mandy Norton's revised risk management frameworks that she published in the fall of 2018.  I believe the organization was clarifying what seemed to be outstanding questions for some time around roles and responsibilities.  But the practical nature of organizing that many people takes time, and -- and I think while those shifts were happening it was a factor in the ability to build enterprise-wide programs and execute them, and one of the factors that led to my recommendation for the creation of a chief operating

---

[205] *Id*. at 98.

[206] *Id*. at 98.

[207] Emily Glazer, Christina Rexrode and AnnaMaria Andriotis, *Wells Fargo Is Trying to Fix Its Rogue Account Scandal, One Grueling Case At a Time*, WALL ST. J., Dec. 27, 2016.

[208] Thornton Tr. at 29.

[209] *Id*. at 71.

[210] *Id*.

office that could more broadly direct work down into the lines of business.[211]

Thornton stated that the process of implementing an enterprise risk program was slow because of pushback from business leaders within the company.[212]  Each line of business controlled its own risk program.[213]  Thornton testified that integration was a difficult but necessary change to comply with the consent orders and align the company with industry standards for other large banks.[214]

Regulators also recognized the need for Wells Fargo to develop an enterprise structure.[215] Prior to 2018, the regulators began increasingly concerned with the bank's federated structure as scandal after scandal came to light.[216]  The 2018 consent orders from the CFPB, OCC, and FRB required the bank to implement certain enterprise components.[217]

A CFPB official told the Committee that Wells Fargo's problems were deeper and more widespread compared to other large banks, where problems tend to be isolated to a single product line or branch.  The CFPB official attributed this to the fact that at Wells Fargo—unlike at other banks—each business line developed its own compliance infrastructure.  The CFPB official identified the lack of a enterprise-wide control group as a root cause of many of the bank's scandals.[218]  The CFPB official stated, "It is unique in my experience for an entity to be so fragmented and have such fundamental problems in every area."[219]  The CFPB official testified:

> Q    Can you elaborate on when you said there were "deep and widespread" problems?
>
> A    We have a lot of regulated entities that have problems. Typically, problems are limited to one product line or branch. Wells Fargo is different in that there were problems in every single product line we looked at. That sets them apart for a typical institution. It makes addressing those problems much more complicated.
>
> Q    Why do you think they were deeper and more widespread? Why do you think that's the case at Wells Fargo? Why across all product lines compare to other banks?
>
> A    We would do a root cause analysis and consistently we found infrastructure weakness in all areas like third-party oversight, complaint response - significant concerns - and product oversight.

---

[211] *Id.*
[212] *Id.* at 67.
[213] *Id.* at 30.
[214] *Id.* at 36.
[215] CFPB.
[216] *Id.*
[217] *Id.*
[218] *Id.*
[219] *Id.*

One other aspect that sets Wells Fargo apart from other large banks, they ran compliance program by product line. Every division was in charge of developing its own compliance infrastructure, with no real incentive for doing it well so there were problems in every line, some more than others.

It is unique in my experience for an entity to be so decentralized and have such fundamental problems in every area.

Q    What is the problem in terms of Wells trying to address those issues? Where are they? What's the pace of them? Are they doing anything to address these?

A    That was the impetus of the 2018 Consent Order – you need to implement an enterprise wide program. As of the time we entered into the 2018 order they still had not done that yet. That is a significant requirement that they're putting together at this point.[220]

## 3. An Immature Risk and Compliance Culture

As recently as 2018, Wells Fargo's risk management and compliance programs were underdeveloped and fragmented—contrary to the industry trend toward a robust and highly integrated program. Wells Fargo's competitors generally combined risk and compliance into an enterprise-wide risk management process. Wells Fargo was slow to adopt that model. Wells Fargo Chief Compliance Officer Mike Roemer described the company's outdated model when he joined the company in January 2018. He stated:

When I started, at the top of the house there were approximately 200 compliance colleagues, then there were compliance colleagues embedded throughout the company in front line business units. Today, we have 4,300 [compliance personnel] that all report up to the chief compliance officer at the enterprise level. We not only identified people performing compliance in the businesses and centralized them, we also hired more than 500 people over the last 10-14 months. Compliance will probably grow over the course of the next year or so to approximately 5,000 people. Those colleagues are now all connected as a team. They are spread throughout the entire organization, but there is solid line reporting to the CCO. That allows us to spread the compliance story, spread the compliance framework, and make sure that we are, in fact, culture carriers across the entire organization.[221]

Chief Risk Officer Amanda Norton compared the bank's compliance culture to its large bank peers. Wells Fargo was years behind its peers because those banks had "catalysts" that caused

---

[220] *Id.*

[221] Joe Mont, *A new CCO's Herculean task at Wells Fargo*, COMPLIANCE WEEK, May 17, 2019.

them to develop risk and compliance programs years earlier.  Wells Fargo was not among the large banks that engaged in risky lending practices prior to 2008 and subsequently developed a non-financial risk program.  Norton stated:

> Q     Okay.  I think you -- you have said numerous times throughout the day that Wells Fargo's compliance and conduct management was immature.
>
> A     Uh-huh.
>
> Q     You know, Wells Fargo is a megabank, right?  Its peers are Bank of America, Citibank, J.P. Morgan.  And I think you said you worked at Bank of America and JPMC before coming to Wells Fargo.
>
> Were you surprised by or kind of concerned by the immaturity of Wells Fargo's compliance and risk management and conduct oversight compared to what you had seen in its peers?
>
> A     I was not -- I wasn't surprised, given, you know, the issues that obviously were very public.  You know, the -- the context here is that all of the banks had to build these programs.
>
> I left Bank of America in 2009.  And at that point, they did not have these programs built out.  But, you know, they have built those out. They had a catalyst to get this work done.  JPMorgan had catalysts that are all very public, I think, that meant that, you know, a lot of this work got done before.  And then, of course, the -- I view that the sales -- the sales practices issue was symptomatic of a broader set of issues.  And if it hadn't been sales issues, it would have been something that would have popped.  But eventually that would have become apparent.
>
> So, you know, I wasn't surprised that it was as immature as it was given that -- you know, given the fact that their catalyst -- or the Wells Fargo's catalyst happened so much later in the game.  I mean, they had really, you know, gone through the cycle relatively unscathed.
>
> Q     Is it fair to say that they were behind their peers in developing these compliance mechanisms?
>
> A     Yes.  That's a fair thing to say, yes.[222]

An OCC official explained that the Bank's risk management and risk assessment has improved since 2018, but the company "still struggles" to incorporate risk management into its

---

[222] Norton Tr.

culture.[223]  An OCC official stated, "Since 2018, there has been major progress in risk management and assessment, but Wells struggles with putting risk assessment in their culture."[224]

## C. Deficit of In-House Expertise

Documents and testimony show several Wells Fargo employees lacked the experience and expertise to implement the reforms that are necessary to transform the bank.  That lack of in-house expertise caused the bank to rely excessively on third-party consultants.  The documents and testimony highlight the need for the company to continue to recruit talent from outside the bank.  Chief Risk Officer Amanda Norton drew a connection between the company's tendency to promote from within and the lack of expertise at the company.  Norton stated:

> Q    It seems to be a theme today -- you said that, you know, there were people in place who didn't have the necessary qualifications or expertise to do the functions that they were overseeing.  Is that something that you found was unique to Wells Fargo in comparison to your experience at JPMC or Bank of America?
>
> A    I've seen examples of it in other places.  But I've never seen it quite as prevalent as it is at Wells Fargo.  And I think that was the historical culture, to promote from within.  Certainly, you know, when I joined the operating committee, with the exception of Allen Parker, every single member of the operating committee had been with the company for quite some time.  And, you know, there's value to that.  I'm not dismissing that.
>
> But, you know, when you need to, you know, push through transformation, particularly if it's sort of a new discipline, you know, I think you would expect to see more external or properly placed -- and, you know, we didn't -- most of the company had never done this before, so naturally you would expect to be putting leaders in place that probably were coming externally.[225]

At least five long-serving Wells Fargo employees with risk management responsibilities have been removed or reassigned since 2018.

### 1. Justin Thornton

---

[223] OCC.
[224] *Id*.
[225] Norton Tr.

Justin Thornton ran the company's "Sales Practices Consent Order Program Office" (COPO) and managed about 20 people as of December 2016.[226]  Thornton's office was responsible for collating and submitting the company's responses to the regulators' consent orders.  Thornton managed COPO and its successor from 2016-2019.[227]

Prior to assuming that role, Thornton held roles in marketing and human resources at the bank.[228]  In 2016, Sloan and Loughlin selected Thornton even though he had not previously had "a role that was exclusively focused on consumer financial protection."[229]  Thornton eventually oversaw Wells Fargo's efforts related to the 2018 consent orders, which were rolled into a single office in 2018.[230]

Thornton provided the company's submissions to the regulators pursuant to the consent orders.[231]  Various parts of Wells Fargo were tasked with creating the plans, and Thornton's team submitted them.[232]  Thornton served as the main point of contact between the bank and the regulators.[233]

When Amanda Norton joined the company in 2018, she became aware of concerns related to the adequacy of the company's submissions.[234]  At that time, none of the company's plans had been accepted  by the regulators—they needed additional work.[235]  The company still expanded the scope of COPO's responsibilities under Justin Thornton to include the 2018 consent orders, despite limited progress toward complying with the 2016 orders.

Norton's initial assessment was that Thornton was "very articulate and having a lot of history with regard to the issues at hand."[236]  Norton, however, came to "have some concerns" as to the reliability of the information Thornton provided related to the company's effort to comply with the consent orders.[237]  Norton told the Committee that Thornton's progress reports were too optimistic and did not align with the facts on the ground.[238]  Norton stated:

> Q       You stated, when we began speaking of Mr. Thornton, you stated
>         that his role was eliminated due to reorganization.  Prior to his role
>         being eliminated, had you received -- excuse me.  Did you have any
>         conversations with anyone at Wells Fargo related to Mr. Thornton's
>         performance as head of the Consent Order Program Office?

---

[226] Emily Glazer, Christina Rexrode and AnnaMaria Andriotis, *Wells Fargo Is Trying to Fix Its Rogue Account Scandal, One Grueling Case At a Time*, WALL ST. J., Dec. 27, 2016.
[227] Thornton Tr. at 8.
[228] *Id*.
[229] *Id*. at 9.
[230] *Id*. at 55.
[231] *Id*.
[232] *Id*. at 166.
[233] *Id*. at 104.
[234] Norton Tr.
[235] *Id*. at 60.
[236] *Id*. at 69.
[237] *Id*.
[238] *Id*.

A      Yeah.  I would say probably as, you know, second quarter timeframe, beginning of third quarter, and particularly as we were working with -- with Derek on the new SEO -- SEO office, I had become more concerned that particularly Justin's reporting and metrics weren't fully transparent and, you know, didn't provide some of the detail or truly accurate reflection of the progress that was being made.  So I was starting to have some concerns, yes.

Q      Can you provide any particular examples?

A      I think some of the reporting would show us -- would show more of an optimistic view of where we actually stood and, you know, as we dug into some more of the details, you know, that didn't reconcile with what we were actually discovering.

Q      In the case where reporting for Mr. Thornton showed a more optimistic view of where things stood, are you referring to where things have stood as it relates to work under the consent orders?

A      It would largely have been work under the consent orders, yeah.  And it's not to say that, you know, the work wasn't being done.  It was really more -- it was a true reflection of the status of the progress that was being made.  Problems would appear late in the game.

Q      To your knowledge, did these issues result in any inaccurate reporting to the Board as to the status of any of Wells Fargo's risk management related programs?

A      I'm not sure I would characterize it as inaccurate.  You know, I think any -- any issues or challenges that were surfaced was certainly appropriately escalated both to management and to the Board.  What I think when you get into these very detailed plans, I think there wasn't the, you know, the deep -- an accurate reflection, you know, more at the very granular level around the true progress.  So I -- you know, it -- it was misleading in some cases, yeah.

Q      Did the -- did Mr. Thornton's optimistic view of where things stood result in any misleading information provided to regulators?

A      I don't recall what would have been provided to regulators.  They -- they certainly received the Board reporting.  But I would say that, you know, we -- we had, you know -- reporting was one input into the dialogue so, you know, at the Board meetings and with our regulators the conversations would not have just been about the reporting.  It would have been, you know, discussion around, you know, challenges and progress in general with the business leaders and not just with Justin.  So, you know, the reporting on the face of it might have been mislead -- or too optimistic.

Q    In Wells Fargo's submissions to the regulators, did Wells Fargo include timelines as to completion of expected milestones under the consent orders?

A    Yes.  We generally include timelines.

Q    Were -- in your view, were those -- were there any instances in which Wells Fargo submitted misleading timelines to the regulators?

A    I mean, I think the timelines typically tended to be projected timelines, so I think those were always developed in good faith, meaning that when the plans were put in place, you know, the intent was to deliver against those timelines.

I think what the reporting did, if I could just provide a little bit more context, was a lot of the measures were more back ended.  So during that period of time, it looked like, you know, we were making progress.  Then as we get towards more of the big deliverables, if you'd like, we realized that we had some challenges so, you know, that would result -- in some cases, would result in needing to extend timelines.  So it was really that transparency around how we were getting to some of the bigger milestones that came towards the end.

Once we hit those challenges, that was fully reported and became -- you know, it was very apparent.  But what we needed is really more detailed reporting, we call them smart milestones today, but it's really points along the way to say are we still on track to meet these big deliverables at the end.  And I think that was the nuance around the reporting that was lacking.[239]

Norton subsequently clarified her testimony about Thornton.  She told the Committee that Thornton did not intentionally mislead the Board.  She stated:

So we talked little bit about some of the reporting that was in place, and I just wanted to clarify and be unambiguous about the fact that in no way was the reporting -- there was no intent to be misleading with the reporting.  And what I thought the way that I could do is explain what I meant by that.

So the reporting that was in place was designed to report against milestones of, you know, some of the remediation plans.  Very often and in many cases these milestones were very back-ended, meaning, they were very close to the overall deliverable date, and what we needed to do, and what we've developed now is what I referenced as smart milestones, meaning interim

---

[239] Norton Tr. at 61.

milestones, to be able to say, if we get to this point here, at this time, we know we're on track.

And what that allows you to do then is course-correct if something, you know, hits a challenge or something goes off track. And we didn't have those in place. So it was a -- it was a design flaw in the reporting, as opposed to there was absolutely categorically no intent to mislead with that reporting. It's just that we needed much more granularity to be able to say, we're at day 30 of a 90-day remediation cycle, and we're on track, because we know that we've met this particular milestone. And we didn't have those in place.

We have since been developing some of those, and it gives you more granularity, and it gives you the opportunity to course-correct along the way as needed.

And so I just wanted to be really, really clear about that. I didn't want there to be any misinterpretation, because I think Justin actually did a -- one of his strengths, in fact, was his ability and his willingness to raise issues as he saw them and escalate them. So he was very transparent in that way. It's just this was -- you know, the performance issue was around, you know, a flawed design in the reporting.[240]

Officials at the bank's regulators also expressed concerns regarding Thornton. An OCC official stated Thornton misunderstood the scope of the company's requirements under the consent orders.[241] According to witnesses, the OCC was acutely frustrated with the bank's lack of progress under Thornton.[242] Thornton was the regulators' point of contact and was positioned to hear directly about the issues examiners were seeing with the bank.[243] Thornton, however, did not escalate matters effectively.[244] An OCC official stated:

Q    Describe some areas where management failed to escalate.

A    During the sales practices consent order, we discovered this would have to extend out another year. Justin Thornton never informed us, we had to ask for an update. He never informed the Board, we had to tell them. Justin was surprised to have to submit another action plan despite major issues, such as materiality. You could tell he did not understand. They created an enterprise plan that did not include the entirety of the material changes that needed to occur. An extension was requested too readily, and it had clearly not been

---

[240] Id. at 92-93.
[241] OCC-HFSC-EF-2019-00008481(On file with Committee).
[242] OCC.
[243] *Id*.
[244] *Id*.

made a priority. The bigger picture was that there were a lot of requests being made last minute.[245]

In June 2018, Wells Fargo announced the reorganization of consent order management.[246] After the regulators implemented the 2018 consent orders, the bank rolled the efforts to comply with the new regulatory requirements into the same office managing the response to the 2016 consent order.[247] Thornton led the new office, renamed the Consent Order Program Office.[248]



**Wells Fargo | Corporate Risk**

*Message from Mandy Norton*

## Consent Order Program Office to expand

June 21, 2018

I am pleased to share that we are expanding the work of the Sales Practices Consent Order Program Office to include the most recent FRB[1], OCC[2] and CFPB[3] consent orders and related Matters Requiring Attention (MRAs). Going forward, it will be called the Consent Order Program Office (COPO). **Justin Thornton** will continue to lead the office, as well as the Rebuilding Trust Office, which he has led since 2016.

The COPO will provide oversight and direction on design, implementation planning, program management, and reporting to the Operating Committee, Board of Directors and other stakeholders for the underlying work of these consent orders and related MRAs. The team will partner closely with the leaders of the associated initiatives, and with **Sarah Dahlgren**, head of Regulatory Relations.

As part of this change, **Kris Klos** will join Justin's team and report directly to him, effective immediately. She will lead the strategy for the design and implementation planning for the three recent orders as we integrate this additional work into the COPO. Kris was most recently the corporate entity executive for Wells Fargo's Legal Entity Office on the Enterprise Finance and Information Technology team, and she has 22 years of risk management and internal auditing experience. We are happy to welcome her back to Corporate Risk.

In addition, **Shin Lee** will expand her role to lead program management for all of the COPO, and **John Ewins** will expand his role to lead oversight for implementation planning and execution of all underlying initiatives, with both continuing to report to Justin.

Expanding Justin's team and the oversight for this work will continue to advance our goal to have an integrated, holistic, and effective approach to our change efforts across these consent orders. This structure also supports our comprehensive plan for strengthening and transforming risk management across the company.

Mandy Norton
Chief Risk Officer

The OCC expressed concerns with the team managing the company's response to the consent orders and, according to an OCC official, they raised those concerns with both Sloan and the Board of Directors.[249] The official testified there seemed to be no change as to how the bank was dealing with regulatory compliance through COPO, which consisted largely of the same staff and resources as its predecessor.[250] An OCC official testified that the bank largely

---

[245] *Id.*
[246] WF-HFSC-000057455 (On file with Committee).
[247] *Id.*
[248] *Id.*
[249] OCC.
[250] *Id.*

reshuffled its existing employees rather than hiring the needed expertise from outside the bank.[251]

Chronic issues related to developing plans and slow progress toward compliance with the consent orders eventually caused Norton to lose faith in Thornton. Thornton was "displaced" when his role was eliminated and a new office, called the Strategic Execution & Operations Office, took over COPO's responsibilities.[252]

## 2. Theresa LaPlaca

In May 2017, Theresa LaPlaca was named the head of the company's new Conduct Management Office, formerly known as the Office of Ethics, Oversight and Integrity, after serving in an interim capacity since January 2017. According to Norton, LaPlaca "was an example of placing someone in a role that didn't have the needed experience or expertise" and an "ineffective leader."[253] Norton stated that LaPlaca was soon encouraged to retire.[254] Norton told the Committee:

> Q    Okay. Were there other leaders that were direct reports to you that have since left Wells Fargo for any reason? Of the list that you can see here in the dark blue.
>
> A    Yes. There are several.
>
> Q    Okay. Can you identify them for me?
>
> A    Theresa LaPlaca is the first one. We exited Theresa -- I can't recall if it was first or second quarter. She retired.
>
> Q    And were there any concerns about her performance that led to her retirement?
>
> A    Yes. We had performance issues with Theresa. And again, it was really around -- I think this was an example of placing someone in a role that didn't have the needed experience and expertise. I think her attention to detail, you know, some of the leadership and management skills that were needed to move this program forward, she did not have any of that -- a lot of that.
>
> Q    What was her background?

---

[251] *Id.*
[252] Norton Tr. at 65.
[253] *Id.* at 104, 230.
[254] *Id.* at 72.

A    I don't recall her entire history, but I understand that she spent a chunk of time in the financial -- the finance organization. I think she might have been a CFO along the way. I don't recall.

Q    And how long was she in the role of head of conduct management office before she exited Wells Fargo?

A    I don't recall exactly. I believe she was placed in the role maybe late 2017, early 2018, but I don't know for sure. And then she left the company in the first quarter of this year, of 2019.[255]

In LaPlaca's case, Sloan—a 31-year company veteran by the time he retired in 2019—moved an unqualified existing employee into a risk management role rather than hiring from outside of the bank. Norton stated the company's "historical culture, to promote from within" was at odds with her expectation that a company that needed a "transformation" would rely on "more external or properly placed" leaders.[256]

Karen Peetz, who served as Chair of the Board's Risk Committee, also had issues with LaPlaca.[257] Peetz testified that LaPlaca did not have the expertise to deal with the fallout from the 2016 consent orders.[258] Peetz testified:

Q    What was the nature of your interaction with Ms. LaPlaca?

A    We interacted quite often due to her attending Risk Committee and HR Committee meetings for the Board. She was very diligent and passionate on the charge she had been given but my impression was that she was not a specialist in any of the areas she oversaw.

She was in charge of complaints and allegations both internal and external, and she was not ready for the onslaught of what was happening at the bank. There were not good systems in place – all of the functions were immature, and this did not allow her to deal with the problem.[259]

Peetz also stated that LaPlaca sometimes had incomplete information.[260] LaPlaca was expected to provide information related to employee complaints to company leadership. The lack of data that could have helped the company identify cultural issues undermined the effort to implement the requirements of the consent orders.[261] Peetz testified:

Q    Did you communicate with anyone about LaPlaca's performance?

---

[255] *Id*. at 72.
[256] *Id.* at 193-194.
[257] Peetz.
[258] *Id*.
[259] *Id*.
[260] Peetz.
[261] Peetz.

A       Yes, Mike Loughlin and then Mandy when she arrived.

Q       What were your issues with Ms. LaPlaca?

A       I readily asked Loughlin when we were going to get better info from her team. We regularly complained about the quality of info we were receiving from Ms. LaPlaca. It wasn't personal, and Teresa wasn't bad at her job, but the information was insufficient to comply with the consent orders.

Q       When did you first raise concerns about Ms. LaPlaca to Mr. Loughlin?

A       Probably, sometime in 2017.

Q       What was his reaction?

A       There was heavy stock put on technology fixes that were coming. That was not a sufficient response for me.

Q       Besides reporting and metrics, were there any other issues you discussed about Ms. LaPlaca?

A       No, but as Risk Chair, she reached out to me about frustration on her part. She once said that she didn't know how she was going to be able to pull it all together. I told her she needed to tell us if there were structural problems we need to fix. She was overwhelmed.

Q       When did she say this?

A       Once was in-person in Charlotte and once during a break at a Board meeting in June of 2018 I think.

Q       Did she specify what her complaints were about the structure?

A       Resources and technology related.

Q       Did you get specific on which resources?

A       Yes, tracking and metrics.

Q        Can you elaborate on what you mean tracking?

A       On the Risk Committee, we would get reports on complaints and allegations. We were regularly seeing these reports and my opinion was that we weren't getting good data.  This was a major issue and would effect how new versus old complaints were processed.  The

lack of good reports would not allow us to progress with those sections of the consent orders.[262]

Peetz stated LaPlaca contacted her when she resigned and seemed happy to be unburdened.[263] Peetz testified that LaPlaca asked for advice about how to join corporate boards.[264] In July 2019, LaPlaca joined the Board of Eagle Bancorp based in Maryland.[265]

### 3. Mark D'Arcy

Mark D'Arcy served as Wells Fargo's Chief Operational Risk Officer from 2017 until he resigned in August 2018.[266] Operational risk represented a significant portion of the non-financial risk at the bank.[267] When Norton joined the company, the operational risk department was one her top concerns after reviewing the regulators' comments.[268] She described the infrastructure as "immature."[269]

As Chief Operational Risk Officer, D'Arcy reported directly to Norton.[270] Norton told the Committee that, after conversations with others at the bank, she recognized D'Arcy lacked an understanding of how operational risk management was supposed to function.[271] Norton did not believe D'Arcy understood what an enterprise risk structure should look like in a bank the size of Wells Fargo.[272] Norton stated that under D'Arcy, the operational risk function at the bank was too small.[273] Norton described confusion related to D'Arcy's implementations under the consent orders.[274] Shortly after arriving at the bank, and after receiving feedback internally, ". . . we made the decision to enter into a departure agreement with Mr. D'Arcy."[275] Norton stated:

> Q    And at the time you started, was that individual Mark D'Arcy?
>
> A    Mark D'Arcy was the head of operational risk when I started at the company, yes.
>
> Q    Could you describe the circumstances of Mr. D'Arcy's departure from his position as head of operational risk?

---

[262] *Id.*

[263] *Id.*

[264] *Id.*

[265] Ken McCarthy, *Wells Fargo alum joins board of Eagle in Maryland*, AMERICAN BANKER, July 2, 2019.

[266] Caroline Basile, *Top risk exec to leave Wells Fargo*, WALL ST. J., Aug. 14, 2018.

[267] Norton Tr. at 25.

[268] *Id.*

[269] *Id.*

[270] *Id.* at 54.

[271] *Id.* at 55.

[272] *Id.*

[273] *Id.* at 42.

[274] *Id.*

[275] *Id.* at 55.

A       So as part of my assessment when I came on Board, was to assess all of the leaders. You know, I typically like to have some time to -- to see how they're performing and how they're operating. I received a lot of feedback internally from around the status of the operational risk program. There seemed to be a lot of confusion around the direction, no specifics. And so we made the decision to enter into a departure agreement with Mr. D'Arcy.

Q       Could you elaborate on some of the feedback you received?

A       If I recall, it was largely around confusion of -- of what an operational risk program is, confusion around the policies and standards. It was reported to me that -- that he was, you know, very high level and wasn't able to clearly articulate what actually needed to get done. And I think the other piece of feedback I recall was that he operated, you know, in a very silent way, meaning, you know, he operated within the risk organization without engaging business partners in terms of implementation.

Q       When you say confusion around what operational risk program is, whose confusion are you referring to?

A       I would say general confusion, you know, primarily within the businesses, but also within my team.[276]

Norton stated her "overall assessment was that it [D'Arcy's consent order work] was inadequate."[277] In September 2018, Norton hired Mark Weintraub as the new Head of Operational Risk.

Karen Peetz also had concerns about how D'Arcy managed operational risk.[278] Peetz emphasized to Duke and Sloan the need to go outside the bank for risk expertise to comply with the consent orders.[279] Peetz stated the D'Arcy knew what needed to be done but was incapable of creating or implementing plans, which caused submissions to the regulators to be delayed.[280] Peetz testified:

Q       What was your perception of Mr. D'Arcy's abilities as Chief Operational Risk Officer?

