# EXHIBIT G

# *Wells Fargo & Co Update: Federal Reserve Consent Order Conference Call - Final*

FD (Fair Disclosure) Wire

February 2, 2018 Friday

Copyright 2018  ASC Services II Media, LLC
All Rights Reserved

Copyright 2018 CCBN, Inc.

**Length:** 4597 words

## Body

Corporate Participants

* John M. Campbell

Wells Fargo & Company - Director of IR

* John Richard Shrewsberry

Wells Fargo & Company - CFO & Senior EVP

* Timothy J. Sloan

Wells Fargo & Company - CEO, President & Director

Conference Call Participants

* Betsy Lynn Graseck

Morgan Stanley, Research Division - MD

* John Eamon McDonald

Sanford C. Bernstein & Co., LLC., Research Division - Senior Analyst

* Robert Scott Siefers

Sandler O'Neill + Partners, L.P., Research Division - MD, Equity Research

Presentation

OPERATOR: Good day. My name is Tricia, and I will be your conference operator today. At this time, I would like to welcome everyone to the Wells Fargo Conference Call. (Operator Instructions) Please note that today's call is being recorded. Thank you. I would now like to turn the call over to John Campbell, Director of Investor Relations. Sir, you may begin the conference.

JOHN M. CAMPBELL, DIRECTOR OF IR, WELLS FARGO & COMPANY: Thank you, Tricia. Good afternoon. Thank you for joining our call today where our CEO and President, Tim Sloan; and our CFO, John Shrewsberry, will discuss the Federal Reserve's consent order and answer your questions. This call is being recorded.

Wells Fargo & Co Update: Federal Reserve Consent Order Conference Call - Final

Our news release and presentation are available on our website at *www.wellsfargo.com*, and I'd like to caution you that we may make forward-looking statements during today's call that are subject to risks and uncertainties. Factors that may cause actual results to differ materially from expectations are detailed in our SEC filings, including the Form 8-K filed today containing our news release and presentation and the Form 10-K for the year ended December 31, 2016. Information about any non-GAAP financial measures referenced, including a reconciliation of those measures to GAAP measures, can be found in our SEC filings available on our website.

I will now turn the call over to our CEO and President, Tim Sloan.

TIMOTHY J. SLOAN, CEO, PRESIDENT & DIRECTOR, WELLS FARGO & COMPANY: Thank you, John, and I want to thank all of you for joining us. We thought it was important to have this call for several reasons: to discuss the consent order that we entered into with the Federal Reserve Board of Governors today, which I would like to make clear is not related to any new matters; to highlight the strong progress we've already made to enhance our risk management program; to emphasize our commitment to satisfy the requirements of the consent order as quickly as possible while we continue to serve our customers' financial needs; and to explain why we believe the asset limitations we will operate under until we've completed this work are manageable.

On Page 1 of our presentation, we summarized the Federal Reserve consent order relating to our governance oversight and compliance and operational risk management program, which relates to prior issues, including our sales practices announcement on September 8, 2016. While we do not know what the response from the Federal Reserve would be, Chair Yellen commented in her quarterly news conference in September of last year that they may take actions to make sure the right set of controls were in place at Wells Fargo. It's important to note that in the consent order, the Federal Reserve acknowledges the efforts that we've taken over the past 17 months to improve corporate governance and risk management. However, they believe there is more work that needs to be done, and we agree.

Within 60 days, we will submit plans to the Federal Reserve that leverage existing plans and efforts already underway to further enhance the board's effectiveness in carrying out its oversight and governance to the company and further improve the firm-wide compliance and operational risk management program.

After the Federal Reserve approves our plans, we will engage independent third parties to conduct a review to confirm the adoption and implementation of the plans to be completed no later than September 30, 2018. Until this third-party review is completed to the satisfaction of the Federal Reserve, we are required to hold our total consolidated assets at December 31, 2017 levels.

