# EXHIBIT Q

265

**U.S. House Committee on Financial Services**
*"Holding Megabanks Accountable: An Examination of Wells Fargo's Pattern of Consumer Abuses"*
**March 12, 2019**

**Questions for Mr. Timothy J. Sloan, Chief Executive Officer of Wells Fargo & Company, on behalf of Chairwoman Maxine Waters, Congresswoman Joyce Beatty, Congressman Jesús "Chuy" Garcia, Congressman Ed Perlmutter, Congresswoman Katie Porter, Congresswoman Ayanna Pressley, and Congresswoman Rashida Tlaib:**

**Chairwoman Maxine Waters:**

**Outstanding Consent Orders**

1. **Mr. Sloan, during the hearing you testified that Wells Fargo & Company ("Wells Fargo") has fourteen open consent orders with federal regulators. Please list and provide a brief description of every open consent order that Wells Fargo or a subsidiary has with a federal regulator.**

*Response:* Wells Fargo is currently subject to 11 open consent orders. Of the 14 consent orders I spoke about in my testimony, one was lifted in 2018, another is a stipulated judgment that has expired, and a third was recently dismissed on April 9, 2019 after Wells Fargo completed all remediations under the order (descriptions provided below).

*Open Consent Orders*

#1. Mortgage Servicing (FRB): In April 2011, Wells Fargo entered into a consent order with the Board of Governors of the Federal Reserve System ("FRB") regarding mortgage loan servicing, loss mitigation activities, foreclosure activities, and related services. The consent order requires Wells Fargo's Board to strengthen its oversight and enterprise-wide risk management activities. It also requires Wells Fargo to strengthen its audit function, as well as its enterprise-wide risk management and compliance programs. On February 9, 2012, Wells Fargo agreed to pay an $87 million civil money penalty associated with this consent order. Wells Fargo continues to report escalated matters to the FRB on a quarterly basis pending the closure of the consent order.

#2. Mortgage Origination (FRB): In July 2011, Wells Fargo entered into a consent order with the FRB regarding certain "cash-out refinancing loans" and sales practices at Wells Fargo Financial. Wells Fargo agreed to provide remediation to customers who were improperly directed to higher interest loans or who had their income information falsified, and to pay an $85 million civil money penalty. Wells Fargo also agreed to improve its anti-fraud and UDAP oversight and to modify compensation and performance management practices to better incentivize responsible lending practices.

#3. Real Estate Settlement Procedures Act/"Genuine Title" (CFPB): In January 2015, Wells Fargo entered into a consent order with the Consumer Financial Protection Bureau ("CFPB")

1

266

and the Maryland Office of the Attorney General's Consumer Protection Division ("CPD") in relation to allegations that Wells Fargo home loan officers improperly accepted marketing services from title company Genuine Title in violation of the Real Estate Settlement Procedures Act, the Consumer Financial Protection Act, and the Maryland Consumer Protection Act. Under the consent order, Wells Fargo agreed to pay $10.8 million in remediation to customers, a $21 million civil money penalty to the CFPB, and $3 million to CPD. In addition, Wells Fargo agreed to prepare and put in place a comprehensive compliance plan designed to ensure that Wells Fargo's home loan officers refrain from giving or accepting any fee, kickback, or thing of value and comply with the terms of the consent order. All remediation and payments of civil money penalties are complete.

#4. Add-on Products (OCC): In June 2015, Wells Fargo entered into a consent order with the Office of the Comptroller of the Currency ("OCC") regarding two third-party products: (1) Credit Defense Platinum ("CDP"), an optional third-party product that cancelled a portion of a debt or covered monthly payment upon certain life events; and (2) Identity Theft Protection ("ITP"), an optional third-party product that provided credit monitoring and/or credit report retrieval services. The consent order requires remediation to CDP and ITP customers and contains provisions regarding broader issues, such as oversight of third-party vendors. We have provided over $31 million to over 175,000 accounts and we continue to have constructive dialogue with the OCC on an ongoing basis to clarify expectations, receive feedback, and assess progress under the consent order. Additionally, as of May 2017, we no longer sell consumer add-on products.

#5. Bank Secrecy Act/Anti-Money Laundering (OCC): In November 2015, Wells Fargo entered into a consent order with the OCC focused on internal control deficiencies in Wholesale Banking related to its Bank Secrecy Act/Anti-Money Laundering program ("BSA/AML"). Pursuant to the consent order, Wholesale Banking is working to enhance its BSA/AML customer risk assessment, customer due diligence, front line monitoring and governance and oversight. A number of technology and organizational changes were made to improve internal processes. We continue to have constructive dialogue with the OCC on an ongoing basis to clarify expectations, receive feedback, and assess progress under the consent order.

#6. Servicing Private Student Loans (CFPB): In August 2016, Wells Fargo entered into a consent order with the CFPB regarding certain legacy student loan servicing practices that occurred between 2010 and 2013 concerning: how payments were allocated across multiple loans, how partial payments were aggregated, and a systems programming error related to the assessment of late fees. All of these practices were amended or discontinued by no later than May of 2013, three years prior to issuance of the consent order. The consent order requires Wells Fargo to pay not less than $410,000 in relief to customers, to update credit bureaus of impacted customers, and to pay a $3.6 million civil money penalty. The civil money penalty was paid in 2016, credit bureau updates were completed in April 2018, and financial remediation to customers was completed by July 31, 2018. Post-remediation validation of the impacted customer population is underway, and Wells Fargo will remediate any additional

2

267

impacted accounts that are identified. The consent order also requires Wells Fargo to develop a compliance plan covering go-forward commitments related to these legacy servicing practices. A draft compliance plan is pending non-objection from the CFPB.

#7. Sales Practices (CFPB): In September 2016, Wells Fargo entered into a consent order with the CFPB regarding allegations of unfair, deceptive, and abusive acts and practices with respect to the Community Bank. The order included a civil money penalty of $100 million. We continue to have constructive dialogue with the CFPB on an ongoing basis to clarify expectations, receive feedback and assess progress under the consent order.

#8. Sales Practices (OCC): In September 2016, Wells Fargo entered into a consent order with the OCC regarding alleged unsafe or unsound practices concerning the Bank's risk management activities and its oversight of sales practices in the Community Bank. The order included a civil money penalty of $35 million. We continue to have constructive dialogue with the OCC on an ongoing basis to clarify expectations, receive feedback and assess progress under the consent order.

#9. Board Effectiveness and Risk Management (FRB): In February 2018, Wells Fargo entered into a consent order with the FRB requiring further enhancements in the Board's effectiveness in carrying out its oversight and governance; and further improvements to Wells Fargo's compliance and operational risk management program. The consent order requires Wells Fargo to submit plans to fulfill both requirements for the FRB's review. Until the plans are approved and implemented to the satisfaction of the FRB, Wells Fargo's total consolidated assets will be limited to the level as of December 31, 2017. We continue to have constructive dialogue with the FRB on an ongoing basis to clarify expectations, receive feedback and assess progress under the consent order.

#10 and #11. Compliance-risk Management, Collateral Protection Insurance, and Mortgage Rate Lock (OCC & CFPB): In April 2018, Wells Fargo entered into consent orders with the OCC and the CFPB regarding compliance risk management, its customer remediation program, collateral protection insurance, and mortgage interest rate-lock extension fee issues. Under the terms of the orders, Wells Fargo is to remediate customers harmed by the Bank's collateral protection insurance and mortgage interest rate lock extension fee practices. The CFPB assessed a $1 billion civil money penalty against the Bank and credited the $500 million penalty collected by the OCC toward the satisfaction of its fine. The consent orders required Wells Fargo to submit plans related to its enterprise-wide compliance risk management program, a staffing assessment and program for the compliance risk management, Internal Audit program with respect to compliance, and customer remediation program. We continue to have constructive dialogue with the OCC and CFPB on an ongoing basis to clarify expectations, receive feedback and assess progress under the consent orders.

3

268

*Closed Consent Orders*

#12. Sales Practices (City of Los Angeles): In September 2016, Wells Fargo agreed to a stipulated judgment with the City of Los Angeles. As part of that settlement, Wells Fargo paid $50 million and agreed to participate in a restitution program for affected California customers. The stipulated judgment had a two-year term, which expired on September 13, 2018. Wells Fargo now considers the matter to be closed.

#13 and #14. Servicemembers Civil Relief Act (OCC & DOJ): In September 2016, Wells Fargo entered into consent orders with the OCC and the U.S. Department of Justice ("DOJ") regarding noncompliance with the Servicemembers Civil Relief Act ("SCRA"). The OCC order required a 10-year review of accounts across Wells Fargo. The DOJ order required a review of Wells Fargo Dealer Services accounts from January 1, 2008 through October 4, 2016. With respect to the OCC order, Wells Fargo completed all requirements, deliverables, and remediations; the OCC terminated the order on June 18, 2018. With respect to the DOJ order, Wells Fargo has completed all remediations; the U.S. District Court for the Central District of California dismissed the order, with prejudice, on April 9, 2019.

