# EXHIBIT Y

# House Financial Services Committee Holds Hearing on Wells Fargo

CQ Transcriptions

March 11, 2020 Wednesday

Copyright  2020 CQ-Roll Call, Inc.        All Rights Reserved

All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.

## Body

House Financial Services Committee Holds Hearing On Wells Fargo

March 11, 2020 10:00 A.M.

SPEAKERS:

REP. MAXINE WATERS (D-CALIF.), CHAIRWOMAN

REP. CAROLYN B. MALONEY (D-N.Y.)

REP. NYDIA M. VELAZQUEZ (D-N.Y.)

REP. BRAD SHERMAN (D-CALIF.)

REP. GREGORY W. MEEKS (D-N.Y.)

REP. WILLIAM LACY CLAY (D-MO.)

REP. DAVID SCOTT (D-GA.)

REP. AL GREEN (D-TEXAS)

REP. EMANUEL CLEAVER II (D-MO.)

REP. ED PERLMUTTER (D-COLO.)

REP. JIM HIMES (D-CONN.)

REP. BILL FOSTER (D-ILL.)

REP. JOYCE BEATTY (D-OHIO)

REP. DENNY HECK (D-WASH.)

REP. JUAN C. VARGAS (D-CALIF.)

REP. JOSH GOTTHEIMER (D-N.J.)

REP. VICENTE GONZALEZ (D-TEXAS)

REP. AL LAWSON (D-FLA.)

House Financial Services Committee Holds Hearing on Wells Fargo

DEL. MICHAEL F.Q. SAN NICOLAS (D-GUAM)

REP. RASHIDA TLAIB (D-MICH.)

REP. KATIE PORTER (D-CALIF.)

REP. CINDY AXNE (D-IOWA)

REP. SEAN CASTEN (D-ILL.)

REP. AYANNA S. PRESSLEY (D-MASS.)

REP. BEN MCADAMS (D-UTAH)

REP. ALEXANDRIA OCASIO-CORTEZ (D-N.Y.)

REP. JENNIFER WEXTON (D-VA.)

REP. STEPHEN F. LYNCH (D-MASS.)

REP. TULSI GABBARD (D-HAWAII)

REP. ALMA ADAMS (D-N.C.)

REP. MADELEINE DEAN (D-PA.)

REP. JESUS "CHUY" GARCIA (D-ILL.)

REP. SYLVIA R. GARCIA (D-TEXAS)

REP. DEAN PHILLIPS (D-MINN.)

REP. PATRICK T. MCHENRY (R-N.C.), RANKING MEMBER

REP. PETER T. KING (R-N.Y.)

REP. FRANK D. LUCAS (R-OKLA.)

REP. BILL POSEY (R-FLA.)

REP. BLAINE LUETKEMEYER (R-MO.)

REP. BILL HUIZENGA (R-MICH.)

REP. SEAN P. DUFFY (R-WIS.)

REP. STEVE STIVERS (R-OHIO)

REP. ANN WAGNER (R-MO.)

REP. ANDY BARR (R-KY.)

REP. SCOTT TIPTON (R-COLO.)

REP. ROGER WILLIAMS (R-TEXAS)

REP. FRENCH HILL (R-ARK.)

REP. TOM EMMER (R-MINN.)

House Financial Services Committee Holds Hearing on Wells Fargo

REP. LEE ZELDIN (R-N.Y.)

REP. BARRY LOUDERMILK (R-GA.)

REP. ALEX X. MOONEY (R-W.VA.)

REP. WARREN DAVIDSON (R-OHIO)

REP. TED BUDD (R-N.C.)

REP. DAVID KUSTOFF (R-TENN.)

REP. TREY HOLLINGSWORTH (R-IND.)

REP. ANTHONY GONZALEZ (R-OHIO)

REP. JOHN W. ROSE (R-TENN.)

REP. BRYAN STEIL (R-WIS.)

REP. LANCE GOODEN (R-TEXAS)

REP. DENVER RIGGLEMAN (R-VA.)

[*]WATERS: Thank you for your patience. Without objection, the chair is authorized to declare a recess of the committee at any time. This hearing is entitled Holding Wells Fargo Accountable: Examining the Role of the Board of Directors in the Bank's Egregious Pattern of Consumer Abuses. I now recognize myself for four minutes to give an opening statement.

Today, we receive testimony from Ms. Elizabeth Duke and Mr. James Quigley, who, until earlier this week, served as chair of the board of directors of Wells Fargo and Company and Wells Fargo Bank, respectively. Both have resigned after I called for their resignations following the release of a scathing majority staff report on Wells Fargo's compliance failures and their individual failures as board members.

But, the resignations do not absolve them of their failures. Directors at Wells Fargo and institutions across this country must understand that they're the last line of defense when it comes to protecting their company's shareholders, employees, and customers.

And while Ms. Duke and Mr. Quigley said they resigned to, "Avoid distraction," let me be clear, this is not a distraction. We're examining misconduct and dereliction of duty.

Over the past decade, Wells Fargo's board, management, and regulators have all failed to fix the company's internal control weaknesses that caused enormous harm for millions of consumers throughout the country. The majority staff's report examines Wells Fargo's compliance with five consent orders that require the company's board and management to clean up the systemic weakness that has led to widespread consumer abuses and compliance breakdowns.

As board members, Ms. Duke and Mr. Quigley were responsible for ensuring that Wells Fargo's CEO and other management executed an effective program to manage those risks.

However, the majority staff report found that Wells Fargo's board, number one, failed to ensure management could competently address the risk management of deficiencies, allowed management to repeatedly submit materially deficient plans to address consumer abuses, prioritize financial considerations, over fixing consumer abuses, and did not hold senior management accountable for repeated failures.

The majority staff's report also revealed attitudes and failures on the part of Ms. Duke and Mr. Quigley that are dismaying.

House Financial Services Committee Holds Hearing on Wells Fargo

When the Consumer Financial Protection Bureau included Ms. Duke's letters requesting actions from the bank, she responded by asking, and I quote, "Why are you sending it to me, the board, rather than the department manager?" This was surprising to CFPD officials and gives the appearance of a see no evil mentality from Ms. Duke. And an unwillingness to exercise the oversight required of her as a member of the board.

Mr. Quigley also did not appear to understand the gravity of his board responsibilities. When the Office of the Controller of the Currency wanted to schedule a meeting with the bank's directors to discuss, "Progress and accountability, " Mr. Quigley told other bank officials that he was, and I quote, "Currently scheduled to be away on vacation in some islands on those dates." And commented that, "The sense of urgency is surprising."

These statements were made after several public enforcement actions against Wells Fargo for massive consumer abuse scandals.

While Ms. Duke and Mr. Quigley have resigned, they must be held accountable for the dereliction of du--their duties and members of Wells Fargo's board.

So, I now recognize the ranking member of the committee, the gentleman from North Carolina, Mr. McHenry for four minutes.

MCHENRY: Well, thank you, Madam Chair. Thank you for holding this hearing. And I want to thank our witnesses for volunteering--voluntarily complying with the request of the committee to appear.

Today's hearing and the legislative proposals attached to it would make Rahm Emanuel proud. He once said you never want a serious crisis to go to waste.

Well, make no mistake, Wells Fargo has been in crisis mode for a while now. We'll hear more about the makings of that crisis today from our witnesses. They had a front row seat. They are part of the problem in many respects.

In that spirit, the democrats followed Rahm Emanuel's advice and rolled out policy proposals that would do everything from expand the scope of CFPB's authority to automatically downsize certain banks. And from--and from those proposals, it has complete lack of connection with the evidence before us in the example of Wells Fargo.

We found that with Wells Fargo, the problem wasn't that the CFPB lacked certain authority. The problem was that the CFPB ignored a series of red flags at Wells Fargo. That was under Richard Cordray's leadership of the CFPB.

We found the problem wasn't that Wells Fargo is too big to manage. The problem was it was deeply mismanaged. My colleagues on the other side of the aisle also have some ideas about the standards to which we should hold board members.

How about we start with a--the proper legal framework and the standards that shareholders and the courts use? So, let's start there. Let's walk through those.

Under the law, members of a corporate board of directors owe three fiduciary duties. The duty of care, the duty of loyalty, and the duty of good faith. Those concepts aren't very complicated.

Directors must be diligent. They must subordinate their personal interests beneath the interest of the company. And they have to act in the best interest of the shareholders.

Those standards make sense because at the end of the day, directors represent the interest of the shareholders. Shareholders expect the board to do three basic things.

First, hold management accountable. Second, push back when management provides incomplete or overly optimistic information. And third, make sure the company has the right leaders in place.

House Financial Services Committee Holds Hearing on Wells Fargo

It looks like, based on what we've heard yesterday from Mr. Scharf, the board might have finally got that last one right, the question of leadership. But, we have a lot of questions today about everything leading up to the board's decision to elect Mr. Scharf.

We need to hear why the board chose a company insider to lead Wells Fargo back in 2016. We need to hear why the board failed to recognize that management wasn't fixing the company's problems. And we need to hear why the board stood behind that management team for so long, until the Trump administration's regulators forced change.

I think there's a lot that we can learn to ensure that new decision makers deliver on the much needed changes to this institution. I look forward to your answers today about this history.

And thank you, Madam Chair, for hosting this hearing. And I look forward to the questions.

WATERS: Thank you very much. I now recognize the chair of the subcommittee on oversight and investigations, Mr. Green, for one minute.

GREEN: Thank you, Madam Chair.

Madam Chair, the evidence speaks for itself. I have an article-styled 35 bankers were sent to prison for financial crisis crimes. Bankers can go to jail. They can be held accountable. This is from CNN Business on April 28, 2016.

Many of these crimes involved relatively small amounts of money at smaller banks. Smaller banks pay a price. Big banks pay off the government. $3 billion in fines paid by Wells Fargo, a bank that has demonstrated that it will commit fraud. NBC News article, February 21, 2020.

I also have a--an article that's styled, violation tracker parent company summary. This is from Good Jobs. And the total amount of penalties that Wells Fargo has paid since 2000 amounts to $17,296,835,949. The evidence speaks for itself. Wells Fargo has been running a criminal enterprise.

WATERS: I now recognize the subcommittee's ranking member, Mr. Barr, for one minute.

BARR: Thank you, Chairwoman Waters and Ranking Member McHenry.

Ms. Duke, Mr. Quigley, you'll testify to the committee today in your capacity as former board members of Wells Fargo. Let me be clear about two things.

First, it's clear that the board made some mistakes. We heard yesterday how important new leadership is to the company and I think the board will also benefit from fresh perspectives.

Second, decisions about whether certain directors should continue to serve are for shareholders to make. Congress should not substitute its judgment for theirs. The chairwoman's call for the witnesses to resign was inappropriate. And I'm sorry you're here under these circumstances.

The Republican report highlights a series of missteps by Wells Fargo's board since 2016 and I will address those in my questioning short--shortly. But, right now, I wish to emphasize what the ranking member said yesterday. There are pressing issues affecting our economy that this committee should focus on. Instead, we are spending time, energy, and resources speaking to two former board members of a company whose CEO testified yesterday.

I yield back.

WATERS: I want to welcome today's witnesses. Until earlier this week, Elizabeth Duke was the chair of the board of directors of Wells Fargo and Company.

Prior to joining Wells Fargo's board, Ms. Duke served a number of positions, including as a member of the board of governors of the Federal Reserve System.

House Financial Services Committee Holds Hearing on Wells Fargo

Also earlier this week, Mr. James Quigley served as both a director of Wells Fargo and Company and as the independent chairman of Wells Fargo Bank. Concurrently, with his service as a director of Wells Fargo and chair of Wells Fargo Bank, Mr. Quigley served and continues to serve as the chairman of the board of Hess Corporation and director of the board of Merrimack Pharmaceuticals.

While Ms. Duke and Mr. Quigley no longer serve on Wells Fargo's board, it is my expectation that they will be forthcoming in their testimony and responses to members' questions today.

Without objection, all of the witnesses written statements will be made part of the record.

Before we begin, I would like to swear the witnesses in. Ms. Duke and Mr. Quigley, please stand and raise your right hand.

Do you solemnly swear to affirm that the testimony you will give before this committee in the matters now under consideration will be the truth, the whole truth, and nothing but the truth, so help you God? Thank you.

Let the record show that the witnesses answered in the affirmative. You may sit now.

Each of you will have five minutes to summarize your testimony. When you have one minute remaining, a yellow light will appear. At that time, I would ask you to wrap up your testimony so we can be respectful of the committee members' time.

Ms. Duke, you are now recognized for five minutes to present your oral testimony.

DUKE: Chairwoman Waters, Ranking Member McHenry, and members of the committee, thank you for inviting us to testify at today's hearing.

With heightened volatility in financial markets, a strong Wells Fargo is needed now more than ever. Transformational changes are getting traction inside the company with strong new leadership in management. I believe that today, the company has the right team and path forward to be fully deserving of the trust customers place in us every day.

Over the past several days, however, it became clear to my colleague, Jim Quigley, and me that the recent attention on our leadership of the board could hinder the ability of the company and its new CEO to turn the page and focus on the future. And this company must move forward.

For this reason, last Sunday, we informed our board colleagues of our decision to resign effectively immediately. We're confident that the board has all the necessary experience and skill sets to smoothly manage the leadership transition.

When I look at Wells Fargo today, I see a community bank that under Merrimack focuses on customers rather than sales. I see a fully transformed board with structural changes that improved the board's governance and effectiveness.

I see an executive management team that balances a new approach with institutional knowledge. I see a risk management team and a risk platform that is under construction from the ground up. And I see a CEO with the ability to execute on the significant remaining work necessary to meet the company's regulatory commitments.

Ever since the board learned the truth about what was going on inside Wells Fargo, it has been continuously and deeply engaged in understanding the problems and their solutions and insisting on action.

