**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY SECURITIES LITIGATION | Case No. 1:20-cv-04494 (GHW)<br><br>**CLASS ACTION**<br><br>**ORAL ARGUMENT REQUESTED** |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ....................................................................................................1

II.   STATEMENT OF FACTS .....................................................................................5

    A.    Wells Fargo Commits Massive Consumer Fraud Leading to Record Fines,
           Punitive Consent Orders, and an Unprecedented Asset Cap ..................................5

    B.    Defendants Repeatedly Misrepresent the Bank's Compliance with the Consent
           Orders and Withhold Material Information from Investors...................................6

        1.    Defendants Misleadingly Tell Investors That the Bank Had "Plans in
                Place" and Was Already "Executing" Those Plans, Failing to Disclose
                That the Regulators Rejected the Bank's Proposed Plans .......................... 6

        2.    Defendant Sloan Knowingly Lies to Congress About the Bank's
                Compliance with the Consent Orders ........................................................ 10

        3.    The Bank's Interim-CEO, CFO, and Board Chairwoman Continue to
                Misrepresent the Bank's Compliance with the Consent Orders ............... 12

    C.    A Thorough House Financial Services Committee Investigation Finds That Wells
           Fargo Misrepresented Its Compliance with the Consent Orders ..........................13

    D.    Duke and Director Quigley Are Forced to Resign, and the Bank's New CEO and
           Others Provide Damning Testimony ....................................................................14

    E.    The Truth Emerges ............................................................................................15

III.  ARGUMENT...........................................................................................................15

    A.    The Complaint Adequately Pleads Material Misstatements and Omissions .........16

        1.    Defendants Repeatedly Omitted Highly Material Information from
                Investors, and the Rules Governing CSI Are No Excuse ......................... 17

        2.    Defendants Misled Investors That the Bank Had Approved "Plans in
                Place" Under the Consent Orders and Was "Executing" Those Plans ..... 21

        3.    Defendants Misled Investors That the Bank Had Disclosed All Material
                Updates Concerning the Consent Orders................................................... 39

        4.    Defendants Misled Investors About the Asset Cap Being Lifted............. 43

    B.    The Complaint Adequately Pleads Scienter ........................................................47

1.    Sloan, Shrewsberry, Duke, and Parker Were Personally Responsible for Ensuring Compliance with the Consent Orders ........................................ 48

2.    The Defendants Were Each Told That the Regulators Rejected the Bank's Proposed Stage 1 Plans .............................................................................. 48

3.    Sloan Admitted That He Misrepresented the True Facts to Congress and the Media ...................................................................................................... 50

4.    Sloan and Duke Manipulated the Bank's Disclosures to Actively Conceal the Truth ..................................................................................................... 50

5.    The Bank's Compliance with the Consent Orders and Removal of the Asset Cap Were the Most Important Issues Facing the Bank ................... 52

6.    Defendants Repeatedly Spoke about the Status of the Bank's Compliance with the Consent Orders, Including in Response to Analyst Questions ... 52

7.    The Bank's CEO and Chairperson Were Forced to Resign ...................... 53

8.    Sloan Was Financially Motivated to Mislead Investors .......................... 54

9.    Defendants' Counter-Narrative Is Uncompelling .................................... 55

C.    The Complaint Adequately Pleads Section 20(a) Claims ..................................... 59

IV.    CONCLUSION .................................................................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)...................................................................................35, 57

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)................................................................52, 53

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)..........................................................................................20

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017).........................................................................42, 43

*Bricklayers and Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012).........................................................................27

*Burges v. BancorpSouth, Inc.*,
2015 WL 1640544 (M.D. Tenn. Mar. 11, 2015) ............................................................20

*Burges v. BancorpSouth, Inc.*,
2015 WL 4198795 (M.D. Tenn. July 10, 2015) ............................................................20, 21

*Burkle v. OTK Assocs., LLC*,
2 F. Supp. 3d 519 (S.D.N.Y. 2014) ..........................................................................32

*Caiola v. Citibank, N.A., N.Y.*,
295 F.3d 312 (2d Cir. 2002)...............................................................................4, 20

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F. 3d 227 (2d Cir. 2014)..................................................................................59

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ................................................................28

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013).....................................................................44, 45, 47

*City of Birmingham Firemen's and Policemen's Supplemental Pension Sys. v.*
*Ryanair Hldgs.*,
2020 WL 2834857 (S.D.N.Y. June 1, 2020) ................................................................59

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012).........................................................................54

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ........................................................................45

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020).................................................................35, 36, 43, 46

*In re Delcath Sys., Inc. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014)......................................................................................58

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018)....................................................................................43

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
413 F. Supp. 3d 187 (S.D.N.Y. 2019)...................................................................16, 24, 39, 60

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013).....................................................................................45

*In re ForceField Energy Inc. Sec. Litig.*,
2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) ........................................................................31

*Galestan v. OneMain Hldgs., Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018).....................................................................................50

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)....................................................................................................30

*Gormley v. Magicjack Vocaltec Ltd.*,
220 F. Supp. 3d 510 (S.D.N.Y. 2016).....................................................................................17

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ..........................................................................56

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016)......................................................................................................55

*In re Intercept Pharm., Inc. Sec. Litig.*,
2015 WL 915271 (S.D.N.Y. Mar. 4, 2015) ............................................................................52

*JBCHoldings. NY, LLC v. Pakter*,
931 F. Supp. 2d 514 (S.D.N.Y. 2013).....................................................................................56

*Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006).....................................................................................30

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)..................................................................................................................19

*In re MBIA, Inc., Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010)......................................................................31, 55

*Meyer v. Jinkosolar Hldgs. Co.*,
    761 F.3d 245 (2d Cir. 2014)...................................................................................16, 45

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ...........................................................................28

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ............................................................................27, 53

*Nguyen v. New Link Genetics Corp.*,
    297 F. Supp. 3d 472 (S.D.N.Y. 2018)...........................................................................54

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...................................................................................47, 53

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)...................................................................................35, 46, 57

*Overton v. Todman & Co., CPAs, P.C.*,
    478 F.3d 479 (2d Cir. 2007).........................................................................................47

*In re Par Pharm. Inc. Sec. Litig.*,
    733 F. Supp. 668 (S.D.N.Y. 1990) ..............................................................................20

*Perrigo Co. PLC v. Mylan N.V.*,
    2015 WL 9916726 (S.D.N.Y. Oct. 29, 2015) .............................................................32

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)..........................................................................27

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
    2017 WL 5312182 (S.D.N.Y. Nov. 13, 2017).............................................................49

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)..............................................................56

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015)......................................................................50, 53

*Rubin v. Schottenstein, Zox & Dunn*,
    143 F.3d 263 (6th Cir. 1998) .......................................................................................20

*S.E.C. v. Gabelli*,
    653 F.3d 49 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013)...........................16

*S.E.C. v. Mayhew*,
  121 F.3d 44 (2d Cir. 1997)................................................................................27

*In re Salix Pharm, Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).....................................44, 48, 52, 53

*In re Sanofi-Aventis Sec. Litig.*,
  774 F. Supp. 2d 549 (S.D.N.Y. 2011)............................................................52, 58

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
  968 F.3d 204 (2d Cir. 2020).....................................................................18, 20, 21

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)............................................................................47, 55

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)...........................................16, 27, 53

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019).................................................................................28

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020) ................................................. passim

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 4208442 (S.D.N.Y. July 21, 2020) ...............................................39, 55

*In re Synchrony Fin. Sec. Litig.*,
  2021 WL 560204 (2d Cir. Feb. 16, 2021).....................................................15, 28

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)................................................................56

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).....................................................................................47, 48, 54

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)..............................................................28, 46, 47, 58

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013)...............................................................53

*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003)................................................................52

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)..............................................................................45

vii

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b-5(b) ................................................................................................16

## I.    **INTRODUCTION**

This action arises from Wells Fargo's false and misleading statements and omissions during the Class Period of February 2, 2018 through March 12, 2020, regarding the status of its compliance with the historic Consent Orders imposed by the Bank's Regulators following the Bank's massive consumer frauds.[1] The Complaint is backed by the reports of the U.S. House of Representatives Committee on Financial Services (the "House Financial Services Committee"), which conducted an in-depth investigation and issued detailed findings, including that Defendants' public statements were "unsupported by the facts on the ground," "inaccurate and misleading," and had "no basis." The Bank's intentional false statements and omissions were so significant that the Chairwoman of the House Financial Services Committee formally recommended that the U.S. Department of Justice ("DOJ") consider criminal charges against the Bank's former CEO, Defendant Timothy J. Sloan ("Sloan"), for lying to Congress. As the true facts were exposed to investors, the Bank's stock price plummeted, with investors losing billions of dollars in shareholder value.

In 2018, in response to Wells Fargo's years of "reckless banking practices," the Bank's Regulators levied a historic $1 billion fine and imposed an unprecedented asset cap prohibiting the Bank from growing its assets until it satisfied the three stages of the Consent Orders. As the Bank's then-Chairwoman, Defendant Elizabeth Duke ("Duke"), acknowledged, the Bank's "credibility and perhaps even viability as a company [wa]s dependent on [it] successfully exiting" the Consent

---

[1] Capitalized terms not defined in this brief have the meanings assigned in the Consolidated Amended Class Action Complaint ("Complaint"), and the term "Consent Orders" refers to the three consent orders imposed by the Regulators in 2018. Citations to "¶"; "Mot."; and "DX" are to the Complaint, Defendants' memorandum of law in support of their motion to dismiss (ECF No. 90), and the Declaration of Richard C. Pepperman II (ECF No. 91). Unless otherwise stated, all emphasis is added, and internal quotation marks and citations are omitted.

Orders. To do so, the Bank was required to: first, receive written regulatory approval of a plan to reform the Bank's compliance and oversight systems ("Stage 1"); second, implement and execute the plan ("Stage 2"); and third, obtain third-party validation of the execution and implementation of the plan ("Stage 3").

Throughout the Class Period, Defendants made numerous false and misleading statements and omitted material facts regarding the Bank's compliance with the Consent Orders. First, they misled investors into believing that Wells Fargo had passed Stage 1 of the Consent Orders and was working through Stage 2. On at least eleven occasions during the Class Period, they said that the Bank had the required "plans in place" (*i.e.*, past Stage 1) and was "executing the plan as opposed to designing it" (*i.e.*, in Stage 2). Second, Defendants falsely touted the Bank's transparency regarding their compliance with the Consent Orders, stating that "our investors know everything that's material that we know" and there was "nothing new to report." Third, Defendants misleadingly stated that the Bank would satisfy the FRB Consent Order's requirements and the asset cap would be lifted in 2019, without disclosing the true facts undermining their timeline.

Unknown to investors, Wells Fargo's required compliance overhaul did not even get off the ground during the Class Period. Behind the scenes, the Regulators rejected—on six separate occasions—the Bank's Stage 1 Plan as "materially incomplete," containing "pervasive inaccuracies," replete with "illogical timeframes," and "so inadequate as to raise concerns about the company's leadership." They also criticized the Bank and Sloan for their public misrepresentations about the Consent Orders, causing Sloan to privately "apologize [to the Federal Reserve] for the mischaracterizations in his statements during [congressional] hearings and to the media," and resign from the Bank. Internally, the Bank admitted it "totally biffed it" and recognized that, if disclosed, investors would find the true facts "completely unacceptable." Even

2

by the end of the Class Period—three years after the Consent Orders were issued—Wells Fargo had no approved plans and was still mired in Stage 1 of the Consent Orders.

The true facts have now been revealed. Following a confidential year-long investigation, in March 2020, the House Financial Services Committee issued a pair of reports and held a series of grueling congressional hearings. The House Reports detailed the Bank's litany of rejection letters from its Regulators, as well as threats of further enforcement action in the face of the Bank's continued noncompliance. During the hearings, Defendant Duke admitted she knew during the Class Period that the Bank's management team could not get plans "written in a complete fashion" and that its delays were "red flags." Defendant Charles W. Scharf ("Scharf"), Sloan's replacement, further admitted that the House Reports were "consistent with what [he] found since [he] arrived at the Company." Members of the House Financial Services Committee excoriated Defendants for their "dereliction of duty" and for "allow[ing] management to repeatedly submit materially deficient plans in response to the consent orders." As the market learned the full truth, Wells Fargo's stock price plummeted approximately 23%.

Faced with these facts, Defendants try to rewrite their Class Period statements. They graft in words that were never said, strip the context away from the "true facts on the ground," and argue about what Defendants supposedly "meant" as opposed to what they actually said. But as set forth below, the plain language of Defendants' statements was false and misleading, including by omission, causing investors to reasonably believe that the Bank had satisfied Stage 1 of the Consent Orders, had provided all material updates to the market, and that the Bank would satisfy the FRB Consent Order's requirements and the asset cap would be timely lifted.

Defendants also try to hide behind the very Regulators who identified their wrongdoing. They claim that they could not speak truthfully to investors because of purported restrictions on

disclosing confidential supervisory information ("CSI"). But Defendants repeatedly spoke to investors in detail about the status of their compliance with the Consent Orders and their interactions with the Regulators—the very same topics they claim CSI rules barred them from disclosing. The law is clear that if Defendants cannot speak fully, they must remain silent, but "upon choosing to speak, one must speak truthfully about material issues" and "be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002).

Defendants also contend that the Complaint fails to plead a strong inference of scienter. But they ignore the Complaint's detailed allegations and established Second Circuit law. Indeed, this is not a case where Defendants merely "could have" accessed contradictory information. Rather, there is no question that Defendants had actual knowledge flatly contradicting their public statements: they each personally received multiple formal rejection letters and critical reports from the Regulators, regularly attended (sometimes daily) meetings with the Regulators, and were required to pen their own "progress reports" that showed the Bank's failings. They also ignore the House Financial Services Committee's findings of intentional wrongdoing.

The Complaint also includes a plethora of additional facts bolstering the scienter inference. Among other things, Sloan admitted that he lied to the public, he was forced to resign, and $15 million of his compensation was clawed back. And Congress demanded that Duke and another long-time Director, James Quigley, resign due to their fraudulent conduct. The Complaint also alleges in detail how the Bank's most senior executives actively concealed material facts from investors, including agreeing to "tone down" a disclosure for fear of investors learning the truth.

In sum, the Complaint pleads actionable claims. Defendants' Motion should be denied.

4

## II.    STATEMENT OF FACTS

### A.    Wells Fargo Commits Massive Consumer Fraud Leading to Record Fines, Punitive Consent Orders, and an Unprecedented Asset Cap

In 2016, Regulators found that Wells Fargo had engaged in "pervasive and persistent misconduct" and "reckless," "unsafe," and "unsound" risk management and oversight banking practices. ¶¶2, 44. As a result, the CFPB and the OCC fined Wells Fargo a record $135 million and issued coordinated consent decrees mandating reform of the Bank's risk management. ¶37.

