UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE WELLS FARGO & COMPANY
SECURITIES LITIGATION

No. 20 Civ. 4494 (GHW)

**Oral Argument Requested**

---

## DEFENDANTS' REPLY MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS
## THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Nanci L. Clarence (*pro hac vice*)
Josh Cohen (*pro hac vice*)
Adam F. Shearer (*pro hac vice*)
CLARENCE DYER & COHEN LLP
899 Ellis Street
San Francisco, California  94109
Telephone:  (415) 749-1800
Facsimile:  (415) 749-1694
nclarence@clarencedyer.com
jcohen@clarencedyer.com
ashearer@clarencedyer.com

*Counsel for Defendant Timothy J. Sloan*

Richard C. Pepperman II
Leonid Traps
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
peppermanr@sullcrom.com
trapsl@sullcrom.com

Christopher Michael Viapiano
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C.  20006
Telephone:  (202) 956-7500
Facsimile:  (202) 293-6330
viapianoc@sullcrom.com

*Counsel for Defendants Wells Fargo &
Company, John R. Shrewsberry, C. Allen
Parker, Elizabeth Duke, and Charles W.
Scharf*

April 2, 2021

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................... 2

I.      Plaintiffs Do Not Plead Any Actionable Misstatements....................................................... 2

        A.      Plaintiffs Improperly Rely on Isolated Words and Phrases ..................................... 2

        B.      CSI Regulations Barred Disclosure of Specific Regulatory
                Communications ....................................................................................................... 5

        C.      Plaintiffs' Attempt to Rely on Opinion Statements Fails ........................................ 7

        D.      Plaintiffs' Attempt to Rely on Forward-Looking Statements Fails ...................... 10

        E.      Plaintiffs Distort and Overstate the HFSC Reports' Findings .............................. 12

        F.      Plaintiffs Fail to Show That Sloan's HFSC Testimony Is Actionable ................... 14

II.     Plaintiffs Do Not Plead the Required Strong Inference of Scienter ................................. 17

        A.      Plaintiffs' Allegations About Defendants as a Group Are Insufficient ................ 17

        B.      Plaintiffs Fail to Allege a Strong Inference of Scienter as to Any
                Individual Defendant. ............................................................................................ 20

III.    Plaintiffs Do Not State a Section 20(a) Claim. ................................................................. 24

CONCLUSION.......................................................................................................................... 24

# TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Abramson* v. *Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)......................................................................................18

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020).................................................................8

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)........................................................................17

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005)........................................................................23

*Burges* v. *BancorpSouth, Inc.*,
2015 WL 4198795 (M.D. Tenn. July 10, 2015) ......................................................5-6

*Burkle* v. *OTK Assocs., LLC*,
2 F. Supp. 3d 519 (S.D.N.Y. 2014)............................................................................17

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) .........................................................6-7

*City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013)..............................................................11, 12, 18

*City of Omaha Police & Fire Ret. Sys.* v. *Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020).......................................................................17

*In re Delcath Sys., Inc. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014)..........................................................................18

*Ganino* v. *Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)................................................................................16, 17

*In re Gen. Elec. Sec. Litig.*,
2021 WL 357756 (2d Cir. Feb. 3, 2021).....................................................................18

*Glaser* v. *The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011).........................................................................21

*Gray* v. *Wesco Aircraft Holdings, Inc.*,
454 F. Supp. 3d 366 (S.D.N.Y. 2020).........................................................................18

*In re HEXO Corp. Sec. Litig.*,
    2021 WL 878589 (S.D.N.Y. Mar. 8, 2021) ...................................................................21, 22

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ........................................................................19

*In re IBM Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998)...................................................................................................5

*Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016)...................................................................................................19

*Mulligan* v. *Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) .....................................................................................7

*New Orleans Emps. Ret. Sys.* v. *Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ...........................................................................................19

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)..........................................................................................................8, 18

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007).....................................................................................5

*Overton* v. *Todman & Co., CPAs, P.C.*,
    478 F.3d 479 (2d Cir. 2007)...................................................................................................5

*In re Par Pharm., Inc. Sec. Litig.*,
    733 F. Supp. 668 (S.D.N.Y. 1990).........................................................................................6

*Pirnik* v. *Fiat Chrysler Autos., N.V.*,
    2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ...................................................................18, 23

*Plumbers & Pipefitters Nat'l Pension Fund* v. *Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020).......................................................................19

*Plumbers & Pipefitters Nat'l Pension Fund* v. *Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015).....................................................................................21

*S.C. Ret. Sys. Grp. Tr.* v. *Eaton Corp. PLC*,
    791 F. App'x 230 (2d Cir. 2019) ...........................................................................................2

*S. Cherry St., LLC* v. *Hennessee Grp.*,
    573 F.3d 98 (2d Cir. 2009)..............................................................................................20, 23

*Shields* v. *Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)..................................................................................................10

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)...........................................................................19

*Singh* v. *Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)...............................................................................................7

*Skiadas* v. *Acer Therapeutics Inc.*,
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) ................................................. 4, 18-19

*Skiadas* v. *Acer Therapeutics Inc.*,
    2020 WL 4208442 (S.D.N.Y. July 21, 2020) ...........................................................4

*Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*,
    33 F. Supp. 3d 401 (S.D.N.Y. 2014)......................................................................24

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021)...............................................................................2, 7, 11

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008)...................................................................................17

*Tongue* v. *Sanofi*,
    816 F.3d 199 (2d Cir. 2016)....................................................................6, 8, 10, 18

*Vining* v. *Oppenheimer Holdings Inc.*,
    2010 WL 3825722 (S.D.N.Y. Sept. 29, 2010)........................................................23

*In re Vivendi Universal, S.A., Sec. Litig.*,
    842 F. Supp. 2d 522 (S.D.N.Y 2012).......................................................................24

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)......................................................................19

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
    2016 WL 2757760 (S.D.N.Y. May 11, 2016) .........................................................18

*Wochos* v. *Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ...............................................................................10

**PRELIMINARY STATEMENT**

Defendants' motion demonstrated that the Complaint tries to plead securities fraud by relying on isolated snippets lifted from much longer statements.  Instead of addressing the full text of Defendants' statements (quoted in Defendants' motion), Plaintiffs' Opposition doubles down on this stratagem by continuing to rely exclusively on three- and four-word phrases while, ironically, accusing *Defendants* of "try[ing] to rewrite" the challenged statements and "strip[ping] the context away."  (Opp'n 3.)  For instance, Plaintiffs assert that Allen Parker falsely stated on April 12, 2019 that Wells Fargo was "way down the road" (*id*. at 32), when what Parker actually said is that "our work is in various stages of progress, *some of it* is way down the road . . . *[o]ther parts of it are a little bit earlier in the process*" (Defs.' Br. 41 (emphasis added)).

Beyond this fundamental flaw, Plaintiffs repeatedly criticize Defendants for failing to disclose to the market the details of banking regulators' communications with Wells Fargo, but trivialize the fine line that Defendants had to walk between updating investors on the general status of Wells Fargo's efforts to comply with the consent orders while avoiding disclosure of any specific communications with regulators, which would have violated federal banking law and could have resulted in civil and criminal penalties.  Plaintiffs also fundamentally misunderstand the consent orders, suggesting that Wells Fargo could not implement any remedial measures until it obtained regulatory approval of its plans, even if that meant doing nothing to improve governance and risk management (the whole point of the consent orders) for months or years.

