UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                           :

IN RE WELLS FARGO & COMPANY
  SECURITIES LITIGATION

-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/30/2021

1:20-cv-04494-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

In 2018, Defendant Wells Fargo ("Wells Fargo" or the "Bank") entered into three consent orders (the "2018 Consent Orders") with federal regulators to rectify corporate mismanagement under which fraudulent practices had occurred, including the opening of millions of unauthorized bank accounts and charging hundreds of thousands of borrowers for unnecessary insurance without their consent.  The Federal Reserve Board (the "Federal Reserve") issued one of the 2018 Consent Orders (the "2018 FRB Consent Order"), which included an asset cap (the "Asset Cap") prohibiting Wells Fargo from expanding its assets until it had complied with the 2018 FRB Consent Order's requirements.  Two other consent orders were issued by the Office of the Comptroller of the Currency (the "OCC"), and the Consumer Financial Protection Bureau (the "CFPB").

Investors were concerned about the ramifications of the 2018 Consent Orders—and the Asset Cap in particular—on Wells Fargo's viability as a bank and its stock value, and they monitored the Bank's compliance with the 2018 Consent Orders.  Those investors include the lead plaintiffs in this action, Handelsbanken Fonder AB, Public Employees' Retirement System of Mississippi, the Rhode Island Office of the General Treasurer on behalf of the Employees' Retirement System of Rhode Island, and the Louisiana Sheriffs' Pension & Relief Fund (together, the "Lead Plaintiffs").

In 2018 and 2019, after the 2018 Consent Orders were issued, Wells Fargo's senior executives and directors (the "Individual Defendants," and together with Wells Fargo, the

"Defendants") made certain statements that the Lead Plaintiffs argue misleadingly represented the status of Wells Fargo's compliance with the orders.  Specifically, Lead Plaintiffs argue that Defendants' statements conveyed that Wells Fargo had passed Stage 1 and was focused on the later execution stages, when in reality, Wells Fargo had submitted multiple Stage 1 Plans, which were rejected by the regulators.  Furthermore, Lead Plaintiffs assert that Wells Fargo misled its investors about the timeframe for lifting the Asset Cap, and gave an unrealistically short timeframe, when it knew that the removal would be significantly delayed based on the multiple extensions that Wells Fargo had requested and received, and the unfavorable feedback that the regulators had given on Wells Fargo's proposed plans and timelines.  Lead Plaintiffs claim that when the public learned of Wells Fargo's failure to satisfy the 2018 Consent Orders' requirements, the price of its stock dropped precipitously.

Lead Plaintiffs have brought this securities class action on behalf of other similarly situated investors who purchased or acquired Wells Fargo securities between February 2, 2018 and March 12, 2020 (the "Class Period").  They allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, and that the Individual Defendants violated Section 20(a) of the Exchange Act.

For the reasons that follow, Lead Plaintiffs have plausibly alleged that certain statements made by Defendants Tim Sloan, John Shrewsberry, Allen Parker, and Elizabeth Duke were deliberately or recklessly false or misleading, so Defendants' motion to dismiss Lead Plaintiffs' Section 10(b) and Rule 10b-5 claims is DENIED as to Mr. Sloan, Mr. Shrewsberry, Mr. Parker, Ms. Duke, and Wells Fargo.  However, Lead Plaintiffs have failed to allege that the remaining statements alleged are actionable, so the motion is GRANTED as to the claims based on those statements.

## I.     BACKGROUND

### A.     Facts[1]

#### 1.     The Defendants

Defendants in this action are Wells Fargo, a commercial bank that is listed on the New York Stock Exchange, and certain of its directors and senior executives:  Timothy J. Sloan, John R. Shrewsberry, Charles W. Scharf, C. Allen Parker, and Elizabeth Duke.  CAC ¶¶ 21-26.

Mr. Sloan served as the Chief Executive Officer ("CEO") and President of Wells Fargo from October 2016 to March 2019, when he was asked to resign.  *Id.* ¶ 22.  He previously worked as the Chief Financial Officer ("CFO") and Chief Operating Officer of Wells Fargo.  *Id.*  Mr. Sloan was a director on Wells Fargo's Board of Directors (the "Board") and was a member of Wells Fargo's management-level operating committee.  *Id.*

Mr. Shrewsberry was Wells Fargo's Senior Executive Vice President and CFO from May 2014 to July 2020.  *Id.* ¶ 23.  Mr. Shrewsberry also sat on Wells Fargo's management-level operating committee.  *Id.*

Mr. Scharf is Wells Fargo's current CEO and President.  He took over that position in October 2019.  *Id.* ¶ 24.  Mr. Scharf is a director on Wells Fargo's Board and is a member of Wells Fargo's management-level operating committee.  *Id.*

---

[1] Unless otherwise noted, the facts are drawn from the Consolidated Amended Complaint ("CAC"), Dkt. No. 74, and are accepted as true for the purposes of this motion to dismiss.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In addition to the facts pleaded in the CAC, the Court may consider "written instruments attached, statements incorporated by reference, [ ] public disclosure documents filed with the SEC[,]" and "items of which it has taken judicial notice under Federal Rule of Evidence 201."  *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019).  "[A] plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."  *Menaker v. Hofstra Univ.*, 935 F.3d 20, 27 n.7 (2d Cir. 2019) (quoting *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002)).

Mr. Parker served as the Senior Executive Vice President and General Counsel of Wells Fargo from March 2017 to March 2019 and was the Bank's interim CEO from March 2019 until October 2019. *Id.* ¶ 25. Mr. Parker returned to his role as General Counsel from October 2019 until his retirement in March 2020. *Id.* Mr. Parker was a director on the Board from March 2017 to October 2019 and was a member of Wells Fargo's management-level operating committee. *Id.*

Ms. Duke was a director on Wells Fargo's Board from January 2015 to March 2020, serving as the Chairwoman of the Board from January 2018 until she was asked to resign on March 8, 2020. *Id.* ¶ 26. As Chairwoman, Ms. Duke's duties included "facilitating effective communication between the Board and stockholders, and being available for consultation and direct communication with major stockholders," and "serving as an additional point of contact for the Company's primary regulators." *Id.* Ms. Duke sat on the Bank's Risk Committee from March 2015 to March 2019. *Id.*

The Individual Defendants, as high ranking individuals within Wells Fargo, are alleged to have been directly involved "in both the everyday business of Wells Fargo and its compliance with the 2018 Consent Orders [and] directly participated in the management of Wells Fargo's operations, including its public reporting functions, had the ability to, and did control, Wells Fargo's conduct, and were privy to confidential information concerning Wells Fargo and its business, operations and statements regarding the 2018 Consent Orders." *Id.* ¶ 27.

2.      Lead Plaintiffs

Lead Plaintiff Handelsbanken Fonder AB is a mutual fund management company based in Stockholm, Sweden. CAC ¶ 16. Lead Plaintiff Public Employees' Retirement System of Mississippi is the retirement system for nearly all non-federal public employees in the State of Mississippi. *Id.* ¶ 17. Lead Plaintiff Employees' Retirement System of Rhode Island is a public pension fund that provides benefits to public employees of the State of Rhode Island. *Id.* ¶ 18. Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund is a public pension fund that provides pension and other

benefits for sheriffs, deputy sheriffs, and tax collectors in the State of Louisiana. *Id.* ¶ 19. Lead Plaintiffs allege that they purchased shares of Wells Fargo stock during the Class Period. *Id.* ¶¶ 16-19.

    3.  The Consent Orders

   As a nationally charted bank, Wells Fargo is subject to oversight by the three regulatory bodies relevant to this action: the Board of Governors of the Federal Reserve System (the "Federal Reserve"), the Office of the Comptroller of the Currency (the "OCC"), and the Consumer Financial Protection Bureau (the "CFPB," and together with the Federal Reserve and the OCC, the "Regulators"). *Id.* ¶¶ 29-30. On September 8, 2016, the OCC and the CFPB fined Wells Fargo $135 million, following investigations during which the OCC and the CFPB determined that Wells Fargo employees were "(i) transferring funds from consumers' accounts without their knowledge or consent into new accounts, with the customers unknowingly racking up associated fees and charges; (ii) causing customers to apply for credit card accounts without the customers' authorization; (iii) issuing and activating debit cards to customers without the customers' authorization; and (iv) creating phony email addresses to enroll its customers in online-banking services without their consent." *Id.* at ¶¶ 37-38. In addition to the fine, the OCC and the CFPB ordered that Wells Fargo enter into coordinated compliance risk management consent orders to prevent future misconduct (the "2016 OCC/CFPB Consent Orders"). *Id.* (citing *In the Matter of Wells Fargo Bank, N.A.*, AA-EC-2016-67, Consent Order for a Civil Money Penalty (Sept. 8, 2016); *In the Matter of Wells Fargo Bank, N.A.*, CFPB No. 2016-CFPB-0015, Consent Order (Sept. 6, 2016)). Those orders mandated that Wells Fargo put in place an enterprise risk management program to detect and prevent unsafe banking practices and mitigate future risks from such practices. *Id.* ¶ 40.

   Following the 2016 OCC/CFPB Consent Orders, Wells Fargo did little to improve its oversight and risk management practices. *Id.* ¶ 42. Further investigation found that the misconduct

at Wells Fargo was more pervasive than initially thought.  *Id.*  As a result, on February 2, 2018, the Federal Reserve imposed its own consent order on Wells Fargo (the "2018 FRB Consent Order"). *Id.* ¶ 43.  The 2018 FRB Consent Order mandated that Wells Fargo overhaul its governance and risk management processes to prevent such practices from occurring within Wells Fargo again.  *Id.*  The exact terms were negotiated for weeks between the Federal Reserve and the Bank's top executives, including Mr. Sloan, Mr. Shrewsberry, Ms. Duke, and Mr. Parker.  *Id.*  In the 2018 FRB Consent Order, the Federal Reserve said that Wells Fargo's weak compliance practices were caused by a business strategy that "emphasized sales and growth" and that the Bank failed to ensure that adequate risk management framework was in place.  *Id.* ¶ 44.

The 2018 FRB Consent Order outlined a specific process, with benchmarks and timelines, to evaluate whether Wells Fargo was in compliance with the order.  *Id.* ¶ 47.  The order described three stages that Wells Fargo needed to pass:

- **Stage 1:  Approved Plans**.  Wells Fargo was required to submit "written plans that [were] acceptable to the [Federal Reserve]" (the "Stage 1 Plans") within sixty days of the order (by April 3, 2018).  *Id.* ¶ 48.  The Stage 1 Plans were expected to detail how Wells Fargo would institute effective compliance and operation risk management programs and oversight, and a program to ensure the Board performed its duties.  *Id.*  The Stage 1 Plans also had to include a timeline for full implementation.  *Id.*  Wells Fargo could not proceed to Step 2 without first submitting satisfactory Stage 1 Plans and receiving notification in writing that its plans were acceptable to the Federal Reserve.  *Id.* ¶ 49.

- **Stage 2:  Implementation**.  After Wells Fargo completed Step 1, it would be tasked with adopting and implementing the Stage 1 Plans within ten days of their

approval by the Federal Reserve. *Id.* ¶ 50. During this stage, Wells Fargo was
expected to fully comply with those plans. *Id.*

- **Stage 3: Validation**. After completing Step 2, Wells Fargo would be required
  to retain a third party to conduct an independent review of the effectiveness of
  Wells Fargo's implementation of the approved plans. *Id.* ¶ 51. This review was
  scheduled to be completed by no later than September 30, 2018. *Id.* The
  independent reviewer would evaluate "the Board's improvements in effective
  oversight and governance . . . [and] enhancements to the [Bank]'s compliance
  and operational risk management program." *Id.*

The 2018 FRB Consent Order also included a unique remedy which prevented Wells Fargo
from increasing the size of its assets until it had completed all three stages of the order (the "Asset
Cap"). *Id.* ¶ 55. The Asset Cap prevented Wells Fargo from generating revenue by increasing
interest-earning assets or providing more loans at lower interest rates. *Id.* ¶ 56. This penalty was
significant because it restricted Wells Fargo's ability to grow and its ability to earn net interest
income, resulting in a steep loss in revenue for the bank. *Id.*

The 2018 FRB Consent Order required that Wells Fargo's directors sign the order. *Id.* ¶ 53.
Mr. Sloan, Ms. Duke, and all of the other members of the Board at Wells Fargo signed it. *Id.* In
addition, the Federal Reserve sent letters to each director on February 2, 2018, in which it set forth
the expectation that the Board would "ensure that senior management establishes and maintains an
effective risk management structure that has sufficient stature, authority, and resources" and warned
that the Federal Reserve would be closely monitoring the board's performance. *Id.* The Federal
Reserve also demanded that Wells Fargo replace three then-current Board members by April 2018,
and a fourth by the end of 2018, and that the Board submit progress reports detailing the actions
taken to secure compliance with the 2018 FRB Consent Order. *Id.* ¶ 54.

Institutions like Barclays and J.P. Morgan, along with financial media outlets such as CNN Business and Bloomberg, broadcast their concerns and their surprise at the severity of the Asset Cap. *Id.* ¶¶ 57-58. J.P. Morgan downgraded Wells Fargo's stock on February 5, 2018, citing the "harsh" and "rare" consent order, which J.P. Morgan said reflected the regulators' frustration with Wells Fargo. *Id.* ¶ 57.

