**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY SECURITIES LITIGATION | Case No. 1:20-cv-04494-GHW <br><br> **CLASS ACTION** |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ..................................................................................................1

II. BACKGROUND OF INVESTORS' CLAIMS................................................................................5

III. PROCEDURAL HISTORY.......................................................................................................9

IV. ARGUMENT.......................................................................................................................11

    A. The Proposed Class Satisfies Rule 23(a) ...............................................................12

        1. Numerosity Is Established ...........................................................................12

        2. Commonality Is Established ........................................................................12

        3. Typicality Is Established..............................................................................13

        4. Adequacy Is Established ..............................................................................14

        5. Ascertainability Is Established.....................................................................15

    B. The Proposed Class Satisfies Rule 23(b)(3) ...........................................................16

        1. Common Questions of Law and Fact Predominate Over Individual Issues...........................................................................................................16

            a. The Fraud-On-The-Market Presumption Applies.........................17

            b. The *Affiliated Ute* Presumption of Reliance Also Applies ............22

            c. Damages Will Be Calculated Using a Common Methodology That Is Consistent with the Class-wide Theory of Liability ........................................................................23

        2. A Class Action Is Superior to Other Available Methods for Resolving This Controversy ...................................................................24

    C. Lead Counsel Should Be Appointed Class Counsel.............................................24

V. CONCLUSION.....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affiliated Ute Citizens of Utah v. U.S.*,
   406 U.S. 128 (1972)..................................................................................................3, 22, 23

*In re Allergan PLC Sec. Litig.*,
   2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021)................................................................... *passim*

*In re Alstom SA Sec. Litig.*,
   253 F.R.D. 266 (S.D.N.Y. 2008) ...............................................................................12

*Amchem Prod., Inc., v. Windsor*,
   521 U.S. 591 (1997)....................................................................................................16

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)........................................................................................12, 16, 17

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act
   ("ERISA") Litig.*,
   281 F.R.D. 134 (S.D.N.Y. 2012) ...............................................................................14

*In re Barrick Gold Sec. Litig.*,
   314 F.R.D. 91 (S.D.N.Y. 2016) ........................................................................13, 15, 17, 23

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988).....................................................................................................3, 17

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ...............................................................................18, 19, 20

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
   2017 WL 3608298 (S.D.N.Y. Aug. 22, 2017)............................................................11

*In re Dynex Cap., Inc. Sec. Litig.*,
   2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ...............................................................25

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011).....................................................................................................16, 17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009)..........................................................................................14

*In re Gentiva Sec. Litig.*,
   281 F.R.D. 108 (E.D.N.Y. 2012).................................................................................15

*In re Glob. Brokerage, Inc.*,
  2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021) ...........................................................................19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014).....................................................................................................................17

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings,
  Inc.*,
  338 F.R.D. 205 (S.D.N.Y. 2021) ...........................................................................................17, 23

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  210 F.R.D. 476 (S.D.N.Y. 2002) ................................................................................................11

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ..........................................................................................18, 21

*Lapin v. Goldman Sachs & Co.*,
  254 F.R.D. 168 (S.D.N.Y. 2008) ...........................................................................................13, 15

*Martinek v. AmTrust Fin. Servs., Inc.*,
  2022 WL 326320 (S.D.N.Y. Feb. 3, 2022).........................................................................15, 21, 22

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  328 F.R.D. 86 (S.D.N.Y. 2018) ...................................................................................................19

*Purple Mountain Trust v. Wells Fargo & Company*,
  2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) ................................................................. *passim*

*Rougier v. Applied Optoelectronics, Inc.*,
  2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ............................................................................22

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2019 WL 3001084 (S.D.N.Y. July 10, 2019) ................................................................... *passim*

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) .................................................................................................22

*In re SunEdison, Inc. Sec. Litig.*,
  329 F.R.D. 124 (S.D.N.Y. 2019) .................................................................................................25

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
  546 F.3d 196 (2d Cir. 2008).........................................................................................................20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).......................................................................................................................11

*In re Teva Sec. Litig.*,
  2021 WL 872156 (D. Conn. Mar. 9, 2021) ...........................................................................20, 22

*Villella v. Chem. and Mining Co. of Chile Inc.*,
    333 F.R.D. 39 (S.D.N.Y. 2019) ......................................................................22

*In re Vivendi Universal, S.A.*,
    242 F.R.D. 76 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)...........................................................................16

*In re Wells Fargo & Co. Sec. Litig.*,
    2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)............................................5, 6, 7, 23

*Wilson v. LSB Indus., Inc.*,
    2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)..................................................18, 21

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ...............................................................14, 16

**STATUTES**

Securities Exchange Act of 1934 Section 10(b) ........................................................4, 16

Securities Exchange Act of 1934 Section 20(a) .........................................................4, 9

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(a) ............................................................................................12, 15, 16

Fed. R. Civ. P. 23(b) ................................................................................................ *passim*

Fed. R. Civ. P. 23(g) .............................................................................................4, 24, 25

H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995), *reprinted in* 1995
    U.S.C.C.A.N. 730 ..........................................................................................15

## TABLE OF DEFINED TERMS

| **Term** | **Meaning** |
|---|---|
| [Proposed] Class | All persons or entities who purchased or otherwise acquired the common stock of Wells Fargo between May 30, 2018 and March 12, 2020, inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are Defendants; officers and directors of Defendant Wells Fargo; Defendants' immediate family members, legal representatives, heirs, successors or assigns; and any entity in which any Defendant has or had a controlling interest. |
| ¶ | Consolidated Class Action Complaint for Violations of Federal Securities Laws, *In re Wells Fargo & Company Securities Litigation*, No. 20-cv-04494 (GHW), filed on November 9, 2020 (ECF No. 74) (the "Complaint"). |
| 2018 CFPB Consent Order | *In the Matter of Wells Fargo Bank, N.A.*, File No. 2018-BCFP-0001, Consent Order (Apr. 20, 2018). |
| 2018 FRB Consent Order | *In the Matter of Wells Fargo Bank, San Francisco, California,* CFPB No. 18-007-B-HC, Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended (Feb. 2, 2018). |
| 2018 OCC Consent Order | *In the Matter of: Wells Fargo Bank, N.A. Sioux Falls, South Dakota,* AA-EC-2018-16, Consent Order For A Civil Money Penalty (Apr. 20, 2018). |
| Bernstein Litowitz | Bernstein Litowitz Berger & Grossmann LLP, Court-appointed co-Lead Counsel. |
| CFPB | Consumer Financial Protection Bureau. |
| Class Period | May 30, 2018 through March 12, 2020, inclusive. |
| Cohen Milstein | Cohen Milstein Sellers & Toll PLLC, Court-appointed co-Lead Counsel. |
| Consent Orders | 2018 FRB Consent Order, 2018 CFPB Consent Order, and 2018 OCC Consent Order, collectively. |
| DOJ | U.S. Department of Justice. |
| Duke | Elizabeth "Betsy" Duke, named Defendant, former Director at Wells Fargo and former Chairwoman of Wells Fargo's Board. |

