UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY SECURITIES LITIGATION | No. 20 Civ. 4494 (GHW) (SN) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .........................................................................................................................3

      A.      The Consent Orders and Alleged Misstatements.......................................................3

      B.      The Alleged Corrective Disclosures and the Onset of the COVID
              Pandemic.................................................................................................................4

      C.      Plaintiffs' Reliance on a Generic Event Study and a Highly Generalized
              Damages Methodology in Moving for Class Certification......................................7

ARGUMENT................................................................................................................................8

I.      Plaintiffs Have Failed to Satisfy the Requirements for Invoking a Presumption of
      Classwide Reliance ...............................................................................................................9

      A.      Plaintiffs Cannot Rely on the Fraud-on-the-Market Presumption of
              Reliance During the COVID Period ........................................................................9

              1.      Plaintiffs' Event Study Model Is Generic and Does Not Account
                     for the Market Disruptions Caused by the COVID Pandemic and
                       Lockdown ....................................................................................................11

              2.      The Results of Plaintiffs' Event Study Indicate a Failure to
                       Account Properly for the Increased Volatility of the COVID Period........13

               3.      Plaintiffs' Theory That the Price Decline on March 12, 2020 Was
                       Caused by Information from the Prior Day Is Inconsistent with an
                       Efficient Market...........................................................................................15

      B.      Plaintiffs Cannot Avoid the Burden of Proving Market Efficiency During
               the COVID Period by Relying on the *Affiliated Ute* Presumption for Cases
               Primarily Involving Omissions................................................................................16

II.      Plaintiffs Have Not Presented a Methodology Capable of Measuring Damages on
      a Classwide Basis Consistent with Their Theory of Liability ...........................................17

      A.      Plaintiffs Provide No Damages Methodology for Addressing the
               Dramatically Increased Volatility During the COVID Period...............................18

      B.      Plaintiffs Provide No Damages Methodology That Can Account for Public
               Information Released Before the Alleged Corrective Disclosures and for
               Confounding Information Released on the Same Days as Those
               Disclosures............................................................................................................19

C.       Plaintiffs Provide No Damages Methodology Capable of Scaling Price Drops to Earlier Alleged Misrepresentations..........................................................20

III.    Lead Plaintiffs' Claims Are Subject to Unique Arguments and Defenses, Rendering Them Atypical of Those of the Proposed Class.................................................................21

CONCLUSION..................................................................................................................................25

# TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Affiliated Ute Citizens of Utah* v. *United States*,
   406 U.S. 128 (1972) ........................................................................................................16

*Amchem Prods., Inc.* v. *Windsor*,
   521 U.S. 591 (1997) ..........................................................................................................8

*Baffa* v. *Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000) ........................................................................................22, 23

*BlackRock Balanced Cap. Portfolio (FI)* v. *Deutsche Bank Nat'l Tr. Co.*,
   2018 WL 5619957 (S.D.N.Y. Aug. 7, 2018) ...................................................................17

*Blank* v. *Jacob*,
   2009 WL 3233037 (E.D.N.Y. Sep. 30, 2009) ..................................................................22

*Cammer* v. *Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ..................................................................................9, 10

*Comcast Corp.* v. *Behrend*,
   569 U.S. 27 (2013) .......................................................................................................8, 17

*In re Countrywide Fin. Corp. Sec. Litig.*,
   273 F.R.D. 586 (C.D. Cal. 2009) .....................................................................................10

*In re Freddie Mac Sec. Litig.*,
   281 F.R.D. 174 (S.D.N.Y. 2012) .....................................................................................10

*GAMCO Invs., Inc.* v. *Vivendi, S.A.*,
   927 F. Supp. 2d 88 (S.D.N.Y. 2013) ...............................................................................22

*George* v. *China Auto. Sys., Inc.*,
   2013 WL 3357170 (S.D.N.Y. July 3, 2013) ....................................................................23

*Gordon* v. *Sonar Cap. Mgmt. LLC*,
   92 F. Supp. 3d 193 (S.D.N.Y. 2015) ...............................................................................22

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ..........................................................................................................9

*IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*,
   2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ...................................................................9

*Krogman* v. *Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ..................................................................................9

*Menaldi* v. *Och-Ziff Cap. Mgmt.*,
328 F.R.D. 86 (S.D.N.Y. 2018) ...................................................................................16

*Meyer* v. *Greene*,
710 F.3d 1189 (11th Cir. 2013) ..................................................................................16

*Miller* v. *Thane Int'l, Inc.*,
615 F.3d 1095 (9th Cir. 2010) ....................................................................................10

*Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*,
2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ..........................................................18

*In re Petrobras Sec. Litig.*,
104 F. Supp. 3d 618 (S.D.N.Y. 2015).........................................................................22

*Pipefitters Local No. 636 Defined Ben. Plan* v. *Bank of Am. Corp.*,
275 F.R.D. 187 (S.D.N.Y. 2011) ................................................................................25

*Plymouth Cnty. Ret. Ass'n* v. *Innovative Tech., Inc.*,
2021 WL 4298191 (S.D.N.Y. Sept. 21, 2021).............................................................25

*In re PolyMedica Corp. Sec. Litig.*,
453 F. Supp. 2d 260 (D. Mass. 2006) .........................................................................10

*Purple Mountain Tr.* v. *Wells Fargo & Co.*,
2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) ...........................................................10

*Ret. Fund* v. *J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) ................................................................................18

*Rocco* v. *Nam Tai Elecs., Inc.*,
245 F.R.D. 131 (S.D.N.Y. 2007) ................................................................................22

*Schwab* v. *E\*TRADE Fin. Corp.*,
752 F. App'x 56 (2d Cir. 2018) ..................................................................................16

*Sicav* v. *Wang*,
2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ...............................................................18

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Bombardier, Inc.*,
546 F.3d 196 (2d Cir. 2008)........................................................................................10

*Waggoner* v. *Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)..............................................................................10, 16, 18

**RULES**

Fed. R. Civ. P. 23 ................................................................................................................8, 17, 22

Fed. R. Civ. P. 26 ............................................................................................................................13

Defendants Wells Fargo & Company ("Wells Fargo" or the "Company") and Timothy Sloan, John Shrewsberry, C. Allen Parker, and Elizabeth Duke respectfully submit this memorandum of law in opposition to Lead Plaintiffs' Motion for Class Certification.

## PRELIMINARY STATEMENT

Plaintiffs have failed to satisfy their burden of demonstrating through rigorous analysis that the requirements for class certification have been met because their motion ignores the facts that make this action unique. Plaintiffs and their expert, Dr. Michael Hartzmark, do not even mention that the largest declines in Wells Fargo's stock price supposedly caused by the alleged misstatements coincided with the unprecedented market disruptions caused by the COVID pandemic in March 2020. Nor do they even attempt to account for the extensive publicly available information that preceded the alleged corrective disclosures about Wells Fargo's progress in complying with three regulatory consent orders and the anticipated timeline for lifting the cap on Wells Fargo's assets. They also ignore the glut of confounding negative information that became public on the same dates as the alleged corrective disclosures, and they do not discuss Plaintiffs' own trading histories and individualized analyses of the relevant facts. These omissions are fatal to Plaintiffs' motion for class certification for three primary reasons.

