# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE WELLS FARGO & COMPANY SECURITIES LITIGATION

Case No. 1:20-CV-04494-GHW-SN

# EXPERT REPORT OF RENÉ M. STULZ, PH.D.

**December 23, 2022**

## Table of Contents

I. Qualifications & Assignment ..... 1

A. Qualifications ..... 1

B. Assignment & Compensation ..... 2

II. Summary of Allegations and Hartzmark Report ..... 3

A. Plaintiffs' Allegations ..... 3

B. Dr. Hartzmark's Analysis and Opinions Regarding Market Efficiency ..... 5

C. Dr. Hartzmark's Analysis and Opinions Regarding Damages ..... 7

III. Summary of Opinions ..... 8

A. Market Efficiency ..... 8

B. Methodology for the Calculation of Damages ..... 10

IV. Market Efficiency in Financial Economics ..... 15

V. Dr. Hartzmark Has Not Established that the Market for Wells Fargo Stock Was Efficient During the Period of Market Disruption Caused by COVID-19 ..... 21

A. Dr. Hartzmark's Event Study Model Is Generic and By Construction Does Not Account for the Impact of COVID-19 on Financial Markets ..... 23

B. Dr. Hartzmark's Event Study is Unreliable During the Period of Market Disruption Caused by COVID-19 ..... 31

1. Dr. Hartzmark Does Not Account for Observed Dramatic Increases in Volatility ..... 33

2. Dr. Hartzmark Does Not Account for the Change in Relationship Between Wells Fargo's Stock and Market and Industry Indices ..... 38

3. The Observed Clustering of Statistically Significant Abnormal Returns and the Correlation Between Abnormal Returns and Market Returns Illustrate the Unreliability of Dr. Hartzmark's Event Study During the COVID-19 Period ..... 40

C. Plaintiffs' Allegations Regarding March 12, 2020 Are Not Consistent with Market Efficiency ..... 44

VI. Dr. Hartzmark Fails to Propose a Methodology to Measure Damages Stemming Only from Plaintiffs' Theory of Liability ..... 46

A. Dr. Hartzmark Does Not Provide a Methodology to Calculate Damages, Only a Generic Framework ..... 51

B. Dr. Hartzmark Fails to Propose a Methodology that Can Measure Damages Stemming Only from Plaintiffs' Allegations Given Information Already Available to the Market ..... 52

1. Operational Risk Management Deficiencies at Wells Fargo—and the Company's Failure to Remediate those Deficiencies to the Satisfaction of Its Regulators—Predate the 2018 Consent Orders and the Putative Class Period .... 53

2. Prior to and During the Putative Class Period, Some Market Participants Discussed the Complexity of Remediating Wells Fargo's Operational Deficiencies, Expressed Skepticism Regarding the Timing of Complying with the 2018 Consent Orders, and Noted that Regulators Were Not Satisfied with the Company's Progress ..... 59

C. Dr. Hartzmark Does Not Offer a Methodology that Can Measure the Extent to Which the Alleged Corrective Disclosures on the First Three Alleged Corrective Disclosures Dates Changed Market Expectations ..... 74

1. On Each of the First Three Alleged Corrective Disclosure Dates, Wells Fargo Released Earnings Results Prior to the Alleged Corrective Disclosures.... 76

2. On Each of the First Three Alleged Corrective Disclosure Dates, Wells Fargo Also Disclosed Information on Topics Unrelated to the Allegations on the Conference Calls Along with the Alleged Corrective Disclosures..... 78

D. Dr. Hartzmark Has Not Proposed a Methodology that Can Measure Damages Reliably on the Last Three Alleged Corrective Disclosure Impact Dates Consistent with Plaintiffs' Theory of Liability..... 80

1. Dr. Hartzmark's Event Study Does Not Reliably Measure Abnormal Returns in March 2020..... 85

2. Dr. Hartzmark Has Not Provided a Methodology to Measure Any Damages Relating to Incrementally New Information About the Misrepresentations, Rather than Consequences of Known Facts ..... 88

E. Plaintiffs' Allegations Suggest Patterns of Inflation that Dr. Hartzmark Has Provided No Methodology to Estimate or Measure ..... 91

1. There Is No Established Basis in the Hartzmark Report to Assume that the Events that Ultimately Occurred on Days of Alleged Corrective Disclosures Could Have Been Disclosed at an Earlier Time ..... 92

2. Plaintiffs' Allegations Link the Impact of the Asset Cap on Wells Fargo's Business to Interest-Earning Opportunities Which Dr. Hartzmark Does Not Address ..... 97

# I. Qualifications & Assignment

## A. Qualifications

1. I hold the Everett D. Reese Chair of Banking and Monetary Economics at The Ohio State University. I am also Director of the Dice Center for Research in Financial Economics at The Ohio State University and a Research Associate of the National Bureau of Economic Research in Cambridge, Massachusetts. Since receiving my Ph.D. in Economics from the Massachusetts Institute of Technology in 1980, I have taught at the Massachusetts Institute of Technology, the University of Rochester, the University of Chicago, and The Ohio State University. I was a Bower Fellow at the Harvard Business School from 1996 to 1997.

2. I am a past president of the American Finance Association; a fellow of the American Finance Association, the Financial Management Association, the European Corporate Governance Institute, and the Wharton Financial Institutions Center; and a past president of the Western Finance Association. I received a Doctorate Honoris Causa from the University of Neuchâtel in Switzerland and the Risk Manager of the Year award from the Global Association of Risk Professionals. I have also been recognized by a number of organizations for my contributions to financial economics by awards or by invitations to be a keynote speaker. I belong to the editorial boards of many academic and practitioner publications. Further, I am a member of the Asset Pricing and Corporate Finance Programs and the director of the Risk of Financial Institutions Group of the National Bureau of Economic Research. I was editor of the *Journal of Finance* for 12 years and co-editor of the *Journal of Financial Economics* for five years (these are two of the top three journals in the field of financial economics). Thomson Reuters has included me in its list of the world's most influential scientific minds, which identifies top researchers based on the number of authored publications that are highly cited by peers.[1]

3. I have published more than 100 articles in finance and economics journals, including the *Journal of Political Economy*, the *Journal of Financial Economics*, the *Journal of Finance*, and the *Review of Financial Studies*. I am the author of a textbook titled *Risk Management and*

---

[1] *See*, *e.g.*, "The World's Most Influential Scientific Minds," *Thomson Reuters*, December 2015, p. 46.

*Derivatives*, a co-author of *The Squam Lake Report: Fixing the Financial System*, and have edited several books, including the *Handbook of the Economics of Finance* and *International Capital Markets*.

4.     I have taught in executive development programs in North America, Europe, and Asia, and consulted for major corporations, law firms, the New York Stock Exchange, the International Monetary Fund, and the World Bank.  I also have served as a member of advisory boards of the U.S. Treasury and of the Federal Reserve Bank of New York.  I have belonged to several corporate boards and was the vice-chairman of the board of trustees of the Global Association of Risk Professionals, where I also chaired the governance committee.

5.     A copy of my curriculum vitae is attached as **Appendix A**, which also includes a list of my publications over the last 10 years.  **Appendix B** contains a list of my testimony over the last four years.

### B.     Assignment & Compensation

6.     I have been retained in this matter by counsel for Wells Fargo & Company ("Wells Fargo" or the "Company") to review and respond to the Expert Report of Michael L. Hartzmark, Ph.D., dated October 3, 2022 ("Hartzmark Report").  I was asked to analyze whether Dr. Hartzmark has established an economic basis for his conclusion that the market for Wells Fargo stock was efficient throughout the putative Class Period, as I have been informed Plaintiffs must establish in order for this litigation to proceed as a class action.  Further, I have been informed by counsel that Plaintiffs must demonstrate the existence of a damages methodology that can be applied in a class-wide manner consistent with Plaintiffs' theory of liability, and I have been asked to assess whether Dr. Hartzmark has done so in the Hartzmark Report.

7.     The analyses and opinions expressed in this report are my own.  I am compensated for my time and services in this matter at my regular hourly rate of $1,200.  I am assisted in this matter by staff of Cornerstone Research, who work under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

8.      A list of the materials I considered in preparing this report is attached as **Appendix C**. My work in this matter is ongoing, and I reserve the right to supplement my opinions in the event that Plaintiffs or their experts submit additional analyses or information.

## II.      Summary of Allegations and Hartzmark Report

### A.      Plaintiffs' Allegations

9.      Plaintiffs seek to certify a class of "all persons or entities who purchased or otherwise acquired the common stock of Wells Fargo between May 30, 2018 and March 12, 2020, inclusive" (the "putative Class Period").[2]  Plaintiffs allege that Defendants made "misrepresentations concerning the Bank's … compliance and progress with satisfying its obligations" under the consent orders it entered into with the Federal Reserve on February 2, 2018 (the "2018 Federal Reserve Consent Order") and the Comptroller of the Currency (the "OCC") and Consumer Financial Protection Bureau (the "CFPB") on April 20, 2018 (the "2018 OCC/CFPB Consent Orders") (collectively the "2018 Consent Orders").[3]  Plaintiffs also allege that Defendants represented to investors that they "had the required 'plans in place' and [were] 'executing' and 'implementing' those plans"[4] while "[i]n reality … the Regulators rebuked and repeatedly rejected Wells Fargo's proposed plans to satisfy the 2018 Consent Orders."[5]

10.      More specifically, Plaintiffs claim that Defendants falsely "conveyed to investors that the Bank had successfully completed Stage 1," which allegedly required the design and approval of plans to improve operational risk management, "and had entered Stage 2," which allegedly involved the implementation of those plans;[6] "falsely touted the Bank's purported transparency regarding the status of its compliance with the 2018 Consent Orders;"[7] and "repeatedly falsely

---

[2] Lead Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification, *In re Wells Fargo & Company Securities Litigation*, October 3, 2022 ("Memo of Law ISO Motion for Class Certification"), p. 5.

[3] Memo of Law ISO Motion for Class Certification, pp. v, 1.  I understand that, following the Court's ruling on Defendants' Motion to Dismiss, alleged misrepresentations remain on the following 10 dates: May 30, 2018, June 13, 2018, July 13, 2018, December 4, 2018, January 15, 2019, February 12, 2019, March 12, 2019, May 30, 2019, September 27, 2019, and December 10, 2019.

[4] Memo of Law ISO Motion for Class Certification, p. 6.

[5] Memo of Law ISO Motion for Class Certification, p. 7.

[6] According to Plaintiffs, "[i]n Stage 1, the Bank was required to submit a compliant plan to the Regulators [and] in Stage 2, the Bank would implement the plans after they had been approved by the Regulators."  *See* Memo of Law ISO Motion for Class Certification, p. 6.

[7] Memo of Law ISO Motion for Class Certification, p. 7.

claimed that, in light of the Bank's progress, the asset cap" imposed as part of the 2018 Federal Reserve Consent Order "would be lifted on an expected timeframe and in the near term."[8] Plaintiffs also assert that "the market was intently focused on the Bank's compliance with the 2018 Consent Orders" because "the asset cap blocked the Bank's ability to take advantage of interest-earning opportunities, which was the Bank's largest source of income."[9]

11. I understand that Plaintiffs allege that the following disclosures (the "alleged corrective disclosures") removed artificial inflation from Wells Fargo's stock price:[10]

*a)* January 15, 2019: Plaintiffs allege that, during a conference call discussing 2018 Q4 earnings, "Defendant Sloan stunned the market by announcing the asset cap … was likely to remain 'through the end of 2019'—more than a year longer than originally represented."[11]

*b)* April 12, 2019: Plaintiffs allege that, during a conference call discussing 2019 Q1 earnings, "Defendant Parker[] announced that the Bank would no longer meet the 2018 FRB Consent Order's requirements and have the asset cap lifted by the end of 2019," "refused to provide any further guidance on the timing of … having the asset cap lifted," and stated that "the Bank had 'a substantial amount of work yet to do, to satisfy the expectations of our regulators.'"[12]

*c)* January 14, 2020: Plaintiffs allege that Wells Fargo Chief Executive Officer Charles Scharf revealed "that the Bank was still at the 'first step' … and still had a 'great deal' of work to do to comply with the 2018 Consent Orders," admitting that "'we made some terrible mistakes and have not effectively addressed our shortcomings.' He further announced that the Bank's failure to address these shortcomings had 'led to financial underperformance,'"[13] and

---

[8] Memo of Law ISO Motion for Class Certification, p. 7.

[9] Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, *In re Wells Fargo & Company Securities Litigation*, November 9, 2020 ("Complaint"), ¶ 4.

[10] My understanding of the dates on which Plaintiffs allege artificial inflation was removed from Wells Fargo's stock price is based on the "Loss Causation" section of the Complaint, in which Plaintiffs specifically reference declines in Wells Fargo's stock price on January 15, 2019, April 12, 2019, January 14, 2020, March 5, 2020, March 11, 2020, and March 12, 2020. *See* Complaint, Section VII, ¶¶ 239, 245, 254, 258, 262. In his report, Dr. Hartzmark references an "event window of March 5-12, 2020." *See* Hartzmark Report, Appendix D, footnote 11. I note, however, that in their Complaint Plaintiffs only point to specific price declines on March 5, 11, and 12, 2020, and that none of the dates between March 6, 2020 and March 10, 2020 (the other dates during Dr. Hartzmark's "event window") have statistically significant price declines in Dr. Hartzmark's event study model (and March 10, 2020 has a statistically significant price increase). *See* Hartzmark Report Backup Materials.

[11] Complaint, ¶ 238. Plaintiffs also allege misrepresentations and omissions during this call, associated with Defendant Sloan's statements that Wells Fargo was "in complete agreement with the Fed about what needs to be done, and we're in the midst of implementing that," and that the Company was "continuing to actively work and implement the new risk management framework." Complaint, ¶ 167.

[12] Complaint, ¶ 244.

[13] Complaint, ¶ 251.

stated that "'I'm not suggesting here that any of these public issues will be closed this year.'"[14]

*d)* March 5, 2020: Plaintiffs allege that "on March 4 and 5, 2020, the House Financial Services Committee issued scathing reports that added detail regarding how much more work Wells Fargo had left in the regulatory process, the Bank's chronic failure to submit compliant Stage 1 Plans to its Regulators, and the Regulators' repeated warnings of future enforcement actions because of the Bank's non-compliance."[15] Plaintiffs further allege that on March 5, "Chairwoman Waters called for the resignations of Defendant Duke and Director Quigley for their failures in response to the 2018 Consent Orders, both of whom stepped down on the eve of their pre-scheduled testimony."[16]

*e)* March 11, 2020: Plaintiffs allege that the truth regarding the misrepresentations was revealed to investors by certain statements made in congressional testimony on March 10 and 11, including that (1) "the extensions and missed deadlines for the Stage 1 Plan submissions had raised 'concerns for the Board' … and were a 'red flag'"; (2) the "Board was … aware that the management team … was not capable of getting plans 'written in a complete fashion'"; and (3) "vast portions of the Stage 1 Plan proposal … were 'currently under resubmission.'"[17]

*f)* March 12, 2020: Plaintiffs allege that "the market continued to digest the prior revelations" and "the Bank's shares fell an additional 15.9%."[18]

**B. Dr. Hartzmark's Analysis and Opinions Regarding Market Efficiency**

12. In support of Plaintiffs' motion for class certification, Dr. Hartzmark opines that "Wells Fargo common stock rapidly responded to unanticipated and material Company-specific information consistent with efficient markets"[19] and "traded in an efficient market throughout the Class Period."[20]

---

[14] Complaint, ¶ 252.
[15] Complaint, ¶ 258.
[16] Complaint, ¶ 258.
[17] Complaint, ¶ 260. Plaintiffs also point to the testimony of Wells Fargo Board Chair Elizabeth Duke that "some of the criminal actions taken by employees at Wells Fargo should be prosecuted by federal officials." Complaint, ¶ 260. Additionally, Plaintiffs allege that, on March 10, 2020, "Chairwoman Waters also published a letter requesting that the DOJ investigate Defendant Sloan" related to his statements during his March 12, 2019 congressional testimony. Complaint, ¶ 259.
[18] Complaint, ¶ 262.
[19] Hartzmark Report, ¶ 10.
[20] Hartzmark Report, ¶ 76.

13.     To support this conclusion, Dr. Hartzmark considers a series of factors that he states are "typically used by courts to analyze market efficiency,"[21] including the so-called first four *Cammer* factors[22] and the so-called *Krogman* factors.[23]  Dr. Hartzmark also purports to analyze "whether the price of Wells Fargo common stock rapidly reacted to disclosures of material, new information"[24] (the fifth *Cammer* factor) by conducting two analyses.[25]

14.     In analyzing the fifth *Cammer* factor, he first determines "whether there was a difference between the observed proportions of statistically significant abnormal returns on news days as compared to no-news days."[26]  To do so, he first measures the "level of statistical significance of Wells Fargo's stock price movement[s]" on each date in the putative Class Period using an event study.[27]  He then classifies dates as either "news days" ("days when there are company announcements related to earnings or guidance") or "no-news days" (all other trading days), and compares the proportion of statistically significant abnormal returns between these two groups.[28] He finds that "Wells Fargo's common stock price exhibited an abnormal price reaction that is statistically significant" on 71.4% of his "news days" (five of seven) and on 5.6% of his "no-news days" (25 of 443).[29]  Dr. Hartzmark concludes from these findings that "Wells Fargo-specific information and large price movements of Wells Fargo stock during the Class Period were related" and states that this "provides substantial support for the conclusion that Wells Fargo common stock traded in an efficient market throughout the Class Period."[30]

15.     Second, he performs a "cause and effect analysis examining autocorrelation" and tests whether "the daily abnormal returns of Wells Fargo common stock … exhibit persistent and

---

[21] Hartzmark Report, ¶ 10.

[22] The *Cammer* Factors Dr. Hartzmark considers are "(1) average weekly turnover; (2) analyst coverage; (3) number of market makers or dealers of the security, along with arbitrageurs; and (4) the issuer's eligibility to file SEC Form S-3 and to incorporate by reference other SEC Forms."  Hartzmark Report, ¶ 16.

[23] The *Krogman* Factors Dr. Hartzmark considers are "(1) the market capitalization; (2) the bid-ask price spread; and (3) the float (i.e., the amount of outstanding security not held by insiders of the corporation)."  Hartzmark Report, ¶ 17.

[24] Hartzmark Report, ¶ 56.

[25] The fifth *Cammer* factor is related to the concept of efficiency in financial economics known as semi-strong form market efficiency.  *See* **Section IV**.  *See also* Hartzmark Report, ¶¶ 54, 56.

[26] Hartzmark Report, ¶ 67.  Dr. Hartzmark defines "news days" as "days when there are company announcements related to earnings or guidance" and all other trading days as "no-news days."  Hartzmark Report, ¶ 62.  The terms "abnormal return" and "residual return" both refer to the difference between the company-specific return predicted by a regression model and the actual return for Wells Fargo's stock.  I use the term "abnormal return" in this report.

[27] Hartzmark Report, ¶ 57.

[28] Hartzmark Report, ¶ 62.

[29] Hartzmark Report, ¶ 67.

[30] Hartzmark Report, ¶ 70.

systematic autocorrelation."[31]  He finds that "the daily abnormal returns of Wells Fargo common stock do not exhibit persistent and systematic autocorrelation" and concludes that this "offers [] support for [his] opinion that Wells Fargo common stock traded in an efficient market throughout the Class Period."[32, 33]

### C.    Dr. Hartzmark's Analysis and Opinions Regarding Damages

16.    Dr. Hartzmark also opines that "[t]he calculation of damages for violations of Section 10(b) of the Exchange Act alleged in this matter may be computed on a class-wide basis using broadly accepted methodologies that would be common to all Class members."[34]  He proposes to calculate damages using the "out-of-pocket methodology," which would calculate "per share inflation losses" as the "difference between the per share artificial inflation when the Class member acquired shares … and the per share artificial inflation when the Class member sold shares."[35]

17.    Dr. Hartzmark defines inflation on a given date as "the difference between the actual prices paid on that day for Wells Fargo common stock and the true or 'but-for' values of the security absent the alleged misrepresentations and omissions."[36]  He proposes constructing an "inflation ribbon" that "represents an estimate of the daily level of artificial inflation" using the "results of [an] event study,"[37] "based on the price reactions to disclosures either related to or revealing the alleged misstatements and omissions."[38]  Notably, he does not identify these disclosures nor provide a methodology that he would follow to do so, although I assume that he

---

[31] Hartzmark Report, Section VI.B.4, ¶ 71.

[32] Hartzmark Report, ¶ 71.

[33] As discussed in **Section IV**, the definition of efficiency that Dr. Hartzmark appears to use is consistent with the semi-strong form of efficiency in financial economics.  The lack of autocorrelation is a necessary, but not sufficient, condition for the market to be semi-strong form efficient.  As an example, if a stock moved completely randomly, there would be no autocorrelation, but the stock price would not incorporate all publicly available information.

[34] Hartzmark Report, ¶ 10.  *See also* Hartzmark Report, ¶ 78 ("damages … can be calculated on a class-wide basis using a common methodology well-accepted by courts.").

[35] Hartzmark Report, ¶ 82.

[36] Hartzmark Report, ¶ 80.

[37] Hartzmark Report, ¶¶ 83–84.

[38] Hartzmark Report, ¶ 84.

intends "disclosures either related to or revealing the alleged misstatements and omissions"[39] to include the alleged corrective disclosures, consistent with his statements at deposition.[40]

18. Dr. Hartzmark does not specify how one could use the "results of [an] event study" to calculate the "actual inputs into the out-of-pocket methodology."[41] Instead, he claims that such inputs could be calculated at a later stage of the case, "by parsing (*i.e.*, disaggregating the abnormal stock price movement into portions related and unrelated to the allegations) and scaling over time the changes in the inputs,"[42] if necessary, using what he calls "commonly used and widely accepted techniques."[43]

## III. Summary of Opinions

### A. Market Efficiency

19. Dr. Hartzmark has no basis in financial economics (or in the analyses presented in the Hartzmark Report) to support his conclusion that Wells Fargo stock traded in an efficient market during the portion of the putative Class Period that coincides with the period of market disruptions caused by the onset of the COVID-19 pandemic. As I document in this report, the disruptions associated with the COVID-19 pandemic were significant and associated with substantial increases in both overall market and Wells Fargo stock volatility.

20. As I discuss in **Section IV**, research in financial economics has shown that whether a market for a security is efficient is a question that must be examined empirically with respect to the particular security and at a particular point in time. Even a security that trades efficiently most of the time may trade inefficiently at certain times, such as times of market dislocations. Recent research, as well as my own analysis in this report, raises questions about market

[39] Hartzmark Report, ¶ 84.
[40] Deposition of Michael L. Hartzmark, and Exhibits, December 8, 2022 ("Hartzmark Deposition"), pp. 289:24–290:11 ("Q. And what's the difference between 'related to' or 'revealing' -- A. Well -- Q. -- the alleged misstatements and omissions? A. 'Related to' the misstatements would be -- I would consider that to be what is often referred to as a front-end. So inflation that's related to the misstatements. And generally, 'revealing' alleged omissions or misstatements are associated with alleged partial corrective disclosures.").
[41] Hartzmark Report, ¶¶ 83, 87.
[42] Hartzmark Report, ¶ 87.
[43] Hartzmark Report, ¶ 88.

efficiency in February and March 2020 as the onset of the COVID-19 pandemic disrupted financial markets.[44]

21.    Despite the fact that part of the putative Class Period corresponds to the onset of a global pandemic that caused vast disruptions in the financial markets, the analysis of efficiency presented in the Hartzmark Report is entirely generic. As far as I can determine, based on Dr. Hartzmark's other publicly available expert reports, Dr. Hartzmark's approach here is methodologically similar, if not identical to, approaches he has utilized in other expert reports in different matters.[45] Crucially, it does not in any way take into account the market disruption due to the onset of the COVID-19 pandemic. In fact, COVID-19 and the pandemic are not discussed at all by Dr. Hartzmark anywhere in the body of his report, nor is the effect of the associated market dislocation and increased volatility.

22.    Indeed, Dr. Hartzmark's analysis of the fifth *Cammer* factor is based on an event study that I demonstrate is unreliable during the period of heightened market volatility and dislocation associated with the onset of the COVID-19 pandemic in late February and March 2020.[46] Due to his event study model's failure to appropriately take into account prevailing market conditions at that time, and because, as a matter of financial economics, market efficiency cannot simply be presumed, especially in a period of extreme market dislocation such as the onset of the COVID-19 pandemic, Dr. Hartzmark has failed to establish an economic basis to conclude that the market for Wells Fargo's stock was efficient during the period affected by COVID-19 market disruptions. This is important, because the period of market disruptions caused by COVID-19 spans multiple weeks of the putative Class Period and includes three of the six alleged corrective disclosures in this matter.[47]

23.    As a result, Dr. Hartzmark's conclusion "that Wells Fargo common stock exhibits the type of cause-and-effect relationship described in *Cammer* and *Krogman*, supporting a

---

[44] As discussed in **Section V.A** below, a "disconnect between stock prices and news" during the COVID-19 pandemic has been identified in a recently released academic study, which concludes that certain large price movements in February and March of 2020 are not adequately explained by economic news, including "fundamentals, interest rates[,] or corporate profit shares." Niels J. Gormsen and Ralph S.J. Koijen, "Financial Markets and the COVID-19 Pandemic," University of Chicago Booth School of Business Working Paper, 2022, pp. 1–34, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248500 ("Gormsen and Koijen (2022)") at pp. 12, 24.
[45] *See* **Section V.A**.
[46] *See* **Section V**.
[47] Complaint, ¶¶ 258, 262.

conclusion of market efficiency"[48] is unreliable and unfounded as a matter of financial economics.

24. Further, and relatedly, even Plaintiffs' allegation that the price decline in Wells Fargo's stock on March 12, 2020 was caused by allegedly corrective information released well before market close on the *previous* day (March 11, 2020) is not consistent with market efficiency of Wells Fargo's stock as understood by financial economists, and is not consistent with Dr. Hartzmark's opinion that "Wells Fargo common stock rapidly responded to unanticipated and material Company-specific information consistent with efficient markets."[49] If Plaintiffs are correct that the market did not fully react to information released on March 11 until sometime the following day (particularly given that a substantial portion of the decline on March 12 does not occur until the afternoon on that day), the price decline on March 12 would represent a delayed reaction to information that was released on the prior day while market efficiency requires, as an economic matter, that security prices rapidly incorporate value-relevant information.

**B. Methodology for the Calculation of Damages**

25. Dr. Hartzmark fails to propose a methodology that can reliably measure damages stemming only from Plaintiffs' theory of liability. His assertion that damages "can be calculated on a class-wide basis using a common methodology well-accepted by courts"[50] is unsupported given the generic nature and minimal detail of his purported damages methodology. It is my understanding that "out-of-pocket" damages are a definitional concept meaning that damages are calculated based on share price inflation, and not a specific methodology that can actually be implemented to calculate inflation (i.e., the "actual inputs" that would be necessary to calculate the "true or 'but-for' values of the security absent the alleged misrepresentations and omissions," in Dr. Hartzmark's language).[51] While Dr. Hartzmark does mention in his report the use of event studies and reliance on "commonly used and widely accepted techniques,"[52] neither event studies nor "commonly used and widely accepted techniques" are methodologies that can be directly implemented to calculate share price inflation. An event study, for example, is a tool that (if

[48] Hartzmark Report, ¶ 55.
[49] Complaint, ¶ 262; Hartzmark Report, ¶ 10.
[50] Hartzmark Report, ¶ 78.
[51] Hartzmark Report, ¶¶ 80, 87.
[52] Hartzmark Report, ¶¶ 83, 88.

properly implemented) can measure company-specific stock price movements and determine whether those movements are statistically significant; it is not alone a sufficient methodology to measure inflation.

26. In addition, the description of damages calculations in Section VII of the Hartzmark Report is essentially the same as his descriptions in expert reports that Dr. Hartzmark has submitted in other litigations.[53] While a generic approach could potentially be appropriate in some instances that lack the complexity of this matter (which I discuss at length in subsequent sections), this generic description does not provide Dr. Hartzmark a basis to conclude that he would at a later stage of *this* litigation be able to calculate damages in a manner that is consistent with Plaintiffs' allegations.

27. Specifically, Dr. Hartzmark's generic proposal that inflation be calculated "based on the price reactions to disclosures either related to or revealing the alleged misstatements and omissions"[54] is insufficient for him to conclude, as a matter of economics, that damages can be calculated in a manner consistent with Plaintiffs' allegations against Wells Fargo, which I understand relate to its progress complying with the 2018 Consent Orders, and consistent with the specific circumstances associated with those allegations, as summarized below. Importantly, I am not suggesting that Dr. Hartzmark needed to have actually calculated damages and/or inflation or performed a loss causation analysis at this time, but I am opining that he has not provided a methodology that could be used to calculate damages at a later stage in a manner consistent with Plaintiffs' allegations, as I understand Plaintiffs need to demonstrate, for three primary reasons (in addition to providing only a generic framework).

28. First, a reliable damages methodology would, at a minimum, need to be based on a reliable measurement of abnormal returns on the dates of "disclosures either related to or revealing the alleged misstatements and omissions."[55] At the outset, my discussion in this report focuses on the dates of the alleged corrective disclosures identified in the Complaint because Dr. Hartzmark has not provided any description of a methodology to identify any other dates that fit his definition of being "related to or revealing" the alleged misrepresentations. To measure

[53] *See* **Section VI**.
[54] Hartzmark Report, ¶ 84.
[55] Hartzmark Report, ¶ 84.

abnormal returns for these dates, the only methodology Dr. Hartzmark specifically proposes to use is the "same type of event study" he used for his market efficiency analysis, which analyzes Wells Fargo's stock price movements based on changes in the market and two industry indices.[56] However, as discussed above and in detail in **Section V**, the event study Dr. Hartzmark uses for his market efficiency analysis is not reliable, as it does not account for the disruption in financial markets and associated volatility caused by the onset of the COVID-19 pandemic or the change in the relationship between Wells Fargo and the indices used in his event study model during this period. Potential modifications to his methodology accounting for these changes produce results that contradict Dr. Hartzmark's results in his report. In particular, when these modifications are implemented, there is *no* statistically significant stock price movement on two of the three alleged corrective disclosure impact dates in March 2020.[57] If the market for Wells Fargo stock was efficient, as Dr. Hartzmark claims, the price decline on March 12, 2020, the final alleged corrective disclosure impact date in this period, could not have been caused by the alleged corrective disclosure made on March 11, 2020. Indeed, there is also evidence suggesting that the observed decline on March 12, 2020 was due to factors other than the allegations. As a result, Plaintiffs' claim that the alleged corrective disclosures on March 11, 2020 caused price declines on March 11 and 12, 2020 is inconsistent with Dr. Hartzmark's conclusion that Wells Fargo's stock traded in an efficient market.

29. Second, even if he had a reliable methodology to measure abnormal returns (which he does not), Dr. Hartzmark fails to propose a methodology that can determine the incremental price reaction on relevant days solely due to disclosures revealing the alleged truth behind the alleged misrepresentations as opposed to other factors. In other words, Dr. Hartzmark fails to propose a methodology to calculate "true or 'but-for' values of the security absent the alleged misrepresentations and omissions"[58] given the totality of information that was already available to the market. His failure to propose any such methodology is particularly problematic here, because, based on my analysis, alleged disclosures revealing the alleged misrepresentations may not have been new information (as opposed to information known before the beginning of the putative Class Period or before the dates of the alleged corrective disclosures), and the alleged

[56] Hartzmark Report, ¶ 83, Appendix D.
[57] *See* **Section VI.D.1.**
[58] Hartzmark Report, ¶ 80.

corrective disclosures may have reflected consequences of previously known facts about Wells Fargo's progress in implementing changes under the 2018 Consent Orders.  At various times both before and during the putative Class Period, some market participants expressed an apparent understanding of the complexity of the risk management changes that were needed as part of the 2018 Consent Orders, and some expressed skepticism about how long the process of implementing these changes would take and discussed Wells Fargo's failures to meet deadlines imposed by regulators.  For example, *Reuters* reported in December 2018 (weeks before the first alleged corrective disclosure) that the Federal Reserve had rejected Wells Fargo's remediation plan,[59] and, in April 2019, Wells Fargo stopped providing a timeline for having the asset cap lifted.[60]  Given the substantial information that was already publicly available about Wells Fargo's progress in addressing the regulatory issues subject to the allegations, there is no methodology offered in the Hartzmark Report that would allow Dr. Hartzmark to determine the incremental impact of the allegations on the price declines observed on the days of the alleged corrective disclosures (as opposed to other factors) in order for him to calculate the "but-for" value of Wells Fargo stock he claims is needed.

30.     For example, as to the first three alleged corrective disclosures, negative information unrelated to the alleged misrepresentations became available in addition to information that Plaintiffs claim revealed the alleged misrepresentations.  And, by the time of the third alleged corrective disclosure on January 14, 2020, market analysts had discussed uncertainty and skepticism regarding Wells Fargo's stated timeline for exiting the asset cap, Wells Fargo had stopped providing an estimated timeline, and there was discussion of numerous instances in which Wells Fargo had failed to remediate its risk management to the satisfaction of its regulators.  In the face of all of this publicly available information about the alleged misrepresentations, Dr. Hartzmark has presented no methodology to measure the price declines solely due to any incremental impact of the alleged misrepresentations, rather than other unrelated negative information, in order to calculate inflation and the "but-for" price of Wells Fargo's stock.

---

[59] Patrick Rucker, "Wells Fargo Reform Plans Fail to Satisfy Fed after Scandals: Sources," *Reuters News*, December 6, 2018.

[60] During an earnings call on April 12, 2019, Interim CEO Parker stated that "we do not feel it's appropriate to provide guidance as to the timing of the lifting of the asset cap."  Wells Fargo & Company, 2019 Q1 Earnings Call Transcript, dated April 12, 2019 ("2019 Q1 Earnings Call"), p. 6.

31.    Third, Dr. Hartzmark's proposed methodology is apparently based on stock price reactions to disclosures regarding the alleged misrepresentations, but these reactions are insufficient on their own to measure inflation and therefore damages in a manner consistent with Plaintiffs' theory of liability at earlier times during the putative Class Period.  In particular, Dr. Hartzmark fails to propose a methodology that can determine whether information sufficiently similar to that disclosed on the days of disclosures related to the alleged misrepresentations could possibly have been disclosed earlier, and whether such an earlier disclosure would have had the same price implications for Wells Fargo's stock.  Yet, Dr. Hartzmark appears to agree that this is relevant when he discusses the potential need for "scaling over time the changes in the inputs" in order to estimate how the "price reaction due to the revelation of the truth … might change over time."[61]

32.    Without having a methodology to do this "scaling," a damages calculation based solely on stock price reactions to disclosures regarding the alleged misrepresentations would be inconsistent with the reality that Wells Fargo's interactions with its regulators evolved over the course of the putative Class Period.[62]  Plaintiffs' allegations themselves suggest that "disclosures either related to or revealing the alleged misstatements and omissions" could not have been made at the beginning of the putative Class Period, at least not substantially in the same form in which they ultimately occurred.  As an example, Plaintiffs allege that CEO Sloan's testimony in March 2019 contained misstatements regarding the "Bank's purported satisfaction of the 2018 OCC/CFPB Consent Orders' requirements" in the wake of specific developments in 2018 that Wells Fargo had not disclosed to the market.[63]  However, those misstatements related to events that took place after the start of the putative Class Period (i.e., after May 30, 2018), and the Hartzmark Report does not establish any basis to assume that Wells Fargo could have disclosed these developments at the beginning of the putative Class Period.  Without such a basis, there is no foundation to assume that price declines that occurred *after* these developments would have caused the same effect on Wells Fargo's stock price had they been made earlier.  Therefore, Dr. Hartzmark has provided no basis to claim that these price declines can, in the future, be used to measure inflation.

---

[61] Hartzmark Report, ¶¶ 87, 90.
[62] Complaint, ¶ 7.
[63] Complaint, ¶¶ 178–179.

33. Similarly, Plaintiffs own allegations suggest that inflation needs to be "scaled." As an example, consider Plaintiffs' allegation that "the asset cap blocked the Bank's ability to take advantage of interest-earning opportunities, which was the Bank's largest source of income."[64] This allegation implies that the value relevance of information about the asset cap at different points in time during the putative Class Period would depend on, among other factors, the available "interest-earning opportunities" that would be expected to have been changing over time, which further implies that any inflation caused by alleged misstatements regarding when the asset cap would be lifted would also change over time and that "scaling" will ultimately be required.

34. Dr. Hartzmark, however, provides no methodology to translate any price declines caused by alleged corrective disclosures to measures of inflation at earlier times during the putative Class Period, which is necessary in order to calculate damages reliably and in a manner consistent with Plaintiffs' allegations.

## IV. Market Efficiency in Financial Economics

35. In general, financial economists distinguish between different forms of market efficiency based on the type of information that is incorporated in asset prices. Financial economists consider three forms of market efficiency, which differ based on the universe of information that is incorporated in asset prices: weak form, semi-strong form, and strong form.[65] I understand that, in this matter, a presumption of reliance on the alleged material misrepresentations requires conditions that are analogous to what financial economists refer to as the semi-strong form of market efficiency, which is defined as prices fully reflecting publicly available information. Under the semi-strong form, the market efficiency hypothesis holds that stock prices adjust quickly and fully to new, unexpected value-relevant public information.[66] This definition

[64] Complaint, ¶ 4.

[65] Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, 1991, pp. 1575–1617 ("Fama (1991)") at pp. 1575–1577.

[66] Stephen A. Ross et al., *Corporate Finance*, Sixth Edition (New York, NY: McGraw-Hill, 2002), p. 346 ("A market is semistrong-form efficient if prices reflect (incorporate) all publicly available information, including information such as published accounting statements for the firm as well as historical price information. … However, if the market is semistrong efficient, the price should rise immediately upon the news release."). *See also*, for example, Jason T. Greene and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of

appears to be consistent with the definition underlying Dr. Hartzmark's claim that "Wells Fargo common stock rapidly responded to unanticipated and material Company-specific information consistent with efficient markets."[67]

36. To test the hypothesis of semi-strong form efficiency, economists may analyze whether, and how quickly, stock prices adjust to reflect publicly available information, the question asked by the fifth *Cammer* factor. I understand that courts have also considered the other *Cammer* factors and the *Krogman* factors in assessments of market efficiency. I am not offering a legal opinion as to what should be considered by courts in assessing market efficiency, or as to the legal implications of these various factors. However, as a financial economist, Dr. Hartzmark has no basis to draw conclusions regarding the efficiency of Wells Fargo's stock, as that concept is understood in financial economics, based on those other factors. Indeed, I am not aware of any generally accepted peer-reviewed literature on market efficiency in financial economics supporting the notion that a financial economist can draw a conclusion of efficiency based on such factors alone. Therefore, in this report, I focus on Dr. Hartzmark's analysis of the fifth *Cammer* factor.

37. A corollary of the efficient market hypothesis is that stale or reiterated information should not impact stock prices if markets are semi-strong form efficient. In other words, finding that reiteration of previously publicly-disclosed information impacts the stock price is inconsistent with market efficiency. As an introductory corporate finance textbook states:

> According to the efficient-market hypothesis, a stock's abnormal return at time *t*, $AR_t$, should reflect the release of information at the same time, *t*. Any information released before then, though, should have no effect on abnormal returns in this period, because all of its influence should have been felt before. In other words, an efficient market would already have incorporated previous information into prices.[68]

38. The question of market efficiency has been investigated in various financial markets for more than 50 years. Research has shown that even securities listed on major stock exchanges

Overnight and Daytime News Releases," *Financial Management* 25, no. 1, 1996, pp. 19–42; Jeffrey A. Busse and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65, no. 3, 2002, pp. 415–437.

[67] Hartzmark Report, ¶ 10. Unless otherwise stated, subsequent discussion on market efficiency relates to the semi-strong form of market efficiency.

[68] Stephen A. Ross et al., *Corporate Finance*, Sixth Edition (New York, NY: McGraw-Hill, 2002), p. 351.

may not trade in an efficient market at all times.  It is, therefore, not sufficient for a financial economist to presume market efficiency, to infer market efficiency from one period to another, or to infer market efficiency from typical characteristics of securities that trade on major exchanges.  Market efficiency must instead be empirically tested for individual securities during specific periods of time and as to particular types of information.

39.    While the general findings in the financial economics literature as of the late 1980s provided much support for semi-strong form market efficiency, empirical research at that time had also identified examples that appeared to be inconsistent with semi-strong form market efficiency, as summarized by Professor Fama in his 1991 article.[69]  Since 1991, academic research has studied implications for the efficient market hypothesis of real-world practicalities and complexities in markets.  Much of this literature has focused on the role of market frictions. If there are no frictions in the functioning of markets, in an efficient market, investors who notice obvious price discrepancies (i.e., inefficiencies) will seek to exploit the discrepancies to the point that any inefficiencies disappear.  Broadly, transactions by investors that take advantage of departures from efficiency are called arbitrage transactions.  But a seminal study published in 1997 by Shleifer and Vishny showed that there can be limits to the ability of investors to exploit departures from efficiency and these limits arise because of the existence of frictions in the workings of markets.[70]

40.    Since the publication of the article by Shleifer and Vishny, the academic literature has studied certain frictions in the way markets work that may impede market efficiency.  Examples of such frictions include funding constraints,[71] constraints on trading,[72] constraints on investor attention,[73] and frictions due to processing of information.[74]  Importantly, the literature has

---

[69] Fama (1991).

[70] The article prominently focused on the difficulties that arbitrageurs, such as hedge funds, may face in raising funds to exploit market inefficiencies.  *See* Andrei Shleifer and Robert W. Vishny, "The Limits of Arbitrage," *The Journal of Finance* 52, no. 1, 1997, pp. 35–55.

[71] *See*, *e.g.*, Mark Mitchell and Todd Pulvino, "Arbitrage Crashes and the Speed of Capital," *Journal of Financial Economics* 104, no. 3, 2012, pp. 469–490.

[72] *See*, *e.g.*, Gene D'Avolio, "The Market for Borrowing Stock," *Journal of Financial Economics* 66, nos. 2–3, 2002, pp. 271–306.

[73] Hirshleifer et al show that a stock incorporates new earnings-related information more slowly if there are contemporaneous earnings announcements made by other firms on the same day.  *See* David Hirshleifer et al., "Driven to Distraction: Extraneous Events and Underreaction to Earnings News," *The Journal of Finance* 64, no. 5, 2009, pp. 2289–2325 ("Hirshleifer et al. (2009)").

[74] *See*, *e.g.*, Lauren Cohen and Dong Lou, "Complicated Firms," *Journal of Financial Economics* 104, no. 2, 2012, pp. 383–400.

shown that these frictions can affect the efficiency of large publicly traded stocks.[75]  These

frictions can lead to situations where stock prices overreact to, underreact to, or fail to react to

new information.[76]  Frictions in the way markets operate can also change over time.  This

highlights the need for careful empirical investigation of efficiency for each security and

timeframe.

41.    For example, academic studies have found that constraints on short-selling can inhibit

trading by certain informed investors, which can lead to delays in the incorporation of new

information into security prices.[77]  In particular, these studies provide support for the idea that

restrictions on short-selling—due to difficulties in borrowing shares or to regulatory

constraints—can lead to markets that are less efficient.[78]  Similarly, academic research suggests

that increases in margin requirements can have a negative impact on market efficiency, because

such increases may constrain capital available for arbitrageurs or may reduce market specialists'

incentives to acquire more information.[79]

42.    Moreover, academic literature has shown that during periods of financial turmoil, there

are more frictions that can inhibit market efficiency and which can lead to dislocations in equity

markets, as liquidity (which is generally seen as a pre-condition for market efficiency and which

---

[75] *See*, *e.g.*, Owen A. Lamont and Richard H. Thaler, "Anomalies: The Law of One Price in Financial Markets," *Journal of Economic Perspectives* 17, no. 4, 2003, pp. 191–202 at pp. 195–196.

[76] *See*, *e.g.*, Kent Daniel et al., "Investor Psychology in Capital Markets: Evidence and Policy Implications," *Journal of Monetary Economics* 49, no. 1, 2002, pp. 139–209 at pp. 159, 162, 165, 167, 169–170.

[77] Douglas W. Diamond and Robert E. Verrecchia, "Constraints on Short-Selling and Asset Price Adjustment to Private Information," *Journal of Financial Economics* 18, no. 2, 1987, pp. 277–311.

[78] *See*, *e.g.*, Charles M. Jones and Owen A. Lamont, "Short-Sale Constraints and Stock Returns," *Journal of Financial Economics* 66, nos. 2–3, 2002, pp. 207–239; Pedro A. C. Saffi and Kari Sigurdsson, "Price Efficiency and Short Selling," *The Review of Financial Studies* 24, no. 3, 2011, pp. 821–852; Arturo Bris et al., "Efficiency and the Bear: Short Sales and Markets around the World," *The Journal of Finance* 62, no. 3, 2007, pp. 1029–1079; Ekkehart Boehmer and Juan (Julie) Wu, "Short Selling and the Price Discovery Process," *The Review of Financial Studies* 26, no. 2, 2013, pp. 287–322; Alessandro Beber and Marco Pagano, "Short-Selling Bans around the World: Evidence from the 2007–09 Crisis," *The Journal of Finance* 68, no. 1, 2013, pp. 343–381 at pp. 344–345.

[79] Ferhat Akbas et al., "Initial Margin Requirements and Market Efficiency," Working Paper, 2022, pp. 1–50, Appendix pp. 1–34, https://ssrn.com/abstract=3792433 ("Akbas et al. (2022)") at pp. 1, 30 ("Combining the Fed's 22 changes in margin requirements with a hand-collected sample of earnings announcements between 1934-1975, we show that higher margin requirements induce greater delay in incorporating earnings information into prices. … We conclude that higher margin requirements adversely impact market efficiency by constraining the outside capital available for arbitrageurs to a greater extent than they constrain noise trading activity.  As a result, informed investors fail to incorporate earnings news into prices in a timely fashion, and are thus prevented from counteracting the tendency for uninformed investors to underreact to this information.").  *See also* Sergei Glebkin et al., "Funding Constraints and Informational Efficiency," *The Review of Financial Studies* 34, no. 9, 2021, pp. 4269–4322 at p. 4271 ("It is intuitive that, when constraints become tighter, specialists must take smaller positions and thus profit less on their private information.  Anticipating the reduced scope for profit, they acquire less information ex ante. As specialists acquire less information, the price becomes less informative about asset fundamentals in equilibrium.").

Dr. Hartzmark identifies as a characteristic of an efficient market) is often reduced in such times.[80] Academic literature has found that shocks during a crisis can cause liquidity to dry up in some financial markets, and that "liquidity-induced contagion mechanisms" can cause this effect to spread to other markets, such as the equity markets.[81]

43. Indeed, the literature has shown that market efficiency does not always hold, even for equities trading on major exchanges, including during times of crisis. For example, in September 2008, during the global financial crisis of 2007–2008 ("Global Financial Crisis" or "GFC"), an old 2002 article from the *Chicago Tribune* on the "2002 bankruptcy of United Airlines' parent company resurfaced on the Internet and was mistakenly believed to be reporting a new bankruptcy filing by the company."[82] Although the report was corrected shortly afterwards on the same day, and United Airlines issued a statement denying having filed for bankruptcy, Carvalho et al. (2011) find that the price of United Airlines took *seven* days to recover from the large price decline following this mistaken report.[83] In an efficient market, security prices should react rapidly to new information, not react to stale information, and recover as soon as false information has been identified as such. This example, however,

[80] Markus K. Brunnermeier, "Deciphering the Liquidity and Credit Crunch 2007–2008," *Journal of Economic Perspectives* 23, no. 1, 2009, pp. 77–100 at pp. 92, 94 ("The mechanisms that explain why liquidity can suddenly evaporate operate through the interaction of market liquidity and funding liquidity. Through these mechanisms, a relatively small shock can cause liquidity to dry up suddenly and carry the potential for a full-blown financial crisis. … The loss spiral is more pronounced for stocks with low market liquidity, because selling them at a time of financial distress will bring about a greater price drop than selling a more liquid asset would."). Jens Dick-Nielsen et al., "Corporate Bond Liquidity before and after the Onset of the Subprime Crisis," *Journal of Financial Economics* 103, no. 3, 2012, pp. 471–492 at p. 471 ("We analyze liquidity components of corporate bond spreads during 2005–2009 using a new robust illiquidity measure. The spread contribution from illiquidity increases dramatically with the onset of the subprime crisis."). Hartzmark Report, ¶ 15 ("an efficient market … can be characterized as a liquid market that can absorb a reasonable amount of trading volume at relatively low trading costs.").

[81] Francis A. Longstaff, "The subprime credit crisis and contagion in financial markets," *Journal of Financial Economics* 97, no. 3, 2010, pp. 436–450 at pp. 437, 447 ("For example, finding that shocks tended to be transmitted with a lag from the less-liquid ABX index market to the highly liquid stock and Treasury bond markets argues against a correlated-information view of financial contagion. … Thus, the results (which, of course, are limited to the specific episode studied) appear to be more consistent with either the liquidity-induced contagion mechanisms presented by Allen and Gale (2000), Kodres and Pritsker (2002), and Brunnermeier and Pedersen (2005), or the risk-premium contagion mechanism implied by Vayanos (2004), Acharya and Pedersen (2005), and Longstaff (2008). … Cross-market linkages became much stronger and significant during the sub-prime crisis, consistent with the standard definition of financial contagion.").

[82] Carlos Carvalho et al., "The Persistent Effects of a False News Shock," *Journal of Empirical Finance* 18, no. 4, 2011, pp. 597–615 ("Carvalho et al. (2011)") at p. 597.

[83] UAL Corp. was traded at NASDAQ under the ticker symbol "UAUA" and reported a market cap of approximately $1.6 billion at the close of the trading session prior to September 8, 2008, the day the stale news resurfaced. *See* Carvalho et al. (2011) at pp. 597, 600.

provides "evidence on systematic deviations from informationally frictionless and efficient markets" during a period of market turmoil associated with the Global Financial Crisis.[84]

44.     Another example of inefficiency for a stock traded on a major exchange is described in an article by Huberman and Regev, which showed large and significant stock price reactions to the release of stale news regarding an apparent breakthrough in cancer research by EntreMed that had previously been made public.[85]  Importantly, this article shows that an inefficient stock price reaction can occur even for a large company.  Specifically, Bristol-Myers Squibb, a widely followed NYSE-traded firm with a market capitalization over $100 billion at the time, was in a partnership with EntreMed which had achieved an apparent breakthrough in cancer research.[86] Although this breakthrough was published in various news outlets more than five months prior, it was not until the result was mentioned on the front page of *The New York Times* that Bristol-Myers Squibb experienced a return of 3.12% (corresponding to an increase in market capitalization of $3.3 billion).[87]  As noted by Huberman and Regev, the same information had been published previously in various news outlets, including *The New York Times*.  Semi-strong form market efficiency requires that security prices rapidly react to new information.  In an efficient market, security prices should not react to old, previously released news, as this information should already be reflected in the security prices prior to the repetition of the news. Subsequent to the study by Huberman and Regev, research by Tetlock confirmed that republication of stale news can subsequently have a price impact, which is inconsistent with semi-strong form market efficiency.[88]

45.     In sum, the well-recognized and documented existence of departures from market efficiency in developed financial markets underscores the need to assess market efficiency empirically for the individual securities and during specific time periods at-issue.

---

[84] Carvalho et al. (2011) at p. 598 ("Our paper adds to the available evidence on systematic deviations from informationally frictionless and efficient markets.").

[85] Gur Huberman and Tomer Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance* 56, no. 1, 2001, pp. 387–396 ("Huberman and Regev (2001)") at p. 387.

[86] Huberman and Regev (2001) at pp. 392, 394.

[87] EntreMed also experienced a large abnormal return following *The New York Times* publication.  Specifically, EntreMed experienced a "Friday-close-to-Monday-close return of 330 percent [which] was highly unusual: bigger than all but two of the over 28 million daily returns of stocks priced at $3 or more between January 1, 1963, and December 31, 1997."  Huberman and Regev (2001) at pp. 391, 394.

[88] Paul C. Tetlock, "All the News That's Fit to Reprint: Do Investors React to Stale Information?" *The Review of Financial Studies* 24, no. 5, 2011, pp. 1481–1512.  Deviations from efficiency such as this are abundant in the finance literature.

## V.    Dr. Hartzmark Has Not Established that the Market for Wells Fargo Stock Was Efficient During the Period of Market Disruption Caused by COVID-19

46.    Dr. Hartzmark has failed to establish a basis in financial economics to conclude that Wells Fargo common stock traded in an efficient market during the period of market disruption caused by COVID-19.  This period includes three of the six alleged corrective disclosure impact dates in this matter and coincides with a significant volume of Wells Fargo shares being traded, which suggests that potentially large numbers of putative class members acquired shares during this time.[89]

47.    As mentioned above, in his report, Dr. Hartzmark opines that "Wells Fargo common stock rapidly responded to unanticipated and material Company-specific information consistent with efficient markets"[90] and "traded in an efficient market throughout the Class Period."[91]  To support this conclusion, Dr. Hartzmark considers a series of factors that he states are "typically used by courts to analyze market efficiency,"[92] including the first four *Cammer* factors[93] and the *Krogman* factors.[94]  Dr. Hartzmark also purports to analyze the fifth *Cammer* factor that examines "whether the price of Wells Fargo common stock rapidly reacted to disclosures of material, new information."[95]  The fifth *Cammer* factor is related to the concept of efficiency in financial economics known as semi-strong form market efficiency, and as discussed in **Section IV**, is the factor on which I focus in this report.

48.    As part of his examination of the fifth *Cammer* factor, Dr. Hartzmark attempts to determine "whether there was a difference between the observed proportions of statistically significant abnormal returns on news days as compared to no-news days."[96]  Therefore, as a threshold matter, in order to reliably conduct this analysis, Dr. Hartzmark would need to reliably

---

[89] For example, the aggregate volume of Wells Fargo shares traded between February 24, 2020 and March 12, 2020, inclusive, was 626.1 million shares, more than 15% of the shares outstanding in that period.

[90] Hartzmark Report, ¶ 10.

[91] Hartzmark Report, ¶ 76.

[92] Hartzmark Report, ¶ 10.

[93] The *Cammer* factors Dr. Hartzmark considers are "(1) average weekly turnover; (2) analyst coverage; (3) number of market makers or dealers of the security, along with arbitrageurs; and (4) the issuer's eligibility to file SEC Form S-3 and to incorporate by reference other SEC Forms."  Hartzmark Report, ¶ 16.

[94] The *Krogman* factors Dr. Hartzmark considers are "(1) the market capitalization; (2) the bid-ask price spread, and (3) the float (i.e., the amount of outstanding security not held by insiders of the corporation)."  Hartzmark Report, ¶ 17.

[95] Hartzmark Report, ¶ 56.

[96] Hartzmark Report, ¶ 67.  Dr. Hartzmark defines "news days" as "days when there are company announcements related to earnings or guidance" and all other trading days as "no-news days."  Hartzmark Report, ¶ 62.

measure abnormal returns of Wells Fargo's stock. Abnormal returns are commonly estimated using an event study, and, accordingly, Dr. Hartzmark relies on an event study model here as well.[97]

49. There are three key flaws that render Dr. Hartzmark's analysis unreliable. First, Dr. Hartzmark's analysis of efficiency is generic and the majority of the period that Dr. Hartzmark analyzes occurs before the COVID-19 pandemic affected financial markets, including *all seven* of the "news days" used in his "cause and effect analysis."[98] As detailed in this section, however, the COVID-19 pandemic significantly affected markets starting in early 2020. Further, as discussed in **Section IV** above, it is well accepted in the financial economics literature that even in markets that are efficient most of the time, securities may trade inefficiently at particular points in time due to frictions and market disruptions. As a result, even if one accepts that Dr. Hartzmark has established efficiency for most of the putative Class Period, one cannot, as a matter of financial economics, extend that conclusion to the period during which financial markets were affected by the onset of the COVID-19 pandemic. A rigorous analysis of market efficiency of Wells Fargo's stock during the putative Class Period should involve a careful examination focused on this particular subperiod. However, Dr. Hartzmark performs no such examination.

50. Second, the market disruptions caused by the onset of the COVID-19 pandemic render Dr. Hartzmark's event study model, which underlies his analysis of the fifth *Cammer* factor, unreliable during the COVID-19 period. In particular, Dr. Hartzmark's model fails to take into account the increased volatility of stock returns during this period, as well as the changed relationship between Wells Fargo's stock and the market and industry indices during this time period. This failure results in an event study model that cannot reliably measure the abnormal returns of Wells Fargo's stock, which underlie Dr. Hartzmark's analysis of the fifth *Cammer* factor; as such, that entire analysis is unsupported and unreliable as a gauge of market efficiency during at least the portion of the putative Class Period coinciding with the onset of the COVID-19 pandemic.

51. Third, Plaintiffs' allegation that the price decline in Wells Fargo's stock on March 12, 2020 was caused by allegedly corrective information released well before the market closed on

[97] Hartzmark Report, ¶¶ 56, 58, 62.
[98] Hartzmark Report, Exhibit VIII.

the previous day is not consistent with market efficiency of Wells Fargo's stock as defined by financial economists, and further is not consistent with Dr. Hartzmark's opinion that "Wells Fargo common stock rapidly responded to unanticipated and material Company-specific information consistent with efficient markets."[99] If Plaintiffs are correct that the market did not fully react to information released on March 11, 2020 until sometime the following day, the price decline on March 12, 2020 (of which a substantial portion does not occur until the afternoon on that day) would represent a delayed reaction to information that was released on the prior day, but market efficiency requires, as an economic matter, that security prices rapidly incorporate value-relevant information.

### A. Dr. Hartzmark's Event Study Model Is Generic and By Construction Does Not Account for the Impact of COVID-19 on Financial Markets

52. For his event study, Dr. Hartzmark uses a regression analysis to determine the expected return of Wells Fargo on a given date based on the returns of a market index and two industry indices.[100] This approach is the same as in reports he has submitted in other cases, in which he analyzed the company's return based on the returns of a market index and either one or two industry indices.[101] Though he testified that he conducted some analysis of the "COVID period,"[102] this analysis appears nowhere in his report or in the supporting backup materials that I

---

[99] Hartzmark Report, ¶ 10.

[100] Hartzmark Report, Appendix D, ¶¶ 1–2.

[101] *See* Expert Report of Michael L. Hartzmark, Ph.D., *In re Finisar Corporation Securities Litigation*, August 14, 2017 ("Hartzmark Finisar Report"), ¶ 77; Expert Report of Michael L. Hartzmark, Ph.D., *In re Illumina, Inc. Securities Litigation*, September 14, 2018 ("Hartzmark Illumina Report"), ¶ 77; Expert Report of Michael L. Hartzmark, Ph.D., *In re HD Supply Holdings, Inc. Securities Litigation*, March 1, 2019 ("Hartzmark HD Supply Report"), ¶ 77; Expert Report of Michael L. Hartzmark, Ph.D., *In re Signet Jewelers Limited Securities Litigation*, March 15, 2019 ("Hartzmark Signet Jewelers Report"), Appendix D, ¶ 2; Expert Report of Michael L. Hartzmark, Ph.D., *Christakis Vrakas, et al. v. United States Steel Corporation et al.*, April 19, 2019 ("Hartzmark US Steel Report"), Appendix D, ¶ 2; Expert Report of Michael L. Hartzmark, Ph.D., *Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al.*, May 28, 2019 ("Hartzmark Applied Optoelectronics Report"), Appendix D, ¶ 2; Expert Report of Michael L. Hartzmark, Ph.D., *Lord Abbett Affiliated Fund, Inc. et al. v. Navient Corporation, et al.*, September 13, 2019, Appendix D, ¶ 2 ("Hartzmark Navient Report"); Expert Report of Michael L. Hartzmark, Ph.D., *In re: CenturyLink Sales Practices and Securities Litigation*, January 22, 2020 ("Hartzmark CenturyLink Report"), Appendix D, ¶ 2; Expert Report of Michael L. Hartzmark, Ph.D., *Patricia A. Shenk, et al. v. Mallinckrodt PLC, et al.*, July 29, 2020 ("Hartzmark Mallinckrodt Report"), Appendix D, ¶ 2; Expert Report of Michael L. Hartzmark, Ph.D., *State of Alaska, et al. v. Ryder System, Inc., et al.*, September 23, 2022 ("Hartzmark Ryder Report"), Appendix D, ¶ 8.

[102] Hartzmark Deposition, p. 73:18–25 ("A. I looked at the correlation of the squared abnormal returns and the VIX index. I looked at scatterplots of residuals. And determined, for the purposes of this analysis of what I was asked to opine, on market efficiency and the common damages methodology, that no such adjustment was required in terms of the empirical support for my -- for my conclusion and opinion.").

have reviewed and that I understand he has provided. Indeed, neither COVID-19 nor the pandemic are mentioned by Dr. Hartzmark anywhere in the body of his report. Dr. Hartzmark also does not mention the effects of the associated market dislocation and increased volatility, despite the significant impact COVID-19 had on financial markets and the potential implications of these dislocations for market efficiency, as I discuss further below.

53. Further, Dr. Hartzmark states that to "estimate the predicted return and return variation of Wells Fargo common stock, [he] use[s his] … standard 120 days as a [c]ontrol [p]eriod."[103] However, to reliably model abnormal returns, the control period needs to be representative of the period of time one wishes to analyze. For example, if one is estimating abnormal returns during a period of market dislocation such as the one caused by the onset of the COVID-19 pandemic, the control period should be representative of market conditions at the time. Here, however, the 120-day control period is identical to that used in at least 12 of Dr. Hartzmark's publicly available reports addressing class certification of common stock purchasers that I have identified that were filed during the period August 2017 to September 2022, none of which involves a period of market turmoil like that caused by COVID-19.[104] This period of market turmoil ultimately prevents Dr. Hartzmark's model from reliably estimating abnormal returns and, in addition, Dr. Hartzmark does not conduct any tests to determine if the market was efficient during this period specifically.

54. In particular, the use of a generic control period of 120 trading days, or approximately six months, means that when Dr. Hartzmark is estimating the abnormal returns of Wells Fargo's stock in March 2020, he is using data dating back to September 2019 to estimate the predicted relationship between Wells Fargo returns and the returns of market and industry indices. This means that, to the extent that the relationship between Wells Fargo's stock and the market and industry indices changed during the period of market disruption caused by COVID-19, or the volatility of returns changed which, as I demonstrate, both did, Dr. Hartzmark's approach would

[103] Hartzmark Report, Appendix D, ¶ 3.

[104] *See* Hartzmark Finisar Report, ¶ 78; Hartzmark Illumina Report, ¶ 78; Hartzmark HD Supply Report, ¶ 78; Hartzmark Signet Jewelers Report, Appendix D, ¶ 3; Hartzmark US Steel Report, Appendix D, ¶ 3; Hartzmark Applied Optoelectronics Report, Appendix D, ¶ 3; Hartzmark Navient Report, Appendix D, ¶ 3; Hartzmark CenturyLink Report, Appendix D, ¶ 3; Hartzmark Mallinckrodt Report, Appendix D, ¶ 3; Hartzmark Ryder Report, Appendix D, ¶ 10; Expert Report of Michael L. Hartzmark, Ph.D., *SEB Investment Management AB, et al. v. Symantec Corporation, et al.*, January 17, 2020, Appendix D, ¶ 3; Expert Report of Michael L. Hartzmark, Ph.D., *Public Employees' Retirement System of Mississippi, et al. v. Mohawk Industries, Inc., et al.*, January 25, 2022, Appendix D, ¶ 3.

not properly account for these changes, leading to unreliable estimates of abnormal returns and their statistical significance.

55.    Moreover, I note that Dr. Hartzmark's analysis of the fifth *Cammer* factor is further generic in that it evaluates only the relationship between earnings announcements and stock prices.  He does not demonstrate that the announcements he uses for his test are representative of the last three alleged corrective disclosures, which comprise congressional reports and testimony, not earnings announcements.[105]  Even for the first three alleged corrective disclosures, while these disclosures occurred on days with earnings releases, the nature of the allegedly corrective information released is not about earnings but rather about progress in achieving regulatory requirements.[106]  Dr. Hartzmark himself has stated in prior writings that, as a general proposition, there are too few earnings dates in a typical class period to establish a systematic cause-and-effect relationship using only earnings dates as "news" dates.[107]  In sum, Dr. Hartzmark has not reliably established a basis to support his conclusion that Wells Fargo's stock "reacted quickly to *all types* of material, unanticipated news … throughout the Class Period."[108]

56.    Finally, Dr. Hartzmark's analysis of the fifth *Cammer* factor only evaluates "news" dates in market conditions during time periods unaffected by the COVID-19 pandemic (his last "news" date is January 14, 2020),[109] which is not representative of the last three alleged corrective disclosures, which occurred during a period of market turmoil caused by the onset of the COVID-19 pandemic.  The fact that Dr. Hartzmark does not address this issue in his report is of

---

[105] Indeed, Dr. Hartzmark testified that how quickly the market reacts to a piece of information can differ for different types of information, specifically distinguishing congressional hearings from earnings announcements. Hartzmark Deposition, pp. 166:10–167:15 ("Q. Okay.  If you assume an efficient market, when would you expect the price of a security to start reacting to new material, publicly available information?  A. I thought I answered this. Information, there's different types of information, and the factors involved in disseminate -- disclosing, disseminating and digesting that information will cause the information to be -- move different, different amounts. … Where it's disclosed; how it's disclosed; how it is disseminated; how it -- what the information is, as we discussed before, there are all types.  It will be -- likely will be different when you have, you know, some type of congressional hearing where there are disclosures as opposed to a previously announced conference call or investor event.").

[106] *See* **Section II.A**.

[107] Michael L. Hartzmark and H. Nejat Seyhun, "The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation," *Virginia Law & Business Review* 6, no. 3, 2012, pp. 415–466 at p. 429 ("Should the expert wish to reliably demonstrate that efficiency exists based on cause-and-effect by using a specific type of disclosure—say, earnings—he then must deal with the fact that the class period is generally too short to have a sufficient number of disclosures to infer statistical significance.  For example, even when the class period is four years long, there are only sixteen earnings announcements—hardly a large enough sample to reliably test whether there exist any systematic relationships between earnings disclosures and price movements.").

[108] Hartzmark Report, ¶ 55 (emphasis added).

[109] Hartzmark Report, footnote 92.

particular concern, given that events associated with COVID-19 significantly impacted financial markets and Wells Fargo's business in March 2020. Indeed, academic researchers are continuing to fully assess the implications of these events on security markets, but preliminary indications are that the onset of the COVID-19 pandemic resulted in dislocations in various markets which could impact market efficiency, as discussed below.

57. It is widely understood that many financial markets experienced issues with liquidity (which is generally seen as a condition for the functioning of the arbitrage mechanism that supports market efficiency and which Dr. Hartzmark states is one characteristic of an efficient market)[110] during this period. As discussed in this section, the U.S. stock market was also affected,[111] including as a result of the effects of the dislocations in other markets, which raises questions about stock market efficiency during this time period in general, including in particular the efficiency of the market for Wells Fargo's stock. Indeed, the U.S. stock market exhibited extreme volatility during this time. Dr. Hartzmark's report does not address this issue at all, despite the fact that Plaintiffs' last three alleged corrective disclosure impact dates (March 5, 11, and 12, 2020) coincide with substantial market disruptions due to the onset of the COVID-19 pandemic.

58. Financial markets that are typically considered to be well developed experienced significant disruptions in February and March of 2020. For example, the Federal Reserve noted "highly unusual disruptions in Treasury financing markets associated with the coronavirus outbreak."[112] Market commentators stated that these "highly unusual disruptions" in the Treasury market could impair the functioning of other markets as well, as the Treasury market is the "foundation for trading in many other securities markets"[113] and that if the Treasury market

---

[110] Given that efficient markets depend upon arbitrage by informed investors to eliminate any temporary inefficiencies that may arise, and given that illiquidity hampers the ability of informed market participants to perform arbitrage, liquidity is frequently viewed as being tied to the concept of market efficiency. *See*, *e.g.*, Tarun Chordia et al., "Liquidity and Market Efficiency," *Journal of Financial Economics* 87, no. 2, 2008, pp. 249–268 at p. 267 ("greater liquidity engender[s] a higher degree of informational efficiency."). *See also* Hartzmark Report, ¶ 15 ("… an efficient market … can be characterized as a liquid market …").

[111] Gormsen and Koijen (2022).

[112] Federal Reserve Bank of New York Press Release, "Statement Regarding Treasury Reserve Management Purchases and Repurchase Operations," March 12, 2020. *See also* "Recent Disruptions and Potential Reforms in the U.S. Treasury Market: A Staff Progress Report," *U.S. Department of the Treasury, Board of Governors of the Federal Reserve System, Federal Reserve Bank of New York, U.S. Securities and Exchange Commission, and U.S. Commodity Futures Trading Commission*, November 8, 2021, pp. 12–13.

[113] Eric Milstein and David Wessel, "What Did the Fed Do in Response to the COVID-19 Crisis?" *Brookings*, December 17, 2021.

"experience[d] large-scale illiquidity it w[ould] be difficult for other markets to price effectively and could lead to large-scale position liquidations elsewhere."[114]  Moreover, at least one report commented that the steps taken by the Federal Reserve to support the Treasury market "proved insufficient" at ensuring funding markets functioned efficiently in light of "the disruption of flows of credit across other financial markets."[115]  These disruptions in the Treasury markets would be expected to affect the equity markets as well, given that the liquidity and volatility of the Treasury market is closely connected to the liquidity and volatility of the stock market.[116]

59.      In addition to the Treasury market, other fixed-income markets, including the corporate bond market, generally suffered severe market dislocations following the emergence of COVID-19.[117]  For example, an increase in customer demand for immediacy, which led investors to rapidly pull out of corporate bond funds, coupled with a lack of dealer supply of immediacy, caused a liquidity crisis in the corporate bond market which only fully receded months after the initial COVID-19-related shock.[118]  Researchers have also noted that fixed income markets experienced temporary failures of the law of one price—the requirement that in efficient markets two assets with the same present value of future cash flows will trade at the same price,

---

[114] Colby Smith and Brendan Greeley, "Fed Promises to Pump Trillions of Dollars into Financial Markets," *Financial Times*, March 12, 2020.

[115] Eric Milstein and David Wessel, "What Did the Fed Do in Response to the COVID-19 Crisis?" *Brookings*, December 17, 2021 ("As one of our colleagues, Don Kohn, former Federal Reserve Vice Chair, said in March 2020: 'The Treasury market in particular is the foundation for trading in many other securities markets in the U.S. and around the world; if it's disrupted, the functioning of every market will be impaired.  The Fed's purchase of securities is explicitly aimed at improving the functioning of the Treasury and MBS markets, where market liquidity had been well below par in recent days.' But targeting the Treasury market proved insufficient, given the severity of the COVID recession and the disruption of flows of credit across other financial markets.  So the Fed intervened directly in the markets for corporate and municipal debt to ensure that key economic actors could raise funds to pay workers and avoid bankruptcies.").

[116] Tarun Chordia et al., "An Empirical Analysis of Stock and Bond Market Liquidity," *The Review of Financial Studies* 18, no. 1, 2005, pp. 85–129 at pp. 111, 126 ("[L]iquidity in both stock and bond markets is lower in down-markets, possibly because of strained market-making capacity during periods of market declines."; "Liquidity and volatility shocks are positively and significantly correlated across stock and bond markets at daily horizons, indicating that liquidity and volatility shocks are often systemic in nature." ).

[117] Gormsen and Koijen (2022) at p. 17 ("Fixed income markets are subject to substantial stress and illiquidity during the height of the crisis in March 2020.  This stress resulted in large fluctuations in prices on fixed income securities as well as price dislocations and temporary failures of the law of one price.  These patterns were present both in the Treasury market and in the corporate bond market.").

[118] Mahyar Kargar et al., "Corporate Bond Liquidity during the COVID-19 Crisis," *The Review of Financial Studies* 34, no. 11, 2021, pp. 5352–5401 at pp. 5384–5385 ("In particular, we find that the initial panic was caused by shocks to both customers' demand for immediacy and dealers' willingness to supply it.  The former shock receded quickly, and almost fully, after the mere announcement of the Fed's intention to enter the market and purchase bonds.  The latter shock, however, lingered months after markets appeared to calm, indicating that elevated trading volume in conjunction with balance sheet constraints remain a risk in times of crisis.").  *See also* Maureen O'Hara and Xing (Alex) Zhou, "Anatomy of a Liquidity Crisis: Corporate Bonds in the COVID-19 Crisis," *Journal of Financial Economics* 142, no. 1, 2021, pp. 46–68 at p. 49 ("Some dealers reportedly reached their balance sheet capacity and hence were unable to absorb more sales.").

regardless of where or how they are traded—during this period, which is consistent with market inefficiency.[119, 120]

60.      The short term funding market, which the SEC noted is "critical to the performance of the … equity markets," also experienced disruptions which resulted in "higher funding costs, increased bid-ask spreads, and increased margin requirements and collateral haircuts in some market segments."[121]  Indeed, many financial institutions increased margin requirements during this time,[122] and, as discussed in **Section IV**, research suggests that increases in margin requirements can have a negative impact on market liquidity and efficiency.[123]  As a result of increased margin requirements, margin calls increased, which put more downward pressure on prices.  For example, the International Monetary Fund noted that "[t]he sharp tightening in financial conditions put pressure on leveraged investors in March, forcing them to close out some of their positions in order to meet margin calls or to rebalance their portfolios—a dynamic that likely amplified asset price declines."[124]

61.      In light of the disruptions to the U.S. Treasury market, the corporate bond market, and short-term financing markets following the COVID-19 outbreak, it is inappropriate for Dr.

---

[119] Richard Roll et al., "Liquidity and the Law of One Price: The Case of the Futures-Cash Basis," *The Journal of Finance* 62, no. 5, 2007, pp. 2201–2234 at p. 2201 ("The law of one price is a fundamental building block of modern financial theory. Indeed, several well-known pricing relations in finance depend on the notion that two traded or synthesized instruments with the same future cash flows should trade at the same price.").  *See also* Aris Protopapadakis and Hans R. Stoll, "Spot and Futures Prices and the Law of One Price," *The Journal of Finance* 38, no. 5, 1983, pp. 1431–1455 at p. 1431 ("In efficient markets, international commodity arbitrage implies that, for a standard commodity, prices in two markets expressed in a common currency will not differ but for transport costs.").

[120] Gormsen and Koijen (2022) at p. 17 ("Fixed income markets are subject to substantial stress and illiquidity during the height of the crisis in March 2020.  This stress resulted in large fluctuations in prices on fixed income securities as well as price dislocations and **temporary failures of the law of one price**.  These patterns were present both in the Treasury market and in the corporate bond market." (emphasis added)).

[121] These issues were caused by the "sharp, unexpected increase in demand for cash and short-dated, near-cash investments and related liquidity."  S.P. Kothari et al., "U.S. Credit Markets Interconnectedness and the Effects of the COVID-19 Economic Shock," *U.S. Securities and Exchange Commission*, October 2020, p. 17.

[122] "The Role of Financial Markets and Institutions in Supporting the Global Economy during the COVID-19 Pandemic," *Financial Services Forum, Institute of International Finance, and ISDA*, May 2021, p. 56 ("Additionally, increased volume and market volatility directly increased variation margin.  Margin models reacted to the heightened volatility, which further drove up margin requirements.  These increases in margins posed significant challenges for banks' liquidity management.").

[123] Brunnermeier and Pedersen (2009) show that "under certain conditions, margins are destabilizing and market liquidity and funding liquidity are mutually reinforcing, leading to liquidity spirals."  *See* Markus K. Brunnermeier and Lasse Heje Pedersen, "Market Liquidity and Funding Liquidity," *The Review of Financial Studies* 22, no. 6, 2009, pp. 2201–2238 ("Brunnermeier and Pedersen (2009)") at p. 2201.  *See also* Akbas et al. (2022) at p. 1 ("Combining the Fed's 22 changes in margin requirements with a hand-collected sample of earnings announcements between 1934-1975, we show that higher margin requirements induce greater delay in incorporating earnings information into prices.").

[124] "Global Financial Stability Overview: Markets in the Time of COVID-19," *International Monetary Fund*, April 2020, p. 6 (emphasis removed).

Hartzmark to essentially assume (by ignoring these findings in his report) that the U.S. equity markets functioned without similar disruptions.

62. Yet there is evidence that equity markets were also disrupted or dislocated. In fact, the last three alleged corrective disclosure impact dates occurred on days when the U.S. stock market exhibited particularly large losses (*see* **Exhibits 1A and 1B**), with the S&P 500 declining by 3.4%, 4.9%, and 9.5%—at that time the largest daily decline since 1987[125]—on March 5, 11, and 12, 2020, respectively. Moreover, the stocks of Wells Fargo's main peers also exhibited large losses on these dates.[126]

63. Observing such large losses in the stock market suggests the existence of unusual and significant volatility. Indeed, market volatility increased sharply beginning around February 24, 2020, with the increase continuing through the first half of March 2020 (as measured by the Chicago Board Options Exchange's CBOE Volatility Index ("VIX") shown in **Exhibits 2A and 2B**).[127] Academic research suggests that such increases in volatility can signal general market dislocation, consistent with the other examples of dislocations discussed in this section.[128] Further, as I discuss in **Section V.B.1**, the volatility of Wells Fargo's stock (and of its abnormal returns) exhibited a pattern similar to that of the overall market volatility during this time. Volatility is an important factor in assessing whether returns of a stock are statistically significant, and this increased volatility is something that Dr. Hartzmark does not address in his report.

64. A further indication of the effect of the onset of the COVID-19 pandemic on the stock market is that market-wide "circuit breakers"—15-minute trading halts that occur if the S&P 500

125 Pippa Stevens et al., "Stock Market Live Thursday: Dow Tanks 2,300 in Worst Day since Black Monday, S&P 500 Bear Market," *CNBC*, March 12, 2020.

126 Wells Fargo benchmarked its performance against peers in industry conference presentations in 2018 and 2019. The peer firms include Bank of America, PNC, Citi, J.P. Morgan, and U.S. Bank. *See, e.g.*, Wells Fargo & Company Presentation, "Financial Overview," May 10, 2018, pp. 3, 46; Wells Fargo & Company Presentation, "Fixed Income Investor Update," May 2019, p. 14. As of March 12, 2020, these five peers constituted 81.70% of Dr. Hartzmark's Focused Industry Index (and were the five largest constituents) and 28.63% of Dr. Hartzmark's Broad Industry Index. Calculating a simple average of total stock returns across those five peers, yields an average decline of 5.7%, 5.8% and 10.5% on March 5, 2020, March 11, 2020, and March 12, 2020, respectively.

127 Rob McLean et al., "Dow Plunges 1,000 Points, Posting Its Worst Day in Two Years as Coronavirus Fears Spike," *CNN Business*, February 24, 2020 ("The VIX [], a measure of market volatility, shot up more than 46% [on February 24, 2020].").

128 Paolo Pasquariello, "Financial Market Dislocations," *The Review of Financial Studies* 27, no. 6, 2014, pp. 1868–1914 at p. 1884.

Index declines by a certain amount from the prior day's closing price[129]—were triggered four times during this period, including on the March 12, 2020 alleged corrective disclosure impact date.[130]  Prior to March 2020, market-wide circuit breakers had only been triggered once before, in 1997.[131]  These circuit breakers are triggered when the S&P 500 declines by more than 7% and are intended to halt trading "if a severe market price decline reaches levels that may exhaust market liquidity."[132]  Given that Dr. Hartzmark recognizes that "an efficient market … can be characterized as a liquid market,"[133] the triggering of these circuit breakers provides potentially relevant considerations for market efficiency that Dr. Hartzmark does not address in his report.

65.    Finally, academic literature has identified large price movements in February and March of 2020 not adequately explained by "economic news, including fundamentals, interest rates, or corporate profit shares."[134]  Such a "disconnect between stock prices and news"[135] raises further questions about market efficiency, especially given that Dr. Hartzmark's own test of market

---

[129] "Self-Regulatory Organizations; New York Stock Exchange LLC; Notice of Filing of Proposed Rule Change to Adopt on a Permanent Basis the Pilot Program for Market-Wide Circuit Breakers in Rule 7.12," Securities Act Release No. 34–92428, July 16, 2021 ("Securities Act Release No. 34–92428"), p. 3 ("A market-wide trading halt will be triggered if SPX declines in price by specified percentages from the prior day's closing price of that index. The triggers are set at three circuit breaker thresholds: 7% (Level 1), 13% (Level 2), and 20% (Level 3). A market decline that triggers a Level 1 or Level 2 halt after 9:30 a.m. and before 3:25 p m. would halt market-wide trading for 15 minutes.").

[130] The circuit breakers caused halts in trading on March 9, 2020, March 12, 2020 (an alleged corrective disclosure impact date), March 16, 2020, and March 18, 2020.  *See* Securities Act Release No. 34–92428, pp. 6–8.

[131] Circuit breakers had been established after the October 19, 1987 stock market crash.  Securities Act Release No. 34-92428, p. 24 ("On October 19, 1987, the DJIA declined 22.6%.  In response, U.S. exchanges established the first 'circuit breakers,' designed to temporarily restrict trading in stocks, stock options, and stock index futures when markets experience a severe, rapid decline.").

[132] Specifically, since June 2012, these circuit breakers are triggered when the S&P 500 declines by more than 7% prior to 3:25 PM.  *See* "Stock Market Circuit Breakers," *Investor.gov*.

[133] Hartzmark Report, ¶ 15.  *See also* Hartzmark Deposition, pp. 164:19–165:6 ("Q. How do you define an inefficient market? … A. Illiquid. …").

[134] Gormsen and Koijen (2022) at p. 12 ("Cox et al. (2020) conclude that the sudden decline and rapid recovery cannot be explained by fundamentals, interest rates or corporate profit shares, thus assigning the price movements to the price of risk driven by large fluctuations in risk aversion or sentiment.  This result is consistent with the broader message emerging from this literature.").  *See also* Josue Cox et al., "What Explains the COVID-19 Stock Market?" NBER Working Paper No. 27784, 2020, pp. 1–35, https://www.nber.org/papers/w27784, at p. 2 ("[Market movements during COVID-19 demonstrated] wild volatility in the pricing of stock market risk, driven by fluctuations in risk aversion or beliefs/sentiment."); Gormsen and Koijen (2022) at p. 2 ("One of the main takeaways from the review is that we need new theories to understand fluctuations in stock prices.  The large fluctuations we observed during the pandemic cannot be easily explained by news or by theories revolving around persistent shocks to risk aversion, macroeconomic risks or errors in expectations about fundamentals.  One of the main questions for asset pricing going forward is therefore to explain why stock prices moves so strongly without clear economic news.").

[135] Gormsen and Koijen (2022) at p. 24.

efficiency examines the relationship between news and stock price changes,[136] as discussed further in **Section V.B.3**.

66. The existence of these market disruptions and dislocations across typically well-developed, liquid markets means that it is inappropriate for a financial economist to infer that the market for a security, such as Wells Fargo stock, was efficient during the period associated with the onset of the COVID-19 pandemic based on an analysis of data outside of the pandemic. This is especially true in this case, as Dr. Hartzmark does not even discuss these issues in the Hartzmark Report, and his market efficiency analyses of Wells Fargo's stock are mostly based on events and observations that occurred prior to these well-documented market dislocations. Dr. Hartzmark has therefore not established a reliable basis to support his conclusion that Wells Fargo stock "reacted quickly to all types of material, unanticipated news … *throughout* the Class Period."[137]

### B. Dr. Hartzmark's Event Study is Unreliable During the Period of Market Disruption Caused by COVID-19

67. The concerns about market efficiency during the onset of the COVID-19 pandemic are not simply abstract and theoretical, but demonstrated through specific market disruptions that were observed. In fact, as discussed in this section, Dr. Hartzmark has provided no basis to reach a conclusion of efficiency for Wells Fargo stock based on his analysis of the fifth *Cammer* factor, because I demonstrate that the observed market disruptions render his event study unreliable during this period.

68. The market disruptions at the onset of the COVID-19 pandemic include that the volatility of U.S. stocks generally, and Wells Fargo's stock specifically, increased substantially beginning in late February 2020.[138] Accounting for this change in volatility is important for the reliability of an event study because the statistical significance of an abnormal return is assessed using the

[136] Hartzmark Report, ¶¶ 54–55.
[137] Hartzmark Report, ¶ 55 (emphasis added).
[138] In deposition, Dr. Hartzmark appeared to agree that the impact of COVID-19 on markets began in late February. Hartzmark Deposition, pp. 151:23–152:12 ("Well, part of the issue in this particular case is that, you know, the 'COVID period,' per se, you know, different experts will define it differently. I think the press really looked at it, say, from February, late February in the 20s, you know, 21st, 22nd, you know, really through the rest of the year. And so that would be the period. But -- yeah, that would be, I think, as I look at the COVID period. Q. So you considered the COVID period to start in late February 2020; is that right? A. In terms of its impact on markets.").

volatility of abnormal returns, which may be affected—and, as I show in **Section V.B.1** below, in the case of Dr. Hartzmark's event study is affected—by stock volatility.

69.    In addition to volatility, it is also important for a proper event study model to use a control period in which the relationship between Wells Fargo's stock return and those of the market and/or the industry is sufficiently comparable to that in the period of interest.  If these relationships differ between the two periods, which they may for a number of reasons (including if correlations among stocks generally increase, as has been found in times of crisis), then the event study model may not reliably measure abnormal returns in the period of interest.  As shown in **Section V.B.2** below, this appears to have happened at the onset of the COVID-19 pandemic for Dr. Hartzmark's event study model.  His failing to account for changed relationships between Wells Fargo and the market and industry results in unreliable measures of abnormal returns.

70.    As discussed, the event study methodology Dr. Hartzmark relies on in his report uses a control period of the prior 120 trading days (approximately six months) to estimate the abnormal return on each date.[139]  This methodological choice means that, even for dates in the period affected by the onset of the COVID-19 pandemic, the observations used by Dr. Hartzmark to estimate his model are predominantly from a period unaffected by COVID-19.  In other words, Dr. Hartzmark's event study does not account for the changed market environment due to COVID-19.

71.    Finally, I provide additional evidence in **Section V.B.3** below showing that Dr. Hartzmark's estimates of abnormal returns in March 2020 indeed demonstrate that his model is misspecified.  I show that in Dr. Hartzmark's specification, statistically significant abnormal returns are disproportionally frequent shortly after February 24, 2020, a characteristic of a model that Dr. Hartzmark himself characterized at deposition as a "red flag" and has stated in prior writings would cause the regression specification to "need[] modification."[140]  Basing his

---

[139] Hartzmark Report, Appendix D, ¶¶ 3–4.

[140] Hartzmark Deposition, p. 77:2–9 ("Q. But it's fair to say that finding 31 percent days with significant returns in an event study suggests a problem with the regression?  A. It suggests there might be an omitted variable.  But like I said, it also would suggest that you -- again, be careful, it's a red flag."); Michael L. Hartzmark and H. Nejat Seyhun, "Understanding the Efficiency of the Market for Preferred Stock," *Virginia Law & Business Review* 8, no. 2, 2014 ("Hartzmark and Seyhun (2014)"), pp. 149–230 at pp. 190–191 ("The fact that plaintiffs' expert found twenty of the sixty-five days between June 6, 2008 and September 8, 2008, or 31% of the days, with significant returns should have suggested that a different statistical model was required or that complete reliance on the regression results would lead to the wrong conclusion.  Having such a high proportion of days with statistically significant returns suggests that the regression specification needed modification.").

analysis on a model that is neither capable of calculating abnormal returns reliably nor correctly assessing whether abnormal returns are statistically significant is highly problematic and renders Dr. Hartzmark's analysis unreliable.

### 1. Dr. Hartzmark Does Not Account for Observed Dramatic Increases in Volatility

72. The S&P 500 reached what was then an all-time high on February 19, 2020, before declining sharply by late February 2020.[141] **Exhibits 1A and 1B** depict the market index used by Dr. Hartzmark (the S&P 500)[142] and Wells Fargo's stock price. On both February 24 and 25, 2020, the S&P 500 declined by more than 3%, the largest daily declines since December of 2018. Market declines continued, with some variation, through March 2020 and included the two largest single-day declines since 1987[143] and four days on which the market-wide circuit breakers were triggered.[144] Between February 21, 2020 (the last trading day before February 24, 2020, the date of the first large decline in the S&P 500) and March 23, 2020 (approximately one month into the COVID-19 crisis period), the S&P 500 lost over 32% of its value. The declines in U.S. bank stocks were even more severe—both Wells Fargo's stock price and Dr. Hartzmark's Focused Industry Index started to decline around February 24, 2020, and both fell by more than 45% by March 23, 2020.[145] Losses ultimately began to subside on March 24, 2020, when the S&P 500 increased by 9%[146] (and Wells Fargo's stock price increased by more than 14%).

---

[141] Fred Imbert, "S&P 500 and Nasdaq Jump to Record Highs, Dow Climbs More than 100 Points," *CNBC*, February 19, 2020 ("The S&P 500 and Nasdaq Composite rose to record highs on Wednesday [February 19, 2020].").

[142] Hartzmark Report, Appendix D, footnote 2. Dr. Hartzmark uses the S&P 500 Total Return Index (referenced hereafter as the S&P 500) as his market index.

[143] Pippa Stevens et al., "Stock Market Live Thursday: Dow Tanks 2,300 in Worst Day since Black Monday, S&P 500 Bear Market," *CNBC*, March 12, 2020; Pippa Stevens et al., "Stock Market Live Monday: Dow Drops 13%, Trump Says Recession Possible, Trading Halted at Open," *CNBC*, March 16, 2020.

[144] Securities Act Release No. 34-92428, pp. 6–8.

[145] The return for Dr. Hartzmark's Focused Industry Index is net of Wells Fargo's return. Dr. Hartzmark's Broad Industry Index (net of Wells Fargo's return) declined by approximately 42% in the same period.

[146] The public press attributed this recovery to the announcement after market hours on March 23, 2020 that the U.S. government's fiscal stimulus package was expected to pass the following morning. *See*, *e.g.*, Yun Li et al., "Stock Market Live Tuesday: Dow Soars 2,100 Points, Biggest Jump in 80 Years, Stimulus Close," *CNBC*, March 24, 2020 ("Senate Minority Leader Charles Schumer said he expects an agreement on Tuesday. 'We expect to have an agreement tomorrow morning,' Schumer told reporters Monday night."). *See also* Chris Matthews and Andrea Riquier, "Dow Posts Best Percent Gain Since 1933 on Hope for Plan to Rescue Economy from Coronavirus," *MarketWatch*, March 24, 2020 ("U.S. stocks soared Tuesday, with the Dow Jones Industrial Average notching its biggest one-day point gain ever and its best percentage gain since 1933, a day after plumbing the lowest levels since

73. Concurrently with the observed losses, volatility increased dramatically in late February 2020, for both the broad U.S. equity markets and for Wells Fargo stock specifically. A commonly used measure of U.S. stock market volatility is the VIX index—a measure calculated from prices of options on the S&P 500 (the market index used in Dr. Hartzmark's event study model)[147] and designed to depict the 30-day expected volatility in the S&P 500.[148] On February 24, 2020, the VIX increased by 46.6%, the largest single-day percent increase in over two years. As depicted in **Exhibits 2A and 2B**, the VIX continued to increase sharply over the following days, and by the end of the same week, on February 28, 2020, it closed at more than double its level just a week earlier. With some variation, it continued to rise thereafter, nearly doubling again to close above 75 on March 12, 2020, the last day of the putative Class Period—a level that had not been reached since the peak of the Global Financial Crisis in late 2008.[149] The VIX then peaked at an all-time high closing level of 82.7 on March 16, 2020, two trading days after the end of the putative Class Period.[150]

74. Like the volatility of the U.S. equities market overall, Wells Fargo's stock volatility also spiked starting on February 24, 2020 and into March 2020. Specifically, as depicted in **Exhibits 3A and 3B**, the implied volatility of 30-day at-the-money call options on Wells Fargo's stock (which is illustrative of the expected 30-day volatility for Wells Fargo's stock) increased more than *400%* from a closing level of 20.3 on February 21, 2020 to 102.7 on March 12, 2020.[151] Like the VIX, this implied volatility also peaked two trading days after the end of the putative Class Period, closing at 128.9 on March 16, 2020 (the highest level since April 2009).[152]

75. The timing of this sharp increase in volatility in late February 2020 is problematic for Dr. Hartzmark's event study analysis as he applies his event study, estimated mostly on dates before the onset of the COVID-19 crisis and corresponding increase in volatility, to dates in March

---

2016, amid growing optimism that Congress will come to an agreement on a fiscal stimulus package aimed at combatting the economic impact of the coronavirus epidemic.").

[147] Hartzmark Report, Appendix D, ¶ 2.

[148] "Trade VIX Options Nearly 24 Hours a Day," *Cboe*.

[149] Pippa Stevens et al., "Stock Market Live Thursday: Dow Tanks 2,300 in Worst Day since Black Monday, S&P 500 Bear Market," *CNBC*, March 12, 2020.

[150] **Exhibits 2A and 2B**. Yun Li, "Wall Street's Fear Gauge Closes at Highest Level Ever, Surpassing Even Financial Crisis Peak," *CNBC*, March 16, 2020.

[151] Similarly, the 20-day trailing return volatility of Wells Fargo's stock increased by more than *350%* in this window.

[152] **Exhibits 3A and 3B**.

2020. For each such date in March 2020 Dr. Hartzmark analyzes, his model is estimated using 120 trading days prior to the date,[153] meaning that even for the dates analyzed by Dr. Hartzmark at the very end of the putative Class Period, the vast majority of his estimation window is prior to February 24, 2020 (i.e., prior to the sharp increase in volatility). This is despite Dr. Hartzmark himself having stated in prior writings that, in what appear to be similar circumstances to the regression model he uses in this case, a model based on a rolling estimation window was not capable of accounting for structural changes in the underlying return distribution,[154] such as that represented by the sharp spike in volatility here. Additionally, Dr. Hartzmark's use of "dummy variables to account and adjust for atypical returns during [the] control period" effectively *excludes* all trading dates from March 5, 2020 through March 11, 2020 if they fall within his estimation windows.[155] As a result, even for the last date analyzed by Dr. Hartzmark (March 12, 2020), his estimation window consists of 107 trading days prior to February 24, 2020 (two of which are excluded using dummy variables)—i.e., prior to the sharp increase in volatility—compared to only 13 trading days thereafter (five of which are excluded from the analysis using dummy variables).[156] Consequently, the return volatility of Wells Fargo's stock used by Dr. Hartzmark to assess statistical significance of abnormal returns is substantially lower for dates in March 2020 than the actual volatility of Wells Fargo's stock given the increased volatility due to COVID-19 and the global pandemic, which biases his event study for that period by making it more likely that abnormal returns will be statistically significant when they would not be with a model accounting for increased volatility during the COVID-19 pandemic.

---

[153] Hartzmark Report, Appendix D, ¶ 3.

[154] Hartzmark and Seyhun (2014) at p. 187 ("The *Freddie Mac* court agreed with both experts that there were two distinct periods with different … return distributions. … The plaintiffs' expert felt this problem was corrected by using rolling linear regressions – that is, the same regression specification over a different time period each day. However, this technique does not correct for the problem when there are two or more distinct periods with changes in the underlying return distributions and multiple omitted variables.").

[155] Hartzmark Report, Appendix D, Section B (capitalization omitted). Dr. Hartzmark uses dummy variables for each date where he finds that "important Wells Fargo-specific information" was released, because these days "could possibly have atypical returns." In an event study regression model, adding dummy variables for individual days makes the abnormal return of these days zero by construction, which has the effect of excluding these days from the analysis. *See also* Hartzmark Report, Appendix D, footnote 11. Even if it were appropriate to use dummy variables for the period from March 5, 2020 to March 12, 2020, Dr. Hartzmark could have extended his estimation window to include additional days during the period of market disruption caused by COVID-19 in order to more accurately measure volatility during that period.

[156] In calculating an abnormal return for March 12, 2020 and assessing whether it is statistically significant, Dr. Hartzmark uses an estimation window from September 19, 2019 to March 11, 2020. Seven days in this 120 trading day estimation window are effectively excluded (using dummy variables) by Dr. Hartzmark (two before February 24, 2020, and five thereafter). *See* Hartzmark Report, Appendix D, footnote 11.

76. The magnitude of this issue can be seen in **Exhibit 3B**, which summarizes different volatility measures for Wells Fargo's stock during the onset of the COVID-19 pandemic and related market disruptions in February and March 2020. The blue line with circle markers and the red line with square markers in this exhibit depict the expected 30-day and 90-day volatilities as implied by prices for at-the-money call options on Wells Fargo's stock on each day. As discussed, these implied volatilities increased sharply starting on February 24, 2020. The purple line with diamond markers depicts the volatility of Wells Fargo's daily returns in the 120-trading-day estimation window Dr. Hartzmark uses to analyze each day. As a result of Dr. Hartzmark's rolling regression approach and the large number of days he effectively removes using dummy variables, the sharp increase in volatility is not reflected in Dr. Hartzmark's estimation windows for any of the three alleged corrective disclosure dates in March 2020—this is indicated by the nearly flat slope of the purple line until after March 13, 2020 (i.e., one would have to extend Dr. Hartzmark's model after the end of the putative Class Period for that model to begin showing the increase in volatility that was already present in the data in the weeks prior) and the large difference between this line and the blue and red lines.[157]

77. Because Dr. Hartzmark attempts to assess whether an abnormal return that he calculates for a certain date is statistically significant based on the volatility of all other abnormal returns in the estimation window, by failing to appropriately account for the increased volatility starting in late February 2020, Dr. Hartzmark underestimates the volatility of his estimated abnormal returns.

78. I further illustrate this issue using statistical analysis by testing for a change in the volatility of abnormal returns before and after February 24, 2020—the date on which market losses and volatility began to increase sharply.

79. Even in Dr. Hartzmark's last estimation window that uses data closest to the end of the putative Class Period (the model used for assessing March 12, 2020), there are only eight trading days including and after February 24, 2020—a limited amount of data to test for a break in volatility. I therefore extend Dr. Hartzmark's event study model through March 23, 2020 (i.e., I

[157] As an example, for March 11, 2020, the volatility of daily returns in Dr. Hartzmark's estimation window is 21% (**Row I of Exhibit 3C**), compared to 110% between February 24, 2020 and March 23, 2020 (**Row II of Exhibit 3C**).

estimate a model using 120 trading days ending on March 23, 2020).[158]  My estimation window ends on March 23, 2020, one month after February 24, 2020, in order to include more days in March 2020 that are part of the COVID-19 crisis period and are like the days of the alleged corrective disclosure impact dates in March 2020.

80.    I assess whether the volatility of abnormal returns is different before and after February 24, 2020 using a Levene test, a commonly used methodology to compare the volatility in two samples.[159, 160]  The results of this test are summarized in **Exhibit 4**—the test finds a statistically significant change in the volatility of abnormal returns in the period from February 24, 2020 to March 23, 2020 as compared to that of the period before February 24, 2020.  As depicted in the exhibit, the volatility of abnormal returns is substantially *higher* after February 24, 2020 as compared to before.

81.    As mentioned, in his event study, Dr. Hartzmark assesses the statistical significance of abnormal returns by evaluating whether a certain abnormal return is unlikely to be observed given the estimated volatility during the control period.  With higher volatility, large abnormal returns (in absolute value) are more likely to be observed by chance alone, so it becomes less likely that such abnormal returns are statistically significant.  As an example, if a stock is highly volatile, a 5% abnormal return may not be unusual, while such an abnormal return could be very unusual if the stock is not volatile.  Thus, by using control periods with substantially lower volatility than existed during the period affected by COVID-19, Dr. Hartzmark's event study methodology is misspecified and overstates statistical significance during the period affected by COVID-19.[161]

---

[158] To be consistent with Dr. Hartzmark's approach, I include dummy variables for October 15, 2019, January 14, 2020, and March 5 through 11, 2020.  Consistent with his approach, I also include a dummy variable for March 12, 2020.

[159] When conducting the Levene test, I exclude the zero abnormal returns on dummy dates since these abnormal returns are a result of the dummy variables and thus are not representative of abnormal returns on non-dummy dates.

[160] *See*, *e.g.*, David C. LeBlanc, *Statistics: Concepts and Applications for Science* (Sudbury, MA: Jones and Bartlett, 2004), p. 243 ("The Levene Test is used … to test the Null hypothesis that two population variances are equal.").

[161] At his deposition, Dr. Hartzmark appeared to agree that structural breaks (a change in volatility being an example of a structural break) must be accounted for when assessing the statistical significance of abnormal returns.  Hartzmark Deposition, p. 224:6–13 ("Q. … But in Biomarin, you found a break point on March 25, 2020, and so you used the post-event period; is that correct?  A. Well, in Biomarin, the earnings dates were all subsequent to March of 2020, so it was very critical that they be measured with that, that control, I -- and they found the break point.").

### 2. Dr. Hartzmark Does Not Account for the Change in Relationship Between Wells Fargo's Stock and Market and Industry Indices

82. In addition to accounting for increases in volatility, it is also important for a proper event study model to use a control period in which the relationship between Wells Fargo's stock return and those of the market and/or the industry are the same as in the period of interest. If either relationship (with the market and/or industry) changes over time and this change is not appropriately reflected in the chosen estimation window—for example because the estimation window is too far in the past—then the abnormal returns calculated in the period of interest based on that estimation window can be unreliable.

83. Dr. Hartzmark's event study estimates an average relationship (as measured by the regression "coefficients") between Wells Fargo's stock returns and the returns of a market and two industry indices using a 120-trading-day estimation window.[162] Those coefficients are then used to calculate a predicted stock price return for Wells Fargo on event dates by applying them to the indices' returns on that day. However, regression coefficients can change abruptly for multiple reasons, including during periods of large market or industry movements.

84. Academic literature has shown that, as an empirical matter, correlations (and thus regression coefficients, which are determined in part by the correlations) increase during times of crisis or recessions, meaning that all companies' stocks tend to move more similarly during times of crisis, such as the onset of the COVID-19 pandemic. Therefore, because correlations can increase during times of crisis or recessions, the relationship between company returns and market and/or industry returns in those periods can differ from the observed relationship in normal times.[163]

85. Indeed, the correlation between Wells Fargo's stock and the market index was higher in March 2020 than during Dr. Hartzmark's estimation windows for dates in March 2020. As an example, the correlation was 0.70 in Dr. Hartzmark's estimation window for assessing Wells

---

[162] Hartzmark Report, Appendix D, ¶¶ 2–3.

[163] *See*, *e.g.*, Joost Driessen et al., "The Price of Correlation Risk: Evidence from Equity Options," *The Journal of Finance* 64, no. 3, 2009, pp. 1377–1406 at p. 1377 ("There is considerable evidence that correlations between asset returns change over time and that stock return correlations increase when returns are low … Financial crises are often viewed as episodes of unusually high correlations"). *See also* Andrew Ang and Joseph Chen, "Asymmetric Correlations of Equity Portfolios," *Journal of Financial Economics* 63, no. 3, 2002, pp. 443–494 at p. 443 ("Correlations between U.S. stocks and the aggregate U.S. market are much greater for downside moves, especially for extreme downside moves, than for upside moves.").

Fargo's abnormal return on March 11, 2020 compared to 0.95 in the period from February 24, 2020 to March 23, 2020 (i.e., after the observed sharp increase in volatility).[164] This increase in the correlation with the market implies that the event study coefficients, which depend in part on correlation, would likely also be affected. While one does not observe the same degree of increase in the correlation with industry indices from February 24, 2020 to March 23, 2020, the increase is apparent over the longer period from March 12, 2020 to August 31, 2020 (**Row III of Exhibit 5**).[165]

86. To formally check whether the coefficients in Dr. Hartzmark's regression model would have been affected by the COVID-19 pandemic had Dr. Hartzmark taken into account such an effect, I used a similar methodology to test for a structural break as above for volatility.[166] Specifically, I estimated a model based on Dr. Hartzmark's methodology through March 23, 2020 (i.e., using 120 trading days ending on March 23, 2020),[167] but I allowed for a structural break in coefficients (jointly for the market and industry indices) on February 24, 2020 (the beginning of sharp stock price declines and increased stock volatility for Wells Fargo and the market overall).[168] I then conducted a Chow test to evaluate whether the coefficients (jointly for the market and industry indices) after the break date deviate from the coefficients prior to the break date.[169] The results of this test are depicted in **Exhibit 6** and indicate a statistically significant change in the regression coefficients.

[164] *See* **Rows I and II of Exhibit 5**.

[165] For this analysis I use the industry returns "net of the general market index return" following Dr. Hartzmark's methodology. *See* Hartzmark Report, Appendix D, footnote 2.

[166] In deposition, Dr. Hartzmark stated that he tested for a structural change in coefficients. Hartzmark Deposition, p. 158:12–18 ("Q. Okay. And on that point, on the break point, what specifically are you looking for? A. In the terms of the break point as to whether there's coefficient change, whether the coefficient changes, you know, at a particular date.") and p. 222:15–18 ("Q. And you did or did not do that analysis here as well? A. I think -- I thought I had mentioned that earlier that I did a break-point analysis."). The analysis underlying such a test is not present in the backup material that I reviewed and that I understand he provided with his report. Nevertheless, to the extent Dr. Hartzmark attempted to test for a structural break in his event study model for the March 2020 alleged corrective disclosure dates, and to the extent that he did not identify the presence of such a break, there are insufficient observations after February 24, 2020 in his test to reliably assess whether the coefficients have changed with the onset of the COVID-19 pandemic, as discussed in **Section V.B.1**.

[167] As discussed in **Section V.B.1**, even in Dr. Hartzmark's estimation window for March 12, 2020 there are eight trading days including and after February 24, 2020 (after excluding dummy dates)—an insufficient amount of data to test for a break in coefficients in this case. I extend the model through March 23, 2020 to include more observations in the test.

[168] Like Dr. Hartzmark, I include dummy variables for October 15, 2019, January 14, 2020, and March 5, 2020 through March 11, 2020. Consistent with his approach, I also include a dummy variable for March 12, 2020.

[169] *See*, *e.g.*, Gregory C. Chow, "Tests of Equality between Sets of Coefficients in Two Linear Regressions," *Econometrica* 28, no. 3, 1960, pp. 591–605.

87. Therefore, the findings discussed in this section indicate that there was a structural break in regression coefficients that is not accounted for in Dr. Hartzmark's model. Because Dr. Hartzmark's coefficients are incorrectly estimated, the abnormal returns calculated based on these coefficients are not reliable estimates of company specific returns, which Dr. Hartzmark relies on for his analysis of the fifth *Cammer* factor and market efficiency. In other words, Dr. Hartzmark is assuming that the same relationship between Wells Fargo returns and the market and industry indices existed during the COVID-19 pandemic as before the onset of the pandemic, despite empirical evidence that this was in fact not the case, which leads his event study to be misspecified.

### 3. The Observed Clustering of Statistically Significant Abnormal Returns and the Correlation Between Abnormal Returns and Market Returns Illustrate the Unreliability of Dr. Hartzmark's Event Study During the COVID-19 Period

88. The market disruptions discussed in prior sections, and Dr. Hartzmark's failure to account for them in his event study, ultimately render Dr. Hartzmark's event study methodology unreliable when applied to the period affected by the onset of the COVID-19 pandemic. This conclusion is consistent with Dr. Hartzmark's own prior recognition that the type of regression model he uses in this litigation is not capable of accounting for structural changes in the underlying return distribution,[170] such as a sharp increase in volatility.

#### a) Observed Clustering of Statistically Significant Abnormal Returns

89. Dr. Hartzmark stated in his deposition that finding many days with statistically significant abnormal returns in a short time period would be a "red flag," and stated in prior

[170] Hartzmark and Seyhun (2014) at p. 187 ("The *Freddie Mac* court agreed with both experts that there were two distinct periods with different … return distributions. … The plaintiffs' expert felt this problem was corrected by using rolling linear regressions – that is, the same regression specification over a different time period each day. However, this technique does not correct for the problem when there are two or more distinct periods with changes in the underlying return distributions and multiple omitted variables.").

writings that such a finding "suggest[s] that a different statistical model was required or that complete reliance on the regression results would lead to the wrong conclusion."[171, 172]

90. Yet Dr. Hartzmark's abnormal returns during the period of market disruptions associated with the COVID-19 pandemic display exactly this pattern, as shown in **Exhibits 7A and 7B**. During the period from February 24, 2020 to March 23, 2020, there are 15 trading dates not excluded from Dr. Hartzmark's event study (using his criteria for excluding days) when it is extended through March 23, 2020. As discussed, I extend Dr. Hartzmark's event study and consider the period through March 23, 2020 in order to include more days in March 2020 that are part of the COVID-19 crisis period and are like the days of the alleged corrective disclosure impact dates in March 2020.[173] Applying Dr. Hartzmark's extended event study model to these 15 dates results in five dates with statistically significant abnormal returns (33.3% of the 15 dates).[174, 175] This represents a relatively large number of days with statistically significant abnormal returns during this period of time. By comparison, the 428 trading dates in the putative Class Period prior to this time period (May 30, 2018 to February 21, 2020) had only 21 statistically significant abnormal returns (4.9%) according to Dr. Hartzmark's event study.[176]

---

[171] In deposition, Dr. Hartzmark described this finding as a "red flag." Hartzmark Deposition, p. 77:2–10 ("Q. But it's fair to say that finding 31 percent days with significant returns in an event study suggests a problem with the regression? A. It suggests there might be an omitted variable. But like I said, it also would suggest that you -- again, be careful, it's a red flag. And -- and therefore, you know, let's focus on, you know, everything surrounding it.").

[172] Hartzmark and Seyhun (2014) at pp. 190–191 ("Furthermore, as discussed above, the fact that the event studies were based on improper regression specifications that omitted key variables further confused the relationship between significant abnormal returns and material disclosures or news events. The fact that the plaintiffs' expert found twenty of the sixty-five days between June 6, 2008 and September 8, 2008, or 31% of the days, with significant returns should have suggested that a different statistical model was required or that complete reliance on the regression results would lead to the wrong conclusion. Having such a high proportion of days with statistically significant returns suggests that the regression specification needed modification.").

[173] Note that I extend Dr. Hartzmark's event study to illustrate a particular problem with his approach. There is no reason to conclude that his event study would reliably measure abnormal returns on the impact dates of the alleged corrective disclosures in March 2020 if there is evidence that his model is not reliable when applied to days close in time to the impact dates of the alleged corrective disclosures.

[174] **Exhibit 7A**. During the period from February 24, 2020 to March 23, 2020, there are 21 trading days and eight statistically significant abnormal returns (38.1%) when Dr. Hartzmark's event study model is applied. I remove from these counts the dates during the "event window of March 5-12, 2020" identified by Dr. Hartzmark in his Appendix D. *See* Hartzmark Report, Appendix D, footnote 11. If I only remove the three dates which I understand to be alleged corrective disclosure impact dates (March 5, 2020, March 11, 2020, and March 12, 2020), there are 18 trading days and six statistically significant abnormal returns (33.3%).

[175] I note that extending the analysis another week to March 30, 2020 would add another three statistically significant returns, such that of the 20 trading dates (after excluding dummy dates and March 12, 2020) between February 24, 2020 and March 30, 2020, an extension of Dr. Hartzmark's event study model would identify eight statistically significant abnormal returns (40%). Of these, seven of the 11 trading dates between March 16, 2020 and March 30, 2020 (64%) are statistically significant.

[176] **Exhibit 7A**. During the period from May 30, 2018 to February 21, 2020 there are 435 trading days and 26 statistically significant abnormal returns (6.0%) in Dr. Hartzmark's event study model. I remove from these counts

91.    This concentration of unexplained significant returns (a "red flag" in Dr. Hartzmark's description) strongly suggests that either Dr. Hartzmark's event study is misspecified and fails to account for the challenges laid out above, or Wells Fargo stock did not trade in an efficient market based on the logic of Dr. Hartzmark's own purported test of market efficiency, as follows.  His test of efficiency is based on the premise that in efficient markets the "incidence rate of returns that are [statistically significant] is greater on high information flow (or 'news') days than the incidence rate on lesser information flow (or 'no-news') days."[177]  Therefore, under Dr. Hartzmark's own approach, the existence of a cluster of days with statistically significant abnormal returns without the corresponding release of value-relevant information would be inconsistent with market efficiency.[178]  However, it is not clear from Dr. Hartzmark's analysis that the release of such information is responsible for the clustering of statistically significant abnormal returns here, and it is unlikely to be based on my review of information disclosed.[179]  Therefore, this concentration of unexplained significant abnormal returns during the period from February 24, 2020 to March 23, 2020 suggests that either Dr. Hartzmark's event study is

---

the dummy dates for which Dr. Hartzmark assigned "dummy variables."  *See* Hartzmark Report, Appendix D, footnote 11.

[177] Hartzmark Report, ¶ 62.

[178] Dr. Hartzmark also agreed with the statement that "in an efficient market, a stock's price remains relatively stable in the absence of news."  Hartzmark Deposition, p. 216:5–13 ("Q. Yes.  Do you agree or disagree with the statement: 'In an efficient market, a stock's price remains relatively stable in the absence of news, and changes very rapidly as the market receives new and unexpected information'?  A. Yes.  I mean, on average, the nature of this, this analysis.  Q. 'Yes' is you agree?  A. Yes.").

[179] I reviewed information releases during the period from March 13, 2020 to March 23, 2020 using an extension of Dr. Hartzmark's approach for identifying news in his Appendix C, which contains a "chronology of company news" for Wells Fargo.  I find examples of statistically significant abnormal returns during this period without corresponding Wells Fargo-specific news identified by the sources in Dr. Hartzmark's Appendix C that would be expected to cause a statistically significant return.  For example, on March 20, 2020 (a day with a significant abnormal return of -2.15% using Dr. Hartzmark's model), Dr. Hartzmark's search criteria do not identify any articles about Wells Fargo released from after market close on March 19, 2020 through market close on March 20, 2020 and do not identify any analyst reports issued by analysts that provide "in-depth analyst coverage" on this date.  I identify only one analyst report on March 20, 2020 from GlobalData, which Dr. Hartzmark considers a "technical" analyst as opposed to an analyst that provides "in-depth analyst coverage."  *See* Hartzmark Report, ¶ 27.  *See also* Hartzmark Report, footnote 87 ("For the Wells Fargo chronology, I compiled lists of SEC filings, analyst reports, and news articles.  I compiled the list of all of Wells Fargo SEC filings from May 30, 2018 to March 12, 2020 from the SEC website.  The list of analyst reports is based on reports available from the Refinitiv and Capital IQ electronic databases.  For news articles contained in the chronology, I searched Factiva.  Due to the extensive media coverage, I include in the chronology only stories for the following sources obtained from Factiva using the company code 'Wells Fargo & Company': Barron's – All sources; Business Wire – All sources; Dow Jones Newswires- All sources; Reuters – All sources; The New York Times – All sources; The Wall Street Journal – All sources; and Theflyonthewall.com.  To eliminate duplicate stories, a news story was considered a duplicate and eliminated if it had exactly the same date, timestamp, headline, news source, and lead paragraph as another news story.").

misspecified or that Wells Fargo stock did not trade in an efficient market based on the logic of Dr. Hartzmark's own test of efficiency.[180]

#### b) Observed Correlation Between Abnormal Returns and Market Returns and Market Volatility

92. Another indication that Dr. Hartzmark's event study is misspecified during the period of market disruption caused by COVID-19 is that Dr. Hartzmark's abnormal returns are correlated with market returns in this period. As discussed, Dr. Hartzmark includes a market index (the S&P 500, net of Wells Fargo) in his event study to calculate abnormal returns that are not explained by (i.e., correlated with) market or industry factors. He states that his event study analysis "allow[s] [him] to conclude that Wells Fargo-specific information and large price movements of Wells Fargo stock during the Class Period were related and cannot be attributed to random volatility, or to market or sector factors."[181] This statement is only true if his event study actually removes market factors from the calculated abnormal returns. However, simply plotting Dr. Hartzmark's abnormal returns against the return of his market index shows that this is not the case during the period of market disruptions caused by COVID-19. **Exhibit 8A** depicts such a plot for the period of February 24, 2020 to March 23, 2020.[182] As depicted in the exhibit, the abnormal returns from Dr. Hartzmark's event study are statistically significantly correlated with market returns (because the regression line of Wells Fargo abnormal returns on market returns has a statistically significant slope coefficient), indicating that the event study fails at accounting for market returns in this period.

---

[180] As stated above, the assumption underlying Dr. Hartzmark's purported test of market efficiency supports such a conclusion, as his test is based on the premise that in efficient markets the "incidence rate of returns that are outside the bounds of what would be expected by chance … is greater on high information flow (or 'news') days than the incidence rate on lesser information flow (or 'no-news') days." Hartzmark Report, ¶ 62. *See also* Hartzmark and Seyhun (2014) at pp. 190–191 ("Furthermore, as discussed above, the fact that the event studies were based on improper regression specifications that omitted key variables further confused the relationship between significant abnormal returns and material disclosures or news events. The fact that the plaintiffs' expert found twenty of the sixty-five days between June 6, 2008 and September 8, 2008, or 31% of the days, with significant returns should have suggested that a different statistical model was required or that complete reliance on the regression results would lead to the wrong conclusion. … Having such a high proportion of days with statistically significant returns suggests that the regression specification needed modification.").

[181] Hartzmark Report, ¶ 70.

[182] The analysis in **Exhibit 8A** is not an evaluation of Dr. Hartzmark's event study estimation window, but it is an evaluation of his event study results. I therefore *include* the abnormal returns that Dr. Hartzmark calculated for his dummy dates in the exhibit and this analysis. Per Dr. Hartzmark's methodology, the dummy dates are *excluded* from the estimation window he uses in calculating these abnormal returns.

93. In the period of market disruption caused by COVID-19, there may in fact be other variables in addition to market returns that are not correctly accounted for in Dr. Hartzmark's event study. In **Section V.B.1**, I showed that Dr. Hartzmark does not appropriately account for a substantial change in the volatility of Wells Fargo's stock (and market volatility in general) starting around February 24, 2020. In addition to my findings with respect to the correlation of Wells Fargo abnormal returns with the market above, if the volatility of abnormal returns is further correlated with market volatility, this would also be an indicator that Dr. Hartzmark's model may be misspecified. In fact, at his deposition, Dr. Hartzmark stated that such a correlation—specifically, a correlation between his squared abnormal returns (a measure of volatility) and the VIX market volatility index—would be problematic.[183] **Exhibit 8B** shows that Dr. Hartzmark's squared abnormal returns and the VIX are in fact statistically significantly correlated in the period from February 24, 2020 to March 23, 2020 (as measured by the coefficient of the regression line of squared abnormal returns on the VIX index),[184] again indicating that his model is misspecified and unreliable.[185]

### C. Plaintiffs' Allegations Regarding March 12, 2020 Are Not Consistent with Market Efficiency

94. Moreover, Plaintiffs' allegation that Wells Fargo's stock declined on March 12, 2020 in response to news released on March 11, 2020, if correct, suggests that the market for Wells Fargo stock was not efficient in March 2020.

[183] Hartzmark Deposition, p. 74:7–16 ("Q. Okay. And what is the correlation of the squared and the normal return and the VIX index give you? A. Say that again? Q. The correlation you were referring to just now, what does that tell you? A. Oh, it would tell me if there was some component missing in estimating the abnormal returns that was associated with the change in VIX."). As mentioned above, Dr. Hartzmark also claimed that he "looked at the correlation of the squared abnormal returns and the VIX index." *See* Hartzmark Deposition, p. 73. However, Dr. Hartzmark has not provided any of this analysis in his report or the supporting backup materials; my analysis, described above, shows that there is a correlation. Dr. Hartzmark also stated that he did not consider or rely upon that analysis. *See* Hartzmark Deposition, p. 153:19–23. If he references or reports this analysis in the future, I may supplement my opinions.

[184] As in **Exhibit 8A**, I include Dr. Hartzmark's dummy dates in **Exhibit 8B**.

[185] At his deposition, Dr. Hartzmark suggested that one possible solution would be to include the VIX in the regression estimation. Hartzmark Deposition, pp. 149:23–150:6 ("Q. And if abnormal returns are related to the volatility of the general market, what does that tell you? A. It would suggest -- especially for the purposes, say, of loss causation -- to possibly that you might want to include that as a variable, an explanatory variable in your regression."). I note that even if such a modification did improve his regression, it would not be a substitute for correctly assessing residual volatility (*see* discussion in **Section VI.D.1**).

95.     Plaintiffs do not allege a corrective disclosure on March 12, 2020 and instead claim that the market "continued to digest the prior revelations."[186]  The congressional hearings on March 11, 2020, which Plaintiffs allege contained corrective disclosures, concluded by 12:51 PM EDT—approximately three hours prior to the close of stock markets at 4:00 PM EDT.[187]

96.     Dr. Hartzmark finds that Wells Fargo's stock traded in an efficient market, concluding that "Wells Fargo common stock price reacted quickly to all types of material, unanticipated news."[188]  As a result, any alleged news revealed in these hearings would generally be expected to have been reflected in Wells Fargo's closing stock price on March 11, 2020.

97.     Further, as seen in **Exhibits 9D and 9E**, the intra-day movement of Wells Fargo's stock compared to the market and the industry movements on March 12, 2020 further suggests that Plaintiffs' claim is inconsistent with efficiency.  Wells Fargo's stock on March 12, 2020 diverges from the market and industry indices (represented by the S&P 500 ETF and S&P Bank ETF in **Exhibit 9D**) mainly during the second half of the trading day.  Importantly, as illustrated in **Exhibit 9E**, which shows Wells Fargo and industry peers,  Wells Fargo's stock appears to particularly diverge from industry peers after the March 12, 2020 Federal Reserve announcement at 12:53 PM EDT regarding actions to increase liquidity in the market in reaction to turmoil caused by the onset of the COVID-19 pandemic.[189]  Prior to the announcement, Wells Fargo was trading at similar levels as some of its industry peers: at levels slightly above Citi and US Bancorp and at levels slightly below Bank of America, JP Morgan, and PNC.  After the Federal Reserve announcement, Wells Fargo was trading at levels below most, if not all, of these peers.  As explained below in **Section VI.D**, this Federal Reserve announcement of an expansion in monetary policy may have affected Wells Fargo differently than it affected its peers for a number of reasons (and differently than predicted by Dr. Hartzmark's event study model).  Moreover, this announcement, and therefore the apparent divergence in Wells Fargo's stock price from industry peers, occurs a full 24 hours after the alleged corrective disclosures on March 11, 2020.

---

[186] Complaint, ¶ 262.

[187] Further, the last statement with alleged corrective information referenced in the "Loss Causation" section of the Complaint occurred even earlier, before 12:00 PM EDT. *See* Complaint, Section VII. *See also* U.S. House Committee on Financial Services, "03/11/2020 – Holding Wells Fargo Accountable: Examining the Role of the Board... (EventID = 110719)," *YouTube*, March 11, 2020.

[188] Hartzmark Report, ¶ 55.

[189] Federal Reserve Bank of New York Press Release, "Statement Regarding Treasury Reserve Management Purchases and Repurchase Operations," March 12, 2020. *See also* Tweet from Federal Reserve Bank of New York, "Statement Regarding Treasury Reserve Management Purchases and Repurchase Operations," March 12, 2020 12:53 PM EDT.

98. Finally, note that, as described in **Section VI.D.1**, alternative event study models that attempt to account for some of the disruption caused by the COVID-19 pandemic indicate that Wells Fargo's stock price decline on March 11, 2020 (the date on which the congressional hearings occurred) is not statistically significant in the first place. This fact pattern (a stock that does not react to information in the hours after it was released on March 11, 2020 but does later react the next day on March 12, 2020) is not consistent with an efficient market.

## VI. Dr. Hartzmark Fails to Propose a Methodology to Measure Damages Stemming Only from Plaintiffs' Theory of Liability

99. Similar to his analysis of market efficiency, Dr. Hartzmark's discussion of class-wide damages (as described above in **Section II.C**) is generic and nearly identical to that in other expert reports he has written.[190] He simply lays out what I understand to be the legal framework for calculating out-of-pocket damages based on share price inflation, without explaining how the "actual inputs"[191] to that framework could be calculated in a manner consistent with Plaintiffs' theory of liability.[192] This is the case despite Dr. Hartzmark recognizing that inflation on a given date will ultimately need to be calculated as "the difference between the actual prices paid on that day for Wells Fargo common stock and the true or 'but-for' values of the security absent the alleged misrepresentations and omissions."[193] And yet he does not describe any implementable methodology for calculating the "but-for" value. To be clear, I am not saying that Dr. Hartzmark needed to have actually calculated the "but-for" value (or performed any type of loss causation analysis for that matter), only that he has not demonstrated that a methodology exists that could be used to do so in the future in a manner consistent with Plaintiffs' theory of liability, which I understand Plaintiffs are required to demonstrate at the class certification stage.

100. The little detail Dr. Hartzmark *does* provide about how damages could ultimately be calculated—references to an event study to measure "price reactions to disclosures either related

[190] *See*, *e.g.*, Hartzmark Mallinckrodt Report, Section VII; Hartzmark Ryder Report, Section VII. Further, in 2019 and 2020, Dr. Hartzmark filed expert reports that contained a discussion on class-wide damages that included similar language to describe a generic methodology. *See, e.g.*, Hartzmark HD Supply Report, Section VII; Hartzmark Navient Report, Section XI; Hartzmark US Steel Report, Section VIII; Hartzmark CenturyLink Report, Section X.

[191] Hartzmark Report, ¶ 87.

[192] Hartzmark Report, Section VII.

[193] Hartzmark Report, ¶ 80.

to or revealing the alleged misstatements and omissions"[194] and other "commonly used and widely accepted techniques"[195]—inadequately describes how damages could be reliably calculated and may be inconsistent with Plaintiffs' theory of liability in this case. In particular, though Plaintiffs allege certain corrective disclosures regarding Wells Fargo's timeline for having the asset cap lifted and its progress complying with the 2018 Consent Orders,[196] the market had access to an abundance of information on these topics prior to those dates. For example, a *Reuters* article in December 2018 (before the first alleged corrective disclosure) reported that the Federal Reserve had rejected Wells Fargo's remediation plan.[197] In addition, in April 2019, as part of the second alleged corrective disclosure, Wells Fargo announced that it would no longer provide the market with its expectation for when the asset cap would be lifted.[198] As a result, the various alleged corrective disclosures revealing the alleged "truth" about Wells Fargo's timeline for having the asset cap lifted and its progress complying with the 2018 Consent Orders may not have been new information to the market, and may have reflected the consequences of known facts. Yet Dr. Hartzmark does not provide any methodology that would ultimately be able to take this into account.

101. The discussion in this section assumes for the purposes of my report that the alleged misrepresentations did mislead the market as Plaintiffs allege. Nevertheless, even under this assumption, Dr. Hartzmark has not provided a methodology that can measure inflation. In order to establish the existence of such a methodology, Dr. Hartzmark would need to articulate how the methodology could measure the incremental impact of the alleged misrepresentations in light of any expressed market skepticism and in light of any available information about Wells Fargo's progress, particularly because Wells Fargo's stock price would be expected to have declined following the alleged corrective disclosures even absent any inflation remaining due to alleged misrepresentations. This is because, even absent any remaining inflation, the stock price could have declined due to the realization of uncertain, negative consequences of known facts and other negative information unrelated to the allegations being released on these dates. In

[194] Hartzmark Report, ¶ 84.
[195] Hartzmark Report, ¶ 88.
[196] For a discussion of Plaintiffs' allegations, *see* **Section II.A**.
[197] Patrick Rucker, "Wells Fargo Reform Plans Fail to Satisfy Fed after Scandals: Sources," *Reuters News*, December 6, 2018.
[198] During the earnings call on April 12, 2019, Interim CEO C. Allen Parker stated that "we do not feel it's appropriate to provide guidance as to the timing of the lifting of the asset cap." 2019 Q1 Earnings Call, p. 6.

other words, even if the market price fully reflected that making progress under the 2018 Consent Orders was uncertain, and even if it fully discounted Wells Fargo's public statements about an expected timeline, the stock price would still be expected to have fallen once the risk that setbacks that were previously uncertain materialized, (i.e., when the possible setbacks became certainties). Therefore, in order to calculate inflation, a methodology is needed to separate the declines that would have occurred regardless of the alleged misrepresentations (and therefore do not represent the removal of inflation) from those that were incrementally due to the alleged misrepresentations (and therefore can be due to the removal of inflation).

102. In addition, Dr. Hartzmark's generic description of how damages could ultimately be calculated is entirely dependent on being able to reliably measure company-specific price changes (abnormal returns), because it "begins with" a measurement of those movements.[199] However, as described above in **Section V**, in the context of my discussion of Dr. Hartzmark's failure to demonstrate market efficiency, Dr. Hartzmark's event study (a tool he uses to calculate company-specific abnormal returns) is unreliable during the period of market disruptions caused by the COVID-19 pandemic and cannot serve as the basis for any reliable calculation of damages.

103. The following hypothetical example illustrates why Dr. Hartzmark has not established that an event study—the only specific "technique" Dr. Hartzmark has proposed—could be used to reliably measure damages given Plaintiffs' theory of liability and the information about Wells Fargo's progress in complying with the 2018 Consent Orders disclosed prior to and throughout the putative Class Period in this case.

104. Suppose the observed stock price decline on an alleged corrective disclosure impact date is equal to one dollar. To determine what portion of the decline, if any, is due to company-specific information (the only type of information which I understand can give rise to damages in this matter), one needs to calculate an abnormal return. The calculation of an "inflation ribbon" is central to the framework Dr. Hartzmark provides and is "based," as Dr. Hartzmark describes it, on "the price reactions" he measures.[200] Given that the "price reaction" is an important input

[199] Hartzmark Report, ¶ 83 ("To calculate the inputs for the out-of-pocket methodology or formula, an expert often begins with the same type of event study I used above in Section VI to evaluate the price-related factors. Using the results of the event study along with the disclosures of firm-specific information, daily abnormal returns or price movements are calculated.").

[200] Hartzmark Report, ¶ 84.

to Dr. Hartzmark's proposed damages methodology, the difference between a $0.50 abnormal decline and a $0.90 abnormal decline would make a substantial difference for potential damages. However, as discussed in **Section V**, the event study used by Dr. Hartzmark for his market efficiency analysis cannot reliably estimate the amount of the abnormal price decline because his event study is misspecified and does not take into account market dislocations associated with the onset of the COVID-19 pandemic.

105. Nevertheless, suppose for the sake of illustration that the abnormal decline could somehow reliably be estimated to be $0.50 using an event study. In an efficient market, that amount of the company-specific price decline is due to all new, company-specific information released on that date, not only information corrective of the alleged misrepresentations. Therefore, to calculate damages, one needs a methodology to apportion the abnormal price change due to the response to new incremental information revealing the truth behind the alleged misrepresentations regarding Wells Fargo's progress in complying with the 2018 Consent Orders from all other company-specific information, including the consequences of previously-disclosed information about Wells Fargo's progress in complying with the 2018 Consent Orders and other confounding information unrelated to the allegations.[201] In an efficient market, which Dr. Hartzmark opines that Wells Fargo's common stock traded in, information is rapidly incorporated into the price, such that the expected consequences of facts are incorporated into the price when those facts are first disclosed.[202] Therefore, if all $0.50 of the price decline is due to, for example, unexpected consequences of previously-disclosed facts about progress in complying with the 2018 Consent Orders, then, as an economic matter, none of that decline is a proper measure of previous inflation in the stock price.[203] There is no methodology offered in

[201] Dr. Hartzmark describes such an exercise as "parsing" and recognizes that it might be necessary, but provides no methodology to perform it in a manner that addresses the unique circumstances of this case. *See* Hartzmark Report, ¶ 87.

[202] Dr. Hartzmark opines that "Wells Fargo common stock rapidly responded to unanticipated and material Company-specific information consistent with efficient markets." Hartzmark Report, ¶ 10.

[203] Dr. Hartzmark defines inflation as the "difference between the actual prices paid … for Wells Fargo common stock and the true or 'but-for' values of the security absent the alleged misrepresentations and omissions (i.e., had the truth been disclosed the price would have been the true value)." Hartzmark Report, ¶ 80. Therefore, under Dr. Hartzmark's definition, inflation can only be caused by allegedly corrective information that had not already been disclosed because information that had already been disclosed would already be reflected in the stock price in an efficient market. When information is disclosed in an efficient market, the market incorporates all expected consequences of that information into the stock price. If a piece of information that is disclosed leads to a consequence on a later date and the consequence causes a price decline, then that consequence must not have been inevitable (i.e., expected with 100% certainty) when the information was initially disclosed. Later, unexpected consequences of information related to the alleged fraud which had been previously disclosed cannot represent the

the Hartzmark Report that can be used to determine the incremental impact of Plaintiffs' allegations on the price declines observed on the alleged corrective disclosure impact dates (as opposed to other factors) given the substantial information that was already publicly available about Wells Fargo's progress in addressing the regulatory issues at various times during the putative Class Period.

106. Further, even if Dr. Hartzmark had proposed a methodology that could reliably measure ("parse," in his description) abnormal stock price changes due to the revelation of the truth behind the alleged misrepresentations, these price reactions may be relevant to consider as a starting point but are insufficient on their own to measure inflation and therefore damages consistent with Plaintiffs' theory of liability at earlier times during the putative Class Period. Dr. Hartzmark appears to agree that the alleged inflation in Wells Fargo's stock price could change during the putative Class Period when he discusses the potential need for "scaling over time the changes in the inputs" in order to estimate how the "price reaction due to the revelation of the truth … might change over time."[204] In particular, Plaintiffs allege, for example, that Wells Fargo "received a steady stream of rejection letters … and stern rebukes" from its regulators over the course of the putative Class Period.[205] These allegations imply that the same "disclosures either related to or revealing the alleged misstatements and omissions"[206] could not possibly have been made at the beginning of the putative Class Period, at least not substantially in the same form in which they ultimately occurred, if Wells Fargo was receiving information from regulators over time. Dr. Hartzmark, however, provides no methodology to translate any price declines caused by alleged corrective disclosures to measures of inflation at earlier times during

removal of inflation because the price following the initial disclosure of the information would represent the price "had the truth been disclosed." For example, as discussed in **Section VI.C.2** below, prior to each of the quarterly earnings announcement dates during the putative Class Period, it had been previously disclosed that Wells Fargo would be operating under the asset cap for that quarter. In an efficient market, Wells Fargo's stock price would have already incorporated any expected consequences of operating under the asset cap for that quarter. Therefore, any subsequent backward-looking information on earnings for that quarter that causes a stock price decline would not represent the removal of inflation because, even if a portion of that past performance had been affected by the asset cap, this would only represent an unexpected consequence of that information as opposed to new information corrective of the alleged misstatements related to Wells Fargo's timeline for having the asset cap lifted and its progress complying with the 2018 Consent Orders.

[204] Hartzmark Report, ¶¶ 87, 90. In deposition, Dr. Hartzmark described scaling as "adjusting the amount of harm over time." Hartzmark Deposition, p. 291:9–12.

[205] Complaint, ¶ 7. *See also* Complaint, ¶¶ 80, 87, 93, 105.

[206] Hartzmark Report, ¶ 84.

the putative Class Period, which is necessary in order to calculate damages reliably and in a manner consistent with Plaintiffs' allegations.

107. Given these complexities, which are discussed in more detail in the sections that follow, Dr. Hartzmark's generic reference to an event study to measure "price reactions to disclosures either related to or revealing the alleged misstatements and omissions"[207] and other "commonly used and widely accepted techniques"[208] does not provide a methodology to calculate damages reliably and consistent with Plaintiffs' theory of liability, and indeed may be in some ways inconsistent with Plaintiffs' theory of liability in this case.

### A. Dr. Hartzmark Does Not Provide a Methodology to Calculate Damages, Only a Generic Framework

108. As described above in **Section II.C**, Dr. Hartzmark claims that damages "can be calculated on a class-wide basis using a common methodology well-accepted by courts."[209] This assertion—and the minimal detail that follows—is highly generic, and Dr. Hartzmark has used nearly identical language in expert reports for other matters.[210] Specifically, Dr. Hartzmark's generic damages discussion does not address Plaintiffs' theory of liability nor any of the unique circumstances in this matter that I discuss in this section, such as the fact that several of the alleged corrective disclosures occurred during the market disruptions caused by COVID-19 and that some market participants—including an investment advisor for one of the lead Plaintiffs—expressed skepticism regarding the alleged misstatements.

109. Dr. Hartzmark simply provides a framework—the "out-of-pocket methodology"—that he says can be used in this matter.[211] I understand that framework is, in fact, often used. But as an economic matter, the framework cannot be applied without a methodology to come up with appropriate inputs ("actual inputs," as Dr. Hartzmark calls them).[212] Dr. Hartzmark has provided

[207] Hartzmark Report, ¶ 84.
[208] Hartzmark Report, ¶ 88.
[209] Hartzmark Report, ¶ 78.
[210] *See*, *e.g.*, Hartzmark Mallinckrodt Report, Section VII; Hartzmark Ryder Report, Section VII. Further, in 2019 and 2020, Dr. Hartzmark filed expert reports that contained a discussion on class-wide damages that included similar language to describe a generic methodology. *See, e.g.*, Hartzmark HD Supply Report, Section VII; Hartzmark Navient Report, Section XI; Hartzmark US Steel Report, Section VIII; Hartzmark CenturyLink Report, Section X.
[211] Hartzmark Report, ¶ 79.
[212] Hartzmark Report, ¶ 87.

no methodology that describes how an expert could eventually calculate those inputs in a manner consistent with Plaintiffs' allegations.

110. Despite the lack of a methodology to determine these "actual inputs," Dr. Hartzmark seems to recognize—correctly—that simply using the price declines on the impact dates of alleged corrective disclosures as a measure of inflation may be insufficient for at least two reasons. First, the alleged corrective disclosures may be accompanied by additional company-specific information, which will require the price declines on those dates to be "pars[ed]."[213] Second, the price declines on the alleged corrective disclosure impact dates may not measure inflation at other times during the putative Class Period, which will require the price declines to be "scal[ed]."[214] However, Dr. Hartzmark's acknowledgement that these adjustments may be necessary, without providing any methodology to actually implement them, does not demonstrate that these adjustments can ultimately be made in a manner consistent with Plaintiffs' theory of liability.

### B. Dr. Hartzmark Fails to Propose a Methodology that Can Measure Damages Stemming Only from Plaintiffs' Allegations Given Information Already Available to the Market

111. As discussed, Dr. Hartzmark proposes to measure inflation using the stock price reaction to disclosures "related to or revealing" the allegations.[215] However, to measure inflation this way, Dr. Hartzmark's methodology must be able to determine the portion of the price reaction on such days that reflects the market's response to the disclosures "related to or revealing" the allegations, as opposed to consequences of already known facts or confounding information. Dr. Hartzmark does not propose a methodology capable of such apportionment given Plaintiffs' theory of liability and the relationship between, on the one hand, information disclosed prior to and during the putative Class Period about Wells Fargo's progress in complying with the 2018 Consent Orders that Plaintiffs do *not* allege as corrective, and, on the other, the alleged misrepresentations and alleged corrective disclosures on these same topics.

112. As I discuss in this section, certain market participants (1) expressed an apparent recognition of the complexity of the changes required in Wells Fargo's operational risk

[213] Hartzmark Report, ¶ 88.
[214] Hartzmark Report, ¶ 88.
[215] Hartzmark Report, ¶ 84.

management to satisfy the 2018 Consent Orders; (2) discussed Wells Fargo's publicly-disclosed failures to meet deadlines imposed by its regulators under the 2018 Consent Orders; and (3) noted that lifting the asset cap was subject to the discretion of the Federal Reserve and to external developments that could pose challenges to have the asset cap lifted. Given this context, some market participants also expressed skepticism about how long it would take for Wells Fargo to satisfy its regulators under the 2018 Consent Orders and have the asset cap lifted. This suggests that the alleged corrective disclosures, when they ultimately occurred, may not have been new information to the market or may have reflected consequences of known facts. In turn, this means that without a methodology to measure only the incremental impact of allegedly corrective information, one cannot reliably attribute inflation and damages to the observed price declines following the alleged corrective disclosures.

113. In this section, I begin by providing an overview of publicly-disclosed deficiencies in Wells Fargo's operational risk management, the Company's failure to remediate them to the satisfaction of its regulators prior to the 2018 Consent Orders, and discuss information regarding the Company's progress in satisfying its regulators during the putative Class Period. In the next section, I conclude by explaining how Dr. Hartzmark's generic discussion fails to provide a methodology that can, in light of the expression of skepticism by some market participants, measure the stock price declines caused by the alleged corrective disclosures rather than declines due to unrelated information or information that was not incremental, new, and related to the allegedly misrepresented facts that was released on certain alleged corrective disclosure dates, and provide examples of such information.

### 1. Operational Risk Management Deficiencies at Wells Fargo—and the Company's Failure to Remediate those Deficiencies to the Satisfaction of Its Regulators—Predate the 2018 Consent Orders and the Putative Class Period

114. Prior to the putative Class Period, Wells Fargo experienced several well-publicized difficulties with its operational risk management, which led to consent orders issued by its regulators that predate the 2018 Consent Orders.[216] Throughout 2016 and 2017, Wells Fargo

[216] Financial institutions generally divide risk into three types: credit risk, market risk, and operational risk. *See* René M. Stulz, "Risk Management Failures: What Are They and When Do They Happen?" *Journal of Applied*

identified failures in the Company's operational risk management and disclosed new issues it had identified. As discussed further in **Section VI.B.2** below, this history of Wells Fargo's repeated and publicly-disclosed challenges underscores the uncertainty associated with satisfying the 2018 Consent Orders and having the asset cap lifted.

#### a) Operational Risk Management Deficiencies at Wells Fargo Prior to the Putative Class Period

115. On September 8, 2016, Wells Fargo announced settlements ("Sales Practices Settlements") and consent orders with the OCC and CFPB (the "2016 Consent Orders") related to the creation of unauthorized consumer banking and credit accounts ("Sales Practices

---

*Corporate Finance* 20, no. 4, 2008, pp. 39–48 at p. 44. While credit risk encapsulates the likelihood that borrowers will repay their loans, and market risk encapsulates the likelihood a security fluctuates in value due to adverse movements in market factors such as asset prices, foreign exchange rates, or interest rates, operational risk is defined as "the risk of loss resulting from inadequate or failed internal processes, people, and systems or from external events." *See* Joshua V. Rosenberg and Til Schuermann, "A General Approach to Integrated Risk Management with Skewed, Fat-Tailed Risks," *Journal of Financial Economics* 79, no. 3, 2006, pp. 569–614 ("Rosenberg and Schuermann (2006)") at p. 579; "International Convergence of Capital Measurement and Capital Standards," *Basel Committee on Banking Supervision*, June 2004, p. 147. Operational risk management is younger than other branches of risk management at financial institutions. It relies on different tools than financial risk management (e.g., process changes rather than hedging), is highly labor intensive (e.g., it often requires oversight by individual line managers and consultation from technical experts), and historically has received less focus than credit and market risk management by bank managers. *See* Brian W. Nocco and René M. Stulz, "Enterprise Risk Management: Theory and Practice," *Journal of Applied Corporate Finance* 18, no. 4, 2006, pp. 8–20 at pp. 10, 14. In contrast to financial risk, an important source of operational risk is internal, and the sources of operational risk are diverse (e.g., internal fraud, external fraud, employment practices, and workplace safety, among others). *See* Peter Sands et al., "Rethinking Operational Risk Capital Requirements," *Journal of Financial Regulation* 4, no. 1, 2018, pp. 1–34 at p. 7. Historically, operational risk has also been more difficult to quantify. *See* Joseba Eceiza et al., "The Future of Operational-Risk Management in Financial Services," *McKinsey & Company*, April 2020, p. 2. Operational risk regulation is also younger: while the Basel Committee on Banking Supervision ("BCBS") ascribed formal capital charges to credit risk and market risk as early as 1988 and 1996, respectively, only in 2004 did the BCBS declare that operational risk would also hold a regulatory capital charge. *See* Rosenberg and Schuermann (2006) at p. 570. Many large banks made significant changes to their operational risk management systems after the Global Financial Crisis because of problems and issues experienced during the GFC. *See* Joseba Eceiza et al., "The Future of Operational-Risk Management in Financial Services," *McKinsey & Company*, April 2020, p. 2. In a 2009 survey of financial services executives, more than half stated they either had overhauled or planned to overhaul their institution's risk management post-GFC. *See* Phil Davis, "After the Storm: A New Era for Risk Management in Financial Services," *The Economist Intelligence Unit*, June 2009, p. 3. In contrast to other large banks, Wells Fargo emerged relatively unscathed from the GFC. *See* Brad Kelly, "Wells Fargo Rides through Crisis after Avoiding Subprime Slime," *Investor's Business Daily*, October 3, 2008. As a result, while other large banks overhauled and consolidated their risk management practices in the wake of the GFC, Wells Fargo did not begin to re-evaluate its risk management until later. Following the revelation of issues at Wells Fargo's Community Bank in 2016, Wells Fargo turned its attention to evaluating and consolidating its risk management practices. *See* Wells Fargo & Company, "2016 Annual Report," February 1, 2017, p. 7. These changes continued in the following years, with Wells Fargo adding a significant number of compliance and operational risk management staff to its headcount. *See* 2019 Q1 Earnings Call. In 2018, CEO Sloan noted that while Wells Fargo's "best" in class credit and market risk management had supported the bank through the GFC, Wells Fargo still needed to substantially improve its operational risk management and compliance. *See* Victoria Guida and Aubree Eliza Weaver, "Checking In with Wells Fargo," *Politico*, June 7, 2018.

Issues").[217]  The 2016 Consent Orders required Wells Fargo to, among other things, design and implement plans to remediate deficiencies in the Company's governance and risk management by the end of 2017.[218]

116.    The announcement of the Sales Practices Settlements resulted in public scrutiny of Wells Fargo's failures in operational risk management and corporate culture.  For example, in congressional hearings on September 20, 2016 and September 29, 2016, politicians voiced their disappointment with the Company.[219]  In the wake of this increased scrutiny, on September 27, 2016, the independent directors of Wells Fargo's Board of Directors declared an investigation into the Sales Practices Issues and announced that the independent directors would "take all appropriate actions to … ensure that … systems and processes are improved."[220]  On April 10, 2017, Wells Fargo's independent directors released a report ("2017 Independent Directors' Report"), detailing failures in the Company's operational risk management that contributed to the Sales Practices Issues, many of which overlapped with the issues that would later be identified in the 2018 Consent Orders, including Wells Fargo's decentralized structure.[221]  Finally, the 2017 Independent Directors' Report also noted that Wells Fargo had made progress

---

[217] The settlements with the Office of the Los Angeles City Attorney, OCC, and CFPB totaled $185 million in addition to $5 million in customer remediation.  *See* Wells Fargo Press Release, "Wells Fargo Issues Statement on Agreements Related to Sales Practices," September 8, 2016; Consent Order, *In the Matter of: Wells Fargo Bank, N.A.*, *Sioux Falls, South Dakota,* United States of America Consumer Financial Protection Bureau, Administrative Proceeding 2016-CFPB-0015, September 4, 2016 ("2016 CFPB Consent Order"); Consent Order, *In the Matter of: Wells Fargo Bank, N.A. Sioux Falls, South Dakota*, United States of America Department of the Treasury Comptroller of the Currency, AA-EC-2016-66, September 6, 2016 ("2016 OCC Consent Order").

[218] 2016 CFPB Consent Order, ¶¶ 39, 41–42; 2016 OCC Consent Order, pp. 6–10.

[219] *See*, *e.g.*, Hearing on "Examining Wells Fargo's Unauthorized Accounts and the Regulatory Response" before the Committee on Banking, Housing, and Urban Affairs of the United States Senate, September 20, 2016, pp. 12–13 (Senator Brown: "… where was management … it just does not seem quite right that it did not occur to anybody on the board … to top management that they should do something more affirmatively until that August 2015 date when the regulators sort of helped you suggest and come to that conclusion."); Hearing on "Holding Wall Street Accountable: Investigating Wells Fargo's Opening of Unauthorized Customer Accounts" before the Committee on Financial Services of the United States House of Representatives, September 29, 2016.

[220] Wells Fargo Press Release, "Independent Directors of Wells Fargo Conducting Investigation of Retail Banking Sales Practices and Related Matters," September 27, 2016.

[221] The report found that "Wells Fargo's decentralized corporate structure gave too much autonomy to the Community Bank's senior leadership" which "resisted and impeded outside scrutiny or oversight [and] minimized the scale and nature of the problem."  "Independent Directors of the Board of Wells Fargo & Company: Sales Practices Investigation Report," *Wells Fargo & Company*, April 10, 2017 ("2017 Independent Directors' Report"), p. i.

in remediating deficiencies in its operational risk management but that this process was ongoing.[222]

117. Following the release of the 2017 Independent Directors' Report, additional deficiencies in Wells Fargo's operational risk management were disclosed, including issues relating to allegedly inappropriate charges for collateral protection insurance ("CPI")[223] and mortgage rate-locks,[224] which became subjects of the 2018 OCC/CFPB Consent Orders.

**b) The 2018 Federal Reserve Consent Order**

118. On February 2, 2018, Wells Fargo announced it had entered into the 2018 Federal Reserve Consent Order that required the Company to submit and implement plans to remediate deficiencies in its operational risk management, compliance, and Board governance.[225] The 2018 Federal Reserve Consent Order did not identify new issues,[226] but instead required Wells

---

[222] 2017 Independent Directors' Report, p. i ("The Board has taken numerous actions and supported management steps to address these issues"); p. 71 ("The buildout of Corporate Risk is continuing and efforts to centralize the risk function have been accelerated.").

[223] Wells Fargo Press Release, "Wells Fargo Announces Plan to Remediate Customers for Auto Insurance Coverage," July 27, 2017 ("Customers' auto loan contracts require them to maintain comprehensive and collision physical damage insurance on behalf of the lender throughout the term of the loan. As permitted under those contracts, Wells Fargo would purchase CPI from a vendor on the customer's behalf if there was no evidence — either from the customer or the insurance company — that the customer already had the required insurance. CPI insurance protects against loss or damage to a vehicle serving as collateral to secure a loan and helps ensure that borrowers can pay for damages to a vehicle. In response to customer concerns, in July 2016 Wells Fargo initiated a review of the CPI program and related third-party vendor practices. … Wells Fargo's review determined that certain external vendor processes and internal controls were inadequate. As a result, customers may have been charged premiums for CPI even if they were paying for their own vehicle insurance, as required, and in some cases the CPI premiums may have contributed to a default that led to their vehicle's repossession.").

[224] Wells Fargo Press Release, "Wells Fargo Announces Plan to Refund Customers for Mortgage Rate Lock Extension Fees," October 4, 2017 ("Wells Fargo … today announced plans to reach out to all home lending customers who paid fees for mortgage rate lock extensions requested from Sept. 16, 2013, through Feb. 28, 2017, and to refund customers who believe they shouldn't have paid those fees. The company previously disclosed that it was reviewing past policies and procedures regarding the circumstances in which mortgage rate lock extension fees were assessed to customers, and Wells Fargo CEO Tim Sloan mentioned the refund plans during an appearance Tuesday, Oct. 3, before the U.S. Senate Committee on Banking, Housing and Urban Affairs."). Mortgage rate lock fees are fees charged by lenders to lock in a mortgage interest rate for a borrower prior to the mortgage being funded. *See* "Interest Rate Lock," *Wells Fargo*.

[225] Wells Fargo Press Release, "Wells Fargo Commits to Satisfying Consent Order with Federal Reserve," February 2, 2018 ("Under the consent order, the company will provide plans to the Federal Reserve within 60 days that detail what already has been done, and is planned, to further enhance the board's governance oversight, and the company's compliance and operational risk management.").

[226] Wells Fargo Press Release, "Wells Fargo Commits to Satisfying Consent Order with Federal Reserve," February 2, 2018 ("'It is important to note that the consent order is not related to any new matters, but to prior issues where we have already made significant progress.'"). A Vining Sparks equity analyst noted that "the Federal Reserve didn't mention any new items, which by default is an independent confirmation that Wells Fargo management has successfully identified all the underlying short-falls." "Last Shoe Has Dropped Clearing Path for Long-Term Value," *Vining Sparks*, February 5, 2018, p. 1.

Fargo to continue making progress on remediating previously identified deficiencies, including complying with the 2016 Consent Orders, which the Federal Reserve determined Wells Fargo had failed to do.[227]  The Federal Reserve identified some of the same operational risk management issues as those that had been identified previously, including Wells Fargo's decentralized structure.[228]

119.    To address these previously-identified issues, the 2018 Federal Reserve Consent Order required Wells Fargo to submit two plans within 60 days (by April 3, 2018): (1) to improve the Board of Directors' (the "Board's") oversight and governance and (2) to improve its firmwide compliance and operational risk management program.[229]  The Board was ordered to submit a "written plan to further enhance the Board's effectiveness in carrying out its oversight and governance."[230]  The Federal Reserve called for the Board to ensure that centralized and independent corporate functions were established for effective operational risk management and compliance.[231]  The Company also had to submit a "written plan to further improve its firmwide compliance and operational risk management program."[232]  These plans were to be put in place to "ensure that the Bank complie[d] with the [2016 Consent Orders]"[233] and "continue[d] to implement improvements in its governance and risk management in order to comply with safe and sound banking practices, and applicable laws and regulations."[234]

---

[227] Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, *In the Matter of Wells Fargo & Company, San Francisco, California*, United States of America before the Board of Governors of the Federal Reserve System, Docket No. 18-007-B-HC, February 2, 2018 ("2018 Federal Reserve Consent Order"), pp. 3–4 ("WFC's Board shall take appropriate steps to fully utilize WFC's financial and managerial resources … to serve as a source of strength to the Bank, including, but not limited to, taking steps to ensure that the Bank complies with the [2016 Consent Orders].").

[228] The Federal Reserve noted that the Board should "maintain effective … governance and oversight … including the establishment and maintenance of robust risk management and compliance programs on a consolidated basis." 2018 Federal Reserve Consent Order, p. 2.

[229] 2018 Federal Reserve Consent Order, pp. 4–7.

[230] 2018 Federal Reserve Consent Order, p. 4.

[231] The Federal Reserve required that the Board's plan address actions to (1) "ensure that the Firm's strategy and risk tolerance are clear and aligned and within the Firm's risk management capacity;" (2) "further improve its oversight of senior management;" (3) "ensure senior management's ongoing effectiveness in managing the Firm's activities and related risks and promoting strong risk management across the Firm;" and (4) "ensure senior management establishes, and thereafter maintains … an effective and independent firmwide risk management function[,] … an effective risk tolerance program[,] … an effective risk identification and escalation framework … [, and] a comprehensive and effective risk data governance and management framework." 2018 Federal Reserve Consent Order, pp. 4–6.

[232] 2018 Federal Reserve Consent Order, p. 6.

[233] 2018 Federal Reserve Consent Order, p. 4.

[234] 2018 Federal Reserve Consent Order, p. 3.  The 2018 Federal Reserve Consent Order required that Wells Fargo's plan address actions to support (1) "effective testing and validation measures for compliance and operational risks;" (2) "specific measures management will take to integrate all applicable compliance and operational risk

120. Under the 2018 Federal Reserve Consent Order, Wells Fargo was prohibited from taking any action that would cause its total assets (measured on a 2-quarter daily average) to exceed its total assets as of the close of FY 2017 without the permission of the Federal Reserve.[235] The 2018 Federal Reserve Consent Order stipulated that this asset "cap" would be lifted only after an independent review of "the Board's improvements in effective oversight and governance of the Firm, and … enhancements to the Firm's compliance and operational risk management program, each as required" in the Order.[236]

**c) The 2018 OCC/CFPB Consent Orders**

121. On April 20, 2018, Wells Fargo announced it had entered into additional consent orders with the OCC and CFPB related to the alleged improper placement and management of CPI on automobile loan accounts and the improper assessment of mortgage interest rate-lock extension fees (issues that had been publicly-disclosed in 2017, as discussed above).[237] In addition to addressing these issues, the 2018 OCC/CFPB Consent Orders reiterated that the Company's compliance issues had been longstanding and noted that the OCC/CFPB had previously identified and ordered Wells Fargo to remedy these issues (e.g., as was ordered as part of the 2016 Consent Orders), but that the OCC and CFPB were not satisfied with Wells Fargo's remediation to that point.[238]

122. The 2018 OCC/CFPB Consent Orders jointly ordered Wells Fargo to submit within 60 days a "Compliance Risk Management Program" ("CRMP") to address issues similar to those that had been previously identified by Wells Fargo and its regulators, including those recently

requirements into business process and control designs and related change management initiatives;" (3) "specific measures to enhance the firmwide operational risk management program;" and (4) "a review of policies, procedures and practices … for remediating customers." 2018 Federal Reserve Consent Order, pp. 6–7.

[235] 2018 Federal Reserve Consent Order, p. 8; Wells Fargo & Company, Special Call Transcript, dated February 2, 2018 ("Consent Order Update Call"), p. 5.

[236] 2018 Federal Reserve Consent Order, p. 7.

[237] Wells Fargo Press Release, "Wells Fargo Enters into Consent Orders with OCC and CFPB," April 20, 2018.

[238] For example, the 2018 OCC Consent Order noted that, "[s]ince at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile. … The Bank has begun corrective action, and has committed to taking all necessary and appropriate steps to remedy the deficiencies identified by the OCC and to establish an effective compliance risk management program." *See* Consent Order, *In the Matter of: Wells Fargo Bank, N.A.*, *Sioux Falls, South Dakota*, United States of America Department of the Treasury Comptroller of the Currency, AA-EC-2018-15, April 20, 2018 ("2018 OCC Consent Order"), pp. 2–3.

enumerated in the 2018 Federal Reserve Consent Order.[239] For example, the 2018 OCC/CFPB Consent Orders required that the CRMP address issues related to the centralization of Wells Fargo's operational risk management structure and improvement of the Board's oversight of senior management.[240]

### 2. Prior to and During the Putative Class Period, Some Market Participants Discussed the Complexity of Remediating Wells Fargo's Operational Deficiencies, Expressed Skepticism Regarding the Timing of Complying with the 2018 Consent Orders, and Noted that Regulators Were Not Satisfied with the Company's Progress

123. Prior to and throughout the putative Class Period, market participants (1) expressed an apparent recognition of the complexity of the changes required in Wells Fargo's operational risk management to satisfy the 2018 Consent Orders; (2) discussed Wells Fargo's publicly-disclosed failures to meet deadlines imposed by its regulators under the 2018 Consent Orders; and (3) noted that lifting the asset cap was subject to the discretion of the Federal Reserve and to external developments that could pose challenges to have the asset cap lifted. Given this context, some market participants also expressed apparent skepticism about Wells Fargo's timeline for how long it would take to satisfy its regulators under the 2018 Consent Orders and have the asset cap lifted. As described in detail below, there is no methodology offered in the Hartzmark Report that could, in light of this public information, be used to determine the incremental impact of the disclosures "related to" the allegations on the price declines observed on any days such disclosures were made (as opposed to other factors), including the days of the alleged

[239] 2018 OCC Consent Order, p. 7; Consent Order, *In the Matter of: Wells Fargo Bank, N.A. Sioux Falls, South Dakota*, United States of America Consumer Financial Protection Bureau, Administrative Proceeding 2018-BCFP-0001, April 20, 2018 ("2018 CFPB Consent Order"), ¶ 42.

[240] Wells Fargo was required to address (1) "[a]n effective compliance risk framework;" (2) "[a]n effective, independent monitoring and testing function;" (3) "[a] program that establishes enterprise-wide policies and processes to ensure effective compliance governance;" and (4) "[p]rocedures for reporting and escalating significant compliance concerns to senior management and the Board." 2018 OCC Consent Order, pp. 7–8. In addition to the CRMP, Wells Fargo was required to submit a plan for remediating consumers harmed by the CPI and mortgage rate-lock issues and a plan to augment its internal audit compliance program. Wells Fargo was also ordered to pay a $1 billion penalty and the OCC stipulated that Wells Fargo submit a request of no supervisory objection before it appointed any individual to a position of "senior executive officer, or to the appointment of any Chairman of the Board or any other individual to the Board" or made certain types of payments to Company employees that may have been involved in the issues identified in the Order. *See* 2018 OCC Consent Order, pp. 10–21; Wells Fargo Press Release, "Wells Fargo Enters into Consent Orders with OCC and CFPB," April 20, 2018.

corrective disclosures, given the substantial information that was already publicly available about Wells Fargo's progress in addressing the regulatory issues subject to the allegations.

**a) Prior to the Putative Class Period, Some Market Participants Discussed That Wells Fargo's Remediation of Deficiencies Was an Ongoing and Complex Process and Expressed Skepticism Regarding the Timing for the Lifting of the Asset Cap**

124. Following the 2016 Consent Orders and 2017 Independent Directors' Report, as well as new issues identified in 2017, market participants discussed Wells Fargo's operational risk management deficiencies, and the complex and long process involved in remediating them. Following the announcement of the 2018 Federal Reserve Consent Order on February 2, 2018, nearly four months prior to the putative Class Period, some market participants discussed that Wells Fargo had not remediated its operational deficiencies to the satisfaction of its regulators. Given the complex nature of the work that remained for Wells Fargo to address its deficiencies, and the 2018 Federal Reserve Consent Order that revealed that the Federal Reserve was not satisfied with the Company's progress satisfying the 2016 Consent Orders, some market participants expressed skepticism about Wells Fargo's timeline for how long it would take to satisfy the Federal Reserve and have the asset cap lifted prior to the putative Class Period.

125. Prior to the 2016 Consent Orders, Wells Fargo's operational risk management was decentralized[241] and Wells Fargo had to centralize its operational risk management to comply with the Orders.[242] This required significant expansion in the hiring of risk professionals with knowledge of operational risk management. Indeed, in its 2017 Annual Report, the Company noted that it had hired a new chief compliance officer and chief operational risk officer, had "newly created [the] role of head of regulatory relations," and had hired more "than 2,000 external team members … to risk roles to strengthen [its] capabilities during the past two

[241] *See*, *e.g.*, 2017 Independent Directors' Report, p. i ("Wells Fargo's decentralized corporate structure gave too much autonomy to the Community Bank's senior leadership, who were unwilling to change the sales model or even recognize it as the root cause of the problem. Community Bank leadership resisted and impeded outside scrutiny or oversight and, when forced to report, minimized the scale and nature of the problem.").

[242] *See*, *e.g.*, 2017 Independent Directors' Report, p. 12 ("The fragmentation and decentralization of control functions needs to be and is being addressed.").

years."[243] In addition, in 2017, the Board implemented substantial personnel and structural changes to augment its oversight of the Company's operational risk management.[244]

126. However, even as Wells Fargo worked to remediate deficiencies, developments in 2017 demonstrated that Wells Fargo still had additional progress to achieve. Following Wells Fargo's disclosure of the CPI issues in 2017 and prior to the 2018 Federal Reserve Consent Order, a *Seeking Alpha* article published in November 2017 opined that Wells Fargo's "inadequate" "governance and controls" posed a "material risk[ that was] … unlikely to be mitigated in 2018 or even 2019."[245]

127. When the 2018 Federal Reserve Consent Order was issued, months before the putative Class Period, some market participants publicly acknowledged that it demonstrated that Wells Fargo had failed to remediate its operational risk management deficiencies to its regulators' satisfaction (including as ordered by the 2016 Consent Orders).[246] For example, Buckingham Research Group stated the Order revealed that the Federal Reserve "was impatient with the pace of change" and "clearly pushing [Wells Fargo] to accelerate the implementation of more stringent and firmwide risk management and compliance procedures."[247] Moreover, some equity analysts noted that remediating the operational deficiencies to the satisfaction of its regulators would be challenging for Wells Fargo given the complexity of the process. S&P Global Ratings commented that the 2018 Federal Reserve Consent Order "underscore[d] … the complexities of improving compliance and operational risk controls" to the satisfaction of the Company's regulators "throughout its very large organization."[248] Similarly, Deutsche Bank noted that Wells Fargo was "a big company" and it was "understandable that it takes time to identify issues"[249] and Sandler O'Neill and Partners noted that Wells Fargo had "plenty of challenges" and that it did not expect these to be resolved to the satisfaction of its regulators "overnight."[250]

[243] Wells Fargo & Company, "2017 Annual Report," February 15, 2018, p. 15.
[244] *See*, *e.g.*, Wells Fargo Press Release, "Wells Fargo Announces Board Changes," August 15, 2017.
[245] Richard J. Parsons, "Wells Fargo: Here's Why It's Time to Play Defense," *Seeking Alpha*, November 30, 2017.
[246] 2016 CFPB Consent Order, ¶¶ 39, 41–42; 2016 OCC Consent Order, pp. 6–10.
[247] "Consent Order Not Good News, but Are We Done Now?" *Buckingham Research Group*, February 5, 2018, p. 1.
[248] "Wells Fargo & Co. Downgraded to 'A-/A-2' from 'A/A-1' on Prolonged Regulatory and Governance Issues; Outlook Is Stable," *S&P Global Ratings*, February 7, 2018, p. 2.
[249] "Four Steps That Could Boost Shares," *Deutsche Bank*, April 13, 2018, p. 1.
[250] "WFC 1Q18 Earnings Review: Lowering EPS Estimates but Keeping BUY Rating," *Sandler O'Neill & Partners*, April 13, 2018, p. 2.

128.    In addition, some market participants commented that the lifting of the asset cap was at the Federal Reserve's discretion and subject to both internal processes at the Federal Reserve and external developments.  After the 2018 Federal Reserve Consent Order was announced, Citigroup noted that "[t]here remains a lot of uncertainty for investors" regarding the asset cap "since there is a lot of discretion on the part of the Fed as to whether restrictions will be lifted."[251]  Further, some market participants noted that regulatory restrictions on banks were often in place longer than expected.[252]  Moreover, when the asset cap was first imposed, it could be lifted by Federal Reserve staff.  However, following a request from Senator Elizabeth Warren, it was announced on May 11, 2018 that the Federal Reserve had determined that the asset cap could only be lifted after a public vote by the Board of Governors.[253]  In the wake of that decision, Cowen & Co. noted that "[r]escinding the asset cap was always going to be politically difficult" and that the decision "only further ratchet[ed] up the politics."[254]

129.    In this context, some market participants publicly expressed skepticism about how long it would take for Wells Fargo to satisfy the Federal Reserve and have the asset cap lifted.  On February 4, 2018, Jefferies stated that "the timeline for the Fed's ultimate approval is unknown,"[255] and Bernstein expressed that "we don't think anyone can predict with certainty how long [the 2018 Federal Reserve Consent Order] (or elements of it – like the asset cap)" would be in place.[256]  Another equity analyst firm noted its "concern[]" at "the disconnect between management's sunny sense that the Fed 'wants to see [the Company] satisfy the requirements … and will work with us along the way,' and Chairman Powell's darker remark that" the Federal Reserve "'will not lightly lift' the asset cap."[257]  Even after Wells Fargo stated

---

[251] "Fed Doesn't Pull Any Punches -- Downgrade to Neutral," *Citigroup*, February 4, 2018, p. 3.

[252] *See*, *e.g.*, "Revenue Growth Likely to Disappoint Relative to Expense Reduction Efforts," *Compass Point Research & Trading*, March 19, 2018, p. 2; "Federal Reserve Pounces on Wells Fargo with a Cease and Desist Order," *RBC*, February 5, 2018, pp. 2–3.

[253] Michelle Price, "Fed to Put Wells Fargo Remediation Plan to Public Board Vote: Letter," *Reuters News*, May 11, 2018.

[254] Jim Puzzanghera, "Wells Fargo Will Need a Formal Vote from the Federal Reserve before Growth Restrictions Are Lifted," *Los Angeles Times*, May 11, 2018.

[255] "Consent Orders: End of the Beginning or Beginning of the End?" *Jefferies*, February 4, 2018, p. 1.

[256] "Back in the Penalty Box - What Are Investors Asking?" *Bernstein*, February 9, 2018, p. 2.  *See also* "Fed Doesn't Pull Any Punches -- Downgrade to Neutral," *Citigroup*, February 4, 2018, p. 3 ("[t]here remains a lot of uncertainty for investors as to … the asset cap growth (since there is a lot of discretion on the part of the Fed as to whether restrictions will be lifted).").

[257] "The Opportunity and Threat from Digital Disintermediation," *RenMac*, April 22, 2018, pp. 2–3.

its expectation that the asset cap would be in place through early 2019 on May 10, 2018, Goldman Sachs noted that the "timing of the resolution" still "remains uncertain."[258]

**b) During the Putative Class Period and Prior to January 15, 2019, the First Alleged Corrective Disclosure, Some Market Participants Discussed Wells Fargo's Remediation Efforts and Publicly Expressed Skepticism Regarding the Timing of Having the Asset Cap Lifted**

130. Plaintiffs allege that on January 15, 2019, during the 2018 Q4 earnings call, "Defendant Sloan stunned the market by announcing the asset cap … was likely to remain 'through the end of 2019'—more than a year longer than originally represented."[259] However, during the putative Class Period but prior to January 15, 2019, some market participants had already expressed skepticism about Wells Fargo's timeline for how long it would take to satisfy the Federal Reserve and have the asset cap lifted in light of public discussion on Wells Fargo's challenges in complying with the 2018 Consent Orders. Indeed, prior to the alleged corrective disclosure on January 15, 2019, some equity analysts had already forecast that the asset cap could remain in place through the end of 2019 and beyond. Dr. Hartzmark has not offered any methodology that could, in light of this public information, be used to determine the incremental impact of the allegations on the price decline observed on January 15, 2019 as opposed to other factors, such as the consequences of already-known facts.

131. Wells Fargo's failures in complying with the 2018 Consent Orders had been highlighted by public press reports during the putative Class Period and prior to January 15, 2019. Some market participants noted that these reports demonstrated that Wells Fargo had not made satisfactory progress under the 2018 Consent Orders and, consequently, publicly expressed skepticism about the asset cap being lifted any time soon. On October 2, 2018 for example, OCC Chief Joseph Otting was quoted saying, "[w]e are not comfortable where we are with

[258] On May 10, 2018 during its 2018 Investor Day, and prior to the putative Class Period, Wells Fargo stated that it was "making plans to operate under the asset cap for the first part of 2019." Wells Fargo & Company, Analyst/Investor Day Transcript, dated May 10, 2018, p. 6; "Cost Cuts, Capital Return Could Drive 17%+ ROTCEs Despite Near-Term Revenue Growth Challenges," *Goldman Sachs*, May 13, 2018, p. 3.
[259] Complaint, ¶ 238.

[Wells Fargo]."[260]  J.P. Morgan noted that the OCC's dissatisfaction with Wells Fargo highlighted "the difficulty that Wells Fargo faces in moving past its scandals" and that the "key implication" was "whether the Fed's asset cap" would be extended since the "setbacks in completing the customer remediation relate to operational risk."[261]  Additionally, *The New York Times* reported later that month that Wells Fargo had "suspended two senior executives … at the request of regulators at the [OCC]."[262]  *The Wall Street Journal* commented that the suspensions signaled "that the gulf between the embattled bank and its government overseers is widening" and that Wells Fargo had "struggled to convince regulators … that it has the right people in place to clean up the mess."[263]  In early December 2018, *Reuters* reported that the Federal Reserve had rejected Wells Fargo's initial plans submitted under the 2018 Federal Reserve Consent Order[264] and was not satisfied with the Company's progress in remediating operational deficiencies.[265]  In response, a Portales Partners equity analyst was quoted as saying, "'[t]he asset cap will not be removed any time soon, but I don't think that's a surprise;'"[266] Evercore ISI similarly noted that the news "could further extend the possibility of an exit from the cap;"[267] and Autonomous Research expressed that it was "starting to feel" like the asset cap would be in place "forever," noting that "investors are … sensitive to the broader relationship between Wells and regulators" and the article made "that bit seem a work in progress."[268]

---

[260] Patrick Rucker and Pete Schroeder, "Wells Fargo Has Not Done Enough to Refund Cheated Drivers: Regulator," *Reuters News*, October 2, 2018.

[261] "Auto Remediation Work Completion Delayed Further - To Last Until 2020; Implications for Asset Cap? - ALERT," *J.P. Morgan*, October 30, 2018, p. 1.

[262] Emily Flitter, "Wells Fargo Suspends 2 Executives Amid Regulatory Review," *The New York Times*, October 24, 2018.

[263] Emily Glazer, "Departure of Top Wells Fargo Executive Shows Chasm with Regulator," *The Wall Street Journal*, November 14, 2018.

[264] Patrick Rucker, "Wells Fargo Reform Plans Fail to Satisfy Fed after Scandals: Sources," *Reuters News*, December 6, 2018 ("The Federal Reserve has rejected Wells Fargo & Co's plans to prevent further consumer abuses and told the scandal-plagued lender it needs stronger checks on management.").

[265] On December 10, 2018, *Reuters* reported that Federal Reserve Chairman Powell had written to Senator Warren and stated that "[w]e do not intend to lift the asset cap until remedies to these issues have been adopted and implemented to our satisfaction."  Patrick Rucker and Imani Moise, "Wells Fargo Won't Be Allowed to Grow Until Problems Fixed: Fed's Powell," *Reuters News*, December 10, 2018.

[266] Hannah Levitt, "Wells Fargo Says It's Cleaning Up.  Regulators Demand More," *Bloomberg*, December 6, 2018.

[267] "Another Potential Consent Order Snag?" *Evercore ISI*, December 6, 2018, p. 1.

[268] "Asset Cap Forever," *Autonomous Research*, December 6, 2018, p. 2.  *See also* Stephen Simpson, "Wells Fargo Still Discounting a Host of Challenges," *Seeking Alpha*, December 20, 2018 ("Wells Fargo still has a lot of work to do to dig itself out of the hole it created for itself. … The Fed recently rejected (reportedly) the company's … plan, and that follows reports of a … rejection of its auto insurance remediation plan. On top of that, the Chief Administrative Officer and Chief Auditor were both placed on leave … there is a risk that the company's punitive [asset] cap will remain in place longer than expected.").  *See also* "4Q18 Earnings Preview: Lowering Estimates, but LC Bank Stocks Still Cheap," *Morgan Stanley,* January 8, 2019, p. 36 ("With recent headlines suggesting the Fed

132. In addition to the public reports on the regulators' dissatisfaction with Wells Fargo's progress, market participants continued to comment on the complexity of Wells Fargo's efforts to remediate its operational deficiencies to the satisfaction of its regulators.[269] One analyst noted that Wells Fargo's "turnaround, even for a company of its size, seem[ed] to be taking a long time,"[270] and on December 6, 2018, Evercore ISI stated it was "concern[ed]" about management's "ability to address the [Federal Reserve's concerns]."[271] Further, in anticipation of the Democratic Party's expected control of the U.S. House of Representatives following the 2018 November midterm election (which ultimately materialized), some market participants noted how political developments could pose a challenge to having the asset cap lifted. Indeed, Wells Fargo's management explained that the process for lifting the asset cap had become "very political."[272] In an article published in August 2018 titled "Wells Fargo investors stop panicking learn to live with [the asset] cap," a Cowen & Co. equity analyst was quoted as saying, "[w]e don't know how the Federal Reserve could lift the cap this year. And lifting it next year could become a problem if the Democrats retake the House in November as we expect."[273] Following the 2018 midterm election, the *Los Angeles Times* similarly reported that, "with Democrats winning control of the House of Representatives," the prospect of the Federal Reserve voting to lift the asset cap "seems less likely" since "[n]o regulator wants to go before a committee and explain why they're letting the bank off the hook."[274]

---

has raised concerns with WFC's plans to boost their internal control systems, investors will focus on any updates with Wells' ability to exit the asset cap by 2Q19.").

[269] Wells Fargo itself publicly highlighted the complexity and uncertainty of the process, stating that there was "no checklist" for its process remediating operational deficiencies to the satisfaction of its regulators and noted that this process was "subjective." *See*, *e.g.*, Wells Fargo & Company, Presentation Transcript at Barclays Global Financial Services Conference, dated September 14, 2018, p. 12; Robert Armstrong and Laura Noonan, "Wells Fargo: Repairing a Damaged Brand," *Financial Times*, January 14, 2019.

[270] James Rufus Koren, "CEO Tim Sloan Has Had Two Years to Fix Wells Fargo. Is He Running Out of Time?" *Los Angeles Times*, November 25, 2018.

[271] "Another Potential Consent Order Snag?" *Evercore ISI*, December 6, 2018, p. 1.

[272] Victoria Guida and Aubree Eliza Weaver, "Checking In with Wells Fargo," *Politico*, June 7, 2018. Following a meeting with Wells Fargo's management, an equity analyst noted that management had expressed that "the Fed's public vote process" had created an "ambiguity on timing" with respect to when the asset cap would be lifted. *See* "Highlights from Our Meetings with Management: Expenses and Investing in Focus," *Keefe, Bruyette & Woods*, August 27, 2018.

[273] Hannah Levitt, "Wells Fargo Investors Stop Panicking, Learn to Live with Cap," *Bloomberg*, August 6, 2018 (capitalization omitted). *See also* James Rufus Koren, "CEO Tim Sloan Has Had Two Years to Fix Wells Fargo. Is He Running Out of Time?" *Los Angeles Times*, November 25, 2018 ("[Raymond Jones analyst] Mills said the prospect of such a vote [on lifting the asset cap] going Wells Fargo's way, at least in the short term, seems less likely … 'No regulator wants to go before a committee and explain why they're letting the bank off the hook.'").

[274] James Rufus Koren, "CEO Tim Sloan Has Had Two Years to Fix Wells Fargo. Is He Running Out of Time?" *Los Angeles Times*, November 25, 2018.

133. Given this context, Wells Fargo's January 15, 2019 announcement that it expected the asset cap to remain in place through 2019 may not have been surprising to investors. In fact, during the putative Class Period and prior to that announcement, some equity analysts commented that their expected timing for the lifting of the asset cap exceeded what Wells Fargo had publicly stated at the time.[275] For example, on June 14, 2018, RBC commented, "[t]he company recently reiterated that it expects the asset cap to remain in place through the 'first part of 2019.' We expect, however, the asset cap could remain in place well into the second half of 2019."[276] On January 2, 2019 (before the first alleged corrective disclosure), RBC pushed its expected timeline further to 2020 following public press reports (such as those mentioned above) that Wells Fargo had failed to satisfy its regulators.[277] Similarly, on December 6, 2018, Evercore ISI did not expect the Company to "exit[] the cap until the end of 2020 at the earliest" and noted its "belie[f]" that "the Street" shared a similar outlook.[278] Indeed, following the January 15, 2019 announcement, a J.P. Morgan analyst commented that it was "not surprised by the extension of the asset cap"[279] and Evercore ISI reiterated that it "didn't have WFC exiting the asset cap restriction until after 2020 (and it appears the Street feels the same)."[280] Similarly, the coverage analyst for Wells Fargo at PZENA Investment Management ("PZENA"), the investment manager to Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") during the putative Class Period, testified that he [redacted][281]

[275] On May 10, 2018 during its 2018 Investor Day, and prior to the putative Class Period, Wells Fargo stated that it was "making plans to operate under the asset cap for the first part of 2019" and, on July 13, 2018, during its 2018 Q2 earnings call, Wells Fargo stated that it expected the asset cap to be lifted "in the first half of [2019]." Wells Fargo & Company, Analyst/Investor Day Transcript, dated May 10, 2018, p. 6; Wells Fargo & Company, 2018 Q2 Earnings Call Transcript, dated July 13, 2018 ("2018 Q2 Earnings Call"), p. 23; Complaint, ¶ 238.

[276] "Fine Tuning EPS Estimates," *RBC*, June 14, 2018, p. 1.

[277] "Upgrading to Sector Perform but WFC Still Navigating through the Regulatory Storm," *RBC*, January 2, 2019, p. 1.

[278] "Another Potential Consent Order Snag?" *Evercore ISI*, December 6, 2018, p. 1. Similarly, on November 25, 2018, the *Los Angeles Times* reported that "[equity] analysts say they expect the cap to stay in place for most of the coming year" (i.e., most of 2019). James Rufus Koren, "CEO Tim Sloan Has Had Two Years to Fix Wells Fargo. Is He Running Out of Time?" *Los Angeles Times*, November 25, 2018.

[279] "Weak 4Q: Lower Revenues, Higher Core Non-Interest Expenses; Asset Cap to Continue Until YE'19," *J.P. Morgan*, January 15, 2019, p. 1.

[280] "4Q Wrap: Weak Fees Mar Qtr & Asset Cap Pushed Out, but Constructive on ROE Outlook," *Evercore ISI*, January 15, 2019, p. 1.

[281] Deposition of Eric Hagemann, and Exhibits, November 8, 2022 ("Hagemann Deposition"), pp. 22:22–23:11, 56:14–57:8 [redacted] Hagemann Deposition, p. 20:3–7.

134. Dr. Hartzmark has not offered any methodology that could be used to determine the incremental impact of disclosures "related to" Plaintiffs' allegations on the price decline observed on January 15, 2019, as opposed to other factors, particularly given that some market participants had expressed an expectation for the timing for the lifting of the asset cap that exceeded what Wells Fargo had publicly stated prior to the first alleged corrective disclosure.

#### c) Between the First and Second Alleged Corrective Disclosures (on January 15, 2019 and April 12, 2019), Some Market Participants Publicly Expressed Skepticism Regarding the Timing for the Lifting of the Asset Cap

135. Plaintiffs allege that on April 12, 2019, during the 2019 Q1 earnings call, "Defendant Parker[] announced that the Bank would no longer meet the 2018 FRB Consent Order's requirements and have the asset cap lifted by the end of 2019," "refused to provide any further guidance on the timing of … the asset cap [being] lifted," and stated that "the Bank had 'a substantial amount of work yet to do, to satisfy the expectations of our regulators.'"[282] However, some market participants had already previously expressed skepticism about Wells Fargo's updated timeline for how long it would take to satisfy the Federal Reserve and have the asset cap lifted in light of public discussion regarding Wells Fargo's challenges in complying with the 2018 Consent Orders. Dr. Hartzmark has not offered any methodology that could, given this public information, be used to determine the incremental impact of the allegations on the price decline observed on April 12, 2019 as opposed to other factors, such as the consequences of already-known facts.

136. Wells Fargo's continuing inability to satisfy its regulators under the 2018 Consent Orders was discussed publicly, particularly around the time of former Wells Fargo Chief Executive Officer Timothy Sloan's testimony before Congress on March 12, 2019. On March 9, 2019, *The New York Times* reported that Wells Fargo was then still "negotiating the details of the [2018 Federal Reserve Consent Order] plan with the Fed."[283] Also prior to the hearing, *The Wall Street Journal* reported that the OCC was "debating [the] rare step" to "force out additional top

[282] Complaint, ¶ 244.
[283] Emily Flitter and Stacy Cowley, "Wells Fargo Says Its Culture Has Changed. Some Employees Disagree.," *The New York Times*, March 9, 2019.

executives or directors" at Wells Fargo and considering charging a "special fee" because it had "spent so much time dealing with [the Company]."[284]  During the hearing, Representative Maxine Waters commented that "Wells Fargo [had] failed to clean up its act" and Representative Nydia Velázquez stated that Wells Fargo had failed in its remediation and that was "exactly why [the Federal Reserve]" had not "remove[d] the cap."[285]

137.    Immediately following the hearing, in a written statement, an OCC spokesperson stated that the OCC "continue[d] to be disappointed with [Wells Fargo's] performance under our consent orders."[286]  *The Wall Street Journal* reported on the statement and noted that the OCC had "[s]lam[med]" Well Fargo,[287] J.P. Morgan commented that the OCC's "notable" rebuke raised the "question of whether the OCC will push for any changes in the leadership of the company,"[288] and Bank of America Merrill Lynch noted a "potential extension on the resolution" of the asset cap.[289]  In a press conference on March 20, 2019, Federal Reserve Chairman Powell commented "we will not lift [the asset cap] until Wells Fargo … comes forward with plans, implements those plans, and we're satisfied with what they've done.  And that's not where we are right now."[290]  In light of the Federal Reserve's "strict commentary," one analyst commented that the asset cap was "an ongoing concern."[291]

138.    Indeed, following the announcement of CEO Sloan's retirement from Wells Fargo on March 28, 2019, Bank of America Merrill Lynch stated that his retirement "seemed inevitable, given both regulatory and investor frustration."[292]  *The Wall Street Journal* noted that "[t]he harsh words from regulators left Mr. Sloan with little option but to resign."[293]  Moreover, on

---

[284] Emily Glazer, "Wells Fargo Regulators Weigh Executive Shakeup as CEO Heads to Washington," *The Wall Street Journal*, March 11, 2019.

[285] Hearing on "Holding Megabanks Accountable: An Examination of Wells Fargo's Pattern of Consumer Abuses" before the Committee on Financial Services of the United States House of Representatives, March 12, 2019, pp. 76, 78.

[286] Rachel Louise Ensign and Andrew Ackerman, "Regulator Slams Wells Fargo after CEO Testifies to Congress," *The Wall Street Journal,* March 12, 2019.

[287] Rachel Louise Ensign and Andrew Ackerman, "Regulator Slams Wells Fargo after CEO Testifies to Congress," *The Wall Street Journal*, March 12, 2019.

[288] "OCC Rebuke Yesterday a Notable Event; House Hearing Continues Political Risk - ALERT," *J.P. Morgan*, March 12, 2019, p. 1.

[289] "Value, or Value Trap?  A Bull/Bear Deep Dive," *Bank of America Merrill Lynch*, March 19, 2019, p. 1.

[290] Federal Reserve, Chair Jerome Powell's Press Conference Transcript, dated March 20, 2019, p. 7.

[291] "Time to Lawyer Up," *Autonomous Research*, March 29, 2019, p. 1.

[292] "Shares Should Rally on CEO Transition," *Bank of America Merrill Lynch*, March 28, 2019, p. 1.

[293] Rachel Louise Ensign and Andrew Ackerman, "Scandals Tarnished Wells Fargo.  Washington Claimed Its CEO.," *The Wall Street Journal*, March 30, 2019.

April 9, 2019, Senator Warren issued a press release quoting OCC Chief Otting as saying that the OCC shared Senator Warren's "concerns regarding the progress of Wells Fargo toward meeting [the OCC's] regulatory expectations" and quoting CFPB Director Kathleen Kraninger as saying that she "[was not] satisfied with the Bank's progress to date."[294] Indeed, I understand that Lead Plaintiff Employees' Retirement System of Rhode Island ("ESRI") received a letter from shareholders on April 10, 2019 addressed to the Board and stating that, "[d]espite Wells Fargo's efforts," the Federal Reserve and OCC "remain unsatisfied by the progress Wells Fargo has made in correcting the root causes of the fake accounts scandal."[295]

139. Some market participants also discussed the particular challenges Wells Fargo faced in remediating operational deficiencies to the satisfaction of its regulators. In the weeks prior to April 12, 2019, market participants noted that "[r]eforming decades of past mistakes at an institution as large as Wells [Fargo] is a difficult and time-consuming endeavor,"[296] that it would take "some time and effort" to resolve Wells Fargo's "regulatory, reputational and operational issues,"[297] and noted the "complexity and severity of the organizational and regulatory pressures" faced by the Company.[298] Some market participants also publicly acknowledged that the March 2019 congressional hearing that had been scheduled after the Democratic Party won control of the U.S. House of Representatives and the upcoming 2020 general election constituted developments that posed further challenges to having the asset cap lifted. RBC, for example, noted that "the lifting of asset freeze at [year end] 2019 could turn into a political football with the 2020 Presidential election."[299] Following the congressional hearing, an equity analyst noted that the "bipartisan nature of some of the frustrations with" Wells Fargo would make the "lifting

[294] Senator Elizabeth Warren Press Release, "Regulators Unsatisfied with Wells Fargo, Prepared to Ensure the Bank's Compliance with Consent Orders: Fed, OCC, and CFPB Agree with Senators Warren and Brown on Wells Fargo's Inadequate Progress," April 9, 2019.

[295] Deposition of Justin Maistrow, and Exhibits, November 4, 2022 ("Maistrow Deposition"), 99:18–102:4; Maistrow Deposition, Defendants' Exhibit 6, WFC_ESRI-0003762–84 at 63.

[296] "Sloan Steps Down as Wells Fargo CEO; Interim CEO Selected as Board Begins Search for Replacement," *Morningstar*, April 1, 2019, p. 2.

[297] "1Q19 EPS Preview: Searching for a New CEO and Revenue Growth," *Barclays*, April 5, 2019, p. 3.

[298] Ben Walsh, "Warren Buffett Says Wells Fargo's Next CEO Shouldn't Come from Wall Street — Or Wells Fargo," *Barron's*, April 8, 2019.

[299] "Asset Cap Sticks Around for 2019 but Company Remains Focused on Expense Reduction," *RBC*, January 15, 2019, p. 1.

[of] the cap more difficult"[300] and, similarly, Cowen & Co. stated that it did not expect "the Federal Reserve [to] lift the asset cap until anger on Capitol Hill has lessened."[301]

140. Given this context, Wells Fargo's April 12, 2019 announcement that it no longer expected that the asset cap would be lifted by the end of 2019 and that the Company would no longer provide guidance as to the timing for the lifting of the asset cap may not have been at all surprising to investors. In fact, prior to April 12, 2019, some equity analysts commented that their expected timing for the lifting of the asset cap was later than what Wells Fargo publicly stated on January 15, 2019. For example, J.P. Morgan stated, "Wells expects to operate under this cap until [year end] '19, but we would not be surprised if it continues into 2020;"[302] Citigroup commented, "[w]e do not expect the asset cap to get lifted until mid-2020;"[303] and Keefe, Bruyette & Woods noted, "we would expect the asset cap to be in place during 2020."[304]

141. Indeed, after Wells Fargo disclosed that it would no longer be providing guidance for the timing of the lifting of the asset cap—i.e., the alleged corrective disclosure—on April 12, 2019, Keefe, Bruyette & Woods noted that this announcement was "in line with [its] expectations"[305] and Morgan Stanley commented that the announcement was "not a surprise given public statements made by regulators recently."[306] Indeed, I understand that the coverage analyst for Wells Fargo at PZENA, the investment manager to Lead Plaintiff Louisiana Sheriffs, [REDACTED] [307] In fact, that analyst [REDACTED] [308]

---

[300] "DC Woes Continue," *Raymond James*, March 12, 2019, p. 1.

[301] Jim Puzzanghera, "Wells Fargo CEO Tim Sloan's Message of Contrition and Improvement Draws Bipartisan Rebuke," *Los Angeles Times*, March 12, 2019.

[302] "OCC Rebuke Yesterday a Notable Event; House Hearing Continues Political Risk - ALERT," *J.P. Morgan*, March 12, 2019, p. 1.

[303] "Alert: The Right Move, but Next Move Is More Important," *Citigroup*, March 28, 2019, p. 1.

[304] "CEO Sloan Steps Down; Search for an External Successor Begins," *Keefe, Bruyette & Woods*, March 28, 2019, p. 1.

[305] "Management Commits to Expenses but NII Guided Down," *Keefe, Bruyette & Woods*, April 12, 2019, p. 1.

[306] "1Q19 Earnings Day 1: JPM, WFC, PNC," *Morgan Stanley*, April 15, 2019, p. 2.

[307] [REDACTED] PZN000103.

[308] [REDACTED] *See* [REDACTED] PZN000105. *See also* [REDACTED] PZN000104. [REDACTED]

142. Dr. Hartzmark has not offered any methodology that could be used to determine the incremental impact of Plaintiffs' allegations on the price decline observed on April 12, 2019 as opposed to other factors, particularly given that, by that time, some market participants appear to have already publicly discounted the updated timeline that Wells Fargo had provided in the first alleged corrective disclosure.

**d) After the Second Alleged Corrective Disclosure on April 12, 2019, Some Market Participants Discussed Regulators' Dissatisfaction with Wells Fargo's Progress**

143. Plaintiffs allege that on January 14, 2020, Mr. Scharf, who was announced as Wells Fargo's new CEO on September 27, 2019,[309] revealed "that the Bank was still at the 'first step' … and still had a 'great deal' of work to do to comply with the 2018 Consent Orders," admitting that the Company had "'made some terrible mistakes and have not effectively addressed [its] shortcomings.'"[310] He further announced that the Bank's failure to address these shortcomings had "'led to financial underperformance,'"[311] and stated that "I'm not suggesting here that any of these public issues will be closed this year."[312] Plaintiffs also allege that, "on March 4 and 5, 2020, the House Financial Services Committee issued scathing reports that added detail regarding how much more work Wells Fargo had left in the regulatory process, the Bank's chronic failure to submit compliant Stage 1 Plans to its Regulators, and the Regulators' repeated warnings of future enforcement actions because of the Bank's non-compliance,"[313] and that certain statements made in congressional testimony on March 10 and 11 revealed the truth to investors, including that (1) "the extensions and missed deadlines for the Stage 1 Plan submissions had raised 'concerns for the Board' … and were a 'red flag'"; (2) the "Board was … aware that the management team … was not capable of getting plans 'written in a complete fashion'"; and (3) "vast portions of the Stage 1 Plan proposal … were 'currently under resubmission.'"[314]

[309] Wells Fargo Press Release, "Wells Fargo Names Charles W. Scharf Chief Executive Officer and President," September 27, 2019.
[310] Complaint, ¶ 251.
[311] Complaint, ¶ 251.
[312] Complaint, ¶ 252.
[313] Complaint, ¶ 258.
[314] Complaint, ¶ 260.

144. However, between the April 12, 2019 alleged corrective disclosure and the alleged corrective disclosure dates in January and March 2020, Wells Fargo no longer guided the market as to its estimate for when the asset cap would be lifted.[315] Further, during that time, some market participants continued discussing Wells Fargo's difficulties in satisfying its regulators under the 2018 Consent Orders.

145. Following the April 12, 2019 alleged corrective disclosure, regulators continued to publicly express their dissatisfaction with Wells Fargo's progress under the 2018 Consent Orders. On May 15, 2019, when asked in a congressional hearing if the OCC's position had changed from being "disappointed" with Wells Fargo's progress "under [the OCC's] consent orders," OCC Chief Otting replied that "it has not."[316] On July 31, 2019, Federal Reserve Chairman Powell stated that "the problems at Wells Fargo … were … pretty deep," had not "been fixed quickly," and were not expected to "to be fixed quickly."[317] He also noted that the Federal Reserve was "not … considering" lifting the asset cap.[318] In the wake of these statements, CFRA Research commented that these "concerns from … the [Federal Reserve and OCC]" raised "uncertainties [about] whether WFC can resolve business practices, operational processes and compliance with regulatory requirements in a timely manner."[319] Odeon noted that it was "evident" that the regulators' view "as to what this company should be is being forced on the organization" and that the "government is apparently unhappy with the pace of change."[320]

146. Reports of regulators' dissatisfaction with Wells Fargo continued throughout 2019. In December, for example, *The Wall Street Journal* reported that the OCC had notified Wells Fargo of a "massive backlog of employee human-resources complaints and poor controls" in a July

[315] Complaint, ¶ 244.
[316] Hearing on "Examining the Efforts, Activities, Objectives, and Plans of Federal Regulatory Agencies with Respect to Prudential Regulations for U.S. Financial Institutions and Credit Unions" before the Committee on Banking, Housing, and Urban Affairs of the United States Senate, May 15, 2019, pp. 31–32.
[317] Federal Reserve, Chair Jerome Powell's Press Conference Transcript, dated July 31, 2019, p. 19.
[318] Federal Reserve, Chair Jerome Powell's Press Conference Transcript, dated July 31, 2019, p. 19.
[319] "Wells Fargo & Company," *CFRA Research*, July 17, 2019, p. 2.
[320] "When Not If," *Odeon*, August 1, 2019, p. 3.

2019 letter.[321]  The article also reported that, in May 2019, Wells Fargo's top OCC examiner had "offered a blunt critique of the bank's progress" to Wells Fargo's in-house counsel.[322]

147.    Further, following the 2019 Q1 earnings call on April 12, 2019, some market participants continued to discuss the "complexity associated with satisfying [the] regulators' demands."[323] After new CEO Scharf was announced on September 27, 2019, one equity analyst stated that it "suspect[ed] it will take some time" for Wells Fargo to get the asset cap removed and to repair its "regulatory relations" given the Company's "size" and the "scope" of the issues[324] and another commentator similarly noted that "[t]urnarounds take time."[325]  Market participants also discussed how the upcoming 2020 general election posed a challenge to having the asset cap lifted.  In late 2019, Keefe, Bruyette & Woods noted that it did not expect the asset cap to be lifted "prior to the U.S. elections in November 2020,"[326] RBC noted that it would not be a "surprise" if the cap was left in "place until after the election,"[327] and Cowen & Co. stated that, given the "political environment, it is hard to see how the Federal Reserve could vote to lift the asset cap on the bank next year [in 2020]."[328]

148.    Dr. Hartzmark has not offered any methodology that could be used to determine the incremental impact of disclosures "related to" Plaintiffs' allegations on the price decline observed on any alleged corrective disclosure date following April 12, 2019 that reflects the market's response only to the disclosures "related to" the allegations, as opposed to consequences of already-known facts.

---

[321] Rachel Louise Ensign, "Banking Regulator Rebukes Wells Fargo's HR Operations," *The Wall Street Journal*, December 4, 2019.

[322] Rachel Louise Ensign, "Banking Regulator Rebukes Wells Fargo's HR Operations," *The Wall Street Journal*, December 4, 2019.

[323] "Q1 2019 Results: Healthy Balance Sheet and Respectable Profitability at a Time of Franchise Uncertainty," *Moody's*, April 12, 2019, p. 1.

[324] "WFC Names Charlie Scharf New CEO; Post-Call Thoughts," *Sandler O'Neill & Partners*, September 27, 2019, p. 2.

[325] John M. Mason, "Wells Fargo: The Shadow of Bad Management Remains," *Seeking Alpha*, December 5, 2019, p. 3.

[326] "Spotlight on the Efficiency Ratio at Wells Fargo," *Keefe, Bruyette & Woods*, November 20, 2019, p. 11.

[327] "3Q19: Noisy Quarter but Underlying Trends Remain Challenging," *RBC*, October 15, 2019, p. 2.

[328] Richard Craver, "Wells Fargo Gets Poor Reputation Ranking to Start 2020," *Hickory Daily Record*, December 26, 2019.

### C. Dr. Hartzmark Does Not Offer a Methodology that Can Measure the Extent to Which the Alleged Corrective Disclosures on the First Three Alleged Corrective Disclosures Dates Changed Market Expectations

149. This combination of case-specific facts—Wells Fargo's publicly discussed difficulties satisfying its regulators and public discussion relating to progress towards satisfying the 2018 Consent Orders—underscores the failure of Dr. Hartzmark's generic approach to damages. Dr. Hartzmark cannot simply use the price declines following the first three alleged corrective disclosures to measure the impact of only the allegedly corrective information, because other information was released on those dates (either confounding information or information that represented the consequences of already known facts about the progress under the 2018 Consent Orders). In other words, to ultimately measure inflation in a manner consistent with Plaintiffs' theory of liability, an expert would have to either directly measure the incremental inflationary impact of changes in market expectations regarding progress under the 2018 Consent Orders that were caused by corrective information or, alternatively, measure the impact of all confounding information and consequences of already-known facts about progress under the 2018 Consent Orders and remove them from the overall company-specific price decline.

150. This failure is particularly glaring given that Dr. Hartzmark recognizes that, in general, it may be necessary "to account for confounding information," but provides no methodology to do so reliably here, instead merely claiming that there are "many techniques that could be used," without assessing which, if any, specific techniques could be used given the facts in this matter.[329]

151. For example, Dr. Hartzmark suggests that one general approach to parsing confounding information is "the analysis of intraday pricing."[330] On three alleged corrective disclosure impact dates in this case (January 15, 2019, April 12, 2019, and January 14, 2020) Wells Fargo released its quarterly earnings results, which represented the dissemination of new value-relevant

---

[329] Hartzmark Report, ¶¶ 88, 90.

[330] Hartzmark Report, ¶ 90 ("[A]ssuming parsing or scaling were appropriate, there are many techniques that could be used to estimate the portion of the price reaction due to the revelation of the truth and how that price response might change over time. These include, among others: the analysis of intraday pricing (if disclosures are made at different times), analysis of market and media commentary, examination of the elements that cause changes in actual or estimated earnings-per share or EBITDA (by individual analysts, the company or a consensus of analysts), or analysis of detailed accounting and company information, such as a breakdown of revenues and earnings for different divisions, businesses, types of customers, facilities, geographic locations, etc.").

information to the market.[331]  On each of these dates, earnings information was provided to the market in two steps.  First, the Company provided information on its quarterly financial results via a "pre-market earnings release."  Second, approximately two hours after the earnings release during market hours, Wells Fargo hosted a call to discuss the quarter's results and answer questions from equity analysts covering the Company, during which the alleged corrective disclosures were made, as shown in **Exhibits 9A, 9B, and 9C**.  Therefore, the pre-market earnings releases that did not contain allegedly corrective information were made public before earnings calls that did contain allegedly corrective information.  Intraday analysis could theoretically be used to account for price movements associated with the pre-market earnings releases to the extent they represented confounding information if the information in the earnings releases were fully reflected in Wells Fargo's stock price within a few hours (i.e., the time between the pre-market earnings release and the earnings call containing the allegedly corrective information).  If, however, as Dr. Hartzmark suggests, information takes longer to be incorporated in stock prices,[332] then he cannot use an intraday analysis because the information in the pre-market earnings releases would continue to affect Wells Fargo's stock price after the alleged corrective disclosures; thus, parsing using an "analysis of intraday pricing" would not suffice.  In addition, Dr. Hartzmark has not addressed how he would design a reliable intraday event study in this case and, notably, the event study he presents in his report uses daily returns data, not an intraday analysis.

152.    Regardless, even if an intraday analysis could account for confounding information released in the pre-market earnings releases, Dr. Hartzmark has not proposed an analysis to account for other confounding information released on the same earnings calls as the alleged corrective disclosures, as summarized in **Section VI.C.2** below.[333]  Particularly in light of the market commentary about Wells Fargo's difficulties satisfying regulators and public expression of skepticism regarding the Company's timeline for having the asset cap lifted, Dr. Hartzmark has not proposed a methodology to measure inflation that can reliably account for the fact that

---

[331] Complaint, ¶¶ 238, 244, 251.

[332] Hartzmark Report, ¶ 62 ("Whether the material information disclosed on these days is unanticipated or anticipated will, in an efficient market, be reflected in the price movements (or lack thereof) observed on the day or days that follow.").

[333] Hartzmark Report, ¶ 90.

the alleged corrective disclosures were not the only Company-specific information released on the first three alleged corrective disclosure dates.

### 1. On Each of the First Three Alleged Corrective Disclosure Dates, Wells Fargo Released Earnings Results Prior to the Alleged Corrective Disclosures

153.     All three pre-market earnings releases contained, at least in part, information that was negative in nature, implying the information released may have put downward pressure on Wells Fargo's stock price.  However, given that the alleged corrective disclosures all occurred on conference calls later in the day, Dr. Hartzmark does not establish a basis to attribute any price movement prior to the conference calls (such as those resulting from disclosures in the pre-market releases) to the alleged corrective disclosures.[334]  On these three dates, equity analysts expressed negative reactions to Wells Fargo's pre-market earnings releases due to lower-than-expected earnings results.  On each of these dates, equity analysts commented that Wells Fargo had missed core earnings expectations.[335]  Specifically, prior to the earnings call on January 15, 2019, Credit Suisse characterized core EPS as "a bit below expectations,"[336] consistent with Goldman Sachs' description of a "moderate miss," and Citigroup's description of a "[s]light [c]ore [m]iss."[337]  Prior to the earnings call on April 12, 2019, Oppenheimer described "WFC's core operating fundamentals [as] short of our expectations"[338] and Goldman Sachs described core earnings as "modestly weaker" than its estimate.[339]  Similarly, prior to the earnings call on

---

[334] Further, given that it had already been disclosed to the market that Wells Fargo was operating under the asset cap in the prior quarter, in an efficient market, Wells Fargo's stock price would have already incorporated the market's expectation of the consequences of operating under the asset cap for that quarter.  As a result, any stock price reaction related to the release of the prior quarter's performance that deviated from expectations due to realization of previously known uncertainties about that performance cannot represent the removal of inflation.

[335] Core earnings adjust reported GAAP earnings for one-time items and profits deemed unrelated to a company's central business activities.  *See* Ethan Rouen et al., "Core Earnings: New Data and Evidence," *Journal of Financial Economics* 142, no. 3, 2021, pp. 1068–1091.

[336] "First Thoughts: Some + / Some –," *Credit Suisse*, January 15, 2019, p. 1.

[337] "First Take: Encouraging Core Operating Trends Offset by Market Sensitive Revenue Weakness," *Goldman Sachs*, January 15, 2019, p. 1.  *See also* "Results: 4Q18 Early Read – Sorting Through the Noise; Slight Core Miss and Peg Core EPS at $1.08," *Citigroup*, January 15, 2019, p. 1.

[338] "1Q19 First Take Pre-Call: Core Results Remain Under Pressure," *Oppenheimer*, April 12, 2019, p. 1 ("Unlike the two other big banks that reported this morning, WFC's core operating fundamentals were short of our expectations, which had themselves generally trended down in recent quarters.").

[339] *See also* "First Take: A Core Miss on Higher Expenses and a Reserve Build," *Goldman Sachs*, April 12, 2019, p. 1 ("WFC reported 1Q19 EPS of $1.20 vs GSe/FactSet consensus of $1.22/$1.12, although excluding one-timers and non-core items … earnings per share of $0.95 came in modestly weaker compared to our estimate of $1.05.").

January 14, 2020, Barclays described core EPS as "below expectations"[340] and Goldman Sachs calculated core EPS as 14% below its forecast.[341] Following these negative earnings releases, on January 15, 2019 and January 14, 2020, Wells Fargo's stock price appeared to decline prior to each day's alleged corrective disclosures.[342]

154. If negative news released in the pre-market earnings releases (such as core EPS misses) were incorporated within Wells Fargo's stock price rapidly (as the academic literature suggests it would be),[343] then such confounding information could perhaps be addressed with an intraday event study. However, such a methodology would not be possible if it takes longer than a few hours for information to be incorporated, and Dr. Hartzmark suggests in both the Hartzmark Report and in reports in other matters that information may take *days* to be fully disseminated and digested by market participants.[344] Therefore, though Dr. Hartzmark suggests that he could use "an analysis of intraday pricing" to parse the price reaction from the negative information released in the pre-market earnings releases, his own statements suggest that such an analysis would be insufficient to measure consistent with Plaintiffs' theory of liability—and even if it would be sufficient, he has provided no methodology to implement such an analysis.

[340] "WFC 4Q19 EPS Instant Insight: Falls Short of Expectations," *Barclays*, January 14, 2020, p. 1 ("Core EPS looks to be below expectations. Lower than expected fee income (equity investments, other) followed by higher than anticipated expenses drove the shortfall.").

[341] "First Take: A Clear Miss, but Investors Likely to Focus More on What the Core Run Rate Is," *Goldman Sachs*, January 14, 2020, p. 1. Goldman Sachs had forecast a core EPS of $1.07 per share and calculated an actual core EPS of $0.92 per share for 2019 Q4.

[342] Wells Fargo's stock price had already decreased from the closing price on January 14, 2019, of $48.42, to a price of $47.64 when the earnings call began at 10:00 AM EST on January 15, 2019. Similarly, Wells Fargo's stock price had already decreased from the closing price on January 13, 2020, of $52.11, to a price of $50.65 when the earnings call began at 10:00 AM EST on January 14, 2020.

[343] *See*, *e.g.*, Tarun Chordia et al., "Evidence on the Speed of Convergence to Market Efficiency," *Journal of Financial Economics* 76, no. 2, 2005, pp. 271–292; Jeffrey A. Busse and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65, no. 3, 2002, pp. 415–437.

[344] Hartzmark Report, ¶ 62 ("Whether the material information disclosed on these days is unanticipated or anticipated will, in an efficient market, be reflected in the price movements (or lack thereof) observed on the day **or days** that follow." (emphasis added)). Dr. Hartzmark has previously testified that "it might take more than a trading day for news to be disseminated and digested (or processed) by interested parties." Hartzmark Navient Report, ¶ 210.

### 2. On Each of the First Three Alleged Corrective Disclosure Dates, Wells Fargo Also Disclosed Information on Topics Unrelated to the Allegations on the Conference Calls Along with the Alleged Corrective Disclosures

155. Even if "an analysis of intraday pricing" could account for the negative information released in the pre-market earnings releases, Dr. Hartzmark has proposed no methodology that could reliably account for confounding information that was conveyed to the market during the same earnings calls in which the allegedly corrective information was released on the first three alleged corrective disclosure dates. These earnings calls contained both a detailed discussion of Wells Fargo's most recent quarter's results as well as new information, including management's guidance (or lack of guidance) on Wells Fargo's future income and expenses. Dr. Hartzmark has not proposed a methodology to measure inflation that can reliably account for the fact that confounding Company-specific information was disclosed on the same earnings calls as the alleged corrective disclosures.

156. Wells Fargo's earnings calls during the putative Class Period typically provided commentary regarding the prior quarter's results. For example, on the January 15, 2019 earnings call, Wells Fargo released additional information on its disappointing 2018 Q4 fee income results. When asked about the current quarter's "fee income trends," Wells Fargo Chief Financial Officer John Shrewsberry discussed how he would "adjust for what's happened in the S&P" for some fee income line items, and the potential implications for the 2019 Q1 results.[345] However, Dr. Hartzmark would have no basis to attribute any stock price reaction related to discussion of the Company's negative performance in the prior quarter to a measure of inflation and ultimately damages for two reasons. First, the drivers of the negative performance in these quarters do not appear to be related to the asset cap or the alleged misrepresentations, and indeed were not discussed by equity analysts in that context. Second, even if the negative performance *had* been caused by the asset cap, market participants had been informed prior to each date's conference call that Wells Fargo would be operating under the cap for that quarter. If, in this hypothetical example, Wells Fargo operating under the asset cap had caused the bank to miss its EPS guidance (though I have seen no indication that it did), then the price reaction resulting from

[345] When Steven Chubak of Wolfe Research asked about "some of the fee income trends that we saw in the quarter," CFO Shrewsberry replied that "the impact to what happened in the fourth quarter won't be felt until the first quarter" for certain items. Wells Fargo & Company, 2018 Q4 Earnings Call Transcript, dated January 15, 2019, p. 22.

a consequence (an EPS miss) of a known fact (Wells Fargo operating under the asset cap in 2018 Q4) is not the same as a price reaction resulting from an alleged corrective disclosure about Wells Fargo's asset cap emergence timeline or progress under the 2018 Consent Orders. In an efficient market, Wells Fargo's stock price would have already incorporated the market's expectation of the consequences of operating under the asset cap for that quarter. As a result, a price reaction following the discussion of the prior quarter's performance that deviated from expectations due to realization of previously known uncertainties about that performance (e.g., the effect of macroeconomic trends) cannot represent the removal of inflation. Dr. Hartzmark has not proposed any methodology to parse the confounding prior-quarter information from the alleged corrective disclosures contained in Wells Fargo's conference calls.

157. Wells Fargo's earnings calls all provided further clarity on management guidance. For example, on the April 12, 2019 earnings call, Wells Fargo announced a reduction in its net interest income ("NII") guidance for 2019, which analysts attributed to net interest margin ("NIM") compression and industry headwinds, rather than asset growth revisions.[346] Given the revision was unrelated to asset growth and applied to a period for which the market already expected that Wells Fargo would be operating under the asset cap, there is no established basis in the Hartzmark Report to attribute any negative price reaction following this disclosure to a removal of inflation.

158. As another example, during the earnings call on January 14, 2020, both Wells Fargo CEO Scharf and CFO Shrewsberry declined to provide expense guidance despite being asked to do so by five separate equity analysts during the Q&A portion of the call.[347] In this instance, a *lack* of guidance provided a new piece of potentially confounding information, as some equity analysts

---

[346] Analysts commented that Wells Fargo's reduced 2019 NII guidance appeared to be driven by NIM compression and attributed it to (1) a lower and flatter yield curve, (2) upward pressure on deposit pricing, and (3) tightening loan spreads. *See*, *e.g.*, "Reconciling $1.8b Net II Guide Down & Why It Implies Lower 2020 Net II," *Deutsche Bank*, April 15, 2019, p. 1 ("As it sounds like the outlook for asset growth for 2019 hasn't changed, we assume all of the guide down in net II $ is due to weaker net interest margin/NIM."); "EPS Resets Lower on Meaningful NII Guide-Down," *Autonomous Research*, April 15, 2019, p. 4 ("NII was weak this quarter, with NIM down 3bps sequentially due to run-off/sales of higher-yielding assets and a flattening curve. Citing the same factors, management lowered its NII guidance for FY19 to a 2-5% y/y decline. We now model a 3% decline for FY19 NII (vs. our prior flattish forecast), with NIM declining steadily over the course of the year on continued mix shift and upward pressure on deposit pricing. We largely maintain our forward estimates for loan growth and fees.").

[347] Five equity analysts asked about expense guidance in some form: John McDonald (Autonomous Research), Scott Siefers (Piper Sandler), Matt O'Connor (Deutsche Bank), John Pancari (Evercore), and Ken Usdin (Jefferies). Each time they asked, CFO Shrewsberry and CEO Scharf refused to give specific guidance. *See* Wells Fargo & Company, 2019 Q4 Earnings Call Transcript, dated January 14, 2020 ("2019 Q4 Earnings Call").

viewed the unwillingness to provide guidance negatively[348] and analysts had repeatedly expressed concerns about Wells Fargo's expenses.[349] CFO Shrewsberry suggested Wells Fargo's expense uncertainty was not related to any one issue or business line, but to Wells Fargo's process of going "business by business" to establish what "best-in-class" cost efficiency meant across the organization; there is no established basis in the Hartzmark Report to attribute any uncertainty about expenses to the asset cap or compliance with the 2018 Consent Orders.[350] As a result, this lack of expense guidance could be confounding information, and Dr. Hartzmark has not provided a reliable methodology to parse the price reaction due to this confounding information from the price reaction (if any) due to the alleged corrective disclosure.

159. The nature of earnings releases is that a large amount of company-specific, often value-relevant, news is disseminated to the market rapidly, often over the course of a few hours. In this context, Dr. Hartzmark's generic list of "techniques" to account for any confounding news fails to show that the impact, if any, of the alleged corrective disclosures on Wells Fargo's stock price, could be estimated reliably.

### D. Dr. Hartzmark Has Not Proposed a Methodology that Can Measure Damages Reliably on the Last Three Alleged Corrective Disclosure Impact Dates Consistent with Plaintiffs' Theory of Liability

160. Dr. Hartzmark's discussion of damages also fails to describe a methodology that can reliably measure any damages stemming from price declines on the last three alleged corrective

---

[348] Jefferies analysts noted "[t]he timing of the next strategic update under new CEO Scharf is uncertain, and the expense outlook remains opaque for the out-years." "4Q19 Earnings Wraps," *Jefferies*, January 14, 2020, p. 1. *See also* "4Q19 Wrap: Cutting Ests & Uncertainty Persists; Remain on Sidelines," *Evercore ISI*, January 14, 2020, p, 1 ("Call takes: No update on 2020 expenses; implication appears higher (for now)."); "Wells Fargo & Company Under Construction: Lowering '20E Below $4," *Bank of America Merrill Lynch*, January 14, 2020, p. 1 ("[W]e think the lack of near-term visibility, particularly on expenses, should keep the stock range-bound at these lower levels.").

[349] For example, one of the areas of focus for analyst commentary following the appointment of CEO Scharf in September 2019 was expenses. *See, e.g.*, "Good Driver at the Reins, but Hard to Turn Stagecoach on a Dime," *Baird*, September 30, 2019, p. 1 ("Expense visibility is low. Just last year at Investor Day WFC outlined a 2019 expense target of ~$52B-$53B with potential to reach a ~$50B-$51B expense run-rate in 2021. The operating environment and leadership have clearly changed, but WFC now expects 2019 expenses to be at the high end of the previous range (~$52B-$53B) given more investment in compliance and risk management, and 2020 expenses likely trend flattish Y/Y. The company's efficiency ratio is now the worst among the large-cap banks at ~64% in 2019E (peer median ~59%). There is significant opportunity to improve, but new leadership likely resets expectations and may provide an extended timetable for mean reversion vs. peers given macro headwinds.").

[350] Matt O'Connor of Deutsche Bank remarked that, "I'm sure you're a little tired of all the expense questions kind of near term, I do want to ask though longer term on cost. Charlie, you said about being best-in-class efficiency. And I guess just how do you define that?" CFO Shrewsberry replied: "Sure. We're going business by business and selecting the peer group that best represents the -- either the products or the segments that establish what best-in-class looks like." 2019 Q4 Earnings Call, pp. 22–23.

disclosure impact dates, for at least two reasons. First, Dr. Hartzmark's event study does not reliably measure abnormal returns in this period due to the market disruptions coinciding with the onset of the COVID-19 pandemic. In **Section V.B**, I explained that Dr. Hartzmark's model fails to account for changes in volatility and in the relationship between Wells Fargo and the market and industry indices during this period. Relatedly, Dr. Hartzmark's event study may not be able to reliably measure abnormal returns during March 2020 if certain market or industry news affects Wells Fargo differently than market or industry news has historically affected Wells Fargo (which is particularly likely if a particular type of news that was infrequent during the historical estimation window becomes more frequent). As an example, if COVID-19 pandemic-related news impacted Wells Fargo more strongly than other banks and companies and this is not captured by the event study model because other (non-COVID-19 pandemic-related) industry and market news during the estimation window on average did not affect Wells Fargo more strongly than its peers, then the impact of news related to the COVID-19 pandemic on Wells Fargo would be underestimated by the model and improperly included in an estimate of Wells Fargo's abnormal return. Indeed, the academic literature has documented that U.S. banks faced substantial risks and their stocks performed poorly during the COVID-19 pandemic and that risk exposure and stock performance during the COVID-19 pandemic varied greatly among the different banks.[351]

161. One type of information that was particularly important for banks generally, but also Wells Fargo specifically, during the onset of the COVID-19 pandemic was news about the Federal Reserve's monetary policy.[352] The Federal Reserve responded to the COVID-19 pandemic and related market turbulences with multiple monetary policy changes in March 2020, including cuts to the Federal Funds Rate (an overnight interest rate), increased Treasury securities purchases (open market operations), and increased repurchase agreement ("repo") offerings.[353] Everything else equal, these actions by the Federal Reserve increase the money

[351] *See*, *e.g.*, Viral V. Acharya et al., "Why Did Bank Stocks Crash during COVID-19?" NBER Working Paper No. 28559, 2021, pp 1–82, https://www nber.org/papers/w28559.

[352] As an example, the *Financial Times* reported on March 9, 2020 that "investor consensus is that there will be very little profit growth, and possibly profit declines, in the [bank] industry's Fed-dominated future." Robert Armstrong, "What Banks Are Worth in a World of Non-Stop Rate Cuts," *Financial Times*, March 9, 2020.

[353] On March 3, 2020, at 10:00 AM EST the Federal Reserve announced that it had lowered the target range for the federal funds rate by half of a percentage point, to between one and 1.25 percentage points. On March 15, 2020, at 5:00 PM EDT the Federal Reserve made a similar announcement signaling that it would once again be lowering the target range to between zero and .25 percentage points. Additionally, on March 15, 2020, the Federal Reserve

supply and reduce market interest rates.[354]  The Federal Reserve in fact communicated monetary policy changes on two of the alleged corrective disclosure impact dates (March 11 and 12, 2020).[355]

162.    Changes in interest rates (including but not limited to the Federal Funds Rate) can have a large effect on banks' profits, and analysts noted that Wells Fargo was *particularly* negatively exposed to rate cuts and other types of expansionary monetary policy.  For example, an equity analyst from J.P. Morgan concluded on March 13, 2020, that Wells Fargo's earnings per share would decline more than those of its peers if the Federal Reserve cut interest rates.[356]  Moreover, another equity analyst noted that "we expect [Wells Fargo's] peers to be larger beneficiaries of governmental and central bank programs" since Wells Fargo "remains at an absolute growth disadvantage relative to peers that do not operate under an asset cap."[357]

163.    Additionally, apart from monetary policy, Wells Fargo was differently situated than other peer banks in other areas that were expected to be particularly relevant due to the market turmoil caused by the onset of the COVID-19 pandemic, three examples of which are discussed below. First, Wells Fargo had less revenue from trading—one of the business segments that was expected to perform strongly in March 2020 due to high trading activity in response to the

---

announced that it would "increase its holdings of Treasury securities by at least $500 billion and its holdings of agency mortgage-backed securities by at least $200 billion" and that its Open Market Desk had "expanded its overnight and term repurchase agreement operations." These actions were followed by a statement on March 23, 2020, in which the Federal Reserve stated it would continue to purchase Treasury securities and agency mortgage-backed securities and offer large-scale overnight and term repurchase agreement operations.  *See* Federal Reserve Board Press Release, "Federal Reserve Issues FOMC Statement," March 3, 2020; Federal Reserve Board Press Release, "Federal Reserve Issues FOMC Statement," March 15, 2020; Federal Reserve Board Press Release, "Federal Reserve Issues FOMC Statement," March 23, 2020.

[354] Robert H. Frank and Ben S. Bernanke, *Principles of Economics* (New York, NY: McGraw-Hill, 2001), p. 626 ("The Fed's purchase of government bonds, from the public, with the result that bank reserves and the money supply are increased, is called an open-market purchase.").

[355]  On March 11, 2020, the Federal Reserve announced plans to offer at least $175 billion in overnight repo operations and at least $45 billion in two-week term repo operations twice per week over the next month.  On March 12, 2020, the Federal Reserve announced it would continue to offer at least $175 billion in daily overnight repo operations and at least $45 billion in two-week term repo operations twice per week over the next month.  The Federal Reserve also announced additional operations: "the Desk will offer $500 billion in a three-month repo operation at 1:30 pm ET that will settle on March 13, 2020.  Tomorrow, the Desk will further offer $500 billion in a three-month repo operation and $500 billion in a one-month repo operation for same day settlement.  Three-month and one-month repo operations for $500 billion will be offered on a weekly basis for the remainder of the monthly schedule."  Federal Reserve Bank of New York Press Release, "Statement Regarding Repurchase Operations," March 11, 2020; Federal Reserve Bank of New York Press Release, "Statement Regarding Treasury Reserve Management Purchases and Repurchase Operations," March 12, 2020.

[356] "Earnings Impact: Zero Rates, Energy Exposure, Revolver Drawdowns; Where Can We Go from Here?" *J.P. Morgan*, March 13, 2020, p. 6.

[357] "1Q20 Results: Meeting Our Expectations but Our Expectations Were Low," *Keefe, Bruyette, & Woods*, April 14, 2020, p. 1.

market movements—than many of its peers. An equity analyst from J.P. Morgan noted on March 5, 2020 that a "drop in equity markets" would "likely partly [be] offset near term by stronger trading revenues from the pickup in volatility and hence higher volumes" for some banks.[358] The analyst found that this offsetting effect would be less strong for Wells Fargo (5% of revenue from trading) than for Bank of America, J.P. Morgan, or Citigroup (between 14% and 21% of revenue from trading)[359]—banks that are constituents of both of Dr. Hartzmark's industry indices.

164. Second, in addition to having a smaller trading business, an equity analyst from Atlantic Equities commented: "For the major banks, the higher trading and [investment banking] fees largely offset the [quarter-over-quarter] increase in provisions [due to COVID-19]. The clear exception to this is [Wells Fargo], which does not have the offsetting investment banking division."[360]

165. Third, Wells Fargo faced heightened credit risk in comparison to its peers due to its loan mix. Wells Fargo had relatively high exposure to sectors that were particularly vulnerable to losses because of the market turmoil caused by the COVID-19 pandemic, including community banking,[361] commercial banking,[362] and residential and commercial real estate.[363] These sectors suffered from decreased economic activity, which increased risk of loan defaults. For example, one equity analyst noted Wells Fargo's "sizable loan portfolio of around $399 billion in community loans and $456 billion in commercial loans," adding that the pandemic "could impact the loan repayment capacity of both commercial and community banking customers, exposing

358 "COVID-19 Impact: NIM, Markets-Related, Payments Fees Hit; Refis Up; HY Spreads Up but Still Low," *J.P. Morgan*, March 5, 2020, p. 11.

359 "COVID-19 Impact: NIM, Markets-Related, Payments Fees Hit; Refis Up; HY Spreads Up but Still Low," *J.P. Morgan*, March 5, 2020, p. 11. *See also* Hugh Son, "Wells Fargo Shares Tumble 5% after Posting $2.4 Billion Loss, Dividend Slashed to 10 Cents," *CNBC*, July 14, 2020 ("unlike JP Morgan Chase or Citigroup, Wells Fargo lacks a sizeable Wall Street trading division, and that business has been on fire this year amid surging volatility and unprecedented Fed support.").

360 "Upgrading WFC to Neutral," *Atlantic Equities*, July 22, 2020, p. 5. *See also* "Pain Continues for WFC in Q2, Common Equity Tier 1 Holding Up, Big Expense Cuts Coming," *Morningstar*, July 15, 2020, p. 2 ("Wells' business mix is not helping the bank maintain profitability during the current downturn … Meanwhile, peers with corporate and investment banking segments reported solid profits, largely helped by investment banking and trading revenues.").

361 "Can Wells Fargo's Stock Recover to $37 Anytime Soon?" *Trefis*, April 1, 2020, p. 1.

362 "Estimating the Impact of Expected Economic Contraction on C&I Loan Loss Rates," *BMO Capital Markets*, April 20, 2020, p. 1.

363 "COVID-19 Impact: NIM, Markets-Related, Payments Fees Hit; Refis Up; HY Spreads Up but Still Low," *J.P. Morgan*, March 5, 2020, p. 10; "Credit Costs Are The Big Unknown; Exposures To Key Sectors, Small Business; Shadow Bank Loans," *J.P. Morgan*, March 23, 2020.

[Wells Fargo] to the possibility of sizable losses."[364] A Citi equity analyst noted Wells Fargo's "large residential mortgage portfolio," as a result of which Wells Fargo had "a larger exposure to a downturn in the housing market relative to other banks," such that "if the recovery in the housing market were to falter, it could potentially have a bigger impact at Wells Fargo."[365] Consistent with the above discussion, I understand that Lead Plaintiff Public Employees' Retirement System of Mississippi's ("MissPERS") investment manager, Longview Partners, stated that Wells Fargo faced pressure on its revenues because central banks "push[ed] interest rates back towards zero" in response to the COVID shock and that credit risk was "particularly material for" Wells Fargo due to the "combination of loan losses and falling rates."[366]

166. Alternative illustrative models, which I discuss in **Section VI.D.1** below, that attempt to account for some of the above factors by allowing volatility and exposures to the market and industry to change during the COVID-19 pandemic period suggest that the price declines on March 5, 2020 and March 11, 2020 are not statistically significant, meaning that there is no evidence that the Wells Fargo company-specific price changes were different from zero. In addition, there is reason to conclude that the abnormal price decline on March 12, 2020 was not due to the removal of inflation, but rather constituted a Wells Fargo-specific response to a policy announcement by the Federal Reserve that disproportionately affected Wells Fargo relative to its peers. However, Dr. Hartzmark does not propose a methodology that could evaluate that hypothesis, as would be necessary if he intends to use this "disclosure[] … related to or revealing the alleged misstatements and omissions" as a basis for calculating damages.[367] Second, even if there were statistically significant price declines on these dates, Dr. Hartzmark has provided no methodology that can determine whether those price declines relate to any new information

[364] "Can Wells Fargo's Stock Recover to $37 Anytime Soon?" *Trefis*, April 1, 2020, p. 1. *See also* "WFC 1Q20 EPS Instant Insight," *Barclays*, April 14, 2020, p. 2 ("Commercial nonaccrual loans rose $621mn predominantly driven by [commercial real estate] CRE and [commercial and industrial] C&I], as the effect of the COVID-19 on market conditions began to impact its customer base."); "Estimating the Impact of Expected Economic Contraction on C&I Loan Loss Rates," *BMO Capital Markets*, April 20, 2020, p. 1 ("Four banks among our coverage universe of 39 large-cap banks and specialty lenders have C&I loans equal to more than twice their respective total tangible common equity (TCE); CIT, WFC, BAC, and JPM (in that order) are most exposed to corporate-related credit risk.").

[365] "Model Update," *Citigroup*, March 23, 2020, pp. 3–4. *See also* Carleton English, "Wells Fargo Looks Exposed to Coming Mortgage Crunch, Analyst Says," *Barron's*, March 30, 2020 ("Wells Fargo (WFC) with 12.6% of mortgage servicing market share, will be especially affected. JPMorgan itself has a 6.8% share, and Bank of America (BAC) has a 3.9% share.").

[366] Deposition of Charles Nielsen, and Exhibits, November 2, 2022 ("Nielsen Deposition"), Plaintiffs' Exhibit 2, WFC_MissPERS-0019702–42.

[367] Hartzmark Report, ¶ 84.

about the alleged misrepresentations as opposed to consequences of already-known facts about Wells Fargo's inability to satisfy the regulators as to progress under the 2018 Consent Orders, as I discuss in **Section VI.D.2** below.

### 1. Dr. Hartzmark's Event Study Does Not Reliably Measure Abnormal Returns in March 2020

167. In order to "begin[]" a calculation of damages with an event study,[368] as Dr. Hartzmark puts it, one would need an event study capable of reliably measuring abnormal returns and their statistical significance. As discussed in **Section V**, Dr. Hartzmark's event study model is generic and does not appropriately account for COVID-19 related market disruptions. In this section, I consider four illustrative regression models that attempt to account for some of the issues with Dr. Hartzmark's regression model. These models suggest that neither alleged corrective disclosure in March 2020—i.e., neither March 5, 2020 nor March 11, 2020—is associated with a statistically significant abnormal return. And, as discussed in **Section V.C**, in an efficient market, information released during trading hours on March 11, 2020 would not be expected to affect Wells Fargo's stock price on March 12, 2020.[369]

168. As discussed in **Section V.B.1**, starting around February 24, 2020, stock markets (overall and Wells Fargo specifically) entered a period of sharply declining prices and sharply increased volatility (*see* **Exhibits 1A – 3C**). Dr. Hartzmark's rolling 120-trading-day regression model is not capable of accounting for such an abrupt structural change—an issue that, as discussed, Dr. Hartzmark himself has previously recognized outside this litigation.[370] Similarly, as discussed in

[368] Hartzmark Report, ¶ 83 ("To calculate the inputs for the out-of-pocket methodology or formula, an expert often begins with the same type of event study [Dr. Hartzmark] used [in his] Section VI to evaluate the price-related factors.").

[369] As noted in **Section II.A** above, Plaintiffs point to a price decline on March 12, 2020, though they do not claim that any corrective information was released on that day. In **Section V.C** above, I explained how, if Dr. Hartzmark is correct that the market for Wells Fargo stock was efficient, the price decline on March 12, 2020 could not have been caused by the alleged corrective disclosure made on March 11, 2020. Indeed, on March 12, 2020, Wells Fargo's stock appears to particularly diverge from the industry after a Federal Reserve announcement at 12:53 PM ET (*see* **Exhibit 9D**. As explained above, this announcement may have affected Wells Fargo differently than its peers (and differently than predicted by Dr. Hartzmark's event study model).

[370] Hartzmark and Seyhun (2014) at p. 187 ("The *Freddie Mac* court agreed with both experts that there were two distinct periods with different … return distributions. … The plaintiffs' expert felt this problem was corrected by using rolling linear regressions – that is, the same regression specification over a different time period each day. However, this technique does not correct for the problem when there are two or more distinct periods with changes in the underlying return distributions and multiple omitted variables.").

**Section V.B.2**, Dr. Hartzmark's model also is not capable of accounting for a potentially changed relationship between Wells Fargo and the market and industry indices.

169. It is important to note that all alleged impact dates in March 2020—March 5, 11, and 12, 2020—occur in the midst of the disruptions to equity markets caused by COVID-19; the daily declines in the S&P 500 (Dr. Hartzmark's market index) on these three dates are three of the five largest declines in the entire putative Class Period (nearly two years).[371] The remaining two of the five largest S&P 500 declines occurred on February 27, 2020 (i.e., shortly before the three alleged corrective disclosure dates in March 2020) and on March 9, 2020 (i.e., in the middle of the three trading days between the alleged corrective disclosures on March 5, 2020 and March 11, 2020). As mentioned in **Section V.A** above, the decline in the S&P 500 on March 12, 2020 was the largest daily decline since 1987 (in fact larger than any daily decline during the Global Financial Crisis). As of the date of this report, March 12, 2020 remains the second largest decline in the S&P 500 since 1987, surpassed only by March 16, 2020 (two trading days after the end of the putative Class Period). Moreover, as discussed in **Section V.A** above, market-wide circuit breakers which had not been triggered since 1997 were triggered four times during the onset of the COVID-19 pandemic, including on March 12, 2020.

170. To account for some of the issues with Dr. Hartzmark's regression model—i.e., to account for the increased volatility as well as a potentially changed relationship between Wells Fargo's stock and the market and industry indices—I consider four alternative illustrative regression models below. Each of the four models uses data after February 24, 2020 to calculate and evaluate abnormal returns on March 5, 11, and 12, 2020 and illustrates that Dr. Hartzmark's model is not robust to alternative specifications.

171. First, one can attempt to account for the effects on markets of the onset of the COVID-19 pandemic by choosing a different estimation window than the backward-looking 120-day estimation window used by Dr. Hartzmark. In particular, I estimate the model over a shorter time period that coincides more closely with the onset of the COVID-19 pandemic. **Column B of Exhibit 10** depicts the result of a model estimated from February 24, 2020 (the beginning of stock price declines and increased stock market volatility for Wells Fargo and the market overall) to March 23, 2020. As previously discussed in **Section V**, I include data through March 23,

[371] This result also holds if Wells Fargo is removed from the market index.

2020 (after the end of the putative Class Period) in order to have enough data to estimate the model under the circumstances here. In other words, as with the Levene and Chow tests discussed in **Section V.B**, the estimation window ends one month after February 24, 2020 and just before the market began to recover on March 24, 2020. As in Dr. Hartzmark's model (*see* **Column A of Exhibit 10**), the abnormal return on March 5, 2020 is not statistically significant, and, in contrast to Dr. Hartzmark's results, the abnormal return on March 11, 2020 is also not statistically significant.[372]

172.    Second, one can estimate a model using data starting on February 24, 2020 (as in the first approach above) but ending on a later date than March 23, 2020 to incorporate even more data post February 24, 2020. For example, **Column C.1 of Exhibit 10** depicts the results of a model estimated using 60 trading days starting on February 24, 2020. Like in the first model above, the abnormal returns on both March 5, 2020 and March 11, 2020 are not statistically significant.[373]

173.    Third, one can estimate a model using 120 trading days of data (like Dr. Hartzmark), using data through March 23, 2020 but allowing for a structural break in the model on February 24, 2020.[374] **Column D.1 of Exhibit 10** depicts the result of such a model estimated using 120 trading days (the length used by Dr. Hartzmark) ending on March 23, 2020 but allowing for a break in volatility on February 24, 2020. Similar to the first two models discussed above, both March 5, 2020 and March 11, 2020 exhibit abnormal returns that are not statistically significant.[375]

---

[372] As in Dr. Hartzmark's model, none of the other dates in his "event window of March 5-12, 2020" have statistically significant price declines in this model or any other alternative model shown in **Exhibit 10** except for March 12, 2020, which is discussed in **Section V.C**.

[373] **Column C.2 of Exhibit 10** uses the same model but using 90 instead of 60 trading days starting on February 24, 2020. This model also results in abnormal returns on March 5, 2020 and March 11, 2020 that are not statistically significant.

[374] In some instances, changes in volatility can be modeled using generalized auto-regressive conditional heteroskedasticity ("GARCH") models. These models require that the nature of a studied shock in volatility is similar to other shocks (even if smaller) during the estimation window. As a result, such models are typically not appropriate to model extreme increases in volatility due to large regime-shift shocks. In the context of large shocks, the academic literature has typically used such models to study the persistence and decline in volatility after large shocks, rather than the increased volatility because of the shock itself. *See*, *e.g.*, Robert F. Engle and Chowdhury Mustafa, "Implied ARCH Models from Options Prices," *Journal of Econometrics* 52, nos. 1–2, 1992, pp. 289–311 at p. 307; James D. Hamilton and Raul Susmel, "Autoregressive Conditional Heteroskedasticity and Changes in Regime," *Journal of Econometrics* 64, nos. 1–2, 1994, pp. 307–333 (noting that "extremely large shocks, such as the October 1987 crash, arise from quite different causes … than [] small shocks."). As a result, GARCH is less suitable for analyzing Wells Fargo's stock returns in March 2020 than other approaches, such as those described herein.

[375] **Column D.2 of Exhibit 10** repeats the same model but allows for a break in both volatility and coefficients (to also account for potentially changed coefficients due to the onset of the COVID-19 pandemic). This model also results in abnormal returns on both March 5, 2020 and March 11, 2020 that are not statistically significant.

174. Finally, one can use a control period of 120 trading days following each alleged corrective disclosure impact date, as opposed to 120-trading-days preceding each such date (which is what Dr. Hartzmark does in his model). Indeed, Dr. Hartzmark himself identifies such an after-the-event approach as an acceptable "choice[] for the estimation period."[376] In such a model, the abnormal returns on both March 5, 2020 and March 11, 2020 again are not statistically significant. The results of this model are depicted in **Column E of Exhibit 10**.

175. The results of all these alternative models illustrate that Dr. Hartzmark's findings using his event study model are not robust to alternative specifications that attempt to account for market disruption and other related changes caused by the onset of the COVID-19 pandemic. Once those are accounted for, as above, the results suggest that the Wells Fargo company-specific abnormal returns on March 5, 2020 and March 11, 2020 are not statistically significant, which is consistent with no incrementally new information being revealed to the market on those dates.

### 2. Dr. Hartzmark Has Not Provided a Methodology to Measure Any Damages Relating to Incrementally New Information About the Misrepresentations, Rather than Consequences of Known Facts

176. As previously discussed, by the time of the last three alleged corrective disclosures there was publicly available information that there had been a number of challenges related to Wells Fargo's interactions with regulators, including (1) Wells Fargo's failures to satisfy the 2016 Consent Orders;[377] (2) reports in the fall of 2018 that the Federal Reserve had rejected Wells Fargo's remediation plans;[378] (3) comments from the Federal Reserve, OCC, and the CFPB expressing dissatisfaction with Wells Fargo's progress in achieving the changes required under the consent orders in March, April, and May of 2019;[379] (4) Interim CEO Parker's statement in April 2019 that the Company "do[es] not feel it's appropriate to provide guidance as to the

---

[376] Hartzmark Report Appendix D, footnote 3. The article cited by Dr. Hartzmark states that "[a] strong case can be made for a post-event estimation period" if there is evidence of a structural break that "is expected fundamentally to alter the firms' sensitivity to market returns." Glenn V. Henderson, Jr., "Problems and Solutions in Conducting Event Studies," *The Journal of Risk and Insurance* 57, no. 2, 1990, pp. 282–306 at p. 292.

[377] *See*, *e.g.*, "Consent Order Not Good News, but Are We Done Now?" *Buckingham Research Group*, February 5, 2018, p. 1.

[378] Patrick Rucker, "Wells Fargo Reform Plans Fail to Satisfy Fed after Scandals: Sources," *Reuters News*, December 6, 2018.

[379] *See* **Section VI.B.2**.

timing of the lifting of the asset cap;"[380] (5) Federal Reserve Chairman Jerome Powell stating in July of 2019 that the Federal Reserve was not "considering [lifting the asset cap] right now;"[381] and (6) CEO Scharf's comments on January 14, 2020, which Plaintiffs allege revealed "that the [b]ank was still at the 'first step' … and still had a 'great deal' of work to do to comply with the 2018 Consent Orders."[382] Dr. Hartzmark has not proposed a methodology that can measure the incremental stock price impact of "disclosures either related to or revealing the alleged misstatements and omissions" in March 2020 given that Wells Fargo's challenges regarding the 2018 Consent Orders were previously and publicly discussed, as I have demonstrated.

177. Indeed, the information disclosed in the congressional reports and hearings on March 5, 2020, and March 11, 2020 (which included the alleged corrective disclosures) included items that dealt with historical events that would not necessarily be expected to have an effect on Wells Fargo's future financial position and which would, therefore, not be expected to affect Wells Fargo's stock price in an efficient market. For example, the Complaint alleges that during testimony to Congress contained in the House Minority Report released on March 5, 2020, former Wells Fargo Director Karen Peetz "'identified [former CEO Sloan] as a major impediment to the Board's ability to move the company forward in terms of compliance with the consent orders.'"[383] However, when this report was made public, it had been almost a year since Mr. Sloan had resigned as CEO (which occurred on March 28, 2019).[384]

178. Further, the congressional reports and hearings on March 5, 2020 and March 11, 2020 included information that had been disclosed previously, which would also not be expected to affect Wells Fargo's stock price in an efficient market. For example, the market had already been informed that Wells Fargo had more work to do to comply with the 2018 Consent Orders[385] and have the asset cap lifted before March 5, 2020. As discussed above, the fact that regulators had not been satisfied with Wells Fargo's efforts in developing remediation plans had been

---

[380] 2019 Q1 Earnings Call, p. 6.

[381] Federal Reserve, Chair Jerome Powell's Press Conference Transcript, dated July 31, 2019, p. 19 ("… [Wells Fargo] will be under the growth cap, our enforcement action, until the Board votes to lift it, and that's not something we're considering doing right now.").

[382] 2019 Q4 Earnings Call, pp. 5, 16; Complaint, ¶ 251 (emphasis removed).

[383] Complaint, ¶ 118.

[384] Complaint, ¶ 220.

[385] *See*, *e.g.*, 2019 Q4 Earnings Call, pp. 4–5 ("We still have much more work to do to put these issues behind us ….").

discussed publicly (for example, in May 2019 testimony from the OCC),[386] and it was this information that was reiterated in the congressional reports on March 5, 2020 and that Plaintiffs claim corrected the alleged misstatements.[387] Similarly, prior to the congressional hearing on March 11, 2020, the market had already learned that the Board had been concerned about missed deadlines[388] and that the Board did not have confidence in management's ability to satisfy regulators,[389] information that was reiterated in congressional testimony and that Plaintiffs claim corrected the alleged misstatements.

179. To the extent that there was any new and unanticipated information released on March 5, 2020 or March 11, 2020, it is not clear that the information had any implications for Wells Fargo's future cash flows and risks, as would be required for that information to affect the Company's stock price in an efficient market. The House reports and congressional hearings focused primarily on actions within Wells Fargo and interactions between Wells Fargo and its regulators between the time of the 2016 Consent Orders and the hearings. Wells Fargo's past difficulties with regulators (in addition to being public information, as discussed above) were not necessarily informative of its future interactions, particularly given changes to Wells Fargo's management and Board. Indeed, RenMac noted that "The OCC is more constructive now[,] commenting, after the release of the FSC report, that 'while the bank has much work ahead, we are encouraged by the leadership and focus on regulatory matters by the bank's new Chief Executive Officer.'"[390]

---

[386] As discussed above, on May 15, 2019, when asked in a congressional hearing if the OCC's position had changed from being "disappointed" with Wells Fargo's progress "under [the OCC's] consent orders," OCC Chief Otting replied that "it has not." Hearing on "Examining the Efforts, Activities, Objectives, and Plans of Federal Regulatory Agencies with Respect to Prudential Regulations for U.S. Financial Institutions and Credit Unions" before the Committee on Banking, Housing, and Urban Affairs of the United States Senate, May 15, 2019, pp. 31–32.

[387] Indeed, I understand that the coverage analyst for Wells Fargo at PZENA, the investment manager for Lead Plaintiff Louisiana Sheriffs, noted that he [redacted] Hagemann Deposition, pp. 64:4–21; 19:21–22; 23:8–11. Similarly, the CIO for Ceredex, another investment manager for Lead Plaintiff Louisiana Sheriffs, noted that [redacted] Deposition of Mills Riddick, and Exhibits, November 29, 2022 ("Riddick Deposition"), pp. 105:2–23; 21:3–6; 24:20–25.

[388] "Interim Report III – Uniquely Flawed: An Overview of Failures and Structural Deficiencies at Wells Fargo," *United States House of Representatives Committee on Financial Services, Minority Staff*, March 5, 2020 ("Minority Staff House Report"), p. 82.

[389] Minority Staff House Report, p. 82.

[390] "Encouragement from the OCC," *RenMac*, March 7, 2020, p. 2. *See also* "Scharf to Testify Today," *Autonomous Research*, March 10, 2020, p. 4 ("Scharf is saying all the right things, and it may help ease some tension with politicians and regulators.").

180. Consistent with the change in Wells Fargo's leadership and indications that the information in the hearings was not new and/or not necessarily value-relevant, there was relatively little equity analyst coverage of the congressional reports and hearings (compared to days with earnings releases).[391] Of the analyst reports from contributors that Dr. Hartzmark identifies as providing "[i]n-depth analyst coverage,"[392] I only identify 10 reports between March 5 and March 12, 2020 that discuss either the House reports or the congressional hearings (and none after March 12, 2020).[393] Only one equity analyst report discussed the hearing on March 11, 2020. By comparison, I identify 28 reports issued by 17 analysts on January 14, 2020 and January 15, 2020 following the earnings announcement and conference call on January 14, 2020.

181. In sum, given the wealth of information that was already publicly available before March 2020 and the challenges of properly measuring abnormal returns in that period as described in **Section V** above, Dr. Hartzmark has not proposed a methodology that can reliably measure damages from any new corrective information on these days, if any.

### E. Plaintiffs' Allegations Suggest Patterns of Inflation that Dr. Hartzmark Has Provided No Methodology to Estimate or Measure

182. Dr. Hartzmark has not proposed a methodology that can measure the patterns of inflation that are implied by Plaintiffs' allegations in this case. Though he states that "there are commonly used and widely accepted techniques to account for … potential changes in inflation

---

[391] Dr. Hartzmark stated that "it's good as reference to look at analyst reports when they come out" as the analysts are "paid to provide meaningful information to clients." *See* Hartzmark Deposition, p. 208:4–18 ("Q. Let's say it's -- it doesn't reflect all material information about the company; all material, publicly available information about the company. A. Well, and they're spending -- I guess, my hypothetical would be that those analysts should be fired. I mean, analysts are paid to provide meaningful information to clients; that's why they're a good measure. And that's why it's good as reference to look at analyst reports when they come out because they're not done -- you know, an analyst isn't going to be spending its time on immaterial information and, willy-nilly, you know, issuing reports.").

[392] Hartzmark Report, ¶ 27.

[393] These reports include "Mixed Regulatory News for Financials: Fed's Stress Test Revamp/CFPB Structure," *Raymond James*, March 5, 2020; "Weekly Wrap: Market Floor Rises on Biden's Jump as Virus Fears Extend Volatility," *Raymond James*, March 6, 2020; "Regulatory Challenges Complicate Self-Help; Rigid Cost Base, Low ROA Leave Wells Earnings Vulnerable," *UBS*, March 9, 2020; "WFC Announces Resignation of Two BOD Members," *Piper Sandler*, March 9, 2020; "House Reports: Far Behind on Regulatory Issues; Several Concerns: Expenses, Transparency, Board," *J.P. Morgan*, March 9, 2020; "Board Resignations Are Yet Another Step to Move beyond Legacy Issues," *Moody's*, March 9, 2020; "What We Learned from CEO Charlie Scharf's Testimony before the House Fin'l Services Committee—Fixing Takes Time," *Credit Suisse*, March 10, 2020; "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 45 | March 10, 2020," *Barclays*, March 10, 2020; "Downgrading Wells Fargo Stewardship Rating to Poor after New Details Emerge from House Reports," *Morningstar*, March 11, 2020; "Takeaways from Hearings: Timing of Resolution, Expenses, Regulators and CEO/Board on Watch," *J.P. Morgan*, March 11, 2020.

over time (*i.e.*, scaling),"[394] Dr. Hartzmark does not say anything about which of these generic "techniques" could apply or be used to measure damages reliably in a manner consistent with Plaintiffs' theory of liability in this case. As a result, Dr. Hartzmark's approach is inconsistent with, and at best incomplete given, Plaintiffs' allegations in this matter in at least two ways. First, Plaintiffs allege that Wells Fargo received new information from regulators after the start of the putative Class Period,[395] meaning that the Company allegedly gained additional insights into when the asset cap might be lifted and its regulators' dissatisfaction with its progress, which could in turn impact inflation. Second, as mentioned in **Section II.A**, Plaintiffs allege that "the asset cap blocked the Bank's ability to take advantage of interest-earning opportunities, which was the Bank's largest source of income,"[396] which implies that under Plaintiffs' theory, misrepresentations about the expected duration of the asset cap or the Company's progress in having the asset cap lifted would have different effects on Wells Fargo's stock price if the interest-earning opportunities available to the Company changed over time. Dr. Hartzmark has provided no methodology to tie inflation to either changes in the information available to the Company or to the Company's interest-earning opportunities.

### 1. There Is No Established Basis in the Hartzmark Report to Assume that the Events that Ultimately Occurred on Days of Alleged Corrective Disclosures Could Have Been Disclosed at an Earlier Time

183. Plaintiffs allege that Wells Fargo "received a steady stream of rejection letters … and stern rebukes"[397] from its regulators over the course of the putative Class Period regarding its progress complying with the 2018 Consent Orders. The allegation that Wells Fargo's interactions with its regulators evolved over the putative Class Period implies that the information that Wells Fargo could have disclosed early in the putative Class Period was different than the information it allegedly could have disclosed after those interactions had occurred later in the putative Class Period (and the information that was eventually disclosed).

[394] Hartzmark Report, ¶ 88.

[395] For example, Plaintiffs allege that Wells Fargo concealed the fact that on July 24, 2018 it had received a rejection letter from the OCC regarding its initially submitted plan under the 2018 OCC/CFPB Consent Orders. Similarly, Plaintiffs allege that Wells Fargo concealed the fact that on March 11, 2019 it had received a second rejection letter from the Federal Reserve regarding its submitted plan under the 2018 Federal Reserve Consent Order. *See* Complaint, ¶¶ 85–86, 93–95. *See*, more generally, Complaint, ¶ 7.

[396] Complaint, ¶ 4.

[397] Complaint, ¶ 7.

This means that a methodology to calculate inflation would need to take into account that what could have been disclosed likely evolved over the putative Class Period. If portions of the allegedly corrective information could not have been disclosed (or if the consequences of such information could not have been foreseen as inevitable) at the beginning of the putative Class Period, then that information could not have contributed to alleged inflation at that time, because it could not have affected the stock price at that time "had the truth been disclosed."[398] It therefore follows that if the information that Wells Fargo allegedly could have disclosed changed over time (and did not change only at the same time as the "disclosures either related to or revealing the alleged misstatements and omissions"[399]), then the amount of alleged inflation would have changed as well. In the absence of any methodology to address these circumstances, Dr. Hartzmark has not proposed a damages approach that is able to account for changes in what Wells Fargo could have disclosed, consistent with the allegations in this case.

184.    Indeed, Plaintiffs' allegations appear to be based on a chronology of events related to the 2018 Consent Orders throughout the putative Class Period, with alleged details about Wells Fargo's repeated interactions with regulators and politicians. For example, Plaintiffs allege that, "on July 24, 2018, the OCC rejected the Bank's proposed Stage 1 Plan"[400] for the first time, and then "again formally rejected the Bank's proposed Stage 1 Plan on November 21, 2018."[401]

185.    Given these developments over time, there is no established basis in the Hartzmark Report to assume that all the information Plaintiffs allege Wells Fargo misrepresented during the putative Class Period could have been disclosed at the beginning of the putative Class Period. For example, consider Plaintiffs' allegation that CEO Sloan's testimony in March 2019 contained misstatements regarding the "Bank's purported satisfaction of the 2018 OCC/CFPB Consent Orders' requirements" in the wake of specific developments in 2018 that Wells Fargo had not disclosed to the market.[402] Plaintiffs allege misrepresentations in CEO Sloan's testimony related to different events during the putative Class Period,[403] such as Wells Fargo's first

---

[398] As discussed above, Dr. Hartzmark defines inflation as the "difference between the actual prices paid … for Wells Fargo common stock and the true or 'but-for' values of the security absent the alleged misrepresentations and omissions (i.e., had the truth been disclosed the price would have been the true value)." Hartzmark Report, ¶ 80.
[399] Hartzmark Report, ¶ 84.
[400] Memo of Law ISO Motion for Class Certification, p. 7. *See also* Complaint, ¶ 80.
[401] Memo of Law ISO Motion for Class Certification, p. 8. *See also* Complaint, ¶ 87.
[402] Complaint, ¶ 178.
[403] Complaint, ¶ 179.

rejection letter from the OCC on July 24, 2018[404]; the OCC's formal rejection of Wells Fargo's second Stage 1 Plan proposal on November 21, 2018[405]; and the OCC's Quarterly Management Report on March 4, 2019.[406] However, those events all took place *after* the start of the putative Class Period on May 30, 2018, and there is no established basis in the Hartzmark Report to assume that Wells Fargo could have disclosed these developments at the beginning of the putative Class Period.[407]

186. Further, even in a hypothetical scenario in which the same alleged corrective information about Wells Fargo's progress on the 2018 Consent Orders could have been disclosed from the beginning of the putative Class Period, the stock price decline following the alleged corrective disclosures later in the putative Class Period would not necessarily be informative about inflation earlier in the putative Class Period. For that to have been the case, the market would need to have understood the hypothetical earlier disclosures to have the same effects and share price implications as they did later, when the actual alleged corrective disclosures occurred. If this is not the case, the value impact of the earlier hypothetical disclosures would have differed, and inflation at the earlier date would therefore not equal the price decline following the actual alleged corrective disclosures. This is particularly relevant here given the uncertainties and difficulties faced by Wells Fargo, as well as the external uncertainties with regulators, issues that were discussed by market participants (see **Section VI.B** above). For example, there is no established basis in the Hartzmark Report to assume that a price reaction caused by the public criticism of Wells Fargo by members of Congress during the hearings in March 2020 would have been the same as a price reaction caused by disclosure of the underlying facts regarding progress

[404] Complaint, ¶ 80.
[405] Complaint, ¶ 87.
[406] Complaint, ¶ 89.
[407] As another example, Plaintiffs allege that Board Chair Duke revealed during her testimony on March 11, 2020 "that the extensions and missed deadlines for the Stage 1 Plan submissions had raised 'concerns for the Board.'" Complaint, ¶ 260. These "concerns" in response to the "extensions and missed deadlines" presumably could not have been disclosed until those "extensions and missed deadlines" occurred, and all of the "extensions" referenced by Plaintiffs occurred after the start of the putative Class Period. *See* Complaint, ¶ 218. *See also* "The Real Wells Fargo: Board & Management Failures, Consumer Abuses, and Ineffective Regulatory Oversight," *United States House of Representatives Committee on Financial Services, Majority Staff*, March 4, 2020 ("Majority Staff House Report"), p. 50 ("On June 5, 2018, Sloan, on behalf of Wells Fargo, sent a letter to the Federal Reserve formally requesting an extension to the deadline for submitting revised plans pursuant to the Federal Reserve's feedback. Sloan wrote in the letter that, '[t]he requested extension would provide additional time for the Company to develop a robust response that is acceptable to the Federal Reserve by September 19, 2018.'"). *See also* Majority Staff House Report, footnote 243 ("On August 24, 2018, WFC requested to extend the September 19, 2018 submission deadline to October 31, 2018."); Majority Staff House Report, p. 34 ("The CFPB extended the July 20, 2019 deadline until June 2020, further delaying any potential disclosure of additional consumer abuses committed by Wells Fargo.").

alone.[408] Plaintiffs' allegations in the Complaint contain numerous references to such criticism from Congress (unrelated to the alleged corrective information), such as the statement from Representative Al Green that Wells Fargo ran a "criminal enterprise."[409] Allegations of "criminal" behavior by congressional representatives may lead to further investigations or legislation that could have negative effects on the Company beyond what would be caused by earlier disclosures of the underlying facts about progress in complying with the 2018 Consent Orders.

187. Similarly, according to the Complaint, Chairwoman Maxine Waters stated that "the Bank's failure to comply with the 2018 FRB Consent Order had inspired bills for Congress to exercise power to require the Bank's reform, stating that, '[w]hile the Federal Reserve's asset cap was a good start, it didn't seem to change the bank's behavior. Accordingly, we will discuss a number of bills that would compel further action by regulators and rein in abusive megabanks like Wells Fargo to hold them, including their management and Boards accountable for their actions.'"[410] New legislation to "rein in … Wells Fargo" would be expected to have a negative effect on Wells Fargo's stock price, and may not have been proposed in response to a different disclosure nearly two years earlier by the Company itself.

188. Relatedly, there is no established basis in the Hartzmark Report to assume that criticism of Wells Fargo's regulators would have been perfectly foreseeable or would have occurred had the underlying facts about progress under the 2018 Consent Orders been disclosed earlier. For example, during the hearings, Congress criticized the OCC for failing to properly monitor and

---

408 Indeed, the coverage analyst for Wells Fargo at PZENA, the investment manager for Lead Plaintiff Louisiana Sheriffs, noted that [redacted] Hagemann Deposition, p. 45:15–25. Similarly, the CIO at Ceredex, another investment manager for Lead Plaintiff Louisiana Sheriffs, noted that [redacted] Riddick Deposition, pp. 44:8–45:24. Louisiana Sheriffs purchased Wells Fargo stock after the release of the congressional reports and the congressional hearings through Ceredex on March 9, 2020 and through PZENA on May 13, 2020 and May 19, 2020. *See* Responses and Objections to Defendants' Wells Fargo & Company, Timothy J. Sloan, and John R. Shrewsberry's First Set of Interrogatories, *In re Wells Fargo & Company Securities Litigation*, March 16, 2022, Exhibit A; Riddick Deposition, Defendants' Exhibit 5, CVA_LS_00094–6; Hagemann Deposition, Defendants' Exhibit 8, PZN000002–5 at 2–3.

409 Complaint, ¶ 135 ("During the March 11, 2020 hearings, House Financial Services Committee members also criticized Wells Fargo's Board for not removing Defendant Sloan sooner than March 2019 for his misconduct and public misstatements, with Congressman Al Green stating that the Bank ran a 'criminal enterprise.'").

410 Complaint, ¶ 130.

supervise Wells Fargo.[411]  Such criticism (consistent with the public scrutiny of the Company's regulators' failures to oversee it since the Sales Practices Settlement)[412] could be expected to cause the regulators to more zealously supervise Wells Fargo or to cause the Federal Reserve to be more reluctant to lift the asset cap, in order to avoid similar criticism in the future.  Either of these responses from regulators would pose challenges for Wells Fargo that could affect its stock price.  Indeed, a J.P. Morgan equity analyst noted that Congress's "comments should keep regulators looking very closely at the next steps, which puts more pressure on Wells' CEO and Board to make sure they are fully buttoned up, in addition to delivering on time."[413]  This additional regulatory pressure could have a negative effect on Wells Fargo, but may not have occurred had the Company or its regulators disclosed the alleged truth about progress nearly two years earlier at the beginning of the putative Class Period.

189.    Without an appropriate methodology for "scaling" of inflation to account for the fact that inflation on days when Wells Fargo allegedly should have disclosed information about progress under the 2018 Consent Orders was different than inflation allegedly removed on the days with "disclosures either related to or revealing the alleged misstatements and omissions,"[414] Dr. Hartzmark has not proposed a methodology to measure inflation consistently with Plaintiffs' allegations.

---

[411] Hearing on "Holding Wells Fargo Accountable: CEO Perspectives on Next Steps for the Bank That Broke America's Trust" before the Committee on Financial Services of the United States House of Representatives, March 10, 2020, p. 54 ("[W]hen I read all of these deficiencies and regulatory efforts, … a report issued by the OCC's Office of Enterprise Government and the Ombudsman reviewing the OCC's supervision of the bank sales practices concluded that the OCC did not take timely and effective supervisory actions. The OCC failed to conduct comprehensive reviews in testing and monitoring systems and controls over sales practices between 2011 and 2014.").

[412] *See*, *e.g.*, Hearing on "Examining the Efforts, Activities, Objectives, and Plans of Federal Regulatory Agencies with Respect to Prudential Regulations for U.S. Financial Institutions and Credit Unions" before the Committee on Banking, Housing, and Urban Affairs of the United States Senate, May 15, 2019, p. 33 (Senator Warren: " [P]eople all across this country were scammed and squeezed by Wells Fargo. … [T]he OCC never uttered a peep about their executives who were leading this.  The OCC blew it once by letting Tim Sloan take over.").

[413] "Takeaways From Hearings: Timing of Resolution, Expenses, Regulators and CEO/Board on Watch," *J.P. Morgan*, March 11, 2020, p. 2.

[414] Hartzmark Report, ¶ 84.

**2. Plaintiffs' Allegations Link the Impact of the Asset Cap on Wells Fargo's Business to Interest-Earning Opportunities Which Dr. Hartzmark Does Not Address**

190. Plaintiffs allege that "the asset cap blocked the Bank's ability to take advantage of interest-earning opportunities, which was the Bank's largest source of income."[415] Plaintiffs' allegations therefore link the value impact of the asset cap to Wells Fargo's interest-earning opportunities. However, despite his generic references to "scaling,"[416] Dr. Hartzmark has not proposed a methodology capable of accounting for changes in Wells Fargo's interest-earning opportunities, and thus has not proposed a methodology consistent with Plaintiffs' theory of liability.

191. The extent to which "the asset cap blocked the Bank's ability to take advantage of interest-earning opportunities"[417] depends on (1) whether Wells Fargo could add interest-earning assets (either because its total assets were below the asset cap or because there were lower yielding assets on its balance sheet that could be replaced) and (2) the amount of interest-earning opportunities available to Wells Fargo (in the form of potential new interest-earning assets). The asset cap limited Wells Fargo's total assets to its December 31, 2017 level of $1.95 trillion.[418] One factor that can affect Wells Fargo's total assets is the amount of deposits that Wells Fargo receives. For example, every dollar that is deposited in the bank (which increases deposits) initially becomes a dollar of cash held by the bank (which increases assets).[419] Wells Fargo's assets are composed of both interest-earning assets (such as debt securities and loans), and noninterest-earning assets (such as cash and due from banks and goodwill), the sum of which were restricted by the asset cap.[420] The majority of assets on Wells Fargo's balance sheet are

[415] Complaint, ¶ 4.
[416] Hartzmark Report, ¶¶ 87, 90.
[417] Complaint, ¶ 4.
[418] Wells Fargo Press Release, "Wells Fargo Commits to Satisfying Consent Order with Federal Reserve," February 2, 2018. *See also* Wells Fargo & Company, "2017 Annual Report," February 15, 2018, p. 11.
[419] Wells Fargo & Company, "2018 Annual Report," February 15, 2019, p. 101 ("Deposits have historically provided a sizable source of relatively low-cost funds. Deposits were 135% of total loans at December 31, 2018, and 140% at December 31, 2017.").
[420] *See* Wells Fargo & Company, "2018 Annual Report," February 15, 2019, p. 51.

interest-earning,[421] but within this category of assets, some assets yield more income for the bank than others.

192.    Early in the putative Class Period, there are indications that Wells Fargo had flexibility in its balance sheet, which allowed it to reduce certain portfolios (of assets and deposits) while continuing to grow traditional loans and deposits.[422]  After the announcement of the asset cap, Wells Fargo announced plans to continue to grow certain categories of assets (such as interest-earning loans) by substituting traditional loans in place of other assets (such as trading assets and short-term investments), without increasing total assets, such that it could continue to take advantage of more advantageous interest-earning opportunities.[423]  In the same way, Wells Fargo's plan specifically targeted certain deposit portfolios for reductions such that it could continue to increase traditional deposits.  The initial deposit categories Wells Fargo targeted for reductions included nonoperational deposits and deposits from other financial institutions.[424]  Reductions in these categories were reported to benefit total average deposit cost and so-called deposit betas.[425]

---

[421] Wells Fargo & Company, "2018 Annual Report," February 15, 2019, p. 51.  Wells Fargo had $1,888,892 million in total average assets in 2018.  Of these, $1,738,482 million were earning assets and $150,410 million were noninterest-earning assets.

[422] "Fed Consent O[r]der Disappointing, but Necessary to Move Past Legacy Issues," *Deutsche Bank*, February 4, 2018, p. 1 ("We don't view the asset cap as meaningfully impacting WFC growth plans for 2018 given continued planned run-offs of certain loan portfolios and flexibility to run off some lower yielding assets.  Mgmt intends to run off $50-75b of lower yielding assets in order to remain below the $2tr cap and still be able to grow other areas as previously planned."); "Fed Doesn't Pull Any Punches -- Downgrade to Neutral," *Citigroup*, February 4, 2018, p. 3 ("As part of the consent order, Wells Fargo's total assets may not exceed Dec 31, 2017 levels.  In order to comply with this restriction, Wells is planning to reduce some of its lower return assets by $50-75 billion and this is estimated to have a $300-400 million ($0.05-0.10 per share) impact on 2018 earnings.  A lot of these assets were funded with noncore deposits … which were put on the balance sheet given that Wells had cushion on its SLR ratio so made sense and is now an obvious area for the company to shrink without impacting the longer term franchise value.").

[423] Consent Order Update Call, p. 6.

[424] Consent Order Update Call, p. 6.  *See also* "Blindside Hit on the Stagecoach, Consent Order Likely to Pressure Shares," *Baird*, February 5, 2018, pp. 2–3 ("Management will take a series of actions to enable WFC to continue to grow traditional loans and deposits in the near term.  Portfolios that could be temporarily reduced to facilitate customer growth include non-operational deposits, financial institutions' deposits, and trading assets/short-term investments.").  *See also* "DIS Disclosure Requirements, DIS85, Liquidity," *Basel Committee on Banking Supervision*, December 15, 2019 ("Operational deposits include deposits from bank clients with a substantive dependency on the bank where deposits are required for certain activities (i.e. clearing, custody or cash management activities). Deposits in institutional networks of cooperative banks include deposits of member institutions with the central institution or specialized central service providers. … Non-operational deposits are all other unsecured wholesale deposits, both insured and uninsured.").

[425] Consent Order Update Call, p. 6.  Deposit costs are the interest payments banks payout in exchange for holding customer deposits.  Deposit betas measure the percentage change in market interest rates that banks must pass on to their customers.  As of 2017 Q2, Wells Fargo had larger deposit betas than its peer banks.  *See also* Nathan Stovall and Chris Vanderpool, "At U.S. Banks, Some Deposit Betas Break from the Herd," *S&P Global Market Intelligence*, October 3, 2017.

193. Based on this plan, Wells Fargo stated at the beginning of the putative Class Period that it expected the asset cap to have a "relatively modest balance sheet impact."[426] In February 2018, Wells Fargo initially estimated that the impact of the actions it would need to take to remain under the asset cap would have a $300-400 million impact on 2018 earnings.[427, 428] By the start of the putative Class Period, that estimate had been reduced to less than $100 million on 2018 earnings.[429]

194. Additionally, the asset cap may have had a limited effect on Wells Fargo's ability to manage its balance sheet due to factors unrelated to the asset cap itself. First, the Company was already working on "de-risking" its balance sheet and "reducing [its] exposure to certain riskier assets" prior to the 2018 Consent Orders.[430] As discussed above, reductions in certain asset categories can make room for growth in others, so previously planned reductions in these asset categories meant Wells Fargo could make fewer unplanned reductions that would impact its expected earnings. Second, some market participants also noted that Wells Fargo had been struggling to grow its balance sheet prior to the imposition of the asset cap, suggesting there may have been a lack of "interest-earning opportunities" notwithstanding the asset cap. Indeed, assets at peer banks were growing relatively slowly during the majority of the putative Class Period as well. For example, during the first year and a half after the imposition of the asset cap (i.e., from 2018 Q1 to 2019 Q2), the total assets of peer banks increased by 4.5% on average.[431] This

[426] Consent Order Update Call, p. 6.

[427] Consent Order Update Call, p. 6 ("[B]ased upon our preliminary analysis of one set of assumptions for prospective balance sheet optimization activities to manage within the asset cap, we estimate 2018 net income would be reduced by approximately $300 million to $400 million after tax.").

[428] For context, as of February 1, 2018 (the day before the announcement of the asset cap), the consensus estimate for Wells Fargo's FY 2018 net income was $23.7 billion, per Refinitiv Eikon.

[429] Wells Fargo & Company, Presentation Transcript at Bernstein Strategic Decisions Conference, dated May 31, 2018, p. 9 ("Originally, we thought the impact was going be somewhere between $300 million and $400 million this year, and the update was it's going to cost a little bit less than $100 million. So we've got some flexibility."). I note that these statements by Wells Fargo are not alleged to be misstatements by Plaintiffs. *See* Complaint, Section V.

[430] Wells Fargo & Company, 2018 Q1 Earnings Call Transcript, dated April 13, 2018 ("As a reminder, prior to the consent order, we were already focused on reducing our exposure to riskier assets including certain legacy consumer real estate loans and near prime and sub-prime auto loans."). *See also* "WFC Agrees to Consent Order with Asset Caps; but Likely Limited Fin'l Impact," *Sandler O'Neill & Partners*, February 5, 2018, p. 2 ("A BS cap strikes us as an unusual penalty. But thankfully, in WFC's case, the practical implications are pretty limited. WFC has contended with muted balance sheet growth for the past several Q's, anyway, given sluggish industry growth and conscious de-emphasis of certain asset classes (i.e. indirect auto).").

[431] Total assets from Wells Fargo's peers–Bank of America Corporation, Citigroup Inc., JPMorgan Chase & Co., The PNC Financial Services Group, Inc., and U.S. Bancorp, Inc.–are considered. By comparison, the total assets of the same peers grew by 11.7% from 2019 Q2 to 2020 Q1.

relatively slower growth is consistent with relatively fewer opportunities to grow assets during this period.

195. Consistent with these facts, commentary early in the putative Class Period suggests that the asset cap, at least initially, may not have posed a binding constraint for Wells Fargo, and that the potential value impact of the asset cap to Wells Fargo may therefore have been limited at that time. For example, one equity analyst stated that "the practical implications [of the asset cap] are pretty limited," as Wells Fargo had "contended with muted balance sheet growth for the past several [quarters], anyway, given sluggish industry growth."[432] Another equity analyst stated that "expectations [were] for very limited asset growth in the coming years to begin with."[433] Finally, I understand that [redacted][434]

196. Over the course of the putative Class Period, the value impact of the asset cap may have evolved as the economic environment and Wells Fargo's balance sheet changed over time. For example, an equity research team from RBC stated in January 2019 that in its view "the company has balance sheet flexibility and will re-mix its asset mix to continue to support

[432] "WFC Agrees to Consent Order with Asset Caps; but Likely Limited Fin'l Impact," *Sandler O'Neill & Partners*, February 5, 2018, p. 2.

[433] "Finding a Good Deal on a Stage Coach; Upgrade to Buy," *UBS*, April 5, 2018, p. 14 ("The timing of the lifting of the asset cap remains uncertain to us, and our model does not factor in any asset growth till 2Q19. Ultimately, while probably more impactful to sentiment than to near term financial results (expectations are for very limited asset growth in the coming years to begin with), the continuation of the restriction could negatively impact earnings in the out years (e.g. beyond 2019)."). *See also* "Wells Struggles to Stay Out of the Headlines," *Macquarie Research*, February 6, 2018, p. 1 ("[T]he consent order is another negative headline that appears to be hurting its image and causing lower client activity, as WFC has underperformed peers such as JPM and BAC for loan growth over the past several quarters."); "Back in the Penalty Box - What Are Investors Asking?" *Bernstein*, February 9, 2018, p. 5 ("Wasn't the fundamental outlook muted prior to this? Yes, the company had already seen deceleration in core top-line drivers from slowing loan growth (run-off of auto and home equity, sluggish commercial demand), lack of NIM expansion, and pressure on mortgage fees.").

[434] Hagemann Deposition, Defendants' Exhibit 4, PZN000099. *See also* Hagemann Deposition, pp. 55:3–56:6 [redacted]; Nielsen Deposition, Defendants' Exhibit 7, LONGVIEW_MS_WF_000030–72 at 35 [redacted]

customer growth."[435] However, a year later in January 2020, the same RBC equity research team stated that "[g]oing forward, it may prove to be more challenging to support customer growth due to the cap."[436] Similarly, an equity analyst from Credit Suisse stated in January 2019 that Wells Fargo's "issue is less about balance sheet capacity,"[437] but, by February 2020 characterized the "asset cap" as "the binding constraint" for "balance sheet growth."[438] Indeed, I understand that [REDACTED], Lead Plaintiff Louisiana Sheriffs' investment manager PZENA noted that [REDACTED][439] [REDACTED], and Wells Fargo's coverage analyst [REDACTED].[440]

197. Combined with Plaintiffs' allegations, the above suggests that the value impact of disclosures regarding the expected duration of the asset cap would have differed at different points of the Class Period. However, Dr. Hartzmark offers only a vague reference to "scaling"

---

[435] "Asset Cap Sticks Around for 2019 but Company Remains Focused on Expense Reduction," *RBC*, January 15, 2019, p. 2 ("Balance Sheet Mix: As a results of the C&D, WFC must keep its asset size at the 4Q17 level. Today, the company has balance sheet flexibility and will re-mix its asset mix to continue to support customer growth, in our view. Should the asset freeze remain in place, however, into late 2020, we believe it would be likely more difficult to support new customer growth.").

[436] "4Q19: There Will Be a Time to Own WFC but Not Today," *RBC*, January 16, 2020, p. 2 ("Balance Sheet: As a result of the C&D, WFC must keep its total average asset size at the 4Q17 level. Today, the company is an estimated $20 billion below the cap. Going forward, it may prove to be more challenging to support customer growth due to the cap.").

[437] "Consent Order Relief Delayed; Top Line Momentum Challenged; Remain Neutral," *Credit Suisse*, January 15, 2019, p. 1 ("Consent order relief likely to be delayed through year end 2019 … the issue is less about balance sheet capacity and more tied to lingering reputational headwinds holding this franchise back from a more decided move forward; revenue growth remains challenged.").

[438] "First Thoughts from the 21st Annual Credit Suisse Financial Services Forum," *Credit Suisse*, February 27, 2020, p. 1 ("In terms of loan growth … expected to run around ~4% in 2020 with equal retail deposit growth (balance sheet growth under the asset cap is the binding constraint)."). *See also* "A Stinging Rebuke from the Fed," *Oppenheimer*, February 4, 2018, p. 1 ("Thus, the near-term financial and business impact of the consent order seems limited to us. Management estimated it at $300-$400M, or less than 2% of earnings. Thus, financially speaking, it should not be a big deal."); "Core Results in Line, but Another Round of Estimate Cuts on Tap," *Oppenheimer*, July 16, 2019, p. 1 ("We believe that the Fed has put WFC management into an extremely difficult position with the asset cap restriction, a penalty more publicly visible than what was handed C and BAC in the heart of the crisis. It seems to drive uneconomic divestitures, in order to convince folks that one is still open for business and has balance sheet capacity.").

[439] Hagemann Deposition, Defendants' Exhibit 5, PZN000106.

[440] Hagemann Deposition, pp. 61:24–63:4 [REDACTED]

inflation if necessary,[441] not a methodology to measure inflation in a manner consistent with the allegations and changes in Wells Fargo's economic situation.

198. Therefore, similar to the other complexities of this case detailed above, Dr. Hartzmark has not demonstrated that he is able to reliably calculate damages consistent with patterns of inflation suggested by Plaintiffs' allegations, given the generic nature and minimal detail of his purported damages methodology.

Executed this 23rd of December, 2022

René M. Stulz

[441] Hartzmark Report, ¶¶ 87, 90.

**APPENDIX A**

**René M. Stulz**

Fisher College of Business
806 Fisher Hall
2100 Neil Avenue
Columbus, OH 43210-1144
Phone: (614) 292-1970
Fax: (614) 292-2359
E-mail: stulz.1@osu.edu
Homepage
Google Scholar

Home Address:
3419 River Seine Street
Columbus, OH 43221
Phone: (614) 771-1110
Cell: (614) 206-0265

**UNDERGRADUATE STUDIES**

University of Neuchâtel, Switzerland, Licence es Sciences Économiques, 1975.

**GRADUATE STUDIES**

London School of Economics, 1975-1976, Visiting Graduate Student.

Massachusetts Institute of Technology (MIT), 1976-1980, Ph.D. in Economics.

**ACADEMIC APPOINTMENTS**

Ohio State University, Everett D. Reese Chair of Banking and Monetary Economics, 1996 to present.

University of Southern California, Visiting Professor, 2007.

University of Chicago, Visiting Professor, Stigler Center, 2003-2004.

Northwestern University, Visiting Scholar, Kellogg School of Management, 2003-2004.

Harvard University, Business School, August 1996 to July 1997, Bower Fellow.

Ohio State University, Director of the Dice Center for Research in Financial Economics, 1995 to present.

Ohio State University, Ralph Kurtz Chair in Finance, 1993-1996.

Ohio State University, Riklis Chair in Business and its Environments, 1988-1993.

Ohio State University, Professor of Finance, 1985 to present.

University of Chicago, Visiting Professor of Finance, 1986-1987.

Massachusetts Institute of Technology, Visiting Associate Professor of Finance, Fall 1985.

Ohio State University, Associate Professor of Finance, 1983-1985.

University of Rochester, Assistant Professor of Finance and Economics, 1980-1983.


**OTHER POSITIONS**

Research Associate, National Bureau of Economic Research (Asset Pricing Group and Corporate Finance Group).

Director, NBER Group on the Risks of Financial Institutions, 2005 to present.

Chairman, Scientific Council, Swiss Finance Institute, 2006 to 2019.

Finance Research Advisory Committee, Office of Financial Research, U.S. Treasury, 2016 to 2019.

Board of Directors, American Finance Association, 1988 to 2000, 2002 to 2006.

Consultant to the World Bank, the IMF, the NYSE, Federal Reserve Bank of New York, corporations, and law firms.

Expert testimony in federal courts, state courts, and domestic and international arbitrations.

Taught executives in Europe, Asia and North America (open enrollment as well as for corporations, courses on risk management, banking, derivatives, corporate valuation, investments).

Advisory Committee, Morningstar, 2000-2002.

Director, Banque Bonhôte, 2002 to 2020.

Director, Wegelin Fund Management, 1999 to 2010.

President, Gamma Foundation, 2002 to 2013.

Director, Community First Financial Group, Inc., 2001 to 2010.

Director, Peninsula Banking Group, Inc., 2001 to 2010.

Trustee, Global Association of Risk Professionals, 2002-2020; executive committee, 2004-2011; chair of governance committee, 2011-2020; vice-chair, 2017-2019.

Vice-Chairman, Board of Trustees, Global Association of Risk Professionals, 2019-2020.

Chairman, Financial Risk Management Examination Certification Committee, Global Association of Risk Professionals, 2002 to 2020.

Chairman, New York Federal Reserve Bank/GARP Global Risk Forum (2011, 2013, 2016, 2019), Bank of England/GARP Global Risk Forum (2012, 2014, 2017, 2020), Hong Kong Monetary Authority/GARP Global Risk Forum (2013, 2015).

International Advisory Committee, NCCR, 2002 to 2011.

External Reviewer, London Business School Finance Department, 2005.

Financial Advisory Roundtable (FAR), Federal Reserve Bank of New York, 2006 to 2010.

Guest Contributor, Harvard Law School Corporate Governance Blog.

Squam Lake Group, member, 2008 to present.

Senior Academic Fellow, Asia Bureau of Finance and Economic Research, 2012 to present.

Fellow, Wharton Center for Financial Institutions, 2013 to present.

Nominating Committee, American Finance Association, 2016, 2018.

**HONORS, SCHOLARSHIPS AND FELLOWSHIPS**

Advanced Researcher Fellowship, Swiss National Science Foundation, 1978-1980.

Dean's Research Professorship, Ohio State University, Spring 1984.

Pacesetter Research Award, Ohio State University, April 1986.

President-Elect (1993) and President (1994), International Economics and Finance Society.

Docteur Honoris Causa, University of Neuchâtel, Switzerland, 1998.

Eastern Finance Association Scholar Award, 1998.

Selected keynote speeches: ABFER, Asia-Pacific Finance Association, Bank of the Netherlands Governance Conference, Bocconi Derivatives Annual Conference, Drexel Corporate Governance Conference, Eastern Finance Association, European Corporate Finance Institute, European Finance Association, Financial Management Association, European Financial Management Association, Financial Management Association European Conference, FDIC Annual Conference, Rising Stars Conference, Fourth Annual Conference on Asia-Pacific Financial

Markets of the Korean Securities Association, French Finance Association, German Finance Association, Infiniti Conference, Notre Dame/SEC Conference, Northern Finance Association, Swiss Banking Association 100th Anniversary Conference, Western Finance Association, World Finance Conference, China International Conference in Finance, South Carolina Conference on Banking and Fixed Income, Asian Finance Association Conference, Seoul Asian Financial Forum, Oklahoma University Energy and Commodities Finance Research Conference, ECGI Roundtable Riga, Institutional Investor Private Markets Summit, 7th HEC Paris Workshop.

Assurant Lecture, Georgia Tech University, 2004.

Fellow, Financial Management Association, 2000.

Fellow, American Finance Association, 2005.

Fellow, European Corporate Governance Institute, 2005.

Vice-President (2002), Program Chair, (2003), President (2004), Western Finance Association.

Vice-President (2002), President-elect (2003), President (2004), American Finance Association.

Who's Who in Banking and Finance; Who's Who in Economics.

Jensen Prize for best article in Corporate Finance in the Journal of Financial Economics, 2000, 2008, 2017; runner-up, 2011.

William F. Sharpe Award for the best paper published in the Journal of Financial and Quantitative Analysis during the year 2003.

Selected by the magazine Treasury and Risk Management as one of the 100 most influential people in finance (June 2004).

René M. Stulz Scholar Development Fund, created in 2005 by former Ph.D. students.

Fama/DFA Prize for best article in Capital Markets and Asset Pricing in the Journal of Financial Economics, 2005.

Nominated for a Brattle Prize for best paper in Corporate Finance in the Journal of Finance in 2005.

Risk Who's Who, Charter Member, 2006.

Best paper, First Asian-Pacific Capital Markets Conference, Seoul, 2006.

Outstanding Academic Contribution to Corporate Governance Award, Drexel University, 2009.

Risk Manager of the year award, Global Association of Risk Professionals, 2009.

Swiss Finance Institute/Banque Privée Espirito Santo Prize 2010.

Trailblazer in Finance Award, 2014.

Reuters, Highly-Cited Researchers, first time in 2014.

Ohio State University, Distinguished Scholar Award, 2016.

**CONGRESSIONAL TESTIMONY**

"Over-the-Counter Derivatives Markets Act of 2009," testimony to the House of Representatives Committee on Financial Services, 2009.

"Oversight of the Mutual Fund Industry: Ensuring Market Stability and Investor Confidence," Subcommittee on Capital Markets and Government Sponsored Enterprises, House of Representatives Committee on Financial Services, 2011.

**BOOKS**

Risk Management and Derivatives, Southwestern College Publishing, 2003.

Handbook of the Economics of Finance, volume 1, edited with George Constantinides and Milton Harris, North-Holland, 2003.

Handbook of the Economics of Finance, volume 2, edited with George Constantinides and Milton Harris, Elsevier, 2013.

International Capital Markets, 3 volumes, edited with Andrew Karolyi, Edward Elgar, 2003.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2004.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2005.

The Risks of Financial Institutions, edited with Mark Carey, University of Chicago Press, 2006.

The Squam Lake Report: Fixing the Financial System, co-authored with the Squam Lake Group, Princeton University Press, 2010.

**PUBLISHED PAPERS**

"On the Effects of Barriers to International Investment," Journal of Finance, 1981, 36(4), 923-934; reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 1-36.

"A Model of International Asset Pricing," Journal of Financial Economics, 1981, 9(4), 383-406.

"The Forward Exchange Rate and Macroeconomics," Journal of International Economics, 1982, 12(3/4), 285-299.

"Options on the Minimum or the Maximum of Two Risky Assets: Analysis and Applications," Journal of Financial Economics, 1982, 10(2), 161-185, reprinted in Options Markets, vol. 2, George Constantinides and A. G. Malliaris, eds., Edward Elgar Publishing, 2001.

"On the Determinants of Net Foreign Investment," Journal of Finance, 1983, 38(2), 459-468.

"The Demand for Foreign Bonds," Journal of International Economics, 1983, 15(3/4), 225-238.

"Optimal Hedging Policies," Journal of Financial and Quantitative Analysis, 1984, 19(2), 127-140.

"Currency Preferences, Purchasing Power Risks and the Determination of Exchange Rates in an Optimizing Model," Journal of Money, Credit and Banking, 1984, 16(3), 302-316; reprinted in Monetary Policy and Uncertainty, Manfred J. M. Neumann, ed., Nomos, 1986.

"Pricing Capital Assets in an International Setting: An Introduction," Journal of International Business Studies (Winter 1984), 55-73; reprinted in International Financial Management: Theory and Applications, Donald R. Lessard, ed., John Wiley & Sons, 1985.

"Macroeconomic Time-Series, Business Cycles and Macroeconomic Policies," with Walter Wasserfallen, Carnegie-Rochester Conference Series on Public Policy (Spring 1985), 9-55.

"An Analysis of Secured Debt," with Herb Johnson, Journal of Financial Economics, 1985, 14(4), 501-522, reprinted in The Debt Market, vol. 3, Steve A. Ross, editor, Edward Elgar, 2000.

"The Determinants of Firm's Hedging Policies," with Clifford W. Smith, Journal of Financial and Quantitative Analysis, 1985, 20(4), 391-406; reprinted in Studies in Financial Institutions: Commercial Banks, C. James and C.W. Smith, eds., McGraw Hill, 1993, and in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L. Culp and Merton H. Miller, eds., Risk Publications, London, 1999.

"Asset Pricing and Expected Inflation," Journal of Finance, 1986, 41(1), 209-224.

"Risk Bearing, Labor Contracts and Capital Markets," with Patricia B. Reagan, Research in Finance, 1986, 6, 217-232.

"Interest Rates and Monetary Policy Uncertainty," Journal of Monetary Economics, 1986, 17(3), 331-348.

"Time-Varying Risk Premia, Imperfect Information and the Forward Exchange Rate," International Journal of Forecasting, 1987, 3(1), 171-178.

"The Pricing of Options with Default Risk," with Herb Johnson, Journal of Finance, 1987, 42(2), 267-280.

"An Equilibrium Model of Exchange Rate Determination and Asset Pricing with Non-Traded Goods and Imperfect Information," Journal of Political Economy, 1987, 95(5), 1024-1040.

"Managerial Control of Voting Rights: Financing Policies and the Market for Corporate Control," Journal of Financial Economics, 1988, 20(1/2), 25-54, reprinted in M.C. Jensen and C.W. Smith, eds., The Modern Theory of Corporate Finance, McGraw-Hill, 1989 (second edition).

"Risk and the Economy: A Finance Perspective," with K.C. Chan, Risk and the Economy, in C.C. Stone, ed., Financial Risk: Theory, Evidence and Implications, Proceedings of the Eleventh Annual Economic Conference of the Federal Reserve Bank of St. Louis, Kluwer Academic Publishers, 1988.

"Capital Mobility and the Current Account," Journal of International Finance and Money, 1988, 7(2), 167-180.

"The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," with Yong Cheol Kim, Journal of Financial Economics, 1988, 22(2), 189-205.

"Contracts, Delivery Lags, and Currency Risks," with Patricia Reagan, Journal of International Money and Finance, 1989, 8(1), 89-104.

"The Pricing of Stock Index Options in General Equilibrium," with Warren Bailey, Journal of Financial and Quantitative Analysis, 1989, 24(1), 1-12.

"Managerial Performance, Tobin's q, and the Gains from Successful Tender Offers," with Larry Lang and Ralph Walkling, Journal of Financial Economics, 1989, 24(1), 137-154.

"Real Exchange Rate Dynamics and the Financial Theory of the Trading Firm," in Recent Developments in International Banking and Finance, S. Khoury and A. Ghosh, eds., Probus Publishing Company,1989, 3, 247-262.

"Properties of Daily Stock Returns from the Pacific Rim Stock Markets: Evidence and Implications," with Warren Bailey and Edward Ng, in S.G. Rhee and R. Chang, eds., Pacific-Basin Capital Markets Research, North Holland, 1990, 155-171.

"The Pricing of Currency Options: A Review," in R. E. Schwartz and C. W. Smith, eds., Handbook of Currency and Interest Rate Risk Management, Simon & Schuster, 1990, 5/1-5/20.

"Stock Index Futures in Switzerland: Pricing and Hedging Performance," with Walter Wasserfallen and Thomas Stucki, Review of Futures Markets, 1990, 9(3), 576-592.

"The Distribution of Target Ownership and the Division of Gains in Successful Takeovers," with Ralph A. Walkling and Moon H. Song, Journal of Finance, 1990, 45(3), 817-834.

"Managerial Discretion and Optimal Financing Policies," Journal of Financial Economics, 1990, 26(1), 3-26, reprinted in The Theory of Corporate Finance, M.J. Brennan, ed., Edward Elgar, 1995.

"Benefits of International Diversification: The Case of Pacific Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management, 1990, 16(4), 57-61.

"A Test of the Free Cash Flow Hypothesis: The Case of Bidder Returns," with Ralph A.Walkling and Larry H. Lang, Journal of Financial Economics, 1991, 29(2), 315-335.

"Is There a Global Market for Convertible Bonds?" with Yong-Cheol Kim, Journal of Business, 1992, 65(1), 75-92.

"Industry Contagion Effects of Bankruptcy and Firm Size," with Larry Lang, in Ed Altman, ed., Bankruptcy and Distressed Restructurings, Business One Irwin, 1992, 215-221.

"Contagion and Competitive Intra-Industry Effects of Bankruptcy Announcements," with Larry Lang, Journal of Financial Economics, 1992, 32(1), 45-60.

"Global Financial Markets and the Risk Premium on U.S. Equity," with K.C. Chan and Andrew Karolyi, Journal of Financial Economics, 1992, 32(2), 137-168.

"Portfolio Management and Exchange Rate Risks: New Theoretical and Empirical Perspectives," with Warren Bailey and Edward Ng, S. Khoury and A. Ghosh, eds., Recent Developments in International Banking and Finance, 1992, 6, 230-248.

"Optimal Hedging of Stock Portfolios Against Foreign Exchange Risks: The Case of the Nikkei 225," with Warren Bailey and Edward Ng, Global Finance Journal, 1992, 3(2), 97-114.

"Contracting Costs, Inflation and Relative Price Volatility," with Patricia Reagan, Journal of Money, Credit and Banking, 1993, 25(3), Part 2, 585-601.

"Tobin's q, Diversification, and Firm Performance," with Larry Lang, Journal of Political Economy, 1994, 102(6), 1248-1280, reprinted in Empirical Corporate Finance, vol. IV, Michael Brennan, ed., Edward Elgar, 2001.

"International Asset Pricing: An Integrative Survey," Handbook of Modern Finance, R. Jarrow, M. Maksimovic and W. Ziemba, eds., North Holland-Elsevier, 1995, 201-223.

"Asset Sales, Firm Performance and the Agency Costs of Managerial Discretion," with Larry Lang and Annette Poulsen, Journal of Financial Economics, 1994, 37(1), 3-37, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"The Cost of Capital in Internationally Integrated Markets," European Financial Management, European Financial Management, 1995, 11-22.

"An Analysis of the Wealth Effects of Japanese Offshore Dollar-Denominated Convertible and Warrant Bond Issues," with Jun-Koo Kang, Yong-Cheol Kim and Kyung-Joo Park, Journal of Financial and Quantitative Analysis, 1995, 30(2), 257-270.

"Globalization of Capital Markets and the Cost of Capital: The Case of Nestlé," Journal of Applied Corporate Finance, 1995, 8(3,Fall), 30-38.

"Foreign Equity Investment Restrictions, Capital Flight, and Shareholder Wealth Maximization," with Walter Wasserfallen, Review of Financial Studies, 1995, 8(4), 1019-1057.

"Leverage, Investment and Firm Growth," with Larry Lang and Eli Ofek, Journal of Financial Economics, 1996, 40(1), 3-29.

"How Different is Japanese Corporate Finance?", with Jun-Koo Kang, Review of Financial Studies, 1996, 9(1), 109-139.

"Information, Trading and Stock Returns: Lessons from Dually-Listed Securities," with K.C. Chan, Wai-Ming Fong, and Bong-Chan Kho, Journal of Banking and Finance,1996, 20(7), 1161-1187.

"Timing, Investment Opportunities, Managerial Discretion, and the Security Issue Decision," with Kooyul Jung and Yong-Cheol Kim, Journal of Financial Economics, 1996, 42(2), 159-185, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"Why Do Markets Move Together? An Investigation of U.S.-Japan Stock Return Comovements," with G. Andrew Karolyi, Journal of Finance, 1996, 51(3), 951-986.

"Rethinking Risk Management," Journal of Applied Corporate Finance, 1996 (Fall), 8-24. Reprinted in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L Culp and Merton H. Miller, eds., Risk Publications, London, 1999, and in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999.

"Why Is There a Home Bias? An Analysis of Foreign Portfolio Equity Ownership in Japan," with Jun-Koo Kang, Journal of Financial Economics, 1997, 46(1), 3-28.

"Are Internal Capital Market Efficient?" with Hyun-Han Shin, Quarterly Journal of Economics, 1998, 113(2), 531-552.

"The Determinants and Implications of Corporate Cash Holdings," with Tim Opler, Lee Pinkowitz, and Rohan Williamson, Journal of Financial Economics, 1999, 52(1), 3-46. A shortened version of this paper appeared as "Corporate Cash Holdings," Journal of Applied Corporate Finance, 2001, 14(1), 55-79.

"Do Foreign Investors Destabilize Stock Markets? The Korean Experience in 1997," with Hyuk Choe and Bong-Chan Kho, Journal of Financial Economics, 1999, 54(2), 227-264.

"The Underreaction Hypothesis and the New Issue Puzzle: Evidence from Japan," with Yong-Cheol Kim and Jun-Koo Kang, Review of Financial Studies, 1999, 12(3), 519-534.

"International Portfolio Flows and Security Markets," in International Capital Flows, edited by Martin Feldstein, University Chicago Press, 1999, 257-293, reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 387-423.

"Globalization, Corporate Finance and the Cost of Capital," Journal of Applied Corporate Finance, 1999, 12(3), 8-25.

"Do Banking Shocks Affect Firm Performance? An Analysis of the Japanese Experience," with Jun-Koo Kang, Journal of Business, 2000, 73(1), 1-23.

"Banks, the IMF, and the Asian crisis," with Bong-Chan Kho, Pacific Basin Finance Journal, 2000, 8(2), 177-216.

"U.S. Banks, Crises, and Bailouts: From Mexico to LTCM," with Bong-Chan Kho and Dong Lee, American Economic Review, 2000, 90(2), 28-31.

"Financial Structure, Corporate Finance and Economic Growth," International Review of Finance, 2000, 1(1), 11-38.

"Merton Miller and Modern Finance," Financial Management, 2000, 29(4), 119-131. Reprinted in the Journal of Applied Corporate Finance, 2001(Winter), 8-20.

"International Competition and Exchange Rate Shocks: A Cross-Country Industry Analysis of Stock Returns," with John Griffin, Review of Financial Studies, 2001, 14(1), 215-241.

"Divestitures and the Liquidity of the Market for Corporate Assets," with Frederick Schlingemann and Ralph A. Walkling, Journal of Financial Economics, 2002, 64(1), 117-144, reprinted in Corporate Restructuring, vol. 2, John Campbell and David J. Denis, ed., Edward Elgar Publishing, 2005.

"Should we Fear Capital Flows?" in International Financial Markets: The Challenge of Globalization, Leonardo Auernheimer (Editor), University of Chicago Press, 2003, Chicago, Ill.

"Corporate Governance, Investor Protection, and the Home Bias," with Magnus Dahlquist, Lee Pinkowitz, and Rohan Williamson, Journal of Financial and Quantitative Analysis, 2003, 38(1), 87-110.

"Equity Market Liberalizations as Country IPOs," with Rodolfo Martell, American Economic Review, Papers and Proceedings, 2003, 93(2), 97-101.

"Culture, Openness, and Finance," with Rohan Williamson, Journal of Financial Economics, 2003, 70(3), 313-349.

"A New Approach to Measuring Financial Contagion," with Kee-Hong Bae and Andrew Karolyi, Review of Financial Studies, 2003, 16, 717-763. Pre-publication Working Paper

"Are Assets Priced Locally or Globally?" with Andrew Karolyi, in Constantinides, George, Milton Harris and René Stulz (eds.), The Handbook of the Economics of Finance, North Holland, 2003.

"Why are Foreign Firms that List in the U.S. Worth More?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2004, 71(2), 205-238.

"Daily Cross-Border Flows: Pushed or Pulled?" with Federico Nardari and John Griffin, Review of Economics and Statistics, 2004, 86(3), 641-657.

"Firm Size and the Gains from Acquisitions," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Financial Economics, 2004, 73, 201-228.

"Should we Fear Derivatives?" Journal of Economic Perspectives, 2004, 18(3), 173-192; reprinted in The ICFAI Journal of Derivatives Markets, 2005, 2(1), 42-53.

"Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Finance, 2005, 60(2), 757-782 (Reprinted in Mergers and Acquisitions, J. Harold Mulherin, ed., Edward Elgar Publishing, 2012).

"Do Domestic Investors have an Edge? The Trading Experience of Foreign Investors in Korea," with Hyuk Choe and Bong-Chan Kho, Review of Financial Studies, 2005, 18(3),795-829.

"The Limits of Financial Globalization," Journal of Finance, 2005, 60(4), 1595-1638; reprinted in Journal of Applied Corporate Finance, 2007, 19(1), 8-15.

"Does the Contribution of Corporate Cash Holdings and Dividends to Firm Value Depend on Governance? A Cross-Country Analysis," with Lee Pinkowitz and Rohan Williamson, Journal of Finance, 2006, 61(6) 2725-2751; reprinted in Journal of Applied Corporate Finance, 2007, 19(1), 81-87.

"Dividend Policy and the Earned/Contributed Capital Mix: A Test of the Life-cycle Theory," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2006, 81(2), 227-254.

"Enterprise Risk Management: Theory and Practice," with Brian W. Nocco, Journal of Applied Corporate Finance, Fall 2006, 18(8), 8-20.

"Do Investors Trade more when Stocks have Performed Well? Evidence from 46 Countries," with John M. Griffin and Federico Nardari, Review of Financial Studies, 2007, 20(3), 905-951.

"Why Do Firms Become Widely Held? An Analysis of the Dynamics of Corporate Ownership," with Jean Helwege and Christo Pirinsky, Journal of Finance, 2007, 62 (3), 995-1028.

"Hedge Funds: Past, Present, and Future," Journal of Economic Perspectives, 2007, 21(2), 175-194.

"The Economics of Conflicts of Interests in Financial Institutions," with Hamid Mehran, Journal of Financial Economics, 2007, 85(2), 267-296.

"Why Do Countries Matter so much for Corporate Governance?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2007, 86, 1-39.

"How do Diversity of Opinion and Information Asymmetry Affect Acquirer Returns?" with Sara B. Moeller and Frederik P. Schlingemann, Review of Financial Studies, 2007, 20(6), 2047-2078.

"Do Local Analysts know more? A Cross-Country Study of Performance of Local Analysts and Foreign Analysts," with Kee-Hong Bae and Hongping Tan, Journal of Financial Economics, 2008, 88(3), 581-606.

"Why Do Private Acquirer Pay so Little Compared to Public Acquirers?" with Leonce L. Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, Journal of Financial Economics, 2008, 89(3), 375-390

"Risk Management Failures: What Are They and When Do They Happen?" Journal of Applied Corporate Finance, 2008, 20(4), 39-48.

"Private Benefits of Control, Ownership, and the Cross-Listing Decision," with Craig Doidge, G. Andrew Karolyi, Karl V. Lins, and Darius P. Miller, Journal of Finance, 2009, 64(1), 425-466.

"Has New York Become Less Competitive than London in Global Markets? Evaluating Foreign Listing Choices Over Time," with Craig Doidge, and G. Andrew Karolyi, Journal of Financial Economics, 2009, 91(3), 253-277.

"Differences in Governance Practices between U.S. and Foreign Firms: Measurement, Causes, and Consequences," with Reena Aggarwal, Isil Erel, and Rohan Williamson, Review of Financial Studies, 2009, 22(8), 3171-3209.

“Managerial Ownership Dynamics and Firm Value," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2009, 92(3), 342-361.

“How Much Do Banks Use Credit Derivatives to Hedge Loans?" with Bernadette Minton and Rohan Williamson, Journal of Financial Services Research, 2009, 35(1), 1-31.

"Securities Laws, Disclosure, and National Capital Markets in the Age of Financial Globalization," Journal of Accounting Research, 2009, 47(2), 349-390.

"Why Do U.S. Firms Hold so Much More Cash than they Used to?" with Thomas W. Bates, and Kathleen M. Kahle, Journal of Finance, 2009, 64(5), 1985-2021.

"Financial Globalization, Governance, and the Evolution of the Home Bias," with Bong-Chan Kho and Francis E. Warnock, Journal of Accounting Research, 2009, 47(2), 597-635.

"Seasoned Equity Offerings, Market Timing and the Corporate Lifecycle," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2010, 95(3), 275-295.

"Why do Firms Appoint CEOs as Outside Directors?" with Rüdiger Fahlenbrach and Angie Low, Journal of Financial Economics, 2010, 97(1), 12-32.

"Credit Default Swaps and the Credit Crisis," Journal of Economic Perspectives, 2010, 24(1), 73-92.

"Why Do Foreign Firms Leave U.S. Equity Markets?" with Craig Doidge and G. Andrew Karolyi, Journal of Finance, 2010, 65(4), 1507-1553.

"Hedge Fund Contagion and Liquidity Shocks," with Nicole M. Boyson and Christof W. Stahel, Journal of Finance, 2010, 65(5), 1789-1816.

"Bank CEO Incentives and the Credit Crisis," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2011, 99, 11-26 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"When Are Analyst Recommendation Changes Influential?" with Roger K. Loh, Review of Financial Studies, 2011, 24(2), 593-627.

"The Credit Crisis Around the Globe: Why Did Some Banks Perform Better?" with Andrea Beltratti, Journal of Financial Economics, 2012, 105(1), 1-17 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Why Are U.S. Stocks More Volatile?" with Söhnke M. Bartram and Gregory Brown, Journal of Finance, 2012, 67(4), 1329-1370.

"Market Institutions, Financial Market Risks, and The Financial Crisis," with Mark Carey, Anil K. Kashyap, and Raghuram Rajan, Journal of Financial Economics, 2012, 104(3),421-424.

"This Time Is the Same: Using Bank Performance in 1998 to Explain Bank Performance during the Recent Financial Crisis," with Rüdiger Fahlenbrach and Robert Prilmeier, Journal of Finance, 2012, 67(6), 2139-2185 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Access to Capital, Investment, and the Financial Crisis," with Kathleen Kahle, Journal of Financial Economics, 2013, 110(2), 280-299.

"The U.S. Left Behind? Financial Globalization and the Rise of IPOs Outside the U.S.," with Craig Doidge and G. Andrew Karolyi, Journal of Financial Economics, 2013, 110(3), 546-573.

"Why Did Holdings of Highly-Rated Securitization Tranches Differ So Much Across Banks?" with Isil Erel and Taylor Nadauld, The Review of Financial Studies, 2014, 27(2), 404-453.

"Liquid-Claim Production, Risk Management, and Bank Capital Structure: Why High Leverage is Optimal for Banks," with Harry DeAngelo, Journal of Financial Economics, 2015, 116, 219-236.

"Corporate Acquisitions, Diversification, and the Firm's Lifecycle" with Asli M. Arikan, Journal of Finance, 2016, 71(1), 139-194.

"Do U.S. Firms Hold More Cash than Foreign Firms?" with Lee Pinkowitz and Rohan Williamson, The Review of Financial Studies, 2016, 29(2), 309-348.

"Why Don't All Banks Practice Regulatory Arbitrage? Evidence from the Usage of Trust Preferred Securities," with Nicole Boyson and Rüdiger Fahlenbrach, The Review of Financial Studies, 2016, 29(7), 1821-1859.

"Risk Management, Governance, Culture and Risk-Taking in Banks," Economic Policy Review, Federal Reserve Bank of New York, 2016, 22(1), 43-59 (A shorter version was published as "Risk-Taking and Risk Management by Banks," Journal of Applied Corporate Finance, 2015, 27(1), 8-18).

"Firm Rigidities and the Decline of Growth Opportunities," with Claudio Loderer and Urs Wälchli, Management Science, 2016, 63(9), 3000-3020.

"Portable Country Governance and Cross-Border Acquisitions," with Jesse A. Ellis, Sara B. Moeller, and Frederik P. Schlingemann, Journal of International Business Studies, 2017, 48(2), 148-173.

"The U.S. Listing Gap," with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2017, 123, 464-487.

"Is the US Public Corporation in Trouble?" with Kathleen Kahle, Journal of Economic Perspectives, 2017, 31(3), 67-88.

"Do Independent Director Departures Predict Future Bad Events?" with Rüdiger Fahlenbrach and Angie Low, 2017, The Review of Financial Studies, 30(7), 2131-2358.

"What Is the Shareholder Wealth Impact of Target CEO Retention in Private Equity Deals?" with Leonce Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, 2017, Journal of Corporate Finance, 46, 186-206.

"Why Does Fast Loan Growth Predict Poor Performance for Banks?" with Rüdiger Fahlenbrach and Robert Prilmeier, The Review of Financial Studies, 2017, 31(3), 1014-1063.

"Corporate Deleveraging and Financial Flexibility," with Harry DeAngelo and Andrei S. Gonçalves, The Review of Financial Studies, 2018, 31(8), 3122-3174.

"Eclipse of the Public Corporation or Eclipse of the Public Markets?" with Craig Doidge, Kathleen Kahle, and Andrew Karolyi, Journal of Applied Corporate Finance, 2018, 30(1), 8-16.

"Is Sell-Side Research More Valuable in Bad Times?" with Roger K. Loh, Journal of Finance, 2018, 73(3), 959-1013.

"Do Firms Issue More Liquidity When Markets Become More Liquid?" with Rogier M. Hanselaar and Mathijs A. van Dijk, Journal of Financial Economics, 2019,133(1), 64-82.

"Are the Largest Banks Valued More Highly?" with Bernadette Minton and Alvaro Taboada, Review of Financial Studies, 2019, 32(12), 4604-4652.

"FinTech, BigTech, and the Future of Banks," Journal of Applied Corporate Finance, 2019, 31(4), 86-97.

"Why Is Contagion Asymmetric During the European Sovereign Crisis?" with Andrea Beltratti, Journal of International Money and Finance, 2019, 99.

"Does the Stock Market Make Firms More Productive?" with Ben Bennett and Zexi Wang, Journal of Financial Economics, 2020, 136(2), 281-306.

"Public Versus Private Equity," Oxford Economic Policy Review, 2020, 36(2), 275-290.

"Risk Management, Firm Reputation, and the Impact of Successful Cyberattacks on Target Firms," with Shinichi Kamiya, Jun-Koo Kang, Jungmin Kim, and Andreas Milidonis, Journal of Financial Economics, 2021, 139(3), 719-749.

"Why Does Equity Capital Flow Out of High Tobin's q Industries," with Dong Wook Lee and Hyun-Han Shin, Review of Financial Studies, 2021, 24(4), 1867-1906.

"Why Are Firms with More Managerial Ownership Worth Less?" with Kornelia Fabisik, Rüdiger Fahlenbrach, and Jérôme Taillard, Journal of Financial Economics, 2021, 140(3), 699-725.

"How Valuable is Financial Flexibility when Revenue Stops? Evidence from the COVID-19 Crisis" with Rüdiger Fahlenbrach and Kevin Rageth, Review of Financial Studies, 2021, 34(11), 5474-5521.

"Where there Fire Sales in the RMBS Market?" with Craig B. Merrill, Taylor D. Nadauld, and Shane M. Sherlund, Journal of Monetary Economics, 2021, 122, 12-37.

"Why Are Corporate Payouts So High in the 2000s?" with Kathleen Kahle, Journal of Financial Economics, 2021, 142 (3), 1359-1380.

"Have Exchange-Listed Firms Become Less Important for the Economy?" with Frederik P. Schlingemann, Journal of Financial Economics, 2022, 143(2)927-958.

"Are Analyst Short-Term Trade Ideas Valuable?" with Justin Birru, Sinan Gokkaya, and Xi Liu, Journal of Finance, forthcoming.

"Leverage and Cash Dynamics," with Harry DeAngelo and Andrei Gonçalves, Review of Finance, forthcoming.

"Do Firms with Specialized M&A Staff Make Better Acquisitions?" with Sinan Gokkaya and Xi Liu, Journal of Financial Economics, forthcoming.

**PROFESSIONAL JOURNAL ARTICLES, BOOK REVIEWS, NOTES AND COMMENTS**

Review of "Managing Foreign Exchange Risk," Richard J. Herring, ed., Journal of Money, Credit and Banking (February 1985), 124-125.

"On Capital Mobility in the World Economy," Carnegie-Rochester Conference Series on Public Policy (Spring, 1986), 105-114.

"Portfolio Management in International Capital Markets," Financial Markets and Portfolio Management (1, 1986), 18-23.

"Portfolio Insurance, Program Trading and the Crash of 1987," Financial Markets and Portfolio Management (1, 1988), 11-22.

"SMI Futures," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (4, 1989), 288-300.

"Benefits of International Diversification with Daily Data: The Case of Pacific-Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management (4, 1990), 57-61.

"Portfolio Insurance with Options and Futures on the SMI," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (2, 1990), 99-115.

"Securities Transaction Taxes: Lessons from the International Experience," in The Globalization of Equity Markets, Jeffrey Frankel, ed., University of Chicago Press, 1994.

"Identifying and Quantifying Exposures," with Rohan Williamson, in Financial Risk and the Corporate Treasury: New Developments in Strategy and Control, Robert Jameson, ed., Risk Publications, London, 1997, 33-51 (Reprinted in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999). Pre-publication Working Paper

"What's Wrong with Modern Capital Budgeting?" Financial Practice and Education, Fall/Winter 1999, p.5-9.

"Diminishing the Threats to Shareholder Wealth," Financial Times, Mastering Risk Series, April 25, 2000.

"Why Risk Management is not Rocket Science," Financial Times, Mastering Risk Series, June 27, 2000.

"An Emotional High for Stocks?" a review of "Irrational Exuberance" by Robert J. Shiller, Science (June 30, 2000), 2323.

"Demystifying Financial Derivatives," The Milken Institute Review, Third Quarter 2005, 20-31.

"Merton Miller," New Palgrave Dictionary, 2006.

"Financial Derivatives: Lessons from the Subprime Crisis," The Milken Institute Review, First Quarter 2009, 59-70.

"Six Ways Companies Mismanage Risk," Harvard Business Review, February 2009, 87(3), 86-94.

"In Defense of Derivatives and How to Regulate Them," Wall Street Journal, April 7, 2009.


**SELECTED RESEARCH IN PROGRESS AND WORKING PAPERS**

"Has the Bond Market Really Become Less Liquid?" with Mike Anderson.

"Why has there Been a Secular Decline in Idiosyncratic Risk since 2000?" with Söhnke Bartram and Gregory Brown.

"Who Benefits from Analyst 'Top Picks?" with Justin Birru, Sinan Gokkaya, and Xi Liu.

"Is Financial Globalization in Reverse After the 2008 Global Financial Crisis? Evidence from Corporate Valuations," with Craig Doidge and Andrew Karolyi.

"Does Joining the S&P 500 Index Hurt Firms?" with Benjamin Bennett and Zexi Wang.

"Why Do Bank Boards Have Risk Committees?" with James Tompkins, Rohan Williamson, and Zhongxia Ye.

"How Important is Moral Hazard for Distressed Banks?" with Itzhak Ben-David and Ajay A. Palvia.

"Why Did Small Business FinTech Lending Dry Up During the COVID-19 Crisis?" with Itzhak Ben-David and Mark Johnson.

**EDITORIAL AND REFEREEING ACTIVITIES**

Advisory Board, ECGI Corporate Governance blog, 2021 to present.

Advisory Board, Journal of Risk and Financial Management, 2018 to present.

Editorial Board, Journal of Financial Intermediation, 2013 to present.

Advisory Editor, Journal of Investment Management, 2003 to present.

Advisory Editor, Journal of Financial Economics, 2000 to 2021.

Advisory Editor, Journal of Financial Services, 1999 to present.

Editor, Journal of Finance, 1988 to 2000.

Editor, Corporate Finance Abstracts, Social Science Research Network, 1998 to present.

Editor, Journal of Financial Economics, 1982 to 1987.

Board of Editors, Journal of Banking and Finance, 2008.

Co-Editor, Banking and Financial Institutions Abstracts, Social Science Research Network, 1998 to present.

Co-Editor, Financial Markets and Portfolio Management, 1999 to present.

Associate Editor, Journal of Risk, 2006 to present.

Board of Editors, Japan and the World Economy, 2006 to present.

Advisory Editor, The Review of Finance, 2003 to 2009.

Advisory Editor, Journal of Economic Perspectives, 2006 to 2008.

Associate Editor, Journal of Economic Perspectives, 2003 to 2005.

Associate Editor, Journal of Financial Abstracts, 1994 to 1998.

Associate Editor, Journal of Financial Economics, 1988 to 1999.

Associate Editor, Journal of International Finance and Accounting, 1988 to present.

Associate Editor, Global Finance Journal, 1988 to 2015.

Associate Editor, Journal of International Financial Markets, Institutions and Money, 1989 to present.

Associate Editor, Journal of Fixed Income, 1991 to present.

Associate Editor, Journal of International Trade and Finance, 1992 to present.

Associate Editor, Journal of Financial and Quantitative Analysis, 1983-1985.

Acted as an ad hoc referee for AER, JIE, JAE, JFE, JME, JMCB, JFQA, QJE, JF, JB, JPE, Canadian Journal of Economics, Management Science, Marketing Science, Journal of International Money and Finance, Journal of International Business Studies, the Canadian NSF and the NSF.

**APPENDIX B**

# Deposition and Trial Testimony of René M. Stulz During the Past Four Years

**Case Name:** SSA Bonds
**Case No.:** A.T.40346, European Commission
**Date of Testimony:** July 2019 (Oral Hearing)

**Case Name:** In Re Equifax, Inc. Securities Litigation
**Case No.:** No. 17-CV-3463-TWT, United States District Court, Northern District of Georgia
**Date of Testimony:** September 2019 (Deposition)

**Case Name:** Lord Abbett Affiliated Fund, Inc. et al. v. Navient Corporation et al.
**Case No.:** No. 16-112-MN, United States District Court, District of Delaware
**Date of Testimony:** December 2019 (Deposition), June 2021 (Deposition)

**Case Name:** Joseph Prause v. TechnipFMC PLC et al.
**Case No.:** No. 4:17-cv-02368, United States District Court, Southern District of Texas
**Date of Testimony:** February 2020 (Depositions)

**Case Name:** In Re Volkswagen "Clean Diesel" Marketing Sales Practices, and Products Liability Litigation; BRS v. Volkswagen AG, et al., Case No. 16-cv-3435 ("Bondholders Securities Action")
**Case No.:** MDL No. 2672-CRB (JSC), United States District Court, Northern District of California
**Date of Testimony:** February 2020 (Deposition)

**Case Name:** Mayagüez S.A. v. Citigroup, Inc., Citibank, N.A.
**Case No.:** No. 1:16-cv-06788-PGG-JLC, United States District Court, Southern District of New York
**Date of Testimony:** May 2020 (Deposition)

**Case Name:** In re WeWork Litigation
**Case No.:** No. 2020-0258-AGB, Court of Chancery, Delaware
**Date of Testimony:** February 2021 (Deposition)

**Case Name:** In re Envision Healthcare Corporation Securities Litigation
**Case No.:** No. 3:17-cv-01112, United States District Court, Middle District of Tennessee, Nashville Division
**Date of Testimony:** May 2021 (Deposition)

**Case Name:** In Re Navient Corporation Securities Litigation
**Case No.:** No. 17-cv-08373-RBK-AMD, United States District Court, District of New Jersey
**Date of Testimony:** June 2021 (Deposition)

**Case Name:** Evanston Police Pension Fund v. McKesson Corporation et al.
**Case No.:** No. 3:18-cv-06525-CRB, United States District Court, Northern District of California
**Date of Testimony:** July 2021 (Deposition)

**Case Name:** In re Allergan PLC Securities Litigation
**Case No.:** No. 18-cv-12089, United States District Court, Southern District of New York
**Date of Testimony:** September 2021 (Deposition)

**Case Name:** Gordon v. Vanda Pharmaceuticals Inc. et al.
**Case No.:** No. 1:19-cv-01108-FB-LB, United States District Court, Eastern District of New York
**Date of Testimony:** October 2021 (Deposition)

**Case Name:** Tollen v. Geron Corporation et al
**Case No.:** No. 3:20-cv-00547-WHA, United States District Court, Northern District of California
**Date of Testimony:** October 2021 (Deposition)

**Case Name:** Patrick McDermid v. Inovio Pharmaceuticals, Inc. et al.
**Case No.:** No. 2:20-cv-01402-GJP, United States District Court, Eastern District of Pennsylvania
**Date of Testimony:** November 2021 (Deposition)

**Case Name:** Strathclyde Pension Fund v. Bank OZK et al.
**Case No.:** No. 4:18-cv-00793-DPM, United States District Court, Eastern District of Arkansas
**Date of Testimony:** December 2021 (Deposition)

**APPENDIX B**

**Case Name:** Boston Retirement System v. Uber Technologies, Inc. et al.
**Case No.:** No. 3:19-cv-06361-RS, United State District Court, Northern District of California
**Date of Testimony:** February 2022 (Deposition)

**Case Name:** Ahmad Odeh v. Immunomedics, Inc. et al.
**Case No.:** No. 2:18-17645-MCA-ESK, United States District Court, District of New Jersey
**Date of Testimony:** May 2022 (Deposition)

**Case Name:** In re Qualcomm Incorporated Securities Litigation
**Case No.:** No. 3:17-cv-00121-JAH-WVG, United States District Court, Southern District of California
**Date of Testimony:** November 2022 (Deposition)

# Documents Considered List

**Academic Articles**

- Alessandro Beber and Marco Pagano, "Short-Selling Bans around the World: Evidence from the 2007–09 Crisis," *The Journal of Finance* 68, no. 1, 2013, pp. 343–381.
- Andrei Shleifer and Robert W. Vishny, "The Limits of Arbitrage," *The Journal of Finance* 52, no. 1, 1997, pp. 35–55.
- Andrew Ang and Joseph Chen, "Asymmetric Correlations of Equity Portfolios," *Journal of Financial Economics* 63, no. 3, 2002, pp. 443–494.
- Aris Protopapadakis and Hans R. Stoll, "Spot and Futures Prices and the Law of One Price," *The Journal of Finance* 38, no. 5, 1983, pp. 1431–1455.
- Arturo Bris et al., "Efficiency and the Bear: Short Sales and Markets around the World," *The Journal of Finance* 62, no. 3, 2007, pp. 1029–1079.
- Brian W. Nocco and René M. Stulz, "Enterprise Risk Management: Theory and Practice," *Journal of Applied Corporate Finance* 18, no. 4, 2006, pp. 8–20.
- Carlos Carvalho et al., "The Persistent Effects of a False News Shock," *Journal of Empirical Finance* 18, no. 4, 2011, pp. 597–615.
- Charles M. Jones and Owen A. Lamont, "Short-Sale Constraints and Stock Returns," *Journal of Financial Economics* 66, nos. 2–3, 2002, pp. 207–239.
- David Hirshleifer et al., "Driven to Distraction: Extraneous Events and Underreaction to Earnings News," *The Journal of Finance* 64, no. 5, 2009, pp. 2289–2325.
- Douglas W. Diamond and Robert E. Verrecchia, "Constraints on Short-Selling and Asset Price Adjustment to Private Information," *Journal of Financial Economics* 18, no. 2, 1987, pp. 277–311.
- Ekkehart Boehmer and Juan (Julie) Wu, "Short Selling and the Price Discovery Process," *The Review of Financial Studies* 26, no. 2, 2013, pp. 287–322.
- Ethan Rouen et al., "Core Earnings: New Data and Evidence," *Journal of Financial Economics* 142, no. 3, 2021, pp. 1068–1091.
- Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, 1991, pp. 1575–1617.
- Ferhat Akbas et al., "Initial Margin Requirements and Market Efficiency," Working Paper, 2022, pp. 1–50, Appendix pp. 1–34, https://ssrn.com/abstract=3792433.
- Francis A. Longstaff, "The Subprime Credit Crisis and Contagion in Financial Markets," *Journal of Financial Economics* 97, no. 3, 2010, pp. 436–450.
- Gene D'Avolio, "The Market for Borrowing Stock," *Journal of Financial Economics* 66, nos. 2–3, 2002, pp. 271–306.

- Glenn V. Henderson, Jr., "Problems and Solutions in Conducting Event Studies," *The Journal of Risk and Insurance* 57, no. 2, 1990, pp. 282–306.
- Gregory C. Chow, "Tests of Equality between Sets of Coefficients in Two Linear Regressions," *Econometrica* 28, no. 3, 1960, pp. 591–605.
- Gur Huberman and Tomer Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance* 56, no. 1, 2001, pp. 387–396.
- James D. Hamilton and Raul Susmel, "Autoregressive Conditional Heteroskedasticity and Changes in Regime," *Journal of Econometrics* 64, nos. 1–2, 1994, pp. 307–333.
- Jason T. Greene and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management* 25, no. 1, 1996, pp. 19–42.
- Jeffrey A. Busse and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65, no. 3, 2002, pp. 415–437.
- Jens Dick-Nielsen et al., "Corporate Bond Liquidity before and after the Onset of the Subprime Crisis," *Journal of Financial Economics* 103, no. 3, 2012, pp. 471–492.
- Joost Driessen et al., "The Price of Correlation Risk: Evidence from Equity Options," *The Journal of Finance* 64, no. 3, 2009, pp. 1377–1406.
- Joshua V. Rosenberg and Til Schuermann, "A General Approach to Integrated Risk Management with Skewed, Fat-Tailed Risks," *Journal of Financial Economics* 79, no. 3, 2006, pp. 569–614.
- Josue Cox et al., "What Explains the COVID-19 Stock Market?" NBER Working Paper No. 27784, 2020, pp. 1–35, https://www.nber.org/papers/w27784.
- Kent Daniel et al., "Investor Psychology in Capital Markets: Evidence and Policy Implications," *Journal of Monetary Economics* 49, no. 1, 2002, pp. 139–209.
- Lauren Cohen and Dong Lou, "Complicated Firms," *Journal of Financial Economics* 104, no. 2, 2012, pp. 383–400.
- Mahyar Kargar et al., "Corporate Bond Liquidity during the COVID-19 Crisis," *The Review of Financial Studies* 34, no. 11, 2021, pp. 5352–5401.
- Mark Mitchell and Todd Pulvino, "Arbitrage Crashes and the Speed of Capital," *Journal of Financial Economics* 104, no. 3, 2012, pp. 469–490.
- Markus K. Brunnermeier, "Deciphering the Liquidity and Credit Crunch 2007–2008," *Journal of Economic Perspectives* 23, no. 1, 2009, pp. 77–100.
- Markus K. Brunnermeier and Lasse Heje Pedersen, "Market Liquidity and Funding Liquidity," *The Review of Financial Studies* 22, no. 6, 2009, pp. 2201–2238.
- Maureen O'Hara and Xing (Alex) Zhou, "Anatomy of a Liquidity Crisis: Corporate Bonds in the COVID-19 Crisis," *Journal of Financial Economics* 142, no. 1, 2021, pp. 46–68.

- Michael L. Hartzmark and H. Nejat Seyhun, "The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation," *Virginia Law & Business Review* 6, no. 3, 2012, pp. 415–466.
- Michael L. Hartzmark and H. Nejat Seyhun, "Understanding the Efficiency of the Market for Preferred Stock," *Virginia Law & Business Review* 8, no. 2, 2014, pp. 149–230.
- Niels J. Gormsen and Ralph S.J. Koijen, "Financial Markets and the COVID-19 Pandemic," University of Chicago Booth School of Business Working Paper, 2022, pp. 1–34, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248500.
- Owen A. Lamont and Richard H. Thaler, "Anomalies: The Law of One Price in Financial Markets," *Journal of Economic Perspectives* 17, no. 4, 2003, pp. 191–202.
- Paolo Pasquariello, "Financial Market Dislocations," *The Review of Financial Studies* 27, no. 6, 2014, pp. 1868–1914.
- Paul C. Tetlock, "All the News That's Fit to Reprint: Do Investors React to Stale Information?" *The Review of Financial Studies* 24, no. 5, 2011, pp. 1481–1512.
- Pedro A. C. Saffi and Kari Sigurdsson, "Price Efficiency and Short Selling," *The Review of Financial Studies* 24, no. 3, 2011, pp. 821–852.
- Peter Sands et al., "Rethinking Operational Risk Capital Requirements," *Journal of Financial Regulation* 4, no. 1, 2018, pp. 1–34.
- René M. Stulz, "Risk Management Failures: What Are They and When Do They Happen?" *Journal of Applied Corporate Finance* 20, no. 4, 2008, pp. 39–48.
- Richard Roll et al., "Liquidity and the Law of One Price: The Case of the Futures-Cash Basis," *The Journal of Finance* 62, no. 5, 2007, pp. 2201–2234.
- Robert F. Engle and Chowdhury Mustafa, "Implied ARCH Models from Options Prices," *Journal of Econometrics* 52, nos. 1–2, 1992, pp. 289–311.
- Sergei Glebkin et al., "Funding Constraints and Informational Efficiency," *The Review of Financial Studies* 34, no. 9, 2021, pp. 4269–4322.
- Tarun Chordia et al., "An Empirical Analysis of Stock and Bond Market Liquidity," *The Review of Financial Studies* 18, no. 1, 2005, pp. 85–129.
- Tarun Chordia et al., "Evidence on the Speed of Convergence to Market Efficiency," *Journal of Financial Economics* 76, no. 2, 2005, pp. 271–292.
- Tarun Chordia et al., "Liquidity and Market Efficiency," *Journal of Financial Economics* 87, no. 2, 2008, pp. 249–268.
- Viral V. Acharya et al., "Why Did Bank Stocks Crash during COVID-19?" NBER Working Paper No. 28559, 2021, pp. 1–82, https://www.nber.org/papers/w28559.

**Annual Reports**

- Wells Fargo & Company, "2016 Annual Report," February 1, 2017.
- Wells Fargo & Company, "2017 Annual Report," February 15, 2018.
- Wells Fargo & Company, "2018 Annual Report," February 15, 2019.

**Bates Stamped Documents**

- PZENA Memo on Wells Fargo 2019 Q1 Earnings Report, PZN000103.
- PZENA Memo on Wells Fargo 2019 Q3 Earnings Report, PZN000104.
- PZENA Memo on Wells Fargo 2019 Q4 Earnings Report, PZN000105.

**Books**

- David C. LeBlanc, *Statistics: Concepts and Applications for Science* (Sudbury, MA: Jones and Bartlett, 2004).
- Robert H. Frank and Ben S. Bernanke, *Principles of Economics* (New York, NY: McGraw-Hill, 2001).
- Stephen A. Ross et al., *Corporate Finance*, Sixth Edition (New York, NY: McGraw-Hill, 2002).

**Congressional Hearings**

- Hearing on "Examining Wells Fargo's Unauthorized Accounts and the Regulatory Response" before the Committee on Banking, Housing, and Urban Affairs of the United States Senate, September 20, 2016.
- Hearing on "Holding Wall Street Accountable: Investigating Wells Fargo's Opening of Unauthorized Customer Accounts" before the Committee on Financial Services of the United States House of Representatives, September 29, 2016.
- Hearing on "Implementation of The Economic Growth, Regulatory Relief, and Consumer Protection Act" before the Committee of Financial Services of the United States House of Representatives, October 2, 2018.
- Hearing on "Holding Megabanks Accountable: An Examination of Wells Fargo's Pattern of Consumer Abuses" before the Committee on Financial Services of the United States House of Representatives, March 12, 2019.
- Hearing on "Examining the Efforts, Activities, Objectives, and Plans of Federal Regulatory Agencies with Respect to Prudential Regulations for U.S. Financial Institutions and Credit Unions" before the Committee on Banking, Housing, and Urban Affairs of the United States Senate, May 15, 2019.

- Hearing on "Holding Wells Fargo Accountable: CEO Perspectives on Next Steps for the Bank That Broke America's Trust" before the Committee on Financial Services of the United States House of Representatives, March 10, 2020.
- Hearing on "Holding Wells Fargo Accountable: Examining the Role of the Board of Directors in the Bank's Egregious Pattern of Consumer Abuses" before the Committee of Financial Services of the United States House of Representatives, March 11, 2020.

**Congressional Reports**

- "The Real Wells Fargo: Board & Management Failures, Consumer Abuses, and Ineffective Regulatory Oversight," *United States House of Representatives Committee on Financial Services, Majority Staff*, March 4, 2020.
- "Interim Report III – Uniquely Flawed: An Overview of Failures and Structural Deficiencies at Wells Fargo," *United States House of Representatives Committee on Financial Services, Minority Staff*, March 5, 2020.

**Data Sources**

- Bloomberg: Closing price data for Wells Fargo stock and Dr. Hartzmark's indices from July 1, 2020 to September 1, 2020.
- CRSP: Closing price data and dividend adjusted returns series for Wells Fargo from January 2, 2018 to December 31, 2020 and its peers from March 5, 2020 to March 12, 2020.
- Factiva: Headlines for Wells Fargo from March 13, 2020 to March 23, 2020.
- Refinitiv Eikon: S&P 500 Total Return Index closing price data from January 2, 2018 to December 31, 2020, VIX closing levels from January 2, 2018 to December 31, 2020, Wells Fargo equity options implied volatilities from April 2, 2009 to December 31, 2020, Wells Fargo's peers' reported total assets data for March 31, 2018 to March 31, 2020, and Wells Fargo's net income consensus estimates as of February 1, 2018.
- S&P Global: Index weightings data on March 12, 2020 and from July 1, 2020 to September 1, 2020.
- SEC Edgar: Wells Fargo SEC filings from March 13, 2020 to March 23, 2020.
- Tick Data: Intraday trades data for Wells Fargo and market and industry exchange traded funds on January 14, 2019, January 15, 2019, April 11, 2019, April 12, 2019, January 13, 2020, January 14, 2020, March 11, 2020, and March 12, 2020; and Wells Fargo's peers on March 11, 2020 and March 12, 2020.

**Depositions**

- Deposition of Charles Nielsen, and Exhibits, November 2, 2022.
- Deposition of Justin Maistrow, and Exhibits, November 4, 2022.

- Deposition of Eric Hagemann, and Exhibits, November 8, 2022.
- Deposition of Mills Riddick, and Exhibits, November 29, 2022.
- Deposition of Michael L. Hartzmark, and Exhibits, December 8, 2022.

**Expert Reports**

- Expert Report of Michael L. Hartzmark, Ph.D., *In re Finisar Corporation Securities Litigation*, August 14, 2017.
- Expert Report of Michael L. Hartzmark, Ph.D., *In re Illumina, Inc. Securities Litigation*, September 14, 2018.
- Expert Report of Michael L. Hartzmark, Ph.D., *In re HD Supply Holdings, Inc. Securities Litigation*, March 1, 2019.
- Expert Report of Michael L. Hartzmark, Ph.D., *In re Signet Jewelers Limited Securities Litigation*, March 15, 2019.
- Expert Report of Michael L. Hartzmark, Ph.D., *Christakis Vrakas, et al. v. United States Steel Corporation, et al.*, April 19, 2019.
- Expert Report of Michael L. Hartzmark, Ph.D., *Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al.*, May 28, 2019.
- Expert Report of Michael L. Hartzmark, Ph.D., *Lord Abbett Affiliated Fund, Inc., et al. v. Navient Corporation, et al.*, September 13, 2019.
- Expert Report of Michael L. Hartzmark, Ph.D., *SEB Investment Management AB, et al. v. Symantec Corporation*, *et al.*, January 17, 2020.
- Expert Report of Michael L. Hartzmark, Ph.D., *In re: CenturyLink Sales Practices and Securities Litigation*, January 22, 2020.
- Expert Report of Michael L. Hartzmark, Ph.D., *Patricia A. Shenk, et al. v. Mallinckrodt PLC, et al.*, July 29, 2020.
- Expert Report of Michael L. Hartzmark, Ph.D., *In re Tesla, Inc. Securities Litigation*, September 22, 2020.
- Expert Report of Michael L. Hartzmark, Ph.D., *In re Venator Materials PLC Securities Litigation*, November 19, 2021.
- Expert Report of Michael L. Hartzmark, Ph.D., *Public Employees' Retirement System of Mississippi, et al. v. Mohawk Industries, Inc., et al.*, January 25, 2022.
- Expert Report of Michael L. Hartzmark, Ph.D., *State of Alaska, et al. v. Ryder System, Inc., et al.*, September 23, 2022.
- Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, *In re Wells Fargo & Company Securities Litigation*, October 3, 2022.

**Legal Documents**

- Consent Order, *In the Matter of: Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, United States of America Consumer Financial Protection Bureau, Administrative Proceeding 2016-CFPB-0015, September 4, 2016.
- Consent Order, *In the Matter of: Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, United States of America Department of the Treasury Comptroller of the Currency, AA-EC-2016-66, September 6, 2016.
- Consent Order for a Civil Money Penalty, *In the Matter of: Wells Fargo Bank, N.A., Sioux Falls, South Dakota*, United States of America Department of the Treasury Comptroller of the Currency, AA-EC-2016-66, September 6, 2016.
- Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, *In the Matter of Wells Fargo & Company, San Francisco, California*, United States of America before the Board of Governors of the Federal Reserve System, Docket No. 18-007-B-HC, February 2, 2018.
- Consent Order, *In the Matter of: Wells Fargo Bank, N.A. Sioux Falls, South Dakota*, United States of America Consumer Financial Protection Bureau, Administrative Proceeding 2018-BCFP-0001, April 20, 2018.
- Consent Order, *In the Matter of: Wells Fargo Bank, N.A.*, *Sioux Falls, South Dakota*, United States of America Department of the Treasury Comptroller of the Currency, AA-EC-2018-15, April 20, 2018.
- Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, *In re Wells Fargo & Company Securities Litigation*, November 9, 2020.
- Memorandum Opinion and Order, *In re Wells Fargo & Company Securities Litigation*, September 30, 2021.
- Responses and Objections to Defendants' Wells Fargo & Company, Timothy J. Sloan, and John R. Shrewsberry's First Set of Interrogatories, *In re Wells Fargo & Company Securities Litigation*, March 16, 2022.
- Lead Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification, *In re Wells Fargo & Company Securities Litigation*, October 3, 2022.

**Other Public Sources**

- "DIS Disclosure Requirements, DIS85, Liquidity," *Basel Committee on Banking Supervision*, December 15, 2019.
- "Global Financial Stability Overview: Markets in the Time of COVID-19," *International Monetary Fund*, April 2020.
- "Independent Directors of the Board of Wells Fargo & Company: Sales Practices Investigation Report," *Wells Fargo & Company*, April 10, 2017.
- "International Convergence of Capital Measurement and Capital Standards," *Basel Committee on Banking Supervision*, June 2004.

- "Interest Rate Lock," *Wells Fargo*.
- "Recent Disruptions and Potential Reforms in the U.S. Treasury Market: A Staff Progress Report," *U.S. Department of the Treasury, Board of Governors of the Federal Reserve System, Federal Reserve Bank of New York, U.S. Securities and Exchange Commission, and U.S. Commodity Futures Trading Commission*, November 8, 2021.
- "Stock Market Circuit Breakers," *Investor.gov*.
- "The Role of Financial Markets and Institutions in Supporting the Global Economy during the COVID-19 Pandemic," *Financial Services Forum, Institute of International Finance, and ISDA*, May 2021.
- "The World's Most Influential Scientific Minds," *Thomson Reuters*, December 2015.
- "Trade VIX Options Nearly 24 Hours a Day," *Cboe*.
- Joseba Eceiza et al., "The Future of Operational-Risk Management in Financial Services," *McKinsey & Company*, April 2020.
- Phil Davis, "After the Storm: A New Era for Risk Management in Financial Services," *The Economist Intelligence Unit*, June 2009.
- S.P. Kothari et al., "U.S. Credit Markets: Interconnectedness and the Effects of the COVID-19 Economic Shock," *U.S. Securities and Exchange Commission*, October 2020.

**Presentations**

- Wells Fargo & Company Presentation, "1Q18 Quarterly Supplement," April 13, 2018.
- Wells Fargo & Company Presentation, "2Q18 Quarterly Supplement," July 13, 2018.
- Wells Fargo & Company Presentation, "3Q18 Quarterly Supplement," October 12, 2018.
- Wells Fargo & Company Presentation, "4Q18 Quarterly Supplement," January 15, 2019.
- Wells Fargo & Company Presentation, "1Q19 Quarterly Supplement," April 12, 2019.
- Wells Fargo & Company Presentation, "2Q19 Quarterly Supplement," July 16, 2019.
- Wells Fargo & Company Presentation, "3Q19 Quarterly Supplement," October 15, 2019.
- Wells Fargo & Company Presentation, "4Q19 Quarterly Supplement," January 14, 2020.
- Wells Fargo & Company Presentation, "Wells Fargo Update: Federal Reserve Consent Order," February 2, 2018.
- Wells Fargo & Company Presentation, "Financial Overview," May 10, 2018.
- Wells Fargo & Company Presentation, "Fixed Income Investor Update," May 2019.

**Press Releases**

- ECB Press Release, "ECB Announces Easing of Conditions for Targeted Longer-Term Refinancing Operations (TLTRO III)," March 12, 2020.
- ECB Press Release, "ECB Announces Measures to Support Bank Liquidity Conditions and Money Market Activity," March 12, 2020.
- ECB Press Release, "ECB Banking Supervision Provides Temporary Capital and Operational Relief in Reaction to Coronavirus," March 12, 2020.
- ECB Press Release, "Monetary Policy Decisions," March 12, 2020.
- Federal Reserve Bank of New York Press Release, "Statement Regarding Repurchase Operations," March 11, 2020.
- Federal Reserve Bank of New York Press Release, "Statement Regarding Treasury Reserve Management Purchases and Repurchase Operations," March 12, 2020.
- Federal Reserve Board Press Release, "Federal Reserve Issues FOMC Statement," March 3, 2020.
- Federal Reserve Board Press Release, "Federal Reserve Issues FOMC Statement," March 15, 2020.
- Federal Reserve Board Press Release, "Federal Reserve Issues FOMC Statement," March 23, 2020.
- Senator Elizabeth Warren Press Release, "Regulators Unsatisfied with Wells Fargo, Prepared to Ensure the Bank's Compliance with Consent Orders: Fed, OCC, and CFPB Agree with Senators Warren and Brown on Wells Fargo's Inadequate Progress," April 9, 2019.
- Senator Sherrod Brown Press Release, "Brown Calls on Banks to Suspend Stock Buybacks in Light of Coronavirus Concerns," March 12, 2020.
- Wells Fargo Press Release, "Wells Fargo Issues Statement on Agreements Related to Sales Practices," September 8, 2016.
- Wells Fargo Press Release, "Independent Directors of Wells Fargo Conducting Investigation of Retail Banking Sales Practices and Related Matters," September 27, 2016.
- Wells Fargo Press Release, "Wells Fargo Announces Board Changes," August 15, 2017.
- Wells Fargo Press Release, "Wells Fargo Announces Plan to Remediate Customers for Auto Insurance Coverage," July 27, 2017.
- Wells Fargo Press Release, "Wells Fargo Announces Plan to Refund Customers for Mortgage Rate Lock Extension Fees," October 4, 2017.
- Wells Fargo Press Release, "Wells Fargo Commits to Satisfying Consent Order with Federal Reserve," February 2, 2018.

- Wells Fargo Press Release, "Wells Fargo Reports Preliminary First Quarter 2018 Net Income of $5.9 Billion; Diluted EPS of $1.12," April 13, 2018.
- Wells Fargo Press Release, "Wells Fargo Enters into Consent Orders with OCC and CFPB," April 20, 2018.
- Wells Fargo Press Release, "Wells Fargo Reports $5.2 Billion in Quarterly Net Income," July 13, 2018.
- Wells Fargo Press Release, "Wells Fargo Reports $6.0 Billion in Quarterly Net Income; Diluted EPS of $1.13," October 12, 2018.
- Wells Fargo Press Release, "Wells Fargo Reports $6.1 Billion in Quarterly Net Income; Diluted EPS of $1.21," January 15, 2019.
- Wells Fargo Press Release, "Wells Fargo Reports $5.9 Billion in Quarterly Net Income; Diluted EPS of $1.20," April 12, 2019.
- Wells Fargo Press Release, "Wells Fargo Reports $6.2 Billion in Quarterly Net Income; Diluted EPS of $1.30," July 16, 2019.
- Wells Fargo Press Release, "Wells Fargo Names Charles W. Scharf Chief Executive Officer and President," September 27, 2019.
- Wells Fargo Press Release, "Wells Fargo Reports Third Quarter 2019 Net Income of $4.6 Billion," October 15, 2019.
- Wells Fargo Press Release, "Wells Fargo Reports Fourth Quarter 2019 Net Income of $2.9 Billion," January 14, 2020.
- Wells Fargo Press Release, "Wells Fargo Reports First Quarter 2020 Net Income of $653 Million," April 14, 2020.
- Wells Fargo Press Release, "Wells Fargo Reports Second Quarter 2020 Net Loss of $2.4 Billion, which Included an $8.4 Billion Increase in the Credit Loss Reserve Driven by Current and Forecasted Economic Conditions," July 14, 2020.

**Public Press and Other Online Content**

- Adam Samson et al., "Strains in US Government Bond Market Rattle Investors," *Financial Times*, March 12, 2020.
- Adam Samson et al., "US Stocks Fall 10% in Worst Day Since 1987 Crash," *Financial Times*, March 12, 2020.
- Andrew Bary, "Why 4 of the Biggest U.S. Banks Now Trade Below Book Value," *Barron's Online*, March 12, 2020.
- Ben Walsh, "Warren Buffett Says Wells Fargo's Next CEO Shouldn't Come from Wall Street — Or Wells Fargo," *Barron's*, April 8, 2019.
- Brad Kelly, "Wells Fargo Rides through Crisis after Avoiding Subprime Slime," *Investor's Business Daily*, October 3, 2008.

- Carleton English, "Wells Fargo Looks Exposed to Coming Mortgage Crunch, Analyst Says," *Barron's*, March 30, 2020.
- Chris Matthews and Andrea Riquier, "Dow Posts Best Percent Gain Since 1933 on Hope for Plan to Rescue Economy from Coronavirus," *MarketWatch*, March 24, 2020.
- Colby Smith and Brendan Greeley, "Fed Promises to Pump Trillions of Dollars into Financial Markets," *Financial Times*, March 12, 2020.
- Emily Flitter, "Wells Fargo Suspends 2 Executives Amid Regulatory Review," *The New York Times*, October 24, 2018.
- Emily Flitter and Stacy Cowley, "Wells Fargo Says Its Culture Has Changed. Some Employees Disagree.," *The New York Times*, March 9, 2019.
- Emily Glazer, "Departure of Top Wells Fargo Executive Shows Chasm with Regulator," *The Wall Street Journal*, November 14, 2018.
- Emily Glazer, "Wells Fargo Regulators Weigh Executive Shakeup as CEO Heads to Washington," *The Wall Street Journal*, March 11, 2019.
- Eric Milstein and David Wessel, "What Did the Fed Do in Response to the COVID-19 Crisis?" *Brookings*, December 17, 2021.
- Factbase Videos, "Remarks: Donald Trump Addresses the Nation on the Coronavirus from The Oval Office - March 11, 2020," *YouTube*, March 11, 2020.
- Fred Imbert, "S&P 500 and Nasdaq Jump to Record Highs, Dow Climbs More than 100 Points," *CNBC*, February 19, 2020.
- Gillian Tett, "Coronavirus Trade Disruption Could Start a 'Dash for Cash,'" *Financial Times*, March 12, 2020.
- Hannah Levitt, "Wells Fargo Investors Stop Panicking, Learn to Live with Cap," *Bloomberg*, August 6, 2018.
- Hannah Levitt, "Wells Fargo Says It's Cleaning Up. Regulators Demand More," *Bloomberg*, December 6, 2018.
- Hugh Son, "Wells Fargo Shares Tumble 5% after Posting $2.4 Billion Loss, Dividend Slashed to 10 Cents," *CNBC*, July 14, 2020.
- Jack Ewing, "Europe's Central Bank's Steps to Stem Coronavirus Damage Leave Investors Cold," *The New York Times*, March 12, 2020.
- James Rufus Koren, "CEO Tim Sloan Has Had Two Years to Fix Wells Fargo. Is He Running Out of Time?" *Los Angeles Times*, November 25, 2018.
- Jesse Hamilton and Elizabeth Dexheimer, "Wells Fargo Fails to Appease Regulator Over Auto Reimbursements," *Bloomberg Law*, October 2, 2018.
- Jesse Pound, "Stocks Making the Biggest Moves Midday: Boeing, Nike, United Airlines, Citigroup and More," *CNBC*, March 12, 2020.

- Jim Puzzanghera, "Wells Fargo Will Need a Formal Vote from the Federal Reserve before Growth Restrictions Are Lifted," *Los Angeles Times*, May 11, 2018.
- Jim Puzzanghera, "Wells Fargo CEO Tim Sloan's Message of Contrition and Improvement Draws Bipartisan Rebuke," *Los Angeles Times*, March 12, 2019.
- Joe Wallace and David Hodari, "Oil Markets Point to a Lasting Glut of Crude," *The Wall Street Journal*, March 12, 2020.
- John Heltman, "Fed Chief Hints Wells Fargo's Regulatory Issues Are Far from Over," *American Banker*, March 20, 2019.
- John M. Mason, "Wells Fargo: The Shadow of Bad Management Remains," *Seeking Alpha*, December 5, 2019.
- Josh Mitchell and Joshua Zumbrun, "Economists See Rising Risks of Recession World-Wide," *The Wall Street Journal*, March 12, 2020.
- Joy Wiltermuth, "Here's a Breakdown of U.S. Bank Exposure to the Energy Industry as Oil Prices Tank," *MarketWatch*, March 12, 2020.
- Ken Shreve, "Dow Jones Dives 2,000 Points; 9 Components Fall 10%+ as Coronavirus Spreads in U.S.," *Investor's Business Daily*, March 12, 2020.
- Margot Patrick et al., "Markets Shudder Even as ECB Counters Pandemic's Impact," *The Wall Street Journal*, March 12, 2020.
- Martha C. White, "Why Did the Federal Reserve Inject Half a Trillion Dollars into the Financial System?" *NBC News*, March 12, 2020.
- Michael S. Derby, "Fed Repos Surge after it Expands Offerings, $361.5 Billion Now Outstanding," *The Wall Street Journal,* March 12, 2020.
- Michelle Price, "Fed to Put Wells Fargo Remediation Plan to Public Board Vote: Letter," *Reuters News*, May 11, 2018.
- Nathan Stovall and Chris Vanderpool, "At U.S. Banks, Some Deposit Betas Break from the Herd," *S&P Global Market Intelligence*, October 3, 2017.
- Neil Haggarty, "Regulators to Dems: We Are Not satisfied with Wells Fargo," *American Banker Online*, April 9, 2019.
- Nick Timiraos and Julia-Ambra Verlaine, "Fed to Inject $1.5 Trillion in Bid to Prevent 'Unusual Disruptions' in Markets," *The Wall Street Journal*, March 12, 2020.
- Patrick Rucker, "Wells Fargo Reform Plans Fail to Satisfy Fed after Scandals: Sources," *Reuters News*, December 6, 2018.
- Patrick Rucker and Imani Moise, "Wells Fargo Won't Be Allowed to Grow Until Problems Fixed: Fed's Powell," *Reuters News*, December 10, 2018.
- Patrick Rucker and Pete Schroeder, "Wells Fargo Has Not Done Enough to Refund Cheated Drivers: Regulator," *Reuters News*, October 2, 2018.
- Pippa Stevens et al., "Stock Market Live Thursday: Dow Tanks 2,300 in Worst Day since Black Monday, S&P 500 Bear Market," *CNBC*, March 12, 2020.

- Pippa Stevens et al., "Stock Market Live Monday: Dow Drops 13%, Trump Says Recession Possible, Trading Halted at Open," *CNBC*, March 16, 2020.
- Rachel Louise Ensign, "Banking Regulator Rebukes Wells Fargo's HR Operations," *The Wall Street Journal*, December 4, 2019.
- Rachel Louise Ensign and Andrew Ackerman, "Regulator Slams Wells Fargo after CEO Testifies to Congress," *The Wall Street Journal*, March 12, 2019.
- Rachel Louise Ensign and Andrew Ackerman, "Scandals Tarnished Wells Fargo. Washington Claimed Its CEO.," *The Wall Street Journal*, March 30, 2019.
- Richard Craver, "Wells Fargo Gets Poor Reputation Ranking to Start 2020," *Hickory Daily Record*, December 26, 2019.
- Richard J. Parsons, "Wells Fargo: Here's Why It's Time to Play Defense," *Seeking Alpha*, November 30, 2017.
- Rob McLean et al., "Dow Plunges 1,000 Points, Posting Its Worst Day in Two Years as Coronavirus Fears Spike," *CNN Business*, February 24, 2020.
- Robert Armstrong, "What Banks Are Worth in a World of Non-Stop Rate Cuts," *Financial Times*, March 9, 2020.
- Robert Armstrong and Laura Noonan, "Wells Fargo: Repairing a Damaged Brand," *Financial Times*, January 14, 2019.
- "Regulator Says Wells Fargo Still Carries Negative Cargo -- ESG Insight," *Dow Jones Institutional News*, December 5, 2019.
- Silvia Amaro, "ECB Surprised Markets by Not Cutting Rates, but Announces Stimulus to Fight Coronavirus Impact," *CNBC*, March 12, 2020.
- Stephen Morris et al., "Banks Scramble as Companies Rush to Tap Back-Up Credit Lines," *Financial Times*, March 12, 2020.
- Stephen Simpson, "Wells Fargo Still Discounting a Host of Challenges," *Seeking Alpha*, December 20, 2018.
- Tom Fairless, "ECB Expands Stimulus Measures, but Doesn't Cut Rates," *The Wall Street Journal*, March 12, 2020.
- Tweet from Federal Reserve Bank of New York, "Statement Regarding Treasury Reserve Management Purchases and Repurchase Operations," March 12, 2020 12:53 PM EDT.
- Tweet from Mitch McConnell, "Notwithstanding the scheduled state work period, the Senate will be in session next week. I am glad talks are ongoing between the Administration and Speaker Pelosi. I hope Congress can pass bipartisan legislation to continue combating the coronavirus and keep our economy strong.," March 12, 2020 1:20 PM EDT.
- U.S. House Committee on Financial Services, "03/11/2020 - Holding Wells Fargo Accountable: Examining the Role of the Board... (EventID=110719)," *YouTube*, March 11, 2020.

- Victoria Guida and Aubree Eliza Weaver, “Checking In with Wells Fargo,” *Politico*, June 7, 2018.
- Yun Li, “Wall Street’s Fear Gauge Closes at Highest Level Ever, Surpassing Even Financial Crisis Peak,” *CNBC*, March 16, 2020.
- Yun Li et al., “Stock Market Live Tuesday: Dow Soars 2,100 Points, Biggest Jump in 80 Years, Stimulus Close,” *CNBC*, March 24, 2020.

**SEC Releases**

- “Self-Regulatory Organizations; New York Stock Exchange LLC; Notice of Filing of Proposed Rule Change to Adopt on a Permanent Basis the Pilot Program for Market-Wide Circuit Breakers in Rule 7.12,” Securities Act Release No. 34-92428, July 16, 2021.

**Transcripts**

- Federal Reserve, Chair Jerome Powell’s Press Conference Transcript, dated March 20, 2019.
- Federal Reserve, Chair Jerome Powell’s Press Conference Transcript, dated July 31, 2019.
- Wells Fargo & Company, 2018 Q1 Earnings Call Transcript, dated April 13, 2018.
- Wells Fargo & Company, 2018 Q2 Earnings Call Transcript, dated July 13, 2018.
- Wells Fargo & Company, 2018 Q3 Earnings Call Transcript, dated October 12, 2018.
- Wells Fargo & Company, 2018 Q4 Earnings Call Transcript, dated January 15, 2019.
- Wells Fargo & Company, 2019 Q1 Earnings Call Transcript, dated April 12, 2019.
- Wells Fargo & Company, 2019 Q2 Earnings Call Transcript, dated July 16, 2019.
- Wells Fargo & Company, 2019 Q3 Earnings Call Transcript, dated October 15, 2019.
- Wells Fargo & Company, 2019 Q4 Earnings Call Transcript, dated January 14, 2020.
- Wells Fargo & Company, Special Call Transcript, dated February 2, 2018.
- Wells Fargo & Company, Analyst/Investor Day Transcript, dated May 10, 2018.
- Wells Fargo & Company, Presentation Transcript at Bernstein Strategic Decisions Conference, dated May 31, 2018.
- Wells Fargo & Company, Presentation Transcript at Barclays Global Financial Services Conference, dated September 14, 2018.
- White House, Press Briefing Transcript, dated March 11, 2020.

**Analyst Reports**

- "Wells Fargo: WTF?!?!?" *Autonomous Research*, February 2, 2018.
- "CCAR 2018 Expectations, Instructions & Scenarios: Record Payout Expected," *Barclays*, February 2, 2018.
- "In an Unprecedented Move, the Fed Caps WFC's Balance Sheet Growth Until Governance and Controls Are Improved," *Barclays*, February 4, 2018.
- "Fed Caps Asset Growth: Lowering Estimates and Target," *BMO Capital Markets*, February 4, 2018.
- "Fed Doesn't Pull Any Punches -- Downgrade to Neutral," *Citigroup*, February 4, 2018.
- "First Thoughts on the Consent Order... One More/Last (?) Bump on the Long Road Forward," *Credit Suisse*, February 4, 2018.
- "Fed Consent O[r]der Disappointing, but Necessary to Move Past Legacy Issues," *Deutsche Bank*, February 4, 2018.
- "Fed Hits the Brakes, but B/S Remix Cushions the Blow; Remain Outperform," *Evercore ISI*, February 4, 2018.
- "We reduce estimates after consent order announcement, but think impact is manageable; remain Buy rated (on the Americas CL)," *Goldman Sachs*, February 4, 2018.
- "Consent Orders: End of the Beginning or Beginning of the End?" *Jefferies*, February 4, 2018.
- "Downgrading to Market Perform; Shifting to Defense from Offense Is Negative," *Keefe, Bruyette & Woods*, February 4, 2018.
- "A Stinging Rebuke from the Fed," *Oppenheimer*, February 4, 2018.
- "Honey, Cancel Dinner Reservations..." *Susquehanna*, February 4, 2018.
- "The rear view mirror remains elusive; consent order adds to challenges," *UBS*, February 4, 2018.
- "Blindside Hit on the Stagecoach, Consent Order Likely to Pressure Shares," *Baird*, February 5, 2018.
- "What can WFC earn post-consent order? More than what the market expects," *Bank of America Merrill Lynch*, February 5, 2018.
- "U.S. Large-Cap Banks: State of the Industry," *Barclays*, February 5, 2018.
- "Yellen's unfriendly fareWell(s)," *Bernstein*, February 5, 2018.
- "Consent Order Not Good News, but Are We Done Now?" *Buckingham Research Group*, February 5, 2018.
- "Hit with Consent Order," *Compass Point Research & Trading*, February 5, 2018.

- "Harsh Fed Consent Order: Asset Growth Freeze - Direct & Indirect Income Hit; Downgrading To UW," *J.P. Morgan*, February 5, 2018.
- "The Politics of Banking Regulation After WFC," *Keefe, Bruyette & Woods*, February 5, 2018.
- "Restricted in a High Growth Environment, Downgrading to Underweight," *Morgan Stanley*, February 5, 2018.
- "Consent Order Offers a Healthy Progress Sign," *Nomura*, February 5, 2018.
- "New Consent Order Preventing Balance Sheet Growth; Remain Neutral," *Piper Jaffray*, February 5, 2018.
- "Lowering EPS Estimates after Consent Order; Reiterate Underperform," *Raymond James*, February 5, 2018.
- "Federal Reserve Pounces on Wells Fargo with a Cease and Desist Order," *RBC*, February 5, 2018.
- "WFC Agrees to Consent Order with Asset Caps; but Likely Limited Fin'l Impact," *Sandler O'Neill & Partners*, February 5, 2018.
- "Last Shoe Has Dropped Clearing Path for Long-Term Value," *Vining Sparks*, February 5, 2018.
- "Reputational damage exceeds earnings impact," *Atlantic Equities*, February 6, 2018.
- "Flagging the Pushback on Staying Put," *Evercore ISI*, February 6, 2018.
- "Wells Struggles to Stay Out of the Headlines," *Macquarie Research*, February 6, 2018.
- "Wells Fargo & Co. Downgraded to 'A-/A-2' from 'A/A-1' on Prolonged Regulatory and Governance Issues; Outlook Is Stable," *S&P Global Ratings*, February 7, 2018.
- "Old News, But New Constraints; Model Update Post Consent Order," *Jefferies*, February 8, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 28 | February 9, 2018," *Barclays*, February 9, 2018.
- "Back in the Penalty Box - What Are Investors Asking?" *Bernstein*, February 9, 2018.
- "What We'll Be Probing for at the 19th Annual *Credit Suisse* Financials Conference," Credit Suisse, February 9, 2018.
- "Update following recent rating affirmation and assignment of a negative outlook," *Moody's*, February 9, 2018.
- "US BANKS COMPENDIUM 2018," *Autonomous Research*, February 12, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 29 | February 12, 2018," *Barclays*, February 12, 2018.

- "Markets-Related Revenue Expectations," *Compass Point Research & Trading*, February 12, 2018.
- "What Large Cap Banks Investors Are Saying - Feedback on WFC Downgrade," *Morgan Stanley*, February 12, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 30 | February 13, 2018," *Barclays*, February 13, 2018.
- "Model Update," *Citigroup*, February 13, 2018.
- "Conference Comments: Guidance Unchanged; Confident in Resolving C&D Order," *Evercore ISI*, February 13, 2018.
- "Reliable Finance Follows Island Finance, Wells Exits Puerto Rico Auto Business," *Keefe, Bruyette & Woods*, February 14, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 32 | February 15, 2018," *Barclays*, February 15, 2018.
- "When tax reform isn't your friend. Potential implications for CCAR," *Bernstein*, February 15, 2018.
- "Excess Capital: Where Do We Stand After Tax Reform? WFC on Top; MS Most Leveraged to SLR Reform," *Buckingham Research Group*, February 15, 2018.
- "CS Financial Services Forum Highlights," *Credit Suisse*, February 15, 2018.
- "Expect Margin Dynamics to Improve," *RenMac*, February 19, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 33 | February 21, 2018," *Barclays*, February 21, 2018.
- "Updating the Financials Investment Framework Following Release of FR Y-9C Forms," *BMO Capital Markets*, February 21, 2018.
- "proceed with caution," *Berenberg*, February 22, 2018.
- "The Large Cap U.S. Banks Should Improve Their Median ROTCE By Over Another Percentage Point, As Rates Move Higher," *Vining Sparks*, February 23, 2018.
- "Updating Estimates to Reflect Expectations for Higher Rates and Better Market Activity," *Keefe, Bruyette & Woods*, February 26, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 39 | March 1, 2018," *Barclays*, March 1, 2018.
- "10K Flags Risks, most of which are well understood; some new additions," *Credit Suisse*, March 1, 2018.
- "Releases 2017 10K - Investigation of Wealth Management Unit in 'preliminary stages'," *RBC*, March 1, 2018.
- "It goes on and on and on and on," *Autonomous Research*, March 2, 2018.

- "What Large Cap Banks Investors Are Saying - Who Has the Best 2018 CCAR Payouts?" *Morgan Stanley*, March 5, 2018.

- "*RBC* Capital Markets' Financial Institutions Conference Preview March 6-7 in New York City," RBC, March 5, 2018.

- "US BANKS: An Investor's Guide," *Autonomous Research*, March 6, 2018.

- "Absent further regulatory action, the bank looks to future growth," *Goldman Sachs*, March 6, 2018.

- "*RBC* Capital Markets' Financial Institutions Conference Updates from Day 1," RBC, March 7, 2018.

- "Wells Fargo's review of its wealth management business threatens to broaden its reputational damage," *Moody's*, March 8, 2018.

- "*RBC* Capital Markets' Financial Institutions Conference Updates from Day 2," RBC, March 8, 2018.

- "Highlights from meeting with Head of Community Banking and Consumer Lending," *Bernstein*, March 9, 2018.

- "Game of Thrones at GS Resolved; Vote Expected on Senate Bill," *Buckingham Research Group*, March 12, 2018.

- "Curb your (CCAR) enthusiasm," *Bank of America Merrill Lynch*, March 13, 2018.

- "Revenues still a pressure point for 2018," *Bernstein*, March 15, 2018.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 51 | March 19, 2018," *Barclays*, March 19, 2018.

- "Revenue Growth Likely to Disappoint Relative to Expense Reduction Efforts," *Compass Point Research & Trading*, March 19, 2018.

- "Mgmt Meeting - Wholesale Bkg: Slow Loan, Tsy Mgmt Growth; Less Trading Post Asset Cap; Cost Cuts," *J.P. Morgan*, March 19, 2018.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 52 | March 20, 2018," *Barclays*, March 20, 2018.

- "1Q18 Earnings Preview: Trading Stirs from Year-Long Slumber; Buy GS & JPM into the Print," *Morgan Stanley*, March 22, 2018.

- "BANK OF THE FUTURE: The ABCs of Digital Disruption in Finance," *Citigroup*, March 25, 2018.

- "Spotlight on Big Bank M&A: Are We Ready for Lift-Off?" *Keefe, Bruyette & Woods*, March 25, 2018.

- "Good Banks Left Behind: Upgrading USB to Outperform and Buyers of WFC," *Baird*, March 26, 2018.

- "Losing Rate Visibility," *Compass Point Research & Trading*, March 26, 2018.

- "Wells Fargo - Reshuffles Risk Management Executives," *Compass Point Research & Trading*, March 26, 2018.
- "Endless bad press," *Autonomous Research*, March 27, 2018.
- "Expense levers to widen the operating leverage jaws in '19/20," *Bernstein*, March 28, 2018.
- "1Q Preview: Higher Rates, Stronger Eq Mkts, Mixed Tdg To Offset Weak Loan Growth, Wider Libor-OIS," *J.P. Morgan*, March 29, 2018.
- "Western Banks & Thrifts - 1Q18 Quarterly Preview," *Sandler O'Neill & Partners*, March 29, 2018.
- "Branch reductions - who's cut the most, and who has more to go?" *Bernstein*, April 2, 2018.
- "That's a Wrap on Q1… Solid Trading, Less Banking (Better in March), What's Next?" *Credit Suisse*, April 2, 2018.
- "1Q18 Preview: ROTCEs look to reach post-Crisis highs on tax reform and revenue growth from rates and volatility," *Goldman Sachs*, April 2, 2018.
- "Dinosaurs or Digital Banking Superstars?" *Citigroup*, April 3, 2018.
- "1Q preview and M2M," *Atlantic Equities*, April 4, 2018.
- "Q1 Preview: More Turbulent Tape of Late, but Results and Outlook Decent Overall," *Baird*, April 4, 2018.
- "1Q18E Done and Good; What's Next?" *Credit Suisse*, April 4, 2018.
- "The One Thing That Matters Most in 1Q for Each Bank," *Deutsche Bank*, April 5, 2018.
- "Finding a Good Deal on a Stage Coach; Upgrade to Buy," *UBS*, April 5, 2018.
- "1Q18 Earnings Preview: TCBI/IBKC/SIVB positioned to bounce, cautious on PB/TCF," *Bank of America Merrill Lynch*, April 6, 2018.
- "1Q18 EPS Preview: Learning to Manage Under the Asset Cap," *Barclays*, April 6, 2018.
- "Tweaking EPS estimates ahead of 1Q earnings," *Bernstein*, April 6, 2018.
- "Revising Models Ahead of 1Q18 Earnings," *BMO Capital Markets*, April 9, 2018.
- "Banks & Brokers 1Q18 Preview: Above Consensus Across the Board," *Buckingham Research Group*, April 9, 2018.
- "Waiting on deposit competition & loan growth: key debates into first quarter 2018 results," *UBS*, April 9, 2018.
- "The Evolution of Stress—New CCAR a Long Time Coming and a Welcomed Change," *Credit Suisse*, April 10, 2018.

- "The Fed Proposes Stressed Capital Buffers for G-SIBs," *Keefe, Bruyette & Woods*, April 10, 2018.
- "Investor Focus Areas: CCAR Risk, Deposit Betas, LIBOR, and the Consumer Credit Cycle," *Nomura*, April 10, 2018.
- "Fed Proposes Simpler Capital Rules; Positive Development for Regionals," *Piper Jaffray*, April 10, 2018.
- "Securities Re-Pricing Now a NIM Tailwind for Many Banks," *Baird*, April 11, 2018.
- "New capital proposal: Real relief for regionals; GSIBs, not so much," *Bank of America Merrill Lynch*, April 11, 2018.
- "Fed Formally Proposes SCB and CCAR Revisions - Capital Targets Likely Flat," *Barclays*, April 11, 2018.
- "CCAR stress capital buffer proposal expected to be constructive for the large banks," *Goldman Sachs*, April 11, 2018.
- "New Capital Proposal: Stress Capital Buffer Added; Capital Reqmt Could Rise For Some, Will Be Volatile," *J.P. Morgan*, April 11, 2018.
- "New Fed Stress Test Proposal is Positive ... Regulatory Changes Picking up Steam," *Morgan Stanley*, April 11, 2018.
- "WFC Earnings Prep 1Q18," *Credit Suisse*, April 12, 2018.
- "1Q Call – 4 Autono-bites," *Autonomous Research*, April 13, 2018.
- "1Q18: What am I looking at?" *Autonomous Research*, April 13, 2018.
- "Q118 Initial Thoughts: Messy Quarter, Lower Expectations Help Limit Downside," *Baird*, April 13, 2018.
- "WFC 1Q18 EPS Instant Insight," *Barclays*, April 13, 2018.
- "1Q18: Lowering Estimates and Target Price due to Lower Expected Revenues," *BMO Capital Markets*, April 13, 2018.
- "1Q18 First Look: Citigroup & Wells Fargo," *Buckingham Research Group*, April 13, 2018.
- "Results: 1Q18 Core Top Line Trends Remain Tough, Expenses Look To Be On Track," *Citigroup*, April 13, 2018.
- "Four Steps That Could Boost Shares," *Deutsche Bank*, April 13, 2018.
- "1Q Call Takes: Top Line Headwinds Persist; Eyes on L/T Expense Oppty," *Evercore ISI*, April 13, 2018.
- "First Take: Weaker results on higher efficiency ratio, but the focus will be on the outlook," *Goldman Sachs*, April 13, 2018.
- "1Q18 First Look: Weak Quarter as Margin and Average Loan Growth Miss," *Keefe, Bruyette & Woods*, April 13, 2018.

- "JPM/WFC Mortgage Banking Results Come In Weaker than Expected; MSR Valuations Up as Expected," *Keefe, Bruyette & Woods*, April 13, 2018.
- "JPM/WFC/C 1Q18 Read-Across for Financial Sub-Sectors: Follow-Up," *Keefe, Bruyette & Woods*, April 13, 2018.
- "Wells Fargo & Co.: 1Q18 First Pass: Large PPOP Miss," *Morgan Stanley*, April 13, 2018.
- "'Fixer Upper' Story Likely Extends into 2019: Playing for LT Value in the Face of NT Pain," *Nomura*, April 13, 2018.
- "Better Expenses & Credit Offset Softer Revs," *Nomura*, April 13, 2018.
- "1Q18 First Take Pre-Call: Fundamentals Remain Under Pressure," *Oppenheimer*, April 13, 2018.
- "Yet to Regain their Footing," *Oppenheimer*, April 13, 2018.
- "First Look: Headline Beat, but Weaker Operating Result," *Piper Jaffray*, April 13, 2018.
- "1Q First Look: Noisy Quarter Masks Fundamental Weakness," *Raymond James*, April 13, 2018.
- "Reducing EPS Estimates; Reiterating Underperform Rating," *Raymond James*, April 13, 2018.
- "1Q18: The Stagecoach is Still Under Repair," *RBC*, April 13, 2018.
- "Wells Fargo & Co. Ratings Are Unaffected By Possible Regulatory Penalties," *S&P Global Ratings*, April 13, 2018.
- "WFC 1Q18 Earnings Review: Lowering EPS Estimates but Keeping BUY Rating," *Sandler O'Neill & Partners*, April 13, 2018.
- "WFC 1Q18 Preliminary Earnings Review," *Sandler O'Neill & Partners*, April 13, 2018.
- "1Q18 First Look - 1xers Drive Consensus Beat," *Susquehanna*, April 13, 2018.
- "1Q18 Post Conference Call Model Update," *Susquehanna*, April 13, 2018.
- "Earnings Read-Through: C/JPM/WFC 'Takeaways from the Money Center Banks Results'," *UBS*, April 13, 2018.
- "Noisy 1Q18; EPS beat on one timers; revenue challenges persist; waiting on expense leverage," *UBS*, April 13, 2018.
- "Wells Fargo Is Still Reeling From Recent Reputational Issues, But 2H'18E Should Begin To Turn The Tide," *Vining Sparks*, April 13, 2018.
- "Earnings Day 1: Results Pretty Good Overall, Negative Reactions a Bit Overdone," *Baird*, April 15, 2018.

- "1Q18 Wrap: Uninspiring Qtr, but Remain Constructive on L/T Outlook," *Evercore ISI*, April 15, 2018.
- "C/JPM/PNC/WFC: 1Q18 Earnings Wraps," *Jefferies*, April 15, 2018.
- "1Q18 Results: A Transitional Year for Wells Starts with a Tough Quarter," *Keefe, Bruyette & Woods*, April 15, 2018.
- "Valuation is Enticing but Headwinds Remain; Remain Neutral," *Piper Jaffray*, April 15, 2018.
- "A spooky reaction to mixed results on Friday the 13th: recapping day 1 of bank earnings," *UBS*, April 15, 2018.
- "Investor patience running thin," *Bank of America Merrill Lynch*, April 16, 2018.
- "1Q18 EPS Review: Needs to Exit the Headlines and Find Its Revenue Base," *Barclays*, April 16, 2018.
- "Updating EPS estimates on JPM (+/=), Citi (-), PNC (-) and WFC (-) following 4Q results." *Bernstein*, April 16, 2018.
- "Lowering Est. & Target, but 2019 Cons. Too Low and Stock Oversold," *Buckingham Research Group*, April 16, 2018.
- "Weak 1Q: Lower Core Revenues And Higher Expenses; Core Efficiency Much Weaker," *J.P. Morgan*, April 16, 2018.
- "Still tough sledding," *Macquarie Research*, April 16, 2018.
- "1Q18 Earnings Day 1: JPM, C, WFC & PNC," *Morgan Stanley*, April 16, 2018.
- "Wells Settles for $1 Billion with OCC & CFPB," *Keefe, Bruyette & Woods*, April 20, 2018.
- "Wells Fargo's additional consent orders are credit negative," *Moody's*, April 20, 2018.
- "Reducing 1Q18 EPS for $1 Billion Fine; Regulatory Overhang Remains," *Raymond James*, April 20, 2018.
- "WFC to Revise 1Q EPS to Account for OCC/CFPB Consent Orders," *Sandler O'Neill & Partners*, April 20, 2018.
- "The Opportunity and Threat from Digital Disintermediation," *RenMac*, April 22, 2018.
- "Model update: remain Neutral," *Atlantic Equities*, April 23, 2018.
- "Checking in on Estimate Revision Trends," *Buckingham Research Group*, April 23, 2018.
- "Post 1Q18, taking a more conservative view on estimates; target price now $62," *Credit Suisse*, April 23, 2018.
- "Operating leverage slows, but valuation remains attractive," *Goldman Sachs*, April 23, 2018.

- "OCC/CFPB Settlement: $1 Bil Fine, 20% Accrued; More Reqmts, Mgmt Appointments; AML Extension? - ALERT," *J.P. Morgan*, April 23, 2018.
- "Updating Model to Reflect 1Q18 Legal Accrual," *RBC*, April 23, 2018.
- "Updating Model on Better Accrual Color," *Susquehanna*, April 23, 2018.
- "Bank Stock Weekly: Is the market on board with PPNR revisions?" *Bernstein*, April 26, 2018.
- "Uncle!!!" *Autonomous Research*, April 27, 2018.
- "Capital return should become a meaningful EPS/ROE lever," *Bernstein*, April 27, 2018.
- "A lower bar heading into 2018 Investor Day," *UBS*, April 27, 2018.
- "Dig a little deeper in the Well," *Macquarie Research*, April 30, 2018.
- "Ten Updates We're Looking For at Investor Day," *Evercore ISI*, May 3, 2018.
- "WFC Investor Day Preview," *Keefe, Bruyette & Woods*, May 3, 2018.
- "2018 Investor Day Preview: Moving the Stage Coach from Limp to Gallop," *Barclays*, May 4, 2018.
- "What we won't hear at Investor Day (and will)," *Bernstein*, May 4, 2018.
- "Investor Day Preview; Expense/Capital Reveals, But Revs. Still The Push Point," *Jefferies*, May 4, 2018.
- "1Q18 10-Q Review: 1Q EPS Reduced; Suspended Certain Fiduciary Fees," *Barclays*, May 7, 2018.
- "10Q disclosure-largely consistent; watching the detail; awaiting Investor Day," *Credit Suisse*, May 7, 2018.
- "What Large Cap Banks Investors Are Saying," *Morgan Stanley*, May 7, 2018.
- "WFC 2018 Investor Day Preview; Look for a 2019 Expense Target," *Sandler O'Neill & Partners*, May 7, 2018.
- "Investor Day Ahead," *Autonomous Research*, May 8, 2018.
- "Superregional Spotlight: Structural ROA and ROTCE levers and the path to 'normalized' returns," *Bernstein*, May 8, 2018.
- "Can WFC Surprise on Expenses?" *Buckingham Research Group*, May 8, 2018.
- "What's driving NIM expansion at your favorite bank?" *Bernstein*, May 9, 2018.
- "Investor Day Follow-Up: Time to Hit the Targets," *Baird*, May 10, 2018.
- "Raising estimates: Better EPS visibility; next up, reg risk," *Bank of America Merrill Lynch*, May 10, 2018.
- "2018 Investor Day: Clouds Clearing," *Barclays*, May 10, 2018.

- "Investor Day Instant Insights," *Barclays*, May 10, 2018.
- "First Thoughts on the Investor Day Outlook," *Credit Suisse*, May 10, 2018.
- "Cost Targets Better Than Expected; Investor Day Recap," *Deutsche Bank*, May 10, 2018.
- "Early Investor Day Takes: Focused on Mitigating Impact of Revenue Headwinds via Expense & Capital Mgmt," *Evercore ISI*, May 10, 2018.
- "Investor Day 2018 First Take: Short term headwinds remain, but the outlook is incrementally positive," *Goldman Sachs*, May 10, 2018.
- "2018 Investor Day Review: Leaning on Expense Saves and Capital Return Near Term," *Keefe, Bruyette & Woods*, May 10, 2018.
- "Wells Fargo's securities fraud class-action settlement is credit positive, but legal and regulatory challenges persist," *Moody's*, May 10, 2018.
- "3 Key Takeaways from WFC's Investor Day So Far," *Morgan Stanley*, May 10, 2018.
- "Positive Operating Leverage & Capital Return to Drive Higher Returns Despite NT Challenges," *Nomura*, May 10, 2018.
- "Quick Take on Investor Day Targets: All Eyes on Expenses," *Piper Jaffray*, May 10, 2018.
- "Early Takeaways from WFC Investor Day Presentations," *Sandler O'Neill & Partners*, May 10, 2018.
- "2018 Investor Day: Commitment to higher returns even if revenue backdrop remains uncertain," *UBS*, May 10, 2018.
- "2018 Investor Day: Guidance suggests commitment to right sizing costs/producing better returns," *UBS*, May 10, 2018.
- "Lower revenues only partly offset by lower costs," *Atlantic Equities*, May 11, 2018.
- "Building a strong foundation while focusing on better returns for '19/'20," *Bernstein*, May 11, 2018.
- "2018 Investor Day: Lower Costs, Higher Payouts," *BMO Capital Markets*, May 11, 2018.
- "Key Takeaways from WFC's Investor Day," *Buckingham Research Group*, May 11, 2018.
- "Highlights from Wells Fargo's Investor Day," *Credit Suisse*, May 11, 2018.
- "Investor Day Wrap: Controlling What It Can Control," *Evercore ISI*, May 11, 2018.
- "Inv. Day Wrap; Solid Cost Message, A Wait on Revs., Longer Tail on Asset Cap," *Jefferies*, May 11, 2018.
- "2018 Investor Day: Gearing Up for 17% ROTCE," *Morgan Stanley*, May 11, 2018.

- "Reiterate Underperform Rating Following Investor Day," *Raymond James*, May 11, 2018.
- "Investor Day: A Work in Progress," *RBC*, May 11, 2018.
- "Thoughts from 2018 WFC Investor Day; Reiterate BUY Rating," *Sandler O'Neill & Partners*, May 11, 2018.
- "2018 Investor Day Recap," *Susquehanna*, May 11, 2018.
- "Recent Headwinds Have Plagued WFC's Reported Earnings, But Core Earnings Power Continues To Build," *Vining Sparks*, May 11, 2018.
- "Cost Cuts, Capital Return Could Drive 17%+ ROTCEs Despite Near-Term Revenue Growth Challenges," *Goldman Sachs*, May 13, 2018.
- "Our Take On Investor Day: Controlling What They Can Control," *Oppenheimer*, May 13, 2018.
- "Model Update Post-Investor Day; Remain Neutral," *Piper Jaffray*, May 13, 2018.
- "Investor Day: Expenses, Cap Return Key Drivers; Regulatory Issues Key Uncertainty Plus Revenues," *J.P. Morgan*, May 14, 2018.
- "Established 1852; Re-established in 2018," *Macquarie Research*, May 14, 2018.
- "Question Bank: 2018 DB Global Financial Services Conference Edition," *Deutsche Bank*, May 15, 2018.
- "CCAR '18 Preview: Higher Earnings = Higher $ Payouts," *Jefferies*, May 16, 2018.
- "The Drip Continues, Albeit Not Related to Sales Practice Issues," *Evercore ISI*, May 17, 2018.
- "CCAR 2018: Our Expectations and Updated Capital Return Assumptions," *Keefe, Bruyette & Woods*, May 17, 2018.
- "Updating Estimates to Generally Reflect Tougher Stress Test Conditions," *Keefe, Bruyette & Woods*, May 17, 2018.
- "Media Reports Suggest Employees Took Shortcuts on Consent Order Documentation," *Sandler O'Neill & Partners*, May 17, 2018.
- "Kafkaesque," *Autonomous Research*, May 18, 2018.
- "The Long View: Bank profitability - as good as it gets?" *Bernstein*, May 18, 2018.
- "Banking on technology: The shareholder benefits of a digital future," *Goldman Sachs*, May 22, 2018.
- "Bank Stock Weekly: I'd pay to see that," *Bernstein*, May 23, 2018.
- "Previewing 2018 CCAR; WFC Biggest Potential Winner (or Loser)," *Deutsche Bank*, May 23, 2018.
- "LEANER AND CLEANER?" *Bernstein*, May 24, 2018.

- "Wells Fargo: Stabilizing the Core to Move Forward," *Bernstein*, May 25, 2018.
- "Recalibrating '18 buyback expectations," *Bank of America Merrill Lynch*, May 28, 2018.
- "Who has been doing the frothy lending," *Autonomous Research*, May 29, 2018.
- "2018 Survey Results from Beyond the Basics Conference," *Citigroup*, May 29, 2018.
- "Talking Deposits, Regulation Roadmap, and Importance of Tech To Drive Differentiation," *Citigroup*, May 29, 2018.
- "Dissecting the Top 20 Banks' 1Q18 Profitability," *RBC*, May 29, 2018.
- "2018 DB Global Financial Services Conference Takeaways," *Deutsche Bank*, May 31, 2018.
- "Highlights from CEO presentation at *Bernstein*'s Strategic Decisions Conference," *Bernstein*, June 1, 2018.
- "Will the Harsh Scenario be a Harsh Reality…Previewing CCAR 2018," *Credit Suisse*, June 1, 2018.
- "A Meaningful Improvement In Operating Earnings Is Primary Driver of Double-Digit Increase In Capital Deployment," *Vining Sparks*, June 1, 2018.
- "Bank Stock Outlook, Forecasting & Valuation," *Barclays*, June 4, 2018.
- "U.S. Banks 2018 CCAR Outlook - More Challenging," *RBC*, June 4, 2018.
- "Straight Outta Conference," *Bernstein*, June 5, 2018.
- "Opportunism at its best... Wells Fargo selling branches on the path to its 2020 Vision," *Credit Suisse*, June 5, 2018.
- "Opportunism at its best… Wells Fargo selling branches on the path to its 2020 Vision," *Credit Suisse*, June 5, 2018.
- "Wells Fargo Announces Sale of 52 Retail Branches to Flagstar Bancorp," *RBC*, June 5, 2018.
- "Branch Sale," *Autonomous Research*, June 6, 2018.
- "The Case For Higher Relative Valuation: Better Earnings Visibility, Better Growth and Rising Returns," *Oppenheimer*, June 6, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 103 | June 7, 2018," *Barclays*, June 7, 2018.
- "CCAR 2018 Follow Up—What the Large Cap Bank Managements have Shared," *Credit Suisse*, June 7, 2018.
- "Federal Reserve Gives the Official Stress Test and CCAR Release Dates," *Keefe, Bruyette & Woods*, June 7, 2018.
- "2018 CCAR Preview: All eyes are on the stagecoach," *Macquarie Research*, June 7, 2018.

- “CCAR Preview: Higher Capital Returns, Stable Payout Ratios,” *Piper Jaffray*, June 7, 2018.
- “CCAR: Prepping for a Tougher Test,” *Autonomous Research*, June 8, 2018.
- “Previewing Our 2018 CCAR Expectations,” *Sandler O'Neill & Partners*, June 8, 2018.
- “CCAR Preview 2.0: Meaningful capital return despite tougher scenario,” *Barclays*, June 11, 2018.
- “CCAR 2018: Expect Large Increase In Dividends And Higher Buybacks At Most Banks,” *J.P. Morgan*, June 11, 2018.
- “Payouts start to pay dividends: 2018 CCAR survey results and preview,” *Goldman Sachs*, June 12, 2018.
- “2018 CCAR Capital Returns Bolstered by Reg Reform, Tax Cut; CMA/BK/RF/ZION Likely Winners,” *Raymond James*, June 12, 2018.
- “CCAR - don’t poke the bear?” *Bernstein*, June 14, 2018.
- “MS Financials Conference Day 2 Recap - Go National with Digital,” *Morgan Stanley*, June 14, 2018.
- “Fine Tuning EPS Estimates,” *RBC*, June 14, 2018.
- “Fine Tuning EPS Estimates,” *RBC*, June 14, 2018.
- “2018 DFAST/CCAR Preview: Despite Rigorous Stress Scenarios, Pay-Out Ratios Remain Buoyant,” *UBS*, June 14, 2018.
- “Regulatory tailwinds post 2018 CCAR?” *Atlantic Equities*, June 15, 2018.
- “2Q18 Mid Quarter Update #2… Updating the Data Points,” *Credit Suisse*, June 15, 2018.
- “CCAR Preview: Dividend Leaders Likely Rewarded,” *Baird*, June 18, 2018.
- “What Large Cap Banks Investors Are Saying,” *Morgan Stanley*, June 18, 2018.
- “Wealth restructuring,” *Autonomous Research*, June 19, 2018.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 111 | June 19, 2018,” *Barclays*, June 19, 2018.
- “Who shoots, who scores this CCAR season?” *Bernstein*, June 19, 2018.
- “CCAR 2018: Capital Return Up, But Payout Ratios Likely Stall; Trust Banks Should Shine,” *Buckingham Research Group*, June 19, 2018.
- “US Bank 2018 Stress Test: Expect Capital Return Dollars Up, Total Payout Ratios Down,” *Citigroup*, June 19, 2018.
- “Upgrading C to BUY; GS/WFC Top Picks; 2Q Preview,” *Deutsche Bank*, June 19, 2018.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 112 | June 20, 2018," *Barclays*, June 20, 2018.
- "DFAST: Tuff Stuff," *Autonomous Research*, June 21, 2018.
- "US Banks: June 2018," *Autonomous Research*, June 21, 2018.
- "DFAST Results: Mission Accomplished Again – All Banks Passed Stress Test," *Baird*, June 21, 2018.
- "DFASTen your seatbelts: 100bp less capital return capacity," *Bank of America Merrill Lynch*, June 21, 2018.
- "How could WFC stock perform under four CCAR scenarios?" *Bank of America Merrill Lynch*, June 21, 2018.
- "2018 DFAST: A Tougher Test, But Something's Not Right Here: Divergence on Tax Assumptions?" *Buckingham Research Group*, June 21, 2018.
- "DFAST Worse Than Expected, but More Details Needed," *Deutsche Bank*, June 21, 2018.
- "DFAST 2018: The Fed Makes the Start of Summer More Stressful for Select Banks," *Keefe, Bruyette & Woods*, June 21, 2018.
- "2Q18 Earnings Preview: Hints of Loan Growth Coming," *Morgan Stanley*, June 21, 2018.
- "It's Mulligan Time: Eight Banks Screen as Being at Risk of Having to Take the Mulligan," *Nomura*, June 21, 2018.
- "2018 DFAST Results: More Adverse Scenarios, But Everyone's Still a Winner," *Oppenheimer*, June 21, 2018.
- "Quit Stressing: Tougher Fed Stress Test Still Won't Change Capital Plans," *Piper Jaffray*, June 21, 2018.
- "Winners from DFAST Results Include BAC, BBT, BK, CMA, NTRS, WFC, and ZION," *Raymond James*, June 21, 2018.
- "Commercial banks and specialty finance fare better than brokers and money centers in DFAST," *UBS*, June 21, 2018.
- "DFAST results reflect harsh scenario," *Atlantic Equities*, June 22, 2018.
- "DFAST 2018 Review: All Banks Pass, Through GS, MS & STT Not By Much," *Barclays*, June 22, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 114 | June 22, 2018," *Barclays*, June 22, 2018.
- "DFAST shows some hits and misses; but raises bigger questions about what SCB means for GSIBs," *Bernstein*, June 22, 2018.
- "CCAR Setup Positive for HBAN, WFC, and BBT, but Negative for AXP and MS," *BMO Capital Markets*, June 22, 2018.

- "2018 DFAST Results: Capacity Outlook Is Mixed Bag – WFC Looks Good…Jury Still Out On GS & MS," *Citigroup*, June 22, 2018.
- "2018 DFAST—All Banks Pass albeit with Less Cushion for Modelled Capital Returns," *Credit Suisse*, June 22, 2018.
- "Stress Test Mostly Fine, But Does Create Some Quarrels," *Evercore ISI*, June 22, 2018.
- "2018 CCAR: Round 1 indicates a more difficult test but most banks should be able to meet return expectations," *Goldman Sachs*, June 22, 2018.
- "DFAST 2018: Lower Cushion May Temper Capital Return At STT; PNC, CFG Prefs Needed? Stress Capital Buffer Up," *J.P. Morgan*, June 22, 2018.
- "We like IBs more than the Fed," *Macquarie Research*, June 22, 2018.
- "The Curious Case of the 2018 DFAST," *Morgan Stanley*, June 22, 2018.
- "2018 DFAST - Banks Handle the More Draconian Scenario With Capital to Spare," *RBC*, June 22, 2018.
- "2018 DFAST Results by the Numbers," *Susquehanna*, June 22, 2018.
- "All Large Cap U.S. Banks Passed The Stress Tests & Should Be Able to Deploy Meaningful Amounts of Capital," *Vining Sparks*, June 22, 2018.
- "U.S. Banks: 2Q18 Preview – Strong Growth (Again)," *RBC*, June 25, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 116 | June 26, 2018," *Barclays*, June 26, 2018.
- "CCAR Banks Hot; Cards, Brokers & Trust Not," *Autonomous Research*, June 28, 2018.
- "CCAR Results: Solid News After Recent Weakness, Payouts Moving Higher," *Baird*, June 28, 2018.
- "No objection: WFC to return 13% of market cap," *Bank of America Merrill Lynch*, June 28, 2018.
- "Why so stressed? Dividends grow 34%, banks to return 10% of market cap," *Bank of America Merrill Lynch*, June 28, 2018.
- "Initial Look at CCAR 2018," *Barclays*, June 28, 2018.
- "CCAR 2018: A Marginal Positive Surprise," *BMO Capital Markets*, June 28, 2018.
- "2018 CCAR Results – WFC Is the Standout," *Citigroup*, June 28, 2018.
- "CCAR Results Positive for Bank Stocks; WFC/STI/HBAN Winners," *Deutsche Bank*, June 28, 2018.
- "Americas Banks: 2018 CCAR - Round 2: Catalyst for a relief rally on dividend growth," *Goldman Sachs*, June 28, 2018.
- "Banks: CCAR '18 First Look: More of a Barbell This Year," *Jefferies*, June 28, 2018.

- "Banks: CCAR '18 Full Review: Smooth in the Middle, Rough Around the Edges," *Jefferies*, June 28, 2018.
- "2018 CCAR Results: Capital Return Still Moves Higher but Misses Expectations," *Keefe, Bruyette & Woods*, June 28, 2018.
- "2018 CCAR: Regionals Fare Better Than Cards Fed Greenlights Capital Plans, Peak-Level Payouts," *Nomura*, June 28, 2018.
- "2018 CCAR Mostly Good! Simple Math Will Grind the Bears Down," *Oppenheimer*, June 28, 2018.
- "CCAR Group Results: Total Capital Returned Increased 22% to $168 billion from $138 billion; 31 Non-Objections, 3 Conditional Non-Objections, 1 Objection," *RBC*, June 28, 2018.
- "WFC's 2018 Return of Capital Plan Approved; Total Capital Return Increased 71% from 2017," *RBC*, June 28, 2018.
- "Western Banks & Thrifts - 2Q18 Quarterly Preview," *Sandler O'Neill & Partners*, June 28, 2018.
- "WFC 2Q18 Earnings Preview," *Sandler O'Neill & Partners*, June 28, 2018.
- "2018 CCAR vs. Consensus," *Susquehanna*, June 28, 2018.
- "2018 CCAR Results – Initial Views; Rapid Response Conference Call at 5:30PM," *UBS*, June 28, 2018.
- "Mostly positive CCAR results: Wells Fargo aces the test: qualitative pass and capital return upside," *UBS*, June 28, 2018.
- "Banks: WFC the big winner from 2018 CCAR," *Atlantic Equities*, June 29, 2018.
- "CCAR 2018 Review: $164bn of Capital to be Returned Over Next 4 Quarters," *Barclays*, June 29, 2018.
- "U.S. Banks: CCAR results OK overall, but some clear hits and misses," *Bernstein*, June 29, 2018.
- "Only Modest Redemption for DFAST's 'Losers' in 2018 CCAR; WFC the Big Winner," *Buckingham Research Group*, June 29, 2018.
- "Stressed and Done – 2018 CCAR Results," *Credit Suisse*, June 29, 2018.
- "Wells Delivers...And Then Some," *Evercore ISI*, June 29, 2018.
- "Large Cap Banks CCAR 2018 Overall Good But Mixed: Avg Proforma Div Yld 3%; RF, Citi Dividends; STT Conditional Approval Impact?" *J.P. Morgan*, June 29, 2018.
- "WFC wins the day," *Macquarie Research*, June 29, 2018.
- "2018 CCAR: Fed Offers a Guiding Hand Through a Tougher CCAR," *Morgan Stanley*, June 29, 2018.

- "CCAR Takeaways: Big Bump in Capital Return for Large Regionals," *Piper Jaffray*, June 29, 2018.
- "Banking: 2018 CCAR Results: WFC, STI, RF, HBAN Winners," *Raymond James*, June 29, 2018.
- "U.S. Banks: 2018 CCAR – A Record $168 Billion to Be Returned to Shareholders," *RBC*, June 29, 2018.
- "2018 CCAR Results Review," *Sandler O'Neill & Partners*, June 29, 2018.
- "Large Cap U.S. Banks Received Approval To Deploy Over $160 Billion of Capital Over Next 12 Months," *Vining Sparks*, June 29, 2018.
- "Capital optimization efforts given a boost: increasing EPS estimates; price target rises to $63," *UBS*, July 1, 2018.
- "Bank Tear Sheets: 2Q18 Earnings Edition," *Deutsche Bank*, July 2, 2018.
- "Americas Banks: Capacious large-cap CCAR buyback authorizations provide downside support, earnings and return upside," *Goldman Sachs*, July 2, 2018.
- "Positive Stress Test Results Lift Overhang Upgrading to Equal-Weight," *Morgan Stanley*, July 2, 2018.
- "Model Refresh for CCAR and Rates," *Citigroup*, July 3, 2018.
- "Banks: Multiple tailwinds, receding headwind," *Atlantic Equities*, July 4, 2018.
- "Our 2Q18 Preview: Steady Fundamentals & Cheap Stocks," *Oppenheimer*, July 4, 2018.
- "Global Banks Roadmap Bankosaurus Techs Revisited," *Autonomous Research*, July 5, 2018.
- "Banks: Powered By Data: Driven By Digital," *Jefferies*, July 5, 2018.
- "Banks: H.8 and Curve Update - Weekly & Quarter End Loan Monitor (6/27)," *Jefferies*, July 6, 2018.
- "LIBOR still helping, for now," *Macquarie Research*, July 6, 2018.
- "US Banks Chart of the Week What would a revised SCB rule look like?" *Bank of America Merrill Lynch*, July 8, 2018.
- "US BANKS: 2Q Preview," *Autonomous Research*, July 9, 2018.
- "Q2 Preview: Expectations Lower, Fundamentals Fine, Banks Due for a Bounce," *Baird*, July 9, 2018.
- "2Q18 Preview: Positive Set-up," *BMO Capital Markets*, July 9, 2018.
- "2Q18 Preview: Lack of 'Hard Catalysts,' But Negative Sentiment Overdone," *Buckingham Research Group*, July 9, 2018.
- "Large Cap Banks 2Q18 Earnings Preview: Will We See Justification for the Worrying…" *Credit Suisse*, July 9, 2018.

- "The One Thing That Matters Most in 2Q for Each Bank," *Deutsche Bank*, July 9, 2018.
- "2Q Regional Bank Preview: Are We Lending Yet?" *Evercore ISI*, July 9, 2018.
- "2Q18 Preview: An in-line quarter should reinforce investor confidence in continued bank operating performance," *Goldman Sachs*, July 9, 2018.
- "Banks: Time for the 'Rates to Growth' Transition; 2Q18 Preview," *Jefferies*, July 9, 2018.
- "2Q18 Universal Banks Preview Fundamentals Expected to Outshine Macro Risks and Provide a Sunny Outlook for the Group," *Keefe, Bruyette & Woods*, July 9, 2018.
- "U.S. Banks: 2Q18 Earnings Preview – Part II EPS Estimates, Reporting Dates, and Conference Call Numbers," *RBC*, July 9, 2018.
- "Market Thinking Game: Bank of America and JPMorgan remain favored over Wells and Citigroup," *UBS*, July 9, 2018.
- "Optimism fades on late cycle concerns: quantifying content from 50 investor meetings," *UBS*, July 9, 2018.
- "2Q18 Preview: See you in September," *Bank of America Merrill Lynch*, July 10, 2018.
- "Large-Cap Banks: Can the group get a little love this earnings season?" *Bernstein*, July 10, 2018.
- "Banking: 2Q18 Large Bank Earnings Preview," *Raymond James*, July 10, 2018.
- "Regional Banks: 2Q18 Earnings Preview," *Susquehanna*, July 10, 2018.
- "2Q18 EPS Preview: Expect Sequential NII Growth Despite Asset Cap Drag," *Barclays*, July 11, 2018.
- "Mortgage & Housing Monitor: Another Tough Quarter for Mortgage Banking," *Piper Jaffray*, July 11, 2018.
- "WFC Earnings Prep 2Q18," *Credit Suisse*, July 12, 2018.
- "Moderate Qtr: NIM Up, Strong M&A, Loan Synd; Loan Growth Modest With Mix Shift - Card Growth Slowing?" *J.P. Morgan*, July 12, 2018.
- "Wells Fargo 2Q18: Still waiting for revs to turn," *Autonomous Research*, July 13, 2018.
- "Q218 Initial Thoughts: Mixed Quarter, Capital Return Limits Downside," *Baird*, July 13, 2018.
- "Underneath the mess, progress," *Bank of America Merrill Lynch*, July 13, 2018.
- "Wells Fargo (WFC) Annual & Quarterly Earnings Model," *Barclays*, July 13, 2018.
- "2Q18: Raising Estimates and Target Slightly due to Better NIM and Credit," *BMO Capital Markets*, July 13, 2018.

- "2Q18 First Look: Citigroup & Wells Fargo," *Buckingham Research Group*, July 13, 2018.
- "Results: 2Q18 Early Read – Messy Quarter, But We See Glass As Half Full," *Citigroup*, July 13, 2018.
- "2Q18 First Impressions: Pretty much as expected—some +/ some –" *Credit Suisse*, July 13, 2018.
- "2Q18: Net Interest Income and Credit Both Better, But Fees Worse," *Deutsche Bank*, July 13, 2018.
- "2Q Call Takes: Front-Loading Capital Return & Expense Outlook Intact, but Fees Remain Elusive," *Evercore ISI*, July 13, 2018.
- "2Q First Look: Tough Qtr; Fees & Expenses Miss, but NIM & Credit Better," *Evercore ISI*, July 13, 2018.
- "2Q Wrap: Top Line Headwinds Persist, but Remain Positive as Returns Strengthen," *Evercore ISI*, July 13, 2018.
- "Wells Fargo & Co. (WFC): First Take: A noisy quarter, but improving NII trends drive a core beat," *Goldman Sachs*, July 13, 2018.
- "2Q18 First Looks: C, WFC," *Jefferies*, July 13, 2018.
- "2Q18 First Look: Results Meet but Sustainability of Higher NII in Question," *Keefe, Bruyette & Woods*, July 13, 2018.
- "JPM/WFC/C 2Q18 Read-Across for Financial Sub-Sectors: Follow-Up," *Keefe, Bruyette & Woods*, July 13, 2018.
- "2Q18 First Pass: Consent Order a Drag on Results," *Morgan Stanley*, July 13, 2018.
- "Core Miss on Lower Fees & Higher Expenses First Look," *Nomura*, July 13, 2018.
- "First Take Pre-Call: Core Fundamentals Roughly as Expected," *Oppenheimer*, July 13, 2018.
- "First Look: Lots of Noise, but Appears to be a Slight Operating Beat," *Piper Jaffray*, July 13, 2018.
- "2Q First Look: Fundamentals Remain Weak in Noisy Quarter," *Raymond James*, July 13, 2018.
- "WFC 2Q18 Earnings: Estimated Core EPS of $1.13 Comes in Ahead of $1.11 Estimate and Consensus of $1.12; Lower Credit Costs More than Offset Mortgage Banking Weakness," *RBC*, July 13, 2018.
- "WFC 2Q18 Earnings Review: Noisy 2Q but Story Intact; Reiterate BUY Rating," *Sandler O'Neill & Partners*, July 13, 2018.
- "WFC 2Q18 Preliminary Earnings Review: Core EPS Below Us and the Consensus," *Sandler O'Neill & Partners*, July 13, 2018.
- "2Q18 First Look - Asset Yield Improvement," *Susquehanna*, July 13, 2018.

- "2Q18 Post Conference Call Model Update," *Susquehanna*, July 13, 2018.

- "Even with some encouraging signs amid messy results, underwhelming 2Q18 results," *UBS*, July 13, 2018.

- "2Q18: The Stagecoach is Stuck in the Regulatory Mud," *RBC*, July 14, 2018.

- "Upgrading to Outperform, Capital Return & Expense Saves Can Carry Shares Higher," *Keefe, Bruyette & Woods*, July 15, 2018.

- "Still Not on Full Stride, But Core Fundamentals Appear to Be Stabilizing," *Oppenheimer*, July 15, 2018.

- "Recapping day 1 of large bank earnings: JPM the winner; second half 2018 key for WFC and C," *UBS*, July 15, 2018.

- "Bank Earnings Day 1: Generally Solid Results As Expected," *Baird*, July 16, 2018.

- "2Q18 EPS Review: Buyback, Cost Cut Accelerations to Aid 2H18 and 2019," *Barclays*, July 16, 2018.

- "Large-Cap Banks: Updating EPS estimates on JPM (+), Citi (+), PNC (=/-) and WFC (-) following 2Q results," *Bernstein*, July 16, 2018.

- "Growth Still Challenging, But Core Trends Stabilizing," *Buckingham Research Group*, July 16, 2018.

- "Weak 2Q: Sharp Drop In Non-Int Inc, Overstated NIM Rise; Lower Loans, Non-Int Inc To Offset Buybacks," *J.P. Morgan*, July 16, 2018.

- "C/JPM/PNC/WFC: 2Q18 Earnings Wraps," *Jefferies*, July 16, 2018.

- "Still a restructuring story; returns trending up," *Macquarie Research*, July 16, 2018.

- "2Q18 Earnings Day 1: JPM, C, WFC & PNC," *Morgan Stanley*, July 16, 2018.

- "Near-term Challenges Persist 2Q18 EPS Review: Lowering Estimates on Softer Top-line Growth Outlook," *Nomura*, July 16, 2018.

- "Some Positive Signs but Revenue Headwinds Remain Intact; Staying Neutral," *Piper Jaffray*, July 16, 2018.

- "Reducing 2018 EPS Estimate for 2Q Miss; Reiterating Underperform Rating," *Raymond James*, July 16, 2018.

- "Operating and Capital Leverage in 2019: Reducing 2018 EPS by 10c to $4.50," *RenMac*, July 16, 2018.

- "2Q18 Results Pretty Much as Expected; Reducing 2018 estimates; 2019E unchanged," *Credit Suisse*, July 17, 2018.

- "Notes From Our Meetings With CFO John Shrewsberry," *Oppenheimer*, July 19, 2018.

- "LPLA Raised Sweep Rates with 4 - 60% Beta Range; AMP, WFC also Hiked," *Credit Suisse*, July 23, 2018.

- "Too Rich To Change? Global Banks Insights," *Citigroup*, July 24, 2018.
- "Raising Estimates Following the Announced Redemption of High-Cost Preferreds," *Keefe, Bruyette & Woods*, July 24, 2018.
- "Well, well, Wells," *Berenberg*, July 27, 2018.
- "Post 2Q: NIM Increase Slowing As Funding Costs Rise Faster; Bank M&A Picking Up," *J.P. Morgan*, July 31, 2018.
- "DOJ fine: Not new news, and no impact to $24.5bn buyback," *Bank of America Merrill Lynch*, August 1, 2018.
- "Wells Fargo & Co. (WFC): Settles with DOJ on legacy RMBS issues with no EPS impact," *Goldman Sachs*, August 1, 2018.
- "Wells Fargo Agrees to Pay $2.09 Billion Penalty to Settle Probe into U.S. Mortgages," *RBC*, August 1, 2018.
- "WFC Resolves Pre-Crisis Mortgage Issues; Penalty Already Fully Accrued," *Sandler O'Neill & Partners*, August 1, 2018.
- "Questions for financial services companies attending our conference (Update)," *UBS*, August 2, 2018.
- "Question Bank: 3Q18 Edition," *Deutsche Bank*, August 3, 2018.
- "Financial Services Competitor Conference Guide," *Raymond James*, August 3, 2018.
- "WFC Releases 2Q18 10Q-No Surprises but Litigation Issues Remain," *RBC*, August 3, 2018.
- "'Beta Data' Edition 1: Deposit Costs on the Move," *Evercore ISI*, August 5, 2018.
- "2Q18 10-Q Review: New Regulatory Inquiries; $0.03 Hit from Prefs in 3Q," *Barclays*, August 6, 2018.
- "Large Cap Banks & Brokers: Climbing The Wall Of Worry," *Buckingham Research Group*, August 6, 2018.
- "What's New in the 10-Q," *Credit Suisse*, August 6, 2018.
- "Banks 'unfollow' third-party data sharing," *Bank of America Merrill Lynch*, August 7, 2018.
- "US Banks: Nibbling at NIBs," *Autonomous Research*, August 8, 2018.
- "Notes from Management Meetings," *Citigroup*, August 8, 2018.
- "KBW Bank Buzz - Deposit Betas Remain All the Rage - 2Q18 Ed." *Keefe, Bruyette & Woods*, August 8, 2018.
- "Sensitizing a Potential Branch Deposit Divestiture by Wells Fargo Out West," *Piper Jaffray*, August 9, 2018.
- "*UBS* Financials Conference highlights: risk discipline/driving operating leverage remain focus," *UBS*, August 9, 2018.

- "Tom Brown's Banking Weekly: 8/10/18," *Second Curve Advisory Services*, August 10, 2018.
- "Bank Weekly: A Closer Look at the Recent California Wildfires," *Raymond James*, August 13, 2018.
- "CD Players," *Autonomous Research*, August 22, 2018.
- "Tom Brown's Banking Weekly: 8/24/18," *Second Curve Advisory Services*, August 24, 2018.
- "Bank Stock Weekly: At what point does the NIM expansion stop?" *Bernstein*, August 27, 2018.
- "Highlights from Our Meetings with Management: Expenses and Investing in Focus," *Keefe, Bruyette & Woods*, August 27, 2018.
- "Sensitizing Additional Midwest Branch & Deposit Divestures by Wells Fargo," *Piper Jaffray*, August 30, 2018.
- "US Banks:LIBOR Lull," *Autonomous Research*, September 4, 2018.
- "Banks: What's The Big DIF? Truing-Up FDIC Surcharge Impacts," *Jefferies*, September 4, 2018.
- "Loan Yields: Wide Divergence In Rise In Yields; Increase With Further Hikes Could Slow," *J.P. Morgan*, September 5, 2018.
- "Top Picks & Best Relative Value Ideas Regionals: Buy High Loan Betas; Cards: Buy Growth vs. Credit; Networks: Beware of Overcrowding," *Nomura*, September 5, 2018.
- "U.S. Large-Cap Banks – Fall 2018," *Barclays*, September 6, 2018.
- "Issues at the Wholesale Bank Not New News," *Evercore ISI*, September 6, 2018.
- "1H18 CRE Service Provider Review," *Raymond James*, September 6, 2018.
- "Media Reports Suggest DoJ Probing Previously Known Documentation Issue," *Sandler O'Neill & Partners*, September 6, 2018.
- "Banks: Hot Money Monitor; What's the Magic Number?" *Jefferies*, September 7, 2018.
- "Oh LIBOR, you were once our friend; downgrading CMA and WFC to Neutral," *Macquarie Research*, September 7, 2018.
- "Time for a Pause," *Macquarie Research*, September 7, 2018.
- "Financial Services Competitor Conference Guide," *Raymond James*, September 10, 2018.
- "News Story: Negative News On Auto Customer Remediation Plan; Other Implications? - ALERT," *J.P. Morgan*, September 12, 2018.
- "3Q NII Soft & Firmer 2020 Expense Target," *Autonomous Research*, September 14, 2018.

- "Wells Fargo & Company (WFC, OW/Pos, $55.00) Jason Goldberg, CFA," *Barclays*, September 14, 2018.
- "Wells Fargo & Company (WFC, $55.00, Outperform, Target: $63.00)," *Keefe, Bruyette & Woods*, September 14, 2018.
- "See Ya Next Spring," *Macquarie Research*, September 14, 2018.
- "WFC Provides Mid-Quarter Update and Codifies 2020E Expenses; Adjusting Ests." *Sandler O'Neill & Partners*, September 14, 2018.
- "2020 expense guidance underpins considerable profitability improvement potential," *UBS*, September 14, 2018.
- "Updating Model to Reflect Management Commentary," *RBC*, September 17, 2018.
- "JPMORGAN: Dimon Digest," *Autonomous Research*, September 18, 2018.
- "Perceptions Versus Reality; Our 3Q Preview," *Oppenheimer*, September 18, 2018.
- "Reiterate Underperform Rating; Fundamental Challenges Remain," *Raymond James*, September 18, 2018.
- "Large-Cap Banks: What's a bank investor to dream about next?" *Bernstein*, September 19, 2018.
- "Wells Fargo & Co. 'A-/A-2' Ratings Affirmed On Expected Progress On Operational Risk Controls; Outlook Remains Stable," *S&P Global Ratings*, September 20, 2018.
- "A means to an end," *Autonomous Research*, September 21, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 166 | Sept 21, 2018," *Barclays*, September 21, 2018.
- "Large Cap Regional Banks and Mortgage/Consumer Lenders," *Piper Jaffray*, September 21, 2018.
- "Updating Model for Adjusted Preferred Dividends," *RBC*, September 21, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 167 | Sept 24, 2018," *Barclays*, September 24, 2018.
- "Retail Brokerage Industry Analysis: Gains for RJF, Pain for WFC," *Buckingham Research Group*, September 24, 2018.
- "2020 Playbook: Bet on Self-Help, Cycle Winners; Avoid Cash Calamities," *Wolfe Research*, September 24, 2018.
- "Initiate at Outperform, $71 PT - Don't Get Bogged Down in Fee Pressures, WFC is a 'Self-Help' Story," *Wolfe Research*, September 24, 2018.
- "'Beta Data' Edition 2: Loan Betas Still Trailing, but Signs of Life," *Evercore ISI*, September 24, 2018.
- "3Q18 Earnings Preview: Loan Growth Holding Steady, Focus on NII Growth," *Morgan Stanley*, September 24, 2018.

- "What's Driving Slower C&I Loan Growth At Banks: Lower Demand? Or Huge Surge In Competition?" *J.P. Morgan*, September 25, 2018.
- "Measuring Deposit Attrition from Previous Branch Deals as WFC Waits in Wings," *Piper Jaffray*, September 25, 2018.
- "3Q Preview; How Higher LT Rates Impact Banks (Best/Worst Positioned)," *Deutsche Bank*, September 26, 2018.
- "Banks: Trading update and 3Q18 preview," *Atlantic Equities*, September 27, 2018.
- "Western Banks & Thrifts – 3Q18 Quarterly Preview," *Sandler O'Neill & Partners*, September 27, 2018.
- "UBS Evidence Lab: app download share gains maintained, but employee sentiment worsens," *UBS*, September 27, 2018.
- "Large-Cap Banks: Should bank investors stress about the SCB (or SCB + CECL)?" *Bernstein*, September 28, 2018.
- "Large Cap Regional Banks and Mortgage/Consumer Lenders," *Piper Jaffray*, September 30, 2018.
- "Growth Groans," *Autonomous Research*, October 2, 2018.
- "If This is Late Cycle… Slower Growth will Show Us Which Banks are more Fit to Thrive," *Credit Suisse*, October 2, 2018.
- "3Q18 Universal Banks Preview Bar Is Lowered Again, but Stock Prices Lowered More," *Keefe, Bruyette & Woods*, October 2, 2018.
- "Rising Rates Are Good For You! Leaning Against The Ministry of Truth," *Oppenheimer*, October 2, 2018.
- "Accounting for CECL: expect significant and wideranging impacts for banks and specialty finance," *UBS*, October 2, 2018.
- "Deep dive on CECL: reserve true ups should not dent capital strength; C&I focused banks fare best," *UBS*, October 2, 2018.
- "Investor Feedback — Key Takeaways," *Wolfe Research*, October 3, 2018.
- "Banking: 3Q18 Large Bank Earnings Preview," *Raymond James*, October 3, 2018.
- "US BANKS: 3Q Preview – Low Expectations," *Autonomous Research*, October 4, 2018.
- "Large-Cap Banks: Can bank stocks work their way out of the basement?" *Bernstein*, October 4, 2018.
- "Americas Banks: Macro driven sell-off presents attractive entry point for large cap banks," *Goldman Sachs*, October 4, 2018.
- "Weak Loan Growth But Controlled Expenses; 3M-1M Libor Full Circle; 10Y Yield Spike; Loan Outlook?" *J.P. Morgan*, October 5, 2018.

- "3Q18 Earnings Preview: The Bar is Lowered," *Evercore ISI*, October 7, 2018.
- "A low bar heading into 3Q18; addressing key debates; Citi and Regions seem well positioned," *UBS*, October 7, 2018.
- "Q3 Preview: Late-Cycle Apathy Provides Opportunity, Lean Long into Reporting," *Baird*, October 8, 2018.
- "The One Thing That Matters Most in 3Q for Each Company," *Deutsche Bank*, October 8, 2018.
- "3Q18 EPS Preview: Stable NII, NIM but Costs Becoming Better Controlled," *Barclays*, October 9, 2018.
- "Bank Stock Weekly: Sizing the FDIC surcharge - how much will the roll-off boost operating leverage next year?" *Bernstein*, October 9, 2018.
- "Large Cap U.S. Banks Expected To Deliver Over 30% Earnings Growth Both Year-Over-Year & Over Past 12 Months," *Vining Sparks*, October 9, 2018.
- "3Q18 Preview: Will results confirm investors' worst concerns?" *Bank of America Merrill Lynch*, October 11, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 178 | Oct 11, 2018," *Barclays*, October 11, 2018.
- "WFC: What's ahead for WFC in 3Q and beyond? Looking at 2019/20 scenarios," *Bernstein*, October 11, 2018.
- "Wells Fargo Research Primer," *Bloomberg Intelligence*, October 11, 2018.
- "WFC Earnings Prep 3Q18," *Credit Suisse*, October 11, 2018.
- "3Q18 Snap: Lacklustre revenue and loan growth," *Atlantic Equities*, October 12, 2018.
- "Q318 Initial Thoughts: Largely in Line with Solid Operating Leverage," *Baird*, October 12, 2018.
- "Light at the end of the tunnel," *Bank of America Merrill Lynch*, October 12, 2018.
- "WFC 3Q18 EPS Instant Insight," *Barclays*, October 12, 2018.
- "3Q18 First Look: Results Seem Good Enough," *Buckingham Research Group*, October 12, 2018.
- "Results: 3Q18 Early Read – Noisy Quarter, But Underlying Trends Look Solid," *Citigroup*, October 12, 2018.
- "3Q18: Have Revenues Inflected? EPS Miss On Items," *Deutsche Bank*, October 12, 2018.
- "3Q First Look: Fees Drive Miss, but B/S & NIM Trends Better; Expenses also a Positive," *Evercore ISI*, October 12, 2018.
- "3Q18 Call Takes: Brighter Days Likely on the Horizon," *Evercore ISI*, October 12, 2018.

- "Wells Fargo & Co. (WFC): First Take: A return to operating leverage," *Goldman Sachs*, October 12, 2018.
- "3Q18 First Looks: C, WFC," *Jefferies*, October 12, 2018.
- "3Q18 First Look: Higher Expenses Drive a Miss, but May Not Run Rate," *Keefe, Bruyette & Woods*, October 12, 2018.
- "JPM/WFC/C 3Q18 Read-Across for Financial Sub-Sectors: Follow-Up," *Keefe, Bruyette & Woods*, October 12, 2018.
- "WFC/JPM Mortgage Banking Trends Somewhat Better than Forecast; Margins Improve, While Volumes Mixed," *Keefe, Bruyette & Woods*, October 12, 2018.
- "Company Very noisy, but core results hit our number," *Macquarie Research*, October 12, 2018.
- "A less noisy 3Q18 was credit-positive, but overhead remains high and capital returns are accelerating," *Moody's*, October 12, 2018.
- "3Q18 First Pass: EPS Miss on Weaker Fees, No Update on Consent Order Yet," *Morgan Stanley*, October 12, 2018.
- "Q3 Reflects Inflection in Operating Leverage First Look," *Nomura*, October 12, 2018.
- "First Take Pre-Call: Encouraging Signs of Stabilization," *Oppenheimer*, October 12, 2018.
- "First Look: Mixed Quarter but Could Be Enough," *Piper Jaffray*, October 12, 2018.
- "3Q First Look: EPS Miss as Fundamental Performance Still Challenged," *Raymond James*, October 12, 2018.
- "Reducing EPS Estimates for Smaller Balance Sheet," *Raymond James*, October 12, 2018.
- "3Q18: Regulatory Issues Continue to Weigh on Results," *RBC*, October 12, 2018.
- "WFC 3Q18 Earnings: Estimated Core EPS of $1.09 falls short of $1.19 estimate and consensus of $1.17 reflecting weaker core noninterest income," *RBC*, October 12, 2018.
- "WFC 3Q18 Preliminary Earnings Review: Core EPS Below Us and the Consensus," *Sandler O'Neill & Partners*, October 12, 2018.
- "3Q18 first take: a lot of moving parts, but maybe a step closer to level setting revenue expectations," *UBS*, October 12, 2018.
- "Money center read thrus: Equities look solid (MS+); Consumer credit trends remain benign," *UBS*, October 12, 2018.
- "While WFC's 3Q'18 Earnings Continued To Be Impacted By Its Recent Issues, Its Inflection Point Is Approaching," *Vining Sparks*, October 12, 2018.
- "3Q18: Raising Out-year Estimates Marginally," *BMO Capital Markets*, October 14, 2018.

- "3Q18 Results: Consumers Holding in As We Wait for Commercial Activity to Pick Up," *Keefe, Bruyette & Woods*, October 14, 2018.
- "The Stabilization Continues," *Oppenheimer*, October 14, 2018.
- "Q3 Follow-Up: Solid Quarter with Better Operating Leverage, We Are Buyers," *Baird*, October 15, 2018.
- "3Q18 EPS Review: The Stagecoach Appears to be Making the Turn," *Barclays*, October 15, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 180 | Oct 15, 2018," *Barclays*, October 15, 2018.
- "Large-Cap Banks: EPS revisions following 3Q results; Upgrading PNC to Outperform," *Bernstein*, October 15, 2018.
- "Headwinds Fading?" *Buckingham Research Group*, October 15, 2018.
- "Americas Banks: Earnings Day 1: Late cycle concerns trump in-line operating trends," *Goldman Sachs*, October 15, 2018.
- "Weak 3Q: Core Revenue Down Ex Ineffective Hedge Gain - Weak NII and Fees; Non-Int Exp Up Modestly," *J.P. Morgan*, October 15, 2018.
- "C/JPM/PNC/WFC: 3Q18 Earnings Wraps," *Jefferies*, October 15, 2018.
- "Visibility improving; upgrading to OP," *Macquarie Research*, October 15, 2018.
- "Correction - 3Q18 Earnings Day 1: JPM, C, WFC & PNC," *Morgan Stanley*, October 15, 2018.
- "Thesis Reaffirming Trends: Reiterate Buy Revenue Growth Concerns Abate Amid Signs of Stabilization," *Nomura*, October 15, 2018.
- "WFC 3Q18 Earnings Review: Reducing EPS Estimates but Reiterate BUY Rating," *Sandler O'Neill & Partners*, October 15, 2018.
- "Big Bank Earnings Digest: Finishing on a High Note," *Wolfe Research*, October 17, 2018.
- "US banks: positive trends for Q4," *Atlantic Equities*, October 18, 2018.
- "What's driving post-earnings EPS revisions?" *Bank of America Merrill Lynch*, October 21, 2018.
- "LAST EDITION – U.S." *Credit Suisse*, October 22, 2018.
- "Model Maintenance; Trimming 2019E: $62 Target Price Unchanged," *Credit Suisse*, October 22, 2018.
- "Large-Cap Banks: What do current valuations say about 2019 EPS estimates?" *Bernstein*, October 26, 2018.
- "Wells Fargo's management changes are a credit-negative reminder of its unresolved sales practices issues," *Moody's*, October 29, 2018.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 191 | October 30, 2018," *Barclays*, October 30, 2018.

- "Auto Remediation Work Completion Delayed Further - To Last Until 2020; Implications for Asset Cap? - ALERT," *J.P. Morgan*, October 30, 2018.

- "2018 Banking & Financial Services Conference Question Book: BofAML's 2018 Future of Financials Conference," *Bank of America Merrill Lynch*, November 2, 2018.

- "No Turning Back The Clock, So Not The Time To Buy The Dip; Refreshing Ratings And Target Prices," *Citigroup*, November 2, 2018.

- "Question Bank: 4Q18 Edition," *Deutsche Bank*, November 2, 2018.

- "WFC: NIM over NCO in the 'Late Cycle' – Reiterate Target of $65," *RenMac*, November 4, 2018.

- "US Banks Day 1 takeaways: Banks upbeat about the future," *Bank of America Merrill Lynch*, November 5, 2018.

- "Legal eagles," *Autonomous Research*, November 6, 2018.

- "US BANKS: Q-Tips," *Autonomous Research*, November 6, 2018.

- "US Banks Day 2 takeaways: Large-caps generally optimistic about 2019," *Bank of America Merrill Lynch*, November 6, 2018.

- "3Q18 10-Q Review: Another Pick-a-Pay Gain Coming in 4Q," *Barclays*, November 6, 2018.

- "What's New in the 10-Q," *Credit Suisse*, November 6, 2018.

- "Wells Fargo & Company (WFC, $53.66, Outperform, Target: $63.00)," *Keefe, Bruyette & Woods*, November 6, 2018.

- "Model Update: Updating Model to Reflect 4Q Loan Sales," *RBC*, November 6, 2018.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 197 | November 7, 2018," *Barclays*, November 7, 2018.

- "Tech Troubles," *Autonomous Research*, November 8, 2018.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 198 | November 8, 2018," *Barclays*, November 8, 2018.

- "WFC Instant Insight - BAAB Conference Bullets," *Barclays*, November 9, 2018.

- "Focusing on Returns in Wealth Management," *Evercore ISI*, November 9, 2018.

- "Head of Wealth and Investment Management Discusses Business Trends," *Raymond James*, November 9, 2018.

- "WFC Discusses Its Wealth Management Business at the BAAB," *RBC*, November 9, 2018.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 200 | November 12, 2018," *Barclays*, November 12, 2018.

- “Banks: BAAB ’18 Conference Takeaways,” *Jefferies*, November 12, 2018.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 202 | November 14, 2018,” *Barclays*, November 14, 2018.
- “A Deep Dive Into Deposit Betas And Deposit Flows Why Rising Rates Are Still Good For You,” *Oppenheimer*, November 14, 2018.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 204 | November 16, 2018,” *Barclays*, November 16, 2018.
- “Establishing a 2020 Estimate; Target Price Unchanged at $62,” *Credit Suisse*, November 18, 2018.
- “Alert: Some Good News – FDIC Surcharge Is Over,” *Citigroup*, November 20, 2018.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 206 | November 21, 2018,” *Barclays*, November 21, 2018.
- “Bank Stock Weekly: EPS will matter again...eventually…” *Bernstein*, November 21, 2018.
- “US Rates Watch Q3 GSIB scores suggest modest year-end funding pressures,” *Bank of America Merrill Lynch*, November 26, 2018.
- “Wells Fargo is Change – I Think,” *Rafferty Capital Markets*, November 26, 2018.
- “Bank Weekly: 3Q18 Deposit Beta Update; Current Cycle Industry Deposit Betas Continue to Rise,” *Raymond James*, November 26, 2018.
- “Fed Highlights the Risks of Leverage Lending in Its Inaugural Financial Stability Report,” *RBC*, November 28, 2018.
- “Model Update: Refreshing Our Estimates,” *Citigroup*, November 30, 2018.
- “Consensus Growth Outlook Is Pollyannaish,” *Nomura*, November 30, 2018.
- “The Return of the Bank: Net Interest Margins Reach A Turning Point- Funding Advantages and Net Interest Income Projections,” *Morningstar*, December 3, 2018.
- “Wells Fargo Is Still Attempting to Put Its Account Scandals and Other Woes in the Rear-View Mirror,” *Morningstar*, December 3, 2018.
- “US Financials Conference 2018 - Key Takeaways,” *Goldman Sachs*, December 4, 2018.
- “Management Provides Update for 4Q18,” *Keefe, Bruyette & Woods*, December 4, 2018.
- “Reanalyzing Bank Profitability: Funding Advantages, NIMs, and Peak Profitability Amid Rate Changes,” *Morningstar*, December 4, 2018.
- “Spotlight on Bank Credit: Leveraged Lending in Focus,” *Keefe, Bruyette & Woods*, December 5, 2018.
- “Asset Cap Forever,” *Autonomous Research*, December 6, 2018.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 214 | December 6, 2018," *Barclays*, December 6, 2018.
- "214 | December 6, 2018," *Credit Suisse*, December 6, 2018.
- "Another Potential Consent Order Snag?" *Evercore ISI*, December 6, 2018.
- "Sentiment grows more bearish: quantifying content of fifty investor meetings post 3Q18 results," *UBS*, December 6, 2018.
- "Global Financials Blast: Disrupt the banks? If you can't beat 'em, join 'em!" *Bernstein*, December 7, 2018.
- "What to Focus on in Current Sell Off; Stocks Near Post Crisis Relative Lows," *Deutsche Bank*, December 10, 2018.
- "CECL Seminar Recap: Keeping an Open Mind," *Barclays*, December 11, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 217 | December 11, 2018," *Barclays*, December 11, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 218 | December 12, 2018," *Barclays*, December 12, 2018.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 15, Issue 220 | December 14, 2018," *Barclays*, December 14, 2018.
- "19 Stocks for 2019: Our Highest Conviction Calls," *UBS*, December 17, 2018.
- "Deep Dive on CECL - Analysis/Potential Implications and Considerations for CECL," *Jefferies*, December 18, 2018.
- "Holiday Opportunities: A Chance to Pivot to Self Help Before the New Year Starts," *Keefe, Bruyette & Woods*, December 18, 2018.
- "Bank Stock Sell-Off At or Near End; 4Q Preview," *Deutsche Bank*, December 20, 2018.
- "CECL Is Coming," *Morgan Stanley*, December 20, 2018.
- "Western Banks & Thrifts - 4Q18 Quarterly Preview," *Sandler O'Neill & Partners*, December 20, 2018.
- "Reducing EPS Estimates; Revenue Likely to Decline Again in 2019," *Raymond James*, December 21, 2018.
- "Announces Settlement with State Attorneys General," *Keefe, Bruyette & Woods*, December 28, 2018.
- "WFC Reaches $575 Million Agreement Regarding Retail Sales Practices, Auto-Loan and Mortgage Charges," *RBC*, December 28, 2018.
- "WFC Discloses Settlement with State Attorneys General," *Sandler O'Neill & Partners*, December 28, 2018.
- "Prepare for the Great Divide: 2019 Outlook," *Credit Suisse*, January 1, 2019.

- "U.S. Large-Cap Banks 2019 Outlook: Past, Present & Yet to Come: Less Good Doesn't Mean Bad, Buy Banks," *Barclays*, January 2, 2019.
- "U.S. Research at a Glance," *RBC*, January 2, 2019.
- "Upgrading to Sector Perform but WFC Still Navigating through The Regulatory Storm," *RBC*, January 2, 2019.
- "2019 Regional Banks 'Soundtrack' (…aka Outlook)," *Evercore ISI*, January 3, 2019.
- "4Q: Stronger C&I Loans, But Lower Markets Related Revenues; Year End Repo Mkts Volatility Exacerbated," *J.P. Morgan*, January 3, 2019.
- "Sandler O'Neill's Top Ideas for 2019," *Sandler O'Neill & Partners*, January 3, 2019.
- "Banks: earnings momentum surprisingly strong," *Atlantic Equities*, January 4, 2019.
- "U.S. Banks 2019 Outlook: Has Elvis Left the Building?" *Bernstein*, January 4, 2019.
- "4Q18 Preview and 2019 Outlook: The Less You Pay, The More It's Worth," *Oppenheimer*, January 4, 2019.
- "US Banks Chart of the Week: Why the GSIB surcharge may be the ultimate binding constraint," *Bank of America Merrill Lynch*, January 6, 2019.
- "2019 Outlook: 50% of recession case priced in suggests favorable risk reward skew; PNC down to Neutral," *Goldman Sachs*, January 7, 2019.
- "2019 Outlook: Late Cycle Playbook Prompts Valuation Rethink; D/G Universal & Trust Banks to Market Weight," *Wolfe Research*, January 8, 2019.
- "Past as Prologue for the Present? It's All About the Forward Look," *Credit Suisse*, January 8, 2019.
- "Banks: 2019 Outlook; Oversold, But With Overhangs," *Jefferies*, January 8, 2019.
- "4Q18 Earnings Preview: Lowering Estimates, but LC Bank Stocks Still Cheap," *Morgan Stanley*, January 8, 2019.
- "2018 reset expectations, setting the stage for outperformance; constructive on large cap banks," *UBS*, January 8, 2019.
- "4Q18 Results Preview: Lowering Estimates & Targets, but Upside Remains," *Buckingham Research Group*, January 9, 2019.
- "Tactical Time to Buy; CFG, FITB, and MS to Buy; Downgrading BK to Neutral," *Citigroup*, January 9, 2019.
- "4Q18 Universal Banks Preview: A Tough Year End, but Loan Growth Looks Solid," *Keefe, Bruyette & Woods*, January 9, 2019.
- "4Q18 EPS Preview: Core Revenue Growth Inflection in Sight," *Barclays*, January 10, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 7 | January 10, 2019," *Barclays*, January 10, 2019.

- "Americas Banks: Sizing up GS 4Q18 earnings vs. consensus: MS and WFC expected to come in ahead," *Goldman Sachs*, January 10, 2019.
- "Asset Managers," *Autonomous Research*, January 11, 2019.
- "AUTONODAILY: LC, FRC, GSKY, IVZ, ACGL, BITMAIN, ASSET MGMT, FED," *Autonomous Research*, January 11, 2019.
- "WFC Earnings Prep 4Q18," *Credit Suisse*, January 11, 2019.
- "Inst. Leveraged Loans Vs Bank C&I Loans In 4Q; Lev. Loan Spreads Sharp Reversal; Risk Up A Little," *J.P. Morgan*, January 11, 2019.
- "Offsets in a tough environment," *Autonomous Research*, January 15, 2019.
- "Bank Earnings Day 1: Mixed Results Top Low Expectations," *Baird*, January 15, 2019.
- "Q418 Initial Thoughts: Fees Below Expectations but Loan Growth Solid," *Baird*, January 15, 2019.
- "Key to 2019: Greater progress, less noise," *Bank of America Merrill Lynch*, January 15, 2019.
- "4Q18 EPS Review: Operating EPS Improves but Asset Cap Extended," *Barclays*, January 15, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 10 | January 15, 2019," *Barclays*, January 15, 2019.
- "WFC 4Q18 EPS Instant Insight," *Barclays*, January 15, 2019.
- "4Q18: Lowering Estimates Marginally Due to Weaker Fees and Credit," *BMO Capital Markets*, January 15, 2019.
- "Read-Throughs From JPM and WFC Results: Mixed," *BMO Capital Markets*, January 15, 2019.
- "Asset Cap Extension Bad Optics, But Hints of Growth," *Buckingham Research Group*, January 15, 2019.
- "Results: 4Q18 Early Read – Sorting through the Noise; Slight Core Miss and Peg Core EPS at $1.08," *Citigroup*, January 15, 2019.
- "4Q18 - Fee Income Pressures in Focus as Core Results Soft," *Wolfe Research*, January 15, 2019.
- "4Q18 - Under (Fee) Pressure," *Wolfe Research*, January 15, 2019.
- "Consent Order Relief Delayed; Top Line Momentum Challenged; Remain Neutral," *Credit Suisse*, January 15, 2019.
- "First Thoughts: Some + / Some –," *Credit Suisse*, January 15, 2019.
- "DBRS: Wells Fargo Reports Solid 4Q18 Results; Plans To Operate Under the Asset Cap Through 2019," *DBRS*, January 15, 2019.

- "4Q18: Disappointing Quarter Ex Items and Asset Cap Expected to Linger," *Deutsche Bank*, January 15, 2019.
- "4Q First Look: Weaker Fees & Expenses Mask Better B/S Trends," *Evercore ISI*, January 15, 2019.
- "4Q Wrap: Weak Fees Mar Qtr & Asset Cap Pushed Out, but Constructive on ROE Outlook," *Evercore ISI*, January 15, 2019.
- "First Take: Encouraging Core Operating Trends Offset by Market Sensitive Revenue Weakness," *Goldman Sachs*, January 15, 2019.
- "Weak 4Q: Lower Revenues, Higher Core Non-Interest Expenses; Asset Cap to Continue Until YE'19," *J.P. Morgan*, January 15, 2019.
- "4Q18 First Look: Noisy Quarter but a Top-Line Miss Prevails," *Keefe, Bruyette & Woods*, January 15, 2019.
- "4Q18 Results: Ongoing Asset Cap Caps Any Positives at Earnings," *Keefe, Bruyette & Woods*, January 15, 2019.
- "JPM/WFC 4Q18 Read-Across for Financial Sub-Sectors: Follow-Up," *Keefe, Bruyette & Woods*, January 15, 2019.
- "Mortgage Banking: Mixed Results with JPM Weak and WFC Largely in Line," *Keefe, Bruyette & Woods*, January 15, 2019.
- "Wells Managing to Asset Cap Through the End of 2019," *Keefe, Bruyette & Woods*, January 15, 2019.
- "Client activity increased but market-sensitive revenues weighed on the quarter," *Macquarie Research*, January 15, 2019.
- "4Q18 First Pass: In-Line on Core Banking, but Fees Pressured by 4Q Market Volatility," *Morgan Stanley*, January 15, 2019.
- "Read-Across from JPM and WFC 4Q18 Results to the Midcap Banks," *Morgan Stanley*, January 15, 2019.
- "Top-Line Miss but Core Operating Trends Okay," *Nomura*, January 15, 2019.
- "4Q18 First Take-Pre-Call: Noisy Quarter But More Or Less In Line," *Oppenheimer*, January 15, 2019.
- "Roughly In-line Quarter But Asset Cap Continues to Linger," *Oppenheimer*, January 15, 2019.
- "Credit Card Monitor: 2018 Ends on a Positive Note - A Sign of Things to Come," *Piper Jaffray*, January 15, 2019.
- "First Look: Core Revenue Trend Remains Lower," *Piper Jaffray*, January 15, 2019.
- "4Q First Look: EPS Beat on Taxes but Core Issues Remain," *Raymond James*, January 15, 2019.

- "Reducing EPS Estimates for Slower Revenue Growth Outlook," *Raymond James*, January 15, 2019.
- "Asset Cap Sticks Around for 2019 but Company Remains Focused on Expense Reduction," *RBC*, January 15, 2019.
- "WFC 4Q18 estimated core EPS of $1.09 falls short of our $1.15 estimate and the $1.18 consensus estimate; Asset Cap Expected to Remain in Place Through YE 2019," *RBC*, January 15, 2019.
- "Bulletin: Wells Fargo's Expectation For An Extended Asset Cap Is A Credit Negative, But Progress Toward Removal Should Continue," *S&P Global Ratings*, January 15, 2019.
- "WFC 4Q18 Earnings Review: Reducing EPS Estimates but Reiterate BUY Rating," *Sandler O'Neill & Partners*, January 15, 2019.
- "WFC 4Q18 Preliminary Earnings Review: Core EPS Below Us and the Consensus," *Sandler O'Neill & Partners*, January 15, 2019.
- "4Q18 is messy, but core trends appear to be (mostly) as expected," *UBS*, January 15, 2019.
- "Revising estimates after noisy 4Q18 results; WFC EPS tweaked down; JPM earnings resilient," *UBS*, January 15, 2019.
- "WFC's Earnings Are Still Impacted By Its Recent Issues, But Lower Expenses & Shares Are First Positive Signs," *Vining Sparks*, January 15, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 11 | January 16, 2019," *Barclays*, January 16, 2019.
- "Large-Cap Banks: Modestly lowering EPS estimates at JPM and WFC following 4Q results," *Bernstein*, January 16, 2019.
- "JPM/WFC: 4Q18 Earnings Wraps," *Jefferies*, January 16, 2019.
- "4Q18 Earnings Day 2: JPM & WFC," *Morgan Stanley*, January 16, 2019.
- "Wells Fargo Continues To Be Hurt By Low Mortgage Income, Asset Cap Delays Add to Disappointment," *Morningstar*, January 16, 2019.
- "Asset Cap Sticks Around for 2019 but Company Remains Focused on Expense Reduction," *RBC*, January 16, 2019.
- "Wells Fargo now plans to operate under the Fed's asset cap through 2019, a credit negative," *Moody's*, January 18, 2019.
- "US banks: credit positive, valuations appealing," *Atlantic Equities*, January 22, 2019.
- "4Q18 Recap - Messy earnings, but 2019 outlook largely intact," *Goldman Sachs*, January 22, 2019.
- "Higher dividend yield should support near-term outperformance," *Goldman Sachs*, January 22, 2019.

- "Dividend Increase a Modest Net Positive for Capital Return Story," *Keefe, Bruyette & Woods*, January 22, 2019.
- "Bank Stocks in Price Discovery Mode: Bull-Bear Debate: Solid Growth at Undemanding Valuations vs. Deceleration and Late-Cycle Fears," *Nomura*, January 22, 2019.
- "4Q18 Recap/Outlook; Remain Positive, But More Selective After 20% Rally," *Deutsche Bank*, January 24, 2019.
- "Bank CEOs constructive in Davos but await Waters at home; White House planning GSE overhaul; HBAN 4Q inline but rate hike removal reduces revenue, expense outlook; C not concerned on FRTB, BEAT, GSIB or TLAC; WFC launching new visual identity, ad campaign; JPM expanding private bank south; USB starting ABS lending; STT building new HQ…" *Barclays*, January 25, 2019.
- "A Sigh of Relief with 4Q… Macro and Competitive Positioning Critical to 2019," *Credit Suisse*, January 25, 2019.
- "WFC CEO defends his performance and student offering; MTB CEO focused on community, talent, and tech but hard to predict M&A; SNC exam shows credit quality improves but leverage loan risk remains; YTD loan growth tracking ahead of 2015, '16 & '18; FASB CECL roundtable today…" *Barclays*, January 28, 2019.
- "4Q18 Review and Outlook: Pop Justified, More to Come Despite 1Q Headwinds," *Barclays*, January 29, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 220 | January 29, 2019," *Barclays*, January 29, 2019.
- "PG&E Exposure Very Limited At Our Banks; Some Marks Taken, Some Hedges," *J.P. Morgan*, January 29, 2019.
- "US Card Issuers: 4Q18 Wrap-Up," *Citigroup*, January 30, 2019.
- "Trust Stuff," *Autonomous Research*, January 31, 2019.
- "Post 4Q: Fed On Hold – NIM Stalled; Any C&I Loans To Cap Mkts? Lack Of Catalysts Near Term," *J.P. Morgan*, January 31, 2019.
- "Bank Stock Weekly: Profitability peaking?" *Bernstein*, February 4, 2019.
- "4Q18 Review: Brighter Skies Ahead," *Morgan Stanley*, February 4, 2019.
- "WFC adds several outside senior hires; Loan officers foresee weaker demand, tighter terms and deteriorating asset quality in 2019; House examining banks servicing marijuana businesses as well as leveraged lending; Shadow banking continues to expand…" *Barclays*, February 5, 2019.
- "Time to Stress—2019 CCAR Scenarios Released (This Is Step 1)," *Credit Suisse*, February 5, 2019.
- "2019 CCAR Scenarios Released: Fed Adds Incremental Stress for Those Banks Still Participating," *Keefe, Bruyette & Woods*, February 5, 2019.

- "A mixed bag for 2019 CCAR scenarios; tougher economic scenario but more transparency helps," *UBS*, February 5, 2019.
- "CCAR nuances + investor feedback," *Bank of America Merrill Lynch*, February 6, 2019.
- "Question Bank: 1Q19 Edition," *Deutsche Bank*, February 6, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 27 | February 8, 2019," *Barclays*, February 8, 2019.
- "The Weekly Chu: Week of February 11th, 2019," *Wolfe Research*, February 11, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 29 | February 12, 2019," *Barclays*, February 12, 2019.
- "29 | February 12, 2019," *Credit Suisse*, February 12, 2019.
- "Conference Presentation: Loan Growth Holding Up Well," *Evercore ISI*, February 12, 2019.
- "Key Takeaways from CFO's Presentation," *Keefe, Bruyette & Woods*, February 12, 2019.
- "Rising to Its Card Giant Potential: Meeting with Head of Cards & Retail Services," *Nomura*, February 13, 2019.
- "Cautious Optimism; CS Financial Services Forum Highlights," *Credit Suisse*, February 14, 2019.
- "Fed's 2019 CCAR Preapprovals Provide Most Banks With Ample Room to Return Capital; A Slight Negative for MTB," *Citigroup*, February 15, 2019.
- "Banks: CCAR '19; Got Scenarios/Letters, Still Waiting for Instructions," *Jefferies*, February 19, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 32 | February 20, 2019," *Barclays*, February 20, 2019.
- "Previewing JPM Investor Day; M&A Scorecard; HBAN/MTB MOE?" *Deutsche Bank*, February 20, 2019.
- "U.S. Portfolio Strategy: What are the consequences of the post-GFC corporate debt binge?" *Bernstein*, February 21, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 34 | February 22, 2019," *Barclays*, February 22, 2019.
- "Adjusting for the Baseline and Mid-Quarter Updates, Downgrading STT to Underperform," *Keefe, Bruyette & Woods*, February 24, 2019.
- "Adjusting estimates to mark-to-market market sensitive revenue," *Goldman Sachs*, February 26, 2019.
- "Legal eagle," *Autonomous Research*, February 28, 2019.

- "CEO & CFO takeaways: More meaningful signs of progress in '19," *Bank of America Merrill Lynch*, February 28, 2019.
- "2018 10-K Review: Loan Sale Gain, Service Interruption to Impact 1Q," *Barclays*, February 28, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 38 | February 28, 2019," *Barclays*, February 28, 2019.
- "What's New in the 10-K-litigation risk remains elevated; core fundamental trends in line," *Credit Suisse*, February 28, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 40 | March 4, 2019," *Barclays*, March 4, 2019.
- "CCAR 2019 Instructions Released," *Barclays*, March 6, 2019.
- "As Good as It Gets," *BMO Capital Markets*, March 6, 2019.
- "2019 CCAR: No More Qualitative Objection for U.S. Banks," *Keefe, Bruyette & Woods*, March 6, 2019.
- "CCAR Instructions: Release Looks Like a Dud, But There is More Than Meets the Eye," *Wolfe Research*, March 7, 2019.
- "Time to Stress, Step 2 -- 2019 CCAR Instructions Released," *Credit Suisse*, March 7, 2019.
- "2019 Guidelines Support Our View That CCAR Won't Be a Major Catalyst," *Deutsche Bank*, March 7, 2019.
- "Banks: CCAR '19 Instructions - That Looks Familiar," *Jefferies*, March 7, 2019.
- "Upgrading the Moat Ratings of JPMorgan and Bank of America; Scale, Scope, and the Future of Banking," *Morningstar*, March 7, 2019.
- "Mortgage & Housing Monitor: Data Showing Positive Signals," *Piper Jaffray*, March 7, 2019.
- "Highlights from our meeting with Wells Fargo's Treasurer," *Bernstein*, March 8, 2019.
- "2019 RBC Capital Markets Financial Institutions Conference Preview," *RBC*, March 8, 2019.
- "How the market may react to leadership changes," *Bank of America Merrill Lynch*, March 11, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 45 | March 11, 2019," *Barclays*, March 11, 2019.
- "LCR Takeaways: WFC Low Non-Operational Deposits Drop YoY, BAC Low Operational Corp Dep But Offset," *J.P. Morgan*, March 11, 2019.
- "OCC Rebuke Yesterday a Notable Event; House Hearing Continues Political Risk – ALERT," *J.P. Morgan*, March 12, 2019.

- "DC Woes Continue," *Raymond James*, March 12, 2019.
- "Worst day ever," *Autonomous Research*, March 13, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 47 | March 13, 2019," *Barclays*, March 13, 2019.
- "Highlights from the RBC Financial Institutions Conference," *RBC*, March 13, 2019.
- "Maybe any PR is good PR," *Autonomous Research*, March 14, 2019.
- "WFC: Model Maintenance: trimming our 2019 estimate," *Credit Suisse*, March 14, 2019.
- "Highlights from the RBC Financial Institutions Conference," *RBC*, March 14, 2019.
- "Lend Now a More Important Part of the Return Equation for Transactors," *Barclays*, March 15, 2019.
- "Spotlight on Credit: Collateralized Loan Obligations in Focus," *Keefe, Bruyette & Woods*, March 17, 2019.
- "Mgmt Meeting: Auto Finance - Much Change Under Way; Used Car Sales, Spreads Holding Up Vs New," *J.P. Morgan*, March 18, 2019.
- "Value, or Value Trap? A Bull/Bear Deep Dive," *Bank of America Merrill Lynch*, March 19, 2019.
- "Revising Our EPS Estimates for Flat Rates," *Citigroup*, March 19, 2019.
- "Living off of December," *Macquarie Research*, March 19, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 53 | March 22, 2019," *Barclays*, March 22, 2019.
- "U.S. Large-Cap Banks: State of the Industry," *Barclays*, March 25, 2019.
- "Conference Call Transcript: Co-branded Credit Card Expert Call," *Citigroup*, March 25, 2019.
- "Life Without Rate Hikes...Not That Hugely Different," *Oppenheimer*, March 25, 2019.
- "Bank Stock Performance Following Previous Fed Rate Peaks; 1Q19 Preview," *Deutsche Bank*, March 26, 2019.
- "*UBS* Evidence Lab inside: IT survey suggests size matters; could consolidation be a result?" UBS, March 26, 2019.
- "1Q19 Earnings Preview: Buy the Print," *Morgan Stanley*, March 27, 2019.
- "Tim Sloan Retiring, Board Looking Externally for Replacement," *Baird*, March 28, 2019.
- "Post-call thoughts + 2020/2021 bull/bear EPS sensitivities," *Bank of America Merrill Lynch*, March 28, 2019.

- "Shares Should Rally on CEO Transition," *Bank of America Merrill Lynch*, March 28, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 57 | March 28, 2019," *Barclays*, March 28, 2019.
- "CEO Departure: Commitment to Hiring an Outsider a Key Positive," *Buckingham Research Group*, March 28, 2019.
- "Alert: The Right Move, but Next Move Is More Important," *Citigroup*, March 28, 2019.
- "Because You May Have Missed It: 2019 CCAR Model Changes Negative for COF, C, JPM," *Wolfe Research*, March 28, 2019.
- "CEO Tim Sloan Retiring," *Credit Suisse*, March 28, 2019.
- "Moving Aside to Move Forward  Wells Fargo CEO Search Begins Tomorrow," *Credit Suisse*, March 28, 2019.
- "Downgrading to HOLD Given Mgmt and EPS Uncertainty," *Deutsche Bank*, March 28, 2019.
- "Call Takes: CEO Change a Positive, but Less Visibility on Expense Efforts," *Evercore ISI*, March 28, 2019.
- "Quick Pre-Call Take on Sloan Resignation," *Evercore ISI*, March 28, 2019.
- "CEO retiring, internal interim CEO appointed, and search for external replacement underway," *Goldman Sachs*, March 28, 2019.
- "CEO Sloan Steps Down; Search for an External Successor Begins," *Keefe, Bruyette & Woods*, March 28, 2019.
- "CEO Sloan Steps Down; Not a Resolution But the Start of a Process," *Oppenheimer*, March 28, 2019.
- "CEO Exit Signals a Turning Point, but Fundamental Outlook Remains Murky," *Piper Jaffray*, March 28, 2019.
- "Wells Fargo CEO Tim Sloan Announces Retirement; General Counsel C. Allen Parker to Serve as Interim CEO," *RBC*, March 28, 2019.
- "Western Banks & Thrifts – 1Q19 Quarterly Preview," *Sandler O'Neill & Partners*, March 28, 2019.
- "Clearing the air with regulators and policymakers? Tim Sloan steps down as CEO," *UBS*, March 28, 2019.
- "US banks: consumer lending up, NIMs down," *Atlantic Equities*, March 29, 2019.
- "Time to Lawyer Up," *Autonomous Research*, March 29, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 58 | March 29, 2019," *Barclays*, March 29, 2019.

- "Wells Fargo & Company: A new external CEO will help Wells Fargo move past its legacy issues," *Moody's*, March 29, 2019.

- "Stepping Aside," *Morgan Stanley*, March 29, 2019.

- "Extension of the Cycle Favors Cards: Bank Estimates Too High but Valuations Discount Downside; Upgrading KEY & RF to Neutral," *Nomura*, March 29, 2019.

- "Upgrade to Market Perform; Sloan Retirement Removes a Headwind," *Raymond James*, March 29, 2019.

- "CEO Tim Sloan to Retire; BOD Commences Search for New Permanent CEO," *Sandler O'Neill & Partners*, March 29, 2019.

- "TOM BROWN'S BANKING WEEKLY: 3/29/19," *Second Curve Advisory Services*, March 29, 2019.

- "The Death of Wells Fargo As We Know It," *Vining Sparks*, March 29, 2019.

- "*Vining Sparks* Large Cap U.S. Bank Disclosures," Vining Sparks, March 29, 2019.

- "1Q19 Preview: Q1 operating trends vs. the end of the Fed rate hiking cycle," *Goldman Sachs*, March 31, 2019.

- "Downgrading to Market Perform, It's Tough to Sail a Ship Without a Captain," *Keefe, Bruyette & Woods*, March 31, 2019.

- "Q1 Preview: Results Fine, Outlook the Issue," *Baird*, April 1, 2019.

- "S&P Revises Outlook on Wells Fargo & Co. (HoldCo) to Negative," *BMO Capital Markets*, April 1, 2019.

- "Shedding Some Light on the CCAR Models," *Credit Suisse*, April 1, 2019.

- "Sloan Steps Down as Wells Fargo CEO; Interim CEO Selected as Board Begins Search for Replacement," *Morningstar*, April 1, 2019.

- "A low bar could set stage for near term outperformance; positive on Citigroup into 1Q19," *UBS*, April 1, 2019.

- "What Matters Most in 1Q for Each Bank; Update on Current Trends," *Deutsche Bank*, April 2, 2019.

- "1Q19 Universal Banks Preview: Setup Is No Slam Dunk for Estimates to Move Higher," *Keefe, Bruyette & Woods*, April 3, 2019.

- "1Q19 Large Bank Earnings Preview," *Raymond James*, April 4, 2019.

- "1Q19 preview: Bottom line, will it be good enough?" *Bank of America Merrill Lynch*, April 5, 2019.

- "1Q19 EPS Preview: Searching for a New CEO and Revenue Growth," *Barclays*, April 5, 2019.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 63 | April 5, 2019," *Barclays*, April 5, 2019.

- “1Q19 Earnings Tear Sheets,” *Deutsche Bank*, April 5, 2019.
- “Some Like it Frothy,” *Autonomous Research*, April 8, 2019.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 64 | April 8, 2019,” *Barclays*, April 8, 2019.
- “1Q19 Preview,” *BMO Capital Markets*, April 8, 2019.
- “CCAR Payout Ratios to Improve Given Easing of DFAST Stress Scenarios,” *Citigroup*, April 8, 2019.
- “The Weekly Chu: Week of April 8th, 2019,” *Wolfe Research*, April 8, 2019.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 65 | April 9, 2019,” *Barclays*, April 9, 2019.
- “PFG: PFG to Acquire WFC's Retirement Business,” *Credit Suisse*, April 9, 2019.
- “We Estimate 15-20% Potential EPS Risk (At Least Initially) from New CEO,” *Deutsche Bank*, April 9, 2019.
- “1Q: Weak Mkts, Including Lag Effects, C&I Loans Better Than Feared, NIM Down; Priced In?” *J.P. Morgan*, April 9, 2019.
- “Principal to Acquire Wells Fargo's Institutional Retirement & Trust Business,” *RBC*, April 9, 2019.
- “WFC to Sell Institutional Retirement & Trust Business to PFG,” *Sandler O'Neill & Partners*, April 9, 2019.
- “Despite Current Investor Fears, The Large Cap U.S. Banks Should Still Be Able To Deliver Strong YOY Earnings Growth,” *Vining Sparks*, April 9, 2019.
- “US Banks (Large Cap): The banks who say NII,” *Autonomous Research*, April 10, 2019.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 66 | April 10, 2019,” *Barclays*, April 10, 2019.
- “Leveraged Loans - Further Probe: LBO Loans Share Up - Money Centers Small Players; Who’s Leading?” *J.P. Morgan*, April 10, 2019.
- “WFC Earnings Prep 1Q19,” *Credit Suisse*, April 11, 2019.
- “Q1 Initial Thoughts: Softer Quarter, but Weaker Results Expected,” *Baird*, April 12, 2019.
- “V/MA: JPM, WFC Q1 Card Volumes Decelerate,” *Barclays*, April 12, 2019.
- “WFC 1Q19 EPS Instant Insight,” *Barclays*, April 12, 2019.
- “1Q19: Lowering Estimates and Target Due to Lower Expected NII,” *BMO Capital Markets*, April 12, 2019.
- “Results: 1Q19 Early Read; Good Expense Progress, Topline Remains Soft,” *Citigroup*, April 12, 2019.

- "1Q19 - Results Disappoint as WFC Stuck in ~$4 Earnings Quagmire," *Wolfe Research*, April 12, 2019.
- "1Q19 First Impressions--Mixed," *Credit Suisse*, April 12, 2019.
- "Specialty Finance: JPM-WFC Results: Card Healthy Tho Spend Slowed; Positive for SLM," *Credit Suisse*, April 12, 2019.
- "1Q19 Results Confirm EPS Power Lower Than Expected," *Deutsche Bank*, April 12, 2019.
- "Lowering 2019e By 9% To $4.60 On Lower Net II and Fewer Buybacks," *Deutsche Bank*, April 12, 2019.
- "1Q19 First Look: Tough Quarter; All Eyes on Top Spot," *Evercore ISI*, April 12, 2019.
- "Downgrading to In Line as Earnings Headwinds & Mgmt Uncertainty Limit Upside," *Evercore ISI*, April 12, 2019.
- "First Take: A Core Miss on Higher Expenses and a Reserve Build," *Goldman Sachs*, April 12, 2019.
- "Operating leverage trends impaired; Downgrade from Buy to Neutral and removing from Americas Conviction List," *Goldman Sachs*, April 12, 2019.
- "1Q19 First Look: WFC," *Jefferies*, April 12, 2019.
- "1Q19 First Look: Revenues and Credit Both Drive a Miss," *Keefe, Bruyette & Woods*, April 12, 2019.
- "1Q19 Results: Wells Quickly Pulls off the Band-Aid in 2019 but It Still Hurts," *Keefe, Bruyette & Woods*, April 12, 2019.
- "JPM/WFC 1Q19 Read-Across for Financial Sub-Sectors: Follow-Up," *Keefe, Bruyette & Woods*, April 12, 2019.
- "Management Commits to Expenses but NII Guided Down," *Keefe, Bruyette & Woods*, April 12, 2019.
- "Mortgage Banking: Trends Generally Better But Read-Through Unclear," *Keefe, Bruyette & Woods*, April 12, 2019.
- "Q1 2019 Results: Healthy Balance Sheet and Respectable Profitability at a Time of Franchise Uncertainty," *Moody's*, April 12, 2019.
- "1Q19 First Pass: Stock Likely Weaker on Higher Expenses, Credit Reserves," *Morgan Stanley*, April 12, 2019.
- "Midcap Banks: Read-Across from JPM, WFC, and PNC's 1Q19 Results to the Midcap Banks," *Morgan Stanley*, April 12, 2019.
- "EPS Miss but Core Revenue Growth Improves," *Nomura*, April 12, 2019.
- "1Q19 First Take Pre-Call: Core Results Remain Under Pressure," *Oppenheimer*, April 12, 2019.

- "The Twisting and Dangling May Persist a While...." *Oppenheimer*, April 12, 2019.
- "First Look: Core Operating Miss as Provisions Move Higher," *Piper Jaffray*, April 12, 2019.
- "1Q First Look: EPS Beat, but Fundamentals Remain Challenged," *Raymond James*, April 12, 2019.
- "Reducing 2020 EPS Estimate for Lower Net Interest Income," *Raymond James*, April 12, 2019.
- "WFC 1Q19 estimated core EPS of $1.00 below consensus of $1.10, *RBC* estimate of $1.15," RBC, April 12, 2019.
- "WFC 1Q19 Earnings Review: Reducing EPS Estimates but Keeping BUY Rating," *Sandler O'Neill & Partners*, April 12, 2019.
- "WFC 1Q19 Preliminary Earnings Review: Core EPS Below Us and the Consensus," *Sandler O'Neill & Partners*, April 12, 2019.
- "1Q'19 Earnings Release Summary Review," *Vining Sparks*, April 12, 2019.
- "Beyond the Curve... mix, growth, positioning, and pricing drive the forward look for NII," *Credit Suisse*, April 14, 2019.
- "1Q19: No Light At the End of the Tunnel," *RBC*, April 14, 2019.
- "JPMorgan and PNC kick off 1Q19 bank earnings with strong results; Wells' NII guide disappoints," *UBS*, April 14, 2019.
- "EPS Resets Lower on Meaningful NII Guide-Down," *Autonomous Research*, April 15, 2019.
- "Downgrade to Neutral: Help wanted," *Bank of America Merrill Lynch*, April 15, 2019.
- "1Q19 EPS Review: Cuts NII Guide and Asset Cap Exit Timeline for New CEO," *Barclays*, April 15, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 69 | April 15, 2019," *Barclays*, April 15, 2019.
- "Downgrade to NEUTRAL; Throwing in the Towel on Revenue Inflection," *Buckingham Research Group*, April 15, 2019.
- "1Q Review – Tough Quarter But We See Long-Term Value," *Citigroup*, April 15, 2019.
- "WFC: No Reason to Get Off the Sidelines," *Wolfe Research*, April 15, 2019.
- "Momentum Challenged; Conviction Requires CEO Clarity; TP Reduced to $52," *Credit Suisse*, April 15, 2019.
- "Reconciling $1.8b Net II Guide Down & Why It Implies Lower 2020 Net II," *Deutsche Bank*, April 15, 2019.

- "Weak 1Q: Core Pretax Income Down Sharply YoY - Lower Revenues A Drag; NII To Fall; Stay UW," *J.P. Morgan*, April 15, 2019.
- "Wells Fargo : Earnings Beat, CEO Search, NII Weakness Expected, CECL Guidance," *J.P. Morgan*, April 15, 2019.
- "JPM/PNC/WFC: 1Q19 Earnings Wraps," *Jefferies*, April 15, 2019.
- "So … that was disappointing," *Macquarie Research*, April 15, 2019.
- "1Q19 Earnings Day 1: JPM, WFC, PNC," *Morgan Stanley*, April 15, 2019.
- "Wells Fargo Lowers Net Interest Income Guidance; Outlook Turns More Negative," *Morningstar*, April 15, 2019.
- "Early Bank Reporting Shows Positive Trends: Maintaining Estimates Ahead of 1Q19 Results," *Nomura*, April 15, 2019.
- "Sentiment Is Fickle: 1Q19 Earnings Scorecard (Round 1)," *Nomura*, April 15, 2019.
- "Remain on the Sidelines Until Revenue Outlook Improves; Target Drops to $50," *Piper Jaffray*, April 15, 2019.
- "Takeaways from First Days of Earnings: EPS Growth Remains on Track," *Piper Jaffray*, April 15, 2019.
- "U.S. Research at a Glance," *RBC*, April 15, 2019.
- "First Edition - U.S. Alert," *Credit Suisse*, April 16, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 74 | April 23, 2019," *Barclays*, April 23, 2019.
- "Missed the starting gun," *Berenberg*, April 24, 2019.
- "2020 EPS to Approach $4, with $5 Unlikely Until 2022/or Later," *Deutsche Bank*, April 29, 2019.
- "Downgrading BAC to Neutral," *Atlantic Equities*, April 30, 2019.
- "How Willing Is Your Bank to Pay Up for Deposits? April 2019," *Morgan Stanley*, May 1, 2019.
- "Fed Hangover: Churn Continues Despite Rate Plateau," *Novantas*, May 1, 2019.
- "U.S. Large-Cap Banks: State of the Industry," *Barclays*, May 3, 2019.
- "Does the High Efficiency Ratio Reflect a Revenue or Expense Issue?" *Citigroup*, May 3, 2019.
- "WFC Releases 1Q19 10Q: WFC Expects to Sell $2.0 Billion in Pick-a-Pay Loans in 2Q19; *RBC* Expects WFC Will Report a Gain on Sale," RBC, May 3, 2019.
- "What's New in the 10-Q---litigation risk increased; earnings visibility compromised," *Credit Suisse*, May 5, 2019.

- "Comparing bank CECL reserve estimates to our own; earnings impacts to gain greater attention," *UBS*, May 5, 2019.

- "1Q19 10-Q Review: Another PaP Loan Sale Gain in 2Q; CECL to Aid Reserves," *Barclays*, May 6, 2019.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 83 | May 6, 2019," *Barclays*, May 6, 2019.

- "Question Bank: 2Q19 Edition," *Deutsche Bank*, May 6, 2019.

- "1Q 10-Q: New Retail Bank Issues, Core NII Down, Brokerage/AUM Outflow, Oil & Gas NPL Sharp Rise," *J.P. Morgan*, May 6, 2019.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 85 | May 8, 2019," *Barclays*, May 8, 2019.

- "Highlights from Meetings with Interim CEO and CFO; Reiterate BUY Rating," *Sandler O'Neill & Partners*, May 8, 2019.

- "Will CECL Increase Earnings Volatility?" *RBC*, May 9, 2019.

- "The Weekly Situation: Trust The Process," *Evercore ISI*, May 10, 2019.

- "Updated NII guidance appears conservative, but valuation upside limited, pending new CEO," *Goldman Sachs*, May 13, 2019.

- "NII Could Still Be a Risk," *Autonomous Research*, May 14, 2019.

- "WFC Conference Feedback – Lower Expenses, Active Buyback Should Mitigate NII Pressure," *Barclays*, May 14, 2019.

- "Investor Presentation Focuses on NII Guidance for 2019," *Keefe, Bruyette & Woods*, May 14, 2019.

- "2019 CCAR Deep Dive: SCB Trumps Payouts," *Wolfe Research*, May 15, 2019.

- "A portfolio manager's guide to investing in Financials," *Goldman Sachs*, May 15, 2019.

- "Analyzing CD Duration & Yield Curve Trends in Assessing NIM Outlooks," *Piper Jaffray*, May 15, 2019.

- "Degradation continues," *Autonomous Research*, May 16, 2019.

- "WFC: How low can it go- (Expenses, that is)," *Bank of America Merrill Lynch*, May 16, 2019.

- "Sizing the US Card Payments Landscape," *Citigroup*, May 16, 2019.

- "April Credit Monitor: Range-Bound Normalization w/ Expected Seasonal Trends," *Jefferies*, May 16, 2019.

- "CCAR 2019: Our Expectations and Updated Capital Return Assumptions," *Keefe, Bruyette & Woods*, May 16, 2019.

- "The Secrets of NIM; Deposit Betas, Mix, and Flows Edition," *Jefferies*, May 17, 2019.

- "Sizing the Consumer Checking Opportunity," *Nomura*, May 17, 2019.
- "Competition Exhibition: Reviewing Competitive Factors Across Footprints," *Baird*, May 20, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 93 | May 20, 2019," *Barclays*, May 20, 2019.
- "Still See 15-20% EPS Risk, But What's The Right P/E? Shares Fully Valued," *Deutsche Bank*, May 20, 2019.
- "1Q LCR Filings: Operating Deposits Negative - Faster Drop, Led By Wells Fargo, State Street, Bank Of NY," *J.P. Morgan*, May 20, 2019.
- "US BANKS: Auto Acceleration," *Autonomous Research*, May 21, 2019.
- "*UBS* Evidence Lab inside: Analysis of Card Rewards Indicates Strongest Pre-Provision Economics at High End Rewards Cards, Moderate/Median Income Cash Back Cards," UBS, May 21, 2019.
- "US Banks: What to expect when expecting," *Autonomous Research*, May 22, 2019.
- "US Banks: Can you trade the CCAR?" *Autonomous Research*, May 23, 2019.
- "Leveraged Loans: Risk Rising - LBO Share Up, Direct Lending Share Up Sharply In Middle Market LBOs," *J.P. Morgan*, May 23, 2019.
- "1Q19 Update on Banking Industry Beta Trends," *Sandler O'Neill & Partners*, May 23, 2019.
- "Highlights from expert call on digital banking: can banks seize opportunity to deepen relationships?" *UBS*, May 23, 2019.
- "Chu on This: Question Bank for Conference Season," *Wolfe Research*, May 24, 2019.
- "Mortgage & Housing Monitor: Positive Developments in 1Q but Headwinds Remain," *Piper Jaffray*, May 28, 2019.
- "2019 Beyond the Basics Takeaways," *Citigroup*, May 29, 2019.
- "Consumer Banking Presentation: Consumers Healthy & Deposit Pressures Reasonable," *Keefe, Bruyette & Woods*, May 29, 2019.
- "CEO Presentation at Bernstein's Strategic Decisions Conference," *Autonomous Research*, May 30, 2019.
- "Retail takeaways," *Autonomous Research*, May 30, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 100 | May 30, 2019," *Barclays*, May 30, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 101 | May 31, 2019," *Barclays*, May 31, 2019.
- "2019 DB Global Financial Services Conference Takeaways," *Deutsche Bank*, May 31, 2019.

- "H.8 and Curve Update - Weekly Loan Monitor (5/22)," *Jefferies*, May 31, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 102 | June 3, 2019," *Barclays*, June 3, 2019.
- "Flagging Regional Bank EPS Risk from Fed Insurance Cuts," *Evercore ISI*, June 3, 2019.
- "Updating the downside case due to global growth concerns," *Goldman Sachs*, June 3, 2019.
- "Banks: Thoughts on Trade-Related Correction and Rate Cut Scenarios," *Jefferies*, June 4, 2019.
- "Wholesale Banking: The opportunities ahead," *Bank of America Merrill Lynch*, June 5, 2019.
- "2019 CCAR Forecast—Manageable Stress," *Credit Suisse*, June 5, 2019.
- "Considering lawyering up full-time?" *Autonomous Research*, June 6, 2019.
- "Focus on Wholesale Banking: Looking to Benefit from a 'Peace Dividend'," *Barclays*, June 6, 2019.
- "2019 CCAR Forecast - Manageable Stress," *Credit Suisse*, June 6, 2019.
- "Banks: CCAR 2019 Preview; (CCAR)bon Copy," *Jefferies*, June 6, 2019.
- "2019 Financials Conference Preview and Top Picks," *Morgan Stanley*, June 6, 2019.
- "Wholesale Banking Business Detailed to Investors," *RBC*, June 6, 2019.
- "Key takeaways from the 'On the Road with Wells Fargo' event on Wholesale Banking," *UBS*, June 6, 2019.
- "Wholesale Banking, Centralized & Simplified," *Autonomous Research*, June 7, 2019.
- "Wholesale Banking: Crucial to WFC's turnaround story," *Bank of America Merrill Lynch*, June 7, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 105 | June 6, 2019," *Barclays*, June 7, 2019.
- "Wholesale Banking 'On the Road' Highlights," *Jefferies*, June 7, 2019.
- "Thesis Intact Following Wholesale Banking Presentation," *Raymond James*, June 7, 2019.
- "U.S. RESEARCH AT A GLANCE," *RBC*, June 7, 2019.
- "Highlights from WFC Wholesale Banking Analyst/Investor Event," *Sandler O'Neill & Partners*, June 7, 2019.
- "Previewing Our 2019 CCAR Expectations," *Sandler O'Neill & Partners*, June 7, 2019.
- "CCAR 2019: Expect Dividends, Buybacks To Rise Further, Over 100% Return On Average," *J.P. Morgan*, June 10, 2019.

- "Wholesale Bkg Day: Further Cost Improvement Likely, FICC Trading Up Sharply, Treasury Mgmt Weak," *J.P. Morgan*, June 10, 2019.
- "What Large Cap Bank Investors Are Asking: What to Expect From 2019 CCAR Results?" *Morgan Stanley*, June 10, 2019.
- "Downgrading WFC to Underweight," *Atlantic Equities*, June 11, 2019.
- "WFC Announces Sale of Eastdil; No Change to EPS Estimates," *Sandler O'Neill & Partners*, June 11, 2019.
- "Rate Environment Resets NII Guide to Lower End of Range," *Keefe, Bruyette & Woods*, June 12, 2019.
- "MS Financials Conference Day 1 Recap - Yield Curve In Focus," *Morgan Stanley*, June 12, 2019.
- "Conference takeaways," *Autonomous Research*, June 13, 2019.
- "CCAR preview: No stress, but what about catalysts?" *Bank of America Merrill Lynch*, June 13, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 110 | June 13, 2019," *Barclays*, June 13, 2019.
- "Measuring Who Is Most Impacted from Flatter Yield Curve," *Citigroup*, June 13, 2019.
- "NIM May Drop 10bps in 2Q; 2020 Consensus EPS Likely 15-20% Too High," *Deutsche Bank*, June 13, 2019.
- "MS Financials Conference Day 2 Recap - Got NIM Pressure? Banks Seek Tech Efficiencies," *Morgan Stanley*, June 13, 2019.
- "2019 CCAR Preview: STT, BAC, PNC Likely Winners," *Raymond James*, June 14, 2019.
- "Spotlight on CECL," *Keefe, Bruyette & Woods*, June 16, 2019.
- "Making the turn to the back 9," *Macquarie Research*, June 16, 2019.
- "DFAST/CCAR 2019: A Less Stressful Event?" *Buckingham Research Group*, June 17, 2019.
- "EPS Changes: 4% or Less: 6/17/19," *Credit Suisse*, June 17, 2019.
- "Large Cap U.S. Banks Total Payout Ratio Remains At 100% & Generates Over 10% of Incremental Shareholder Value," *Vining Sparks*, June 17, 2019.
- "Do investors still CCARe?" *Autonomous Research*, June 18, 2019.
- "Do investors still CCARe? - Previewing capital return estimates," *Autonomous Research*, June 18, 2019.
- "Earnings revision," *Autonomous Research*, June 18, 2019.
- "CCAR Preview: Results an Incremental Positive for Sentiment," *Baird*, June 18, 2019.

- "Large-Cap CCAR 2019 Preview: Active Capital Management to Continue for Most," *Barclays*, June 18, 2019.
- "Boring Should Be Beautiful - 2019 DFAST/CCAR Preview," *Evercore ISI*, June 18, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 114 | June 19, 2019," *Barclays*, June 19, 2019.
- "2Q19 Preview; NIM Risk & Offsets; Still Cautious on WFC, Positive on BBT/STI," *Deutsche Bank*, June 19, 2019.
- "2019 CCAR Preview and Survey Results," *Goldman Sachs*, June 19, 2019.
- "U.S. Banks 2019 CCAR Outlook," *RBC*, June 19, 2019.
- "Global Banks Roadmap: Bankosaurus Techs: Spend Fast, Save Slow," *Autonomous Research*, June 20, 2019.
- "US BANKS: Into the Shadows," *Autonomous Research*, June 21, 2019.
- "Initial Look at DFAST 2019: All banks 'pass', most with improved 'scores'," *Barclays*, June 21, 2019.
- "DFAST 2019: All Clear," *Buckingham Research Group*, June 21, 2019.
- "DFASTen Your Seatbelts: Payouts Set to Increase," *Wolfe Research*, June 21, 2019.
- "2019 DFAST Results—First Thoughts--Manageable Stress," *Credit Suisse*, June 21, 2019.
- "DFAST Results: School's Out for Summer - All Banks Receive Passing Grade," *Baird*, June 23, 2019.
- "DFAST 2019 Review: All Banks 'Pass', All But NTRS With Improved 'Scores'," *Barclays*, June 23, 2019.
- "Using DFAST Results to Assess Post-CCAR Pay-out Surprise Potential," *BMO Capital Markets*, June 23, 2019.
- "DFAST Results Better than Expected; BAC/GS/PNC Notable Winners," *Deutsche Bank*, June 23, 2019.
- "Americas Banks: 2019 CCAR: Round 1 - Test stress more in-line with prior years, ex. 2018," *Goldman Sachs*, June 23, 2019.
- "Banks: DFAST '19; Generally Better for Most, COF Closest to Minimums," *Jefferies*, June 23, 2019.
- "DFAST 2019: Results Prove Less Stressful Than in Years Past and CCAR Surprises Should Be Limited," *Keefe, Bruyette & Woods*, June 23, 2019.
- "No Sweat," *Macquarie Research*, June 23, 2019.
- "DFAST Update--Another Year in Which Everyone's a Winner," *Oppenheimer*, June 23, 2019.

- "2019 DFAST Results Pave the Way for Strong Levels of Capital to be Returned," *RBC*, June 23, 2019.
- "DFAST results encouraging for Wells, money centers, brokers, and trust banks," *UBS*, June 23, 2019.
- "US banks: DFAST results more positive in 2019," *Atlantic Equities*, June 24, 2019.
- "Bank payouts on D-FAST track," *Autonomous Research*, June 24, 2019.
- "Stress-free: No surprises from DFAST," *Bank of America Merrill Lynch*, June 24, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 117 | June 24, 2019," *Barclays*, June 24, 2019.
- "DFAST Results Are In; Green Light For Higher Capital Return For Most Banks," *Citigroup*, June 24, 2019.
- "2019 DFAST Results—Manageable Stress; More Manageable Stress Capital Buffers," *Credit Suisse*, June 24, 2019.
- "Updating earnings estimates for the new rate reality and assessing what's priced in," *Goldman Sachs*, June 24, 2019.
- "Large Cap Banks: DFAST 2019 Positive For Sector, Lower Credit Losses, Capital Return Well Positioned," *J.P. Morgan*, June 24, 2019.
- "2019 DFAST: Let the Good Times Roll," *Morgan Stanley*, June 24, 2019.
- "2019 DFAST Results Better Than Last Year, and We Expect No Capital Return Surprises Next Week," *Morningstar*, June 24, 2019.
- "Green Shoots Appearing on the Deposit Cost Front- Watching/Waiting for the Turn," *Piper Jaffray*, June 24, 2019.
- "Quit Stressing: Much Better Stress Test Results This Time Around," *Piper Jaffray*, June 24, 2019.
- "Review of 2019 DFAST Results," *Sandler O'Neill & Partners*, June 24, 2019.
- "Positive DFAST Results Clear Path For Continued Meaningful Capital Deployment," *Vining Sparks*, June 24, 2019.
- "NIMplications of Rate Cuts… What's the Cost and What's in the Stocks?" *Credit Suisse*, June 26, 2019.
- "CCAR Results: Capital Actions Solid, Total Return Yields Compelling," *Baird*, June 27, 2019.
- "Capital plans beat expectations, but don't get too 'CCAR'ried away," *Bank of America Merrill Lynch*, June 27, 2019.
- "CCAR 2019 Review: Capital Return to Stay Elevated over Next 12 Months," *Barclays*, June 27, 2019.

- "Initial Look at CCAR 2019," *Barclays*, June 27, 2019.
- "CCAR 2019: Small Beat," *BMO Capital Markets*, June 27, 2019.
- "CCAR 2019: Significant Upside at BAC, JPM and STT," *Buckingham Research Group*, June 27, 2019.
- "2019 CCAR: Go for Gold(man)," *Wolfe Research*, June 27, 2019.
- "CCAR Results a Win-Win for Banks; Remain Positive on Stocks," *Deutsche Bank*, June 27, 2019.
- "Banks: CCAR '19 First Look," *Jefferies*, June 27, 2019.
- "2019 CCAR Results: Cash Remains King and Banks Are Giving More Back Than Expected," *Keefe, Bruyette & Woods*, June 27, 2019.
- "US Universal Banks Universally Won," *Macquarie Research*, June 27, 2019.
- "The Buybacks Will Continue … Dividend Hikes Too," *Oppenheimer*, June 27, 2019.
- "WFC Receives No Objection to its 2019 Capital Plan; Total Capital Return Decreased 3.1% from 2018 but Dividend Increased 13%" *RBC*, June 27, 2019.
- "Western Banks & Thrifts – 2Q19 Quarterly Preview," *Sandler O'Neill & Partners*, June 27, 2019.
- "Solid CCAR results; upside surprises at JPM, BAC, and trust banks," *UBS*, June 27, 2019.
- "US banks: BAC, JPM and GS with big buybacks," *Atlantic Equities*, June 28, 2019.
- "Big banks deliver big beats," *Autonomous Research*, June 28, 2019.
- "Weekly Bank Briefing (7/1/19)," *Barclays*, June 28, 2019.
- "Stressed, Done and Done Well--Plenty of Capital to Support CCAR 2019 Results," *Credit Suisse*, June 28, 2019.
- "Americas Banks: 2019 CCAR: Round 2 - Payouts exceed expectations, as test more closely resembles prior years," *Goldman Sachs*, June 28, 2019.
- "CCAR 2019 : Preferred and Sub Issuance Estimates," *J.P. Morgan*, June 28, 2019.
- "Dividends Up Solidly; Total Capital Return Up Most At PNC, Followed By Northern Trust And BofA," *J.P. Morgan*, June 28, 2019.
- "Banks: CCAR '19 Full Review; Better To Be In Than Out," *Jefferies*, June 28, 2019.
- "Update: 2019 CCAR Results: Cash Remains King and Banks Are Giving More Back Than Expected," *Keefe, Bruyette & Woods*, June 28, 2019.
- "2019 CCAR: The Last Hurrah!" *Morgan Stanley*, June 28, 2019.
- "No Big Surprises for 2019 Stress Tests: Money Center Banks Are the Big Winners With Repurchases," *Morningstar*, June 28, 2019.
- "2019 CCAR: Bank Payouts Surprise Positively," *Nomura*, June 28, 2019.

- "CCAR Takeaways: What More Must Banks Do?" *Piper Jaffray*, June 28, 2019.
- "June 28, 2019 U.S. Banks: A Record $190 Billion (Est.) Returned to Shareholders," *RBC*, June 28, 2019.
- "2019 CCAR Results Review," *Sandler O'Neill & Partners*, June 28, 2019.
- "What Large Cap Bank Investors Are Asking: Will JPM use their full buyback authorization?" *Morgan Stanley*, July 1, 2019.
- "Some Fun Facts About Banks...." *Oppenheimer*, July 1, 2019.
- "Q2 Preview: Expectations Lower, Bracing for Weaker Guidance," *Baird*, July 2, 2019.
- "Late Cycle, Low Interest Rates and Low Expectations…what's the path forward?" *Credit Suisse*, July 2, 2019.
- "What you need to know about regional bank net interest margins; Downgrade CMA to Sell (from Neutral)," *Goldman Sachs*, July 2, 2019.
- "Mortgage Banking: Benefit In 2Q, 3Q From Spike In Refis But Partial Offset From Servicing," *J.P. Morgan*, July 2, 2019.
- "Banks: Mortgage Market Metrics Show Positive Side of Low Rates," *Jefferies*, July 2, 2019.
- "US banks: NIM pressures to show in Q2 results," *Atlantic Equities*, July 5, 2019.
- "At What Level Will Net Interest Income Bottom? We May Find Out Soon," *Deutsche Bank*, July 7, 2019.
- "2Q19 Earnings Preview: The Elephant in the Room; Lowering Ests," *Evercore ISI*, July 7, 2019.
- "Lower Rates, Lower Estimates, and Low Expectations," *Keefe, Bruyette & Woods*, July 7, 2019.
- "2Q19 Preview for U.S. Large-cap Banks, Specialty Finance, and Financial Technology," *BMO Capital Markets*, July 8, 2019.
- "2Q19 Preview: The trade off of lower rates vs. capital returns," *Goldman Sachs*, July 8, 2019.
- "2Q19 Earnings Preview: All Eyes on NII," *Morgan Stanley*, July 8, 2019.
- "The Rating is the Hardest Part," *Autonomous Research*, July 9, 2019.
- "2Q19 EPS Preview: Trimming Estimates, But Buybacks Help Soften Blow," *Buckingham Research Group*, July 9, 2019.
- "Modest 2Q Hurt By NIM; Divergent Signals From Markets," *J.P. Morgan*, July 9, 2019.
- "Are US banks at peak profitability? Lowering EPS estimates to account for lower interest rates," *UBS*, July 9, 2019.

- "2Q Preview: Late Cycle Scenario Analysis Favors GS, RJF, EVR, LPLA; Downgrade WFC to Underperform," *Wolfe Research*, July 10, 2019.
- "The Evolution of Stress—Takeaways from the Fed's Stress Testing Conference," *Credit Suisse*, July 10, 2019.
- "What Matters Most For Each Bank Headed Into 2Q EPS & Conf Calls," *Deutsche Bank*, July 10, 2019.
- "Gleanings From Prior Insurance Fed Cuts," *Evercore ISI*, July 10, 2019.
- "2Q preview: Is the party over?" *Bank of America Merrill Lynch*, July 11, 2019.
- "2Q19 EPS Preview: Looking for Levers to Offset NII Pressure," *Barclays*, July 11, 2019.
- "Updating Models For New Rates Curve," *Citigroup*, July 11, 2019.
- "U.S. Banks: 2Q19 Earnings Preview – Part II," *RBC*, July 11, 2019.
- "Still Searching," *Autonomous Research*, July 12, 2019.
- "WFC: Earnings Prep 2Q19," *Credit Suisse*, July 12, 2019.
- "Back book/front book getting thin," *Macquarie Research*, July 12, 2019.
- "Mortgage & Housing Monitor: 2Q Setting Up to be Best Quarter Since 3Q16," *Piper Jaffray*, July 15, 2019.
- "Q2 snap: faster NIM declines and higher costs," *Atlantic Equities*, July 16, 2019.
- "Wells Fargo 2Q19: Headline beat, but core a touch light," *Autonomous Research*, July 16, 2019.
- "Q2 Follow-Up: Estimates Lower but Dividend Yield Attractive," *Baird*, July 16, 2019.
- "Q2 Initial Thoughts: Core Results Below Expectations," *Baird*, July 16, 2019.
- "Earnings growth may be elusive in '20," *Bank of America Merrill Lynch*, July 16, 2019.
- "WFC 2Q19 EPS Instant Insight," *Barclays*, July 16, 2019.
- "2Q19: Lowering Estimates and Target Due to Lower Expected NII and Higher Costs," *BMO Capital Markets*, July 16, 2019.
- "Pushing Out Expense Saves; Lowering Ests & Target," *Buckingham Research Group*, July 16, 2019.
- "Expenses Are Proving Stubborn To Bring Down – Lowering Estimates," *Citigroup*, July 16, 2019.
- "2Q19: Not All Bad but NII Disappointment Likely to Weigh on Shares," *Wolfe Research*, July 16, 2019.
- "2Q19 First Impressions," *Credit Suisse*, July 16, 2019.

- "JPM-WFC: Card Healthy - Acceleration in Balance/Spend; Competition in Auto & Student," *Credit Suisse*, July 16, 2019.
- "Outlook Confirms Lower EPS Power; 2Q Mostly In Line, Ex Items," *Deutsche Bank*, July 16, 2019.
- "2Q Wrap: Heavy Expense Burden Drives Another Sharp Est Cut; Uncertainty Persists," *Evercore ISI*, July 16, 2019.
- "2Q19 First Look: LLP and Top Line Drive EPS Beat; Expense Outlook Revised Higher," *Evercore ISI*, July 16, 2019.
- "First Take: Slight miss, as expenses remain elevated, although credit remains benign," *Goldman Sachs*, July 16, 2019.
- "2Q19 First Look," *Jefferies*, July 16, 2019.
- "JPM/WFC: 2Q19 Earnings Wraps," *Jefferies*, July 16, 2019.
- "2Q19 First Look:Revenues & Provision Drive a Low Quality Beat," *Keefe, Bruyette & Woods*, July 16, 2019.
- "2Q19 Results: Estimates Fall Again and the Bottom of the Wells Still Not Certain," *Keefe, Bruyette & Woods*, July 16, 2019.
- "Expenses Guided to High End With No Improvement in 2020," *Keefe, Bruyette & Woods*, July 16, 2019.
- "Q2 2019 results: Balance sheet strength is tarnished by a high expense base and lingering regulatory uncertainty," *Moody's*, July 16, 2019.
- "2Q19 First Pass: Expense Miss," *Morgan Stanley*, July 16, 2019.
- "2Q19 Print Is in Line but Low Quality," *Nomura*, July 16, 2019.
- "Core Results in Line, but Another Round of Estimate Cuts on Tap," *Oppenheimer*, July 16, 2019.
- "WFC First Take Pre-Call: In-Line Quarter," *Oppenheimer*, July 16, 2019.
- "First Look: Core Operating Miss; Expenses & NIM a Headwind," *Piper Jaffray*, July 16, 2019.
- "Operating Leverage Still a Ways Out; Target Drops to $47," *Piper Jaffray*, July 16, 2019.
- "2Q First Look: EPS Beat, but NIM Contracts More Than Expected," *Raymond James*, July 16, 2019.
- "Reducing 2020 EPS Estimate for Lower NII, Higher Expenses," *Raymond James*, July 16, 2019.
- "2Q19: Still Unable to Find the Light at the End of the Tunnel," *RBC*, July 16, 2019.
- "WFC 2Q19 estimated core EPS of $1.14 below consensus of $1.16, *RBC* estimate of $1.18," RBC, July 16, 2019.

- "WFC 2Q19 Earnings Review: Lowering 2020E EPS but Reiterate BUY Rating," *Sandler O'Neill & Partners*, July 16, 2019.
- "WFC 2Q19 Preliminary Earnings Review: Core EPS a Penny Below the Consensus," *Sandler O'Neill & Partners*, July 16, 2019.
- "Mixed first take on 2019," *UBS*, July 16, 2019.
- "Tuesday takeaways: 2020 another transition yr for WFC; JPM level sets NII outlook; revising estimates," *UBS*, July 16, 2019.
- "Positive Reported Earnings Surprises Melted Away After Unusual Gains Were Peeled Back," *Vining Sparks*, July 16, 2019.
- "Lowering forward EPS on higher expenses and a weaker NIM/NII trajectory," *Autonomous Research*, July 17, 2019.
- "2Q19 EPS Review: Maintains NII Outlook but Now Cautious on Costs," *Barclays*, July 17, 2019.
- "Wells Fargo & Company," *CFRA Research*, July 17, 2019.
- "*DBRS*: Wells Fargo Reports Solid Results for 2Q19; Lower Expenses and Provision Offset Flat Revenues," DBRS, July 17, 2019.
- "Core Results in Line, Revenue Pressure Remains, NII Revised Down Further," *J.P. Morgan*, July 17, 2019.
- "Weak 2Q: Lower Core Revenues And RoTCE, High Expenses YoY; 2020 Expenses To Run Higher," *J.P. Morgan*, July 17, 2019.
- "The quarter was fine…the guidance was not; downgrading to Neutral," *Macquarie Research*, July 17, 2019.
- "2Q19 Earnings Day 2: GS, JPM, WFC," *Morgan Stanley*, July 17, 2019.
- "Expenses To Remain Elevated for Wells Over the Medium Term, Rate Pressures Also in Focus," *Morningstar*, July 17, 2019.
- "Reducing 2020 EPS Estimate for Lower NII, Higher Expenses," *Raymond James*, July 17, 2019.
- "U.S. RESEARCH AT A GLANCE," *RBC*, July 17, 2019.
- "Analysis for NYSE : WFC," *Trefis*, July 18, 2019.
- "US BANKS: 2Q So Far," *Autonomous Research*, July 19, 2019.
- "WFC: Trimming Estimates," *Credit Suisse*, July 19, 2019.
- "2Q Universal & Trust Bank Earnings Wrap," *Wolfe Research*, July 22, 2019.
- "2Q19 Recap - A shifting rate curve begins to impact the growth trajectory," *Goldman Sachs*, July 22, 2019.
- "Peak NIMs Are in the Rear View," *Nomura*, July 22, 2019.

- "US banks: NIM pressures lead revenues lower," *Atlantic Equities*, July 23, 2019.
- "2Q19 Recap & Outlook; Remain Positive on BBT/GS, Cautious on WFC," *Deutsche Bank*, July 25, 2019.
- "Upgrading Universal Banks to Overweight and Upgrading BAC, C, and GS," *Keefe, Bruyette & Woods*, July 25, 2019.
- "The Fed is likely to cut and banks don't agree on what it means; will deposit betas disappoint?" *UBS*, July 25, 2019.
- "Grading on the Curve… Some Make it Look Easier than Others; 2Q19 Wrapped Up," *Credit Suisse*, July 29, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 138 | July 31, 2019," *Barclays*, July 31, 2019.
- "Post 2Q: Tepid Qtr But Strong Stock Performance – NIM Decline Guidance Less Than Feared," *J.P. Morgan*, July 31, 2019.
- "FED CUTS RATES. NOW WHAT?" *Novantas*, July 31, 2019.
- "Discover Financial Services (DFS): Key takeaways from meetings with CEO," *Goldman Sachs*, August 1, 2019.
- "How Willing Is Your Bank to Pay Up for Deposits? July 2019," *Morgan Stanley*, August 1, 2019.
- "When Not If," *Odeon*, August 1, 2019.
- "Question Bank: 3Q19 Edition and Five Questions for Five Months," *Deutsche Bank*, August 2, 2019.
- "WFC's Earnings Pressures Continues To Worsen; However, De-Risking Is Freeing Up Capital To Return To Shareholders," *Vining Sparks*, August 2, 2019.
- "Rebates and reserves reflect cost pressures," *Autonomous Research*, August 5, 2019.
- "2Q19 10-Q Review: Gains to Add $0.22 in 3Q, RPL Increases $0.8bn," *Barclays*, August 5, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 141 | August 5, 2019," *Barclays*, August 5, 2019.
- "Wells Fargo & Company," *CFRA Research*, August 5, 2019.
- "What's New in the 10Q; Litigation Risk Increased, Again," *Credit Suisse*, August 5, 2019.
- "Securing the Vaults – Spending on Cyber," *Morgan Stanley*, August 6, 2019.
- "PNC Financial Services (PNC): Takeaways from meetings with management," *Goldman Sachs*, August 9, 2019.
- "The way too early mock 2020 CCAR," *Macquarie Research*, August 9, 2019.

- “Will Wells Fargo & Co Build Long-Term Returns?” *Sadif Investment Analytics*, August 9, 2019.
- “WFC: Effective Digital Engagement in a Data Economy,” *RenMac*, August 10, 2019.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 146 | August 12, 2019,” *Barclays*, August 12, 2019.
- “What Large Cap Bank Investors Are Asking: What Is the Impact of Rates Moving Even Lower?” *Morgan Stanley*, August 12, 2019.
- “Mortgage & Housing Monitor: Refi Wave Could Mirror 2016,” *Piper Jaffray*, August 12, 2019.
- “Moody’s raises outlook from negative to stable, maintains ratings,” *Autonomous Research*, August 14, 2019.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 148 | August 14, 2019,” *Barclays*, August 14, 2019.
- “NIMplications of Rate Cuts, Part II… What’s the Cost and What’s in the Stocks?” *Credit Suisse*, August 15, 2019.
- “U.S. Banks: Bank Stocks Look Oversold,” *RBC*, August 15, 2019.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 150 | August 16, 2019,” *Barclays*, August 16, 2019.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 151 | August 19, 2019,” *Barclays*, August 19, 2019.
- “Remaining legal and regulatory obstacles do not pose a credit pitfall,” *Moody’s*, August 19, 2019.
- “We Take a Deep Dive Into Wells Fargo, Updating Our Fair Value Estimate to $58, We Still See Value,” *Morningstar*, August 20, 2019.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 153 | August 21, 2019,” *Barclays*, August 21, 2019.
- “Banks: The Secrets of NIM; Asset Side Edition (The ’Stoplight’ Revived),” *Jefferies*, August 21, 2019.
- “Transitions create uncertainty, but some revenue headwinds easing: management meeting highlights,” *UBS*, August 21, 2019.
- “First Thoughts Post Management Meetings,” *Credit Suisse*, August 22, 2019.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 155 | August 23, 2019,” *Barclays*, August 23, 2019.
- “U.S. Banks: Dissecting the Top 20 Banks’ 2Q19 Profitability,” *RBC*, August 23, 2019.
- “Wells Fargo & Company,” *Watchdog Research*, August 23, 2019.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 157 | August 27, 2019," *Barclays*, August 27, 2019.
- "Management Meeting Takeaways, full detail," *Credit Suisse*, August 27, 2019.
- "Preparing for CECL: A Review of Management Comments about Expected Impacts," *Sandler O'Neill & Partners*, August 27, 2019.
- "Wells Fargo Sizable Drop QoQ in Stable Retail Deposits, Lagging Peers for Third Quarter in a Row," *J.P. Morgan*, August 28, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 159 | August 29, 2019," *Barclays*, August 29, 2019.
- "3Q19 Mid Quarter Update #1—Updating the Data Points," *Credit Suisse*, August 29, 2019.
- "Climate Risk: Must Do Better," *Autonomous Research*, September 3, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 161 | September 3, 2019," *Barclays*, September 3, 2019.
- "Executive Comp Analysis Shows Wide Range In Terms Of Shareholder Alignment And Governance," *Citigroup*, September 3, 2019.
- "Happy LIBOR Day: Flagging Exposures to the LIBOR Move," *Evercore ISI*, September 3, 2019.
- "An Early Look at 3Q Trends--Two Months In," *Deutsche Bank*, September 4, 2019.
- "Wells Fargo: Reviewing the Pros and Cons," *Autonomous Research*, September 5, 2019.
- "Quarles Speaks… Considering Refinements to the Stress Capital Buffer; First Thoughts," *Credit Suisse*, September 5, 2019.
- "Wells Fargo & Co. (WFC): Key takeaways from management meeting," *Goldman Sachs*, September 5, 2019.
- "Sharp Rise in Refis, Spreads To 2016 Levels, Partly Offset By Servicing Revenues, NIM; Channel Mix Shift," *J.P. Morgan*, September 5, 2019.
- "Questions to ask bank management teams," *UBS*, September 5, 2019.
- "Do implied 4Q19 NII outlooks suggest downside to 2020 estimates?" *UBS*, September 6, 2019.
- "Views on the Payments Landscape from the West Coast," *Keefe, Bruyette & Woods*, September 8, 2019.
- "3Q NII guide down looks in-line," *Autonomous Research*, September 9, 2019.
- "*Barclays* Global Financial Services Conference," Barclays, September 9, 2019.
- "Conference Slides: Lowered NII Outlook; Reiterated Expense Target," *Evercore ISI*, September 9, 2019.

- "Management Provides Updated Guidance on NII and Mortgage Banking," *Keefe, Bruyette & Woods*, September 9, 2019.
- "Lowering Numbers to Reflect Updated NII Guide; Target Drops to $46," *Piper Jaffray*, September 9, 2019.
- "Updating Earnings Estimates," *RBC*, September 9, 2019.
- "WFC Provides Mid-Quarter Update, Lower EPS Estimates," *Sandler O'Neill & Partners*, September 9, 2019.
- "Cutting EPS estimates on lower NII; limited line of sight on efficiency improvements; dg to Neutral," *UBS*, September 9, 2019.
- "Negative operating leverage in evidence," *Atlantic Equities*, September 10, 2019.
- "CFO comments and 3Q guidance," *Autonomous Research*, September 10, 2019.
- "Conference Recap for Day One," *Barclays*, September 10, 2019.
- "Conference Review – Key Takeaways, Company Recaps and Polling Results," *Barclays*, September 12, 2019.
- "Mid-Quarter EPS Adjustments Post Competitor Conference," *Raymond James*, September 12, 2019.
- "WFC: Trimming Estimates," *Credit Suisse*, September 13, 2019.
- "Payments M&A: Why, Why now and Who's next?" *Bernstein*, September 16, 2019.
- "August Credit Monitor: Continued Stability as Card Losses Grow but Auto's Falls," *Jefferies*, September 17, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 172 | September 18, 2019," *Barclays*, September 18, 2019.
- "WFC Bull/Bear," *Deutsche Bank*, September 18, 2019.
- "Consumer Dashboard: U.S. Consumer Continues to Underpin the Economy," *Piper Jaffray*, September 19, 2019.
- "Opacity should help sustain commercial bank profitability: treasury banking call highlights," *UBS*, September 19, 2019.
- "CECL Impact: Reserves +25% With Wide Divergence, Comparing Banks Harder; Provisions More Volatile?" *J.P. Morgan*, September 20, 2019.
- "Banks: Third Time's the Charm? Cutting Estimates Again," *Autonomous Research*, September 23, 2019.
- "Global Banks: More Plumbing Kerfuffles," *Autonomous Research*, September 23, 2019.
- "What Large Cap Bank Investors Are Asking: What happened in the repo market this past week?" *Morgan Stanley*, September 23, 2019.
- "How much upside from mortgage refis?" *Atlantic Equities*, September 24, 2019.

- "Global Banks: Don't Blame it on the GSIB," *Autonomous Research*, September 25, 2019.
- "US BANKS:Into the Shadows," *Autonomous Research*, September 25, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 177 | September 25, 2019," *Barclays*, September 25, 2019.
- "Stress Capital Buffers: A Final Rule Forthcoming but Changes Should be Modest," *Keefe, Bruyette & Woods*, September 26, 2019.
- "Key Highlights from Today's Housing/Mortgage Expert Call," *RBC*, September 26, 2019.
- "Western Banks & Thrifts – 3Q19 Quarterly Preview," *Sandler O'Neill & Partners*, September 26, 2019.
- "BNY Mellon's Charlie Scharf hired as CEO," *Autonomous Research*, September 27, 2019.
- "CEO announcement could break stock out of range," *Bank of America Merrill Lynch*, September 27, 2019.
- "WFC names Charlie Scharf CEO, Todd Gibbon appointed BK's Interim CEO," *Barclays*, September 27, 2019.
- "Alert: Charlie Scharf Announced as New CEO," *Citigroup*, September 27, 2019.
- "New CEO Good For Co LT, but EPS Power To Be Meaningfully Lowered," *Deutsche Bank*, September 27, 2019.
- "Quick Takes from CEO Announcement Call – Remain Positive on Implications for Stock," *Evercore ISI*, September 27, 2019.
- "Wells Fargo Names Charlie Scharf CEO; Positive for Stock," *Evercore ISI*, September 27, 2019.
- "Appointment of new CEO," *Goldman Sachs*, September 27, 2019.
- "CEO Conference Call Yields Little in New Information," *Keefe, Bruyette & Woods*, September 27, 2019.
- "Wells Fargo Names Charlie Scharf as CEO," *Keefe, Bruyette & Woods*, September 27, 2019.
- "New leadership at Wells Fargo is credit positive and unlikely to result in significant strategic changes," *Moody's*, September 27, 2019.
- "Wells Fargo and Bank of New York Mellon: Fresh Start for Wells, BK in Great Hands," *Morgan Stanley*, September 27, 2019.
- "Wells Fargo Hits a Home Run With New CEO Charles Scharf," *Morningstar*, September 27, 2019.
- "New CEO An Excellent Choice, But Now The Hard Part Starts," *Oppenheimer*, September 27, 2019.

- "New CEO Could Mark Turning Point; Reiterate Neutral," *Piper Jaffray*, September 27, 2019.
- "WFC Names Charlie Scharf New CEO - Quick Thoughts," *Sandler O'Neill & Partners*, September 27, 2019.
- "WFC Names Charlie Scharf New CEO; Post-Call Thoughts," *Sandler O'Neill & Partners*, September 27, 2019.
- "Major overhang removed: Charles Scharf appointed as CEO, but questions remain," *UBS*, September 27, 2019.
- "Now comes the hard part," *Bank of America Merrill Lynch*, September 29, 2019.
- "Charlie in Charge: Our thoughts and Investor Feedback," *Wolfe Research*, September 29, 2019.
- "Analyst's Notes: Wells Fargo & Co." *Argus*, September 30, 2019.
- "Scharf a Positive Step," *Autonomous Research*, September 30, 2019.
- "Wells Fargo:A Solid Step Forward," *Autonomous Research*, September 30, 2019.
- "Good Driver at the Reins, but Hard to Turn Stagecoach on a Dime," *Baird*, September 30, 2019.
- "WFC & BK: CEO Shuffle a Spark for WFC, but Turnarounds Take Time," *Buckingham Research Group*, September 30, 2019.
- "Fresh Start," *Morgan Stanley*, September 30, 2019.
- "What Large Cap Bank Investors Are Asking: How much more upside to WFC after CEO appointment?" *Morgan Stanley*, September 30, 2019.
- "Charles Scharf to Become New CEO," *RBC*, September 30, 2019.
- "3Q19 Preview, Bank Bull/Bear & Which Stocks We're Asked Most About," *Deutsche Bank*, October 1, 2019.
- "Brokerage Commissions in Focus Again, Schwab Cuts Select Commissions to $0," *Keefe, Bruyette & Woods*, October 1, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 180 | Sept 30-Oct 2, 2019," *Barclays*, October 2, 2019.
- "Follow the Fed: Upgrading BK to Peer Perform," *Wolfe Research*, October 2, 2019.
- "3Q19 Preview: Quarterly trends softening; investor focus on impacts of lower rates and weaker global macro," *Goldman Sachs*, October 2, 2019.
- "Estimates Fall for Most, Risks Rise for All," *Keefe, Bruyette & Woods*, October 2, 2019.
- "3Q19 should support multiple convergence for Citi and Key; NII guides for regionals in focus," *UBS*, October 2, 2019.

- "Q3 Preview: Expectations Lower, but Results Likely Not a Meaningful Catalyst," *Baird*, October 3, 2019.
- "Late Cycle, Low Interest Rates and Suitably Low Expectations… what's the path forward?" *Credit Suisse*, October 3, 2019.
- "Framing EPS Hit from a Credit Cycle and How Long Do Losses Stay High," *Deutsche Bank*, October 3, 2019.
- "CECL Tracker: First Edition," *Keefe, Bruyette & Woods*, October 3, 2019.
- "3Q19 EPS Preview: See Upside at C, JPM & RJF; Greater Revision Risk at WFC & GS," *Buckingham Research Group*, October 4, 2019.
- "New CEO; New Path Forward; Reducing 2020E on the Path to $6.00 per Share; TP Now $53," *Credit Suisse*, October 4, 2019.
- "Negative Rates: Will the U.S. Be Any Different?" *Keefe, Bruyette & Woods*, October 7, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 184 | October 8, 2019," *Barclays*, October 8, 2019.
- "Proceed with Caution; See Negative EPS Revisions and Valuation is Flashing Red," *Citigroup*, October 8, 2019.
- "Auto Finance Monthly: September Used Prices Flat to Down YoY: Inflection Point or Noise?" *Sandler O'Neill & Partners*, October 8, 2019.
- "3Q19 Preview for Large-cap Banks, Specialty Finance, Asset Management, and Fintech," *BMO Capital Markets*, October 9, 2019.
- "3Q'19 Earnings Season Is The First In Several Years That We Haven't Forecasted A Positive Earnings Surprise," *Vining Sparks*, October 9, 2019.
- "Weak 3Q: Lower Rates, Loan Growth; Securities Surge, Repo Turmoil, Swift Deposit Rate Cuts," *J.P. Morgan*, October 10, 2019.
- "Negative Interest Rates and the Implications to Banks," *Keefe, Bruyette & Woods*, October 10, 2019.
- "3Q preview: What to do when macro trumps micro?" *Bank of America Merrill Lynch*, October 11, 2019.
- "3Q19 EPS Preview: Operating Trends Pressured; New CEO to Start Soon," *Barclays*, October 11, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 186 | October 11, 2019," *Barclays*, October 11, 2019.
- "US BANKS:Simple CECL," *Autonomous Research*, October 14, 2019.
- "WFC: Earnings Prep 3Q19," *Credit Suisse*, October 14, 2019.
- "What Large Cap Bank Investors Are Asking: What Do You Expect in 3Q19 Earnings?" *Morgan Stanley*, October 14, 2019.

- "U.S. Banks: 3Q19 Earnings Preview - Part II," *RBC*, October 14, 2019.
- "Analyst's Notes: Wells Fargo & Co." *Argus*, October 15, 2019.
- "WFC - underlying result looks fine but NIM decline bigger than expected," *Atlantic Equities*, October 15, 2019.
- "Wells Fargo 3Q19: Core EPS Looks Light, Lots of Moving Parts," *Autonomous Research*, October 15, 2019.
- "Wells Fargo:3Q19 Call—4 Autono-bites," *Autonomous Research*, October 15, 2019.
- "Q3 Follow-Up: EPS Estimates Unchanged but NII Outlook Remains Tough," *Baird*, October 15, 2019.
- "Q3 Initial Thoughts: Mixed Quarter, Fees Below Expectations, NII in Line," *Baird*, October 15, 2019.
- "The power of hope," *Bank of America Merrill Lynch*, October 15, 2019.
- "3Q19 EPS Review: NII Still Pressured, but Fee, Expense Trends Stabilizing," *Barclays*, October 15, 2019.
- "WFC 3Q19 EPS Instant Insight," *Barclays*, October 15, 2019.
- "3Q19: Lowering Estimates and Target Due to Lower Expected NII," *BMO Capital Markets*, October 15, 2019.
- "3Q19 First Look: JPM, GS, C, WFC," *Buckingham Research Group*, October 15, 2019.
- "3Q19 Takeaways: No Material EPS Revisions a Small Victory vs. Low Expectations," *Buckingham Research Group*, October 15, 2019.
- "Wells Fargo & Company," *CFRA Research*, October 15, 2019.
- "First Impressions-Noisy but Ok relative to our operating forecast," *Credit Suisse*, October 15, 2019.
- "JPM and WFC bode well for EFX Q3 mortgage," *Credit Suisse*, October 15, 2019.
- "JPM and WFC Reinforce Confidence in Above Consensus Estimates," *Credit Suisse*, October 15, 2019.
- "JPM-C-WFC: Card Stable – Modest Deceleration In Balance/Spend; Competition In Auto," *Credit Suisse*, October 15, 2019.
- "*DBRS* Morningstar: Wells Fargo Reports Lower 3Q19 Results on Litigation Accrual," DBRS, October 15, 2019.
- "What To Focus on From Here and What We Learned From 3Q19," *Deutsche Bank*, October 15, 2019.
- "3Q19 First Look: Top Line Generally In Line, Expenses Pressured," *Evercore ISI*, October 15, 2019.

- “3Q19 Wrap: NII Outlook Positive; Up to Charlie re: Expenses,” *Evercore ISI*, October 15, 2019.
- “Americas Banks: Key observations from day 1 of 3Q19 earnings,” *Goldman Sachs*, October 15, 2019.
- “First Take: A messy quarter, with largely in-line core results,” *Goldman Sachs*, October 15, 2019.
- “Weak 3Q: Lower NII, Trading Revenue Fastest Grower; Revenues Remain Key Unknown,” *J.P. Morgan*, October 15, 2019.
- “3Q19 First Looks: C, WFC,” *Jefferies*, October 15, 2019.
- “Card Issuer Volumes from JPM, WFC, and Citi: Healthy, but Modest Deceleration,” *Jefferies*, October 15, 2019.
- “3Q19 First Look: Noisy Quarter but Roughly In Line With Our Expectations,” *Keefe, Bruyette & Woods*, October 15, 2019.
- “3Q19 Results: Moving in the Right Direction, but Valuation Reflects That Already,” *Keefe, Bruyette & Woods*, October 15, 2019.
- “JPM/WFC 3Q19 Read-Across for Financial Sub-Sectors: Follow-Up,” *Keefe, Bruyette & Woods*, October 15, 2019.
- “Management Provides NII Guidance for 2020,” *Keefe, Bruyette & Woods*, October 15, 2019.
- “Stuck in an Air Pocket,” *Nomura*, October 15, 2019.
- “3Q19 ‘Core’ Results Better Than Expected,” *Oppenheimer*, October 15, 2019.
- “3Q19 ‘Core’ Results Better Than Expected,” *Oppenheimer*, October 15, 2019.
- “Dropping Estimates as Revenue Headwinds Continue; Remain Neutral,” *Piper Jaffray*, October 15, 2019.
- “Not Terrible...Slight Operating Miss within a Noisy Quarter,” *Piper Jaffray*, October 15, 2019.
- “3Q First Look: EPS Miss on Litigation Costs,” *Raymond James*, October 15, 2019.
- “Reducing EPS Ests. for Higher Expenses, but Revenue Higher as Well,” *Raymond James*, October 15, 2019.
- “3Q19: Noisy Quarter but Underlying Trends Remain Challenging,” *RBC*, October 15, 2019.
- “WFC 3Q19 Core EPS of $1.02 falls short of consensus-matching $1.18; Credit and capital remain strong in an otherwise noisy quarter,” *RBC*, October 15, 2019.
- “WFC 3Q19 Earnings Review: Bumping up 2020E EPS; Reiterate BUY Rating,” *Sandler O'Neill & Partners*, October 15, 2019.

- “WFC 3Q19 Preliminary Earnings Review: Core EPS Within a Penny of Our Estimate,” *Sandler O'Neill & Partners*, October 15, 2019.
- “Better than feared rules day 1 of bank earnings; JPM and C results mostly thesis enhancing,” *UBS*, October 15, 2019.
- “Lots of moving parts but 3Q19 results consistent with view that earnings estimates to fall,” *UBS*, October 15, 2019.
- “3Q model updates,” *Autonomous Research*, October 16, 2019.
- “3Q19 Review – Underneath The Noise, Core Trends Were In Line,” *Citigroup*, October 16, 2019.
- “3Q Earnings Miss, New CEO Inbound,” *J.P. Morgan*, October 16, 2019.
- “C/JPM/WFC: 3Q19 Earnings Wraps,” *Jefferies*, October 16, 2019.
- “3Q19 Earnings Day 1: C, GS, JPM, WFC,” *Morgan Stanley*, October 16, 2019.
- “Wells Fargo Takes $1.6 Billion Legal Charge in the Quarter, Net Interest Income Under Pressure,” *Morningstar*, October 16, 2019.
- “The Weekly Chu: Week of October 21st, 2019,” *Wolfe Research*, October 21, 2019.
- “3Q Noisy but Ok relative to our operating forecast,” *Credit Suisse*, October 21, 2019.
- “3Q19 Recap - Better quarter, but the weaker forward earnings trajectory untouched,” *Goldman Sachs*, October 21, 2019.
- “It’s Not Doomsday, but Challenges Persist,” *Nomura*, October 21, 2019.
- “US banks: upgrading BAC to Overweight,” *Atlantic Equities*, October 22, 2019.
- “Daley spins the rumor mill,” *Autonomous Research*, October 25, 2019.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 197 | October 28, 2019,” *Barclays*, October 28, 2019.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 200 | October 31, 2019,” *Barclays*, October 31, 2019.
- “Jason Goldberg’s Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 201 | November 1, 2019,” *Barclays*, November 1, 2019.
- “Future of Financials Conference: Most requested companies,” *Bank of America Merrill Lynch*, November 3, 2019.
- “The Expense Path May Take Many Turns,” *Autonomous Research*, November 4, 2019.
- “The Expense Path May Take Many Turns,” *Autonomous Research*, November 4, 2019.
- “3Q19 10-Q Review: Legal RPL Down; $0.07 Eastdil Sale Gain in 4Q19,” *Barclays*, November 4, 2019.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 202 | November 4, 2019," *Barclays*, November 4, 2019.
- "What's New in the 10Q," *Credit Suisse*, November 4, 2019.
- "3Q 10-Q: Addition To Possible Legal Costs Given Large 3Q Charge," *J.P. Morgan*, November 4, 2019.
- "3Q 10-Q: Addition To Possible Legal Costs Given Large 3Q Charge," *J.P. Morgan*, November 4, 2019.
- "What Large Cap Bank Investors Are Asking: Which Banks Are Most at Risk From CECL?" *Morgan Stanley*, November 4, 2019.
- "Risk control buildout continues," *Autonomous Research*, November 5, 2019.
- "Reiterating 2020 NII Guidance, but CFO Notes It Is Still Early," *Keefe, Bruyette & Woods*, November 5, 2019.
- "CFO on NII, expenses and Charlie Scharf," *Autonomous Research*, November 6, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 204 | November 6, 2019," *Barclays*, November 6, 2019.
- "Future of Financials takeaways: Controlling their destiny," *Bank of America Merrill Lynch*, November 7, 2019.
- "AUTONODAILY: APO, FHN, FRC, PGR, TDFs, FLOWS, PEPSI," *Autonomous Research*, November 8, 2019.
- "WFC Instant Insight - BAAB Conference Bullets," *Barclays*, November 8, 2019.
- "BAAB Takes: Filling the Data Management Lake," *Evercore ISI*, November 8, 2019.
- "Takeaways from BAAB Presentation," *Raymond James*, November 8, 2019.
- "WFC Presents at the 2019 BAAB Conference," *RBC*, November 8, 2019.
- "WFC Highlights from 2019 BAAB Conference Presentation," *Sandler O'Neill & Partners*, November 8, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 207 | November 11, 2019," *Barclays*, November 11, 2019.
- "Top Seven Questions for New CEO; Revisiting Cost Story," *Deutsche Bank*, November 12, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 209 | November 13, 2019," *Barclays*, November 13, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 210 | November 14, 2019," *Barclays*, November 14, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 211 | November 15, 2019," *Barclays*, November 15, 2019.

- "4Q19 Mid Quarter Update #1—Updating the Data Points," *Credit Suisse*, November 18, 2019.
- "What Large Cap Bank Investors Are Asking: What's The Impact of Trade Tensions Easing? How to Model Day 2 CECL Impact?" *Morgan Stanley*, November 18, 2019.
- "Survey results from Moody's Analytics conference sheds light on potential CECL impacts," *UBS*, November 19, 2019.
- "Spotlight on the Efficiency Ratio at Wells Fargo," *Keefe, Bruyette & Woods*, November 20, 2019.
- "Searching for Revenue Stabilization," *Autonomous Research*, November 21, 2019.
- "Searching for Revenue Stabilization," *Autonomous Research*, November 21, 2019.
- "Leveraged Lending: A marked slowdown but mounting tail-risks," *UBS*, November 21, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 216 | November 22, 2019," *Barclays*, November 22, 2019.
- "Meeting Takes: Getting the Lay of the Land; Don't Expect Expense Guide Until 4Q," *Evercore ISI*, November 22, 2019.
- "3Q GSIB scores imply 35% b/s reduction by year-end," *Bank of America Merrill Lynch*, November 25, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 217 | November 25, 2019," *Barclays*, November 25, 2019.
- "What Large Cap Bank Investors Are Asking: Who is Most Exposed to Nonprime Auto? How did GSIB Scores Trend in 3Q19? Why's BBT/STI Underperforming?" *Morgan Stanley*, November 25, 2019.
- "What Goes Up, Must Come Down?" *Credit Suisse*, December 1, 2019.
- "Getting Worse Before it Gets Better; Downgrading to Underperform," *Raymond James*, December 2, 2019.
- "Wells Fargo Names Scott Powell Chief Operating Officer," *RBC*, December 2, 2019.
- "*UBS* Evidence Lab inside: Take it to the bank - a guide to branch networks and strategies, volume III," UBS, December 2, 2019.
- "Scharf hires new COO," *Autonomous Research*, December 3, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 221 | December 3, 2019," *Barclays*, December 3, 2019.
- "WFC Names Scott Powell as COO," *Sandler O'Neill & Partners*, December 3, 2019.
- "Question Bank: 4Q19 Edition and 2020 Outlook," *Deutsche Bank*, December 4, 2019.
- "OCC focuses on bank's HR," *Autonomous Research*, December 5, 2019.

- "WFC - Focus on Consumer Banking: The Transformation Continues," *Barclays*, December 5, 2019.
- "WFC: On the Road with Consumer Banking," *Credit Suisse*, December 5, 2019.
- "Key takeaways from Consumer Bank management presentation," *Goldman Sachs*, December 5, 2019.
- "Banks: The Digital Future; a Survey of Retail Customer Trends," *Jefferies*, December 5, 2019.
- "Wells Fargo:Consumer Banking—5 Autono-bites," *Autonomous Research*, December 6, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 224 | December 6, 2019," *Barclays*, December 6, 2019.
- "The Weekly Situation: Wells Bells; Charlie's Comin' on Like a Hurricane," *Evercore ISI*, December 6, 2019.
- "Consumer Investor Day: Lots Of Investments Underway To Catch Up; Deposit Growth Lags Peers," *J.P. Morgan*, December 6, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 225 | December 9, 2019," *Barclays*, December 9, 2019.
- "Banks: Introducing the Bankruptcy Blotter: Vol. 1," *Jefferies*, December 9, 2019.
- "2020 Outlook: Volatility Returns on Multiple Fronts," *Keefe, Bruyette & Woods*, December 9, 2019.
- "What Large Cap Bank Investors Are Asking: When Will WFC Deliver Positive Operating Leverage in its Consumer Business?" *Morgan Stanley*, December 9, 2019.
- "GS US Financial Services Conference 2019 - Key Takeaways," *Goldman Sachs*, December 10, 2019.
- "Takeaways from Presentation: Capital and Costs in Focus," *Keefe, Bruyette & Woods*, December 10, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 227 | December 11, 2019," *Barclays*, December 11, 2019.
- "Takeaways from Day 2 of the GS US Financial Services Conference 2019," *Goldman Sachs*, December 12, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 230 | December 16, 2019," *Barclays*, December 16, 2019.
- "Playing for 'Singles': Bank Top Picks with Stocks in 'Late Innings'," *Citigroup*, December 16, 2019.
- "Consumer Credit Quality: Master Trust and Macroeconomic Data Updates," *Credit Suisse*, December 16, 2019.

- "On Average, Large Cap U.S. Banks Have Generated Over A 30% Total Return In 2019 While Outperforming The S&P 500," *Vining Sparks*, December 16, 2019.
- "Day 2 CECL accounting shouldn't drive material negative revisions," *Bank of America Merrill Lynch*, December 17, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 231 | December 17, 2019," *Barclays*, December 17, 2019.
- "U.S. Large-Cap Banks: 2020 Outlook Survey Results," *Barclays*, December 17, 2019.
- "Rolling Forward our Valuation Framework; Target Price Adjustments," *Credit Suisse*, December 17, 2019.
- "AUTONODAILY: VOYA, LPLA, STT, CB, PRU, INTER, BANKS, OUTLOOK," *Autonomous Research*, December 18, 2019.
- "CECL Pressure Coming to a Retailer Near You," *Morgan Stanley*, December 18, 2019.
- "Wells Fargo (WFC)," *Odeon*, December 18, 2019.
- "US BANKS:Into the Shadows," *Autonomous Research*, December 19, 2019.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 16, Issue 233 | December 19, 2019," *Barclays*, December 19, 2019.
- "Hard To Follow 2019; Politics, Technicals, Rates Key Drivers of Stocks; Fundamentals Moderate," *J.P. Morgan*, December 19, 2019.
- "CECL Pressure Coming to a Retailer Near You," *Morgan Stanley*, December 19, 2019.
- "Western Banks & Thrifts — 4Q19 Quarterly Preview," *Sandler O'Neill & Partners*, December 19, 2019.
- "Risk Reward Update," *Morgan Stanley*, December 20, 2019.
- "A Quantum of Respect: Our 4Q19 and 2020 Outlook," *Oppenheimer*, December 20, 2019.
- "Scharf's review process," *Autonomous Research*, December 30, 2019.
- "Bove Briefing," *Odeon*, January 1, 2020.
- "US Banks (Large Cap): 2020 Outlook—Less Upside After a Strong 2019," *Autonomous Research*, January 2, 2020.
- "US Banks: 2020 Outlook: Things Getting Weird Out There," *Baird*, January 2, 2020.
- "US Banks and Credit Cards," *Citigroup*, January 2, 2020.
- "Sentiment check-in," *Autonomous Research*, January 3, 2020.
- "Diversified Banks & Brokers: 2020 Outlook: A Year for Playing Offense and Defense," *Wolfe Research*, January 5, 2020.

- "2020 Outlook and 4Q19 Preview; More Cautious On Stocks From Here," *Deutsche Bank*, January 5, 2020.
- "2020 Regional Banks 'Soundtrack' (…aka Outlook)," *Evercore ISI*, January 5, 2020.
- "US Large-Cap Banks 2020 Outlook: Past Present & Yet to Come: As Things Change, They Stay the Same," *Barclays*, January 6, 2020.
- "Looking Back to Look Forward: 4Q19 Earnings Preview," *Credit Suisse*, January 6, 2020.
- "2020 Outlook: In search of relative value; add C to CL, move USB down to Sell," *Goldman Sachs*, January 6, 2020.
- "US Banks: 4Q19 Earnings Tear Sheets," *Deutsche Bank*, January 7, 2020.
- "Large Cap Banks 4Q Preview: Tepid 4Q: Loan/Deposit Ratios Lowest Since 1985; Repo Spreads Down; Notable Items Include USB," *J.P. Morgan*, January 7, 2020.
- "4Q19 Earnings Preview: All About the Outlook," *Morgan Stanley*, January 7, 2020.
- "4Q19 Large Banks Earnings Preview," *Raymond James*, January 7, 2020.
- "US banks - anticipate strong YoY rebound in Q4," *Atlantic Equities*, January 8, 2020.
- "4Q19 Preview for Large-Cap Banks, Specialty Finance, Asset Management, and Fintech," *BMO Capital Markets*, January 8, 2020.
- "Dissecting the Cost Base and the Path Forward," *Jefferies*, January 8, 2020.
- "4Q19 Preview & 2020 Outlook: Brokers Over Banks; Upgrade GS & Downgrade NTRS," *Buckingham Research Group*, January 9, 2020.
- "What Matters Most For Each Bank Headed Into 4Q19," *Deutsche Bank*, January 9, 2020.
- "Banks Weather Rate Cuts, but All Eyes Focused on 2020," *Keefe, Bruyette & Woods*, January 9, 2020.
- "U.S. Banks and Specialty Finance: Ready or not, CECL is coming: a user's guide to financial analysis and forecasting," *UBS*, January 9, 2020.
- "4Q19 EPS Preview: Awaiting Strategic Update from the New CEO," *Barclays*, January 10, 2020.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 5 | January 10, 2020," *Barclays*, January 10, 2020.
- "CECL Update: Likely Small Rise In Provisions On Day 2, Room For Variation; Loan Growth Impact?" *J.P. Morgan*, January 10, 2020.
- "4Q'19 Earnings Season Reflects Continued Stability In Profitability Despite Meaningful NIM Compression," *Vining Sparks*, January 10, 2020.
- "WFC: Earnings Prep 4Q19," *Credit Suisse*, January 12, 2020.

- "Wells Fargo 4Q19: High expenses, soft fees drive miss," *Autonomous Research*, January 13, 2020.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 6 | January 13, 2020," *Barclays*, January 13, 2020.
- "U.S. Banks: 4Q19 Earnings Preview – Part II," *RBC*, January 13, 2020.
- "Analyst's Notes: Wells Fargo & Co." *Argus*, January 14, 2020.
- "Wells Fargo: Improvement timeline uncertain," *Autonomous Research*, January 14, 2020.
- "Wells Fargo & Company (WFC): Q4 Follow-Up: Estimates Lower, Long Turnaround Process Ahead," *Baird*, January 14, 2020.
- "Wells Fargo & Company (WFC): Q4 Initial Thoughts: Mixed Quarter, Revenue Fine but Expenses Elevated," *Baird*, January 14, 2020.
- "Wells Fargo & Company Under Construction: Lowering '20E Below $4," *Bank of America Merrill Lynch*, January 14, 2020.
- "4Q19 EPS Review: 'Expense Levels Are Significantly Too High'," *Barclays*, January 14, 2020.
- "WFC 4Q19 EPS Instant Insight: Falls Short of Expectations," *Barclays*, January 14, 2020.
- "4Q19: Lowering Estimates and Target Due to Lower Expected Fees and Higher Costs," *BMO Capital Markets*, January 14, 2020.
- "Wells Fargo & Company," *CFRA Research*, January 14, 2020.
- "4Q19 Review: Value Is Intriguing, But Requires Patient Capital," *Citigroup*, January 14, 2020.
- "4Q19 Earnings First Look: WFC, C, & JPM - Disappointing WFC Results Highlight Better Franchise Momentum at Peers," *Wolfe Research*, January 14, 2020.
- "First Impressions-Falling Short of Forecasts," *Credit Suisse*, January 14, 2020.
- "JPM-C-WFC: Card Stable – Strength In Balance/Spend Growth Sustained," *Credit Suisse*, January 14, 2020.
- "4Q19: More Cost Questions Than Answers After Miss, First Conf Call," *Deutsche Bank*, January 14, 2020.
- "4Q19 First Look: Expense and Fee Shortfall Drive Miss; No Outlook Provided," *Evercore ISI*, January 14, 2020.
- "4Q19 Wrap: Cutting Ests & Uncertainty Persists; Remain on Sidelines," *Evercore ISI*, January 14, 2020.
- "First Take: A Clear Miss, but Investors Likely to Focus More on What the Core Run Rate Is," *Goldman Sachs*, January 14, 2020.

- "4Q19 First Looks: C, WFC," *Jefferies*, January 14, 2020.
- "4Q19 Earnings Wraps," *Jefferies*, January 14, 2020.
- "Card Issuer Volumes from JPM, WFC, and Citi: First Read-Through for V & MA," *Jefferies*, January 14, 2020.
- "4Q19 First Look: Noisy Quarter Drives a Broad-Based Miss," *Keefe, Bruyette & Woods*, January 14, 2020.
- "4Q19 Results: Closing the Books on a Tough Year, 2020 May Be a Similar Sequel," *Keefe, Bruyette & Woods*, January 14, 2020.
- "Key Takeaways from the 4Q19 Earnings Call," *Keefe, Bruyette & Woods*, January 14, 2020.
- "Base Setting for the Scharf Era Begins: First Look: Softer Top Line and Higher Expenses Drive EPS Miss," *Nomura*, January 14, 2020.
- "First Take Pre-Call: Still Struggling in 4Q19," *Oppenheimer*, January 14, 2020.
- "What Could He Say???" *Oppenheimer*, January 14, 2020.
- "WFC 4Q19 First Look: Core EPS Well Below Us and the Consensus on Expense Miss," *Piper Sandler*, January 14, 2020.
- "EPS Miss on Litigation Accruals and Higher Other Expenses," *Raymond James*, January 14, 2020.
- "Reducing EPS Estimates for Higher Expenses," *Raymond James*, January 14, 2020.
- "WFC 4Q19 core EPS of $0.85 vs. our $1.09 estimate and $1.11 consensus; core business trends remain under pressure while expenses stay elevated," *RBC*, January 14, 2020.
- "Wells Fargo & Co.'s Earnings Dip And Capital Decline Are Credit Negatives, Offset By Positive Business Momentum," *S&P Global Ratings*, January 14, 2020.
- "Day 1 recap: Wells investment case takes a big hit; Citigroup and JPMorgan deliver," *UBS*, January 14, 2020.
- "Underwhelming 4Q19 as expense levels continue to weigh on results," *UBS*, January 14, 2020.
- "Expense Uncertainty Weighs; Trimming Estimates," *Buckingham Research Group*, January 15, 2020.
- "Assess (in process), Fix (in process) and Move Forward (not yet); TP now $54," *Credit Suisse*, January 15, 2020.
- "4Q Missed: Light Revenues, Expenses Running High," *J.P. Morgan*, January 15, 2020.
- "Weak Core 4Q: Expenses Running Higher; Review Underway, No Date For New Targets," *J.P. Morgan*, January 15, 2020.

- "4Q19 Earnings Day 1: C, JPM, WFC," *Morgan Stanley*, January 15, 2020.
- "Wells Reports a Tough Fourth Quarter: More Legal Charges, and Future Expense Outlook Is Cloudy," *Morningstar*, January 15, 2020.
- "Downgrading WFC to Neutral and Lowering EPS Estimates; 4Q19 Earnings Review," *Piper Sandler*, January 15, 2020.
- "WFC's Earnings Continue To Worsen; And, Clean-Up Could Continue Through 2020E Before Improving Again In 2021E," *Vining Sparks*, January 15, 2020.
- "4Q19: There Will Be a Time to Own WFC but Not Today," *RBC*, January 16, 2020.
- "U.S. Large-Cap Banks: Weekly Bank Briefing (1/21/20)," *Barclays*, January 17, 2020.
- "4Q19 Universal & Trust Bank Earnings Wrap," *Wolfe Research*, January 19, 2020.
- "Expect Efficiency to Improve in 2021," *RenMac*, January 19, 2020.
- "Large Cap Banks: Quarles Speaks… More Insight Into the Path of New CCAR," *Credit Suisse*, January 20, 2020.
- "US banks: Q4 summary, downgrading BAC," *Atlantic Equities*, January 21, 2020.
- "Growth Challenged & Upside Constrained in 2020: Revenue Headwinds Tougher to Offset with Opex Cuts, Although NIM Stabilization Could Bode Well for 2021," *Nomura*, January 21, 2020.
- "4Q19 Recap: Ending the year on a high note," *Goldman Sachs*, January 22, 2020.
- "The Daily Deck: Housing is just getting started," *RBC*, January 22, 2020.
- "The Future of Payments: Part II. Moving to Digital Wallets and the Extinction of Plastic Cards," *Deutsche Bank*, January 23, 2020.
- "Risk Reward Update," *Morgan Stanley*, January 23, 2020.
- "OCC brings down the hammer on former execs," *Autonomous Research*, January 24, 2020.
- "4Q19 Recap/Outlook: Despite 7% Lag YTD, Remain Cautious on Stocks," *Deutsche Bank*, January 26, 2020.
- "How we get to $3.85 in 2020," *Bank of America Merrill Lynch*, January 27, 2020.
- "The One Thing That Mattered Most for Each Bank from 4Q Results," *Deutsche Bank*, January 27, 2020.
- "4Q19 Bank Earnings Scorecard (Final): Revenue Headwinds Tougher to Offset with Opex Cuts; Still Too Early to Get More Bullish on the Group," *Nomura*, January 27, 2020.
- "Risk/Reward More Balanced with Pullback – Upgrading WFC and ZION to Neutral," *Baird*, January 28, 2020.
- "Some Make it Look Easier than Others—4Q19 Wrapped Up," *Credit Suisse*, January 28, 2020.

- "Quick Takes from 4Q19 EPS: It's All About Expenses (…Unfortunately)," *Evercore ISI*, January 28, 2020.
- "CECL — Ready or Not Here it Comes," *Piper Sandler*, January 28, 2020.
- "The bull case: Asset cap lift near-term, >$5 in EPS power later," *Bank of America Merrill Lynch*, January 29, 2020.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 17 | January 29, 2020," *Barclays*, January 29, 2020.
- "4Q Recap: Overall neutral on the space; more execution-risk on DFS," *Deutsche Bank*, January 30, 2020.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 19 | January 31, 2020," *Barclays*, January 31, 2020.
- "Revisiting How Lower LT Rates Impact NIMs; BAC/USB/WFC Most at Risk," *Deutsche Bank*, February 3, 2020.
- "How Willing Is Your Bank to Pay Up for Deposits? Jan 2020," *Morgan Stanley*, February 3, 2020.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 21 | February 4, 2020," *Barclays*, February 4, 2020.
- "KBW Bank Buzz - Margins and NII Somewhat Mixed in 4Q19; Stocks Giving Back Some Gains," *Keefe, Bruyette & Woods*, February 4, 2020.
- "LAUNCHING ESG INVESTMENT STRATEGY SERIES: Key Trends, Data Vendors, and Portfolio Analytics," *Wolfe Research*, February 5, 2020.
- "Fed Releases Stress Test Scenarios, Committed to SCB but No Details Yet," *Barclays*, February 6, 2020.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 23 | February 6, 2020," *Barclays*, February 6, 2020.
- "Time to Stress—2020 CCAR Scenarios Released (this is Step 1)," *Credit Suisse*, February 6, 2020.
- "Americas Banks: 2020 CCAR scenarios - Mixed to potentially worse YoY, although ultimate impacts remain unclear," *Goldman Sachs*, February 6, 2020.
- "2020 DFAST Scenarios: Slightly Harsher Economic Scenarios in 2020," *RBC*, February 6, 2020.
- "2020 CCAR Variables Out: Tougher Test with No SCB Yet, Supports our Lower Payouts from 3Q20," *Morgan Stanley*, February 7, 2020.
- "Federal Reserve Releases 2020 Stress Test Scenarios," *Raymond James*, February 7, 2020.
- "Upon further review: '20 DFAST 'in-line', SCB language throws a wrench," *Bank of America Merrill Lynch*, February 10, 2020.

- "What Large Cap Bank Investors Are Asking: Why Does CECL in Bank Run Stress Tests Matter?" *Morgan Stanley*, February 10, 2020.

- "Debate takeaways: We look to find a reason to believe," *Bank of America Merrill Lynch*, February 11, 2020.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 26 | February 11, 2020," *Barclays*, February 11, 2020.

- "Question Bank: 1Q20 Edition," *Deutsche Bank*, February 11, 2020.

- "CCAR 2020: Leveraged Loans, Trading, Non-US Stressed More - Money Centers More Exposure," *J.P. Morgan*, February 11, 2020.

- "Scharf Shifts Reporting Structures and Makes Strategic Hires," *Keefe, Bruyette & Woods*, February 11, 2020.

- "Right Time, Right Place; Previewing Our West Coast Financial Svcs Conference," *Piper Sandler*, February 11, 2020.

- "WFC Reorganizes Business Lines Under CEO Charlie Scharf," *Piper Sandler*, February 11, 2020.

- "Scharf Re-Organizes WFC - Heavy Lifting Still Lies Ahead," *RBC*, February 11, 2020.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 27 | February 12, 2020," *Barclays*, February 12, 2020.

- "New Org Structure Partly Back To Structure Before Scandal Was Public; CIB Elevated To Own Segment," *J.P. Morgan*, February 12, 2020.

- "The Weekly Situation: The Harder the Conflict, the Greater the Triumph," *Evercore ISI*, February 13, 2020.

- "Risk Reward for Wells Fargo & Co. (WFC.N) has been updated," *Morgan Stanley*, February 13, 2020.

- "Model Update: Updating Estimates," *RBC*, February 13, 2020.

- "Model maintenance; preferred stock redemption," *Credit Suisse*, February 14, 2020.

- "Banks: Mortgage Refi Coming Up Roses Again," *Jefferies*, February 14, 2020.

- "US Large Cap Banks: 1Q20 Mid Quarter Update #1—Updating the Data Points," *Credit Suisse*, February 18, 2020.

- "MS/ETFC Merger: Third Time's the Charm," *Wolfe Research*, February 20, 2020.

- "DOJ/SEC settlement a positive, but road to recovery is a long one," *Bank of America Merrill Lynch*, February 21, 2020.

- "Settlements Clear Some of the Clouds; Next Stop…Asset Cap," *Evercore ISI*, February 21, 2020.

- "Settles DOJ and SEC Investigations; Settlement Fully Reserved," *Keefe, Bruyette & Woods*, February 21, 2020.

- "DOJ and SEC Announce Settlements With Wells Fargo; Our Thesis Is Gradually Playing Out," *Morningstar*, February 21, 2020.

- "WFC Reaches Settlements to Resolve Outstanding Community Bank Sales Practices-Related DOJ and SEC Investigations," *RBC*, February 21, 2020.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 34 | February 24, 2020," *Barclays*, February 24, 2020.

- "What We'll Be Probing for at the 21st Annual Credit Suisse Financial Services Forum," *Credit Suisse*, February 24, 2020.

- "One More Settlement But Many Consent Orders Pending; House Unconvinced, To Hold More Hearings," *J.P. Morgan*, February 24, 2020.

- "Settlement with DoJ and SEC closes a chapter in drawn-out sales malpractices aftermath," *Moody's*, February 24, 2020.

- "WFC Reaches $3 bil. Sales Practice Settlement with DOJ and SEC," *Piper Sandler*, February 24, 2020.

- "Reiterate Underperform Rating Following Settlement With DOJ and SEC," *Raymond James*, February 24, 2020.

- "Wells Fargo & Co. Settles A Major Legal Overhang, But Other Uncertainties Remain," *S&P Global Ratings*, February 24, 2020.

- "Wells Fargo & Company (WFC)," *Zacks Equity Research*, February 24, 2020.

- "Power - Deals and Alliances Profile," *GlobalData*, February 25, 2020.

- "Suggestion: Start with the longer term trading plans," *Stock Traders Daily Research*, February 25, 2020.

- "CECL conference takeaways: does an accounting change have real impacts on economic decisions?" *UBS*, February 25, 2020.

- "2019 10-K Review: Legal RPL Down $1bn; $0.06 Pref Charge in 1Q20," *Barclays*, February 27, 2020.

- "First Thoughts from the 21st Annual Credit Suisse Financial Services Forum," *Credit Suisse*, February 27, 2020.

- "Lowers NII Outlook Ex Recent Move in Rates; No 2020 Expense Guide," *Evercore ISI*, February 27, 2020.

- "Reduces NII Guidance Slightly; Revision Does not Consider Recent Rate Move," *Keefe, Bruyette & Woods*, February 27, 2020.

- "Reduces NII Guidance at Investor Conference," *Raymond James*, February 27, 2020.

- "Global Reference Guide to COVID-19 ('coronavirus')," *RBC*, February 27, 2020.

- "Wells Fargo: Upgrading to Neutral," *Atlantic Equities*, February 28, 2020.
- "CFO offers NII, loan, deposit, expense guidance," *Autonomous Research*, February 28, 2020.
- "US Banks: Assessing a 3 Rate Cuts Scenario Using Our Scenario Model," *RBC*, February 28, 2020.
- "Wells Fargo & Company," *CFRA Research*, February 29, 2020.
- "Americas Banks: Revisiting bank downside analysis," *Goldman Sachs*, March 1, 2020.
- "Suggestion: Start with the longer term trading plans," *Stock Traders Daily Research*, March 1, 2020.
- "Wells Fargo & Company," *CFRA Research*, March 2, 2020.
- "What We Learned from the Banks at the 21st Annual CS Financial Services Forum," *Credit Suisse*, March 2, 2020.
- "WFC: 10K Takeaways," *Credit Suisse*, March 3, 2020.
- "Coronavirus, the Fed, and the Steady 2020 That Wasn't," *Morningstar*, March 3, 2020.
- "Mortgage & Housing Monitor: Sudden Rate Move Sets Up Huge Demand Shift," *Piper Sandler*, March 3, 2020.
- "A Wright Investors' Service Research Report: Wells Fargo & Company," *Wright*, March 3, 2020.
- "US Banks: Dark & Stormy," *Autonomous Research*, March 4, 2020.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 41 | March 4, 2020," *Barclays*, March 4, 2020.
- "SCB May Facilitate Higher Capital Return to Bank Shareholders," *BMO Capital Markets*, March 4, 2020.
- "CFRA RAISES OPINION ON SHARES OF WELLS FARGO & COMPANY TO HOLD FROM SELL," *CFRA Research*, March 4, 2020.
- "A More Dynamic Rate Approach Favors BK, LPLA," *Wolfe Research*, March 4, 2020.
- "The Fed Taketh (Rates), The Fed Giveth (SCB); Final SCB Rule Positive for Trusts," *Wolfe Research*, March 4, 2020.
- "Time to Stress, Step 2 -- 2020 CCAR Instructions Released, SCB Adopted," *Credit Suisse*, March 4, 2020.
- "Americas Banks: Updating estimates for lower rates outlook and market levels," *Goldman Sachs*, March 4, 2020.
- "Stress Capital Buffers Finalized and Will Be Effective in 2020," *Keefe, Bruyette & Woods*, March 4, 2020.

- "Potentially lower litigation accruals are credit positive, but weaker net interest income in 2020 offsets benefit," *Moody's*, March 4, 2020.
- "Capital Rules Further Simplified & CCAR Instructions Released," *RBC*, March 4, 2020.
- "SCB: Better than expected but watch the nuance," *Bank of America Merrill Lynch*, March 5, 2020.
- "SCB Finalized, CCAR Instructions Out: Capital Return Should Persist," *Barclays*, March 5, 2020.
- "Model Refresh – Lower NII Driving Our Estimates Down To $3.70 In 2020," *Citigroup*, March 5, 2020.
- "Key Takeaways From The 2020 CCAR Guidelines," *Deutsche Bank*, March 5, 2020.
- "SCB in CCAR 2020: Target capital ratios largely unchanged; greater control over mix of capital return," *Goldman Sachs*, March 5, 2020.
- "COVID-19 Impact: NIM, Markets-Related, Payments Fees Hit; Refis Up; HY Spreads Up but Still Low," *J.P. Morgan*, March 5, 2020.
- "Banks: CCAR '20 Instructions; SCB Finalized, Leverage Buffer Out," *Jefferies*, March 5, 2020.
- "SCB Rules Finally Out," *Morgan Stanley*, March 5, 2020.
- "Updating Our Bank Projections for Rate Cuts and Coronavirus; Better Value Is Starting to Emerge," *Morningstar*, March 5, 2020.
- "It's Just Your 19th Nervous Breakdown . . .Our Mini-Preview on the Occasion of Mr. Powell's Panic in the Fed," *Oppenheimer*, March 5, 2020.
- "Mixed Regulatory News for Financials: Fed's Stress Test Revamp/CFPB Structure," *Raymond James*, March 5, 2020.
- "Wells Fargo & Co," *S&P Global Ratings*, March 5, 2020.
- "Latest Economic Scenarios Imply Greater Hit to NIMs Than Credit Quality (So Far)," *BMO Capital Markets*, March 6, 2020.
- "Initial Thoughts on Our House View of Fed Cuts to Zero Lower Bound; Key Is Whether It Is Transitory," *Citigroup*, March 6, 2020.
- "Moving to Zero Rates – Reducing PT to $43," *Citigroup*, March 6, 2020.
- "Morningstar Company Valuation Model," *Morningstar*, March 6, 2020.
- "Weekly Wrap: Market Floor Rises on Biden's Jump as Virus Fears Extend Volatility," *Raymond James*, March 6, 2020.
- "Encouragement from the OCC," *RenMac*, March 7, 2020.
- "Board members resign," *Autonomous Research*, March 9, 2020.
- "US BANKS: Energy Exposure Disclosure," *Autonomous Research*, March 9, 2020.

- "How 'real time' are CECL adjustments on economic outlook?" *Bank of America Merrill Lynch*, March 9, 2020.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 44 | March 9, 2020," *Barclays*, March 9, 2020.
- "CFRA KEEPS HOLD OPINION ON SHARES OF WELLS FARGO & COMPANY," *CFRA Research*, March 9, 2020.
- "Wells Fargo & Company," *CFRA Research*, March 9, 2020.
- "Some Thoughts on Today's Moves on Oil Price Shock….Stocks Getting Interesting," *Citigroup*, March 9, 2020.
- "Americas Banks: Revisiting the impact of lower oil prices on large banks," *Goldman Sachs*, March 9, 2020.
- "House Reports: Far Behind on Regulatory Issues; Several Concerns: Expenses, Transparency, Board," *J.P. Morgan*, March 9, 2020.
- "Stress Capital Buffer: Generally As Expected - Buffers Likely To Vary To Manage Stress Test Variability," *J.P. Morgan*, March 9, 2020.
- "Board Members (Duke, Quigley) Resign; Noski Becomes Chairman," *Keefe, Bruyette & Woods*, March 9, 2020.
- "Despite Higher Payouts, Dividends Are Safe Even Under Severely Stressed Scenario," *Keefe, Bruyette & Woods*, March 9, 2020.
- "Board Resignations Are Yet Another Step to Move beyond Legacy Issues," *Moody's*, March 9, 2020.
- "Updating Our Bank Projections for Rate Cuts and Coronavirus; Better Value Is Starting to Emerge," *Morningstar*, March 9, 2020.
- "WFC Announces Resignation of Two BOD Members," *Piper Sandler*, March 9, 2020.
- "WFC - Betsy Duke Resigns as Chair and member of Wells Fargo Board of Directors," *RBC*, March 9, 2020.
- "Regulatory Challenges Complicate Self-Help; Rigid Cost Base, Low ROA Leave Wells Earnings Vulnerable," *UBS*, March 9, 2020.
- "Scharf to Testify Today," *Autonomous Research*, March 10, 2020.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 45 | March 10, 2020," *Barclays*, March 10, 2020.
- "What We Learned from CEO Charlie Scharf's Testimony before the House Fin'l Services Committee—Fixing Takes Time," *Credit Suisse*, March 10, 2020.
- "Bank stocks starting to price in a full-fledged recession," *Bank of America Merrill Lynch*, March 11, 2020.
- "Wells Fargo and Company crashes 39% in past quarter; Institutional Ownership up 5%" *BuySellSignals Research*, March 11, 2020.

- "Takeaways from Hearings: Timing of Resolution, Expenses, Regulators and CEO/Board on Watch," *J.P. Morgan*, March 11, 2020.
- "Social Distancing Could Drive Higher Credit Losses," *Morgan Stanley*, March 11, 2020.
- "Downgrading Wells Fargo Stewardship Rating to Poor After New Details Emerge from House Reports," *Morningstar*, March 11, 2020.
- "C&I: Ready, Aim…Draw!" *Autonomous Research*, March 12, 2020.
- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 47 | March 12, 2020," *Barclays*, March 12, 2020.
- "Prepared to Commit... Testing Our Banks' Ability to Fund Undrawn Credit Lines," *Credit Suisse*, March 12, 2020.
- "Americas Banks: Assessing the risk of industry drawdowns on revolvers on the banking industry," *Goldman Sachs*, March 12, 2020.
- "Looking Back at Credit Line Utilization in Periods of Stress," *Credit Suisse*, March 13, 2020.
- "Revisiting bank valuations if we enter a (potentially) recessionary world; MS up to Buy, USB up to Neutral," *Goldman Sachs*, March 13, 2020.
- "Earnings Impact: Zero Rates, Energy Exposure, Revolver Drawdowns; Where Can We Go from Here?" *J.P. Morgan*, March 13, 2020.
- "Wells Fargo & Company," *CFRA Research*, March 14, 2020.
- "Banks: Framing P/TBV Valuation," *Autonomous Research*, March 15, 2020.
- "US BANKS: Restaurants – I'll Take Mine To Go," *Autonomous Research*, March 15, 2020.
- "Fed Takes Significant Actions to Encourage Lending, Big Banks Halt Share Repurchase Near-term," *Barclays*, March 15, 2020.
- "Americas Banks: Fed cuts rates to 0-0.25% and takes other actions to ease pressure on funding markets; G-SIBs and USB suspend buybacks through 2Q20," *Goldman Sachs*, March 15, 2020.
- "Share Buyback Suspended Through June; Big Banks Providing Support to Combat COVID-19," *Keefe, Bruyette & Woods*, March 15, 2020.
- "The Fed Cuts Rates to Zero, Takes Series of Policy Measures to Offer Support Amidst Coronavirus," *Morningstar*, March 15, 2020.
- "U.S. Banks - The Federal Reserve Fires Its Bazooka," *RBC*, March 15, 2020.
- "Suggestion: Start with the longer term trading plans," *Stock Traders Daily Research*, March 15, 2020.
- "Cross Asset Strategy: Regulatory mountains may need to be moved," *Bank of America Merrill Lynch*, March 16, 2020.

- "Jason Goldberg's Bank Brief | U.S. Large-Cap Banks | Volume 17, Issue 49 | March 16, 2020 …," *Barclays*, March 16, 2020.
- "Fed Launches Preemptive Strike; BK Clear Standout," *Wolfe Research*, March 16, 2020.
- "Rates Cut to Zero, Material EPS Hit; Large Banks Suspend Buybacks Thru 2Q20; Modest 1-2% EPS Hit," *J.P. Morgan*, March 16, 2020.
- "Banks: Updated MTM Analysis; 'ZIRP and 50' Scenario," *Jefferies*, March 16, 2020.
- "Morningstar | The Fed Cuts Rates to Zero, Takes Series of Policy Measures to Offer Support Amidst Coronavirus," *Morningstar*, March 16, 2020.
- "US Banks - recession testing provides comfort," *Atlantic Equities*, March 17, 2020.
- "CECL Seminar: FASB Full Steam Ahead, But Fed Could Slow It Down," *Barclays*, March 17, 2020.
- "Potential COVID-19 EPS Math 2.0: Getting Hit From Many Sides," *Barclays*, March 17, 2020.
- "Americas Banks: Fed encourages banks to dip into capital buffers to support lending around coronavirus concerns," *Goldman Sachs*, March 17, 2020.
- "Wells Fargo & Company(WFC) Zacks Company Report," *Zacks Equity Research*, March 17, 2020.
- "Lowering Estimates for Darker Times," *Autonomous Research*, March 18, 2020.
- "Five ways the Fed could stem the panic," *Bank of America Merrill Lynch*, March 18, 2020.
- "Banks: Thoughts on C&I and Sector Loan Disclosures," *Jefferies*, March 18, 2020.
- "Examining Hospitality/Leisure Exposure for Banks," *Raymond James*, March 18, 2020.
- "Rating Update for Wells Fargo & Co," *Sadif Investment Analytics*, March 18, 2020.
- "Watchdog Report: WFC - Now with Critical / Key Audit Matters," *Watchdog Research*, March 18, 2020.
- "What CCAR Implies About What's Ahead," *Oppenheimer*, March 19, 2020.
- "U.S. Banks: Banks' EPS Estimates and Price Targets Revisions," *RBC*, March 19, 2020.
- "Where does CECL stand now? Takeaways from recent conversations," *UBS*, March 19, 2020.
- "Wells Fargo & Co (WFC) - Financial and Strategic SWOT Analysis Review," *GlobalData*, March 20, 2020.
- "Quantifying the Impact of Economic Contraction on System-Wide NPA Formations," *BMO Capital Markets*, March 22, 2020.

- "Updating liquidity, capital and earnings hits from revolvers and loans in at-risk industries; sizing revolver draws so far; and assessing sustainability of dividends," *Goldman Sachs*, March 22, 2020.

- "Banks: Taking News Inventory (as of 3/22)," *Jefferies*, March 22, 2020.

- "Crisis-Tested CEO Will Steer Through Economic and Regulatory Challenges," *Paragon*, March 22, 2020.

- "Wells Fargo & Co (WFC) Model Update," *Citigroup*, March 23, 2020.

- "Credit Costs Are The Big Unknown; Exposures To Key Sectors, Small Business; Shadow Bank Loans," *J.P. Morgan*, March 23, 2020.

- "Bear Market Rally: Six Bank Stocks and Two Preferreds that Could Benefit," *Odeon*, March 24, 2020.

- "The bank value trade: mirage, not miracle," *Berenberg*, March 25, 2020.

- "Banks: Drawing Lines," *Autonomous Research*, March 26, 2020.

- "Are We There Yet?" *Morgan Stanley*, March 26, 2020.

- "1Q20 Western Bank Preview," *Piper Sandler*, March 26, 2020.

- "Reducing money center estimates by ~40%; C still our top pick," *Bank of America Merrill Lynch*, March 27, 2020.

- "Capital relief provided for CECL; higher risk books should benefit; GAAP results don't change," *UBS*, March 27, 2020.

- "Estimating the Impact of  Economic Contraction on Bank Solvency Ratios," *BMO Capital Markets*, March 30, 2020.

- "Asset Cap Update: House Fin. Services Committee Chair Waters Probes Wells' Request To Lift Asset Cap," *J.P. Morgan*, March 30, 2020.

- "Fed Delays Full CECL Reg Capital Impact Until 2025, Consumer Finance Stocks Biggest Beneficiaries," *Morgan Stanley*, March 30, 2020.

- "Updating for a New Economic Baseline: Upgrading JPM and BK to OP, Downgrading C and STT to MP," *Keefe, Bruyette & Woods*, March 31, 2020.

- "The Road Ahead: The Quarters Not the Years Tell the Story; Upgrading USB to OP," *Oppenheimer*, March 31, 2020.

- "Can Wells Fargo's Stock Recover to $37 Anytime Soon?" *Trefis*, April 1, 2020.

- "WFC 1Q20 EPS Instant Insight," *Barclays*, April 14, 2020.

- "1Q20 Results: Meeting Our Expectations but Our Expectations Were Low," *Keefe, Bruyette & Woods*, April 14, 2020.

- "Estimating the Impact of Expected Economic Contraction on C&I Loan Loss Rates," *BMO Capital Markets*, April 20, 2020.

- "Pain Continues for Wells Fargo in Q2, Common Equity Tier 1 Holding Up, Big Expense Cuts Coming," *Morningstar*, July 14, 2020.
- "Pain Continues for WFC in Q2," *Morningstar*, July 15, 2020.
- "Upgrading WFC to Neutral," *Atlantic Equities*, July 22, 2020.

Note: In addition to the materials in this list, I considered all materials cited in my report and exhibits to form my opinions.

**EXHIBIT 1A**

Wells Fargo & Company
Daily Closing Stock Price vs. S&P 500 Total Return Index
1/2/18 – 12/31/20
Price (USD)
$90
$80
$70
$60
$50
$40
$30
$20
$10
$0
Class Period
5/30/18 – 3/12/20
3/5/20: Alleged Corrective Disclosure
Wells Fargo
S&P 500 Total Return Index
1/2/18
4/21/18
8/8/18
11/26/18
3/15/19
7/3/19
10/20/19
2/6/20
5/26/20
9/12/20
12/31/20

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *CRSP*; *Refinitiv Eikon*

Note: Prices are adjusted for dividends. The S&P 500 Total Return Index is pegged to Wells Fargo's stock price on 5/29/18 by applying the returns of the S&P 500 Total Return Index to that price forward and backward from 5/29/18.

**EXHIBIT 1B**

Wells Fargo & Company
Daily Closing Stock Price vs. S&P 500 Total Return Index
1/2/20 – 4/30/20
Price (USD)
$70
$60
$50
$40
$30
$20
$10
$0
1/2/20
1/14/20
1/27/20
2/6/20
2/19/20
3/2/20
3/12/20
3/24/20
4/3/20
4/16/20
4/28/20
2/24/20
3/5/20: Alleged Corrective Disclosure
3/11/20: Alleged Corrective Disclosure
3/23/20
S&P 500 Total Return Index all-time high to date, 2/19/20: 6,886.47
2/24/20: The S&P 500 Total Return Index declines 3.3%. Wells Fargo declines 2.7%.
3/23/20: The S&P 500 Total Return Index closes 32.8% lower than on 2/21/20, before rising 9.4% the next day. Wells Fargo closes 47.1% lower than on 2/21/20, before rising 14.5% the next day.
Wells Fargo
S&P 500 Total Return Index

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *CRSP*; *Refinitiv Eikon*

Note: Prices are adjusted for dividends. The S&P 500 Total Return Index is pegged to Wells Fargo's stock price on 2/21/20 by applying the returns of the S&P 500 Total Return Index to that price forward and backward from 2/21/20.

**EXHIBIT 2A**

## CBOE Volatility Index (VIX)[1]
## 1/2/18 – 12/31/20

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *Refinitiv Eikon*

Note:
[1] The CBOE Volatility Index (VIX) is calculated using prices of 30-day options on the S&P 500. Levels are depicted at market close.
[2] Dr. Hartzmark's estimation window for 3/11/20 covers the 120 trading days from 9/18/19 through 3/10/20. The average VIX closing level is calculated across this period and excludes the dummy dates from Dr. Hartzmark's event study methodology.

**EXHIBIT 2B**



## CBOE Volatility Index (VIX)[1]
### 1/2/20 – 3/31/20

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *Refinitiv Eikon*

Note:
[1]  The CBOE Volatility Index (VIX) is calculated using prices of 30-day options on the S&P 500.  Levels are depicted at market close.
[2]  Dr. Hartzmark's estimation window for 3/11/20 covers the 120 trading days from 9/18/19 through 3/10/20.  The average VIX closing level is calculated across this period and excludes the dummy dates from Dr. Hartzmark's event study methodology.

**EXHIBIT 3A**

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *Refinitiv Eikon*

Note:
[1] Volatilities implied from 30-day and 90-day at-the-money call options on Wells Fargo & Company stock at the daily market close.
[2] Dr. Hartzmark's estimation window for 3/11/20 covers the 120 trading days from 9/18/19 through 3/10/20. The average 30-day implied volatility is calculated across this period and excludes the dummy dates from Dr. Hartzmark's event study methodology.



**EXHIBIT 3B**

# Wells Fargo & Company
## Equity Options Implied Volatility vs. Volatility of Daily Returns in Dr. Hartzmark's Estimation Window
1/2/20 – 3/31/20

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *CRSP*; *Refinitiv Eikon*

Note:
[1] Volatilities implied from 30-day and 90-day at-the-money call options on Wells Fargo & Company stock at the daily market close.
[2] For each day, the line depicts the annualized volatility of daily returns in the 120-trading-day period prior to the charted date (the period used by Dr. Hartzmark to estimate his model for this day), excluding the dummy dates from Dr. Hartzmark's event study methodology. Dr. Hartzmark's event study was extended through 3/31/20. Consistent with his methodology, 3/12/20 is also treated as a dummy date.

**EXHIBIT 3C**

# Wells Fargo & Company
# Volatility of Daily Stock Returns

| | Time Period | Volatility of Daily Stock Returns[1] |
|---|---|---|
| [I] | 9/18/19 – 3/10/20[2] | 21% |
| [II] | 2/24/20 – 3/23/20[3] | 110% |
| [III] | 3/12/20 – 8/31/20[4] | 73% |

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *CRSP;* Wells Fargo Press Release, "Wells Fargo Reports First Quarter 2020 Net Income of $653 Million," April 14, 2020; Wells Fargo Press Release, "Wells Fargo Reports Second Quarter 2020 Net Loss of $2.4 Billion, which Included an $8.4 Billion Increase in the Credit Loss Reserve Driven by Current and Forecasted Economic Conditions," July 14, 2020

Note:
[1] Volatility of returns is annualized.
[2] The volatility of daily stock returns is calculated for the date range used by Dr. Hartzmark to estimate the abnormal return on 3/11/20 (120 trading days prior to 3/11/20). The dummy dates from Dr. Hartzmark's event study methodology are excluded.
[3] The volatility of daily stock returns is calculated for the COVID decline month started 2/24/20 and ending on 3/23/20. The dummy dates from Dr. Hartzmark's event study methodology are excluded. Consistent with Dr. Hartzmark's methodology, 3/12/20 is also treated as a dummy date.
[4] The volatility of daily stock returns is calculated for the 120 trading days immediately following 3/11/20. Consistent with Dr. Hartzmark's methodology, 3/12/20, 4/14/20, and 7/14/20 are also treated as dummy dates and are excluded.

**EXHIBIT 4**

# Wells Fargo & Company

# Levene Test of Equality in the Volatility of Abnormal Returns Before and After February 24, 2020[1]

## Tested Period: 10/1/19 – 3/23/20[2]

| **Volatility of Abnormal Returns** | |
|---|---|
| Period 1: 10/1/19 – 2/21/20 | 11% |
| Period 2: 2/24/20 – 3/23/20 | 31% |
| **Levene Test F-Statistic** | 22.255 * |

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022

Note:
[1] Whether the volatility of abnormal returns in period 1 is equal to the volatility of abnormal returns in period 2 was tested using a Levene Test. An asterisk on the test F-statistic indicates statistical significance at the 5% level, meaning that the null hypothesis of equal volatilities is rejected at the 95% confidence level.
[2] The abnormal return series is created by applying Dr. Hartzmark's event study methodology (using 120 trading days, Dr. Hartzmark's market index, Dr. Hartzmark's orthogonalized industry indices, and including dummy variables for Dr. Hartzmark's dummy dates) in an estimation window ending on 3/23/20 (i.e., 10/1/19 – 3/23/20). Consistent with Dr. Hartzmark's methodology, 3/12/20 is also treated as a dummy date. Volatility of abnormal returns is annualized and calculated excluding dummy dates.

**EXHIBIT 5**

# Wells Fargo & Company

## Correlation of Daily Stock Returns with Dr. Hartzmark's Market and Orthogonalized Industry Indices

| | Time Period | Correlation with Market[1] | Correlation with Broad Industry[2] | Correlation with Focused Industry[2] |
|---|---|---|---|---|
| [I] | 9/18/19 – 3/10/20[3] | 0.70 | 0.49 | 0.48 |
| [II] | 2/24/20 – 3/23/20[4] | 0.95 | 0.41 | 0.50 |
| [III] | 3/12/20 – 8/31/20[5] | 0.80 | 0.72 | 0.76 |

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *Bloomberg*; *S&P Global*; Wells Fargo Press Release, "Wells Fargo Reports First Quarter 2020 Net Income of $653 Million," April 14, 2020; Wells Fargo Press Release, "Wells Fargo Reports Second Quarter 2020 Net Loss of $2.4 Billion, which Included an $8.4 Billion Increase in the Credit Loss Reserve Driven by Current and Forecasted Economic Conditions," July 14, 2020

Note:
[1] Correlation with the market index used in the Hartzmark Report: the S&P 500 Total Return Index, excluding Wells Fargo.
[2] Correlation with the two industry indices used in the Hartzmark Report: the S&P 500 Financial Sector Total Return Index, excluding Wells Fargo ("Broad Industry"), and the S&P 500 Banks Total Return Index, excluding Wells Fargo ("Focused Industry"). Both the Broad Industry and the Focused Industry are orthogonalized against the market index according to Dr. Hartzmark's event study methodology.
[3] Correlations are calculated for the date range used by Dr. Hartzmark to estimate the abnormal return on 3/11/20 (120 trading days prior to 3/11/20). The dummy dates from Dr. Hartzmark's event study methodology are excluded.
[4] Correlations are calculated for the COVID decline month started 2/24/20 and ending on 3/23/20. The dummy dates from Dr. Hartzmark's event study methodology are excluded. Consistent with Dr. Hartzmark's methodology, 3/12/20 is also treated as a dummy date.
[5] Correlations are calculated for the 120 trading days immediately following 3/11/20. Consistent with Dr. Hartzmark's methodology, 3/12/20, 4/14/20, and 7/14/20 are also treated as dummy dates and are excluded.

**EXHIBIT 6**

# Wells Fargo & Company
# Chow Test of Equality in Regression Coefficients
# Before and After February 24, 2020[1]
## Tested Period:  10/1/19 – 3/23/20[2]

| | |
|---|---|
| Chow Test F-Statistic | 5.195 * |

Source:  Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022

Note:
[1]  Whether the regression coefficients in period 1 are equal to those in period 2 was tested using a Chow Test.  An asterisk on the test F-statistic indicates statistical significance at the 5% level, meaning that the null hypothesis of equal regression coefficients in the two periods is rejected at the 95% confidence level.
[2]  Dr. Hartzmark's event study methodology (using 120 trading days, Dr. Hartzmark's market index, Dr. Hartzmark's orthogonalized industry indices, and including dummy variables for Dr. Hartzmark's dummy dates) is applied using an estimation window ended 3/23/20 (i.e., 10/1/19 – 3/23/20).  Consistent with Dr. Hartzmark's methodology, 3/12/20 is also treated as a dummy date.  Additionally, to conduct a Chow test, a dummy variable for observations on or after 2/24/20 ("break period dummy"), and an interaction term between the break period dummy and each of Dr. Hartzmark's event study indices is included.  The reported F-statistic tests if the coefficients of the Chow test variables (break period dummy and interaction terms) are jointly significant.

**EXHIBIT 7A**

# Wells Fargo & Company
# Statistically Significant Abnormal Returns in Dr. Hartzmark's Event Study Before and After February 24, 2020

| | **Period 1:**<br>**5/30/18 – 2/21/20** | **Period 2:**<br>**2/24/20 – 3/23/20** |
|---|---|---|
| *Dummy Dates Included* | | |
| Trading Days | 435 | 21 |
| Trading Days with Statistically Significant Abnormal Returns | 26 | 8 |
| Percentage of Trading Days with Statistically Significant Abnormal Returns | 6.0% | 38.1% |
| *Dummy Dates Excluded* | | |
| Trading Days | 428 | 15 |
| Trading Days with Statistically Significant Abnormal Returns | 21 | 5 |
| Percentage of Trading Days with Statistically Significant Abnormal Returns | 4.9% | 33.3% |

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022

Note: Dr. Hartzmark uses dummy variables for each date where he finds that "important Wells Fargo-specific information" was released, because these days "could possibly have atypical returns." He reports abnormal returns through 3/12/20 in his report. Dr. Hartzmark's event study was extended through 3/31/20. Consistent with his methodology, 3/12/20 is also treated as a dummy date. The differences in the percentages of trading days with statistically significant abnormal returns between the period before 2/24/20 and the period after 2/24/20 are statistically significant at the 5% level, both including and excluding dummy dates, using Fisher's Exact Test.

**EXHIBIT 7B**

# Wells Fargo & Company

## Abnormal Returns in Dr. Hartzmark's Event Study[1]

## 12/2/19 – 3/31/20

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022

Note:
[1] Dr. Hartzmark reports abnormal returns through 3/12/20 in his report. Dr. Hartzmark's event study was extended through 3/31/20. Consistent with his methodology, 3/12/20 is also treated as a dummy date. Abnormal returns are statistically significant if they fall outside of the 95% confidence interval.
[2] During the period from 2/24/20 to 3/23/20, eight out of 21 trading dates have statistically significant abnormal returns (38.1%). After removing Dr. Hartzmark's dummy dates (and 3/12/20), five out of 15 trading dates have statistically significant abnormal returns (33.3%).

**EXHIBIT 8A**

# Wells Fargo & Company
## Abnormal Returns in Dr. Hartzmark's Event Study vs. Change in Market Index
2/24/20 – 3/23/20

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022

Note: Dr. Hartzmark reports abnormal returns through 3/12/20 in his report. Dr. Hartzmark's event study was extended through 3/31/20. Consistent with his methodology, 3/12/20 is also treated as a dummy date. The Pearson correlation coefficient between the abnormal returns in Dr. Hartzmark's event study and the change in market index is 0.526. The red line of best fit has slope 0.287 (statistically significant at the 5% level).

**EXHIBIT 8B**



# Wells Fargo & Company
## Squared Abnormal Returns in Dr. Hartzmark's Event Study vs. VIX Index
2/24/20 – 3/23/20

Source:  Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *Refinitiv Eikon*

Note:  Dr. Hartzmark reports abnormal returns through 3/12/20 in his report.  Dr. Hartzmark's event study was extended through 3/31/20.  Consistent with his methodology, 3/12/20 is also treated as a dummy date.  The Pearson correlation coefficient between the squared abnormal returns in Dr. Hartzmark's event study and the VIX index is 0.534.  The red line of best fit has slope 0.0000508 (statistically significant at the 5% level).

**EXHIBIT 9A**

# Wells Fargo & Company

## Intraday Stock Price vs. Market and Industry Exchange Traded Funds

1/15/19

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *Tick Data*; *SEC EDGAR*; Wells Fargo & Company 2018 Q4 Earnings Call Transcript, dated January 15, 2019

Note: All times presented in Eastern Standard Time (EST). Opening and closing prices from Dr. Hartzmark's Backup Materials are reported by *Bloomberg*. All other prices are volume weighted at the minute level. Prices are pegged to Wells Fargo's closing price on 1/14/19. Trades which occurred between 11:00 PM and 6:00 AM are not displayed.

**EXHIBIT 9B**

# Wells Fargo & Company
## Intraday Stock Price vs. Market and Industry Exchange Traded Funds
## 4/12/19

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *Tick Data*; *SEC EDGAR*; Wells Fargo & Company 2019 Q1 Earnings Call Transcript, dated April 12, 2019

Note: All times presented in Eastern Daylight Time (EDT). Opening and closing prices from Dr. Hartzmark's Backup Materials are reported by *Bloomberg*. All other prices are volume weighted at the minute level. Prices are pegged to Wells Fargo's closing price on 4/11/19. Trades which occurred between 11:00 PM and 6:00 AM are not displayed.

**EXHIBIT 9C**

# Wells Fargo & Company
## Intraday Stock Price vs. Market and Industry Exchange Traded Funds
## 1/14/20

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *Tick Data*; *SEC EDGAR*; Wells Fargo & Company 2019 Q4 Earnings Call Transcript, dated January 14, 2020

Note: All times presented in Eastern Standard Time (EST). Opening and closing prices from Dr. Hartzmark's Backup Materials are reported by *Bloomberg*. All other prices are volume weighted at the minute level. Prices are pegged to Wells Fargo's closing price on 1/13/20. Trades which occurred between 11:00 PM and 6:00 AM are not displayed.

**EXHIBIT 9D**

# Wells Fargo & Company
## Intraday Stock Price vs. Market and Industry Exchange Traded Funds
## 3/12/20

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *Tick Data*; Federal Reserve Bank of New York; White House Press Briefing Transcript, dated March 11, 2020; Factbase Videos, "Remarks: Donald Trump Addresses the Nation on the Coronavirus from The Oval Office - March 11, 2020," *YouTube*, March 11, 2020; Securities Act Release No. 34-92428

Note: All times presented in Eastern Daylight Time (EDT). Opening and closing prices from Dr. Hartzmark's Backup Materials are reported by *Bloomberg*. All other prices are volume weighted at the minute level. Prices are pegged to Wells Fargo's closing price on 3/11/20. Trades which occurred between 11:00 PM and 6:00 AM are not displayed. At 9:03 PM on 3/11/20, President Trump announced a 30-day ban on travel from Europe to the United States. At 9:35 AM on 3/12/20, a Level 1 trading halt was triggered under the SEC's Market-Wide Circuit Breaker rules. At 12:53 PM on 3/12/20, the Federal Reserve announced that it would continue to offer at least $175 billion in daily overnight repo operations and at least $45 billion in two-week term repo operations twice per week over the next month.

**EXHIBIT 9E**

# Wells Fargo & Company
## Intraday Stock Price vs. Wells Fargo's Peers
### 3/12/20



Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *Tick Data*; *S&P Global*; Wells Fargo Conference Presentations; Federal Reserve Bank of New York; White House Press Briefing Transcript, dated March 11, 2020; Factbase Videos, "Remarks: Donald Trump Addresses the Nation on the Coronavirus from The Oval Office - March 11, 2020," *YouTube*, March 11, 2020; Securities Act Release No. 34-92428

Note: All times presented in Eastern Daylight Time (EDT). Opening and closing prices from Dr. Hartzmark's Backup Materials are reported by *Bloomberg*. All other prices are volume weighted at the minute level. Prices are pegged to Wells Fargo's closing price on 3/11/20. Trades which occurred between 11:00 PM and 6:00 AM are not displayed. Wells Fargo benchmarked its performance against peers in industry conference presentations in 2018 and 2019. The peer firms include Bank of America Corporation, Citigroup, Inc., JPMorgan Chase & Co., The PNC Financial Services Group, Inc., and U.S. Bancorp, Inc. *See* Wells Fargo Presentation, "Financial Overview," May 10, 2018, pp. 3, 46; Wells Fargo Presentation, "Fixed Income Investor Update," May 2019, p. 14. As of 3/12/20, these five peers constituted 81.70% of Dr. Hartzmark's Focused Industry Index (and were the five largest constituents) and 28.63% of Dr. Hartzmark's Broad Industry Index. At 9:03 PM on 3/11/20, President Trump announced a 30-day ban on travel from Europe to the United States. At 9:35 AM on 3/12/20, a Level 1 trading halt was triggered under the SEC's Market-Wide Circuit Breaker rules. At 12:53 PM on 3/12/20, the Federal Reserve announced that it would continue to offer at least $175 billion in daily overnight repo operations and at least $45 billion in two-week term repo operations twice per week over the next month.

**EXHIBIT 10**

# Wells Fargo & Company
## Dr. Hartzmark's vs. Alternative Event Study Results
### March 2020 Alleged Corrective Disclosure Impact Dates

| | [A] | [B] | [C.1] | [C.2] | [D.1] | [D.2] | [E] |
|---|---|---|---|---|---|---|---|
| | Dr. Hartzmark's Model (Rolling Pre-date Estimation)[2] | Estimation in COVID Decline Month[3] | Estimation in 60 Days Starting 2/24/20[3] | Estimation in 90 Days Starting 2/24/20[3] | Break in Volatility on 2/24/20[4] | Break in Volatility and Index Coefficients on 2/24/20[4] | Rolling Post-date Estimation[5] |
| **Estimation Window** | **120 Days Prior to Each Analysis Date** | **2/24/20 – 3/23/20** | **2/24/20 – 5/18/20** | **2/24/20 – 6/30/20** | **10/1/19 – 3/23/20, Break on 2/24/20** | **10/1/19 – 3/23/20, Break on 2/24/20** | **120 Days Following Each Analysis Date** |
| **Abnormal Return[1]** | | | | | | | |
| 3/5/20 | -1.29% | -1.64% | -0.68% | -0.53% | -1.31% | -1.53% | -0.45% |
| 3/11/20 | -3.36% * | -2.26% | -2.26% | -2.39% | -2.77% | -2.14% | -2.32% |
| 3/12/20 | -7.69% * | -6.18% * | -6.49% * | -6.81% * | -6.81% * | -6.06% * | -6.70% * |
| **Observations** | 120 | 21 | 60 | 90 | 120 | 120 | 120 |

Source: Expert Report of Michael L. Hartzmark, Ph.D., and Backup Materials, October 3, 2022; *Bloomberg*; *S&P Global*; Wells Fargo Press Release, "Wells Fargo Reports First Quarter 2020 Net Income of $653 Million," April 14, 2020; Wells Fargo Press Release, "Wells Fargo Reports Second Quarter 2020 Net Loss of $2.4 Billion, which Included an $8.4 Billion Increase in the Credit Loss Reserve Driven by Current and Forecasted Economic Conditions," July 14, 2020

Note:
[1] Asterisks indicate statistical significance at the 5% level.
[2] Abnormal returns reported in Dr. Hartzmark's report.
[3] Dr. Hartzmark's event study specification (using Dr. Hartzmark's market index, Dr. Hartzmark's orthogonalized industry indices, and including dummy variables for Dr. Hartzmark's dummy dates) is applied using a fixed control period as indicated. Consistent with Dr. Hartzmark's methodology, 3/12/20 and 4/14/20 are also treated as dummy dates. Reported abnormal returns for dummy dates are equal to the estimated coefficient for the corresponding dummy variable.
[4] The regression model uses Dr. Hartzmark's event study indices (raw returns), Dr. Hartzmark's dummy variables, and a fixed control period spanning 120 trading days ended 3/23/20. Consistent with Dr. Hartzmark's methodology, 3/12/20 is also treated as a dummy date. The regression models in [D.1 and D.2] allow the volatility of the abnormal returns to differ before and after the break date of 2/24/20. The regression model in [D.2] additionally also allows the market and industry index coefficients to differ before and after the break date of 2/24/20. The regression model is estimated using generalized least squares. Reported abnormal returns for dummy dates are equal to the estimated coefficient for the corresponding dummy variable.
[5] Dr. Hartzmark's event study specification (using 120 trading days, Dr. Hartzmark's market index, Dr. Hartzmark's orthogonalized industry indices, and including dummy variables for Dr. Hartzmark's dummy dates) is applied using the 120 trading days immediately following each analysis date as the estimation window. Consistent with Dr. Hartzmark's methodology, 3/12/20, 4/14/20, and 7/14/20 are also treated as dummy dates. The necessary return series were constructed based on Dr. Hartzmark's backup, which was supplemented with additional price, dividend, and index weighting data after 6/30/20.