A       He was another person who I had pushed to be replaced. He knew what should be done but could not execute it.

Q       In what way was he deficient in his execution?

---

[276] *Id.*
[277] *Id.*
[278] Peetz.
[279] *Id.*
[280] *Id.*

A    He was too theoretical. He could not transfer theory into practice.

Q    Did you tell anyone at Wells Fargo that Loughlin or D'Arcy were incapable of doing what was needed to be done?

A    I spoke to Tim Sloan, Betsy Duke, and the full Risk Committee about my concerns.

Q    Any members disagree?

A    Not a person.

* * *

Q    Did Ms. Duke or Mr. Quigley express concerns when you arrived?

A    Certainly, Betsy collaborated with me after I alerted her to the matter, but she did not say anything to me when I arrived.

Q    What was Tim Sloan's response to your conversation?

A    He had seen similar deficiencies but did not act on them.  But there was no push back when I informed him of the situation.

* * *

Q    You said Mark D'Arcy is too theoretical. Was that reflected in submissions to regulators?

A    Yes, it was during that whole drafting process. This is a major issue. The submissions only reflected what already existed because that was all that was implemented. That wasn't good enough.[281]

## 4. Reliance on Third-Party Consultants

The bank frequently had to turn to consultants and other third parties to make up for the institutional expertise that it lacked.  Norton told the Committee:

Q    To review the bank's processes and perhaps what went wrong with the sales practices issue.  Can you just identify those to the extent that you know what those might be so we can be sure to try to track them down?

A    To answer that question fully, I would have to get back to you, but certainly sales practice we had, you know, Grant Thornton do their review.  We've had Protiviti do an assessment.  But we do engage

---

[281] *Id.*

> third parties and consultants to try and inform us and provide the right input and ensure that we're building best practices. So we, you know -- depending on how you prioritize that question we have a -- you know, we do seek external help and appropriate my view to assure that we are building best practices. But the very specific third-party reviews, the one that comes to mind is obviously the Grant Thornton.[282]

Norton stated that the frequent need to hire independent consultants reflected the lack of experience at the company.[283] Norton stated:

> Q    Wells Fargo had a lot of consultants working on these plans. They had Grant Thornton. They had McKinsey. They had -- Pricewaterhouse was also involved in the sales practice. Was it -- did it concern you that Wells Fargo needed so much help from outside to meet the expectations of its regulators, that it didn't have the resources internally to meet the expectations of its regulators?

> A    I think it's always important -- you mentioned a number of different consultants. Each of these consultants typically have different areas of expertise. So it's not unusual, I think, for multiple consultants to be engaged on a broad array of issues like this.

> What I would say is the extent to which we engage those consultants was, you know, very telling of the level of experience and expertise at the company. And we just talked about that previously and that, you know, these programs hadn't been built out. Many people had been at the company a long time so had never had any experience.

> So I think the -- you know, to try and effect change quickly, the natural default would be to go to consultants to help do that. So I don't think it's particularly unusual. And, you know, is it -- is it concerning? I think at that stage, when you haven't got all of the right people on board, I think it's a natural thing to do.

> Today, you know, we've got more experience and expertise in-house. You know, a lot of it is being recruited externally, so I would expect our reliance on consultants to go down over time, but -- [284]

Norton also stated that the lack of internal expertise was a factor in the company's stagnant effort to comply with the consent orders.[285] Norton told the Committee:

---

[282] Norton Tr. at 152.
[283] *Id.* at 153.
[284] *Id.*
[285] *Id.*

Q    Do you think the bank's lack of internal experience related to compliance and consent orders and the need to hire external consultants kind of has -- is one of the causes why it's taken so long and it hasn't been completed to comply with these -- especially the 2016 order?  You know, I mean, I'm trying to understand why there were so many do-overs and why it's taking so long.  I mean, would you say it's fair to assume that it kind of stems from the lack of kind of internal expertise that was at the bank at the time it was issued?

A    I think it was a factor, certainly.

Q    Yeah.

A    And I think, you know, whenever you bring external consultants in, they don't know the company.  And so coming back to, you know, some of the challenges that I've articulated is you really need people that know their processes and know their businesses to help drive and build the implementation plans.  And I think there was a period of time where both consultants and the risk management team was being relied on to do all of that and sort of throw it over the transom.  And I think what -- some of the changes we've made recently is to really engage what -- other subject-matter experts in the business to help build the implementation plans.

We can have risk-management consultants sort of define the policies or the non-negotiables, but you need some of those subject-matter experts within the businesses to be able to design the implementation plans.

So I think, you know, that's sometimes a bigger challenge with a consultant, that they don't know the company.

But I -- you know, I would say in -- you know, when you have never done something like this before, you know, it does take a while to build teams and get leaders, especially with the high prevalence of gardening leave and things like that, it takes a while to, you know, recruit and on-board someone, and then they've got to come up to speed.  So, you know, consultants are a good way to try and kick start some of these programs.  But, you know, it's not without challenge, too.[286]

Justin Thornton testified that third party reviews were required by the regulators, but Wells Fargo depended on them to come up with the plans that would be submitted to regulators as well.[287]  The COPO office routinely relied on consultants to develop plans, which raised

---

[286] *Id*. at 196-198.
[287] Thornton Tr. at 53.

concerns among the company's regulators.[288]  Witnesses testified it was unusual for a large bank to rely so heavily on consultants because financial institutions are regularly responding to regulators in the compliance context.[289]

---

**FINDING:**

Wells Fargo relied extensively on consultants and contractors, including to draft the plans the bank submitted to the CFPB and OCC under the consent orders.  The bank's over-reliance on consultants reflected a lack of in-house expertise.

---

An OCC official stated that Wells Fargo relied "too heavily" on third-party consultants, like Promontory, to create compliance plans.  The consent order required a third-party to review the bank's plans, but not to create them.[290]  The OCC official explained:

> Q    What issues did you perceive with Wells Fargo's consulting with Promontory?
>
> A    The bank should not have to rely on a consulting firm to do its work. The bank didn't have an individual they could rely on to communicate any plans. It was incredibly disappointing that the bank had to rely on Promontory to create their own plan. I saw this as unacceptable.[291]

The OCC would expect a bank the size of Wells Fargo to have an adequate risk and compliance infrastructure in place to design its own plans pursuant to the consent orders.[292]  In comparison to other banks, the OCC official stated that it was unusual for banks of Wells Fargo's size to need help devloping a compliance plan.[293]  Banks continuously respond to new regulatory demands, and there is an expectation that financial institutions have expertise in-house.[294]  The examiner from the OCC testified:

> Q    Is it unusual for banks to need outside help to create compliance plan?
>
> A    Yes, unusual for a bank of this size.[295]

---

[288] OCC.
[289] *Id.*
[290] *Id.*
[291] *Id.*
[292] *Id.*
[293] *Id.*
[294] *Id.*
[295] *Id.*

## THE ROLE OF THE BOARD OF DIRECTORS

The Wells Fargo Board of Directors is responsible for managing the business and affairs of the company. Various investigations, however, found the Board was not aware of the risks associated with the company's sales practices until 2015.

Prior to the consent orders with the CFPB and OCC in 2016, management reports failed to convey the scope of the Community Bank's aggressive sales quotas and cross-selling tactics to the Board, and management provided incomplete and misleading information to the Board. According to an internal report, "The Board only learned that approximately 5,300 employees had been terminated for sales practices violations through the September 2016 settlements with the Los Angeles City Attorney, the OCC and the CFPB."[296]

The Justice Department found the Board did not receive reliable information from company management. Wells Fargo's $3 billion settlement with the Justice Department states:

> On numerous occasions, Community Bank senior leadership . . . made statements and gave assurances to the Company's management and Board of Directors that minimized the scope of the sales practices problem and led key gatekeepers to believe the root cause of the issue was individual misconduct rather than the sales model itself.

The Justice Department also found managers "minimized the problems" to the Board of Directors, by casting the problems as driven by individual misconduct instead of the sales model itself.[297]

By 2017, the Board had taken several steps in response to the sales practices scandal.[298] The quality of the information provided to the Board from management continued to be a problem under Tim Sloan, however, as the company navigated the requirements of the various consent orders.

The information deficit appears to have left the Board of Directors several years behind in terms of understanding the scope of the company's deficiencies. Under the terms of the company's consent orders with the CFPB and OCC in 2018, the Board of Directors is responsible for reviewing all plans before they are submitted to the regulators.

---

[296] Board Report at i.

[297] Dep't of Justice Press Release, "Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization" (Feb. 21, 2020), *available at*: https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices.

[298] *Id.* Wells Fargo replaced and reorganized the leadership of the Community Bank; eliminated sales goals and reformed incentive compensation; accelerated the centralization of control functions is being accelerated. The Board separated the role of the Chairman and the CEO, strengthened the charters of Board Committees and established regular reporting to the Board by the new Office of Ethics, Oversight and Integrity. The Board also terminated for cause five senior executives of the Community Bank and imposed forfeitures, clawbacks and compensation adjustments on senior leaders totaling more than $180 million.

> ## VIII.
> ### Role of the Board
>
> **IT IS FURTHER ORDERED** that:
>
> 46.    The Board (or a Committee of the Board, which may include the Compliance
> Committee) must review all submissions (including plans, reports, programs,
> policies, and procedures) required by this Consent Order before submission to
> the Bureau.

The FRB's consent order also places significant requirements on the Board, including a requirement that the Board submit a plan to "further enhance the Board's effectiveness in carrying out its oversight and governance" of the company.[299]

The plans submitted to the company's regulators to date have been shoddy, incomplete, and in some cases, late.  The chronic deficiencies in the company's submissions indicate the Board has not been sufficiently involved in the regulatory compliance effort.

## A. Incomplete Submissions

Wells Fargo routinely submitted incomplete plans to the bank's regulators.[300]  A CFPB official testified the CFPB quickly became frustrated with the bank's submissions.[301]  The official testified that the bank's submissions were incomplete, and the quality of the plans showed a lack of understanding as to the extent of the actions that would be necessary to comply with CFPB's orders.[302]

### FINDING:

The CFPB objected that Wells Fargo routinely submits "a plan for a plan," rather than fully developed strategies as required by the consent orders.

The CFPB official testified that the bank's submissions were just "plans for plans."[303] The bank would submit hypothetical outlines for how management planned to resolve issues in the consent orders.[304]  The CFPB official told the Committee that submissions should be

---

[299] Fed Consent Order.
[300] CFPB.
[301] *Id*.
[302] *Id*.
[303] *Id.*
[304] CFPB.

completely-developed strategies for reform.[305]  The submissions indicated management was not taking the CFPB's consent orders seriously, at least at the outset.[306]

The documents show a senior Wells Fargo official based in Washington, D.C. met with CFPB officials in November 2018 and learned "that on both the compliance plan and the remediation plans the Bureau was expecting more/swifter progress."[307]  The documents also show the CFPB told senior Wells Fargo officials that the company's compliance plan under the 2018 consent order was "a plan for a plan."[308]

The CFPB would not accept "plans for plans" and advised the bank so "repeatedly" during meetings with management.[309]  An OCC official testified the plans were just "outlines" that the bank believed would satisfy the regulators.[310]  They did not.

Documents and testimony show a disconnect between the content of conversations between CFPB officials and the bank and the plans submitted to the regulators.  In fact, the evidence shows regular communications regarding the company's lack of progress; a CFPB official testified the bank should not have been surprised with the regulators' frustrations regarding issues of completeness and timeliness.

Officials at the regulators believed the bank was unable to submit complete plans due to the deficiencies of the company's risk offices.[311]  The bank was "wholly deficient" in terms of expertise related to all areas of the consent order, according to a CFPB witness.[312]

Documents show the bank was still building its programs while simultaneously submitting plans that represented the programs had been implemented, among other tactics.[313]  Internal CFPB notes from a meeting with Wells Fargo show the extent of the CFPB's concerns with respect to the bank's submissions pursuant to the consent order.[314]

The notes state, "For each of these plans (Redress and Compliance) there was the initial submission on the due date and then resubmission 90 or more days later. . . . A plan for a plan."[315]  The documents show CFPB believed the bank's "programs being implemented by the plans the bank submits are being built and are developing while in use."[316]  Because Wells Fargo's consent order team ignored "verbal requests," the CFPB created a "tracker" and "resorted to letters" to communicate with the company.[317]

---

[305] *Id*.
[306] *Id*.
[307] HFSC_CFPB-041019_00021477 (On file with Committee).
[308] *Id.*
[309] *Id*.
[310] OCC.
[311] CFPB.
[312] *Id*.
[313] HFSC_CFPB-041019_00005222 (On file with Committee).
[314] *Id*.
[315] *Id*.
[316] *Id.*
[317] *Id*.

At the meeting, CFPB examiners were growing impatient with the bank's lack of progress.[318]  A CFPB official stated:

Q    In this document, he references a "plan for a plan." I've heard that term come up a lot with the regulators in how they react to Wells Fargo submissions. I was wondering how you reacted to that in the meeting.

A    That is something that we all identified. Not just in this instance but as a general response. A plan for a plan is never a final submission. If we would request a remediation plan for CPI, for example, rather than put together a fulsome plan, they would put together a framework.  They would submit that framework as a finalized plan. When questioned the bank would say: "well this is our plan for a plan and we'll flesh it out later." This was very frustrating from my perspective and everyone at the CFPB.

Q    Did that cross over into compliance with the 2016 Consent Order? Did that occur with remediation plans and also initial compliance plans?

A    Yes, I would put initial compliance plans into that category.[319]

The regulators constantly communicated with the bank to make sure the consent order team understood the expectations, but the bank continued to submit incomplete plans, some of which were missing entire sections.[320]  Even after a plan was rejected, and the regulators would explain why, the bank still failed to subsequently submit an acceptable version.[321] A CFPB witness testified:

Q    Wells Fargo is supposed to know what Bureau expects of them, so it is surprising that they would miss entire sections. For the CPI program – that didn't include auto finance - did CFPB communicate to Wells Fargo that it needed to include dealer services?

A    As the bank was putting together its second plan, we would have meetings about progress they were making. It was clear what we expected. I think it was the very first progress meeting that they presented a plan for addressing it. They failed to address the whole second half of expectations we supplied them. So, we told them very early. The submission was still wholly incomplete.[322]

---

[318] CFPB.
[319] Id.
[320] Id.
[321] Id.
[322] Id.

The CFPB official testified that the bank submitted incomplete plans just to meet deadlines, including plans that were missing entire sections.[323]  The official testified:

Q        You have used the term "incomplete" multiple times in terms of submissions; can you elaborate? Is the bank missing subject areas? What is the CFPB's perspective on how their submissions have been incomplete?

A         I would say it encompasses all of those. The plans are incomplete in every meaning of the word. Some cases are superficial, but some cases they were missing entire areas of operation. This is unacceptable. An example of the latter is the CPI plan that we require under the 2018 order. The initial submission only addressed indirect auto lending and didn't address the direct auto lending program at all. It was missing a complete set of consumers and controls at the bank.[324]

Witnesses stated that the bank does not have the technology infrastructure to provide its regulators with key data and metrics.  Wells Fargo's audit technology lags far behind other institutions of a similar size, according to a CFPB official.[325]  This affected the quality of the bank's submissions and caused the CFPB to request routine data.[326]  Absent an upgraded technology infrastructure, the bank cannot demonstrate it has met the consent order's remediation requirements.[327]

CFPB examiners remain concerned about the quality of the bank's submissions.[328] Officials at the CFPB have not seen progress in the quality of the company's submissions.[329]  A CFPB official stated:

Q        Were there concerns about the pace of progress?

A        Yes, we had concerns about the pace of progress. Whether it tied to extensions or incompleteness, there were concerns about pace.

Q        Can you elaborate on the concerns about pace?

A        Using sales practice compliance as an example, they submitted and resubmitted the plan numerous times each with numerous deficiencies. The net effect is that we are further down the timeline and still do not have one effective plan in place. Not that they've missed deadlines, but plans are incomplete and need more work. The

---

[323] *Id.*
[324] *Id.*
[325] *Id.*
[326] *Id.*
[327] *Id.*
[328] *Id.*
[329] *Id.*

bank seems to be concerned with meeting deadlines on time and that is it.[330]

Documents show members of the Board of Directors were also frustrated.[331] Summary notes from a November 2017 meeting between CFPB officials and the bank, Tim Sloan and Betsy Duke requested clear guidance as to what the CFPB needed to see in the bank's redress plan.[332] This document shows Duke wanted to "limit the number of plan submissions" and she asked the CFPB to identify "what needs updating" so the bank could "complete a final plan."[333]

A CFPB official testified that Duke seemed "frustrated" because the CFPB would not simply tell the bank what needed to be in the redress plan. The CFPB, however, expected the bank to create its own plan in comportment with the requirements of the consent orders. A CFPB official told the Committee this is not how the regulatory relationship works—it is not the regulator's role to create the bank's redress plan. The regulators review and object to complete submissions from the bank as appropriate.[334]

## FINDING:

Wells Fargo expected its regulators to effectively create a redress plan for the company. This fundamental misunderstanding of the supervisory relationship revealed that the bank lacked the expertise to develop a complete plan to remediate customers who were harmed. To date, the bank has not received a supervisory non-objection for a complete redress plan.

The bank's expectations for the CFPB's role in developing the redress plan show the bank lacked experience and expertise related to regulatory compliance.[335] Similarly, an OCC official stated that the bank relied too heavily on the regulators to tell them what to do.[336] The OCC official testified that other large banks are generally able to recognize and develop plans to address the problems that regulators identify.[337]

As recently as December 2019, the CFPB objected to the bank's submission for material deficiencies.[338] To date, CFPB officials do not have confidence that the bank is capable of submitting complete plans.[339] A CFPB official told the Committee that there are still concerns about the bank's staff, which continues to affect the bank's ability to produce "quality reports."[340]

---

[330] *Id.*
[331] HFSC_CFPB-041019_00021582 (On file with Committee).
[332] *Id.*
[333] *Id.*
[334] CFPB.
[335] *Id.*
[336] OCC.
[337] *Id.*
[338] CFPB.
[339] *Id.*
[340] *Id.*

An OCC official stated that Wells Fargo minimized deficiencies in its submissions and seemed to be concerned with "appearing to meet deadlines" as opposed to doing the "actual work."[341]  The OCC was in constant communication with the bank regarding submissions, but the bank lacked the talent and infrastructure to create plans to comply with the consent order.[342]  An OCC official explained that there was no sense of urgency to hire the right people to get the submissions in order.[343]  The OCC objected to a series of incomplete plans that appeared to be submitted for the sole purpose of meeting deadlines pursuant to the consent order.[344]  An OCC official stated:

> Q    When the submissions would come in would they be complete?
>
> A    No. For example, if the action plan was to include 15 milestones, Wells would not include all 15 milestones. In order to meet the deadline, they would just submit what they had. They would not address deficiencies – they would just submit it incomplete anyways.[345]

The OCC also told the Committee the bank's management would not take accountability for the poor quality of their submissions.[346]  In fact, the bank pushed back when their plans were rejected.[347]  An OCC official stated this posture was highly unusual—no other bank needed this much "hand holding."[348]  The OCC official stated:

> The institutional culture at Wells is one of slow progress. There are no calls to action, no accountability from management or other staff. They minimize crucial issues with the consent orders and MRAs. At other banks when they are issued an MRA, the CEO and other management staff have a sense of urgency and are all hands-on deck. The submissions are complete and timely. Wells has no sense of urgency.[349]

The OCC's Quarterly Management Report summarizes what examiners told the Board at a July 2019 meeting.[350]  The document shows OCC examiners told the Board that they must "meet their commitments," including a need to "develop a track record of success against your regulatory commitments."[351]  Regulators at the OCC also told the company to meet "commitments with quality" and advised the bank that when they are "unable to meet your commitments", they must "understand why."[352]

---

[341] OCC.
[342] *Id.*
[343] *Id.*
[344] *Id.*
[345] *Id.*
[346] *Id.*
[347] *Id.*
[348] *Id.*
[349] *Id.*
[350] OCC-HFSC-WF-2019-00038450 (On file with Committee).
[351] *Id.*
[352] *Id.*

The quality of the plans reflected that neither management nor the Board were truly invested in creating quality plans.[353] An OCC official described the submissions as an exercise in "box checking."[354] Regarding the messages OCC delivered to the Board in July 2019, an OCC official stated:

> Q    On page 4, it says "meet your commitments." What did you mean by this?
>
> A    I was trying to be clear in my frustrations. We need for them to meet deadlines and do well in order to move forward.
>
> Q    What are the 3 points of emphasis that the OCC wanted the Board to hear?
>
> A    Meet commitments; create a track record of success; address the root cause. This needs to happen for the bank to progress under the orders.[355]

The OCC has rejected every remediation plan submitted by Wells Fargo, multiple times.[356] According to the OCC, the constant "back and forth" with very little progress frustrates the company's regulators because it delays the enactment of policies and procedures that will protect the public.[357]

The Federal Reserve has continuously received incomplete submissions from Wells Fargo.[358] FRB officials told the Committee the company's submissions were low quality and missing key pieces.[359] The documents show the FRB rejected the company's plans related to Board Effectiveness and a Risk Management Program because the plans were "materially incomplete."

In a letter to Tim Sloan and Betsy Duke on May 7, 2018,  the FRB stated the firm's plans addressing Board effectiveness and a Risk Management Program "are materially incomplete."[360] The plans were "missing key elements and significant parts are unclear."[361]

The letter also stated the submissions lacked milestones and timelines required under the consent order, which would have made it impossible for the FRB to evaluate the company's progress.[362] Officials at FRB noted in the letter a lack of progress on risk management at the bank.[363] Officials from the FRB wrote: "To satisfy the requirements of the Order, the firm must

---

[353] OCC.
[354] Id.
[355] Id.
[356] Id.
[357] Id.
[358] FRB.
[359] Id.
[360] FRB_HFSC-00003438 (On file with Committee).
[361] Id.
[362] Id.
[363] Id.

establish operation and compliance risk management programs that can effectively identify, measure, monitor, and control those risks."[364]

FRB officials told the Committee the Wells Fargo Consent Order Written Plans submitted on April 3, 2018 were missing major components such as plans to address the company's deficiencies in operational and compliance risk management. Despite weekly calls between the FRB officials and Wells Fargo, Wells Fargo submitted plans that were "insufficient."[365]

> **FINDING:**
>
> Federal Reserve Board staff had concerns about the "safety and soundness" of areas of Wells Fargo covered by its Consent Order after the company submitted its initial plan in response to the February 2, 2018 Consent Order. The plans were so inadequate as to raise concerns about whether the company had the right leader.

FRB officials were concerned the company did not have the appropriate leaders in place to develop submissions to meet the FRB's expectations.[366] In fact, the FRB had "safety and soundness" concerns with areas of the company that were covered by the Consent Order after the first submissions because the plans were so inadequate.[367]

FRB officials were also disappointed in the second round of submissions, which were rejected because, while the FRB considered some aspects of the plans acceptable or partially acceptable, other aspects lacked fundamental elements necessary to address the target issues.[368] The plans failed to comprehensively address the company's deficiencies with operational and compliance risk management.[369] FRB officials decreased the frequency of meetings with the bank in an attempt to allow the bank to reflect the FRB's prior feedback in the second submission.[370] The purpose of the weekly meetings were to give feedback in order to improve the quality of the company's plan submissions.[371] The second submission, however, was still insufficient overall and was rejected.[372]

In connection with the rejection of the second submission, the FRB informed the bank of possible escalations if the company continued to submit incomplete plans.[373] The FRB informed the firm that the FRB could consider additional actions if the bank were to produce unacceptable

---

[364] *Id.*
[365] FRB.
[366] *Id.*
[367] *Id.*
[368] *Id.*
[369] *Id.*
[370] *Id.*
[371] *Id.*
[372] *Id.*
[373] *Id.*

plan materials along the lines of its first two plan submissions.[374]  To date, the bank has not submitted a third written plan.[375]

## B. Missed Deadlines

The bank's chronic inability to develop comprehensive plans pursuant to the consent orders caused the company's management to request extensions to deadlines.[376]  A CFPB official testified the amount of extension requests was unusual.[377]  The bank frequently filed extension requests at the last minute.[378]  The CFPB official testified:

> Q       Did Wells Fargo ask for an extension to submit any reports or plans?
>
> A       Yes, they asked for extensions. Many extensions.[379]

The CFPB granted every request for an extension but negotiated what the submission would look like by the new deadline.[380]  A CFPB witness told the Committee Wells Fargo management tried to limit the scope of the submissions but the CFPB would not accept lower standards with respect to materiality.[381]

Officials from the bank's regulators stated that even after multiple extensions, the bank submitted incomplete submissions—the submissions were often superficial and lacking missing multiple required sections.[382]  The bank's submissions seemed "thrown together."[383]  The cycle of extensions and insufficient submissions was unusual, according to a CFPB witness.[384]  A CFPB official testified:

> Q       How many submissions did they have to submit? How do they compare to other banks in getting it right on the first or second try?
>
> A       It is very unusual. We see it on the non-bank side because those entities are not used to being regulated as heavily. It is very unusual for a bank the size of Wells to not have the proper infrastructure to submit acceptable plans.
>
> Q       So usually when banks have to comply, do they get it right on the first time?

---

[374] FRB_HFSC-00018565-75 (Mar. 11, 2019) (On file with Committee).
[375] FRB.
[376] CFPB.
[377] *Id.*
[378] *Id.*
[379] *Id.*
[380] *Id.*
[381] *Id.*
[382] *Id.*
[383] *Id.*
[384] *Id.*

A       No but the extent of the repeated requests for extensions and the lack of nonobjections is unusual.

Q       So, maybe normally they get it right on the first or second submission?

A       Usually they get it right quickly and the deficiencies are usually narrow or easily addressed, but that is not the case here. These were material issues.[385]

The bank's regulators also had concerns about the data used to support submissions, even after extensions were granted to allow the company to implement new technology.  For instance, the CFPB did not accept any of the audits submitted for the individual lines of business at the bank due to a lack of meaningful metrics.[386]  The CFPB took issue with the company's audit program and pushed for better tracking technology.[387]

> **FINDING:**
>
> Wells Fargo routinely requests extensions to deadlines for submitting remediation and reform plans.  The bank's regulators typically grant those requests, but the company's plans remain deficient, even with the extra time.  Wells Fargo's inability to submit plans that meet regulatory standards exposes the bank's customers to additional harm, according to the bank's regulators.