While operating under this constraint, we are open for business, and we will continue to serve our customers' financial needs, including saving, borrowing and investing. I want to repeat. We are open for business.

Turning to Page 2. Since the Sales Practices Settlements, we've taken significant actions to further enhance the governance and risk management programs referenced in the consent order, and much of the foundational work has been completed. We strengthened board governance and oversight, centralized control functions, improved leadership and expertise in critical areas of risk management and increased our investment spending and resources to address compliance and operating risk deficiencies. I'm confident in our ability to successfully address the issues cited in the consent order because we've been successful in resolving regulatory concerns in the past.

For example, we took feedback from a 2015 resolution plan submission very seriously and took meaningful steps to strengthen our resolution planning capabilities, including committing significant additional resources and working deliberately to address regulatory concerns. Our revised submission adequately remediated the remaining deficiencies, and we ended up with better resolution planning capabilities. We will be just as relentless in satisfying the requirements of the consent order we signed today.

On Page 3, we highlight the actions taken by the board, including significant changes to its leadership, composition and governance practices. For example, last year, the board conducted a thoughtful and deliberate self-evaluation of its own effectiveness, which was facilitated by Mary Jo White, former Chair of the SEC. Over the past year, the board has named 6 new independent directors: 3 in 2017 and 3 who just joined our board in January of this year.

Wells Fargo & Co Update: Federal Reserve Consent Order Conference Call - Final

And as we shared with the Fed, our -- we shared our plans to refresh an additional 4 directors in 2018, with the retirement of 3 of those directors occurring by the end of our annual meeting this year.

In addition to the actions taken by the board, we have been working to strengthen compliance and operational risk management. Last year, we spent $3.9 billion on risk. We centralized all risk management functions and are now implementing a fully integrated operating model for risk management across all business and staff groups.

We hired over 2,000 external team members to risk roles during the past 2 years to strengthen our capabilities, including a new Chief Operational Risk Officer and a new Chief Compliance Officer, who have extensive industry experience. And just this week, we announced a new Head of Regulatory Relations who will join Wells Fargo next month. She is a 25-year veteran of the Federal Reserve Bank of New York and will be instrumental in leading our efforts to have a sustained, proactive dialogue around risk, controls and compliance and will work across Wells Fargo to ensure we are meeting our regulatory commitments.

Additionally, we have established dedicated groups led by internal leaders with strong track records in areas like credit risk, resolution planning and cyber defense. These groups are focused on key risk control areas, including a Conduct Management Office, an Enterprise Data Management function and a Comprehensive Customer Remediation Group.

As highlighted on Page 5, our balance sheet provides us with a lot of flexibility to minimize the impact to our customers of the asset cap. Starting in the second quarter, we will be required to hold Wells Fargo's total consolidated assets at approximately $2 trillion, the level as of year-end 2017. This limitation will be measured on a 2-quarter daily average, which provides some flexibility to manage temporary asset fluctuations. Having a $2 trillion balance sheet provides us with the ability to serve our customers' financial needs, including saving, borrowing and investing as well as the ability to deliver a competitive ROE for our shareholders.

On our balance sheet, there are certain portfolios that have benefited net interest income and ROE but are dilutive to ROA due to their generally low-risk and large asset scale characteristics. By temporarily eliminating -- limiting, excuse me, some of these activities, we can reduce the balance sheet in a relatively short period of time. These actions would impact a modest percentage of our total balance sheet and reduce only a portion of the impacted portfolios while creating headroom to continue to serve our customers and grow other asset categories, including traditional loans and deposits, without growing the overall balance sheet.

On Page 6, we highlight some of the levers we could use to optimize the balance sheet. As you can see, while the balances in these portfolios are meaningful, the temporary actions under consideration would reduce only a portion of the balances and would likely reflect a mix of actions. For example, at year-end, we had approximately $200 billion of nonoperational deposits. These are commercial deposits and not related to retail customers. Reducing these deposits would result in a modest reduction in net interest income, a manageable liquidity coverage ratio impact, and since these are higher cost deposits, average deposit cost and deposit betas would be reduced.