**Fraudulent Account Openings**

**Mr. Sloan, you testified that Wells Fargo reached out to more than 40 million customers through 246 million individual communications about potentially unauthorized account openings. In response to a question about how many customers responded to Wells Fargo's outreach efforts, you testified "[a] very small percentage came in to see us, notwithstanding our best efforts to contact everyone. And then to the extent that they weren't satisfied with what our offer was, we hired a mediator at our expense on their behalf and we've resolved all of those customers that have come in."**

2. **As of March 12, 2019, how many customers have responded to Wells Fargo's outreach about potentially unauthorized account openings?**

*Response:* See response to question #5 below.

3. **As of March 12, 2019, how many customers have elected to proceed to mediation about unauthorized account openings?**

*Response:* See response to question #5 below.

4. **As of March 12, 2019, what is the total dollar amount of remediation Wells Fargo has provided to customers who affirmatively approached Wells Fargo about unauthorized account but did not request mediation?**

*Response:* See response to question #5 below.

4

269

5.  **As of March 12, 2019, what is the total dollar amount of remediation Wells Fargo has provided to consumers who approached Wells Fargo about unauthorized account openings who requested remediation?**

*Response*: Since September 2016, Wells Fargo has asked any customer to contact the Company directly with complaints relating partially or entirely to the issues identified in the September 2016 CFPB consent order. Wells Fargo has paid over $30 million to customers to date in connection with our proactive remediation efforts and these complaints. This amount does not include the settlement in the *Jabbari* class action.

**Mr. Sloan you testified that Wells Fargo has changed its incentive plan at the Bank. A March 9, 2019 New York Times article reported that, "employees are urged to refer prospects to salespeople in the bank's mortgage or wealth management division, and some branch workers are eligible for bonuses if those referrals turn into sales . . . . In addition, most branch employees can get bonuses based on their branch's overall performance."[1]**

6.  **Under the Bank's current incentive compensation plan for bank tellers, is the number of referrals made by an employee that result in a sale a factor in determining the amount of a teller's bonus?**

*Response:* No.

7.  **Under the Bank's current incentive compensation plan for personal bankers employed at retail branches, is loan volume a factor in determining the amount of a personal banker's bonus?**

*Response:* Yes, loan volume is included as a component of a personal banker's incentive compensation opportunity. A personal banker is eligible to receive incentive compensation for all loan volume referrals that result in production. There are no minimum standards or goals.

8.  **Under the Bank's current incentive compensation plan for branch employees, is a branch's overall performance a factor in determining the amount of a branch employee's bonus?**

*Response:* Yes, performance metrics related to branch performance are included as factors in the determination of a branch employee's incentive opportunity. These performance metrics are measured at the respective branch level and are tied to the branch's overall performance. The metrics are related to Customer Experience, Branch Primary Customer Growth, and Household Relationship Balance Growth.

- **Customer Experience (CE):** performance is measured based on a survey that gathers feedback on the overall experience, satisfaction, and loyalty of the branch customers.

---

[1] Emily Flitter and Stacy Cowley, "Wells Fargo Says Its Culture Has Changed. Some Employees Disagree," New York Times (March 9, 2019), *available at*: https://www.nytimes.com/2019/03/09/business/wells-fargo-sales-culture.html.

270

- **Branch Primary Customer Growth:** performance is measured on the retention and growth of checking customers who use Wells Fargo as their main financial institution.
- **Household Relationship Balance Growth:** measures how we are satisfying our consumer and small business customer's financial needs through balance retention, acquisition, and deepening existing relationships.

**Mr. Sloan, you testified that the head of Wells Fargo's Community Banking division reported to you when you were the Chief Operating Officer at Wells Fargo from November 2015 to October 2016. On September 8, 2016, the Consumer Financial Protection Bureau (CFPB), the Office of the Comptroller of the Currency (OCC), and the City of Los Angeles Attorney's fined Wells Fargo Bank, N.A. ("Wells Fargo Bank" or "Bank") $185 million for opening millions of unauthorized deposit and credit card accounts without the consumers' consent or knowledge between January 1, 2011 to September 8, 2016.**

9. **When you were the Chief Operating Officer at Wells Fargo, were your aware of the Bank filing Suspicious Activity Reports (SARS) with the Financial Crimes Enforcement Network (FinCEN) related to the opening of unauthorized deposit accounts in the Community Banking division?**

*Response:* Wells Fargo has policies, procedures, and internal controls that are reasonably designed to comply with its legal obligations to monitor, detect, and report suspicious activities. Under Federal law, Suspicious Activity Reports ("SARs"), and any information that would reveal the existence of a SAR, are confidential, 31 U.S.C. § 5318(g)(2)(A)(i) and 12 C.F.R. § 21.11(k).

10. **Between January 1, 2011, and September 8, 2016, how many SARS reports did Wells Fargo file with FinCEN related to the opening of unauthorized deposit accounts in the Community Banking division?**

*Response:* See response to #9 above.

**2018 OCC & CFPB Consent Orders**

**On April 20, 2018, Wells Fargo entered into consent orders with the CFPB and the OCC for forcing auto-loan customers to take out unnecessary auto insurance and charging erroneous rate-lock extension fees to prospective mortgage-loan borrowers. Wells Fargo acknowledged that at least 27,000 of its customers may have had their vehicle repossessed following defaults arising from the additional costs of expensive and unnecessary insurance that Wells Fargo added to their loans. With respect to the improper rate-lock fees, 110,000 customers paid rate-lock fees averaging $1,012 between 2013 and 2017.**

11. **Did Wells Fargo discipline or terminate anyone in Bank management based on the 2018 OCC and CFPB consent orders?**

271

*Response:* The Bank takes these issues very seriously and has taken adverse employment action with respect to team members at all levels in response to operational risk and/or business operations deficiencies.

**12. Was the compensation of any senior Bank manager clawed back because of the 2018 OCC and CFPB consent orders?**

*Response:* Our Board has broad discretion to hold senior managers accountable through claw backs, forfeitures, and other compensation adjustments. The Board has exercised that discretion in the past and will continue to consider whether compensation adjustments are appropriate. For example, as we publicly disclosed, in response to unacceptable retail banking sales practices, the Board clawed back or caused to be forfeited approximately $180 million in senior management compensation, an amount that remains among the largest in corporate history.

**13. Based on the most current information, how many auto-loan customers that Wells Fargo forced to take out unnecessary auto insurance will receive remediation?**

*Response:* See response to #14 below.

**14. Based on the most current information, what is the total dollar amount of remediation Wells Fargo expects to provide to these auto-loan customers?**

*Response:* Under its collateral protection insurance remediation plan, Wells Fargo has identified approximately 863,000 accounts for remediation so far, with an estimated $415 million to be paid to the customers associated with those accounts. As this is an ongoing remediation, however, the number of affected customers and the dollar figures may change.

**15. Based on the most current information, how many of the approximately 110,000 Wells Fargo customers charged mortgage rate-lock extension fees between 2013 and 2017 will receive remediation?**

*Response:* See response to #16 below.

**16. Based on the most current information, what is the total dollar amount of remediation Wells Fargo expects to provide to customers charged mortgage rate-lock extension fees between 2013 and 2017?**

*Response:* Wells Fargo reached out to the customers of all 110,717 home mortgage loans with borrower-paid rate lock extension fees for extensions requested during the period of the September 2013 policy (from September 16, 2013 through February 28, 2017), and offered them a full refund with interest if the customer believed they should not have been charged. Wells Fargo did this even though its internal review suggested that most customers who paid rate lock extension fees were appropriately charged. Wells Fargo will pay the refund no questions asked, subject to no conditions or releases. Further, for customers Wells Fargo identified as having previously complained about a rate lock extension fee for an extension requested under the

272

September 2013 policy, Wells Fargo proactively issued them refunds with interest (or just interest, if the fee in question previously had been refunded); they did not need to ask for one.

To date, Wells Fargo has refunded more than $100 million to customers of approximately 100,000 mortgage loans (more than 90% of the affected population). The response rate to Wells Fargo's remediation outreach efforts was very high, though refunds are still available to customers who have not yet responded, and the remediation is substantially complete.