I served on the board committee that investigated sales practices. Not only was I appalled by the harm to customers, but I was sickened to hear our--how our employees were treated by their managers. I started as a teller and a new accounts representative and identified with those employees.

House Financial Services Committee Holds Hearing on Wells Fargo

Our investigation of sales practices was thorough and unfettered. Our attorneys conducted 100 interviews, reviewed interview notes from over 1,000 more, collected 35 million documents from over 300 custodians. We instructed them to brief regulators, government agencies, and the staff of this committee to assist in your own investigations.

The appendix in my written testimony provides a comparison of our findings and those of the OCC, the SEC, and the DOJ.

The work to truly and sustainably address the root causes of the problems we've discovered in the company has taken time to implement. More time than anyone anticipated and more time than any of us, especially the board of directors would've liked.

I get the frustration of this committee and our regulators; comes through loud and clear in your report. But I can assure you that nobody is more frustrated than we are that the bank has not yet satisfied the requirements of the consent orders we've entered into. As members of the--of the committee overseeing consent order work, Jim and I reviewed progress reports and grilled staff and management about every detail on a monthly basis, and we are confident the board will continue to hold management accountable until the job is finished.

Throughout our tenure on the board, however, we remain mindful that the board cannot supplant management in the administration of the enterprise. Consistent with widely-accepted principles of corporate governance, the board's primary responsibilities are to oversee the company's management and business strategies, to select a well-qualified CEO, to monitor and evaluate the CEO's performance, and importantly, not to micromanage the company's business, including in its day-to-day execution of the consent order requirements.

Recognizing the critical importance of the responsibility to select a well-qualified CEO, I appointed Jim to lead the CEO search that resulted in the hiring of Charlie Scharf. You heard from Charlie yesterday about his plans and timetables going forward. We know that our former colleagues on the board are determined to provide him the space and support to complete the work.

We are no longer able to speak on behalf of Wells Fargo or address the company's questions about the company going forward. We're also constrained by the scope of regulators' waivers of their confidential supervisory privilege. But within those limitations, we are here to answer your questions to the best of our ability. Thank you.

WATERS: Thank you. Mr. Quigley, you're now recognized for five minutes.

QUIGLEY: Chairwoman Waters, Ranking Member McHenry, and members of the committee. I'm here to share my perspectives as a former member of the board of Wells Fargo on the bank's commitment to its customers, to restore its brand, and to realize its aspirational vision and purpose.

As the committee is aware, I decided to resign from the board to permit the bank to turn the page and move forward with a focus on its future. I brought to my role as a Wells Fargo board member a deep conviction in the values of trust and confidence. I learned those from my parents, a forest ranger, and a schoolteacher. And I took them with me to Deloitte where I rose to become the CEO.

Restoring customer trust and confidence in Wells Fargo was our most important priority after we learned of the egregious sales practices. In her written testimony, Ms. Duke has detailed many of the transformational changes that the board has overseen in our efforts to do everything possible to ensure that similar problems never happen again. And while there's more to be done, undeniably, I believe Wells Fargo is making progress.

I'd like to highlight two changes that are particularly important to me. First, the board oversaw a huge investment to strengthen the compliance function of Wells Fargo. One of my roles at Deloitte was leading the manufacturing group, so I understand the importance of zero defects. I know why it's critical to do it right the first time, and I carried that thinking with me to my governance and oversight role at Wells Fargo. I wanted zero customer harm. And if it ever occurred, I wanted it detected through the bank's control and monitoring processes, and remediated as quickly as humanly possible.

House Financial Services Committee Holds Hearing on Wells Fargo

As you heard from Mr. Scharf yesterday, the bank's compliance teams have added more than 3300 employees since the end of 2017, more than doubling the size of that function in less than three years.

Second, the board encouraged and supported the changes in senior management of the bank, bringing new capability and stimulating cultural change. Since 2006, Wells Fargo has hired a new chief operating officer, chief risk officer, general counsel, chief auditor, chief compliance officer, head of HR, and head of technology.

I personally devoted much of 2019 to leading the search for a new CEO, and I'm confident that we selected the best candidate to lead the bank. Because I believe deeply in the critical role of culture in an organization like Wells Fargo, I was especially supportive of the culture Mr. Scharf is working to establish, one with clear priorities; best-in-class standards of operational excellence and integrity, a unified bank with clear line of sight across the business, accountability of management, and most important of all, a renewed commitment to completing the work of doing right by our customers and satisfying our regulators.

The cultural and structural changes that are necessary to address the bank's challenges are far-reaching. We believe that getting those things right and in a way that would provide lasting change ultimately serves customers and employees better than doing them quickly. I believe the changes we oversaw will make Wells Fargo stronger, more reliable, and more deserving of customer trust. And where--and while there's still more to do, I'm confident the company is moving in the right direction.

Because I'm no longer a member of the company's board, I cannot speak for the board today. I have my personal reflections, including the importance of distinct and separate roles for management and the board. The board must oversee the company's management and business strategies, but it cannot replace or do the job of management, and that principle was critical to me during my tenure at Wells Fargo.

In my testimony today, I must also respect the limits on my ability to disclose confidential bank supervisory information. The regulators have not provided full CSI waivers, and I need to be particularly careful to stay within the limits of the waivers we've received. Within those constraints, I look forward to answering the committee's questions.

WATERS: Thank you very much, and I appreciate your presence here today. Let me start by asking Ms. Duke, how many years have you served Wells Fargo on the board?

DUKE: Five years.

WATERS: Five years. Mr. Quigley, how many years?

QUIGLEY: Six.

WATERS: Six years. Are you compensated for serving on the board?

DUKE: Yes, we are.

WATERS: How much is your compensation?

DUKE: My compensation in the last year was somewhere around $630,000.

WATERS: 600 and how much?

DUKE: 30 thousand.

WATERS: 30 thousand. Mr. Quigley, how much was your compensation?

QUIGLEY: $417,000 last year.

WATERS: Thank you very much. I want to get into the majority staff's report. Ms. Duke, how did you prepare for today's hearing? Did you read the majority staff's report?

House Financial Services Committee Holds Hearing on Wells Fargo

DUKE: I did.

WATERS: Mr. Quigley, how did you prepare for today's hearing? Did you read the majority staff's report?

QUIGLEY: Yes.

WATERS: Ms. Duke and Mr. Quigley, you stated that you resigned from the board, quote, out of continued loyalty to Wells Fargo, and ongoing commitment to serve customers and employees, unquote, and to, quote, avoid distraction that could impede the bank's future progress, unquote.

Ms. Duke, Mr. Quigley, notably absent from your resignation announcement is any acknowledgment of responsibility for the multitude of board failures documented in the majority staff's report.

Do you disagree that as board chairs, you were responsible for the board's approval of poor quality consent order submissions and failure to hold ineffective leaders like former CEO Tim Sloan accountable? Ms. Duke?

DUKE: Thank you, Chairwoman. I--I believe wholeheartedly that we both spent the time, used our judgment, did the inquiries, and did our job as thoroughly and as completely as we possibly could. I--and made decisions in accordance with our best judgment about what was the best course of action for the company. Our role in reviewing the consent order submissions was, in reviewing them from a very high level, the--any of the deficiencies that were in the details of those submissions are the responsibility of management.

WATERS: Thank you. Are you aware that Wells Fargo has paid out $17 billion since 2008, I believe, on settlements because of fraud, wrongdoing, and other kinds of problems at the bank? Are you aware of that?

DUKE: I would take that to be true. I don't know the total dollar amount.

WATERS: Mr. Quigley, how were you made aware of each of these problems that ended up in the hands of our regulators, where Wells Fargo had to pay out these settlements? How did they come before the board? Did you know about each of them?

QUIGLEY: I was aware and was informed as a result of being the chairman of the audit committee, and the judgments that are required in preparing timely, reliable financial information, and the need to be able to estimate when an obligation is probable and measurable, and needed to be recognized in those financial statements. I was also a member of the risk committee and a member of the regulatory compliance and oversight committee, and management was transparent with us as those items were maturing and moving forward.

WATERS: Weren't you shocked when time and time again, you were confronted with these scandals that were being presented to the board, and they continued, right up through today?

QUIGLEY: The sales practice abuses were very troubling to me, and shocked perhaps is not an overstatement of how I felt when I was made aware that, in fact, those practices were something far more than had earlier been provided to us.

WATERS: So doesn't the majority staff report demonstrate your dereliction of duty as board chairs to ensure that the company submitted comprehensive plans that met all of the requirements of the orders? Do you take responsibility for that?

QUIGLEY: I absolutely agree with what Ranking Member McHenry pointed out on what is the duty of care and what is the business judgment rule, and how can a board member be properly informed on matters that are clearly management responsibility. I emphasized in my opening statement that I believe effective governance requires clear separation between management and the board, and anytime those lines get blurred, I believe the enterprise becomes less safe and less sound.

WATERS: So are you saying to me --

House Financial Services Committee Holds Hearing on Wells Fargo

QUIGLEY: And less accountability.

WATERS: --you do not consider it a dereliction of your duty to Wells Fargo's shareholders and its customers in dealing with these consent orders? You're trying to talk now about making sure that there are clear lines between the board and management, and separate yourself from some of the management responsibilities. Don't you think it was a dereliction of duties not to be on top of all of this?

QUIGLEY: I know what I've done as a board member of Wells Fargo, and I am comfortable with that work and the way that I performed that role. I did my very best. I could do nothing more, and the company deserved nothing less.

WATERS: Thank you. My time is up. And the gentleman from North Carolina, Ranking Member Mr. McHenry, is recognized for five minutes.

MCHENRY: So Mr. Quigley, you're in charge of the audit committee. There was never any question about the quality of the financial information provided. There's severe decision--severe negative consequences for management decisions made and board decisions, as it relates to management. So let's get to this question of fiduciary duty.

Ms. Duke, you're chair of the board, so I want to start with you. Mr. Quigley says that--the terminology I use on fiduciary duty for board members is approximately right; do you agree?

DUKE: I do.

MCHENRY: Okay. So that responsibility to ensure that the company is managed appropriately is a key component of that.

DUKE: That's correct.

MCHENRY: Okay. So the board's responsibilities under the consent orders that Chairwoman Waters was-- mentioned, the consent orders, what was the board's responsibility under the consent orders?

DUKE: The board's responsibility under the consent orders was to review and make sure that the submissions were submitted, and to review quarterly progress reports for submission to the regulators for the OCC and for the Fed. For the CFPB, the frequency was a little bit different, but it was the same responsibility.

MCHENRY: Okay. So what does it mean when a regulator rejects a submission made by the bank from material deficiencies?

DUKE: So it means that the bank has to correct those deficiencies, has to address those issues.

MCHENRY: So both the CFPB in December 2019--in December 2019 and the OCC in July of 2019 referred to deficiencies. It was based off the quality of the submissions. So did the CFPB ever reject the bank submissions?

DUKE: I don't remember receiving--

MCHENRY: The answer is yes. The answer is yes, they rejected--there's never been a submission to the CFPB that was fully accepted.

DUKE: We have never received non-objection from the CFPB on the consent orders that were submitted.

MCHENRY: Non-objection?

DUKE: That is the regulatory term.

MCHENRY: Sure. So it was the quality-- there were deficiencies in the quality of submissions; is that correct? Material deficiencies is the term. The answer is yes.

House Financial Services Committee Holds Hearing on Wells Fargo

DUKE: Yes.

MCHENRY: Okay. Did the OCC ever reject the bank submissions? Again, the answer is--

DUKE: Yes.

MCHENRY: --yes. Herein lies the problem. When the board and the board chair cannot answer this question, under the consent orders with the federal government that the board had a requirement to review these plans, I'm asking you a very basic question. I was going to--my hope was that I could get to my point here, and you won't even answer yes when it was clear that the board decision here, that there are material deficiencies from every one of your regulators in the submissions you had.

So let me move on. The Federal Reserve also rejected your submissions. I'm not going to ask for a response. The answer is yes. We'll move on.

So--and since you were a former governor of the Federal Reserve, I think that is of particular concern. So what efforts did the board make to remedy the deficient submissions?

DUKE: So we reviewed the submissions. We discussed with the regulators what the deficiencies were. We had--the management began to work on re-submissions. We reviewed those resubmissions. The resubmission to the Federal Reserve was submitted. It came back with portions of the consent order being put into three buckets: generally acceptable, partially acceptable, and not acceptable.

With respect to paragraph two, the paragraph that covers the board's effectiveness, there were--all of them were generally acceptable, with the exception of three which were partially acceptable. On paragraph three, there were several that were partially acceptable, I believe one that was generally acceptable, and two or three primarily around compliance and operational risk management that were not acceptable and are currently under resubmission. The paragraph two submission has--was resubmitted, I believe, in early February.

MCHENRY: Okay. So was there ever a sense of a question about the urgency of management to respond to the regulatory orders?

DUKE: There was never any question about the importance of the work in the company.

MCHENRY: Was there concern by the board about the speed by which management was responding to these orders?

DUKE: There was a great deal of concern by the board about the speed with which not only the orders were being responded to, but also the work to improve the risk management of the company and the quality of that work.

MCHENRY: So how do incomplete and late submissions reflect on the safety and soundness of your institution, of your former institution?

DUKE: They don't reflect well on them.

MCHENRY: Okay. So Wells entered into a $480 million settlement with shareholders in 2018; is that correct?

DUKE: That's correct.

MCHENRY: Okay. Can you help us understand the basis for that settlement? Okay, then let me help you with that.

DUKE: Okay.

MCHENRY: The bank and executives made misrepresentations and omissions about the bank's business model and sales practice.

House Financial Services Committee Holds Hearing on Wells Fargo

I have a lot of other questions here I wasn't able to get to. I have deep concern about just the responsiveness of the board. It's clear from the documents that the majority and minority have that we have the same findings of facts. There are severe deficiencies in management practices that were unique to Wells Fargo and unique failures of this board of directors. That's why we're having this hearing, even though you've both resigned.