Despite these directives, on February 2, 2018, the Federal Reserve found that Wells Fargo failed to "establish[] and maintain[] an adequate risk management framework" (¶44), causing the Federal Reserve to impose its own severe consent order on Wells Fargo, accompanied by an unprecedented asset cap (the "FRB Consent Order"). ¶43. The asset cap prohibited Wells Fargo from increasing the size of its assets, and therefore impaired Wells Fargo's largest source of income: interest income on interest-earning assets. ¶¶55-56. Analysts called the asset cap "severe and unprecedented" and a "'Fear of God' Penalty." ¶¶57-58. The Federal Reserve also criticized Sloan, Duke, and the entire Wells Fargo Board for failing to "meet our supervisory expectations" and warned that it expected the Board to "ensure that senior management establishes and maintains an effective risk management structure that has sufficient stature, authority, and resources." ¶53.

The FRB Consent Order was negotiated by Defendants Sloan, Duke, John R. Shrewsberry ("Shrewsberry"), and Allen Parker ("Parker") and signed by Sloan and Duke and the entire then-current Board. ¶¶43, 53. The FRB Consent Order made the Board responsible for submitting to the Federal Reserve "written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof." ¶54.

To satisfy the FRB Consent Order and lift the asset cap, the Bank was required to overhaul its governance and risk management through a specific three-stage process. ¶¶47-51. At Stage 1,

5

the Bank was required to submit a compliant plan to the Federal Reserve detailing the measures it would take to correct its oversight failures and how and when those measures would be implemented (the "Stage 1 Plan"). ¶48. At Stage 2, once the Federal Reserve gave written approval to the Bank's proposed Stage 1 Plan, the Bank was required to "implement the approved plans and thereafter fully comply with them." ¶50. And at Stage 3, the Bank was required to hire a third party to validate that the approved plans were effectively implemented and provide that validation to the Federal Reserve. ¶51.

On April 20, 2018, the OCC and CFPB imposed additional coordinated consent orders on the Bank, fining the Bank over $1 billion for continuing to operate in a manner that was "reckless, unsafe, or unsound" (the "OCC/CFPB Consent Orders" and together with the FRB Consent Order, the "Consent Orders"). ¶59. Like the FRB Consent Order, the OCC/CFPB Consent Orders demanded that Wells Fargo fix its compliance risk management and remediate harmed consumers, including through satisfying the same three stages of reform: approved plans, "implementing" and "executing" those plans, and receiving third-party "validation" of the execution of the plans. ¶¶60-64. The OCC/CFPB Consent Orders placed "ultimate responsibility" for compliance on the Board, including Defendants Sloan and Duke. ¶65.

> **B.**     **Defendants Repeatedly Misrepresent the Bank's Compliance with the Consent Orders and Withhold Material Information from Investors**
>
> > **1.**     **Defendants Misleadingly Tell Investors That the Bank Had "Plans in Place" and Was Already "Executing" Those Plans, Failing to Disclose That the Regulators Rejected the Bank's Proposed Plans**

On February 2, 2018, Sloan announced the FRB Consent Order and told investors that the Bank was "on a fast track" to resolving it. ¶144. On April 3, 2018, Wells Fargo submitted its proposed Stage 1 Plan to the Federal Reserve. That same day, the Federal Reserve met with Duke and told her that the Bank's Stage 1 Plan was deficient, "missing major components such as plans

6

to address the company's deficiencies in operational and compliance risk management." ¶70.

Just weeks later, on May 7, 2018, in a letter to Sloan and Duke, the Federal Reserve officially rejected the Bank's Stage 1 Plan submission (the "May 7, 2018 Rejection Letter"). ¶71. The May 7, 2018 Rejection Letter, also reviewed by Parker and Shrewsberry, stated that the Bank's submission was so "materially incomplete" and "insufficient" that it "cannot be evaluated by [Federal Reserve] staff for [its] adequacy," that it "fail[ed] to comprehensively address operational risk," and that it was "missing key elements," including "key implementation details about all self-identified categories of operational risk." *Id.* It also stated that required "milestones and timelines" were missing, making it "impossible for the FRB to evaluate the company's progress." ¶72. The Bank's proposal was "so inadequate as to raise concerns about the company's leadership," and the Federal Reserve instructed the Bank to resubmit a compliant Stage 1 Plan within 90 days–*i.e.*, by July 2, 2018. *Id*.

The next day, after reviewing the May 7, 2018 Rejection Letter, Board member Theodore Craver admitted to Duke that ***"we totally biffed it"*** and that "[i]t would seem that there is little under the very important category of 'clean up the mess' that is bigger than this recent submission to the Fed." ¶73. Director Craver further internally acknowledged that "investors and customers would view this feedback from the Fed as completely unacceptable." ¶¶73-74.

Nonetheless, without disclosing the May 7, 2018 Rejection Letter to investors, just three weeks later during a May 30, 2018 Deutsche Bank Global Financial Services Conference, Shrewsberry denied that there was "anything meaningful we aren't already talking about" and said that "our investors know everything that's material that we know." ¶76.

On June 5, 2018, Sloan sent a letter to the Federal Reserve privately requesting a three-and-a-half month extension to submit an acceptable Stage 1 Plan, explaining that the Bank needed

more time to develop a "response that is acceptable to the Federal Reserve." ¶77.

During a June 13, 2018 Morgan Stanley Financials Conference, Shrewsberry did not mention the Federal Reserve's May 7, 2018 Rejection Letter or the Bank's delay in resubmitting its plans. Instead, he falsely stated that the Bank was "implementing" and "executing" under the FRB Consent Order and stressed that "it's the last mile of knitting all of this together." ¶¶78, 149. The following month, during a July 13, 2018 earnings call, Sloan reiterated there was "no change in the update from Investor Day" and claimed that the Bank's "expectation is that sometime in the first half of next year" the asset cap would be lifted. ¶79.

On July 24, 2018, Defendants were told that the OCC also had rejected its Stage 1 Plan under the OCC/CFPB Consent Orders (the "July 24, 2018 Rejection Letter"). ¶80. The July 24, 2018 Rejection Letter said that "the bank's submission response lacks substance and detail" and that the Bank's resubmission needed to "demonstrate prompt corrective actions" because delay in compliance could lead to further "supervisory and/or enforcement action." ¶81. The same day, the OCC met with the Bank's entire Board, including Sloan and Duke, to discuss the Bank's deficient submission and to reprimand its leadership for its failure in "addressing outstanding regulatory issues" and "holding senior management accountable." ¶82. During that meeting, Wells Fargo's Board admitted that its Stage 1 Plan proposal had been merely a "work in progress." ¶83. On August 11, 2018, Duke and Sloan met with the OCC again, and the OCC chastised the Bank for "ignor[ing]" the OCC's input, incomplete plans, and "*ad hoc*, insufficient" remediation. ¶84.

On August 24, 2018, Sloan sent yet another extension request to the Federal Reserve, pushing out the Bank's resubmission of its Stage 1 Plan to October 31, 2018. ¶85.

On November 21, 2018, in a letter to Wells Fargo's senior leaders, the OCC again formally rejected the Bank's Stage 1 Plan proposal (the "November 21, 2018 Rejection Letter"). The OCC

stated the Bank's "plan is not adequately supported." ¶87. As CFPB officials explained to Wells Fargo during a follow-up meeting, the proposed Stage 1 Plan was only "a plan for a plan." *Id*.

On December 4, 2018, despite these stern rejections, during a Goldman Sachs Investor Conference and then on a televised segment on CNBC, *Squawk on the Street*, Sloan told investors that the Bank was "executing the plan as opposed to designing it" and "we've got plans in place, we're executing on those plans" under the FRB Consent Order. ¶¶86, 157, 212, 232. Sloan likewise assured investors that there was "nothing new to report in terms of the timing or the dialogue with the regulators." ¶¶88, 160, 232. Even though the Bank had no reasonable basis to believe its revised Stage 1 Plan would be acceptable in light of the Bank's communications with the Regulators, Sloan also misleadingly told investors that the Bank would satisfy all of the FRB Consent Order's requirements and be relieved of the asset cap by "the first part of next year." ¶¶88, 162.

On January 15, 2019, during the Bank's fourth quarter 2018 earnings call, Sloan again spoke about the Bank's compliance with the Consent Orders. While he said that he had to be "careful" not to disclose CSI, he chose to tell investors about the Bank's communications with the Regulators, falsely stating that "we're in complete agreement with the Fed about what needs to be done, and we're in the midst of implementing that." ¶¶86, 167. He failed to disclose reality: the Regulators' multiple rejection letters, rebukes and threatened further enforcement action. ¶¶87, 168. Later that day, he appeared on Bloomberg's *Closing Bell* and continued to conceal the truth regarding the Bank's regulatory issues. ¶¶170-71.

Meanwhile, the Regulators continued to voice their dissatisfaction. During a January 24, 2019 meeting, the Federal Reserve told Wells Fargo's executives that the revised proposal submitted on October 31, 2018 was riddled with "improbable and unrealistic" deadlines. ¶89.

Nonetheless, on February 12, 2019, Shrewsberry attended a Credit Suisse Forum and again

spoke about the Bank's compliance with the Consent Orders. He claimed that the Bank was "making great progress" and that it was "reasonable" that the asset cap would be lifted by the "end of the year." ¶173. At no point did he disclose that the Federal Reserve had just weeks before informed Defendants that the Bank's Stage 1 Plan was "improbable and unrealistic." ¶¶89, 176.

On February 15, 2019, the OCC told Defendant Duke that it was "deeply concerned about the continuing (and in some cases worsening) problems," including the "large number of extension requests," and "missed expected completion dates." ¶89. Shortly thereafter, in a March 4, 2019 Quarterly Management Report to Wells Fargo, the OCC told Defendants that the Bank's "management and Board oversight remain inadequate," called its submission "poor-quality" and concluded that Wells Fargo's response had been "unacceptable." *Id*.

Rather than reveal to investors that the Bank was still at square one under the Consent Orders, on March 4, 2019, Sloan and Duke intentionally deleted from the Bank's proxy filing that there was a "substantial amount of work remaining to meet the expectations outlined" in the Consent Orders. ¶¶90-91. They agreed that this information, if disclosed, would cause the Bank's investors to (correctly) understand that "we are not close to lifting of the asset cap" and, accordingly, they decided that it was "better to tone down the [Bank's] actual disclosures…" *Id*.

### 2. Defendant Sloan Knowingly Lies to Congress About the Bank's Compliance with the Consent Orders

On March 12, 2019, Sloan testified before Congress. The day before his scheduled testimony, the Federal Reserve sent him a letter formally rejecting the Bank's second, revised Stage 1 Plan proposal (the "March 11, 2019 Rejection Letter"), finding that it "remain[ed] materially incomplete," had "illogical timeframes," and suffered from "[p]ervasive inaccuracies." ¶93. The Federal Reserve warned that "[c]ontinued failure to submit acceptable plans reflects poorly on the [the Bank], and negatively influences supervisors' view of the board and senior

management's capacity to effectively manage and govern the firm." ¶94. The Federal Reserve cautioned that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions." *Id*.

During his sworn testimony, Sloan hid these facts. He told Congress that the Bank had the requisite "plans in place" under the OCC/CFPB Consent Orders and was "executing that plan." He further stated that the Bank had "done" what was required under the FRB Consent Order "to improve the Board governance and oversight." ¶¶95, 178. Recognizing that he had lied during his testimony, Sloan then privately "called the Federal Reserve to apologize for his mischaracterizations in his statements during the hearings and to the media." ¶¶96, 219.

The OCC was stunned. On March 13, 2019, the OCC privately concluded that Sloan's testimony was false because the OCC had rejected the Bank's proposed plans, and told the Wells Fargo Board that Sloan's testimony was "inaccurate." ¶98. The OCC said that the Bank's "lack of progress in the controls environment … ha[s] wasted time and weakened the institution, creating further safety and soundness concerns." ¶99. The OCC "seriously question[ed]" whether Sloan could "affect the necessary changes given the circumstances." ¶100. In an executive session with the Bank's Board that same day, excluding Sloan, the OCC said that "Tim [Sloan] has been reluctant to make the necessary changes." *Id*.

On March 20, 2019, the OCC again told Sloan that "[t]here are many examples here where [you] ha[ve] failed to show the leadership necessary to move the institution forward when it is clear that there are significant problems," including risk and compliance. ¶101.

As a result, Wells Fargo's Board ousted Sloan, announcing his "resignation" just days later, on March 28, 2019. ¶102. But the Bank and Defendants concealed that Sloan was being ousted due to the Regulators' serious concerns about his failed leadership of the Bank and his false

11

statements to the public regarding the Bank's compliance with the Consent Orders. Defendants also hid that Sloan would "resign" without any incentive compensation for 2019. *Id*.

### 3.   The Bank's Interim-CEO, CFO, and Board Chairwoman Continue to Misrepresent the Bank's Compliance with the Consent Orders

The deception continued after Sloan's "resignation." On April 12, 2019, the Bank's interim CEO, Parker, assured investors that the Bank was "way down the road" in satisfying the Consent Orders and was "pointed toward completion and implementation." ¶¶104, 192. Shrewsberry, in an appearance on CNBC the same day, likewise said that the Bank was "later in that cycle" and not "just doing the same thing over" under the FRB Consent Order. ¶¶104, 195. Hidden from investors, among other things, was that the CFPB had written to Wells Fargo's Board the same day, echoing the OCC's findings that the Bank was not in compliance with the OCC/CFPB Consent Orders and reiterating that the CFPB had not approved the Bank's Stage 1 Plan submission. ¶105.

Making matters worse, on June 10, 2019, Duke and Parker requested yet another extension from the Federal Reserve, until April 30, 2020, to try to submit an acceptable Stage 1 Plan. ¶106. Then, in a July 2019 Examination Report sent to Wells Fargo, the OCC stated that it was "deeply concerning that [the] Board and management were unable to address these concerns with the appropriate resources, escalation, and urgency." ¶105. These concerns were reiterated in a September 9, 2019 report sent to the Bank, which stated that "many plans have been resubmitted multiple times or extended" without compliance with the OCC/CFPB Consent Orders and that the Bank's "remediation efforts remain[] a concern." *Id*.

On September 27, 2019, Duke, nevertheless, told investors that the Bank was "pretty well along in a lot of the work, and we've defined out the work for each individual piece of it, each individual agreement with a regulator." ¶107. On October 15, 2019, Parker also falsely assured investors that "we've designed and implemented … our new risk management framework." *Id*.