In addition, Plaintiffs fail to defend the Complaint's improper attempt to plead fraud based on generalized and caveated opinion statements, and they incorrectly argue that the PSLRA does not protect Defendants' forward-looking statements by ignoring the surrounding cautionary language.  Plaintiffs' efforts to piggyback on the HFSC reports and challenge Tim Sloan's HFSC testimony misstate the scope of the HFSC's findings and ignore what the two reports and Sloan

actually said.  And rather than allege that each Defendant spoke with an intent to deceive, Plaintiffs improperly lump the Defendants together, attempting to plead scienter based on little more than their general responsibilities and an inaccurate portrayal of their statements.

Finally, Plaintiffs fail to defend their Section 20(a) claim, particularly against Charles Scharf, for whom they can allege neither control nor culpable participation.

## ARGUMENT

### I.   Plaintiffs Do Not Plead Any Actionable Misstatements.

In trying to identify a false or misleading statement, Plaintiffs advance multiple arguments unsupported by the law or well-pled facts.  None is a basis to deny Defendants' motion.

### A.   Plaintiffs Improperly Rely on Isolated Words and Phrases.

Far from ignoring Defendants' "actual words" (Opp'n 23), Defendants' motion devoted dozens of pages to quoting the challenged statements in full.  That effort was necessary because Plaintiffs "may not cherry pick" isolated words and phrases "to plausibly allege fraud."  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 171 (2d Cir. 2021).  Plaintiffs nevertheless continue to rely on three- and four-word snippets that were part of much longer statements, while accusing Defendants of "rewrit[ing]" the challenged statements and "strip[ping] the context away." (Opp'n 3, 32-33, 39.)  Defendants provided the Court with the full text of the challenged statements (Defs.' Br. 17-49), which makes clear that Plaintiffs have distorted the statements at issue by plucking selective phrases from longer statements.  *See S.C. Ret. Sys. Grp. Tr.* v. *Eaton Corp. PLC*, 791 F. App'x 230, 234 (2d Cir. 2019) ("Considering [the] response in full—rather than considering the edited version that plaintiff provides in its brief—no misrepresentation or omission occurred.").

For example, Plaintiffs assert that Sloan told investors on February 2, 2018 that "the Bank was 'on a fast track' for the FRB Consent Order," which was allegedly misleading because the FRB "never gave the Bank 'fast track' status" and the "Bank had not yet 'even submitted a plan

to the [FRB].'"  (Opp'n 6, 43-44.)  Plaintiffs ignore that Sloan used the four-word phrase "on a fast track" on the *same day* the FRB consent order was announced.  No investor could have interpreted Sloan's comments on Day 1 laying out "what the deliverables are" under the consent order and when "we'll submit th[e] plan to the Fed" (future tense) as suggesting Wells Fargo *already* had submitted a plan.  (Defs.' Br. 17.)  No one says "I hope we do it sooner" when supposedly talking about something they already have done.  (*Id.*)  Nor did Sloan say that the FRB had conferred fast track "status" on the bank.  (Opp'n 43-44.)  He simply laid out the consent order's requirements and timeline for submission of plans to the FRB—"in 60 days."  (Defs.' Br. 17.)

Plaintiffs similarly strip away all context for John Shrewsberry's May 30, 2018 remark that "our investors know everything that's material that we know" and his July 13, 2018 comment that Wells Fargo was in "the last mile of knitting all of this together."  (*Id.* at 19, 21.)  Plaintiffs ignore that the first phrase responded to a question not about the consent orders but about other "things that have been in the media."  (*Id*. at 19.)  And Plaintiffs misread the second phrase to mean that Wells Fargo was nearly finished "knitting together" the entire consent-order process (Opp'n 8, 23-24), but ignore the language surrounding the quoted phrase, where Shrewsberry made clear that what was being "knit[] . . . together" was not implementation of approved plans but an "understanding of all the potential risks that exist," and cautioned that "it won't be done until that is done" and "there's still some drawing board [*i.e*., early-stage] activity" (Defs.' Br. 21).

Plaintiffs repeatedly focus on any references to Wells Fargo's having "plans in place" or to its "implementing" or "executing" plans.  (Opp'n 2, 6, 8-9, 11, 17-18, 21-26, 29, 31, 33-34, 47, 49-50, 59.)  Plaintiffs argue that Wells Fargo could not have progressed to "implementing" or "executing" its plans until it "achieved approval" from regulators to "progress[] into the

'implementation' and 'execution' stage." (*Id*. at 21, 24, 30.)  What Plaintiffs ignore, and Defendants explained, is that the challenged statements said nothing about the implementation of plans *approved* by regulators (a word Defendants never once used), but rather about improvements Wells Fargo had made and plans it had adopted while still awaiting regulatory approval as part of an iterative process. (Defs.' Br. 26, 36.)[1]

Plaintiffs' argument rests on the incorrect assumption that Wells Fargo could not take any steps to improve its governance and risk management until its regulators had formally approved its plans.  That is not so.  The consent orders nowhere prohibit Wells Fargo from implementing plans and making improvements before receiving formal approval.  On the contrary, the FRB consent order recognizes that the Company "has implemented and must continue to implement improvements" and requires the Company to "submit . . . written progress reports detailing . . . *all actions taken*" each quarter.[2] (ECF 91-1 at 2-3, 10 (emphasis added).)  Neither investors nor the regulators would have expected Wells Fargo to sit on its hands and do nothing to "implement[]" or "execut[e]" planned improvements for months or years on end while it awaited regulatory approval, even if those improvements were part of plans yet to be approved.  (Defs.' Br. 25.) Moreover, Sloan made clear from the very first day that the FRB consent order was announced that the Company would seek to "leverage existing plans and efforts already underway" in complying with the consent order.  (ECF 91-7 at 2.)

Plaintiffs contend that, even if Defendants' statements were true when made, later feedback

---

[1] Plaintiffs argue in the alternative that the statements are ambiguous and that the Court "cannot dismiss . . . claims based on [such] statements as a matter of law." (Opp'n 38 (quoting *Skiadas* v. *Acer Therapeutics Inc.*, 2020 WL 3268495, at *9 (S.D.N.Y. June 16, 2020) (*Skiadas I*)).)  But *Skiadas I* defined "ambiguity" as "susceptible of two different meanings," rather than simply "unclear."  *Skiadas* v. *Acer Therapeutics Inc.*, 2020 WL 4208442, at *3 (S.D.N.Y. July 21, 2020) (*Skiadas II*).

[2] The OCC and CFPB consent orders likewise did not bar the Company from implementing improvements and require similar reporting.  (ECF 91-3 at 17; ECF 91-2 at 5.)

from regulators constituted "intervening events" that "rendered each statement misleading and created a duty to update."[3]  (Opp'n 47 n.14.)  Beyond the fact that the purported "intervening events" were communications from regulators and thus CSI (*see infra* at 5-7), Defendants *did* provide updates to the extent they legally could.  (*E.g.*, Defs.' Br. 25 ("originally we were hoping [the asset cap] would be lifted by the end of this year . . . our view today is that we're operating under the asset cap and our expectations are sometime in the first half of next year"); *id*. at 28 ("taking a little bit longer); *id*. at 29 (same); *id*. at 39 ("substantial amount of work yet to do").)