Because Wells Fargo had failed to comply with the 2016 OCC/CFPB Consent Orders, the OCC and CFPB also fined Wells Fargo over $1 billion for its failure to correct its risk management and oversight practices and imposed additional consent orders on Wells Fargo on April 20, 2018 (the "2018 OCC/CFPB Consent Orders," and together with the 2018 FRB Consent Order, the "2018 Consent Orders"). *Id.* ¶ 59 (citing *In the Matter of Wells Fargo Bank, N.A.*, File No. 2018-BCFP-0001, Consent Order (Apr. 20, 2018) (hereinafter, "2018 CFPB Consent Order"); *In the Matter of: Wells Fargo Bank, N.A. Sioux Falls, South Dakota*, AA-EC-2018-16, Consent Order For A Civil Money Penalty (Apr. 20, 2018) (hereinafter, "2018 OCC Consent Order")). Similar to the 2018 FRB Consent Order, the 2018 OCC/CFPB Consent Orders were structured in three stages:

- **Stage 1: Approved Plans**. Wells Fargo was required to submit a plan acceptable to the OCC and CFPB within sixty days of the order (by June 19, 2018) to address risk management and compliance, and by August 18, 2018, to submit a plan as to how it would identify and redress its harmed consumers (the "OCC/CFPB Stage 1 Plans"). *Id.* ¶ 61. Wells Fargo could not proceed to the next step until it received notice in writing that neither the OCC nor CFPB objected to its plans. *Id.* ¶ 62.

- **Stage 2: Implementation**. After completing Stage 1, Wells Fargo would then be required to execute and implement the accepted plans, and could not deviate from the approved plans without further written approval. *Id.* ¶ 63.

- **Stage 3: Validation**.  After completing Stage 2, Wells Fargo would be required to validate the execution of its plans and submit a report to the OCC and CFPB. Wells Fargo would not be considered to be in compliance with the consent orders until it completed all three stages.  *Id.* ¶ 64.

To ensure that Wells Fargo's senior executives were involved in the compliance process, the OCC and CFPB mandated that the Board "review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order before submission."  *Id.* ¶ 65.

4.      Wells Fargo's First Stage 1 Proposal

Pursuant to the 2018 FRB Consent Order, Wells Fargo submitted its proposed Stage 1 Plans on April 3, 2018, which the Federal Reserve rejected summarily, citing material deficiencies, including the absence of "major components such as plans to address the company's deficiencies in operational and compliance risk management."  *Id.* ¶¶ 69-70.  The Federal Reserve met with Ms. Duke that day to discuss the 2018 FRB Consent Order and the proposal's deficiencies.  *Id.* ¶ 70.  On May 7, 2018, the Federal Reserve sent Mr. Sloan and Ms. Duke written notice of its rejection of the April 3, 2018 plans (the "May 7, 2018 Rejection Letter"), stating that the proposed plans were insufficient and so materially incomplete that they could not "be evaluated by [the Federal Reserve] staff for their adequacy."  *Id.* ¶ 71.  Furthermore, the proposed Stage 1 plan lacked the proposed milestones and timelines that were required by the consent order.  *Id.* ¶ 72.  In the May 7, 2018 Rejection Letter, the Federal Reserve ordered Wells Fargo to resubmit its Stage 1 proposal within 90 days (by July 2, 2018).  *Id.*  However, Wells Fargo's efforts to develop compliant Stage 1 Plans for the 2018 FRB Consent Order continued to fall short.  *Id.* ¶ 77.  On June 5, 2018, Mr. Sloan requested an extension from the Federal Reserve to submit acceptable Stage 1 Plans, stating that the Bank needed additional time to develop an acceptable response.  *Id.*  Mr. Sloan asked for the deadline to be extended to September 19, 2018.  *Id.*

Shortly thereafter, on July 24, 2018, the Bank was notified that the OCC had also rejected its proposed Stage 1 Plan under the 2018 OCC/CFPB Consent Orders (the "July 24, 2018 Rejection Letter"). *Id.* ¶ 80. In the letter, the OCC stated that the submission "lack[ed] substance and detail in a number of areas[,]" including remediation for all impacted customers, and remedying the Bank's internal audit function. *Id.* The OCC met with the Bank's Board that day to discuss the non-compliant proposal and expressed its concerns regarding oversight of senior management. *Id.* ¶ 82. The Board told the OCC that their Stage 1 Plan was a "work in progress[,]" and OCC and CFPB officials later testified that the proposal was only a "plan for a plan." *Id.* ¶ 83. On August 11, 2018, Ms. Duke and Mr. Sloan, along with Director James Quigley and Wells Fargo's Head of Regulatory Relations, Sarah Dahlgren, met with the OCC's comptroller and other senior officials to discuss the Stage 1 proposal. *Id.* ¶ 84. During that meeting, the OCC expressed its frustration that Wells Fargo had ignored its input, that plans submitted were not complete, and the established deadlines were not met. *Id.*

        5.      Wells Fargo's Second Stage 1 Proposal

On August 24, 2018, Mr. Sloan requested another extension from the Federal Reserve for more time—until October 31, 2018—to submit a revised Stage 1 Plan proposal under the 2018 FRB Consent Order. *Id.* ¶ 85. On September 11, 2018, the Federal Reserve granted the request. *Id.* ¶ 85 n.24. However, the Regulators continued to be dissatisfied with the Bank's Stage 1 Plans. *Id.* ¶ 87, 89. On November 21, 2018, the OCC sent Wells Fargo another letter formally rejecting Wells Fargo's second Stage 1 proposal (the "November 21, 2018 Rejection Letter"). *Id.* ¶ 87. In the November 21, 2018 Rejection Letter, the OCC explained that it was "unable to provide a no supervisory objection to the portion of the CPI Remediation Plan specific to Wells Fargo Auto Finance (WFAF) because the plan is not adequately supported." *Id.* The Bank met with the Federal Reserve on January 24, 2019 and was told that the deadlines in the revised October 31, 2018

10

proposal were "improbable and unrealistic." *Id.* ¶ 89.  In a February 15, 2019 email to Ms. Duke, the OCC said it was "deeply concerned about the continuing (and in some cases worsening) problems in a number of areas, evidenced by large number of extension requests, missed expected completion dates that are not communicated in a timely manner, failed audit validations, and extensions of Consent Order deadlines." *Id.*  And in a March 4, 2019 Quarterly Management Report to Wells Fargo, the OCC stressed that the Bank's "management and Board oversight remain inadequate," expressing its concern with Wells Fargo's "missed deadlines" and its "poor-quality action plans," and calling Wells Fargo's performance "unacceptable." *Id.*

On March 11, 2019, Mr. Sloan and Ms. Duke received another formal rejection letter from the Federal Reserve for Wells Fargo's second, revised proposed Stage 1 Plans (the "March 11, 2019 Rejection Letter").  *Id.* ¶ 93.  The letter stated that the submission "remain[ed] materially incomplete[,]" contained illogical timeframes, and suffered from "[p]ervasive inaccuracies." *Id.*  In the letter, the Federal Reserve informed Wells Fargo that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions" and that the Bank's "[c]ontinued failure to submit acceptable plans reflects poorly on the [Bank], and negatively influences supervisors' view of the board and senior management's capacity to effectively manage and govern the firm." *Id.* ¶ 94 (alterations in original).

6.     March 12, 2019 Congressional Testimony

In February 2019, Representative Maxine Waters, Chairwoman of the U.S. House of Representatives Committee on Financial Services, initiated an investigation to "(1) determine and evaluate the non-public actions taken by Wells Fargo's board, management, and regulators to facilitate improvements at Wells Fargo; and (2) identify policy solutions to ensure consumers are protected from recidivist megabanks like Wells Fargo." Ex. D, Dkt. No. 91-4 at 4.  On March 12, 2019, the day after the Federal Reserve's second rejection letter, Mr. Sloan testified before Congress,

after being subpoenaed to answer questions about "Wells Fargo's varied engagements with its regulators, including Wells Fargo's compliance with its outstanding consent orders."  CAC ¶ 92. The hearing was publicly televised and viewed by investors, analysts, and the financial press.  *Id.* When asked the following day by members of Congress why the Asset Cap had not been removed, Mr. Sloan testified that Wells Fargo had "done" what the Federal Reserve required and added in his written testimony that the Bank was "mak[ing] progress" with the 2018 Consent Orders.  *Id.* ¶ 95. When asked whether regulators had raised any objections to the Bank's submitted plans, Mr. Sloan responded "I can assure you that we have plans in place," without disclosing that Wells Fargo's proposed plans had in fact been rejected.  *Id.*  Lead Plaintiffs allege that following the hearing, Mr. Sloan personally called the Federal Reserve apologizing for his mischaracterizations to Congress and to the media, but no similar apology was made to the public or investors.  *Id.* ¶ 96.  Following Mr. Sloan's testimony, securities analysts and members of the financial press broadcasted that Defendants were complying with the Regulators' requirements.  *Id.* ¶ 97.

On March 13, 2019, the OCC staff internally expressed their disappointment with Mr. Sloan's testimony because Wells Fargo was not in compliance with the 2018 OCC/CFPB Consent Orders.  *Id.* ¶ 98.  The OCC also informed the Board of its disapproval of Mr. Sloan's "inaccurate" testimony.  *Id.*  After Mr. Sloan testified before Congress, the OCC staff met with the Board, including Ms. Duke and Mr. Sloan.  *Id.* ¶ 99.  During that meeting, the OCC staff reprimanded the Board, expressing that they were both disappointed and dissatisfied with Mr. Sloan's performance as CEO in bringing Wells Fargo into compliance.  *Id.* ¶ 100-01.  The OCC expressly told the Board in that meeting that, "in many risk dimensions, the lack of progress in the controls environment . . . have wasted time and weakened the institution, creating further safety and soundness concerns."  *Id.* ¶ 99.  The OCC reminded the Board that the OCC "told [Wells Fargo] that it was essential the bank demonstrate the ability and willingness to remediate known issues and establish an adequate risk management framework under [Mr. Sloan]'s leadership.  You have not done that."  *Id.* ¶ 100.  The

OCC repeated its concerns with Mr. Sloan's performance during a meeting with him on March 20, 2019, stating that "[t]here are many examples here where [you] ha[ve] failed to show the leadership necessary to move the institution forward when it is clear that there are significant problems" and that his failures posed "serious reputation and safety and soundness risks to the bank if they remain uncorrected." *Id.* ¶ 101.

> 7.      Change of Leadership and Continued Failure to Comply

Wells Fargo asked Mr. Sloan to step down, and the Bank announced his resignation on March 28, 2019. *Id.* ¶ 102.  Mr. Parker stepped into Mr. Sloan's shoes as Wells Fargo's interim CEO and continued the work on the Consent Orders. *Id.* ¶ 104.  On April 12, 2019, Mr. Parker assured investors that Wells Fargo was "pointed toward completion and implementation," with the remaining work under the 2018 FRB Consent Order "consist[ing] of completing and implementing efforts that are substantially underway." *Id.*  Mr. Shrewsberry reiterated these statements on CNBC later that day. *Id.*

However, Wells Fargo's progress did not improve with new leadership.  On April 12, 2019, the CFPB wrote to the Board emphasizing that Wells Fargo was still not in compliance with the 2018 OCC/CFPB Consent Orders. *Id.* ¶ 105.  On June 10, 2019, Ms. Duke and Mr. Parker requested yet another extension from the Federal Reserve until April 30, 2020. *Id.* ¶ 106.  In the OCC's July 2019 Examination Report, it repeated that it was concerned that the Board and management were unable to address the outstanding issues "with the appropriate resources, escalation, and urgency." *Id.* ¶ 105.  And on September 9, 2019, the OCC told Wells Fargo's management and Board that it was not in compliance with the 2018 OCC/CFPB Consent Orders, reprimanding the Bank for the fact that "many plans have been resubmitted multiple times or extended" and that the Bank's "remediation efforts remain[] a concern." *Id.*

8.      The House Financial Services Committee's Findings

In March of 2020, the United States House Committee on Financial Services (the "House Financial Services Committee" or "HFSC") released the findings of its year-long investigation into Wells Fargo's purported compliance with the 2018 Consent Orders (the "House Reports"). CAC ¶ 109; *see generally* Ex. D; Ex. F, Dkt. No. 91-6.  The investigation included a review of internal and regulator documents; briefings from the Federal Reserve, the OCC, the CFPB, the SEC, and Wells Fargo; and interviews of individuals from Wells Fargo and the Regulators.  CAC ¶¶ 109-110, 113.  The House Reports referenced over 208,000 documents produced by Wells Fargo and more than 25,000 internal documents and communications produced from the Bank's Board.  *Id.* ¶ 111. After reviewing those materials, the HFSC found that the Board had abdicated its responsibility to oversee the compliance process, that the Regulators had not approved Wells Fargo's Stage 1 proposals, and that Mr. Sloan had made false and misleading public statements about the Bank's compliance status during the March 12, 2019 Hearing.  Ex. D, Dkt. No. 91-4 at 36–41, 44, 61–62; *see* CAC ¶ 111.

The officials from the Regulators that were interviewed expressed their dissatisfaction with Wells Fargo's performance and testified that Wells Fargo's proposals were insufficient and incomplete, which Wells Fargo had been informed of.  CAC ¶ 115.  Additionally, Karen Peetz, the Chair of Wells Fargo's Risk Committee, testified to the HSFC that the Board was regularly in contact with the Regulators regarding the status of the Bank's compliance with the consent orders. *Id.* ¶ 117.  Ms. Peetz testified that the Board and the Risk Committee would routinely hold meetings to prepare the Bank's submissions and to discuss the Regulator's feedback, during which she would raise concerns with management, specifically informing them that their proposals and risk management were insufficient.  *Id.* ¶ 118-19.  The HFSC also specifically found that Mr. Sloan made inaccurate statements on several occasions, including his statements during his March 12, 2019

testimony to Congress about Wells Fargo's compliance and the Asset Cap.  *Id.* ¶¶ 123-126; *see also* Ex. D at 61; Ex. F at ECF p. 32.