| Term | Meaning |
|---|---|
| Ex. | Exhibits to the Declaration of John C. Browne and Laura H. Posner in Support of Lead Plaintiffs' Motion for Class Certification. |
| Federal Reserve | Board of Governors of the Federal Reserve System. |
| Hartzmark Rep. | The accompanying Expert Report of Michael L. Hartzmark, Ph.D. |
| Handelsbanken | Handelsbanken Fonder AB. |
| HFSC | U.S. House of Representative Financial Services Committee. |
| HFSC Rpt. | U.S. House of Representatives, Committee on Financial Services, *The Real Wells Fargo: Board & Management Failures, Consumer Abuses, and Ineffective Regulatory Oversight*, Report Prepared by the Majority Staff of the Committee on Financial Services (116th Cong. Mar. 2020). |
| Joint Decl. | The accompanying Declaration of John C. Browne and Laura H. Posner in Support of Lead Plaintiffs' Motion for Class Certification. |
| Lead Plaintiffs | Handelsbanken, Mississippi PERS, Rhode Island, and Louisiana Sheriffs, collectively. |
| Louisiana Sheriffs | Louisiana Sheriffs' Pension & Relief Fund. |
| Mississippi PERS | Public Employees' Retirement System of Mississippi. |
| NYSE | New York Stock Exchange. |
| OCC | The Office of the Comptroller of the Currency. |
| Parker | C. Allen Parker, named Defendant, former Senior Executive Vice President and General Counsel of Wells Fargo. |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4. |
| Regulators | Well Fargo's three primary regulators – Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, and the Consumer Financial Protection Bureau. |
| Rhode Island | State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island. |
| Scharf | Charles W. Scharf, current CEO and President of Wells Fargo. |
| Shrewsberry | John R. Shrewsberry, named Defendant, former Senior Executive Vice |

| Term | Meaning |
|------|---------|
|  | President and CFO of Wells Fargo. |
| Sloan | Timothy J. Sloan, named Defendant, former CEO and President of Wells Fargo. |
| Wells Fargo or the Bank | Wells Fargo & Company. |

Court-appointed Lead Plaintiffs Handelsbanken, Mississippi PERS, Rhode Island, and Louisiana Sheriffs (collectively, "Lead Plaintiffs" or "Plaintiffs") respectfully submit this memorandum of law in support of their motion to (i) certify the action as a class action, (ii) appoint Plaintiffs as Class Representatives, and (iii) appoint Lead Counsel Bernstein Litowitz and Cohen Milstein as Class Counsel.

## I.    **PRELIMINARY STATEMENT**

This securities class action is ideally suited for class treatment under Rule 23.  The action arises from Defendants' misstatements to investors concerning Wells Fargo's purported compliance with three consent orders ("Consent Orders") that the Bank was required to enter into before the beginning of the Class Period to rectify systemic and egregious corporate mismanagement and fraud.  Defendants' common course of deceptive conduct harmed Plaintiffs and the proposed Class.   Common questions that can be answered by class-wide proof predominate, and the class mechanism is the superior means of resolving Plaintiffs' claims.  And, the proposed class representatives are sophisticated institutional investors, exactly whom Congress intended to lead securities class actions.[1]

As the Complaint alleges and the evidence has shown, Defendants made class-wide misrepresentations concerning the Bank's purported compliance and progress with satisfying its obligations under the Consent Orders.  For example, the Bank represented that it had "plans in place" to comply with the Consent Orders, was "executing" on those plans, the asset cap would be timely lifted, and "investors know everything that's material that we know" when, in reality, the Regulators were privately telling Wells Fargo that the Bank's compliance plans were so

---

[1] Unless otherwise noted, all emphasis is added, and internal citations, punctuation, and subsequent history are omitted.

- 1 -

"materially incomplete" and "insufficient" that the Regulators could not even review them. Indeed, then-CEO Defendant Timothy J. Sloan ("Sloan") testified before the House Financial Services Committee ("HFSC") that the Bank was "executing [its] plans[s]" and was "in compliance with th[e] plans" but omitted that, just the day before, the Federal Reserve formally rejected the Bank's proposed plan. This deception resulted in the HFSC Committee Chairwoman referring Sloan to the U.S. Department of Justice regarding a criminal violation of lying to Congress. ¶141.

Ultimately, investors learned the truth through a series of disclosures in 2019 and 2020 concerning the Bank's compliance failures, including the forced resignations of two Wells Fargo directors, damning congressional hearings and reports, and the Bank's admissions that it had made "some terrible mistakes and have not effectively addressed our shortcomings"—disclosures that damaged investors by causing substantial declines in the price of Wells Fargo stock.

Like most securities fraud class actions, this case is ideally suited for class certification because it arises from common public misrepresentations and omissions that harmed tens of thousands of investors in a like manner. As courts have repeatedly explained, "securities fraud suit[s]" are "particularly well suited to class treatment." *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *1 (S.D.N.Y. Sept. 8, 2021). In fact, multiple courts have previously certified securities cases against Wells Fargo, including just six weeks ago in *Purple Mountain Trust v. Wells Fargo & Company*, 2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) ("*Purple Mountain*"). The proposed Class readily satisfies Rule 23's requirements.

***First***, numerosity is easily satisfied because there are thousands of Class members. There were approximately 4.1 billion shares of Wells Fargo common stock issued and outstanding during the Class Period, and an average of 104.9 million shares traded weekly.

*Second*, this Action involves many common issues of law and fact, including whether (i) Defendants' statements and omissions concerning the Bank's compliance with the Consent Orders, and the timing in which the Federal Reserve would lift the asset cap were false or misleading; (ii) Defendants acted with scienter in making these statements; (iii) Defendants' misstatements and omissions caused investors' losses; (iv) Defendants Sloan, Shrewsberry, Parker, and Duke controlled Wells Fargo; and (iv) the Class suffered damages.

*Third*, the typicality requirement is easily satisfied because Lead Plaintiffs were harmed by the same alleged false and misleading statements and omissions as other Class members.