*First*, to rely on the fraud-on-the-market presumption of reliance, Plaintiffs must show that Wells Fargo's stock traded in an efficient market during the entire proposed class period. In an attempt to satisfy that burden, Plaintiffs evaluate market efficiency during the onset of the COVID pandemic and lockdowns by comparing the performance of Wells Fargo's stock in late February and March 2020 with its performance during the 120-day period dating back to September 2019 and by using purported "news days" that occurred *before* the COVID period. Nothing in Plaintiffs' motion or their expert's report supports those flawed comparisons. To the contrary, as Defendants' expert demonstrates, the onset of the global pandemic in late February and March 2020 caused

significant increases in volatility and reductions in liquidity, resulting at times in the unprecedented use of market-wide "circuit breakers" to stop equities trading altogether. The pandemic and resulting lockdowns scrambled the entire market, including both industry and company trading patterns, as Plaintiffs and their investment managers recognized. Plaintiffs' motion fails even to mention this problem, and therefore fails to satisfy the prerequisites for class certification for the final part of the proposed class period. Nor can Plaintiffs evade the requirement of demonstrating market efficiency by citing an alternative presumption of reliance for cases primarily involving omissions. As Plaintiffs themselves recognize, this "action arises from Defendants' misstatements to investors" (Mot. 1), and *not* primarily from omissions.

*Second*, Plaintiffs must, but fail to, offer a methodology for measuring damages on a classwide basis that is consistent with their liability theory. Dr. Hartzmark presents only a highly generic methodology for measuring damages, assuring the Court that he will figure out how to actually apply this methodology to this case's unique facts at some point down the road. Even if courts have approved such a highly generalized approach in other securities actions, it is neither appropriate nor adequate here. This case involves numerous unique factors, including a dramatic break in the proposed class period (due to COVID), extensive public disclosures of information that revealed what Plaintiffs claim was the truth *before* the alleged corrective disclosures, the disclosure of extensive confounding information such as negative earnings on the same dates as the alleged corrective disclosures, and challenges in "scaling" later price drops to earlier times in the proposed class period. Plaintiffs and their expert again address none of these complications, instead improperly punting them to a later point in the case.

*Third*, the four Plaintiffs in this action are each subject to unique defenses and arguments. Three made significant purchases of Wells Fargo stock shortly *after* the alleged corrective

disclosures, including in March 2020.  Two delegated all trading authority to investment managers that came to their own long-term views of what they considered the (modest) effect of the asset cap on Wells Fargo's business, and clearly did *not* rely on the challenged statements.  One manager testified that ██ ████████████████████████████████████████ ████████████████  Another Plaintiff, a foreign fund manager, is subject to a unique defense because it does not actually own the securities at issue.  And discovery from the remaining Plaintiff shows that it knew about Wells Fargo's alleged lack of progress under the consent orders, the information that was allegedly hidden.  These individualized defenses and arguments render Plaintiffs' claims atypical of those of the proposed class, thus defeating class certification.

## BACKGROUND

### A.        The Consent Orders and Alleged Misstatements

In 2018, Wells Fargo entered into three consent orders (the "Consent Orders") with the Board of Governors of the Federal Reserve System ("FRB"), the Office of the Comptroller of the Currency ("OCC"), and the Consumer Financial Protection Bureau ("CFPB").    Mandating enterprise-wide reforms, the Consent Orders required Wells Fargo to submit its plans to the regulators for their approval and to implement the plans' reforms.  Wells Fargo provided periodic updates to the market on its evolving work under the Consent Orders.  Plaintiffs initially challenged sixteen such statements beginning in February 2018, but the Court dismissed Plaintiffs' claims based on five of the statements.  (ECF No. 96.)  As a result, eleven statements, made between May 30, 2018 and December 10, 2019, remain in this case.  Those statements generally conveyed that Wells Fargo had plans in place and that its work under the Consent Orders was progressing.[1]

---

[1] Plaintiffs assert that the "limited document discovery obtained to date has corroborated Lead Plaintiffs' core allegations" that the challenged statements were knowingly false or misleading. (Mot. 10.)  Those merits issues are irrelevant to class certification.  In any event, Plaintiffs are wrong.  Plaintiffs' motion cherry-picks snippets from certain documents that actually demonstrate

Congress, the media, and investors closely followed Wells Fargo's progress in meeting the Consent Orders' requirements. Market observers paid particular attention to the FRB order, which imposed an "asset cap" on Wells Fargo. But observers, including Plaintiffs and their investment managers, came to their own conclusions about these matters and their importance over time. For example, in the first quarter of 2018, an investment manager (Longview Partners) for Plaintiff Public Employees' Retirement System of Mississippi ("MissPERS") concluded that ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████ (Ex. 2 (Longview Decl.) ¶ 10.) And an investment manager (PZENA Investment Management) for Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") ███████████████████

████████████████████████████████████████████████████████████

██████ (Ex. 3 (PZENA Dep. Ex. 7) at -88.) In discussing its investment decisions for Louisiana Sheriffs, PZENA's representative testified that ████████████████████████

██████████████████████████████ (Ex. 4 (PZENA Dep. Tr.) at 73.)

## B.    The Alleged Corrective Disclosures and the Onset of the Pandemic

Plaintiffs assert that the truth supposedly concealed by the alleged misstatements was revealed to the market through five alleged corrective disclosures. They do not account, however, for earlier-disclosed information on the exact same topics, confounding information released on the same dates as the alleged corrective disclosures, and, for the final corrective disclosures in March 2020 with the largest price drops, the onset of the pandemic and the resulting lockdowns.

---

that Wells Fargo was making progress under the Consent Orders. ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

**January 15, 2019 Earnings Call.**  According to Plaintiffs, Wells Fargo's former CEO Tim Sloan first announced on January 15, 2019 that the asset cap would remain in place through the end of 2019.  (Am. Compl. ("AC") ¶ 238.)  Well before that date, however, market participants had forecast that the cap would remain in place through that time or later based on publicly available information.  In October 2018, for example, the OCC publicly stated that "[w]e are not comfortable where we are with" Wells Fargo, and in December 2018, the press publicly reported that the FRB had rejected Wells Fargo's initial plan under the FRB's order.  (Ex. 1 (Expert Report of René M. Stulz ("Stulz Rpt.")) ¶ 131.)  Due to this information, analysts opined *before* the alleged corrective disclosure that the asset cap "will not be removed any time soon, but I don't think that's a surprise," and recognized a "Street" view that the cap would be in place through at least 2020.  (*Id.* ¶¶ 131, 133.)  Consistent with this view, Plaintiff Louisiana Sheriffs' investment manager stated ███████████████████████████████████████████ ██ ██████████  (Ex. 4 at 56-57.)