Documents and testimony show the bank continues to request extensions and submit incomplete plans.  As of December 2019, the bank's submissions to the CFPB must still be revised.[388]  The bank's inability to submit plans that meet the CFPB's standards exposes the bank's customers to further harm, according to witnesses.[389]

OCC officials had similar experiences with respect to deadline extension requests.  An OCC official stated the bank lacked a sense of urgency.[390]  The official told the Committee a bank under Wells Fargo's level of scrutiny would ordinarily have an "all hands on deck" approach to meeting deadlines and completing submissions.[391]  Thornton, however, told the Committee that the bank had a weekly "all-hands crisis response" following sales practices issues between October and December 2016.[392]

---

[385] *Id.*
[386] *Id.*
[387] *Id.*
[388] *Id.*
[389] *Id.*
[390] OCC.
[391] *Id.*
[392] Thornton at 186.

The testimony creates the appearance that the bank's crisis response effort was insufficient. The OCC said Wells Fargo "was in the habit of sending emails last minute" and they would "often miss requirements."[393] An OCC official testified:

Q     What were the concerns surrounding deadlines?

A     Wells was in the habit of sending emails last minute when they did not meet deadlines. This would be for a variety of reasons, but it was clear the bank was not ready to give us their plans. Sometimes the bank would notify us or sometimes the OCC would catch the lack of progress and address it with them. They would not always send the required official letters of missing a deadline nor take the formal actions necessary to ask for an extension. This was frustrating because they would often miss requirements in OCC mandated action plans.[394]

The OCC has observed some improvements related to meeting deadlines and submitting more complete plans.[395] An OCC official testified that the bank's new management are focused on meeting deadlines and more capable of handling the workload associated with creating a complete plan.[396] Still, progress is slow. The OCC official stated:

Q     Has there been improvements in deadlines?

A     Yes, they are meeting their deadlines more. They owed a lot by year end 2019 and met most of their deadlines. The new management is quite focused on accountability but there is still stalling. In context of sales practices there were often extension requests. Especially in this consent order. There was a short time remaining before the due date and not enough work product. There was too much feedback needed by the bank on individual remediations for the plan to be fully ready.

Q     What is the level of feedback required by Wells Fargo in this context?

A     In most cases there is a question of a lookback period for a remediation. That is normal for a regulator to advise an entity. In the case of Wells Fargo, there is no set standard, which is unusual. Every remediation differs between data collection, lookback, and determination of amount paid. This should have been addressed.[397]

---

[393] OCC.
[394] *Id.*
[395] *Id.*
[396] *Id.*
[397] *Id.*

The Federal Reserve Board staff also raised concerns about the company's frequent requests for an extension. For example, in June and August of 2018, Wells Fargo requested an extension of time to make its plan submission pursuant to the consent order and permission for the bank to submit portions of its plan at different times, which the Federal Reserve granted.[398] The FRB negotiated the terms of an extension and allowed the company to submit its plan in two pieces.[399]

The FRB shared concerns with the Wells Fargo Board of Directors after the company's first and second submissions, related to the adequacy of those submissions.[400] The FRB, however, did find in March 2019 that the Board effectiveness part of the second submission was "generally acceptable."[401]

An FRB official stated the Wells Fargo Board was not performing its oversight responsibility by enforcing deadlines on the company's managers.[402] FRB officials had internal discussions regarding the quality of the company's submissions and their expectations that the Wells Fargo Board should step in.[403] The FRB repeatedly expressed that position to the company's managers and the company's Board.[404] The FRB remains disappointed in the timeliness and quality of the bank's submissions.[405]

## C. Ineffective Oversight

Documents show the Board's perception of the company's progress and its level of engagement on consent order compliance was often at odds with the facts on the ground. There was a disconnect between the Board and the company as management attempted to implement the requirements of the 2016 consent orders from CFPB and OCC. The documents and testimony also show internal Board disagreements regarding the bank's progress toward complying with the regulators' consent orders.

---

**FINDING:**

The OCC and CFPB expect a bank's board to ensure compliance with bank enforcement actions within required time frames by holding management accountable, among other things. The documents show the Board continued to support the company's management despite overwhelming evidence that the consent order compliance program was inadequate.

---

In February 2017, Karen Peetz joined the Wells Fargo Board of Directors. Peetz was the retired president of The Bank of New York Mellon Corp. Before BNY Mellon, Peetz spent 16

---

[398] FRB_HFSC-00003445; WF-HFSC-000064263; FRB_HFSC-00003450.
[399] FRB.
[400] *Id.*
[401] FRB_HFSC-00018565-75 (Mar. 11, 2019) (On file with Committee).
[402] FRB.
[403] *Id.*
[404] *Id.*
[405] *Id.*

years with JPMorgan Chase in various roles.  Peetz was expected to "provide particular expertise in financial services, client services and regulatory matters."[406]

Peetz testified the Board was highly involved in the process regarding the consent orders and overhauling the risk management program at the bank.[407]  As Risk Committee Chair, Peetz oversaw all types of risk at the bank and all preparations of material for regulatory submissions.[408]  Peetz testified:

> Q       Describe your role as risk committee chair?
>
> A       My interpretation was to make sure that all of those risks were covered. To take a holistic approach to enterprise risk and make sure to divide time and meetings to cover all types of risk.  It was my responsibility to make sure all regulatory materials were well prepared, enable good discussions of what were the risks that needed to be reviewed, and provide clarity to other Board members about the status of risk compliance.  I was in charge of following up on risk issues and ensuring that regulatory compliance was being dealt with.[409]

The Board and its Risk Committee would routinely hold special meetings to prepare submissions for the regulators.[410]  Peetz stated that the Risk Committee was highly involved in these submissions from "the conceptual nature of the response to editing the final draft."[411]

Peetz testified, however, that the Board would not always agree with how management was handling the submissions to the regulators.  In executive sessions, the full Board discussed feedback from the regulators and next steps.[412]  Peetz would push back on management because she felt the draft submissions were "not going far enough."[413]

Members of the Board identified that there was a "learning curve" at the bank for how to implement the requirements of various consent orders.  Peetz testified the lack of information flowing to the Board was problematic, and there were doubts as to whether the information shared with the Board was too optimistic.[414]  Peetz tried to help other Board members understand that risk management at Wells Fargo was "insufficient."[415]

---

[406] Hilary Burns, *Wells Fargo names two independent directors — former BNY Mellon president and former Staples CEO*, CHARLOTTE BUS. JOUR., Feb. 21, 2017.
[407] Peetz.
[408] *Id*.
[409] *Id*.
[410] *Id*.
[411] *Id*.
[412] *Id*.
[413] *Id*.
[414] *Id*.
[415] *Id*.

Peetz was able to draw upon her prior experience as President of BNY Mellon to understand the industry standards for a compliance function at a large bank.[416]  Peetz stated that Sloan lacked the expertise to manage the overhaul of the whole risk management program.[417] She testified Sloan was not willing to prioritize regulatory compliance over growth of the company.  Sloan's posture trickled down to management and affected how the company dealt with the consent orders.[418]

Peetz identified Sloan as a major impediment to the Board's ability to move the company forward in terms of compliance with the consent orders.[419]  Peetz eventually began to lose faith in Sloan's ability to successfully navigate the bank's regulatory issues, and reported that Board members held a range of views on the topic, which evolved over time.[420]  Peetz continuously escalated her concerns to Betsy Duke, but Duke did not agree with her assessment.[421]

Email communications between Peetz and Duke show Duke had confidence in the bank's consent order compliance program as of November 2017, after a series of the bank's plans were rejected by the CFPB and OCC.[422]  In a November 16, 2017 email from Duke to Peetz, Duke discouraged Peetz' escalation of certain matters pertaining to meeting deadlines.[423]  The email states: "We are early days with the sales practices CO but so far I have found Justin to be organized and thoughtful in his presentations."[424]

Peetz testified she repeatedly raised management's lack of progress and had concerns with management's lack of urgency.[425]  Duke, however, continued to defend management.  She wrote: "So while I too am very interested in an overall project plan, I don't want to throw out or discourage the work that is being accomplished on the projects that are well underway . . . ."[426]

---

[416] *Id.*
[417] *Id.*
[418] *Id.*
[419] *Id.* at 20.
[420] *Id.*
[421] WFBOD-HFSC-00000407 (On file with Committee).
[422] *Id.*
[423] Peetz.
[424] WFBOD-HFSC-00000407 (On file with Committee).
[425] Peetz.
[426] WFBOD-HFSC-00000407 (On file with Committee).



> Thanks, Karen.
>
> We are planning a discussion with Tim at the November meeting and have requested that he discuss his strategy for addressing our regulatory shortcomings.
>

**REDACTED – NONRESPONSIVE BEP**

> We are early days with the sales practices CO but so far I have found Justin to be organized and thoughtful in his presentations. Once we get past this final submission we can turn our attention to the master plan. I think it will take a bit of trial and error to find the right reporting level but I have confidence that we can get there. There is a bit of a tricky distinction here in that the RCOC remit is to oversee work to complete the consent order. The Risk Committee will presumably focus on the overall enterprise view of Sales Practice risk. The plan for the consent order is probably a subset of the master plan for sales practice risk. You, Jim Quigley and I will be working on both so we should be able to figure out the intersection of the two.
>

**REDACTED – NONRESPONSIVE BEP**

> So while I too am very interested in an overall project plan, I don't want to throw out or discourage the work that is being accomplished on the projects that are well underway with the reporting we have requested.
>
> -----Original Message-----
> From: Karen Peetz [mailto:█████████████]
> Sent: Thursday, November 16, 2017 3:36 PM
> To: Betsy Duke <████████████████>
> Cc: Jim Quigley <████████████████>; John Baker <████████████████>; Sue Swenson <████████████████>
> Subject: Re: RCOC meeting
>

**REDACTED – NONRESPONSIVE BEP**    I believe we need to insist on "time lapsed" plans for all major RCOC and Risk deliverables. That is the best discipline to outline the entire scope of the effort required

Peetz began to worry as none of the company's submissions had been approved by any of the regulators.[427] Peetz testified that she had to become more "hands-on" due to the lack of work being done at the management level.[428] Peetz stated that throughout her time as Risk Committee Chair the situation "improved because of applied pressure from the Board," but still remained "deficient" when she left the Board in April of 2019.[429] Peetz credited the improvements of enterprise risk management to the "total and excellent" engagement of the Board with management.[430]

Board members were regularly in contact with the bank's regulators, including monthly calls and meetings with the OCC, CFPB, and Federal Reserve.[431] Peetz was ordinarily accompanied by Duke in conversations with the company's regulators about the status of consent

---

[427] Peetz.

[428] *Id*.

[429] *Id*.

[430] *Id*.

[431] *Id*.

order compliance.[432] Peetz stated that the "regulators knew us better than we knew ourselves."[433] She testified that the regulators saw problems at the bank that were not identified by management or the Board.[434]

Officials from the bank's regulators told the Committee that the Board did not sufficiently fulfill its responsibilities to oversee the consent order compliance program.[435] Officials at the CFPB believed the Board was ultimately responsible for all operations of the bank, and in part blamed the Board's lack of accountability for the slow progress of the company under the consent orders.[436] A CFPB official testified:

> Q    In general – what were the CFPB's expectations with respect to the level of Board engagement and involvement in Wells Fargo Consent Orders? What was their role in making sure they complied?
>
> A    Our expectation with any bank is that the Board of Directors are directly responsible for operations of the bank.
>
> Q    What were CFPB's expectations with respect to the Board's level of engagement? Were they responsive?
>
> A    The Board of Directors are responsible for Wells Fargo and we would hold them responsible for that.[437]

The CFPB was concerned with the lack of availability of certain members of the Board. Witnesses stated that in a case like this, the expectation is for the Board to be interacting regularly with the bank's regulators.[438] In a letter to the Board, CFPB officials expressed "disappointment" that then-Chairman of the Board Stephen Sanger and Duke were unavailable for a meeting. The letter stated, "We were disappointed to hear from our designated Wells Fargo Bank, N.A. . . . points of contact that the two of you did not have the flexibility to meet with us in connection with your July 2017 or August 2017 Wells Fargo Board of Directors meetings."[439]

Documents and testimony show CFPB officials who interacted with the Board of Directors felt the Board was not responsive to their guidance. A CFPB official testified that the bank failed to make progress in several areas despite repeated notifications to the Board.[440] The CFPB did not expect the Board to be involved in the day-to-day business of the bank. With respect to regulatory compliance, however, the CFPB believed the Board should be providing leadership and oversight.[441]

---

[432] *Id.*
[433] *Id.*
[434] *Id.*
[435] *Id.*
[436] CFPB.
[437] *Id.*
[438] *Id.*
[439] HFSC_CFPB_041019-00001599 (On file with Committee).
[440] *Id.*
[441] *Id.*

A CFPB official testified that the burden fell on the Board to drive consent order compliance after a series of management's submissions were rejected by the regulators.[442] The regulators expected the Board to step in and hold management accountable when the bank's consent order submissions were rejected.[443] Officials at the CFPB, however, testified that the Board failed to conduct aggressive oversight related to regulatory compliance.[444]

In fact, documents show the Board preferred the CFPB not to contact members directly in some cases.[445] Notes from a meeting between CFPB officials and the Board show Duke requested not to receive letters "asking for a department of the bank to do something," preferring such letters go to the specific lines of business.[446] A CFPB official was surprised that a high-ranking member of the Board, or any director for that matter, would not want to be alerted to ongoing issues at the company.[447] The CFPB official testified:

> Q    So again, following up on the theme of whether or not Ms. Duke or other Board members pushed back when CFPB directly communicated with them as there were issues.
>
> A    Her statement came as a surprise to me. A Board member should never object to receiving things from a regulator in my experience. This is unusual and surprising.[448]

Officials at the OCC were also concerned with the Board's lack of action.[449] An OCC official stated that since Wells had not made any real progress in 2017 and 2018, the Board should have taken steps to be more involved in regulatory compliance.[450] The OCC official told the Committee that one of the Board's roles as an independent oversight body was to ensure regulatory compliance.[451] The Board failed to do so.[452]

Regulators at the OCC saw the Board as complacent.[453] An OCC official confirmed that the Board received actionable information on a regular basis but did little in response.[454] Officials at the OCC presented issues surrounding senior management, like Sloan, but the Board did not take action.[455]

Internal communications show the OCC and the FRB identified Sloan as a major obstacle to the bank's progress but the Board refused to address the issue.[456] In an internal email, an

---

[442] *Id.*
[443] *Id.*
[444] *Id.*
[445] *Id.*
[446] HFSC_CFPB-041019_00021584 (On file with Committee).
[447] CFPB.
[448] *Id.*
[449] OCC.
[450] *Id.*
[451] *Id.*
[452] *Id.*
[453] *Id.*
[454] *Id.*
[455] *Id.*
[456] OCC-HFSC-WF-2019-00039273 (On file with Committee)

official from the OCC stated "the Board, headed by Betsy Duke, has made clear their emphatic support for Tim." Despite a series of setbacks, the "board remains behind him."[457] The email also states, "The only way in which the Board will act is if 1) financial performance significantly falters, including the stock price (which will spur investors to pressure the Board) or 2) the regulators (us or the Fed) make it clear Sloan needs to go."

The OCC lost confidence in Sloan's ability to bring the bank into compliance with the consent orders.[458] The OCC shared this assessment with the Board, several times, but the Board was unwilling to take actions.[459] An OCC official stated:

> Q     You previously said that the OCC had the view that the Board needed to address the management situation with Sloan and the fact that the bank is not making any progress under the consent orders. What did the Board want to do?
>
> A     The OCC had the opinion that the Board needed to get rid of Sloan, but the Board had to make that decision. The Board was not taking the correct steps even after being presented with fact sheets, ratings, MRAs, missed MRAs, and missed deadlines between 2016 and 2018.
>
> Q     Did the OCC ever direct the Board to terminate Sloan?
>
> A     No. I only talked about the progress and performance of executives. I specifically talked about Sloan's lack of accountability, but it was up to the Board to make that call.[460]

Officials from the bank's regulators attended a July 2018 Board meeting, where the OCC led discussions around the status of the consent orders. An OCC official explained that during the meeting, it became obvious that Duke did not understand how far behind the bank was in complying with the consent orders.[461] The OCC official told the Committee it was clear Duke did not have an "accurate picture of the situation."[462] Examiners at the OCC stated Board accountability was a persistent issue and grew concerned with Duke's leadership.[463]

Members of the Board informed regulators that the plans the company submitted to the regulators were a "work in progress."[464] The regulators were concerned that this indicated the Board approved management's "plan for a plan" approach.[465]

---

[457] *Id.*
[458] *Id.*
[459] *Id.*
[460] *Id.*
[461] *Id.*
[462] *Id.*
[463] *Id.*
[464] Peetz.
[465] OCC.

Peetz, however, testified that the Board was more active and involved than at other banks.[466] Peetz stated that after the July 2018 Board meeting, the Board understood the complaints from its regulators and worked to ensure the company's submissions were of a "higher quality."[467] Peetz stated that the Board was dedicated to a complete risk overhaul at the bank and made that clear to management.[468]

Peetz identified the quality of information provided to the Board from management as a key factor driving the low-quality submissions.[469] The lack of "good information" caused the Board to lose confidence in the management teams handling the consent orders.[470]

The OCC also raised concerns that documents shared with the Board were "inaccurate" and "overly optimistic" regarding the company's progress.[471] The materials did not reflect the "gravity of the situation," according to the OCC.[472] An OCC official stated that the materials provided to the Board were too "optimistic" and did not paint the "full picture of the difficulties" related to progress under the consent orders.[473] The OCC official explained:

Q       What concerns did you have about board reporting?

A       The concerns were related to issues around transparency. The reports were often very positive, sometimes overly so. One had to dig to find the meaningful stuff. The information presented to them was sometimes misleading.

Q       What are certain examples in board reporting issues?

A       Technology reporting was typically quite upbeat, more than was accurate. No detail about MRAs that were old or failed. Very tactical reporting on consent orders with no response sections.

Q       How is new management making reporting to board more direct now?

A       The main issues are being put right up front with problems. Not placing serious issues in a secondary position so they are overlooked.[474]

Peetz stated that the Board had expanded beyond its traditional oversight function while the firm built out its management team.[475] In the absence of a Chief Risk Officer, Peetz took on

---

[466] Peetz.
[467] *Id*.
[468] *Id*.
[469] *Id*.
[470] Peetz.
[471] OCC.
[472] *Id*.
[473] *Id*.
[474] *Id*.
[475] Peetz.

responsibility for communicating information to the Board related to risk until Amanda Norton was hired.[476] Peetz resigned from the board due to the immense workload, much of which would ordinarily have been handled by management.[477]

Peetz believed the Board should have taken more drastic steps by removing managers, such as Tim Sloan, whose lack of accountability slowed the bank's progress under the consent orders.[478] Peetz identified herself on one end of the spectrum compared to other directors in regard to extreme moves the board needed to make to fully comply with the regulators.[479] Peetz resignation troubled officials at the bank's regulators.[480]

Regulatory officials have seen some improvements in terms of the quality of information provided to the Board.[481] An OCC official stated the information going to the Board has become more realistic and direct, which positions the Board to be more effective.[482]

The FRB, however, continues to have concerns with the Wells Fargo Board's role in the submissions.[483] The Board is required to conduct oversight of the creation and implementation of consent order compliance plans.[484] FRB officials believe the Wells Fargo Board should be more involved in the process and hold management accountable.[485]

## SNAPSHOT OF THE BANK'S ONGOING TRANSFORMATION

Wells Fargo continues to undergo a companywide transformation in the wake of the scandals at the bank.[486] The bank has hired new business leaders in an effort to "create a flatter line of business organizational structure and provide leaders with clear authority, accountability and responsibility."[487] This reorganization is an answer to many ongoing problems raised in the bank's second set of consent orders issued in 2018.[488]

Following heavy criticism from regulators and Congress regarding the lack of progress under both the 2016 and 2018 consent orders, Wells Fargo's Board of Directors announced significant changes to corporate leadership, including hiring a new chief executive officer.[489]

---

[476] *Id*.
[477] Peetz.
[478] *Id*.
[479] *Id*.
[480] OCC.
[481] OCC.
[482] *Id*.
[483] FRB.
[484] *Id*.
[485] *Id*.
[486] Wells Fargo Press Release, "Wells Fargo Announces Organizational Changes" (Feb. 11, 2020), *available at*: https://newsroom.wf.com/press-release/corporate-and-financial/wells-fargo-announces-organizational-changes.
[487] *Id*.
[488] *Id*.
[489] *Id*.

Charles Scharf was named CEO in September of 2019.[490]  Scharf immediately began working with the Board to "create the right structure to build our business over the long term and increase our ability to successfully execute on our top priority, which is the risk, regulatory, and control work."[491]  Still, the company has a great deal of work to do to comply with the various consent orders and other regulatory requirements.

## A. Some Signs of Progress

The OCC identified recent progress towards compliance with the outstanding requirements under the consent orders.  The Bank met deadlines for submissions at the end of 2019, and new management appears focused on accountability, according to an OCC official.[492] The OCC official testified:

> Q       What are the three points of emphasis for the OCC at this point?
>
> A       Meet commitments; create a track record of success; address the root cause.
>
> Q       Have these points been achieved so far since July?
>
> A       Yes, there is movement towards a successful record.
>
> Q       Has there been improvement in deadlines?
>
> A       Yes, they are meeting their deadlines. They owed a lot by year end 2019 and met their deadlines. The new management is quite focused on accountability.[493]

According to the OCC, the bank's new management have been proactive and seem to understand the "root cause issues."[494]  An OCC official stated:

> Q       So, there has been progress. Given the state of Wells Fargo today, can they satisfy open remaining issues?
>
> A       The recent conversations with newest management have been very productive. They clearly understand some of the root cause issues including that people are too nice. Two former CEOs in important positions in the bank make a difference in setting expectations and following up on them.[495]

---

[490] *Id.*
[491] *Id.*
[492] OCC.
[493] OCC.
[494] *Id.*
[495] *Id.*

With regards to the current status of the consent orders, a CFPB official testified the most recent re-submissions are currently under review. The bank combines feedback from the CFPB and OCC and revises their submissions accordingly.[496] A CFPB official testified:

Q      Contrary to what you've said, the compliance risk management, all the plans listened have not been approved by the CFPB. What is the current status of these four plans? Have there been additional submissions? Are you still considering previous plans? I didn't see any other submissions since then that've been approved. Have they submitted multiple version of each of these plans?

A      No. Just the initial submissions.

Q      Are those currently under review?

A      Yes.

Q      Has the Bureau communicated significant problems with them? What's holding them up?

A      Compliance risk management has outstanding issues. They had additional submissions; they revised the plan again. They supplied new plans in March 2019, May 2019 and December of 2019. It's just a matter and they keep revising and resubmitting.

Q      Is that in response to specific feedback you're giving them or them just voluntarily revising?

A      Feedback from CFPB and feedback from OCC because there's lots of overlap. That's primarily what's prompting the revisions. [497]

The CFPB has not committed to provide a supervisory non-objection to the most recent consent order submissions related to the company's compliance program.[498] A CFPB official told the Committee that Wells Fargo's compliance infrastructure is still not satisfactory.[499] The official testified:

Q      You talked about not seeing progress between 2016 and 2018. Has the pace of progress in terms of Wells Fargo's ability to address various deficiencies improved since 2018, over the past two years?

A      Their ability to self-identify?

---

[496] CFPB.
[497] *Id.*
[498] *Id.*
[499] *Id.*

Q     Yes, or just general self-compliance weaknesses? Has that improved? Has their ability to put compliance structures in place improved since 2018?

A     If there has been improvement, there hasn't been enough to give me the comfort level to non-object.

Q     Big Picture - have you seen, 2011 to now you've been supervising them, has your confidence increased or decreased in their ability to fix their problems? They've made a lot of statements saying they're working. Is your confidence growing or weakening that they're going to be able to fix it?

A     I'm not a point feeling comfortable saying they've improved. Have they declined? I wouldn't say there has been much improvement or decline yet.

Q     So, they haven't gotten better? Having robust programs in place?

A     I would not feel comfortable saying that they've had a satisfactory program.[500]

## B. New Leadership

The Board of Directors of Wells Fargo announced on September 27, 2019 that Charles Scharf would be the company's new chief executive officer.[501]  Betsy Duke, Chair of the Board, stated that hiring Scharf was part of "Wells Fargo's continued transformation."[502]  The selection of Scharf represented the Board's recognition that the company needed expertise from outside in order to transform.

Scharf publicly made promises that the company would continue to undergo needed leadership changes in order to fully comply with the regulators.[503]  He stated that the company is in the midst of "fundamental change" to fully engage with all stakeholders including "regulators, customers, elected officials, investors, and communities."[504]

Following unprecedented public statements by the bank's regulators and pressure from Congress, the bank also moved to hire new leaders from outside the company.  Wells Fargo

---

[500] *Id*.

[501] Wells Fargo Press Release, "Wells Fargo Names Charles W. Scharf Chief Executive Officer and President" (Sept. 27, 2019), *available at*: https://newsroom.wf.com/press-release/corporate-and-financial/wells-fargo-names-charles-w-scharf-chief-executive-officer.

[502] *Id*.

[503] Ben Eisen, *Wells Fargo CEO: A Wonderful Bank That Made 'Some Terrible Mistakes'*, THE WALL STREET JOURNAL, Jan. 14, 2020.

[504] Wells Fargo Press Release, *supra* note 497.

added experienced leaders with new perspectives, such as Scott Powell, Bill Daley, and Ray Fisher, as part of its "new organizational structure" designed to improve controls at the bank.[505]

### 1. CEO Charles Scharf

Charles Scharf joined Wells Fargo as CEO and President on October 21, 2019.  Unlike his predecessors, Scharf was not an internal hire.[506]  Before joining Wells Fargo, Scharf served as the chairman and CEO of the Bank of New York Mellon from July 2017 to October 2018 and the CEO of Visa Inc. from 2012 to 2016.[507]  With a 24-year background in the financial services industry, Scharf has held executive positions with One Equity Partners, JP Morgan Chase, Bank One Corp, Salomon Smith Barney, and Citigroup.  At JP Morgan Chase, Scharf oversaw the integration of Washington Mutual during the 2008 credit crisis.[508]

Since October 2019, Scharf has held "a marathon of meetings" with executives to discern the ways in which they do business.[509]  According to reports, his direct management style has prompted a reconsideration of many aspects of Wells Fargo's operations.  CFO John Shrewsberry told regulators that "everything's on the table for consideration.  He's certainly not beholden to decisions that we made previously."[510]  For instance, Scharf hired a Chief Operating Officer in December 2019, a move resisted by his predecessor.