It is still very early, and we will continue to evaluate our options. But based upon our preliminary analysis of one set of assumptions for prospective balance sheet optimization activities to manage within the asset cap, we estimate 2018 net income would be reduced by approximately $300 million to $400 million after tax. This analysis assumed we would primarily limit certain trading assets, short-term investments and certain deposits that have less liquidity value by $50 billion to $75 billion on average to accommodate assumed asset growth in lending, deposit-taking and other asset and liability categories as well as to provide an internal buffer that we expect to maintain to ensure that we remain below the asset cap.

The average assumed NIM on the asset and liability categories reduced for this analysis was in the range of 70 to 75 basis points. The actual actions taken and the resulting financial impact will be dependent on underlying business trends and strategies that will be determined over time. But the takeaway here is that we have meaningful levers we can pull within the cap and still grow loans and deposits with relatively modest balance sheet impact.

On Page 7, we summarize a number of key questions related to the consent order. I've addressed many of these already so let me highlight a few. We understand the urgency to comply with the consent order so that our risk

Wells Fargo & Co Update: Federal Reserve Consent Order Conference Call - Final

management program can be best-in-class and the limit on our asset growth can be removed. After the Federal Reserve approves the plans, we will engage independent third parties to conduct a review to be completed no later than September 30, 2018. The asset cap will remain in effect until the third-party review has been completed to the satisfaction of the Federal Reserve.

On our earnings call last month, we provided additional details on our targeted $4 billion of expense reductions and stated that we expect full year 2018 total expenses to be in the range of $53.5 billion to $54.5 billion. We had already contemplated ongoing additional investments in risk management this year and remain committed to achieving our targeted expense reductions and still believe our 2018 expenses will be in the range we provided.

We have also highlighted that returning more capital to shareholders is a priority. With 190 basis points of capital above our internal common equity Tier 1 target of 10% as of year-end, we remain committed to returning more capital to our shareholders.

On Page 8, we summarize the key takeaways from the consent order we signed today. Over the past 17 months, we have been focused on many of the same issues cited by the Federal Reserve, and we believe the consent order provides the framework needed for resolving these issues with the Fed. I am confident that we will meet the consent order requirements while continuing to serve our customers' financial needs, that we will maintain our strong liquidity and capital levels and that the financial impacts will be manageable.

I want to assure our customers, our team members, our communities and our shareholders that Wells Fargo is open for business. We take the consent order very seriously, and we will work diligently to fix the issues identified. And as a result, we'll be a better, stronger and more customer-focused company than ever before. We are committed to being transparent, and we'll provide updates as they occur, including at our Investor Day in May.

John Shrewsberry and I will now take your questions.

Questions and Answers

OPERATOR: (Operator Instructions) Our first question comes from Scott Siefers from Sandler O'Neill.

ROBERT SCOTT SIEFERS, MD, EQUITY RESEARCH, SANDLER O'NEILL + PARTNERS, L.P., RESEARCH DIVISION: I think you ended up answering a number of my questions. But I guess more of the same on you suggested at backward looking from -- by all accounts, this (inaudible) order looks like it is. But I guess between the CCAR qualitative review and the living will, the Fed's already had a -- kind of a number of opportunities to opine on your kind internal control management, et cetera. So there's nothing new that's come out from any of those other kind of public things that would have led to this, right?

TIMOTHY J. SLOAN: That's correct.

ROBERT SCOTT SIEFERS: Okay. All right. Perfect. And then just on the balance sheet [metrics], I guess it feels, John, like the method would be obviously limitation of the total asset size but potentially accretive to the margin here as we go forward, albeit probably minimally so just given the type of dollar amounts that we would be looking at just within the context of the total Wells Fargo Bank, too. Is that a fair way to think about it?