**Public Comments by OCC and Federal Reserve**

**As the hearing was concluding, the Office of the Comptroller of the Currency (OCC) issued a statement to the press, "We continue to be disappointed with Wells Fargo Bank N.A.'s performance under our consent orders and its inability to execute effective corporate governance and a successful risk-management program. We expect national banks to treat their customers fairly, operate in a safe and sound manner, and follow the rules of law."[2] Furthermore, the next day it came to light that you received $2 million in performance-based incentive pay for 2018, and total compensation of $18.4 million for the year. In reaction to that news being made public, a Federal Reserve Board spokesperson said, "The Federal Reserve does not approve pay packages. We expect boards of directors to hold management accountable."**

**17. What is your reaction to the OCC's comments that they are disappointed with your bank's performance under their consent orders, and your bank's inability to execute effective corporate governance and a successful risk-management program?**

*Response:* I have always been focused on meeting—and exceeding—the expectations of our regulators. This is absolutely essential and we cannot lose focus on the commitments we have made. I believe much progress has been made to improve our risk management, including in areas of compliance, incentive compensation, customer complaints, ethics allegations, and training, but there is additional important work yet to do.

**18. What steps have you taken in the past, and what additional steps are you taking to execute effective corporate governance and run a successful risk-management program?**

*Response:* Wells Fargo is dedicated to continuing to transform our risk management practices, and meeting and exceeding the expectations of our regulators. While we have more work to do to meet regulatory expectations, Wells Fargo continues to make progress against our action plans in response to our consent orders. Becoming the financial services leader in risk management is one of our six aspirational goals. We have made meaningful progress to enhance our governance and risk management, including in the following ways:

- Risk Management Framework: We have enhanced our Risk Management Framework, which transforms how we manage risk throughout the organization in a comprehensive,

---

[2] Kate Berry, "What's behind OCC's public rebuke of Wells Fargo?" American Banker (March 15, 2019), *available at*: https://www.americanbanker.com/news/whats-behind-occs-public-rebuke-of-wells-fargo

8

273

integrated, and consistent manner. Our risk management framework consists of our three lines of defense—(1) the front line which consists of Wells Fargo's risk-generating activities, including all activities of its four primary business groups and certain activities of its enterprise functions, (2) independent risk management, which consists of our Corporate Risk function, and (3) internal audit, which is Wells Fargo Audit Services.

- Hiring: We have hired new leaders from outside the Company in key roles, including a new Chief Risk Officer, Chief Compliance Officer, Head of Regulatory Relations, Head of Human Resources, Head of Technology, and Chief Auditor. Additionally, we continued to enhance the skills and expertise of our Corporate risk team by hiring 3,200 additional risk management professionals externally since 2016.

- Board: The Board has made significant changes to its leadership, composition, and governance practices. The Board has undergone significant Board refreshment and enhanced the skills and experience represented on the Board. A majority of the Board's independent directors having joined the Board since January 2017. The Board also has reconstituted the membership of several Board committees. Since September 2017, six of seven standing Board committees have new committee chairs. The Board also has reviewed committee responsibilities and amended committee charters to sharpen focus and reduce duplication in risk oversight. With respect to the Risk Committee in particular, the Board enhanced the Risk Committee's membership to include additional members with experience identifying, assessing, and managing risk exposure of large financial firms; consolidated oversight of the Company's Corporate Risk function and Company-wide risk management activities under the Risk Committee; and formed two subcommittees to assist the Risk Committee in connection with its oversight of compliance and technology risks. The Company has also enhanced reporting to the Operating Committee and the Board more generally. For example, members of the Operating Committee receive weekly reporting on concerns team members bring to the attention of executives and Board members, as well as a monthly dashboard that includes analysis and commentary related to customer complaints. The Company also enhanced oversight of conduct risk by centralizing the handling of internal investigations, complaints oversight, and sales practice oversight.

- Culture: We have taken significant steps to promote a workplace culture where team members are encouraged to raise concerns without fear of retaliation. All team members are accountable for risk management, we reinforce that expectation through ongoing communications and training, including our Code of Ethics and Business Conduct training that all team members are required to complete annually.

**19. How long have you been working to improve corporate governance and risk management at the bank, and how much longer will it take to implement further reforms to address the concerns of the bank's regulators?**

*Response:* We have been continuously working to improve corporate governance and risk management at the Bank, and we continue to make progress against our action plans to address issues under our consent orders with our regulators and meet regulatory expectations. We have

274

made, and continue to make, fundamental changes as we transform the Company. We have centralized many aspects of our organizational structure, strengthened risk management, and improved governance practices and oversight. While we have more work to do, we believe we are on the right path and making real progress.

**20. Do you agree with the OCC that national banks should treat their customers fairly, operate in a safe and sound manner, and follow the rules of law?**

*Response:* Yes. Every national bank should treat their customers fairly and operate in a safe and sound manner, and Wells Fargo is no different. Wells Fargo's commitment to excellent customer service is enshrined, amongst other places, in our Code of Ethics and Business Conduct: "We provide our customers and prospective customers with advice, service, and many products, and we are committed to making financial products and services available to them on a fair, transparent, and consistent basis, and to conducting business in a responsible manner." Mistreating or dealing unfairly with customers has no place at Wells Fargo We are committed to following all applicable laws, rules and regulations that apply to our businesses—that includes operating our national bank in a safe and sound manner

**21. What is your reaction to the Federal Reserve's comments that while they do not approve specific pay packages, they expect boards of directors to hold bank management accountable for their actions?**

*Response:* I agree that Boards of Directors should hold bank management accountable for their actions and I firmly believe that the Board of Directors of Wells Fargo has always, and continues, to do just that.

**22. Was the board of directors aware of the concerns your regulators have with the bank's inability to resolve requirements stipulated by the various consent orders the bank is under when it approved your 2018 pay package?**

*Response:* Our executives' compensation is approved by our Board's Human Resources Committee ("HRC") and is determined within a governance framework that is based on our compensation principles and includes consideration of risk management, absolute and relative Company performance, business line performance for business leaders, and individual performance. In assessing performance under the Company's compensation program, although the HRC and the Board recognized progress in various risk and other areas, the HRC and the Board also noted that more progress is required to meet regulatory expectations and achieve the Company's risk management objectives and that accelerated progress continues to be required.

The Company's compensation governance framework includes assessments of the risks that are part of executive compensation practices. For example, a high proportion our executives' compensation is structured as long-term, performance-based equity that remains at risk until payment, is forward-looking, contingent on financial performance and risk assessments, and subject to substantial holding requirements that extend beyond retirement to further support strong risk management practices. The Board has broad discretion to forfeit and adjust unpaid equity awards granted to our executives. Since 2016, the Board and its HRC have taken a

275

number of decisive actions to promote executive accountability as discussed in our 2016 and later proxy statements.

**Wrongful Foreclosures**

**In November 2018, Wells Fargo reported in its 3rd quarter 2018 10-Q that it wrongfully denied hundreds of mortgage loan modifications due to a "calculation error" in its underwriting software. According to Wells Fargo, its own internal investigation revealed that "870 customers were incorrectly denied a loan modification or were not offered a loan modification or repayment plan in cases where they otherwise would have qualified." The Bank further found that it had foreclosed on 545 of these customers after their loan modification was erroneously denied.**

**23. Has the number of customers affected by foreclosures resulting from the Bank's error changed since November 2018?**

*Response:* Because this is an ongoing remediation, Wells Fargo is still in the process of determining the final number of affected customers. To date, Wells Fargo has identified approximately 880 affected customers, although that number remains subject to further review.

**24. You testified that, in addition to providing $15,000 to each customer affected by foreclosure resulting from the Bank's error, Wells Fargo reached out to these customers "to come to see us and if there was additional harm that was done to them, we'll make it right." How many of these customers have approached Wells Fargo about additional compensation?**

*Response:* See response to question #25 below.

**25. For those customers affected by foreclosure resulting from the Bank's error, what is the total dollar amount of compensation that Wells Fargo has provided beyond the $15,000 initially provided to each affected customer?**

*Response:* Because this is an ongoing remediation, the number of customers approaching Wells Fargo about additional compensation, as well as the compensation figures, remain in flux. Compensation varies case-by-case based on individual circumstances. Wells Fargo remains committed to fully compensating affected customers.

**Add-on Products**

**In its most recent 10-K, Wells Fargo disclosed that, "[t]he Company is reviewing practices related to certain consumer 'add-on' products, including identity theft and debt protection products that were subject to an OCC consent order entered into in June 2015, as well as home and automobile warranty products, and memberships in discount programs . . . Sales of certain of these products have been discontinued over the past few years primarily due to decisions made by the Company in the normal course of business, and by mid-2017, the Company had ceased selling any of these products to consumers."**

11

276

**26. When did Wells Fargo stop selling credit-card add on products?**

*Response:* Wells Fargo has been discontinuing the sales of credit card add-on products over the past few years and ceased selling credit card add-on products to consumers as of May 2017.

**27. When did Wells Fargo stop selling home and automobile warranty products, and memberships in discount programs?**

*Response:* Wells Fargo stopped selling memberships in discount programs in September 2012. It stopped selling home warranty products in July 2013, and automobile warranty products in October 2016.