So with that, thank you, Madam Chair, for hosting this hearing, and look forward to the questions.

WATERS: Thank you very much. The gentlewoman from New York, Ms. Velasquez, is recognized for five minutes.

VELAZQUEZ: Thank you, chairwoman and ranking member. Ms. Duke and Mr. Quigley, yesterday I questioned Mr. Scharf about the Federal Reserve's 2018 consent order. And listening to your answers to the ranking member, I just can't help but question the fact that you reviewed those plans that were materially deficient, but you concluded that they were acceptable and then you sent it. So was this on purpose?

DUKE: Excuse me, I'm sorry?

VELAZQUEZ: The fact that you sent acceptable but deficient materials, that plan that you sent to the Fed, did you-- did you do that on purpose?

DUKE: No, ma'am, no.

VELAZQUEZ: So paragraph two of the consent decree requires Wells Fargo to submit a plan that enhances the board's effectiveness in carrying out its oversight on governance of the bank. Ms. Duke, until Sunday night you were both--and Mr. Quigley--longtime board members of the bank. Don't you think submitting inadequate plans to the Fed shows the board's focus on profit, not on addressing the core operational risk management problems at the bank?

DUKE: I think the board and the company have been focused very intensively on the operational risk management of the bank. The requirements of the board--

VELAZQUEZ: So then explain how the Fed meeting minutes state that the Fed staff concluded you were primarily concerned with lifting the asset cap, even though you were unable to evaluate the degree of actual progress made by the bank on risk identification. Do you understand why this calls into question your commitment to the consent decree's requirement?

DUKE: My focus was on getting the work done to meet the requirements for operational risk management.

VELAZQUEZ: After the Federal Reserve rejected Wells Fargo April 2018 submission, Ted Craver, a director at Wells Fargo, sent you an email and questioned whether the plan missed the mark, and I quote, because Wells Fargo perhaps, and I quote, rushed the job in its deal to clear this hurdle, meaning the asset cap, quickly.

Given the comments in Mr. Craver's email, can you understand why regulators, legislators, and even consumers do not view the board's effort to comply with the consent decree to be genuine? Do you understand that?

DUKE: I do.

VELAZQUEZ: And Mr. Quigley?

QUIGLEY: Not different.

VELAZQUEZ: I'm sorry, I cannot hear you.

QUIGLEY: I said I also find that disappointing.

VELAZQUEZ: Disappoint--and what action have you taken to make sure that--?

House Financial Services Committee Holds Hearing on Wells Fargo

QUIGLEY: Paragraph two of the Fed consent order required significant changes in board effectiveness, and committee structures have been re--

VELAZQUEZ: So let me ask you, sir, what specific actions can you point to that you have taken to show that you are, in fact, committed?

QUIGLEY: We rewrote the charter for the audit committee, and we transferred risk management oversight that was causing some confusion between the risk committee and the audit committee, and we moved those paragraphs to the audit committee charter.

VELAZQUEZ: And are the regulators satisfied?

QUIGLEY: With respect to paragraph two, which was related to board effectiveness, the Federal Reserve has said that we are--we have been responsive there. And we've changed the committee structure--

VELAZQUEZ: Thank you. Ms. Duke and Mr. Quigley, I think it is clear to me, to staff at the Federal Reserve, and even other executive within Wells Fargo, that the priority of the two of you and the overall focus of the board was on lifting the asset cap and exiting the consent decree, and not actually fixing the risk management problems at the bank or holding senior management accountable. That is why you are here, and I am--and I will dare to say that probably, you will have to come back if you do not change the culture in the institution. I yield back.

WATERS: The gentlewoman from Missouri, Ms. Wagner, is recognized for five minutes.

WAGNER: Thank you, Madam Chairwoman. Ms. Duke, may I ask you to adjust your mic up a little bit? We're having a little difficulty hearing you.

DUKE: Oh, I'm sorry.

WAGNER: Thank you. Ms. Duke and Mr. Quigley, thank you for coming before the committee today to testify. Yesterday, we heard from Wells Fargo's new CEO, Mr. Scharf, about what steps he has taken in his first approximately six months to address the bank's deficiencies. While I remain cautiously optimistic that Mr. Scharf is the right person to move this business in the right direction, my questions today will be regarding your actions and, in some cases, lack thereof to address the myriad of deep-seated issues within Wells Fargo.

The committee's reports found that Wells Fargo routinely requests extensions to deadlines for submitting remediation and reform plans. Regulators typically grant those requests, but the bank's plans remain insufficient, even with the extra time.

Ms. Duke or Mr. Quigley, do you see differences between Sloan and Scharf's handling of the consent orders? Is there--meaning, I guess, is there a greater sense of urgency now with respect to regulatory compliance?

DUKE: So, first of all, I'd like to say that the missed deadlines that--that--that the regulators talk about our--are completely unacceptable and I--and I don't view those as acceptable. On the re-submissions and the--the--the feedback on them, I--I guess, I think about it because these are big, important pieces of work. I think about them similar to the first capital exercises that the Fed ran with CCAR, as well as, the--the submission of plans under the--the living will provisions, and those plans have gone through several iterations. There have been a number of banks, including Wells Fargo, whose original plans were not acceptable, and they've had to--to improve them.

WAGNER: Ms. Duke, was the board aware of the number of extensions that the bank requested in order to submit plans under the consent orders?

DUKE: The board was aware of any change in the--the plans for the consent orders themselves. I believe some of the comments about extensions had to do, not just with the consent orders, but with--with other work that was due to the agencies.

WAGNER: Did that re--raise any kind of concerns for the board?

House Financial Services Committee Holds Hearing on Wells Fargo

DUKE: It did. We spent, in our board meetings, they are now consumed with regulatory issues. So, we have now reporting not only to the board, but to a number of committees as to the status of not just the consent orders, but MRAs, MRIs, matters requiring attention that--that are also subject of regulatory--

WAGNER: So, that was a red flag that the consent order program was not working.

DUKE: So, I--let me give you this as an example. When Charlie came to the bank and we were reviewing his--the fir--the agenda for the first board meeting he was going to attend, and I--and we'd had long conversations with him about what we were doing, and I said, "Charlie, I apologize, there are no agenda items about the business, they're all about the regulatory situation". And he said, "I understand, that's where we are".

WAGNER: What--what about the fact the plans were repeatedly rejected? Knowing that, why didn't the board take more aggressive action with respect to holding management accountable for the deficiencies of the consent order compliance program?

DUKE: Well, there are a number of places where the people who were working on those submissions were changed. There--someone else was working on them, in particular, the ones that had to do with risk management. So, we got a new chief risk officer. We got a new chief compliance officer. We have been through for chief operational risk officers. So--so, it--we were changing out the people, looking for the people who could actually get the--the plans written in a--in a complete fashion.

WAGNER: Ms. Duke, the documents show you preferred the regulators to provide feedback directly to the heads of business lines. Yeah, help us understand why you did not want to hear from the regulators directly.

DUKE: So, I--I--I'd very much like to address that--that piece of the report. I have been in a regulated industry for all of my career. I've been in the regulatory agency. I have enormous respect for supervisors, examiners, and the work that they do. And I've been in constant contact with the regulators at the OCC and at the Federal Reserve. The individual there, we did meet with him on numerous occasions. I found him difficult, I found him not knowledgeable about what was going on in Wells Fargo, and I found that he sent--he did send us letters on details that really belonged somewhere else. But I should never have said, "Why are you sending this to me?" I know better than to do that and--and I apologize for that.

WAGNER: Thank you for that admission. I yield back, Madame chair.

WATERS: Thank you. The gentleman from California, Mr. Sherman, who is also the chair for the subcommittee on investor protection, entrepreneurship, and capital markets, is now recognized for five minutes.

SHERMAN: The nation was shocked by the behavior of Wells Fargo. But what's equally shocking is that Wells Fargo seems uninterested in atoning for what it did. Was there any discussion at the board, Ms. Duke, of being on the right side of history and instructing your lobbyists to lobby in favor of the overdraft protection act so that you could do something good for the consumers of the country having--having ripped them off by the tens of millions? Yes or no, was there discussion of supporting that act?

DUKE: In the board meeting, we've discussed overdraft programs, but we've not discussed any discussions with lobbyists--

SHERMAN: --But you did not discuss what your lobbyists do in Washington which affect not just your customers, which might be one in 10 or one in 20 Americans, you didn't even discuss the idea of being on the right side of history for all the consumers. Did you discuss whether you should assert the rights under the arbitration provisions so that the arbitration provision kept somebody out of court for the phony account when they only signed it for the real account? Was that discussed in the board?

DUKE: We did not. Or--

SHERMAN: --Well, it sounds like the board is terribly disinterested in atoning for the harm done to consumers in general in the country, or the particular consumers that were consumers of the bank. But let's shift from the

House Financial Services Committee Holds Hearing on Wells Fargo

outrageous of the past to the crisis of the president. The stress test is designed to deal with what happens when you have a catastrophic event in the economy because we know that, every year, there's some chance that such an event might occur. But once one event occurs, that does not diminish the likelihood of a second event occurring.

So, we've had one called the coronavirus, you could almost call it a two, the decline in oil prices which has shook up a bit by the economy. That means we could very well have a third, it's no more likely or less likely that something else that you did the stress test for would occur. Every dollar of dividends you pay or stock buybacks that you do makes the bank less able to deal with these catastrophes. You testified that America needs a strong Wells Fargo in today's economy. You put together, at the board level, back in July, a stock buyback and dividend program. Did that program anticipate what you would do if the country had one--call it 1 1/2 catastrophes that could affect the bank and the economy and could very well have another one?

DUKE: I believe the design of those stress tests actually does that so, within the stress test, there are not only changes in the economy and--and economic variables, but also plugged into it are assumptions about different risk events.

SHERMAN: So, the--the--the boa--the board is coro--you were still on the board when the coronavirus hit, you were there a couple days ago. You believe a strong Wells Fargo is needed for our economy and that you have a national duty to provide a strong Wells Fargo. And after the coronavirus broke, did you have discussions of ending or scaling back your stock buy--back--buyback program?

DUKE: So, I have not attended a board meeting since then. But I--I, you know spend a lot of--

SHERMAN: --Well, I would assume this being a national--

DUKE: --time thinking about--I--I did speak with--I did speak with Charlie about the actions the company was taking internally, the--the--

SHERMAN: --How about the stock buyback program? The weakening the bank, endangering the nation because you are too big to fail, in order to enrich the management by keeping the stock price up? No discussions of that since this epidemic arose?

DUKE: The design of the stress test on capital are to include the effects of unforeseen events--

SHERMAN: --But once you have one of unforeseen event, then it's much more likely wh--that you--that she'll end up with sev--well, once you--you plan for one or two or three. Once you have one, then the likelihood of four increases because you already have one. And you're saying this coronavirus, you never thought about doing anything to diminish the payments to shareholders?

DUKE: So, I--I joined the Federal Reserve in August 2008. I am very much aware of the risks to banking. I know absolutely what it looks like when a run on a bank starts. I know, once it starts, how difficult it is to withdrawal--

SHERMAN: --So, we're just--

DUKE: --I know how important capital is to the--

SHERMAN: --So, you know all these things--

DUKE: --I know how important liquidity is--

SHERMAN: --when we have a change in circumstance, you'd think we'd have a change in policy unless only the interests of management matter to the director--to the directors. I yield back.

WATERS: The gentleman's time has expired. The gentleman from Kentucky, Mr. Barr, is recognized for five minutes.

House Financial Services Committee Holds Hearing on Wells Fargo

BARR: Thank you, Madame Chairwoman. Ms. Duke and Mr. Quigley, I admit I'm somewhat amused by my Democrat colleague's demand that you change the culture at Wells Fargo, otherwise, you'll have to come back to this committee. I'm amused because you both have resigned from the board as of last Sunday, and you are no longer in a position to make any changes at the bank. I think it's clear that the majority wants only to embarrass you and continue their persistent defamatory, anti-bank rhetoric. But since you're here, let's look to the past, let's look to your service on the board in the past, which I think you can testify about.

The Republican report provides evidence that you and your fellow board members understood the regulators' frustration with Mr. Sloan, yet, he remained in place. So, let me just read to you specifically from that report. The report says that the evidence shows that Sloan and his team provided incomplete and exceedingly optimistic information to Congress, the public, and the board of directors. Wells Fargo was no closer to complying with the regulators' consent orders when Tim Sloan resigned in March 2019 than when his team took over in 2016.

What troubles me the most is that it's--the report finds that, between 2016 and 2019, the company routinely submitted incomplete plans to the regulators and missed deadlines. The submissions were fr--frequently late or incomplete or both. So, my question is, why did Mr. Sloan remain as CEO for so long during that course of--of an incomplete compliance program?

QUIGLEY: I would just want to emphasize that our assessment of Mr. Sloan and his performance collected many, many data points from lots of places, and it wasn't reliant solely on representations that he might make. I acknowledge that he led as a glass half-full type of leader and he had a sense of optimism. I also had regular, and many times during the past year, daily communications with our regulators. And so, I understood what they're thinking was and that helped me in my oversight of him and his performance as our CEO and the HRC committee because they were concerned about wanting to drive accountability deeper into the culture revised our performance management system so that, in order to qualify for a bonus, you had to have made significant progress on regulatory matters.

BARR: Ms. Duke? Well, let me move on. Let me ask you this, the--the Republican report also shows very clearly that the regulators under the Obama administration were asleep at the switch. Federal regulators identified issues related to Wells Fargo's sales practices as early as 2009. Unfortunately, it took an "LA Times" article to bring it to their attention years later. And even then, under Director Cordray and other regulators, they dragged their feet.

In contrast, regulators under the Trump administration have taken decisive action to correct the mistakes that the bank, including implemented--implementing an unprecedented asset And calling for sweeping changes to the bank's risk management. Ms. Duke, do you believe that the actions by the Trump administration financial regulators, including the imposition of the asset, were appropriate and fair given the gravity of the abuses and the need to send a message to management?