12

**C.    A Thorough House Financial Services Committee Investigation Finds That Wells Fargo Misrepresented Its Compliance with the Consent Orders**

In early March 2020, the House Financial Services Committee released its findings into Wells Fargo's purported compliance with the Consent Orders. The House Reports were a product of a confidential, year-long investigation that included interviews of high-level Wells Fargo executives and senior regulatory officials, as well as a review of over 233,000 internal Bank documents. ¶109. The House Financial Services Committee found that: (i) even as of March 2020, the Regulators had not approved Wells Fargo's "shoddy" and "incomplete" Stage 1 Plan proposals under the Consent Orders; and (ii) Defendants' public statements about Wells Fargo's purported satisfaction of the Consent Orders were "incomplete" and "unsupported by the facts on the ground" at the time that Defendants made them. ¶¶109-26.

The House Financial Services Committee gave multiple examples of Defendants' false and misleading statements. For example, it found that Sloan's March 12, 2019 congressional testimony "gave inaccurate and misleading testimony about the status of Wells Fargo's compliance with the requirements" of the Consent Orders. ¶123. Sloan misled the public that the Bank "was fully complying with its regulators" and that "the bank had done everything the regulators asked, and was on track to resolve the consent orders." *Id.* He also falsely "downplayed the bank's status with the regulators and mischaracterized the situation to Congress." *Id.*

The House Financial Services Committee further found that Sloan's testimony that "we are in compliance with those plans" (¶178) was false and misleading because neither the CFPB nor the OCC had approved the Bank's plan proposal. ¶124. As the House Financial Services Committee explained, "Wells Fargo was no closer to complying with the regulators' consent orders when Tim Sloan resigned in March 2019 than when his team took over in 2016." ¶123. Additionally, the House Financial Services Committee found that Wells Fargo and its executives

"misrepresented the bank's progress toward lifting the FRB's asset cap in a series of public statements." ¶125. On this score, it found that "there was no basis for" Defendants' statements to investors that the asset cap would be lifted during the first half of 2019. ¶126.

### D. Duke and Director Quigley Are Forced to Resign, and the Bank's New CEO and Others Provide Damning Testimony

The House Reports were issued in connection with a trio of hearings set for the second week of March 2020, at which Scharf, Duke, and Director Quigley were set to testify. ¶127.

During the first hearing, Scharf admitted that the House Reports were "consistent with what I found since I arrived at the Company; [t]hat we have not done what is necessary to be done." ¶131. He further admitted that, even two years after the Consent Orders, the Bank "ha[d] not yet done what's necessary to address [its] shortcomings." *Id*. Following that first hearing, Chairwoman Waters sent a letter to the DOJ requesting it criminally investigate Sloan for his "inaccurate and misleading testimony" to Congress on March 12, 2019. ¶141.

Faced with the Bank's well-documented misstatements, the House Financial Services Committee's scathing reports and calls from Chairwoman Waters for them to resign, Duke and Director Quigley resigned just days before they were set to testify. ¶128. At the second hearing, Congressman McHenry, the top Republican on the House Financial Services Committee, stated that "[i]t's clear from the documents that the majority and minority [] have the same findings of facts … [S]evere deficiencies in management practices that were unique to Wells Fargo and [the] unique failures of this Board of Directors." ¶133. Chairwoman Waters found Duke and Director Quigley engaged in a "dereliction of duty." *Id.* Others were even harsher, with Congressman Scott stating that the Board "allowed the bank's management to repeatedly submit material that was deficient in response to the consent orders from our regulators. You did that." *Id.* Congressman Scott accused the directors of "not coming with the truth." *Id.* "What a sorry excuse for a Board,"

14

he concluded. *Id*.

Confronted with Congress's findings, Duke admitted that she knew the Regulators had rejected the Bank's Stage 1 Plan proposals repeatedly and that the Bank's late submissions and serial extension requests were "red flags." ¶134. Duke also admitted that she had contemporaneous knowledge that Wells Fargo could not do the work required by the Consent Orders and the management team was not capable of getting plans "written in a complete fashion." *Id*. Duke further recognized that certain former Wells Fargo employees should face criminal charges. ¶135.

Following the hearings, Wells Fargo clawed back $15 million in performance share awards that it had granted Sloan in 2019 due to his "role and responsibility for the Company's progress in resolving outstanding regulatory matters." ¶137. The Bank also belatedly revealed that Sloan received no severance upon his "resignation" from the Bank due to "the status of the Company's risk management objectives and outstanding regulatory matters, including the progress that continued to be required on both at the time of his resignation." *Id*.

### E.   The Truth Emerges

As the truth was revealed over the course of several disclosures throughout 2019 and early 2020, the price of Wells Fargo's stock cratered. ¶¶239, 245-46, 254, 258, 262. On each disclosure, analysts and the press commented on the revelations, but were assured by Defendants that they were in agreement with the Regulators and implementing their Stage 1 Plan. ¶¶241-43, 248-49, 256. All told, investors lost billions in shareholder value, including when the Bank's stock price dropped over 22.5% after the conclusion of the March 2020 congressional hearings. ¶142.

## III.   ARGUMENT

As the Second Circuit recently reiterated, the court "must be careful not to mistake [the PSLRA's] heightened pleading standards for impossible ones," and plaintiffs "need not prove their entire case within the confines of the complaint." *In re Synchrony Fin. Sec. Litig.*, 2021 WL

15

560204, at *1 (2d Cir. Feb. 16, 2021). "Even under the [PSLRA], which establishes heightened pleading requirements for securities fraud claims, the usual rules for determining motions to dismiss pertain: the well-pleaded allegations of the complaint are deemed true and all reasonable inferences are drawn in favor of the pleader." *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *10 (S.D.N.Y. Nov. 26, 2018).

Defendants here contest only whether the Complaint sufficiently alleged (i) material misstatements or omissions; (ii) scienter; and (iii) control person liability. As discussed below, these arguments fail.

### A.    The Complaint Adequately Pleads Material Misstatements and Omissions

Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" *or* "omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "A statement is misleading if a reasonable investor would have received a false impression from the statement." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *7 (S.D.N.Y. June 16, 2020) (Woods, J.) ("*Skiadas I*"). "The law is well settled ... that so-called half-truths—literally true statements that create a materially misleading impression—will support claims for securities fraud." *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011). "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Hldgs. Co.*, 761 F.3d 245, 250 (2d Cir. 2014).

"[W]hether a reasonable investor, in the exercise of due care, would have received a false impression from a statement requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts [and] is therefore generally a question of fact for the jury"—not for resolution on a motion to dismiss. *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 210 (S.D.N.Y. 2019) (Woods, J.) ("*DoubleLine*

16

*II*"); *Gormley v. Magicjack Vocaltec Ltd.*, 220 F. Supp. 3d 510, 516 (S.D.N.Y. 2016) (same).

As described further below, throughout the Class Period, Defendants misled investors by omitting highly material information on the very topics about which they elected to speak, and by making false and misleading statements.

### 1.    Defendants Repeatedly Omitted Highly Material Information from Investors, and the Rules Governing CSI Are No Excuse

As Defendants' Motion demonstrates over the course of twenty-five pages, Defendants spoke repeatedly throughout the Class Period regarding their compliance with the Consent Orders. On at least sixteen separate occasions, Defendants falsely spoke regarding the Consent Orders, including claiming to be "executing" and "implementing" the required "plans" (*see, e.g.*, ¶¶149, 157, 163, 167, 185, 192, 195, 198, 201, 205, 208), to have nothing new to disclose or to have disclosed "everything that's material that we know" regarding their progress in satisfying the Consent Orders (*see, e.g.*, ¶¶146, 154, 160) and that the asset cap would be lifted in the (completely unrealistic) time frames Wells Fargo had said (*see, e.g.*, ¶¶144, 152, 154, 162, 165, 177).

Despite electing to speak repeatedly about their compliance with the Consent Orders, Defendants concealed highly material information on that topic, including: (i) that the Bank never passed Stage 1; (ii) that the Federal Reserve, OCC, and CFPB rejected on six separate occasions the Bank's Stage 1 Plans; (iii) the Regulators' harsh reprimands of the Bank and its leadership for its deficient plan proposals; (iv) the Regulators' repeated rebukes of the Bank, its top executives and the Board for their failure to comply with the Consent Orders' basic requirements, which they found "deeply concerning"; and (v) the Regulators' repeated threats of further enforcement as a consequence of the Bank's persistent failures. ¶¶69-72, 74-75, 80-84, 87-89, 93-94, 98-100, 105, 116. Having elected to speak about their purported status of compliance with the Consent Orders and put the topic "in play," Defendants were obligated—but failed—to "speak accurately and

17

completely." *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020).

Defendants argue that certain of these omissions should be excused because CSI restrictions tied their hands. *See* Mot. at 19, 23, 24, 28, 33, 43-45, 47.[2] But the rules governing confidential supervisory information ("CSI") do not alter their obligations under, or excuse any of their violations of, the federal securities laws.

First, Defendants' CSI argument is wholly undermined by the fact that Defendants repeatedly spoke to investors at length on the very topics they claim are restricted by CSI. For example, during Sloan's congressional testimony, he spoke repeatedly (and falsely) about the status of the Bank's compliance with the Consent Orders. After stating that he could not disclose CSI, Sloan told Congress—in response to the question of "whether or not the bank is in compliance, based on reviews that are done by the OCC and Consumer Bureau"—that *"[w]e are in compliance with those plans."* ¶178. Similarly, when asked whether "the bank disclosed to investors the status of the plans that it submitted to the OCC and the Consumer Bureau, including whether the regulators have raised any objections to the bank's submitted plans," he made clear that, while he could not disclose CSI, he could state (and did falsely state) that the Bank had the *"plans in place."* ¶¶95, 178. Defendants cannot logically claim that they were restricted by CSI from accurately telling investors they were not in compliance with the Consent Orders, when they regularly, and falsely, told investors the exact opposite, namely that they were in compliance.

Indeed, Defendants concede that whether the Bank was still preparing its Stage 1 Plan under the Consent Orders (as opposed to implementing and executing those plans) was not CSI.

---

[2] Defendants concede that CSI restrictions do not excuse their omissions with respect to the following statements: February 2, 2018; June 13, 2018; December 4, 2018 on CNBC; January 15, 2019 on Bloomberg; February 12, 2019; April 12, 2019 on the earnings call and on CNBC; September 27, 2019; or December 10, 2019.

For example, Defendants claim (wrongly) that Shrewsberry "made clear [to investors] that Wells Fargo was still working on a suitable submission" under the Consent Orders. Mot. at 22. Defendants further claim (again wrongly) that Sloan "stated that Wells Fargo was still waiting for the FRB to complete its review of the Company's plans." Mot. at 28. Defendants' arguments that they *did disclose* to investors that they had not received approval of their proposed Stage 1 Plan contradicts their argument in their Motion that they *could not tell* investors these very same facts.

Moreover, the Regulators, Congress, and the Bank's ex-CEO have each recognized that "CSI restrictions" did not excuse Defendants' misrepresentations. Both the Democrats and Republicans on the House Financial Services Committee found that Wells Fargo and its ex-CEO gave, notwithstanding any CSI restrictions, "inaccurate and misleading testimony," with Chairwoman Waters recommending criminal action against Sloan for doing so. ¶¶123, 141. The OCC likewise found—and told the Bank's Board—that Sloan's public statements were "inaccurate," regardless of any CSI limitations. ¶98. And Sloan himself conceded that CSI restrictions did not permit him to misrepresent the truth, which is precisely why he personally called the Federal Reserve "to apologize for his mischaracterizations in his statements during the hearings and to the media." ¶96.

If Defendants believed that CSI restrictions precluded them from telling the truth, they should have said so, instead of speaking half-truths and outright lies about the status of their compliance with the Consent Orders. As the Supreme Court has explained, "companies can control what they have to disclose under [the securities laws] by controlling what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011). Full disclosure is required "when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Id*. When one "speaks on an issue or topic," they put the topic "in play" and thus

trigger the duty to "speak accurately and completely." *Setzer*, 968 F.3d at 214 n.15; *see also Caiola*, 295 F.3d at 331 ("upon choosing to speak, one must speak truthfully about material issues" and "be both accurate and complete.").

As courts routinely recognize, that principles permitting or requiring nondisclosure do not override or alter a company's obligation under the federal securities laws to speak accurately and completely once the topic has been put "in play." For example, in *In re Par Pharmaceuticals Inc. Securities Litigation*, defendants argued that the Fifth Amendment privilege against self-incrimination excused their failure under the federal securities laws to disclose the full truth. 733 F. Supp. 668, 675 (S.D.N.Y. 1990). In rejecting this contention, the court explained that "[r]ather than force [the defendant] to incriminate himself, the federal securities laws require him to refrain from issuing misleading statements." *Id.* at 675 n.8. The court noted that defendants control their own fate: they "did not have to permit the issuance of the misleading statements which created the duty to disclose the incriminating information." *Id.*; *see also Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998) (rejecting attorney's assertion of confidentiality as defense to Exchange Act liability because the attorney "assume[d] a duty to provide complete and nonmisleading information with respect to subjects on which he undert[ook] to speak").[3]

Likewise, in *Burges v. BancorpSouth, Inc.*, defendants pointed to CSI restrictions to excuse their misrepresentations that they were "in compliance with all banking laws" and "had no knowledge of any fact or circumstance" that would impede regulatory approval. *Burges v. BancorpSouth, Inc.*, 2015 WL 4198795, at *4 (M.D. Tenn. July 10, 2015); Mem. in Supp. of Def. Mot. to Dismiss (ECF No. 56), *Burges v. BancorpSouth, Inc.*, No. 14-1564, 2015 WL 1640544

---

[3] Indeed, the Supreme Court in *Basic* addressed a very similar situation, noting that a defendant that wishes to maintain the secrecy of ongoing merger negotiations may simply be silent or answer "no comment" to a question on the topic. *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).

20

(M.D. Tenn. Mar. 11, 2015). The court rejected this argument, explaining that when defendants "chose to speak on the issue of their compliance with banking laws and regulations" they could not be misleading. *Burges*, 2015 WL 4198795, at *4-5.

The same logic applies here. Rather than remain silent, Defendants chose to speak to investors at length and repeatedly about their purported "progress" with the Consent Orders, including how they were "executing" under them, had "nothing new to report in terms of [the Bank's] dialogue with the regulators," and that the asset cap would be lifted, "sometime in the first half of next year." *See, e.g.*, ¶¶88, 95, 154, 178. Having put these subjects "in play," Defendants were obligated to "speak accurately and completely." *Setzer*, 968 F.3d at 214 n.15. They failed to do so and cannot now invoke "CSI restrictions" to excuse that failure.