### B.   CSI Regulations Barred Disclosure of Specific Regulatory Communications.

In Plaintiffs' view, Wells Fargo had two stark choices:  disclose the details of the feedback it had received from regulators on its submissions, which would have violated CSI regulations (Defs.' Br. 7-8), or respond to every question from Congress or analysts related to the consent orders with "no comment" (Opp'n 18, 20 & n.3).[4]  But Defendants could not have been expected either to violate CSI regulations and incur the wrath of regulators *or* to remain entirely silent in response to persistent questions from Congress and securities analysts on significant regulatory restrictions affecting the Company.  In none of the cases Plaintiffs cite did a court rule that a defendant has a duty to disclose information in violation of federal law requiring confidentiality— in fact, none of Plaintiffs' cases discusses CSI restrictions at all.[5]  A reasonable investor would

---

[3] Plaintiffs' principal case, *Overton* v. *Todman & Co., CPAs, P.C.*, 478 F.3d 479, 487 (2d Cir. 2007), "deal[s] only with an *accountant's* duty to correct financial statements later found to be erroneous, false, or misleading," *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 254 n.9 (S.D.N.Y. 2007) (emphasis added).  For non-accountants, a duty to correct arises "if and when a speaker learns that a prior statement was misleading when made." *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998).

[4] Plaintiffs assert that Defendants conceded that CSI restrictions did not apply to some communications.  (Opp'n 18 n.2.)  Defendants made no such concession, instead stating categorically that all "communications with [] regulators about the consent orders constitute CSI."  (Defs.' Br. 7.)

[5] *See*, *e.g.*, *Burges* v. *BancorpSouth, Inc.*, 2015 WL 4198795, at *4 (M.D. Tenn. July 10, 2015) (concluding, without reference to CSI rules, that "Defendants affirmatively stated that they were in compliance with all banking laws").  Recognizing that the court in *Burges* did not address CSI regulations,

have expected Defendants to do exactly what they did:  provide general status updates without disclosing specific, non-public communications with the Company's regulators.

Defendants had to carefully navigate CSI rules while answering pointed questions to ensure they did not violate federal law and subject themselves to civil or even criminal penalties, and their statements reflect their best efforts to achieve that balance.  (*See*, *e.g*., Defs.' Br. 27 ("[A] lot of the dialogue that we have with the Fed is covered by [CSI], so I want to be very careful in the feedback I'm providing."); *id*. at 36 n.3 ("I want to be very careful because I don't want to disclose any [CSI].").)  Defendants disclosed what they believed they could, highlighting "internal matters" and referencing "other sources of information" such as the regulators' public statements—*i.e*., the limited information the regulators permit financial institutions to disclose to investors.  *See*, *e.g*., FRB, Bank Holding Company Supervision Manual, Bk. Compl. Gd. 1991533, § 1065.0.2 (2020).

Moreover, the regulators' negative feedback on the Company's plans "did not prevent Defendants from expressing optimism" that Wells Fargo ultimately could satisfy regulators' demands.  *Tongue* v. *Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016).  As in *Tongue*, Plaintiffs are "sophisticated investors, no doubt aware" of the CSI restrictions on what Defendants could disclose.  *Id*.  Plaintiffs contend that Defendants' statements discussed the "mechanisms of compliance" and that "[c]ourts have repeatedly held that statements about specific progress in the face of undisclosed regulatory impediments are materially misleading."  (Opp'n 28.)  But neither of the cases Plaintiffs cite involved feedback from banking regulators protected by strict confidentiality rules.  *See In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600,

---

Plaintiffs cite the defendants' underlying motion to dismiss in that case, which simply referred in passing to the CFPB and FDIC's CSI rules. (Opp'n 20-21.)  The court, however, did not address this argument at all and therefore did not "reject[]" it as Plaintiffs contend. (*Id.* at 20.)  *In re Par Pharmaceutical, Inc. Securities Litigation*, 733 F. Supp. 668, 675 & n.8 (S.D.N.Y. 1990), dealt with the Fifth Amendment's self-incrimination protection, which is a privilege held by (and thus waivable by) the speaker—unlike CSI, a privilege held by the regulators that Defendants had no power to waive.

at \*1, 8 (S.D.N.Y. May 24, 2018) (undisclosed "Stop Work Order" from Nuclear Regulatory Commission); *Mulligan* v. *Impax Labs., Inc.*, 36 F. Supp. 3d 942, 968 (N.D. Cal. 2014) ("significant warnings from the FDA").  More importantly, Defendants' statements do not include any "actionable assurances of actual compliance" that can create liability.  *Singh* v. *Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).  Defendants at no point referred to a "clean compliance record," *id*.; on the contrary, they stressed that "[r]ecent public statements on the part of our regulators have indicated their disappointment with our progress to date" (Defs.' Br. 39, 40, 47).  CSI regulations prevented them from disclosing regulators' non-public statements to the Company.

Plaintiffs respond by attempting to analogize the challenged statements to the defendant's assertion in *Synchrony* that it was "not getting any pushback" from customers on changes it had made to its underwriting policies, 988 F.3d at 168, even though a major customer had switched to a competitor in response to those changes.  (Opp'n 28.)  Here, however, Defendants never suggested that the Company had received no negative feedback from its regulators; rather, each Defendant emphasized that much more work could or would be needed to meet regulatory expectations.[6]  When read in their entirety, Defendants' statements "suggest[] a company actively working to improve its compliance efforts, rather than one expressing confidence in their complete (or even substantial) effectiveness."  *Singh*, 918 F.3d at 64.

## C.    Plaintiffs' Attempt to Rely on Opinion Statements Fails.

Plaintiffs do not seriously dispute that many of the challenged statements are opinions,[7]

---

[6] *See, e.g.*, Defs.' Br. 18 ("There's a lot of back and forth, and it's become clear after the first couple of cycles or exchanges or series of meetings, that it's going to take a little bit longer."); *id*. at 22 ("We've gotten some very thoughtful feedback from them."); *id*. at 29 ("[T]he asset cap will be around a little bit longer, it reflects a very large complex body of work that we're working on with the Fed to, to satisfy the terms of the consent order."); *id*. at 32 ("[W]e have more work to do to meet regulatory expectations.").

[7] *See, e.g.*, Defs.' Br. 18 (Feb. 2, 2018); *id*. at 26 (Dec. 4, 2018); *id*. at 31 (Feb. 12, 2019); *id*. at 44 (May 30, 2019); *id*. at 46 (Sept. 27, 2019).  Plaintiffs ignore, for example, Shrewsberry's "sense" that

arguing instead that Defendants are liable because their opinions "omitt[ed] material contrary facts," namely, the feedback the Company had received from regulators.  (Opp'n 35, 36, 43 n.11, 46.)  But "[t]he 'core inquiry'" is "whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'"  *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *16 (S.D.N.Y. Apr. 2, 2020) (quoting *Tongue*, 816 F.3d at 210).  When read in full, Defendants' statements do not say or suggest that Wells Fargo had received regulatory approval.  As a result, the absence of regulatory approval is not an "omitted fact[]" that would "conflict with what a reasonable investor would take from the statement[s]."  *Id.*

Plaintiffs again focus on handpicked three- and four-word phrases, while ignoring that many of the statements when read in their entirety conveyed nothing more than general positive sentiments that in no way contradicted regulatory feedback.  For example, Shrewsberry said, "I think [the FRB consent order is] taking a little bit longer because it's the first of its kind"; Parker stated, "I think there is a meeting of the minds in terms of what we need to do, but the task itself is a significant one"; Sloan said, "our expectations are" that the asset cap will be lifted "in the first half of next year"; and Elizabeth Duke stated, "I think we have a good understanding with our regulators on what they are looking for." (Defs.' Br. 25, 30, 44, 46.)  Each of these statements is an opinion statement that conveyed general optimism, not a statement of fact about regulatory approval that "expresses certainty about a thing."  *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015).