        9.      March 2020 Congressional Hearings

The House Reports were issued in connection with pre-scheduled hearings before the HSFC to discuss the Bank's new CEO, Mr. Scharf, and two of the Bank's directors, Ms. Duke and Mr. Quigley.  CAC ¶ 127.  Prior to the hearings, the Chairwoman of the HFSC, Congresswoman Waters called for Ms. Duke and Mr. Quigley's resignations due to their failure to meet their responsibilities as board members.  *Id.* ¶ 128.  They both resigned, just days before they were scheduled to testify. *Id.*  During Mr. Scharf's testimony, he testified that Wells Fargo had not yet done "what is necessary" or "address[ed its] shortcomings[,]" and that the Bank had a "great deal" of work to do. *Id.* ¶¶ 131–32.  In her testimony on March 11, 2020, Ms. Duke stated that she was aware that the Regulators had continued to reject Wells Fargo's proposed Stage 1 Plans.  *Id.* ¶ 134.

        10.     Current Status

Wells Fargo has yet to satisfy the 2018 Consent Orders, and as a result the Asset Cap remains in place. *Id.* ¶¶ 139-140.  Analysts have noted that due to the Asset Cap, the Bank has missed out on billions of dollars in profits, not including the billions that it spent to address its operational problems. *Id.* ¶ 140.  Certain individuals, including Mr. Sloan may face criminal investigations. *Id.* ¶ 141.  For example, on March 10, 2020, Congresswoman Waters wrote to the Department of Justice regarding Mr. Sloan's Congressional testimony and requested an investigation into whether he knowingly and willfully made a false statement to Congress. *Id.*

On September 9, 2021, the OCC issued two consent orders to Wells Fargo Bank, N.A.  Dkt. No. 94 at 1; *see also* Dkt. No. 95 at 1. In one order,[2] the OCC imposed a civil penalty and stated that

    [w]hile the Bank has taken steps to comply with the 2018 Order and is committed to
    addressing the remaining requirements in the Order, the Bank has failed to fully and

---

[2] Wells Fargo has proffered that the other consent order pertains to deficiencies in Wells Fargo's Home Lending business, which are unrelated to this action.

> timely implement effective and sustainable corrective actions required by the Order
> related to enterprise-wide compliance risk management and customer remediation
> and is thereby in violation of the 2018 Order.

Dkt. No. 94 at 1; Dkt. No. 94-1 at 3.  The OCC assessed a $250 million penalty for

deficiencies unrelated to this action, and for the Bank's insufficient progress under the 2018

Order.  Dkt. No. 94 at 1; Dkt. No. 94-1 at 1.

### B.    Procedural History

Adam Perry, a Wells Fargo investor who purchased stock during the Class Period, initiated

this action on June 11, 2020 against Wells Fargo, Mr. Scharf, Mr. Sloan, and Mr. Shrewsberry.  Dkt.

No. 1.  On August 29, 2020, the Court appointed Lead Plaintiffs and approved their selection of

lead counsel.  Dkt. No. 59.  On November 9, 2020, Lead Plaintiffs filed a consolidated amended

class action complaint, and added Ms. Duke and Mr. Parker as defendants.  CAC, Dkt. No. 74.

Lead Plaintiffs alleged that Defendants made sixteen statements that were false and/or misleading,

and that investors lost over $54 billion in market capitalization when shareholders learned that Wells

Fargo was not in compliance with the 2018 Consent Orders and had yet to clear Stage 1.  *Id.* ¶¶ 143–

210.  According to Lead Plaintiffs, Defendants' misrepresentations and material omissions artificially

inflated the price of Wells Fargo stock, so when the truth of Defendants' noncompliance was

revealed, the stock price fell drastically.  *Id.* ¶ 237.  On January 22, 2021, Defendants moved to

dismiss the consolidated complaint, on the basis that Lead Plaintiffs had failed to state a claim.  Dkt.

No. 89, Mot. to Dismiss Pl.'s Am. Compl; *see also* Dkt. No. 90, Defs.' Mem. of Law in Support of

Their Mot. to Dismiss the Consolidated Am. Class Action Compl. ("Memo.").  Lead Plaintiffs

opposed Defendants' motion on March 8, 2021.  Dkt. No. 92, Mem. in Opp'n to Defs' Mot. to

Dismiss ("Opp'n").  Defendants replied on April 2, 2021.  Dkt. No. 93, Defs.' Reply Mem. Of Law

in Supp. Of Their Mot. to Dismiss ("Reply").  On September 9, 2021, Wells Fargo submitted a

notice of supplemental authority, notifying the Court of the OCC's September 9, 2021 consent

orders.  Dkt. No. 94.  On September 13, 2021, Lead Plaintiffs responded. Dkt. No. 95.

## II.   LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  If a complaint fails to meet this pleading standard, a defendant may move to dismiss it for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  It is not enough for a plaintiff to allege facts consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679 (citation omitted).  The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  But

> [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  A complaint must therefore contain more than "naked assertions devoid of further factual enhancement."  Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87-88 (2d Cir. 2013) (brackets omitted) (quoting *Iqbal*, 556 U.S. at 678-79).  So a complaint that offers "labels and conclusions" or "naked assertions"

without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (brackets omitted) (citing *Twombly*, 550 U.S. at 555, 557).

Securities fraud claims are also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99 (citation omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.* (citation omitted). Under the PSLRA, plaintiffs must also specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). A plaintiff must therefore "do more than say that the statements . . . were false and misleading; [she] must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

## III.   DISCUSSION

### A.  Section 10(b) and Rule 10b-5 Liability

Lead Plaintiffs have plausibly alleged that certain of Defendants' statements were made in violation of federal securities laws. Under Section 10(b) and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b-5(b); *see also* 15 U.S.C. § 78j(b). To survive a defendant's motion to dismiss a claim brought under Section 10(b) and Rule 10b-5, a plaintiff must plausibly plead the following elements: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a

connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).  Defendants argue that Lead Plaintiffs have failed to set forth particularized allegations that the challenged statements were materially false or misleading when made, or that Defendants acted with fraudulent intent, as required by the first and second elements.

1.    **False or Misleading Statements or Omissions**

a.    **Legal Standard**

To satisfy the first element, Lead Plaintiffs must allege that Defendants made actionable misstatements or omissions under Rule 10b-5.  "A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (citation omitted).  When a company does not have an obligation to speak but does so anyway, it assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate" (quotation omitted)).  And "literally true statements" are actionable if they "create a materially misleading impression."  *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013).  "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *Morgan Stanley Info. Fund,* 592 F.3d at 366 (internal quotation marks omitted).  Accordingly, plaintiffs "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud." *Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.)*, 988 F.3d 157, 171 (2d Cir. 2021).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5[,]" *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988), but omissions can also be actionable under section 10(b). An omission is actionable if the omitted information was subject to "an affirmative legal disclosure obligation" or the omitted information is "necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011). The key is the "presence of a prior statement that otherwise is or will become materially misleading" because of the omission. *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 206 (S.D.N.Y. 2019).

Thus, to incur liability, misrepresentations or omissions must be material. An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Levinson*, 485 U.S. at 240 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449(1976)). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Caiola*, 295 F.3d at 329 (quotation omitted).

i.    Statements of Opinion

As a general principle, "[t]o be actionable, a misrepresentation must be one of existing fact, and not merely an expression of opinion, expectation, or declaration of intention." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 507 (S.D.N.Y. 2009) (quotation omitted). Statements of opinion must be examined in the context in which they arise. "[T]he investor takes into account the customs and practices of the relevant industry." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). "[A]n omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Id.* Opinion statements can give rise to liability in two distinct

ways, even if they are sincerely believed:  if they contain false embedded statements of fact or if they "omit[ ] material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion."  *Id.* at 189; *see Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (holding that *Omnicare* applies beyond Section 11 claims, to claims arising under Section 10(b) and Rule 10b-5).

First, liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting facts she supplied were untrue.'" *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 185–86).  "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events."  *Lopez*, 173 F. Supp. 3d at 24.  The Second Circuit has firmly rejected the "fraud by hindsight" approach.  *See Stevelman v. Alias Rsch, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

Second, "opinions, although sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Tongue*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 188–89).  A reasonable investor "expects not just that [the speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time."  *Omnicare*, 575 U.S. at 189.  However "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts," and "does not expect that every fact known to [a speaker] supports its opinion statement."  *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 194).  Therefore, a statement of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  *Id.* (quoting *Omnicare*, 575 U.S. at 194).

At the pleading stage, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Id.* at 209 (quoting *Omnicare*, 575 U.S. at 194).  The "core inquiry is whether the omitted facts would 'conflict with what a reasonable

investor would take from the statement itself.'" *Id.* at 210 (quoting *Omnicare*, 575 U.S. at 194). The Supreme Court emphasized that this "is no small task for an investor." *Omnicare*, 575 U.S. at 194.

### ii.     Corporate Optimism and Puffery

General statements of optimism and puffery are nonactionable under federal securities laws because they are not "sufficiently specific that a reasonable investor could rely on [them] as a 'guarantee of some concrete fact or outcome.'" *Lopez*, 173 F. Supp. 3d at 29 (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014)); *see also In re Vale*, No. 1:15-cv-9539, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017) (statements regarding "what Vale is 'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and what its 'priorities' are" were nonactionable). Even "misguided optimism is not a cause of action, and does not support an inference of fraud" because, as stated above, the Second Circuit has "rejected the legitimacy of 'alleging fraud by hindsight.' *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (citing *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)). Allegations that a defendant should have been "more alert and more skeptical" are insufficient; speakers are "not required to take a gloomy, fearful or defeatist view of the future." *Shields*, 25 F.3d at 1129–30.

However, like opinion statements, statements of optimism and puffery can be actionable where they "contradict facts that are known to a defendant," *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016), or where they amount to "'misrepresentations of existing facts' that were made even though the speaker 'knew that the contrary was true,'" *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 298 (quoting *Novak v. Kasak*, 216 F.3d 300, 315 (2d Cir. 2000)).

### iii.     Forward-Looking Statements

A statement is not actionable if it falls under the PSLRA's safe-harbor provision for "forward-looking statements." *See* 15 U.S.C. § 78u–5(c). The PSLRA includes several definitions of

forward-looking statements.  *See* 15 U.S.C. § 78u–5(i)(1)(A), (C)).  Under the safe-harbor provision, "a defendant is not liable if (1) 'the forward-looking statement is identified and accompanied by meaningful cautionary language,' (2) the forward-looking statement 'is immaterial,' or (3) 'the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading.'"  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245–46 (2d Cir. 2016) (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).  "Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies."  *Id.*  However, the Second Circuit has held that "'[a] statement may contain some elements that look forward and others that do not,' and 'forward-looking elements' may be 'severable' from 'non-forward-looking' elements.  *Id.* (quoting *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.,* 620 F.3d 137, 144 (2d Cir. 2010); *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.").

However, there are limits to the safe harbor's reach.  "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information."  *Slayton*, 604 F.3d at 772 (citation omitted); *see also City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 (S.D.N.Y. 2013) (citing *Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 265 n.3 (2d Cir. 2010) (summary order)) ("[G]eneric and mere boilerplate words of caution—for example, a statement at the beginning of a conference call that states merely that 'forward-looking statements are 'subject to certain risks and uncertainties''—are insufficient to put investors on notice of the risks at hand and therefore to inoculate these statements.").  Because "[c]autionary language in securities offerings is just about universal[,]" "the key question a district court must decide when determining whether to grant a motion to dismiss a securities fraud complaint is whether plaintiffs have overcome the existence of such language.  Plaintiffs may do this by showing, for example, that

the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Halperin v. Ebanker Usa.com*, 295 F.3d 352, 359 (2d Cir. 2002). The Court must evaluate the language "on a case-by-case basis. In all cases, however, the court must keep in mind that a complaint fails to state a claim of securities fraud if *no reasonable investor* could have been misled about the nature of the risk when he invested." *Id.*

### b.   Application

The Consolidated Amended Complaint alleges that Defendants made numerous false and misleading statements during the Class Period. The Court will walk through each of these statements in chronological order. In several of the challenged statements, Lead Plaintiffs have relied on selective quotations. Portions of statements not included in the CAC, but incorporated into it by reference, are discussed below for context.

#### i.   February 2018 Federal Reserve Consent Order Conference Call

On February 2, 2018, Wells Fargo held an investor conference to discuss the 2018 FRB Consent Order, which had been issued that same day. CAC ¶ 144. The following exchange took place:

> INVESTOR QUESTION:  So you went through very clearly the actions that you've taken over the past several years, 1.5 years or so, and yet there's still some more work to do. Is it -- did the Fed identify very clearly what those remaining steps or next steps are that they're asking you to do? Or is that a little bit more open-ended?
> SLOAN:  No, I wouldn't describe it [as] open-ended. I mean, we have a very constructive relationship with the Fed. There's a lot of discussion, candidly, every day, as you would imagine. And we're in the midst of continuing to improve all the areas within risk the Fed's concerned about, that we're concerned about candidly. I don't think there's a mystery here. And candidly, I think that it was -- it's helpful in the consent order that it's clear from a timing standpoint what the deliverables are. 60 days -- Fed -- we'll put our plans together in 60 days. The Fed will look at those plans. Then we'll -- during that same period, we will continue to make sure that they're implemented across the entire company. Then we'll bring in an independent third party. They'll take a look, and they'll opine that, that's happening. And then we'll submit that plan to the Fed. We're going do that by September 30, 2018, this year. I hope we do it sooner. And then the Fed will take a look at it and respond. So we're on a fast track here, and we're looking forward to making the improvements that are necessary.