*Fourth*, Lead Plaintiffs are sophisticated institutional investors whose interests in prosecuting this Action are squarely aligned with those of the Class, and who will fairly and adequately protect the interests of the Class.  Additionally, Lead Plaintiffs' chosen counsel are among the most experienced class action law firms in the country.

*Fifth*, the proposed Class is readily ascertainable, as it is defined by objective criteria and definite boundaries, including the defined class of purchasers of Wells Fargo common stock.

*Sixth*, this Action readily satisfies Rule 23(b)(3)'s predominance requirement.  Common issues of law and fact abound—including concerning Defendants' unitary course of conduct, falsity, materiality, scienter, and loss causation—and are subject to common proof.  Moreover, class-wide reliance is presumed where, as here, Defendants' stock trades on an efficient market and Defendants failed to disclose facts they were under a duty to disclose.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988) (adopting fraud-on-the-market presumption); *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153 (1972) (adopting presumption of reliance for omissions).  As confirmed in the expert report of Dr. Michael Hartzmark, the market for Wells

Fargo common stock, which trades on the NYSE, is efficient.  Further, damages can be calculated based on a class-wide methodology that is consistent with Plaintiffs' theory of liability.

***Seventh***, a class action is the "superior" method of resolving this dispute under Rule 23(b)(3) because many thousands of investors suffered damages as a result of Defendants' alleged misconduct; individual actions are unworkable due to litigation costs; it is desirable to hear all such claims in this court; and there is no difficulty in maintaining this litigation as a class action.

***Finally***, pursuant to Rule 23(g), Lead Counsel should be appointed as Class Counsel because they are well qualified to prosecute this Action on behalf of Lead Plaintiffs and the Class.

The recent grant of class certification in a different securities case against Wells Fargo underscores the propriety of class certification here.  In *Purple Mountain*, the Bank did not even dispute many of the Rule 23 elements, including numerosity, typicality, adequacy, commonality, superiority, and certain predominance factors.  The court found all elements of class certification to be met and certified the class of Wells Fargo common stock purchasers in a period preceding the proposed Class Period in this case.  *Purple Mountain*, 2022 WL 3357835, at *1-6.  Here, too, there can be no meaningful dispute that class treatment is appropriate.

Lead Plaintiffs respectfully request that the Court certify the following proposed Class:

All persons or entities who purchased or otherwise acquired the common stock of Wells Fargo between May 30, 2018 and March 12, 2020, inclusive (the "Class Period"), and were damaged thereby.[2]

Lead Plaintiffs further respectfully request that the Court appoint Lead Plaintiffs as Class Representatives and appoint Lead Counsel as Class Counsel.

---

[2] Excluded from the proposed Class are Defendants; officers and directors of Defendant Wells Fargo; Defendants' immediate family members, legal representatives, heirs, successors or assigns; and any entity in which any Defendant has or had a controlling interest.

## II.     BACKGROUND OF INVESTORS' CLAIMS

This is a securities class action brought under Sections 10(b) and 20(a) of the Exchange Act on behalf of all persons or entities who purchased or otherwise acquired the common stock of Wells Fargo between May 30, 2018 and March 12, 2020, inclusive, and were damaged thereby.[3]

Prior to the beginning of the Class Period, Wells Fargo repeatedly engaged in serious, widespread misconduct in its consumer banking division, including by opening deposit and credit card accounts without authorization to rack up fees and increase assets. ¶¶37-41. This misconduct resulted in severe and unprecedented sanctions against the Bank by the OCC and CFPB. *Id.*

Less than a year later, in 2018, the Federal Reserve discovered that the Bank's illegal practices were even more pervasive than originally thought and, as a result, required Wells Fargo to enter into a consent order to comprehensively overhaul its governance and risk management processes. ¶¶42-44. Several months later, the CFPB and OCC found that the Bank had continued to operate in a "reckless, unsafe or unsound" manner that violated federal banking and lending laws and imposed two additional coordinated consent orders and fined the Bank over $1 billion for its continued failure to correct its risk management and oversight. ¶59. Not only was the OCC and CFPB's $1 billion fine historic, the Federal Reserve backed its consent order with an unprecedented "asset cap" that prohibited the Bank from growing its assets until it satisfied the Federal Reserve's requirements—a punishment that market commentators referred to as the "'Fear of God' Penalty." ¶58.

By the beginning of the Class Period, Wells Fargo's ability to satisfy the requirements

---

[3] The Complaint alleged a class period from February 2, 2018 through March 12, 2020 (¶270), but at this time Lead Plaintiffs seek certification of a class of investors from May 30, 2018 through March 12, 2020, in accordance with the Court's ruling on the motion to dismiss. *See In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *12-13 (S.D.N.Y. Sept. 30, 2021).

imposed by the Consent Orders was the single most pressing concern for the Bank's investors. As described in a February 4, 2018 *Bloomberg* report, Wells Fargo's compliance was imperative, as the Bank had "no other choice if it wants to escape the regulator's wrath." ¶45. And Defendant Duke admitted in an internal February 19, 2018 email that Wells Fargo's "credibility and perhaps even viability as a company is dependent on successfully exiting these consent orders." ¶66.

To do so, the Consent Orders required Wells Fargo to remedy its compliance deficiencies in three distinct stages. In Stage 1, the Bank was required to submit a compliant plan to the Regulators; in Stage 2, the Bank would implement the plans after they had been approved by the Regulators; in Stage 3, the Bank was required to validate that the approved plans were effectively implemented and provide that assessment to the Regulators. ¶¶48-51, 60-65.

During the Class Period, Defendants made repeated false positive statements and omitted to disclose critical information to investors about the Bank's compliance with the Consent Orders. For example, the Bank told investors it had the required "plans in place" and was "executing" and "implementing" those plans under the Consent Orders. *See* ¶¶149, 152, 157, 163, 167, 178, 182, 198, 208. In doing so, Defendants conveyed to investors that the Bank had successfully completed Stage 1 and had entered Stage 2. For instance, on June 13, 2018, when asked "what's left to do for the consent order," Defendant Shrewsberry stated, "It's the last mile of knitting all of this together." ¶¶78, 149-50; *see also In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *13-14 (holding Plaintiffs alleged there was "no basis" for this statement). Similarly, on January 15, 2019, Defendant Sloan told investors, "[W]e're in complete agreement with the Fed about what needs to be done, and we're in the midst of implementing that." ¶¶86, 167; *see also In re Wells Fargo*, 2021 WL 4482102, at *18 (holding Plaintiffs alleged "there was no basis for [Sloan's] claim that the Bank knew what needed to be done and was implementing it").