On the same date as the alleged corrective disclosure, Wells Fargo also released earnings results that were "below expectations," as well as information about disappointing fee income trends unrelated to the allegations here.  (Stulz Rpt. ¶¶ 153, 156.)  This confounding information was the focus of analyst reports after the January 15, 2019 earnings call.  (Ex. 5 (Goldman Sachs); Ex. 6 (Credit Suisse) (earnings "a bit below expectations").)

**April 12, 2019 Earnings Call.**  Plaintiffs next allege that Wells Fargo's former general counsel and interim CEO C. Allen Parker disclosed on April 12, 2019 that the asset cap would not be lifted before the end of 2019, that Wells Fargo had a substantial amount of work yet to do, and that it would not provide further guidance on how long the asset cap was expected to remain in place.  (AC ¶ 244.)  In fact, Wells Fargo disclosed that it expected the asset cap to remain in place

through at least the end of 2019 in a Form 10-K filed *two months before* Parker's statement during the April 2019 earnings call.  (Ex. 7.)  Plaintiffs also ignore the extensive public information available before the April 2019 alleged corrective disclosure, including, in March 2019 alone, Congress's criticism of Wells Fargo, the OCC's statement that it was "disappointed with" Wells Fargo's "performance under our consent orders," and the FRB's public commentary that it would not lift the asset cap until "we're satisfied with what they've done [a]nd that's not where we are right now."  (Stulz Rpt. ¶ 137.)  As a result of this public information, analysts stated that Parker's April 12, 2019 statement was "in line with" "expectations" and "not a surprise."  (*Id.* ¶ 141.)  Some analysts, like PZENA, ███████████████████████████████████████ ████████████████  (*Id.*)

As with the first alleged corrective disclosure, Wells Fargo released on April 12, 2019 earnings results that fell "short of" "expectations."  (*Id.* ¶ 153.)  It also announced a reduction in annual net interest income.  (*Id.* ¶ 157.)  Again, analyst commentary focused on this confounding information, not on the alleged corrective disclosure.  (*Id.* ¶ 153.)

**January 14, 2020 Earnings Call.**  Plaintiffs allege that Wells Fargo's new CEO Charles Scharf disclosed on January 14, 2020 that the Company had a "great deal" of work to do.  (AC ¶¶ 251-52.)  This statement likewise broke no new ground because it was preceded by negative public commentary by the OCC in May 2019 and the FRB in July 2019 (and related press coverage) that conveyed essentially the same information.  (Stulz Rpt. ¶¶ 145-47.)  The alleged corrective disclosure also occurred on the same day as a large earnings miss, with results far "below expectations," that was the focus of analyst coverage.  (*Id.* ¶¶ 153-54.)

**March 2020 HFSC Reports and Testimony.**  All of the final alleged corrective disclosures occurred in March 2020.  On March 4 and 5, 2020, the House Financial Services

Committee ("HFSC") issued two reports criticizing Wells Fargo's compliance with the Consent Orders. (AC ¶ 258.) On March 10 and 11, 2020, testimony before the HFSC supposedly revealed Board concerns about the Company's regulatory submissions. (*Id.* ¶ 260.) Although there was no corrective disclosure the next day—March 12, 2020—Plaintiffs contend that "the market continued to digest the prior revelations." (*Id.* ¶ 262.) Plaintiffs do not attempt to square this contention that the market required multiple days to "digest" HFSC testimony with their claim that the market for Wells Fargo's stock is efficient or with their expert's conclusion that "Wells Fargo common stock *rapidly* responded to unanticipated and material Company-specific information." (Mot. Ex. A, ECF No. 147-1 ("Hartzmark Rpt.") ¶ 10 (emphasis added).)

These March 2020 corrective disclosures coincided with an extraordinary time in economic history. Between February 24, 2020 and March 23, 2020 (the "COVID Period"), the financial markets were subject to unprecedented volatility and frictions as the global COVID pandemic came into view. (Stulz Report ¶¶ 63, 72.) This one-month period included the two largest single-day stock market declines since 1987, and *four* days when market-wide circuit breakers were triggered and trading was halted. (*Id.* ¶ 64.) The last and only time a market-wide circuit breaker was triggered was 23 years earlier, in 1997. (*Id.*) Plaintiffs and their investment managers understood that this was an extraordinary time, testifying that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 8 (Ceredex Dep. Tr.) at 103.) Remarkably, Plaintiffs' motion and their expert report never even mention the word "COVID."

### C. Plaintiffs' Reliance on a Generic Event Study and a Highly Generalized Damages Methodology in Moving for Class Certification

Plaintiffs seek to certify a proposed class of all persons or entities that purchased Wells Fargo common stock between May 30, 2018 and March 12, 2020. To satisfy their burden of demonstrating that the market for Wells Fargo's stock was efficient, Plaintiffs rely on an event

study by Dr. Hartzmark.[2]  This event study purports to measure daily "abnormal returns" of Wells Fargo's stock price relative to the market as a whole and to Wells Fargo's supposed industry, and to compare incidence of abnormal returns "following 'news dates'—dates with earnings or guidance announcements— . . . to all other dates in the Class Period."  (Mot. 21.)  Dr. Hartzmark also offers a broad sketch of a proposed damages methodology, but does not explain how he would actually come up with the inputs for this methodology in this case beyond asserting that "an expert often begins with the same type of event study [he] used."  (Hartzmark Rpt. ¶ 83.)

Neither Plaintiffs' motion nor Dr. Hartzmark's report so much as mentions COVID, even though the largest price drops in this case occurred during the COVID Period.  Beyond referencing the highly general damages methodology Dr. Hartzmark plans to use later and the names of some tools he would consider using, Plaintiffs and Dr. Hartzmark do not actually explain how they propose to calculate damages in this case.

## ARGUMENT

The Supreme Court has repeatedly emphasized that class certification "is proper only if the trial court is satisfied, after a rigorous analysis," that Rule 23's prerequisites "have been satisfied." *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013).  Plaintiffs must "be prepared to prove" and "affirmatively demonstrate" each of these prerequisites, *id.*, including that the plaintiffs' "claims or defenses" are "typical" of those of the proposed class and that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(a)(3) & (b)(3).  Rule 23(b)(3)'s "predominance criterion is far more demanding" than Rule 23(a)'s requirements. *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 624 (1997).  Plaintiffs

---

[2] Dr. Hartzmark is a professional consultant and expert witness in securities class actions, and has not held an academic position since 1987.  Although he published a couple of law review articles between 2011 and 2014, he has not published anything since, and he has not published anything in a peer-reviewed economics or financial publication since 1991.  (Hartzmark Rpt. App. A.)

have not shown that common questions will predominate over individual questions relating to reliance and damages. Plaintiffs here also are subject to unique defenses that defeat typicality.