Scharf also appears to recognize that a sense of urgency is necessary to meet compliance goals.  He stated, "We all have to act a little bit more impatient for some of these things, and demand more of each other. I'm going to constantly ask the question, 'Can we do a better job? Can we do something faster?'"[511]

Scharf, on his first day as CEO, published a company-wide memorandum that detailed his immediate priorities for Wells Fargo and how compliance with regulatory requirements would take precedence.  He stated, "our priorities today are clear: Remediate all regulatory and control issues in the company and serve our customers every day with the highest operational and ethical standards."[512]  He committed to remediating the harms suffered on account of Wells Fargo's actions.  He stated, "the bank will put all available resources toward building out operations, risk and control functions, and making harmed customers whole." [513]

In a January 14, 2020 earnings call, Scharf provided a blunt assessment of Wells Fargo's performance in light of its regulatory failings and focused on compliance as a prerequisite to

---

[505] Eisen, *supra* note 499.
[506] *Wells Fargo & Company, Charles W. Scharf*, https://www.wellsfargo.com/about/corporate/governance/scharf/ (last visited Feb. 20, 2020).
[507] *Id*.
[508] *Id.*
[509] *Wells Fargo's Scharf sows unease while considering change*, AMERICAN BANKER, Dec. 27, 2019.
[510] *Id.*
[511] Imani Moise, *New Wells Fargo CEO says he wants to fix problems, isn't a 'wallflower'*, REUTERS, Oct. 31, 2019.
[512] Hannah Levitt, *Charlie Scharf Takes Over Wells Fargo With a Lengthy To-Do List*, BLOOMBERG, Oct. 21, 2019.
[513] *Id.*

sustained financial performance.[514]  Scharf asserted a commitment to institutional accountability and a regard for regulators, calling them "clear, direct, [and] tough but fair.  The work is on us at this point."[515]

Scharf, unlike his predecessor, declined to speculate as to when the FRB's asset cap may be lifted, choosing to focus instead on compliance, efficiency, and curtailing expenses.[516]  Scharf stated:

> Many have focused on the Fed consent order but remember we have 12 public enforcement actions that require significant resource commitment. While I certainly wish more of this work was behind us, what's required of us is clear and we will get it done. It's work that other banks have done already, so there's a clear roadmap for what we need to achieve.[517]

A CFPB official testified to the Committee it is too soon to evaluate Scharf's performance.[518] The official stated:

> Q      I know it's been only a few months. Any difference since Scharf came on?
>
> A      Too soon to make that verdict yet. He did a critical review of senior management position and brought on management outside the bank – one thing he has done that prior CEOs have not done. It's too early to see results.  It's a promising move.[519]

## 2.  Scott Powell

Scott Powell is former CEO of Santander Holdings USA and Santander Consumer USA Holdings.  He was hired by Wells Fargo in December 2019 to be its Chief Operating Officer and Senior Executive Vice President.[520] As CEO of Santander Holdings USA, Powell is credited with leading its financial turnaround, including resolving significant regulatory issues, implementing customer-focused oversight programs, improving financial and operating controls, and increasing community and employee engagement.[521]

---

[514] Kevin Wack, *'Extraordinarily inefficient': Scharf's blunt assessment of Wells Fargo*, AMERICAN BANKER, Jan. 14, 2020.

[515] *Id.*

[516] Wells Fargo Earnings Call (Jan. 14, 2020), *available at*: https://seekingalpha.com/article/4316892-wells-fargo-company-wfc-ceo-charlie-scharf-on-q4-2019-results-earnings-call-transcript?part=single.

[517] *Id*.

[518] CFPB.

[519] *Id*.

[520] Ben Lane, *Wells Fargo hires Santander US CEO Scott Powell to serve as chief operating officer*, HOUSING WIRE, Dec. 2, 2019.; Wells Fargo & Company Scott E. Powell, https://www.wellsfargo.com/about/corporate/governance/powell/ (last visited Mar. 4, 2020).

[521] Lane, *supra* note 516.

As COO, Powell will oversee regulatory execution and relations, enterprise shared services and a range of operational functions across the company.[522] He will be empowered to execute on the company's regulatory commitments, build the strongest possible operational standards and governance and deliver consistent, high-quality customer service.[523]  In a January 14, 2020 earnings call, Scharf re-emphasized the importance of Chief Operating Officer Scott Powell's mission to "lead a transformation in which operational excellence becomes part of the firm's culture."[524]

## C. Reorganization

On February 11, 2020, Wells Fargo announced new business leaders and changes designed to redevelop the business' organizational structure.[525]  These changes are aimed to improve risk, regulatory and control work within the bank. The bank will also create a Strategy, Digital Platform & Innovation group to enhance the company's focus on preparing for a digital future and enhancing the customer experience.[526]

The new model of leadership features five lines of business CEOS that report directly to CEO Scharf, each of which will be represented on the company's Operating Committee.[527] Mary Mack will become CEO of Consumer and Small Business Banking, Perry Pelos CEO of Commercial Banking, and Jon Weiss CEO of Corporate & Investment Banking.  Wells Fargo will hire a new CEO of Wealth & Investment Management.  The bank also hired Mike Weinbach from JPMorgan Chase as CEO of Consumer Lending.[528]

In addition to these leadership changes, Wells Fargo will change its operational structure. Each business line will have operation leaders that will report directly to the Chief Operating Officer Scott Powell.[529] Powell created a Sales Practice Oversight and Management role to establish a standardized approach to sales practicing monitoring, analytics and reporting. Michael Cleary from Santander US joined the bank on February 4, 2020 to fill this critical role.[530]

## D. Reforms to the Board of Directors

---

[522] Wells Fargo Press Release, "Wells Fargo Names Scott Powell Chief Operating Officer" (Dec. 2, 2019), *available at:* https://newsroom.wf.com/press-release/corporate-and-financial/wells-fargo-names-scott-powell-chief-operating-officer

[523] *Id.*

[524] Wells Fargo Earnings Call (Jan. 14, 2020), *available at*: https://seekingalpha.com/article/4316892-wells-fargo-company-wfc-ceo-charlie-scharf-on-q4-2019-results-earnings-call-transcript?part=single.

[525] Wells Fargo Press Release, *supra* note 476.

[526] *Id.*

[527] *Id.*

[528] *Id.*

[529] *Id.*

[530] *Id.*

After the retirement of Karen Peetz, regulators expressed concerns regarding the apparent lack of financial services experience on the Board.[531]  An OCC official stated that Peetz was the only board member on the bank's board with relevant banking expertise.[532]  The official said that "Peetz would drive conversations" because she was the "only banker on the board."[533]  According to the OCC, regulators advised Betsy Duke to add more banking experience to the Board.[534]

In response, the Board changed its makeup.  The Board added two new members with extensive bank experience, Charles Noski and Dick Payne.  The Board will consist of sixteen independent directors from various backgrounds.  The current makeup of the Board is significantly different from 2016, when the sales practices scandal came to light.  In fact, nearly two-thirds of the Board has turned over.  The current membership has more technology and financial services expertise compared to its predecessor.

| 2016 Board of Directors | 2020 Board of Directors |
| --- | --- |
| John D. Baker II | John D. Baker II |
| Elaine L. Chao | Celeste A. Clark |
| John S. Chen | Theodore F. Craver, Jr. |
| Lloyd H. Dean | Wayne M. Hewett |
| Elizabeth A Duke | Elizabeth A. Duke |
| Donald M. James | Donald M. James |
| Enrique Hernandez, Jr. | Maria R. Morris |
| Susan E. Engel | Charles H. Noski |
| Cynthia H. Milligan | Richard B. Payne |
| Federico F. Peña | Juan A. Pujadas |
| James H. Quigley | James H. Quigley |
| Stephen W. Sanger | Ronald L. Sargent |
| John G. Stumpf | Charles W. Scharf |
| Suzanne M. Vautrinot | Suzanne M. Vautrinot |
| Susan G. Swenson | Vacant Spot |
| | Vacant Spot |

Wells Fargo describes the Board as being "committed to sound and effective corporate governance practices."[535]  The Board has indicated to officials at the bank's regulators that they are dedicated to making the needed changes under the consent orders.[536]  The company's 2019 proxy statement stated:

---

[531] OCC.

[532] *Id.*

[533] *Id.*

[534] *Id.*

[535] *Wells Fargo & Company Leadership and Governance*, https://www.wellsfargo.com/about/corporate/governance/ (last visited Mar. 4, 2020).

[536] Peetz.

Our Company and Board of Directors look and operate very differently today. Over the past year, the Company has hired several new leaders, including our chief risk officer, head of human resources, head of technology, and chief auditor. In addition, our Board has added more directors with expertise in financial services, risk management, technology/cyber, regulatory, human capital management, finance, consumer, business process and operations, and social responsibility matters; adjusted committee structures, charters, and membership; enhanced agenda planning; and worked with management to better focus materials provided to the Board. While the Board and its committees have experienced much change, we remain focused on responding to stakeholders, enhancing oversight, and creating long-term value for shareholders.[537]

The current composition of the Bank's Board of Directors is still lacking in some areas, according to an OCC official. Specifically, the OCC official identified the Audit and Examination Committee, and the Governance and Nominating Committee [GNC] as needing "a second look."[538] The official stated:

Q      What is the current composition of bank Board?

A      It is not where it needs to be. The OCC has raised concerns with Duke and Quigley. In general, there is more banking experience and members but there needs to be more.

Q      Any committees specifically that need more?

A      The risk committee is very effective. Ron Sargent is very effective. GNC could use a second look. Audit and examination committee could use a second look.[539]

Witnesses from the company testified that the Board is highly involved in regulatory compliance.[540] The company's Chief Risk Officer reports directly to the Chair of the Board's Risk Committee.[541] Amanda Norton, Chief Risk Officer of Wells Fargo, stated that she has frequent conversations with the Chair of the Risk Committee.[542] These conversations include status updates on the consent orders and risk related issues at the bank.[543] The risk officers at the company also provide support for Board committees.[544] Norton stated:

---

[537] Wells Fargo & Company Proxy Statement, 2019 Annual Meeting of Shareholders (2019), *available at*: https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2019-proxy-statement.pdf
[538] OCC.
[539] *Id*.
[540] Norton Tr. at 6.
[541] *Id*.
[542] *Id*. at 13.
[543] Peetz.
[544] Norton Tr. at 6.

Q    Which Board-level committees do you currently support?

A    So I, the key -- the Board level was the question?

Q    Board level, yes.

A    The key one is the risk committee at the Board.  And as a point of reference, as a second-line function, I am a direct report -- I have two direct reports.  So I have an administrative reporting line to the CEO, and I have a direct reporting line into the chair at the risk committee.  So the risk committee is obviously a key committee that I support.

My team and I also support the -- there's a couple of subcommittees at the risk committee currently which is the compliance subcommittee and the technology subcommittee.  My team would support those.  Me and my team would support those.  And then the credit committee where obviously we discuss credit risks for the company.  We would support that.

And then we currently have a finance committee where we discuss market risk and interest rate risk.  My team would be in support of that.  And then, of course, if there's any risk-related topics at the actual Board meeting, at the full Board meeting, I would support that.[545]

All submissions to the regulators must receive Board approval.  Management updates the Board at quarterly Board meetings and provides support for Board committee agendas.  Norton stated:

Q    I guess my question is, so you mentioned that one committee manages all the consent order work.  However, some of the committees you've mentioned may have a role independent of that particular executive committee, with respect to the outcomes of that work.  For example, you mentioned the incentive compensation committee, and incentive compensation, of course, is a program that has provisions under the Federal Reserve consent order and also the OCC's consent order.

So to the extent that any of the committees on which you serve have a role in consent order compliance -- start with the Federal Reserve consent order -- could you describe how they work -- how their input is provided with respect to the company's submissions pursuant to that consent order?

A    So all of the risk management committees that I sit on, obviously, you know, collectively have a broad role in managing risk at the

---

[545] *Id*. at 13.

company.  The work that we're putting in place against, say, the Federal bank's consent order could, and has, shaped the way that we construct or run some of those committees, but in turn, also govern and manage components of both our implementation and our sustainability around elements of the consent order.

You know, that -- as I mentioned, we reconstructed a lot of the committees to more effectively manage risk more and do it in a more detailed and transparent way.  That was, in some ways, a direct response to some of the concerns of the consent order.

But now we're using those committees to drive, you know, continued evolvement and implementation of all of our plans under not just our consent orders, but other issues and just, you know, generally trying to maintain, you know, best industry practice.[546]

## CONCLUSION

The documents and testimony make clear that the company's leadership are facing an extraordinary challenge.  The bank's unique federated structure and lack of an enterprise-wide risk management program were unlike those at any other large bank.  This divergence from industry standards caused the bank to fall several years behind their peers in terms of developing an enterprise-wide risk management program, among other things.

The company's federated structure and extreme sales culture were at the root of the company's problems.  The lack of in-house expertise undermined the company's efforts to reform the bank pursuant to regulatory orders, and the company remains under consent agreements dating back to 2016.  Even after pressure from Congress and the bank's regulators, Wells Fargo did not commit to a full transformation under the leadership of long-serving company insiders.  Over the course of several years of failing to comply with various requirements under consent orders from the CFPB, OCC, and FRB, it became clear the company needed a fresh perspective.

The bank has been slow to make progress, but new leaders appear committed to transforming the company's culture.  Regulators testified the bank is still far from coming out from under the consent orders, but there are signs of progress as more talent joins the company from the outside.  For instance, the quality and timeliness of the bank's submissions to its regulators appears to have improved, marginally.

Wells Fargo must continue to integrate business line structures, improve risk and compliance infrastructure, and modernize technology for audit and conduct management.  The CEO's emphasis on regulatory compliance above all else gives the bank its best chance to move beyond

---

[546] *Id*. at 17.

the sales practices scandal and other consumer abuses that have plagued the bank for nearly 20 years.

The Board of Directors is critical to the company's future. Documents and testimony show the Board—whether due to misinformation from management or a lack of urgency or both—was not sufficiently engaged from 2016 to 2019. Documents show the Directors did not recognize the scope of the company's deficiencies because management provided misleading and overly optimistic materials. A series of rejected submissions and other feedback from the company's regulators should have caused the Board to adopt a more aggressive posture, sooner.

The Board showed it learned from past mistakes related to promoting from within by selecting Charlie Scharf and empowering him to recruit new senior leadership from outside the bank. The Board should continue to add relevant expertise related to regulatory compliance to its own ranks.

The Board of Directors and CEO must work together to transform the company and improve the supervisory relationship. The bank's customers deserve better.

## EXHIBITS

1.  **Republican Staff Report:**

    *"Was the Cop on the Beat?": Interim Majority Staff Report on the Wells Fargo Fraudulent Accounts Scandal* (June 6, 2017)

2.  **Republican Staff Report:**

    *Did the CFPB Let Wells Fargo "Beat the Rap?": Second Interim Majority Staff Report on the Wells Fargo Fraudulent Accounts Scandal* (September 19, 2017)



WAS THE "COP ON THE BEAT"?:
INTERIM MAJORITY STAFF REPORT ON THE WELLS FARGO FRAUDULENT
ACCOUNTS SCANDAL

COMMITTEE ON FINANCIAL SERVICES, U.S. HOUSE OF REPRESENTATIVES
HON. JEB HENSARLING, CHAIRMAN

SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS
HON. ANN WAGNER, CHAIRMAN

115TH CONGRESS, FIRST SESSION
JUNE 6, 2017

*This report has not been officially adopted by the Committee on Financial Services and may not necessarily reflect the views of its Members.*

**TABLE OF CONTENTS**

EXECUTIVE SUMMARY .................................................................................... 1

DISCUSSION ................................................................................................... 2

   I.    Anatomy of a Scandal. ......................................................................... 2

   II.   The Committee's Investigation. .......................................................... 3

      A.    Wells Fargo's Cooperation with the Committee. ......................... 4

      B.    OCC's Cooperation with the Committee. ...................................... 5

      C.    The CFPB's Defiance of a Congressional Records Request and Subpoena. 5

   III.  Outstanding Matters. ......................................................................... 8

   IV.  Staff Recommendations for Further Action. ................................... 13

## EXECUTIVE SUMMARY

On September 8, 2016, the world learned of one of the worst banking scandals in years.  Since at least May 2001, thousands of Wells Fargo & Company ("Wells Fargo" or the "Bank") employees had been engaged in the practice of defrauding customers by opening millions of unneeded, and at times, unauthorized bank accounts.  Evidence suggested that executives at the Bank had turned a blind eye to this fraud for years.

The House Financial Services Committee ("Committee") immediately began a comprehensive investigation of this matter to answer two critical questions:  (1) how and why Wells Fargo allowed these fraudulent activities to occur at a disturbing scale across the Bank for well over a decade; and (2) whether or not federal financial regulators were effective in detecting and remedying Wells Fargo's fraudulent branch sale practices.

As a part of its investigation, the Committee sought records and information on September 16, 2016, from Wells Fargo, the Office of the Comptroller of the Currency ("OCC"), and the Consumer Financial Protection Bureau ("CFPB").

Wells Fargo and the OCC have cooperated in full with the Committee's investigation to date.  Among other things, they promptly produced sensitive and confidential internal records relating to Wells Fargo's branch sales practices requested by the Committee.

The CFPB, however, has not cooperated with the Committee's investigation.  In response to the Committee's records request, the CFPB did not produce a *single* internal record related to its Wells Fargo branch sales practice investigation.  Over the course of six months, the CFPB only produced 1,010 pages of records, comprised almost entirely of records easily obtainable from Wells Fargo or the OCC.  Faced with six months of the CFPB's refusal to voluntarily comply with its records request, the Committee subpoenaed the records from the CFPB on April 4, 2017, and gave the CFPB four additional weeks to produce those records.  The CFPB's response to this legally binding Subpoena was to produce records that Wells Fargo had already produced to it—records the CFPB knew that Wells Fargo had already produced to the Committee.

Due to CFPB Director Richard Cordray's failure to honor his legal obligation to produce all records responsive to the Committee's Subpoena, the Committee's Wells Fargo investigation is at an impasse.  Key questions remain unanswered.  For example, the Committee cannot substantiate Director Cordray's Congressional testimony on the current record.

Director Cordray testified before the Committee that the CFPB had engaged in supervisory activity regarding Wells Fargo's branch sales practices prior to May

1

8, 2015.  No records before the Committee corroborate this claim.  Indeed, the only records before the Committee—those produced by the OCC and Wells Fargo—call it into question.

Similarly, Director Cordray also testified before the Committee that the CFPB's Wells Fargo investigation was "independent and comprehensive."  But nothing before the Committee corroborates this claim.  Again, records produced by Wells Fargo and the OCC raise questions regarding this claim.

In light of the foregoing, Committee Staff recommends that the Chairman takes steps, up to and including preparing for possible contempt proceedings against Director Cordray should they prove necessary, to enforce the Committee's Subpoena in order to obtain the records and information necessary to complete the Committee's Wells Fargo investigation.

## DISCUSSION

### I.     Anatomy of a Scandal.

On December 21, 2013, the *Los Angeles Times* ("*L.A. Times*") published an article about Wells Fargo employees opening unneeded, and sometimes unauthorized, accounts for customers.  The article alleged that the high pressure culture in many branches to meet sales goals led to employees acting with an apparent disregard as to whether customers needed additional accounts.

In response to the article, the Office of the Los Angeles City Attorney ("L.A. City Attorney") initiated an immediate investigation, and on May 4, 2015, filed a civil lawsuit against Wells Fargo "alleging the company has victimized consumers by opening customer accounts, and issuing credit cards, without authorization— then failing to inform customers of the alleged misuse of their personal information or refund fees for unwanted services."[1]  L.A. City Attorney Michael Feuer said the lawsuit "alleges that in Wells Fargo's push for growth the bank often elevated profit over its customers' legal rights."[2]

That same day, Wells Fargo self-reported to the CFPB the existence of the lawsuit by the L.A. City Attorney regarding branch sales practices.[3]  Four days later, on May 8, 2015, the CFPB initiated a supervisory review, requesting that

---

[1]  Press Release, Office of the City Attorney for the City of L.A., *City Attorney Feuer Files Lawsuit Against Wells Fargo for Allegedly Opening Unauthorized Customer Accounts* (May 5, 2015), *available at*, http://freepdfhosting.com/c7384fa6fc.pdf (last visited June 5, 2017).

[2]  *Id.*

[3]  *See* Letter from Edwin Chow of CFPB to Yvette Hollingsworth of Wells Fargo, WF-0000001 (May 8, 2015), App. at 102; *see also*, CFPB, *Wells Fargo Full Continuous Supervision Examination Report*, OCC-HRSC-0001007 (Sept. 8, 2016) ("CFPB Examination Report"), App. at 1–35.  All citations to "App." are citations to the Appendix to this Interim Report in which the Committee has released key records forming the basis for its analysis.

2

Wells Fargo produce "a comprehensive description of the company's consumer financial services sales policies" and records relating to internal investigations relevant to the allegations in the complaint.[4]  On June 26, 2015, the OCC, which had identified issues with Wells Fargo's sales practices as early as 2010, issued a Supervisory Letter to Wells Fargo with a number of Matters Requiring Attention ("MRAs") and corresponding corrective actions.[5]  These MRAs required that Wells Fargo management revisit the company's sales practices and revamp the company's process for receiving and responding to complaints.[6]

By September 8, 2016, Wells Fargo had reached simultaneous settlements with the L.A. City Attorney, the OCC, and the CFPB, in which the Bank agreed to pay a collective $185 million in fines and set aside $5 million to remediate customer harm.[7]  The total fine was comprised of $100 million assessed by the CFPB, $35 million assessed by the OCC, and $50 million assessed by the City and County of Los Angeles.[8]  The Bank did not admit fault in any of these settlements.[9]

## II.    The Committee's Investigation.

Following the public announcement of the OCC's, L.A. City Attorney's, and CFPB's settlements with Wells Fargo on September 8, 2016, the Committee initiated an investigation into:  (1) how and why Wells Fargo allowed these fraudulent activities to occur at a disturbing scale across the Bank since at least May 2001; and (2) whether or not federal financial regulators were effective in detecting and remedying Wells Fargo's fraudulent branch sale practices.  The Committee promptly held a hearing regarding Wells Fargo's branch sales practices on September 29, 2016, where the then-CEO of Wells Fargo, John Stumpf, testified.[10]  The Committee also

---

[4]  *See* Letter from Edwin Chow of CFPB to Yvette Hollingsworth of Wells Fargo, WF-0000001 (May 8, 2015), App. at 102.  The CFPB also requested that the Bank take steps to preserve all potentially responsive records.  *Id.*

[5] OCC, Office of Enterprise Governance and the Ombudsman, *Lessons Learned Review of Supervision of Sales Practices at Wells Fargo*, at 4 (Apr. 19, 2017), App. at 103–17.

[6]  OCC Supervisory Letter WFC 2015-36 (June 26, 2015), App. at 71–79.

[7]  OCC Consent Order for a Civil Money Penalty, In the Matter of Wells Fargo Bank, N.A., AA-EC-2016-67 (OCC Sept. 8, 2016), App. at 118–29; L.A. City Stipulated Final Judgment, *People of the State of California v. Wells Fargo & Company*, No. BC 580778 (L.A. Super. Ct. Sept. 8, 2016), App. at 130–53; CFPB Consent Order, *In the Matter of Wells Fargo Bank*, N.A., 2016-CFPB0015 (CFPB Sept. 8, 2016), App. at 154–79.

[8]  *Id.*

[9]  *Id.*

[10]  *Holding Wall Street Accountable:  Investigating Wells Fargo's Opening of Unauthorized Accounts: Hearing Before the H. Comm. on Financial Services*, 114th Cong. 2 (Sept. 29, 2016).

promptly sent records requests to Wells Fargo, the OCC, and the CFPB on September 16, 2016.[11]

The Committee requested that Wells Fargo produce all records that the Bank had produced or made available to the OCC, CFPB, or the L.A. City Attorney.[12]

The Committee requested that the OCC produce all records relating to its enforcement action against Wells Fargo, including all supervisory and investigative records, correspondence, and applicable policies.[13]

The Committee requested that the CFPB produce all records relating to its enforcement action against Wells Fargo, including all supervisory and investigative records, correspondence, and applicable policies.[14]

## A.    Wells Fargo's Cooperation with the Committee.

Wells Fargo has cooperated in full with the Committee's investigation to date.  Wells Fargo began producing records on September 27, 2016, and continued producing records on a rolling basis.  To date, Wells Fargo has produced over 140,000 pages of records.[15]  These records include supervisory correspondence with the CFPB; training materials and internal policies; incentive compensation plans; sales quality manuals, assessments, and reviews; sensitive internal email correspondence; interrogatory responses to the CFPB; transcripts of employee interviews with the CFPB; customer complaints; and the PricewaterhouseCoopers Report commissioned by Wells Fargo to examine the scope of potentially unauthorized account openings; among other records.[16]  Wells Fargo responded to questions for the record from the Committee's September 29 hearing and has been responsive to all other questions and requests made by the Committee to date.  The Board of Wells Fargo has kept the Committee apprised of its own independent investigation, and briefed Committee Staff on both on its progress and at its completion.

---

[11]  *See* Letter from the Hon. Jeb Hensarling to James M. Strother (Sept. 16, 2016), App. at 180–81; Letter from the Hon. Jeb Hensarling to the Hon. Thomas J. Curry (Sept. 16, 2016), App. 182–83; Letter from the Hon. Jeb Hensarling to the Hon. Richard Cordray (Sept 16, 2016), App. 184–85.

[12]  Letter from the Hon. Jeb Hensarling to James M. Strother (Sept. 16, 2016), App. at 180–81.

[13]  Letter from the Hon. Jeb Hensarling to the Hon. Thomas J. Curry (Sept. 16, 2016), App at 182–83.

[14]  Letter from the Hon. Jeb. Hensarling to the Hon. Richard Cordray (Sept. 16, 2016), App. at 184–85.

[15]  Letter from Michael D. Bopp, Esq., to the Hon. Jeb Hensarling (Sept. 27, 2016); Letter from Michael D. Bopp, Esq. to the Hon. Jeb Hensarling (Oct. 13, 2016); Letter from Michael D. Bopp, Esq. to the Hon. Jeb Hensarling (Oct. 14, 2016); Letter from Michael D. Bopp, Esq. to the Hon. Jeb Hensarling (Oct. 28, 2016); Letter from Michael D. Bopp, Esq. to the Hon. Jeb Hensarling (Nov. 1, 2016);  Letter from Michael D. Bopp, Esq. to the Hon. Jeb Hensarling (Nov. 9, 2016); Letter from Michael D. Bopp, Esq. to the Hon. Jeb Hensarling (Nov. 21, 2016); Letter from Michael D. Bopp, Esq. to the Hon. Jeb Hensarling (Dec. 2, 2016).

[16]  *Id*.