JOHN RICHARD SHREWSBERRY, CFO & SENIOR EVP, WELLS FARGO & COMPANY: I think it is. The leverage that Tim had mentioned are some of the activities that we've taken on as we've had excess room under the leverage ratio. So it's been, as Tim said, net income-enhancing and ROE-enhancing to take on even more high-cost deposits because they've generated more net income. So that creates room to shrink the balance sheet a little bit, provides more flexibility, but it probably is ROA and NIM-enhancing in the process.

ROBERT SCOTT SIEFERS: Okay. And then the final one. It sounds like -- I think you answered this, but there's definitely no restriction on what you're able to do under the -- your current CCAR allowances for this year, right?

JOHN RICHARD SHREWSBERRY: Yes. No, no, no. We're still operating under our non-objection from last year, and nothing's changed.

Wells Fargo & Co Update: Federal Reserve Consent Order Conference Call - Final

OPERATOR: Our next question comes from Betsy Graseck of Morgan Stanley.

BETSY LYNN GRASECK, MD, MORGAN STANLEY, RESEARCH DIVISION: A couple of questions. I understand like you've got the nonoperating deposits, which maybe you could peel down a little bit. I would think nonoperating deposits are noninterest-bearing. Is that accurate? So should we expect that cost of funds moves a bit higher when you're going through this stabilization mode?

JOHN RICHARD SHREWSBERRY: No. I mean, I think what we'll do is, as we work through this, we'll be looking at buckets of deposits to peel down, and higher-cost, low-liquidity value ones will be the first. And so, for example, I think the bucket of FICC-related deposits would be -- I think the impact of that would probably overwhelm taking down the portion of nonoperating deposits that are noninterest-bearing. So that's why I think that this will probably be NIM-enhancing at the margin anyway.

BETSY LYNN GRASECK: Okay. And then just on the CCAR that's upcoming. I mean, we just got those ratios yesterday, but I was just wondering how you think about the ask in an environment where you've got this consent order going on. Does it matter? Does the consent order interact at all or interplay at all with, for example, the qualitative element of the CCAR?

TIMOTHY J. SLOAN: Okay, John.

JOHN RICHARD SHREWSBERRY: It's hard to say. I mean, we did well in CCAR last year and every prior year, and we've, as expected, meaningfully improved all elements that are taking a look at under the qualitative approach. So we'll be approaching this one based on how our business is performing, the amount of capital that we have, the scenarios, as you said, that were released yesterday. I don't think, at least at this point, that much would change in our approach as a result of this. In fact, if anything, from an RWA growth perspective, at least in the first year, there's a little bit more -- there's less uncertainty from the readers' perspective of the plan because we're operating within this cap.

TIMOTHY J. SLOAN: Yes. And, Betsy, I would just emphasize that since our submission of our CCAR last year, there were no new issues that are -- have come out of this consent order or this consent order covers. And since that time, we've continued to make additional investments, we've brought on new people, we've made improvements. And so we're arguably farther along than we were a year ago in addressing these concerns. Again, we take this very seriously, and we've got more work to do. But as John said, I think we're going approach our CCAR the way we've done in the past, taking that CCAR very seriously but certainly balancing our need to continue to increase our capital return to our shareholders.

BETSY LYNN GRASECK: Okay. And then just one last one. So you went through very clearly the actions that you've taken over the past several years, 1.5 years or so, and yet there's still some more work to do. Is it -- did the Fed identify very clearly what those remaining steps or next steps are that they're asking you to do? Or is that a little bit more open-ended?