**28. To date, what is the total dollar amount of remediation provided to customers by Wells Fargo for its sale of credit-card add-on products?**

*Response:* See response to question #31 below.

**29. To date, how many customers has Wells Fargo remediated for its sale of credit-card add-on products?**

*Response:* See response to question #31 below.

**30. To date, what is the total dollar amount of remediation provided to customers by Wells Fargo for its sale of home and automobile warranty products, and memberships in discount programs?**

*Response:* See response to question #31 below.

**31. To date, how many customers has Wells Fargo remediated for its sale of home and automobile warranty products, and memberships in discount programs?**

*Response:* With respect to remediation provided to customers for the sale of add-on products listed above, Wells Fargo is working with regulators on plans to make affected customers whole. Thus far, Wells Fargo has distributed approximately $57 million in remediation to about 609,000 accounts. Additional remediation plans are ongoing.

**Mandatory Arbitration**

**Mr. Sloan you testified that Wells Fargo in certain circumstances enforces the mandatory arbitration provisions in the Bank's customer agreements.**

**32. In what circumstances does Wells Fargo enforce the mandatory arbitration provisions in the Bank's customer agreements?**

12

277

*Response:* Arbitration is never Wells Fargo's first step in resolving customer disputes and the bank does not use arbitration agreements for all consumer products. When a customer raises a concern, the Bank first tries to resolve the issue informally so that formal dispute resolution proceedings are unnecessary. This resolves the overwhelming majority of customer concerns. If the dispute cannot be resolved informally, arbitration is generally a faster and less expensive way to resolve the dispute compared to litigating in court. Wells Fargo's customer agreements provide that arbitrations be administered by the American Arbitration Association ("AAA"), a nationally known and respected non-profit organization.

Wells Fargo believes that arbitration is a fair, efficient, and effective forum available for a customer to pursue a legal claim and resolve a legal dispute through an impartial third-party. By resolving legal disputes through arbitration, both the consumer and the business have the ability to reach a positive resolution at a lower cost.

**33. How many arbitrations did customers file against Wells Fargo between January 1, 2013 and January 1, 2019?**

*Response:* Wells Fargo does not track its arbitration in a way that would make this type of information readily accessible. But its major administrator of consumer arbitration—the American Arbitration Association—provides data concerning arbitrations initiated over the last five years on a quarterly basis on its website. Its data indicates that customers filed 268 arbitrations against Wells Fargo businesses in the last five years. During the same period, the data shows that Wells Fargo filed 16 arbitrations against customers. (Note that this data reflects the second quarter of 2014 through the first quarter of 2019, and excludes employment arbitrations.)

Of the 268 cases where customers filed arbitration, only 19 cases contain information on prevailing party. Of these 19 cases, Wells Fargo prevailed in 12 cases, and the consumer prevailed in 7 cases. The majority of the cases does not include any information on the award. There are 21 reported cases that include how much the consumer was awarded. In 14 of these cases, the customer was awarded $0; for the remaining 7 cases the consumers were awarded a total of $377,384.

As for the 16 cases in which Wells Fargo initiated arbitration, there is no information on prevailing party for 12 of these cases. Wells Fargo was reported as the prevailing party in four of the matters. The majority of the cases have no information on award. Of the 16 cases, there are 4 reported cases that include how much the Bank was awarded. In 1 of these cases, the Bank was awarded $0. The total award for the other 3 cases was $24,556.

**34. How many arbitrations did Wells Fargo file against customers between January 1, 2013 and January 1, 2019?**

*Response:* See response to question #33 above.

**35. In arbitrations filed by customers against Wells Fargo between January 1, 2013 and January 1, 2019, how many times was the customer designated the prevailing party?**

13

278

*Response:* See response to question #33 above.

**36. In arbitrations filed by customers against Wells Fargo between January 1, 2013 and January 1, 2019, how many times was Wells Fargo designated the prevailing party?**

*Response:* See response to question #33 above.

**37. What was the total dollar amount awarded to customers who prevailed in arbitrations filed against Wells Fargo between January 1, 2013 and January 1, 2019?**

*Response:* See response to question #33 above.

**38. In arbitrations filed by Wells Fargo against customers between January 1, 2013 and January 1, 2019, how many times was the customer designated the prevailing party?**

*Response:* See response to question #33 above.

**39. In arbitrations filed by Wells Fargo against customers between January 1, 2013 and January 1, 2019, how many times was Wells Fargo designated the prevailing party?**

*Response:* See response to question #33 above.

**40. What was the total dollar amount awarded to Wells Fargo when it prevailed in arbitrations it filed against customers between January 1, 2013 and January 1, 2019?**

*Response:* See response to question #33 above.

**Debt Collection**

**Mr. Sloan, a March 9, 2019 New York Times article reported that at the Bank's large debt collection operation in Des Moines, "workers in December were expected to handle at least 30 calls an hour and recoup $34,000 in unpaid credit-card and other debts for the month. In January, the targets rose to 33 calls an hour and $40,000, goals that many employees there failed to attain, according to internal records."[3]**

**41. Are debt collectors employed by Wells Fargo expected to make thirty-three call per hour?**

*Response:* In our Card & Retail Services, Wells Fargo previously used a scorecard to assess and manage the performance of our debt collectors, which took into account certain metrics such as calls per hour or dollars collected. The target levels for such metrics were set based on historical

---

[3] Emily Flitter and Stacy Cowley, Wells Fargo Says Its Culture Has Changed. Some Employees Disagree, March 9, 2019, *available at*: https://www.nytimes.com/2019/03/09/business/wells-fargo-sales-culture.html.

14

279

trends and business goals. As of March 1, 2019, Wells Fargo suspended the use of this scorecard for purposes of performance management.

**42. Are debt collectors employed by Wells Fargo expected to recoup $40,000 per month?**

*Response:* See response to #41 above.

**43. Does Wells Fargo evaluate its debt collection employees based on the number of calls they make per hour or the amount of money they recoup per month?**

*Response:* See response to #41 above.

**44. Has Wells Fargo disciplined any of its debt collectors for not meeting a targeted number of calls per hour?**

*Response:* In Card & Retail Services, when a team member's performance declines and does not meet the expectation of the role, a manager will coach the team member on how they can improve their performance. If improvement is not shown, or shown to a satisfactory degree, the manager will begin the corrective action process. The corrective action process can include actions such as an informal warning, formal warning and/or final warning, and potential termination if the team member was not successful in improving performance. Before March 1, 2019, team members may have gone through the correction action process based on the scorecard, which took into account certain metrics such as calls per hour or dollars collected. The use of the scorecard for the purposes of performance management has been discontinued since March 1, 2019.

**45. Has Wells Fargo terminated any of its debt collectors for not meeting a targeted number of calls per hour?**

*Response:* See response to #44 above.

**46. Has Wells Fargo disciplined any of its debt collectors for not meeting a targeted collection amount per month?**

*Response:* See response to #44 above.

**47. Has Wells Fargo terminated any of its debt collectors for not meeting a targeted collection amount per month?**

*Response:* See response to #44 above.

**48. Describe all metrics that Wells Fargo uses to determine incentive compensation for employees engaged in debt collection.**

15

280

*Response:* As of April 1, 2018, for our Card & Retail Services, we increased the base pay for all our debt collectors and eliminated the use of incentive compensation for our employees engaged in debt collection activities.

**Student Checking Accounts**

**In August 2018, the CFPB's Student Loan Ombudsman Seth Frotman resigned after, as he alleged, his superiors suppressed a report investigating campus debit cards. That report was released to the public in December 2018. According to the report, students with active college-endorsed Wells Fargo accounts paid on average $46.99 in fees over a 12-month period during the 2016-2017 academic year, the highest of any bank that offers college-sponsored student bank accounts.[4]**

**49. For each year from 2016-2018, how much fee revenue did Wells Fargo generate from students holding a Wells Fargo college-endorsed account?**

*Response:* The Department of Education (DOE) requires schools to provide "the number of students who had financial accounts under the contract at any time during the most recently completed award year, and mean and median of actual costs incurred by those account holders." The schools rely on financial institutions to provide this information so that they can comply with the DOE regulation. However, because there is no uniform method for reporting this data, there appears to be inconsistency in the reporting methodologies among campus card providers and vendors providing other financial services that are subject to the regulation. Simply put, each financial institution decides how to provide what it believes to be the most accurate and transparent information.