DUKE: I don't disagree with any of the actions of our regulators.

BARR: I was encouraged yesterday to hear Mr. Scharf speak about the urgency and the focus on the consent orders and dealing with the consent orders. You know, he--he testified yesterday that, resolving the regulatory matters was his top priority. Do you feel that was the case under Mr. Sloan?

DUKE: I feel like resolving the issues that led to the--to the consent order, so, resolving the weaknesses in operational and compliance risk management were the priority across the company. But I do applaud and appreciate Mr. Scharf--Charlie's emphasis on getting this work done. It's one of the reasons that we were so happy to hire him. And I--I think his jo--(INAUDIBLE) his job is not going to be easy. And I think he needs the full support of the board and he needs to be able to put his full attention on doing that.

BARR: Well, my time is expiring, but I was impressed by Mr. Scharf's testimony as well. And more than just his testimony, the fact that he is making these changes and bringing in outside leadership, there's been dramatic changes that have--that have taken place there, and I--I wish him well. I yield back.

House Financial Services Committee Holds Hearing on Wells Fargo

WATERS: The gentleman from New York, Mr. Meeks, who's also the chair for the subcommittee on consumer protection and financial institutions, is recognized for five minutes.

MEEKS: Thank you, Madame Chair. Let me ask both of you, Mr.--Ms. Duke and Mr. Quigley, you have accountability, right, as being board chairs or on the board? There's accountability that you have?

DUKE: Yeah.

MEEKS: CEOs have accountability, correct?

QUIGLEY: Yes.

MEEKS: Okay. Mr. McHenry said that the responsibility is care, loyalty, and good faith. So, the first questions I would have is, is there any loyalty to your custer--customers? Do you have, as a board members, was their loyalty there? Or just to the stockholders or the shareholders, and those individuals who were employed by the company? What--what's that loy--any loyalty goes to the customers?

QUIGLEY: Use of the term duty of care, duty of loyalty, business judgment rule, all of that is grounded in Delaware law and relates to the Companies Act and the relationship between the board and the shareholders who elect us to represent them.

MEEKS: But I'm asking you as a member of the board--

QUIGLEY: I absolutely have a sense of loyalty and a sensitivity related to all stakeholders that an enterprise touches (PH).

MEEKS: Okay. So here's my question. And, you know, up until when you first were asked to come here you were on the board, so I want to talk about those things that took place while you were on the board to make sure. So you were on the board, if I'm not mistaken, in September 2016. That's correct?

QUIGLEY: That is correct.

MEEKS: Okay, so you were there when there was the fake account scandal. You were on the board again in 2016 when it was--came out that it was improperly repossessing service member cars. You were on the board in December '16 when Wells Fargo fails in its living will test. You were on the board--both have some accountability (PH)--in March 2017 when there were more fake accounts. You were on the board again when Wells Fargo flunked community lending tests. You were on the board in April 2017 when the whistleblower won a $5.4 million decision and got his job back.

You were on the board in August 2017 when the lawsuit over overcharging small business retailers. You were on the board in February 2018 when the Federal Reserve restricts your size. You were on the board in February 2018 also when the Sacramento sued the Wells Fargo over discrimination against black and Latino borrowers. You were on the board on March 18th (PH) when the wealth management investigation emerges. You were on the board on April 20--on April 2018 when there was a $1 billion settlement for mortgage locks and auto loan issues.

So you were on the board on May 2018 authoring business information without client knowledge. You were on the board on May 2018th (PH) when $480 million to settle securities fraud lawsuit. You were on the board in June 2018 when the SEC fined for lending investors astray. You were on the board in July 2018 when refunds (PH) over ads like pet insurance and legal insurances. You were on the board in July 2018 private bank wealth management issues.

And I could keep going on, but I'm running out of time. I'd probably run out of time before I talk about all of the things that took place at Wells Fargo when you were on the board and chair of the board and supposed to have some accountability. And doing all of this, my question then would be, you know, in December 2015, you know, when the feds came back there were changes made to the composition. Were there changes made to the composition of the Wells Fargo board in response to the fed's concerns back then?

House Financial Services Committee Holds Hearing on Wells Fargo

You don't have to answer that because I know, no. There was none except for one board member who retired. The company nominated its entire 2015 board for reelection in 2016 when all this was going on. Did Wells Fargo change its CEO? Did the board change? I'll answer for you, no. The chairman and CEO John Stumpf (PH) retired a year later in October 2016 in the wake of the sales fraud scandal, and only after he had offered unsatisfactory testimony before us. That might be why you resigned before you came to us. How about the chief risk officer? Did you find-- did Wells Fargo find a new chief risk officer in response to the fed's concerns about a week risk culture at the company? I'll answer for you again, no, Wells Fargo then chief risk officer, Mike Loughlin, continued to serve in that role through his retirement in mid-2018 and claimed that the company should not donate to charity unless regulators acted more favorably towards Wells Fargo. In fact, in response to the fed's concerns going back to 2015, Wells Fargo's culture was the source of its risk management problems, and Wells Fargo made no changes. You made no changes.

WATERS: The gentleman from Missouri, Mr. Luetkemeyer, is recognized for five minutes.

LUETKEMEYER: Thank you, Madam Chair. I want to follow up a little bit on Congressman Barr's comments with regards to the Republican report and information in there and go back to where I think some of the problem started here, for the fact of not being able to recognize it. And it really concerns me from the standpoint that, you know, you go back already to 2009 when it shows that the regulators indicated there was a problem with some of your employee sales tactics. And then in 2013 the Los Angeles Times ran a story on--leading to ethical breaches at Wells Fargo. And then in 2014 in December they broke the story that eventually broke everything out.

And so my question is--I think, Mr. Quigley, you were on the board for all that period--most of that period of time. And I think, Ms. Duke, you came on very shortly thereafter or right around that period of time. What was your reaction to the news story at that point?

QUIGLEY: We were appalled by the claims in that story.

LUETKEMEYER: And what action did you take to find out other information or stop the practice?

QUIGLEY: The risk committee asked the leader of the community bank to come to the committee and explain what had been asserted.

LUETKEMEYER: Well, you know, Mr. Stumpf was in here during that period of time, and I asked him point-blank because he was firing about 1000 people a year over a five-year period and kept it up--I kept asking him; I said, why have you not changed the culture in your bank because you keep firing people and say well no, fixing it. No, you're not fixing it if you keep firing 1000 people every year. I mean, that's not fixing it. You should fix it so you don't have to fire anybody, so everybody's doing the right thing. So did that not send up some red flags for you when he kept firing people and nothing changed?

QUIGLEY: The board was not aware of the pace of those terminations that you're referencing until the testimony that Mr. Stumpf gave in September 2016 and we read the materials that he was going to be providing to this committee. That was the first time that the magnitude of those sales practice violations became something to the board, and the board then acted decisively, and that's when we commenced the special investigation to do the root cause analysis. And the incentive compensation plan in the community bank was then terminated, as was the leader of that bank.

LUETKEMEYER: Well, that's fine, but then according to the--our report here, it says the chief risk officer that joined the Wells Fargo in 2018 showed that the company lacked the capacity to detect and fix problems compared to its competitors, which means you got a bit different business model, a different management style, which is fine as long as it works, but apparently it wasn't working.

So was the board concerned--and according to our report here it indicates that their concerns were dismissed by that individual. They were not believed (PH) that--do you believe your executive officer, Mr. Sloan, over the risk management committee's report apparently. Did that not strike you as kind of concerning that the risk committee

House Financial Services Committee Holds Hearing on Wells Fargo

says we need to be changing management style, and yet there was a conflict there? Did you not--did you take sides? Apparently you did on this.

QUIGLEY: I'm sorry that I sort of lost the--

LUETKEMEYER: Okay.

QUIGLEY: --the track (INAUDIBLE)--

LUETKEMEYER: My question is you have--

QUIGLEY: The federated model (INAUDIBLE)

LUETKEMEYER: --you have a different management style than most banks your size, and there was concern about that style with regards to those risk officers you hired in 2018 who apparently resigned in 2019. Did that not concern you at the time that there was a pointing out of this problem, and yet the executive officer seemed to say we're okay; our management style is fine? So apparently you took sides in the situation and chose your executive officer over your risk management team and said we need to change the way we're going and what we're doing, how we're doing business here. Can you give me a rationale on why you did that?

QUIGLEY: There's no question that we had to build an independent risk management structure as we were transitioning from and trying to make part of our--what the old Wells Fargo was, that federated model. When the risk management sat inside that line of business, we did not have independent effective risk management, and we did not have the right issues being escalated. And so I'm pleased with the progress that was being made to build out that independent risk management group. And as the chairman of the compliance subcommittee of the risk committee, I worked very closely with our chief compliance officer, and the significant dramatic addition of resources and new capability that was coming to the bank to build that independent risk management function.

LUETKEMEYER: That answer leaves me wanting more, but my time is out. Thank you. I'll yield back.

WATERS: Thank you. The gentleman from Georgia, Mr. Scott, is recognized for five minutes.

SCOTT: Thank you, Chairlady. This has been an interesting and yet very disturbing hearing. And let me tell you why. Something is rotten in the cotton here. You all are not coming with the truth. On yesterday we spoke with your chief executive officer. He had an excuse. He's only been around for four weeks. You brought him in. But you two have been on this board throughout the entire germination of this shameful attack on the trust and confidence of the American people in your bank.

Now, first of all, you all allowed, while you were on the board, you allowed the bank's management to repeatedly submit material that was deficient in response to the consent orders from our regulators. You did that. You did not hold your management accountable. Don't you know if I was sitting on the board of directors and I'm making $400,000 as you, $600,000 as you of this money, I would be much more plainful (PH). What? You mean the Federal Reserve is coming in and laying the blame? They did, directly at the feet of the board, saying you're not holding management responsible.

Who came up with this idea to make up accounts, make them up, false accounts? Not one or two people, millions, and you all sat on that board and you said nothing. You did nothing. The answer has to be--we have to find the answer from you today. Why did you allow this rabid conflict with the American people's trust in our banking system to permeate while you're sitting there all these years? Whose idea was it to place this on the backs of your employer's--your employees, to make up these accounts? Somebody had to do it. Your chief executive from yesterday can't be held responsible for that, but you all did.

Who came up with this idea to do this? Tell us right now. Tell us. Somebody had to. You're sitting on the board. They're coming up with this, and you all did not hold your management responsible? What a sorry excuse for a board that you said nothing about this. This is what's amazing about this appearance. Why? Who made that decision to say let it go on? And why did you do it and say nothing? Answer that for me.

House Financial Services Committee Holds Hearing on Wells Fargo

Why didn't you hold your management responsible? And why did you allow them to give these unacceptable reports to our banking regulators, why? Whose idea was it? Come on, tell us. Come closer. Tell us. Who made that decision to make up these accounts falsely? Who? Tell us. Therein lies the problem. And I hope, and I pray that the people of this country see your stone silence when you won't even answer this question, when you won't even respond to the regulators. This is an unpardonable sin that Wells Fargo has embanked on the American people.

WATERS: Thank you. The gentleman from Colorado, Mr. Tipton, is recognized for five minutes.

TIPTON: Thank you, Madam Chair, and appreciate both of you coming here as private citizens, now voluntarily coming in to be able to address this committee. I have a number of critiques that I believe you probably understand many are valid. But I think a lot of our job needs to be looking forward, as well, in terms of as a legislative body what rules and regulations ought to be applied. Were regulators asleep at the switch in terms of actually enforcing with Wells Fargo some of the board compliance as well. And one of the issues that we've had a lot of conversation on in our committee is in regards to the CRA. March 2017, Wells Fargo received a rating of needs to improve. In a press release that came out of the bank dated in March 2017 stated that the performance aspects of the CRA exam included lending test, the investment test, service test.

Wells Fargo earned an outstanding or highly satisfactory rating. Ultimately, the needs to improve CRA rating came according to the OCC from the non-CRA performance factors. Ms. Duke, you were privy to the circumstances of this rating downgrade in your capacity on the board. Is that accurate?

DUKE: Yes, sir, it is. The--under those tests, the company received higher scores. But as a result of the issues, not only sales practices, but with some other issues, the OCC elected to double downgrade the--

TIPTON: Okay, what was your reaction to that rating downgrade?

DUKE: So I understand the reason for it. I actually--we did appeal that rating, and the reason for that is this. I think the CRA is a really, really important law and a really important part of our banking system. When I was a regulator, I actually did hearings around the country about changes to CRA, and I think it's important that the CRA be used for the purposes that it was intended. And while I recognize and--and--and don't condone at all the behavior that led to the double downgrade, I question the use of that as a tool to--to deal with the other problems of the company.

TIPTON: So as a former regulator you've had a lot of different capacities. Do you think it's important with CRA ratings as an example, that they're less subjective and more objective in terms of some of the performance?

DUKE: So I no longer make the rules on CRA, so I think my opinion is--is--is not (INAUDIBLE)

TIPTON: Well, as a former regulator I was just curious.

DUKE: I think CRA is really important, and we need to find ways to measure it, but we also need to find ways to measure and know what the needs of communities are, and individual communities, be they urban or rural. And I think the banks have a real important responsibility to meet those needs, especially in low to moderate income areas.

TIPTON: Wells is a big bank. I have a lot of small community banks that are within my district, as well. In general, what options are available to a bank if it fundamentally disagrees with the decision that's handed down from a regulator?

DUKE: There is an appeal process, but you know, at least in our case that appeal was denied. And I would--I would say that the issues that small banks--because I was a community banker for almost all my career--it's much harder in a community bank to be able to find the investments that do meet the requirements of the CRA and to have as complete a picture. So I think, you know, paying attention to the resources and the ability of the different institutions. I've seen cases where community banks got together, pooled their funds and did really good things in their community together rather than individually.