### 2. Defendants Misled Investors That the Bank Had Approved "Plans in Place" Under the Consent Orders and Was "Executing" Those Plans

In addition to omitting material facts, Defendants' statements regarding their status of compliance under the Consent Orders were false and misleading. In truth, the Bank never had the "plans in place" required by the Consent Orders, and never moved past designing its plans under Stage 1 to begin "implementing" and "executing" under Stage 2. To the contrary, the Regulators repeatedly—on six separate occasions—rejected the Bank's proposed Stage 1 Plans, finding them "unacceptable," "poor-quality," "wholly incomplete," "inadequate," and merely "a plan for a plan." ¶¶71, 80, 87, 89, 93, 105, 116. The Bank's top executives and directors internally admitted that the Bank "totally biffed it" in its Stage 1 Plan submission and, if investors learned the truth, they would find it "completely unacceptable." ¶¶73-74. Even by the end of the Class Period, two years later, the Bank *still* had not achieved approval of its plans under any of the Consent Orders and had not progressed into the "implementation" and "execution" stage. ¶¶69-72, 77, 85, 93.

Further, both the Democratic and Republican members of the House Financial Services

21

Committee found that Defendants misrepresented Wells Fargo's purported status of compliance with the Consent Orders. The House Financial Services Committee found that the Bank's public statements were "incomplete" and "unsupported by the facts on the ground" at the time that Defendants made them. ¶¶121-24. It further determined that Sloan "gave inaccurate and misleading testimony about the status of Wells Fargo's compliance with the requirements" of the OCC/CFPB Consent Order. ¶123. It also found that Sloan misled the public into believing that the Bank "was fully complying with its regulators," "had done everything the regulators asked," and "was on track to resolve the consent orders." *Id*. And it concluded that Sloan falsely and misleadingly "downplayed the bank's status with the regulators and mischaracterized the situation to Congress." *Id*. Each of the challenged statements at issue in this case is virtually identical to the representative examples Congress found to be false and misleading and is false and misleading for the same reasons identified by Congress. *Compare* ¶163 ("We've got plans in place. We're executing on those plans.") and ¶157 ("we're executing the plan") *with* ¶178 ("we have plans in place" and "we are executing that plan").

Even Defendants admit that certain of their Class Period statements were false and misleading. In March 2019, Sloan privately "apologize[d] for his mischaracterizations in his statements during the hearings and to the media." ¶96. And, his replacement, Scharf, further admitted to Congress that the House Reports—which documented Defendants' false and misleading public statements—were "consistent with what I found since I arrived at the Company; [t]hat we have not done what is necessary to be done." ¶¶96, 131.[4]

---

[4] Defendants claim that the House Reports specifically identified "only" some of their statements as false and misleading. *See* Mot. at 3. The House Financial Services Committee, however, did not claim to provide an exhaustive list of Defendants' false statements; instead, it concluded that Defendants made a "series" of false and misleading statements. ¶125.

The Complaint also details that investors were deceived by Defendants' statements. Securities analysts contemporaneously reported (incorrectly) that Sloan had "done everything that is humanly possible to do [to satisfy the Consent Orders], and the Board has too" and that the Bank had "submitted all of what was asked from them [by the Regulators] in terms of remediation plans." ¶97. When the truth was finally revealed, investors expressed surprise, and the Bank's stock price plunged. ¶¶237-63.

Ignoring the Complaint's detailed allegations, Defendants attempt to sidestep liability by contending that the Complaint "distorts" their statements to investors and that, put in their "full context," their statements were accurate and complete. But their actual words during the Class Period, as well as the House Financial Services Committee's findings and investors' harsh reaction to the revelation of the truth, amply demonstrate that Defendants' statements were misleading.

**June 13, 2018 – Morgan Stanley Conference (Shrewsberry):** During the June 13, 2018 Morgan Stanley conference, an analyst asked Shrewsberry to "give us some color on what's left to do for the consent order . . . what part of the process are you in now." In response, Shrewsberry told investors that the Bank was in ***"the last mile of knitting all of this together"*** and working now to ***"finish the last piece of it."*** ¶¶149, 152; DX I at 3. Further, in response to questions whether the Bank was "already executing on the specific requests" in the FRB Consent Order, he answered "***Yes***." *Id*. In truth, the Bank had not even passed Stage 1 of the Consent Order; indeed, just three weeks prior, the Federal Reserve had sent the Bank a formal letter flatly rejecting its Stage 1 Plan submission as "materially incomplete," "insufficient," and "missing key elements." ¶71.

Defendants now claim that Shrewsberry meant that Wells Fargo was still working on a plan to submit to the Federal Reserve and was not yet in the execution stage. Mot. at 21-22. But Defendants ignore his actual words. Shrewsberry never said the Bank was still working on a plan,

he said it was "already executing" on it. And, regardless, even if Shrewsberry had meant to convey that the Bank was still working on a plan, it still would have been misleading because he never disclosed that the Federal Reserve had already rejected the Bank's Stage 1 Plan submission.

Defendants also try to rewrite Shrewsberry's June 13, 2018 statements by asserting that "what was being 'knit together'" was simply the Board's understanding of business risk at Wells Fargo—not satisfaction of the FRB Consent Order. Mot. at 21-22. Defendants, however, ignore that Shrewsberry was responding to the question, "what's left to do for the consent order" and "what part of the process" was the Bank "in now" to satisfy the FRB Consent Order. ¶149; DX I at 4. Defendants' self-serving interpretation of Shrewsberry's statement is baseless and cannot be adopted as a matter of law at the pleading stage. *DoubleLine II*, 413 F. Supp. 3d at 210.

**December 4, 2018 – Goldman Sachs Conference (Sloan):** During the December 4, 2018 Goldman Sachs conference, an analyst asked Sloan about the asset cap and to "update us on the progress in terms of getting it lifted." In response, Sloan falsely stated that ***"we're executing the plan as opposed to designing it***," never disclosing that—in actuality—the Regulators rejected the Bank's proposed Stage 1 Plan and, as a result, Wells Fargo had no plans to execute under the FRB Consent Order. ¶157; DX K at 6.

Defendants now claim that Sloan meant only that the Bank was implementing and executing its "internal plans." *See* Mot. at 25. But Sloan was not asked about "internal plans," and Sloan did not remotely suggest that his response was confined to "internal plans." To the contrary, he responded to direct questions about "progress in terms of getting [the Federal Reserve's asset cap] lifted," which required execution of an approved Stage 1 Plan. ¶178. Indeed, the phrase "internal plans"—despite its plentiful appearance in Defendants' Motion—was never uttered by Sloan in the statements at issue or the transcripts that Defendants attach to their Motion. And, of

24

course, investors and analysts were focused on the plans Wells Fargo submitted to the Regulators, necessary to lift the Federal Reserve's asset cap—not any of its "internal plans."[5]

Moreover, as discussed below, just hours after Sloan publicly stated on December 4, 2018 that the Bank was "executing the plan as opposed to designing it" (¶157), he made nearly identical statements during an interview on CNBC (¶163). Defendants do not argue that Sloan's second statement on CNBC concerned "internal plans," as opposed to the Bank's plans submitted to the Federal Reserve. *See* Mot. at 26. They provide no explanation for why investors would understand these two virtually identical statements made within hours on the same day to refer to different types of plans.

**December 4, 2018 – CNBC Appearance (Sloan):** During his December 4, 2018 appearance on CNBC, Sloan again misled investors regarding the Bank's compliance with the Consent Orders, similarly stating, ***"We've got plans in place. We're executing on those plans."*** ¶163; DX L at 2. Just like his statement earlier in the day, Sloan never disclosed that, in reality, the Regulators had rejected the Bank's plans and, as a result, Wells Fargo had no "plans in place" and was not yet at the "executing" stage—Stage 2. ¶157; DX K at 6.

Defendants try to explain this statement away by contending that Sloan only meant that the Bank was executing on the Stage 1 Plan "while it awaited the FRB's response." Mot. at 26. But, again, that is not what Sloan actually said. He said without qualification that Wells Fargo was "executing on those plans" and "making the improvements that we've talked about with the Fed in operational and compliance risk, to be able to demonstrate that they should be comfortable to

---

[5] Contrary to Defendants' suggestion (Mot. at 25), the FRB Consent Order does not refer to Wells Fargo's "internal plans." The "written progress reports" required by the FRB Consent Order were to detail "all actions taken to secure compliance with the provisions of this Order"—not in meeting any separate, "internal plans." ¶54; DX A at 10.

lift the asset cap." ¶163; DX L at 2. Sloan did *not* state that the Bank was executing on the plan "while it awaited the FRB's response," as Defendants claim. Indeed, Wells Fargo could not begin "executing on [the] plans" submitted to the Federal Reserve until it received the Federal Reserve's written approval of its plans (¶49) which it never received because the Federal Reserve rejected the Bank's proposed plans as "materially incomplete" and "insufficient." ¶¶71-72, 85.

**January 15, 2019 – Earnings Call (Sloan):** During the January 15, 2019 earnings call, an analyst questioned Sloan about the Bank's progress under the FRB Consent Order. Sloan responded by falsely stating that Defendants were continuing to "*implement* the new risk management framework," and that *"we're in complete agreement with the Fed* about what needs to be done," emphasizing again that *"we're in the midst of implementing that*." ¶167; DX N at 9. In truth, the Bank was not "in agreement with the Fed"—the Federal Reserve had rejected the Bank's Plan and stated that it was "so inadequate as to raise concerns about the company's leadership." ¶72. Nor could the Bank possibly have been "in the midst of implementing" anything, as it lacked the approved plans necessary to advance to implementation—Stage 2.

Defendants claim that Sloan was simply saying that "Wells Fargo was still waiting for the FRB to complete its review of the Company's plans." Mot. at 28. Not so. Sloan told investors that the Federal Reserve had already provided its "feedback," the Bank was already "incorporating the input," "in complete agreement with the Fed about what needs to be done," and "in the midst of implementing that." ¶¶86, 167; DX N at 9. These statements perpetuated the false and misleading impression that the Bank was through Stage 1 planning, and into Stage 2 "implementation," and certainly do not disclose the sum or substance of the Regulators' serious concerns and issues with the Bank's progress and Stage 1 Plan proposal.

Defendants alternatively try to characterize Sloan's statements as "generic" and therefore

immaterial as a matter of law. Mot. at 28-29. This fails. "Courts must exercise great caution" before deeming a statement immaterial on the pleadings. *Bricklayers and Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012). Dismissal is appropriate only if a statement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id*.

Regardless, Sloan's January 15 statements, like all of the challenged statements, were plainly material to investors. **First,** they concerned the biggest threat facing the Bank: consent orders backed by an unprecedented "Fear of God" asset cap that prohibited the Bank from growing. ¶¶55-58. **Second,** Defendants spoke "repeatedly in an effort to reassure the investing public" about the Consent Orders "in response to direct questions" from analysts and Congress. *Signet*, 2018 WL 6167889, at *11-12; *see also In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (statements material when "made repeatedly in an effort to reassure the investing public"). **Third,** Defendants acknowledged the materiality of their misstatements, with a Board member writing that investors and customers would view the Federal Reserve's feedback "as completely unacceptable." ¶¶73-74; *see also S.E.C. v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) ("[A]major factor in determining whether information was material is the importance attached to it by those who knew about it."). **Finally,** the "sharply negative market reaction" to the revelation of the truth—including the massive stock price declines and harsh response from analysts (¶¶237-63)—undermines Defendants' assertions that the challenged statements were "immaterial." *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) (materiality supported by "precipitous decrease in share price that occurred after" truth was revealed).

Moreover, contrary to Defendants' arguments, even if Sloan's statements could be characterized as generic statements about "progress" (which they cannot), such statements are not

*per se* immaterial. Mot. at 16. Courts have repeatedly held that statements about specific progress in the face of undisclosed regulatory impediments are materially misleading. *See, e.g.*, *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *1, 3, 8 (S.D.N.Y. May 24, 2018) (statements that company was hitting "milestones," passed audits "pretty well," and "continue[s] to make progress" were misleading when they omitted "stop work order" and other delays); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 968 (N.D. Cal. 2014) (statements that remedying regulatory issues was "well underway" and company was "implement[ing] changes" were materially misleading when they omitted "significant warnings from the FDA" and lack of progress, especially in "an industry where regulatory compliance … is essential").

Defendants' cited cases do not hold otherwise. In *Tongue v. Sanofi* (Mot. at 15-16), unlike here, defendants made only "generalized" statements that they were "satisfied" with their "progress." 816 F.3d 199, 213 (2d Cir. 2016). And, in *Singh v. Cigna Corp.*, defendants made only generic statements "about having 'policies and procedures' and allocating 'significant resources,'" with the *Singh* court distinguishing cases where, as here, defendants discussed the "mechanisms of compliance." 918 F.3d 57, 64 (2d Cir. 2019). Indeed, in *Synchrony*, the Second Circuit recently distinguished general "optimistic opinions," such as those at issue in *Tongue* and *Singh* and the other cases defendants cite. 2021 WL 560204, at *6-8, 10. As the Circuit explained, in contrast to vague, positive statements—like "pretty confident" and "pretty positive"—defendants' statements that they had not received "pushback" were materially misleading because, like here, they "misrepresented facts pertaining to events that had already transpired." *Id*. at *1, 6-8, 10.

**March 12, 2019 – Congressional Testimony (Sloan):** During Sloan's March 12, 2019 highly televised congressional testimony, Chairwoman Waters asked him directly: "Has the OCC indicated its non-objection to the bank's compliance audit on customer remediation plans? Has the

28

Consumer Bureau indicated its non-objection?" In response, Sloan testified that "I can assure you that we are working very constructively with what we have in place and *we are executing that plan.*" Chairwoman Waters requested confirmation: "For those who are listening, I am simply asking whether or not the bank is in compliance, based on reviews that are done by the OCC and the [CFPB], and you heard that answer." In response, Sloan repeated, *"We are in compliance with those plans."* Chairwoman Waters asked one more time whether "the bank disclosed to investors the status of the plans that it submitted to the OCC and the Consumer Bureau, including whether the regulators have raised any objections to the bank's submitted plans?" Sloan responded for the third time: "I can assure you that we have plans in place." ¶178; DX E at 6-7. Finally, Congresswoman Velázquez asked Sloan "why the Fed [had]n't remove[d] the asset cap?" In response, Sloan stated that, "[a]s part of the consent order with the Fed, they want us to improve the Board governance and oversight, *which we have done.*" ¶182; DX E at 6; *see also* ¶185.

Each of these statements was false, misleading, and omitted material facts. The Bank had not "done" what the Federal Reserve required. Just one day prior, the Federal Reserve sent Sloan a letter rejecting—again—the Bank's proposed Stage 1 Plan, finding that it "remain[ed] materially incomplete," contained "illogical timeframes," and suffered from "[p]ervasive inaccuracies." ¶93. The Bank also did not have the "plans in place" required by the OCC/CFPB Consent Orders; nor was it in "compliance with those plans." In the OCC's March 4, 2019 Quarterly Management Report to the Bank, the OCC said that the Bank's plans were "poor-quality," its response had been "unacceptable," and it had "missed deadlines." ¶89. As the House Financial Services Committee explained in its Reports, Sloan "gave inaccurate and misleading testimony" that caused Congress and the public to wrongly believe the Bank "was fully complying with its regulators" and "had done everything the regulators asked, and was on track to resolve the consent orders." ¶123.