Plaintiffs' distortion of Duke's only alleged misstatement illustrates this central flaw in the Complaint.  Plaintiffs assert that Duke, during a September 27, 2019 investor call to introduce Scharf as Wells Fargo's new CEO, committed securities fraud by stating in response to an analyst's

---

compliance with the consent orders "will take all of the amount of time that we've described," and Parker's "expectation" that "we're going to be focused more on execution" in the future.  *Id*. at 20-22, 40-41.

question that "we're pretty well along in a lot of the work, and we've defined out the work for each individual piece of it," and that "I think we have a good understanding with our regulators on what they are looking for." (Opp'n 36.) This opinion statement cannot be the basis of a fraud claim. Duke's statement, read in full, did not conflict with the regulators' feedback: nothing about "defin[ing] out the work" or Duke's belief that "we have a good understanding with our regulators" about "work [that] will continue" implies prior regulatory approval. (Defs.' Br. 46.) Plaintiffs also do not allege that Duke's statement was an inaccurate expression of her opinion about the status of the Company's remediation efforts. The statement recognized that more work remained and simply expressed optimism that new leadership might be able to "accelerate that work." (*Id*. ("And so that work will continue to the extent that Charlie can use his experience and insights to get through some of the pieces and accelerate that work, that will be terrific.").)

Plaintiffs also consistently omit important cautionary language conveyed with Defendants' opinions. For example, Plaintiffs argue that the Court should ignore as "separate statements" or "stray comments" Parker's May 30, 2019 warnings that the "hard work is going to continue" and that the regulators have "expressed some frustration." (Opp'n 33, 34.) But these comments were made in response to analyst questions in the very same conference where Parker also offered his opinions that "I think we're largely there" and "I think there is a meeting of the minds in terms of what we need to do." (Defs.' Br. 43-44.) Indeed, after Parker stated that "I think there is a meeting of the minds in terms of what we need to do, but the task itself is a significant one," he said *in the next two sentences* "that hard work is going to continue" and "I can't really put a timetable on that." (*Id.* at 44.) Parker also stressed earlier in the conference that the regulators had "expressed some frustration with where the company was in terms of the progress that it made," which he described as "unusual." (*Id*. at 43.) Parker's full comments are not "stray" or "separate"; they are

integrated cautionary statements that expressly warned investors not to take too rosy a view. Moreover, even if the Court credits Plaintiffs' characterization of Parker's statements as too optimistic in hindsight, even "misguided optimism is not a cause of action," and "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future." *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994). Plaintiffs cannot state a claim for securities fraud by cherry-picking a few words from a lengthy conference and ignoring everything else Parker said. *See Tongue*, 816 F.3d at 211 (courts "need to examine the context of an allegedly misleading opinion, and context is instructive here").

### D.      Plaintiffs' Attempt to Rely on Forward-Looking Statements Fails.

Plaintiffs argue that the PSLRA safe harbor does not apply to many of the challenged forward-looking statements—including those referencing what the Company was "planning" or "reasonably expect[ed]" or noting that Wells Fargo's work was "pointed toward completion" or "will continue" (Defs.' Br. 20, 24, 41, 46)[8]—because (i) "the Complaint challenges only Defendants' *omissions*," and (ii) "Defendants made only generic warnings" that did not constitute "meaningful cautionary language." (Opp'n 44-45.)

Plaintiffs cannot circumvent the PSLRA safe harbor by arguing that Defendants' forward-looking statements purportedly omitted material facts. Forward-looking statements "necessarily reflect[] an implicit assertion that the goal is achievable based on *current circumstances*," and "[t]he statutory safe harbor would cease to exist if it could be defeated" by reframing a challenge to a forward-looking statement as a challenge to an omission. *Wochos* v. *Tesla, Inc.*, 985 F.3d

---

[8] *See, e.g.*, Defs.' Br. 22 (July 13, 2018); *id*. at 23-24 (Dec. 4, 2018); *id*. at 27-28 (Jan. 15, 2019); *id*. at 41-42 (Apr. 12, 2019); *id*. at 17-18 (Feb. 2, 2018); *id*. at 39-42 (Apr. 12, 2019); *id*. at 43-45 (May 30, 2019). For instance, Defendants stated that "[o]ur goal is to make the fundamental investments and changes that we need to make," that "we're going to be able to operate under the asset cap," and that "we're going to do whatever is necessary." *Id*. at 22, 28, 41.

1180, 1192 (9th Cir. 2021).   The Second Circuit also has recognized that a "corporation's expressions of optimism . . . , without 'definite positive projections,' do not create a duty to disclose all aspects . . . to investors."  *Synchrony*, 988 F.3d at 167.  Reasonable investors would have known that Defendants' forward-looking statements could not have exhaustively listed every potentially relevant fact, especially those covered by CSI regulations.

Plaintiffs' cited cases are not to the contrary.  In one decision, the court determined that the PSLRA safe harbor did not apply because the defendants continued to promote a public construction timeline that was "no longer realistic." *City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*, 957 F. Supp. 2d 277, 306 (S.D.N.Y. 2013).  But that case involved firm lead times for various milestones in the construction project:  the defendants' "extremely aggressive schedule" required a feasibility study to be completed, which left "approximately a year . . . to plan and prepare for the start of construction."  *Id*.  The feasibility study experienced delays, rendering defendants unable to meet their stated timeline.  *Id*.  By contrast, the consent orders at issue here did not have the same rigid or predictable timetable as a construction project, and Defendants candidly acknowledged slippages in their expected timeline.  For instance, Shrewsberry stated on May 30, 2018—less than four months after the FRB consent order was entered—that it had "become clear . . . that it's going to take a little bit longer" and emphasized that "getting the work right is the most important thing," even if "it could take a little bit longer than was originally envisioned."  (Defs.' Br. 18-19.)  The next month, Shrewsberry said that "I expect that [the asset cap] will be gone in the time frames that we've talked about," but added in the next sentence "more important[] is making sure that we're focused . . . on getting the work done right" and also warned, "[I]f it takes us a short amount of time, . . . a medium amount of time, [or] a long amount of time, it's getting it done right . . . [that] matters the most" and "we're not in a hurry."  (*Id*. at 20-21.)

Plaintiffs' argument that Defendants' forward-looking statements were not accompanied by "meaningful cautionary language" also fails.  Plaintiffs cite *Kinross Gold* for the proposition that "mere boilerplate words of caution" are "insufficient to put investors on notice of the risks at hand."  957 F. Supp. 2d at 301.  But the court there held that a cautionary statement at the outset of a conference call that "speakers would 'be making forward-looking statements during the presentation,' and directed the call participants to the cautionary language" in other documents satisfied the PSLRA safe harbor and was not the sort of "boilerplate caution that the Second Circuit has held insufficient to put investors on notice."  *Id*. at 303.  Defendants' cautionary language likewise met the PSLRA's requirements.  For example, at the beginning of Wells Fargo's July 13, 2018 earnings call, the Company's Head of Investor Relations "caution[ed]" investors "that we may make forward-looking statements during today's call that are subject to risks and uncertainties" and referred investors to "our second quarter earnings release and quarterly supplement," "the Form 8-K filed today," and other "SEC filings," all of which contained further cautionary language.  (ECF 91-10 at 2.)  Similarly, at the beginning of the December 4, 2018 conference, Sloan warned that his presentation "has certain forward-looking statements regarding our expectations about the future" and told investors where they could "find more information about our risk factors."  (ECF 91-11 at 1-2.)  These additional warnings were "more than sufficient." *Kinross Gold*, 957 F. Supp. 2d at 303.