*See* Memo at 17.  Lead Plaintiffs challenge Mr. Sloan's statement that referred to the Bank being "on a fast track" to resolving the 2018 FRB Consent Order.  *Id.*  Lead Plaintiffs assert that Mr. Sloan's statement is actionable because at the time, Wells Fargo had not submitted any plans to the Federal Reserve.  However, when Mr. Sloan's statement is read in the context of his entire answer, the Court is not persuaded that Mr. Sloan's failure to disclose that Wells Fargo had not yet submitted plans to the Regulators renders the statement false or misleading.  A reasonable investor could not have been misled by his statement to believe that Wells Fargo was "on a fast track" to achieve compliance. The 2018 Consent Order was issued that morning, and Mr. Sloan's statements were optimistic and forward-looking, as Wells Fargo's Stage 1 proposal was not due until April 13, 2018.  Furthermore, he clearly outlined the steps required by the order, and stated that Wells Fargo would put together its plans in 60 days.  Mr. Sloan's framing of his expectation of the timing for Wells Fargo's compliance was cautiously optimistic (e.g., "I hope we do it sooner.").  Mr. Sloan's statements would be understood to mean that the Bank was working on a fast track, given the compliance schedule required under the Orders, not that it was guaranteed to accomplish the goals established by the Orders on a fast track.  Accordingly, Mr. Sloan's statements at the February 2, 2018 investor conference were not false or misleading to a reasonable investor.

    ii.  May 2018 Deutsche Bank Global Financial Services Conference

  On May 30, 2018, Mr. Shrewsberry presented at the Deutsche Bank Global Financial Services Conference.  CAC ¶ 146.  During the conference, an analyst asked Mr. Shrewsberry to elaborate on why lifting the Asset Cap was taking longer than expected.  Memo. at 18-19.  Mr. Shrewsberry answered that it was just "the nature of the regulatory engagement.  There's a lot of back and forth, and it's become clear after the first couple of cycles or exchanges or series of meetings, that it's going to take a bit longer."  CAC ¶ 146.  Mr. Shrewsberry was further asked to frame where Wells Fargo was on remediating the issues in the 2018 FRB Consent Order "and where

the heavy lifting is still to come." *Id.*; *see also* Memo. at 18-19.  In response, Mr. Shrewsberry stated that "I don't think at this point that there's anything meaningful that we aren't already talking about, certainly, since our last 10-Q, so the inventory is pretty complete" and that "our investors know everything that's material that we know."  CAC ¶ 146.  Lead Plaintiffs assert that Mr. Shrewsberry's statements are actionable because the Federal Reserve had formally rejected Wells Fargo's Stage 1 proposal three weeks prior.  *Id.* ¶ 147.  Indeed, prior to the Deutsche Bank Global Financial Services Conference, Wells Fargo's Board member, Theodore Craver mused in an email to Ms. Duke that investors would view the rejection and the Federal Reserve's feedback "as completely unacceptable." *Id.*; *see also id.* ¶¶ 73-74.

Defendants argue that Mr. Shrewsberry could not legally disclose that the Federal Reserve had rejected the proposal because it was confidential information and that a reasonable investor would not have been misled because Mr. Shrewsberry explained that the lifting of the Asset Cap would take longer than expected.  Memo. at 19.  However, even if the rejection itself was confidential, "upon choosing to speak, one must speak truthfully about material issues." *Caiola,* 295 F.3d at 331.  A reasonable investor would certainly consider the FRB's rejection of Wells Fargo's first proposal, and its obvious impact on the timing of Wells Fargo's ability to fully comply with the consent order, to be material information.  Mr. Shrewsberry could have responded that he was not permitted to discuss the status of Wells Fargo's compliance with the orders.  But instead, he promised investors that they knew all material information, which was false.  Accordingly, Mr. Shrewsberry's statement at the May 2018 Deutsche Bank Conference was false, or at least materially misleading to a reasonable investor.

### iii.    June 2018 Morgan Stanley Financials Conference

On June 13, 2018, Mr. Shrewsberry presented at the 2018 Morgan Stanley Financials Conference.  CAC ¶ 149.  During the conference, an analyst asked Mr. Shrewsberry to "at this stage,

maybe give us some color on what's left to do for the consent order" and "what part of the process are you in now[.]" *Id.* In response, Mr. Shrewsberry stated that "[i]t's the last mile of knitting all of this together" and that his sense was that "it will take all of the amount of time that we've described before we finish the last piece of it or set ourself on a course to maturity for the last piece of it." *Id.*; *see also id.* ¶ 152. *Id.* Defendants argue that Mr. Shrewsberry's statements describe a risk assessment deliverable that was being prepared for the Federal Reserve and the Board. Memo. at 21. But Mr. Shrewsberry's answer was given in response to a request for an update "on what's left to do for the consent order." *Id.* In that context, a reasonable investor would understand that the phrase "all of this together" referred to the consent order's requirements. Lead Plaintiffs further assert that Mr. Shrewsberry's statements are false or misleading because the Federal Reserve had formally rejected Wells Fargo's Stage 1 proposal and one week prior to Mr. Shrewsberry's statements, Wells Fargo had requested an extension for the resubmission of its Stage 1 Plans. *Id.* The Court agrees. Based on those updates, Lead Plaintiffs have adequately pleaded that Defendants were far closer to the starting line than "the last mile" of compliance, and a reasonable investor would have understood that Mr. Shrewsberry's opinions were based on facts consistent with his statements.

In addition to stating that his sense was that "it will take all of the amount of time that we've described before . . .", Mr. Shrewsberry also informed investors that he expected "[the Asset Cap] [would] be gone in the time frames that we've talked about." CAC ¶ 152. Defendants argue that Mr. Shrewsberry made classic nonactionable opinion statements, emphasizing that he prefaced his statements with the phrases "I expect" and "my sense is[.]". Memo at 22. However, as the Supreme Court made clear in *Omnicare* such phrases do not operate as a magic shield against liability; a reasonable investor may "understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." 575 U.S. at 188-89.

Here, the facts alleged by Lead Plaintiffs show that there was no basis for Mr. Shrewsberry's expectations about the timeline under the consent order.  In fact, communications with the Regulators indicated that the Bank would need even more time to fully comply with the orders than originally anticipated.  Although investors "do[ ] not expect that every fact known to [a speaker] supports its opinion statement[,]" *Tongue*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 194), a reasonable investor does expect that the opinion "fairly aligns with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 189.  And here, Lead Plaintiffs have clearly identified specific material facts that conflict with Mr. Shrewsberry's statement:  the month before the Morgan Stanley Financials Conference, Wells Fargo received May 7, 2018 Rejection Letter, which stated that the Bank's initial plans were insufficient and so materially incomplete that they could not "be evaluated by [the Federal Reserve] staff for their adequacy" because the Bank had failed to include proposed milestones and timelines for compliance, as required by the consent order.  CAC ¶¶ 71-72. In that letter, the Federal Reserve ordered Wells Fargo to resubmit its Stage 1 proposal within 90 days (by July 2, 2018), and on June 5, 2018, the Bank requested an extension to September 19, 2018. *Id*; *see also id.* ¶ 77.  Based on that context, Lead Plaintiffs have adequately pleaded that Mr. Shrewsberry's opinions are actionable because they omitted facts that conflicted with his statements; a reasonable investor would understand from the questions asked and Mr. Shrewsberry's responses that the facts on the ground supported his expected timeline.

iv.    July 2018 Earnings Call

On July 13, 2018, the Bank held an earnings call regarding its second quarter 2018 financial results.  CAC ¶ 154.  At the outset of that call, Wells Fargo warned that it may make forward-looking statements "that are subject to risks and uncertainties."  Memo. at 22; *see also* Ex. J, Dkt. No. 91-10 at 2.  During the earnings call, an analyst asked Mr. Sloan for an update on the timing of the Asset Cap.  Ex. J. at 17.  Mr. Sloan stated that there was "[n]o change in the update from Investor

Day" (on May 10, 2018) and that "our expectation is that sometime in the first half of next year, we'll be able to move through that." *Id.* In his answer, Mr. Sloan further emphasized that "our goal is not to just meet expectations so we can get the asset cap lifted. Our goal is to make the fundamental investments and changes that we need to make in how we manage operational and compliance risk at the company. That's the goal, and that's where -- really where we're focused, but no update from a timing standpoint." *Id.*

Lead Plaintiffs assert that Mr. Sloan's statements are actionable because after Investor Day, Wells Fargo had requested and received an extension for the resubmission of its Stage 1 Plans, which was a material update. CAC ¶¶ 78-79, 155. Lead Plaintiffs further assert that Mr. Sloan's statement regarding when the Asset Cap would be lifted was misleading because of the extension and, when rejecting Wells Fargo's Stage 1 Proposal, the Federal Reserve had also told the Bank on April 3, 2018, that its proposed timeline was not realistic or sound. *Id.* ¶ 156.

First, Mr. Sloan's statement that there had been "no change" since Investor Day is actionable. Wells Fargo argues that it could not have informed investors of the extension request without disclosing confidential information. Memo. at 23. Mr. Sloan could have explained that to investors; but instead, he chose to speak. Therefore, he assumed "a duty to be both accurate and complete." *Caiola*, 295 F.3d 312. In telling investors that there was "no change[,]" he made a statement of fact that was plainly false. *See Omnicare*, at 575 U.S. at 183 (explaining that "[a] fact is 'a thing done or existing'" that "expresses certainty about a thing[.]"). A reasonable investor would have accepted Mr. Sloan's words at face value, and understood them to mean that there had indeed been no updates, and certainly no changes that affected Wells Fargo's timeline for compliance. The predictable inference from Mr. Sloan's statements is that the timeframe outlined in the consent order still applied. But at that point, the May 7, 2018 Rejection Letter and the Bank's extension request added a delay of five months from the original timeline. Furthermore, even if Mr. Sloan's statement was literally true—which it was not—a reasonable investor would have been misled by

that representation because the Bank did not inform its investors of the May 7, 2018 Rejection Letter, a key update on the timing of the Asset Cap, during Investor Day.

Second, Mr. Sloan's description of the timeframe for lifting the Asset Cap is also actionable. Although the Bank was not obligated to disclose all facts that may have "potentially undermined" Mr. Sloan's prediction, *Tongue*, 816 F.3d at 212, a reasonable investor would expect that his prediction "fairly align[ed] with the information in the [speaker's] possession at the time." *Omnicare*, 575 U.S. at 189. While Wells Fargo's extension request did not render it impossible for the Asset Cap to be lifted in early 2019, and Lead Plaintiffs have identified specific material facts that conflict with the timeline provided by Mr. Sloan: the May 7, 2018 Rejection Letter, which highlighted that the Bank had failed to include proposed milestones and timelines for compliance, as required by the consent order, and the Bank's extension request. CAC ¶¶ 71-72. In that light, Lead Plaintiffs have adequately pleaded that Mr. Shrewsberry's opinions are actionable because they omitted facts that conflicted with his statements; a reasonable investor would understand that the facts in Mr. Sloan's possession were consistent with his expected timeline.

The fact that the Bank warned investors at the outset of the call that it might make forward-looking statements does not save it from liability. The PSLRA's safe harbor for such statements applies when the statements are accompanied by "meaningful" cautionary language, so to avail themselves of the safe harbor, "defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772. The Bank's warning that it "we may make forward-looking statements during today's call that are subject to risks and uncertainties" was not "tailored to the specific future projection" about the timing of the Bank's compliance. *Id.* at 772-73 (2d Cir. 2010) (citing *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d at 256). Lead Plaintiffs have adequately alleged that the "warnings" "did not expressly warn of or did not directly relate to the risk" that resulted in their loss. *Halperin*, 295 F.3d at 359 (2d Cir. 2002).

v.   December 2018 Goldman Sachs U.S. Financial Services
Conference

On December 4, 2018, Mr. Sloan presented at a Goldman Sachs U.S. Financial Services

Conference.  CAC ¶ 157.  During that conference, Mr. Sloan, warned attendees that "[t]he

presentation that I'm about to give creates and has certain forward-looking statements regarding our

expectations about the future" and that "[a] number of the factors, many beyond our control, could

cause results to differ materially from management's current expectations."  Memo. at 23-24; *see also*

Ex. K, Dkt. No. 90-11 at 1.  During the conference, the following exchange took place:

> QUESTION:  Okay, great.  So perhaps we can move on to the consent order.  You've
> talked about having a good dialogue with the Fed and you've also talked about planning to
> operate under the cap for at least the first part of next year.  Can you update us on the
> progress in terms of getting it lifted?  And I guess, the most important question is, is there
> anything that you would be doing strategically that you cannot do as a result of the consent
> order?
> MR. SLOAN:  Sure.  There's really nothing new to report in terms of the timing or the dialogue
> with the regulators, whether it's related to the consent order or any other area.  We've
> introduced our new risk management framework, that's up and operating.  We've -- are
> continuing to improve compliance and operational risk.  We've got a little bit more work to
> do, but we're executing the plan as opposed to designing it and so that reflects a fair amount
> of progress.  We're still planning on operating under the asset cap through the first part of
> next year.  It's really not impacting our ability to serve our customers in any of the businesses
> today.  We've talked about that a lot.  I appreciate why that continues to be a question, but it's
> really not having much impact.  And it's not really impacting what else we want to do and
> we're continuing to innovate, we're continuing to invest, we're continuing to hire really high-
> quality people.  So, so far, so good.

Memo at 23-24.