Defendants also falsely touted the Bank's purported transparency regarding the status of its compliance with the 2018 Consent Orders. For instance, on May 30, 2018, when asked "where you are" under the Federal Reserve's Consent Order, Defendant Shrewsberry stated, "our investors know everything that's material that we know." ¶¶76, 146; *see also In re Wells Fargo*, 2021 WL 4482102, at \*13 (holding that this statement was actionable because Shrewsberry "promised investors that they knew all material information, which was false").

Finally, Defendants repeatedly falsely claimed that, in light of the Bank's progress, the asset cap would be lifted on an expected timeframe and in the near term. For instance, Defendants stated there was "no change in the update from Investor Day" with respect to the asset cap and "our expectation is that [it will be lifted] sometime in the first half of next year." ¶79; *see also In re Wells Fargo*, 2021 WL 4482102, at \*14.

In reality, and in direct conflict with Defendants' positive statements, the Regulators rebuked and repeatedly rejected Wells Fargo's proposed plans to satisfy the 2018 Consent Orders. *See* ¶¶69-72, 75, 80-84, 87, 89, 93-94, 105, 116. For example, on April 3, 2018, the Federal Reserve told Defendant Duke that the Bank's Stage 1 Plan was deficient and "missing major components such as plans to address the company's deficiencies in operational and compliance risk management." ¶70. On May 7, 2018, in a letter to Defendants Sloan and Duke, the Federal Reserve wrote that the Bank's submission was so "materially incomplete" and "insufficient" that it "cannot be evaluated by [Federal Reserve] staff for [its] adequacy" and rejected the Bank's proposed Stage 1 Plan. ¶71.

Similarly, on July 24, 2018, the OCC rejected the Bank's proposed Stage 1 Plan, writing to the Bank's top executives that "[d]espite the OCC including detailed requirements and expectations . . . the bank's submission response lacks substance and detail in a number of areas."

¶80. The Bank admitted to the OCC that it knew that the proposed Stage 1 Plan was only a "work in progress" and a "plan for a plan." ¶83. The OCC again formally rejected the Bank's proposed Stage 1 Plan on November 21, 2018 (*see* ¶87) and, on March 11, 2019, the Federal Reserve again rejected the Bank's proposed Stage 1 Plan as "materially incomplete" and suffering from "pervasive inaccuracies." ¶93.

The next day, March 12, 2019, Defendant Sloan testified before the HFSC regarding the Bank's progress under the 2018 Consent Orders. ¶92. Defendant Sloan testified that the Bank was "executing [its] plan[s]," was "in compliance with th[e] plans," and had "plans in place" for the 2018 Consent Orders while omitting that, the day before, the Federal Reserve formally rejected the Bank's Stage 1 Plan. ¶¶92-95. Shortly after that testimony, Sloan personally—but unbeknownst to investors—"called the Federal Reserve to apologize for his mischaracterizations in his statements during the hearings and to the media." ¶96. In addition, just one day after Sloan's testimony, the OCC staff concluded that Sloan's testimony was false. ¶98.

The truth was revealed over a series of disclosures starting on January 15, 2019. On that day, Defendants announced that the asset cap imposed by the Federal Reserve was likely to remain "through the end of 2019"—more than a year longer than originally represented. ¶¶238-39. Then, on April 12, 2019, Defendants disclosed that it would not meet the Federal Reserve's requirements and so the asset cap would not be lifted by the end of 2019. ¶¶244-45. And on January 14, 2020, Scharf admitted that the Bank still had a "great deal" of work to do to comply with the Consent Orders, and conceded that "we made some terrible mistakes and have not effectively addressed our shortcomings." ¶¶251-55.

On March 4 and 5, 2020, the HFSC issued scathing reports detailing how much work Wells Fargo had left in the regulatory process, the Bank's chronic failure to submit compliant Stage 1

Plans to its Regulators, and the Regulators' repeated warnings of future enforcement actions due to the Bank's ongoing non-compliance. ¶258. On March 10, 2020, Chairwoman Waters published a letter requesting that the DOJ investigate Defendant Sloan for knowingly providing false and misleading statements during his March 12, 2019 public testimony that the Bank was in compliance with the Consent Orders. ¶259.

Finally, on March 10 and March 11, 2020, Scharf, Defendant Duke, and Director James Quigley testified before Congress in public sessions closely watched by investors and analysts. During those sessions, Defendant Duke revealed for the first time that the Bank's extensions and missed deadlines for the Stage 1 Plan submissions had raised "concerns for the Board" and were a "red flag." ¶260. In addition, Defendant Duke admitted that vast portions of the Stage 1 Plan for the Federal Reserve Consent Order were "currently under resubmission." *Id.* In light of the new information disclosed as part of the Congressional hearings, analysts reviewed their ratings of Wells Fargo, concluding that "extremely harsh" questioning by legislators revealed that the Bank was "still trying to submit plans for how it will resolve some of the consent orders." ¶261.

### III.    PROCEDURAL HISTORY

On August 29, 2020, the Court appointed Plaintiffs Handelsbanken, Mississippi PERS, Rhode Island and Louisiana Sheriffs as Lead Plaintiffs, and Bernstein Litowitz and Cohen Milstein as Lead Counsel for the Class. *See* ECF No. 59. Since their appointment, Lead Plaintiffs have vigorously prosecuted this action, including filing a detailed amended complaint and successfully opposing in significant part Defendants' motion to dismiss. *See, e.g.*, Exs. B-E. The Court's 61-page Opinion and Order largely denied Defendants' motion to dismiss, rejecting their class-wide arguments that they purportedly made no actionable misstatements or omissions, did not act with scienter, were unable to disclose the truth to investors because of a purported confidential

supervisory information privilege, and were not liable under Section 20(a) of the Exchange Act. *See* ECF No. 89.

Since that time, Lead Plaintiffs have pursued discovery, including serving and responding to extensive discovery requests. To date, Lead Plaintiffs have obtained over 200,000 pages of documents from Defendants or third parties, primarily consisting of documents previously produced by the Bank to the HFSC. Defendants have withheld another 70,000 responsive documents that they claim may contain confidential supervisory information ("CSI") and so are exempt from disclosure under the bank examination privilege. Lead Plaintiffs have made multiple outstanding requests to the Regulators seeking authorization to obtain these voluminous withheld materials.

The limited document discovery obtained to date has corroborated Lead Plaintiffs' core allegations. For example, discovery has shown that Defendants met regularly with the Regulators who told the Bank it was not making sufficient progress towards even submitting compliant Stage 1 Plans, let alone getting those Plans approved. For instance, █████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ Ex. I.