**I.    Plaintiffs Have Failed to Satisfy the Requirements for Invoking a Presumption of Classwide Reliance.**

> **A.    Plaintiffs Cannot Rely on the Fraud-on-the-Market Presumption of Reliance During the COVID Period.**

"Investors can recover damages in a private securities fraud action only if they prove that they relied on the defendant's misrepresentation in deciding to buy or sell a company's stock." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 263 (2014). Plaintiffs seek to avoid the burden of proving individual reliance by invoking the fraud-on-the-market presumption of reliance. To invoke this presumption, Plaintiffs must show, among other things, that Wells Fargo's stock traded in an efficient market. *Id.* at 268. Without the benefit of that presumption, each class member would bear the burden of proving individualized reliance on the alleged misstatements, which would defeat the predominance of common questions. *Id.* at 267-68. Significantly, "Plaintiffs bear the burden of proving market efficiency—defendants do not." *IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*, 2013 WL 5815472, at *21 (S.D.N.Y. Oct. 29, 2013).

Courts often consider the five so-called *Cammer* factors in assessing market efficiency: (1) average weekly trading volume, (2) analyst reporting, (3) number of market makers and arbitrageurs, (4) eligibility to file SEC Form S-3, and (5) "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer* v. *Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).[3] The

---

[3] Courts sometimes also consider the three *Krogman* factors: (1) market capitalization, (2) bid-ask spread, and (3) float. *Krogman* v. *Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). Plaintiffs' expert also discusses, in connection with *Cammer*'s fifth factor, whether Wells Fargo stock exhibited "autocorrelation." Autocorrelation measures whether a security's historical price changes predict future price changes (Mot. 22), but does not purport to "show[] [the] cause and effect relationship" required by the fifth *Cammer* factor. 711 F. Supp. at 1287. As Dr. Stulz

*Cammer* test imposes a "high bar" and a "rigorous standard." *Miller* v. *Thane Int'l, Inc.*, 615 F.3d 1095, 1103 (9th Cir. 2010). Although not strictly required in all cases, the fifth *Cammer* constitutes the only "[d]irect evidence" of market efficiency, with the others serving as "'indirect' indicia." *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 89, 98 (2d Cir. 2017).[4] As *Cammer* itself put it, the fifth factor "is the essence of an efficient market and the foundation for the fraud on the market theory." 711 F. Supp. at 1287.[5]

Plaintiffs have failed to satisfy their burden of proving that the market for Wells Fargo common stock was efficient during the COVID Period. As Dr. Stulz explains, Plaintiffs' generic event study does not account for dramatic increases in volatility and significant changes in the relationship between Wells Fargo's stock price and the market index during the COVID Period.

---

explains, the *existence* of autocorrelation indicates market inefficiency, but its *absence*, as here, does not itself support market efficiency. (Stulz Rpt. ¶ 15 n.33.) Indeed, if security prices moved randomly, there would be no autocorrelation, but no one would consider that market efficient.

[4] Dr. Hartzmark opines that it is not "necessary to show support from every factor," but he cites only cases and no academic literature as support for that view. (Hartzmark Rpt. ¶ 14 n.18; *see* Stulz Rpt. ¶ 36.) In *Waggoner*—one of the cited cases—the Second Circuit held that "a plaintiff seeking to demonstrate market efficiency need not *always* present direct evidence of price impact through event studies," and that a court's decision in a particular case to rely on other factors was "*within the range* of permissible decisions." 875 F.3d at 97-99 (emphasis added). But the Second Circuit also stressed that district courts have wide discretion to apply the *Cammer* factors to the cases and markets before them. *Id.* And *Waggoner* did not involve a market dislocation during the class period like the COVID pandemic and lockdown. Neither did a recent out-of-Circuit decision repeatedly cited by Plaintiffs. *See Purple Mountain Tr.* v. *Wells Fargo & Co.*, 2022 WL 3357835 (N.D. Cal. Aug. 15, 2022). Given the dramatic increase in volatility during the COVID Period, it is critical that Plaintiffs here show through a reliable methodology that there was, in fact, "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287.

[5] *See Teamsters Loc. 445 Freight Div. Pension Fund* v. *Bombardier, Inc.*, 546 F.3d 196, 207 (2d Cir. 2008) ("Without the demonstration of such a causal relationship, it is difficult to presume that the market will integrate the release of material information about a security into its price."); *In re Freddie Mac Sec. Litig.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012) ("This is the critical factor—the *sine qua non* of efficiency."); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009) (fifth factor "differs from the others" and "explores whether an important *result* of an efficient market exists," such that it is "the 'most important' *Cammer* factor") (emphasis in original) (quoting *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 268 (D. Mass. 2006))).

Dr. Stulz demonstrates that, for this period, Plaintiffs' event study (1) clusters statistically significant results, which Dr. Hartzmark himself has previously identified as a sign of an unreliable event study; and (2) exhibits a significant correlation between Wells Fargo's stock price and the broader market index, which means that Dr. Hartzmark's model fails its own test of measuring "movements of Wells Fargo stock" that "cannot be attributed to" the "market" (Hartzmark Rpt. ¶ 70). Finally, Plaintiffs' own allegation that the market took two days to digest HFSC testimony on March 11, 2020 also suggests market inefficiency during the COVID Period.

### 1.    Plaintiffs' Event Study Is Generic and Does Not Account for the Market Disruptions Caused by the COVID Pandemic and Lockdown.

Markets are not static. Instead, economic research confirms that "[e]ven a security that trades efficiently most of the time may trade inefficiently at certain times, such as times of market dislocations" and "frictions," thus requiring "careful empirical investigation of efficiency for each security and timeframe." (Stulz Rpt. ¶¶ 20, 40.) The COVID Period was a time of profound market dislocation and extreme volatility. The stock market saw some of its largest declines ever and significant "frictions" in liquidity, including the triggering of market-wide circuit breakers *four times* in one month (after having been triggered only *once* since 1997). (*Id.* ¶ 64.) Plaintiffs and their investment managers recognized this dislocation and volatility, testifying that ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ (Ex. 8 at 103-04, 115-16, 124.)

Yet Plaintiffs and their expert do not even mention COVID anywhere in their submissions, and attempt to utilize the same generic event study that Dr. Hartzmark has used in other cases for the entire class period. In particular, Dr. Hartzmark uses his typical regression model to calculate the abnormal return for Wells Fargo's stock price on a given date compared to the returns of a

market index and two industry indices, and then attempts to determine "whether there was a difference between the observed proportions of statistically significant abnormal returns on news days" (defined as dates of earnings or guidance announcements) "as compared to no-news days." (Hartzmark Rpt. ¶ 67.)  To calculate the abnormal return for each day, Dr. Hartzmark uses as a control period the 120-day period before that day, which means that, when Dr. Hartzmark is calculating the abnormal return of Wells Fargo's stock in March 2020, he is using control data going back to September 2019.  (*Id.* App. D ¶ 3.)  Thus, nearly all of the control-period days for calculating abnormal returns during the COVID Period are from pre-COVID Period days.  (Stulz Rpt. ¶ 49, 53-54.)