### B.      OCC's Cooperation with the Committee.

The OCC has also cooperated in full with the Committee's investigation to date.  Within three days, the OCC began producing records relating to its supervision of, and enforcement action against, Wells Fargo, including sensitive and confidential internal OCC documentation such as supervision reports and memoranda.[17]  Over the next weeks and months, the OCC continued to produce records responsive to the original September 16 records request and additional Committee records requests.[18]  These records include communications with the CFPB and L.A. City Attorney; a comprehensive timeline of OCC's supervision related to sales practices at Wells Fargo; draft CFPB consent orders; records of calls and meetings with the CFPB; the CFPB's four year Examination Report of supervision of Wells Fargo; OCC Supervisory Letters on Wells Fargo sales practices and other correspondence; third-party analysis of sales practice issues commissioned by Wells Fargo; internal OCC memoranda regarding supervisory planning, scoping, and conclusions; and Reports of Examination; among other records.[19]  On September 21, 2016, representatives from the OCC, along with those from the CFPB, appeared at a bipartisan briefing regarding the Wells Fargo Enforcement matter, and OCC Staff voluntarily answered questions asked by Congressional Staff.

### C.      The CFPB's Defiance of a Congressional Records Request and Subpoena.

Unlike Wells Fargo and the OCC, the CFPB has not cooperated with the Committee's investigation to date.  At the September 21, 2016, bipartisan briefing, representatives from the CFPB refused to answer questions from Congressional Staff about the CFPB's investigation, citing a lack of authorization from Director Cordray to discuss supervisory matters.  As a result, the Committee requested a second briefing from representatives of the CFPB who were authorized to answer questions regarding the Wells Fargo matter.[20]  Director Cordray responded to this request by stating that he would make CFPB staff available again for a briefing, but

---

[17]  Letter from Carrie Moore to the Hon. Jeb Hensarling (Sept. 19, 2016), App. at 186.

[18]  *See, e.g.*, Letter from the Hon. Sean P. Duffy to the Hon. Thomas Curry (Nov. 16, 2016).  On April 19, 2017, the OCC issued a report on its oversight of Wells Fargo.  *See* OCC, Office of Enterprise Governance and the Ombudsman, *Lessons Learned Review of Supervision of Sales Practices at Wells Fargo* (Apr. 19, 2017), App. at 103–17.  The report was commissioned by Comptroller of the Currency Thomas Curry to "identify any supervision gaps and lessons learned to improve the OCC's supervisory processes going forward."  *Id.* at 2, App. at 105.  The report found that the OCC "did not take timely and effective supervisory actions after Wells Fargo and the OCC identified significant issues with the complaint management and sales practices."  *Id.* at 4, App. at 107.

[19]  *See* OCC-Wells 0000001–OCC-Wells 0000840; OCC-HFSC-0000001-April 2017–OCC-HFSC-0000968-April 2017.

[20]  Letter from the Hon. Jeb Hensarling to the Hon. Richard Cordray (Sept. 21, 2016), App. at 187.

that he himself was "in the best position to convey a comprehensive response."[21] Based on Director Cordray's representation that he was the best person to address the Committee's questions, the Committee asked the Director to brief the Committee about the CFPB's investigation.[22]  In that letter, the Committee also reminded Director Cordray of the Committee's request for CFPB records, and stated that the production of all relevant records would be a precondition for the Director to testify at any Committee hearing about Wells Fargo.[23]  Director Cordray replied that he would not brief the Committee.[24]

The CFPB responded to the September 16 records request on September 23, 2016, by producing 176 pages of records.  This production contained *no* internal CFPB records regarding the Wells Fargo branch sales issue.  It was composed entirely of CFPB policies and procedures and other material readily obtainable from Wells Fargo or the OCC such as information-sharing MOU's and information-sharing requests between the CFPB and the L.A. City Attorney's Office and the OCC, as well as correspondence between the CFPB and the Bank.[25]  The CFPB also promised the future production of "additional responsive materials."[26]

When no additional records were forthcoming, on November 3, 2016, the Committee reiterated its request and again requested the production of all relevant records.[27]  The CFPB responded on November 10 and produced 834 pages of records.  In this production, the CFPB again did not produce a single internal record regarding the CFPB's investigation of Wells Fargo's branch sales practices, such as internal emails or memoranda relating to its investigation.  Again, the CFPB only produced records readily obtainable from Wells Fargo or the OCC such as the Civil Investigative Demands ("CID") the CFPB sent Wells Fargo.[28]

On April 4, 2017—more than *six months* after the initial Committee records request—and in the face of the CFPB's failure to voluntary comply, the Committee subpoenaed the overdue records—*i.e.*, "all records relating to the CFPB's investigation of Wells Fargo."[29]  The Committee gave the CFPB until May 2, 2017—four weeks—to comply with this Subpoena.  Three days after the Subpoena issued,

---

[21] Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling (Sept. 22, 2016), App. at 188–89.

[22] Letter from the Hon. Jeb Hensarling to the Hon. Richard Cordray (Sept. 22, 2016), App. at 190.

[23] *Id.*

[24] Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling (Sept. 22, 2016), Appt. at 191.

[25] Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling (Sept. 23, 2016), App. at 192–93.  HFSC_CFPB_WF_00001–00175.

[26] *Id.* at 2. App at 192–93.

[27] Letter from the Hon. Sean P. Duffy to the Hon. Richard Cordray (Nov. 3, 2016), App. at 194.

[28] *See* HFSC_CFPB_WF_00176–HFSC_ CFPB_WF_001010.

[29] H. Fin. Servs. Comm. *Subpoena Duces Tecum* to the Hon. Richard Cordray, Schedule A at Specification 27 (April 4, 2017) (internal quotation omitted), App. at 200.  The Subpoena also compelled production of "All records relating to the sales practices of Wells Fargo" described in the CFPB's consent order."  *Id.* at Specification 26, App. at 200.

Director Cordray assured the Committee in oral testimony: "If there are documents you don't have, happy to try to provide them."[30]

On May 2, 2017, the CFPB responded to the Committee's Subpoena by producing the records that Wells Fargo had previously produced to the CFPB in response to the CFPB's CIDs. The CFPB knew that Wells Fargo had already produced these records to the Committee *months* ago.[31] Once again, the CFPB did not produce *any* internal records regarding its Wells Fargo investigation, even though it was now legally compelled to do so. In his letter to the Committee accompanying the production of the subpoenaed records, Director Cordray offered no explanation of the CFPB's inability to produce all records subpoenaed by the Committee, stating only his subjective determination that the materials the CFPB produced to date "comprises the *key* documentation of the Bureau's investigation of Wells Fargo."[32] Director Cordray has in no way asserted any claim of privilege or protection to justify withholding responsive records.

Based on a review of the records produced to the Committee by OCC and Wells Fargo, it is incontrovertible that the CFPB possess additional records responsive to the Committee's Subpoena that the CFPB has failed to produce to the Committee. For example, the OCC has produced a CFPB report and contemporaneous OCC employee notes of calls with the CFPB, recounting CFPB decision memoranda and communications that appear to be essential to the CFPB's Wells Fargo investigation. [33] *None* of these, or other responsive records, have been produced to the Committee by the CFPB.

Additionally, in at least one instance, the CFPB has intervened in the OCC's production of records responsive to the OCC's document request, suggesting redactions to an examination report prior to its production by the OCC to the

---

[30] *The 2016 Semi-Annual Reports of the Bureau of Consumer Financial Protection: Hearing Before the H. Comm. on Financial Services*, 115th Cong., at 32 (Apr. 5, 2017) ("April 2017 Committee Hearing"), App. at 286.

[31] *See* WF-0000001–WF-0140462. The CFPB knew that the records had been produced, because Well Fargo notified the CFPB of this fact prior to producing the records to the Committee. *See* Letter from Michael D. Bopp, Esq. to Edwin L Chow (CFPB) (Sept. 26, 2016), App. at 216–17; Letter from Anand Raman, Esq. to Mary McLeod, Esq. (CFPB) (Oct. 3, 2016), App. at 218–20; Letter from Darren Welch, Esq. to Karen J. Rice, Esq. (CFPB) (Nov. 9, 2016), App. at 221–22. The CFPB also *re*-produced records previously produced to the Committee. Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, at 17–18 (May 2, 2017), App. at 239–40.

[32] *Id.*, at 18 (emphasis added), App. at 240.

[33] *See, e.g.*, Examination Report, App. at 1–35; Wells Fargo Sales Practices—CFPB Call Notes, at OCC-LD-00002774, at 1 (Jul. 8, 2016) (OCC call notes in which CFPB attorneys stated that they were preparing a memorandum for Director Cordray seeking authority to charge Wells Fargo), App. at 80.

Committee.  At the OCC's request, the CFPB later withdrew its redaction request, and the OCC then produced the unredacted record to the Committee.[34]

## III.    Outstanding Matters.

Due to the CFPB's non-compliance with the Committee's Subpoena compelling the production of CFPB records, the Committee's investigation into the Wells Fargo matter has reached an impasse, and critical questions remain unanswered.  Significantly, without reviewing the internal records the CFPB refuses to produce to the Committee, the Committee cannot substantiate several important assertions that Director Cordray made to Congress in public hearing testimony.

**1.**  For instance, in a hearing before the Committee on April 5, 2017, Director Cordray testified before the Committee that the CFPB engaged in supervisory activity of Wells Fargo related to branch sales practices prior to May 8, 2015.[35]  No records or other information before the Committee corroborate this claim.

Based on the evidence the Committee has reviewed to date it does not appear that the CFPB ever contacted the Bank about its branch sales practices prior to the Bank informing the CFPB on May 4, 2015, about the L.A. City Attorney's complaint.[36]

---

[34] The Committee does not credit the CFPB's reluctant "cooperation" in this matter; were it not for the OCC, which would be under a legal compulsion to produce the unredacted record if the Committee were to subpoena it, the Committee has no reason to believe that the CFPB, which failed to produce this and other responsive records even under a subpoena, would have agreed to remove the redactions.

[35] *See* April 2017 Committee Hearing, Trans. at 29 ("**MRS. WAGNER**.  Are you denying that the CFPB initiated its supervisory review of Wells Fargo's branch sales practices on May 9, 2015?  Yes or No?  **MR. CORDRAY**.  We actually had engaged in supervisory activity prior to that time."), App at 283.  *See also* Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling (Sept. 23, 2016), App. at 192–93; April 2017 Committee Hearing, Trans. at 10, 33–34, App. at 264, 287–88.  *An Examination of Wells Fargo's Unauthorized Accounts and the Regulatory Response:  Hearing Before the S. Comm. On Banking Housing & Urban Affairs*, 115th Cong., Trans. at 145:22–146:19, 162:5–11 (Sept. 20, 2016) ("Senate Banking Hearing"), App. at 512–13, 529.

[36] Notwithstanding the fact that the Committee has received hundreds of thousands of pages of responsive material pertinent to its investigation as well as numerous briefings and interviews with bank executives and counsel, Committee staff to date have seen no evidence that the CFPB ever contacted Wells Fargo about its fraudulent branch sales practices prior to May 4, 2015.  To the contrary, the Bank executives and counsel that the Committee have spoken with about the issue of the CFPB's engagement with the Bank regarding its branch sales practices, including former General Counsel James Strother, have indicated that they are not aware of the CFPB ever contacting Wells Fargo about the bank's fraudulent branch sales practices prior to the bank self-reporting to the CFPB on May 4, 2015.  Their representations to the Committee adhere with then-CEO John Stumpf's testimony before the Senate Banking Committee that the Bank self-reported to the CFPB in May 2015.  Senate Banking Hearing, Trans. at 62–63, 88–89, App. at 429–30, 455–56.

In addition, the CFPB's Examination Report of Wells Fargo—the Report the CFPB sought to redact before the OCC provided it to the Committee—details a record of all of the CFPB's supervision activities with regard to the Bank for the time period between January 28, 2013, and September 8, 2016.[37]  The Examination Report contains no record of any CFPB supervisory activity related to Wells Fargo's branch sales practices prior to May 4, 2015.[38]  The CFPB's Wells Fargo Examination Report shows that the CFPB sent Wells Fargo 65 Matters Requiring Attention ("MRA") and six supervisory letters during the three year examination period, but did not send the Bank a single supervisory letter or MRA directed at the Bank's branch sales practices during this time period.  Moreover, the Examination Report is *explicit* that the CFPB *did not* initiate a supervisory review of Wells Fargo's branch sales practice until May 8, 2015—after the L.A. City Attorney filed its lawsuit.[39]

The only other mention of the CFPB's work on Wells Fargo's branch sales practices in the Examination Report is the statement that the CFPB "scheduled in 2014 an examination of [retail banking sales practices] to commence in 2015."[40]  It is unclear whether this examination ever commenced and, if so, on what date.

**2.**  Another instance of Director Cordray's public testimony before the Committee that cannot be corroborated by the record before the Committee is his claim that the CFPB's investigation was "*independent and comprehensive.*"[41]

**a.**  In early 2016, Wells Fargo was close to reaching a settlement with the L.A. City Attorney.  *Wells Fargo* then asked in May 2016 for the CFPB to expedite its investigation and "to coordinate the timing with the City of Los Angeles" on the resolution of both actions.[42]  The CFPB indicated to the OCC that Wells Fargo's

---

Moreover, Director Cordray appears to confirm that the CFPB's did not reach out to the Bank about its fraudulent branch sales practices until this time frame when he represented to the Committee on September 23, 2016, that the CFPB "began directly engaging Wells Fargo [regarding its branch sales practices] in the spring of 2015."  Letter from Richard Cordray to Jeb Hensarling (Sept. 23, 2016), App. at 192.

[37]  CFPB Examination Report, App. at 1–35.

[38]  *See Id.*

[39]  CFPB Examination Report, at 17 (indicating that the CFPB "initiated a supervisory review of Wells Fargo's branch sales practices on May 8, 2015."), App. at 17.

[40]  *Id.*

[41]  April 2017 Committee Hearing, Written Testimony of the Hon. Richard Cordray at 6 (emphasis added), App. at 247; *see also*, *e.g.*, Senate Banking Hearing, Trans at 144:25–145:21 (Director Cordray denying before the Senate Banking Committee that the CFPB may have relied primarily on outside sources, such as PricewaterhouseCoopers ("PWC"), to determine the number of unauthorized deposit and credit card accounts that Wells Fargo opened), App. at 511–12.

[42]  Email from Jennifer LaRoche (OCC) to Brendan Clegg (OCC) and Lauren Snook (OCC), OCC-HFSC-000028-9-April 2017, at 2 (June 30, 2016), App. at 85; *see also*, Email from Jennifer LaRoche to Gerard Sexton (OCC) et al., OCC-LD-00002794 (May 26, 2016), App. at 83–84; Email from Jennifer LaRoche to Gregory Coleman (OCC), et al., OCC-LD-00002792 (June 29, 2016), App. at 101.

"objective was and is to provide the CFPB with all information necessary for the CFPB to make an enforcement decision *without having to conduct a full investigation* in order to align with the timing of the anticipated settlement with the city of LA."[43]

Wells Fargo's interest in a simultaneous resolution appears to have been related to one of the proposed terms of a settlement with the L.A. City Attorney. The CFPB explained to the OCC that the L.A. City Attorney wanted an injunction against future illegal practices by Wells Fargo, which the Bank believed "could have dire consequences for it under the Securities Act, and it would therefore prefer to enter into a consent order with CFPB."[44]

In response to these overtures, the CFPB appears to have worked to move the settlement on the *Bank's* timetable. For example, in May of 2016, a CFPB attorney told the OCC that the CFPB "[was] interested in trying to coordinate on the timing with LA but only if LA is willing to slow down its settlement/action a little."[45] In June of 2016, the CFPB reiterated this statement: "Our timing has changed a bit. At the bank's request, we have picked up the pace and are now aiming for a resolution of enforcement action by mid-July, possibly as early as the week of the 18th. Also we're working to coordinate the timing with the City of Los Angeles, again at the bank's request."[46]

CFPB officials then apparently admitted to the OCC that it did not matter that the CFPB would be willing to forego a full investigation if "the CFPB is satisfied that it has sufficient information from the Bank *that there is no need for a full investigation*, and the CFPB is able to put enough protection in its enforcement document to prevent any future violations."[47]

The records also indicate that the CFPB actively worked in July 2016 to ensure that Wells Fargo entered into a consent order with the CFPB—the *Bank's*

---

[43] Email from Jennifer LaRoche to Gerard Sexton (OCC) et al., OCC-LD-00002794, at 1 (May 26, 2016) (emphasis added), App. at 83.

[44] Email from Lauren Snook to Gregory Coleman et al., OCC-FRSC-0000380-April 2017, at 1 (July 1, 2016), App. at 97.

[45] Email from Jennifer LaRoche to Gerard Sexton et al., OCC-LD-00002794, at 1 (May 26, 2016), App. at 83.

[46] Email from Jennifer LaRoche to Brendan Clegg and Lauren Snook, OCC-HFSC-000028-9–April 2017, at 2 (June 30, 2016), App. at 86. *See also* Email from Jennifer LaRoche to Greg Sexton et al., OCC-LD-00002260 (June 30, 2016), App. at 95–96; Email from Jennifer LaRoche to Gregory Coleman (OCC), et al., OCC-LD-00002792 (June 29, 2016), App. at 101.

[47] Email from Jennifer LaRoche to Gerard Sexton et al., OCC-LD-00002794, at 1 (May 26, 2016) (emphasis added), App. at 83. *See also* Email from Jennifer LaRoche to Brendan Clegg and Lauren Snook, OCC-HFSC-000028-9–April 2017, at 2 (June 30, 2016) (OCC employee emailing CFPB attorneys that: "Based on our previous conversations, my understanding is that the CFPB would not be ready to make a decision as to whether it has sufficient information to support the initiation of an enforcement action until late July or early August."), App. at 86.

preferred resolution.  Internal OCC contemporaneous call notes indicate that the L.A. City Attorney stated he was "willing to forgo injunctive relief IF the Bank enters into a CFPB consent order requiring it to implement a compliance plan that would satisfy all of the City's concerns."[48]  The CFPB in turn indicated that "it may also be in the OCC's interest for the Bank to avoid such an injunction."[49]  The CFPB agreed that "an injunction may cause safety and soundness issues" for Wells Fargo, and "stated that their goal is to talk the City of LA out of some of their injunctive relief requests and get them to rely on the CFPB."[50]

**b.**  On July 1, 2016, contemporaneous OCC notes record CFPB attorneys stating that the CFPB would not charge all possible areas of violation and would not pursue traditional remedies such as actions under the Truth in Lending Act ("TILA"):

> The CFPB indicated that while these 4 practices would be the basis for any action that ends in a negotiated settlement, the CFPB believes that the Bank engaged in other illegal conduct beyond the 4 practices described above. CFPB indicated that the compliance plan will require the Bank to correct not only the four practices on which the order will be based, but also other the other potentially illegal practices the CFPB has identified at the Bank (including but possibly not limited to unauthorized enrollments in online bill pay and Express Send).  The CFPB is currently gathering information on these practices.  If the case does not reach a negotiated settlement, the CFPB may file a complaint in federal court alleging the above 4 practices, but may later amend the complaint to include additional practices that it believes violate applicable laws (UDAAP, TILA, TISA, EFTA, GLBA, etc.).  The CFPB also noted that should the Bank agree to a Consent Order, the CFPB would use the Remediation Plan/Compliance Plan mechanisms as means of remediating and correcting all illegal practices at the Bank, and not just the 4 outlined above.[51]

**c.**  On a July 2016 call, Jeffrey Ehrlich, CFPB Deputy Enforcement Director, explained to the OCC that the CFPB was content to only charge the four preliminary claims referenced above:  "because [the CFPB has] reached the CMP

---

[48]  Email from Lauren Snook to Gregory Coleman et al., OCC-FRSC-0000380-April 2017, at 1 (July 1, 2016), App. at 97.

[49]  OCC, Wells Fargo Sales Practices—CFPB Call Notes, OCC-LD-00002774, at 2 (Jul. 8, 2016), App. at 81.

[50]  *Id.* at 3, App. at 82.

[51]  Email from Lauren Snook to Gregory Coleman et al., OCC-FRSC-0000380-April 2017, at 3 (July 1, 2016) App. at 99.

[Civil Monetary Penalty] figure that they would likely impose, regardless of additional information on other practices."[52]

**d.** Another contemporaneous OCC note of communications with CFPB in July of 2016 reflects the CFPB's admission that if Wells Fargo did not settle, the CFPB would proceed via an action in federal court because that course "would allow the CFPB to continue to collect evidence, and they would seek an injunction. Administrative action would require them to be ready to go to trial on filing."[53]

**e.** Finally, the Examination Report issued on September 8, 2017,—*after* the September 6, 2016, settlement—stated that the CFPB's "review of retail branch activity is still in process and its findings will be reported under separate cover."[54] (The CFPB attempted to prevent the Committee from obtaining this information from the OCC by suggesting it be redacted).[55] The CFPB has not informed the Committee of the status of the supervisory review or its findings.

**f.** Records received from the OCC also suggest that the CFPB relied significantly on the work of the OCC and the L.A. City Attorney for evidence for its allegations.[56] For instance, based on the records currently in the Committee's possession, the evidence for the CFPB's finding regarding the unauthorized opening of credit cards appears to have been a PricewaterhouseCoopers Report that the OCC directed Wells Fargo to commission.[57] Similarly, the CFPB's evidence for the 1.5 million bank accounts opened without authorization appears to have been the PricewaterhouseCoopers Report and consumer declarations taken by the L.A. City Attorney's office.[58] Based on the evidence available to the Committee, only one of the CFPB's primary and corroborating pieces of evidence, the PricewaterhouseCoopers Report, could have determined the number of unauthorized accounts.

---

[52] OCC, Wells Fargo Sales Practices—CFPB Call Notes, OCC-LD-00002774, at 2 (Jul. 8, 2016), App. at 81.

[53] *Id.* at 3, App. 82.

[54] CFPB Examination Report at 17, App. at 17.

[55] *Compare* CFPB Examination Report, App. at 1–35, *with*, CFPB, *Wells Fargo Full Continuous Supervision Examination Report*, OCC-HRSC-0000971 (Sept. 8, 2016) (containing CFPB redactions), App. at 36–70.

[56] To be sure, there is often nothing wrong with a regulator relying on outside evidence in an enforcement action, or coordinating with other regulators. In this case, however, the records currently available to the Committee raise important questions about whether Director Cordray has made misleading claims about the work the CFPB did to discover and investigate Wells Fargo's consumer banking sales practices, or took credit for work that was performed by others. Again, because of Director Cordray's current contumacy, the Committee cannot answer these critical questions.

[57] OCC, Wells Fargo Sales Practices—CFPB Call Notes, OCC-LD-00002774, at 1 (Jul. 8, 2016), App. at 80. In this meeting, the CFPB stated that *corroborating* evidence were interrogatories, document requests, and interviews with Wells Fargo employees. *Id.*

[58] *Id.* 1–2, App. at 80–81.

**IV.     Staff Recommendations for Further Action.**

In light of the CFPB's actions to date, Committee Staff conclude that Director Cordray is in default of the Committee's Subpoena.  Without receipt of all records requested by the Committee from the CFPB, the Committee cannot complete its investigation into the Wells Fargo matter.  Accordingly, Committee Majority Staff recommend that the Chairman:  (1) issue deposition subpoenas to CFPB employees to investigate Director Cordray's default; and (2) prepare to, if necessary, initiate contempt proceedings against Director Cordray unless the CFPB produces *all* responsive records.



DID THE CFPB LET WELLS FARGO "BEAT THE RAP"?:
SECOND INTERIM MAJORITY STAFF REPORT ON THE WELLS FARGO FRAUDULENT
ACCOUNTS SCANDAL

COMMITTEE ON FINANCIAL SERVICES, U.S. HOUSE OF REPRESENTATIVES
HON. JEB HENSARLING, CHAIRMAN

SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS
HON. ANN WAGNER, CHAIRMAN

115TH CONGRESS, FIRST SESSION
SEPTEMBER 19, 2017

*This report has not been officially adopted by the Committee on Financial Services
and may not necessarily reflect the views of its Members.*

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ....................................................................................................... 4

DISCUSSION ........................................................................................................................... 7

I.   The Recommendation Memorandum Reveals that the CFPB Settled
     with Wells Fargo for One Cent on the Dollar and Fails to Adequately
     Explain this Decision. ........................................................................................... 7

     A. The Recommendation Memorandum Calculated a Potential Penalty to Wells
        Fargo of Over $10 Billion. ............................................................................... 7

     B. The Recommendation Memorandum Fails to Adequately Explain Why the
        CFPB Sought Authority to Settle the Case for $100 Million—One Percent of
        the CFPB's Possible Conservative Penalty Estimate of over $10 Billion. .......... 9

II.  The Recommendation Memorandum and Other Internal CFPB
     Records Do Not Substantiate Assertions that Director Cordray Made
     to Congress Regarding the CFPB's Investigation of Wells Fargo, But
     Do Raise Questions Regarding Their Veracity ............................................... 11

     A. The Committee Continues to be Unable to Corroborate Director Cordray's
        Representation to the Committee that the CFPB's Investigation Was
        "Independent and Comprehensive." ................................................................... 11

     B. The Committee Continues to be Unable to Corroborate Director Cordray's
        Representations to Congress in Testimony Before the Senate Banking
        Committee on September 20, 2016, and This Committee on April 5, 2017, as
        Well as Correspondence with the Committee Dated September 23, 2016, That
        the CFPB Was Actively Investigating or Conducting Active Supervision
        (Internal or External) of Wells Fargo's Fraudulent Branch Sales Practices
        After Receiving "Whistleblower Tips in Mid-2013" or at any Point Prior to the
        Filing of the Los Angeles City Attorney Complaint on May 4, 2015. ............... 15

     C. Newly Obtained Internal CFPB Documents Also Suggest That Director
        Cordray Appears to Have Been Advised by his Staff That he May Have Made
        Misstatements to Congress Concerning the CFPB's Investigation of Wells
        Fargo, But Director Cordray Has Yet to Correct the Record. ........................... 17

III. Internal CFPB Records Obtained by the Committee Raise Grave
     Questions As to Whether Director Cordray, Other Senior CFPB
     Officials, and CFPB Oversight Attorneys Engaged in Actions that Had

**the Effect of Obstructing the Committee's Lawful Oversight Related to the Wells Fargo Account Scandal.**........................................................**20**

A.  The CFPB Fails To Produce The Recommendation Memorandum In Response To The Committee's Records Request Despite The Memorandum Apparently Being Deemed A Key Document For The Purposes Of Preparing Director Cordray For The Senate Banking Committee's Wells Fargo Hearing. .............20

B.  Director Cordray Does Not Produce the Recommendation Memorandum Despite Being Given Multiple Opportunities to Do So. ......................................23

C.  The Committee Issues the First Interim Majority Staff Report Detailing Director Cordray's Failure to Comply with the April 4 Subpoena and Provides Director Cordray With As Much Detail as Possible on the Records the Committee Believed the CFPB Failed to Produce. ...............................................25

D.  Director Cordray Responds to the First Interim Majority Staff Report and Appears to Work to Conceal the Fact that the CFPB Has Not Produced the Recommendation Memorandum and Other Key Documents. ...........................26

**STAFF RECOMMENDATIONS**.......................................................................................**32**

## EXECUTIVE SUMMARY

On June 6, 2017, the House Financial Services Committee ("Committee") issued its first Interim Majority Staff Report regarding the Committee's investigation into the Wells Fargo & Co. ("Wells Fargo" or "Bank") fraudulent accounts scandal entitled *Was the 'Cop on the Beat'?*[1]  This report concluded that the Committee could not complete its investigation because the Bureau of Consumer Financial Protection ("CFPB") and its Director, Richard Cordray, had failed to fully comply with the Committee's subpoena seeking all records relating to the CFPB's investigation of Wells Fargo.[2]

With the publication of this second Interim Majority Staff Report, the Committee is regrettably still unable to complete its investigation because Director Cordray remains in default of the Committee's April 4, 2017, *Subpoena Duces Tecum* ("April 4 Subpoena").[3]

Nevertheless, the Committee has obtained a crucial new document in its investigation—a document that the CFPB appears to have unlawfully and deliberately withheld from this Committee for over one year.  This document, a "Recommendation Memorandum" presented to and approved by Director Cordray, assessed the CFPB's case against Wells Fargo and sought authorization to enter into settlement negotiations with—or sue—the bank.[4]

Among other things, the Recommendation Memorandum suggests that the Obama-era policy of "Too Big to Jail" remains alive and well at the CFPB.[5]  For instance, the Memorandum notes that by application of the lowest statutory penalty

---

[1] MAJORITY STAFF OF THE H. COMM. ON FIN. SERVS., 115TH CONG., WAS THE "COP ON THE BEAT"?: INTERIM MAJORITY STAFF REPORT ON THE WELLS FARGO FRAUDULENT ACCOUNTS SCANDAL (June 6, 2017) ("June 6 Report"), https://financialservices.house.gov/uploadedfiles/2017-6-6_interim_cfpb_wells_fargo_report_final.pdf.