TIMOTHY J. SLOAN: No, I wouldn't describe it open-ended. I mean, we have a very constructive relationship with the Fed. There's a lot of discussion, candidly, every day, as you would imagine. And we're in the midst of continuing to improve all the areas within risk the Fed's concerned about, that we're concerned about candidly. I don't think there's a mystery here. And candidly, I think that it was -- it's helpful in the consent order that it's clear from a timing standpoint what the deliverables are. 60 days -- Fed -- we'll put our plans together in 60 days. The Fed will look at those plans. Then we'll -- during that same period, we will continue to make sure that they're implemented across the entire company. Then we'll bring in an independent third party. They'll take a look, and they'll opine that, that's happening. And then we'll submit that plan to the Fed. We're going do that by September 30, 2018, this year. I hope we do it sooner. And then the Fed will take a look at it and respond. So we're on a fast track here, and we're looking forward to making the improvements that are necessary.

BETSY LYNN GRASECK: And so on a kind of best-case scenario, asset values staying flat through some time in fourth quarter, obviously, could potentially go further than that, but on a fast-track basis, flat asset values for 2018.

Wells Fargo & Co Update: Federal Reserve Consent Order Conference Call - Final

TIMOTHY J. SLOAN: I hope, yes. I mean, it would -- clearly, if we're going to be submitting that plan and in terms of the third-party consultant review, we'll want to be very sure that the changes that we've made and improvements are implemented and we're operating appropriately. But we want to have this cap lifted as soon as possible. And we're going to work very hard to ensure that's the case.

BETSY LYNN GRASECK: And just marching orders for the folks in the trenches here. I would wonder if you could just share with us what you're talking with them about only because I would think every competitor is looking at this saying, "Okay, well, these are going to be on the back foot for the full year so let's go after market share." How do you respond to that?

TIMOTHY J. SLOAN: Well, we are in a very competitive business, whether we have a consent order or not, and our marching orders to our team is go out and serve your customers, fulfill our vision, right, take deposits, make loans, right? We are open for business, right? Clearly, there are going to be some small amount of customers that will be impacted by some of the actions that John said. That's a very small number. But we are open for business, and that's what we're telling our team. I sent a note out to all 260,000 team members just a while ago and reinforced that to them.

OPERATOR: (Operator Instructions) Our next question comes from John McDonald of Bernstein.

JOHN EAMON MCDONALD, SENIOR ANALYST, SANFORD C. BERNSTEIN & CO., LLC., RESEARCH DIVISION: Just a question on the net income drag that you mentioned in the one scenario you ran the $300 million, $400 million after tax. That sounds like it's mostly related to the asset mix. Is that right?

JOHN RICHARD SHREWSBERRY: Well, it's related to high-quality, low-yielding assets on the one side and then lower liquidity value deposits on the other side.

JOHN EAMON MCDONALD: Okay. But the balance sheet impact. That's really the balance sheet stuff?

JOHN RICHARD SHREWSBERRY: Yes, that is us taking that down so that we create a little bit of a buffer, so that we don't inadvertently run our average above the 12/31 level and still accommodate all the room to grow our core business, our lending and deposit-taking that we do with our retail and commercial customers.

JOHN EAMON MCDONALD: Okay. So to the extent there are other compliance-related costs related to this in terms of the third-party review and things like that, there are those, but you've got contemplated those in your $53.5 billion to $54.5 billion expense guide. Is that the way to think about that?

JOHN RICHARD SHREWSBERRY: That's right. Yes, I don't -- I mean, with all -- I wouldn't tell this to the consulting community, but I don't think those expenses are going to be that significant. There's a lot of work to do. But in the scheme of $53.5 billion to $54.5 billion worth of expense, that won't be a difference-maker. The amount of investment that we're making in the activities themselves to improve our governance, compliance and operational risk programs is already occurring in the run rate at the high level necessary to succeed. So that's not incremental.

JOHN EAMON MCDONALD: Okay. And then just as a reminder, what's not included in that expense guide for the year? Was legal expense, is that primarily what you've excluded from that?