For each of the 2016-2017 and 2017-2018 award years, Wells Fargo reported using a two-year cohort of accounts linked to campus IDs. This approach includes all customers with campus cards linked to financial account products such as checking accounts at any time during the two years prior to the reporting cut-off date. Because Wells Fargo does not ask schools to send us personally identifiable data about students that would allow us to monitor student status, the publicly-reported cost data provided to our school customers has not excluded former students whose ID cards or co-branded debit cards remain linked to Wells Fargo accounts after the students leave school. Similarly, because we allow nonstudent campus ID card holders, such as faculty and staff, to participate in the Wells Fargo Campus Card Program, we expect some nonstudent data to be reflected in the cost disclosures along with data about students and former students.

In addition, it appears that other providers may have used a narrower approach in their DOE reporting. For example, at least one provider appears to factor into its cost disclosures only accounts that were newly opened during the most recent award year. Had Wells Fargo interpreted the regulation to allow us to report only newly opened linked accounts, we would

---

[4] February 5, 2018 Analysis from Bureau's Office for Students and Young Consumers, *available at*: https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/bcfp_foia_letter-to-department-education_record_2018-02.pdf.

16

281

have reported far fewer active accounts, and our average fee per active account for the most recent reporting period would have been roughly $27 a year, which is more in line with our peer institutions (full service banking providers of campus card services).

Prior to choosing to bank with Wells Fargo and link their school ID to a Wells Fargo account, students are given simple and clear disclosures that outline the services and fees that come with their accounts. Customers who link their campus card to a Wells Fargo Everyday Checking account are not charged a monthly service fee for that account. With tools like automatic zero-balance alerts and 24-hour mobile and online account access, combined with service enhancements we have made to reduce potential fees – such as not charging an overdraft or return item fee on any transaction of $5 or less, and not charging an overdraft fee if an account balance is overdrawn by $5 or less – and our extensive ATM network offering no-fee cash access, our customers are well positioned to avoid fees. In fact, over 40% incurred no fees, almost 80% paid costs below the mean, more than 60% of students paid no ATM fees, and more than 80% paid no overdraft fees. Finally, with the changes in our program outlined below, we would expect further reductions in fees over time.

**50. Did Wells Fargo communicate with any CFPB or Department of Education officials regarding the CFPB report that was made public in December 2018?**

*Response:* No.

**51. What actions, if any, did Wells Fargo take in response to the 2018 report?**

*Response:* Wells Fargo is always working to improve how we serve our customers, including students who participate in our Campus Card program. We reviewed the public data studied by the CFPB, and have announced improvements to our Campus Card Program. Those improvements, which launched in March 2019, include: (a) one overdraft/non-sufficient funds fee refund per calendar month; (b) no fees for overdraft protection transfers from a linked savings account; (c) four withdrawals from non-Wells Fargo ATMs per monthly fee period with no fee from Wells Fargo; and (d) one incoming domestic or international wire fee refund per calendar month.

**52. Has Wells Fargo taken any actions to reduce the fees it charges college students?**

*Response:* In March 2019, Wells Fargo introduced several new benefits to its Campus Card Program to reduce fees for college students. These new benefits include: (a) one overdraft/non-sufficient funds fee refund per calendar month; (b) no fees for overdraft protection transfers from a linked savings account; (c) four withdrawals from non-Wells Fargo ATMs per monthly fee period with no fee from Wells Fargo; and (d) one incoming domestic or international wire fee refund per calendar month. In addition to these benefits, which are specific to the Campus Card Program, Wells Fargo is helping all its retail customers avoid fees with tools such as "Overdraft Rewind," automatic zero-balance alerts, and 24-hour mobile and online account access. We are also reducing potential fees by not charging an overdraft or return item fee on any transaction of $5 or less, and by not charging an overdraft fee if an account balance is overdrawn by $5 or less.

17

282

**Layoffs**

**In September 2018 Wells Fargo announced it planned to reduce its workforce by five to ten percent.**

**53. Since September 2018, how many employees has Wells Fargo laid off in the United States?**

*Response:* Between September 1, 2018 and April 9, 2019, Wells Fargo notified 3,391 team members that their positions were being eliminated. Of that total, approximately 810 team members have been reassigned to either short-term or permanent positions within Wells Fargo, and some portion of the short-term positions may become permanent as well. As a result, approximately 2,580 team members have been displaced from Wells Fargo since September 1, 2018. Wells Fargo currently has over 20,000 job openings, and is committed to working with displaced employees to find new positions within the company.

**54. Since September 2018, how many employees has Wells Fargo hired overseas?**

*Response:* 3,902.

**55. Since September 2018, how many employees has Wells Fargo laid off in its U.S. call centers?**

*Response:* Wells Fargo does not classify any team members as "call center" employees.

**56. Since September 2018, how many employees has Wells Fargo hired to work in its overseas call centers?**

*Response:* Wells Fargo does not classify any team members as "call center" employees.

**Congresswoman Joyce Beatty:**

**Question #1**

**In your 10-Q filing from August 2018, your company stated that "an internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010 and October 20, 2015, when the error was corrected." Additionally, the filing stated, "as a result of this error, approximately 625 customers were incorrectly denied a loan modification...in approximately 400 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered a loan modification, a foreclosure was complete." Wells Fargo later updated those numbers to 870 customers who were incorrectly denied a loan and your company had improperly foreclosed on 545 of these customers.**

18

283

**What explains the gap between identifying the error in October 2015 and disclosing the error nearly 3 years later in August of 2018?**

*Response:* Wells Fargo did not disclose the calculation error in the Home Preservation Application ("HPA") tool in October 2015 because a review of a sample of accounts at that time showed that the error had not harmed customers. In 2018, while reviewing an unrelated issue, Wells Fargo re-reviewed the HPA tool error and determined that, in fact, it had impacted loan modification decisions between April 2010 and October 2015. Wells Fargo then disclosed this information in its second quarter 10-Q filing in August 2018.

**Question #2**

**To increase diversity among head coaches and general managers in the National Football League, the league instituted the "Rooney Rule," whereby every team has to at least interview a minority candidate in the hiring process of a new head coach and general manager. Implemented in 2003 for head coaches and in 2009 for general managers, the Rooney Rule has been credited with increase diversity among NFL head coaches. For example, in the 12 seasons prior to the rule, the NFL had only six non-white head coaches, while the first 12 seasons the rule was instituted, the league added 14 coaches of color. Other organizations and corporations have taken notice of this diversity and inclusion strategy, including companies like Xerox and Amazon.**

**Can you discuss the role this rule, or similar ones have played within Wells Fargo?**

*Response:* In 2016, I instituted a new policy that essentially implemented the Rooney Rule at the Bank, which required a diverse slate of candidates *and* diverse interview panels for senior management and executive positions, two to five levels below the CEO.

**Question #3**

**One area of focus within the diversity and inclusion space that I am particularly interested in, that I don't thinks gets enough attention is the diversity of money. And what I am referring to when I say diversity of money are activities such as asset management.**

**Can you describe any initiatives at Wells Fargo to diversify your asset managers, investment advisors and any broker-dealer firms that Wells Fargo has a contractual relationship to help manage customers wealth?**

*Response:* The Wells Fargo Investment Institute (WFII) sources diverse-owned, as well as diversified asset management firms and strategies for its recommended list from a number of different sources, including proprietary and non-proprietary databases, industry contacts, and client referrals.

Additionally, WFII participates in a number of Wells Fargo sponsored events throughout the year for WFII, Wells Fargo Advisors (WFA), which is Wells' broker-dealer, business to meet with minority owned asset management firms to better understand their capabilities, and to discuss opportunities to join the Wells Fargo platform, including navigating our onboarding process. WFII's goal is to add eight more diverse owned asset managers to its recommended list in 2019.

19

284

Furthermore, the head of Wells Fargo's Global Manager Research business, Greg Maddox, is a member of National Association of Securities Association (NASP), and has presented at NASP events where he has discussed some of the access challenges for diverse owned asset managers and diverse financial services professionals in general. These have been informative and highly productive sessions. In addition, Hazlitt Gill from WFII spoke recently at a NASP event in San Francisco focused on diversity, inclusion, and access for diverse financial services professionals along with other senior leaders from two large California state pension funds and some California foundations. These types of events bring Wells Fargo manager selection leaders and analysts in closer and more regular contact with diverse owned asset managers and provides opportunities to explore partnerships and other engagement with small and large diverse owned asset management firms.

Finally, WFII believes that attracting and retaining diverse analysts is also important to establish a culture of equality and openness. The research team at Wells Fargo responsible for screening and selecting recommended managers for our clients is itself a diverse team (close to 50% are either a minority, female, or both), and has a goal of hiring more diverse analysts in the future.