House Financial Services Committee Holds Hearing on Wells Fargo

TIPTON: Well, you've dealt with small banks, big banks. You peel back to the very regulators that make a determination. No real chance to be able to turn it over. It occurs to me that there ought to be some independent measures to be able to have some of that actually be able to address. You both have been hit a lot here today in terms of board performance. You probably reflected back just a little bit in terms of how the boards ought to be able to react to management decisions and hiring. Do you have some thoughts that maybe when we're looking at legislation now reflecting back where things could be done better?

QUIGLEY: I think there's no question about the fundamental approach to corporate governance and having the opportunity to be able to play that hand and do what you need to do in the best interest of your shareholders. And now in the world, as we think much more broadly than just shareholders, as Charlie pointed out yesterday, thinking about all those stakeholders, we absolutely were appalled by the sales practices abuses. And as soon as we were aware, we took immediate action.

WATERS: The witnesses have requested a brief break, so the committee will stand in recess for five minutes. Thank you.

(RECESS)

WATERS: The committee will come to order. The gentleman from Texas, Mr. Green, who is also the chair for the Subcommittee on Oversight and Investigations, is recognized for five minutes.

GREEN: Thank you, Madam Chair. Madam Chair, as a practitioner, I once represented a recipient of welfare who was charged with a crime because she made more money at a job and received some benefits from the federal government. She had to be prosecuted. A crime was alleged. If this bank were much smaller, had maybe ten employees who were engaging in this type of activity, opening up fraudulent accounts, creating fraudulent credit cards, someone would be prosecuted.

A small bank would have had prosecutions take place within the ranks of a person within the bank. Evidence shows that small banks have had persons prosecuted. But Wells Fargo created 1.5 million fraudulent accounts. Wells Fargo had over 500,000 credit cards created fraudulently.

Is it the case that if you become so big and you create such a grand scheme that you're beyond the law? The law ought to apply to Wells Fargo, just as it applied to that welfare recipient, just as it would apply to any small bank in this country. Wells Fargo cannot be too big to prosecute. You can't be too big to jail. Wells Fargo has to be held accountable.

We cannot allow $17,296,835,949 in penalties to become simply the cost of doing business. While these criminal activities were taking place, you were making billions. And you sat on the board, and you knew what was happening, and this morning you as much is acknowledged fraud when the chairwoman asked about the accounts. Did anybody ever think to say somebody ought to go to jail, somebody has to be prosecuted?

This is a crime. 1.5 million accounts, it's unbelievable. It's unimaginable, yet no one has been prosecuted. Maybe I'm mistaken. If someone at Wells Fargo has been prosecuted for these egregious offenses, would you kindly extend a hand into the air, either of the two of you or both? Let the record reflect that no hand has been extended into the air. I shall have a photograph of this in my office, and it will have under it, "Ask me about this picture." And it will show you, it will show you, with no hand raised, and I will explain this to people.

You cannot escape the long arm of the law. It applies to all. If you believe that this board could have done more to bring to justice those who perpetrated these criminal activities, raise your hand, please. Let the record reflect that the board members have concluded that no one or the board could not have done more because no hand was raised. I shall have a photograph of this in my office, along with other photographs, I might add that I've collected from persons who have been similarly situated.

We are now at a point in our history where we've got to rethink the Wells Fargo paradigm. I concur with those who are saying we've got to rethink whether or not Wells Fargo is not only too big to fail, but we corrected that, but also,

House Financial Services Committee Holds Hearing on Wells Fargo

too big to exist. Maybe you are too big to manage. Maybe the solution is going to have to be something that emanates here because you're not being prosecuted. At some point, the long arm of the all--the law has to reach Wells Fargo.

I yield back the balance of my time.

WATERS: The gentleman from Texas, Mr. Williams, is recognized for five minutes.

WILLIAMS: Thank you, Madam Chairman. Thank you both for coming here today. And yesterday, we heard from the new CEO Charles Scharf who said Wells Fargo still has a lot of work to do before the structural problems that allowed these scandals to go unnoticed were so longer fixed. The previous CEO, Tim Sloan, seem to only care about getting the asset cap lifted by the Fed to expand businesses without fixing the underlined problems it caused customers to be harmed in the first place.

As board members, I'm disappointed that you were not more active in your positions to get Wells Fargo back to the strong presence that they have historically been in this country. So, reports uncovered that the board was well aware of the regulator's concerns over Mr. Sloan's poor performance and misleading public comments about the company's progress. And yet, he was still able to keep his position as CEO.

As a small business owner, myself, for 50 years, I'm a car dealer in Texas, I know how important the attitude at the top levels of leadership are to my employees. The CEO sets the tone, and if they are not taking the past problem seriously, then it's hard to get other employees to change their behavior, as well. So, Ms. Duke, quickly, why did you stick with Tim Sloan for so long?

DUKE: So I'm going to answer your question, but if I could just respond--

WILLIAMS: No, ma'am. I've got time here. Please, answer my question.

DUKE: Okay. Tim--we stuck with Tim--Tim Sloan--we need in the CEO when we--when we replaced John Stump. Tim Sloan immediately stopped the sales practices incentives, replaced most of the management in the Community Bank. He--he took action quickly. We had problems that needed to be addressed immediately. The--the time it takes to find someone in an external search, and as a number of you noticed, the question of whether or not anyone with the ability to sit into this role would be willing to--to come into that role.

WILLIAMS: Okay.

DUKE: A question of--

WILLIAMS: All right. I understand. All right. The committee reports uncovered that there were a lot of third-party consultants brought in to work with regulators once the scandal broke. It makes sense to bring outside experts in, in order to make necessary short-term adjustments to protect consumers. However, it also doesn't seem like there was a large push, in turn, only to higher individuals to deal with the nonfinancial risk and the long-term. So, Mr. Quigley, did you have any concerns that Wells Fargo couldn't do this work internally? Or why wasn't it a priority, even after the regulators voiced their concern?

QUIGLEY: I definitely had concerns and was unhappy with the pace that was occurring. With respect to the use of third parties, as the former CEO of a large professional services firm, I know that sometimes when you want to accelerate progress, you will look to a third party to trying to accelerate the activity that needs to be taken, but we needed to build capability, and we needed to recruit capability, and we needed to build capacity into that independent risk management group.

And one thing that I know is true, to find the most able resource, takes much more time than finding the most available resource. I'm not happy with the time that has been required, but I am pleased that progress is now being made. And I agree with the points that Mr. Scharf made yesterday with respect to the real urgent nature of the action that needs to be taken, and his absolute focus on regulatory.

House Financial Services Committee Holds Hearing on Wells Fargo

WILLIAMS: All right. Good. So, as we mentioned earlier, the regular--the regulators took the highly unusual step of making a public statement that Tim Sloan was being overly optimistic in his comments about the progress of Wells Fargo becoming compliant with various consent orders. So, Mr. Quigley, in your testimony, you state that once the board is made aware that they were not receiving quality information, decisive actions were taken to fix the issue. So, my question is what drug--quickly, what structural changes that were made in turn--internally to ensure that the board will receive complete and accurate information moving forward?

QUIGLEY: We have a very active communication between committee chairs and their liaison officer who is bringing information. We review those agendas and challenge the quality of the data that's coming our direction. I was pleased with the elimination of the federated model. I was pleased with the need to strengthen the independent risk management group. And went back, came higher quality information to the board to enable stronger and more effective oversight.

WILLIAMS: All right. In closing, let me just say this. I hope that--this--institution eliminates the I don't know attitude. We've heard that from so many people. I don't know. And it's unbelievable. I have 200 employees, and I think I know. And that--that I don't know attitude has really run rampant and I hope that your leadership level will stop that. And I still can't believe how much money they pay these Board of Directors.

(LAUGHTER)

WATERS: Me either, Mr. Williams. The gentleman from Missouri, Mr. Cleaver, who is also the chair for the subcommittee on national security, international development and monetary policy, is recognized for five minutes.

CLEAVER: Thank you, Madam Chair. Let me--let me, first of all, express some appreciation and to make in some surprise. I--you were not subpoenaed, so you came here of--of your own volition, and so thank you for coming. Some of us were doubting seriously whether or not you would come, so I appreciate you coming.

Let me--try to get to make some information from you. I'm--I'm gravely concerned about the report received, the committee report. We--we received. Are either of you aware of an informal, unofficial, secret back channel to the CFPB, to the regulators at the CFPB?

QUIGLEY: I'm not aware of that, and I don't believe that it occurred. I don't know what it was referenced. I did read the committee report, and I was the one that had quarterly meetings with Mr. Blankenstein. And when I would meet with him, there were always members of the CFPB there with him, and I was always accompanied by people from Wells Fargo.

CLEAVER: Thank you. I'm not--so you're saying that the Senate people got something wrong or made it up or--

QUIGLEY: I understand your question was, was I aware of a back-channel communication to the CFPB, and I'm saying no. I was not.

CLEAVER: I know. But that also means they put it in the report, so if somebody did something incorrectly or falsely, maybe even with intentionality, but you just really got my attention when you said you met with Mr. Blankenstein. Is--is--do you detected a kind of racial attitudes when you were leading with him?

QUIGLEY: I did not. He came to our board of directors and spoke on behalf of the CFPB and following is report to the board, I then reached out to try to meet with him, if he had time, when I was in Washington. And, again, those meetings I was always accompanied by someone from Wells Fargo and he was always accompanied by others from the CFPB. I never had a one-on-one with him.

CLEAVER: Well, I'm only interested in that because of the fact that we know he used the N word because it was his text message. I mean it was his email. You're not aware of that?

QUIGLEY: I read what was in the report, but I had never seen it before.

CLEAVER: It's right there now.

House Financial Services Committee Holds Hearing on Wells Fargo

QUIGLEY: This was a note that Allen (PH) sent to me just summarizing the discussion that he had with Mr. Blankenstein and then at the time that he was departing. And I didn't follow up. I was not--I didn't never have any further communication with him.

CLEAVER: But, you--but, when you saw that were you alarmed? Well, if you have to think about it, you weren't so. So, I mean, you know, there's been an allegation about the back channel, which you said was not there. And--so, I'll chance it, I just--it's so offensive to me as a human being to be referred to with the nastiest name that somebody could call somebody of my color. So, let's move on.

Who appoints the compensation committee? I mean you guys are gone, I'm trying to find a--get information, who appoints compensation committee?

DUKE: All the committees are appointed by the governance and nominating committee.

CLEAVER: All right. is--is that like desirable committee on the bank board?

DUKE: I don't think it's necessarily the desirable committee. We look for people on that committee who have had responsibility in their careers for human resources. We also look to make sure that that committee is diverse because they deal with so many issues related to our management and employees.

CLEAVER: A lot of people want to be on the appropriations committee here in Congress, so Mr. Quigley, do you--

QUIGLEY: --I'm sorry. I didn't understand the question.

CLEAVER: No, the same question, the compensation board are people like pushing and shoving?

QUIGLEY: There was a time and as an auditor I'm a little sensitive to this, but there was a time when everybody wanted to avoid the audit committee because they felt that was just simply a place not to be. But, I believe the aggressive approach--

WATERS: --Finish your statement.

QUIGLEY: The aggressive approach with respect to the human resources committee and the comp committee that's become a difficult seat on any board. And I don't see people elbowing and fighting and trying to have that privilege. That is a very heavy load.

CLEAVER: Thank you. Thank you, Mr. Chair.

WATERS: Thank you. The gentleman from Ohio, Mr. Davidson, is recognized for five minutes.

DAVIDSON: I thank the chairwoman. And, Ms. Duke, Mr. Quigley, in your view now that you're no longer with the board, do you believe that some of the criminal actions taken by employees of Wells Fargo should be prosecuted by federal officials or do you believe that the fines that have already implemented provide enough redress for consumers?

DUKE: Sir, I appreciate the ability to answer that. I wanted to respond to it twice before. We--when we did our investigation of what happened in sales practices. We delivered all of the evidence that we found to the SEC, DOJ, both civil and criminal.

DAVIDSON: In your pleads you highlight--the plea agreements, you highlighted as you paid fines, settlements, as a corporation, you acknowledged that crimes were committed.

DUKE: That's correct. That's correct. We don't have the ability to prosecute. But, what we did do with the individuals that we found to be culpable was to call back, forfeit, not pay compensation, to terminate for cause and we--we fined individuals through those mechanisms $180 million or so. And in particular Carrie Tolstedt and John Stumpf, we took significant amounts of money, 60-some million each I think.

House Financial Services Committee Holds Hearing on Wells Fargo

DAVIDSON: So, should the federal government prosecute them for committing federal crimes?

DUKE: That's a decision for the prosecutors, but there is--we have in no way impeded their ability to do so.

DAVIDSON: Mr. Quigley?

QUIGLEY: We provided all of the information that we learned through the investigation--

DAVIDSON: --I understand, should they be prosecuted? They commit a crime, should they be prosecuted?

QUIGLEY: I'm not in a position--

DAVIDSON: --You don't have an opinion on the matter?

QUIGLEY: --I'm not the one on the bench.

DAVIDSON: Vote present.

DUKE: I would say yes.

DAVIDSON: On the buttons you get yes, no or present. So, you guys say present? It's not an essay, yes, no or present? Should they be prosecuted? You acknowledged that someone committed--it wasn't the ATM's. It wasn't the conference rooms that committed crimes. Someone that worked for Wells Fargo committed crimes. Should they be prosecuted?

QUIGLEY: Your point is acknowledged.

DAVIDSON: Present. Pathetic. I don't know what else to say. I'm glad you're not on the board there, frankly. Presumably, by getting hired for such a board, you had an exceptional amount of experience and you were well qualified, considered so by someone who offered you the position and a generous compensation package for being board members. How was the culture at Wells Fargo different than the presumably positive cultures that you were part of before or is this really just endemic of all the places? Should we look at everyone in this industry the same that the world is looking at Wells Fargo?