29

Defendants try to evade liability for Sloan's false statements by claiming that Congress, Chairwoman Waters, the OCC, the media, and investors uniformly misunderstood him. Defendants' arguments fail.

*First,* Defendants assert that Sloan was only referring to the Bank's "internal plans"—not the plans submitted to the Regulators. *See* Mot. at 35-36. But, as above, Sloan did not limit his statements to "internal plans," and he was responding to direct questions about "the plans that [the Bank] submitted to the OCC and [CFPB]." ¶178. And even if Sloan's statements could be interpreted to refer to "internal plans," it was misleading for Sloan to respond to questions about "the bank's submitted plans" while hiding the material fact that those "submitted plans" had been rejected, including on the day before his testimony.[6]

*Second,* Defendants attempt to interpose a truth-on-the-market defense to excuse Sloan's misstatements and omissions. Mot. at 37-39. This fails. It is well-established that "[d]efendants' burden [of establishing a truth-on-the-market defense is] extremely difficult, perhaps impossible, to meet"—even "at the summary judgment stage." *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006). As the Second Circuit has explained, the "truth-on-the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Defendants try to avoid the relevant legal test by recasting their truth-on-the-market arguments as a challenge to materiality (Mot. at 37-39), but "the high burden imposed by the truth-

---

[6] Defendants also claim Sloan's March 12, 2019 testimony that the Bank "continues to make progress against our action plans in response to our consent orders" and "to address issues under our consent orders with our regulators and meet regulatory expectations" were literally true. Mot. at 33-34. They were not. Far from making "progress" against "action plans" in response to the Consent Orders and "meet[ing] regulatory expectations," the Bank's plans had been rejected— including just the day before. ¶¶93-95. And even if these statements were somehow literally "true," they misleadingly omitted material facts.

on-the market defense applies even when defendants challenge an omission's materiality." *See In re ForceField Energy Inc. Sec. Litig.*, 2017 WL 1319802, at *12 (S.D.N.Y. Mar. 29, 2017).

As support for their "truth-on-the-market" defense, Defendants point to the OCC's one-sentence public statement on March 12, 2019 that "[w]e continue to be disappointed with [Wells Fargo's] performance under our consent order." *See* Mot. at 37. But this in no way "corrected" Sloan's testimony that the Bank had "plans in place" under the Consent Orders and was "executing" those plans. Among other things, the OCC did not disclose that the Bank's plans had been rejected, and the Bank had never entered the "execution" phase of the OCC's Consent Order. Plus, nothing in the OCC's one-line statement concerned (much less "corrected" or "counterbalanced") Sloan's false and misleading testimony about the Bank's status of compliance with the FRB Consent Order—an entirely different order issued by an entirely different regulator.

Additionally, after the OCC's March 12, 2019 statement, Defendants reaffirmed and repeated Sloan's misrepresentations, assuring investors that the remaining work under the Consent Orders "consists of completing and implementing." *See, e.g.*, ¶¶189, 192, 195, 198, 201, 205, 208, 248-49, 256; *see also In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 581-82 (S.D.N.Y. 2010) (rejecting "truth-on-the-market" defense where defendants continued to make misleading statements).

***Finally,*** the public response to the ultimate revelation of the truth eviscerates this defense. To uncover the full truth, Congress was required to conduct a year-long investigation, including a review of over 233,000 internal Bank documents and multiple days of congressional hearings. Both the Democrat and Republican members of the House Financial Services Committee concluded that Sloan gave "inaccurate and misleading testimony" to Congress and that the Bank's Board, including Sloan, Duke, and Parker, "allowed the bank's management to repeatedly submit

material that was deficient in response to the consent order." ¶¶123, 133, 141. Waters even recommended that the DOJ initiate a criminal investigation into Sloan's misstatements. ¶141. And, after learning the full truth, securities analysts expressed surprise, and Wells Fargo's stock fell approximately 23% within a matter of days—which is not the response that would have occurred if the truth were already known a year earlier, as Defendants now claim. ¶¶261-62.[7]

**April 12, 2019 – Earnings Call (Parker) & CNBC Appearance (Shrewsberry):** During the Bank's first-quarter earnings call on April 12, 2019, Parker said that much of the work remaining under the FRB Consent Order ***"consists of completing and implementing efforts that are substantially underway."*** ¶189. During a media appearance the same day, Shrewsberry said the Bank was "later in that cycle [of satisfying the FRB Consent Order] today," assuring investors that the Bank was not "just doing the same thing over" but rather was "further down the maturity curve of the type of work, the nature of the work, that has to be done." ¶195; DX T at 4. In truth, the Bank was not in the "implementing" stage (Stage 2); nor was it "way down the road" or "later in th[e] cycle" of satisfying of the FRB Consent Order. Rather, it was still at the beginning. Indeed, untold to investors, the Federal Reserve weeks earlier sent to the Bank's top executives a second rejection letter, finding that the Stage 1 Plan submission "remain[ed] materially incomplete," contained "illogical timeframes," and still suffered from "[p]ervasive inaccuracies." ¶93.

Faced with these allegations, Defendants try to rewrite Parker's and Shrewsberry's April

---

[7] Defendants' authorities are distinguishable. In *Burkle v. OTK Assocs., LLC*, 2 F. Supp. 3d 519 (S.D.N.Y. 2014), five separate sources "accurately and clearly" corrected Defendants' single misstatement. *Id*. at 522-24. And in *Perrigo Co. PLC v. Mylan N.V.*, 2015 WL 9916726 (S.D.N.Y. Oct. 29, 2015), the defendant-company "formally conveyed" corrective information in an SEC filing on the same day as its executive's misstatement during a media appearance. *Id*. at *17. Here, by contrast, Defendants made a series of false and misleading statements on the same subject for years, and never once issued any correction or retraction.

12, 2019 statements. *See* Mot. at 42, 43.[8] Defendants contend that Parker and Shrewsberry—when they discussed "implementing" and "implementation"—were referring to the implementation of an "iterative, task-by-task process" unrelated to the FRB Consent Order. Mot. at 43. But Shrewsberry's statement was in direct response to a CNBC analyst's direct question about what the Bank was doing to lift the Federal Reserve's asset cap, which required satisfying the FRB Consent Order. Shrewsberry was not responding to a question about an unrelated "iterative, task-by-task process." ¶¶189, 195. Additionally, Shrewsberry made clear that the "business-process-by-business process" that he referenced in his CNBC interview *was* "as [he] said on the call [that] morning," the "executing" phase of the FRB Consent Order. DX T at 4. Indeed, during the Bank's earnings call held earlier on the same day of his CNBC interview, Shrewsberry described the work under the FRB Consent Order, including the "execution phase," which he defined as the "business by business, function by function, process by process" phase. DX S at 16.[9]

Defendants also repeat their truth-on-the-market defense, pointing this time to Parker's April 12, 2019 comments that "our work is in various stages of progress" and Shrewsberry's comment that the Bank had "a variety of different streams of work." Mot at 42-43. But none of these stray comments disclosed the truth: that, among other things, the Regulators had repeatedly rejected the Bank's proposed plans under the Consent Orders. Nor did they remotely counterbalance Defendants' specific representations to the public that the Bank had "plans in

---

[8] Defendants also attempt to excuse Parker's deception because he became CEO "less than three weeks earlier." Mot. at 39. But Parker was not new to Wells Fargo; for the prior two years, he had been the Bank's General Counsel and sat on its management-level Operating Committee where he was heavily involved in the Bank's responses to the Regulators. ¶¶25, 43, 75.

[9] Shrewsberry repeated during the Goldman Sachs Conference on December 10, 2019, that the execution stage of the FRB Consent Order was one-and-the-same as the "process by process and risk by risk" approach, explaining that a "third party" will review the "process by process and risk by risk" work to "demonstrate" implementation to the Federal Reserve. DX X at 3.

place" under the Consent Orders and was "executing the plan as opposed to designing it."[10]

**May 30, 2019 – Sanford C. Bernstein Conference (Parker):** During a May 30, 2019 investor call, an analyst asked Parker "what still needs to be done to get the asset cap lifted." In response, Parker falsely stated that, with respect to the Corporate Governance component of the FRB Consent Order, ***"we're largely there"*** and that, with respect to the "operational risk and compliance" component, ***"there is a meeting of the minds in terms of what we need to do."*** ¶198; DX U at 4. But the Bank was not "largely there," and there was no "meeting of the minds" with the Federal Reserve; to the contrary, the Federal Reserve had twice rejected, and never once approved, the Banks's proposed Stage 1 Plan.

Defendants urge the Court to ignore Parker's false statement and focus instead on his separate statements that the Bank's "hard work is going to continue" and that the Regulators had "expressed some frustration with where the company was in terms of the progress that it made." Mot. at 14-15, 43-45. Those separate statements, however, were neither corrective of nor inconsistent with the challenged statements. Parker's reference to Regulators' vague frustrations from months earlier did not counteract or correct Defendants' more specific positive statements that Wells Fargo had progressed to the implementation stage under the Consent Orders.

The public response to the revelation of the true facts further undermines Defendants' argument that Parker's vague statements disclosed the truth. In March 2020, when investors learned that the Bank's plans proposed to the Federal Reserve were still under "resubmission,"

---

[10] The same can be said of Federal Reserve Chairman Powell's March 20, 2019 comment that the Bank had more work to do under the FRB Consent Order. Mot. at 40 n.6. This did not disclose the true extent of the Bank's noncompliance or negate Defendants' false statements. In fact, on April 12, 2019, Parker downplayed Powell's comments and reinforced the notion that the Bank had passed Stage 1, claiming that the Bank's "completing and implementing efforts that are substantially underway." ¶189; DX S at 4.

analysts reported surprise that "[o]ne of Wells Fargo's challenges is that it is still trying to submit plans for how it will resolve some of the consent orders." ¶¶260-61.

Defendants next argue that Parker's May 30, 2019 statement is an inactionable "opinion" because his statement included the words "I think." Mot. at 14-15, 44. Defendants are wrong. As the Supreme Court held in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, "magic words" such as "we think" or "we believe" do not automatically confer protection as they "can preface nearly any conclusion, and the resulting statements … remain perfectly capable of misleading investors." 575 U.S. 175, 193 (2015). Plus, as the Second Circuit has made clear, the Supreme Court's decision in *Omnicare* "reduced the significance of district courts' classification of statements as those of fact or opinion" and "rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175-76 (2d Cir. 2020). Indeed, investors expect that a stated opinion "fairly aligns with the information in the issuer's possession at the time" and if it does not, the "omissions clause creates liability." *Omnicare*, 575 U.S. at 189.

Here, even if Parker's statements were genuinely held "opinions," they are still actionable for omitting material contrary facts. *Id*. Among other things, they omitted that the Federal Reserve repeatedly rejected the Bank's plans as "materially incomplete," "illogical," replete with "[p]ervasive inaccuracies," and "so inadequate as to raise concerns about the company's leadership." ¶¶69-72, 77, 80-85, 89, 93, 105, 116; *see also, e.g.*, *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 477 F. Supp. 3d 123, 134 (S.D.N.Y. 2020) (opinion statement that company had "agreements in principle" was actionable where the company "had failed to reach anything approaching an agreement in principle").

**September 27, 2019 – Investor Call (Duke):** During the September 27, 2019 investor call, Duke touted the status of the Banks' satisfaction of the Consent Orders, falsely stating that "we're pretty well along in a lot of the work, and we've defined out the work for each individual piece of it, each individual agreement with a regulator," adding, "we have a good understanding with our regulators on what they are looking for." ¶201; DX V at 6. But, far from reaching "agreement" with the Regulators and progressing "pretty well along" under the Consent Orders, the Bank did *not* have an agreed-upon plan and never advanced under the Consent Orders. To the contrary, the Regulators repeatedly told Duke and the Bank that their submitted plans were wholly "deficient," "raise[d] concerns about the company's leadership," and were "deeply concerning." ¶¶69-72, 77, 80-85, 89, 93, 105, 116. For this reason, when the true facts were fully uncovered in March 2020, Chairwoman Waters called for Duke's resignation for "fail[ing] in [her] responsibility as board member," with members of Congress lambasting Duke for her "dereliction of duty" as a director and for "allow[ing] the bank's management to repeatedly submit material [to the Regulators] that was deficient in response to the consent orders." ¶¶128, 133.

Defendants argue that Duke's September 27, 2019 statement is an inactionable "opinion." Mot. at 12, 14-15, 46. This argument fails for similar reasons as above. Even if properly characterized as an "opinion" (which it is not), Duke's statements misled investors by omitting material facts, including that the Federal Reserve rejected the Bank's proposed plans as "materially incomplete," "illogical," replete with "[p]ervasive inaccuracies," and "so inadequate as to raise concerns about the company's leadership" (¶¶69-72, 77, 80-85, 89, 93, 105, 116), and that just weeks earlier, in a September 9, 2019 report, the OCC told her that "many plans have been resubmitted multiple times or extended" without compliance with the OCC/CFPB Consent Orders (¶105). *See, e.g., World Wrestling*, 477 F. Supp. 3d at 134.

**October 15, 2019 – Earnings Call (Parker):** During the October 15, 2019 earnings call, an analyst asked Parker for an "update on where you stand on the [FRB Consent Order] and remediating the operational risk and controls," and where the Bank was "in that process." Parker responded by stating that "[w]ith regard to the issues raised in the Fed consent order … [w]e're good ways down the road," assuring investors that *"we've designed and implemented … our new risk management framework."* ¶205; DX W at 15. But, of course, the Bank was *not* a "good ways down the road" and it had *not* "implemented [its] new risk management framework" under the FRB Consent Order. Just the opposite, the Bank had not passed Stage 1, its plans had been repeatedly rejected, and the Bank had not yet even resubmitted a new plan.

Defendants again contend that the Court should ignore the statements pled in the Complaint and look instead to Parker's separate statements that the Bank had "additional work to do" and that the Regulators had "earlier in the year," "expressed their disappointment" with the Bank's general "progress." Mot. at 47-48. But like before, these separate statements were neither corrective of nor inconsistent with his challenged statements. ¶¶69-72, 206. The Regulators' prior, vague statements about "disappointment" did not correct Parker's later, more specific assertions—as shown by, among other things, the market's ultimate reaction to the revelation of the true facts.