### E.    Plaintiffs Distort and Overstate the HFSC Reports' Findings.

In response to Defendants' showing that the two HFSC reports together reference only three of the 16 challenged statements, Plaintiffs argue that the reports "did not claim to provide an exhaustive list of Defendants' false statements; instead, [they] concluded that Defendants made a 'series' of false and misleading statements."  (Opp'n 22 n.4.)  Plaintiffs add that the reports "gave multiple examples" and assert that "[e]ach of the challenged statements at issue in this case is

-12-

virtually identical to the representative examples Congress found to be false and misleading." (*Id*. at 13, 22.)  Far from supporting Plaintiffs' position on "[e]ach of the challenged statements at issue" (*id*. at 22), the HFSC reports—after a "year-long investigation"—turned up exactly *three* purportedly false statements by *one* Defendant, none of which is actionable as securities fraud.

> On the page Plaintiffs reference (*id*. at 22 n.4 (citing AC ¶ 125)), the Minority Report states:
>
> Tim Sloan made a series of incomplete and overly optimistic public statements about the bank's progress toward complying with the CFPB and OCC consent orders, and the FRB's asset cap.  Sloan's *predictions* related to the timeline for satisfying regulatory requirements were *overly optimistic* and were unsupported by the facts on the ground.

(ECF 91-6 at 32 (emphases added).)   The Minority Report nowhere suggests that any other Defendant (Shrewsberry, Parker, or Duke) ever made an incomplete or overly optimistic public statement about Wells Fargo's progress under the consent orders, and it points to only three statements by Sloan:  (i) his February 2, 2018 "fast track" comment on the day that the FRB consent order was entered, (ii) his December 2, 2018 statement on CNBC that "he expected the asset cap to be lifted in the first half of 2019," and (iii) his March 12, 2019 HFSC testimony.  (*Id*. at 30-33.)  The Minority Report does *not* describe these three statements as mere "examples"; rather, Sloan's three statements constitute the entirety of the "series" cited in the report.

The Minority Report first argues that Sloan "misrepresented the bank's progress toward lifting the FRB's asset cap" on February 2, 2018 because, "[a]t the time, Wells Fargo had not even submitted a plan to the FRB" and "Sloan knew or should have known at the time it was unrealistic to expect the cap to be lifted in early 2018."  (*Id*. at 32.)  Like Plaintiffs, the Minority Report ignores that Sloan made his "fast track" remark on the same day the FRB consent order was entered.  Wells Fargo could not have submitted a plan under the consent order within hours of its entry, and Sloan never said on February 2 that he expected the asset cap to be "lifted in early 2018." In fact, under the timeline Sloan described that day, the FRB would not even consider whether to

lift the asset cap until the fourth quarter of 2018. (*See* Defs.' Br. 17; ECF 91-6 at 32.)

The Minority Report contends that Sloan's December 4, 2018 statement on CNBC "that he expected the asset cap to be lifted in the first half of 2019" was overly "optimistic." (ECF 91-6 at 32.) The Minority Report notes that the FRB had "rejected the company's initial plan for changes to its governance and risk management programs" over six months earlier in May 2018. (*Id.*) Like Plaintiffs, however, the Minority Report omits that Sloan's December 4, 2018 comment came *after* Wells Fargo had submitted its revised plans to the FRB on October 31, 2018, but *before* the FRB partially rejected those revised plans on March 11, 2019. (Defs.' Br. 26.)

The Minority Report's treatment of Sloan's March 12, 2019 HFSC testimony is even less helpful to Plaintiffs, as it relies exclusively on NPR's paraphrasing of Sloan's testimony rather than what Sloan actually said. (ECF 91-6 at 31 & nn.102-04.) Sloan never testified, as NPR wrote, that Wells Fargo was "fully complying with its regulators," nor did he say that the Company "was on track to resolve the consent orders." Rather, he made clear in his written testimony that "we have more work to do to meet regulatory expectations," and he testified orally that "we are working very constructively with what we have in place." (Defs.' Br. 33-34.) The Minority Report also stresses that, "[j]ust an hour after Sloan finished testifying, the OCC issued an unprecedented statement to correct the record." (ECF 91-6 at 31.)

For its part, the Majority Report cites only Sloan's March 12, 2019 HFSC testimony and does not suggest that Sloan made any other supposedly "misleading" statement. (ECF 91-4 at 61.) Like the Minority Report, the Majority Report does not challenge a single statement by Shrewsberry, Parker, or Duke and does not refer to Sloan's HFSC testimony as a mere "example."

### F.    Plaintiffs Fail to Show That Sloan's HFSC Testimony Is Actionable.

Despite devoting significant attention to Sloan's 2019 HFSC testimony, Plaintiffs continue to focus on only a few short excerpts of that testimony (Opp'n 28-29), ignoring Sloan's caveat that

-14-

"we have more work to do" and his warning that he could not "respond specifically to . . . question[s] because that would mean . . . disclosing confidential supervisory information" (Defs.' Br. 33-34).

Plaintiffs take issue with Sloan's comments that "we are working very constructively with what we have in place and we are executing that plan," that "[w]e are in compliance with those plans," and that the FRB "want[s] us to improve the Board governance and oversight, which we have done." (Opp'n 29.) Plaintiffs contend that Sloan could not have truthfully made those remarks because the regulators had not approved Wells Fargo's plans. But Sloan never stated that the regulators had approved any of the Company's submissions and his generic references to "executing that plan" and "compliance with those plans" do not comment on the status of regulatory approval. In response to persistent questioning, Sloan simply tried to assure HFSC members that Wells Fargo had taken steps to improve its governance and risk management. As HFSC member Patrick McHenry observed in questioning Sloan, "since 2016, the bank has entered into settlements with every single one of its Federal regulators," and "[t]he various settlements required the bank to develop plans . . . to address internal deficiencies." (ECF 91-5 at 3.) Wells Fargo attempted to comply with the 2018 consent orders by "leverag[ing]" those "existing plans." (ECF 91-7 at 2.) In his written testimony, Sloan also listed a number of detailed improvements that Wells Fargo already had implemented, and Plaintiffs do not allege that Wells Fargo had not made those changes. (ECF 91-17 at 8-9.) In short, the Company was "executing" and in "compliance with" its existing plans, even though it had not yet received approval for the plans it had submitted under the 2018 consent orders. (*See supra* at 3-5.)

Plaintiffs next dismiss as a "truth-on-the-market" defense the OCC's unprecedented statement just an hour after Sloan finished testifying that the OCC continued to be disappointed

-15-

by Wells Fargo's performance under its consent order.  (Opp'n 30-31.)  As Defendants explained, a "truth-on-the-market" defense rebuts an alleged misrepresentation "'by showing that the truth of the matter was already known' to the market."  (Defs.' Br. 38 n.5 (quoting *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)).)  By contrast, the OCC issued its statement immediately after Sloan finished testifying.  Such a high-profile contemporaneous disclosure is very different from relying on information already available to the market before the challenged statement.  Plaintiffs also ignore that FRB Chairman Powell made a similar critical statement about a week later, which Parker discussed during the Company's next earnings call.  (*Id*. at 39, 40 n.6.)