Lead Plaintiffs first assert that Mr. Sloan's statement that there was "really nothing new to

report in terms of the timing or the dialogue with the regulators, whether it's related to the consent

order or any other area" was misleading.  The Court agrees.  Again, Mr. Sloan made a statement of

fact that was plainly false.  A reasonable investor would expect that Wells Fargo had not received

any feedback or that there were no updates that affected the timing of the Bank's compliance with

the orders.  However, at the time Mr. Sloan's statement was made, the Federal Reserve had rejected

the initial proposed Stage 1 Plans, Wells Fargo had requested and was granted two extensions for

resubmitting its Stage 1 Plans.  CAC ¶¶ 160-61.  Wells Fargo had resubmitted its plans to the Federal

Reserve on October 31, 2018, and those revised plans were under consideration.  *Id.* ¶¶ 158-62.  The

investors had not been informed of any of that information, and therefore, all of those events would

have been considered "new."  Defendants again argue that Mr. Sloan could not divulge details, such

as the rejection or the Bank's extension request, to investors because it was confidential.  However,

instead of conveying that to investors, Mr. Sloan chose to answer, and because he took that

approach he was required to "speak truthfully about material issues."  *Caiola*, 295 F.3d at 331.

Accordingly, Mr. Sloan's statement that there was "nothing new to report" was misleading.

Lead Plaintiffs assert that Mr. Sloan's answer implies that Wells Fargo was "executing [*the*

*Stage 1] plan* as opposed to designing it" and that he misled investors by stating that there was

"nothing new to report[,]" CAC ¶ 157 (emphasis added).  Defendants argue that the portion of Mr.

Sloan's statements that discussed executing plans was made in reference to Wells Fargo's internal

plans.  It is true that Mr. Sloan's use of the words "execute" and "plans" do not, by default, mean

that he was referring to the formal plans required by the consent order.  However, Mr. Sloan was

answering a question that asked him specifically about the consent order and the Bank's progress.

Thus, it would be reasonable for an investor to infer that his comments about execution were made

in that context and his statement would have been misleading to a reasonable investor.

Lead Plaintiffs also challenge Mr. Sloan's statement that Wells Fargo was "still planning on

operating under the [A]sset [C]ap through the first part of next year[,]" arguing that it was materially

misleading because he failed to disclose that the Bank had yet to submit a satisfactory Stage 1 Plan to

the Federal Reserve.  *Id.* ¶ 162.  Here too, like Mr. Sloan's July 2018 statement, Mr. Sloan's

prediction, though not impossible, was misleading based on the facts in Wells Fargo's possession.  A

reasonable investor could understand Mr. Sloan's statement to mean that the initial timeline was still

in place.  However, at this point, there was a five month delay due to the Federal Reserve's rejection

and the Bank's extension request; Mr. Sloan made his statements at the end of 2018 and the Bank

32

had not yet received a no-objection letter regarding its Stage 1 plans. "[T]he court must take account of whatever facts [the speaker] did provide[,]" and here, although investors were informed at the outset of that call that management's expectations could differ from reality, investors were given no information that would assist them in understanding just how unreasonable and divorced from reality Mr. Sloan's projection was, based on the facts identified by Lead Plaintiffs. *Omnicare*, 575 U.S. at 196.

Here too, the boilerplate warnings that Mr. Sloan's presentation "creates and has certain forward-looking statements regarding our expectations about the future" and that "[a] number of the factors, many beyond our control, could cause results to differ materially from management's current expectations" do not render his statements inactionable. Lead Plaintiffs have adequately alleged that the "warnings" did not contain specific information about the Bank's failure to submit a Stage 1 Plan worthy of approval and its effect on the Asset Cap timeline. Accordingly, Defendants are not entitled to avail themselves of the PSLRA's safe harbor for forward-looking statements for Mr. Sloan's statements at the Goldman Sachs conference.

vi.    December 2018 *Squawk on the Street* Appearance

On December 4, 2018, Mr. Sloan appeared on the CNBC televised segment, *Squawk on the Street*. CAC ¶ 163. When asked about the timing for removal of the Asset Cap, Mr. Sloan stated, "we've got plans in place we're executing on those plans," and that "sometime in the first half of next year" the Asset Cap would be lifted. *Id.* ¶¶ 163, 165. At the time, the Bank had requested and received two extensions for submitting its Stage 1 Plans and had not received approval to begin implementing those plans under Stage 2. *Id.* ¶ 165. Mr. Sloan's full statement is below:

> So originally we were hoping it would be lifted by the end of this year and what we're – our view today is that we're operating under the asset cap and our expectations are sometime in the first half of next year but, Wilfred, it's on us to make sure that we're making the improvements that we've talked about with the FED in operational and compliance risk. To be able to demonstrate that they should be comfortable to lift the asset cap. We've got plans in place. We're executing on those plans. We've got a terrific leadership team on the risk

side.  So I'm optimistic that we'll continue to make progress.  But we need to demonstrate
that we're deserving of the asset cap being lifted.

Memo. at 25; *see also* Ex. L, Dkt. No 91-2 at 2.  The House Financial Services Committee later

determined that Mr. Sloan's statements "misrepresented the bank's progress toward lifting the FRB's

asset cap," had "no basis," and was "unsupported by the facts on the ground."  CAC ¶ 166.

      Defendants argues that Mr. Sloan's statements were framed as opinions and that his

statements are not actionable merely because his stated expectations proved not to be accurate.

Memo. at 25-26.  At the time Mr. Sloan made his statements, Wells Fargo was still waiting to hear

back from the Federal Reserve on its revised plans, submitted on October 31, 2018.  CAC ¶ 165.  As

Defendants point out, Lead Plaintiffs did not allege that the Bank was not executing its proposed

plans during this waiting period.  Memo at 25–26.  However, Mr. Sloan's statements were at least

misleading, based on the facts alleged in the CAC.  Because Mr. Sloan connected the execution of

Wells Fargo's plans with the Asset Cap's removal, a reasonable investor could believe that Wells

Fargo had successfully completed Stage 1.  Because the challenged statements are ambiguous, the

Court cannot dismiss Lead Plaintiffs' claims based on those statements as a matter of law.  At the

motion to dismiss stage of a securities fraud action, "the court reads ambiguities" in challenged

statements "in [the plaintiff's] favor."  S*kiadas v. Acer Therapeutics Inc.*, No. 1:19-CV-6137, 2020 WL

3268495, at *9 (S.D.N.Y. June 16, 2020), *reconsideration denied*, No. 1:19-CV-6137, 2020 WL 4208442

(S.D.N.Y. July 21, 2020) (quoting *Umbach v. Carrington Inv. Partners*, No. 3:08CV484 (EBB), 2009 WL

413346, at *6 (D. Conn. Feb. 18, 2009)).  "That is simply an application of the maxim that a court

must draw all reasonable inferences in the plaintiff's favor on a motion to dismiss."  *Id.*  Mr. Sloan's

statements can reasonably be understood to have been a reference to the Stage 1 Plans, so the Court

must construe them as referring to progress on the consent orders at this stage.

vii.    January 2019 Earnings Call

On January 15, 2019, the Bank held an earnings call regarding its fourth quarter 2018 results. CAC ¶ 167.  Wells Fargo informed participants that they "may make forward-looking statements during today's call that are subject to risks and uncertainties."  Memo. at 22 (citing Ex. J at 2). During the call, Mr. Sloan stated that "we're in complete agreement with the Fed[eral Reserve] about what needs to be done, and we're in the midst of implementing that . . . [and] we're continuing to actively work and implement the new risk management framework."  CAC ¶ 167; *see* Ex. N, Dkt. No. 91-14 at 8-9.  Lead Plaintiffs argue that Mr. Sloan's statements were materially false or misleading because the Federal Reserve had rejected the Bank's Stage 1 Plans, and therefore Wells Fargo had not proceeded to Stage 2, the implementation stage.  CAC ¶ 168.  And, at that point, Wells Fargo had requested and received two extensions for submitting its Stage 1 Plans.  *Id.* Whether a statement is "misleading," is "evaluated not only by literal truth, but by context and manner of presentation." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (cleaned up).

Defendants are correct that the consent orders did not preclude Wells Fargo from implementing new risk management practices while it was waiting for the Regulators' approval.  In fact, once the Regulators approved the proposed plans, Wells Fargo was not permitted to deviate from the approved plan.  However, the context of Mr. Sloan's answer is instructive here and his answer could have been materially false or misleading to a reasonable investor.  First, Mr. Sloan warned listeners that "a lot of the dialogue that we have with the Fed is covered by confidential supervisory information, so I want to be very careful in the feedback I'm providing."  Ex. N at 8-9. However, Mr. Sloan answered the question and provided investors with an update on the Bank's progress on complying with the orders.  By doing so, he undertook "a duty to be both accurate and complete." *Caiola*, 295 F.3d at 331.  At that point, given the nature of the Regulators' feedback, Lead Plaintiffs have adequately pleaded that there was no basis for his claim that the Bank knew what needed to be done and was implementing it.  Mr. Sloan did not frame his statements as his

opinions or include any caveats with regard to his framing of the Bank's progress. Accordingly, a reasonable investor could have understood his statement that the Bank and the Federal Reserve had reached a "complete agreement" to mean just that. Accordingly, when reading the CAC in the light most favorable to Lead Plaintiffs, Mr. Sloan's statements are actionable.

Here too, the Bank's warning about potential "forward-looking statements" does not render Mr. Sloan's statements inactionable. The challenged statements were not "forward-looking" because Mr. Sloan was describing the Bank's current or past progress—e.g., "*we're in* complete agreement"; "*we're in the midst* of implementing that"; "*we're continuing to* actively work and implement the new risk management framework." Accordingly, the PSLRA's safe harbor does not apply to those statements.

viii.    January 2019 *Closing Bell* Appearance

On January 15, 2019, Mr. Shrewsberry spoke with Bloomberg reporters on "Bloomberg Markets: What'd You Miss?" CAC ¶ 170. During that conversation, Mr. Shrewsberry was asked to respond to Mr. Sloan's announcement during the January 15, 2019 Earnings Call that the Bank would operate under the Asset Cap until the end of 2019, rather than the first half of 2019, and "what that means for the bottom line and what that means for specific growth initiatives that Wells was perhaps looking to unfold but perhaps now put on hold." *Id.*; *see also* Memo. at 29-30; Ex. O, Dkt. No. 91-15 at 1. Mr. Shrewsberry answered that "With respect to, to the expectation that the asset cap will be around a little bit longer, it reflects a very large complex body of work that we're working on with the Fed to, to satisfy the terms of the consent order that we entered into a year ago and it will take longer. There's no, there's nothing more to read into that other than that it's a big body of work and it takes long, it takes time to execute on. It doesn't really impact our day to day strategic activities or the way we serve our either consumer or commercial customers." Memo at 29-30; Ex. O at 1.

36

Lead Plaintiffs assert that Mr. Shrewsberry's statement that "there's nothing more to read into that other than that it's a big body of work and it takes long, it takes time to execute on" was materially false or misleading because the delay in lifting the Asset Cap was caused by the Bank's failure to submit a compliant Stage 1 Plan, and the response omitted material information about the Bank's progress, including the Federal Reserve's rejection and negative criticism about the Bank's performance under the order.  CAC ¶ 172.  That argument is only viable based on a partial reading of Mr. Shrewsberry's answer, without the surrounding statements that provide the listener with the proper context.  That portion of Mr. Shrewsberry's answer was responding to the reporter's request for a comment on the bottom line and future growth initiatives.  As shown by the sentence immediately preceding the challenged statement, Mr. Shrewsberry did disclose that the Asset Cap would be around longer than projected because it was taking longer for Wells Fargo to work with the Regulators to satisfy the terms of the Consent Order.  Ex. O at 1.  Section "10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  "Disclosure is required . . . only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading."  *Id.* (citation omitted).  In light of the specific framing of the reporter's question and Mr. Shrewsberry's vague—but accurate—response, Mr. Shrewsberry's failure to disclose that Wells Fargo had already received a rejection as a part of that long process is not actionable.  *See Ind. Pub. Ret. Sys. v. SAIC, Inc.,* 818 F.3d 85, 97–98 (2d Cir. 2016) (explaining that even when statements are only half true, that fact "does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment.").

> ix.    February 2019 Credit Suisse Financial Services Forum

On February 12, 1019, Mr. Shrewsberry presented at the 2019 Credit Suisse Financial Services Forum.  CAC ¶ 173.  Mr. Shrewsberry was asked during the forum whether there were any

updates on the 2018 FRB Consent Order and why compliance with the order was taking longer than expected. *Id.* In response, Mr. Shrewsberry stated that

> I think it's taking a little bit longer because it's the first of its kind, and it is sort of an expanding body of work in terms of detail. And we're working -- it's very constructive, a lot of back and forth, no disagreement on the general direction we're heading in. But there isn't sort of a clear cut case for, first, this happens, then this happens, then that happens. Even though you might have read it that way, we all might've read it that way in the original letter, it's just a little bit more vague in terms of when completion exists. But we're making great progress, and I think the current sense of end of the year is -- seems like a reasonable one while that's happening.

Lead Plaintiffs challenge Mr. Shrewsberry's statements, arguing that "the Bank was not 'making great progress' toward complying with the 2018 FRB Consent Order and its progress did not reflect an ability to lift the Asset Cap by the "end of the year"' and the delay in lifting the Asset Cap was not due to its novelty or "an expanding body of work." CAC ¶ 174, 175.

Defendants argue that Mr. Shrewsberry made general and vague statements of corporate optimism, which are "precisely the type of puffery that [the Second Circuit] and other circuits have consistently held to be [no]nactionable." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021). However, defendants may be liable for misrepresentations of material fact, and Mr. Shrewsberry's statements were not consistent with the feedback the Bank had received from the regulators. At that point, the Bank had received multiple rejections of its Stage 1 Plans and asked for multiple extensions. Furthermore, the Regulators had given the Bank serious criticism of its efforts towards compliance. For example, the OCC expressed its frustration that Wells Fargo had ignored its feedback, failed to meet the established deadlines, that plans submitted were not complete, and the established deadlines were not met. And the OCC explained that Wells Fargo's plan was "not adequately supported" and the Federal Reserve told the Bank that the deadlines in its revised October 31, 2018 proposal were "improbable and unrealistic."