Ex. J.

Ex. K.

Ex. L.  And on March 4, 2019, the OCC issued a quarterly report heavily criticizing the Bank's "unacceptable" progress to date, labeling the Bank's management and Board oversight as "inadequate," and noting that "the vast majority of progress appears to come after repeated pressure by regulators, calling out missed deadlines, failed validations, and poor-quality action plans."  HFSC Rpt. at 42.

Ex. M.

Lead Plaintiffs now move for class certification under Rule 23.  ECF No. 143.

## IV.   ARGUMENT

The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007).  "The Second Circuit requires a liberal, rather than restrictive, interpretation of Rule 23,"

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2017 WL 3608298, at *2 (S.D.N.Y. Aug. 22, 2017), and courts in this district recognize that "securities fraud suit[s]" are "particularly well suited to class treatment," *Allergan*, 2021 WL 4077942, at *1; *see also In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 486 (S.D.N.Y. 2002).

To obtain class certification, parties must satisfy Federal Rule of Civil Procedure 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3). *See In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *7 (S.D.N.Y. July 10, 2019). As the Supreme Court has explained, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage"; the question is whether the Rule 23 requirements are met, not whether Plaintiffs will ultimately prevail. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013). Each Rule 23 requirement is satisfied here.

## A.    The Proposed Class Satisfies Rule 23(a)

### 1.    Numerosity Is Established

In the Second Circuit, Rule 23(a)(1)'s numerosity requirement is presumed for classes larger than 40 members and, in securities fraud class actions, shown where there are a large number of shares outstanding and traded during the relevant period. *See Allergan*, 2021 WL 4077942, at *6; *Signet*, 2019 WL 3001084, at *8. Here, Wells Fargo traded on the national NYSE, had more than 4.5 billion shares of common stock issued and outstanding during the Class Period, and had an average of 103.8 million shares traded weekly. *See* Ex. A (Hartzmark Rep.) ¶23. Accordingly, the numerosity requirement is readily satisfied.

### 2.    Commonality Is Established

Commonality exists when "common issues of law or fact affect all class members." *Signet*, 2019 WL 3001084, at *8. Courts in this District hold that, in securities cases, commonality is satisfied where "plaintiffs allege that class members have been injured by similar material

- 12 -

misrepresentations and omissions." *Allergan*, 2021 WL 4077942, at \*6; *see also In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 276 (S.D.N.Y. 2008) (same).

The common questions of law and fact in this case are numerous and include: (i) whether Defendants' statements (including that they were "executing" on the Consent Orders, were being transparent about their compliance, and the asset cap would be timely lifted) were materially false and misleading when made; (ii) whether Defendants omitted material information regarding the status of the Bank's compliance; (iii) whether Defendants acted with scienter; (iv) whether the price of Wells Fargo's common stock was artificially inflated during the Class Period due to these alleged misstatements; (v) whether Defendants' misrepresentations and omissions caused Class members to suffer economic losses when the truth was revealed; and (vii) whether Defendants Sloan, Shrewsberry, Parker, and Duke controlled Wells Fargo during the Class Period.

Courts routinely certify classes in securities fraud cases involving such common questions. *See Purple Mountain*, 2022 WL 3357835, at \*3 (finding commonality satisfied in case against Wells Fargo involving similar questions as those here); *Signet*, 2019 WL 3001084, at \*8 ("This case—as is typical of most securities fraud putative class actions—raises common questions of law and fact."); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 103 (S.D.N.Y. 2016) (commonality satisfied due to class-wide questions of falsity, materiality, and damages).

### 3.    Typicality Is Established

The typicality requirement "is satisfied when each class member's claim arises from the same course of events" and "each class member makes similar legal arguments to prove the defendant's liability." *See Barrick Gold*, 314 F.R.D. at 98. The typicality requirement does not require the plaintiff's claims to be identical; rather, the plaintiff must show the claims are "'so interrelated that the interests of the class members will be fairly and adequately protected in their absence,' and that the claims of the potential class members 'share a common question of law or

of fact.'" *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 176 (S.D.N.Y. 2008).

Here, Lead Plaintiffs' claims arise from the same alleged course of conduct that gives rise to claims of other Class members, are based on the same legal theory, and will be proven by the same set of operative facts. As such, the typicality requirement is satisfied. *See Purple Mountain*, 2022 WL 3357835, at *2; *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act ("ERISA") Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012).

### 4.    Adequacy Is Established

To satisfy the adequacy requirement, the proposed class representative must "fairly and adequately protect the interests of the class." *Signet*, 2019 WL 3001084, at *9. The adequacy requirement "seeks to ensure that Plaintiff's interests are not antagonistic to those of the Class and that Plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Id.* "The focus is on uncovering 'conflicts of interest between named parties and the class they seek to represent.' In order to defeat a motion for certification, however, the conflict 'must be fundamental.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). Lead Plaintiffs satisfy each factor of the adequacy inquiry.

*First*, Lead Plaintiffs "suffer[ed] the same injury as the class members" as a result of Defendants' material misrepresentations and omissions and thus "possess the same interest" in obtaining the best possible recovery. *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003). Like all Class members, Lead Plaintiffs purchased Wells Fargo stock during the Class Period and were subjected to the same fraudulent conduct. No conflicts exist between Lead Plaintiffs and the Class. *See Purple Mountain*, 2022 WL 3357835, at *2.

*Second*, Lead Plaintiffs have vigorously prosecuted this Action on behalf of the Class and will continue doing so. Lead Plaintiffs fully understand their duties and responsibilities as class representatives. *See* Ex. B at ¶5; Ex. C at ¶5; Ex. D at ¶5; and Ex. E at ¶5. Lead Plaintiffs have

demonstrated their commitment to lead this Action for the Class, including by, *inter alia*, retaining and overseeing experienced counsel; filing a detailed amended complaint; successfully opposing in substantial part Defendants' motion to dismiss; propounding and responding to discovery requests and interrogatories; and filing the instant motion for class certification. *Id.* ¶4. Lead Plaintiffs will continue to actively participate in and supervise the litigation through trial. *Id.* ¶5. As such, Lead Plaintiffs more than fulfill the adequacy requirement. *See Lapin*, 254 F.R.D. at 176.

Moreover, Lead Plaintiffs are each experienced institutional investors—precisely the type of plaintiffs favored by Congress to lead securities class actions under the PSLRA. *See In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 113 (E.D.N.Y. 2012) ("[M]any courts have demonstrated a clear preference for institutional investors to be appointed as lead plaintiffs."); H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733 ("Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake.").