These decisions render Dr. Hartzmark's model inadequate to draw conclusions about the movements of Wells Fargo's stock price during the COVID Period, which marked a break with the prior portion of the class period.  Beginning on February 24, 2020, there was a dramatic increase in volatility for both Wells Fargo's stock and the broader financial industry and market. For example, a commonly used measure of stock-market volatility, the VIX index, increased by 46.6% on February 24, 2020, the largest single-day increase in over two years, and continued to rise through the end of the class period to a level not seen since late 2008.  Similarly, the volatility of Wells Fargo's stock price increased dramatically on February 24, 2020 and, by the end of the class period, was at its highest level since mid-2009.  (Stulz Rpt. ¶ 74 & Stulz Exs. 3A, 3B.) Notwithstanding these facts, Dr. Hartzmark's control period for March 2020 is marked by very low volatility.  (*Id.* ¶ 75)  That is critical:  under conditions of higher volatility, the model is more likely to identify "abnormal returns" compared to a period with lower volatility, but these returns are not actually meaningful and do not support market efficiency.  (Stulz Rpt. ¶¶ 75-81.) Dr. Hartzmark himself has recognized this predicament, observing outside the context of this case

that it is a "problem when there are two or more distinct periods with changes in the underlying return distributions." (*Id.* ¶ 75 n.154 (quoting Michael L. Hartzmark & H. Nejat Seyhun, *Understanding the Efficiency of the Market for Preferred Stock*, 8 Va. Bus. L. Rev. 149, 190-91 (2014) ("Hartzmark 2014")).) That is precisely the "problem" here, but Dr. Hartzmark did nothing to solve it.

Compounding this problem, all seven of Dr. Hartzmark's purported "news days" occurred *before* the COVID Period. (Stulz Rpt. ¶¶ 48-49.) As a result, Dr. Hartzmark had no "news day" observations during the COVID Period to analyze for abnormal returns or test the assumption that "news days" were linked with significant abnormal returns during that time. This also forecloses his ability to draw reliable conclusions about efficiency during the COVID Period. (*Id.*)[6]

### 2. The Results of Plaintiffs' Event Study Indicate a Failure to Account Properly for the Increased Volatility of the COVID Period.

Dr. Hartzmark's inability to draw reliable conclusions about market efficiency in late February and March 2020 is not just theoretical, but reflected in startling statistics observed when his methodology is applied to the COVID Period.

In his prior writings, Dr. Hartzmark has opined that the clustering of statistically significant abnormal returns—in that case, 31% of the days in a 65-day period—"should have suggested that a different statistical model was required or that complete reliance on the regression results would lead to the wrong conclusion." (Stulz Rpt. ¶ 71 n.140 (quoting Hartzmark 2014 at 190-91).) As Dr. Hartzmark explained, "[h]aving such a high proportion of days with statistically significant

---

[6] At his deposition, Dr. Hartzmark testified that he "looked at some data" and conducted some analyses regarding volatility for the COVID Period. (Ex. 9 (Hartzmark Dep.) 152-53.) Tellingly, no such analyses appear in his report or backup materials, and Plaintiffs now represent that Dr. Hartzmark "did not consider or rely" upon these analyses. (Exs. 10, 11.) Defendants reserve all rights as to Plaintiffs' refusal to provide "facts or data considered" by Dr. Hartzmark. Fed. R. Civ. P. 26(a)(2). In any event, Dr. Stulz's analyses demonstrate that Dr. Hartzmark's model does not hold up to scrutiny during the COVID Period. (Stulz Rpt. 73-81.)

returns suggests that the regression specification needed modification." (*Id.*) But that is almost exactly the case here. In fifteen trading dates between February 24, 2020 and March 23, 2020, Dr. Hartzmark's event study identifies statistically significant abnormal returns on five days—or *33.3%* of that period—which is magnitudes above the 4.9% of dates with statistically significant abnormal returns in the portion of the class period before COVID and above even the 31% threshold that Dr. Hartzmark previously flagged as requiring modification. (*Id.* ¶ 90.) Such a high percentage of dates with statistically significant abnormal returns indicates that Dr. Hartzmark's model is inadequately specified to measure market efficiency.

During the COVID Period, the Wells Fargo abnormal returns calculated by Dr. Hartzmark also are correlated in a statistically significantly manner with overall market returns, such that a market decline is associated with a negative Wells Fargo abnormal return. (*Id.* ¶ 92.) That significant correlation negates the whole point of Dr. Hartzmark's analysis, which is to "allow [him] to conclude that Wells Fargo-specific information and large price movements of Wells Fargo stock . . . were related and *cannot be attributed to random volatility, or to market or sector factors*." (Hartzmark Rpt. ¶ 70 (emphasis added).) The increased correlation between Wells Fargo's returns and market returns in Dr. Hartzmark's model is also critical because Dr. Hartzmark's model assumes, without basis, that his control period (which is almost entirely pre-COVID) reflects the same relationships between Wells Fargo's stock return and those of the market or industry as during the COVID Period. If those relationships changed over time, Dr. Hartzmark's study unreliably measures abnormal returns. (Stulz Rpt. ¶¶ 92-93.) That is, in fact, the case. As Dr. Stulz explains, during the COVID Period, Wells Fargo was uniquely and negatively affected by macroeconomic conditions relative to its peers because, among other reasons, its profits were more vulnerable to interest rate cuts, it had less trading revenue and a smaller investment banking

division than its peers, and its loan mix was particularly exposed to residential and commercial real estate. (*Id.* ¶¶ 163-165.)[7]  Again, this break in the class period is not merely theoretical; it is illustrated mathematically by Dr. Stulz. (Stulz Rpt. ¶ 86 & Stulz Ex. 6.)  Dr. Hartzmark again does not address this flaw in his model.

### 3.    Plaintiffs' Theory That the Price Decline on March 12, 2020 Was Caused by Information from the Prior Day Is Inconsistent with an Efficient Market.

Plaintiffs' own allegations undermine their contention that the market for Wells Fargo's stock was efficient during the COVID Period.  Although Plaintiffs acknowledge that there was *no* corrective disclosure on March 12, 2020, they contend that the market "continued to digest the prior revelations" during the HFSC testimony on March 11, resulting in a 15.9% stock decline on March 12, the largest alleged in this case. (AC ¶ 262.)  Even worse, the HFSC hearing on March 11 concluded at 12:51 PM EDT, more than three hours before the market closed. (Stulz Rpt. ¶ 95.) Wells Fargo's price diverges from market and industry indices only in the second half of trading on March 12—tellingly, after the FRB announced macroeconomic actions entirely unrelated to Wells Fargo. (*Id.* ¶ 97.)  As a result, there was a 24-hour-plus gap between the purported corrective disclosure during the HFSC hearing in the first half of March 11 and the market reaction in the second half of March 12.