[2] *Id.*

[3] H. Comm. on Fin. Servs. *Subpoena Duces Tecum* to the Hon. Richard Cordray (Apr. 4, 2017), App. at 430–50.

[4] Memorandum from Office of Enforcement, Consumer Fin. Prot. Bureau, to the Hon. Richard Cordray HFSC_CFPB_20170404_0064927 (July 12, 2016) ("Recommendation Memorandum"), App. at 1–23; *see also* Memorandum from the Hon. Richard Cordray to Anthony Alexis, Assistant Dir. for Enforcement, Consumer Fin. Prot. Bureau, HFSC_CFPB_20170404_0064926 (July 12, 2016) ("Decision Memorandum"), App. at 24.

[5] *See* Appendix to June 6 Report, OCC-LD-00002774–75, at App. 81–82 ("CFPB staff stated that [Wells Fargo] may be able to avoid an injunction by settling the case administratively with the CFPB. The reason that the Bank wants to do this in July is because it may influence the City of LA's decision to seek an injunction, which would trigger significant consequence for the Bank under the Investment Adviser Act of 1940.  The CFPB staff thinks that an injunction may cause safety and soundness issues but not sure."), https://financialservices.house.gov/uploadedfiles/appendix_final.pdf; *see also generally* MAJORITY STAFF OF THE H. COMM. ON FIN. SERVS., 114TH CONG., TOO BIG TO JAIL: INSIDE THE OBAMA JUSTICE DEPARTMENT'S DECISION NOT TO HOLD WALL STREET ACCOUNTABLE (July 11, 2016), https://financialservices.house.gov/uploadedfiles/07072016_oi_tbtj_sr.pdf.

4

level against each instance of fraud committed by Wells Fargo employees against bank customers, CFPB estimated that the bank was potentially liable for a statutory civil monetary penalty *exceeding $10 billion*.[6]  This penalty could potentially be increased further, CFPB enforcement attorneys noted, if CFPB determined whether the fraudulent behavior was reckless or knowing, as opposed to negligent, or if the CFPB discovered additional fraudulent behavior not yet reported or violations of other statutes.

Additionally, at the time the CFPB sought authorization to negotiate a settlement with Wells Fargo, the Memorandum indicates that the facts underlying the violations were undisputed and a clear application of the CFPB's authority, simplifying any potential litigation.[7]  Notwithstanding the CFPB's apparent slam-dunk case, Director Cordray approved a settlement with Wells Fargo bank for $100 million—one cent on the dollar of the CFPB's own conservative estimate.  In support of the decision, the Recommendation Memorandum suggested that there were unspecified benefits from settling the case quickly without further investigation.[8]  However, the facts in the Recommendation Memorandum undermine this claim.[9]  As noted in the Recommendation Memorandum, Wells Fargo had already taken steps to suspend fraudulent behavior by its employees and had set aside sufficient funds to make victims whole, meaning there was no further immediate risk to consumers except that which might not be discovered without further investigation.[10]  And, as it would turn out, the CFPB's premature suspension of its investigation meant that it potentially lost the opportunity to discover recently announced instances of consumer harm by Wells Fargo.[11]

Why then would the CFPB rush to settle a strong case against one of the largest banks in the country for one percent of its possible statutory liability?  One possibility is reputational risk:  had the CFPB not settled in time to announce a joint enforcement action with both the Los Angeles City Attorney's Office and the Office of the Comptroller of Currency ("OCC"), that failure might raise difficult questions about whether the CFPB had failed to discover the widespread fraudulent sales account practices at the bank in spite of its ongoing supervision and examination activities.[12]

Adding to the mystery is why, in records discovered by the Committee and made public today, Director Cordray, other senior CFPB officials, and CFPB

---

[6] Recommendation Memorandum, at HFSC_CFPB_20170404_0064933–34,  App. at 7–8

[7] *Id*. HFSC_CFPB_20170404_0064935,  App. at 9.

[8] *Id*.

[9] *See*, *infra*, at IB.

[10] *See*, *infra*, at IB.

[11] *See* Wells Fargo & Company, Quarterly Report (Form 10-Q), at 124 (Aug. 4, 2017).

[12] *See* June 6 Report, at 10 (noting that a CFPB attorney told the Office of the Comptroller of the Currency that the CFPB was "interested in trying to coordinate on the timing with LA but only if LA is willing to slow down its settlement/action a little").

oversight attorneys appear to have deliberately withheld the Recommendation Memorandum and other key records in response to the Committee's records requests and Subpoena, and that some officials even appear to have taken affirmative steps to attempt to conceal the Recommendation Memorandum's existence from the Committee.[13]  Moreover, these internal CFPB records suggest that Director Cordray and his staff appear to have engaged in these activities while simultaneously making public statements that declared an ignorance of what records the Committee sought, and despite Director Cordray's representations to the Committee that the CFPB had produced "the key documentation of the Bureau's investigation of Wells Fargo."[14]  Surely, if the Director could justify his settlement on the merits, there would be no reason to conceal it.

At a minimum, information revealed in the Recommendation Memorandum does not corroborate Director Cordray's congressional testimony that the CFPB conducted an "independent and comprehensive investigation"[15] of Wells Fargo and also raises questions as to the veracity of the Director's testimony before the Senate Banking Committee on September 20, 2016,[16] before this Committee on April 5, 2017,[17] and in his June 14, 2017, letter to Chairman Hensarling in response to the Committee's June 2017 Interim Staff Report ("June 14 Letter").[18]

The Committee's investigation of Wells Fargo and its federal regulators will continue.  Committee Majority Staff ("Staff") recommend that the Committee consider all options to enforce the Committee's Subpoena against the CFPB.

---

[13] CROSS X

[14] Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, at 17–18 (May 2, 2017), App. at 467–68.

[15] *The 2016 Semi-Annual Reports of the Bureau of Consumer Financial Protection: Hearing Before the H. Comm. on Fin. Servs.*, 115th Cong., at 6 (Apr. 5, 2017) ("April 5 Trans.") (statement of the Hon. Richard Cordray), App. at 631.

[16] *See generally An Examination of Wells Fargo's Unauthorized Accounts and the Regulatory Response: Hearing Before the S. Comm. on Banking Housing & Urban Affairs*, 115th Cong. (Sept. 20, 2016) ("Senate Banking Hearing").

[17] *See generally* April 5 Trans.

[18] Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, at 3–5 (June 14, 2017) ("June 14 Letter"), App. at 31–33.

6

## DISCUSSION

I.  **The Recommendation Memorandum Reveals that the CFPB Settled with Wells Fargo for One Cent on the Dollar and Fails to Adequately Explain this Decision.**

A.  **The Recommendation Memorandum Calculated a Potential Penalty to Wells Fargo of Over $10 Billion.**

The CFPB's Enforcement Division's policy is to present the Director with a Recommendation Memorandum to authorize either settlement negotiations with an enforcement subject, or to commence an enforcement action against that subject. A Recommendation Memorandum typically is a comprehensive document that provides: an overview of the enforcement matter; detailed factual background; legal analysis of the causes of action against the subject under investigation based on known conduct; a recommendation by the Enforcement Division to the Director to either settle or sue to resolve the enforcement matter, including suggested penalties or settlement amounts; and an assessment of the risks of the recommended approach. If the Director agrees with the Enforcement Division's assessment and wishes to proceed with an enforcement action, the Director then signs a Decision Memorandum that authorizes the Enforcement Division to pursue a settlement or file a lawsuit under the parameters discussed in the Recommendation Memorandum. In any CFPB enforcement matter, a Recommendation Memorandum is undoubtedly a key document.

For the investigation of Wells Fargo's fraudulent branch sales practices, the CFPB Enforcement Division provided a Recommendation Memorandum to Director Cordray on July 12, 2016.[19] Director Cordray then executed the Decision Memorandum that same day.[20] Although the Committee requested records that include the Recommendation Memorandum just days after the CFPB settled with Wells Fargo, the Committee did not obtain it until September 5, 2017.[21] This was 368 days after the Committee's initial request for records on September 16, 2016, related to the CFPB's investigation in connection with the Wells Fargo scandal, and 140 days after Director Cordray defaulted on the Committee's April 4 Subpoena that clearly compelled production of the Recommendation Memorandum (among other records).

Most CFPB Recommendation Memoranda contain a calculation of possible penalties that could be obtained at trial, and a calculation of the possible "settlement" value of the case—that is the amount of money that the CFPB could reasonably expect to get in a settlement (a value typically discounted from the possible penalties at trial). The Recommendation Memorandum for the Wells Fargo

---

[19] *See* Recommendation Memorandum, at HFSC_CFPB_20170404_0064927–49, App. at 1–23.

[20] *See* Decision Memorandum, at HFSC_CFPB_20170404_0064926, App. at 24.

[21] *See, infra*, at section III.D.

7

matter reveals that the CFPB recommended settling with Wells Fargo for one cent on the dollar—$100 million as opposed to the CFPB's conservative penalty estimate of over $10 billion.[22]

The Recommendation Memorandum's penalty analysis begins with the CFPB calculating that there were two million known violations of the Consumer Financial Protection Act ("CFPA") and a statutory penalty at the time of up to $5,437 per "ordinary" violation.[23]  The Recommendation Memorandum then recounts that the statutory penalty could have been much larger, as the CFPA provides that the penalty for each "reckless" violation was up to $27,186 and the penalty for each "knowing" violation was up to $1.087 million.[24]  But despite the Enforcement Division's observation in the Recommendation Memorandum that "the bank's violations could be characterized as reckless, at least, and possibly knowing," the CFPB did not calculate an enhanced penalty.[25]  Instead, the CFPB calculated the most *conservative* penalty—which was still potentially in excess of $10 billion.[26]  The Recommendation Memorandum then concludes that the "mitigating factors" the CFPB must consider when it calculates a penalty did not justify reducing the penalty:



1700 G Street NW, Washington, DC 20552

July 12, 2016

**Recommendation Memorandum for the Director**

| **FROM** | Lawrence Brown, Barry Reiferson, Leanne Hartmann, John Wells, Jeff Ehrlich, and Tony Alexis, Office of Enforcement |
| --- | --- |
| **SUBJECT** | Authority to Settle with Wells Fargo Bank, N.A. and to File Suit – ENF Matter No. 2016-1667-02 |

\*    \*    \*

---

[22] Recommendation Memorandum, at HFSC_CFPB_20170404_0064933–34.  App. at 7–8.

[23] Recommendation Memorandum, at HFSC_CFPB_20170404_0064933, App. at 7; 12 C.F.R. § 1083.1.

[24] Recommendation Memorandum, at HFSC_CFPB_20170404_0064933, App. at 7; 12 U.S.C. § 5565(c)(2);  12 C.F.R. § 1083.1.

[25] Recommendation Memorandum, at HFSC_CFPB_20170404_0064933, App. at 7.

[26] *Id.* at HFSC_CFPB_20170404_0064933–34.  App. at 7–8.

8

But even if we were to calculate only a first-tier penalty for each of Wells Fargo's more than 2 million violations, the penalty could exceed $10 billion before considering any mitigating factors. Among the mitigating factors we must consider are the size and good faith of the subject, the gravity of the violations, the severity of the risks to or losses suffered by consumers, the history of previous violations, and "such other matters as justice may require."[7] Those factors do not justify significantly reducing the penalty here. Wells Fargo is one of the world's largest banks. Last year, it earned $86.1 billion in net revenue and a $22.9 billion profit; it finished the year with more than $1.8 trillion in total assets.[8] While the amount of known consumer harm is only a few million dollars, the severity of the risks to consumers is demonstrated by the pervasiveness of the violations: the bank opened millions of deposit and credit-card accounts without consumers' consent, affecting more than a million consumers.                    [27]

Often in an enforcement action, there can be a functional difference between a possible statutory penalty and the facts a law enforcement agency can prove and the penalty that it can achieve through litigation.  This is one aspect of what is commonly referred to as litigation risk.  The Recommendation Memorandum reveals that the CFPB's Enforcement Division stated that it saw "no significant risks" in litigation, as both "the facts underlying the violations [the CFPB] identified are undisputed" and the CFPB's "claims are straightforward applications of [its] standard UDAAP authority."[28]

> **B.    The Recommendation Memorandum Fails to Adequately Explain Why the CFPB Sought Authority to Settle the Case for $100 Million—One Percent of the CFPB's Possible Conservative Penalty Estimate of over $10 Billion.[29]**

The Recommendation Memorandum fails to adequately explain why the Enforcement Division recommended that the CFPB settle the matter for one cent on the dollar under the CFPB's *conservative* penalty estimate.  The Enforcement Division claims in the Recommendation Memorandum that there are "benefits" to "proceeding quickly" to a settlement, but those benefits are not articulated, and other factors in the Recommendation Memorandum seemed to weigh against a quick settlement.[30]  For instance, for harmed consumers to obtain some level of financial remediation, a rapid and low dollar value settlement between Wells Fargo and the CFPB was not required, as the Recommendation Memorandum made clear that Wells Fargo had claimed to "have paid redress to all simulated-funding victims through July 2015 and all credit-card victims through September 2015."[31]

---

[27] *Id.* at HFSC_CFPB_20170404_0064927, HFSC_CFPB_20170404_0064934, App. at 8.

[28] *Id.* at 9.

[29] *Id.*, at HFSC_CFPB_20170404_0064932, App. at 6 ("We recommend settling this matter for injunctive relief, redress to consumers, and a $100 penalty.").  To be sure, the Recommendation Memorandum later uses slightly different verbiage: "we recommend settling this matter for a penalty of at least $100 million."  HFSC_CFPB_20170404_0064934, App. at 8.

[30] *Id.* HFSC_CFPB_20170404_0064935, App. at 9.

[31] *Id.* HFSC_CFPB_20170404_0064933, App. at 7.

9

Additionally, a quick settlement pausing or ending the investigation meant that the CFPB risked "failing to identify similar sales-integrity issues involving other products or developing theories for why the practices identified may violate other laws within the Bureau's authority."[32]  In fact, the Recommendation Memorandum states that the CFPB believed there were likely more violations that had yet to be revealed, and consequently the CFPB could potentially have sought a larger statutory penalty because a thorough investigation would likely have revealed addition violations.[33]  Indeed, at the time the Recommendation Memorandum was drafted, the CFPB was waiting on information from Wells Fargo that would have established the number of violations relating to the unauthorized request and activation of debit cards, and the CFPB believed that more violations of unauthorized credit cards and enrollment in online banking services existed than Wells Fargo had reported at the time of the enforcement action's settlement.[34]

It remains unclear why the Enforcement Division suggested that the CFPB settle the matter with Wells Fargo for a penalty of $100 million.[35]  No reason is articulated for the $100 million figure besides a summary conclusion that a "penalty in that amount would sufficiently deter similar violations and would impress upon the bank the need to review its incentive-compensation program and to better monitor its effect on bank employees in the future."[36]  Yet, the Recommendation Memorandum also states that Wells Fargo "failed to appreciate the gravity of what has occurred."[37]  The Recommendation Memorandum notes that in the year 2015 Wells Fargo earned a $22.9 billion profit; why a penalty for less than half of a percent of the Bank's yearly earnings or less than one percent of the potential statutory penalty (under the CFPB's *conservative* estimate) would get Wells Fargo's attention, or make the bank appreciate the seriousness of the violations, is left unexplained. [38]

Committee Staff nor do not take any position as to the size of the penalty assessed in the CFPB's September 8, 2016, Consent Order with Wells Fargo.  This Staff Report reaches no conclusion on the matter, especially as the Committee has not reviewed all relevant CFPB records.  Instead, this Staff Report observes that the Recommendation Memorandum conspicuously lacked analysis to support the penalty that the CFPB ultimately imposed (particularly in light of the delta

---

[32] *Id.* at HFSC_CFPB_20170404_0064935,  App. at 9.

[33] *Id.* at HFSC_CFPB_20170404_0064930,  App. at 4.

[34] *Id.* at HFSC_CFPB_20170404_0064929–30,  App. at 3–4.

[35] *Id.* at HFSC_CFPB_20170404_0064934,  App. at 8.

[36] *Id.*

[37] *Id.*

[38] The Recommendation Memorandum does contain a passage that may help explain the desire for a quick settlement:  "We have worked closely with LA [Office of the Los Angeles City Attorney] and would continue to do so if you authorize us to act.  Ideally, we would simultaneously announce the settlement of LA's pending case and an administrative consent order in ours."  *Id.* HFSC_CFPB_20170404_0064928,  App. at 2.

between the CFPB's internal numbers) and that the analysis present in the Recommendation Memorandum raises questions. All Staff conclude is that these questions are deserving of answers. But until Director Cordray complies with his legal obligations and produces *all* relevant documents, the Committee Staff's review will continue in order to understand all aspects of the CFPB's enforcement action. Committee staff are not yet able to offer final conclusions or recommendations to the Committee.

II.    **The Recommendation Memorandum and Other Internal CFPB Records Do Not Substantiate Assertions that Director Cordray Made to Congress Regarding the CFPB's Investigation of Wells Fargo, But Do Raise Questions Regarding Their Veracity.**

A.    **The Committee Continues to be Unable to Corroborate Director Cordray's Representation to the Committee that the CFPB's Investigation Was "Independent and Comprehensive."[39]**

Additionally, the Recommendation Memorandum raises questions as to the veracity of the Director's representations and requires further exploration.

**1.** The Recommendation Memorandum states that even though other legal theories were potentially in play, the CFPB only pursued CFPA violations:

> The bank's conduct potentially violated the requirements of several federal laws, including TISA, which prohibits inaccurate statements in soliciting deposit contracts; TILA, which requires that credit cards be issued only upon request or application; EFTA, which requires that access cards be issued only upon request or application; and the Gramm-Leach-Bliley Act, which requires banks to safeguard consumer information. For efficiency, we propose to settle or sue for only CFPA violations stemming from the bank's providing products and services without consumers' consent.[40]

**2.** The Recommendation Memorandum also explains the Enforcement Division's position that the CFPB "could continue to investigate whether the bank has committed similar violations with respect to other products and services." But the Recommendation Memorandum ultimately advised against continuing the CFPB's investigation even though the Enforcement Division concluded that this approach risked failing to uncover further misconduct by Wells Fargo:

---

[39] April 5 Trans., at 6 (Apr. 5, 2017) (written statement of the Hon. Richard Cordray, Dir., Consumer Fin. Prot. Bureau), App. at 631. This is still the case when that statement is read as glossed by Director Cordray in response to the June 6 Report. *See* June 14 Letter, at 3–4.

[40] Recommendation Memorandum, at HFSC_CFPB_20170404_0064930, App. at 4.

11



1700 G Street NW, Washington, DC 20552

July 12, 2016

**Recommendation Memorandum for the Director**

| | |
|---|---|
| **FROM** | Lawrence Brown, Barry Reiferson, Leanne Hartmann, John Wells, Jeff Ehrlich, and Tony Alexis, Office of Enforcement |
| **SUBJECT** | Authority to Settle with Wells Fargo Bank, N.A. and to File Suit – ENF Matter No. 2016-1667-02 |

\* \* \*

By pausing our investigation to attempt to resolve this matter, we risk failing to identify similar sales-integrity issues involving other products or developing theories for why the practices identified may violate other laws within the Bureau's authority. The Legal Division perceives optical and legal risks in advancing only UDAAP claims for conduct that may also violate other Federal consumer financial laws, but we (and the Legal Division) believe those risks are outweighed here by the benefits of proceeding quickly. Moreover, during our investigation we briefly explored other acts and practices that may also be illegal, but we've determined that these potential violations are likely to be less pervasive and less egregious than the ones we've identified here. None appear likely to involve significant consumer harm. Given the seriousness of the violations we *have* identified, and the significant penalties associated with them, we see little upside to continuing our investigation in the hope that we might find more. [41]

These portions of the Recommendation Memorandum raise the question of whether the CFPB failed to avail itself of the opportunity to potentially uncover some of the conduct that Wells Fargo publicly reported on August 4, 2017, that may have caused consumer harm, such as issues with Wells Fargo's Collateral Protection Insurance and Guaranteed Auto Protection products.[42] The Committee is actively seeking answers to this important question.[43]

---

[41] *Id.* at HFSC_CFPB_20170404_0064927, HFSC_CFPB_20170404_0064935. App. at 1, 9.

[42] *See* Wells Fargo & Company, Quarterly Report (Form 10-Q), at 124 (Aug. 4, 2017).

[43] The Committee initiated a comprehensive investigation into both: "(1) how and why Wells Fargo and Wells Fargo's apparent agent, National General Insurance ("National General"), charged so many consumers for forced place insurance policies they did not need and how those individuals may have been hurt by these actions via fees or even repossessions; and (2) whether or not federal financial regulators were effective in detecting and remedying Wells Fargo and National General's practices in this area." Letter from the Hon. Jeb Hensarling to the Hon. Maxine Waters, at 1 (Aug. 14, 2017), App. at 540. *See also*, Letter from the Hon. Jeb Hensarling to Timothy Sloan (Aug. 28, 2017), App. at 542–59; Letter from the Hon. Ann Wagner to Barry Karfunkel (Sept. 1, 2017), App. at 560–75; Letter from the Hon. Jeb Hensarling to the Hon. Richard Cordray (Sept. 7, 2017), App. at 576–90; Letter from the Hon. Jeb Hensarling to the Hon. Janet Yellen (Sept. 7, 2017), App. at 606–20; Letter from the Hon. Jeb Hensarling to Keith Noreika (Sept. 7, 2017), App. at 591–605.

**3.**  The Recommendation Memorandum also states that the CFPB believes that Wells Fargo's analysis of the number of unauthorized credit card openings, upon which the CFPB was relying, likely underestimated the actual number of consumers who had been enrolled in credit card product without their consent: "We believe, therefore, that the number of consumers who were actually enrolled in a credit-card product without their consent is likely greater than the 565,000 figure provided by the bank."[44]  Despite this, the Recommendation Memorandum does not reference any effort by the CFPB to investigate whether additional consumers were harmed prior to determining to settle with Wells Fargo.  Based on the current record before the Committee, it is unclear whether the CFPB ever "independently and comprehensively" investigated how many credit cards accounts were opened without consumers' consent.[45]

**4.**  The Recommendation Memorandum states that the CFPB believes that Wells Fargo enrolled significantly more consumers in online-banking services without their knowledge or consent than the number determined by the Los Angeles City Attorney's Office:  "We estimate that the number is far greater nationwide, and we have requested information from Wells Fargo to confirm this."[46]  Based on the incomplete set of information available to the Committee, it is unclear to Staff whether the CFPB ever "independently and comprehensively" investigated the number of consumers who were enrolled in online-banking services without their consent and, if so, why the CFPB did not provide this number in its Consent Order.[47]

**5.**  The Recommendation Memorandum states that the CFPB did not know how many consumers' debit cards were requested and activated without their consent:  "We do not yet know the number of debit cards that were requested and activated by bank employees without consumers' consent; we have outstanding requests to the bank to help us determine that information."[48]  It is unclear to Staff from this limited record whether the CFPB ever "independently and

---

[44] Recommendation Memorandum, at HFSC_CFPB_20170404_0064929–30, App. at 3–4.

[45] The CFPB's Consent Order suggests that the CFPB did not investigate this matter further, as the Consent Order's "Findings and Conclusions as to Unauthorized Credit Cards" cites the same number of violations as stated in the Recommendation Memorandum: "Respondent's [i.e., Wells Fargo's] analysis concluded that its employees submitted applications for 565,443 credit-card accounts that may not have been authorized by using consumers' information without their knowledge or consent." Consent Order at 7, *In the Matter of Wells Fargo Bank*, N.A., 2016-CFPB0015 (CFPB Sept. 8, 2016) ("Consent Order").

[46] Recommendation Memorandum, at HFSC_CFPB_20170404_0064930, App. at 4.

[47] In the "Findings and Conclusions as to Unauthorized Enrollment into Online-Banking Services" section of its Consent Order with Wells Fargo, the CFPB declines to provide even a ballpark estimate of the number of consumers affected by these unauthorized activities. *See* Consent Order at 8–9. Presumably, if CFPB had fully investigated by September 8, 2016, the extent of the number of consumers that had been enrolled in online banking services without their consent, the CFPB would have provided this figure in the Consent Order.