JOHN RICHARD SHREWSBERRY: What we've excluded is outsized operational losses. So I think we have a run rate of something like $150 million per quarter of operational losses. And if we have remediation or settlements, et cetera, generally speaking, related to sales practices or other items, those -- we wouldn't include that in that. We don't know about them so we wouldn't include that in that amount.

JOHN EAMON MCDONALD: Okay. You took a big provision for legal costs in the fourth quarter. Should we expect the kind of range of possible losses beyond your reserves now that you've boosted your reserves by $3 billion or so in the fourth quarter? Should we expect that kind of range of possible that you haven't reserved for to come down because of the reserve you took in the fourth quarter?

Wells Fargo & Co Update: Federal Reserve Consent Order Conference Call - Final

JOHN RICHARD SHREWSBERRY: Most of the things that we took in the fourth quarter, at some level, would have been reflected in the inventory of items that was leading to the reasonably possible being higher at the end of the third quarter. But until we actually put the 10-K out, I wouldn't -- I'm not going to be too final on that because there's new information every day and we're very expansive at our dragnet for things that might have an impact when we compile up us into reasonably possible. So I just have to be patient on that until the 10-K comes out.

JOHN EAMON MCDONALD: Okay. But the things related to this, the actions that led to this consent order and everything else have been known for a while.

JOHN RICHARD SHREWSBERRY: Well, there's nothing -- yes, there's nothing here. There's no settlement amount or civil money penalty or anything like that. So it wouldn't have run through that particular calculus. This is just...

TIMOTHY J. SLOAN: Right. And, John, the underlying concerns as it relates to sales practices or compliance or operational risk, those improvements are what John -- are where we're spending our money, among other places, and are included in that estimate that we've recommitted to today.

JOHN EAMON MCDONALD: Okay, okay. And the last quick thing for me. You mentioned no impact on your targeted cost savings for this year and next year. Is it possible this could affect the timing of how you realize the cost savings? Or is that still just marching on as you would have been doing anyway?

JOHN RICHARD SHREWSBERRY: Marching.

OPERATOR: We have no further questions in queue. Tim Sloan, do you have any closing remarks?

TIMOTHY J. SLOAN: Gosh, I guess I do. No, thank you. I'm just kidding. Again, I apologize for taking some of your late afternoon or evening, particularly those of you that are on the East Coast. I just want to reinforce that our I am very confident that we're going to meet the consent order requirements while continuing to serve our customers' financial needs, that we will continue to maintain very strong liquidity and capital levels. We've been -- we've provided a range in terms of the financial impacts. We believe that, that's manageable. And Wells Fargo is open for business. Thanks for joining us.

JOHN RICHARD SHREWSBERRY: Thank you.

OPERATOR: This concludes today's conference call. Thank you for your participation. You may now disconnect.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

Wells Fargo & Co Update: Federal Reserve Consent Order Conference Call - Final

## Classification

**Language:** ENGLISH

**Publication-Type:** Transcript

**Transcript:** 020218a11251418.718

**Subject:** EXECUTIVES (92%); EQUITY RESEARCH (90%); RISK MANAGEMENT (89%); BANKING & FINANCE REGULATION (88%); ANNUAL REPORTS (79%); BOARDS OF DIRECTORS (79%); LIMITED PARTNERSHIPS (76%); CENTRAL BANKS (66%)

**Company:**  WELLS FARGO & CO (94%);  SANFORD C BERNSTEIN & CO LLP (72%);  SANDLER O'NEILL + PARTNERS LP (72%);  MORGAN STANLEY (58%)

**Ticker:** WFC (NYSE) (94%); MS (NYSE) (58%)

**Industry:** EQUITY RESEARCH (90%); CONFERENCE CALLS (90%); RISK MANAGEMENT (89%); BANKING & FINANCE (89%); BANKING & FINANCE REGULATION (88%); INVESTOR RELATIONS (73%); CENTRAL BANKS (66%)

**Person:** TIMOTHY J SLOAN (94%)

**Load-Date:** February 8, 2018

**End of Document**