**Congressman Jesús "Chuy" Garcia:**

1. **Wells Fargo paid a $1 billion fine last year for cheating car insurance customers. When it comes to fixing such problems, you initially indicated that you would go "above and beyond the actual financial harm as an expression of our regret for the situation." However, your regulator (the OCC) has flunked you on that effort. Earlier this month, *The Capitol Forum* reported that Wells Fargo has directed workers to slow-walk remediation, and in at least one instance, a manager reportedly instructed remediation workers not to research cases thoroughly. Is it time for you to hand this remediation effort over to a neutral firm that will prioritize paying customers back as quickly as possible? Would Wells Fargo consider having the remediation handled by a third party so that the new complications that have surfaced since 2017 can be addressed swiftly?**

*Response:* With respect to any issue that negatively impacts our customers, Wells Fargo is responsible for making things right. That applies to collateral protection insurance ("CPI") programs, as well as to any other issues we need to remediate. In some cases, it may be appropriate to involve third parties to assist us in those efforts while in other cases it may not be.

With respect to CPI in particular, Wells Fargo has used, and continues to use, third parties in developing and executing our remediation efforts. For example, third parties have helped us identify impacted customers and provide compensation. Additionally, we are using a third-party administrator to manage the process of contacting affected customers and sending checks to those who are owed money. We also have devoted significant internal resources to ensure our CPI remediation is carried out correctly and comprehensively. There was no top-down directive "not to research too deep" in order to not remediate customers.

We are confident that our remediation is reaching all impacted customers, and we are sending out remediation checks without requiring our eligible customers to take any action to receive compensation owed to them. Any customers that have questions can find information about our

285

remediation plan on our website, including contact information should they wish to reach out to us. We encourage them to come to us with any questions or concerns.

2.  **In December 2018, Wells Fargo agreed to a \$575 million settlement with all 50 state attorneys general for violation of state consumer protection laws, including improper charges for auto insurance loans. Illinois drivers comprise a considerable portion of the victims in these cases, and are owed nearly \$11 million in compensation as a result of this settlement. Yet according to a letter sent to the Senate Banking Committee last year, drivers in some states will need to submit evidence that they were pushed into unneeded insurance before proceeding with a full refund. In other states, complete and full refunds are being made with no questions asked. Why is Wells Fargo applying a different standard to drivers entitled to remediation in different states? What barriers exist to providing full refunds under a presumption that drivers were wronged, as Wells Fargo is reportedly doing in Arkansas, Michigan, Mississippi, Tennessee, and Washington? Are Illinois drivers not entitled to the same remediation as drivers in states where Wells Fargo is presuming drivers were wronged?**

*Response:* Auto loan agreements typically require borrowers to maintain physical damage insurance on the vehicle that is collateral for the loan. CPI is a product that protects auto lenders and customers from financial losses that would otherwise occur when a borrower's vehicle is damaged if the borrower did not have their own physical damage insurance.

Beginning in 2016, Wells Fargo identified several categories of customers who may have been harmed by CPI placements. One group involves customers who were potentially harmed by having CPI placed even though they had their own physical damage insurance. Another group involves customers in five specific states (Arkansas, Michigan, Mississippi, Tennessee and Washington) who did not receive disclosures that verbatim matched the model statutory language in those states.

We are tailoring our remediation to the precise impacts experienced by affected customers. Any customer who had duplicative CPI placed is automatically eligible to receive a refund of (a) fees that were assessed to the account potentially because of the duplicative coverage; (b) interest the customer paid to finance their CPI premium; and (c) any unnecessary CPI premium that has not already been refunded. Wells Fargo will also compensate these customers for the loss of use of their funds over time.

Additionally, any customer in one of the five abovementioned states who did not receive the verbatim disclosure language will receive a refund of CPI premiums and interest not previously refunded, as well as assessed fees potentially caused by the CPI placement. Even though Wells Fargo is not aware of any harm from the improper disclosure, we are providing remediation even if the customer did not actually have physical damage insurance at the time CPI was placed.

Finally, we will provide additional remediation if improper CPI placement could potentially have contributed to a loan default that resulted in the repossession of the customer's vehicle, or charge-off of the customer's loan on the Bank's books. Customers who experienced a

21

286

repossession are also invited to participate in an independent third-party mediation process at no cost to them if they believe the remediation amount is insufficient to address their situation.

Wells Fargo is eliminating burdens on customers where possible. For example, customers eligible for remediation will not need to take any action to receive a remediation payment. Where customer action is required, Wells Fargo strives to make customer action as simple and easy as possible (e.g., by only requesting minimal information necessary). For example, where our records reflect the customer actually needed CPI, the customer will be invited to submit the identity of their insurance carrier for the relevant time period so that Wells Fargo can evaluate eligibility for refunds if the customer had their own physical damage insurance. Wells Fargo is also delivering compensation and benefits to all impacted customers as quickly and consistently as practicable.

3. **What type of investment hedge instruments does Wells Fargo utilize on mortgages? Did any of the 545 homeowners who were improperly foreclosed on through a "software glitch" last year own loans in Wells Fargo's portfolio? Did you collect mortgage default insurance on the properties that were wrongfully foreclosed on, and if so, how much? Is Wells Fargo willing to share its information on mortgage default insurance, credit default, or derivative hedges against these particular mortgage borrowers? What types of investment hedge instruments (credit default swaps/or any type of derivative hedge type instruments) does Wells Fargo utilize against credit cards, student loans, auto loans/ insurance, mortgage and corporate/business loans, as well as on customer accounts?**

*Response:* No accounts were improperly foreclosed on through the HPA tool error, as the loans at issue were already in foreclosure at the time of the error. Wells Fargo owned the loans for ten of the customers impacted by the issue. Wells Fargo made an insurance claim on only one of those loans, for $15,000. Any other mortgage insurance would have been paid to investors who owned the accounts.

Like other financial institutions, Wells Fargo participates in credit swaps and derivative hedges in order to provide consistent and stable cash flows, to reduce risk exposure, and to reduce transaction costs. With respect to mortgages, Wells Fargo uses a variety of products to hedge risk, but it does not have any loan level hedges or derivatives that would apply to a customer account specifically.

**Congressman Ed Perlmutter:**

1. **How do Guaranteed Auto Protection (GAP) policies and premiums differ in the 11 states in which you issued refunds from the other 39 states?**

*Response:* In indirect auto lending, GAP products are sold by auto dealers to customers when they purchase a vehicle. Individual auto dealers choose which GAP products to offer to customers, and customers choose whether or not to buy them at the time of the vehicle purchase. Wells Fargo does not market or sell GAP to indirect auto lending customers. Auto dealerships

22

287

and the companies that administer the GAP product receive the amount paid for GAP following vehicle sale.

GAP offers customers additional protection beyond a standard automobile insurance policy. If a customer has an accident and the vehicle is totaled, GAP could help pay off the loan balance not covered by their primary insurance.

A number of states have laws regulating different aspects of GAP, and the GAP agreements vary to reflect the requirements of the state in which the GAP product is offered.

The question references the distinction between states in which Wells Fargo manages GAP refunds and states where dealers handle that process. The differences between these groups of states are based on differences in state law, not differences in GAP policies or premiums.

Customers may be eligible for a refund of a portion of the amount paid to the dealer for GAP when their loans end early (for example, due to early payoff or trade-in of the vehicle) or if there is a repossession. Beginning in June 2017, Wells Fargo took over management of issuing refunds to customers with GAP in the states with laws that require lenders to ensure that GAP refunds are made when customers' loans end early. Historically and today, the prevailing industry practice is for dealerships to handle this process. Since Wells Fargo implemented this process in June 2017, the process has expanded and now includes 11 states with laws that require lenders to ensure a refund (AL, CO, IN, IA, MD (for GAP insurance only), MA, NV, OR, TX, VT, and WI) (the "Minority Rule States") plus three additional states (NE, SC, and OK). In these states, Wells Fargo makes GAP refunds to eligible customers and seeks to recoup the refunds from the dealers that sold the GAP product. The 39 states which do not require Wells Fargo to ensure GAP refunds are made when loans end early are referred to as the "Majority Rule States."

**2. Approximately how much does Wells Fargo still owe in GAP refunds in the 39 states over the past five years?**

*Response:* Wells Fargo does not owe GAP refunds to indirect auto lending customers in the Majority Rule States. In those states, the responsibility for making the refund belongs to the auto dealer and GAP administrator who sold the GAP product and received the amount paid for GAP from which the refund is made.

**3. What percentage of GAP refunds does Wells Fargo issue to customers nationwide each year?**

*Response:* Wells Fargo's goal is to refund 100% of eligible customers in states where Wells Fargo manages the GAP refund process. Since Wells Fargo took over management of this process in June 2017, more than 56,000 GAP refunds have been issued following early loan payoffs. Wells Fargo also has enhanced its processes relating to GAP refunds following repossession in order to ensure that customers in states with laws that require lenders to ensure GAP refunds are issued those refunds.