QUIGLEY: At Wells Fargo we have said very stately and very clear that culture change is needed. I'm pleased with the progress that is being made. These are early days for Charlie. But, his commitment to change culture, as I stated in my opening statement, I'm pleased that that is one of his top priorities.

DAVIDSON: Well, better late than never, right? I mean I do think that Mr. Scharf has a lot of potential. I like his resume and background, and, frankly, isn't on my job to hire the board members or the CEO's of any corporation now that I no longer own shares or control shares of a privately held company that I once did. But, I do know the culture matters. So, unless he's empowered to change a ship of 270,000 employees that culture isn't gonna change overnight.

Now, as the federal government, having seen very little action by the executive branch with a  duty to take action where federal crimes have commitment, I think it's right that this--the legislative branch is calling attention to that, not just with the failures with this particular bank, but with the failures within the Department of Justice to prosecute people. Yes, there's prosecutorial digression, but the idea is that every day Americans feel like there's one standard for them and a different standard for the well-connected, well to do people that operate companies like Wells Fargo or, frankly, work at the FBI, the Department of--the Director of National Intelligence, the CIA or any other part of the executive branch.

And we can't have people going around lock her up, lock him up all day because the Department of Justice continually fails to apply one standard of law and have the lady justice blindfolded. There has to be accountability and, frankly, when crimes are committed, particularly in cases like this, 6-plus billion dollars in fines and an

House Financial Services Committee Holds Hearing on Wells Fargo

acknowledgment that the crimes were committed someone should go to jail. We need our Department of Justice to provide that accountability. And we need board members that are gonna do their duty.

So, I look forward to the progress made under the new CEO Scharf. And I hope that we never need to see Wells Fargo here again except to commend them for the positive change in culture that has been accomplished. And I yield.

WATERS: The gentleman Colorado, Mr. Perlmutter, is recognized for five minutes.

PERLMUTTER: Well, I'm gonna sound like a board apologist compared to everybody else here because I look at the role of the board a little differently than the others. But, I am a customer of the bank and have been a customer of the bank for 40 years. And I'm a customer who went from two accounts to eight accounts. Had a line of credit that I had--that I got when I just got out of law school cut in half, but given a credit card for twice that amount with a big, you know, line of credit attached. So, things I never asked for just sort of appeared. So, I know the abuses that occurred.

My--my problem here is there's been a lot of time that has passed, obviously. The report details all of that. The board in some instances appears to have taken really some serious action, you know, with Mr. Stumpf with Mr. Sloan, trying to deal with the consent decrees. But, time just kept passing. So, my questions to you two and you can answer them as you choose. I mean I think there are sort of three choices for me sitting up here. Either you were derelict in your duties and didn't address these consent orders or the culture of the bank needs to be changed pretty dramatically in terms of its personnel and operations or the thing is just too big and too--for any board or anybody, any manager to get their arms around it. It can't be done.

So, Ms. Duke, if you could respond to my concerns.

DUKE: So, what we have found is that some of the issues are directly attributable to individuals. But, a number of the issues are attributable to the structure of the way the company is managed, the decentralized structure. And that is required that we centralize and also standardize and simplify the way all of our employees do their work. We need to--to be much clearer about that. So, when--what that looks like is, for example, if you take 83 different human resource departments and put them together you don't get one fully functioning human resource department. It takes quite a bit of time to build the capabilities of a central human resources department to--to work with the 265,000 employees.

PERLMUTTER: Mr. Quigley, that--but that leads me to some other questions for you. But, Mr. Quigley, your response.

QUIGLEY: If I could just comment on the multiple choice that you offered, I would choose culture change and that's what we have heard from our CEO yesterday. He is driving to build a culture of operational excellence and integrity as a number one priority. I'm pleased that that's what he said to the entire team on day one. And he has not varied from that message. He continues with execution, execution and we need to get to that point.

PERLMUTTER: All right, let me challenge you both on that then because I don't know how many customers, 70 million customers, me being one of them, 275,000 employees, 83 personnel departments. At least five years from the first consent order to try to remodel or revamp the culture and yet that hasn't taken place, still ongoing. And with a lot of things unanswered. I mean it's getting to me that this thing is just too big and that's not the answer I was thinking I would get to, but that's where it's going.

Ms. Duke?

DUKE: I don't think the problems are a function of size, I think they are a function of the way the company is organized and the way it's been organized historically.

PERLMUTTER: And, but now we've gone five years, how long is it gonna take to restructure or reorganize? I was a bankruptcy lawyer for a long time. I did a lot of reorganization. How long do you think this is gonna take to reorganize this company? Now you can look in the review mirror.

House Financial Services Committee Holds Hearing on Wells Fargo

QUIGLEY: We've got a new CEO that you heard from yesterday. And you saw that he is moving with a sense of urgency. He has a new operating committee. He is building the culture. And this is his number one priority and he filled the seat of chief operating officer who has made regulatory progress. That individual is--

PERLMUTTER: --So, you don't think that the last two CEO's were capable of doing that? You're saying this is different?

QUIGLEY: I believe having the CEO from the outside is absolutely different. There was a question earlier about what are the differences between Mr. Sloan and Mr. Scharf and there's no question that this is different under Charlie. And I've been on the board for six years and I'm not working with my fourth CEO. The board was not derelict in its duties, but very much actively at the table and trying to drive change in a way that could be sustainable and to make sure that customer harm never occurs. That's absolutely what I wanted and what the ambition was.

PERLMUTTER: All right, thank you. I yield back.

GREEN: Madame Chair, a unanimous consent request?

WATERS: Without objection, such as the order.

GREEN: Thirty five bankers were sent to prison for financial crisis, CNN business article. Wells Fargo to pay $3 billion over fake accounts scandal, NBC news article. Good Jobs article that tracks the amount of penalties that Wells Fargo has paid since 2000, your unanimous consent that they be placed in the record.

WATERS: Without objection. The gentleman from Tennessee, Mr. Kustoff, is recognized for five minutes.

KUSTOFF: Thank you, Madame Chair, and thank you, Ms. Duke and Mr. Quigley for appearing today. Ms. Duke, in your remarks I heard you talk about how you came up through the ranks as a teller to customer service representative I did the same job back when I was--back when I was younger. My question is that in my district Wells Fargo does have a retail presence, if you were on the frontlines today as a customer service representative and you had one of your main street customers come into the bank, hourly employee, small business person, what have you, what would you tell--why would you tell them that they need to continue banking with Wells Fargo after the years of the deeds?

DUKE: Thank you for that question and--and--and I'd like to talk a little bit about the front-line employees at Wells Fargo because the front-line employees at Wells Fargo were not the reason for the sales practices issues. It was the way they were managed. And there are hundreds of thousands of those employees who come to work every day who have served their customers for 40 years. Many of you have been their customers for 40 years, and they--the--the bond between those employees and their customers and the--the service that they're committed to, and the importance of--of the bank to those customers has been something that, to me, with all of the--the ugliness that I've seen is the reason I joined the board of Wells Fargo.

And I--the employees who work there, their jobs have been much, much harder during the--the--the time that we have--we have created damage to their reputations and to their company's reputation, yet, they continue to love this company, want to do everything they possibly can to make this company succeed and their customers are pulling for them as well. I have--

KUSTOFF: --Well, let me--let me reclaim my time and ask it a different way. Wells Fargo has put those front-line employees in the position of having to defend actions that you just stated they're not responsible for. What do those front-line employees tell their main street customers about why they should continue banking at Wells Fargo?

DUKE: They tell them about the--the service that they offer, they--they pay attention to the customers' needs. They--they look at the customers' needs. They look at the products that we have that meet those customers' needs. We're still the--the largest small-business lender in the country. We're the largest lender in low to moderate income areas. We're the largest mortgage lender, we're the largest agricultural lender, Wells Fargo's still really important in communities and to our customers. And they talk about how important they are there.

House Financial Services Committee Holds Hearing on Wells Fargo

KUSTOFF: Mr. Quigley, would you--would you agree that the Wells Fargo brand and reputation is damaged?

QUIGLEY: Unarguable.

KUSTOFF: Would you--do you believe it's been irreparably damaged?

QUIGLEY: I believe it can be recovered, and the plans that Charlie reported yesterday, looking again at the future of Wells Fargo, were optimistic. We need and want a strong Wells Fargo.

KUSTOFF: We--yesterday and some today, we've talked about sales incentives that were provided to employees back under--under Mr. Sloan, and what they are today. How do you compare those sales incentives for those employees today versus those under--under Sloan?

QUIGLEY: The sales incentives were terminated as soon as the board was informed, and we understood it was part of the root cause of how this abusive behavior occurred. I'm delighted that that's a part of the past. And the new structure focuses on customer experience, and how the individual that comes into the branch that you're asking about, what is their experience? And what do they benefit from being there?

KUSTOFF: Yeah. The two of you are no longer on the board, but I'm going to ask you to speak for those members who are currently on the board. And I'll start with you first, Ms. Duke, do you believe that all current members of the board have the right attitude for a new culture at Wells Fargo?

DUKE: I absolutely do. Many of them were recruited knowing what happened at Wells Fargo, and being committed to making the changes necessary so that it wouldn't happen again.

KUSTOFF: And Mr. Quigley?

QUIGLEY: The same. I'm confident in my former colleagues and their commitment to do what's right.

KUSTOFF: Thank you, and I yield back the remainder of my time.

WATERS: Thank you. The gentlewoman from Ohio, Mrs. Beatty, who was also the chair for the subcommittee on diversity and inclusion, is recognized for five minutes.

BEATTY: Thank you, Madame Chairwoman, and to the witnesses. I've been sitting here for this whole hearing and trying to digest the questions and your responses. And quite frankly, I'm trying to figure out what you thought your roles were as trustees, and--and what you got paid for with so many of these widespread consumer abuses, the regulatory findings, and certainly the lack of effective corporate governance.

Let me start with my question, first, to you, Ms. Duke. You took great pain in writing about your background in your testimony to us, more than I've ever seen in any other testimony. You said--reminded us that you started out as a part-time teller at a drive-through bank, you transitioned as a new account clerk. You take great pains to tell us that you were the second lowest paid employee and how you sat across from cu--customers and how you put them first, how you work your way up, how you became the first woman to chair the American Bankers Association, the board of governance, and how much you understood and knew about regulatory practices, that you were just stellar in this. Yet, you act like you're a member of us.

In your testimony, you also then say you were as appalled as the members of Congress with all of these findings and you didn't know how it happened. Well, that's appalling to me. And then, I notice that you then are the one that also agreed to Mr. Sloan's payment. The board decided that Mr. Sloan was worth more than $18 million in compensation, including a $2 million bonus. Despite all of this, Mr. Duke, you also drafted a proxy statement that you released to the investors stating, the board decided to award Tim a cash bonus for 218 as recognition for his substantial progress in changing the culture and business practices of Wells Fargo and building out a strong management team to focus on the remaining work to strengthen the confines and operational risk. Now, with everything you knew, being paid, being responsible, and his background, and then we hear what they did, the

House Financial Services Committee Holds Hearing on Wells Fargo

abuses to consumers, tell me why you drafted this statement. And did you really believe this? Or did someone make you do this? Or were you paid extra to do this?

DUKE: Congresswoman, I joined the board of Wells Fargo because of the company I thought that it was--

BEATTY: --No, no, no, that's not my question. Tell me why you wrote this statement about him after all these things, and you were there, that happened before when you wrote this statement in 2018?

DUKE: So, we did not find that Mr. Sloan had any responsibility in sales practices. He became the CEO in 2016. We paid him no bonus for 2016, 2017, and--

BEATTY: --No, I'm talking about your statement in '18. A lot happened, as we heard Congressman Meeks read off all of the things that happened between both of your watch. And you can jump in, Mr. Quigley, if you want to respond since you were also there, and certainly read and witnessed when she wrote this to the shareholders. Did you have any response? Did you feel this was misleading the shareholders at Wells Fargo?

QUIGLEY: There's no question that I read the proxy, and there's also no question that I--

BEATTY: --Do you agree with it, yes or no?

QUIGLEY: Yes--

BEATTY: --Because my time--and I have a question for you.

QUIGLEY: Yes.

BEATTY: So--so, you all think, despite now saying it's appalling, all that you've heard that has happened, even in 2018, you know what? This makes me feel that you are as you responsible as he was in all of the things, and it is criminal that you are even sitting here. Mr. Quigley, let me follow up on Congressman Cleaver's line of questioning regarding a back channel relationship between Wells Fargo and CFPB, specifically, a political appointee of the Trump administration--you remember the question--so, Mr. Quigley, you stated to Mr. Cleaver that you did not believe a back channel exists. Yet, in appendage three which is already in the record of the majority staff report, there's an email from acting CEO Allen Parker to you regarding this political appointment. Are you aware of that?

QUIGLEY: I did see the email in the report, yes.

BEATTY: S--and so, do you still have the same response that you had after it says "political"?

QUIGLEY: I--I interpreted the "political" as simply was an appointee into the CFPB.

BEATTY: I'm sorry, my time is up, and I yield back.

WATERS: The gentleman from Texas, Mr. Gonzalez, is recognized for five minutes.

VICENTE GONZALEZ: Thank you, Madame Chair. And I want to begin by thanking Ann Cruz (PH), a dear constituent of mine who's watching from back home. My--I'll begin by saying, former Chairwoman Duke, today you have the auspicious honor of being the first board member, I believe, to testify in front of Congress since Enron. You allege, in your testimony, that you, and indeed, the rest of the board learned from public statements that over 20 times the number of employees were terminated than originally disclosed to you by management. Yet, no one in management was fired for this. At this point, you and the board retained independent counsel to conduct a full and unfettered investigation into the scope and causes of misconduct. Allegedly, this is when the board acted to thoroughly repair the damage done--again, your words, not mine.