**December 10, 2019 – Goldman Sachs Conference (Shrewsberry):** During the December 10, 2019 investor conference, an analyst asked Shrewsberry to "update us on the progress" under the FRB Consent Order and to "remind us on what the process looks like from here." Shrewsberry responded that, "in the relatively near future," the Bank "will have a third-party come in and demonstrate that" the Bank has "adopted and implemented in theory to the satisfaction [of] the Federal Reserve." He further falsely stated that, *"importantly, the work that's underway to prepare for that is what's happening."* ¶208; DX X at 3. But concealed from investors, the Bank

was actually still preparing a Stage 1 Plan (which was due on April 30, 2020), and was years away from a third-party validation of the Bank's execution of the Stage 1 Plan.

Defendants assert that Shrewsberry did not imply the Bank had an approved Stage 1 Plan, but rather described "what the process looks like from here" and "merely noted that a lot of work already had been done in preparation for the independent-review stage and that such work was ongoing." *See* Mot. at 49. Not so. Shrewsberry described the process and then led investors to believe that the "adopt[ing] and implement[ing]" part of the process was *"happening" and "underway."* ¶208. Additionally, in advancing their own counter-factual narrative, Defendants ignore that, under the FRB Consent Order, the Bank could *not* progress to the "adopt[ion] and implement[ation]" stages of the Consent Order without plans approved by the Federal Reserve. ¶49. Accordingly, Shrewsberry's statements that such "adopt[ing] and implement[ing]" was "happening" and "underway" and would show a third party and the Federal Reserve "how we've implemented" were false or, at minimum, highly misleading.

\*          \*          \*

In sum, the Complaint accurately describes Defendants' statements. Defendants' effort to distort the plain meaning of their statements is belied by the very "context" they rely upon, including their actual words during the Class Period, the House Financial Services Committee's findings, and investors' harsh reaction to the revelation of the truth.

In any event, even if the meaning of the challenged statements somehow could be deemed "ambiguous," Defendants are not entitled to dismissal. This Court and others have long recognized that, even when the meaning of "challenged statements [is] ambiguous," the Court "cannot dismiss [plaintiffs'] claims based on those statements as a matter of law." *Skiadas I*, 2020 WL 3268495, at \*9. "At the motion to dismiss stage of a securities fraud action, the court reads ambiguities in

38

challenged statements in [the plaintiff's] favor." *Id*. Indeed, even when "the context of the challenged statements provides some support for [d]efendants' arguments," this does not "render implausible" plaintiffs' allegations that the statements were false or misleading. *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 4208442, at *2 (S.D.N.Y. July 21, 2020) (Woods, J.) ("*Skiadas II*"). If the court "cannot conclude that no reasonable investor could have read the statement as [plaintiff] proposes," the statements are adequately alleged to have been false or misleading. *Id*.; *see also DoubleLine II*, 413 F. Supp. 3d at 207, 210 (finding dispute over what "a reasonable investor would have understood [a term] to mean … *du jour* presents a factual dispute, not a legal one" and "a question of fact for the jury").

### 3. Defendants Misled Investors That the Bank Had Disclosed All Material Updates Concerning the Consent Orders

Defendants also falsely reassured investors throughout the Class Period that Wells Fargo disclosed "everything that's material that we know" and that there was "nothing new to report" regarding their progress in satisfying the Consent Orders and their dialogue with the Regulators, despite the fact that the exact opposite was true. *See* ¶¶146, 154, 160, 170, 173. Investors took comfort in these assurances, with market analysts noting positively at the time that there were "no new headline issues" and that "given the past couple of years for WFC, the absence of any new surprising charges or other revelations is a positive." ¶97. In reality, however, investors did not "know everything" material that the Bank's executives knew, and there were material "new" items "to report," which were instead concealed.

Defendants' attempts to rewrite each of their Class Period assurances fails.

**May 30, 2018 – Deutsche Bank Conference (Shrewsberry):** During the May 30, 2018 investor conference, an analyst asked Shrewsberry: "And just in terms of remediating maybe both what was highlighted in that consent order and then some of the things that have been in the media

with respect to the wealth management investigation … can [you] just frame where you are on some of these issues and where the heavy lifting is still to come." ¶146; DX H at 2. Shrewsberry responded, "I don't think at this point that there's anything meaningful that we aren't already talking about, certainly, since our last 10-Q" and ***"[O]ur investors know everything that's material that we know."*** ¶146.

Investors, however, did not know the very "meaningful" and "material" facts about the Bank's non-compliance with the Consent Orders. On May 7, 2018, just weeks before his statement, the Federal Reserve rejected the Bank's Stage 1 Plan proposal, finding it "materially incomplete," "insufficient," and "so inadequate as to raise concerns about the company's leadership." *See* ¶¶69-72. As Wells Fargo Director Craver wrote in an internal email to Duke at that time, the Bank's rejected Stage 1 Plan submission "was a big miss" and "investors and customers would view this feedback from the Fed as completely unacceptable." ¶¶73-74.

Defendants contend that Shrewsberry's assurances were not misleading because they supposedly did not pertain to the FRB Consent Order. Mot. at 19-20. This is unconvincing. Shrewsberry made these assurances in direct response to a request to "[f]rame where you are" and "where the heavy lifting is still to come" "in terms of remediating maybe both ***what was highlighted in that [FRB] consent order*** and then some of the things that have been in the media with respect to the wealth management investigation." ¶¶76, 146, 233; DX H at 2. Shrewsberry did not limit or exclude the topic of the "consent order," which the analyst specifically asked about.

Finally, contrary to Defendants' contentions (Mot. at 19-20), Shrewsberry's other statements on May 30, 2018—including his statement that "[i]t may take a little bit longer under the asset cap"—in no way revealed the truth, including that the Federal Reserve rejected Wells Fargo's Stage 1 Plan proposal under the FRB Consent Order just three weeks earlier. ¶¶69-72.

40

**July 13, 2018 – Earnings Call (Sloan):** During the July 13, 2018 earnings call, Sloan responded to a request for an "update" on lifting the "asset cap" by stating that there was ***"no change in the update from Investor Day."*** ¶154. This was false. In reality, there was a material change between the Bank's Investor Day and Sloan's statement—namely, just weeks earlier, the Bank requested a lengthy extension to resubmit its previously-rejected Stage 1 Plan proposal, pushing the deadline to five months after the FRB Consent Order's deadline. ¶77.

Defendants contend that Sloan's statement was literally true because the Federal Reserve had rejected the Bank's Stage 1 Plan submission three days before the Investor Day, and there had been no "change" in that from Investor Day. Mot. at 23. But Defendants never told the market about this rejection, and it was plainly misleading for Sloan to state that there was "no change in the update" when Defendants previously concealed actual material updates. Additionally, even Defendants do not argue that their five-month extension request occurred prior to the Investor Day.

**December 4, 2018 – Goldman Sachs Conference (Sloan):** During the December 4, 2018 investor conference, an analyst said to Sloan, "You've talked about having a good dialogue with the Fed and you've also talked about planning to operate under the cap for at least the first part of next year," and then asked Sloan to "update us on the progress in terms of getting it lifted." ¶157; DX K at 5. In response, Sloan falsely stated that ***"[t]here's really nothing new to report in terms of … the dialogue with the regulators, whether it's related to the consent order or any other area."*** ¶160. But, of course, there was much "new to report," as detailed above. *See supra* at 40-41.

Defendants nevertheless claim that Sloan's statement was true because the Federal Reserve rejected the Bank's Stage 1 Plan "more than six months earlier." Mot. at 24. Defendants' assertion, however, ignores that they never before told investors that the Federal Reserve rejected the Bank's

41

plan. Thus, there were "new" material updates for investors, and Defendants cannot plausibly assert that, by their own continued concealment, such information had become stale.

**January 15, 2019 – Bloomberg Appearance (Shrewsberry):** During a January 15, 2019 media appearance, Shrewsberry was asked about the Bank's January 15, 2019 announcement that it would operate under the asset cap until the end of 2019. In response, Shrewsberry stated that ***"there's nothing more to read into [the announcement]*** other than it's a big body of work and it takes time to execute on." ¶170. Contrary to Defendants' assertion, this statement was false: there *was* "more to read into" the Bank's announced change in its timeline for satisfying the FRB Consent Order. As alleged, the delay was caused by the Bank's repeated failure to submit a compliant Stage 1 Plan to the Federal Reserve, its inclusion of unrealistic and unsound dates and timelines, and the Bank's seriatim extension requests. ¶¶69-72, 77, 85, 89, 170-72; *see, e.g.*, *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 759-60 (S.D.N.Y. 2017) (statement "omitted to reveal the—or at least an—elephant in the room" and was therefore "a classic half-truth").

**February 12, 2019 – Credit Suisse Forum (Shrewsberry):** During the February 12, 2019 investor conference, an analyst asked Shrewsberry for "any updates that you have" on the FRB Consent Order and "why [the consent order] might be taking a little bit longer." In response, Shrewsberry similarly stated that "it's taking a little bit longer because it's the first of its kind, and it is sort of an expanding body of work in terms of detail." ¶173; DX P at 5. This statement was false, or at the very least, materially misleading. The Bank was *not* "making great progress" and the delay in lifting the asset cap was *not* because the FRB Consent Order was the "first of its kind" or "an expanding body of work." Rather, the delay was caused by the same "elephant in the room": the Bank's failure to submit a compliant Stage 1 Plan to the Federal Reserve and the Bank's inclusion of "improbable and unrealistic" deadlines. ¶¶69-72, 77, 85, 89, 170-72; *see, e.g.*,

42

*Braskem*, 246 F. Supp. 3d at 760.[11] Indeed, on January 24, 2019, only weeks before Shrewsberry's statement, the Federal Reserve told Wells Fargo's executives that the revised Stage 1 Plan proposal was still riddled with "improbable and unrealistic" deadlines. ¶89.

### 4.    Defendants Misled Investors About the Asset Cap Being Lifted

Defendants buttressed their positive Class Period representations regarding the state of their compliance with the Consent Orders with additional misleading statements regarding when the Bank would satisfy the FRB Consent Order and the asset cap would be lifted. ¶¶144, 152, 154, 162, 165, 177.

As detailed in the Complaint, during a February 2, 2018 Investor Conference Call, Sloan told investors that the Bank was "on a fast track" for the FRB Consent Order and assured investors that the Bank would "leverage existing plans" and that "foundational work [had] been completed." ¶144; DX G at 2. Then, on four separate occasions—the June 13, 2018 Morgan Stanley Conference, July 13, 2018 Earnings Call, December 4, 2018 Goldman Sachs Conference, and December 4, 2018 CNBC Appearance—Sloan and Shrewsberry told investors that the Bank would satisfy the FRB Consent Order, and the asset cap would be lifted, "sometime in the first half of next year," with the cap "gone in the time frames that we've talked about." ¶¶152, 154, 162, 165. On February 12, 2019, with the asset cap still in place, Shrewsberry told investors that the Bank now "reasonab[ly]" believed the asset cap would be lifted by the "end of the year." ¶177.

The truth was that the Federal Reserve never gave the Bank "fast track" status and the Bank

---

[11] Defendants argue this statement was an inactionable opinion because it was preceded by "I think." Mot. at 31. Opinion or not, Shrewsberry's statement "cannot be squared" and is not "fairly align[ed] with" the Federal Reserve's rejection of the plan, the Federal Reserve's admonishment for unrealistic and unsound deadlines, or the Bank's serial extension requests. *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 443-44 (S.D.N.Y. 2018) ("*DoubleLine I*"); *World Wrestling*, 477 F. Supp. 3d at 134.

was never "on a fast track" to resolving the FRB Consent Order. As Congress later found, Sloan's February 2, 2018 statements were misleading; the Bank had not yet "even submitted a plan to the [Federal Reserve] to improve its governance and risk management controls" and, when it eventually did, it was riddled with deficiencies. ¶¶69-72, 125. The House Financial Services Committee further found that "there was no basis for" Sloan's and Shrewsberry's later statements about when the FRB Consent Order would be satisfied and the asset cap would be lifted; these statements "were unsupported by the facts on the ground." ¶¶121-22, 125-126. Untold to investors, prior to these statements, the Federal Reserve had rejected the Bank's proposed Stage 1 Plan, which lacked "milestones and timelines"; the Bank did not even resubmit its second proposal until October 31, 2018; and the Federal Reserve rejected the Bank's proposed plan again in March 2019. ¶¶69-72, 77, 85. These facts—kept well-hidden from investors—undermined Defendants' positive assurances that the Bank would satisfy the FRB Consent Order's requirements, and would have the asset cap lifted, by "the first part" and the "end of" 2019. *See, e.g.*, *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 305-07 (S.D.N.Y. 2013) (statements that there was "no change" and "no reason to change" announced schedule that "was no longer realistic" were actionable especially in light of "concrete facts known to [company], but not the public").

Each of Defendants' offered excuses for failing to disclose these material facts fails.

***First,*** Defendants assert that the PSLRA's safe harbor immunizes them from liability because their statements were purportedly "forward-looking." Mot. at 15. But Defendants ignore that the Complaint challenges only Defendants' ***omissions*** of material facts when telling investors about their expected timeline. *See, e.g.*, ¶¶148, 153, 156, 177. The PSLRA's safe-harbor only immunizes forward-looking statements—it does ***not*** allow Defendants to omit material facts when making such forward-looking statements. *In re Salix Pharm, Ltd.*, 2016 WL 1629341, at *9

44

(S.D.N.Y. Apr. 22, 2016) (safe harbor "does not protect material omissions"). Courts in this District have repeatedly held that a company's failure to disclose material historical facts is "unprotected by the safe harbor, regardless of whether the statements thereby rendered misleading were forward-looking." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013).

**Second,** even if the PSLRA's safe harbor extended to omissions of material facts (which it does not), it would still not apply in this case. The safe harbor applies only when forward-looking statements are accompanied by "meaningful cautionary language." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247 (2d Cir. 2016). "To be 'meaningful,' a 'cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'" *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013). "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Meyer*, 761 F.3d at 251. And "generic and mere boilerplate words of caution" like "a statement at the beginning of a conference call that states merely that forward-looking statements are 'subject to certain risks and uncertainties' are insufficient." *Kinross Gold*, 957 F. Supp. 2d at 301.