Plaintiffs dispute the significance of the OCC's statement by falsely calling it a "one-line statement" and a "one-sentence public statement" and contending that one regulator's statement cannot possibly bear on "an entirely different [consent] order issued by an entirely different regulator."  (Opp'n 31.)  But the OCC statement was neither "one line" nor "one sentence."  The OCC's "rare rebuke" stated:

> We continue to be disappointed with [Wells Fargo's] performance under our consent orders and its inability to execute effective corporate governance and a successful risk management program.  We expect National Banks to treat their customers fairly, operate in a safe and sound manner, and follow the rules of law.

(ECF 91-18 at 1; *see also* ECF 91-6 at 31 (describing OCC release as "an unprecedented statement to correct the record").)

The OCC's highly unusual public statement immediately made prominent headlines, such as *Regulator Slams Wells Fargo After CEO Testifies to Congress* (Wall Street Journal), *Wells Fargo Rebuked by Regulator Over Risk Management* (Financial Times), *We Continue to Be Disappointed With Wells Fargo* (Dow Jones), and *As Wells Fargo CEO Draws Bipartisan Rebuke, OCC Takes Swipe Too* (Bloomberg).  (Appendix A lists multiple articles in various prominent publications that reported the OCC's statement.)  Even if Sloan's testimony could be considered

-16-

misleading (it was not), the OCC's rare public rebuke immediately corrected any mistaken impression and rendered Sloan's statements immaterial. *Burkle* v. *OTK Assocs., LLC*, 2 F. Supp. 3d 519, 522 (S.D.N.Y. 2014). The significant media attention that the OCC's public statement attracted shows that the statement was "conveyed to the public with a degree of intensity and credibility sufficient to counterbalance effectively any misleading information created by the alleged misstatements." *Ganino*, 228 F.3d at 167 (internal quotation marks omitted).

## II.    Plaintiffs Do Not Plead the Required Strong Inference of Scienter.

Rather than "providing a factual basis for scienter for each defendant," *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 664 (S.D.N.Y. 2017), Plaintiffs improperly lump them together, arguing that the Complaint pleads "a strong inference" as to Defendants as a group. (Opp'n 47.) To the extent they address Defendants individually, Plaintiffs base their scienter allegations against Shrewsberry, Parker, and Duke on little more than their positions at Wells Fargo and a selective reading of their statements, and they mischaracterize what Sloan said and when. (*Id*. at 48-55.) Plaintiffs thus fail to meet the PSLRA's heightened burden for pleading scienter for each Defendant individually, and their scienter allegations are not "as compelling as [the] opposing inference of nonfraudulent intent." *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008). Defendants shared general information about Wells Fargo's progress under the consent orders in response to questions, while attempting to avoid unlawful disclosure of CSI by disclosing specific communications with regulators.

### A.    Plaintiffs' Allegations About Defendants as a Group Are Insufficient.

Plaintiffs make three arguments directed at Defendants as a group, but "group pleading" of scienter "runs afoul of the PSLRA's requirement" that Plaintiffs separately plead scienter for each defendant. *City of Omaha Police & Fire Ret. Sys.* v. *Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020). Each of Plaintiffs' arguments fails.

-17-

*First*, relying on *Omnicare*, Plaintiffs assert that Defendants "misstate the legal standard for scienter for opinion statements." (Opp'n 57.) But *Omnicare* involved claims under the Securities Act of 1933, which "do[es] not require a showing of scienter." *Tongue*, 816 F.3d at 209. *Omnicare* thus has no bearing on the scienter element of a claim under Section 10(b) of the Exchange Act. To plead scienter for an opinion, a plaintiff must allege "facts that, if true, would be sufficient to show that the speaker did not 'actually hold[] the stated belief.'" *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *5 (S.D.N.Y. May 11, 2016); *see Kinross Gold*, 957 F. Supp. 2d at 301 ("[T]he *sine qua non* of a securities fraud claim based on false opinion is that defendants deliberately misrepresented a truly held opinion."). Plaintiffs must plead not only that Defendants' opinion statements were false or misleading, but also that Defendants intentionally misrepresented their truly held beliefs. *See Pirnik* v. *Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *8 (S.D.N.Y. Oct. 5, 2016).[9] This is "no small task," *Gray* v. *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 400 (S.D.N.Y. 2020), *aff'd*, 2021 WL 745310 (2d Cir. Feb. 26, 2021), and Plaintiffs' allegations fail. (Defs.' Br. 2, 4, 14, 18, 26, 52, 54, 56-58.)[10]

*Second*, Plaintiffs argue that Defendants sought to "maintain appearances long enough to come into compliance without investors learning the truth" and that "postponing the revelation of the truth, even in the short term, is consistent with an inference of scienter." (Opp'n 55-56.) In so arguing, Plaintiffs rely on this Court's statements in *Skiadas I* that "allegations of motive [may be]

---

[9] Plaintiffs cite *In re Delcath Systems, Inc. Securities Litigation*, 36 F. Supp. 3d 320, 332-34 (S.D.N.Y. 2014) (Opp'n 58), but *Delcath* did not address the standard for pleading scienter for opinion statements, and held only that defendants there were "reckless" in omitting material facts about a drug trial that "were critical to the FDA's conclusion" that the drug "should not be approved."

[10] Plaintiffs' reliance on *Abramson* v. *Newlink Genetics Corp.*, 965 F.3d 165, 175-76 (2d Cir. 2020), is misplaced because it, too, applies the Securities Act and never mentions scienter. In another Exchange Act case, the Second Circuit recently stated that it "need not determine . . . whether any of the statements alleged [] to be misleading crossed the line drawn in *Omnicare* and *Abramson*, because [the plaintiffs] failed adequately to plead scienter in connection with any of the alleged misrepresentations under Rule 10b-5." *In re Gen. Elec. Sec. Litig.*, 2021 WL 357756, at *2 (2d Cir. Feb. 3, 2021).

-18-

adequate where the company[] need[s] to fundraise to survive" and that an "executive has a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure." 2020 WL 3268495, at *11. But Wells Fargo was not at risk of "failure" in 2018 and 2019, and Defendants had no "incentive to bet the farm." *Id*. The worst potential outcome was that the asset cap would remain in place while Wells Fargo developed compliance plans to the satisfaction of its regulators. Defendants also repeatedly reminded investors of the regulators' public statements of "frustrat[ion]" with Wells Fargo's progress and emphasized the substantial amount of work that needed to be done. (*E.g.*, Defs.' Br. 32, 39, 43.) Lying about the status of the Company's efforts to comply with the consent orders would serve no purpose because the regulators could—and both the OCC and FRB did—express their own views about the Company's efforts. (*See id*. at 52.) This is not a case where the "'the benefits of concealment'" (avoiding potential short-term adverse publicity) "'might [have] exceed[ed] the costs'" (nearly certain regulatory action). (Opp'n 55, 56 (quoting *Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016)).)[11]

*Third*, Plaintiffs contend that the "critical[] importan[ce]" of compliance with the consent orders to Wells Fargo supports an inference of scienter. (*Id*. at 52.) But this is just a poorly disguised "core operations" argument. As Defendants explained (Defs.' Br. 55), even if that doctrine is viable, a plaintiff cannot plead scienter simply by alleging that the fraud concerned an important matter. *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011).[12]

---

[11] The other cases Plaintiffs cite are inapposite. In *Plumbers & Pipefitters National Pension Fund* v. *Davis*, 2020 WL 1877821, at *13 (S.D.N.Y. Apr. 14, 2020), defendants "recklessly failed to disclose" a material trend, and in *In re Hi-Crush Partners L.P. Securities Litigation*, 2013 WL 6233561, at *25 (S.D.N.Y. Dec. 2, 2013), the defendants withheld that a major customer repudiated its contract.