Accepting the allegations in the complaint as true, as the Court must at this stage, Lead Plaintiffs have adequately alleged that Mr. Shrewsberry's statements were false and misleading. *Novak v.*

*Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true").

In addition, reading the CAC in the light most favorable to Lead Plaintiffs, Mr. Shrewsberry's statement that the delay was caused by its novelty, or because there was "an expanding body of work" was false. Although Mr. Shrewsberry began his statement with "I think[,]" there was an untrue statement of fact embedded therein. As explained above, the Regulators were clear about why they had declined to provide Wells Fargo with a non-objection to the Bank's proposed plans. The delay was caused by Wells Fargo's failure to meet the requirements established at the outset by the consent orders. Accordingly, Mr. Shrewsberry's February 2019 statements are actionable.

x.    March 2019 House Financial Services Committee Testimony

On March 12, 2019, during Mr. Sloan's testimony before the HFCS, Chairwoman Waters asked Ms. Sloan if "the OCC indicated its non-objection to the bank's compliance audit on customer remediation plans? Has the Consumer Bureau indicated its non-objection?" CAC ¶ 178. Mr. Sloan responded that both had not objected to the plans, stating,

> I can't respond specifically to your question, because that would mean that I would be disclosing confidential supervisory information that has been shared with us by both the OCC and the CFPB. But I can assure you that we are working very constructively with what we have in place and we are executing that plan that reflects the fundamental changes that I have made since I have become the CEO. I can assure you that we are working very constructively with what we have in place and we are executing that plan.

Memo. at 34-35; *see also* Ex. E, Dkt. No. 5 at 6-7. Chairwoman Waters said "[f]or those who are listening, I am simply asking whether or not the bank is in compliance, based on reviews that are done by the OCC and the [CFPB], and you heard that answer," to which Mr. Sloan repeated: "[w]e are in compliance with those plans." *Id.* Chairwoman Waters asked again whether "the bank disclosed to investors the status of the plans that it submitted to the OCC and the Consumer

Bureau, including whether the regulators have raised any objections to the bank's submitted plans?"
*Id.* Mr. Sloan answered "Again, we cannot disclose confidential supervisory information in terms of
the give-and-take that we have with either the OCC or the CFPB. But I can assure you that we have
plans in place." Mr. Sloan further testified that the Asset Cap had not yet been removed because
"[a]s part of the consent order with the Fed[eral Reserve], they want us to improve the Board
governance and oversight, which we have done." CAC ¶ 182.

Shortly after testimony, the OCC issued a statement stating that it did not agree with Mr.
Sloan's testimony. Ex. D at 7; Ex F at 33. The OCC sent internal messages and informed the
Board of its disapproval, calling Mr. Sloan's testimony inaccurate. *See* CAC ¶ 98. The Federal
Reserve similarly called Mr. Sloan's statements "false" and a CFPB official said they were not
"comfortable" with his testimony. *Id.* ¶ 124. After the hearing, Mr. Sloan called the Federal Reserve
"to apologize for his mischaracterizations in statements during the hearing and to the media." *Id.*
¶ 96.

Separate from the HFSC's findings in its reports that Mr. Sloan's statements were
misleading, the Court also concludes that the CAC adequately alleges that Mr. Sloan's statements
violated federal securities laws. Lead Plaintiffs assert that Mr. Sloan's statements were materially
false or misleading because at the time of his testimony, the Federal Reserve had rejected the Bank's
Stage 1 Plan submissions, the Federal Reserve had repeatedly rebuked and reprimanded the Bank for
its failure to comply with the 2018 FRB Consent Order's requirements, and the Bank's continued
non-compliance would lead to further regulatory enforcement action. Defendants argue that Mr.
Sloan was referring to the Bank's internal plans. However, Chairwoman Waters repeatedly asked
Mr. Sloan a very specific question: that is, whether the Bank's customer remediation plans were in
compliance with the consent orders imposed by the OCC and the CFPB. A reasonable investor
could have understood Mr. Sloan's answer to be in response to that question. Even if Mr. Sloan did
not have a duty to disclose the Regulators' rejections because the information was confidential, the

answer he did provide was misleading given the context, and in need of further clarification or additional information. An omission is actionable under Rule 10b-5 when disclosure of the omitted information was necessary to prevent a particular statement from misleading investors. *See Matrixx Initiatives,* 563 U.S. at 44 (citing 17 C.F.R. § 240.10b-5(b)). Accordingly, Mr. Sloan's answers to Chairwoman Waters' questions are actionable.

Defendants separately argue that Mr. Sloan's statements were not material because the OCC issued its own statement shortly thereafter, "correct[ing] the record" and expressing its dissatisfaction with the Bank's progress. Memo. at 37. Under the "truth on the market" defense, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Thus, "[a] defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known." *Id.*; *see also Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) ("Under the 'truth-on-the-market' doctrine, information already known on the market is . . . immaterial."). However, the Second Circuit has cautioned that "corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino*, 228 F.3d at 167 (internal citation and quotation marks omitted). Accordingly, the "truth-on-the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Id.* at 167 (internal citation omitted); *see also In re Columbia Sec. Litig.*, 155 F.R.D. 466, 482–83 (S.D.N.Y. 1994) ("[D]efendants' burden [of establishing the truth-on-the-market defense is] extremely difficult, perhaps impossible, to meet at the summary judgment stage.").

Defendants are plainly pursuing this defense, despite their arguments that the OCC's written statement did not render Mr. Sloan's statements false or misleading. In any event, the OCC's full written statement has not been presented to the Court. Defendants have only attached to their

motion a *Wall Street Journal* article quoting the OCC as stating that they "continue to be disappointed with [Wells Fargo's] performance under our consent orders and its inability to execute effective corporate governance and a successful risk management program[,]" and the House Reports, which refer to that article.  *See* Ex. R, Dkt. No. 91-18 at 2, Ex. D at 7, Ex. F at ECF p. 33.  That statement, without any additional information, does not appear on its face to contradict the inference created by Mr. Sloan's testimony about where Wells Fargo was in the formal stages of the Consent Orders. Accordingly, Defendants' argument as to the materiality of Mr. Sloan's congressional testimony is reserved for dismissal on summary judgment or trial.

Lead Plaintiffs also challenge certain portions of Mr. Sloan's written testimony for the HFSC members.  CAC ¶ 185.  Mr. Sloan was asked what "steps have you taken in the past, and what additional steps are you taking to execute effective corporate governance and run a successful risk-management program?"  Ex. Q, Dkt. No. 91-17 at 8-10.  Mr. Sloan's answered that

> [w]hile we have more work to do to meet regulatory expectations, Wells Fargo continues to make progress against our action plans in response to our consent orders.  Becoming the financial services leader in risk management is one of our six aspirational goals.  We have made meaningful progress to enhance our governance and risk management, including [action plans for developing Wells Fargo's risk management framework, hiring, Board, and culture].

*Id.*  Mr. Sloan was also asked [h]ow long have you been working to improve corporate governance and risk management at the bank, and how much longer will it take to implement further reforms to address the concerns of the bank's regulators?"  *Id.*  Mr. Sloan responded that

> We have been continuously working to improve corporate governance and risk management at the Bank, and we continue to make progress against our action plans to address issues under our consent orders with our regulators and meet regulatory expectations.

*Id.*[3]

---

[3] Wells Fargo argues that Mr. Sloan's references to "action plans" were referring to the Bank's internal plans, and did not imply that it had obtained approval on the Stage 1 Plans, as Lead Plaintiffs assert.  However, in both answers, Mr. Sloan specifically connected the Bank's action plans to the consent orders and the Regulators.  A reasonable investor could therefore understand comments about the progress of those plans to be related to the Bank's compliance, as Lead Plaintiffs allege.

The Bank's back-and-forth with the Regulators on its proposed plans would indeed be considered "making progress[,]" because by obtaining additional feedback, the Bank was gaining more insight as to what the Regulators were expecting.  Furthermore, Mr. Sloan's comment that the Bank was making meaningful "progress" is vague and therefore nonactionable.  *See In re Adient plc Sec. Litig.*, No. 18-cv-9116, 2020 WL 1644018, at *19 n.14 (finding that statements regarding the defendant's "progress with respect to certain goals, including it being 'on track'" were nonactionable puffery); *Okla. L. Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, No. 18-cv-3021, 2020 WL 127546, at *7 (S.D.N.Y. Jan. 10, 2020) ("It is well established that such general statements about . . . progress, are nonactionable puffery."); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 846 (S.D.N.Y. 2019) (statements that merger integration was "'quick. . . and [showing] 'great progress' [we]re so vague and ill-suited to concrete measurement that they constitute puffery").  Accordingly, Mr. Sloan's statements to the HSFC during the hearing are actionable, but his written testimony is not.

xi.    April 2019 Earnings Call

On April 12, 2019, Wells Fargo held its first-quarter earnings call.  CAC ¶ 189.  During that call, Mr. Parker stated that the remaining work to be done under the 2018 FRB Consent Order "consist[ed] of completing and implementing efforts that are substantially underway."  *Id.*  An analyst asked "what are you either doing differently now, say, versus 6 months ago or plan to do differently to address these things," Mr. Parker said, "we're going to be focused more on execution."  *Id.*  During the same call, Mr. Parker stated that work under the 2018 Consent Orders was "way down the road and is really pointed toward completion and implementation."  *Id.* ¶ 192.  Lead Plaintiffs argue that Mr. Parker's statements were materially false and misleading because the Bank had not received approval of its Stage 1 Plans, and thus, it did not have any plans to focus on implementing.  *Id.* ¶ 192.  Furthermore, Lead Plaintiffs assert that at that point, the Bank had

received its rejections from the Regulators, and been admonished by the Regulators for its insufficient progress.  *Id.*

However, Lead Plaintiffs have ignored the other portions of Mr. Parker's statements, which clarified the statements challenged by Lead Plaintiffs.  During the Earnings Call, Mr. Parker also told investors multiple times that Wells Fargo "ha[d] a substantial amount of work to do" based on the Regulator's disappointment with the Bank's efforts to date.  Memo. at 39-41.  Mr. Parker expressly warned investors that he "[did] not feel it [was] appropriate to provide guidance as to the timing of the lifting of the asset cap."  *Id.* at 39.  Mr. Parker said, with regard to how Wells Fargo was reshaping its risk management framework, that it was going to be focused on "operational excellence[,]" including "business process management."  *Id.* at 40.  With respect to that process, Mr. Parker said that Wells Fargo would be "working harder and smarter, and . . . focused more on execution."  *Id.* at 41.  Accordingly, a reasonable investor would not rely on Mr. Parker's statements to mean that Wells Fargo had moved on to Stage 2 of the consent order, merely because he used the word "execution."

Mr. Parker's comment that Wells Fargo's work was "way down the road" and "really pointed toward completion and implementation" was also taken out of context.  Mr. Parker said that

> [Wells Fargo's] engagement with the regulators . . . is an ongoing engagement.  We get their feedback constantly, and we, therefore, are called upon to respond to it constantly.  And that sometimes means that we have to work hard to understand exactly what their expectations are for us.  I have really had an opportunity through my meetings earlier this week to understand exactly what their expectations are.  And although our work is in various stages of progress, some of it is way down the road and is really pointed toward completion and implementation.  Other parts of it are a little bit earlier in the process.  I think I have a very good handle on where we want to go with them . . . .

Ex. S, Dkt. No 91-19 at 14-15; Memo. at 40-41.  Plainly, on the facts alleged, Mr. Parker's comment about completion and implementation was referring to the work that was "way down the road." Given that Wells Fargo had not yet submitted an acceptable Stage 1 Plan, that statement was accurate.  A reasonable investor would not understand Mr. Parker's comments to mean that Wells

Fargo had successfully moved past Stage 1 of the consent order.  Accordingly, Mr. Parker's statements during the April 12, 2019 Earnings Call are not actionable.  *See Solmetex, LLC v. Dental Recycling of N. Am., Inc.*, No. 17-cv-860, 2017 WL 2840282, at *4 (S.D.N.Y. June 26, 2017) ("While the Court must accept the well-plead[ed] allegations in the pleadings as true, [a plaintiff] cannot plead falsity by quoting statements out of context.").

xii.     April 2019 CNBC Appearance

On April 12, 2019, the same day as Wells Fargo's Q1 2019 Earnings Call, Mr. Shrewsberry appeared on CNBC's program, *First on CNBC*.  CAC ¶ 195.  Mr. Shrewsberry was asked about the Asset Cap and what would be different under Mr. Parker's leadership.  Memo. at 42.  Mr. Shrewsberry answered that

> there's an approach to planning the work, to hiring the necessary people to execute the work, then to executing the work, then to assessing the maturity of the work and then to sort of cycling back around and continually improving it.  All of those things happen in a particular cadence.  They began when the asset cap, or when the Fed consent order was put in place.  There's a variety of different streams of work but each of them have that structure to them in terms of planning it out, putting the right people in, planning further at a more detailed level, executing, testing the execution and understanding the maturity.  So, we're later in that cycle today, which is good.  Later in some streams of work, I'm sure, than in others. But it isn't just doing the same thing over or doing the same thing harder, it's being further down the maturity curve of the type of work, the nature of work, that has to be done.  And as I said on the call this morning, it's really business process by business process, thorough mapping and understanding, identification of risks and controls, and so that the aggregation of all that we do, and how we do it at Wells Fargo, is very well understood, well controlled and well governed.