***Third***, Lead Counsel Bernstein Litowitz and Cohen Milstein have extensive experience and success in prosecuting securities litigation. *See* Exs. F and G. Lead Counsel has a proven track record of success in complex cases such as this one, and has successfully prosecuted high-profile securities fraud class actions, including in this District, recovering billions of dollars on behalf of injured investors across the country. *See id.* Consistent with its track record, Lead Counsel has vigorously prosecuted the Class's claims to date. *See* Joint Decl. ¶13.

### 5.    Ascertainability Is Established

In addition to Rule 23(a)'s requirements, the Second Circuit "also recognizes an implicit 'ascertainability' requirement, which commands that the proposed class be 'defined using objective criteria that establish a membership with definite boundaries.'" *Martinek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *3 (S.D.N.Y. Feb. 3, 2022). This requirement is readily met

in securities class actions like this one, where class "membership is based on objective, definite criteria—namely the dates of shareholders' acquisition of [defendant's] common stock." *Barrick Gold*, 314 F.R.D. at 104; *see also Signet*, 2019 WL 3001084, at \*9 (class definition "clearly delineates the Class's boundaries").

**B.      The Proposed Class Satisfies Rule 23(b)(3)**

In addition to meeting the requirements of Rule 23(a), the proposed Class also satisfies Rule 23(b)(3), which requires that (i) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (ii) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Allergan*, 2021 WL 4077942, at \*8. This inquiry tests whether the class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc., v. Windsor*, 521 U.S. 591, 623 (1997).

**1.      Common Questions of Law and Fact Predominate Over Individual Issues**

The Supreme Court has recognized that "[p]redominance is a test readily met" in securities fraud cases like this one. *Id.* at 625; *see also WorldCom*, 219 F.R.D. at 288 (same); *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 90 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (same). Numerous common questions of law and fact predominate over any individual questions here.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*"). To establish a violation of Section 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen*, 568 U.S. at 460-61.

The Supreme Court has held that issues of "falsity," "materiality," and "loss causation" all raise common questions of law and fact under the facts here, and, accordingly, support class certification. *Id.* at 461-62, 474-75; *Halliburton I*, 563 U.S. at 811-12; *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 215 (S.D.N.Y. 2021). Additionally, the element of "reliance" also raises "common questions" in this case and supports class certification because a presumption of reliance is warranted under the *Basic* fraud-on-the-market theory and under *Affiliated Ute*'s presumption of reliance for omissions of material fact. *See Purple Mountain*, 2022 WL 3357835, at *4-6 (finding predominance satisfied).

### a.     The Fraud-On-The-Market Presumption Applies

As in most securities class actions involving securities traded on a national exchange, the "fraud-on-the-market" presumption of reliance applies here. *See Basic*, 485 U.S. at 224. That presumption is based on the well-founded principle, adopted by the Supreme Court, that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*"). When this "fraud-on-the-market" presumption applies, investors do not need to demonstrate individual reliance. *Halliburton I*, 563 U.S. at 811; *see also Barrick Gold*, 314 F.R.D. at 101 (presumption "obviate[s] the need to prove reliance on an individual basis").

In this case, all of the relevant factors demonstrate that the market for Wells Fargo common stock was efficient. *See also Purple Mountain*, 2022 WL 3357835 at *3 (finding that the market for Wells Fargo common stock was efficient). First, courts consider whether the security at issue trades on a major national exchange—and here, Wells Fargo common stock actively traded on

NYSE, a presumptively efficient market.  *See Halliburton II*, 573 U.S. at 268 ("[T]he market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *15 (S.D.N.Y. Aug. 13, 2018) (NYSE "presumptively efficient").

Next, courts consider the five so-called "*Cammer* factors": (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration Form S-3; and (5) stock price reaction to unexpected, material disclosures.  *See Allergan*, 2021 WL 4077942, at *9-10 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989)).  Finally, courts often consider the so-called "*Krogman* factors," which include: (1) the company's market capitalization; (2) the float for the company's stock; and (3) the bid-ask spread for stock sales.  *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001).

Here, Dr. Hartzmark—a well-recognized economist who has been repeatedly credited as an expert on issues of market efficiency—conducted a thorough analysis of the market for Wells Fargo common stock.[4]  Dr. Hartzmark determined that each of the *Cammer* and *Krogman* factors supports a finding of market efficiency, and his analysis demonstrates without question that Wells Fargo stock traded in an open, well-developed, and efficient market during the Class Period.

**High Weekly Trading Volume (*Cammer* Factor 1)**: Courts hold that weekly turnover—measured by average weekly trading—of greater than 1% justifies a "substantial presumption" of

---

[4] Dr. Hartzmark is the President of Hartzmark Economics Litigation Practice, LLC and previously was a Principal and Director at Navigant Economics (formerly dba Chicago Partners, LLC, a subsidiary of Navigant Consulting, Inc.).  He has served as a testifying expert in numerous securities class actions and has published scholarly articles on many issues in financial economics, including those associated with securities class actions and market efficiency.  His expert reports, which included the topics of market efficiency and common damages methodology, have been cited with approval by courts in this District and across the country.  *See* Hartzmark Rep. ¶¶4-9.

market efficiency. *Cammer*, 711 F. Supp. at 1286. Here, an average of 2.3% of Wells Fargo's shares outstanding—i.e., approximately 103.8 million shares—traded each week. Hartzmark Rep. ¶23. Thus, Wells Fargo's weekly trading volume justifies a "substantial presumption" of market efficiency. *Cammer*, 711 F. Supp. at 1286; *see also Purple Mountain*, 2022 WL 3357835, at \*4 (finding "a good evidentiary basis" for *Cammer* factor 1 where average weekly trading volume of Wells Fargo common stock during the class period was 2% of total share); *In re Glob. Brokerage, Inc.*, 2021 WL 1160056, at \*12 (S.D.N.Y. Mar. 18, 2021) (holding that an "average weekly trading volume of 1% justifies a 'substantial presumption'" of efficiency).

**Significant Analyst Coverage (*Cammer* Factor 2)**: Courts hold that analyst coverage supports market efficiency because when a company's financial disclosures are "closely reviewed by investment professionals" who "make buy/sell recommendations to client investors," the market price fluctuations reflect the financial disclosures "as interpreted by the securities analysts." *Cammer*, 711 F. Supp. at 1286. Here, securities analysts employed by at least 45 firms—including Barclays, Credit Suisse, Deutsche Bank, and JPMorgan—published 812 analyst reports on Wells Fargo securities during the Class Period, further demonstrating efficiency. Hartzmark Rep. ¶27; *see also Cammer*, 711 F. Supp. at 1284, n.30 (finding 15 reports sufficient); *see also Purple Mountain*, 2022 WL 3357835, at \*4 (finding the 250 analyst reports on Wells Fargo sufficient); *Allergan*, 2021 WL 4077942, at \*10 (finding 29 analysts sufficient).