This gap cannot be reconciled with Dr. Hartzmark's opinion that a security must "*rapidly* respond[]" to unanticipated and material Company-specific information" to be "consistent with efficient markets." (Hartzmark Rpt. ¶ 10 (emphasis added).)[8]  Plaintiffs' allegations regarding

---

[7] MissPERS' investment manager itself highlighted the unique and "particularly material" risks Wells Fargo faced from COVID and macroeconomic conditions in March 2020. (Stulz Rpt. ¶ 165.)

[8] *See also* Hartzmark Rpt. ¶ 12 n.13 ("A market in which prices always 'fully reflect' available information is called 'efficient.'"); *id.* ¶ 54 ("[I]n an efficient market, a stock's price remains

March 12—amidst the COVID Period—are inconsistent with a full, rapid response to company-specific information. Plaintiffs "cannot contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits their needs . . . . Either the market is efficient or it is not." *Meyer* v. *Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013). Either their allegations about March 12 defeat Plaintiffs' showing of market efficiency during the COVID Period or Plaintiffs cannot recover for the decline in Wells Fargo's stock price on that date.

### B. Plaintiffs Cannot Avoid the Burden of Proving Market Efficiency During the COVID Period by Relying on the *Affiliated Ute* Presumption for Cases Primarily Involving Omissions.

Rather than demonstrate market efficiency during the COVID Period, Plaintiffs assert that they need not do so because they are entitled to an alternative presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128, 153 (1972), but that presumption applies only "in cases involving primarily omissions, rather than affirmative misstatements." *Waggoner*, 875 F.3d at 93. Courts thus refuse to apply the *Affiliated Ute* presumption unless "there are no positive statements, and reliance as a practical matter is impossible to prove." *Schwab* v. *E\*TRADE Fin. Corp.*, 752 F. App'x 56, 59 (2d Cir. 2018). Indeed, "[i]n many instances, an omission to state a material fact relates back to an earlier statement, and if it is reasonable to think that prior statement still stands, then the omission may also be termed a misrepresentation," "even if the subsequent omission exacerbated the misleading nature of the affirmative statements." *Menaldi* v. *Och-Ziff Cap. Mgmt.*, 328 F.R.D. 86, 94 (S.D.N.Y. 2018).

Under these standards, Plaintiffs cannot avail themselves of the *Affiliated Ute* presumption of reliance. As Plaintiffs themselves state on page 1 of their class-certification motion, this "action arises from Defendants' misstatements to investors." (Mot. 1.) Just as in *Waggoner*, Plaintiffs

---

relatively stable in the absence of news, and changes very rapidly as the market receives new and unexpected information.").

"allege[] numerous affirmative misstatements," and they "focus their claims on those affirmative misstatements." 875 F.3d at 96. As a result, any alleged omissions "are directly related to the earlier statements Plaintiffs also claim are false," which means that the *Affiliated Ute* presumption of reliance cannot apply here under Second Circuit law. *Id.*

## II.     Plaintiffs Have Not Presented a Methodology Capable of Measuring Damages on a Classwide Basis Consistent with Their Theory of Liability.

The Court also should deny Plaintiffs' motion for class certification because Plaintiffs have not presented an adequate methodology for calculating classwide damages. Although Plaintiffs need not quantify their alleged damages at this stage, the Supreme Court has made clear that Rule 23 requires them to present a methodology that "measure[s] only those damages attributable to" their theory of liability. *Comcast*, 569 U.S. at 34-35.

To make this showing, Plaintiffs rely on Dr. Hartzmark's generic description of a methodology for measuring damages that is lifted nearly verbatim from his prior reports. Dr. Hartzmark states only that (1) there is a concept of an "out-of-pocket methodology," (2) this methodology's inputs are "daily levels of artificial inflation," (3) such levels can be calculated as differences between actual prices paid for Well Fargo stock and "true" value of that stock at the time, (4) for that calculation, "an expert often begins with the same type of event study [he] used," and (5) he may or may not use all or some of techniques such as parsing, scaling, intraday pricing, or analysis of company information. (Hartzmark Rpt. § VII.) That is the full extent of Dr. Hartzmark's description of his methodology. In other words, instead of actually presenting a damages methodology, Dr. Hartzmark promises that he can figure out how to do the work later.[9]

---

[9] Although not in a securities case, Dr. Hartzmark has been criticized for offering a damages methodology that was inconsistent with the plaintiffs' liability case and thus with *Comcast*. *See BlackRock Balanced Cap. Portfolio (FI)* v. *Deutsche Bank Nat'l Tr. Co.*, 2018 WL 5619957, at *13-14 (S.D.N.Y. Aug. 7, 2018) (Netburn, Mag. J.).

To be sure, courts have accepted this sort of damages methodology at the class-certification stage in other cases, and the Second Circuit has held that it was not an abuse of discretion to do so in one case. *See Waggoner*, 875 F.3d at 106.[10] This, however, is not the typical securities class action. The facts here present particular challenges in demonstrating that a model can measure damages attributable solely to Plaintiffs' liability theory, and they make a generic, off-the-shelf damages methodology proposal inappropriate. Unlike *Waggoner*, this case uniquely involves a market dislocation during a critical time in the class period. It also involves distinct complexities regarding the public availability of "corrective" information well before the alleged corrective disclosure dates, confounding information released on the same days as the alleged corrective disclosures, and challenges in scaling price drops to prior times in the class period. Plaintiffs and their expert do not say how their methodology will account for any of these complexities.

## A.    Plaintiffs Provide No Damages Methodology for Addressing the Dramatically Increased Volatility During the COVID Period.

As discussed above, Dr. Hartzmark's event study does not reliably measure Wells Fargo's abnormal returns during the COVID Period. Plaintiffs nevertheless propose using, for their damages methodology, "the same type of event study [Dr. Hartzmark] used" to evaluate market efficiency. (Hartzmark Rpt. ¶ 83.) Plaintiffs provide no further detail about how they would account for the increased volatility or significant change in Wells Fargo's relationship to the

---

[10] *But see*, *e.g.*, *Sicav* v. *Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) ("plaintiffs have not shown or explained, concretely, how damages would be calculated as to any individual purchaser"); *Fort Worth Emps.' Ret. Fund* v. *J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) ("Of course, no actual calculation needs to be performed at this stage. But without assurance beyond [the expert's] say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis."); *Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) ("When a class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts . . . that there are unspecified 'tools' available to measure damages, the model amounts to 'no damages model at all,' and the class cannot be certified.").

-18-

market that is evident in the COVID Period.  As Dr. Stulz explains, models that *do* attempt to account for the flaws in Dr. Hartzmark's regression model indicate that *none* of the alleged March 2020 corrective disclosures during the COVID Period are associated with a statistically significant abnormal return.  (Stulz Rpt. ¶¶ 167-75.)  Accordingly, Plaintiffs have offered no methodology that could reliably calculate damages attributable to their theory of liability during the COVID Period.