[48] Recommendation Memorandum, at HFSC_CFPB_20170404_0064930, App. at 4.

comprehensively" investigated the extent to which Wells Fargo debit cards were requested and activated without consumers' knowledge or consent and, if so, why the CFPB did not divulge this number in its Consent Order.[49]

6. Internal CFPB records also raise questions as to whether the CFPB "independently and comprehensively" investigated the extent of the simulated funding and unauthorized deposit accounts openings occurring at Wells Fargo, or whether the CFPB relied primarily, if not exclusively, on the PricewaterhouseCoopers ("PwC") Report ("PwC Report"). For example, in his comments to a draft version of a letter that Director Cordray would send to Chairman Hensarling on June 14, 2017, in response to the June 6 Report ("June 14 Letter"), John Coleman, the CFPB's Deputy General for Oversight and Litigation, advised Director Cordray that his attempt to argue in the draft letter that "we [*i.e.*, the CFPB] conducted our inquiries independently to satisfy our obligation to determine that Wells Fargo had . . . in fact opened millions of deposit and credit card accounts without the knowledge or consent of consumers" overstated, if not misstated, the record.[50] Specifically, Mr. Coleman advised Director Cordray that "[o]n this point, my understanding is that we relied *exclusively* on Wells Fargo's internal audit."[51] Similarly, in a later draft to what would become the June 14 Letter, Jeff Ehrlich, the CFPB's Deputy Enforcement Director, attempted to correct Director Cordray's attempt to argue that the CFPB relied on "the bank's own records to help establish what happened," rather than merely the PwC Report, by advising the Director that "[i]t could be argued that we didn't rely on the bank's own records; rather, we relied on the PwC report, which the bank paid for."[52] Mr. Ehrlich later sought yet another revision to what would become the June 14 Letter, writing:

---

[49] The Consent Order does not offer any indication of the number of consumers who may have been affected by these unauthorized activities. *See* Consent Order at 9–10.

[50] Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040825, at HFSC_CFPB_20170703_0040829, (June 10, 2017, 19:57), App. at 173.

[51] *Id.* at HFSC_CFPB_20170703_0040829, App. at 173 (JRC17) (emphasis added). In a separate comment to another draft of the June 14 Letter, Deputy Enforcement Director Jeffrey Ehrlich defends his Office's enforcement investigation by stating that "[n]otwithstanding what we say in the decision memo, I don't think it is fair to say we relied *exclusively* on the PwC analysis." Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040863, at HFSC_CFPB_20170703_0040867 (June 11, 2017, 11:47), App. at 222 (JPE15) (emphasis in original). Apparently, Mr. Ehrlich wanted to note that there may have been *something* besides the PwC report that the CFPB relied upon, although it is unclear to Staff what that might have been, if anything. If Mr. Ehrlich did have some additional information in mind when he wrote this comment—and was not merely being defensive about his Office's work—Staff find it curious that Mr. Ehrlich would not clearly specify the additional information in his comments, if what he had in mind was, in fact, noteworthy.

[52] Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040891, at HFSC_CFPB_20170703_00408914 (June 12, 2017, 18:11), App. at 231 (JPE1).

14

As I said in my comment, I'm still concerned about saying "we relied on the bank's own records." I know our order used the phrase "the bank's own analysis," but in this context, where the committee report accused us of relying exclusively on the PwC report, I'm afraid using the phrase "the bank's own records" would open us to the attack that once again we're downplaying the significance of our reliance on the PwC report. I'd rather point out that we compelled an analysis of the violations, and in response the bank provided the PwC report. There's no shame in us relying on the PwC report, which we only obtained through our CID. I'd be happy to discuss this further.[53]

Both Coleman's and Ehrlich's advisements to Director Cordray appear to conform with the language of the Consent Order and internal CFPB records acquired by the Committee—including the Recommendation Memorandum. The Consent Order's "Findings and Conclusions as to Unauthorized Deposit Accounts & Simulated Funding" merely notes that "[Wells Fargo's] analysis concluded that its employees opened 1,534,280 deposit accounts that may not have been authorized and that may have been funded through simulated funding, or transferring funds from consumers' existing accounts without their knowledge or consent."[54] No other analysis is mentioned as informing the CFPB's findings.[55] Likewise, the Recommendation Memorandum does not refer to any independent investigative work or analysis apart from the Bank's own analysis.[56]

**B.     The Committee Continues to be Unable to Corroborate Director Cordray's Representations to Congress in Testimony Before the Senate Banking Committee on September 20, 2016,[57] and This Committee on April 5, 2017,[58] as Well as Correspondence with the Committee Dated September 23, 2016,[59] That the CFPB Was Actively Investigating or Conducting Active Supervision (Internal or External) of Wells**

---

[53] Email from Jeffrey Ehrlich to the Hon. Richard Cordray et al., HFSC_CFPB_20170703_0036011, at HFSC_CFPB_20170703_0036011–12 (June 12, 2017, 19:15), App. at 233–34.

[54] Consent Order at 5.

[55] *Id.*

[56] *See* Recommendation Memorandum, at HFSC_CFPB_20170404_0064929–30, App. at 3–4.

[57] *An Examination of Wells Fargo's Unauthorized Accounts and the Regulatory Response: Hearing Before the S. Comm. on Banking Housing & Urban Affairs*, 115th Cong. (Sept. 20, 2016).

[58] *See generally* April 5, App. at 626–751.

[59] Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, at 1 (Sept. 23, 2016) ("Bureau staff first became aware of some related issues around Wells Fargo's sales practices through whistleblower tips in mid-2013, and began conducting initial evaluation of the situation at that time. Bureau staff continued to assess those issues internally through 2014, and then began directly engaging Wells Fargo in the spring of 2015. Direct engagement with Wells Fargo and the Bureau's investigation of the sales-practices issues continued throughout the spring, summer, and fall of 2015, leading eventually to the joint resolution of this matter with the City of Los Angeles City Attorney's Office and the OCC."), App. at 426.

15

**Fargo's Fraudulent Branch Sales Practices After Receiving "Whistleblower Tips in Mid-2013" or at any Point Prior to the Filing of the Los Angeles City Attorney Complaint on May 4, 2015.**

1.  The Recommendation Memorandum notably states that the CFPB's Enforcement Division opened its enforcement investigation in response to the L.A. Times articles and the complaint filed by the Los Angeles City Attorney's Office, as opposed to the CFPB's own investigative work or supervisory activity:

> We opened this matter in March [2016] following media reports and a lawsuit by the Los Angeles City Attorney (LA) alleging that Wells Fargo employees opened accounts for consumers or signed them up for additional products without their consent, and that the employees' conduct was driven by the bank's incentive-compensation program, unrealistic sales goals, and a high-pressure sales culture.[60]

(Indeed this passage could be why as detailed, *infra*, at III.D, Director Cordray may very well have actively concealed the existence of this document from the Committee).

2.  Likewise, the March 2016 Memorandum that opened the investigation into Wells Fargo's fraudulent branch sales practices by the CFPB' Office of Enforcement also does not credit whistleblower tips or cite any CFPB work as its basis to open an enforcement investigation, notwithstanding the fact that this Memorandum mentions certain efforts undertaken by the L.A. Times, Los Angeles City Attorney, the OCC, and the Federal Reserve Bank of San Francisco.[61]

3.  In a separate comment to a draft of what would become Director Cordray's June 14 Letter, Mr. Coleman provides the Director with an exhaustive list of the known evidence of CFPB supervisory activity in the Wells Fargo matter prior to the Los Angeles City Attorney's lawsuit filed on May 4, 2015. That list consists in its entirety of emails among west region supervisory CFPB staff in January 2014 circulating links to the L.A. Times articles about Wells Fargo;[62] a few CFPB emails after the L.A. Times article that propose a supervisory exam of Wells Fargo in the future; and emails about a single whistleblower complaint alleging the unauthorized opening of credit card accounts in a single branch, about which the CFBP enforcement division concludes that "there is not much going on" in the

---

[60] Recommendation Memorandum, at HFSC_CFPB_20170404_0064927, App. at 1.

[61] Opening Investigation Memorandum from Office of Enforcement, Consumer Fin. Prot. Bureau, at HFSC_CFPB_20170902_000061, at HFSC_CFPB-20170902_000061–62, App. at 84–85.

[62] The emails between CFPB staff regarding the L.A. Times articles merely forward the articles for information and contain comments such as, "Hope we can investigate this soon." *See* Email from Susie Clark to Alan Carmer (Jan. 3, 2014, 14:03), HFSC_CFPB_20170404_0064570, at HFSC_CFPB_20170404_0064570 (Jan. 3, 2014, 14:03), App. at 242–43.

whistleblower allegation and refers the complaint back to the Office of Supervision.[63]

**4.**  Likewise, internal CFPB documents used to prepare Director Cordray for Congressional testimony that the CFPB was actively tracking the Wells Fargo fraudulent branch sales practices since receiving whistleblower tips in mid-2013.  In a "Wells Timeline for Hearing Prep 4.1" document prepared by the Office of Supervision denoting the key events pertaining to the Wells Fargo matter, the earliest known CFPB "supervisory activity" is catalogued as "CFPB exam staff circulates the L.A. Times article within the agency."[64]  This chart, last updated by the CFPB on September 15, 2016, makes no mention of any of the whistleblower tips from mid-2013.[65]  Director Cordray repeatedly touted these whistleblowers tips just days later at the September 20, 2016, Senate Banking Committee hearing as being crucial to the CFPB's uncovering of the Wells Fargo scandal.

**C.**  **Newly Obtained Internal CFPB Documents Also Suggest That Director Cordray Appears to Have Been Advised by his Staff That he May Have Made Misstatements to Congress Concerning the CFPB's Investigation of Wells Fargo, But Director Cordray Has Yet to Correct the Record.**

On June 9, 2017, Director Cordray was preparing a letter to the Committee that was intended to respond to the June 6 Report.  In drafting this letter Director Cordray reviewed a "Wells Timeline" document prepared by his staff in September of 2016.  In an email to various CFPB staff Director Cordray notes that everything in this supervision chart "jibes" with his recollection of the significant events in the Wells Fargo matter, except that it does not include reference to any whistleblower tips—a "key point" that he asserts he believed to be true at the time of his Congressional testimony:

---

[63] Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040825, at HFSC_CFPB_20170703_0040829 (June 10, 2017, 19:57), App. at 173, 176 (JRC21).

[64] Email from Julia Szybala, Esq. to Zol Rainey, HFSC_CFPB_20170703_0040743 (Sept. 16, 2016 10:14), *and accompanying attachment*, (CSI) Wells Timeline for Hearing Prep. 4.1, HFSC_CFPB_20170703_0040744, at HFSC_CFPB_20170703_0040744 (Sept. 15, 2017), App. at 377.

[65] *Id.*

17

**From**: RC
**Sent**: Friday, June 09, 2017 11:36 AM
**To**: Coleman, John (CFPB); Chow, Edwin (CFPB)
**Cc**: McLeod, Mary (CFPB); Galicia, Catherine (CFPB); Fulton, Kate (CFPB); Howard, Jennifer (CFPB); Martinez, Zixta (CFPB); Ehrlich, Jeffrey (CFPB); D'Angelo, Chris (CFPB)
**Subject**: FW: Wells Documents

As I work on a responsive letter to the Chairman about the recent staff report, a key point is the document attached here on our supervisory timeline, which contains a chart of events that I am relying on (and that jibes with my own recollection, except that one item not included in the chart but of which I understood myself to be aware at the time of my testimony was that we also had a couple of whistleblower tips on related issues in 2013). The timeframe for sending the letter is urgent, probably as soon as Monday, and so as we do the important work of scrubbing the accuracy of the potential representations I would be making in my letter (a draft of which is also attached), it is important to accomplish all we can on that TODAY thx
RC                                                                                      [66]

In written comments made to him by his staff on June 10, 2017, Cordray appears to have been affirmatively advised that his previous Congressional testimony may have been inaccurate or misleading in that, contrary to Director Cordray's testimony, there were not multiple whistleblower tips in mid-2013 and they did not play a significant role in allowing the CFPB to uncover and actively track the bank's fraudulent branch sales practices.[67]  For example, on June 10, 2017, in a comment to Director Cordray laying out all evidence the Legal Division is aware of concerning the CFPB's Wells Fargo investigative and supervisory activities predating the Los Angeles City Attorney's lawsuit, Mr. Coleman notes that the Legal Division can only confirm the existence of a single whistleblower complaint from that time period, which the Enforcement Division dismissed and referred back to Supervision at the time:

> Emails within [the Enforcement Division] relating to a single whistleblower complaint about, inter alia, the unauthorized opening of credit card accounts in a single branch.  [Enforcement] concludes that there is not much going on and resolves to refer it to [Supervision].[68]

Conforming with Mr. Coleman's affirmative advisement to Director Cordray, the one whistleblower tip on Wells Fargo branch sales practices in 2013 of which the Committee is aware appears not to have been taken seriously by the Division of Enforcement, and subsequently not pursued.  Upon reviewing the whistleblower tip that a staff attorney presented to him, Mr. Ehrlich wrote on May 28, 2013, that he believed the Enforcement Division should pass on investigating the tip and instead present the matter to the CFPB's Office of Supervision ("Supervision"):

---

[66] Email from the Hon. Richard Cordray to John Coleman and Edwin Chow, et al., HFSC_CFPB_20170703_0040833, at HFSC_CFPB_20170703 (June 9, 2017, 11:36), App. at 158–59
[67] *See* Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040825, at HFSC_CFPB_20170703_0040829 (June 10, 2017, 19:57), App. at 173, 176 (JRC21), (KMF24).
[68] *Id.*, at HFSC_CFPB_20170703_0040829, (June 10, 2017, 19:57), App. at 173, 176 (JRC21).

I can't believe I'm saying this, but this seems to me like something we ought to present to Supervision. Maybe check Sentinel first to determine whether there are complaints that indicate this might be widespread. If you agree, send a separate email to [Assistant Director for Enforcement] Tony [Alexis] proposing this action and see whether he approves. Thx.[69]

On June 6, 2013, the same staff attorney emailed Mr. Alexis to inform him of the tip and to recommend, based on the findings from his Sentinel search, that the CFPB address the potential issue of fraudulent branch sales practices through Supervision because "there does not appear to be a significant pattern of unlawful conduct warranting Enforcement Action."[70] Alexis responded in an email the following day, June 7, 2013, that he agreed with this analysis that the matter did not merit further action from the Enforcement Division.[71] While it appears that the whistleblower tip was then referred to Supervision, from Supervision's timeline of events relevant to its work in the Wells Fargo matter it appears that Supervision did not view this "lead" as significant to its supervisory work, particularly since Supervision never formally examined or even contacted the bank about its fraudulent branch sales practices until May 8, 2015[72]—nearly two years after receiving a whistleblower complaint and a mere four days after the bank contacted the CFPB on May 4, 2015, about the Los Angeles City Attorney's complaint filed earlier that day. Indeed, according to the timeline, before the Los Angeles City Attorney's lawsuit was filed on May 4, 2015, the CFPB's most significant planned supervisory action was an examination related to "deposit operations" set to *commence* on December 27, 2015.[73]

Internal CFPB records appear to show that as of at least April 18, 2017, (based on currently available information), the CFPB's oversight team was aware of

---

[69] Email from Jeffrey Ehrlich to CFPB Staff Attorney, at CFPB_HFSC_OI_IMG_2017_08_18_0004506, at CFPB_HFSC_OI_IMG_2017_08_18_0004506 (May 28, 2013, 20:30), App. at 403.

[70] Email from CFPB Staff Attorney to Anthony Alexis, CFPB_HFSC_OI_IMG_2017_08_18_0004510, at CFPB_HFSC_OI_IMG_2017_08_18_0004511 (June 6, 2013, 16:32), App. at 408.

[71] Email from Anthony Alexis to CFPB Staff Attorney, CFPB_HFSC_OI_IMG_2017_08_18_0004510 at CFPB_HFSC_OI_IMG_2017_08_18_0004510 (June 7, 2013, 7:26), App. at 407.

[72] *See* Email from Julia Szybala, Esq. to Zol Rainey, HFSC_CFPB_20170703_0040743 (Sept. 16, 2016 10:14), *and accompanying attachment*, (CSI) Wells Timeline for Hearing Prep. 4.1, HFSC_CFPB_20170703_0040744, at HFSC_CFPB_20170703_0040745 (Sept. 15, 2017), App. at. 378. Moreover, Kate Fulton relayed in her comments to Director Cordray that "Edwin [Chow] recommends striking [a] reference to whistleblower complaints" in the June 14 Letter because whistleblower complaints played no role in the risk rating CFPB assigned to Wells Fargo. *See* Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040825, at HFSC_CFPB_20170703_0040829, June 10, 2017, 19:57), App. at 173 (KMF24).

[73] *See* Email from Julia Szybala, Esq. to Zol Rainey, HFSC_CFPB_20170703_0040743 (Sept. 16, 2016 10:14), *and accompanying attachment*, (CSI) Wells Timeline for Hearing Prep. 4.1, HFSC_CFPB_20170703_0040744, at HFSC_CFPB_20170703_0040744 (Sept. 15, 2017), App. at. 377.

19

the relative *insignificance* of this whistleblower tip to the CFPB's action against Wells Fargo.[74]  Notwithstanding the foregoing, neither Director Cordray nor his staff has at any time sought to retract or amend the Director's Congressional testimony.  In fact, in the June 14 Letter, Director Cordray, in response to his staff's comments, removed all mention of 2013 whistleblower.[75]  Yet even in this June 14 Letter, ostensibly intended to "correct the record" regarding the assertions made in the Committee's interim staff report, Director Cordray nevertheless declined to amend his apparent previous misstatements and overstatements concerning the CFPB's Wells Fargo investigation.[76]  Instead, Director Cordray used the opportunity afforded by the June 14 Letter to tout the CFPB's work and double down on his contention that the CFPB's investigation was both "independent and comprehensive."[77]

## III. Internal CFPB Records Obtained by the Committee Raise Grave Questions As to Whether Director Cordray, Other Senior CFPB Officials, and CFPB Oversight Attorneys Engaged in Actions that Had the Effect of Obstructing the Committee's Lawful Oversight Related to the Wells Fargo Account Scandal.

### A. The CFPB Fails To Produce The Recommendation Memorandum In Response To The Committee's Records Request Despite The Memorandum Apparently Being Deemed A Key Document For The Purposes Of Preparing Director Cordray For The Senate Banking Committee's Wells Fargo Hearing.

*CFPB's Public Actions.*  Shortly after the public announcement of the OCC's, Los Angeles City Attorney's, and CFPB's settlements with Wells Fargo on September 8, 2016, the Committee initiated an investigation into—among other things—whether federal financial regulators were effective in detecting and remedying Wells Fargo's fraudulent branch sales practices.  As is detailed in the June 6 Report, as part of this investigation the Committee sought records from the CFPB on September 16.[78]

---

[74] *See* Email from Julia Szybala, Esq. to Anne Tindall, Esq. and Steven Bressler, Esq., at CFPB_HFSC_OI_IMG_2017_08_18_0004485 (Apr. 18, 2017, 12:33) (citation to attachments omitted), App. at 382–423.

[75] See June 14 Letter, App. at 29–33.

[76] *See id.*

[77] April 5 Trans., at 6 (Apr. 5, 2017) (statement of the Hon. Richard Cordray, Dir., Consumer Fin. Prot. Bureau), App. at 631; see also June 14 Letter, App. at 29–33.

[78] June 6 Report at 5–8.

20

The CFPB produced 176 of records in response to the Committee's September 16 records request on September 23, 2016. [79]  This production was composed entirely of CFPB policies and procedures and other material readily obtainable from Wells Fargo or the OCC, such as information-sharing MOU's and information-sharing requests between the CFPB and the Los Angeles City Attorney's Office and the OCC, as well as correspondence between the CFPB and the Bank.[80]  The CFPB also promised the future production of "additional responsive materials," and to "work with Committee staff to determine how we can most efficiently satisfy the Committee's oversight interests in this matter."[81]

*Behind the Veil.*  This production did *not* include the Recommendation Memorandum,[82] the Decision Memorandum,[83] or other key internal CFPB documents.  The failure to include these documents in the CFPB's records response raises serious questions because when the Committee's request was transmitted on September 16, 2016, it appears that CFPB oversight staff had already begun to gather the key documents regarding the CFPB's Wells Fargo Investigation in order to prepare Director Cordray for his then-upcoming testimony before the Senate Committee on Banking, Housing, and Urban Affairs on September 20, 2016.

**1.**  On September 14, 2016, CFPB Enforcement Staff, Supervision Staff, and Legislative Affairs staff were preparing "documents for RC's binder."[84]  "[T]he first iteration of this binder"[85] contained six documents including the Recommendation Memorandum:

---

[79] Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, at 2 (Sept. 23, 2016), App. at 427.

[80] *See* HFSC_CFPB_WF_00001–00175.

[81] Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, at 2 (Sept. 23, 2016), App. at 427.

[82] *See* Recommendation Memorandum, App. at 1–23.

[83] *See* Decision Memorandum, App. at 24.

[84] Email from John Coleman, Esq. to Julia Szybala, Esq. and Elizabeth France, Esq., HFSC_CFPB_20170902_000126 (Sept. 15, 2016, 12:31), *and accompanying attachments*, Wells Fargo Sales Practice Investigation—Opening Memorandum, HFSC_CFPB_20170902_000128 (Mar. 2016), Decision Memorandum, HFSC_CFPB_20170902_000130 (July 12, 2016), Recommendation Memorandum for the Director, HFSC_CFPB_20170902_000131 (July 12, 2016), Recommendation Memorandum for the Director, HFSC_CFPB_20170902_000154 (Sept. 2, 2016), Consent Order, *In the Matter of Wells Fargo Bank*, N.A., 2016-CFPB0015, HFSC_CFPB_20170902_000185 (CFPB Sept. 8, 2016), Enforcement Action Against Wells Fargo Bank, N.A. re: Illegal Sales Practices—Q&A, HFSC_CFPB_20170902_000211 (undated), Responsible Business Conduct: Self-Policing, Self-Reporting, Remediation, and Cooperation, HFSC_CFPB_20170902_000216–20 (June 25, 2013), Complaint in *California v. Wells Fargo & Co.*, No. BC580778, at HFSC_CFPB_20170902_000221 (Cal. Super. Ct. May 4, 2015), App. at 244–375.

[85] Email from Joanna Pearl to Catherine Galicia et al., HFSC_CFPB_20170902_000126, at HFSC_CFPB_20170902_000127 (Sept. 14, 2016, 11:09), App. at 245.

21

**From:** Pearl, Joanna (CFPB)
**Sent:** Wednesday, September 14, 2016 11:09 AM
**To:** Manna, Meredith (CFPB); Pippin, Matthew (CFPB); Galicia, Catherine (CFPB)
**Cc:** Alexis, Anthony (CFPB); Ehrlich, Jeffrey (CFPB); Donoghue, Kristen (CFPB); Boison, Elizabeth (CFPB)
**Subject:** documents for RC's binder

Hi Meredith,

Attached are:

- The opening memo for this matter
-  Our recommendation settle or sue and Rich's decision memo authorizing action
- Our recommendation memo asking him to sign the consent order
- The final order
- Cleared Q&As on the matter
- The Bureau's Responsible Business Conduct Bulletin

Let me know if you are expecting more from Enforcement for this first iteration of the binder.

Joanna                                                                                    86

This binder appears to have been compiled for the purposes of preparing Director Cordray for his then-upcoming testimony before the Senate Banking Committee on September 20.  This email was forwarded the next day by Catherine Galicia, Assistant Director for Legislative Affairs, to Coleman:

**From:** Galicia, Catherine (CFPB)
**Sent:** Thursday, September 15, 2016 7:25 AM
**To:** Coleman, John (CFPB)
**Subject:** Fw: documents for RC's binder

Here are the SEFL documents that went into the briefing binder last night. LA's complaint is one of them.                                                                          87

Coleman then forwarded that memorandum to two line oversight attorneys who were assigned to handle the response to the Committee's September 16, 2016, records document request.

**From:**           Coleman, John (CFPB)
**To:**             Szybala, Julia (CFPB); France, Elizabeth (CFPB)
**Subject:**        FW: documents for RC''s binder
**Date:**           Thursday, September 15, 2016 12:31:57 PM
**Attachments:**    Opening Investigation Memo---Wells Fargo Sales Practices.docx          88

---

86 *Id.* at HFSC_CFPB_20170902_000126–7 (emphasis added), App. at 244–45.

87 Email from Catherine Galicia to John Coleman, Esq., HFSC_CFPB_20170902_000126 (Sept. 15, 2016, 7:25), App. at 244.

88 Email from John Coleman, Esq. to Julia Szybala, Esq. and Elizabeth France, Esq., HFSC_CFPB_20170902_000126 (Sept. 15, 2016, 12:31), App. at 244.

None of the four internal CFPB documents attached to this email were produced on September 23 despite being highly responsive to the Committee's request and having been identified as documents regarding Wells Fargo that were so important that they deserved the Director's personal review prior to his Senate testimony.

**2.** The next day, September 16, 2016, the same day the Committee's document request arrived, Julia Szybala circulated an elaborate timeline compiled to prepare the Director for his Senate Banking Hearing:

| | |
|---|---|
| **From:** | Szybala, Julia (CFPB) |
| **Sent:** | Friday, September 16, 2016 10:14 AM |
| **To:** | Rainey, Zol (CFPB) |
| **Cc:** | Boison, Elizabeth (CFPB); Tindall, Anne (CFPB) |
| **Subject:** | Timeline Document |
| **Attachments:** | (CSI) Wells Timeline for Hearing Prep 4.1.docx |

Hi Zol,

Attached is the most recent version of the timeline document, which has incorporated minor revisions from Edwin and his team.

Please let me know if you have any questions.

Thanks,

**Julia Szybala**                                                                                                        89

(Anne Tindall, copied on the email, was then Assistant General Counsel for Oversight and in charge of responding to the Committee's request.)  This timeline made reference to key events and dates during the CFPB investigation of Wells Fargo.  Many of these events make specific reference to important sounding internal CFPB documents—one of which is "Settle or Sue Authority Granted."[90]  None of these internal documents were produced on September 23.

### B.    Director Cordray Does Not Produce the Recommendation Memorandum Despite Being Given Multiple Opportunities to Do So.

There were numerous subsequent instances where the CFPB should have produced the Recommendation Memorandum to the Committee, given that Director

---

[89] Email from Julia Szybala, Esq. to Zol Rainey, HFSC_CFPB_20170703_0040743, at HFSC_CFPB_20170703_0040743 (Sept. 16, 2016 10:14), *and accompanying attachment*, (CSI) Wells Timeline for Hearing Prep. 4.1, HFSC_CFPB_20170703_0040744 (Sept. 15, 2017), App. at. 376–79.

[90] (CSI) Wells Timeline for Hearing Prep. 4.1, HFSC_CFPB_20170703_0040744, at HFSC_CFPB_20170703_0040746, App. at 156.

Cordray and Senior CFPB staff were aware of the document and its importance. But the CFPB did not do so.