23

288

4.  **You testified with respect to GAP insurance :**
    **"[The] transaction was actually a transaction between the customer and the auto dealer. We were not involved in the customer's decision to buy that insurance."**

    **I understand the original transaction is between the customer and the auto dealer. But by the time a customer pays off a loan that Wells Fargo bought from the dealer, hasn't Wells Fargo been assigned the dealer's obligations under the loan which includes the GAP addendum?**

*Response:* Typically, GAP products are structured as an addendum to the finance agreement, which is assigned to Wells Fargo for loans that Wells Fargo acquires from auto dealers. The obligations of Wells Fargo, the dealer, and the GAP administrator relative to GAP are governed by specific language set forth in the respective financing agreement and GAP addendum, by state law, and by the agreements between Wells Fargo and the dealer and the dealer and the GAP administrator. While certain obligations are assigned to Wells Fargo when it acquires a loan with GAP, under most GAP agreements, these do not include an obligation to make a GAP refund automatically upon early loan payoff. Some GAP forms used in Minority Rule States specify that the indirect lender must ensure the refund, consistent with state law. In these states, Wells Fargo makes GAP refunds to eligible customers as described in response to question #1 above regardless of the whether the GAP agreement specifically imposes this obligation on Wells Fargo.

5.  **You testified that in eleven states Wells Fargo refunds unearned GAP fees to the customer automatically when the customer pays off the loan. What is the purpose of requiring the customer to send a special notification demanding a refund when an early loan payoff is made in the remaining 39 states?**

*Response:* Wells Fargo does not draft the GAP agreements, but we understand that the purpose of refund request provisions in GAP agreements is to ensure that the party who has the refund obligation and who received the funds from which the refund is made is aware of the customer's request for a refund.

Wells Fargo manages the issuance of refunds to customers with GAP in Minority Rule States when those customers' loans end early, even though Wells Fargo did not sell GAP or receive the amount the customer paid for GAP. Additionally, Wells Fargo has enhanced its communications with customers and dealers in all states, to provide customers with information on GAP products purchased from dealers and to facilitate GAP refunds by auto dealers.

6.  **You testified that "it is not our responsibility to ensure that customers receive those [GAP] refunds from the dealers who receive that money – it never went through Wells Fargo." When a customer finances the GAP insurance and Wells Fargo buys that loan, which I understand is the norm, doesn't Wells Fargo collect the amount of the GAP insurance as part of the customer paying off the full amount of the loan?**

24

289

*Response:* In indirect auto lending, Wells Fargo acquires financing agreements originated by auto dealers. If a customer chooses to purchase GAP (or other products) from the dealer, the customer may choose to finance all or part of that purchase. The dealer and the Company that administers the GAP product, not Wells Fargo, receive the amount paid for GAP. Wells Fargo receives principal and interest payments on the loan.

7. **When Wells Fargo does a "hardship refinance" of a customer's auto loan, I understand Wells Fargo gives the customer a credit for the unearned GAP without requiring that customer to request a refund from the auto dealer or GAP administrator. It is my understanding Wells Fargo then goes out and collects the amount of the unearned GAP fee that it credited to the customer from the dealer or GAP administrator. Why doesn't Wells Fargo employ a similar process when a customer pays off the loan early?**

*Response:* In the situation you describe, if a customer with GAP seeks to refinance his or her loan, it is the customer's responsibility to cancel any aftermarket products with the dealer. In the states in which Wells Fargo took over the responsibility for ensuring refunds following early payoff, however, those refunds are issued automatically to eligible customers.

**Congresswoman Katie Porter:**

1. **Wells Fargo bought the Guaranteed Automobile Protection (GAP) loans in question in <u>Armando Herrara et al. v. Wells Fargo Bank et al.</u> Under the GAP Addendum, once Wells Fargo acquires the loan, it is the ONLY contracting party with the consumer and thus the only party with the contractual obligation with the consumer to refund the money.**

   **Because the cost of GAP is included in the loan, when Wells Fargo collects the entire amount owed on the loan, they are collecting the amount paid for GAP. While Wells Fargo may have a separate side deal with others to get reimbursed later, or to pay the refund on Wells Fargo's behalf, this does not change the fact that Wells Fargo is the party contractually obligated to ensure the consumer receives the refund.**

   **When a consumer purchases a GAP Addendum for their auto loan, does Wells Fargo agree that if the consumer's automobile is stolen or "totaled," then Wells Fargo will waive the difference (the "gap") between what the customer owes on the loan and what the customer receives from their insurance carrier?**

*Response:* In indirect auto lending, GAP products are sold by auto dealers to customers when they purchase a vehicle. Individual auto dealers choose which GAP products to offer to customers, and customers choose whether or not to buy them at the time of the vehicle purchase. Wells Fargo does not market or sell GAP to indirect auto lending customers. Auto dealerships and the companies that administer the GAP product receive the amount paid for GAP following vehicle sale. The obligations of Wells Fargo, the dealer, and the GAP administrator relative to GAP are set forth in state law, the financing agreement and GAP addendum, and in agreements between Wells Fargo and the dealer and between the dealer and the Company that administers the GAP product. The specific terms of these agreements vary. The prevailing industry practice,

25

290

which is reflected in these agreements, is for dealers to provide GAP refunds to borrowers, because the dealers are the party that sells the GAP product to customers, collects the amount paid for GAP following vehicle sale, and have a relationship with the GAP administrator. Historically, Wells Fargo followed the industry practice.

When we identified a deficiency in our controls around tracking of dealer refunds in 11 states with laws that require lenders to ensure a refund (AL, CO, IN, IA, MD (for GAP insurance only), MA, NV, OR, TX, VT, and WI) (the "Minority Rule States"), we took over the management of issuing refunds to customers with GAP products whose loans ended early in those states. In these states, Wells Fargo makes GAP refunds to eligible customers and seeks to recoup the refunds from the dealers that sold the GAP product. The claims in the lawsuit you refer to are based on plaintiffs' allegations that Wells Fargo is obligated to provide GAP refunds automatically in all states under the terms of the GAP agreements. They are not based on state laws that require Wells Fargo to ensure GAP refunds were made. We disagree with the allegations in that lawsuit that Wells Fargo engaged in any wrongdoing. While certain obligations are assigned to Wells Fargo when it acquires a loan with GAP, under most GAP agreements these do not include an obligation to make a GAP refund automatically upon early loan payoff. Some GAP forms used in Minority Rule States specify that the indirect lender must ensure the refund, consistent with state law. In these states, Wells Fargo makes GAP refunds to eligible customers as described above.

In response to your question, the terms of GAP are set forth in the GAP agreements, which vary in their particulars. Generally speaking, GAP waiver agreements provide that if the collateral vehicle is subject to a total loss, the lender will waive the right to collect on certain amounts which may be owed to the lender after payment of the total loss by the customer's auto insurance company. Again, the details of the benefits provided by GAP vary among GAP agreements.

**2.  Under the GAP Addendum, if the loan is terminated early, is the customer entitled to a pro rata refund of what they paid GAP?**

*Response:* As noted above, the terms of GAP are set forth in the GAP agreements and vary in their particulars. Many, but not all, GAP agreements provide that a customer may receive a partial refund of the amount paid for GAP if the customer pays off his or her loan early. Specific eligibility requirements and the details of how the refund amount is calculated vary among GAP agreements.

**3.  When a customer pays off a loan early, does Wells Fargo automatically provide the pro rata refund for GAP to the consumer?  Why or why not?**

*Response:* Historically and today, the prevailing industry practice is for dealerships to handle management of GAP refunds to customers following an early payoff. Since June 2017, Wells Fargo manages the process of issuing refunds to customers with GAP products whose loans ended early in the Minority Rule States, plus three additional states (NE, SC, and OK). In these states, Wells Fargo makes GAP refunds to eligible customers automatically and seeks to recoup the refunds from the dealers that sold the GAP product.

26

291

**4.  Why would a consumer be required to send a written notice to Wells Fargo that the loan has been paid off early as a condition for receiving the refund?  Doesn't Wells Fargo already know the loan has been paid off?**

*Response:* Although Wells Fargo does not draft GAP agreements, we understand that one purpose of refund request provisions in the GAP agreements, which commonly require the customer to request a refund from the dealer or GAP administrator, is to ensure that the party who has the refund obligation, and who received the funds from which the refund is made, is aware of the customer's request for a refund.

**5.  What percentage of customers request a GAP refund? Please provide data disaggregated by state.**

*Response:* In the states for which Wells Fargo administers the refunds, eligible customers whose loans end early receive refunds automatically. In most states, however, customers' requests for GAP refunds go directly to the auto dealers who manage the refund process, or to the company that administers the GAP product. As a result, Wells Fargo does not have data on the percentage of customers in these states who request a GAP refund.