Since then, Wells Fargo engaged in change--in charging improper interest on your customers' accounts, sold unnecessary auto insurance, foreclosed on customers' homes after wrongful denial of loan modification agreements, and essentially, threw people out in the street. And finally, purposefully reduced the customer investment returns on the sales of Wells Fargo advisors' products by actively trading securities you had disclosed

House Financial Services Committee Holds Hearing on Wells Fargo

as long-term holds. All of this conduct is as--is admitted in one consent order or another. There are many active and open orders, that is quite a lot to--to digest. I would ask you, why should we simply--why shouldn't we simply remove the back charter, break up the company, and let the banks out there that can run clean operations have your customers, or Wells Fargo's customers?

How many years until you can properly serve your customers? You don't have to answer that, I know you've already have, in one way or another. If any attorney steals their client's funds, and I know this because I'm a lawyer and practiced law for 20 years, and mixes their funds with clients or deceives them as to the nature and scope of representation of them and consequences are disbarment and potential jail time, why would a bank's charter be any different? You can answer that.

DUKE: So, there were employees who committed criminal acts, you said, was anybody fired? People were fired for the--for the acts that they committed and the information about that has been turned--

VICENTE GONZALEZ: --Management? Is this management that was fired?

DUKE: Yes, yes, yes. In the case of sales practices--

VICENTE GONZALEZ: --Senior management?

DUKE: Senior management. The senior executive responsible for the Community Bank was terminated for cause.

VICENTE GONZALEZ: Well, it's clear that this--

DUKE: --The management of the auto division, I believe, was terminated. So, in--in--and in individual cases where there was misconduct, those employees were terminated and the appropriate suspicious activity reports filed, I believe.

VICENTE GONZALEZ: Well, it's clear that you do not serve your clients' best interests, and I think you admitted that already. If it were up to me, and I believe many members of this committee on both sides of the aisle, a few of you would be in jail today. And certainly, if you were the president of the American Bar Association, instead of the American Bankers Association, you would be disbarred today. And I clearly hope the Department of Justice can--continues to investigate these bad actions by bankers and board members across the country, and hopefully stop this malfeasance in this country. The American people are looking forward to this. And I yield back.

WATERS: The gentleman from Florida, Mr. Lawson, is recognized for five minutes.

LAWSON: Thank you, Madame Chair, and welcome to the committee. I was trying not to make sure that I don't ans--ask the same question as some of the other members asked simply due to the fact that this centers around the same area. But one of the things that I want to know--get you, Mr. do, to respond on, it says that, after--at--in 2017, independent investigation, a report were released into Wells Fargo fraudulent account scandal. The board was supposed to accomplish three goals, and--and these are the ones that I want you to respond to.

And somewhat, you have said some things about them but, one was to get to the root cause of the company's sales scandal and identify solutions so it would never happen again, and restore trust in the bank. In response, Wells Fargo board, on what I can gather, blame it on ex-employees. But don't you think the board, your--yourself included, failed in oversight duty? By serving on the board, you can tell me, on those three issues that came up, how was those three issues handled?

DUKE: The root cause was found to be that the--the sales goals were inappropriately set, that they were too high, and that the sales management was aggressively--was aggressively pursued and.

LAWSON: And to restore the confidence what was discussed on the board--

House Financial Services Committee Holds Hearing on Wells Fargo

DUKE: The sales goals were eliminated. The employees were terminated and the new incentive plan was designed to--to reward customer service and to--to do to be more of team goals than individual goals. What we found is that while there was some of the behavior to get the incentive it was more to avoid criticism by the managers.

LAWSON: OK. The reason why I'm concerned about sales goal I have been involved in sales for maybe 40 years and I know that what happened is management does set these sales goals and for agents and so forth for goals for you to try to reach. And--and but I didn't know until the day I even--when--when the Chairwoman started doing it that banks would have such sales goals that would trickle down to all of the branches so that they would go out and they were trying to attract more business.

What I can't understand is how--even though you said these employees were terminated how could managers that has been in the organization for a long time would not want to monitor all of these branches of the sales goals when they knew they had to know that something was going wrong. Now even though you say that they were eliminated I'm sure Wells Fargo still have sales goals they have to meet. How is that handled now through the board when they establish goals that they want to meet to be the third largest bank to understand Quigley--Mr. Quigley was saying about being a bank that--that provide resources to small businesses to minority firms and so forth--how do you all handle that now in order to make sure that you do the things that are good in the marketplace but allow things to happen such as people 570,000 borrowers bought car insurance that they didn't need. And about 20,000 of them may have had their vehicle repossessed result--results like that. How do you handle that now?

DUKE: So, again, with consumer the co--collateral protection insurance once we found that issue we quit requiring the forced place insurance so that requirement is no longer in place.

LAWSON: You want to respond to that?

QUIGLEY: And the effort was made to one customer at a time, identify harm and then be able to remediate it. And Charlie Scharf gave an update yesterday on the progress with respect to remediation and the aggressive approach that he intends to take to accelerate the timing that is required to get that done and get that done right.

LAWSON: And, a question I might not be able to get answered, do you think Wells Fargo is too large?

QUIGLEY: I do not think Wells Fargo is too large--Wells Fargo needs to change its culture and that is underway under the new CEO that we have recruited.

LAWSON: Madame Chair, I yield back.

WATERS: Thank you. The gentlewoman from Michigan, Ms. Tlaib, is recognized for five minutes.

TLAIB: Thank you, Madame Chair. Thank you so much for your leadership in creating this report. Have you all seen this?

DUKE: Yes, we have.

QUIGLEY: Yes.

TLAIB: And I know, maybe you don't have it in front of you but on page 13 list kind of in a snapshot of some of the abuses, which you call culture. I call cr--criminal schemes. I mean you all made money off of the backs of poor people, off of working people. Fake accounts, millions of people. We're not talking about a short period of time of one mistake. We're talking about from 2011 to 2016 literally enrolling millions of customers into banking products and accounts without their knowledge and consent. We are talking about 27,000 people impacted by unnecessary auto insurance.

I--I actually would differ with my Chairwoman one thing I wouldn't call it unnecessary I would call everything fraudulent, criminal--unnecessary--the fact that you enrolled banking--banks customers literally had their vehicle repossessed following default ar--arising from this added insurance cost that they didn't need, didn't want.

House Financial Services Committee Holds Hearing on Wells Fargo

You know corporate disease is--is--corporate greed is a disease in our country. It is so bad that it infiltrates and I don't like it when corporate America calls it a cultural issue. It's a crime to defraud Americans. Let's be very clear about that. And, I don't want to you to see my passion as oh, I'm a--this is not political--it is the fact that I have the third poorest congressional district in the country.

Literally our communities are frontline communities that get targeted by this. Not-not the--the higher income folks the folks that have two or three jobs. The folks that are trying to survive right now, they are in survivor mode that are being targeted.

Yes or no will you acknowledge I mean the fact that I see that Ms. Duke you were on the board since 2015, Mr. Quigley, you were on the board since 2013, correct? So, on page 13 it talks about service member abuse between 2006 and 2016 Wells Fargo bank charged service members higher interest rates than allowed under the federal law. You would consider that a crime, correct, Ms. Duke?

DUKE: I would.

TLAIB: How about you, Mr. Quigley?

QUIGLEY: I would. And I would also say that that service member re--remedi--remediation that was undertaken Betsy took the lead and was very assertive in moving that forward and I was pleased and proud of her.

TLAIB: Yeah, well in the meantime people's repossess--they got their cars repossessed. I don't know what's going on with their credit report and that's something I'm working with the chairwoman on is trying to get people's credit report to get cleaned up from this. And you know that's impacting people's employment access to housing, all of these opportunities they need to thrive.

You know, erroneous mortgage fees y'all. From 2013 to 2017, your both on the board. We're not talking about one year, six months of bad behavior and criminal scheming of--of working class folks. We're talking about over a decade for many of these criminal schemes and these corrupted kind of behavior. And coming having your chair come before this committee yesterday and not be able to really, truly answer some of the questions with various details was troubling to me.

I need to know from all of you I mean, courageous of you to come before this committee. But this needs to be read by every single  board of directors. Every single one of them need to read this. Because I don't think they realize this is not only about numbers but behind every single report in here is actually a story of a fellow--like a human being that was impacted by these criminal schemes.

So, I want to talk about something I got a CO pay tax and I really, really wan tot emphasize to you all to try to incorporate in like an incentive here if you have your CEO getting paid 200 times more than your own employees and they have to get on public subsidy don't you think that's unfair? Do--do you think that right now having your bank tellers and the folks that work in your institution getting paid 200 times less than the CEO is problematic?

DUKE: So, I've been a bank teller and I've been paid at the lowest rates and I know how difficult it is to survive on that. I think--I think we need to address both the way we compensate them but both career pathing. Because I was able to learn and take advantage of industry education and opportunities (INAUDIBLE).

TLAIB: And Ms. Duke, at the same time they're actually in line to get public subsidies, food assistance things that us, the public have to pay for because you are allowing corporate greed to continue to fester within your company. Mr. Quigley do you--do you agree that we should be paying your workers a living wage? That they shouldn't be paid 200 times almost close to 300 times less than what your employees are getting paid?

QUIGLEY: Charlie responded to that yesterday with respect to what he's doing on the minimum wage.

TLAIB: Yeah. He works for you, right? Charlie works for you?

QUIGLEY: I'm a former member of the board. I recruited him. And I'm pleased that I was able to get him to say yes.

House Financial Services Committee Holds Hearing on Wells Fargo

TLAIB: Are you pleased that you left people--thank you, Madame Chair.

WATERS: Thank you. The gentleman from South Carolina, Mr. Timmons is now recognized for five minutes.

TIMMONS: Thank you, Madame Chair. Ms. Duke, can you explain what the normal duties and responsibilities were for you and other board members?

DUKE: Yes, we received materials in connection with--with meetings. We scheduled meetings. We had meetings of the board, meetings of the committee.

TIMMONS: How often did you meet? How--how often were your meetings?

DUKE: How many meetings did you take out of your calendar last week?

QUIGLEY: When I resigned I removed 85 meetings from my calendar the next in the next 12 months meetings or calls.

TIMMONS: So, time commitment per week, per month what would you guess-what's a good estimate?

QUIGLEY: There were big blocks of time last year when I was working fundamentally full time because I was working to recruit a new CEO. And many of you or many of your colleagues asked Charlie Scharf yesterday--why would you accept such a difficult job? How would you like to be the guy who was recruiting him to get him to a yes?

TIMMONS: Sir.

QUIGLEY: It was time intensive. I don't--I didn't--I haven't kept track of it on a per hour basis. But I was absolutely, many times working fundamentally full time.

TIMMONS: Over the course of your tenure on the board average? 20, 30 hours a week? 15 hours a week?

QUIGLEY: Probably in the 20--20, 30 kind of range.

TIMMONS: Is that the same for you, Ms. Duke?

DUKE: Since I became Chairman I have become availability to the company full time. I don't make other commitments.

TIMMONS: And what--that was my next question--what other jobs or positions do you hold outside of the board or did you hold outside of the board?

QUIGLEY: I'm the Chairman of the Board of Hess Corporations that's the only other public company where I am on the board.

TIMMONS: Did you have any outside?

DUKE: I do not.

TIMMONS: OK. I appreciate that. I'm slightly confused and don't' really understand why we're holding this hearing today. The Chairman called for both of you to resign and you did. There's nothing either of you can do at this point to help right the ship that is Wells Fargo. So with all that is going on in the world today and in the financial system why are we publicly to some degree, humiliating two former board members of Wells Fargo right now? I don't know if this is the beset use of our time. I appreciate you all sitting through it and showing up, I'm not sure I would have.

But I--I'm not excusing the performance. Obviously, it's abundantly clear that both majority and minority reports a lot went wrong and several missteps were made. Which partner with the dereliction of Obama Administration regulators, led to a disastrous result for your bank and its customers. But I still don't' understand what dragging you two in here today is accomplishing. I think it's good that you resigned. I think it was the right decision given the

House Financial Services Committee Holds Hearing on Wells Fargo

circumstance. It's very unfortunate and I'm encouraged by your new CEO. He was very--his testimony yesterday was--was productive I think.

I hope that Wells Fargo can get back on the right track. And I know the committee will continue to keep a close watch along with the regulators to help regain the trust of--of the customers of this committee and of the American public. So, yeah. I just thank you for coming here and with that, I yield back.

WATERS: Thank you. The gentleman from Illinois, Mr. Garcia is recognized for five minutes.

JESUS GARCIA: Thank you, Madame Chair and Chairman Green for convening this hearing and to the two witnesses, thank you as well.

So, regulators have been working and Wells Fargo since 2016 to bring the back into compliance when the bank's current troubles first came to light. The written testimony that each submitted to the committee claims that since that time the board of directors has focused on changing the culture at Wells Fargo, but there's an important change I think you left out.

This week, the Roosevelt Institute published that from 2016 to 2019, Wells Fargo more than doubled the money it put towards dividends and stock buybacks from 12.5 billion to 30.2 billion. Ms. Duke and Mr. Quigley, did you vote in favor of these dividends and buybacks?

DUKE: We voted in favor of the capital plan that included those, yes.

JESUS GARCIA: It included those. That's a yes both of you?

QUIGLEY: Same.

JESUS GARCIA: Mr. Duke and--Ms. Duke and Mr. Quigley, yes or no--did you and the rest of the board decide to direct more resources toward share buybacks and dividends to boost the company's share price, yes or no?

QUIGLEY: The--the capital plan is very clear and all of the elements in it and it's--

JESUS GARCIA: That's a yes?

QUIGLEY: Yes, we did approve the capital plan.

JESUS GARCIA: Both of you?

DUKE: Yes.