Here, Defendants made only generic warnings of future "risks and uncertainties" (Mot. at 15, 17, 22, 24, 27), none of which revealed, among other things, the hidden fact that the Regulators had rejected the Bank's Stage 1 Plan and the stated "risks" had already occurred. *See, e.g.*, *Kinross Gold*, 957 F. Supp. 2d at 305-06 (statements that there was "no change" and "no reason to change" announced schedule were unprotected by safe harbor when "defendants had to appreciate" that "schedule was no longer realistic" because of significant delays in achieving milestones). Moreover, Sloan's and Shrewsberry's purported "warnings" that the Bank was "fundamental[ly]"

45

transforming risk and that "we're not in a hurry" (Mot. at 22, 23) said nothing about the Bank's inability to make any headway toward lifting the asset cap and, in fact, told investors that the Bank's stated expectations for lifting the asset cap already took these considerations into account.[12]

***Third,*** Defendants' material omissions are actionable, even if Defendants' statements are "opinions." Mot. at 12, 18, 22, 23, 26, 31. As the Supreme Court has explained, when opinion statements do not "fairly align[] with the information in the issuer's possession at the time," the omission creates liability. *Omnicare*, 575 U.S. at 189. Thus, even assuming *arguendo* that Defendants subjectively believed their stated expectations (Mot. at 18, 22, 23, 26), they are nonetheless liable for misleading investors because their statements "did not fairly align[ ] with the information in [their] possession at the time," *World Wrestling*, 477 F. Supp. 3d at 134, including the Regulators' repeated rejections of their Stage 1 Plans and the Bank's lengthy extension requests to resubmit their proposed plan. As Duke admitted, the Regulators' rejections and delays were "red flag[s]" that raised "concerns for the [Wells Fargo] Board" (¶134) and she and the Board, which included Sloan, were aware that the management team was not capable of getting plans "written in a complete fashion." *Id*. In addition, the Federal Reserve repeatedly told the Bank that its proposed timelines were not realistic or sound (¶¶69-72, 89) and, as the House Financial Services Committee ultimately found, "there was no basis" for Defendants' statements that the asset cap would be lifted in the first half of 2019 (¶126).

Defendants again rely heavily upon *Tongue*. But in *Tongue*, unlike here, defendants' predictions about the timing of FDA approval were "***not*** in conflict with the FDA's [nonpublic] comments," but rather "fairly align[ed] with the information in the issuer's possession at the time."

---

[12] Defendants also had actual knowledge of their statements' falsity. *See infra* Section III.B.

816 F.3d at 211-12.[13] Here, the opposite is true: Defendants' stated expectations were "in conflict with" and not "fairly aligned" with the Federal Reserve's rejections and findings that the Bank's Plans included unrealistic and unsound dates and deadlines. ¶¶69-72, 89.[14]

### B.    The Complaint Adequately Pleads Scienter

In determining whether scienter is pled, "courts must, … accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309 (2007). Scienter allegations must be viewed "holistically." *Id.* at 326. The question is whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.

Scienter is pled by alleging facts giving rise to a strong inference of conscious "misbehavior *or* recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). A complaint pleads scienter by alleging that defendants "knew facts or had access to information suggesting that [its] public statements were not accurate," or "failed to check information [it] had a duty to monitor." *Id*. at 311. The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. Rather, it need only

---

[13] Defendants' reliance on *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994), is also misplaced. There, the court acknowledged that even optimistic statements must be "subject to what current data indicates," but unlike here, the defendants' statements were consistent with the data "at the time the disclosures were made." *Id*. at 1129.

[14] Each of the challenged statements was false and misleading when made. Even if the Court were to reject that conclusion, subsequent "intervening events" rendered each statement misleading and created a duty to update the earlier statements. In particular, each of the Regulators' rejections further rendered misleading prior claims that the Bank had "plans in place" that it was "executing"; that there were no material updates for investors; and that the asset cap would be timely lifted, and these intervening events created a duty to update. *See Overton v. Todman & Co., CPAs, P.C.*, 478 F.3d 479, 487 (2d Cir. 2007) ("[T]he duty to update requires [the speaker] to correct a statement made misleading by intervening events, even if the statement was true when made."); *Kinross Gold*, 957 F. Supp. 2d at 308 (announcement of schedule that became "unrealistic" "require[d] later correction when intervening events render it misleading").

be "*at least* as strong as any opposing inference." *Id.* at 326. Thus, "[w]hen the competing inferences rest in equipoise, the tie … goes to the plaintiff." *Salix*, 2016 WL 1629341, at *13.

As discussed below, the Complaint alleges numerous facts that give rise to the requisite scienter inference.

### 1. Sloan, Shrewsberry, Duke, and Parker Were Personally Responsible for Ensuring Compliance with the Consent Orders

Sloan, Shrewsberry, Duke, and Parker personally negotiated the FRB Consent Order (¶43), which stated that the Bank's Board, which included Sloan and Duke, was required to review communications to and from the Federal Reserve and to submit "written progress reports" to it. ¶¶53-54, 65-66. Likewise, the OCC/CFPB Consent Orders gave the Board "ultimate responsibility" for compliance. ¶65. Additionally, prior to his appointment as interim CEO, Parker was the Bank's General Counsel. He and Shrewsberry sat on the Bank's management-level Operating Committee and were involved in the Bank's responses to the Regulators. ¶¶25, 43, 75. Defendants do not dispute (nor could they) that they were aware of these obligations and that they reviewed all communications to and from the Regulators.

### 2. The Defendants Were Each Told That the Regulators Rejected the Bank's Proposed Stage 1 Plans

The Regulators sent rejection letters detailing the Bank's failure to comply with Stage 1 of the Consent Orders to the Bank's top executives. For example, on May 7, 2018 and March 11, 2019, the Federal Reserve sent letters, addressed directly to Sloan and Duke, rejecting the Bank's proposed Stage 1 Plan, which the Federal Reserve found was "materially incomplete," "fail[ed] to comprehensively address operational risk," and raised "concerns about the company's leadership." ¶¶71-72, 93. Likewise, on July 24, 2018, November 21, 2018, March 4, 2019, and April 12, 2019, the OCC and CFPB sent Defendants letters rejecting the Bank's Stage 1 Plans, which they found "unacceptable," "deeply concerning," and not in compliance with the OCC/CFPB Consent Orders.

48

The Regulators echoed these findings during frequent, often daily, meetings with the Individual Defendants throughout the Class Period. *See* ¶¶117, 215, 236. During those meetings, the Regulators expressed concerns about the Bank's failures under the Consent Orders, including that the Bank's plan proposals were a "plan for a plan," proposed deadlines were "improbable and unrealistic," corrective actions "take too long," and "lack of progress … ha[s] wasted time and weakened the institution." *See* ¶¶70, 82-84, 87, 89, 99-101. The Bank was unable to address these defects, forcing its executives, including Sloan, Duke, and Parker, to personally request that the Regulators extend the deadlines for them to re-submit their Stage 1 Plans. ¶¶77, 85, 106.[15]

With these rejection letters in hand, Defendants nevertheless told investors that the Bank had its plans in place and was "executing" those plans, that investors had all material updates, and that the asset cap would be timely lifted. For example, just three weeks after the Federal Reserve first rejected the Bank's Stage 1 Plan as "insufficient" and "missing key elements," Shrewsberry told investors that "investors know everything that's material that we know." ¶¶71-72, 146. And just days after receiving the OCC's March 4, 2019 Quarterly Report stating that the Bank was not in compliance with the OCC/CFPB Consent Orders, when asked about "the status of the plans that it submitted to the OCC and the [CFPB]," Sloan told investors that "we are executing that plan"; "[w]e are in compliance with those plans"; and "we have plans in place." ¶178.

Courts routinely find scienter adequately alleged where, as here, Defendants are aware of information that contradicted their statements. *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 2017 WL 5312182, at *2 (S.D.N.Y. Nov. 13, 2017) (scienter alleged when defendants represented that vehicles were compliant with regulations while simultaneously receiving communications from

---

[15] Indeed, Duke testified that she was aware that late submissions and serial extensions were "red flags" and that the Board was concerned Wells Fargo could not do the required work. ¶226.

regulators that vehicles were "out of compliance"); *Galestan v. OneMain Hldgs., Inc.*, 348 F. Supp. 3d 282, 300-01 (S.D.N.Y. 2018) (scienter alleged when defendants made statements contradicted by communications during meetings and conference calls and in "specific reports").

### 3. Sloan Admitted That He Misrepresented the True Facts to Congress and the Media

Shortly after his March 12, 2019 testimony to Congress—in which he stated that the Bank had the "plans in place"—Sloan "called the Federal Reserve to apologize for his mischaracterizations in his statements during the hearings and to the media." ¶96. Yet neither Sloan nor the Bank issued any public apology or retraction; to the contrary, Defendants continued to repeat Sloan's false and misleading statements. Sloan's admission further bolsters the scienter inference. *See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 617-18 (S.D.N.Y. 2015) (scienter inference supported by defendants' later admissions).

Based on nothing but their saying so, Defendants claim that Sloan apologized for lying because he wanted to appease the Regulators—not because he actually lied. Mot. at 54. Their contention is not only implausible, it lacks any basis in the Complaint and ignores that others independently determined that Sloan lied. The OCC found, and privately told the Bank's Board at the time, that Sloan's statements were "inaccurate"; Chairwoman Waters referred Sloan to the DOJ for "inaccurate and misleading" statements; and both the majority and minority members of the House Financial Services Committee determined that Sloan's statements "were unsupported by the facts on the ground" and "had no basis." ¶¶122-23, 222-23, 225. The Bank's new CEO, Scharf, likewise admitted that the House Reports—which documented the Bank's misstatements—were "consistent with what I found since I arrived at the Company." ¶¶131, 225.

### 4. Sloan and Duke Manipulated the Bank's Disclosures to Actively Conceal the Truth

Weeks after the Federal Reserve rejected Wells Fargo's second attempt at a Stage 1 Plan,

Sloan and Duke deliberately modified the Bank's draft SEC disclosures to conceal the true status of the Bank's compliance with the Consent Orders. Specifically, on March 4, 2019, Sloan personally instructed his colleagues to change a statement in Wells Fargo's draft SEC filing that would have—before Sloan's modification—admitted to investors that there was a "substantial amount of work remaining to meet the expectations outlined" in the Consent Orders. ¶¶90-91. Sloan expressed concern to Duke that stakeholders would rightly interpret such a disclosure to mean that "we are not close to lifting of the asset cap"—a fact that he actively sought to conceal. Duke concurred with Sloan's concern and instruction, privately responding to Sloan, *"I think you are right. Probably better to tone down the actual disclosures…."* ¶91.

Sloan's and Duke's intentional manipulation of the Bank's SEC filings further bolsters the scienter inference. Contrary to Defendants' assertions, their decision to "tone down" the Bank's disclosure does not demonstrate an "honest belief" that the Bank did not have a "substantial amount of work remaining." Mot. at 54, 58. Duke was the one who proposed to Sloan that the Bank include the language that there was a "substantial amount of work remaining." *See* DX D, App. 13 at 114. Moreover, any supposed belief that there was not a "substantial amount of work remaining" had no realistic basis. The Federal Reserve had just rejected the Bank's Stage 1 Plan and told Wells Fargo that its proposed deadlines were "improbable and unrealistic"; the OCC had just told Duke it was "deeply concerned about the continuing (and in some cases worsening) problems"; and the OCC had just warned Defendants in writing that the Bank's oversight "remain[ed] inadequate" and its response to the OCC/CFPB Consent Order had been "unacceptable." ¶89.[16]

---

[16] Defendants also try to seize on other language in the proxy-disclosure email to claim that Sloan's financial incentives were fully aligned with Wells Fargo's long-term performance and so he had

51

### 5.    The Bank's Compliance with the Consent Orders and Removal of the Asset Cap Were the Most Important Issues Facing the Bank

The Individual Defendants acknowledged that satisfying the Consent Orders was "critically important" to Wells Fargo's "credibility and perhaps even viability as a company." ¶229. Analysts agreed, describing the "searing nature" of the asset cap, cautioning investors to "remain on the sidelines," and describing Wells Fargo as a "cautionary tale." ¶46. That Wells Fargo's "financial status depend[ed]" on its compliance with the Consent Orders "provide[s] additional support for finding that Defendants acted with scienter." *Salix*, 2016 WL 1629341, at *16; *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (matters "critical to the long term viability" of the company provide additional support for scienter).[17]

### 6.    Defendants Repeatedly Spoke about the Status of the Bank's Compliance with the Consent Orders, Including in Response to Analyst Questions

The Individual Defendants spoke to investors repeatedly about the status of the Bank's compliance with the Consent Orders, while misstating and omitting the true negative state of affairs. These "allegations are sufficient at this stage of litigation to suggest that [Defendants] consciously chose not to disclose ... a significant negative finding, and that [they] therefore acted with scienter." *In re Intercept Pharm., Inc. Sec. Litig.*, 2015 WL 915271, at *11 (S.D.N.Y. Mar. 4, 2015); *see also In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 571 (S.D.N.Y. 2011) (defendants spoke positively after receiving an FDA letter expressing concern over suicide risk).

---

no motive to lie. Mot. at 54 (citing DX D, App. 13 at 114). But of course, Sloan's compensation was not fully aligned with the Bank's long-term performance. Despite the Bank's utter failure to submit compliant plans, Sloan was awarded a $15 million performance award supposedly for changing Wells Fargo's culture and business practices. *Id.* Once the truth was revealed, however, that award was ultimately clawed back. ¶137.

[17] Courts within this District recognize motive where, as here, a company's survival is on the line. *See, e.g.*, *Skiadas I*, 2020 WL 3268495, at *11; *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003).

Additionally, that many of the Individual Defendants' statements were made in direct response to analysts' questions (*see* ¶¶232-33) further supports an inference of scienter. *See Celestica*, 455 F. App'x at 14 (finding sufficient inference regarding issue "about which investors and analysts often inquired"); *Signet Jewelers*, 2018 WL 6167889, at *16 (finding "cogent support" for scienter in attempts to "placate the market in reaction to the inquiries by ... analysts").

Indeed, to the extent any Defendant spoke on topics of such importance without having full information, they were reckless. *See Novak*, 216 F.3d at 308-09 ("fail[ure] to review or check information" was reckless); *Avon* 2019 WL 6115349, at *20 ("[e]ither Defendants received reports" indicating negative information or "they deliberately ignored those reports," either of which is "sufficiently egregious").

### 7.     The Bank's CEO and Chairperson Were Forced to Resign

The Bank's then-CEO, Sloan, "resigned" in March 2019 with no successor in place. ¶102. While the Bank falsely told investors at the time that Sloan resigned for benign reasons, the true circumstances of his departure now demonstrate otherwise. As the Complaint details, Sloan was forced to "resign" just two weeks after (i) his false testimony to Congress; (ii) his apology to the Federal Reserve for lying to Congress and the media; and (iii) the OCC told the Bank's Board that Sloan's testimony was "inaccurate" and that he was an "impediment" to compliance. ¶¶96-102, 220. Additionally, Wells Fargo declined to provide Sloan any severance pay or annual incentive award upon his departure—a fact also kept well-hidden from investors at the time—and then later clawed back $15 million of his compensation due to his "role and responsibility for the Company's progress in resolving outstanding regulatory matters." ¶137. The true, undisclosed circumstances of Sloan's "resignation" strengthen the scienter inference. *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013); *see also Salix*, 2016 WL 1629341, at *15 (scienter supported by suspiciously timed resignations and compensation clawback); *Orthofix*, 89 F. Supp.