[12] Plaintiffs contend that the fact that Defendants' "statements were made in direct response to analysts' questions" supports an inference of scienter (Opp'n 53), but they do not explain why, and the cases they cite do not support this proposition. Both cases found that analysts' questions about an issue may show that defendants were *aware* of that issue, but that is irrelevant to whether Defendants' answers here were intentionally deceptive. *See New Orleans Emps. Ret. Sys.* v. *Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018).

B.     **Plaintiffs Fail to Allege a Strong Inference of Scienter as to Any Individual Defendant.**

Plaintiffs' few remaining allegations specific to each Defendant also fail to plead scienter.

**Tim Sloan.**  Plaintiffs' allegations about Sloan are insufficient to plead that he had "a state of mind approximating actual intent" to deceive investors.  *S. Cherry St., LLC* v. *Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009).

*First*, Plaintiffs assert that Sloan was aware of information contradicting his statements due to his role in negotiating the consent orders, submitting progress reports, and reviewing regulator communications.  (Opp'n 48.)  But the only allegedly contradictory information Plaintiffs identify are communications with regulators.  (*Id*. at 48-49.)  Plaintiffs do not allege how this information contradicts Sloan's statements, shows that he did not believe his opinions, or demonstrates that he knew that his forward-looking statements were false.  (Defs.' Br. 17-18, 22-29, 52-53.)

*Second*, Plaintiffs attempt to transform Sloan's call to the FRB after his March 2019 HFSC testimony into an admission of fraud, asserting that he called not to "appease the Regulators," but because "he actually lied."  (Opp'n 50.)  But Plaintiffs do not allege that Sloan "actually lied" during his testimony (Defs.' Br. 32-39), nor do they explain how a call to FRB in the immediate aftermath of the OCC's unprecedented public rebuke in an effort to clear up any misunderstanding and address any similar concerns the FRB might have is an admission of fraud.

*Third*, Plaintiffs assert that Sloan "actively sought to conceal" that Wells Fargo was "not close to lifting the asset cap" when he suggested in a March 3, 2019 email to Duke that the word "substantial" be removed from a sentence in an SEC filing about the work left to do under the consent orders.  (Opp'n 51.)  Plaintiffs do not contend, however, that the edited sentence in Wells Fargo's SEC filing was false or misleading.  Plaintiffs nevertheless argue that this email shows an intent to deceive investors because the FRB "had just rejected the Bank's Stage 1 Plan."  (*Id*.)  But

the FRB rejected Wells Fargo's revised Stage 1 Plan on March 11, 2019 (AC ¶ 93), eight days *after* Sloan's email exchange with Duke.  Plaintiffs also conflate the different regulators, arguing that concerns expressed by the OCC a month earlier were relevant to Sloan's email related to the asset cap, which is unique to the FRB.  (Opp'n 51.)  And Plaintiffs fail to address Sloan's contemporaneously stated motivation for removing the word "substantial," *i.e.*, to prevent readers from "jump[ing] to the conclusion" that the asset cap would not be lifted soon, while Wells Fargo awaited the FRB's response to its revised plan.  (Defs.' Br. 54-55.)  Plaintiffs' assertion that the real motive was to "conceal the true status of the Bank's compliance" (Opp'n 51) is speculation.

*Fourth*, Plaintiffs contend that Wells Fargo "falsely told investors" that Sloan "resigned for benign reasons," while the "true, undisclosed circumstances of [the] 'resignation' strengthen the scienter inference."  (*Id*. at 53.)  But "resignations must be 'highly unusual and suspicious' to add to a pleading of circumstantial evidence of fraud."  *Glaser* v. *The9, Ltd*., 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011).  Sloan's departure occurred when the Company and he were the subject to intense public criticism following the March 2019 HFSC hearing and Wells Fargo was having unexpected difficulty bringing itself into compliance with the 2018 consent orders.  "'Abrupt' resignations, amidst bad financial news . . . are not surprising."  *In re HEXO Corp. Sec. Litig.*, 2021 WL 878589, at *21 (S.D.N.Y. Mar. 8, 2021).[13]

*Finally*, Plaintiffs assert that "Sloan was financially motivated" to commit fraud because his incentive compensation was tied to Wells Fargo's progress on "risk management objectives and outstanding regulatory matters."  (Opp'n 54.)  "If performance-based compensation were a sufficient predicate for fraud, then 'virtually every company in the United States that experiences

---

[13] In the cases Plaintiffs cite (Opp'n 53-54), courts found an inference of scienter based on a substantial amount of factual support, with resignations only providing "some" additional "weight."  *E.g.*, *Plumbers & Pipefitters Nat'l Pension Fund* v. *Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015).  Plaintiffs provide no such support here.

a downturn in stock price could be forced to defend securities fraud actions.'" *HEXO*, 2021 WL 878589, at *19.  Plaintiffs do not explain how the alleged misstatements could have increased Sloan's compensation, which was tied, in part, to the Company's actual compliance with the consent orders—*i.e.*, whether the regulators ultimately approved Wells Fargo's plans.

**John Shrewsberry.**   Plaintiffs' conclusory allegations about Shrewsberry—that his responsibilities for compliance with the consent orders and his role on the Company's operating committee made him aware of facts contradicting his public statements (Opp'n 48)—are insufficient to raise a strong inference of scienter.  In discussing scienter, the Opposition points to one statement by Shrewsberry—"[o]ur investors know everything that's material"—and argues that this statement was contradicted by regulatory communications (*id*. at 49 (citing AC ¶ 146)) and was made in response to an analyst's question (*id*. at 53 (citing AC ¶ 233)).  As explained above, however, Shrewsberry was not talking about Wells Fargo's progress under the FRB consent order when he made this May 30, 2018 statement (*supra* at 3), and in the same answer, he also said *three times* that compliance with the consent order was going to "take a little bit longer" than expected (Defs.' Br. 18-20).  That Shrewsberry was responding to an analyst's question does not help Plaintiffs plead a strong inference that Shrewsberry was motivated by an intent to defraud.

**Allen Parker.**  Plaintiffs say next to nothing to support an allegation that Parker acted with an intent to defraud, and what they do say falls far short of a strong inference of scienter.  Parker was acutely aware of the scrutiny that Wells Fargo faced, having served as General Counsel and then becoming interim CEO after Sloan's March 2019 resignation.  Parker repeatedly warned investors that there was "a substantial amount of additional work to do" and that regulators had "expressed some frustration with where the company was in terms of the progress that it made." (Defs.' Br. 39, 46-48, 56-57.)  Plaintiffs do not address these explicit warnings or Parker's lack of

any conceivable motive to lie, instead relying on his "responsibility" for compliance with the consent orders and the allegation that he requested (along with Sloan and Duke) extensions of consent-order deadlines. (Opp'n 48-49.) These allegations say nothing about scienter, and the Complaint fails to plead any inference, much less a strong one, that Parker acted with a "conscious recklessness" that "approximat[ed an] actual intent" to deceive. *S. Cherry St.*, 573 F.3d at 109.