Ex. T, Dkt. No. 91-20 at 4; *see also* Memo. at 42-43.  Lead Plaintiffs argue that Mr. Shrewsberry's comments convey that the Bank was "later in [the cycle] and [further down the maturity curve of the type of work" was materially false and misleading because the Bank was still in Stage 1.  CAC ¶ 196. However, Mr. Shrewsberry was describing the multiple tasks that needed to be accomplished to reach compliance, and he made no reference to the specifically defined stages of the Consent Order. At best, Mr. Shrewsberry's description of the progress and various "work streams" were extremely vague, "too general to cause a reasonable investor to rely upon them" and therefore, by definition,

are not material.  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d

187, 206 (2d Cir. 2009).

> xiii.    May 2019 Sanford C. Bernstein Strategic Decisions Conference

On May 30, 2019, Mr. Parker, at that time the interim CEO of Wells Fargo, participated in

the 2019 Sanford C. Bernstein Strategic Decisions Conference.  CAC ¶ 198.  During the conference,

Mr. Parker responded to an analyst's question regarding the Bank's progress in having the Asset Cap

lifted.  *Id.*  Lead Plaintiffs allege that Mr. Parker answered "we're largely there" and "there is a

meeting of the minds in terms of what we need to do" to comply with the 2018 FRB Consent

Order.  *Id.*  However, Lead Plaintiffs' description of Mr. Parker's answer is inaccurate.  Mr. Parker

said:

> And just to refresh everybody's recollection, there are 2 parts to the Fed consent order:  One
> is Corporate Governance, and dramatic changes have been made there over the last year.
> The goal is to really be a Corporate Governance environment that is best-in-class, and I
> think we're largely there . . . The second piece of the Fed consent order is operational risk
> and compliance.  And there, I think there is a meeting of the minds in terms of what we
> need to do, but the task itself is a significant one. A lot of hard work has gone on already and
> that hard work is going to continue.  As I said at first quarter earnings, I can't really put a
> timetable on that . . . We want to satisfy the regulators, we want to have the asset cap lifted,
> but reaching a state of optimal operational risk management and compliance is something
> we need to do foundationally to have the company grow in a safe and sound way.

Memo. at 44.

Although Mr. Parker used the words "I think," they do not render his statements

nonactionable opinions and immune from liability.  As the Supreme Court explained, "some

sentences that begin with opinion words like 'I believe' contain embedded statements of fact."

*Omnicare, Inc.*, 575 U.S. at 185.  At the time Mr. Parker made his statements, the Bank had not even

submitted a third revised plan.  Plainly, there was no basis for Mr. Parker's statements that the Bank

was "largely there" and that the Bank and the Regulators had reached a "meeting of the minds."

Furthermore, "opinions, although sincerely held and otherwise true as a matter of fact, may

nonetheless be actionable if the speaker omits information whose omission makes the statement

misleading to a reasonable investor." *Tongue*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 194). A reasonable investor "expects not just that [the speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 188-89. Mr. Parker's statements were misleading because a reasonable investor could have understood his statements to mean that the Bank and the Regulators had reached an agreement on Wells Fargo's plans under the consent order, which conflicts with the facts Mr. Parker omitted: less than two months before, the Federal Reserve had rejected Wells Fargo's second, revised proposed Stage 1 Plans. CAC ¶ 93. The Federal Reserve harshly criticized Wells Fargo's performance and informed the Bank that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions" and that the Bank's "[c]ontinued failure to submit acceptable plans reflects poorly on [the Bank], and negatively influences supervisors' view of the board and senior management's capacity to effectively manage and govern the firm." *Id.* ¶ 94 (alterations in original). In reading the CAC in the light most favorable to Lead Plaintiffs, the omitted facts conflict with the reasonable inference of Mr. Parker's statements, that is, that the Bank had received notification that its plans were acceptable to the Federal Reserve.

Accordingly, Mr. Parker's May 2019 statements survive Defendants' motion to dismiss.

xiv.    September 2019 Shareholder Call

On September 27, 2019, Wells Fargo held a call with investors and analysts. CAC ¶ 201. During that call, the investors and analysts were informed that Mr. Scharf would be named the Bank's new CEO. Lead Plaintiffs challenge Ms. Duke's statements during that call, specifically her statements that the Bank was "pretty well along in a lot of the work, and we've defined out the work for each individual piece of it, each individual agreement with a regulator . . . we have a good understanding with our regulators on what they are looking for." *Id.*

47

Lead Plaintiffs argue that Ms. Duke's statement would reasonably be understood as meaning the Regulators had already approved Wells Fargo's Stage 1 Plans, and that therefore, the statement was false or misleading. However, Ms. Duke was asked whether Mr. Scharf's new position as CEO would be regulatorily driven, at least initially. Memo. at 45-46. She was explaining that Mr. Scharf's work as CEO had been defined and that Wells Fargo's internal work streams under Mr. Scharf would continue. *See id.* She followed that statement by explaining that they were "all on somewhat different tracks, although a lot of the themes are parallel. And so that work will continue to the extent that [Mr. Scharf] can use his experience and his insights to get through some of the pieces and accelerate that work, that will be terrific." *Id.*

However, like Mr. Parker's "meeting of the minds" statement in May 2019, Ms. Duke's statement that she thought Defendants had a "good understanding" with the Regulators as to what the Regulators were looking for is actionable. Prefacing her statement with opinion words did not render her statement nonactionable. At the time Ms. Duke's statements were made, she had submitted a request for an extension from the Federal Reserve to submit the Bank's Stage 1 Plans by April 30, 2020, so the Bank had not even submitted its revised proposal. Furthermore, earlier that month, the OCC had told the Bank that it was not in compliance with the 2018 OCC/CFPB Consent Orders, and expressed its disappointment with the Bank because "many plans have been resubmitted multiple times or extended" and that the Bank's "remediation efforts remain[] a concern." CAC ¶ 105.

In short, Lead Plaintiffs have adequately alleged that there was no basis for Ms. Duke's statement that the Bank had a "good understanding" with the Regulators as to what needed to be done. A reasonable investor would expect that the statement "fairly aligned" with the information in the Ms. Duke's possession at the time, which it did not. In reading the CAC in the light most favorable to Lead Plaintiffs as the Court must, the omitted facts conflict with the reasonable inference of Ms. Duke's statements. Accordingly, Ms. Duke's statement that the Bank and the

Regulators had reached a "good understanding" is actionable, but her remaining statements during the September 2019 conference are not.

xv.     October 2019 Earnings Call

On October 15, 2019, Wells Fargo held its third-quarter 2019 earnings call. CAC ¶ 205. During that call, an investor asked if there were any updates on where Wells Fargo stood "on the consent order and remediating the operational risk and controls." Memo. at 46-47. Mr. Parker answered that "[w]e're good ways down the road, but I think it's fair to say that we have a substantial amount of additional work to do . . . . At the same time, we've designed and implemented and we're constantly working to enhance our new risk management framework." Lead Plaintiffs argue that Mr. Parker's statement incorrectly suggests that the Stage 1 Plans had already been approved. CAC ¶ 205; Memo. at 46-47.

In the CAC, Lead Plaintiffs omit that Mr. Parker began his answer by explaining that the Bank's conversations with the Regulators were confidential supervisory information, and he reminded the listeners that several regulators expressed disappointment with Wells Fargo's progress. Memo. at 47. Mr. Parker stated in response to the Regulator's criticism, Wells Fargo "redoubled our efforts with regard to trying to satisfy [the regulators'] expectations." *Id.* That statement makes clear that Wells Fargo was still striving for the Regulator's approval, and no reasonable investor would have been misled into thinking that Mr. Parker was referring to implementation of Wells Fargo's Stage 1 Plans rather than its internal risk management framework. Mr. Parker explicitly warned investors that Wells Fargo had "a substantial amount of additional work to do" and later reiterated that "there's a great deal of work to do to meet the expectations of [the] regulators. They're appropriately high." *Id.* When coupled with Mr. Parker's accompanying statements, a reasonable investor could not have been misled by his description of Wells Fargo's progress on its risk management workstreams.

49

xvi.   December 2019 Goldman Sachs U.S. Financial Services
Conference

Mr. Shrewsberry gave a presentation for investors at a Goldman Sachs conference held on

December 10, 2019.  CAC ¶ 208.  During that conference, an analyst asked him for an update on

Wells Fargo's progress under the consent orders, and to remind the investors what the process

under the consent orders looked like.  Memo. at 48, Ex. X, Dkt. No. 91-24 at 3.  Mr. Shrewsberry

answered that "the work that's underway to prepare for [third-party review under Stage 3 of the

2018 FRB Consent Order] is what's happening . . . the beauty of the amount of work that's been

done behind the scenes in preparations for that is that we'll do everything in our power to make it as

easy as possible for people to understand what the program is and how we've implemented it to

make it as seamless as possible."  Ex. X at 3.

Lead Plaintiffs argue that Mr. Shrewsberry's statement was false or misleading because his

answers suggested that the Bank's Stage 1 Plans had been implemented.  Here, the context in which

Mr. Shrewsberry made his statements is important.  Mr. Shrewsberry was asked about Wells Fargo's

progress under the consent orders.  Therefore, his response could reasonably be understood to

mean that Stage 1 and 2 were complete, and that the Bank had progressed to preparing for Stage 3.

That interpretation is consistent with Mr. Shrewsberry's explanation that that "once [Wells Fargo]

reach[ed] a certain point, [it would] have a third-party come in and demonstrate that [it] has been

adopted and implemented" and that stage was not yet scheduled.  Memo. at 48; Ex. X at 3.  Reading

the CAC in the light most favorable to the Lead Plaintiffs, as the Court must at this stage, Mr.

Shrewsberry's statements could have been materially misleading to a reasonable investor.

Accordingly, Mr. Shrewsberry's statements at the December 2019 Goldman Sachs conference are

actionable.

For the reasons described above, Lead Plaintiffs have adequately alleged that certain

statements made by Messrs. Shrewsberry, Sloan, and Parker and Ms. Duke were materially false or

misleading.  However, Lead Plaintiff has failed to adequately allege that the remaining statements violated federal securities laws.  Accordingly, Lead Plaintiffs' Section 10(b) and Rule 10b-5 claim against Defendant Duke is dismissed.

### 2.   Scienter

For the statements made by Messrs. Shrewsberry, Sloan, and Parker and Ms. Duke that have survived Defendants' motion to dismiss, Lead Plaintiffs have adequately alleged that the speakers had the requisite scienter when making those statements.

### a.   Legal Standard

A plaintiff alleging securities fraud must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  The Supreme Court has explained that the "PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quotation omitted).  The question "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 322-23.  To plead scienter for a forward-looking statement, a plaintiff must allege that the statement was made "with actual knowledge" of its falsity. 15 U.S.C. § 78u-5(c)(1)(B).

For all other statements, "recklessness is a sufficiently culpable mental state for securities fraud in this circuit."  *ECA*, 553 F.3d at 198 (citation omitted); *see Slayton*, 604 F.3d at 773 ("[T]he scienter requirement for forward-looking statements is stricter than for statements of current fact.  Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity.").  That standard can be satisfied "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by

alleging facts that constitute strong circumstantial evidence of conscious misbehavior or reclessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quotation omitted).  A plaintiff need not rely exclusively on one of these theories.  Indeed, *Kalnit* held that absent allegations of motive, "the strength of the circumstantial [evidence] must be correspondingly greater."  *Id.* at 142 (quotation omitted).  That accords with the Supreme Court's admonition to consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter."  *Tellabs*, 551 U.S. at 323.

Reckless conduct is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *In Re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (quotation omitted).  But a plaintiff alleging recklessness must allege "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (quotation omitted).  "Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."  *Kalnit*, 264 F.3d at 142 (quotation omitted). "Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  *Id.* (quotation omitted).

An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  If an inference of fraudulent intent is not "at least as compelling" as a contrary inference, it is inadequate, even in a "close case."  *Slayton*, 604 F.3d at 777.  An inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences."  *Tellabs*, 551 U.S. at 324 (quotation omitted); *see also City of Pontiac*, 875 F. Supp. 2d at 372 ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff.").  In sum, "[t]he inquiry on

a motion to dismiss is as follows: 'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007) (quoting *Tellabs*, 551 U.S. at 326).

Rule 9(b) requires that "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009); *see also DeAngelis v. Corzine, 17* F. Supp. 3d 270, 281-82 (S.D.N.Y. 2014) ("[Plaintiff] improperly attempts to group-plead the scienter requirement."); *The Penn. Ave. Funds v. Inyx Inc.*, No. 08-cv-6857, 2010 WL 743562, at *12 (S.D.N.Y. Mar. 1, 2010) ("'[G]roup pleading' of scienter . . . runs afoul of the PSLRA's requirement that a plaintiff 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"(citation omitted).

### b.    Application

Lead Plaintiffs allege that Defendants knew at the time their statements were made that their Stage 1 Plans had been rejected when they made their representations to investors.  As explained above, the Court has determined that only certain statements made by Messrs. Shrewsberry, Sloan, and Parker are actionable.

#### i.    Mr. Shrewsberry

Reading the CAC in a light most favorable to Lead Plaintiffs, it adequately alleges facts sufficient to support an inference that Mr. Shrewsberry possessed the requisite scienter when making his statements.  At the outset, Lead Plaintiffs have not alleged that that Mr. Shrewsberry had "motive and opportunity" to lie, or that he "benefitted in some concrete and personal way from the purported fraud." *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 233 (S.D.N.Y. 2020) (internal quotation marks omitted).  Absent a showing of motive, "the strength of the [plaintiff's]

circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199 (internal

quotation marks omitted).  Here, Lead Plaintiffs attempt to demonstrate scienter under the

"conscious recklessness" approach, which requires that Mr. Shrewsberry "knew facts or had access

to information suggesting that [his] public statements were not accurate." *Emps. Ret. Sys. of Gov't of

the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

Lead Plaintiffs have specifically alleged that Mr. Shrewsberry knew his statements were false,

based on his involvement with the compliance process and understanding of the Regulator's

feedback, including that Mr. Shrewsberry was aware of the May 7, 2018 Rejection Letter, which

precluded Wells Fargo from moving past Stage 1 and progressing towards removing the Asset Cap.