**Substantial Market Maker/Arbitrage Activity (*Cammer* Factor 3)**: Courts find that the existence of market makers supports market efficiency. Numerous market makers ensure that investors "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87; *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (same). During the Class Period, the

- 19 -

NYSE assigned a Designated Market Maker to Wells Fargo common stock, there were 3,116 institutions that filed SEC Form 13F and other documents disclosing the combined sizes of their beneficial and non-beneficial ownership positions of Wells Fargo common stock, and short interest in Wells Fargo common stock ranged from .4% to 1.1% of the public float.  Hartzmark Rep. ¶¶33-39.  This supports the conclusion that investors were able to, and did, "react swiftly" to public information by trading in Wells Fargo stock, driving price changes.  *Cammer*, 711 F. Supp. at 1286-87; *see also Purple Mountain*, 2022 WL 3357835, at *4.

**S-3 Registration Eligibility (*Cammer* Factor 4)**: Courts find that a corporation's eligibility to use SEC Form S-3 "is an important factor weighing in favor" of efficiency, as it reflects the SEC's belief that the market operates efficiently for eligible companies, i.e., all public information "has already been disseminated and accounted for by the market place."  *Cammer*, 711 F. Supp. at 1284-85; *In re Teva Sec. Litig.*, 2021 WL 872156, at *8 (D. Conn. Mar. 9, 2021) (same).  Throughout the Class Period, Wells Fargo easily met the float requirement to file a Form S-3—indeed, the Company's float averaged more than 3,000 times the size required for S-3 registration.  Hartzmark Rep. ¶41.  Moreover, Wells Fargo filed automatic shelf registration on Forms S-3, S-3/A or S-3ASR during the Class Period on January 29, 2020 and February 12, 2020. *Id.*  Accordingly, Wells Fargo was Form S-3 eligible throughout the Class Period, which supports market efficiency.  *See Purple Mountain*, 2022 WL 3357835, at *4.

**Reaction of Stock to New Company-Specific Information (*Cammer* Factor 5)**: "[O]ne of the most convincing ways to demonstrate [market] efficiency [is] to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price."  *Cammer*, 711 F. Supp. at 1291.  Courts have held that an event study that "correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations

in price has been considered *prima facie* evidence of the existence of such a causal relationship." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008). Here, the event study by Plaintiffs' expert provides compelling evidence of this causal relationship by examining Wells Fargo common stock price reactions following "news dates"— dates with earnings or guidance announcements—as compared to all other dates in the Class Period, which strongly indicates that Wells Fargo common stock traded in an efficient market. Hartzmark Rep. ¶¶59-70; *see Purple Mountain*, 2022 WL 3357835, at *4 (finding a cause-and-effect relationship between Wells Fargo news days and movement in the stock price).

**Market Capitalization (*Krogman* Factor 1)**: Higher market capitalization is also indicative of market efficiency because "there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. Wells Fargo's market at the start of the Class Period was $264.3 billion, and throughout the Class Period averaged approximately $227.6 billion—placing it above the 95th percentile of NYSE and NASDAQ traded companies. Hartzmark Rep. ¶¶45-46. This supports a finding of market efficiency. *Id.*; *see also Purple Mountain*, 2022 WL 3357835, at *4 (finding *Krogman* factor 1 satisfied for Wells Fargo); *Allergan*, 2021 WL 4077942, at *10 (market capitalization of $46 to $86 billion); *Martinek*, 2022 WL 326320, at *13 (average market capitalization of $2.71 billion).

**Large Public Float (*Krogman* Factor 2)**: Courts also consider the size of an issuer's float (i.e., shares outstanding not held by insiders) in assessing efficiency. "[A] large public float … may indicate market efficiency '[b]ecause insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security.'" *Wilson*, 2018 WL 3913115, at *15. Over the Class Period, on average, insiders held 0.1% of the shares outstanding, meaning

- 21 -

99.9% of the float was public during the Class Period, which satisfies *Krogman* Factor 2. Hartzmark Rep. ¶48; *see also Purple Mountain*, 2022 WL 3357835, at *4; *Teva*, 2021 WL 872156, at *15 (float of over 98.5% "far higher than other courts have held sufficient").

**Small Bid-Ask Spread (*Krogman* Factor 3)**: "A narrow bid-ask spread is indicative of higher trading volume and courts consider it as a factor for determining market efficiency." *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *13 (S.D. Tex. Nov. 13, 2019); *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 317 (S.D.N.Y. 2016) ("The markets for companies with higher market capitalizations and shares with a smaller bid-ask spread are more likely to be efficient."). During the Class Period, the daily bid-ask spread for Wells Fargo stock averaged only 0.02%, or typically $0.01 per share, which Dr. Hartzmark explains "would have placed [Wells Fargo] below the 25th percentile of NYSE and NASDAQ traded companies." Hartzmark Rep. ¶¶50-51. This low bid-ask spread supports a finding of market efficiency. *Id.*; *see also Purple Mountain*, 2022 WL 3357835, at *4; *Martinek*, 2022 WL 326320, at *14.

*Absence of Autocorrelation*: In addition to the factors above, courts have sometimes considered whether a security's prices exhibit autocorrelation, which is when a security's historical price changes can predict future price changes. *Villella v. Chem. and Mining Co. of Chile Inc.*, 333 F.R.D. 39, 54-55 (S.D.N.Y. 2019). Statistically significant autocorrelation "can be an indicator of market inefficiency." *Id.* at 55. There was no persistent and systemic autocorrelation for Wells Fargo, further supporting a finding of market efficiency. Hartzmark Rep. ¶¶71-75.

In sum, the market for Wells Fargo shares was efficient throughout the Class Period. As a result, Lead Plaintiffs are entitled to the "fraud-on-the-market" presumption of reliance.