**B.      Plaintiffs Provide No Damages Methodology That Can Account for Public Information Released Before the Alleged Corrective Disclosures and for Confounding Information Released on the Same Days as Those Disclosures.**

Plaintiffs rely on alleged corrective disclosures discussing Wells Fargo's progress in complying with the Consent Orders and the expected timeline for lifting the asset cap, but extensive information on those two topics was released to the market *before* the alleged corrective disclosures.  As a result, the alleged corrective disclosures did not contain any new information on those two topics or may have reflected the materialization of a known risk.  (Stulz Rpt. ¶¶ 176-78.)  The corrective disclosure dates also involved the disclosure of significant and negative confounding information, including below-expectations earnings announcements.  (*Id.* ¶¶ 149-59.)  Plaintiffs and Dr. Hartzmark provide no damages methodology that takes into account either this previously released information or the contemporaneously released confounding information.

As just one example, Plaintiffs assert that the first corrective disclosure on January 15, 2019 disclosed that the asset cap would remain in place through the end of 2019.  (AC ¶ 238.)  But that was not news at all because market participants already had come to that (or a more negative) conclusion after a critical public statement by the OCC and reporting that the FRB had rejected Wells Fargo's initial plan.  (*See supra* at 5.)  Even before the January 15, 2019 disclosure, the "Street" view was that the asset cap would remain in place through 2020, and analysts reacted to the purported corrective disclosure by saying, "I don't think that's a surprise."  (*Id.*)  Indeed,

-19-

Plaintiff Louisiana Sheriffs' investment manager ████████████████████████████ ████ (*Id.*)  What is more, on the same date as the corrective disclosure, Wells Fargo disclosed "below expectations" earnings and disappointing fee income trends unrelated to this case.  (*Id.*) Like the January 15, 2019 corrective disclosure, Plaintiffs' other alleged corrective disclosures likewise were (1) preceded by negative public statements by regulators and other reporting of the same information that was later disclosed, and (2) made on the same days that other negative, confounding information, including on earnings, was released.  (Stulz Rpt. ¶¶ 149-59.)

Under these circumstances, Dr. Hartzmark was required to offer a damages methodology capable of isolating the amount of the price decline on the corrective disclosure dates that was attributable to the release of previously unknown information that corrected the alleged misrepresentations (as opposed to confounding information or the repetition of already-known information).  He does not even attempt to do so.  Plaintiffs thus cannot show, under *Comcast*, that they can measure only those damages attributable to Plaintiffs' theory of liability.

### C.    Plaintiffs Provide No Damages Methodology Capable of Scaling Price Drops to Earlier Alleged Misrepresentations.

Even if Dr. Hartzmark could reliably measure abnormal returns due solely to the revelation of the truth supposedly concealed by the alleged misrepresentations (and he provides no evidence that he can), he offers no methodology to translate those declines into measures of inflation at *earlier* times in the class period.  Despite acknowledging that this type of "scaling" exercise could "be necessary" (Hartzmark Rpt. ¶¶ 87-88), Dr. Hartzmark gives no explanation of how scaling would actually work here.  This failure is especially significant in this case for two reasons.

*First*, the status of Wells Fargo's compliance with the Consent Orders, regulatory feedback, and the expected timeline for lifting the asset cap all evolved over the class period.  (Stulz Rpt. ¶¶ 183, 196.)  Indeed, Plaintiffs affirmatively allege new, negative developments over time.  (AC

¶¶ 85-86, 93-95 (asserting that Wells Fargo concealed rejection letters it received in middle of class period).)    That means that "truths" that were purportedly revealed through corrective disclosures, such as specific pieces of negative regulatory feedback, could not possibly have been revealed at the beginning of the class period—because they did not even exist.  (Stulz Rpt. ¶ 183.) Dr. Hartzmark provides no methodology to account for this issue.

*Second*, a core part of Plaintiffs' liability theory is that the asset cap, and statements about the timeline for lifting it, were important because the cap "blocked the Bank's ability to take advantage of interest-earning opportunities, which was the Bank's largest source of income."  (AC ¶ 4.)  That allegation directly links the importance of the asset cap to interest-earning opportunities, but those opportunities changed significantly over the class period.  As Dr. Stulz demonstrates, the space on Wells Fargo's balance sheet to add interest-earning assets and their availability fluctuated, with analysts (including the investment managers for Plaintiffs MissPERS and Louisiana Sheriffs) ███████████████████████████████████████████████ ██████████████████████████████████    (Stulz Rpt. ¶ 195 & n.434.)

Once again, the problem is not that Plaintiffs' expert has failed to actually perform this type of scaling analysis.  It is that he has not presented *any* actual methodology for doing so in the unique circumstances of this case.  That failure too defeats class certification.

## III.    Lead Plaintiffs′ Claims Are Subject to Unique Arguments and Defenses, Rendering Them Atypical of Those of the Proposed Class.

Plaintiffs' motion should be denied for an additional reason:  Each of the four Plaintiffs is subject to unique defenses and arguments, making their claims atypical of those of the class.

"While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the

focus of the litigation." *Baffa* v. *Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000). A "defendant need not show at the certification stage that the unique defense will prevail, only that it is meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense." *Gordon* v. *Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 201 (S.D.N.Y. 2015). Accordingly, a plaintiff that "is subject to an arguable defense of non-reliance on the market has been held subject to a unique defense, and therefore, atypical of the class under Rule 23(a)(3)." *Rocco* v. *Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007). That is the case if the "plaintiff did not 'rely on the market price of the security as an accurate measure of its intrinsic value,'" and instead "utilized a propriet[ar]y metric" such that the market price "factored into [plaintiff's] investment decision only as a comparator." *GAMCO Invs., Inc.* v. *Vivendi, S.A.*, 927 F. Supp. 2d 88, 100 (S.D.N.Y. 2013), *aff'd*, 838 F.3d 214 (2d Cir. 2016).[11]

**Louisiana Sheriffs.** Louisiana Sheriffs' claims are atypical because of the timing of its purchases and its lack of reliance on the alleged misrepresentations in making its purchases.

*First*, Louisiana Sheriffs made large purchases of Wells Fargo stock in February 2019, April 2019, January 2020, March 2020, and May 2020—shortly after each of the alleged corrective disclosures, including after the largest of the declines in Wells Fargo's stock price. (Ex. 12.) "Although there is no per se rule to this effect," courts often have "held that 'a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative.'" *Rocco*, 245 F.R.D. at

---

[11] *See Blank* v. *Jacob*, 2009 WL 3233037, at *6 (E.D.N.Y. Sep. 30, 2009) ("While [plaintiff] may have relied on the price of the stock in determining that the stock was undervalued, he was also relying on his own assessment of the value of the stock. . . . This subjects him to possibly unique defenses and renders [him] atypical."); *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 623 (S.D.N.Y. 2015) (rejecting fund as lead plaintiff because "statements would provide fodder . . . to argue that [it] relied on its own valuation of [the] securities, and not on their market price").