**1.**   On November 3, 2016, the Committee reiterated its records request. [91] The CFPB responded on November 10, 2016, and produced 834 pages of records. Despite the CFPB's promise of a "rolling" production, the CFPB did not produce the Recommendation Memorandum (nor other documents apparently important enough to be given to Director Cordray directly to prepare for his Senate Banking testimony).  In this November 10 production, the CFPB again did not produce a single internal record regarding the CFPB's investigation of Wells Fargo's branch sales practices, such as internal emails or memoranda relating to its investigation. Again, the CFPB only produced records readily obtainable from Wells Fargo or the OCC such as the Civil Investigative Demands ("CID") the CFPB sent Wells Fargo.[92]

**2.**   On April 4, 2017—more than *six months* after the initial Committee records request—and in the face of the CFPB's failure to voluntary comply, the Committee subpoenaed the overdue records—*i.e.*, "all records relating to the CFPB's investigation of Wells Fargo."[93]  The Committee gave the CFPB until May 2, 2017— four weeks—to comply with this Subpoena.  One day after the Subpoena issued, Director Cordray assured the Committee in oral testimony:  "If there are documents you don't have, happy to try to provide them."[94]

On May 2, 2017, the CFPB responded to the Committee's April 4 Subpoena. The CFPB did not produce the Recommendation Memorandum and other records that were so "key" to the CFPB's Wells Fargo investigation that Director Cordray appears to have personally reviewed them before testifying regarding that investigation before the Senate Banking Committee.[95]  What the CFPB did produce

---

[91] Letter from the Hon. Sean Duffy to the Hon. Richard Cordray (Nov. 3, 2016), App. at 428.

[92] *See* HFSC_CFPB_WF_00176–HFSC_CFPB_WF_001010.

[93] H. Comm. on Fin. Servs. *Subpoena Duces Tecum* to the Hon. Richard Cordray, Schedule A, at Specification 27 (Apr. 4, 2017) (internal quotation omitted), App. at 435.  The April 4 Subpoena also compelled production of "All records relating to the sales practices of Wells Fargo" described in the CFPB's consent order."  *Id.* at Specification 26, App. at 435.

[94] April 5 Trans., at 32, App. at 670.

[95] *See* Email from John Coleman, Esq. to Julia Szybala, Esq. and Elizabeth France, Esq., at HFSC_CFPB_20170902_000126 (Sept. 15, 2016, 12:31), *and accompanying attachments*, Wells Fargo Sales Practice Investigation—Opening Memorandum, HFSC_CFPB_20170902_000128 (Mar. 2016), Decision Memorandum, at HFSC_CFPB_20170902_000130 (July 12, 2016), Recommendation Memorandum for the Director, at HFSC_CFPB_20170902_000131–53 (July 12, 2016), Recommendation Memorandum for the Director, at HFSC_CFPB_20170902_000154–84 (Sept. 2, 2016), Consent Order, *In the Matter of Wells Fargo Bank*, N.A., 2016-CFPB0015 (CFPB Sept. 8, 2016), at HFSC_CFPB_20170902_000185–210, Enforcement Action Against Wells Fargo Bank, N.A. re: Illegal Sales Practices—Q&A, at HFSC_CFPB_20170902_000211–15 (undated), Responsible Business Conduct: Self-Policing, Self-Reporting, Remediation, and Cooperation, at HFSC_CFPB_20170902_000216–20 (June 25, 2013), Complaint in *California v. Wells Fargo & Co.*, No. BC580778, at HFSC_CFPB_20170902_000221–57 (Cal. Super. Ct. May 4, 2015), App. at 244– 375.

to the Committee were records that Wells Fargo had previously produced to the CFPB in response to the CFPB's CIDs.  The CFPB knew that Wells Fargo had already produced these records to the Committee *months* ago.[96]  Once again, the CFPB did not produce *any* internal records regarding its Wells Fargo investigation, even though it was now legally compelled to do so.  In his letter to the Committee accompanying the production of the subpoenaed records, Director Cordray offered no explanation of the CFPB's inability to produce all records subpoenaed by the Committee, stating only his subjective determination that the materials the CFPB produced to date "comprises the *key* documentation of the Bureau's investigation of Wells Fargo."[97]

**3.**  As detailed in the August 4, 2017, Arbitration Majority Staff Report, the Committee informed Director Cordray that he was in complete default of the April 4 Subpoena and CFPB staff promptly disputed this fact in a lengthy email,[98] and attached a chart with specifics as to Wells Fargo and closed with:  "If the Committee identifies specific additional records it believes are responsive to this request, the Bureau would be happy to determine whether those documents exist and are in its custody or control."[99]  Yet again, Director Cordray did not avail himself of the opportunity to produce the Recommendation Memorandum.

### C.  The Committee Issues the First Interim Majority Staff Report Detailing Director Cordray's Failure to Comply with the April 4 Subpoena and Provides Director Cordray With As Much Detail as Possible on the Records the Committee Believed the CFPB Failed to Produce.

The June 6 Report extensively detailed the CFPB's lack of meaningful cooperation with the Committee's investigation into the Wells Fargo branch sales practice matter.[100]  In particular, the June 6 Report took Director Cordray and the

---

[96] *See* WF-0000001–WF-0140462.  The CFPB knew that the records had been produced, because Well Fargo notified the CFPB of this fact prior to producing the records to the Committee.  *See* Letter from Michael D. Bopp, Esq. to Edwin L Chow (CFPB) (Sept. 26, 2016), App. at 621–22; Letter from Anand Raman, Esq. to Mary McLeod, Esq. (CFPB) (Oct. 3, 2016), App. at 600; Letter from Darren Welch, Esq. to Kevin J. Rice, Esq. (CFPB) (Nov. 9, 2016), App. at 624–25.  The CFPB also *re*-produced records previously produced to the Committee.  Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, at 17–18 (May 2, 2017), App. at 467–68.  To be sure, the page count of this production was over 57,000 pages, but what matters the most is the quality of the production not the quantity.

[97] Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, at 18 (May 2, 2017) (emphasis added), App. at 468.

[98] *See* Email from Steven Bressler, Esq. to Committee Counsel (June 1, 2017, 18:43), *and accompanying attachment*, CFPB, Summary of Bureau Response to April 4 Subpoena & Related Staff-Level Discussions (June 1, 2017), App. at 470–75.

[99] CFPB, Summary of Bureau Response to April 4 Subpoena & Related Staff-Level Discussions (June 1, 2017), App. at 475.

[100] June 6 Report at 5–8.

25

CFPB staff up on their prior offer and attempted to explain with as much detail as possible what responsive records had not been produced.[101]  First, the June 6 Report demonstrated that based on the CFPB's production to date, no strictly internal CFPB records had been produced.[102]  Second, the June 6 Report stated:

> Based on a review of the records produced to the Committee by OCC and Wells Fargo, it is incontrovertible that the CFPB possess additional records responsive to the Committee's Subpoena that the CFPB has failed to produce to the Committee. For example, the OCC has produced a CFPB report and contemporaneous OCC employee notes of calls with the CFPB, recounting CFPB decision memoranda and communications that appear to be essential to the CFPB's Wells Fargo investigation. [FN. 33. *See, e.g.*, Examination Report, App. at 1–35; Wells Fargo Sales Practices—CFPB Call Notes, at OCC-LD-00002774, at 1 (July 8, 2016) (OCC call notes in which CFPB attorneys stated that they were preparing a memorandum for Director Cordray seeking authority to charge Wells Fargo) . . . ]. *None* of these, or other responsive records, have been produced to the Committee by the CFPB.[103]

Contextually, it is quite clear that the specific document referenced in the OCC notes was the Recommendation Memorandum.  Based on the records presented to the Committee, that was the only Memorandum "seeking authority to charge Wells Fargo" sent to Director Cordray on or about July 8 (in fact on July 12).[104]

### D.   Director Cordray Responds to the First Interim Majority Staff Report and Appears to Work to Conceal the Fact that the CFPB Has Not Produced the Recommendation Memorandum and Other Key Documents.

*The CFPB's Public Actions.*  Director Cordray responded directly to the June 6 Report in the June 14 Letter.  In this document he directly responded to the issue of whether he had complied with the April 4 Subpoena as it concerned the CFPB's Wells Fargo Investigation.  The June 14 Letter made two points relevant here.

---

[101] There is obviously a chicken and egg problem here—and as detailed in the Arbitration Staff Report, Director Cordray's broader approach to the April 4 Subpoena was contumacious. *See generally*, MAJORITY STAFF OF THE H. COMM. ON FIN. SERVS., 115TH CONG., DIRECTOR CORDRAY'S FAILURE TO COMPLY WITH HIS LEGAL OBLIGATIONS UNDER THE COMMITTEE'S SUBPOENA DUCES TECUM DATED APRIL 4, 2017, ISSUED IN PART TO FURTHER THE COMMITTEE'S ON-GOING INVESTIGATION INTO THE CFPB'S ARBITRATION RULEMAKING (Aug. 4, 2017), *available at* https://financialservices.house.gov/uploadedfiles/080417_arbitration_report_final.pdf.

[102] June 6 Report, at 5–8.

[103] *Id.* at 7.

[104] *See* Recommendation Memorandum, at HFSC_CFPB_20170404_0064927–49, App. at 1–23.

- The Director took issue with the June 6 Report discussing "which documents have been produced and which *supposedly* have not" as opposed to Director Cordray's preference of looking to the page count of documents previously produced.[105]
- The Director took issue with a supposed lack of clarity from the Committee, insisting that "CFPB staff have consistently sought further guidance from the Committee staff to narrow and target its inquiries and the appropriate response."[106]

*Behind the Veil.*

1. The day after the June 6 Report issued, on Wednesday June 7, 2017, Director Cordray requested that Mr. Coleman transmit him a number of "documents and emails related to Wells Fargo."[107] Mr. Coleman sent Director Cordray: (1) "correspondence with the Committee related to Wells Fargo"; (2) "[e]xcerpts of the April 5, 2017 testimony transcript related to Wells as well as the

---

[105] Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, at 5 (June 14, 2017) (emphasis added), App. at 33.

[106] *Id.* Through the publication of the First Interim Staff Report in June 2017 and to this day, the CFPB insists that "if the Committee is aware of specific, identifiable categories of documents of interest to it, it behooves Committee Staff to narrow, or at least prioritize, the relevant specifications . . . ." Email from Steven Bressler, Esq. to Committee Counsel (June 1, 2017, 18:43), *and accompanying attachment*, CFPB, Summary of Bureau Response to April 4 Subpoena & Related Staff-Level Discussions (June 1, 2017), App. at 470–75; Email from John Coleman, Esq. (CFPB) to Committee Counsel (Aug. 24, 2017, 14:50), App. at 476–539.

[107] Email from John Coleman, Esq., to the Hon. Richard Cordray, HFSC_CFPB_20170703_0040656 at HFSC_CFPB_20170703_0040656–57 (June 7, 2017, 17:48), *and accompanying attachments*, Letter from Mary McLeod, Esq. to Michael D. Bopp, Esq., HFSC_CFPB_20170703_0040658 (May 25, 2017), Wells Fargo Sales Practices Enforcement Action, HFSC_CFPB_20170703_0040660, Letter from Mary McLeod, Esq. to Michael D. Bopp, Esq., HFSC_CFPB_20170703_0040664 (Sept 17, 2016), Letter from Richard G. Lepley, Esq., to Anand S. Raman, Esq., HFSC_CFPB_20170703_0040665 (Oct. 3, 2016), Letter from Mary McLeod, Esq. to Darren Welch, Esq., HFSC_CFPB_20170703_0040666 (Dec. 8, 2016), Letter from the Hon. Jeb Hensarling to the Hon. Richard Cordray, HFSC_20170703_0040668 (Sept. 16, 2016), Letter from the Hon. Jeb Hensarling to the Hon. Richard Cordray, HFSC_CFPB_20170703_0040670 (Sept. 21, 2016), Letter from the Hon. Richard Cordray to the Hon Richard Cordray, HFSC_CFPB_20170703_0040671 (Sept. 22, 2016), Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040673 (Sept. 23, 2016), Recommendation Memorandum for the Director, HFSC_CFPB_20170704_0040674 (Sept. 22, 2016), Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, CFPB_20170703_0040675 (Sept. 23, 2016), Letter from the Hon. Jen Hensarling to the Hon. Richard Cordray, HFSC_CFPB_20170703_0040677 (Sept. 16, 2016), Letter from the Hon. Sean P. Duffy to the Hon. Richard Cordray, HFSC_CFPB_20170703_0040679 (Nov. 3, 2016), Letter from the Hon. Catherine Galicia to the Hon. Sean P. Duffy, HFSC_CFPB_20170703_0040680 (Nov. 10, 2016), H. Comm. on Fin. Servs. *Subpoena Duces Tecum* to the Hon. Richard Cordray, HFSC_CFPB_20170703_0040681 (Apr. 4, 2017), Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040702 (May 2, 2017), Excerpt of April 5 Hearing Trans, HFSC_CFPB_20170703_0040721 (Apr. 5, 2017), Letter from the Hon. Sonya White, Esq. to Darren Welch, Esq., HFSC_CFPB_20170703_0040734 (Feb. 1, 2017), App. at 34–114.

full transcript"; (3) "[a] document provided to you as part of your preparation for the April 5, 2017 hearing'"; (4) "[a] timeline of relevant events prepared by SEFL staff and provided to the Front Office on September 16"; (5) "Correspondence with Wells Fargo related to HFSC requests to Wells for Information."[108]

**2.** The next day, Director Cordray personally wrote and circulated the first draft of what would become the June 14 Letter:

| From: | RC |
| --- | --- |
| Sent: | Thursday, June 8, 2017 12:52 PM |
| To: | Coleman, John (CFPB) |
| Cc: | McLeod, Mary (CFPB); Galicia, Catherine (CFPB); Fulton, Kate (CFPB); Howard, Jennifer (CFPB); Bressler, Steven (CFPB); O'Brien, Patrick (CFPB); Ehrlich, Jeffrey (CFPB) |
| Subject: | RE: Wells Documents |
| Attachments: | Letter -- Response to Chairman Hensarling 6.9.17.docx |

Here is a draft letter to the Chairman. I continue to think it is important that I take the opportunity to "correct the record" on the issues raised in the staff report, especially the mischaracterization of my testimony, but also on their mischaracterization of the Bureau's work here and how it should be perceived. Let me know your thoughts thx
RC
[109]

In pertinent part, this first draft seems to concede that the CFPB had withheld responsive documents relating to Wells Fargo in the face of the Subpoena: "In fact, the Bureau's production to date in response to the Committee has totaled over 57,000 pages of records in an effort to comply with the broadly worded requests. In an effort to obscure this substantial response, the staff report complains instead about which documents have been produced and which have not."[110]

**3.** Director Cordray then edited his draft throughout the day of June 8, circulating two updated versions in quick succession.[111] The third draft circulated

---

[108] *Id.* at HFSC_CFPB_20170703_0040656–57, App. at 34–35. The fourth point continued "We do not have a record that this previously has been provided to you, but staff who helped you prepare for your September Senate testimony and April House testimony had seen this document, or some version of it" *Id.* at HFSC_CFPB_20170703_0040657, App. at 35.

[109] Email from the Hon. Richard Cordray to John Coleman, Esq., at HFSC_CFPB_20170703_0040759, at HFSC_CFPB_20170703_0040759 (June 8, 2017; 12:52), *and accompanying attachment*, Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040761, App. at 126–33.

[110] *See* Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040766, at HFSC_CFPB_20170703_0040766 (June 8, 2017; 12:52), App. at 133.

[111] *See* Email from the Hon. Richard Cordary to John Coleman, HFSC_CFPB_20170703_0040769 (June 8, 2017; 12:58), Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, at HFSC_CFPB_20170703_0040771 (June 8, 2017; 12:58), App. at 134–41; Email from the Hon. Richard Cordray to Catherine Galicia, Esq., HFSC_CFPB_20170703_0040781 (June 8, 2017; 19:25),

by Director Cordray contained, among other things, a pertinent revision indicated in red underlined font, "In an effort to obscure this substantial response, the staff report complains instead about which documents have been produced and which <u>supposedly</u> have not."[112]  It is unclear why the Director inserted the word "supposedly" given that the Recommendation Memorandum was identified in the June 6 Report and had not been produced.[113]

    **4.**  On Friday, June 9, 2017, Mr. Coleman circulated a detailed redline of Director Corday's draft to senior CFPB officials and attorneys on his staff, Ms. Szybala and Mr. Bressler.[114]  The email strongly advocated against sending any response to the June 6 Report.  It stated in pertinent part:

| | |
|---|---|
| **From:** | Coleman, John (CFPB) |
| **Sent:** | Friday, June 9, 2017 9:35 PM |
| **To:** | Fulton, Kate (CFPB) |
| **Cc:** | McLeod, Mary (CFPB); Galicia, Catherine (CFPB); Howard, Jennifer (CFPB); Martinez, Zixta (CFPB); Ehrlich, Jeffrey (CFPB); D'Angelo, Chris (CFPB); Chow, Edwin (CFPB); Szybala, Julia (CFPB); Bressler, Steven (CFPB) |
| **Subject:** | RE: Wells Documents |
| **Attachments:** | Letter -- Response to Chairman Hensarling 6.9.17 (JC edits and suggestions).docx |

*    *    *

---

Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040783  (June 8, 2017: 19:25), App. at 142–49.

[112] Committee Counsel Redline of Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_004071, at 6 (June 8, 2017, 12:58), *against* Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040783, at 6 (June 8, 2017; 19:25), App. at 150–56.

[113] It is also unclear how Director Cordray would fail to identify the record specifically identified in the June 6 Report as the Decision Memorandum, considering he appears to have considered it a key document for his preparation for the Senate Banking Committee's Wells Fargo hearing, and that document was clearly identified on a timeline which Director Cordray told senior staff "contains a chart of events that I am relying on (and that jibes with my recollection. . . .)"  Email from the Hon. Richard Cordray to John Coleman, Esq. and Edwin Chow, HFSC_CFPB_20170703_0040789, at HFSC_CFPB_20170703_0040789 (June 9, 2017; 11:37), *and accompanying attachments*, Draft Letter from the Hon. Richard Cordray to the Hon. Jeb. Hensarling, HFSC_CFPB_0040791 (June 9, 2017; 11:37), Email from Julia Szybala, Esq. to Zol Rainey, HFSC_CFPB_20170703_0040797 (Sept. 16, 2016; 10:14), *and accompanying attachment*, (CSI) Wells Timeline for Hearing Prep. 4.1, HFSC_CFPB_20170703_0040798, at HFSC_CFPB_20170703_0040800 (Sept. 15, 2017), App. at. 188–99.  Committee Staff do not credit that Director Cordray—a Jeopardy champion renowned for his memory—would have a failure of recollection on such an important point.

[114] *See* Email from John Coleman, Esq. to Kate Fulton Esq., HFSC_CFPB_20170703_0040832 (June 9, 2017; 21:35), *and accompanying attachment*, Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040835 (June 9, 2017; 21:35), App. at 157–67.

29

In general, this exercise has convinced me (and again, I speak only for myself here) that this approach is unwise. This matter does not appear to have gained traction with the press or the public generally, and even if it were otherwise, it is not clear to me how a letter to Chairman Hensarling would become public. Further, debating the facts pertaining to the lead-up and conduct of our Wells matter presents two significant risks. First, we could say something that is contradicted by various documents that the Committee either already has or will obtain from us or others in the future. In only a few hours and based on a necessarily incomplete understanding of the existing record, I have found a number of instances in which I think we overstate or misstate the record, and I am probably better intentioned than others. Second, it seems especially unwise to assert facts in response to the staff report based on documents that the staff has not yet obtained because (they would say, unfairly I think) we have not complied with the Committee's subpoena. Recall that the threatened contempt proceeding is based not on Rich's statements during the hearing that we had engaged in "supervisory activity" prior to LA's lawsuit and conducted an "independent and comprehensive" investigation, but on our alleged failure to provide documents, particularly internal documents, in response to the subpoena. Reliance on internal documents will, therefore, only highlight that we have not yet provided such documents to the Committee.
<span style="float:right">115</span>

Mr. Coleman's comments on Director Cordray's draft stated, in pertinent part:

> further penalties imposed by the Los Angeles City Attorney's office and the OCC. The amount of the penalty assessed by the Bureau was determined by taking into account the statutory factors for calculating such penalties set out in 12 U.S.C. 5565(c)(3), which include the state of mind of the offender, the gravity of the violation, the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided, and such other matters as justice shall require, which typically involves considerations about the deterrence of future violations. The staff report does not take issue with the amounts of the penalties imposed in this matter.
>
> The remaining portion of the questions that are the stated focus of the Committee's investigation is whether the federal financial regulators were effective in detecting Wells Fargo's fraudulent branch sales practices. Again, at the outset the staff report acknowledges that these practices went on for at least a decade before the Bureau even was created at all, and even longer before

Comment [JRC9]: This is true, but note that this statement may prompt a request for our decision memo in this case. That memo begins by stating: "We opened this matter in March following media reports and a lawsuit by the Los Angeles City Attorney (LA) alleging that Wells Fargo employees opened accounts for consumers or signed them up for additional products without their consent. . ."
<span style="float:right">116</span>

The import of Mr. Coleman's comment seems unmistakable. Coleman specially notes that the Decision Memorandum discloses that the CFPB "opened this matter in March following media reports and a lawsuit by the Los Angeles City Attorney," presumably to remind the Director that the Decision Memorandum would lend credence to claims made by Oversight and Investigations Subcommittee Chairman Wagner and other Members of the Committee and undermine the CFPB's narrative.[117] Mr. Coleman therefore suggests deleting the referenced text to ensure that the Committee did not request the Memorandum. (It is unclear why Mr. Coleman did not mention that the Committee had *already* specifically pointed to the Recommendation Memorandum as a document the CFPB had failed to produce.)

The next day, Mary McLeod, the CFPB's General Counsel, replied by writing "All: I agree with John's thoughtful analysis, and strongly feel it would be better

---

[115] Email from John Coleman, Esq. to Kate Fulton Esq., HFSC_CFPB_20170703_0040832, at HFSC_CFPB_20170703_0040832 (June 9, 2017; 21:35), App. at 157.

[116] Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040835, at HFSC_CFPB_20170703_0040837, (June 9, 2017; 21:35), App. at 162.

[117] *Id.* The Recommendation Memorandum later produced to the Committee on September 5, 2017 confirms what Mr. Coleman reminded the Director—that the CFPB opened the matter following media reports and a lawsuit by the Los Angeles City Attorney filed May 4, 2015. *See* Recommendation Memorandum, at HFSC_CFPB_20170404_0064927, App. at 1.

that RC not send a letter."[118]  Mr. Coleman's full email and his comments on the Director's draft letter were forwarded to the Director later that day.[119]

**5.** Director Cordray responded the next day:

| | |
|---|---|
| **From:** | RC |
| **Sent:** | Sunday, June 11, 2017 8:53 AM |
| **To:** | Coleman, John (CFPB); Chow, Edwin (CFPB) |
| **Cc:** | McLeod, Mary (CFPB); Galicia, Catherine (CFPB); Fulton, Kate (CFPB); Howard, Jennifer (CFPB); Martinez, Zixta (CFPB); Ehrlich, Jeffrey (CFPB); D'Angelo, Chris (CFPB); Conrad, Derek (CFPB) |
| **Subject:** | RE: Wells Documents |
| **Attachments:** | Letter -- Response to Chairman Hensarling 6.12.17.docx |

Attached is the latest version of this letter, now dated 6/12.  It incorporates all comments received to date. One paragraph still contains two comment bubbles from John, indicating that he is not in position to confirm two specific points (though I have now made efforts to write around the points raised in these two comments).  I believe we will be hearing from Jeff with his perspective on this paragraph and those two comments, hopefully sometime today.

If people want to discuss this matter in person some more, I am available to do so at 10:00 or so on Monday and perhaps at other times on Monday as Derek might be able to arrange thx
RC                                                                                                          [120]

Pertinent here, Director Cordray made the following edit (as tracked against Coleman's draft and comments):

---

[118] Email from Mary McLeod, Esq., to Kate Fulton, Esq. and John Coleman, Esq., CFBP_HFSC_OI_IMG_2017_08_18_0003471, at CFPB_HFSC_OI_IMG_2017_08_18_0003471–72 (June 10, 2017, 17:13), App. at 73–74.

[119] *See* Email from Kate Fulton, Esq. to the Hon. Richard Cordray, HFSC_CFPB_20170703_0030824 (June 10, 2017; 19:57), *and accompanying attachments*, Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040825 (June 10, 2017, 19:57), Email from John Coleman, Esq. to Kate Fulton Esq., HFSC_CFPB_20170703_0040832 (June 9, 2017; 21:35), *and accompanying attachment*, Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040835 (June 9, 2017; 21:35), App. at 168–87.

[120] Email from the Hon. Richard Cordray to John Coleman, Esq., and Edwin Chow, HFSC_CFPB_20170703_0035990, at HFSC_CFPB_20170703_0035990 (June 11, 2017; 8:53), *and accompanying attachment*, Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling HFSC_CFPB_20170703_0035992 (June 11, 2017; 8:53), App. at 200–07.

31

further penalties imposed by the Los Angeles City Attorney's office and the OCC. ~~The amount of the penalty assessed by the Bureau was determined by taking into account the statutory factors for calculating such penalties set out in 12 U.S.C. 5565(c)(3), which include the state of mind of the offender, the gravity of the violation, the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided, and such other matters as justice shall require, which typically involves considerations about the deterrence of future violations.~~ ~~The staff report does not take issue with the amounts of~~ all of which tend to deter such conduct by Wells Fargo and by any other institution in the future. The staff report does not take issue with the penalties imposed in this matter.

The remaining portion of the questions that are the stated focus of the Committee's investigation ~~is~~concerns whether the federal financial regulators were effective in detecting Wells Fargo's fraudulent branch sales practices. Again, at the outset the staff report acknowledges that these

> **Comment [JRC11]:** This is true, but note that this statement may prompt a request for our decision memo in this case. That memo begins by stating: "We opened this matter in March following media reports and a lawsuit by the Los Angeles City Attorney (LA) alleging that Wells Fargo employees opened accounts for consumers or signed them up for additional products without their consent. . ." [121]

This deletion carries through to the letter's final version. The only explanation of Director Cordray's deletion in the records is Mr. Coleman's comment.

**6.** After 354 days, the CFPB finally produced the Recommendation Memorandum on September 5, 2017. And the Committee had undertaken extraordinary efforts to obtain the document.

## STAFF RECOMMENDATIONS

Committee Staff concludes that the foregoing raises grave questions as to whether Director Cordray, other senior CFPB officials, and CFPB oversight attorneys engaged in actions that had the effect of obstructing the Committee's lawful oversight related to the Wells Fargo fraudulent account scandal. The Committee's examination and investigation continues.

---

[121] Committee Counsel Redline of Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0040819, at 2–3 (June 10, 2017, 11:23) *against* Draft Letter from the Hon. Richard Cordray to the Hon. Jeb Hensarling, HFSC_CFPB_20170703_0035992, at 3 (June 11, 2017, 8:53), App. at 208–14.