**6.  Over the last 6 years, how much has Wells Fargo collected and kept in GAP fees?**

*Response:* As described above, in Wells Fargo's indirect auto lending business, GAP products are sold by auto dealers to customers when they purchase a vehicle and it is the dealerships and the companies that administer GAP products, not Wells Fargo, who receive the amount paid for GAP following vehicle sale. Additionally, in September 2015 Wells Fargo sold Warranty Solutions, a subsidiary of Wells Fargo Dealer Services, which administered GAP. This subsidiary would have received revenue from GAP sales, but because of the sale in 2015, data on the GAP fees received by Warranty Solutions is not available.

**7.  How much is the average GAP refund due? Please provide data disaggregated by state.**

*Response:* The table below provides the average GAP refund by state issued since Wells Fargo took over management of issuing refunds in June 2017.

27

292

| Origination State | Post June 2017 Average Refund |
|---|---|
| AL | $336 |
| CO | $202 |
| IA | $376 |
| IN | $210 |
| MA | $353 |
| MD | $211 |
| NE | $72 |
| NV | $504 |
| OK | $305 |
| OR | $480 |
| SC | $212 |
| TX | $652 |
| VT | $314 |
| WI | $294 |
| Total | $322 |

**8. Is Wells Fargo agreeing to provide GAP refunds in 11 states without written requests for refunds? Why not in the other 39 states, like California?**

*Response:* See response to #3 above.

**9. Is it true that there has been a nationwide class action filed against Wells Fargo in my district that is seeking to require Wells Fargo to refund the money in all 50 states? Is Wells Fargo planning on enforcing the class action waivers in Wells Fargo's arbitration provision to prevent that class action from going forward?**

*Response:* There is a putative class action pending in the Central District of California relating to GAP. No class has been certified. Wells Fargo has not filed a motion to compel arbitration. Wells Fargo has been informed that the plaintiffs intend to amend their complaint. Wells Fargo will assess the appropriateness of arbitration when we receive the amended complaint.

**10. If Wells Fargo enforces the class action waiver, would that will mean each individual consumer will have to file a separate lawsuit for $340?**

*Response:* Customers' loan agreements differ, and contain different avenues for potential relief.

**Congresswoman Ayanna Pressley:**

Mr. Sloan, I remain concerned over Wells Fargo's complete disregard for the growing gun violence epidemic across the country and continued ties with the National Rifle Association

28

293

and gun manufacturers. In the last year alone, there have been approximately 340 mass shootings.[5] In the Massachusetts 7th Congressional district, there have been nearly 2,200 gun violence incidents over the last 5 years.[6]

1. As I mentioned in the hearing, according to an article released in October 2018,[7] Wells Fargo was one of the largest financiers of the gun industry. Since 2012, Wells Fargo provided a $40 million line of credit for Sturm Ruger, a prominent manufacturer of assault style weapons. In answering my question about Wells Fargo's relationship with the National Rifle Association and gun manufacturers broadly, you stated that your company had divested from financing gun companies. However, this information was not included in your company's filings with the Securities and Exchange Commission (SEC) as filed most recently in September of 2018.[8] I respectfully request greater clarification about your statement and your company's ongoing relationship with the gun industry. Specifically, please provide further information on:
    a. Any banking services and products provided to the National Rifle Association.

*Response:* We have a declining banking relationship with the NRA. As has been reported publically, the NRA moved its credit relationship and maintains multiple relationships with other financial institutions around the country.

Wells Fargo is deeply concerned about gun violence and is committed to being an engaged partner in the dialogue about enhancing community safety. To that end, Wells Fargo has announced that it will invest more than $10 million over the next three years to support nonpartisan research on gun violence prevention in our communities and to fund scalable pilots in communities that explore potential enhancements to school safety. Wells Fargo looks forward to collaborating with others on solutions to address this important issue.

    b. Any banking services and products provided to the National Rifle Association of America Political Victory Fund.

*Response:* For confidentiality reasons, it is not our practice to comment specifically on the nature or terms of customer relationships, whether the customer is a consumer, a company or an organization.

    c. Any banking services and products provided to the National Rifle Association Special Contribution Fund.

*Response:* For confidentiality reasons, it is not our practice to comment specifically on the nature or terms of customer relationships, whether the customer is a consumer, a company or an organization.

---

[5] "Gun Violence Archive." Gun Violence Archive, 25 Mar. 2019, www.gunviolencearchive.org/
[6] Ibid.
[7] Mosendz, Polly. "Wells Fargo, the NRA's Bank, Doubles Down on Gun Industry." *Bloomberg* 5 Oct. 2018 Web. 25 Mar. 2019.
[8] Federal Election Commission, 25 Mar. 2019, http://docquery.fec.gov/cgi-bin/forms/C00053553/1260114/

29

294

**d.   Any banking services and products provided to the National Rifle Association Civil Rights Defense Fund.**

*Response:* For confidentiality reasons, it is not our practice to comment specifically on the nature or terms of customer relationships, whether the customer is a consumer, a company or an organization.

**e.   Any banking services and products provided to the National Rifle Association Freedom Action Foundation or any other National Rife Association affiliate.**

*Response:* For confidentiality reasons, it is not our practice to comment specifically on the nature or terms of customer relationships, whether the customer is a consumer, a company or an organization.

**f.   Any current and prior banking services and products provided to Sturm Ruger or any other gun manufacturing company.**

*Response:* Firearms manufacturers are among the hundreds of different industries that Wells Fargo banks. For confidentiality reasons, it is not our practice to comment specifically on the nature or terms of customer relationships whether the customer is a consumer, a company, or an organization. With respect to gun manufacturers, we have a strict due diligence process that monitors our customer's adherence to all state and federal laws in order to be a customer of the bank.

2.   **Please provide more detail on the size of your company's past investments in gun manufacturers over the past two years as well as the dates that you may have terminated your relationship with these companies including Sturm Ruger?  In your response, please include dates and documents related to the divestment from Wells Fargo or other related subsidiaries.**

*Response:* Wells Fargo Asset Management oversees $476 billion in assets under management (AUM), as of 3/31/19, for a broad range of clients, including investment professionals and institutional and individual investors. Of its total AUM, $89 billion is in equities. As an asset manager, we have a fiduciary duty to maximize long-term, risk-adjusted returns in light of each client's investment strategies and objectives. We do consider material ESG issues in the selection of investments, but we must evaluate these considerations in light of the client's stated investment objectives. Across all of our equity strategies, as of 4/18/19 we have $33 million invested in firearms and munitions manufacturers and retailers,[9] which represents 0.04% of our total equities under management.

3.   **How much did Wells Fargo make in overall profits from it's [sic] relationship with the National Rifle Association, any of its affiliates or any gun manufacturing companies?**

---

[9] Defined as at least 4.9% of total company revenues coming from firearms and munitions sales.

295

*Response:* For confidentiality reasons, it is not our practice to comment specifically on the nature or terms of customer relationships whether the customer is a consumer, a company, or an organization.

**Congresswoman Rashida Tlaib:**

**On page 100 of the 2018 Wells Fargo & Company Business Standards Report (available at (https://www08.wellsfargomedia.com/assets/pdf/about/corporate/business-standards-report.pdf), a number of tools for measuring and managing employee satisfaction are listed.  Questions below are provided to Wells Fargo CEO, Tim Sloan.**

a. **Please provide the Committee with summaries of the results of each of the following surveys for FY2016, FY2017, and FY2018 as described in the Business Standards Report: "Team Member Experience surveys," "Pulse surveys," and "Exit surveys."**

*Response:* Wells Fargo does not publicly share the results of the listed surveys.

b. **Please provide the Committee with a blank copy each of the following surveys for FY2016, FY2017, and FY2018 as described in the Business Standards Report: "Team Member Experience surveys," "Pulse surveys," and "Exit surveys."**

*Response:* Wells Fargo does not publicly share its surveys.

c. **Please provide the Committee with a summary of the following Wells Fargo metrics for measuring employee satisfaction for FY2016, FY2017, and FY2018 as described in the Business Standard Report: "completion of training courses," "percent of diverse workforce," and "voluntary team member attrition."**

*Response:* Wells Fargo does not publicly share these metrics.

**Please indicate whether members of Wells Fargo's executive leadership team are willing to meet with representatives of the Committee for Better Banks, made up of current and former Wells Fargo employees, to discuss employee satisfaction and workplace expectations and culture.  If yes, please provide the name(s) and contact information of the Wells Fargo employee who will arrange that meeting.**

*Response:* A Wells Fargo Human Resources leadership team met with team members affiliated with the Committee for Better Banks in June 2017. Since then, Wells Fargo executives have repeatedly expressed their willingness to meet again with team members affiliated with the Committee for Better Banks to discuss their concerns. Those team members have been in contact with Wells Fargo leadership and have all necessary contact information to arrange any future meetings.

31

○