JESUS GARCIA: Which included that. Thank you. So you decided to use more money to pay off shareholders. The majority staff report found that "Wells Fargo's board and management prioritize financial and other considerations (INAUDIBLE) fixing the issues identified by regulators. To me, the fact that Wells Fargo doubled the money it spent paying off shareholders during this time is a clear example of that." Ms. Duke and Mr. Quigley--yes or no, do you agree that Wells Fargo could have used those billions to invest in its workforce which may have, in turn, fixed its internal culture? Yes or no?

DUKE: I would say that we have approved considerable expenses in order to fix the issues that--that we need to fix at Wells Fargo--

JESUS GARCIA: Could it have gone further?

DUKE: --we have not limited those budgets.

JESUS GARCIA: Mr. Quigley?

House Financial Services Committee Holds Hearing on Wells Fargo

QUIGLEY: The number one priority is absolutely remediating those issues and that was clear--made clear by Mr. Scharf yesterday.

JESUS GARCIA: But having done differently could have advanced the cleaning up of the culture. Last year, I introduced the reward work act HR 3355 a bill that bans share buy backs and allows company employees to directly elect one third of their corporate board. I think it's fair to expect companies to invest in their people and in growth rather than simply lining shareholders pockets.

In 2013, we first learned from the Los Angeles Times about Wells Fargo fake account and the pressure tactics that drove employees to open them. The Committee for Better Banks, a group of bank workers who are organizing for better conditions help bring these practices to light and Wells Fargo responded by filing thousands of--by firing thousands of frontline employees. Ms. Duke and Mr. Quigley, was firing frontline employees the correct response to credible reports of management issues at the bank?

DUKE: There was further action needed to be taken managers at the banks. However, whenever an employee is found to have engaged in a dishonest act against the customer that we have no choice but to terminate them.

JESUS GARCIA: Mr. Quigley?

QUIGLEY: Same.

JESUS GARCIA: The culture of a company and accountability in a company always start at the top yes or no-- would you agree?

QUIGLEY: Yes.

DUKE: Yes.

JESUS GARCIA: As board members you both bare responsibility for what went on at Wells Fargo when you were at the top. Your testimony expresses regret about what happened to the banks workers but here we are. Bank workers alerted the public to your bank's practices and they got fired, you both resigned before testifying today. Perhaps to absolve yourselves of what happened on your watch. Do you think it might be a better idea to let employees elect corporate board members for themselves?

QUIGLEY: I'm sorry. I didn't understand your question.

JESUS GARCIA: Do you think it might be a better idea to let employees elect corporate board members for themselves to be represented?

QUIGLEY: I believe in the corporate governance model that shareholders elect the directors.

DUKE: I agree with Mr. Quigley.

JESUS GARCIA OK. So it's clear you are consistent in that. Madame Chair, I yield the rest of my time.

WATERS: Thank you, the gentleman from Texas, Mr. Taylor, is recognized for five minutes.

TAYLOR: Thank you, Madame Chair. Appreciate you both being here.

I served as a bank board member for 12 years at a community bank back in Texas. And, I will say that where you are today is somewhere where I think not a single member of a bank board would ever want to be.

And, I was wondering if you could--actually, let me back up for one second and just say, I find some of the actions that were taken--taking place at Wells Fargo to be criminal in nature. I certainly agree with you, Madam Chair, and some of my colleagues that they were criminal in nature.

House Financial Services Committee Holds Hearing on Wells Fargo

I am surprised that no one has been prosecuted and I certainly would agree with bringing in the--either the U.S. attorney or the district attorney for the--for the jurisdictions that comport with us to ask, "Why has no one been prosecuted?" because I think there's an example to be made here. This is unacceptable behavior and it's criminal.

This is not--and I think--I think we--there's agreement in this room that it was criminal and therefore there should be some discussion with the people that didn't prosecute. What the heck? It's not up to these guys. They're not on the bench. We're not on the bench. But, I think it's--I think it's worth asking that question.

So, surfing back to being on a bank board, do you have any lessons learned as--that you would tell to the other 5500 banks in the United States? Right, so there are 50 to 100,000 people that serve on bank boards across this country for banks, large and small.

What would you--and I hope you don't stop here. I know this is an unpleasant thing, but I think you have something to teach other bank board members about how to run a bank. I mean, you've been through one of the most difficult problems that a bank has been through in the--in the last decade.

What--what do you have to teach, or what would you say to other bank board members or perspective bank board members about what--when you get in this situation, which is thrust on  you. I mean, it's nothing you designed, but it's something that's thrust on you. What--what lessons have you learned? Mr. Quigley?

QUIGLEY: There's no question that the communications with regulators, who have significant presence inside these enterprises, need to be robust and timely and you have to be aggressive in terms of your follow up. And, when it comes to no--to determining that, there is a need for change to occur in a culture, you have to be assertive to make sure that, in fact, that occurs.

And, that might mean that you have to make substantial changes in the leadership team, including at the top. I acknowledge that in my six years on the bank, I've worked for four CEOs.

TAYLOR: And--and actually, just--just quickly to go into that, because actually it was something I wanted to ask about, is your relationship with regulators. So, in my 12 years on the bank board, other than the bank examination reports that the bank would yield every 18 months, that was the only interaction I ever had with a regulator. I never got a call or email from a bank regulator.

Your earlier testimony that you were talking almost daily to regulators honestly was a surprise to me. Was that typical prior to problems at Wells Fargo? I mean, what was your interaction--I mean, how--what led to "day--almost daily" interaction with regulators?

QUIGLEY: In that period of time, I was chairing the CEO Search Committee.--

TAYLOR: --Okay.--

QUIGLEY: --And, so I was interacting with them on a regular basis because of the requirement for me to be able to obtain a supervisory non-objection for the individual that I was recommending. But, prior to the sales practices issue being made public and for the board to be informed and aware, I think a quarterly kind of touch would have been much more to what might have been expected.

But, with the issues that we were dealing with and the aggressive approach to remediation, that interaction with the regulators then simply became much more frequent and of much greater substance.

TAYLOR: What was the standard practice--and I guess this--I would hope this would be for all banks of your size--for regulator board interaction? Because again, my--my experience was 18 months, have a meeting, and then that's it. But, I mean, you're--clearly, it was very different.

DUKE: So, if I could--

TAYLOR: --Sure.--

House Financial Services Committee Holds Hearing on Wells Fargo

DUKE: --most of my career was as a community banker and so my board did not interact with--with the regulators. They didn't--in the community bank, they didn't even come in for the annual review of the--the annual activities. When there was a closeout conference with the regulators--

TAYLOR: --Right.--

DUKE: --the--I think my audit committee would come in and--and meet with the--with the examiners. But, they didn't meet with the board.

When I joined the board of Wells Fargo, for the first two years, maybe close to two years, the regulators would come in and--and present annually their reports of their examinations. But, that was really the extent of--of the contact.

The other piece, though, was that each of the consent orders that we signed had a requirement for an oversight committee of the board and so when--when I--early--soon after I got there, they asked me to serve on that committee and then later, to chair it. And, that did involve the--the reporting that was on the consent orders and so I had regular contact with the--the examiners then about--about those consent orders and the progress on the work under the consent order.

TAYLOR: Thank you. I yield back.

WATERS: Thank you. The gentlewoman from New York, Ms. Maloney, is now recognized for five minutes.

MALONEY: I thank the Chairlady for yielding. Mr. Quigley, I want to ask you about an email exchange you had with the former CEO of Wells Fargo, Allen Parker. That is in Appendix 3 of our committee's staff report. You--you and Mr. Parker were discussing a series of conversations that he had with a political appointee at the CFPB, Eric Blankenstein, about resolving the bank's regulatory issues with the bureau.

Let me read what Mr. Parker wrote to you on May 17th, 2019. He said, and I quote, "Eric also assured me that there--there--there would continue to be political oversight of the engagement with us." Mr. Quigley, are you familiar with this email, yes or no?

QUIGLEY: Yes.

MALONEY: Okay. What--what did you think Mr. Parker meant by political oversight of the relationship with Wells Fargo? Did you understand that he meant Mr. Blankenstein was promising a softball approach to Wells Fargo?

QUIGLEY: I did not interpret it that way, nor do I think that's in fact what occurred.

MALONEY: Well, then what do you think occurred? Do you think it's appropriate for a political appointee at the CFPB to promise a bank softer treatment than the career staff is recommending? Do you understand that that provides an appearance of possible corruption?

QUIGLEY: Let me just provide a little bit of context in terms of my meetings with Mr. Blankenstein. He came to the board in July of, I believe it was '18--no, no, it might have been '17. I'm not sure which year. But, he spoke on behalf of the CFPB at the board meeting in July and I started trying to have a quarterly touch with him when I was in Washington.

Each of those meetings, I was accompanied by someone from Wells Fargo and he was accompanied by others from the bureau.

MALONEY: Well, let me ask you a different question. Do you think it's appropriate for a political appointee, a political appointee at the CFPB, to come to a meeting with a bank and promise a bank softer treatment than the career staff is recommending?

QUIGLEY: No, I don't think that's appropriate and I'm not even sure that it occurred.

House Financial Services Committee Holds Hearing on Wells Fargo

MALONEY: Well, what do you think he meant when he said that he would continue "political oversight" of the engagement?

QUIGLEY: I think he was talking about his departure from the CFPB and that his successor, who was going to be a political appointee, might have continued touch with the bank.

MALONEY: Well, it doesn't read that way to me and I have no further questions.

WATERS: I'd like to thank our witnesses for their testimony today. Without objection, all members will have five legislative days within which to submit additional written questions for the witnesses to the Chair, which will be forwarded to the witnesses for their response.

(INAUDIBLE)

Ms. Porter, we will again give you an opportunity to question the witnesses. I started into the close, but we will rescind that and we will go forward.

PORTER: Thank you very much, Madam Chair, and Mr. Chair--Mr. Ranking Member. I really appreciate the accommodation.

I wanted to ask Ms. Duke and Mr. Quigley about your board compensation. Ms. Duke, how much did you make last year on the board?

DUKE: Six hundred and thirty thousand dollars.

PORTER: And, Mr. Quigley?

QUIGLEY: Four hundred and seventeen thousand.

PORTER: Okay. About how many--how many times last year did the board convene in person--did you convene a full board meeting in person?

QUIGLEY: Full board in person, I'm guessing, but perhaps 12. I had probably 90 meetings in relation to my committee meetings and my calls--

PORTER: --With the full board--the full board met only 12 times?

QUIGLEY: --For a big chunk of last year, I was working full time.

PORTER: Well--well, what about the other company you served on a board of? Were you not working full time for them?

QUIGLEY: Not full time, no.

PORTER: So, if you were working full time for Wells Fargo on the board--

QUIGLEY: --I said for portions of that time, while I was doing the CEO Search--

PORTER: --Got it.--

QUIGLEY: --it required my involvement every single day. That was the point I was trying to make.

PORTER: Got it. So, my question is about your--your thoughts as long term board members of Wells Fargo about the remaining board, because the folks that are sitting on the board today--and I have their bios here--these are folks that oversaw data breaches at Staples, a health marketing scandal at Kellogg, a massive data breach of $110 million at Target.

House Financial Services Committee Holds Hearing on Wells Fargo

These are not exactly--oh, the auditor for AIG. These are not exactly Eagle Scouts. What is your opinion about the current--I'd like to have you go on record with what your opinion is about the capacity of the current board in light of the number of them that have come from scandal ridden or consumer harm situations, to steer Wells Fargo in the right direction going forward.

QUIGLEY: I have confidence in the capability and the integrity of the members of the board that I once served with.

PORTER: Ms. Duke?

DUKE: I do and I think--I think the--the expertise of those directors is excellent. As we have re--repopulated our board, reconstituted our board, we've added a number of new directors. When I joined the board, I was the only director on the board who had banking experience.

There are, now, even without me, I believe four directors who have banking experience. There--

PORTER: --Is--is the board actively seeking additional--and seeking replacements for you two and in the past, in changing board members, is Wells Fargo seeking people who have presided over major corporate or consumer scandals to populate its board or is that just a coincidence? Is that a qualification these days to be on the Wells Fargo board?

DUKE: That is not actively--that's not what we're actively seeking. However, I would say that particularly in the case of Celeste Clark, who is an executive at Kellogg, that her--her experience in dealing with and--and remediating that crisis, that--that health crisis and also as a public policy--she was their public policy officer, I believe, for a time--and her experience in that situation has been invaluable to our board.

PORTER: Do you think that the compensation of board members is in line with the number of hours that they work?

DUKE: It is in line with the level of responsibility that they take in and with the compensation for other directors of similar institutions.

PORTER: Well, let's--let's talk about that responsibility. What are the consequences or personal responsibility that you or Mr. Quigley have suffered as a result of presiding over the board during these scandals?

DUKE: So, we are subject to liability for our actions as a director.--

PORTER: --Does Wells Fargo have directors and officers liability insurance

DUKE: They do. They do.--

PORTER: --that would cover those claims?

DUKE: They have--they have directors and officers liability insurance that covers those claims.

PORTER: So, for the rounding between the two of you, half a million dollars a year, what are the responsibilities for which you deserve such tremendous compensation? What are the consequences? What are the risks that you are personally exposed to as a result of serving on the board?

QUIGLEY: The board's role is to oversee the company's management and business strategies, to evaluate the performance of its CEO, to monitor the performance of that CEO, and to work through the succession plan and selection of the CEO. That was the point I was trying to make earlier, where I was spending full time.

PORTER: Thank you.

WATERS: I'd like to thank the witnesses for their testimony today. Without objection, all members will have five legislative days within which to submit additional written questions for the witnesses to the Chair, which will be forwarded to the witnesses for their response.

House Financial Services Committee Holds Hearing on Wells Fargo

I ask our witnesses to please respond as promptly as you're able. Without objection, all members will have five legislative days within which to submit extraneous materials to the Chair for inclusion in the record. This hearing is adjourned.

**Load-Date:** April 5, 2020

---

**End of Document**