3d at 617-18 (scienter supported by suspiciously timed resignations).

In addition to Sloan, Duke, the Bank's highest-ranking Board member, was also forced out after the House Reports documented her "dereliction of duty" in response to the Consent Orders and immediately following Chairwoman Waters' call for her resignation. ¶¶133, 221. The fact that the Regulators, Congress, and the Bank tied these forced resignations and financial ramifications to Sloan's and Duke's failures under the Consent Orders further bolsters the scienter inference.[18]

### 8.    Sloan Was Financially Motivated to Mislead Investors

Pleading scienter does not require evidence of personal financial incentives or motive. *Tellabs*, 551 U.S. at 325. As courts in this District have repeatedly held, the absence of stock sales or financial gain "does not make the fraud illogical; indeed, if that were the case, motive and opportunity would be the sole test for pleading scienter, not just an alternative test." *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012).

In any event, in this case, Defendant Sloan was financially motivated to misstate the status of the Bank's compliance with the Consent Orders. Sloan's 2019 incentive compensation was tied to the subject matter of the fraud: "the Company's risk management objectives and outstanding regulatory matters, including the progress" on those matters. ¶137. And while a corporate executive's general desire to increase his compensation is not alone adequate to allege scienter, defendants' "specific motives to obtain outsized bonuses may certainly be considered as part of the calculus." *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 498-99 (S.D.N.Y. 2018)

---

[18] Defendants attempt to minimize the significance of the many resignations, claiming that Sloan's departure might be for "any number of reasons ... *most of which* are not related to fraud." Mot. at 55. That argument is not credible given the timing of his departure and the $15 million clawback. And even if true, Defendants' own argument acknowledges that at least part of the basis for his resignation might be "related to fraud." *See* ¶¶96-99, 137, 220.

54

(bonus structure tied to enrollment metrics created a motive to lie about those metrics).[19]

### 9.    Defendants' Counter-Narrative Is Uncompelling

In the face of these detailed allegations of scienter, Defendants attempt to spin their own counterfactual narrative, ignoring the Complaint's well-pled allegations and inventing their own "facts." Their arguments do not overcome the Complaint's strong inference of scienter.

*First,* Defendants contend that an inference of scienter is "illogical" because the Individual Defendants purportedly "stood to gain very little" from the alleged fraud other than postponing the day of reckoning. *See* Mot. at 51-52, 56. But this Court, and many others, have rejected Defendants' argument, which could be interposed in most securities actions. In *Skiadas I*, the Court found that defendants were incentivized to misrepresent the state of FDA approval of a pharmaceutical product to raise money in the short-term and "hope that the FDA would eventually approve" their new product. 2020 WL 3268495, at *11.[20] Quoting Judge Posner, the Court noted that hoping that bad news will be overtaken by good news is a "considered, though ... reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing." *Id.* at *12. Indeed, courts routinely find that postponing the revelation of the truth, even in the short term, is consistent with an inference of scienter because "the benefits of concealment might [have] exceed[ed] the costs." *Indiana Pub.*

---

[19] Wells Fargo's scienter is adequately alleged through the Individual Defendants. Even if the Court finds that the speaker of a particular statement lacked scienter (which it should not), scienter may nonetheless be imputed to Wells Fargo through the knowledge of its other high-level officers who were in regular direct communication with the Regulators. *See MBIA*, 700 F. Supp. 2d at 590.

[20] In *Skiadas II*, the Court distinguished Defendants' primary case cited in its motion, *Shields v. Citytrust Bancorp., Inc.*, explaining that unlike in *Shields*, the defendant knew a fact but publicly claimed the opposite to be true. 2020 WL 4208442, at *8. The same distinction exists here – the Individual Defendants knew they had missed deadlines and submitted incomplete plans, and that the Regulators had rejected those plans and questioned Bank leadership's ability to comply. Defendants nonetheless publicly conveyed the opposite message to investors.

*Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *13 (S.D.N.Y. Apr. 14, 2020) (defendants concealed inventory issues because they hoped a new revenue source was forthcoming); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *25 (S.D.N.Y. Dec. 2, 2013) (finding that "one can logically infer" that defendant "consciously chose to withhold information ... in the hopes that the dispute would be quickly resolved and that investors would be none the wiser"). Similarly, here, Defendants acted recklessly, gambling on the hope that they could maintain appearances long enough to come into compliance without investors learning the truth: that after years of scandals that the Bank had utterly failed to prevent, it could not even put together a plan to address its egregious failures, making investors question, as Director Craver aptly stated, "is there anything you can get right?" ¶74.[21]

***Second,*** Defendants also argue that Sloan or Parker would not lie in light of the intense regulatory scrutiny faced by Wells Fargo. *See* Mot. at 52, 56. Specifically, Defendants argue that Sloan "had to know that Wells Fargo's regulators ... would immediately correct any statement on those subjects they believed to be false." But Defendants offer no basis in the Complaint to support this supposed contemporaneous belief or their assertion, which similarly could be interposed as a defense in every securities action involving a regulated entity. Nor do Defendants point to any allegations indicating that the Regulators routinely correct false and misleading statements by

---

[21] Defendants' cases are distinguishable. *See* Mot. at 51-52. In *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 270 n.12 (S.D.N.Y. 2008), there were no facts showing that defendants were even aware they were violating the "ambiguous" rules of a video game self-regulatory organization; here, the Regulators' rejections were far from "ambiguous." In *JBCHoldings. NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 534 (S.D.N.Y. 2013), an "audacious" theory that defendant intended to set up a company but never deliver *any* revenue was undermined by a more realistic theory that defendant's employment relationship broke down and she sent her clients elsewhere.

entities subject to consent orders.[22]

*Third,* the Defendants misstate the legal standard for scienter for opinion statements, claiming that an opinion is actionable only if the statement was "not honestly believed when [it was] made." *See* Mot. at 50, 52, 54, 56-58. As discussed above, a statement of opinion is actionable if the speaker does not subjectively believe the statement *or* under two different circumstances that have nothing to do with the speaker's belief: (i) if the opinion contains an embedded fact that can be proven false, or (ii) if the opinion statement does not "fairly align[]s with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 189. Opinion statements that are actionable under the latter two categories do not require allegations that the speaker did not honestly believe the statement when made. *Newlink*, 965 F.3d at 175.

Moreover, Defendants' contention ignores the Complaint's allegations that the Individual Defendants could not have honestly believed their purported opinions. As detailed above, *see supra* at 6-12, 46-50, n.11, Defendants were the direct recipients of dozens of written and oral communications from the Regulators rejecting the Bank's submitted plans, rebuking their tardiness, and questioning the Bank's ability to comply. Additionally, former Chair of the Bank's Risk Committee Karen Peetz testified that she specifically told Wells Fargo's Board (including Sloan and Duke) that the Bank's risk management was "insufficient," management's progress was insufficient, and that Sloan was a "major impediment" in complying with the Consent Orders. ¶¶118-19. On these facts, Defendants could not have honestly believed their assertions that, for example, the Bank had a "meeting of the minds" with the Regulators or that the asset cap would be lifted in the first half or end of 2019. ¶¶152, 154, 162, 165, 177, 198, 201.

---

[22] While the OCC did, once, speak publicly regarding Wells Fargo's non-compliance, that statement came very late in the Class Period and was not corrective. *See supra* at 31-32.

The court's decision in *In re Delcath Sys., Inc. Securities Litigation* is instructive. There, the court rejected defendants' argument that their positive beliefs about clinical trial data undermined an inference of scienter. The court explained that the federal regulators' "extreme negativity" about the trial data, along with other allegations, undermined defendants' supposed honest belief. 36 F. Supp. 3d 320, 335-36 (S.D.N.Y. 2014). Here, too, the Regulators' "extreme negativity" about Wells Fargo's response to the Consent Orders undermines the Individual Defendants' supposed "honest beliefs."

Meanwhile, Defendants unpersuasively argue that *Tongue v. Sanofi* supports their claim that Sloan was merely "optimistic." Mot. at 53. In that case, plaintiffs failed to allege that the statements did not "fairly align" with the information they possessed or "that the risks arising out of the FDA feedback were out of the ordinary, or presented a special challenge not of the kind normally confronted" when seeking drug approval. 816 F.3d at 212. Here, in contrast, the Regulators' feedback involved an unprecedented penalty that impacted Wells Fargo's viability, and the Complaint amply demonstrates that Defendants' statements did not "fairly align" with the information they possessed. Further, *Tongue* addressed whether the challenged statements were misleading, not whether supposed optimism was inconsistent with scienter.[23]

*Fourth,* Defendants were not "hamstrung" (Mot. at 53, 55) by CSI limitations. Simply put, Defendants could have chosen not to speak about the Consent Orders if they could not do so truthfully and completely. *See supra* at 17-21.

---

[23] Defendants try to treat the Federal Reserve's March 11, 2019 rejection as a turning point, arguing that Sloan's positive statements beforehand were non-actionable optimism. Mot. at 53. But prior to that second rejection, Defendants (including Sloan) possessed a mountain of bad news and "extreme negativity" (*see Delcath*, 36 F. Supp. 3d at 335-36), the concealment of which supports scienter. Moreover, in *Sanofi-Aventis*, the court held that allegations that the FDA expressed concerns and requested a formal review were sufficient to raise an inference of scienter, even though the FDA had not yet denied approval for the drug. 774 F. Supp. 2d at 571-72.

*Finally,* as discussed above, the Individual Defendants did not accurately or meaningfully disclose the true status of their compliance with the Consent Orders (*see, e.g.*, *supra* at 21, 25, 45-46); thus, any "warnings" that the Bank provided were ineffective and cannot undermine scienter. As courts in this District explain, that defendants "occasionally tempered their predictions" does not undermine allegations of scienter. *City of Birmingham Firemen's and Policemen's Supplemental Pension Sys. v. Ryanair Hldgs.*, 2020 WL 2834857, at *4 (S.D.N.Y. June 1, 2020). Similarly, here, Defendants' purported "warnings" that certain work streams "are further along than others" or on "different tracks" (Mot. at 56-58), did not overcome their repeated, positive, and misleading statements to investors that the Bank was "executing the plan as opposed to designing it."

## C.    The Complaint Adequately Pleads Section 20(a) Claims

The Complaint alleges primary violations of Section 10(b) by Wells Fargo and each of the Individual Defendants, as described above. Thus, the only questions that remain are whether the Insider Defendants (including Scharf) "controlled" the speaking Defendants and whether they were each "a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F. 3d 227, 236 (2d Cir. 2014).

Here, the Insider Defendants are the Bank's top executives and directors, including the CEOs, Board Chairwoman, and CFO. Sloan, Shrewsberry, Scharf, and Parker also served on the Bank's management-level Operating Committee, where they were responsible for setting the "tone at the top" of the Bank and establishing and reinforcing the Bank's supposed risk management culture. ¶¶22-25. Duke, meanwhile, served as Board Chairwoman and sat on the Bank's Risk Committee, where she was responsible for overseeing and managing risk across the Bank. ¶26. Each Insider Defendant directly participated in the management of the Bank's operations, including its public reporting functions, and spoke to investors and securities analysts regularly.

¶¶22-27, 65. These facts sufficiently allege the Insider Defendants' actual ability to "direct … the management and policies" of Wells Fargo. *DoubleLine II*, 413 F. Supp. 3d at 220.

Moreover, the Complaint amply alleges the Insider Defendants' "actual involvement in the making of the fraudulent statements by the putatively controlled entity." *Id. See supra* Section III.A. Among other things, the Insider Defendants were "involved in ... the concealment" of the true facts regarding the Bank's satisfaction of the Consent Orders, including through their "spreading the misstatements" to investors. *DoubleLine II*, 413 F. Supp. 3d at 221.[24]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.[25]

---

[24] Although Defendants dispute Scharf's liability under Section 20(a), Mot. at 60, they do not dispute that, as of the day he became CEO, he "possessed the power to direct or cause the direction of the management and policies of [Wells Fargo]." *DoubleLine II*, 413 F. Supp. 3d at 220. He culpably participated in fraudulent statements made to investors thereafter, including Shrewsberry's December 10, 2019 statement, by not acting to correct them when made. ¶208.

[25] If the Court grants Defendants' motion in any part, Lead Plaintiffs request leave to replead.

Dated: March 8, 2021                                    Respectfully submitted,

/s/    *Steven J. Toll*                                 /s/    *John C. Browne*

**COHEN MILSTEIN SELLERS &**            **BERNSTEIN LITOWITZ BERGER**
**TOLL PLLC**                                          **  & GROSSMANN LLP**
Steven J. Toll (admitted *pro hac vice*)              John C. Browne (JB-0391)
S. Douglas Bunch (SB-3028)                            Jeroen van Kwawegen (JV-1010)
Molly J. Bowen (admitted *pro hac vice*)             Benjamin W. Horowitz (admitted *pro hac vice*)
1100 New York Avenue, N.W., Suite 500                1251 Avenue of the Americas
Washington, DC  20005                                 New York, New York  10020
Telephone: (202) 408-4600                             Tel: (212) 554-1400
Facsimile: (202) 408-4699                             Fax: (212) 554-1444
stoll@cohenmilstein.com                               johnb@blbglaw.com
dbunch@cohenmilstein.com                              jeroen@blbglaw.com
mbowen@cohenmilstein.com                              will.horowitz@blbglaw.com

Laura H. Posner (LP-8612)                             Jonathan D. Uslaner (JU-1942)
88 Pine Street, Fourteenth Floor                      Lauren M. Cruz (admitted *pro hac vice*)
New York, NY 10005                                    2121 Avenue of the Stars
Telephone: (212) 220-2925                             Los Angeles, California  90067
Facsimile: (212) 838-7745                             Tel: (310) 819-3470
lposner@cohenmilstein.com                             jonathanu@blbglaw.com
                                                      lauren.cruz@blbglaw.com

*Counsel for Lead Plaintiffs Mississippi*
*and Rhode Island, and Co-Lead Counsel*              *Counsel for Lead Plaintiffs Handelsbanken*
*for the Class*                                        *and Louisiana Sheriffs, and Co-Lead Counsel*
                                                      *for the Class*

                                                      **KLAUSNER, KAUFMAN, JENSEN &**
                                                      **LEVINSON**
                                                      Robert D. Klausner (admitted *pro hac vice*)
                                                      7080 NW 4th Street
                                                      Plantation, Florida  33317
                                                      Tel: (954) 916-1202
                                                      Fax: (954) 916-1232
                                                      bob@robertdklausner.com

                                                      *Additional Counsel for Louisiana Sheriffs*

61