**Elizabeth Duke.** Plaintiffs' scienter allegations directed at Duke are similarly scant. They cite Duke's role in negotiating the consent orders and reviewing regulator communications, without explaining how this information contradicted the one alleged misstatement attributed to Duke. Plaintiffs assert that Duke's March 3, 2019 email exchange with Sloan about the SEC filing is evidence of an intent to deceive investors, but Duke's alleged misstatement occurred six months *after* that email exchange and Plaintiffs do not contend that the SEC filing contained any false or misleading statement. The email has no bearing on whether Duke "honestly believed" her September 2019 statement when made. *Pirnik*, 2016 WL 5818590, at *8. Plaintiffs also fail to show that Duke's March 9, 2020 resignation—five months after her September 2019 statement— supports an inference of scienter. (Opp'n 54.) "[A]bsent any alleged facts linking the . . . resignation[] and the alleged fraud," the resignation does "not support an inference of conscious misbehavior or recklessness." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 447 (S.D.N.Y. 2005).[14]

**Wells Fargo.** Plaintiffs fail to allege corporate scienter because they do not plead facts creating "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Vining* v. *Oppenheimer Holdings Inc.*, 2010 WL 3825722, at *6 (S.D.N.Y. Sept. 29, 2010). Plaintiffs' assertion that "scienter may nonetheless be imputed to Wells

---

[14] Plaintiffs allege that Duke admitted during her March 2020 HFSC testimony that the deadline extensions were "red flags" and that she "knew" the "management team could not get plans 'written in a complete fashion.'" (Opp'n 3, 49 n.15.) But Plaintiffs do not explain how this testimony raises a strong inference of scienter as to her one alleged misstatement in September 2019. (Defs.' Br. 45-46, 57-58.)

Fargo through the knowledge of its other high-level officers who were in regular direct communication with the Regulators" (Opp'n 55 n.19) is meritless. Plaintiffs do not identify these "other" officers or explain why they supposedly had an intent to deceive.

### III.    Plaintiffs Do Not State a Section 20(a) Claim.

Plaintiffs agree that a failure to plead a primary violation defeats their Section 20(a) claim. *In re Vivendi Universal, S.A., Sec. Litig.*, 842 F. Supp. 2d 522, 527 (S.D.N.Y 2012). This claim also fails because Plaintiffs' conclusory assertions about Defendants' "participat[ion]" in managing the Company and "speaking to investors and securities analysts" (Opp'n 59) are insufficient to plead actual control. Similarly, Plaintiffs' contention that Defendants were "'involved in . . . the concealment' of the true facts" (*id*. at 60) does not provide "particularized facts of the controlling person's conscious misbehavior or recklessness." *Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014).

Plaintiffs defend their frivolous Section 20(a) claim against Wells Fargo's current CEO, Charles Scharf, only in a footnote, falsely stating that he "culpably participated in fraudulent statements made to investors" after he became CEO, "including Shrewsberry's December 10, 2019 statement." (Opp'n 60 n.24.) There are no "statements" (plural): Shrewsberry's December 2019 statement is the *only* challenged statement that was made after Scharf joined Wells Fargo in October 2019. The Complaint pleads no facts showing Scharf's control over or culpable participation in Shrewsberry's unscripted response to an analyst's question at the December 10, 2019 Goldman Sachs conference. The Court should reject Plaintiffs' attempt to hold Scharf liable simply because he became Wells Fargo's CEO before the last challenged statement was made.

### CONCLUSION

The Court should dismiss the Complaint in its entirety and with prejudice.

Dated:    New York, New York
           April 2, 2021

Nanci L. Clarence (*pro hac vice*)
Josh Cohen (*pro hac vice*)
Adam F. Shearer (*pro hac vice*)
CLARENCE DYER & COHEN LLP
899 Ellis Street
San Francisco, California 94109
Telephone:  (415) 749-1800
Facsimile:  (415) 749-1694
nclarence@clarencedyer.com
jcohen@clarencedyer.com
ashearer@clarencedyer.com

*Counsel for Defendant Timothy J. Sloan*

/s/ Richard C. Pepperman II
Richard C. Pepperman II
Leonid Traps
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
peppermanr@sullcrom.com
trapsl@sullcrom.com

Christopher Michael Viapiano
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
Telephone:  (202) 956-7500
Facsimile:  (202) 293-6330
viapianoc@sullcrom.com

*Counsel for Defendants Wells Fargo & Company, John R. Shrewsberry, C. Allen Parker, Elizabeth Duke, and Charles W. Scharf*

**APPENDIX A:**
**REPORTING OF THE OCC'S MARCH 12, 2019 STATEMENT**

*Immediate Reporting of the OCC's Statement*

1.  Robert Armstrong & Kiran Stacey, Wells Fargo Rebuked by Regulator Over Risk Management, Financial Times (March 12, 2019).

2.  OCC in Statement: "We Continue to Be Disappointed With Wells Fargo," Dow Jones Newswire (March 12, 2019).

3.  Steve Goldstein, Wells Fargo CEO Faces Bipartisan Grilling in Front of House Committee, Market Watch (March 12, 2019).

4.  Hannah Levitt & Jesse Hamilton, As Wells Fargo CEO Draws Bipartisan Rebuke, OCC Takes Swipe Too, Bloomberg (March 12, 2019).

5.  Imani Moise & Pete Schroeder, Wells Fargo CEO Avoids Major Stumble at Heated Congressional Hearing, Reuters (March 12, 2019).

6.  Deon Roberts, "You don't get it." Wells Fargo CEO Roasted at Congressional Hearing Amid Bank Scandals, Charlotte Observer (March 12, 2019).

7.  Jim, Puzzanghera, Wells Fargo CEO Tim Sloan's Message of Contrition and Improvement Draws Bipartisan Rebuke, Los Angeles Times (March 12, 2019).

8.  Wells Fargo CEO Draws Bipartisan Ire in U.S. Congress Hearing, Nasdaq (March 12, 2019).

9.  Rachel Louise Ensign & Andrew Ackerman, Regulator Slams Wells Fargo After CEO Testifies to Congress, The Wall Street Journal (March 13, 2019).

*Subsequent Coverage*

10. Kate Berry, What's Behind OCC's Public Rebuke of Wells Fargo?, American Banker (March 15, 2019).

11. Jon Hill, OCC Will Review Wells Fargo's CEO Selection, Law360 (March 15, 2019).

12. In the Pillory:  Wells Fargo Takes a Pasting, from Congress and a Regulator, The Economist (March 16, 2019).

13. Victoria Guida, Wells Fargo CEO Steps Down Amid Rebukes from Regulators, Congress, Politico (March 28, 2019).

14. Jon Hill, Wells Fargo's CEO Search Won't Bring Quick Fixes, Law360 (March 29, 2019).

15. Aaron Back, Exchange:  Heard on the Street: The Wheels Are Still Off Wells Fargo's Coach— Even With a New Driver, the Road Will Stay Bumpy, The Wall Street Journal (March 30, 2019).

16. Imani Moise & Pete Schroeder, How Wells Fargo's Regulators and Employees Drove Out its CEO, Reuters (April 9, 2019).