CAC ¶ 75 (describing an email from Wells Fargo's Head of Regulatory Relations to Messrs. Sloan,

Parker, and Shrewsberry regarding the letter and discussions with the Federal Reserve).

Accordingly, Lead Plaintiffs have satisfied the scienter element with regard to Mr. Shrewsberry's

statements.

ii.    Mr. Sloan

Lead Plaintiffs have adequately alleged scienter as to Mr. Sloan's December 2018 and March

2019 statements by alleging that he "knew facts or had access to information suggesting that [his]

public statements" regarding whether there was anything new to report, and the status of the Bank's

plans under the orders "were not accurate." *Blanford*, 794 F.3d at 306.  To support the inference that

Mr. Sloan intended to "deceive, manipulate, or defraud," Lead Plaintiffs assert that Mr. Sloan, as a

member of the Board, was required to review communications with the Federal Reserve and to

submit written progress reports, that he personally received the rejection letters from the Regulators,

that he requested extensions for the submission of Wells Fargo's Stage 1 Plans, and that he attended

meetings with the Regulators.  CAC ¶¶ 93, 218, 234.  Lead Plaintiffs have alleged that the Regulators

provided feedback to Wells Fargo about their submissions in regular weekly meetings, and that Ms.

Duke testified that there were times that the Board "spoke to regulators every single day." *Id.* ¶ 215-16.  Lead Plaintiffs argue that the Board's multiple requests for extensions imply that Defendants knew that their submissions were not compliant and needed additional time.  Accepting these allegations as true, as the Court must in adjudicating a motion to dismiss, the CAC has plausibly alleged that Mr. Sloan was intimately aware of Wells Fargo's progress at the time he made his public statements.  In addition, based on that involvement, Lead Plaintiffs have adequately alleged that Mr. Sloan's statements did not accurately reflect Mr. Sloan's knowledge about the Bank's progress under the Consent Orders and he chose to conceal the truth from the public.  The fact that Mr. Sloan called the Federal Reserve the day after his Congressional testimony to apologize for his mischaracterizations supports that inference.  Accordingly, Lead Plaintiffs have sufficiently alleged that Mr. Sloan "had access to information that contradicted the challenged statements." *Skiadis v. Acer Therapeutics, Inc.*, No. 1:19-cv-6137, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) (citing *Kalnit*, 264 F.3d at 142).

Furthermore, Lead Plaintiffs argue Mr. Sloan also had the motive and opportunity to commit fraud.  Specifically, Mr. Sloan was financially motivated to misstate the status of Wells Fargo's compliance because his incentive compensation was tied to his role in resolving the outstanding regulatory matters.  Opp'n at 54-55.  Viewing the totality of Lead Plaintiffs' allegations, as the Court must, the inference that Mr. Sloan "had an intent to defraud is at least as compelling as any alternative inference." *Skiadas*, 2020 WL 4208442, at *5.

The opposing inference here is that Mr. Sloan, the Bank's CEO and a member of the Board, was unaware of Wells Fargo's poor performance and Stage 1 Proposal rejections, the subject of numerous communications and meetings with the Regulators.  That possibility is less persuasive and nearly impossible, given that several communications were addressed directly to Mr. Sloan and he regularly attended the in-person meetings.  Instead, based on the facts on the ground, Mr. Sloan "'knew or, more importantly, should have known that [he was] misrepresenting material facts related

to the corporation,' and scienter is adequately plead." *In re Alstom,* 406 F. Supp. 2d at 456–57 (quoting *Novak,* 216 F.3d at 308).

iii.    Mr. Parker

Lead Plaintiffs have adequately alleged scienter as to Mr. Parker's May 2019 statement.  Like Mr. Shrewsberry, Lead Plaintiffs have not alleged that that Mr. Parker had "motive and opportunity" to lie, or that he "benefitted in some concrete and personal way from the purported fraud." *Woolgar,* 477 F. Supp. 3d at 233.  Therefore, "the strength of the [plaintiff's] circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199 (internal quotation marks omitted).  Here too, Lead Plaintiffs attempt to demonstrate scienter under the "conscious recklessness" approach, and they allege that Mr. Parker, as interim CEO and a member of the Board, "knew facts or had access to information suggesting that [his] public statements were not accurate." *Blanford*, 794 F.3d at 306.

Lead Plaintiffs have satisfied their burden at the pleading stage.  Lead Plaintiffs allege that Mr. Parker was responsible for ensuring the Bank's regulatory compliance and that he had access to adverse nonpublic information about the Bank including the rejections from the Regulators.  Lead Plaintiffs allege that Mr. Parker was aware of the May 7, 2018 Rejection Letter and that Mr. Parker corresponded with the Regulators, which included the June 10, 2019 request for an extension to submit Wells Fargo's third attempt at a compliant Stage 1 Plan proposal. *See* CAC ¶ 75 (describing an email on which Mr. Parker was copied, which detailed the letter and discussions with the Federal Reserve).  Accordingly, Lead Plaintiffs have adequately alleged that Mr. Parker knew that his statements that the Bank and the Regulators had a "meeting of the minds" and that the Bank was "largely there" with regard to its compliance under the consent orders were inaccurate.

56

iv.     Ms. Duke

Lead Plaintiffs have adequately alleged scienter as to Ms. Duke's September 2019 statement.

Lead Plaintiffs attempt to demonstrate scienter under the "conscious recklessness" approach, and

they allege that Ms. Duke, as a member of the Board knew that her public statement was not

accurate.  *See Blanford*, 794 F.3d at 306.  Lead Plaintiffs allege that Ms. Duke was the Chairwoman of

the Board and the point of contact for communications with the Regulators.  CAC ¶ 235.  Lead

Plaintiffs also allege that she was responsible for ensuring the Bank's regulatory compliance and that

she had access to adverse nonpublic information about the Bank, including communications with

and rejections from the Regulators.  *Id.*  Accordingly, Lead Plaintiffs have adequately alleged that

Ms. Duke knew that her statement that the Bank and the Regulators had "a good understanding"

was inaccurate.

v.     Imputation of Scienter to Wells Fargo

"Courts routinely impute to the corporation the intent of officers and directors acting within

the scope of their authority."  *In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539, 2017 WL 1102666, at *34

(S.D.N.Y. Mar. 23, 2017) (quoting *Penn. Pub. Sch. Emps. Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d

341, 363 (S.D.N.Y. July 11, 2012)); *see also In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp.

2d 452, 481 (S.D.N.Y. 2006) ("[C]ourts have readily attributed the scienter of management-level

employees to corporate defendants.").  Therefore, the scienter of Defendants Shrewsberry, Sloan,

and Parker, as senior officers of Wells Fargo, should be imputed to Wells Fargo as a corporate entity

with respect to the May 2018, June 2018, December 2018, and March 2019 statements.

**B.  Control Person Liability Under Section 20(a)**

      **1.     Legal Standard**

Section 20(a) of the Exchange Act provides that:

Every person who, directly or indirectly, controls any person liable under any provision
of this title or of any rule or regulation thereunder shall also be liable jointly and

> severally with and to the same extent as such controlled person to any person to whom
> such controlled person is liable . . . unless the controlling person acted in good faith
> and did not directly or indirectly induce the act or acts constituting the violation or
> cause of action.

15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability, a plaintiff must

show (1) a primary violation by the controlled person, (2) control of the primary violator by the

defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the

controlled person's fraud." *ATSI*, 493 F.3d at 108.

   "Control over a primary violator may be established by showing that the defendant

possessed 'the power to direct or cause the direction of the management and policies of a person,

whether through the ownership of voting securities, by contract, or otherwise.'" *SEC v. First Jersey

Secs., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2).  Furthermore, "[i]t

is not sufficient for a plaintiff to allege that an individual defendant has control person status;

instead, the plaintiff must assert that the defendant *exercised* actual control over the matters at issue."

*In re Fannie Mae 2009 Sec. Litig.*, 742 F. Supp. 2d 382, 415 (S.D.N.Y. 2010) (emphasis added).  In

other words, "status as an officer or committee member is generally not enough to constitute

control" and a "mere recitation" of the defendant's position title is not sufficient.  *In re Alstom SA

Sec. Litig.*, 406 F. Supp. 2d 433, 494 (S.D.N.Y. 2005); *see also City of Westland Police & Fire Ret. Sys. v.

MetLife, Inc.*, 928 F. Supp. 2d 705, 720-21 (S.D.N.Y. 2013) ("Neither director status nor mere

membership on an audit committee, standing alone, is sufficient to demonstrate actual control over

a company . . . ." *Id.* (citation omitted)).

   Courts have described the culpable participation requirement as being "similar to the

scienter requirement of Section 10(b)" in that "plaintiffs must 'plead with particularity facts giving

rise to a strong inference that the controlling person knew or should have known that the primary

violator, over whom that person had control, was engaging in fraudulent conduct." *See In re Refco,*

*Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 661 (S.D.N.Y. 2007). At a minimum, culpable participation

"requires 'something more than negligence.'" *In re Alstom SA*, 406 F. Supp. 2d at 490.

Allegations of control for Section 20(a) need only meet Rule 8's notice pleading standard.

Accordingly, even if Lead Plaintiffs' allegations would not be enough to establish control, dismissal

of a Section 20(a) claim is improper as long as it is at least "plausible that Plaintiffs can develop

some set of facts that would pass muster." *In re Global Crossing, Ltd. Sec. Litig.*, No. 2-cv-910, 2005

WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005). "While a party may not ultimately be held liable under

both Section 10(b) and Section 20(a) for the same underlying conduct, it is permissible for Plaintiffs

to pursue both claims at [the pleading] stage [of] the litigation." *In re Alstom SA Sec. Litig.*, 454 F.

Supp. 2d 187, 210–11 (S.D.N.Y. 2006) (citations omitted); *see also Henry v. Daytop Village*, 42 F.3d 89,

95 (2d Cir.1994) (explaining that under Rule 8(e)(2), a plaintiff may plead multiple claims, regardless

of consistency and any inconsistencies may lie either in the statement of the facts or in the legal

theories adopted) (internal citations omitted)).

### 2.    Application

First, Defendants assert that the control person claims should be dismissed because Lead

Plaintiffs have failed to allege a primary violation of section 10(b) or rule 10b-5. *See Wilson v. Merrill

Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011) (affirming the dismissal of a section 20(a) claim

because the plaintiff "failed to state a claim for any primary violation of the securities laws"). For

the reasons stated above, Lead Plaintiffs have pleaded primary violations against Wells Fargo and

Messrs. Shrewsberry, Sloan, and Parker, and Ms. Duke. Therefore, that argument fails.

Second, Defendants argue that Lead Plaintiffs have failed to allege the remaining elements

for their control person liability claims. The Court's determinations as to the scienter of Messrs.

Shrewsberry, Sloan, and Parker and Ms. Duke also establish that the CAC contained enough facts to

demonstrate that the culpable participation requirement for Section 20(a) as to those defendants has

been satisfied.

The remaining question as to those defendants is whether Lead Plaintiffs have sufficiently pleaded facts to support the control person element.  Here, Lead Plaintiffs have specifically alleged that Messrs. Shrewsberry, Sloan, and Parker and Ms. Duke issued the actionable statements, that they "had the power and authority to cause Wells Fargo and its employees to engage in the wrongful conduct alleged herein, . . . [were] involved in the day-to-day operations of the Bank, interacted with Regulators in negotiating and responding to the 2018 Consent Orders, and had primary responsibility for ensuring the Bank's compliance with the 2018 Consent Orders."  CAC¶ 297-99.  Furthermore, Lead Plaintiffs assert that those Defendants had access to the nonpublic information that contradicted their statements, including the rejections from the Regulators.  These allegations, which amount to more than a description of Messrs. Shrewsberry, Sloan, and Parker's titles, describe their personal involvement with the fraud alleged.  Therefore, Lead Plaintiffs' Section 20(a) claims against Messrs. Shrewsberry, Sloan, and Parker survive dismissal.

As for the allegations against Mr. Scharf, the complaint alleges facts that suggest that he exercised "control" over Wells Fargo.  *See* CAC ¶ 301.  However, with regard to the statements that have survived Defendants' motion to dismiss, Lead Plaintiffs have failed to allege that Mr. Scharf acted with any culpability in connection with their dissemination.  Accordingly, Plaintiffs' Section 20(a) claims against Defendant Scharf are dismissed.

## IV.   CONCLUSION

Defendants' motion to dismiss the consolidated amended class action complaint is granted in part and denied in part.  Lead Plaintiffs have requested that if the Court granted any part of Defendants' motion, that they be granted leave to replead their amended complaint.  Opp'n. at 60 n.25.  The Federal Rules of Civil Procedure provide that courts should "freely give" leave to amend "when justice so requires," Fed. R. Civ. P. 15(a)(2), and "[d]istrict courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)."

*ATSI*, 493 F.3d at 108 (citation omitted).  Accordingly, the consolidated amended class action complaint is dismissed in part, without prejudice.

      The Clerk of Court is directed to terminate the motion pending at Dkt. No. 89.

      SO ORDERED.

Dated:  September 30, 2021
New York, New York

                    GREGORY H. WOODS
               United States District Judge