### b.    The *Affiliated Ute* Presumption of Reliance Also Applies

Lead Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute*, which provides that for claims involving a failure to disclose, "positive proof of reliance is not a

prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153-54.  Instead, the presumption "applies 'where a plaintiff's fraud claims are based on omissions' and the 'plaintiff shows that defendants had an obligation to disclose the information and the information withheld is material.'"  *AMC Ent.*, 338 F.R.D. at 216.  Plaintiffs allege that throughout the Class Period, Defendants' public statements omitted numerous material facts, including, among other things, that the Regulators rejected the Bank's proposed plans, identified significant deficiencies in the Bank's compliance programs, warned that further enforcement action may be warranted, and that the asset cap would not be timely lifted.  The Court upheld these allegations.  *See, e.g., In re Wells Fargo*, 2021 WL 4482102, at \*14, 15, 20, 24, 25.  Thus, the Class is also entitled to rely on the *Affiliated Ute* presumption.

### c.    Damages Will Be Calculated Using a Common Methodology That Is Consistent with the Class-wide Theory of Liability

Courts in this Circuit and elsewhere routinely find that determining damages is subject to a common methodology in securities cases because damages can be calculated on a class-wide basis using an event study that measures investors' out-of-pocket damages.  *See Allergan*, 2021 WL 4077942, at \*15 ("there is 'no reason why an event study – the generally accepted method for measuring damages in a securities fraud class action – cannot work in this case'"); *Signet*, 2019 WL 3001084, at \*20 (accepting Dr. Hartzmark's damages model and event study).

As Dr. Hartzmark explains, a common methodology may be used to determine damages traceable to Defendants' misrepresentations and omissions using the standard event study and "out-of-pocket" methodology.  Hartzmark Rep. ¶¶79-91.  Here, damages will be measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale—the same methodology employed in nearly every securities fraud class action, and has been widely endorsed by courts in this District and throughout the Second Circuit.

*See, e.g.*, *Allergan*, 2021 WL 4077942, at *15; *Barrick Gold*, 314 F.R.D. at 103; *see also Purple Mountain*, 2022 WL 3357835 at *5-6. Accordingly, common questions of law or fact predominate, and the first prong of Rule 23(b)(3) is satisfied.

### 2. A Class Action Is Superior to Other Available Methods for Resolving This Controversy

Rule 23(b)(3) also asks whether class resolution will be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Courts have long recognized that class actions are a desirable means for resolving claims based on securities laws," and find superiority is easily established. *Allergan*, 2021 WL 4077942, at *17.

Each of the factors courts consider in assessing superiority are satisfied here. *First*, the number of Class members—in the tens-of-thousands—is far too numerous, and the typical claim is generally too small, for each individual Class member to have an interest in maintaining a separate action. *Second*, Lead Plaintiffs are aware of no other action that seeks recovery under the federal securities laws for damages caused by Defendants' alleged fraud. *Third*, the international geographical dispersion of the Class members makes it desirable to litigate Lead Plaintiffs' claims in this forum. *Finally*, there are no management difficulties that would preclude this Action from being maintained as a class action. *See Allergan*, 2021 WL 4077942, at *16; *Purple Mountain*, 2022 WL 3357835, at *6 (finding superiority established in a case against Wells Fargo).

### C. Lead Counsel Should Be Appointed Class Counsel

Lead Plaintiffs also respectfully request that the Court appoint Lead Counsel as Class Counsel. In appointing Class Counsel, Rule 23(g) provides that the Court consider: (i) the work counsel has done; (ii) counsel's experience in handling, among other things, class actions and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Lead Counsel amply satisfies the Rule 23(g) criteria.  Under Lead Plaintiffs' supervision and direction, Lead Counsel has vigorously prosecuted this case, including by, among things: analyzing, researching and investigating the securities law claims here; drafting a detailed complaint; successfully opposing Defendants' motion to dismiss; conducting ongoing fact discovery; retaining and consulting with experts in economics, damages and banking operations; and assembling a dedicated and highly-skilled team to prosecute the Action.  *See* Joint Decl. ¶13. Lead Counsel has significant experience prosecuting complex securities class actions, deep knowledge of the applicable securities laws, and an exemplary record of success.  *See* Exs. F, G. Indeed, Bernstein Litowitz and Cohen Milstein have recovered billions of dollars for investors in courts in this District, and are well equipped to prosecute investors' claims in this case.  *See* Joint Decl. ¶¶11-12.[5]

## V.    **CONCLUSION**

For the foregoing reasons, Lead Plaintiffs request entry of an Order certifying this Action as a class action pursuant to Federal Rule of Civil Procedure 23; appointing Lead Plaintiffs as the Class Representatives; and approving Bernstein Litowitz and Cohen Milstein as Class Counsel.

---

[5] *See, e.g.*, *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 147 (S.D.N.Y. 2019) ("In light of Bernstein Litowitz's substantial resources and experience in litigating securities class actions, and the conduct of the litigation to date, the Court concludes that Bernstein Litowitz satisfies Rule 23(g)."); *In re Dynex Cap., Inc. Sec. Litig.*, 2011 WL 781215, at *9 (S.D.N.Y. Mar. 7, 2011) ("Cohen, Milstein, Sellers & Toll, PLLC has the experience, knowledge, commitment and record of work on this case to merit appointment as Class Counsel.").

Dated: October 3, 2022

Respectfully submitted,

/s/ Steven J. Toll

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll* (admitted *pro hac vice*)
S. Douglas Bunch
Molly J. Bowen (admitted *pro hac vice*)
1100 New York Avenue, N.W., Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com
mbowen@cohenmilstein.com

Laura H. Posner
88 Pine Street, Fourteenth Floor
New York, NY 10005
Telephone: (212) 220-2925
Facsimile: (212) 838-7745
lposner@cohenmilstein.com

*Counsel for Lead Plaintiffs Public Employees' Retirement System of Mississippi, State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island, and Lead Counsel for the Class*

/s/ John C. Browne

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
John C. Browne
Jeroen van Kwawegen
Michael D. Blatchley
Benjamin W. Horowitz (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
johnb@blbglaw.com
jeroen@blbglaw.com
michaelb@blbglaw.com
will.horowitz@blbglaw.com

Jonathan D. Uslaner
Lauren M. Cruz (admitted *pro hac vice*)
2121 Avenue of the Stars
Los Angeles, California 90067
Tel: (310) 819-3470
jonathanu@blbglaw.com
lauren.cruz@blbglaw.com

*Counsel for Lead Plaintiffs Handelsbanken Fonder AB and Louisiana Sheriffs' Pension & Relief Fund, and Lead Counsel for the Class*

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**
Robert D. Klausner (admitted *pro hac vice*)
7080 NW 4th Street
Plantation, Florida 33317
Tel: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Louisiana Sheriffs' Pension & Relief Fund*

*All electronic signatures ("/s/") are signed with consent of counsel pursuant to Rule 8.5 of this Court's Electronic Case Filing Rules & Instructions, as of May 2, 2022.