136; *see Baffa*, 222 F.3d at 59 (class representative atypical based in part on stock purchase "after the value had drastically declined amidst reports of financial difficulty").  "A plaintiff who has engaged in a post-disclosure purchase is subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision," thereby "requir[ing] that each of the named plaintiffs expend considerable time on unique defenses—precisely the situation the case law does not condone." *George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013).

*Second*, Louisiana Sheriffs entirely delegated its investment decisions to its investment managers, Ceredex Value Advisors and PZENA.  (Ex. 13 (Louisiana Dep. Tr.) at 127 ("To my knowledge and belief, we did not interfere in the investment managers' decision.  It was their decision.  They control the portfolio and the decisions that goes into it.").)  Those investment managers came to their own, independent, long-term views of the value of Wells Fargo stock, and those views are not consistent with Plaintiffs' allegations in this case.  For instance, Ceredex testified that ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (Ex. 8 at 38-40, 44.)  Ceredex considered ████████████████████████████ █████████████████████████████████████ (*Id.* at 44, 90, 121.)  PZENA testified that █████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ Ex. 4 at 34, 45, 63, 71.)  PZENA's █████████████████████████████████ ████████████████████████████████████████████████████ ███████ (Ex. 14 (PZENA Dep. Ex. 3) at 44.)  PZENA ████████████████████████

-23-

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████ (Ex. 3.)  PZENA testified that ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████ (Ex. 4 at 73 (emphasis added).)  It is hard to imagine clearer

evidence that the allegations here did not matter to Louisiana Sheriffs' investment decision, and

that it is an atypical investor.

**MissPERS.**  Like Louisiana Sheriffs, Plaintiff MissPERS bought significant amounts of

Wells Fargo stock in February 2019, April 2019, and March 2020—shortly after alleged corrective

disclosures and including on March 11, 2020, the last corrective disclosure date.  (Ex. 15.)

MissPERS also gave its investment managers "complete discretion" (Ex. 16 (MissPERS Dep. Tr.)

at 100, 106, 128), and those managers ████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████ (Ex. 17 (Eagle Dep. Tr.) at 48, 50, 52).  MissPERS'

investment manager ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

(Ex. 2 ¶ 10  (emphasis added).)  Even shortly *after* the last corrective disclosure, MissPERS'

investment manager ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████ (*Id.* ¶ 12.)  Accordingly, MissPERS is also an atypical plaintiff.

**Handelsbanken Fonder.**  Handelsbanken similarly made significant purchases of Wells

Fargo stock shortly after corrective disclosures in May 2019, January 2020, and April 2020.  (Ex.

18.)  Handelsbanken's claims also implicate a unique issue related to its standing.  In particular, Handelsbanken does not itself own any Wells Fargo stock, but rather is seeking to sue on behalf of third-party "unitholders."   (Ex. 19 (Handelsbanken Prospectus) at -006.)   It thus must demonstrate third-party standing, which in turn will require it to demonstrate that the unitholders cannot themselves sue under Swedish law.  *See Plymouth Cnty. Ret. Ass'n* v. *Innovative Tech., Inc.*, 2021 WL 4298191, at *5 (S.D.N.Y. Sept. 21, 2021).  To make this showing, courts require expert declarations, *id.* (requiring "expert declarations about Austrian law"), but Handelsbanken has not submitted any.  In any event, regardless of how this issue ultimately is resolved, it threatens a sideshow, and courts have rejected lead plaintiff appointments on that basis.  *See Pipefitters Local No. 636 Defined Ben. Plan* v. *Bank of Am. Corp.*, 275 F.R.D. 187 (S.D.N.Y. 2011) (declining to appoint investment manager as lead plaintiff because "arguments could be raised regarding [its] third party standing, which subjects it to a unique defense and may prejudice the class").

**ERSRI.**  Plaintiff ERSRI is also subject to a unique defense.  On April 10, 2019, ERSRI employees reviewed and circulated a draft letter from other shareholders to the Wells Fargo Board emphasizing that the FRB and OCC "remain unsatisfied by the progress Wells Fargo has made." (Ex. 20 (ERSRI Dep. Ex. 6).)  That letter is in tension with Plaintiffs' allegation that, just two days later, Parker misled the market by stating that work under the FRB's Consent Order "consists of completing and implementing efforts that are substantially underway" and that Wells Fargo was "way down the road and is really pointed toward completion."  (AC ¶¶ 189, 192.)  Given that it was aware at least two days earlier that regulators were "unsatisfied" with Wells Fargo's "progress," ERSRI could not have relied on those statements.  At the very least, this unique fact suggests that ERSRI is subject to a significant and potentially dispositive reliance defense here.

## CONCLUSION

For the foregoing reasons, class certification should be denied.

Dated:      New York, New York
             December 23, 2022


*/s/ Leonid Traps*

Nanci L. Clarence (*pro hac vice*)

Josh Cohen (*pro hac vice*)

Adam F. Shearer (*pro hac vice*)

CLARENCE DYER & COHEN LLP

899 Ellis Street

San Francisco, California 94109

Telephone:  (415) 749-1800

Facsimile:  (415) 749-1694

nclarence@clarencedyer.com

jcohen@clarencedyer.com

ashearer@clarencedyer.com

*Counsel for Defendant Timothy J. Sloan*

Ed Swanson (*pro hac vice*)

Mary McNamara (*pro hac vice*)

Carly Bittman (*pro hac vice*)

300 Montgomery St, Suite 1100

San Francisco, California 94104

Telephone: (415) 477 3800

ed@smllp.law

mary@smllp.law

carly@smllp.law

*Counsel for Defendant John R. Shrewsberry*

Karin A. DeMasi

Carolyn Young

Katherine DuBois

825 Eighth Avenue

New York, New York 10019

Tel: (212) 474-1000

Fax: (212) 474-3700

cyoung@cravath.com

kdmasi@cravath.com

kdubois@cravath.com

*Counsel for Defendant C. Allen Parker*

Richard C. Pepperman II

Leonid Traps

SULLIVAN & CROMWELL LLP

125 Broad Street

New York, New York 10004

Telephone:  (212) 558-4000

Facsimile:  (212) 558-3588

peppermanr@sullcrom.com

trapsl@sullcrom.com

Christopher Michael Viapiano

SULLIVAN & CROMWELL LLP

1700 New York Avenue, N.W.

Suite 700

Washington, D.C. 20006

Telephone:  (202) 956-7500

Facsimile:  (202) 293-6330

viapianoc@sullcrom.com

*Counsel for Defendant Wells Fargo & Company*

John Gueli

Stuart Jay Baskin

599 Lexington Avenue

New York, New York 10022

Tel: (212) 848-4000

Fax: (646) 848-4974

jgueli@sherman.com

sbaskin@sherman.com

*Counsel for Defendant Elizabeth Duke*