# Exhibit 9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

:

In re:                              :    Case No.

:    20-cCV-4494 (GHW)

Wells Fargo & Company       :

:

Securities Litigation       :

:

:

---------------------------------X

VIDEOTAPED DEPOSITION OF

EXPERT WITNESS

MICHAEL L. HARTZMARK, Ph.D.

Thursday, December 8, 2022

9:46 a.m.

1251 Avenue of the Americas

New York, New York  10020

Stenographically remotely reported by:

Mayleen Ahmed, RMR, CRR, CRC, CCR/CSR

Job No.: 5582316

APPEARANCES


For Plaintiffs:

BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP

1251 Avenue of the Americas

New York, New York 10020

BY: MICHAEL D. BLATCHLEY, ESQ.

     BRANDON SLOTKIN, ESQ.


COHEN MILSTEIN SELLERS & TOLL PLLC

88 Pine Street - 14th floor

New York, New York 10005

BY: LAURA H. POSNER, ESQ.

     NORHAN BASSIOUNY, ESQ.


COHEN MILSTEIN SELLERS & TOLL PLLC

1100 New York Avenue NW - Fifth floor

Washington, D.C. 20005

BY: JULIE G. REISER, ESQ. [Remotely]

     MOLLY J. BOWEN, ESQ.  [Remotely]

APPEARANCES (Cont'd)


For Defendant Wells Fargo & Co:

SULLIVAN & CROMWELL LLP

125 Broad Street

New York, New York 10004-2498

BY: LEONID TRAPS, ESQ.

CONNOR CARDOSO


For Defendant Elizabeth Duke:

SHEARMAN & STERLING LLP

599 Lexington Avenue

New York, New York 10022-6269

BY: JOHN GUELI, ESQ.


For Defendant Timothy J. Sloan:

CLARENCE DYER & COHEN LLP

899 Ellis Street

San Francisco, California 94109

BY: JOSH COHEN, ESQ. [Remotely]

Page 4

APPEARANCES (Cont'd)


For Defendant John Shrewsberry:

        SWANSON & McNAMARA LLP

        300 Montgomery Street - Suite 1100

        San Francisco, California 94104

        BY: CARLY BITTMAN, ESQ. [Remotely]

            MARY MCNAMARA, ESQ. [Remotely as noted]     04:55:47


For Defendant Allen C. Parker

        CRAVATH, SWAINE & MOORE LLP

        825 Eighth Avenue

        New York, New York 10019

        BY: LIBBY ROZBRUCH


Also Present:

BRIAN FREID, Cornerstone

ANTON EVANGELISTA, Videographer, Veritext


                    ---O0o---

Page 5

I N D E X

WITNESS:  MICHAEL L. HARTZMARK, Ph.D.

EXAMINATION                                          PAGE

BY MR. TRAPS ........................... 11


 MOTIONS TO STRIKE:                        None

 INSTRUCTIONS NOT TO ANSWER:               None

 DOCUMENT/INFORMATION REQUESTS:            None


 ------------------- EXHIBITS ----------------------

DEFENDANTS'

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 10/3/22 Expert Report of Michael L. Hartzmark, Ph.D. | 27 |
| Exhibit 2 | Printout of Hartzmark Economics Litigation Practice web page | 34 |
| Exhibit 3 | "Understanding the Efficiency of the Market for Preferred Stock," Hartzmark, et al., Virginia Law & Business Review, Spring 2014 (149-230) | 57 |

Page 6

--------------- EXHIBITS (Cont'd) -------------

DEFENDANTS'

EXHIBIT          DESCRIPTION                          PAGE

Exhibit 4        "An Economist's View of               80
                 Amgen," Hartzmark, Law360,
                 5/2/13


Exhibit 5        "The Curious Incident of the          86
                 Dog That Didn't Bark and
                 Establishing Cause-and-Effect
                 in Class Action Securities
                 Litigation," Hartzmark, et
                 al., Virginia Law & Business
                 Review, Winter 2012 (415-466)


Exhibit 6        BlackRock Balanced Capital           126
                 Portfolio vs Deutsche Bank
                 National Trust Company 8/7/18
                 Opinion and Order


Exhibit 7        In re: Finisar Corporation           129
                 Securities Litigation 5/24/19
                 Order Striking Plaintiff's
                 Motion for Class Cert

----------------- EXHIBITS (Cont'd) -------------

DEFENDANTS'

EXHIBIT          DESCRIPTION                      PAGE

Exhibit 8        In re: Tesla, Incorporated        132
                 Securities Litigation, Order
                 Denying Motion to Exclude
                 Opinions of Michael Hartzmark


Exhibit 9        3/19/20 In re: Matter of the      139
                 Trusts Established Under the
                 Pooling and Servicing
                 Agreements Relating to the
                 Wachovia Bank Commercial
                 Mortgage Trust Commercial
                 Pass-Through Certificates,
                 Series 2007-C30 Opinion and
                 Order


Exhibit 10       Multimatic Incorporated vs        143
                 Faurecia Interior Systems USA,
                 Inc., 2009 Sixth Circuit
                 decision

---o0o---

DEPOSITION OF MICHAEL L. HARTZMARK, Ph.D. -

December 8, 2022

--------------

THE VIDEOGRAPHER: Good morning. We    09:46:41
are going on the record at 9:46 a.m. on    09:46:42
December 8, 2022.    09:46:48

Please note that the microphones are    09:46:49
sensitive and may pick up whispering and    09:46:50
private conversations. Please mute your    09:46:53
phones at this time. Audio and video    09:46:55
recording will continue to take place unless    09:46:57
all parties agree to go off the record.    09:47:02

This is media unit one of the    09:47:03
video-recorded deposition of Dr. Hartzmark,    09:47:06
taken by counsel for plaintiffs in the matter    09:47:10
of In re: Wells Fargo & Company Securities    09:47:11
Litigation, filed in the Southern District of    09:47:17
New York, Case No. 20-civ-4494(GHW).    09:47:20

The location of the deposition is    09:47:31
Bernstein Litowitz Berger & Grossmann,    09:47:32
1251 Avenue of the Americas in New York City.    09:47:37

My name is Anton Evangelista,    09:47:41
representing Veritext, and I am the    09:47:42
videographer. The court reporter is Mayleen    09:47:44
Ahmed from the firm Veritext.    09:47:47

- DR. HARTZMARK -

I'm not authorized to administer an oath. I'm not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. TRAPS: Leonid Traps, Sullivan & Cromwell, on behalf of defendant, Wells Fargo & Company, and I'm joined by my colleague Connor Cardoso and Brian Freid from Cornerstone.

MS. ROZBRUCH: Libby Rozbruch from Cravath Swaine & Moore on behalf of defendant C. Allen Parker.

MR. GUELI: John Gueli with Shearman & Sterling for defendant Elizabeth Duke.

MS. POSNER: Laura Posner from Cohen Milstein Sellers & Toll. With me today is

Page 10

- DR. HARTZMARK -

Norhan Bassioura [sic]; and on Zoom is                    09:48:47

Julie Reiser and Molly Bowen.                            09:48:49

MR. BLATCHLEY:  Michael Blatchley                  09:48:52

from Bernstein Litowitz Berger & Grossmann               09:48:57

for lead plaintiffs and the witness, and                 09:48:59

with me is Brandon Slotkin.                              09:49:01

THE VIDEOGRAPHER:  And will the                    09:49:02

court reporter please swear in the witness,              09:49:03

and then counsel may proceed.                            09:49:04

MR. COHEN:  Before you do that, this               09:49:09

is Josh Cohen appearing remotely from                    09:49:10

Clarence Dyer & Cohen on behalf of                       09:49:13

defendant Timothy Sloan.                                 09:49:15

MS. BITTMAN:  And good morning, this               09:49:16

is Carly Bittman from Swanson & McNamara,                09:49:18

appearing remotely on behalf of defendant                09:49:24

John Shrewsbury.                                         09:49:29

THE VIDEOGRAPHER:  Thank you.  And                 09:49:30

will the court reporter please swear in the              09:49:31

witness, and then counsel may proceed.                   09:49:33

THE REPORTER:  I'm going to ask that

you, please, raise your right hand.

Do you solemnly swear under penalty

of perjury that you are

- DR. HARTZMARK -

Dr. Michael L. Hartzmark, and the testimony you are about to give in the matter now pending shall be the truth, the whole truth, and nothing but the truth?                    09:50:02

THE WITNESS:  I do.                    09:50:02

THE REPORTER:  Thank you.                    09:50:03

Counsel, we may begin.                    09:50:04

----------------

MICHAEL L. HARTZMARK, Ph.D.

having been duly sworn, testified as follows:

----------------

EXAMINATION

BY MR. TRAPS:                    09:50:06

Q.    Good morning, Dr. Hartzmark.                    09:50:06

A.    Good morning, Mr. Traps.                    09:50:07

Q.    Have you been deposed before?                    09:50:08

A.    Yes.                    09:50:10

Q.    Approximately how many times?                    09:50:10

A.    Probably somewhere close to --                    09:50:11
between 25 and 50.                    09:50:13

Q.    So probably be familiar to you, but                    09:50:17
I'd like to start with some ground rules.                    09:50:21

First, can you please provide verbal                    09:50:22
answers only, no head shakes or nods, to keep the                    09:50:24

Page 12

- DR. HARTZMARK -

record clear?                                             09:50:28

    A.    That --                           09:50:30

    Q.    That is a question.              09:50:32

    A.    Yes.                             09:50:33

    Q.    Please allow me to finish my     09:50:34
question before you answer.  Is that fine?                09:50:36

    A.    Yes.                             09:50:38

    Q.    If you don't understand my question,   09:50:39
please just let me know.  Is that fine?                   09:50:41

    A.    Yes.                             09:50:43

    Q.    I may propose breaks over the course   09:50:44
of the day, but please let me know if you need a          09:50:49
break at any time, and we'll take one after you           09:50:51
answer the pending question.  Is that fine?               09:50:53

    A.    Yes.                             09:50:54

    Q.    Your counsel may object at times.   09:50:56
After they are done, please answer the question           09:51:00
unless they tell you not to answer.                       09:51:01

    Is that fine?                                 09:51:04

    A.    Yes.                             09:51:06

    Q.    Is there any reason at all that you   09:51:06
are not able to provide accurate, truthful, and           09:51:08
complete testimony today?                                 09:51:11

    A.    No.                              09:51:12

Page 13

- DR. HARTZMARK -

Q.    Okay.  Who retained you in this    09:51:16
action?    09:51:17

A.    I was initially retained by -- well,    09:51:18
with respect to this report, I was retained by    09:51:25
counsel from Bernstein Litowitz and counsel from    09:51:29
Cohen Milstein.    09:51:31

Q.    And when you say "with respect to    09:51:34
this report," is there some other retention in    09:51:36
this action?    09:51:38

A.    There was some prior work done by my    09:51:40
staff.  And at that point, I think it was only    09:51:43
done on behalf of Bernstein Litowitz, at least to    09:51:50
my knowledge.    09:51:52

Q.    What was the nature of the prior    09:51:55
work done by your staff?    09:51:57

A.    Well, I'm not -- they communicated    09:51:59
directly with counsel.    09:52:04

Q.    Who's "they"?    09:52:06

A.    My staff.    09:52:08

Q.    You had no role in that?    09:52:09

A.    They would from time to time    09:52:12
communicate with me that they were communicating    09:52:18
with counsel.    09:52:23

Q.    You don't know the nature of the    09:52:24

Page 14

- DR. HARTZMARK -

work that your staff did on behalf of Bernstein          09:52:25

Litowitz?                                                09:52:30

A.      The nature of the work is, you know,             09:52:30

such as, you know, I know they pulled down data          09:52:33

in terms of pricing; some of the components --           09:52:37

you know, the pricing data.  I think it was              09:52:42

mostly empirical work associated with pricing.           09:52:46

Q.      Anything else you can recall?                    09:52:52

A.      No.                                              09:52:57

Q.      And when were you retained for                   09:52:57

purposes of this report?                                 09:53:00

A.      My recollection is somewhere in                  09:53:03

the -- probably the third quarter of 2021.               09:53:04

Q.      Did you know anything about this                 09:53:09

case before you were retained?                           09:53:10

A.      It's sort of a broad question,                   09:53:13

especially for a bank like Wells Fargo.  Did I           09:53:18

know anything?  I mean, you know, I'm not sure in        09:53:23

terms of what type of issue.  I know --                  09:53:26

Q.      Did you know anything about the                  09:53:29

allegations in this case before you were retained        09:53:30

for Wells Fargo?                                         09:53:35

A.      Only as one would read about them in             09:53:35

the newspaper.                                           09:53:38

Page 15

- DR. HARTZMARK -

Q.    What do you mean by "only as one    09:53:42
would read about them in the newspaper"?    09:53:43

A.    As a public citizen, I -- you know,    09:53:46
I read newspapers, I watch news reports, and the    09:53:49
issues associated with Wells Fargo and the    09:53:54
allegations, certainly the allegations in this    09:53:58
case were, I think, widely covered by the news    09:54:01
media.    09:54:05

Q.    Okay.  I'll return to that.    09:54:10

What is your understanding of the    09:54:12
scope of your engagement?    09:54:14

A.    Well, the scope of my engagement    09:54:15
is -- it's stated here in paragraph 1.  It was to    09:54:18
determine whether the common stock of Wells Fargo    09:54:24
company -- Wells Fargo & Company was created in    09:54:27
an open, well-developed, and efficient market,    09:54:31
and also whether the calculation of damages on a    09:54:35
class-wide basis is subject to a common    09:54:41
methodology for all class members.    09:54:42

Q.    And just for the record, you're    09:54:46
looking at your report filed in this action,    09:54:47
correct?    09:54:49

A.    Yes.  I'm referring to paragraph 1    09:54:49
of my report.    09:54:52

Page 16

- DR. HARTZMARK -

Q.      Is it your understanding as you sit          09:54:53

here today that your engagement will extend         09:54:56

beyond class certification?                         09:54:59

A.      No.  I have had no discussion with          09:55:00

respect to that issue.                              09:55:02

Q.      Have you personally done any work in        09:55:02

this case beyond what is discussed in your          09:55:04

report?                                             09:55:06

A.      Have I personally?  No.                     09:55:08

Q.      How did you prepare for this                09:55:13

deposition?                                         09:55:14

A.      I reviewed the report; I reviewed           09:55:17

the Complaint; I reviewed the motion to dismiss     09:55:23

decision.  I think that's -- that's all the         09:55:29

documents I recall reviewing.                       09:55:39

        I think I held one verbal discussion        09:55:42

with my staff folks; any questions, I would         09:55:46

communicate via email.  And then I met with         09:55:54

counsel for the plaintiffs, lead -- lead counsel.   09:55:57

Q.      When you say you had a verbal               09:56:04

discussion with your "staff folks," who is that?    09:56:05

A.      (Indicating.)                               09:56:09

Q.      Who are the staff folks?                    09:56:12

A.      Oh, I had a discussion with a               09:56:14

Page 17

- DR. HARTZMARK -

gentleman by the name of Ken Kotz, K-O-T-Z.                    09:56:17

Q.     Is Mr. Kotz employed at Hartzmark               09:56:29
Economics?                                                     09:56:35

A.     No.                                             09:56:35

Q.     Who is Mr. Kotz?                                09:56:36

A.     Mr. Kotz is an economist.                       09:56:37

Q.     What is his role in this case, if              09:56:46
any?                                                          09:56:48

A.     Mr. Kotz probably was the primary              09:56:48
individual who supported -- supported my writing               09:56:54
of the report.  Under my direction and                         09:57:03
supervision, Mr. Kotz manages cases such as                    09:57:07
these.                                                         09:57:14

Q.     Did anyone else besides Mr. Kotz               09:57:19
support your writing of the report?                            09:57:22

A.     There would have been other                     09:57:24
individuals.                                                   09:57:25

Q.     And who is that?                                09:57:26

A.     With respect to those that I can                09:57:27
recall, I would have had support from                          09:57:33
Sunita Serrano, Matthew Sekerke, Tom Torcio,                   09:57:45
Derek Levarni (phonetic).                                      09:57:57

And there might be other staff,                09:58:01
not -- not staff of Forensic Economics, but other              09:58:03

Page 18

- DR. HARTZMARK -

individuals who helped and support with respect     09:58:08

to the -- the writing of this report.     09:58:13

Q.     Who is Mr. Kotz employed by?     09:58:16

A.     A company by the name of Forensic     09:58:18

Economics, Inc.     09:58:31

Q.     How about Ms. Serrano?     09:58:31

A.     Forensic Economics, Inc.     09:58:35

Q.     Is that true for Matthew Sekerke,     09:58:36

Tom Torcio, and Derek Levarni as well?     09:58:40

A.     No.     09:58:43

Q.     Okay.  Let's start with Mr. Sekerke.     09:58:44

A.     Mr. Sekerke is employed by a firm by     09:58:46

the name of nDogenous.     09:58:49

Q.     Can you spell that for the record?     09:58:53

A.     N, little n, D-O-G-E-N-O-U-S.     09:58:55

Q.     And then Mr. Sekerke?  Oh, is that     09:59:14

Mr. Sekerke.     09:59:18

Mr. Torcio?     09:59:20

A.     Forensic Economics.     09:59:21

Q.     And Mr. Levarni?     09:59:22

A.     Forensic Economics.     09:59:24

Q.     Anyone else who supported your work     09:59:33

in this report?     09:59:36

A.     Oh, Wei Lei Huang, W-E-I, L-E-I,     09:59:40

Page 19

- DR. HARTZMARK -

H-U-A-N-G.                                              09:59:49

Q.    And who is that person employed by?    09:59:52

A.    Forensic Economics.                    09:59:53

Q.    Who role did Forensic Economics have   10:00:03
in your report?                              10:00:06

A.    Forensic Economics, under my           10:00:07
direction and supervision, did the underlying   10:00:13
data pull, certain data analyses, construction of   10:00:19
tables that I had created.  You know, the general   10:00:24
work that is done by staff, you know, underlying   10:00:28
an economic expert, you know, such as whoever is   10:00:33
going to be the expert at Cornerstone.       10:00:36

Q.    Sorry.  What do you mean b, such as,   10:00:48
you know, "whoever is going to be the expert at   10:00:52
Cornerstone"?                                10:00:54

A.    Well, generally, the nature of those   10:00:54
firms who offer litigation support is such that   10:00:56
there are testifying experts; and then below that   10:01:01
are consulting experts who manage the cases,   10:01:04
especially in -- from my experience in firms,   10:01:09
defense firms, the managers take a primary role,   10:01:12
experts sign the report.                     10:01:17

And so it's -- it's quite common   10:01:19
that there'd be a staff of individuals who have   10:01:21

Page 20

- DR. HARTZMARK -

specific skills: empirical skills, spreadsheet            10:01:25

skills, sometimes writing skills.  And -- and            10:01:31

that under the direction and supervision of the            10:01:37

testifying expert, they put together a report.            10:01:39

    Q.    And who role did nDogenous play in            10:01:44

putting together your report?            10:01:51

    A.    nDogenous provides empirical            10:01:53

support.            10:01:58

    Q.    What kind of empirical support?            10:01:58

    A.    What kind of empirical support?            10:02:00

Manipulating data into data sets, running            10:02:06

regressions, auditing, you know, regressions.            10:02:12

    I -- I'm not running regressions,            10:02:15

and so I would -- I have everything audited.  And            10:02:20

so I'll sometimes use nDogenous to, say, audit            10:02:22

Forensic work, and vice versa.            10:02:31

    Q.    Who retained Forensic Economics in            10:02:33

this action?            10:02:35

    A.    Forensic Economics works for            10:02:35

Hartzmark Economics Litigation Practice as a            10:02:57

consulting group.            10:02:42

    Q.    And who retained nDogenous in this            10:02:43

action?            10:02:47

    A.    Same answer.            10:02:47

Page 21

- DR. HARTZMARK -

Q.    Have you used those firms before for          10:02:48
your expert consulting work?                        10:02:50

A.    Yes.                                           10:02:51

Q.    Have you used other expert firms              10:02:58
before to support your consulting work?             10:03:01

A.    Over what period of time are we               10:03:03
talking?                                            10:03:05

Q.    Let's say over the last four years.           10:03:05

A.    Yes.                                           10:03:15

Q.    Why did you select these two firms            10:03:15
for this report?                                    10:03:18

A.    Because of their skill set.                    10:03:20

Q.    And what is their skill set?                   10:03:24

A.    Supporting litigation practice such           10:03:26
as Hartzmark Economics Litigation Practice.         10:03:30

Q.    Presumably other firms have that              10:03:37
skill set too, correct?                             10:03:39

A.    It's correct.  You have a firm here           10:03:42
today, Cornerstone, that has that skill set.        10:03:44

Q.    Is there any particular reason you            10:03:50
chose Forensic Economics and nDogenous as opposed   10:03:52
to other firms?                                      10:04:00

A.    Well, individuals at nDogenous have           10:04:00
been working with me since 2005; and Forensic       10:04:04

Page 22

- DR. HARTZMARK -

Economics has been working with me since -- I'd                10:04:08

say the last decade.                                            10:04:15

    Q.    Did you communicate with any firm       10:04:17

other than Forensic Economics and nDogenous for                 10:04:19

litigation consulting support work?                             10:04:25

        MS. POSNER:  Objection.  With regard       10:04:26

to this litigation --                                           10:04:27

        MR. TRAPS:  No.                            10:04:28

        MS. POSNER:  -- or in general?             10:04:29

        MR. TRAPS:  Fair.  Fair objection.         10:04:31

BY MR. TRAPS:                                                    10:04:32

    Q.    With regard to this litigation.        10:04:32

    A.    With regard to this litigation?  Not    10:04:34

that I recall.                                                  10:04:37

    Q.    I'm just returning to some of the       10:05:13

prior testimony.                                                10:05:15

        You mentioned you reviewed the             10:05:16

report, you reviewed the Complaint, and you                     10:05:18

reviewed the motion to dismiss the decision in                  10:05:20

this case; is that correct?                                     10:05:25

    A.    That's my recollection, yes.            10:05:26

    Q.    Do you recall reviewing any other       10:05:27

documents in preparation for your deposition?                   10:05:28

    A.    No.                                      10:05:37

Page 23

- DR. HARTZMARK -

Q.    Okay.  And then you mentioned one                    10:05:41

verbal discussion with your staff folks, which we          10:05:43

discussed.  And then you said you met with                 10:05:45

counsel for the plaintiffs, correct?                       10:05:48

A.    Yes.                                                 10:05:52

Q.    How many times did you meet with                     10:05:52

counsel for the plaintiffs in preparation for              10:05:54

this deposition?                                           10:05:56

A.    We met once.                                         10:05:58

Q.    And when was that?                                   10:06:00

A.    Yesterday.                                           10:06:01

Q.    And how long was that meeting?                       10:06:03

A.    Somewhere in the area of, I'd say,                   10:06:10

five hours.                                               10:06:12

Q.    Was there anyone other than counsel                 10:06:13

at that meeting?                                          10:06:16

A.    No.                                                 10:06:17

Q.    Was anyone from Forensic Economics                  10:06:18

or nDogenous present at that meeting?                     10:06:21

A.    No.                                                 10:06:24

Q.    And you are testifying here as an                   10:06:24

expert, correct?                                          10:06:30

A.    As -- that's sort of ambiguous.  I                  10:06:35

am testifying here as an expert in finance,              10:06:39

Page 24

- DR. HARTZMARK -

statistics, economics, and -- and the application    10:06:43

of financial, statistical, and economic    10:06:47

principles to the problems that I've been engaged    10:06:51

to -- to opine.    10:06:54

Q.    Okay.  So you mentioned you were    10:06:59

testifying as an expert in finance, correct?    10:07:01

A.    Expert in, yeah, finance.    10:07:04

Q.    Statistics, you also mentioned,    10:07:07

correct?    10:07:10

A.    Yes.    10:07:10

Q.    Economics, correct?    10:07:11

A.    Yes.    10:07:13

Q.    And the application of financial,    10:07:13

statistical, and economic principles to the    10:07:17

problems you've been engaged to opine on,    10:07:18

correct?    10:07:21

A.    Yes.  I think that latter phrase is    10:07:22

probably more applicable.    10:07:24

Q.    What do you mean "more applicable"?    10:07:25

A.    Well, in terms of -- I mean, finance    10:07:28

is a -- it's a broad area, as is economics and    10:07:30

statistics.  What firms like Hartzmark Economics    10:07:38

do is apply principles.  They pull out from their    10:07:40

economics and finance and statistical tool kit,    10:07:43

- DR. HARTZMARK -

the tools that -- you know, at least for a person

like myself that have been trained for over 40

years, and apply to solving problems such as

presented in this particular matter.

Q.    Any other topics you consider

yourself an expert in?

A.    That's a very broad, broad -- I

mean, individually, with respect to certain

areas, I mean, I've testified -- and again, maybe

it's associated with finance, with respect to

investment problems.

I had a -- I was a registered rep,

Series 7 and 63, and worked for a firm.

I have been involved in automotive

wheel business, and so there's aspects of the

automotive wheel business or the aftermarket

automotive industry that, indeed, I'm actually

testified on behalf of a company, you might have

heard of, called Rain-X, the founders of Rain-X.

And, you know, in that regard, I

combined my economics, finance, and statistics

with my knowledge of the automotive market.

I mean, this is a broad -- I've

spent enough time over the last three years to

Page 26

- DR. HARTZMARK -

potentially, I guess, testify with respect to    10:09:09

estate issues.    10:09:11

But needless to say, it's a broad    10:09:14

question.  As it relates to this engagement, I've    10:09:22

been put up, and I've been involved in, as we    10:09:23

discussed earlier, probably, you know, 50 expert    10:09:27

engagements related to issues that I've been    10:09:30

asked to opine in this engagement.    10:09:33

Q.    What issues are you referring to    10:09:39

there in your last answer?    10:09:42

A.    Well, the -- again, if you look at    10:09:44

paragraph 1, I've been asked to opine as to    10:09:46

whether the common stock of Wells Fargo traded in    10:09:48

an open, well-developed, and efficient market,    10:09:53

and whether there's a common damages methodology    10:09:55

that can be applied class-wide.    10:09:58

That's -- that's the engagement that    10:10:00

I've been asked to provide expert testimony.    10:10:02

Q.    Okay.  Let's take a look at your    10:10:10

report in this action.  We're going to mark on    10:10:12

Exhibit Share the Expert Report of Michael L.    10:10:24

Hartzmark, dated October 3, 2022.  I believe you    10:10:31

have a copy.  You have a copy?    10:10:31

For the record, it is 800-something    10:10:45

Page 27

- DR. HARTZMARK -

pages.                                                            10:10:47

A.    No, no.  766.                                              10:10:47

Q.    Fair enough.                                              10:10:47

(Defendants' Exhibit 1 marked for                     10:10:47

identification.)                                               10:10:47

BY MR. TRAPS:                                                   10:11:02

Q.    And when was the last time you             10:11:02
reviewed your report?                                          10:11:03

A.    Within the last five days.               10:11:09

Q.    Do you have any corrections or            10:11:10
amendments to make to your report?                             10:11:12

A.    Not as I sit here today.                  10:11:14

Q.    I think we touched on this.  But          10:11:20
have you conducted any additional analyses on the             10:11:21
topics in your report since the time when it was              10:11:24
filed?                                                         10:11:26

A.    No.                                        10:11:26

Q.    And to be clear, some topics you are      10:11:29
not offering an opinion on.  You are not offering             10:11:32
an opinion on whether any statement or omission               10:11:34
was false or misleading, correct?                             10:11:36

A.    No.  I'm assuming that the                 10:11:42
statements were false and misleading, but I'm not             10:11:43
offering an opinion as to whether they were false             10:11:45

Page 28

- DR. HARTZMARK -

or misleading.                                                10:11:49

Q.    I'm sorry.  Why are you assuming         10:11:50

that?                                                         10:11:52

A.    For the purposes of this report,         10:11:52

assume that the lead plaintiffs will be                      10:11:55

successful at trial in proving the allegations.              10:11:59

Q.    And you are not offering any              10:12:02

opinions on materiality, correct?                            10:12:04

A.    I don't want to belittle it.  I --       10:12:11

in terms of the statistics that I provide, it's a            10:12:14

component.  But as to especially accounting                  10:12:16

materiality?  No.  I'm not offering an opinion               10:12:19

'cause I'm not offering an accounting opinion as             10:12:25

it relates to that component.                                10:12:29

But materiality as a whole?  No.             10:12:30

That's not necessary for my opinions that I've               10:12:33

been asked to provide today.                                 10:12:36

Q.    To what extent is materiality a          10:12:39

component of the statistics that you provide?                10:12:42

A.    Well, in evaluating materiality as       10:12:46

it relates to loss causation, one often uses, as             10:12:49

one factor, statistical measures.                            10:12:55

Q.    But are you opining on loss              10:13:00

causation?                                                   10:13:03

Page 29

- DR. HARTZMARK -

A.     No.                                                    10:13:04

Q.     So I guess I'm wondering to what           10:13:09
extent materiality is factoring into the             10:13:11
statistics that you provide in this report.          10:13:18

A.     I don't think that's what I said.  I         10:13:20
think as respect to your question, I want to be      10:13:22
clear that I am providing information as it           10:13:23
relates to statistical analysis with respect to      10:13:25
the market model and the event study, which is       10:13:28
often a part of materiality analysis that goes       10:13:33
into a loss causation analysis or at least, as I     10:13:36
state in the report, the beginning of that           10:13:39
analysis.  I just want to sort of make clear.        10:13:41

But as it relates to economic            10:13:45
materiality, you know, that I would look at in       10:13:48
loss causation, I'm not offering an opinion          10:13:50
today.                                               10:13:56

Q.     Okay.  I'll come back to that.            10:14:00

And are you offering any opinions in     10:14:03
your report on scienter?                             10:14:05

A.     No.                                         10:14:08

Q.     Could you turn to Appendix A of your      10:14:09
report?                                              10:14:15

MR. TRAPS:  If anyone needs the          10:14:27

Page 30

- DR. HARTZMARK -

reference, you have the ECF -- ECF stamped          10:14:29

version, that's page 98 at 766.                     10:14:32

THE WITNESS:  Yeah.  98 of 766 is          10:14:36

the header page.                                    10:14:38

MR. TRAPS:  Yes.  Exactly.               10:14:43

BY MR. TRAPS:                                          10:14:43

Q.    And this is a CV you appended to       10:14:44

your report, correct?                               10:14:51

A.    That is correct.                        10:14:51

Q.    Do you have any corrections or         10:14:52

updates to Appendix A?                              10:14:53

A.    No corrections that I'm aware of.  I    10:14:59

mean, I've submitted -- I'm trying to see, last     10:15:13

is October 3rd.  I have submitted a report, I       10:15:17

don't think it's in here.                           10:15:27

There's Ryder.  A report....            10:15:29

And I have offered two depositions.     10:15:35

Q.    You mentioned Ryder, I think that's    10:15:41

R-Y-D-E-R.  Is that right?                          10:15:51

A.    R-Y-D-E-R, yes.  Ryder Systems.        10:15:52

Q.    You submitted a report in that         10:15:53

action since October 3, 2022; is that right?        10:15:55

A.    That's my --                            10:15:57

MS. POSNER:  Objection.                  10:15:57

Page 31

- DR. HARTZMARK -

A.     -- recollection.  Oh, wait, say that again?  I might have misspoken.

Q.     You submitted a report on that action on -- sorry.  I think it was taken down not the way I intended it.

You submitted a report in the Ryder action after October 3, 2022?

A.     No.

Q.     Okay.  So it's already listed here?

A.     Yes.

Q.     Okay.  You mentioned you may have done two depositions since the date of this report; is that right?

A.     Yes.

Q.     And in what matter?

A.     Ryder.

Q.     Okay.

A.     Yeah.  It was a deposition that I did subsequent to the report being submitted.  That's why I was using that.

Q.     Okay.  Sorry for that confusion.

You said two depositions, though.  Were they both in Ryder?

A.     No.  The other deposition would have

Page 32

- DR. HARTZMARK -

been in a matter called Biomarin.                    10:17:03

    Q.    Can you spell that?                         10:17:10

    A.    B-I-O-M-A-R-I-N.                            10:17:11

    Q.    I want to start with your                   10:17:29

experience, and apologies if this is a little        10:17:30

tedious.  I will try to --                           10:17:35

    A.    I find it very exciting.                    10:17:37

    Q.    All right.  Excellent.                      10:17:38

          Let's -- let's start from the              10:17:43

beginning.                                           10:17:44

    A.    Which -- which heading do you want          10:17:48

to start in terms of --                              10:17:49

    Q.    Go to "Present Position."                   10:17:50

    A.    Okay.  Sure.                                10:17:53

    Q.    And you first list there Hartzmark          10:17:57

Economics Litigation Practice LLC.                   10:18:02

          Do you see that?                            10:18:02

    A.    Yes.                                        10:18:06

    Q.    What is the nature of the Hartzmark         10:18:06

Economics business?                                  10:18:12

    A.    Hartzmark Economics primarily              10:18:12

provides -- specializes in the application of        10:18:14

economics, financial, and accounting principles      10:18:18

to securities, complex commercial investment,        10:18:20

- DR. HARTZMARK -

intellectual property, antitrust, and automotive    10:18:23

litigation and regulatory matters.    10:18:26

    Q.    How many employees does Hartzmark    10:18:31

Economics have?    10:18:34

    A.    One.    10:18:35

    Q.    And is that you?    10:18:35

    A.    Yes.    10:18:36

    Q.    Okay.  And what is your role as    10:18:46

president at Hartzmark Economics?    10:18:47

    A.    My role as president is to oversee    10:18:49

the operations of Hartzmark Economics Litigation    10:18:54

Practice.    10:19:01

    Q.    Does Hartzmark Economics have a    10:19:02

website?    10:19:04

    A.    Yes.    10:19:07

    Q.    Do you know when it was last    10:19:09

updated?    10:19:11

    A.    Probably in 2013.  I have -- I --    10:19:13

when I -- never mind.  You don't need to know the    10:19:20

genesis.    10:19:25

    Q.    Well, now I'm curious.  What was the    10:19:25

genesis for Hartzmark Economics?    10:19:28

    A.    Well, no, the genesis is, you know,    10:19:29

in 2013, I founded Hartzmark Economics and,    10:19:33

Page 34

- DR. HARTZMARK -

therefore, created a web page.  But I think this            10:19:35

business is -- it's not conducive to sort of               10:19:37

people surfing the web and deciding they want to           10:19:42

call Hartzmark Economics Litigation Practice.              10:19:48

     Q.     Why is it not conducive to that?              10:19:50

     A.     Oh, the nature of expert consulting?          10:19:52

Oh, well, over my more than two decades of --              10:19:56

involved in litigation practice, most of it is            10:20:01

associated with more word of mouth than, you              10:20:04

know, sort of mass website marketing.                      10:20:07

     Q.     Okay.  Did you draft the content              10:20:26

that's on Hartzmark Economics' website?                    10:20:30

     A.     Did I -- yes.  I did not use web              10:20:34

design or whatever.  I did -- I went out, I think          10:20:39

it's GoDaddy, and put in information.  But,                10:20:41

again, this was almost a decade ago.                       10:20:51

     Q.     Okay.  I'm just going to ask one              10:20:54

quick question in exhibit.                                  10:20:56

          MR. TRAPS:  We'll put up on Exhibit             10:21:06

     Share Exhibit 2, Defendant's Hartzmark               10:21:08

     Exhibit 2.                                             10:21:14

          (Defendants' Exhibit 2 marked for              10:21:14

     identification.)                                      10:21:18

BY MR. TRAPS:                                               10:21:18

Page 35

- DR. HARTZMARK -

Q.    Does that look like a poorly printed                    10:21:19

version of the home screen of the Hartzmark                   10:21:24

Economics website home page?                                  10:21:26

A.    Well, I haven't seen it in, like I                      10:21:31

said, about a decade.                                         10:21:33

And so I'll assume this is -- since                           10:21:44

it says "Hartzmark Economics Litigation Practice"             10:21:45

at the top, that this is a -- that this is the                10:21:47

website.                                                      10:21:52

Q.    I just wanted to ask you about the                      10:21:53

sentence that says, the first sentence there that             10:21:56

says:                                                         10:21:57

"As legal and empirical questions                             10:21:59

grow more confounding and securities more                     10:22:00

byzantine, it is important to have experts                    10:22:03

who can solve difficult problems in a legal                   10:22:06

environment."                                                 10:22:08

Do you see that?                                              10:22:16

A.    I do.                                                   10:22:16

Q.    What do you mean by "legal and                          10:22:17

empirical questions grow more confounding"?                   10:22:18

A.    Well, you got -- especially in                          10:22:31

information markets, there's been this expansion              10:22:33

of -- you know, I did a lot of litigation in                  10:22:35

- DR. HARTZMARK -

two-sided markets.  It's just gotten much more

complex.

The idea that you need to integrate,

you know, the knowledge that I have, for example,

in industrial organization as a former professor

that taught that and information markets, you

know, you got this -- you got to be able to sort

of separate it, you know, the antitrust issues

from the information issues.

And so, I mean, I guess that was the

main issue, is that they have someone who can --

who has a background, as I do, in the real world,

having run a company, taken it public, and so

understanding, for example, that institution; who

has had a company trade in on an exchange, and so

maybe understands the micro-structure issues more

than many others; basic principles of finance and

the foundation of finance, which, again, you

know, I have the benefit of age and have seen the

evolution over time.

All of those things you want to, in

essence, be able to extract to, I think, provide

the best problem-solving.  And that's what I'm

selling myself as the best.

- DR. HARTZMARK -

Q.     You mentioned knowledge in industrial organization.  What is that knowledge?

A.     What is that knowledge?

Q.     Yes.  What is your knowledge in industrial organization?

A.     Well, my knowledge is I'm a University of Chicago Ph.D. who took his preliminary exams in industrial organizations specifically.  Participated with Judge Posner, Judge Easterbrook, Richard Epstein, Lester Telser, Ann Peltzman, Dennis Carlton, Dan Fischel in weekly meetings and seminars related to issues of law and economics, which include industrial organization.

I was involved, especially in my work at Lexecon, in all types of issues associated with market structure, defining markets.

I ran what is considered to be the largest antitrust case in the history of the United States as the consulting expert in the Interchange Fee case.

I taught industrial organization and regulatory issues at the University of Michigan,

Page 38

- DR. HARTZMARK -

joint in the economics department of the business          10:25:21

school.  So I have a very extensive background in          10:25:24

industrial organization.          10:25:26

Q.     What is industrial organization?          10:25:34

A.     It sort of says it, the -- you know,          10:25:36

how -- how industry is organized.          10:25:39

Q.     Have you focused on any particular          10:25:41

industries throughout your work?          10:25:44

A.     The benefit of the principles that          10:25:47

you learn at an institution such as University of          10:25:49

Chicago is how to apply economic principles to          10:25:51

all markets.          10:25:56

I've done -- I mean, when I -- in          10:25:58

terms of market structure, I mean, if you look at          10:26:02

the Cornerstone, Lexecon, such, I mean, you get          10:26:05

involved in all of those issues without being          10:26:09

specific experts.          10:26:12

You know, for example, the          10:26:13

testifying expert in the Interchange Fee case,          10:26:16

you know, was not -- did not testify about the          10:26:20

institutional structure of credit cards, and how          10:26:25

banks as issuers were involved, but understood          10:26:28

how to apply economic principles.          10:26:31

That same expert and I worked on a          10:26:34

Page 39

- DR. HARTZMARK -

case related to meat production in the JBS merger    10:26:36

in this country with Swift.    10:26:42

I've been involved with box mergers    10:26:47

and industrial -- I mean, we apply our economic    10:26:49

principles to all markets, whether it be a    10:26:53

banking market, a pharmaceutical market, a    10:26:55

Ryder Truck truck market.  That's the nature of    10:27:00

what economic experts do.    10:27:05

But I'm not -- you know, that's the    10:27:07

nature of sort of industrial organization.    10:27:10

Q.    And have you studied the banking    10:27:12

markets specifically?    10:27:14

A.    As I mentioned, I was -- you know,    10:27:17

heavily involved to the tune of, you know, a    10:27:20

couple million dollars a year for four years in    10:27:25

the credit card market, and -- and the issuers    10:27:32

were my clients.    10:27:34

Initially, it was Bank of America,    10:27:35

Citibank, HSBC, Citi -- okay, Bank of America,    10:27:38

and Chase.  Actually, it went from Chase, to    10:27:44

four, to 17 banks, and then Visa and Mastercard    10:27:47

came in.    10:27:50

And so, I mean, I've -- but I'm    10:27:51

not -- I haven't been asked to opine about the    10:27:55

Page 40

- DR. HARTZMARK -

banking industry with respect to this particular                10:28:00

matter.  I've been asked to offer an opinion of                 10:28:01

whether the market for Wells Fargo stock is open,               10:28:04

well-developed, and efficient, and whether a                    10:28:07

common damages methodology.                                     10:28:09

Q.     Do you recall whether Wells Fargo                        10:28:13

was involved in the case you mentioned, the                     10:28:14

Interchange case?                                               10:28:16

A.     Well, my guess -- I can't recall                         10:28:18

specifically.  But like I said, in the end, 17                  10:28:22

banks were involved.                                            10:28:24

Q.     Any other analyses you can recall                        10:28:27

that you've done of the banking industry                        10:28:31

specifically?                                                   10:28:38

MS. POSNER:  Objection as to form.                              10:28:38

I'm not sure what you're asking.                                10:28:39

A.     You know, it's a very broad                              10:28:46

question.                                                       10:28:47

If you look at my page 4 and 5, I                               10:28:47

would suggest that in the second entry on page 4,               10:28:58

Credit Suisse Securities was involved.                          10:29:01

Wachovia Bank was involved in you'll                            10:29:11

see, like the tenth one, tenth entry there.                     10:29:16

And so that's just -- these are just                            10:29:26

Page 41

- DR. HARTZMARK -

in the last four years.  But I was involved in                10:29:30

the CitiGroup.  And -- on page 5.                             10:29:38

                (Witness reviewing document.)                 10:29:54

                Morgan Stanley.  Although, it is not           10:29:55

a bank in the way that Wells Fargo is.                        10:29:57

                And then I was involved in                     10:30:02

litigation associated with banks and the                     10:30:06

mortgage-backed securities world.  But, again,               10:30:11

that -- that issue as to specific knowledge of               10:30:13

the banking is not, I wouldn't consider, relevant            10:30:17

as it relates to the two questions that I've been            10:30:22

asked to opine.                                              10:30:24

        Q.    Would -- any other specific example            10:30:26

you can think of sitting here today of analysis              10:30:29

you've done of the banking industry specifically?            10:30:33

                MS. POSNER:  Objection as to form.           10:30:35

        A.    Yeah, I'm not sure what you mean by            10:30:36

the "banking industry."  I mean, again, that's               10:30:37

broad.  And so I've answered your question.                  10:30:41

                I mean, I've been involved in                 10:30:42

litigation against Citi; I think I've been                   10:30:44

involved with Chase, Bank of America.  And                   10:30:50

then -- this is outside of the Interchange Fee,              10:31:01

that's -- Credit Suisse.  That's all I can recall           10:31:06

Page 42

- DR. HARTZMARK -

as I sit here today.   10:31:22

Q.   You mentioned CitiGroup or Citi.  Is   10:31:23
that the City of Sunrise Firefighters Pension   10:31:27
Fund versus Citigroup case in the middle of   10:31:31
page 5?   10:31:34

A.   Yes.  But I also was involved -- I   10:31:35
believe Citi was a party to some -- some   10:31:38
litigation prior to the past four years.   10:31:45

Q.   Do you recall the nature of your   10:31:51
work in the City of Sunrise case?   10:31:53

A.   I don't recall.  I just don't   10:31:57
recall.   10:31:57

Q.   All right.  Let's go back to page 1   10:32:05
of your CV.   10:32:07

You list the Office of the Attorney   10:32:14
General State of New Jersey as an independent   10:32:17
contractor from 2015 to present.  Do you see   10:32:18
that?   10:32:21

A.   Yes.   10:32:21

Q.   So what did you do in that role?   10:32:25

MS. POSNER:  Objection.  Just   10:32:27
counsel you to only disclose public   10:32:28
information.   10:32:35

A.   I provided expert testimony, a   10:32:35

Page 43

- DR. HARTZMARK -

series of reports related to the calculation of          10:32:37

damages related in a matter against Credit          10:32:39

Suisse.  It's listed in page -- in the last four          10:32:52

years.          10:32:55

On page 4, Christopher S. Porrino,          10:32:57

Attorney General of New Jersey on behalf of          10:33:00

Amy G. Kopleton, Deputy Chief of the New Jersey          10:33:02

Bureau of Securities versus Credit Suisse          10:33:06

Securities (USA) LLC.          10:33:12

Q.     Anything else you did in that role          10:33:12

beyond what you just described?          10:33:14

MS. POSNER:  Same --          10:33:18

A.     And --          10:33:18

MS. POSNER:  Same counsel, just          10:33:19

anything that is public.          10:33:19

A.     I'm not sure.  I offered opinions          10:33:25

related to damages.  That's all I can say.          10:33:27

Q.     But it's fair to say your work for          10:33:30

the Attorney General was limited to the Credit          10:33:32

Suisse case?          10:33:34

A.     I missed a --          10:33:35

Q.     Sorry.          10:33:36

It's fair to say that your work for          10:33:36

the Attorney General was limited to the Credit          10:33:38

Page 44

- DR. HARTZMARK -

Suisse case?                                          10:33:41

A.    No.                                             10:33:46

Q.    Okay.  So what other -- what other             10:33:47
work did you provide for the Attorney General?       10:33:48

MS. POSNER:  Objection.  Please just                 10:33:50
disclose anything that is public.                    10:33:51

THE WITNESS:  Right.                                 10:33:53

A.    I was going to say, I cannot discuss           10:33:53
anything else that I'm -- or was involved with       10:33:56
respect to the Attorney General.                     10:33:59

Q.    And why can't you discuss that?                10:34:00

A.    I was -- I signed a confidentiality            10:34:03
agreement.                                           10:34:07

Q.    Okay.  All right.  The next row,               10:34:13
MDA Financial Incorporated.  What is                 10:34:17
MDA Financial Incorporated?                          10:34:21

A.    MDA Financial, Inc. is a family                10:34:22
investment company currently.                        10:34:25

Q.    What family?                                   10:34:32

A.    What family?  The Hartzmark family.            10:34:34

Q.    And what do you do in your role as             10:34:41
president of MDA Financial?                          10:34:43

A.    Currently?                                      10:34:45

Q.    Sure.                                           10:34:45

Page 45

- DR. HARTZMARK -

A.    Currently, I oversee, you know,          10:34:46

decisions related to that's -- to investments.   10:34:51

Q.    What kind of investments does             10:35:00

MDA Financial make?                              10:35:08

A.    MDA Financial is part of a larger         10:35:11

series portfolio mostly that is -- has           10:35:17

professional-managed funds, and so the decisions 10:35:21

are made as to which professional managers.      10:35:28

MDA every once in a while will get               10:35:30

involved in other, say, alternative-type         10:35:32

investments.                                     10:35:35

Q.    You say MDA has professionally            10:35:39

managed funds; is that right?                     10:35:42

A.    MDA utilizes, I think is a better         10:35:44

way of saying it.  MDA is not an active manager  10:35:46

but would utilize active managers.               10:35:51

Q.    What active managers does MDA            10:35:54

utilize currently?                               10:35:57

MS. POSNER:  Objection as to                     10:35:59

relevance, but --                                10:35:59

A.    Yeah, I --                                10:35:59

MS. POSNER: -- you can answer.                   10:36:04

A.    I can't recall.                           10:36:04

Q.    Do you know if MDA has any               10:36:05

Page 46

- DR. HARTZMARK -

investments in Wells Fargo?                          10:36:06

A.    MDA has any investments in               10:36:11

Wells Fargo?                                         10:36:14

Q.    Yes.                                     10:36:14

A.    There's a possibility that a             10:36:14

portfolio manager might have, you know,             10:36:16

Wells Fargo in its portfolio.                       10:36:17

Q.    Do you know if MDA is a member of        10:36:28

the putative class in this action?                  10:36:31

A.    I have no idea.                          10:36:39

Q.    Did you do anything to investigate       10:36:39

that?                                               10:36:41

A.    No.  I can't imagine, actually, MDA      10:36:43

would be part of that; but...                       10:36:48

Q.    Why can't you imagine that MDA would     10:36:53

be part of that?                                    10:36:55

A.    Well, it's -- MDA itself is a fairly     10:36:55

small company right now.  And -- and even though    10:36:57

we use professional managers, I had mentioned we    10:37:00

do alternative funds as well, and -- and the        10:37:02

substantial portion would be associated with        10:37:06

alternative funds and some holdover from prior      10:37:08

investments and -- and consulting services and      10:37:14

such.                                               10:37:16

- DR. HARTZMARK -

Q.   And has that been true for the          10:37:17
entire period since 2018?                     10:37:19

A.   Since 2018?                              10:37:21

Q.   Yes.                                     10:37:22

A.   Likely.                                  10:37:25

Q.   But do you know if MDA holds,            10:37:29
directly or indirectly, any common stock?     10:37:32

A.   Any common stock?                        10:37:37

Q.   Yes.                                     10:37:39

A.   Yes.  It holds some common stock,        10:37:39
not necessarily -- I'm not aware of it owning  10:37:43
Wells Fargo common stock.                     10:37:50

Q.   Let's go to academic honors and         10:37:55
fellowships.                                  10:37:57

     The last one listed there is from        10:38:03
1986 to 1987; is that correct?                10:38:05

A.   The last one?                            10:38:08

Q.   The most recent.                         10:38:10

A.   Oh, the most recent?  Okay.  I was       10:38:12
looking at -- the most recent is the John M. Olin  10:38:14
Faculty Fellowship, 1986 to '87.              10:38:21

Q.   And so the last time you had an         10:38:24
academic position was in 1987, correct?       10:38:27

A.   I resigned my position from the          10:38:33

Page 48

- DR. HARTZMARK -

University of Michigan that was joint in the          10:38:36

economics department and the business school in      10:38:41

1988.  I had a tenure track position from 1984 to    10:38:42

1988.                                                 10:38:46

    Q.    Why did you resign, you mentioned,     10:38:46

in 1988?                                              10:38:49

    A.    Oh, why did I resign?                   10:38:50

    Q.    Yes.                                    10:38:51

    A.    Oh, for a variety of personal           10:38:52

reasons, probably the most being that defense        10:38:54

firms such as Lexecon offered folks like me, back    10:38:57

in the 1980s, a lot of money.                         10:39:04

    Q.    Do you currently teach any classes?     10:39:10

    A.    No.                                     10:39:13

    Q.    And when was the last time you          10:39:18

taught a class?                                       10:39:19

    A.    A class in -- can you be more           10:39:23

specific?                                             10:39:25

    Q.    Well, let's -- okay.  Let's limit it    10:39:25

to:  When have you -- when was the last time you     10:39:28

taught a class in financial economics?               10:39:30

    A.    Probably 1986-87.                       10:39:33

    Q.    Okay.  Do you have a law degree?        10:39:39

    A.    Law degree?  No.  No.  I -- as I        10:39:42

Page 49

- DR. HARTZMARK -

said, I sat in at the University of Chicago, the 10:39:46

business school, econ department, and law school 10:39:53

are very -- especially in my time, were very 10:39:54

close.  And as I mentioned, I sat in a law and 10:39:58

economics seminar in the law school every week. 10:40:07

Q.    And is it fair to say that most of 10:40:08

your work these days is in litigation consulting? 10:40:09

A.    These days? 10:40:15

Q.    Right now. 10:40:16

A.    Right now, over the past week or 10:40:18

month, it's been -- you know, other than, you 10:40:21

know, my personal investments and such, it's 10:40:23

associated with litigation support. 10:40:26

Q.    Okay.  Next page, and I think we can 10:40:38

do these quicker.  These were former professional 10:40:39

experiences. 10:40:42

What did you do for the Office of 10:40:45

the Attorney General, State of New York, 2013 to 10:40:49

2019? 10:40:51

MS. POSNER:  Objection.  And counsel 10:40:54

you to only disclose matters that are 10:40:55

public. 10:40:58

A.    Yeah.  The State of New York is -- 10:40:59

was all confidential matters. 10:41:01

Page 50

- DR. HARTZMARK -

Q.     Okay.  Do you have an NDA with the          10:41:05

State of New York?                                   10:41:07

A.     I signed one when I -- as part of my         10:41:09

engagement.                                          10:41:11

Q.     Okay.  Are you involved with any            10:41:13

public litigation on behalf of the State of New      10:41:16

York?                                                10:41:20

A.     Not currently.                               10:41:20

Q.     Okay.  And were you in the past             10:41:24

involved in any publicly disclosed litigation        10:41:26

involving the State of New York?                     10:41:29

A.     I don't know whether there was              10:41:32

publicly disclosed litigation --                     10:41:34

Q.     Okay.                                        10:41:36

A.     -- in terms of the matters I was            10:41:37

involved in.                                         10:41:39

Q.     Okay.  And what is CRA                       10:41:42

International, Inc.?                                  10:41:46

A.     CRA International is a competitor to         10:41:47

Cornerstone.  It's a large firm that provides        10:41:51

financial and economic and litigation and            10:41:56

statistical support for litigation.                  10:42:00

Q.     Okay.  And what did you do for CRA           10:42:04

International?                                        10:42:06

Page 51

- DR. HARTZMARK -

A.    I was engaged -- I can't recall    10:42:12
exactly what it was.  It was some litigation that    10:42:15
they asked me to assist on.    10:42:17

Q.    Were you a testifying expert for    10:42:19
them?    10:42:21

A.    I -- I don't remember whether I was    10:42:24
engaged as a testifying expert or a consulting    10:42:26
expert or -- I can't even recall the matter.    10:42:28

Q.    Okay. And Navigant Economics?  What    10:42:32
is Navigant Economics?    10:42:37

A.    Navigant Economics, again, is a firm    10:42:40
that provides litigation support applying, you    10:42:44
know, the principles of economics, finance, and    10:42:47
statistics.    10:42:50

Q.    And what did you do there?    10:42:50

A.    (No response.)    10:42:52

Q.    What did you do there?    10:42:52

A.    Well, Navigant Economics acquired    10:42:54
the firm that I had been involved -- had been a    10:42:59
partner at Chicago, Chicago Partners.  And while    10:43:01
at Navigant Economics, I provided litigation    10:43:09
support.    10:43:11

Q.    Okay.    10:43:18

And Darma LLC, what is that?    10:43:19

Page 52

- DR. HARTZMARK -

A.    Darma LLC was a firm offering some    10:43:24

litigation support as well as financial and    10:43:28

advisory services.  That was during -- during a    10:43:34

period of time I was also part of the -- PAG?    10:43:36

Yeah, the PAG, P-A-G, program at Oppenheimer,    10:43:42

wherein I could bring them clients and be able to    10:43:49

legally earn a fee.    10:43:51

Q.    Was --    10:43:54

A.    That was also when I had my -- when    10:43:54

I was -- well, actually, it postdates.  Well, I    10:43:57

still had my registered rep license when Darma --    10:43:59

in fact, I had to have it.  It was only when    10:44:07

Navigant took over that I had to give up my -- my    10:44:09

registration.    10:44:12

Q.    Okay.  And then how about Pacific    10:44:20

Biometrics?    10:44:23

A.    Pacific Biometric, as it states    10:44:23

there, I was the interim chief financial officer.    10:44:26

It's a public company.  And I had been on the    10:44:28

board.  And you'll see that in my list of boards.    10:44:36

Had been on the board when we had to take some    10:44:39

action with respect to finance, our -- finance    10:44:41

and accounting personnel, and I took over as the    10:44:43

interim chief financial officer, brought in a new    10:44:49

Page 53

- DR. HARTZMARK -

accounting group, and -- and then, in 2006 left.    10:44:51

Q.    You said you were on the board "when    10:44:58
we had to take some actions with respect to    10:45:01
finance... and accounting personnel."  What are    10:45:03
you referring to there?    10:45:05

A.    Well, I was director and chairman of    10:45:06
the audit committee of Pacific Biometrics, and we    10:45:09
were unhappy with our accounting and finance    10:45:12
personnel.    10:45:14

Q.    And why were you unhappy with them?    10:45:14

MS. POSNER:  Objection as to    10:45:17
relevance.  But go ahead.    10:45:17

A.    I can't recall other than, you know,    10:45:18
job performance.    10:45:22

Q.    Was there any litigation involving    10:45:23
Pacific Biometrics while you were there    10:45:27
regarding -- well, let me stop there.    10:45:32

Was there any litigation, that you    10:45:33
recall, involving Pacific Biometrics while you    10:45:35
were there?    10:45:38

MS. POSNER:  Objection as to    10:45:39
relevance, but go ahead.    10:45:39

A.    Not that I recall.    10:45:40

Q.    What is Cragar -- if I'm pronouncing    10:45:41

Page 54

- DR. HARTZMARK -

that right -- Cragar Industries, Inc.?                   10:45:44

        A.    You're too young.  "Cragar."          10:45:46

        Q.    Okay.                                 10:45:49

        A.    Cragar Mags, M-A-G-S.                 10:45:49

              Cragar Industries was a developer,    10:45:53

designer, assembler, manufacturer, marketer, and         10:45:57

seller of automotive wheels in the -- in the             10:46:01

aftermarket, in the automotive aftermarket.              10:46:03

              We also made race wheels that were    10:46:07

sold directly to -- to the racers.  And I was at         10:46:13

some point in time, chairman, CEO, president, and        10:46:21

treasurer of Cragar Industries.                          10:46:27

        Q.    All right.                            10:46:34

        A.    One thing I'll add is that I did       10:46:35

take the company public.  So I've been -- you            10:46:36

know, I've had hands-on experience of taking a           10:46:39

company public and having its stock trade in a           10:46:41

public market.                                           10:46:44

        Q.    And when was that?                    10:46:44

        A.    I took Cragar public, I believe it     10:46:45

was 1997.                                                10:46:48

        Q.    Can we turn to your publications,      10:47:03

the next page?                                           10:47:05

              MS. POSNER:  You have been going       10:47:05

Page 55

- DR. HARTZMARK -

about an hour.  Do you want to take a    10:47:08

break?  Are you almost done with the CV --    10:47:09

MR. TRAPS:  I'm going to dive into    10:47:12

the publications; so...    10:47:14

MS. POSNER:  All right.  Why don't    10:47:15

we take --    10:47:16

THE WITNESS:  Well, why don't we do    10:47:20

publications and then --    10:47:21

MR. TRAPS:  It will take a little    10:47:21

while 'cause we're going to show a bunch of    10:47:23

them to you.    10:47:25

THE WITNESS:  Oh, okay.  Okay.    10:47:25

MS. POSNER:  Why don't we -- why    10:47:25

don't we take a quick break?    10:47:26

THE WITNESS:  Yeah.  Let's do that.    10:47:27

THE VIDEOGRAPHER:  We are now off    10:47:28

the record.  The time on the video monitor    10:47:29

is 10:47 a.m.    10:47:31

(Recess taken.)    10:47:37

THE VIDEOGRAPHER:  We are now back    11:00:33

on the record.  The time on the video    11:00:34

monitor is 11:00 a.m.    11:00:36

MR. TRAPS:  Okay.  Welcome back.    11:00:40

BY MR. TRAPS:    11:00:44

Page 56

- DR. HARTZMARK -

Q.    Let's look at publications in your
CV, which I think is page 3.  Are you -- are you
there with me?

A.    Yes.

Q.    Are these all of your publications,
or just a subset?

A.    These are all of my publications.

Q.    It's correct you haven't published
anything since 2013?

A.    Yes.

Q.    And why is that?

A.    Too busy.  I just -- I haven't.

Q.    Okay.  And you published, it looks
like, four articles between 2011 and 2014, which
are the first four listed; is that right?

A.    Yes.

Q.    And all four of these articles are
about how courts apply market efficiency; is that
right?

A.    Yeah.  Generally -- yes.

Q.    Were any of those four articles
peer-reviewed?

A.    No.  They're -- no.

Q.    Okay.  And before these four, you

Page 57

- DR. HARTZMARK -

last published in 1991; is that correct?                    11:02:12

       (Witness reviewing document.)                11:02:22

    A.    Yes.                                    11:02:26

    Q.    Any reason for the gap between your       11:02:27

publication in 1991 and your next publication in           11:02:31

2011?                                                      11:02:34

    A.    Yes.                                    11:02:35

    Q.    What's the reason?                      11:02:40

    A.    If you go back to my professional       11:02:44

experience, you'll see that I was at Cragar              11:02:46

Industries from 1993 to 2004.  I was running an          11:02:52

automotive wheel company.                                11:03:04

    Q.    Okay.  Let's look at some of your       11:03:04

publications.                                            11:03:09

      (Defendants' Exhibit 3 marked for     11:03:09

   identification.)                                  11:03:09

    Q.    So we're marking as Defendant's         11:03:11

Exhibit 3 an article called "Understanding the           11:03:14

Efficiency of the Market for Preferred Stock."           11:03:32

And this is in the Virginia Law & Business               11:03:38

Review, Spring 2014 edition, written by Michael          11:03:43

Hartzmark and H. Nejat Seyhun.                           11:03:49

      Do you recognize this?                 11:03:56

    A.    Yes.                                    11:03:57

Page 58

- DR. HARTZMARK -

Q.    And this was, in fact, your most          11:03:57

recent publication, correct?                     11:03:59

A.    Yes.                                        11:04:05

Q.    When was the last time you reviewed        11:04:07

this?                                            11:04:09

A.    I can't recall.                           11:04:09

Q.    Can you recall and give me a              11:04:16

high-level summary of the article?              11:04:18

A.    Well, I think, high level is that it      11:04:27

was an article that discussed preferred stock,   11:04:30

and, specifically, Freddie Mac series preferred  11:04:39

stock.  And evaluating, you know, sort of        11:04:43

applying, the -- if I can remember correctly,    11:04:47

the, you know, sort of Cammer factors to -- to   11:05:01

the Freddie Mac preferred stock.                11:05:02

Q.    Feel free to look at anything in         11:05:10

here as we go.  I'm going to point you to some   11:05:12

particular passages in this for your thoughts.   11:05:17

If you turn to page 159.  This is               11:05:19

the large pagination, but it's at the top-right.  11:05:29

Are you with me?                                11:05:42

(Witness reviewing document.)                   11:05:57

Q.    So I want to ask you about the           11:05:58

sentence, it's after the first block of text.    11:05:59

Case 1:20-cv-04494-JLR-SN   Document 165-9   Filed 12/23/22   Page 60 of 381

Page 59

- DR. HARTZMARK -

It's the first sentence.  And it says:                11:06:02

                "It appears that courts will          11:06:03

        sometimes emphasize the importance of the     11:06:05

        price-related factors because they appear     11:06:08

        to be based on 'more scientific'              11:06:10

        approaches" -- "more scientific" in           11:06:12

        quotes -- "as they employ more complex but    11:06:15

        commonly-accepted econometric tests or even   11:06:19

        studies to exam the price movements rather    11:06:23

        than simple measurements of volumes,          11:06:24

        bid-ask spreads, and the like to evaluate     11:06:27

        openness, development, participation, and     11:06:29

        liquidity."                                   11:06:31

                Do you see that?                      11:06:32

        A.      Yes.  Let me -- let me read this in   11:06:32

    context.                                          11:06:37

                (Witness reviewing document.)         11:06:52

        A.      Okay.  Is there a pending question?   11:07:49

        Q.      Not yet.                              11:07:51

        A.      Oh.                                   11:07:52

        Q.      So what did you mean in that          11:07:54

    sentence?                                         11:07:56

        A.      I think the sentence speaks for       11:08:00

    itself.                                           11:08:03

Veritext Legal Solutions

215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 60

- DR. HARTZMARK -

Q.    Okay.  And when you say "appear to    11:08:03

be based on 'more scientific' approaches," were    11:08:07

you expressing skepticism that that is, in fact    11:08:17

true?    11:08:20

A.    I don't understand the question.    11:08:20

Q.    Let me rephrase it.    11:08:22

When you say "they appear to be    11:08:23

based on 'more scientific' approaches," are you    11:08:26

suggesting any skepticism that the price-related    11:08:33

factors are, in fact, more scientific?    11:08:38

A.    No.    11:08:39

Q.    So you're saying "appear" in    11:08:39

quotation marks.  I was just wondering if you're    11:08:42

skeptical of --    11:08:44

A.    Well, the --    11:08:44

Q.    -- that point.    11:08:45

A.    No.  It's just that there is this    11:08:50

sense that measuring volume which is -- you know,    11:08:52

say, turnover is a mathematical equation.  Right?    11:08:54

You know, it will be the difference between    11:08:59

algebra and calculus.    11:09:00

Doing a regression, you know, makes    11:09:02

it seem like it's complex.  Okay?  So it makes it    11:09:04

seem -- again, that's why we quote it here.  The    11:09:09

Page 61

- DR. HARTZMARK -

appearance that it is somehow, you know, more          11:09:11

scientific than -- than using basic A plus B, or        11:09:19

A divided by B, in terms of, let's say, turnover,       11:09:21

or bid-ask spread, or what I refer to as the            11:09:24

"operational factors."                                  11:09:28

Q.    And do you -- do you think that          11:09:32

price-related factors are, in fact, more                11:09:34

scientific than the operational factors?                11:09:41

A.    No.  The point that I -- you have to      11:09:42

be careful.  That just because an economist runs        11:09:44

a regression, that you somehow weight that as           11:09:47

more important than the so-called operational           11:09:53

factors.  And, indeed, that's why I suggest             11:09:54

there's support for my opinion that the holistic        11:09:58

approach is appropriate.                                11:10:01

Q.    Okay.  And then I think you            11:10:07

mentioned this article is about an opinion in a         11:10:10

case involving Freddie Mac preferred stock; is          11:10:12

that right?                                             11:10:22

A.    That's my recollection.  And it --      11:10:22

yes.  At least it's dealt with, I think, as an          11:10:23

example.                                               11:10:26

Q.    And do you recall the preferred        11:10:30

stock offering by Freddie Mac was called Series         11:10:32

                    - DR. HARTZMARK -

Z?  Does that sound right to you?                    11:10:36

        A.      Only in that I can see in          11:10:39

Section 4C, "Applying the Operational-Related        11:10:42

Cammer Factors to the Freddie Mac Series Z           11:10:44

Preferred" --                                        11:10:48

        Q.      Okay.                                11:10:48

        A.      -- Stock Market."                    11:10:49

        Q.      And do you recall there was a market 11:10:54

index that the experts used in that case called      11:10:55

the S&P 500 Preferred Stock Index, or P-Index?       11:10:57

             Does that ring any bells?               11:11:02

        A.      No.  I don't recall.                 11:11:04

        Q.      Okay.  All right.  Can we continue   11:11:16

on that paragraph on page 159.  Are you back         11:11:17

there?                                               11:11:38

        A.      Yes.  I'm back to 159.               11:11:38

        Q.      All right.  I'm going to skip the    11:11:40

next sentence.  Of course, feel free to read it,     11:11:42

or anything else.  And then the third sentence in    11:11:44

that paragraph:                                      11:11:48

             "Furthermore, because of low            11:11:49

        explanatory power and potential statistical  11:11:50

        problems, quantitative tests relying on      11:11:52

        cause-and-effect, serial correlation, and    11:11:54

Page 63

- DR. HARTZMARK -

other price-related indicators often offer        11:11:58

a false sense of precision and accuracy."         11:12:00

What do you mean there?                            11:12:03

A.    Well, what I mean is that when I            11:12:09

count volume, it's black and white.  Here, your    11:12:10

R-square is less than a hundred percent, and       11:12:12

you're not explaining a hundred percent of the     11:12:14

variation of the movements.                        11:12:19

And so if it's -- the nature of it       11:12:20

is such that there is a difference in sort of, I   11:12:23

guess, you know, it's different when I give you a  11:12:25

statistical estimate as opposed to an actual       11:12:29

calculation.                                       11:12:32

Q.    And beyond the R-squared being less    11:12:35

than a hundred percent, are there any other        11:12:37

potential statistical problems that you're         11:12:42

referring to there?                                11:12:44

A.    I don't recall what I was referring   11:12:46

to a decade ago in there.  I just -- that's the    11:12:48

primary one that -- that I would focus on.         11:12:52

Again, an R-squared is, you know,        11:12:56

less than a hundred percent.  Often R-squareds     11:12:59

are 30 or 40 percent, and that means that          11:13:01

60 percent of the variation is -- is not           11:13:05

Page 64

- DR. HARTZMARK -

explained.  The models are not perfect.                    11:13:08

And I guess the key there was to                    11:13:11

make sure that -- and assist the court, in          11:13:13

understanding that -- that you can make a           11:13:17

calculation.  But to understand that when you       11:13:19

have a calculation here and an estimate here        11:13:22

(indicating), okay, to be careful to not weigh      11:13:26

that estimate and focus totally on that estimate    11:13:29

as -- as a measure.                                 11:13:33

Q.    And the estimate you're referring to          11:13:36

is the price-related factors?                       11:13:38

A.    Well, the price-related factors are           11:13:45

evaluated based on, generally, an event study, as   11:13:47

I did in -- in Wells Fargo.                          11:13:48

Q.    Yeah.                                          11:13:50

A.    And -- and then predicted returns             11:13:50

and abnormal returns.  And then you're -- you're    11:13:51

evaluating statistical issues.  Right?  You're      11:13:54

using statistical inference as opposed to           11:13:56

calculations.  Calculations are different than      11:13:59

estimates.                                           11:14:02

Maybe -- maybe I could have written        11:14:03

in a sentence there is that the courts should       11:14:05

weigh these things again, in a holistic approach,   11:14:08

Page 65

- DR. HARTZMARK -

as a basket, and -- and not get carried away by      11:14:12

the fact that these estimates look, you know, to     11:14:15

them maybe -- if you've never taken regression       11:14:19

analysis or statistical inference, it might seem     11:14:21

like you're, like, I don't know, putting a man on    11:14:23

the moon, when I think they'd end up on Mars.        11:14:28

    Q.    Okay.  All right.  We'll return to    11:14:34

the basket claim.  The sentence after that:          11:14:35

       "These problems can then lead to        11:14:44

   unreliable interpretation of empirical          11:14:45

   results if there is a failure to adjust and     11:14:47

   account for the features and specific terms     11:14:51

   of the security at the center of the            11:14:53

   litigation."                                    11:14:55

    And then the sentence after that:              11:14:58

      "Further empirical problems or                 11:15:02

   misinterpretations emerge, should anomalous     11:15:03

   external factors be ignored and not             11:15:08

   incorporated into the empirical analysis."      11:15:10

    My question is:  What are the                  11:15:13

"anomalous external factors" you're describing       11:15:16

there, or mentioning there?                          11:15:20

    A.    I can't recall whether that is            11:15:26

referring to things like market microstructure       11:15:28

Page 66

- DR. HARTZMARK -

and concepts associated with that.                              11:15:31

                You know, the key is, when you're          11:15:35

looking at these other securities -- such as              11:15:37

preferred stock, corporate bonds; RMBS,                   11:15:39

mortgage-backed securities; CMBS, commercial              11:15:48

mortgage-backed securities -- there are, there            11:15:52

are issues associated with market microstructure          11:15:55

and the nature and the structure of the products          11:16:01

that have to be understood before you can                 11:16:03

correctly interpret these estimates or                    11:16:08

potentially even run the equations to begin with.         11:16:13

        Q.    What is market microstructure?              11:16:19

        A.    Well, it's the market in which a            11:16:22

security trades.                                          11:16:24

        Q.    But what is the "microstructure"           11:16:25

piece of that?                                           11:16:27

        A.    "Microstructure" generally refer to        11:16:27

as, you know, how structure -- for example,              11:16:31

Cammer.  Cammer 3 talks about market-makers.  And        11:16:35

Cammer derived from over-the-counter market,             11:16:41

which has a certain structure to it.  The               11:16:44

corporate bond markets, preferred stock markets          11:16:47

have different microstructure.                           11:16:49

        Q.    I guess I read "anomalous external         11:16:54

Page 67

- DR. HARTZMARK -

factors" to refer to factors outside the security                11:17:00

itself, including because the sentence before                    11:17:02

referred to "terms of the security" itself.                      11:17:05

Do you -- do you believe that                    11:17:11

anomalous external factors refers to the -- still                11:17:13

refers to the security and features of that                      11:17:16

security?                                                        11:17:19

MS. POSNER:  Objection.                          11:17:19

A.    Again, I -- from a decade ago, I                           11:17:20

can't answer that.  What I can tell you is that                  11:17:23

the sentence before that refers to the issues                    11:17:27

associated with pricing a security.  Does it have                11:17:30

an option component to it?  Is it a dead                         11:17:34

instrument with a cap in terms of return?  Okay?                 11:17:38

That's one component.                                            11:17:41

The second component are things sort              11:17:42

of outside the nature of that type of pricing.                   11:17:43

And that's why when I look at anomalous, I think                 11:17:46

of macro -- microstructure.  I can't remember,                   11:17:49

though, a decade back.                                           11:17:54

Q.    Sure.  Any reason to believe that                          11:17:55

anything in here is inaccurate, in this article?                 11:18:00

A.    I --                                                       11:18:05

MS. POSNER:  Objection.  It's a                  11:18:05

Page 68

- DR. HARTZMARK -

79-page article with 257 footnotes.  You're                    11:18:07

asking about a paragraph in the article.                       11:18:10

Do you want him to review it here today?                       11:18:14

BY MR. TRAPS:                                                  11:18:17

Q.    Any reason sitting here today, right                    11:18:18
now, to believe that anything in this article is               11:18:19
inaccurate?                                                    11:18:22

A.    I can't say yes or no on a question                     11:18:22
like that.  As counsel suggested, it's a                       11:18:25
79-page article written a decade ago; coauthored               11:18:30
by a gentleman who is a full professor -- in                   11:18:33
fact, a named professor at the University of                   11:18:39
Michigan Law School of Business; it was not                    11:18:42
peer-reviewed.  And I -- you know, to state that               11:18:44
it is perfect would be overstating what a law                  11:18:53
review article is meant to be.                                 11:18:55

Q.    Okay.  Can we turn to page 187.                         11:18:58

(Witness complying.)                                   11:19:12

Q.    I have a few questions -- I have a                      11:19:40
few questions about this section called "Placid                11:19:41
versus Stormy Periods" that starts on page 187.                11:19:45

Let me ask you about the first                         11:20:21
paragraph in that section.                                     11:20:22

A.    Let me -- I'm still --                                  11:20:24

- DR. HARTZMARK -

Q.     Feel free to -- yes, feel free to     11:20:26

look at as much of it as you want.     11:20:29

(Witness reviewing document.)     11:20:32

Q.     I'll just read out the first     11:20:37

paragraph for the record:     11:20:38

"The Freddie Mac court agreed with     11:20:40

both experts that there were two distinct     11:20:42

periods with different Series Z return     11:20:44

distributions.  Even though preferred stock     11:20:46

pricing theory would predict different     11:20:49

relationships between the price movements     11:20:51

of the Series Z and the P-Index in these     11:20:52

two periods, the defendants' expert assumed     11:20:55

there was a fixed and linear relationship     11:20:58

between the returns of the Series Z and the     11:21:00

P-Index throughout the class period.  The     11:21:02

plaintiffs' expert felt this problem was     11:21:05

corrected by using rolling linear     11:21:07

regressions -- that is, the same regression     11:21:10

specification over a different time period     11:21:13

each day.  However, this technique does not     11:21:15

correct for the problem when there are two     11:21:17

or more distinct periods with changes in     11:21:19

the underlying return distributions and     11:21:21

Page 70

- DR. HARTZMARK -

multiple omitted variables."                          11:21:23

And I will note for the record that          11:21:26

there are footnotes omitted there.             11:21:27

Do you see that paragraph?              11:21:35

A.    This is the first paragraph starting    11:21:35

with, "The Freddie Mac court agreed"?          11:21:37

Q.    Exactly.                                  11:21:39

A.    Yeah.                                      11:21:39

Q.    Do you recall who you were referring      11:21:45

to here?                                        11:21:47

MS. POSNER:  Objection.                 11:21:48

A.    I --                                       11:21:48

MS. POSNER:  In the entire              11:21:49

paragraph?                                      11:21:50

MR. TRAPS:  Yes.                        11:21:50

A.    I don't.  If you can remind me.           11:21:50

Q.    Do you recall -- sorry.                    11:21:53

A.    No.  Again, if you can remind me.  I       11:21:56

just don't even recall what it was I was...    11:21:59

Q.    Do you recall what you meant              11:22:12

specifically by -- by the last sentence, "the  11:22:13

problem when there are two or more distinct    11:22:28

periods with changes in the underlying return  11:22:30

distributions and multiple omitted variables"? 11:22:32

Page 71

                    - DR. HARTZMARK -

    A.    No.  I don't remember what I -- what        11:22:35

we were referring to.                                  11:22:41

          Possibly, the -- I'm reading the             11:23:06

next paragraph.  We talked about the probability       11:23:09

of default, which is a critical factor with            11:23:11

respect to a corporate bond, but I just don't          11:23:15

remember what it was that it -- this was               11:23:20

discussing.                                            11:23:24

    Q.    Do you recall the problem here is            11:23:27

that you had one class period, and within it two       11:23:29

or more distinct periods with changes in the           11:23:34

underlying return distributions?                       11:23:36

          MS. POSNER:  Objection.  Lacks               11:23:37

     foundation.                                       11:23:39

    A.    I can't recall.                              11:23:39

    Q.    Would that be a problem, if you did          11:23:40

an event study over one class period, but that         11:23:42

class period involved -- included within it two        11:23:45

or more distinct periods with changes in the           11:23:48

underlying return distribution?                        11:23:51

          MS. POSNER:  Objection as to form.           11:23:55

     I'm not sure what that question is.               11:23:56

    A.    That's just not clear, both the             11:23:57

question and also whether, what you mean by            11:23:59

Page 72

- DR. HARTZMARK -

"problem"?                                          11:24:03

Are you talking about a regression              11:24:05

that's run over the period?  Are you talking        11:24:06

about a regression that's run prior to this         11:24:08

period?  I just -- I don't even remember --         11:24:10

Q.    Well, let's say --                         11:24:15

A.    -- what this related.                      11:24:16

Q.    -- a regression is run over an            11:24:18

entire period.                                      11:24:21

A.    Okay.                                       11:24:22

Q.    You come to certain conclusions from      11:24:22

that regression, and then it turns out that,        11:24:24

within that period, there are sub periods that      11:24:29

had different "underlying return" -- "changes in    11:24:33

the underlying return distributions."               11:24:37

A.    Okay.                                       11:24:42

Q.    Would that be a problem?                   11:24:42

MS. POSNER:  Objection as to --         11:24:44

Q.    For the regression?                        11:24:45

MS. POSNER:  -- form.  You may           11:24:48

answer.                                          11:24:51

A.    I can't -- can't say in that sort of       11:24:51

generalized hypothetical.                           11:24:52

Q.    Is that something you investigated         11:24:53

- DR. HARTZMARK -

here at all?                                        11:24:55

A.    I don't recall.                              11:24:55

Q.    You don't recall whether you did any         11:24:57

kind of analysis of that in this case?             11:24:59

A.    I -- in which case?                          11:25:02

Q.    Wells Fargo.                                 11:25:03

A.    Oh, okay.  You were pointing at the          11:25:03

paper.                                             11:25:05

Q.    I'm sorry.                                   11:25:07

A.    Can you ask the question again --            11:25:08

Q.    Yeah.                                        11:25:10

A.    -- then?                                     11:25:10

Q.    Do you recall if you did any kind of         11:25:11

analysis of whether there are two or more          11:25:12

distinct periods with changes in the underlying    11:25:14

return distributions in the Wells Fargo case?      11:25:16

A.    I looked at the correlation of the           11:25:22

squared abnormal returns and the VIX index.  I     11:25:23

looked at scatterplots of residuals.  And          11:25:27

determined, for the purposes of this analysis of   11:25:33

what I was asked to opine, on market efficiency    11:25:40

and the common damages methodology, that no such   11:25:42

adjustment was required in terms of the empirical  11:25:46

support for my -- for my conclusion and opinion.   11:25:49

Page 74

- DR. HARTZMARK -

Q.     What do you mean the correlation of the squared and the normal return [sic]?

A.     I mean the correlation between the squared abnormal returns and VIX, volatility in the general market.

Q.     Okay.  And what is the correlation of the squared and the normal return [sic] and the VIX index give you?

A.     Say that again?

Q.     The correlation you were referring to just now, what does that tell you?

A.     Oh, it would tell me if there was some component missing in estimating the abnormal returns that was associated with the change in VIX.

Q.     And what is "VIX"?

A.     VIX, that's a volatility index; it's generally referred to as "VIX."

Q.     All right.  Let's go to 190.  And it's actually -- I'm going to -- again, feel free to look at anything here in your article.  But I'm going to ask about the last sentence which goes on to 191.

And that sentence says:

Page 75

- DR. HARTZMARK -

"The fact that the plaintiffs'                    11:27:24

expert found twenty of the sixty-five days       11:27:27

between June 6, 2008" --                          11:27:29

A.    Wait.  Where are you?  I'm sorry.  I        11:27:31

was reading.                                      11:27:33

Q.    No, no worries.  So it's page 190.          11:27:33

A.    Okay.                                        11:27:37

Q.    And I'm asking about the last, the          11:27:37

very last sentence which starts with "the fact," 11:27:39

and goes on to the next page.                     11:27:41

A.    Oh, the very last sentence there.           11:27:45

Okay.                                             11:27:46

Q.    Exactly.                                     11:27:47

A.    Would you give me a moment, please,         11:27:47

to...                                             11:27:49

Q.    Absolutely.                                  11:27:50

(Witness reviewing document.)              11:27:51

A.    Okay.                                         11:28:06

Q.    Okay.  So the sentence I'm referring        11:29:37

to reads:                                         11:29:40

"The fact that the plaintiffs'             11:29:43

expert found twenty of the sixty-five days       11:29:44

between June 6, 2008 and September 8, 2008,      11:29:46

or 31% of the days, with significant             11:29:51

Veritext Legal Solutions

215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 76

- DR. HARTZMARK -

returns should have suggested that a                    11:29:53

different statistical model was required or             11:29:55

that complete reliance on the regression               11:29:58

results would lead to the wrong                         11:30:00

conclusion."                                           11:30:02

        Do you see that?                               11:30:02

A.    I do.                                             11:30:02

Q.    So what does that mean?                           11:30:07

A.    What does that mean?  It means the               11:30:12

fact that the plaintiffs' expert found 20 of 65        11:30:13

days between June 6, 2008 and September 8, 2008,       11:30:16

or 31 percent, of the days with significant            11:30:20

returns, should have suggested that a different        11:30:24

statistical model was required, that's one.            11:30:26

        And I think if you go to the                   11:30:30

paragraph before, it's the fact that there was an      11:30:31

omitted variable, in terms of the credit, or used      11:30:35

those results but don't completely rely upon           11:30:38

them.  And I think that's pretty clear.                 11:30:42

        If you rely only on those results as           11:30:46

opposed to the holistic basket that I've               11:30:50

mentioned before, or don't examine that and            11:30:54

evaluate it, you might come to the wrong               11:30:59

conclusion.                                            11:31:02

Page 77

- DR. HARTZMARK -

Q.    But it's fair to say that finding    11:31:04

31 percent days with significant returns in an    11:31:09

event study suggests a problem with the    11:31:11

regression?    11:31:13

A.    It suggests there might be an    11:31:14

omitted variable.  But like I said, it also would    11:31:16

suggest that you -- again, be careful, it's a red    11:31:20

flag.  And -- and therefore, you know, let's    11:31:25

focus on, you know, everything surrounding it and    11:31:27

what you're -- what you're trying to do with the    11:31:33

regression.  Okay?  This -- and in this specific    11:31:37

case, I don't even remember what he was trying to    11:31:40

demonstrate.    11:31:43

Q.    Above what percentage number would    11:31:45

give you a red flag of significant returns    11:31:47

observed in a particular time period in a    11:31:54

regression?    11:31:55

A.    I can't --    11:31:56

MS. POSNER:  Objection as to form.    11:31:57

A.    There's no bright line with respect    11:31:58

to that.  Again, you would have to look at, as I    11:32:03

did, you know, correlations; you look at the    11:32:06

graphical, you know, output, and -- and most    11:32:08

critically, ask yourself the problem that you've    11:32:13

Page 78

- DR. HARTZMARK -

been asked to solve.                                    11:32:16

THE REPORTER:  This is the reporter            11:32:26

speaking.  If we can give counsel an               11:32:28

opportunity to object.  I'm having a little         11:32:31

trouble getting the complete objection.            11:32:34

Thank you.                                     11:32:36

BY MR. TRAPS:                                           11:32:51

Q.     So you agree here that 31 percent of     11:32:51

the days showing significant returns was a "red     11:32:53

flag," I believe you used that term.  Right?        11:32:59

A.     Yeah, it would suggest take a look,       11:33:01

ask yourself what you're trying to evaluate, what   11:33:05

problem you're trying to solve; take a look at      11:33:09

other types of information to make any type of      11:33:13

conclusion.                                         11:33:18

And this was -- what? -- 31 percent        11:33:21

of the days over a -- what? -- a 65-day period.     11:33:24

So, yeah, there's no bright line.                   11:33:30

Q.     Okay.  But let's assume a 65-day         11:33:34

period.  At what percentage of significant return   11:33:38

days would make you concerned that there was a      11:33:40

flag that you should investigate further?           11:33:45

A.     I -- again, there's no bright line.       11:33:47

You look at this -- as you look at a basket to      11:33:49

                        - DR. HARTZMARK -

make a decision -- to make -- to offer support

for your opinion related to -- to market

efficiency, you would look at a basket.

                As I said, I looked at -- first of

all, most importantly, what is the problem you're

trying to solve.  Okay?  The problem that you're

trying to solve is run a market model that

provides a reasonable control, reasonable

parameters.  That's one.

                Two, if there does appear to be some

period that might take further analysis, do

further analysis; look at it, as I did.  Do some

empirical analysis; do some graphical analysis.

        Q.    All right.  Let me introduce as

Exhibit 4 --

        A.    Can I put this aside?

        Q.    Yes.

        A.    Or are we going to go back to it?

        Q.    We may go back to it.

        A.    Okay.  I won't throw it out.

        Q.    Don't throw it out.

        A.    I'll put it right here.

        Q.    Put it right there.

                (Defendants' Exhibit 4 marked for

Page 80

- DR. HARTZMARK -

identification.)

MR. TRAPS:  I'm marking as Exhibit 4 a Law360 article from May 2, 2013 called "An Economist's View of Amgen," by Dr. Hartzmark.

BY MR. TRAPS:

Q.   Can I ask you a question just before we get to this article, just about your prior answer, divorced from Exhibit 3.  In your prior answer, you said:

"Two, if there does appear to be some period that might take further analysis, do further analysis; look at it, as I did.  Do some empirical analysis; do some graphical analysis."

Did you do any analysis in the Wells Fargo case for any time period that might have required further analysis within the -- within the class period?

MS. POSNER:  Objection as to form. Even though he's been asked.

A.   Did I do -- I told you, I did correlation of the squared abnormal returns, and I examined the residuals, the output of the

11:35:35
11:35:35
11:35:40
11:35:47
11:35:55
11:35:55
11:36:07
11:36:08
11:36:13
11:36:17
11:36:20
11:36:22
11:36:24
11:36:26
11:36:29
11:36:31
11:36:37
11:36:39
11:36:40
11:36:44
11:36:49
11:36:49
11:36:51
11:36:54

Page 81

- DR. HARTZMARK -

residuals.  And, most critically, I asked what          11:36:57

problem it was that I was trying to solve.              11:37:03

Q.    What problem were you trying to                   11:37:04

solve in the Wells Fargo case?                          11:37:06

A.    I was -- I was asked to determine                 11:37:08

whether the market was efficient over a 450-day         11:37:09

class period.                                           11:37:12

Q.    Did you do any analysis of any                    11:37:12

particular periods within the 450-day class             11:37:14

period?                                                 11:37:18

A.    Well, I do a regression for every                 11:37:18

day within the class period.                            11:37:19

Q.    Did you break out any particular                  11:37:21

class, part of the class period, and do any             11:37:23

further analysis as to just that particular part        11:37:26

of the class period?                                    11:37:30

A.    Yes.  As I told you, I looked at the              11:37:31

correlation of the abnormal -- the squared              11:37:36

abnormal returns and the graphic analysis.              11:37:40

And -- and, again, given the problem            11:37:47

that I was asked to address, you know, felt that        11:37:49

the -- yeah, felt that the approach, the                11:37:54

regressions that are stated in the backup that          11:38:00

you have, were appropriate for the question that        11:38:02

Page 82

- DR. HARTZMARK -

I was being asked.                                      11:38:05

Q.   And you did that analysis for the                 11:38:06

entire class period, correct?                          11:38:07

A.   Well, I did a regression.  I did                   11:38:09

rolling regressions for that period.  The focus        11:38:11

was -- of that analysis included -- included the       11:38:15

whole period, and then sub periods.                    11:38:19

Q.   Okay.  What sub periods?                           11:38:22

A.   Well, I think -- I believe I looked               11:38:26

at a period -- you know, there's -- there is a         11:38:27

period in March of 2020.                               11:38:30

Q.   Okay.  And where can I find that in               11:38:33

your report, that --                                   11:38:36

A.   I --                                              11:38:37

Q.   -- March 2020 analysis?                           11:38:38

A.   I didn't rely on that.  I ran the                 11:38:40

regressions that I did to -- those -- the              11:38:44

regressions that you have are the regressions          11:38:45

that support my opinion.                               11:38:47

Q.   Okay.  And where would I look to                  11:38:52

find the specific analyses you did for                 11:38:54

March 2020?                                            11:38:56

A.   The -- there are abnormal returns                 11:38:56

for every day.  You can look at, you know,             11:38:59

Page 83

- DR. HARTZMARK -

squared abnormal returns.  You can look at the            11:39:01

graph; you can graph those out.  But I don't             11:39:03

have, you know, the graph or -- or such.                 11:39:05

But I relied, for my opinion, on the                     11:39:08

regressions that I ran, the 450 different                11:39:13

regressions that I ran.                                  11:39:16

Q.    Okay.  We'll come back to that.                    11:39:19

Can you take a look at Exhibit 4                          11:39:22

now.  Do you recognize this?                             11:39:25

(Witness reviewing document.)                            11:39:40

Q.    Let me know when you're ready, I'll                11:43:21

ask some specific pieces.                                11:43:24

A.    I'm ready.                                          11:43:25

Q.    Do --                                              11:43:25

A.    I briefly reviewed this.                           11:43:26

Q.    Do you recognize this article?                     11:43:27

A.    This article was published -- you                  11:43:30

know, sort of I wrote it out and published it a          11:43:32

decade ago.  To say that I remember it would be          11:43:37

an overstatement.                                        11:43:39

Q.    Okay.  But you don't doubt that this               11:43:41

is, in fact, an article you wrote and published,         11:43:47

correct?                                                 11:43:49

A.    I know I wrote and I published this               11:43:50

Page 84

- DR. HARTZMARK -

article a decade ago.                                          11:43:53

Q.    Under the first heading, you say:       11:43:57

"This may seem like old news but I             11:44:05

believe one consequence of the Amgen           11:44:08

opinion will be the court's placing greater    11:44:10

scrutiny on the empirical results              11:44:13

economists use to evaluate the fifth Cammer    11:44:15

factor -- cause and effect."                   11:44:19

Do you see that?                       11:44:20

A.    I do.                                     11:44:20

Q.    What do you mean by that?                 11:44:23

A.    I think it's the same as we               11:44:24

discussed before.  Maybe "scrutiny" isn't the  11:44:25

best word 'cause down below there's heavy       11:44:29

reliance on cause and effect.                   11:44:32

Again, we went through this            11:44:36

discussion on the previously article, the idea of  11:44:37

relying, heavily relying just on cause and effect  11:44:40

can be -- you know, doesn't give you the full   11:44:44

picture.                                        11:44:47

Q.    And why do you think Amgen had that       11:44:52

implication?                                    11:44:55

A.    I can't recall.                           11:44:56

Q.    If you go to the first full              11:45:23

- DR. HARTZMARK -

paragraph on the second page, and I'm going to ask you about the last sentence in that paragraph.  But, of course, read anything you want in this article.  You say:

"Thus, there is precedent for denying certification when anomalous price movements only are observed during a small interval within the class period."

Do you see that?

A.     I see that sentence, yes.

Q.     And what do you mean by that?

A.     Well, that, like, two -- 20 percent of the class period allegedly, you know, based on flawed empirical results, the court determined was not efficient based only on cause-and-effect not on the fact that -- and, again, I don't recall whether the other, you know, ten factors were incorporated.

And that, you know, for some reason, they suggested that that two-month period was -- you know, the stock traded in an efficient market.

Q.     Okay.  I'll ask you about some other things in here, but I think we talked about them,

Page 86

- DR. HARTZMARK -

so I can move on to the next exhibit, which is          11:46:56

Exhibit 5.          11:47:11

(Defendants' Exhibit 5 marked for          11:47:11

identification.)          11:47:11

BY MR. TRAPS:          11:47:11

Q.    This is an article entitled, "The          11:47:18

Curious Incident of the Dog That Didn't Bark and          11:47:21

Establishing Cause-and-Effect in Class Action          11:47:26

Securities Litigation," in the Virginia Law &          11:47:28

Business Review, Winter 2012, by Michael L.          11:47:34

Hartzmark and H. Nejat Seyhun.          11:47:39

And when you get a chance, let me          11:47:55

know if you recognize this article.          11:47:56

A.    Well, I recognize that I wrote this          11:47:57

article based on my CV, but I have not looked at          11:48:01

this articles in, again, probably a decade.          11:48:03

Q.    You didn't look at these articles in          11:48:04

preparing for your deposition today?          11:48:06

A.    No.          11:48:07

Q.    Okay.  If we go to page 418.  The          11:48:30

first full paragraph, you say:          11:48:41

"We demonstrate that the          11:48:42

difficulties experts have in showing          11:48:43

whether empirical facts support          11:48:44

Page 87

- DR. HARTZMARK -

cause-and-effect in this context emanate            11:48:46

from six primary sources."            11:48:48

I'm just going to ask you about some            11:48:51

of those sources, not all.  The second one, which            11:48:52

starts with "Second," says:            11:48:58

"Second, the statistical methods            11:49:00

employed to evaluate systematic            11:49:03

cause-and-effect relationships are            11:49:05

imperfect, have limited explanatory power,            11:49:06

and by their very nature are used to detect            11:49:09

deviations from average activity."            11:49:12

And you're talking there about event            11:49:15

studies; is that right?            11:49:17

A.    Events -- well, market models.            11:49:24

Q.    And what do you mean by saying            11:49:35

"market models"?            11:49:36

A.    Well, the statistical methods            11:49:37

employed to evaluate systematic cause-and-effect            11:49:40

relationships generally begin with the            11:49:46

specification of a market model.            11:49:47

Q.    And is that market model, typically,            11:49:52

an event study in a securities litigation case?            11:49:55

A.    It's used for an event study; it's            11:49:58

one of the tools.            11:50:01

- DR. HARTZMARK -

Q.    What do you mean "by their very nature are used to detect deviations from average activity"?

A.    Well, again, the nature of regression is such that you're -- think of it as a -- as you're estimating a line.  And, you know, it's a -- again, this gets to this black-and-white line, and you're looking at deviations from that line.

Q.    And why does that create a difficulty in supporting cause-and-effect?

A.    Because you can have deviations from that line that are caused by all the other issues that we talk about, I think, within this article.

Q.    Your fourth point there says:

"Fourth, there is often difficulty interpreting and assessing the relevance and materiality of a particular disclosure."

What did you mean by that?

A.    Well, especially at the class cert stage, the idea of being able to say, "Oh, based on very limited information, the stock should have gone up or should have gone down," to make

Page 89

- DR. HARTZMARK -

that sort of fundamental distinction.                    11:51:26

Q.    Why is it difficult to do that at          11:51:36

the class cert stage?                                    11:51:38

A.    Look, the class certification              11:51:42

period -- I'm sorry.  At the class certification         11:51:44

stage, you haven't -- you don't have enough              11:51:47

facts; you haven't done a loss causation                 11:51:50

analysis, and, therefore, you haven't linked             11:51:53

disclosures to past statements.                          11:51:56

And so until you do a loss causation        11:52:01

analysis, this issue of -- and I think we                11:52:03

discussed this earlier in the deposition, this           11:52:05

issue of materiality and such is -- is one that,         11:52:07

you know, is, you know, difficult to assess.             11:52:11

And that explains why you do a              11:52:21

holistic approach, both holistic in the sense            11:52:22

that you look not at any individual disclosure           11:52:25

and make, you know, a conclusion based on that,          11:52:30

and -- but you look at the whole class period as         11:52:33

a whole, in addition to the fact that you look at        11:52:35

that and add to that the basket of other                 11:52:40

operational factors in making the assessment as          11:52:43

it relates to market efficiency.                         11:52:46

Q.    And why can't you do that loss             11:52:48

- DR. HARTZMARK -

causation analysis that you're describing at the        11:52:51

class cert stage?        11:52:52

A.        I don't understand the question, and        11:52:53

I don't think I answered it.  What did I answer?        11:52:55

I don't think I said what you're saying.        11:52:59

Q.        Well, let me -- let me quote what        11:53:00

you're saying.        11:53:01

"At the class certification stage,        11:53:02

you ... don't have enough facts; you        11:53:03

[didn't] done a loss causation analysis,        11:53:05

and, therefore, you haven't linked        11:53:09

disclosures to past statements."        11:53:11

So why can't you do that at the same        11:53:12

time that you do your class cert analysis?        11:53:16

MS. POSNER:  Objection.  Asks for a        11:53:19

legal conclusion.  But go ahead.        11:53:20

A.        Well, first of all, you'd have to be        11:53:21

asked to, and engaged, to do a loss causation        11:53:24

analysis, which I have not been engaged to do.        11:53:26

Second of all, to do a loss        11:53:30

causation analysis is really a fact-intensive        11:53:31

analysis.  And as I understand it, discovery is        11:53:34

still ongoing, the facts aren't there.  I mean,        11:53:38

it's just, A, I haven't been asked to do that        11:53:40

Page 91

- DR. HARTZMARK -

and, B, we're not in a stage where I think you                 11:53:44

could do that.                                                  11:53:49

Q.     What facts would you need to do that                    11:53:50

analysis?                                                       11:53:52

A.     I'm not going to speculate at this                       11:53:53

stage.  I have not done a loss causation analysis              11:53:55

or -- nor been asked to think about doing it at                11:53:59

this late stage.                                                11:54:03

I've been asked to examine whether                              11:54:04

the stock is -- trades in an efficient market and              11:54:07

whether there's common damages methodology.                     11:54:10

Q.     We'll come back to that.                                 11:54:16

You have, I guess it's the sixth                                11:54:18

one, but it starts with, "Finally, an improperly"              11:54:20

--                                                              11:54:20

"Finally, an improperly specified                               11:54:24

time period or expected speed of price                          11:54:26

response may lead to incorrect conclusions                      11:54:28

regarding the cause-and-effect                                  11:54:31

relationship."                                                  11:54:33

Do you see that?                                                11:54:33

A.     I do.                                                    11:54:33

Q.     What do you mean "an improperly                          11:54:33

specified time period"?                                         11:54:36

Page 92

- DR. HARTZMARK -

A.     Well, for example, that the response          11:54:40

will be -- has to be within one day.  I mean, as     11:54:42

discussed in these other -- in the other article     11:54:50

that we went through before, different              11:54:52

instruments, or different securities react          11:54:54

differently.                                        11:54:56

Moreover, information, there's no            11:54:56

standard approach in terms of how information is     11:54:58

disseminated and digested.  And so you have to be    11:55:03

very careful in -- in, you know, making sure         11:55:09

that, you know, these issues are accounted for       11:55:13

appropriately.  I mean, and that's, you know --      11:55:17

yeah, accounted for appropriately.                   11:55:21

Q.     What you're describing there is,       11:55:25

that's expected speed of price response, right?      11:55:28

A.     Yeah.  It is -- again, it's -- it's     11:55:32

one of the issues that makes the empirical           11:55:34

analysis of cause-and-effect, you know,              11:55:36

imperfect, so to speak.  I mean, markets are not     11:55:41

perfect.  I think economists and academics and       11:55:46

the courts all agree on that.                        11:55:48

Q.     But when you say "improperly          11:55:49

specified time period," is that referring to         11:55:51

something different than expected speed of price     11:55:53

Page 93

- DR. HARTZMARK -

response, or the same thing?   11:55:56

A.   I can't recall whether -- exactly   11:55:57
what was in my mind or Dr. Sand's mind, but I   11:56:01
believe it's associated with the time period   11:56:08
where news will be disclosed, disseminated, and   11:56:10
digested.   11:56:15

Q.   Okay.  A few more questions on this   11:56:21
article.  If we go to 422, where you say in the   11:56:23
middle of that paragraph:   11:56:48

"In this paper, we primarily focus   11:56:51
on cause-and-effect, or the fifth Cammer   11:56:54
factor, for two reasons."   11:57:00

A.   One second, I was looking at -- I   11:57:01
had flipped over the wrong.   11:57:03

Q.   No worries?   11:57:05

A.   So this paragraph starts on 421.   11:57:06

Q.   Correct.  It does.   11:57:09

A.   "The Second Circuit Court of   11:57:13
Appeals" -- Okay.   11:57:15

Q.   It does start there.   11:57:15

A.   So let me look at...   11:57:16

(Witness reviewing document.)   11:57:37

Okay.  Yeah.  And your question?   11:58:02

Q.   Okay.  In the middle of that   11:58:05

Page 94

- DR. HARTZMARK -

paragraph on 422, it says:                          11:58:06

          "In this paper, we primarily focus        11:58:08

     on cause-and-effect, or the fifth Cammer       11:58:12

     factor, for two reasons.  First, the           11:58:15

     empirical methods utilized by experts to       11:58:16

     test the cause-and-effect relationship" --     11:58:19

     "relationship often can be confusing and       11:58:20

     misleading.  And second, because many          11:58:24

     courts appear to rely heavily on the           11:58:26

     cause-and- effect Cammer factor to             11:58:28

     determine whether a security trades in an      11:58:31

     open, developed, and efficient market -- a     11:58:33

     prerequisite for a class-wide presumption      11:58:37

     of reliance and, thus for class               11:58:40

     certification."                                11:58:42

          Do you see that?                          11:58:43

     A.    Yes.                                      11:58:43

     Q.    So you're saying there that many         11:58:43

courts appear to rely heavily on the fifth Cammer   11:58:45

factor, correct?                                    11:58:49

          MS. POSNER:  Objection.                   11:58:50

     A.    For --                                    11:58:50

          MS. POSNER:  This is as of 2012?          11:58:50

     A.    Yeah.  The article is from 2013.          11:58:51

Page 95

- DR. HARTZMARK -

And, two, I'm not going to, basically, suggest                11:58:55

that I am an expert on legal authority.  I say               11:58:58

"many courts," you know, is that two? three?                 11:59:01

        There were some courts that rely --                  11:59:06

that apparently rely heavily on the                          11:59:07

cause-and-effect Cammer factor back in 2013.                 11:59:11

    Q.    You're saying "some courts," but                   11:59:19

here you say "many courts."                                   11:59:24

    A.    Okay.                                               11:59:26

    Q.    Correct?                                            11:59:26

    A.    I -- it says "many courts."                         11:59:27

    Q.    Okay.                                               11:59:30

    A.    Did I...                                            11:59:31

        (Witness reviewing document.)                        11:59:32

    Q.    And then you say in the next                        11:59:35

paragraph over:                                              11:59:36

        "The Cammer court found this                         11:59:40

    'cause-and-effect' or fifth factor to be                 11:59:42

    'the essence of an efficient market and the             11:59:44

    foundation for the fraud on the market                   11:59:46

    theory.  Subsequent decisions have also                  11:59:47

    held [the] cause-and-effect factor to be                 11:59:49

    the most important.'"                                     11:59:52

        Do you see that?                                      11:59:53

Page 96

- DR. HARTZMARK -

A.    Yes.  And then I cite to -- what? --    11:59:53

to DVI.    11:59:58

Q.    But do you disagree with that    12:00:01

statement in this article?    12:00:02

A.    What; that some courts have    12:00:03

considered it to be the most important?    12:00:05

Q.    Well, that Cammer found this factor    12:00:07

to be the essence of an efficient market and the    12:00:11

foundation for the fraud on the market theory?    12:00:12

A.    That's one sentence out of the    12:00:15

Cammer decision.  Cammer also lists, you know,    12:00:17

four other factors that they consider important    12:00:20

in evaluating whether the market -- whether the    12:00:22

stock trades in an open, well-developed, and    12:00:24

efficient market.    12:00:28

Q.    Do you disagree that subsequent    12:00:28

decisions have also held this cause-and-effect    12:00:31

factor to be the most important?    12:00:36

MS. POSNER:  Objection.  Calls for a    12:00:36

legal conclusion.  But you can answer.    12:00:37

A.    Do I -- say that again?  It was --    12:00:37

Q.    Do you disagree that subsequent    12:00:38

decisions have also held this cause-and-effect    12:00:41

factor to be the most important?    12:00:43

Page 97

- DR. HARTZMARK -

MS. POSNER:  Same objection.                    12:00:44

A.    I wrote it.  I mean, the fact that         12:00:45
certain courts have considered it to be the most  12:00:47
important, at least from my understanding as an    12:00:50
economist -- okay?  I'm not -- I'm not offering a  12:00:57
legal opinion, seems to be they considered that,   12:01:00
and I think that's misguided.                      12:01:03

Q.    Okay.  And then skip the next           12:01:05
sentence -- well, you can read, of course, the     12:01:07
next sentence.  But I'm going to skip the next     12:01:09
sentence and go to the one after.  And it says:    12:01:12

"In fact, certain experts have             12:01:14
suggested that the fifth Cammer factor is          12:01:16
the only one relevant for evaluating               12:01:18
whether a security trades in an open,              12:01:19
developed, and efficient market."                  12:01:21

Do you see that?                           12:01:23

A.    Yes.                                      12:01:23

Q.    And then we can go to that footnote,       12:01:24
and I believe you cite the HealthSouth Corp.       12:01:28
Securities Litigation in a report in that case;    12:01:39
is that correct?                                   12:01:43

A.    That is the footnote there, to the         12:01:43
HealthSouth decision.  I assume it's the           12:01:47

Page 98

- DR. HARTZMARK -

HealthSouth decision.                                           12:01:49

Q.    And do you see where it says, in          12:01:51

quoting the HealthSouth decision:                              12:01:53

          "In fact, Professor Gibbons asserts       12:01:55

     that the factors other than price reaction     12:02:00

     are merely characteristics of securities       12:02:02

     trading in an efficient market and not         12:02:05

     economic tests of efficiency"?                 12:02:07

A.    Uh-hmm.                                        12:02:09

Q.    Do you know -- yes.  Sorry, we        12:02:09

should --  yes or no, do you see that?                         12:02:11

A.    I said yes.  I see it.               12:02:12

Q.    Do you know who Professor Gibbons      12:02:16

is?                                                            12:02:19

A.    Professor Gibbons was an expert in      12:02:20

HealthSouth in 2008.  So I think, you know, 14                 12:02:24

years ago.                                                     12:02:26

          This is a quote from HealthSouth.  I      12:02:34

don't know him personally, no.                                 12:02:38

Q.    Okay.  And then the next paragraph      12:02:43

above the line, the next sentence above the line               12:02:45

says:                                                          12:02:48

          "Because the fifth Cammer factor          12:02:49

     appears to be the most direct test of          12:02:51

- DR. HARTZMARK -

market efficiency, courts often rely more    12:02:53

heavily on this factor, rather than    12:02:55

assigning equal weight to each of the five    12:02:57

factors."    12:03:00

Do you see that?    12:03:00

A.    Yes.    12:03:00

Q.    What does it mean "appears to be the    12:03:01

most direct test of market efficiency"?    12:03:04

A.    It's exactly what I said before.    12:03:08

It's an estimate as opposed to a calculation, and    12:03:09

it's looking at price movements.    12:03:11

Q.    And why is that a more direct test?    12:03:14

A.    Because you're looking directly at    12:03:17

price movements, but you're looking at estimates    12:03:18

versus price movements as opposed to actual    12:03:21

calculations, which the operational factors    12:03:25

provide.    12:03:27

And I think -- and I think courts    12:03:31

since 2013 have understood that the holistic    12:03:32

approach is the appropriate approach.    12:03:39

Q.    And what courts are you referring    12:03:42

there -- referring to there?    12:03:45

A.    Courts that I'm aware of, I -- I've    12:03:46

had -- what? -- a dozen class reports that    12:03:52

Page 100

- DR. HARTZMARK -

have -- wherein in courts have decided that the                12:03:57

security trades in an efficient market, and they               12:04:03

credited my opinion on that.                                   12:04:06

          But I'm not -- I mean, you're asking                 12:04:07

me for a legal conclusion.  I'm just saying based              12:04:09

on my own experience.                                          12:04:11

     Q.    You're analyzing case law in this                   12:04:14

article; no?                                                   12:04:17

     A.    Okay?  I'm referring --                             12:04:17

     Q.    Well --                                             12:04:17

     A.    I'm referring -- I'm referring to                   12:04:20

case law, you know, as an economist.                           12:04:21

     Q.    Okay.                                                12:04:27

     A.    Are we almost done with this                        12:04:40

article?                                                       12:04:42

          MS. POSNER:  Leonid, do you want to                  12:04:42

     take a break?  It's been an hour or so.                   12:04:47

          MR. TRAPS:  Maybe we can power                       12:04:55

     through this document.                                     12:04:57

          MS. POSNER:  I was asking how many                   12:04:58

     more questions you have on this article                   12:04:59

     because we've been going over an hour.                    12:05:01

          MR. TRAPS:  Let's just finish this                   12:05:03

     article.  I think it will be better.  I                   12:05:04

Page 101

- DR. HARTZMARK -

don't think it'll be -- maybe five, ten minutes.  Depends how long he reads.  If you want to take a break --

MS. POSNER:  Yeah, why don't we take a break.

MR. TRAPS:  All right.  Let's take a break.

THE VIDEOGRAPHER:  We are now off the record.  The time on the video monitor is 12:05 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We are now back on the record.  The time on the video monitor is 12:22 p.m.

BY MR. TRAPS:

Q.   Welcome back.  I think we were still on the "Dog That Didn't Bark" article, which I believe it's show.

A.   Correct.  Yeah.

Q.   Can you go to page 429.  I'm going to read from the first full paragraph.

"In securities litigation, the event study inevitably examines a confluence of different types of information that are

Page 102

- DR. HARTZMARK -

released.  It is not unusual that over a    12:23:37

class period the corporation will announce    12:23:39

earnings, dividends, discoveries, new    12:23:41

issues, lawsuits it files, lawsuits filed    12:23:42

against it, projections, regulatory changes    12:23:44

that impact its business, and more.  In an    12:23:47

efficient market, each one of these    12:23:49

releases of information will be expected to    12:23:51

have a different and possibly material    12:23:53

impact on the security price.  Should the    12:23:55

expert wish to reliably demonstrate that    12:23:57

efficiency exists based on cause-and-effect    12:24:01

by using a specific type of disclosure --    12:24:03

say, earnings -- he then must deal with the    12:24:05

fact that the class period is generally too    12:24:07

short to have a sufficient number of    12:24:09

disclosures to infer statistical    12:24:10

significance.  For example, even when the    12:24:15

class period is four years long, there are    12:24:17

only 16 earnings announcements -- hardly a    12:24:19

large enough sample to reliably test    12:24:22

whether there exist any systematic    12:24:24

relationships between earnings disclosures    12:24:27

and price movements."    12:24:30

Page 103

- DR. HARTZMARK -

Do you see that?                                    12:24:33

A.      Yes.                                        12:24:33

Q.      Do you agree that 16 earnings              12:24:33
announcement in a four-year class period is,       12:24:38
quote, "hardly a large enough sample to reliably   12:24:40
test whether there exist any systematic            12:24:40
relationships between earnings disclosures and     12:24:40
price movements"?                                  12:24:47

A.      Well, not when the statistical power       12:24:47
of the test demonstrates otherwise.                12:24:49

Q.      Why is that?                               12:24:54

A.      Well, if you do a -- for example, as       12:24:57
I did in this Wells Fargo case, when we get to     12:24:59
the report, there are seven earnings disclosures,  12:25:03
five of which has statistically significant        12:25:06
returns.                                           12:25:10

The statistical test demonstrates a                12:25:10
-- what? -- 99 percent confidence that it is --    12:25:13
that those two are different.                       12:25:16

Often, you might not have that type                12:25:18
of dramatic difference to give you the sort of     12:25:20
power that I have in this test.  And this is,       12:25:25
basically, saying that, you know, maybe you need   12:25:28
other types of -- you might want to then stretch   12:25:31

Page 104

- DR. HARTZMARK -

it to other types of information.                          12:25:33

The issue becomes then, in                   12:25:35

litigation, different from academia.  Because             12:25:38

academia tests, as this whole laundry list of             12:25:42

different types of information, becomes being             12:25:46

chastised in some way for being subjective and            12:25:49

choosing your information.                                12:25:51

And that's why I use the standard            12:25:53

earnings and guidance, which is academic-based            12:25:55

as -- considered to be important, also considered         12:25:59

to have, you know, reasonably prompt responses.           12:26:03

And in this particular case, the cause-and-effect         12:26:05

is -- is clear.                                           12:26:11

Moreover, the point of this is that          12:26:12

it's hardly enough to just use -- you know, you           12:26:15

got the 16 and you're going to base efficiency            12:26:17

just on that?  No.  You want to use that, if              12:26:19

there's statistical powers there, you put that in         12:26:23

your basket.                                              12:26:26

And as I said, I've got a basket of          12:26:26

12 factors for Wells Fargo that strongly support          12:26:29

that the market and the common stock for                  12:26:32

Wells Fargo is open, well-developed, and                  12:26:35

efficient.                                                12:26:40

Page 105

- DR. HARTZMARK -

Q.    But you don't say here it is hardly a large enough sample to reliably test if there is insufficient statistical power; you just say it is "hardly a large enough sample to reliably test whether there exist any systematic relationships between earnings disclosures and price movements," correct?

MS. POSNER:  Objection.  Is that a question?

MR. TRAPS:  It is.

A.    Well, I say here:

"Should the expert wish to reliably demonstrate that efficiency exists based on cause-and-effect by using a specific type of disclosure -- say, earnings" -- which I've done -- "he then must deal with the fact that the class period is generally too short to have a sufficient number of disclosures to infer statistical significance."

The fact is as it -- that's sometimes the case, but it's not the case in Wells Fargo.

Q.    Okay.  But you --

Page 106

- DR. HARTZMARK -

A.    I was able to infer statistical                12:27:23
significance.                                        12:27:26

Q.    Okay.  But you don't say here that             12:27:27
sometimes you can infer statistical significance     12:27:28
despite this problem, right?                         12:27:32

A.    I don't remember exactly.  I'm                 12:27:33
saying, I look at the sentence before it, and        12:27:35
it's very clear what it is that I'm talking          12:27:37
about.                                               12:27:40

And it's very clear from all of my              12:27:40
articles, that I talk about the cause-and-effect,    12:27:42
to solely rely on cause-and-effect, and 16           12:27:45
earnings -- or, in our case, seven -- from my        12:27:49
opinion, as an economic expert who's done dozens     12:27:54
and dozens of these reports, is wrong, that you      12:27:56
want to look at the basket of factors and look at    12:27:59
it.                                                  12:28:03

But I wouldn't, for example, take an            12:28:03
earnings announcement where there are seven --       12:28:07
seven -- or actually, 16 earnings announcements      12:28:10
where there is not statistical -- you can't infer    12:28:13
anything statistically, and base my full opinion     12:28:17
on that and ignore the 11 other factors.             12:28:21

Q.    We'll come back to the basket here.            12:28:25

- DR. HARTZMARK -

Let's go to 449.  Under "Speed of Response," it says:

"The specified time horizon for the 'proper' speed of response of the security price to a disclosure might well determine whether a disclosure and significant abnormal return are related.  For example, if there is a disclosure on day one and no contemporaneous significant price movement, one might say there is no cause-and-effect relationship between the disclosure and the price reaction if it is assumed that the information should be" -- "should be digested by the market participants and that the price response should be observed within a trading day.  However, if on the following day, there are no intervening disclosures and there is a significant abnormal return, there would appear to be a cause-and-effect relationship between the disclosure and the price reaction with the critical issue being the identification of the proper time horizon or speed of response to measure the relationship."

- DR. HARTZMARK -

Do you see that?                                    12:29:36

A.    Yes.                                          12:29:36

Q.    How do you identify the proper time          12:29:36
horizon or speed of response to measure the        12:29:39
relationship?                                      12:29:41

A.    Well, in a loss causation analysis,          12:29:43
that's critical.  With respect to looking at       12:29:45
cause-and-effect as it relates to market           12:29:50
efficiency, generally, to try to -- to be          12:29:54
objective, I do two things:                        12:29:56

One, is I limit my information to                   12:29:58
earnings and guidance dates when, as we discussed  12:30:01
early, we know there are other critical dates.     12:30:04
Okay?                                              12:30:07

Two, I limit it to one day, even                    12:30:07
though it's clear that different types of          12:30:10
information or the complexity of information        12:30:12
might take greater time to either disseminate or   12:30:14
digest.  Okay?                                     12:30:18

And, therefore, even though it might                12:30:23
take two days, the nature of the cause-and-effect  12:30:25
analysis that I look at is: Is there a response    12:30:27
within one day?  That, in essence, is a bias       12:30:32
against finding cause-and-effect.  Okay?           12:30:39

Page 109

- DR. HARTZMARK -

I mean -- so the key, and we'll                12:30:40
probably get to it later, is objectivity.  I     12:30:43
treat -- you know, you can't look at a sample of 12:30:47
one, and then make conclusions based on that.    12:30:49

Q.    Okay.  And you say there, in the          12:30:55
middle of what I just read:                      12:31:02

          "However, if on the following day,     12:31:04
      there are no intervening disclosures and   12:31:05
      there is a significant abnormal return,    12:31:07
      there would appear to be a cause-and-effect 12:31:10
      relationship between the [earlier day's]   12:31:12
      disclosure and the price reaction..."      12:31:14

          Right?                                 12:31:16

A.    One might infer from that especially      12:31:19
as it relates to loss causation.  Yes.           12:31:23

Q.    What if there are intervening             12:31:26
disclosures on that second day?                  12:31:27

A.    What if there are intervening -- you       12:31:29
know, for the purposes of loss causation?        12:31:31

Q.    Yes.                                       12:31:32

A.    For the purposes of loss causation,        12:31:32
you do what is commonly referred to as "parsing." 12:31:35

Q.    Okay.  We can return to it.  But          12:31:40
what is "parsing"?                               12:31:45

Page 110

- DR. HARTZMARK -

A.    Parsing is separating the effects of    12:31:46

an abnormal return.    12:31:49

Q.    If you go to page -- and this is the    12:31:59

last one, page 453.  And it is the last paragraph    12:32:01

on the page that spills over to 454.    12:32:18

You say:    12:32:24

"The Dynex case demonstrates that    12:32:24

when examining the speed of response, it is    12:32:26

important to account for the type of    12:32:28

security and data at issue.  For example,    12:32:29

when examining informational efficiency in    12:32:31

the context of certain securities such as    12:32:34

corporate bonds, it is also reasonable to    12:32:36

argue that a two-day or longer window might    12:32:38

represent a timely reaction.  One simple    12:32:40

reason for this is the fact that corporate    12:32:43

bonds do not generally trade as frequently    12:32:45

as common stock."    12:32:46

Do you see that?    12:32:52

A.    I do.    12:32:52

Q.    Is it fair to read that as saying    12:32:52

that common stock generally trades more    12:32:56

frequently than corporate bonds?    12:32:57

MS. POSNER:  Objection.    12:32:59

Page 111

- DR. HARTZMARK -

A.   It's been my experience that common                    12:33:05

stock turnover is greater than corporate bond               12:33:08

turnover overall.                                           12:33:12

As it relates to, I guess,                   12:33:13

Wells Fargo corporate bonds, 'cause I thought               12:33:17

that's what we're talking about -- well,                    12:33:19

Wells Fargo is what we we're talking about,                 12:33:22

versus common stock, I haven't done that                    12:33:23

analysis.                                                   12:33:25

Q.   Sure.  And are you also saying here,                   12:33:25

generally, that price reactions occur quicker               12:33:28

with common stock than corporate bonds?                     12:33:31

MS. POSNER:  Objection.                       12:33:34

A.   It depends what you're talking                         12:33:35

about.  You know, all else constant?                        12:33:37

Q.   Yes.                                                   12:33:39

A.   All else constant, I found, in my                      12:33:40

experience, that it takes longer for the                    12:33:42

corporate bond market to react.  But depending on           12:33:45

the nature of the information, the nature of                12:33:47

where it's disclosed, how it's disseminated and            12:33:50

what it's going to take to digest it, it can be            12:33:55

different even within a certain -- the time of             12:33:59

response can be different within a specific                12:34:03

Page 112

- DR. HARTZMARK -

security.                                                              12:34:05

        But I think the point is, again,                              12:34:06
you're getting more towards a loss causation                          12:34:09
issue.  I've objectively examined this market                         12:34:10
looking at one-day returns.                                           12:34:15

        Q.    You mentioned some factors that                         12:34:20
could affect the speed of the -- of the price                         12:34:23
impact, and you said "the nature of the                               12:34:26
information."                                                         12:34:28

        So how would that affect -- in the                           12:34:29
instance of common stock, how would that affect                      12:34:32
how long it takes for the market to absorb --                        12:34:35

        A.    Just what --                                           12:34:35

        Q.    -- the information?                                    12:34:40

        MS. POSNER:  Objection.                                      12:34:40

        A.    Just what I said.                                      12:34:40

        Q.    Well, what kind of information --                      12:34:41
let's take Wells Fargo common stock.                                 12:34:44

        A.    Okay.                                                  12:34:45

        Q.    Let's limit it to that.                               12:34:46

        What kind of information would take                          12:34:47
longer to digest?                                                    12:34:49

        A.    I haven't -- I haven't looked at                       12:34:50
that.  But, again, what I will say is that -- and                    12:34:54

Page 113

- DR. HARTZMARK -

there's economic, academic, peer-reviewed                12:34:59

research that there is -- where it is disclosed          12:35:02

is important.  Okay?  How it is disseminated is          12:35:07

important, and what is necessary for it to be            12:35:11

digested.                                                12:35:14

There are different types of                             12:35:16

information.  If you want to, we'll go back to           12:35:17

the article -- let me find it -- and I'll tell           12:35:20

you different types of information.                      12:35:22

(Witness reviewing documents.)                           12:35:25

I'm going to have to read -- I mean,                     12:35:52

without going back and rereading the whole               12:35:56

article.  There -- there are all types of                12:35:58

information related to companies, whether                12:36:01

it be, you know, from earnings to guidance.              12:36:04

In Wells Fargo, it's going to be                         12:36:08

very complex 'cause it's a huge company, or              12:36:10

new products or new programs or problems                 12:36:14

that it's having.  I mean, information, you              12:36:19

know, is -- is -- I want to say, it is --                12:36:23

it's a multitude of issues.                              12:36:29

And the key is that, again, I was                        12:36:31

asked to look at market efficiency.  And so              12:36:33

instead of looking at samples of one and                 12:36:36

Page 114

- DR. HARTZMARK -

saying, "Okay, this piece of information    12:36:39
takes three days, this information takes    12:36:41
two days" -- which I might have to do in a    12:36:43
loss causation analysis -- I looked at    12:36:46
one-day, close-to-close, returns to do    12:36:49
my -- my statistical analysis, my    12:36:52
cause-and-effect analysis, my    12:36:56
autocorrelation analysis.  And those    12:36:58
strongly support that -- that Wells Fargo    12:37:01
common stock trades in an efficient market.    12:37:04

Q.    I totally understand that's what you    12:37:06
did here.  But do you disagree that the speed of    12:37:07
response could be relevant to market efficiency?    12:37:11

A.    That the speed -- well, I assume one    12:37:15
day.  Yeah, in one day, I'm saying that that    12:37:18
suggests that there's a prompt response of    12:37:23
Wells Fargo stock.  So if we're talking here.    12:37:25

But what I also say is that it    12:37:28
depends on the instrument; it depends on the    12:37:30
nature of the information; it depends on the    12:37:32
source of the disclosure; it depends on how it's    12:37:34
being disseminated; and it depends on what it's    12:37:36
going to take to fully digest it and understand    12:37:40
it and, thus, for market participants to act upon    12:37:45

Page 115

- DR. HARTZMARK -

it and, thus, be reflected in the market price.    12:37:47

Q.    So you're saying you assume that the    12:37:49
speed of response here was one day in Wells    12:37:51
Fargo's --    12:37:55

MS. POSNER:  Objection.    12:37:55

Q.    -- first in the Wells Fargo report?    12:37:55

MS. POSNER:  Objection.  Misstates    12:37:59
the testimony.    12:38:00

A.    No.  I said that that's what I    12:38:01
objectively utilized.  I objectively utilized    12:38:02
earnings dates as being news dates.  Okay?  I    12:38:05
didn't -- I necessarily -- I know those are    12:38:10
information-rich days.  Okay?    12:38:11

I mean, I need to look at 450-day    12:38:15
class period.  I looked at information-rich days,    12:38:18
and I then utilized a one-day window to say that    12:38:21
it's efficient.    12:38:24

It might have been the case that if    12:38:25
certain type of information -- and I wanted to go    12:38:27
into it and look and see how the loss, for    12:38:29
example, or the gain on the date following it,    12:38:32
you know, is -- was -- was determined, then I    12:38:36
would have looked two days.  But then it's    12:38:39
subjective all of a sudden.    12:38:42

Page 116

- DR. HARTZMARK -

I used one day and -- you know, for 12:38:44 these tests, to objectively determine in the same 12:38:45 way that I objectively determined what news was, 12:38:49 which is an academic-based earnings and guidance 12:38:54 day. 12:38:58

Q.    No.  I understand that's what you 12:38:58 did. 12:38:59

Was the speed of response, when you 12:38:59 actually measure it, it could be relevant to 12:39:01 market efficiency, right? 12:39:05

A.    I don't understand the question. 12:39:05

Q.    When you go to do your loss 12:39:06 causation analysis, let's say you find out that 12:39:08 it took a year for Wells Fargo common stock to 12:39:10 affect -- for news regarding Wells Fargo to 12:39:13 affect its common stock, that would bear on 12:39:19 market efficiency, right? 12:39:21

MS. POSNER:  Objection.  Do you 12:39:22 understand the question? 12:39:23

A.    I don't understand.  I mean, a year? 12:39:23 I -- so there's a disclosure, nothing 12:39:25 intervening? 12:39:29

Q.    Yes. 12:39:29

A.    Okay.  So, so -- I mean, and how 12:39:29

Page 117

- DR. HARTZMARK -

that relates to Wells Fargo, which has a head                12:39:31

line every day.  So you have disclosure; you                12:39:33

have, somehow, dissemination; and digestion takes           12:39:41

a year -- okay?  -- to be reflected in the market           12:39:44

price.                                                      12:39:48

Q.    Yeah.  Would you consider that an                12:39:48

efficient market?                                           12:39:51

A.    Would I consider that an efficient            12:39:52

market?  I would look at that in the context of             12:39:53

the -- the other factors.                                   12:39:55

Is there trading in between or does             12:40:00

it -- I mean, take Dynex, for example, where the            12:40:02

court did find it there was a -- it priced a                12:40:04

hundred.  I don't remember exactly what the                 12:40:08

price.  The price is a hundred; there is an                 12:40:09

adverse disclosure.  No trading.                            12:40:12

The first trade afterwards, it's               12:40:14

down at 50.  The market considered that to be               12:40:16

efficient.  It was reflective in the nature of --           12:40:18

the nature of that asset was such that it took              12:40:23

that time.                                                  12:40:26

In this particular -- so you have             12:40:27

Wells Fargo common stock trades, on December 8,            12:40:29

2021, there's a disclosure.  No trading.  And               12:40:34

Page 118

- DR. HARTZMARK -

then on, you know, December 8, 2022, the price    12:40:37

moves.  I mean, it's certainly -- again, when I    12:40:41

would look in the context of all of the other    12:40:48

information, would maybe makes sense.    12:40:51

For example, if it's serve -- Okay.    12:40:53

I mean, and this is -- again, you've come --    12:40:56

you've made a hypothetical that is absolutely    12:40:57

counter -- counter to anything related to    12:40:59

securities markets.    12:41:02

But you have -- you have total serve    12:41:03

days.  You say Wells Fargo stock is a hundred,    12:41:08

and then they come out and say, "Next year we    12:41:10

will pay 50 for the stock."  And everybody knows    12:41:12

that, and everybody agrees that that's going to    12:41:14

happen.    12:41:16

There might not be any trading.    12:41:17

That's the nature of markets.  Right?  Difference    12:41:19

of opinion.  They all know it's going to be 50 a    12:41:21

year from now, and a year from now it's at 50.    12:41:24

But I'm not sure what that has to do with this    12:41:26

particular matter.    12:41:28

Q.    No.  It is a hypothetical.  Let's    12:41:30

take a hypothetical company, not Wells Fargo.    12:41:31

There's a piece of information    12:41:33

Page 119

- DR. HARTZMARK -

that's disclosed; the price doesn't move.  Two    12:41:35

months later, even though trading continues, you    12:41:40

determine that the price impact was felt two    12:41:44

months later.    12:41:47

Does that indicate to you that the    12:41:48

market is efficient or inefficient?    12:41:50

MS. POSNER:  Objection.  It's an    12:41:54

incomplete hypothetical.  But if you can    12:41:55

answer.    12:41:56

A.    Yeah.  I mean, the thing --    12:41:57

"efficient" means that the information is    12:41:57

reflected in the price.  Okay?    12:41:59

Again, as I said, in Dynex, it took    12:42:03

57 days, and the court determined that that was    12:42:06

-- that was reasonable.  Again, no difference of    12:42:07

opinion until day 57.  You know, there was no    12:42:10

reason to trade.    12:42:14

But I would want to look at the    12:42:14

specific situation as it relates to that market    12:42:16

and the institution surrounding it and all of    12:42:21

the, again, the factors that are associated with    12:42:23

it.    12:42:25

Q.    Would you say, generally speaking,    12:42:26

the more efficient the market, the more quicker    12:42:28

Page 120

- DR. HARTZMARK -

the speed of response?    12:42:30

MS. POSNER:  Objection.  To the    12:42:34

extent you can answer that question --    12:42:35

A.    I --    12:42:35

MS. POSNER: -- without further    12:42:36

information.    12:42:36

A.    I've answered that question.  There    12:42:37

are all types of information.  You can't look at    12:42:39

one observation.  A sample of one -- I'll use it    12:42:42

today, N equals 1.  A sample of one.  I'm not    12:42:45

going to make a -- a generalized conclusion on    12:42:50

that.  It might help.  I might use it, but it's    12:42:52

not going to be the definitive factor.    12:42:58

Q.    Sure.  But how could it help?    12:43:01

A.    How could what help?    12:43:03

Q.    You said, "It might help.  I might    12:43:04

use it."  In what way?    12:43:08

A.    Well, look at the speed of response.    12:43:10

If it were the case that -- again, I created an    12:43:11

objective, holistic-times-two approach.  Okay?    12:43:17

It's holistic, one, because I look    12:43:20

at 12 factors in combination to -- to support my    12:43:22

opinion.  Two, it's holistic, I'm not picking and    12:43:25

choosing days out of the 450 and coming up with    12:43:29

Page 121

- DR. HARTZMARK -

anecdotes that it takes too long, too short, too          12:43:32

anything.  I've got 450 days, and I'm evaluating          12:43:37

that whole period; every day is included in my            12:43:40

sample.                                                   12:43:43

          And so you can come up with some --             12:43:46

some issue that is anomalous within that.  But            12:43:48

that doesn't, you know, give you, you know,               12:43:51

really -- you know, I guess it can lend, maybe            12:43:54

can lend some support.  Maybe it can lend some            12:43:59

support that it's complex information, and it             12:44:01

takes a couple of days to -- to digest.  I                12:44:04

mean -- you know, I mean.                                 12:44:10

          So I'm not sure where you're going.             12:44:11

You know, my Wells Fargo is one-day earnings              12:44:13

announcement.                                             12:44:20

     Q.    All right.  Well, we'll come back to           12:44:20

that.  Let me finish off some items on your CV.           12:44:22

          Go to page -- I'm not going to ask              12:44:43

you about your boards.  About your expert                 12:44:52

reports, declarations, and disclosures the past          12:45:02

four years.                                               12:45:06

          Do you see that?                                12:45:06

     A.    Uh-hmm.                                        12:45:06

     Q.    I count around 40 in the last four             12:45:09

Page 122

- DR. HARTZMARK -

years.  Does that sound about right?                    12:45:11

A.    If you say so.                                     12:45:13

Q.    And beyond just the last four years,              12:45:14

approximately how many times would you estimate,        12:45:17

in total, you've been retained as an expert?            12:45:20

MS. POSNER:  Objection.  In his                         12:45:23

life?                                                   12:45:24

MR. TRAPS:  Yes.                                         12:45:24

A.    In my life?                                        12:45:26

Q.    Beyond just the last four years.  If              12:45:26

you had to do a comparison list.                        12:45:30

A.    Of engagements?                                    12:45:31

Q.    Using the same criteria that you                  12:45:32

used to populate this list.                             12:45:34

A.    So that there's a report,                         12:45:36

declaration, and disclosure?                            12:45:38

Q.    Yes.                                              12:45:39

A.    Over my life?  Double this.                       12:45:43

Q.    And then what rough percentage of                 12:45:48

that would be securities class actions                  12:45:52

specifically?                                           12:45:55

A.    Securities class action, meaning                  12:45:59

10b, you know, Exchange Act?                            12:46:03

Q.    Let's do that, yes.                               12:46:05

Page 123

- DR. HARTZMARK -

A.    And we're talking about life?    12:46:09

Q.    Yes.    12:46:11

A.    Less than half.    12:46:13

Q.    Less than half of the 80.    12:46:15

A.    Approximately.  Yes.    12:46:18

Q.    Okay.  And in the ones you list here    12:46:21
in your report, were you retained by the    12:46:27
defendant -- or defendant's counsel in any of    12:46:31
them?    12:46:34

A.    Ah, in this?  Yes.    12:46:34

Q.    Which ones?    12:46:36

(Witness reviewing document.)    12:46:39

A.    In the matter of the Trust    12:46:50
Established of the Pooling Service Agreements, I    12:46:53
was retained by counsel for Appaloosa.    12:46:56

Q.    Okay.    12:47:11

(Witness reviewing document.)    12:47:11

A.    In Jennifer Phillips versus Health &    12:47:19
Home, I was retained by counsel for the    12:47:22
defendant.    12:47:25

I thought there was one more, but I    12:47:32
can't find it.  So I think those two.    12:47:38

Q.    Were any of --    12:47:40

A.    In the last four years.    12:47:42

Page 124

- DR. HARTZMARK -

Q.      Were any of those 10b-5 cases?      12:47:43

A.      No.      12:47:46

Q.      Have you ever been retained by a      12:47:46
defendant or defendant's counsel on a 10b-5 case?      12:47:48

A.      As a testifying expert?      12:47:51

Q.      Yes.      12:47:53

A.      Not since I restarted my practice,      12:47:56
and the DVI decision was -- was made.  Firms like      12:47:59
Sullivan & Cromwell and defense firms won't use      12:48:07
plaintiffs who have public decisions on the      12:48:10
plaintiff side.      12:48:15

Q.      When was the DVI decision?      12:48:16

A.      DVI came out --      12:48:17

Q.      Approximately?      12:48:21

A.      Approximately 2007.      12:48:21

Q.      Okay.  Have you ever concluded in an      12:48:25
expert report, testimony, declaration, that a      12:48:28
market for a security was inefficient?      12:48:31

A.      I think the question is sort of      12:48:34
foolish because, no, if -- if I wrote that      12:48:36
report, I'm not aware of any firm that would      12:48:44
submit it.      12:48:45

Q.      Well, did you ever submit a draft of      12:48:47
a report --      12:48:52

- DR. HARTZMARK -

A.    Yes.                                                    12:48:52

Q.    -- excluded that a market was                         12:48:54
inefficient?                                                 12:48:55

A.    Yes.                                                    12:48:58

Q.    Approximately how many times?                          12:49:07

A.    I've say there have been six times                     12:49:08
when I've been asked to evaluate markets, and               12:49:10
I've declined.                                               12:49:15

Q.    When was the most recent of those?                     12:49:16

A.    Sometime more than four years ago.                     12:49:25

Q.    Would it be fair to say that this                      12:49:28
report you submitted in this case is --                     12:49:30

A.    Actual... I'll take that back.  I                      12:49:32
can't say.  It might have been within the last              12:49:38
four years as well.                                         12:49:40

Yeah.  Go ahead.                                            12:49:42

Q.    Would it be fair to say that your                      12:49:44
report in this case is similar to other reports             12:49:45
you've submitted in other securities cases?                 12:49:48

MS. POSNER:  Objection as to form.                          12:49:51

You can answer.                                             12:49:53

A.    Yes.                                                    12:49:56

Q.    Do you recall any judicial criticism                   12:50:00
of your expert work?                                         12:50:03

Page 126

- DR. HARTZMARK -

A.    "Judicial criticism"?  Can you be more clear?

Q.    Do you recall any judge, panel of judges, criticizing your expert work in a case?

A.    I'm not sure what you mean by that.

Q.    You don't know what I mean by criticism -- "criticizing"?

A.    Judges write a lot.  Can you be more specific?  I mean, I'm not sure what you mean.

Q.    Okay.

(Defendants' Exhibit 6 marked for identification.)

BY MR. TRAPS:

Q.    That's Exhibit 6, page titled "BlackRock Balanced Capital Portfolio vs Deutsche Bank National Trust Company."

Do you recall anything about this case?

A.    Very little other than it was not an Exchange Act case.  It was a class action.  It was a breach of contract case where I was asked and engaged to calculate the benefit of the bargain damages.

Q.    And did the court criticize your

Page 127

- DR. HARTZMARK -

analysis in this case?                                    12:51:55

        A.    Can you point out?  I have not            12:52:00

seen -- when was this? -- for at least the last          12:52:04

four years.                                              12:52:08

        Q.    If you turn to page 13 at the             12:52:21

bottom?                                                  12:52:23

        A.    13?                                        12:52:23

        Q.    Yes.  In the first full paragraph in      12:52:24

the middle, It says, "But Dr. Hartzmark's model         12:52:26

awards each current noteholder damages" --              12:52:29

        A.    I can't see.  On page 13?  Middle --      12:52:31

        Q.    Left column.                              12:52:32

        A.    Oh, left column.                          12:52:33

        Q.    First full paragraph, the middle of       12:52:35

that paragraph.  It starts, "But Dr. Hartzmark's        12:52:37

model."  And then it says, "But Dr. Hartzmark's         12:52:41

model" --                                               12:52:47

            "But Dr. Hartzmark's model awards           12:52:45

        each current noteholder damages designed to     12:52:48

        compensate for all harm over a note's           12:52:51

        entire history, not just those that accrued     12:52:53

        during the noteholder's ownership."             12:52:55

            It talks about an assumption.  And          12:52:59

then in the next paragraph, it says:                     12:53:02

Page 128

- DR. HARTZMARK -

"This version of expectation damages      12:53:05

is problem particular because it runs afoul      12:53:06

of the Supreme Court's decision in      12:53:08

Comcast."      12:53:10

Do you see that?      12:53:10

A.    I do.      12:53:10

Q.    Do you recall that criticism?      12:53:11

A.    That, that because he's using a      12:53:13

different legal theory, that my damages model or      12:53:17

the nature of the award didn't include -- wasn't      12:53:29

appropriate?  Again, I assume that the plaintiffs      12:53:32

would prove that there were benefit of the      12:53:35

bargain damages, and that this was an appropriate      12:53:40

way to calculate benefit of the bargain.      12:53:42

And, again, this, you know, it      12:53:49

doesn't say that it's unreliable; it doesn't say      12:53:50

that I'm not qualified.  It basically, if you      12:53:54

really read the whole decision, you'll see that      12:53:57

it basically says I didn't calculate the damages      12:53:59

based on some different theory of liability.      12:54:02

Q.    Okay.      12:54:06

A.    And I mean, theory of liability is      12:54:16

totally unrelated to what we're talking about      12:54:17

here.  This is TIA claims.      12:54:20

Page 129

- DR. HARTZMARK -

MR. TRAPS:  Let's do Exhibit 7.                12:54:24

(Defendants' Exhibit 7 marked for             12:54:29

identification.)                              12:54:52

BY MR. TRAPS:                                        12:54:52

Q.    Exhibit 7, which should go up on          12:54:52

Exhibit Share, is In Re: -- In re: Finisar          12:54:55

Corporation Securities Litigation.  It's a          12:54:59

decision from May 24, 2019.  Do you see this?       12:55:03

A.    Yes.                                       12:55:06

Q.    So if I go to the last page of the        12:55:10

document, the left column beginning with            12:55:15

"Second," paragraph beginning with "Second," in     12:55:28

the fourth sentence, it says -- strike that.  The   12:55:29

third sentence says:                                12:55:34

"In any event, the court has               12:55:35

reviewed Hartzmark 3 and Defendants'       12:55:37

criticisms of the report.  Many of         12:55:40

Defendants' criticisms" --                 12:55:43

A.    Where is this?  I missed the start.       12:55:43

Q.    Let's go to nine lines down.              12:55:48

A.    Okay.  "In any event."                    12:55:59

Q.    Well, it says:                            12:56:04

"In any event, the court has               12:56:05

reviewed Hartzmark 3 and Defendants'       12:56:09

Page 130

- DR. HARTZMARK -

criticisms of the report.  Many of          12:56:12

Defendants' criticisms are valid.  For      12:56:12

example, Hartzmark study purports to         12:56:14

control for the effect that some, but not    12:56:15

all, of the six analyst reports issued       12:56:17

after December 2nd."                         12:56:19

          Do you see that?                   12:56:20

A.     Uh-hmm.                               12:56:21

Q.     Do you recall this analysis from      12:56:22

this decision?                               12:56:25

A.     Yes.  I recall that they, I believe,  12:56:34

did not dispute my opinions related to market 12:56:36

efficiency; didn't dispute my opinion related 12:56:39

to -- that there was a common damages        12:56:42

methodology; and that in this particular     12:56:46

situation, I didn't persuade him as it related to 12:56:47

price movements at the beginning of the class 12:56:53

period.                                      12:56:59

Q.     And who is "they" in what you just    12:56:59

said?                                        12:57:01

A.     The court.                            12:57:01

Q.     And why do you say "they did not      12:57:11

dispute my opinions related to market        12:57:13

efficiency"?                                 12:57:18

Page 131

- DR. HARTZMARK -

A.    I'm not aware of it.  This is the                    12:57:18

order striking the plaintiff's motion for class            12:57:21

certification.                                             12:57:26

I don't -- I remember, there was --                        12:57:26

there was no dispute with respect to my market             12:57:27

efficiency analysis and the -- and the Cammer/             12:57:30

Krogman factors, and there was no dispute related          12:57:34

to the damages.  The issue was related to price            12:57:39

impact, and I haven't been asked to opine on               12:57:42

price impact here.                                         12:57:44

And, again, I don't see anything                           12:57:45

here that says that the analysis is unreliable.            12:57:47

It basically just says that he didn't agree with           12:57:53

it.  And he accepted -- I guess I don't                     12:57:55

understand.                                                12:57:58

I mean, there's defendants and                             12:57:58

there's plaintiffs.  And, as I understand it --            12:57:59

especially if there's litigation -- one side is            12:58:02

more persuasive than the other.                            12:58:04

Q.    Okay.                                                12:58:08

A.    I don't see where he says anything                   12:58:08

about my qualifications, reliability.                      12:58:10

Q.    But I asked if --                                     12:58:16

A.    Or any --                                             12:58:16

Page 132

- DR. HARTZMARK -

Q.    -- any personally to your work,    12:58:19

right?    12:58:20

A.    Well, I get a -- yeah.  Every    12:58:20

expert, defense expert, criticizes my work.    12:58:23

Q.    Right.  But that's not a court?    12:58:27

A.    Well, I can't -- I can't persuade    12:58:33

every court.  I've had maybe -- what did we go    12:58:34

through?  80?  80 reports and probably 40    12:58:37

decisions, and you've dug out something that's    12:58:39

unrelated to the opinion that I'm expressing in    12:58:44

Wells Fargo, that's fine.    12:58:46

Q.    Okay.    12:58:47

A.    But it doesn't say anything --    12:58:47

again, he didn't say -- if you can point me to    12:58:49

anything where he says I'm not qualified or it's    12:58:51

unreliable, I'd appreciate it.    12:58:55

          MR. TRAPS:  Okay.  Exhibit 8.    12:59:48

          (Defendants' Exhibit 8 marked for    12:59:49

     identification.)    12:59:57

BY MR. TRAPS:    12:59:57

Q.    Exhibit 8 is a decision In re:    01:00:00

Tesla, Incorporated Securities Litigation, and it    01:00:04

is an order denying the motion to exclude the    01:00:06

opinions of Michael Hartzmark.    01:00:09

Page 133

- DR. HARTZMARK -

Q.    Do you recall this case?                01:00:12

A.    I recall this case, yes.              01:00:15

Q.    If you go to page 8.  The section      01:00:21
beginning "Disaggregation of Loss"?          01:00:43

A.    Where is this?  Is a 10?  Or where     01:00:47
is this?  Oh, okay.                          01:00:48

Q.    It should be 8 at the bottom?          01:00:48

A.    Okay.  8 at the bottom, right          01:00:51
column, Disaggregation of Loss"--            01:00:54

Q.    Exactly.                              01:00:56

A.    -- "Caused by Company-Specific        01:00:56
Information"?  Okay.                         01:00:56

Q.    Exactly right.  And it says:           01:00:56

      "According to Tesla, Dr. Hartzmark's   01:00:58

      methodology is fundamentally flawed from  01:00:59

      the outset because he makes no attempt to  01:01:01

      isolate the effect of the allegedly    01:01:03

      misleading information -- 'funding     01:01:04

      secured' -- from the truthful statement  01:01:07

      that Musk was 'considering taking Tesla  01:01:09

      private at $420' per share.            01:01:11

      "Tesla has a point.  Dr. Hartzmark     01:01:14

      included the 'considering taking Tesla  01:01:18

      private at $420' statement in the Musk  01:01:20

Page 134

- DR. HARTZMARK -

Tweets, and he analyzed the effect of the                01:01:23

Musk Tweets as a unit, which meant that he               01:01:25

did not separate any effect related to the               01:01:27

non-false portions of the Tweets which may               01:01:28

have been caused by the $420 statement."                 01:01:31

And then skipping over to the end of                      01:01:35

that paragraph, the last three sentences.                01:01:37

"In other words, Dr. Hartzmark                           01:01:43

assumed that Mr. Musk August 7th tweets                  01:01:45

constituted an 'interwoven bundle' and                   01:01:45

analyzed them accordingly.  The Court views              01:01:45

this as a fair criticism of Dr. Hartzmark's              01:01:45

opinion.  The question is whether it                     01:01:50

renders Dr. Hartzmark's opinion                          01:01:51

inadmissible under Rule 702.  For the                    01:01:54

reasons explained below, the Court                       01:01:57

concludes that it is not."                               01:01:59

Do you see that?                                         01:02:01

A.    Yeah.  I'd like to hear the "reasons               01:02:01

below" then.  Because this is -- this is a pretty        01:02:03

favorable opinion, I think, if you ask anybody.          01:02:05

The other issue is you read the                          01:02:07

defendant's -- you read -- you started with the          01:02:08

defendant's quote.  I mean, to say -- to start           01:02:14

Page 135

- DR. HARTZMARK -

with a defendant's quote is a little unfair it's          01:02:15
criticism.                                                01:02:18

Let me just mention that the                              01:02:18
misinformation is eight words, eight words.  And          01:02:23
plaintiffs -- I have to be -- well, I'm assuming          01:02:25
it's -- that this is public, plaintiff's theory           01:02:30
of liability is that those who are an "interwoven         01:02:32
bundle."  And, indeed, even if they're not --            01:02:37
again, I have to be careful of not giving it              01:02:39
away.                                                     01:02:41

I think you have to read this                             01:02:41
opinion as a whole.  He's taken an                        01:02:43
extraordinarily precise, parsed, scaled, damaged          01:02:47
-- damage technique that I put, and agreed not to         01:02:56
exclude it, to allow me to testify in front of a          01:03:02
jury as to what the actual number is.                     01:03:05

So, first of all, as it relates to                        01:03:10
this, he's agreed the methodology that I propose          01:03:12
in Wells Fargo is acceptable to him.                      01:03:14

The issue becomes the input into                          01:03:17
that damages methodology, which is:  (a) do you           01:03:20
need to parse eight words?  That's what this is.          01:03:26
Okay?  And (b) is the analysis -- and he doesn't          01:03:30
really address it in here -- that I did, which            01:03:34

- DR. HARTZMARK -

basically says the 420, actually, based on the    01:03:37

defense expert, was known to the market, and    01:03:40

that -- the fact that he wanted to go private was    01:03:45

known to the market.  Okay?    01:03:48

And that the only new information in    01:03:50

that Tweet was the fact that he had funding    01:03:54

secured.  But the judge agrees that my damages    01:03:57

methodology is appropriate; the judge agreed that    01:04:00

the market not just for one security but for over    01:04:01

2200 securities, which is what I looked at, is    01:04:05

efficient.  Okay?  So he credits me for just the    01:04:09

opinion that I'm trying to give you.    01:04:14

You're pointing out an input into    01:04:16

this.  I mean, if anything, it reinforces my    01:04:18

opinion in Wells Fargo.  And the issue that he    01:04:22

has is something that he basically says -- if you    01:04:24

really conclude it, based on all the pages you,    01:04:27

you know, ignored, that what I did was    01:04:31

appropriate.    01:04:33

Do you want to read -- I mean, --    01:04:35

never mind.    01:04:38

Q.    I'm not seeking to have a debate    01:04:39

with you about this.  I gave you the opinion,    01:04:42

and I --    01:04:43

Page 137

- DR. HARTZMARK -

A.    The base, he accepts that the    01:04:44

damages methodology -- that there is a common    01:04:49

damages methodology, and he accepts that the    01:04:50

market is efficient.  That's what I've been    01:04:51

asked.  I've not been asked to create inputs into    01:04:53

the common damages methodology.  This deals with    01:04:56

inputs.    01:04:58

And the criticism -- I mean, I think    01:05:00

you just must have looked for the word    01:05:02

"criticism," is explained why he -- he first    01:05:04

criticizes it.  And then he goes on to say, "But,    01:05:07

it's okay.  We're going to leave it in so he can    01:05:11

testify to the jury."    01:05:14

Q.    But do you think the criticism has    01:05:14

any validity?    01:05:16

A.    To the extent -- I mean, now I'm    01:05:17

making -- Okay.  I -- and it's only because I --    01:05:22

no, but I -- I can't make a statement because    01:05:25

should it get out there, I'm being -- I would --    01:05:26

this is going to trial next -- next month.  So    01:05:29

what I've given you is public information from    01:05:32

here, and I don't want to give you anything else    01:05:35

because I can't.    01:05:38

Q.    Okay.    01:05:41

Page 138

- DR. HARTZMARK -

A.    I'll take this criticism any day.    01:05:43

Q.    Do you take criticisms from courts    01:05:51

personally?    01:05:53

A.    Yes.  I take criticisms from courts    01:05:56

personally.  This is -- this is important, right?    01:05:58

Do you -- I mean, I assume you've been criticized    01:06:05

by a judge for something.  Maybe never?    01:06:09

Q.    I agree, I take it personally.  But    01:06:11

it's our job here to talk through everything in    01:06:14

the record.  Right?    01:06:17

A.    And I just told you why he used the    01:06:19

word "criticism," one, and then used the pages to    01:06:23

talk about why there really is no criticism.    01:06:27

Q.    Okay.    01:06:37

MS. POSNER:  Do you have many more?    01:06:37

Because we're at another hour.    01:06:39

THE WITNESS:  Let's go through    01:06:43

these.    01:06:45

MR. TRAPS:  Two more.    01:06:45

MS. POSNER:  Two more?  So let's    01:06:46

finish that up and take lunch.    01:06:47

(Defendants' Exhibit 9 marked for    01:07:05

identification.)    01:07:08

BY MR. TRAPS:    01:07:08

Page 139

- DR. HARTZMARK -

Q.    All right.  This is Exhibit 9, In          01:07:11

re: Trust 2020 WL 1304400.                        01:07:14

          Do you recall this case generally?      01:07:24

A.    I recall this case.  I don't                01:07:27

remember ever seeing this document, though.       01:07:29

Q.    If you go to page 32.                        01:08:01

A.    I want to make clear.  Should we put         01:08:06

into the record what case this is?                01:08:08

Q.    I read the --                                01:08:10

A.    Oh, did you read the caption?               01:08:11

Q.    Not the full caption.  It's In re:          01:08:12

Matter of the Trusts Established Under the         01:08:14

Pooling and Servicing Agreements Relating to the  01:08:17

Wachovia Bank Commercial Mortgage Trust           01:08:19

Commercial Pass-Through Certificates,             01:08:22

Series 2007-C30, which is a mouthful, and it's    01:08:25

March 19, 2020.                                    01:08:31

A.    So I want to remind myself, so I            01:08:33

believe this is a contract dispute, contractual   01:08:36

dispute.  Correct?                                01:08:40

Q.    Do you recall whether it's a                01:08:47

contractual dispute or not?                        01:08:48

          (Witness reviewing document.)           01:08:49

A.    I believe there was money that was          01:08:56

Page 140

- DR. HARTZMARK -

given to one party that the other party                01:08:57

considered to be their money based on contracts.       01:09:01

And I think this was all about contracts.  This        01:09:06

is a pure contract dispute, and I think there was       01:09:11

language -- these are about commercial                 01:09:15

mortgage-backed securities.                            01:09:21

          And if I remember correctly,                 01:09:21

there -- you know, I don't know if you're              01:09:23

familiar, but commercial mortgage-backed               01:09:26

securities have, you know, basically a notebook        01:09:27

full of documents, and there were some                 01:09:30

contradictions within this document -- within the      01:09:40

documents.                                             01:09:45

          And so it wasn't clear who or which          01:09:45

parties were supposed to get this, I believe,          01:09:47

614 million in disputed funds.  So this is not         01:09:51

a -- I want to make clear, a 10b case, not an          01:09:53

efficiency case.  I don't believe there are any        01:09:57

issues about a common damages methodology and          01:10:00

whether it's applicable; so...                         01:10:03

          But if you can point out what                01:10:07

criticism there might be.                              01:10:12

     Q.    Go to page 45.  In the second               01:10:20

column, it says:                                       01:10:28

Page 141

- DR. HARTZMARK -

"The court has outlined several                    01:10:28

deficiencies in these expert reports in           01:10:30

this Opinion."                                     01:10:32

A.    Wait.  I'm sorry.  Where are we?             01:10:33

Q.    Second column.  First paragraph in           01:10:34

--                                                 01:10:35

A.    Where in the second column?                  01:10:35

Q.    First full paragraph.                         01:10:37

A.    Second, "Appaloosa's claims," or is          01:10:38

it --                                              01:10:42

Q.    Page 45.                                      01:10:42

A.    Oh, 45?  Sorry.  I was on 44.                01:10:46

Second paragraph on the left?                      01:10:50

Q.    On the right.                                 01:10:51

A.    On the right?  On the right.                 01:10:51

Q.    First full paragraph.                         01:10:52

A.    Okay.                                          01:10:53

Q.    "The court has outlined several              01:10:54

deficiencies in these expert reports in           01:10:56

this Opinion.  Dr. Hartzmark's economics          01:10:59

'think piece' was, in the Court's                 01:11:00

estimation, too attenuated from the               01:11:02

contract interpretation issues at hand to         01:11:04

be useful, and far outweighed by                  01:11:06

Page 142

- DR. HARTZMARK -

contemporaneous and other empirical    01:11:09

evidence."    01:11:10

   Do you see that?    01:11:18

  A. Yeah.  Yes.    01:11:18

  Q. Do you think the court got it wrong?    01:11:19

  A. I can't even remember.  I mean, this    01:11:20

is -- again, they don't agree with me.  He didn't    01:11:22

say that I'm not qualified.  He said there's    01:11:27

several deficiencies.    01:11:31

   But, again, I'm not sure how this    01:11:33

issue -- and I don't even remember the nature of    01:11:39

the technique that I used to calculate damages,    01:11:43

but this has no -- you know, again, he didn't    01:11:45

find me to be unqualified.    01:11:47

   I don't even see here or -- I mean,    01:11:50

maybe that -- I don't know whether you could say    01:11:52

that he -- I mean, he doesn't say that it's    01:11:55

unreliable.  He just says that it's -- you know,    01:11:57

again, we're dealing with issues.  I mean,    01:12:01

especially this one with contract interpretation.    01:12:03

   So there was a real legal component    01:12:06

to this that, you know, is -- is very different    01:12:08

than a 10b-5 securities litigation so.    01:12:13

   But you can take it as you will.    01:12:17

Page 143

- DR. HARTZMARK -

Q.    Okay.  This is the last one.

(Defendants' Exhibit 10 marked for

identification.)

BY MR. TRAPS:

Q.    On page -- sorry.  I'm introducing

as Exhibit 10, Multimatic Incorporated versus

Faurecia Interior Systems USA, Inc.  This is a

Sixth Circuit decision from 2009.

Do you recall this decision?

A.    Barely.  It was 15 years ago that

I -- I would have written my report.

And I will note that this is not a

class action.  This is not a securities case.

This is not a 10b-5 Exchange Act case.  This is

not a case related to market efficiency, nor is

it a case opining about a common damages

methodology because it is a theft of trade secret

case.

Q.    Do you recall your expert opinion

being excluded here?

A.    No.

Q.    Okay.  On page 9, the last paragraph

on the right column, it says:

"The district court excluded this

Page 144

- DR. HARTZMARK -

evidence under Federal Rules of Evidence                01:14:19

702 and 403, finding that Hartzmark's                   01:14:21

expert opinion rested on speculation and                01:14:24

his methodology had not been scientifically             01:14:27

tested, had not been subject to peer review             01:14:29

and was not generally accepted in the                   01:14:30

economic community.  We reviewed this                   01:14:32

decision for ... abuse -- "for an abuse of              01:14:34

discretion."                                            01:14:37

        Do you see that?                                01:14:39

A.    This is the appeal decision,                      01:14:39

correct?                                                01:14:41

Q.    Correct.                                          01:14:42

A.    Let me be clear, when you say my                  01:14:43

testimony excluded, I was qualified by the court;       01:14:45

I testified in front of a jury about my theory of       01:14:52

liability.  And as this suggests, I was not able        01:14:56

to testify in the $28.7 million of -- of lost           01:14:58

profits, or additional damages.                         01:15:04

        The idea was the exclusion was                  01:15:07

primarily associated with the fact that there was       01:15:14

an issue in this -- again, nonsecurities;               01:15:17

nonclass action, non-Exchange Act -- that there         01:15:20

was an issue with the validity of the data.  But,       01:15:23

Page 145

- DR. HARTZMARK -

understand, this was a theft of secret case.          01:15:26

And the president of the company --          01:15:30
who was not involved with the case, it was the          01:15:32
vice president of Sales -- would not allow the          01:15:34
financials of the company to be disclosed, of          01:15:38
Multimatic.  And I relied upon the vice president          01:15:41
of sales and his numbers that he testified.  And          01:15:44
the court still considered that to be          01:15:47
speculative.  And, therefore, they did not allow          01:15:53
me to give my number.          01:15:54

And -- but they did -- again, they          01:15:59
qualified me.  They said my theory of          01:16:00
liability -- my theory of damages was reliable.          01:16:04
But they just said the number, the input was not          01:16:06
there.          01:16:08

So even in this case, as it relates          01:16:09
to Wells Fargo, they allowed me to testify as to          01:16:11
my theory of damages and that there was a          01:16:16
methodology; it was the inputs in this particular          01:16:18
case.          01:16:20

And that was because of the concerns          01:16:22
the president of the company had in releasing          01:16:23
data to a company that, literally, had taken          01:16:25
their cross car beam and taken the designs to a          01:16:28

Page 146

- DR. HARTZMARK -

competitor and, therefore, they lost all their          01:16:33

business with Chrysler on the Seabring.          01:16:38

Q.    Okay.  I have a couple of questions          01:16:44

on your Appendix B, that may be efficient to --          01:16:45

MS. POSNER:  You're going to be          01:16:50

maybe, like, two more minutes?          01:16:50

MR. TRAPS:  Two more minutes.          01:16:50

MS. POSNER:  We've been going an          01:16:54

hour and 15 minutes.          01:16:56

THE WITNESS:  Okay.          01:16:56

BY MR. TRAPS:          01:16:57

Q.    And this is a list of materials          01:16:57

relied upon; is that right?          01:16:58

A.    Yes.          01:17:05

Q.    To your knowledge sitting here          01:17:05

today, are there any materials relied upon in          01:17:06

this report that aren't listed here in this          01:17:08

appendix?          01:17:10

A.    No.  With the condition that I have          01:17:16

a 40-year history in economics and, therefore,          01:17:17

there is materials that are the foundation of my          01:17:19

expertise and the fact that I am an expert in          01:17:23

economics that are not listed here.  But these          01:17:26

are the materials that I directly relied upon for          01:17:31

Page 147

- DR. HARTZMARK -

the purposes of writing this report and          01:17:34

expressing my opinions.                          01:17:35

Q.    Were there any materials you               01:17:38

considered for this case but did not rely upon?  01:17:39

MS. POSNER:  Objection as to        01:17:44

relevance.                                  01:17:45

A.    I mean, as it relates to sort of a     01:17:46

class certification report?  I can't remember   01:17:53

other materials that I considered.               01:17:58

Q.    Okay.  And there are -- you can take    01:18:01

my word for it -- around 35 judicial decisions   01:18:03

here listed.  Do you -- did you read those cases?  01:18:08

A.    I have read those cases, yes.          01:18:12

Q.    All of them?                           01:18:16

A.    All of them.                           01:18:17

Q.    Have you reviewed any deposition       01:18:20

testimony in this case?                          01:18:23

A.    I can't recall.                        01:18:25

Q.    Have you --                            01:18:27

A.    I will -- careful.  There's a series    01:18:28

of those cases that are decisions related to     01:18:31

reports or matters that I was engaged in, and I  01:18:37

would have reviewed the deposition testimony in  01:18:40

those cases.                                     01:18:42

Page 148

- DR. HARTZMARK -

Q.    I'm sorry.  I think the -- my fault.                    01:18:43

Have you reviewed any deposition                             01:18:45

testimony in this case, in the Wells Fargo case?             01:18:47

A.    Oh, no.                                                01:18:50

Q.    Have you reviewed any documents                        01:18:51

produced in this, the Wells Fargo case?                      01:18:53

A.    No.                                                    01:18:56

MR. TRAPS:  All right.  Let's take                           01:19:01

lunch.                                                       01:19:02

THE VIDEOGRAPHER:  We are now off                            01:19:05

the record.  The time on the video monitor                   01:19:06

is 1:18 p.m.                                                 01:19:08

(Lunch recess taken.)                                        01:19:10

Page 149

- DR. HARTZMARK -

A F T E R N O O N   S E S S I O N          01:19:10

--------------          02:07:30

THE VIDEOGRAPHER:  We are now back          02:07:30

on the record.  The time on the video          02:07:38

monitor is 2:07 p.m.          02:07:40

--------------

MICHAEL L. HARTZMARK, Ph.D.

resumed as a witness and testified further as follows:

--------------

CONTINUED EXAMINATION

MR. TRAPS:          02:07:46

Q.    Welcome back, Dr. Hartzmark.          02:07:46

You mentioned earlier in your          02:07:48

testimony today that you looked at the          02:07:49

correlation of squared residuals in VIX; is that          02:07:50

correct?          02:07:56

A.    Yes.          02:07:56

Q.    And what does that tell you?          02:07:56

A.    It tells me whether the variation of          02:07:58

the abnormal returns is related to the volatility          02:08:05

of the general market.          02:08:11

Q.    And if abnormal returns are related          02:08:19

to the volatility of the general market, what          02:08:24

does that tell you?          02:08:27

Page 150

- DR. HARTZMARK -

A.    It would suggest -- especially for    02:08:28

the purposes, say, of loss causation -- to    02:08:33

possibly that you might want to include that as a    02:08:36

variable, an explanatory variable in your    02:08:38

regression.    02:08:42

Q.    When you say "include it as an    02:08:44

explanatory variable in your regression," do you    02:08:47

mean volatility?    02:08:51

A.    Yeah.  A measure of.  Yeah, some    02:08:51

type of index.  It doesn't have to necessarily be    02:08:53

VIX.  I...    02:08:56

Q.    What if there was no correlation    02:09:18

between the -- sorry.  Strike that.    02:09:20

What if there was no variation    02:09:32

between the abnormal returns and the volatility    02:09:36

of the general market?    02:09:39

A.    That would suggest that your market    02:09:40

model, at least to the extent possible, is -- is    02:09:43

at least incorporating volatility, general market    02:09:50

volatility.    02:09:53

Q.    Do you recall what the correlation    02:09:57

between the squared residuals and VIX look like    02:10:03

in this case for the class period?    02:10:06

A.    I do not.  I don't recall.    02:10:10

Page 151

- DR. HARTZMARK -

Again, I looked at issues associated                02:10:16
with the COVID period, and decided for the          02:10:19
purposes, as I mentioned before, of examining       02:10:24
market efficiency, for the purposes of class        02:10:30
certification, that using the regressions that      02:10:33
I've relied upon was the appropriate way to go;     02:10:37
it would not bias my results.                       02:10:44

And, again, I did -- I didn't find                  02:10:47
any break in the -- in the period; I didn't find    02:10:52
a correlation with volatility.  And I looked at     02:10:55
the residuals.  I believe I even did -- I did a     02:11:01
lot of correlation.  You know, I showed there's     02:11:04
no autocorrelation through the whole period,        02:11:06
suggesting that there's prompt response to          02:11:09
information.                                         02:11:11

And I believe I looked at it, you                   02:11:15
know, sort of over a shorter period without         02:11:17
seeing that there was autocorrelation.              02:11:19

Q.    When you say the COVID period or the          02:11:22
shorter period, what period are you referring to    02:11:25
there?                                              02:11:28

A.    Well, part of the issue in this               02:11:30
particular case is that, you know, the "COVID       02:11:31
period," per se, you know, different experts will   02:11:35

Page 152

- DR. HARTZMARK -

define it differently.                                         02:11:42

          I think the press really looked at              02:11:43

it, say, from February, late February in the 20s,        02:11:45

you know, 21st, 22nd, you know, really through           02:11:49

the rest of the year.  And so that would be the          02:11:52

period.                                                   02:11:56

          But -- yeah, that would be, I think,           02:11:57

as I look at the COVID period.                            02:12:00

    Q.    So you considered the COVID period             02:12:02

to start in late February 2020; is that right?           02:12:05

    A.    In terms of its impact on markets.             02:12:07

I mean, I think -- I'm not going to go out there          02:12:12

and say what our president and other public               02:12:14

officials were saying.  I do remember I                   02:12:17

actually -- it hadn't really hit home.  I was            02:12:22

being deposed in mid-February; so...                      02:12:24

          By mid-February, you know, life was            02:12:27

sort of normal at that point, and I think markets         02:12:30

were reacting as if, you know, there was no COVID         02:12:32

period.                                                   02:12:36

    Q.    So for the COVID period, you said              02:12:48

you looked at correlation between squared                 02:12:50

residuals and VIX; is that correct?                       02:12:55

    A.    Wait.  Before the COVID period?                02:12:57

Page 153

- DR. HARTZMARK -

Q.    No.  For the COVID period, you took                02:13:00

a look at squared residuals versus VIX, correct?        02:13:02

A.    Yes.  I looked at a period, yeah,                  02:13:07

that incorporated what I'll call -- you can call        02:13:08

it, we can call it "the COVID period."                  02:13:11

Q.    And you don't recall the results of               02:13:13

that?                                                    02:13:15

A.    Just that there was no statistical                02:13:15

significance at the 5-percent-or-below level.           02:13:19

Q.    Is that analysis in your report, or               02:13:25

the backup to the report?                               02:13:27

A.    Well, the abnormal returns are in                 02:13:28

the backup to the report.  And VIX is publicly          02:13:30

available.                                              02:13:32

Q.    But did you -- presumably, you did                02:13:32

some form of analysis where you compared VIX to         02:13:37

the abnormal returns squared, correct?                  02:13:39

A.    Well, again, I -- I looked at some                02:13:43

data.  I don't rely upon that for my opinion.           02:13:45

But, you know, I didn't -- you know, I asked one        02:13:57

of my staff to look at it, and they would have          02:13:59

told me that it's not statistically significant.        02:14:01

Q.    And then you said you also looked at              02:14:06

autocorrelation specifically for the COVID              02:14:09

Page 154

- DR. HARTZMARK -

period; is that right?                                    02:14:11

A.    Yeah.  For the question of whether        02:14:12
there was heteroskedasticity.                            02:14:13

Q.    And do you recall what the result of      02:14:18
that analysis was?                                       02:14:20

A.    No.  Just that, again, there was no       02:14:23
statistically significant.                               02:14:27

I also -- I mean, as long as we're       02:14:28
-- are we talking about my report now?                   02:14:31

Q.    Yes.                                       02:14:33

A.    Okay.                                       02:14:33

Q.    Well, let me -- let me caveat that.        02:14:35
We're talking about things you did for your              02:14:37
report.                                                  02:14:39

A.    Okay.  I looked at what -- you know,        02:14:39
whether there was, what might be considered a            02:14:45
break in the parameters.                                 02:14:47

'Cause this is all we're talking         02:14:51
about right now.  I mean, to be clear, is the            02:14:53
parameters that you use to do statistical                02:14:55
inference, and the control period that is                02:14:58
utilized for it.                                         02:15:00

You know, and, again, let me make        02:15:01
clear, I objectively utilized the same exact             02:15:03

Page 155

- DR. HARTZMARK -

control period for every day for the 450 days of        02:15:06

the class period as opposed to potentially             02:15:10

manipulating the data or changing things to --         02:15:15

to, I don't know, get a result.  I don't do a          02:15:21

results-driven analysis.                               02:15:23

            And so I looked and the -- if              02:15:28

anything, in terms of the break of the                 02:15:31

parameters, it happened after the class period.        02:15:36

    Q.    Got it.                                       02:15:37

            But in terms of looking at whether          02:15:41

there was a break in the parameters, as you             02:15:42

referred to it, which parameters are you talking        02:15:45

about?  Which parameters did you look at?               02:15:47

    A.    Of the market model.                          02:15:49

    Q.    But which parameters of the market            02:15:51

model did you look at specifically?                     02:15:53

    A.    I looked at the beta coefficient --          02:15:55

    Q.    Okay.                                         02:15:57

    A.    -- associated with the general                02:15:57

market, 'cause that's what I was -- you know,           02:15:59

same thing can VIX; you're looking at the general       02:16:02

market.                                                02:16:05

    Q.    Okay.  You looked at the beta                 02:16:07

coefficient for the COVID period specifically?          02:16:10

Page 156

- DR. HARTZMARK -

A.    No.  I looked at -- actually,    02:16:15

through the whole period.    02:16:17

Q.    But as part --    02:16:18

A.    That is the whole period.    02:16:21

Q.    But as part of this check you did    02:16:23

that you're describing, you looked at it for the    02:16:24

COVID period specifically?  No?    02:16:27

A.    No.  I looked at it because of the    02:16:28

COVID period, not -- no.  I -- you know, we went    02:16:32

through.  I'm a president of MDA Financial.  I    02:16:35

have a fairly sizeable net worth.  You know, and    02:16:39

I live in the U.S.A.  I knew there was -- there    02:16:41

were market issues in that period.    02:16:47

And so, you know, I -- I didn't    02:16:48

ignore it.  I just it didn't -- it didn't call    02:16:51

for any, any sort of specific issues to do it, to    02:16:55

evaluate it and change the nature of the way I    02:17:00

did my regressions, which is the way I've always    02:17:03

done my regressions.    02:17:07

I didn't sort of reverse-engineer it    02:17:08

after the fact, especially since regressions are    02:17:13

dealing with predicted.  And so you got to sort    02:17:15

of ask yourself, okay, during a control period,    02:17:18

you're trying to get a predicted amount.    02:17:22

Page 157

- DR. HARTZMARK -

So there's -- there's always    02:17:23

questions open as to the control period, and then    02:17:25

the parameters that come out from the regression    02:17:27

over the control period.    02:17:29

Q.    I understand that you did your    02:17:32

regression for the entire class period, which    02:17:33

includes the COVID period.    02:17:37

A.    No.  I did 450 regressions.  I    02:17:39

didn't do a regression.    02:17:43

Q.    And you say you did 450 regressions    02:17:44

because you do regression for each day with the    02:17:46

120-day --    02:17:48

A.    Right.    02:17:48

Q.    -- pre-window control period; is    02:17:49

that right?    02:17:54

A.    Correct.    02:17:54

Q.    Okay.  Besides that regression, or    02:17:55

those regressions in the COVID period, and    02:17:57

besides looking at the correlation of    02:18:03

squared abnormal returns versus VIX, what else    02:18:05

did you look at for the COVID period    02:18:12

specifically?    02:18:14

MS. POSNER:  Objection.  Asked and    02:18:14

answered.  But if you could --    02:18:20

Page 158

- DR. HARTZMARK -

A.    Yeah.  I thought I answered that.  I    02:18:20
looked at the -- whether there was any, what we    02:18:22
call autocorrelations specifically for that    02:18:26
period, and I looked for any break points.    02:18:28

Q.    Okay.  And I'm --    02:18:31

A.    And that, actually -- and, again, I    02:18:33
mean, I -- the break point, the only reason I    02:18:33
look for break -- you can have a break point at    02:18:35
the early part of the period.  I looked at it    02:18:38
because of COVID.    02:18:41

Q.    Okay.  And on that point, on the    02:18:42
break point, what specifically are you looking    02:18:43
for?    02:18:45

A.    In the terms of the break point as    02:18:45
to whether there's coefficient change, whether    02:18:48
the coefficient changes, you know, at a    02:18:50
particular date.    02:18:57

Q.    Okay.  Anything else we haven't    02:18:57
talked about that you did specifically for the    02:19:00
COVID period?    02:19:05

A.    As I said before, I examined the    02:19:05
residuals graphically.  That's a common approach    02:19:07
in, you know, your basic econometrics.    02:19:10

And, you know -- and, again, anyone    02:19:17

Page 159

- DR. HARTZMARK -

can make any adjustment they want to the -- to                02:19:19

the data that I have.  I was asked a question --             02:19:21

to answer the question about cause-and-effect.               02:19:24

And, therefore, assuming we're talking about my              02:19:28

report as opposed to just general issue, I was               02:19:31

asked to look at cause-and-effect.                           02:19:33

There are no earnings dates that are                         02:19:35

affected by this so-called "COVID period."  The              02:19:39

nature of the alleged -- you know, the issues                02:19:42

associated with significance and not significance            02:19:49

are biased against the plaintiffs' position.                 02:19:51

And I did not do any adjustments                             02:19:57

that possibly would be done if you were doing a              02:19:59

loss causation report.                                       02:20:02

Q.    I just want to understand if you did        02:20:05

any other analyses for the COVID period other                02:20:06

than what we've discussed.                                   02:20:08

A.    No.                                          02:20:09

Q.    Okay.  And --                                02:20:10

A.    That I can recall right now.                 02:20:12

Q.    Okay.  And then you say, "The issues         02:20:14

associated with significance and not significance            02:20:16

are biased against the plaintiffs' position."                02:20:18

What do you mean by that?                                     02:20:22

Page 160

- DR. HARTZMARK -

A.    Well, you were alluding to the                 02:20:22

fact -- and I don't know this as a fact -- that      02:20:27

maybe there is a proportion, you had said            02:20:29

possibly 31 percent over a certain period where      02:20:31

there are statistically significant dates.  You      02:20:34

were talking in my article.                          02:20:39

Q.    I was just reading your article to             02:20:41

you.                                                 02:20:43

A.    Well, you were trying to ask me                02:20:43

about bright-line numbers.                           02:20:45

Q.    Yes.                                           02:20:47

A.    To the extent that there are -- that           02:20:48

the standard error of the regression would be        02:20:53

adjusted upwards in some way -- okay? -- and then    02:20:56

you're dealing with the battle of the experts:       02:21:01

exactly how is it adjusted.  Okay?                   02:21:03

To the extent that they were                         02:21:05

adjusted, that would cause there to be fewer         02:21:06

statistically significant dates during the COVID     02:21:09

period, which would then mean, since those are       02:21:13

all non-news dates, that the proportion of           02:21:15

non-news dates with statistically significant        02:21:21

dates would fall.                                    02:21:23

Which would mean that my results,                    02:21:23

Page 161

- DR. HARTZMARK -

when I compare news dates and the statistical        02:21:25

significance and non-news dates, would be            02:21:29

stronger.  And you can't get much more stronger      02:21:32

than 99 percentile.  Maybe we can get                02:21:34

99.9 percent confidence; but...                      02:21:37

          So, again, and as I told you before,       02:21:44

you got to look at the problem that is -- that       02:21:46

you've been asked to evaluate.  The problem is:      02:21:48

Is there -- is it an efficient market?               02:21:51

          Cause-and-effect: look at the news         02:21:54

dates versus the non-news dates; try to be as        02:21:56

objective as possible; use guidance; use earnings    02:22:02

dates.  Okay?  Which is what I did.  Keep the        02:22:06

regression the same; don't use hindsight to          02:22:09

reverse-engineer statistically significant dates     02:22:12

or insignificant dates.                              02:22:14

          And so based on the analysis that I        02:22:15

did -- the break point, the analysis of the          02:22:16

abnormal returns squared, the residual returns --    02:22:20

I objectively determined that, for this problem,     02:22:24

it was conservative for me to run the regressions    02:22:27

as I've presented in this report, and as I feel      02:22:31

very comfortable strongly support the fact that      02:22:34

the co -- that the Wells Fargo stock traded in an    02:22:38

Page 162

- DR. HARTZMARK -

efficient market.                                                02:22:41

Q.    Let's -- I want to ask you about                          02:22:45

some specific passages from your report.  If you                02:22:47

go to page 7, paragraph 12.  Are you with me?                   02:22:53

A.    Yes.                                                       02:23:10

Q.    The first sentence there says:                            02:23:10

"A market is defined as being                                   02:23:12

informationally efficient if prices of                          02:23:14

securities trading in that market reflect                       02:23:15

all material, publicly available                                02:23:17

information."                                                   02:23:19

Do you see that?                                                02:23:21

A.    Yes.                                                       02:23:21

Q.    All right.  I assume you agree with                       02:23:24

that definition --                                              02:23:27

A.    Yes.                                                       02:23:28

Q.    -- because you stated it?                                 02:23:28

A.    Yeah, I cite it.  And I cite to the                       02:23:29

father of finance, Professor Fama.                              02:23:31

Q.    So going off of that definition, if                       02:23:38

you suppose a hypothetical market in which prices               02:23:40

of securities trading in the market do not                      02:23:42

reflect all material, publicly available                        02:23:46

information, you would agree that that would be                 02:23:49

Page 163

- DR. HARTZMARK -

an informational inefficient market, correct?                    02:23:50

MS. POSNER:  Objection as to form.                    02:23:55

A.    Read it back, because I think it's                    02:23:55

wrong.  I don't agree.                    02:23:56

Q.    Okay.  I'm trying to get at the                    02:23:58

converse of your statement.                    02:24:01

Let's say a market, the prices of                    02:24:01

securities trading in that market do not reflect                    02:24:08

all material, publicly available information.                    02:24:11

A.    But they reflect some?                    02:24:15

Q.    They reflect some or not; they don't                    02:24:18

reflect all.                    02:24:22

A.    Well, then, that's an absurd notion.                    02:24:23

That's a perfect market which doesn't exist.                    02:24:25

Q.    Sorry.  Why do you say that?                    02:24:28

A.    You can't have -- you can have --                    02:24:29

let me put it to you in statistical terms.                    02:24:30

You can have statistically                    02:24:33

significant returns that do not reflect material                    02:24:34

information -- the nature of markets are such                    02:24:37

that you can have movements -- and then you can                    02:24:38

have material information that might not be                    02:24:40

reflective, for example, in a day, which is what                    02:24:44

I used to measure, and, you know, it would take                    02:24:47

Page 164

- DR. HARTZMARK -

time.                                                        02:24:51

          Over time, I think that the idea              02:24:51

that securities prices reflect material, publicly        02:24:54

information is -- is one of the well-founded             02:24:59

principles.  I mean, it is a principle now, a           02:25:03

fundamental principle of finance.  So I'm               02:25:05

confused by the question.                               02:25:09

          You know, you can have -- the world           02:25:13

isn't -- you know, isn't perfect; the market            02:25:16

models are not perfect.  And, therefore, you can        02:25:19

have statistically significant returns without          02:25:22

information, and you can have information without        02:25:24

statistically significant returns.                      02:25:27

     Q.    Let me -- let me do it this way.             02:25:28

          You define an efficient market here,          02:25:30

right?                                                   02:25:35

     A.    Uh-hmm.                                       02:25:35

     Q.    How do you define an inefficient            02:25:35

market?                                                  02:25:37

     A.    How do I define an inefficient             02:25:37

market?                                                  02:25:39

     Q.    Yeah.                                         02:25:39

     A.    Like the market -- or the stock of           02:25:40

the company that I ran, Cragar.                         02:25:42

Veritext Legal Solutions

215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 165

- DR. HARTZMARK -

Q.   Well, that's an example.  Right?   02:25:44
How would you define it?   02:25:45

A.   How would I define it?   02:25:46

Q.   Yeah.   02:25:48

A.   Illiquid.   02:25:49

Q.   Okay.   02:25:50

A.   Okay?  Almost no following.   02:25:50

Q.   Okay.   02:25:51

A.   The ability to go in and move   02:25:51
prices.   02:25:53

Q.   Ability by who?   02:25:54

A.   What's that?   02:25:55

Q.   Ability by who?   02:25:56

A.   By traders.   02:25:57

Q.   Okay.   02:26:00

A.   Or me if I wanted to.   02:26:00

Q.   Okay.   02:26:03

A.   Those are character -- again, I'm   02:26:03
looking at this overall.  Right?   02:26:05
An illiquid market; no following.   02:26:07
Okay?  Ability to move market not based on   02:26:10
information but purely on supply and demand.  You   02:26:14
can also -- I don't want to say manipulate   02:26:20
prices.   02:26:22

Page 166

- DR. HARTZMARK -

You know, small market caps 'cause    02:26:23
it doesn't really -- you know, again, it's not    02:26:25
going to be a market where traders are competing;    02:26:29
it's not going to be a $280 billion company.  It    02:26:31
costs a substantial amount of money to get in,    02:26:37
you know.  You got bid/ask spreads, you know, if    02:26:40
you're lucky at a dollar.  I mean, that's an    02:26:43
inefficient market.    02:26:46

Q.    Okay.  If you assume an efficient    02:26:52
market, when would you expect the price of a    02:26:58
security to start reacting to new material,    02:27:00
publicly available information?    02:27:03

A.    I thought I answered this.    02:27:06
Information, there's different types of    02:27:08
information, and the factors involved in    02:27:11
disseminate -- disclosing, disseminating, and    02:27:14
digesting that information will cause the    02:27:16
information to be -- move different, different    02:27:19
amounts.    02:27:22

I did a report a while ago where    02:27:22
there was an almost unrelated posting on a    02:27:26
bulletin board, a very important material    02:27:31
information about a company, and it was the sort    02:27:34
of thing where the investors would never have    02:27:36

Page 167

- DR. HARTZMARK -

gone to that bulletin board.                                                02:27:39

          Well, it took a couple of days                                   02:27:40

before it got out and was disseminated.  In that                           02:27:42

case, disseminate -- once disseminated, it was                             02:27:45

actually digested pretty quickly.  Sometimes                               02:27:48

those things take time to even get digested.                               02:27:51

          Where it's disclosed; how it's                                   02:27:54

disclosed; how it is disseminated; how it -- what                          02:27:57

the information is, as we discussed before, there                          02:28:00

are all types.  It will be -- likely will be                               02:28:02

different when you have, you know, some type of                            02:28:06

congressional hearing where there are disclosures                          02:28:08

as opposed to a previously announced conference                            02:28:11

call or investor event.                                                    02:28:16

     Q.    So help me with that.  You mentioned                            02:28:17

"some type of congressional hearing."  Which way                           02:28:22

does that cut for how fast?                                                02:28:28

     A.    I'm not going to -- you know, you                               02:28:30

can come up with all types of anecdotes or, as I                           02:28:32

said before, "N equals one" sample.                                        02:28:36

          All I'm saying -- the point I'm                                  02:28:38

giving you is -- is -- you had asked when it                               02:28:39

might be different.  Okay?  As to -- for me to                             02:28:40

take out a crystal globe, I wouldn't be here                               02:28:43

Page 168

- DR. HARTZMARK -

right now.  Because if I was that smart, I'd be                02:28:50

rich if I knew exactly from what source, how                  02:28:53

long, how the information would be there.                      02:28:55

You know, that's what people at                                02:28:58

these hedge funds attempt do, even though                      02:29:00

academic research shows they're not successful at             02:29:01

it.  But -- because the markets are so efficient              02:29:04

for stocks like Wells Fargo.  But the nature of               02:29:08

the information doesn't allow you to come up with             02:29:10

a -- with a boilerplate template.                             02:29:11

Q.    Let's look at paragraph 56.                             02:29:41

Page 28.                                                       02:29:50

A.    Page, and then 32 of 766.                              02:29:51

Q.    Correct.                                                02:29:56

A.    Yeah.                                                   02:29:57

Q.    The first sentence there says:                         02:29:58

"To detect whether the price of                               02:30:01

Wells Fargo common stock rapidly reacted to                   02:30:02

disclosures of material, new information, I                   02:30:06

ran a series of empirical tests using the                     02:30:08

results from an event study."                                 02:30:10

Do you see that?                                              02:30:12

A.    Yes.                                                   02:30:12

Q.    And what did you mean by "rapidly"?                    02:30:12

- DR. HARTZMARK -

A.   What did I mean by "rapidly"?

Q.   Yes.

A.   I told you.  I said that in the analysis -- and, again, holistic analysis, 450-day sample, I asked the question of, Did it react within a day?  That was the definition right here.

Q.   Yeah.  Okay.

Later on in your report, you discuss the concept of intraday pricing; is that correct?

A.   Can you show me where you're referring to?

Q.   I would have to do a control F, but I believe it's at the very, very end of your report.

A.   Oh, okay.  See what you meant.  I think you're talking about...

Q.   I believe it's paragraph 90.

A.   90, yeah.  Yes.

Q.   You refer there to intraday pricing; is that right?

A.   Yes.  I refer there.

Q.   So what is intraday pricing?

A.   Intraday pricing?

Page 170

- DR. HARTZMARK -

Q.    Yes.                                                  02:31:16

A.    It's pricing within the day.                         02:31:17

Q.    And can you be more specific?                        02:31:22

How would you use intraday pricing                         02:31:23

in your -- in your analysis?                               02:31:27

MS. POSNER:  Objection.  Which                             02:31:31

analysis are you referring to?                             02:31:31

A.    Yeah.                                                02:31:32

Q.    Any kind of analysis.                                02:31:32

A.    I would look at intraday pricing on                  02:31:33

different time intervals; a minute, five minutes,          02:31:35

50 minutes.                                                02:31:38

Q.    And if it takes a day or more for                    02:31:41

information to be digested into the price of a             02:31:43

market, how do you do intraday pricing in that            02:31:45

scenario?                                                  02:31:48

A.    If it takes -- I'm confused by your                  02:31:53

question.                                                  02:31:56

Q.    Let's say in a certain market, it                    02:31:56

takes over a day for information to be digested            02:31:57

into the price of the security, would intraday             02:31:59

pricing be useful in that scenario?                        02:32:04

A.    Possibly.                                            02:32:06

Q.    Okay.  Under what scenario would it                  02:32:06

Page 171

- DR. HARTZMARK -

be useful?                                                    02:32:08

          MS. POSNER:  Objection as to form.                  02:32:11

     It's an incomplete hypothetical.  But go                 02:32:12

     ahead.                                                   02:32:18

     A.     I mean, with respect to -- I mean,                02:32:18

you can look at a disclosure and the time of a                02:32:20

disclosure, and then follow what happens                      02:32:24

thereafter and see how long it takes.  There's                02:32:25

academic research that does that.                             02:32:29

     Q.     Which academic research is that?                  02:32:32

     A.     I -- I got 40 years' worth of                     02:32:34

articles that I've read.  I don't remember.  You              02:32:37

can ask your economic expert.  But there's --                 02:32:40

there's academic research that has looked at                  02:32:43

response to disclosures and intraday data.                    02:32:46

     Q.     Okay.  Back to paragraph 12 to your               02:32:55

definition of an efficient market there.                      02:33:09

     A.     Say that again?                                   02:33:10

     Q.     I'm just referring back to your                   02:33:11

definition of an efficient market.                            02:33:13

          My question is:  If the same                        02:33:16

information that had already been released                     02:33:21

publicly is released a second time, should that               02:33:25

have a price impact on an efficient market?                   02:33:28

Page 172

- DR. HARTZMARK -

MS. POSNER:  Objection.  Incomplete.          02:33:31

But go ahead.          02:33:32

A.     The question is, is there -- first          02:33:35

of all, the hypothetical is, you know, not          02:33:37

complete.  And it's not clear that, you know,          02:33:44

sort of nothing has happened in between.          02:33:46

If I say A and then a second later          02:33:48

say A, and I expect it to react in a -- in -- you          02:33:50

know, in that time period, then, you know, the          02:33:54

second A probably is -- is not there.          02:33:58

Seldom have I been involved in          02:34:00

situations when there is identical information as          02:34:02

well.  You know, there's often information about          02:34:07

X, and then there's specific information about X,          02:34:10

and they both have impact on the -- on the          02:34:16

market.          02:34:18

Q.    So, hypothetically, if it's the          02:34:20

identical information, in that hypothetical,          02:34:22

under what circumstances would that second          02:34:26

disclosure of the same identical information          02:34:28

still have price impact in an efficient market?          02:34:30

A.    Well --          02:34:33

MS. POSNER:  Objection.  Incomplete          02:34:33

hypothetical.  But go ahead.          02:34:34

- DR. HARTZMARK -

A.    Yeah, I mean, you know, for -- one    02:34:35
example would be if the perceived risk, for    02:34:37
example, associated with, you know, the cash flow    02:34:41
in your extreme hypothetical, and a hypothetical    02:34:44
that I've never come upon, were, was to -- was to    02:34:48
change, that might change the price of a stock.    02:34:52

Because the -- one of the    02:35:00
fundamental principles in finance is that the    02:35:01
stock price is the discounted value of the    02:35:02
expected cash flow.    02:35:05

Actually, then, it would also -- if    02:35:08
the expected cash flow were to change between    02:35:10
those two parts because of something that might    02:35:12
have happened in between, then you might expect    02:35:15
to see identical information.    02:35:18

Q.    Then you might --    02:35:20

A.    But I -- again, your hypothetical is    02:35:22
identical information.  And as I said, I find    02:35:24
that, you know, a little farfetched that it's    02:35:30
identical.    02:35:33

Q.    You referred to Eugene Fama as "the    02:35:37
father of modern finance," I think you just    02:35:52
referred to him in testimony.  Is --    02:35:55

A.    Possibly.    02:35:56

Page 174

- DR. HARTZMARK -

Q.    -- that correct?                                02:35:56

A.    I was not the person who came up            02:35:57

with that moniker.                                    02:35:58

Q.    Who came up with that moniker?             02:36:00

A.    Who came up with that moniker?  I          02:36:03

have no idea.  I know that he won a Nobel prize.      02:36:05

I know that his foundation is in finance, I think     02:36:08

it's in 1976, it's -- is a classic.                  02:36:12

I mean, Eugene Fama, I would think            02:36:15

if you went, certainly, to anybody of my              02:36:18

generation and asked him if they've ever been         02:36:21

touched by finance, they would know Eugene Fama.      02:36:23

Q.    If you go to paragraph -- sorry.           02:36:29

Paragraph 12, footnote 13.  You quote Fama there:     02:36:32

"A market in which prices always             02:36:36

'fully reflect' available information is         02:36:40

called 'efficient.'"                             02:36:43

Do you see that?                         02:36:46

A.    Uh-hmm.                                    02:36:47

Q.    Do you agree with that statement?          02:36:48

A.    There are two things.  First of all,       02:36:51

that's a 1970s article.  His step back his -- his     02:36:52

issue in terms of -- of what he, I believe --         02:36:56

and, again, I don't want to necessarily put           02:37:00

Page 175

- DR. HARTZMARK -

thoughts into his mind -- but fully reflect.  You                02:37:03

know, he never believed the markets,                             02:37:08

fundamentally, have -- reflecting, in essence,                   02:37:10

were always correct.                                             02:37:12

        But I think he's -- he has agreed                02:37:14

that there are, you know, anomalies and such that                02:37:16

happen but disappear.  And, you know -- and that,                02:37:19

you know, market efficiency is one of the -- you                 02:37:22

know, one of the few empirical observations that                 02:37:25

has, you know -- that is sort of agreed upon by,                 02:37:27

you know, most economists, you know, give or                     02:37:32

take, again, anomalies here and there.                           02:37:35

    Q.   Can you turn to page 8, paragraph           02:37:46

14.                                                              02:37:54

       (Witness complying.)                             02:37:54

    Q.   I'm looking at the third sentence.           02:37:59

You say:                                                        02:38:03

       "As explained below, it is important              02:38:04

    to understand that assessment of market          02:38:05

    efficiency does not turn on any one single       02:38:08

    factor, rather, it is an assessment of all       02:38:10

    the factors together that allows one to          02:38:12

    determine whether the market for a security      02:38:14

    is efficient."                                   02:38:16

Page 176

- DR. HARTZMARK -

Q.    Do you see that?                           02:38:19

A.    Yes.                                       02:38:19

Q.    And you -- and you testified              02:38:20
similarly to that already today, correct?       02:38:22

A.    Yes.  It's, again, holistic approach      02:38:26
or you -- you look at the basket of factors.    02:38:29

Q.    And then in the footnote to that,         02:38:32
you say, "nor is it necessary to show support   02:38:36
from every factor."  Do you see that?           02:38:39

A.    Yes.                                       02:38:41

Q.    And you cite a support for that, two      02:38:43
cases; is that right?                           02:38:46

A.    Yes.                                       02:38:47

Q.    Any basis in published financial          02:38:52
economics for -- for that particular statement, 02:38:55
that "nor is it necessary to show support from  02:38:58
every factor"?                                  02:39:00

A.    Well, most of academic research           02:39:03
deals with, you know, a single factor, and, you 02:39:06
know, there's -- there are acad -- there's      02:39:09
academic research related to volume and turnover, 02:39:12
the issues of bid-ask spread.  And, you know,   02:39:17
I've not come upon sort of the single magic     02:39:24
bullet.                                          02:39:27

Page 177

- DR. HARTZMARK -

So is there -- I mean, it's -- you   02:39:28
know, the nature of open, well-developed, and   02:39:34
efficient markets incorporate all of the -- you   02:39:40
know, the academic research, and the sort of one   02:39:43
by one.  And, you know, the Cammer factors have   02:39:46
been -- and Cammer and Krogman factors have   02:39:54
evolved based on this research on these   02:39:58
individual components.   02:40:00

The basic idea -- again, we talked   02:40:02
about Dynex -- right? -- where the court   02:40:05
determined that it wasn't.  And this is why I'm   02:40:07
citing to court cases.  You know, the 57 days was   02:40:10
-- was adequate there; it didn't meet every   02:40:12
factor.   02:40:17

There was a certain amount of   02:40:17
analysts, for example, were following -- if my   02:40:19
recollection is correct, Dynex -- and the price   02:40:22
responded in terms of cause-and-effect even   02:40:24
though it took time.   02:40:28

But in terms of the courts, I don't   02:40:29
think there's been any support for focusing on a   02:40:32
single individual factor.  They focus on a   02:40:37
basket, at least that's been my experience.   02:40:39

If fact, I even say "it's explained   02:40:59

Page 178

- DR. HARTZMARK -

below."  So it's not just this one footnote here, it's everything below there.    02:41:01    02:41:04

Q.    Let's go to where you introduce the factors.    02:41:35    02:41:40

Before we get do that, so, I mean, you go over in your report the various Cammer and Krogman factors, correct?    02:41:47    02:41:48    02:41:53

A.    Yes.  I discuss them.    02:41:58

Q.    I understand your view that they are treated at the basket.  In your view, is any one of the factors necessary to establish efficiency?    02:41:59    02:42:01    02:42:04

A.    In a general sense?    02:42:08

Q.    Yes.    02:42:12

A.    I mean, what are we talking about?    02:42:12

Q.    Let's start in a general sense.    02:42:15

A.    You can't answer that question.  I mean, it's -- I mean, no.  I mean, in Wells Fargo case, I mean, that's sort of odd questioning 'cause all the factors support it.  But as I said before, there's not one that I would weigh more.    02:42:16    02:42:18    02:42:22    02:42:24    02:42:31

And I'm an economist, and that's why I get hired, I believe, is I look at the situation, and I try to do the best I can to assist the court in making that evaluation.    02:42:33    02:42:35    02:42:37    02:42:41

Page 179

- DR. HARTZMARK -

Q.    Okay.  But let's say you're                    02:42:43

evaluating the efficiency of Wells Fargo common      02:42:45

stock, the market for Wells Fargo common stock.      02:42:52

A.    I did.  I don't have to hypothesize            02:42:53

about that.                                          02:42:57

Q.    Let's say you're starting that                 02:42:57

analysis.                                            02:42:59

A.    Okay.                                           02:42:59

Q.    Would you view any of the factors as           02:42:59

necessary to establish that Wells Fargo common       02:43:02

stock is efficient; meaning, if that factor is       02:43:04

not identified as favoring efficiency, the market    02:43:07

is inefficient, in your conclusion?                  02:43:12

A.    It's a hypothetical that you can't             02:43:14

answer.  But I can't imagine that I would make       02:43:16

that decision based on one factor when I just        02:43:18

told you I make the decision based on 12 in a        02:43:21

basket.                                              02:43:24

Q.    Is that --                                     02:43:25

A.    In a holistic approach.  What you're           02:43:26

saying is I would throw out the approach that        02:43:27

I've used for 20 years and that the courts have      02:43:30

certify classes on, and -- and base it on one        02:43:35

single factor?                                       02:43:38

Page 180

- DR. HARTZMARK -

I don't think that would be -- that would -- it wouldn't -- it wouldn't make sense.

Q.    So you can't sitting --

A.    There's a reason, there's a reason the courts have evolved for, you know, at least five if not 12 or more factors.

Q.    So is it fair to say that no individual factor is necessary to find efficiency?

A.    I'd say that all eight of the factors, in combination, should be evaluated to make a determination of whether it's efficient.

Q.    Yes or no, is it necessary?  Is any one of these factors necessary to establish efficiency?

MS. POSNER:  Objection.  Asked and answered a few times now.  But if you can answer it differently, go ahead.

A.    You know, it depends on the specific circumstances.  Okay?

For example, Wells Fargo actually filed S-3.  Okay?  Is that necessary that they have filed it, I would say no.

Q.    Okay.  So that factor is not

- DR. HARTZMARK -

necessary?                                                      02:44:43

A.    Well, it's helpful.  Okay?  But,                          02:44:44

again, by itself, I don't know what it tells me                 02:44:54

other than they filed it or didn't.  And -- you                 02:44:56

know, and that the SEC considers it to be widely                02:44:58

enough disseminated information, that they're                   02:45:00

allowed to file an S-3.  You know, that's --                    02:45:04

that's a vote of SEC confidence.                                02:45:06

These are -- these are different                                02:45:08

ways to -- to measure, you know, what are                       02:45:09

different markets.                                              02:45:11

Q.    I understand that.  But I still                           02:45:19

don't think you're really answering the question,              02:45:20

which is:  For Wells Fargo common stock, are all                02:45:23

of these factors necessary to a finding of                      02:45:25

efficiency?                                                     02:45:27

MS. POSNER:  Objection.  Asked and                              02:45:27

answered.                                                       02:45:28

A.    In my opinion, the basket of factors                      02:45:28

strongly supports efficiency.  I wouldn't want to               02:45:31

weight more -- one more than the other.                         02:45:35

Q.    Okay.  I'll move on.                                      02:45:42

Is any one of these factors                                     02:45:43

sufficient to establish efficiency by itself in                 02:45:45

Page 182

- DR. HARTZMARK -

Wells Fargo's case?                                           02:45:47

A.    Again, I wouldn't want to rely on a          02:45:49
single factor, and that's why I rely on all 12.    02:45:51

Q.    Okay.  I take it there's no                  02:45:54
particular combination of factor that's necessary  02:45:58
or sufficient for market efficiency?               02:46:01

A.    I've given you a combination of              02:46:05
factors that, in my opinion, supports that the     02:46:07
common stock of Wells Fargo trades in an           02:46:12
efficient market.                                  02:46:14

Q.    I guess I'm trying to understand; if         02:46:16
we find out that you're wrong on one of these      02:46:19
factors, you find out that you made a mistake as   02:46:21
to one of the factor, I'm trying to understand     02:46:23
out how that would affect your overall             02:46:25
conclusions and analyses.                          02:46:26

A.    So we find out that there's actually         02:46:27
no trading in Wells Fargo stock?                   02:46:29

Q.    We find out it didn't file an S-3.           02:46:30
A hypo.                                             02:46:34

A.    Okay.                                         02:46:35

Q.    You're at deposition.                        02:46:35

A.    But it's still --                            02:46:37

Q.    It's a hypo.                                 02:46:36

Page 183

- DR. HARTZMARK -

A.    But it's eligible and it's current.    02:46:39

Q.    So you would have to examine the    02:46:41
hypo is what you are saying?    02:46:44

A.    What is that?    02:46:45

Q.    You would have to examine the hypo?    02:46:46

A.    Yes.    02:46:48

Q.    Okay.    02:46:48

A.    I mean, it would only make sense.    02:46:48

Q.    Okay.  And what about if the    02:46:53
operational factors all supported efficiency,    02:46:54
would the price factors contradict it here?    02:46:56

A.    I'd have to look at it.  That's been    02:47:00
an issue in -- in matters.    02:47:02

But, again, I would look -- I'd have    02:47:04
to be very comfortable in my conclusions.  Okay?    02:47:10
I mean, but it's not really relevant in this    02:47:14
particular case because all the operational    02:47:16
factors all ten of them, clearly support market    02:47:21
efficiency, as I define it.  And two, that when    02:47:24
examining autocorrelation and cause-and-effect    02:47:28
based on earnings dates, there's strong support    02:47:31
that the market is efficient.    02:47:34

So in this particular case, you    02:47:35
know, there's -- the whole basket is -- you know,    02:47:37

Page 184

- DR. HARTZMARK -

weighs in favor, and it's a heavyweight in favor          02:47:41

of market efficiency.                                     02:47:45

Q.    Okay.  Let's have -- start from this                02:47:46

case.                                                     02:47:49

We look at Wells Fargo common stock                       02:47:49

for a different period, not this class period,            02:47:50

some other period of time.  Okay?  You run the            02:47:52

same regression, type of regression; you show no          02:47:55

statistically significant abnormal returns for            02:47:59

Cammer factor five; the other factors all stay            02:48:02

the same, show efficiency.                                02:48:06

What's your conclusion in that case?                      02:48:08

A.    In that particular --                               02:48:10

MS. POSNER:  Same objection.                              02:48:12

Incomplete hypothetical.  But go ahead.                   02:48:13

A.    In that particular situation, I                     02:48:14

would evaluate the results that you just put              02:48:15

forth.                                                    02:48:20

For example -- and I thought we                           02:48:25

talked about this before, that -- and it's one of         02:48:26

the issues as to why you don't rely wholly on             02:48:28

cause-and-effect as it relates to news/no news.           02:48:33

What if the fraud associated with                         02:48:37

the company is that they are guiding earnings;            02:48:40

Page 185

- DR. HARTZMARK -

they're manipulating them so that they meet                     02:48:42

expectations every quarter for seven quarters in               02:48:44

a row, and that when there's an earnings                       02:48:49

announcement, there's no change in the price                   02:48:52

because they've met their earnings.                            02:48:53

       I mean, you can find that and still             02:48:59

have an efficient market.  But you -- that's why               02:49:00

you wouldn't rely wholly on that.  And you might               02:49:02

look, you know, to the extent it was necessary in              02:49:06

that particular non -- certainly not Wells Fargo               02:49:09

related.  I mean, it's totally irrelevant as it                02:49:13

relates to Wells.  But in that particular                      02:49:16

circumstance, you go to the next step, at                      02:49:18

minimum.                                                       02:49:21

       But, again, I would argue that you             02:49:21

would look at all the 12 factors as a whole to                 02:49:23

make that conclusion, and take into account the                02:49:26

fact that the company that's under examination is              02:49:29

guiding earnings or is meeting expectations.                   02:49:33

    Q.   What do you mean by "but in that               02:49:38

particular circumstance, you go to the next step,              02:49:40

at minimum"?  What is the next step there?                     02:49:41

    A.   If -- if I were to observe that, I            02:49:44

would look at autocorrelation and try and get a                02:49:48

Page 186

- DR. HARTZMARK -

sense of that.  I would say that that's                           02:49:50

supportive.                                                       02:49:54

I maybe try a different type of                                   02:49:54

news.  You know, for example, it's publicly                       02:49:59

available.                                                        02:50:01

I did a matter wherein this was a                                 02:50:03

discovery company.  It had very little revenue.                   02:50:07

Its earnings announcements were -- were, for all                 02:50:11

intents and purposes, not meaningful.  If you                     02:50:15

looked at all the analysts' reports, the analysts                02:50:18

focused on discovery issues.  And so if you                       02:50:23

looked at the disclosures of discovery issues,                   02:50:27

you found cause-and-effect.  But you didn't find                 02:50:29

cause-and-effect with respect to earnings because                02:50:36

earnings were not important to investors.                        02:50:37

But you'd have to -- again, you'd                                 02:50:39

have to look at the individual circumstances.                    02:50:41

Again, your question not only -- is irrelevant as                02:50:45

it relates to Wells Fargo.                                        02:50:47

Q.    Let me ask you: If there was no case                       02:50:55

law --                                                            02:50:57

A.    Is that who?                                                02:50:58

Q.    If there was no case law at all in                         02:50:59

this area and you were asked to evaluate whether                 02:51:01

Page 187

- DR. HARTZMARK -

Wells Fargo common stock was sufficient for the                02:51:06

class period, you were writing from scratch, you               02:51:08

were made God of the universe, what factors would              02:51:10

you look at if you were starting from scratch?                 02:51:14

    MS. POSNER:  Objection.  Incomplete                02:51:16

    hypothetical.  But you might disagree with          02:51:18

    me on that one.                                     02:51:21

    A.    Well, no, I, I -- let me be honest             02:51:21

with you.  I -- I can look around this room and I              02:51:25

think I'm the oldest person in this room.  Okay?               02:51:27

    I started my career as an economist.                02:51:31

Actually, back in high school, if you want to go              02:51:34

all the way back.  But, really, at the                        02:51:36

University of Chicago in 1978.  Okay?  So I went              02:51:38

through this whole revolution of modern finance.             02:51:40

    And the Cammer factors have evolved                 02:51:44

from really good research and an incredibly                   02:51:47

extensive, widespread research, and they have               02:51:52

evolved.  Okay?                                              02:51:59

    They all -- I mean, it -- so to sort               02:52:00

of say, I'm going to throw out research from,              02:52:02

really, 50 years, and going to just throw it all           02:52:07

away and come up with one measure as of today?  I          02:52:12

think it would be incredibly arrogant and                   02:52:15

Page 188

- DR. HARTZMARK -

speculative on my part.  Okay?                          02:52:19

The court has evolved, the economics                   02:52:20
profession has evolved, and the Cammer factors          02:52:24
and Krogman factors are what they are.  And,            02:52:25
indeed, I think, you know, honestly -- again,           02:52:28
with that history in -- in my rearview mirror,          02:52:30
the basket is -- does make sense because it             02:52:32
allows you to fully evaluate critical aspects.          02:52:35
Okay?  As computing power changes and as markets        02:52:43
possibly change, maybe there'll be one measure          02:52:45
that the courts will look at.                           02:52:48

But right now, you know, I'm not                        02:52:49
going to criticize the courts.  In fact -- and          02:52:51
there are a bunch of other economists who are on        02:52:54
the other side of this.  Okay?  And I can say           02:52:56
they're -- they're all too young to understand          02:52:58
the evolution.                                          02:53:01

I'm not here to criticize what the                      02:53:03
court does.  I think it makes -- makes perfect          02:53:04
sense to put a basket, look at this.  Every             02:53:08
company is different, so I could potentially come       02:53:11
up with something, but then it's going to, maybe        02:53:16
a year from now, be shown that it's not                 02:53:18
appropriate.  Okay?                                     02:53:20

Page 189

- DR. HARTZMARK -

I've also applied Cammer and Krogman    02:53:21

to cap -- corporate bonds; I've applied it to    02:53:24

RMBS.  There is 50 years basic fundamental    02:53:28

economics and finance behind Cammer and Krogman.    02:53:34

Q.    Okay.  But I -- let me interpret    02:53:40

your answer, and you tell me if that's right.    02:53:41

If you were writing from scratch and    02:53:43

you were trying to evaluate whether Wells Fargo    02:53:44

common stock was efficient during the class    02:53:47

period, you would use the same basket that you    02:53:48

use in this report currently?    02:53:52

MS. POSNER:  Objection.  Incomplete    02:53:54

hypothetical.  But go ahead.    02:53:55

A.    Yeah, I can't answer and speculate    02:53:56

how I would write.  If you told me that I    02:53:59

could -- if you told me that I could write and    02:54:06

get the judge to come and spend, I don't know, a    02:54:08

week with me, and we could discuss everything,    02:54:12

and come up with a one-factor that, you know, or    02:54:15

maybe instead of 12, four, you know, maybe, but    02:54:21

the fact of the matter is I can't erase the past.    02:54:27

And as I said, there is fundamental    02:54:32

economics and finance behind all of the Cammer/    02:54:33

Krogman factors; there is court decisions back    02:54:38

Page 190

- DR. HARTZMARK -

and forth; there is -- it just -- you're asking a            02:54:42

question to, basically, again, erase the past.              02:54:44

And I'm not -- I'm not ready to do the that, and           02:54:46

I'm not in a position to do that.                          02:54:49

Q.    It's a hypothetical.  You don't like          02:54:51

hypotheticals, I take it; is that right?                   02:54:53

A.    Well, no, I grew up on                        02:54:54

hypotheticals.  The "Law in Economics" seminar            02:54:58

that I sat in and -- and participated in had lots         02:55:00

of hypotheticals.  I mean, 'cause that's what we           02:55:05

were doing; it was very much a Socratic method.           02:55:07

        But this is a deposition.  And I've               02:55:10

written a report -- which I would hope we could           02:55:12

get to at some point.  And I have offered an              02:55:15

opinion based on fac- -- on a basket of factors.          02:55:20

        You know, your expert can say, you                02:55:23

know what, I think S -- being able to file an S-3         02:55:25

is really the only thing that matters.  Let him           02:55:28

do that.                                                  02:55:30

Q.    Right.  But I'm trying to understand          02:55:30

what you think matters from a financial economic          02:55:32

and not a legal standpoint.                               02:55:35

A.    I have -- I told you, I've answered           02:55:38

that question.                                            02:55:40

Page 191

- DR. HARTZMARK -

From my 50 years of academic,                    02:55:40
economics, including tenure track appointment,   02:55:44
including studying with the father of modern     02:55:49
finance and the father of modern law and         02:55:52
economics, Judge Posner, I feel that Cammer and  02:55:55
Krogman are logical, make sense, and should be   02:56:01
evaluated as a basket.                           02:56:05

Q.    Okay.  Can we go to paragraph 15.          02:56:07
You say:  "The operational factors --            02:56:24

Are you with me?                                 02:56:27

A.    Now I am.  Yes.  I was on the other        02:56:29
page.  Yes.                                      02:56:31

Q.    "The operational factors examine           02:56:32
the trading and arbitrage activity in the        02:56:34
market, with [a] clear understanding' --         02:56:37
I'm sorry, "with the clear understanding         02:56:38
that an efficient market (a) is one in           02:56:40
which anyone can buy and sell securities."       02:56:43

Let me stop there.                               02:56:47

What do you mean by "anyone can buy              02:56:48
and sell securities"?                            02:56:49

A.    Well, that you and I can call up a         02:56:50
broker and easily purchase the security.         02:56:55

Q.    Okay.                                      02:56:58

Page 192

- DR. HARTZMARK -

"(b) is one that has a high level of          02:56:58

trading activity, and for which trading       02:57:01

information is readily available."            02:57:03

What do you mean by "high level of            02:57:06

trading activity"?                            02:57:08

A.    I'm saying activity like Wells Fargo    02:57:09

common stock.                                 02:57:11

Q.    Okay.  But there are --                 02:57:12

A.    On average 21 million shares traded     02:57:13

a day over the class period.                  02:57:18

Q.    Okay.  And then "trading information    02:57:19

is readily available," what does that mean?   02:57:23

A.    Well, that means it's part of a         02:57:25

quote system.  I mean, if I watch CNBC Squawk 02:57:27

Box, I see Wells Fargo below there, there's   02:57:31

quotes.  The information is readily available. 02:57:34

Q.    Okay.  And then:                        02:57:36

"(c) can be characterized as a                02:57:39

liquid market that can absorb a reasonable    02:57:42

amount of trading volume at relatively low    02:57:45

trading costs."                               02:57:47

Do you see that?                              02:57:48

A.    Yes.                                     02:57:48

Q.    What do you mean by a "liquid           02:57:50

Page 193

- DR. HARTZMARK -

market"?

A.    It means that it's liquid.  It means that there aren't frictions in it that prevent, you know, high-cost trading, you know, narrow -- relatively narrow bid-ask spreads.

And, again, I'll say, for Wells Fargo -- because I thought that was what we were talking about, as opposed to generic issues.

Wells Fargo, anyone can get in.  I could -- right now, in the middle of this deposition, I could call and buy stock at the market.  It would likely be based on a one-cent bid-ask spread, and I wouldn't be surprised if 20-plus million shares are trading today.  I mean, it's widely -- it's widely traded.  And so it meets all the criteria.

Q.    You mentioned "frictions."  What are you referring to there?

A.    Well, Cragar common stock, a buyer had to find a seller, or a seller had to find a buyer.  There were transactions and search costs to -- to do that.

Wells Fargo, as I said, I can take this phone right now and not just call one -- I

Page 194

- DR. HARTZMARK -

mean, actually, I don't even have to call.  I can          02:58:49

literally smile into this phone, get on my app,            02:58:51

and buy Wells Fargo stock by the time you finish           02:58:55

your next question.  That's a low cost market             02:58:57

that anybody can get into.                                 02:59:02

        Q.    Are you familiar with the concept of        02:59:03

a market-wide circuit breaker?                             02:59:06

        A.    Of a market-wide circuit breaker?           02:59:08

        Q.    Yes.                                         02:59:11

        A.    Generally.                                   02:59:11

        Q.    And what's your understanding of            02:59:13

that?                                                      02:59:14

        A.    Of a market-wide circuit breaker?           02:59:14

        Q.    Yes.                                         02:59:18

        A.    Well, that if there are issues with         02:59:18

respect to a market, that they will stop trading           02:59:20

for a period of time.                                      02:59:22

        Q.    What kind of issue?                          02:59:23

        A.    What kind of issues?                         02:59:24

        Q.    Yes.                                         02:59:26

        A.    I'm not familiar with the specifics.        02:59:26

I believe it's some up or down issues.                     02:59:28

        Q.    What do you mean up and -- "up or           02:59:31

down issues"?                                              02:59:33

Page 195

- DR. HARTZMARK -

A.    Well, it's -- and you're talking                02:59:33

market-wide.  'Cause in my Tesla case, we had a        02:59:35

stoppage of trade as well.                             02:59:38

But I believe if the market falls by                   02:59:41

a certain amount or goes up by a certain amount,       02:59:45

there's circuit breaker.                               02:59:47

But I'm not -- that's -- I haven't                     02:59:49

been asked to opine about market-wide circuit          02:59:50

breakers.  I've been asked to opine about              02:59:54

Tesla -- not Tesla.  Wells Fargo stock over a          02:59:57

450-day period.                                        03:00:01

Q.    But do you know if a market-wide                 03:00:01

circuit breaker affected the trading of                03:00:04

Wells Fargo common stock during the class period?      03:00:05

A.    I don't recall.                                  03:00:11

Q.    Would the triggering of a                        03:00:16

market-wide circuit breaker tell you anything          03:00:18

about market liquidity?                                03:00:19

A.    A market-wide circuit breaker?  It               03:00:22

would tell me, if you were going to call               03:00:25

Wells Fargo "inefficient," that every stock in         03:00:27

the United States of America that trades on the        03:00:29

NYSE and NASDAQ is inefficient.  It's                  03:00:31

market-wide, right?                                    03:00:35

- DR. HARTZMARK -

Q.    Well, let me ask you a question.  So    03:00:36
if you're evaluating market efficiency for one    03:00:37
day, and that entire day trading was halted    03:00:40
because of the market-wide circuit breaker, would    03:00:44
the market be efficient on that one day?    03:00:48

MS. POSNER:  Objection to the    03:00:50
hypothetical.  Go ahead.    03:00:51

A.    Yeah, if -- if you can find an    03:00:52
economist that will opine based on a sample of    03:00:55
one, then good luck.  Maybe you'll find a market    03:00:57
person, but as an economist, I wouldn't opine on    03:01:00
a market of one -- on a sample size of one.    03:01:04

Q.    But you could have a class period    03:01:06
that's one day; no?    03:01:08

A.    A class period that's one day?    03:01:09

Q.    Surely that could help.    03:01:14

A.    That sounds like a legal question to    03:01:16
me.  Personally, I've never been involved in a    03:01:18
securities case with a one-day class period.    03:01:20

Q.    Okay.  Could a -- could a class    03:01:22
period be two days?    03:01:23

A.    Personally, I've not been involved    03:01:24
in a class action lawsuit that's two days.    03:01:26

Q.    But could conceptually a class    03:01:29

Page 197

- DR. HARTZMARK -

period be two days?                                    03:01:31

MS. POSNER:  Objection.  Calls for a      03:01:32

legal conclusion.                                 03:01:32

A.    I don't -- could it be two days?       03:01:32

Again, I don't know how that affects a 450-day     03:01:39

class period of a company like Wells Fargo.        03:01:42

So that, basically, there are             03:01:45

allegations of lies on Monday, and the            03:01:48

revelation -- so anybody who buys on Monday is     03:01:52

hurt, and revelation of the truth on Tuesday.      03:01:53

Q.    That can certainly happen, though?     03:01:55

MS. POSNER:  Objection.                   03:01:57

A.    Again, I'd like to see, can you        03:01:57

point me to any -- bring this up.  Is there any    03:02:00

proof that that's possible?                       03:02:05

Q.    But you're -- your hypo just now,      03:02:06

that could happen, right?  I mean, the            03:02:09

statement --                                      03:02:11

A.    I have -- I have no hypothetical        03:02:11

right now that I put out.  You maybe put out a     03:02:14

hypothetical.                                     03:02:17

Q.    Here is hypothetical.  The company     03:02:17

makes a misstatement on a Monday, it reveals the   03:02:20

truth on a Wednesday, could that happen?          03:02:22

Page 198

- DR. HARTZMARK -

MS. POSNER:  Objection.  Calls --                    03:02:25

Q.    Could you see a world in which that             03:02:25

could happen?                                         03:02:27

MS. POSNER:  Objection.  Calls for a                  03:02:28

legal conclusion.  And I'm not sure what              03:02:28

you're asking if that "could happen."  But           03:02:29

go ahead.                                             03:02:31

A.    In my personal experience, I've                 03:02:34

never seen anything like that.                        03:02:36

Q.    Okay.  What's the minimum size class            03:02:38

period you've seen?                                   03:02:44

A.    That I've seen?                                 03:02:45

Q.    Yes.                                            03:02:46

A.    Ten days.                                       03:02:46

Q.    Okay.  And if a market-wide circuit            03:02:48

breaker had been in effect all ten of those days,    03:02:51

could the market have been efficient in that          03:02:54

case?                                                 03:02:55

MS. POSNER:  Objection.                               03:02:56

A.    I would --                                      03:02:56

MS. POSNER:  Hypothetical.                            03:02:57

A.    I would look at all the factors                 03:02:57

to -- to -- I'm not sure why that necessarily         03:03:01

would -- because they're market-wide circuit         03:03:04

Page 199

- DR. HARTZMARK -

breakers, why that would rule against efficiency.                    03:03:08

I mean, that.                                                         03:03:11

Q.    Well --                                                         03:03:15

A.    I mean, I have a case now where the                            03:03:15

class is certified market-efficient for 2,000                        03:03:19

securities, and there was a stoppage of trade.                       03:03:24

Just 'cause there's a stoppage of trade, why --                      03:03:26

why should that impact efficiency?                                   03:03:29

There's -- the market -- the NYSE                                    03:03:32

trades from 9:30 to 4:00 every day, and the                          03:03:34

market is efficient.                                                 03:03:37

Q.    But if there's a stoppage that lasts                           03:03:38

for a period of time, then you can't have "a                         03:03:41

market in which anyone can buy and sell                              03:03:45

securities," correct?                                                03:03:47

A.    That's why you would rely on the 11                            03:03:48

other factors.                                                       03:03:51

Q.    I'm sorry.  But the operational                                03:03:55

factors all together examine whether anyone can                      03:03:57

buy and sell securities, according to paragraph                      03:03:59

15, as I read it, no?                                                03:04:01

A.    You know, as opposed to -- with                                03:04:03

artificial constraints, that if there are                            03:04:04

artificial constraints.  I can't -- I can't even                     03:04:08

Page 200

- DR. HARTZMARK -

get close to answering that.                    03:04:11

Q.    Okay.  If you can't, you can't.         03:04:14

Okay.                                          03:04:15

Paragraph 22.  The sentence that             03:04:26

starts "In addition."  I think it's the fourth   03:04:38

sentence.  Are you with me?                     03:04:49

A.    Uh-hmm.  Yes.                           03:04:54

Q.    "In addition, high volume suggests     03:04:56

the possibility that investors will, all        03:04:58

other factors staying constant, be able to      03:05:00

reap greater profits from any information       03:05:02

they may possess because they can more          03:05:05

easily participate in the market."              03:05:07

Do you see that?                             03:05:08

A.    Yes.                                    03:05:08

Q.    And why is the ability of investors    03:05:11

to easily participate in the market relevant to  03:05:12

efficiency?                                      03:05:14

A.    It means that it's easier for them     03:05:17

to vote, vote their particular opinion.         03:05:21

Q.    What do you mean "vote their           03:05:23

particular opinion"?                            03:05:25

A.    Well, if they have information, then   03:05:25

-- or belief that the stock is going to go up,   03:05:27

Page 201

- DR. HARTZMARK -

it's easier for them to get in.                          03:05:29

Q.    All right.  Let's go to paragraph          03:05:36

27.  And here you talk about analyst coverage; is        03:05:49

that right?                                              03:05:52

A.    Paragraph 27?                              03:05:52

Q.    Yes.                                        03:05:53

A.    Paragraph 27 talks about in -- it          03:05:54

talks about in-depth analyst coverage for the           03:05:56

company, and it lists a number of the in-depth          03:05:58

analysts; it talks about ratings agencies; it           03:06:02

talks about technical analysts; and it talks            03:06:07

about the number of analysts reports.                   03:06:09

Q.    Thank you.                                  03:06:13

And it mentions 812 analyst reports         03:06:15

on Wells Fargo during the class period; is that         03:06:18

right?                                                  03:06:23

A.    Yes.                                        03:06:23

Q.    And these are analyst reports that          03:06:25

were available to you and S&P Cap IQ and Acon; is        03:06:27

that right?                                              03:06:36

A.    Well, they would have been listed by        03:06:36

those.  We just download the list.                      03:06:38

Q.    Okay.  So it wouldn't -- the 812            03:06:39

wouldn't include reports that aren't available on        03:06:41

Page 202

- DR. HARTZMARK -

those two sources, correct?                         03:06:43

A.    They would -- yes, there are            03:06:46

additional analyst reports that are not             03:06:48

available.  And those sources, we -- we have        03:06:52

access and we -- for the purposes of Cammer 2 and   03:06:55

analyst reports, I have them download a list of     03:07:00

analyst reports that are available on the S&P       03:07:03

source.                                             03:07:08

I believe there are others.  You          03:07:09

know, like, for example, I think some, for          03:07:10

example, like Goldman Sachs doesn't list like       03:07:13

that.  So there are actually more analyst           03:07:16

reports.                                            03:07:18

Q.    I'm just trying to understand what     03:07:18

your --                                             03:07:19

A.    Yeah, but this is just a list.         03:07:19

Q.    Right.                                  03:07:21

A.    This is based on the list.             03:07:22

Q.    Right.  But the 812 is just from the   03:07:23

S&P Cap IQ and Acon, correct?                       03:07:26

A.    Yes.  S&P Capital IQ and Refinitiv.    03:07:31

Yes.  Yes.                                          03:07:43

Q.    Okay.  Did you review -- let me put    03:07:43

it this way.                                        03:07:45

Page 203

- DR. HARTZMARK -

I assume you didn't personally    03:07:45
review the 812 reports, correct?    03:07:47

A.    I did not review the 812 reports.    03:07:49

Q.    Did you review a subset of the 812    03:07:51
reports?    03:07:54

A.    No, I didn't.  I just told you, we    03:07:54
downloaded a list of analyst reports for the    03:07:58
purposes of evaluating Cammer 2.    03:07:59

Q.    But did you review any of the    03:08:02
reports?    03:08:04

A.    For what purposes?    03:08:04

Q.    I'm just asking if you reviewed    03:08:06
any --    03:08:09

A.    No.    03:08:09

Q.    -- of the reports.    03:08:09

A.    No. No.    03:08:10

Q.    Okay.  And these reports are    03:08:11
included in your Appendix C, correct?    03:08:12

A.    I think the list of -- the list of    03:08:14
the reports is in the -- in the backup, I    03:08:17
believe.    03:08:21

Q.    Okay.  By "backup," do you mean    03:08:21
Appendix C?    03:08:26

A.    Appendix -- well, Appendix C is the    03:08:29

Page 204

- DR. HARTZMARK -

chronology.                                          03:08:32

    Q.    Yes.                                        03:08:32

    A.    Okay.  Those are input separately          03:08:33

from the download from Factiva.                       03:08:37

    Q.    Okay.  So that is separate from the         03:08:41

812 that you're describing here?                      03:08:43

    A.    No.  No.  The 812 will be input into        03:08:45

the Factiva database if they didn't show up.          03:08:49

    Q.    Let me phrase it this way.                  03:08:53

          Do the 812 reports you mention in           03:08:55

paragraph 27 appear in your Appendix C?               03:08:59

    A.    Yes.  Yes.                                   03:09:02

    Q.    In paragraph 27, there seems to be a        03:09:03

distinction between "in-depth analyst coverage"       03:09:07

and "additional technical or analyst firms"; is       03:09:13

that right?                                            03:09:20

    A.    Yes.                                         03:09:20

    Q.    And so what is that difference?             03:09:20

    A.    Well, there are analysts, for               03:09:21

example, that basically use publicly available        03:09:23

information put out like weekly reports, like         03:09:26

Zacks is one of those; and then there are             03:09:28

analysts that go in-depth -- and generally that's    03:09:29

around earnings season -- and evaluate and come       03:09:32

Page 205

- DR. HARTZMARK -

up with their own price targets and financials

and estimates.

Q.    Does it make any difference to your

analysis whether the analyst report is from an

in-depth analyst or a technical, additional

analyst?

A.    For Cammer 2?

Q.    Let's say for Cammer 2.

A.    Cammer 2, no.  I mean, in a loss

causation analysis, I might evaluate it.  But for

the purpose of Cammer 2, Cammer 2 is trying to

say:  Is this company widely followed?

Q.    Why would you evaluate that for loss

causation?

MS. POSNER:  Objection.  Misstates

the testimony.

A.    Why -- a specific report?

Q.    No.  I believe you suggested that

the difference between in-depth and technical

analysts is a quick factor into a loss causation

analysis?

A.    Oh, well, generally, the analysts

who, you know, issue the weekly reports aren't

giving you the type of detail and in-depth

Page 206

- DR. HARTZMARK -

analysis that is often used in a loss causation.                    03:10:44

I wouldn't -- again, it would depend                    03:10:46
on the specifics.  But I found, historically,                    03:10:48
that when you do loss causation, that you employ                    03:10:52
analyst reports as one of your factors to                    03:10:56
determine the input, the inputs into your                    03:10:59
inflation ribbon, and -- and determine, you know,                    03:11:01
whether the losses were caused by factors other                    03:11:04
than the alleged fraud.                    03:11:11

And, you know, these in-depth                    03:11:12
analysts generally offer in-depth evaluation.                    03:11:15
But for the purpose of Cammer 2, this is just,                    03:11:19
basically, you know, is there a following?                    03:11:22

Q.    But does --                    03:11:28

A.    In fact, it says it would be                    03:11:29
"persuasive to allege a significant number of                    03:11:31
securities analyst followed and reported on the                    03:11:34
company's stock."                    03:11:38

I mean, that's -- that's Cammer 2.                    03:11:38
'Cause they understood that that's important for                    03:11:40
dissemination.  And, indeed, I think for                    03:11:46
Wells Fargo that -- you know, it's probably one                    03:11:49
of the top analysts following.                    03:11:53

Q.    But the in-depth --                    03:11:59

Page 207

- DR. HARTZMARK -

A.    Yeah.                                      03:12:02

Q.    -- nature of analyst coverage could       03:12:02

be relevant to Cammer 2?  No?                    03:12:05

A.    No.  I mean, I'm not sure where            03:12:08

you're -- where you're getting at.               03:12:12

I -- there, again, the way I'm                   03:12:22

looking at Cammer 2, is: Is it being followed?   03:12:23

And Wells Fargo, in terms of                     03:12:28

following, is in the 90th to 95th percentile of  03:12:30

companies following.  So that means that         03:12:34

95 percent of the companies -- public companies  03:12:36

in this country.  NASDAQ and NYC have fewer      03:12:38

analysts following them than do Wells Fargo.     03:12:45

That suggests widespread following, which, thus, 03:12:47

means widespread dissemination of information    03:12:51

about Wells Fargo.                               03:12:57

Q.    I know you don't like hypos.  Let me       03:12:57

give you a hypo.                                 03:13:00

A company has a lot of analyst                   03:13:01

reports, but they're all very cursory, does that 03:13:02

matter for Cammer 2?                             03:13:05

MS. POSNER:  Objection.  I don't                 03:13:07

think the issue is that he doesn't like          03:13:08

hypos; they're just incomplete.  But --          03:13:10

Page 208

- DR. HARTZMARK -

A.    What does "cursory" mean?  What does                03:13:13
"cursory" mean in this context?                             03:13:16

Q.    Let's say it's -- it doesn't reflect                  03:13:19
all material information about the company; all             03:13:20
material, publicly available information about              03:13:23
the company.                                                03:13:24

A.    Well, and they're spending -- I                       03:13:27
guess, my hypothetical would be that those                  03:13:29
analysts should be fired.  I mean, analysts are             03:13:32
paid to provide meaningful information to                   03:13:37
clients; that's why they're a good measure.                 03:13:40

And that's why it's good as                                 03:13:45
reference to look at analyst reports when they              03:13:46
come out because they're not done -- you know, an           03:13:48
analyst isn't going to be spending its time on              03:13:53
immaterial information and, willy-nilly, you                03:13:55
know, issuing reports.                                      03:13:58

So your hypothetical makes                                  03:13:59
absolutely no -- I mean, I'm an economist, it               03:14:01
makes no -- it has no economic logic behind it.            03:14:04

You know, we're going to write --                           03:14:06
today, I wake up, the sun is up, and I'm going to           03:14:07
write about Wells Fargo.  It -- I guess if that             03:14:09
were the hypothetical, you'd ask yourself, why             03:14:13

Page 209

- DR. HARTZMARK -

are there more analyst reports around earnings    03:14:18

announcements than otherwise?    03:14:23

MS. POSNER:  Leonid, are you almost    03:14:37

done with factor 2, for a break?    03:14:39

MR. TRAPS:  I think we are.  Yeah.    03:14:42

I think there's not that much left on the    03:14:44

operational factors period, I think it is.    03:14:46

THE WITNESS:  Yeah, might as well    03:14:51

finish operational.    03:14:52

MS. POSNER:  How much longer do you    03:14:53

think you got?    03:14:54

MR. TRAPS:  It depends on the    03:14:55

lengths of the answers.    03:14:56

THE WITNESS:  Well, that depends on    03:14:57

the nature of the hypothetical.    03:14:58

MR. TRAPS:  Five minutes.  It is a    03:14:59

two-sided market.  I agree.    03:15:03

BY MR. TRAPS:    03:15:05

Q.    You include public press beyond just    03:15:05

analyst reports in your Appendix C; is that    03:15:07

correct?    03:15:12

A.    Yeah.  Appendix C is -- turn to it.    03:15:12

Appendix C is what I call a    03:15:18

chronology, so it has both the daily statistics    03:15:22

Page 210

- DR. HARTZMARK -

associated with running their regressions as well    03:15:24

as media headlines.  And I will not -- yeah,    03:15:28

based on download from Factiva.    03:15:36

    Q.    Okay.  That was my next question.    03:15:41

What source did you get these, these articles?    03:15:42

    A.    I'm sorry.  Actually, this is...    03:15:44

       (Witness reviewing document.)    03:15:44

    A.    Yeah.    03:15:45

    Q.    From Factiva; is that right?    03:15:45

    A.    Yeah.  The chronology is described    03:15:47

in footnote 87:    03:15:50

       "Contains only a selection of news    03:15:51

    sources from Factiva given the voluminous    03:15:53

    amount of stories available."    03:15:59

    Q.    Okay.  In paragraph 33, you say    03:16:35

the -- I'm sorry.  If you go to the only full    03:16:37

sentence on page 19.    03:16:42

    A.    Page 19?    03:16:45

    Q.    Yes.    03:16:47

       "The structure of the NYSE,    03:16:48

    including the DMM system, in combination    03:16:50

    with the requirements for being listed,    03:16:52

    leads to the presumption by economists and    03:16:53

    the courts that common stocks traded on the    03:16:55

Page 211

- DR. HARTZMARK -

NYSE trade in an efficient market."      03:16:57

Do you see that?      03:17:00

A.    Yes.      03:17:00

Q.    You have a long footnote that cites      03:17:04
only cases, I believe.      03:17:08

What's the basis for saying that      03:17:09
economists presume that common stocks traded on      03:17:11
the NYSE trade in an efficient market?      03:17:15

A.    Well, the nature of what was called      03:17:17
the "specialist system" and such is considered to      03:17:19
be highly efficient, because you -- you've      03:17:22
centralized the trading bringing all the players,      03:17:24
buyers and sellers together with a book.      03:17:28

So, yeah, I mean, you know, studies      03:17:33
on market, trading market intra -- trading market      03:17:36
microstructure, and suggested that, you know,      03:17:40
NYSE is efficient, which has been consistent with      03:17:42
the courts.      03:17:45

Q.    Any particular economic literature      03:17:46
you would point me to there?      03:17:54

A.    I can't offhand recall.  Again, this      03:17:55
is after 50 years.  Also being a registered rep.      03:17:57
Again, remember I'm a Series 7 and 63.  I was      03:18:01
employed by Fahnestock; I've been involved in the      03:18:05

Page 212

- DR. HARTZMARK -

PAG.  I've been, actually, longer involved with    03:18:08

exchanges than 50 years because we were in    03:18:11

early -- my family had a seat on the New York    03:18:14

Stock Exchange back in the day.    03:18:20

Q.    You're tempting me to ask you about    03:18:25

your family's seat in the New York Stock Exchange    03:18:27

back in the days.    03:18:30

MS. POSNER:  Why don't we take a    03:18:31

break?  We've been going over an hour.    03:18:32

THE WITNESS:  All right.  Well, do    03:18:36

you have more operational?    03:18:38

MR. TRAPS:  I have very little    03:18:39

operational.    03:18:41

THE WITNESS:  Why don't we just let    03:18:41

him finish the operational.  Sorry about    03:18:43

that, bringing that.    03:18:44

MS. POSNER:  Let's ask about a break    03:18:46

about his seat on the Stock Exchange.    03:18:48

BY MR. TRAPS:    03:19:04

Q.    Paragraph 49, that's on page 26.    03:19:04

Let me know when you're there.    03:19:06

A.    Yes.    03:19:10

Q.    Do you see that first sentence?  It    03:19:12

says:    03:19:13

Page 213

- DR. HARTZMARK -

"The size of the bid-ask spread is          03:19:14

calculated as the ask price (quoted by a          03:19:16

prospective buyer at the value he or she is          03:19:18

willing to pay), minus the bid price          03:19:22

(quoted by a prospective seller at the          03:19:24

value he or she is willing to accept)."          03:19:26

          Do you see that?          03:19:28

A.     Yes.          03:19:28

Q.     Any inaccuracy in that sentence?          03:19:29

          (Witness reviewing document.)          03:19:44

A.     Yeah.  Yeah.  It's backwards.          03:19:56

Q.     Do you know if this error appears in          03:20:07

your other reports?          03:20:09

A.     I don't know.  It's never come up          03:20:10

before.          03:20:11

Q.     Okay.          03:20:13

          MR. TRAPS:  We should take a break.          03:20:27

          THE VIDEOGRAPHER:  We are now off          03:20:30

the record.  The time on the video monitor          03:20:31

is 3:20 p.m.          03:20:33

          (Recess taken.)          03:20:36

          THE VIDEOGRAPHER:  We are now back          03:42:08

on the record.  The time on the video          03:42:09

monitor is 3:41 p.m.          03:42:10

Page 214

- DR. HARTZMARK -

BY MR. TRAPS:                                        03:42:17

Q.    Welcome back.  Let's talk about             03:42:18

Cammer Factor 5.  If you go to paragraph 54.  You    03:42:22

start that paragraph with:                           03:42:40

"What is often referred to as the          03:42:42

fifth Cammer factor is a cause-and-effect   03:42:46

relationship between unexpected corporate    03:42:49

events or financial releases and an          03:42:51

immediate response in the stock price."      03:42:54

Do you see that?                           03:42:55

A.    Yes.                                         03:42:55

Q.    And you're quoting Cammer itself           03:42:56

there, correct?                                      03:42:59

A.    Yes.                                         03:43:00

Q.    And why is a cause-and-effect              03:43:04

relationship between unexpected corporate events     03:43:06

or financial releases and an immediate response      03:43:08

in the stock price important?                        03:43:10

MS. POSNER:  Objection.  Lacks             03:43:12

foundation.  Go ahead.                     03:43:12

A.    I'm quoting Cammer.  They suggest           03:43:23

that cause-and-effect relationship between           03:43:25

unexpected corporate events or financial releases    03:43:29

and an immediate response in the stock price is      03:43:31

Page 215

- DR. HARTZMARK -

one way to evaluate cause-and-effect.                03:43:34

Q.    Is that what you did here through         03:43:41
your event study?                                    03:43:44

A.    I evaluated unexpected corporate           03:43:44
events or financial releases.  I used financial      03:43:49
releases to objectively determine news, and used     03:43:51
one-day returns to exam the response in the stock     03:43:54
price.                                               03:43:58

Q.    And in the same paragraph, last           03:44:04
sentence, you say:                                   03:44:08

"As the Krogman court also noted,        03:44:11

'in an efficient market, [the] stock's   03:44:13

price remains relatively stable in the   03:44:16

absence of news, and changes very rapidly  03:44:18

as the market receives new and unexpected  03:44:21

information.'"                            03:44:23

Do you see that?                 03:44:23

A.    Yes.                                       03:44:23

Q.    And you are quoting Krogman there,        03:44:24
correct?                                             03:44:27

A.    Yes.                                       03:44:27

Q.    Any disagreements with that               03:44:27
statement from Krogman?                              03:44:29

A.    Any disagreement?                          03:44:33

Page 216

- DR. HARTZMARK -

Q.    Yes.                                                03:44:34

A.    I mean, I can't -- it's a quote.              03:44:35

What -- I mean, can you be more specific?             03:44:37

Q.    Yes.  Do you agree or disagree with           03:44:42

the statement: "In an efficient market, a stock's     03:44:44

price remains relatively stable in the absence of     03:44:46

news, and changes very rapidly as the market          03:44:48

receives new and unexpected information"?             03:44:51

A.    Yes.  I mean, on average, the nature     03:44:53

of this, this analysis.                              03:44:59

Q.    "Yes" is you agree?                       03:45:01

A.    Yes.                                      03:45:04

Q.    A hypo again.  If your event study       03:45:13

were found unreliable for whatever reason, or you     03:45:18

determined that your event study, looking back,       03:45:21

was unreliable, would you agree that your             03:45:23

analysis of Cammer factor 5 would be unreliable       03:45:26

too?                                                 03:45:30

A.    I guess the issue of the reliability     03:45:31

would depend what you mean.  Again, with the          03:45:34

hypothetical, I would have to, again, take a          03:45:48

look.  I would have to understand what -- why it      03:45:50

was unreliable.                                      03:45:52

Q.    Okay.  Can you briefly -- we touched     03:45:57

Page 217

- DR. HARTZMARK -

on this a number of times today.  But can you                03:45:59

briefly describe the nature of your event study,             03:46:02

just to set the table?                                       03:46:04

A.    I ran 450 regressions based on a                       03:46:06

market-model specification; each 120 days prior              03:46:09

to the -- to the date that we're trying to get               03:46:14

the predictive return; used parameters from those            03:46:16

regressions to estimate whether the abnormal                 03:46:21

returns on the days that I was examining was                 03:46:24

outside of the bounds of what would be expected              03:46:25

by chance.                                                   03:46:27

Q.    And when you say "based on a                           03:46:28

market-model specification," what are you                    03:46:30

referring to there?                                          03:46:32

A.    If you turn to Appendix D, which is                    03:46:36

captioned 725 out of 766, it is explained in that            03:46:40

appendix.                                                    03:46:50

Q.    Let's talk about the control period                    03:47:01

you used.  Is the control period also called an              03:47:03

estimation period?                                           03:47:06

A.    Yeah.  In fact, I have a footnote,                     03:47:08

footnote 3, "The control period is also referred             03:47:15

to as the estimation period."  Footnote 3 in                 03:47:17

Appendix D.                                                  03:47:23

Page 218

- DR. HARTZMARK -

Q.    One second.  Let me turn to                03:47:29

Appendix D.                                        03:47:31

      Can you turn to footnote 3 there.            03:47:48

Yes, that's where you are, right?                  03:47:49

A.    That's where --                              03:47:49

Q.    "The control period is also referred         03:47:51

to as the estimation period."                      03:47:53

A.    That's what I referred to, yes.              03:47:54

Q.    The next sentence says, and it's             03:47:55

quoting an article, I believe:                     03:47:58

      "There are essentially four choices          03:48:01

   for the estimation period: before the event    03:48:02

   window, during the window, after the            03:48:05

   window, and around the window."                 03:48:08

      And then you say:                            03:48:09

      "The majority of event studies use          03:48:10

   an estimation period before the event."         03:48:11

      Do you see that?                             03:48:14

A.    Yes.                                          03:48:14

Q.    What are the pros and cons of using          03:48:20

the pre-event window compared to the other         03:48:23

options you list there?                            03:48:26

A.    The pros and the cons?                       03:48:27

Q.    Yes.                                          03:48:29

Page 219

- DR. HARTZMARK -

A.    Well, market model is trying to          03:48:32

estimate a predictive return based on the        03:48:34

information as of the day that you're examining.  03:48:36

And so economists generally would                03:48:39

like to look at information prior to that day as  03:48:41

opposed to after the day, because, obviously,    03:48:45

there's information afterwards that is, you know, 03:48:48

in hindsight, been made available.  So,          03:48:52

generally, it's -- it's run in advance.          03:48:54

Q.    Under what circumstances would you         03:48:58

consider a post-event window?                    03:49:01

A.    Under what circumstances?                   03:49:02

Q.    Yes.                                        03:49:04

A.    Well, it depends, again, how you            03:49:04

define an event.  I'll often use sort of post-IPO 03:49:09

window because there's -- the stock begins       03:49:14

trading.  That's...                              03:49:18

Q.    And there's no better option than          03:49:20

that scenario, right?                            03:49:24

A.    There's no -- there's no                    03:49:25

alternative.  Well, I -- again, it's             03:49:28

generalizing.  You -- you do post, whether it's  03:49:33

immediately post.  You know what I mean?  And    03:49:36

moving, including the day.  It would depend on    03:49:41

Page 220

- DR. HARTZMARK -

the specific circumstances.                                  03:49:43

Q.    Have you ever used a post-event            03:49:45
window in your work on securities litigation?     03:49:47

A.    A post-event window, post IPO?             03:49:52

Q.    No.  A post-event window in any            03:49:54
case.  Have you ever personally used one?         03:49:57

A.    Well, I used post -- especially on,        03:49:59
say, for example, Section 11 cases that I've been  03:50:04
involved in.                                      03:50:07

Q.    And that's the IPO context you're          03:50:07
referring to?                                     03:50:10

A.    Yes.  It could be similar.  You            03:50:10
know, say, the issuance of stock or bonds you      03:50:14
might -- might look at that post period.           03:50:16

Q.    Have you ever used a post-event            03:50:19
window in a non-IPO case?                          03:50:24

A.    I've used a post-event window in one       03:50:26
circumstance where I found that it was offered,    03:50:34
what I considered to be a superior control         03:50:39
period.                                            03:50:43

Q.    Okay.  So tell me about that, those        03:50:43
circumstances.                                     03:50:47

A.    Tell you about, just general?  I           03:50:47
just -- well, I felt the control period            03:50:49

Page 221

- DR. HARTZMARK -

parameters would give me a better estimate    03:50:52

especially earnings dates, where I was doing --    03:50:56

you know, I was concerned because I do -- in    03:51:01

cause-and-effect, the news dates are generally    03:51:04

looking at a zero-one, a bright-line on/off    03:51:06

switch.  Is it significantly -- is it    03:51:11

statistically significant or not?  So those    03:51:13

earnings dates are very important.    03:51:15

          And so given the nature of the    03:51:18

situation, I felt that the post control period    03:51:22

gave me a better sense on those earnings dates.    03:51:25

Gave, you know, better measure on those earnings    03:51:31

date.    03:51:34

        Q.    Isn't that true in every -- for    03:51:34

almost every 10b-5 case now, that you -- that you    03:51:36

do this kind of event study on?    03:51:40

        A.    I don't --    03:51:43

              MS. POSNER:  Objection as to form.    03:51:43

        A.    -- know what you mean.    03:51:44

        Q.    I'm trying to understand why you    03:51:46

used a post-event window in that case    03:51:48

specifically.    03:51:50

        A.    Oh, because I had evidence that the    03:51:53

parameters, the beta for the standard error, were    03:51:56

Page 222

- DR. HARTZMARK -

superior, better measures in the post period than    03:52:01

in the pre period.                                    03:52:04

Q.    And what did you do to find out that      03:52:05

the beta measures were better, superior measures     03:52:08

in the post period than in the pre period?           03:52:12

A.    In that particular case, I did          03:52:14

what's called a "break point analysis."  And I       03:52:16

looked to see if there was a point within the        03:52:18

class period where there was a break point.  And     03:52:22

I found -- I found a period/point.                   03:52:27

Q.    And what do you mean "break point"?      03:52:29

A.    Where there was a change in the          03:52:32

parameters.                                           03:52:35

Q.    And you did or did not do that           03:52:38

analysis here as well?                                03:52:40

A.    I think -- I thought I had mentioned     03:52:42

that earlier that I did a break-point analysis        03:52:45

and found that it was after the class period.         03:52:47

Q.    Do you recall when after the class       03:52:52

period that break point occurred?                     03:52:54

A.    I can't recall.  I know -- 'cause I       03:52:57

can remember.  The other one was March 25th, was      03:53:02

the break point in my other case.                     03:53:05

Q.    I'm sorry.  What other case?             03:53:09

Page 223

- DR. HARTZMARK -

A.     In my other case.                                 03:53:10

Q.     What other case?                                 03:53:12

A.     Oh, the other case was Biomarin.                 03:53:12

Q.     Biomarin.  And there was a break                03:53:17
point in that case on March 20th?                       03:53:20

A.     25th.                                            03:53:22

Q.     On March 25, 2020 --                             03:53:23

A.     I think.                                         03:53:27

Q.     -- is that correct?                              03:53:32

A.     Yeah.                                            03:53:33

Q.     When did you submit a report in that            03:53:33
case?                                                   03:53:41

A.     I don't remember the exact date.                03:53:41

Q.     Was that break point as a result of            03:53:42
COVID?                                                  03:53:46

A.     I mean, I -- the motivation, as I               03:53:46
mentioned before, to look at -- generally, I            03:53:51
have -- I've done, what?  50 reports.  I never          03:53:53
had an issue with the control period, and run the       03:53:56
120-day rolling regression consistently in -- in        03:54:02
50 reports.  And, therefore, I want to start with       03:54:06
that.                                                   03:54:08

The fact, then, that I looked at the            03:54:10
residuals, the abnormal return squared and, as I        03:54:12

Page 224

- DR. HARTZMARK -

mentioned, did a break point analysis in this   03:54:18

particular case was motivated by COVID.  And, you   03:54:20

know, in a class period within -- within the, you   03:54:24

know, COVID period.   03:54:30

Q.    I understand.  But in Biomarin, you   03:54:30

found a break point on March 25, 2020, and so you   03:54:33

used the post-event period; is that correct?   03:54:36

A.    Well, in Biomarin, the earnings   03:54:38

dates were all subsequent to March of 2020, so it   03:54:40

was very critical that they be measured with   03:54:47

that, that control, I -- and they found the break   03:54:52

point.   03:54:57

As I mentioned before in Wells   03:54:57

Fargo, none of the earnings dates are subsequent   03:54:58

to what would be considered the so-called COVID   03:55:01

period.   03:55:07

And, indeed, what that does do, to   03:55:07

the extent that a parameter, for example, of the   03:55:09

standard error, you know, your expert were to   03:55:13

play with the data and come up with an   03:55:18

alternative increase in the standard error, it   03:55:20

would decrease the number of statistically   03:55:25

significant days and would, therefore, strengthen   03:55:27

my cause-and-effect analysis, which is what I was   03:55:32

Page 225

- DR. HARTZMARK -

asked to examine, to evaluate market efficiency.        03:55:34

Q.    Right.  As to Biomarin, you said:        03:55:39

"The earnings dates were all        03:55:42

subsequent to March 2020 so it was very        03:55:44

critical that they be measured with that        03:55:46

control, [i.e.] find the break point."        03:55:47

At least that's what I have in the        03:55:51

transcript.  Why was it very critical to use a        03:55:53

post-event period in Biomarin -- strike that.        03:56:00

Why did the fact that the earnings        03:56:05

dates occur in subsequent to March of 2020 make        03:56:07

it very critical to use a post-event period in        03:56:12

that case?        03:56:14

A.    Well, because cause-and-effect, to        03:56:14

the extent that you are focused on the earnings        03:56:16

dates, and that's generally a smaller        03:56:19

population -- it's not generally, it's always a        03:56:22

smaller population than the non-earnings dates.        03:56:24

Okay?        03:56:29

Those -- those should be measured so        03:56:30

that you feel -- feel the -- so that the        03:56:33

statistical significance is -- 'cause, again,        03:56:38

it's 1/0.  It doesn't matter whether it's        03:56:41

10 percent, 2 percent.        03:56:45

Page 226

- DR. HARTZMARK -

It's got to be -- you're only asking          03:56:46

the question: Is it statistically significant          03:56:49

more often on news dates than non-news dates?          03:56:51

Q.    So you have to be especially          03:56:54

rigorous with earnings disclosure dates, because          03:56:56

you're using those as your news dates; is that          03:57:00

what you're saying?          03:57:03

MS. POSNER:  Objection.  Misstates          03:57:04

his testimony.          03:57:05

A.    I mean, you -- as I said, I was          03:57:05

rigorous, consistent, and did the evaluation, and          03:57:08

biased it against the finding of a difference          03:57:13

between the two dates in the approach that I          03:57:17

utilized.          03:57:23

Q.    Okay.  And you used the market and          03:57:26

industry indices for your event study, correct?          03:57:37

A.    I actually used what I call a broad          03:57:41

industry index and a focused industry index.          03:57:44

Q.    So you used one market index and two          03:57:48

industry indices, right?          03:57:52

A.    Yeah.  One smaller than the -- you          03:57:53

know, one wide and one broad.  I'm sorry.  One          03:57:56

wide and one narrow, or focused.          03:57:58

Q.    Okay.  And how did you select those          03:58:01

Page 227

- DR. HARTZMARK -

indices?                                                          03:58:02

A.     The indexes were -- were selected           03:58:03

and -- and then run independently.  And then just          03:58:05

adding on the -- running them together, what is           03:58:10

called the adjusted R-squared was superior, so I          03:58:14

decided to utilize that, both of those indexes to         03:58:18

maximize the explanatory power of the market             03:58:23

model.                                                    03:58:26

Q.     But what are these indices?  Where          03:58:26

do you get them from?                                     03:58:29

A.     Oh, from S&P.  They're what would be         03:58:30

considered off-the-shelf indices related to the          03:58:33

financial markets.                                        03:58:36

Q.     Okay.  Do you recall the name, the          03:58:42

names of the indices?                                     03:58:43

A.     Oh, yes.  The broad market index is          03:58:44

the -- is the S&P 500 Financial Sector Double            03:58:51

Return Index, and the focused industry index is          03:58:58

the S&P 500 Banks Total Return Index.                    03:59:01

Q.     Did you do any analysis of the              03:59:25

companies that are in the S&P 500 Financial              03:59:27

Sector Double Return Index?                               03:59:32

A.     Can you be --                               03:59:32

MS. POSNER:  Objection.                   03:59:34

Page 228

- DR. HARTZMARK -

A.    -- more specific?  I don't    03:59:34
understand.    03:59:39

Q.    Did you look at what companies were    03:59:39
included in the broad industry index?    03:59:41

A.    I believe it included Wells Fargo    03:59:43
and many other companies, as you would expect in    03:59:45
a financial industry index.  But I didn't look at    03:59:49
any one company individually other than    03:59:54
extracting and taking out the performance of    03:59:55
Wells Fargo.    03:59:58

Q.    But do you know specifically what    03:59:59
other companies are in that index?    04:00:00

A.    I don't recall.    04:00:03

Q.    Okay.  And same for the focused    04:00:05
industry index?    04:00:12

A.    I believe the focused industry    04:00:12
index, I did look at the participants at some    04:00:15
point.  I think there were 18 banks in that.    04:00:17

Q.    Did you do --    04:00:20

A.    Something like that.    04:00:21

Q.    I'm sorry.  I don't want to cut you    04:00:22
off.    04:00:24

A.    No.  It was somewhere around 18    04:00:24
banks.    04:00:26

Page 229

- DR. HARTZMARK -

Q.     Did you do any analysis comparing    04:00:29
Wells Fargo to the other companies in either of    04:00:31
those indices?    04:00:33

A.     I'm concerned.  I did a regression    04:00:37
analysis which looks at the performance of    04:00:40
Wells Fargo stock; two, I did the broad industry    04:00:42
index first.  And -- well, broad industry index    04:00:45
and the focused industry index as I would, you    04:00:49
know, try to figure out which is -- which offers    04:00:52
better explanatory power.  And then I found,    04:00:54
actually, when I combined the two, it was    04:00:57
superior.    04:01:00

Q.     But did you look at whether these    04:01:02
are the appropriate industry benchmarks for    04:01:04
Wells Fargo?  Did you do any independent analysis    04:01:10
of that?    04:01:12

A.     Well, yes, in the sense that the S&P    04:01:13
500 general market index is the market that    04:01:15
Wells Fargo compares itself.  And then    04:01:22
Wells Fargo has another index they compare    04:01:24
themselves.  It starts with a K.  I don't    04:01:25
remember what -- what it is, that they compare    04:01:28
themselves to.    04:01:30

And I -- my staff did pull it.  But    04:01:33

Page 230

- DR. HARTZMARK -

there's an algorithm as it relates to the                04:01:36
weighting.  Because you got to pull.  You don't          04:01:40
want Wells Fargo to be in the index.  You want           04:01:41
Wells -- have Wells Fargo return being explained         04:01:44
by Wells Fargo return, even a portion.  So you           04:01:49
need to extract it.  They weren't able to extract        04:01:51
it.                                                      04:01:53

         But I believe the correlation for               04:01:54
the changes in the focused industry index in this        04:01:55
K -- I'll call it the "K index," was like a              04:01:58
correlation of 99 percent, and they're virtually         04:02:02
the same indices.                                        04:02:05

     Q.    When you say that these are the               04:02:06
indices that Wells Fargo compares themselves to,         04:02:08
I think you said something like that, what do you        04:02:11
mean by "compares themselves"?                           04:02:13

     A.    Oh, in their SEC filings, you know,           04:02:15
companies generally look at -- you know, provide         04:02:18
their shareholders with financial performance            04:02:21
relative to other indexes.                               04:02:23

         And it's my understanding -- and I              04:02:27
might have looked at it as well, I probably did          04:02:30
look at the Wells Fargo and, you know, they put          04:02:34
in the graph as to their performance.                    04:02:39

Page 231

- DR. HARTZMARK -

Q.    Do you recall which particular SEC                04:02:40
disclosures you're referring to there?                  04:02:42

A.    It would have been during the class               04:02:44
period, 2018-2019.                                      04:02:46

Q.    Okay.  But do you recall which SEC                04:02:48
disclosures during the --                               04:02:50

A.    No.                                               04:02:52

Q.    -- class period?                                  04:02:52

A.    I don't.                                          04:02:52

Q.    Do you do any comparison of the                   04:03:01
composition of Wells Fargo's assets compared to         04:03:03
the other companies in the two industry indices?        04:03:07

A.    I don't understand the question.  A               04:03:14
comparison of their assets in the index?                04:03:16

Q.    Compared to other companies that are              04:03:18
in that index.                                          04:03:20

A.    I don't understand the question.                  04:03:21

Q.    Well, for instance, you could have                04:03:24
taken a deep dive into Wells Fargo's business,          04:03:27
taken a deep dive into the other companies that         04:03:30
are in the index, and taken a look at whether           04:03:33
they seemed very similar to you or not?                 04:03:36

A.    Oh, you mean in sort of manipulate               04:03:39
the results to get the best fit?                        04:03:41

Page 232

- DR. HARTZMARK -

Q.      That's not what I'm suggesting.  I'm          04:03:43

suggesting you take a look at their business.        04:03:45

A.      I have historically chosen                   04:03:47

off-the-shelf indexes that are used by investors     04:03:49

alike and try to avoid sort of arbitrary choice      04:03:56

in terms of deciding.                                04:04:01

It's -- I mean, let's assume I                       04:04:06

follow your suggestion.  What about geographic       04:04:07

location?  What about customer?  And so, I mean,     04:04:09

that's why you use broad indexes because you have    04:04:11

to look downstream, upstream, across.                04:04:14

And so one can arbitrarily determine                 04:04:18

indices.  But I -- I prefer to do off-the-shelf,     04:04:22

major indices that are well-known, well-used,        04:04:25

well-vetted, and that's what I used here.            04:04:31

Q.      What does it mean that the                   04:04:36

"off-the-shelf major indices are well-known,         04:04:38

well-used, and well-vetted"?                         04:04:40

A.      I think everybody around this table,         04:04:41

and probably most people who watch TV, have heard    04:04:43

about the S&P 500.  I mean, S&P indexes are          04:04:47

well-known, well-vetted, sold.  I mean, I'm not      04:04:51

sure.                                                04:04:56

Q.      What about the particular industry           04:04:56

Page 233

- DR. HARTZMARK -

indices?                                                          04:04:57

  A. What about them?                             04:04:59

  Q. How they, they omit one company and         04:05:01

include another company, for instance?                          04:05:03

  A. Well, again, they -- I don't make           04:05:05

that decision.  Wells Fargo calls it a focused                  04:05:08

banking index that's based on their independent                 04:05:12

analysis.                                                        04:05:15

  Q. Okay.  And where does it call it            04:05:16

that?                                                           04:05:18

  A. Where does it call it?  It's called         04:05:18

the S&P Banks Total Return Index.                               04:05:20

  Q. You said Wells Fargo calls it a             04:05:24

focused banking index.                                          04:05:27

  A. Oh, I'm sorry.  That, I misspoke.  I        04:05:29

mis- -- I meant S&P.                                            04:05:32

  Q. Did you do -- we talked about the           04:05:44

analysis you've done over the class period to see              04:05:46

if any, I think you called them, parameters                    04:05:48

changed over the class period.                                  04:05:51

   Did you look specifically as to               04:05:51

whether Wells Fargo's relationship with the                    04:05:55

industry or the market changed over the class                  04:05:58

period?                                                        04:06:04

Page 234

- DR. HARTZMARK -

MS. POSNER:  Objection as to form.    04:06:04

A.    I mean, I don't understand that    04:06:08
question.  Wells -- I don't understand it.  Can    04:06:10
you reword it?    04:06:13

Q.    Sure.  Do you look at whether the    04:06:14
correlation between Wells Fargo's stock price and    04:06:16
the market for either of your two industry    04:06:22
indices changed over the class period?    04:06:26

A.    Those results are in my backup    04:06:28
material.  I mean, and the coefficient standard    04:06:31
errors show and -- and, yes, they change over the    04:06:33
class period.  That's why you -- otherwise I    04:06:36
would use a single, single control period.    04:06:38
That's why I use 450 different control periods.    04:06:41

Q.    And you're comparing residual    04:06:59
returns on days with news as compared to residual    04:07:02
returns on days without news, correct?    04:07:08

A.    For the cause-and-effect analysis,    04:07:09
my news/no news analysis, I compare the    04:07:11
whether -- again, it's a zero-one, black and    04:07:16
white.  If it's at or below the 5 percent level,    04:07:19
it's considered significant.  And then I -- so I    04:07:22
separate whether it's significant or not, and I    04:07:28
separate news and non-news dates.    04:07:30

- DR. HARTZMARK -

Q.    But you're comparing residual returns on days with news as compared to residual returns on days without news, correct?

A.    Right.  I mean, residual returns, I generally refer to them as "abnormal returns."

Q.    Are those synonyms?

A.    Are those synonyms?  An economist will often, yeah, use those interchangeably.

Q.    Okay.  I believe you say that in any event study, some days will have statistically significant price movements even with no news, correct?

A.    That's correct.

Q.    And why is that?

A.    Well, there can be hidden issues.

Fidelity or a big -- big trader decides to rebalance their portfolio, and there's -- there's -- there's movements.  It could be based on private information.  There's insiders who are trading, and they, you know -- they cause some type of movement in the stock.

The nature of the market model, again, is using the 120 days prior to a particular period as your control period.  It

Page 236

- DR. HARTZMARK -

does not explain a hundred percent of the    04:08:49

movement.  Therefore, there's, you know, movement    04:08:51

that could be -- and possibly, in a loss    04:08:54

causation stage, would be -- explained, and that    04:08:55

could potentially result in an abnormal return.    04:09:01

Or the parameters in the market    04:09:04

model which are fixed and, you know, and even    04:09:06

though -- especially companies like Wells Fargo    04:09:13

have a tendency to move with their indexes    04:09:15

pretty, pretty accompli, not all the time.    04:09:17

And so you can have, you know,    04:09:21

movements in the indexes that -- you know, the    04:09:23

market model, in essence, can induce a problem.    04:09:26

I mean, that's -- the paper we went through this    04:09:29

morning discusses some of those issues.    04:09:31

Q.    Would you expect non-news dates with    04:10:04

statistically significant returns to be    04:10:06

distributed evenly over the class period?    04:10:07

A.    Not necessarily.    04:10:10

MS. POSNER:  Objection.    04:10:11

A.    I mean, I have no opinion one way or    04:10:15

-- but not necessarily, as I sit here today.    04:10:17

Q.    Would it be a concern if non-news    04:10:19

dates with statistically significant returns were    04:10:21

Page 237

- DR. HARTZMARK -

clustered in one part of the class period?          04:10:24

A.     No.                                          04:10:26

Q.     And why is that?                             04:10:27

A.     I -- what do you mean?                       04:10:28

Q.     Why was that --                              04:10:31

A.     I mean, I've had situations where            04:10:33

I've had stocks that have had relatively, like     04:10:37

stable returns, and there's been very few          04:10:43

statistically significant abnormal returns.  And   04:10:49

then there's, I don't know, often, for example,    04:10:52

lots of news, important news that comes out        04:10:54

that -- you know, so all of a sudden that          04:11:01

stability disappears because the company is --     04:11:03

is -- how can I say?                               04:11:08

          They're putting out news, but you're     04:11:09

not necessarily getting statistically significant  04:11:11

movements.  You're just -- you have instability    04:11:14

because people are getting concerned, investors    04:11:17

are getting concerned.  But I have not looked at   04:11:24

that issue.                                        04:11:26

Q.     What do you mean you have not looked         04:11:26

at that issue?                                      04:11:28

A.     I haven't.  As it relates to                04:11:28

Wells Fargo, I haven't looked at the distribution  04:11:30

- DR. HARTZMARK -

of significant returns on news versus no news

dates.

Q.    Okay.  Can you go to paragraph 61

back in your report.  You say there:

"Furthermore, there are unobserved

factors that might lead to price movements

without news that are outside the bounds of

what [could] be expected by chance.  These

factors include, among others, unobserved

changes in the market's expectations,

imperfections in the statistical methods

employed to evaluate the systematic

cause-and-effect relationships of a single

firm over a given period of time, and

private trading activity, for example,

insider trading, trading in advance of an

offering or portfolio rebalancing.  These

factors all might drive a large price

response without an observed cause."

Do you see that?

A.    Yes.

Q.    What do you mean by "unobserved

changes in the market's expectations"?

A.    The nature of stock markets, as I

Page 239

- DR. HARTZMARK -

mentioned, is the expected -- discounted expected            04:13:10

cash flow.  And so if there are changes in the              04:13:13

market's expectations related to -- I mean, you             04:13:16

see it all the time on TV, people are trying to             04:13:19

do it, you know, based on consumer sentiment or             04:13:22

something of that nature; you can see all of a              04:13:26

sudden, you know, large price movements for a               04:13:29

single firm, you know, possibly there's something           04:13:32

related to banking, for example.                            04:13:34

       And that you know would be -- just                   04:13:39

because of the nature of the market model, you              04:13:42

would find an abnormal return that is                       04:13:45

statistically significant.  I mean, again, that's           04:13:47

why you have to look at 450 days over the whole             04:13:50

period because there are idiosyncratic issues.              04:13:53

       Q.    And what about "imperfections in the           04:14:07

statistical methods employed to evaluate the                04:14:09

systematic cause-and-effect relationship of a               04:14:11

single firm over a given period of time," what              04:14:14

does that mean?                                             04:14:17

       A.    I -- we talked about it a number of            04:14:17

times.  The issues of the lineal market model do            04:14:20

not have just R-squareds of a hundred percent.              04:14:24

They're estimates.                                          04:14:30

Page 240

- DR. HARTZMARK -

Q.    And then you say "among others"          04:14:39

before introducing those three.  What are the    04:14:43

others that you're referring to?                 04:14:44

A.    At this point -- I'm trying to         04:14:49

think.  The others?  Just noise in the market.  I    04:14:52

mean, you know, I mean, this is -- this is a     04:14:55

fairly incomplete list.  What else could cause?    04:15:03

(Witness reviewing document.)          04:15:06

You know, there are -- there's         04:15:08

behavior that I don't understand in terms of     04:15:09

investors.  That's why you have the behavioral     04:15:11

economists.                                      04:15:19

Q.    Okay.  And in terms of how your       04:15:27

news/no news model works, for purposes of this    04:15:31

event study, you consider company announcements    04:15:34

related to earnings or guidance to be news,      04:15:38

correct?                                         04:15:40

A.    Correct.                               04:15:41

Q.    And how did you decide to use that    04:15:42

definition of "news" for this model?             04:15:45

A.    It's a standard in both academia and    04:15:49

the litigation industry.                         04:15:52

Q.    Did you consider any alternatives?    04:15:54

A.    Not for the purposes of this report,    04:15:57

Page 241

- DR. HARTZMARK -

no.                                                           04:15:59

Q.     Have you ever used in any 10b                          04:16:05
case -- 10b-5 case, at the class cert stage, for              04:16:08
your event study, have you ever used some other               04:16:14
definition of "news"?                                         04:16:21

A.     Yes.  I -- we had this discussion                      04:16:22
earlier.                                                      04:16:23

Q.     What have you used as your                             04:16:24
definition of "news" in other --                              04:16:25

A.     The earlier discussion I told you                      04:16:26
was, after evaluating the situation for a                     04:16:30
discovery company, I used announcements related               04:16:33
to discovery as opposed to earnings 'cause                    04:16:35
earnings was not important to the investors.                  04:16:39

Q.     What do you mean "announcements                        04:16:43
related to discovery"?                                        04:16:46

A.     We discovered something; we failed.                    04:16:47
Those were what the investors were concerned                  04:16:51
about.  That was the news.  In essence, the                   04:16:52
discounted cash flow was based on discovery, not              04:16:58
on earnings.                                                  04:17:01

Q.     Could you have done that in this                       04:17:01
case?                                                         04:17:04

A.     A discovery?                                           04:17:04

Page 242

- DR. HARTZMARK -

Q.    Yes.                                        04:17:05

A.    If I wanted to be totally subjective        04:17:10
and choose news, I mean, there are maybe          04:17:12
alternatives.  But this -- the standard approach  04:17:17
is to use earnings.  I mean, it's as clean as it  04:17:21
gets.                                             04:17:23

And given the fact that their                     04:17:27
earnings announcement are the primary concern for 04:17:31
investors in Wells Fargo stock, I don't know why  04:17:34
you would want to argue issues associated with -- 04:17:37
and I'm not even sure how I would define          04:17:39
"discovery" as it relates to Wells Fargo.  It's a 04:17:43
mature company that has already discovered, you   04:17:45
know, what it is going to do as a banking entity. 04:17:48

Q.    What do you mean it has already             04:17:54
discovered what it is going to do as a banking    04:17:55
entity?                                           04:17:58

A.    I guess maybe I'm assuming that they        04:17:58
have a business plan and a business model, and    04:17:59
that it relates to traditional banking.           04:18:01

Q.    But what kind of discoveries were in        04:18:06
this other case you're describing where you used  04:18:07
the discoveries news model?                       04:18:10

A.    Oh, oil deposits.                           04:18:11

Page 243

- DR. HARTZMARK -

Q.     Anything else?                                         04:18:16

A.     What do you mean "anything else"?                      04:18:17

Q.     What other kinds of examples of                        04:18:19
discovery -- what other things were included in              04:18:21
your definition of "discovery" there?                        04:18:23

A.     Well, the company was an oil                           04:18:25
exploration and development company, and its                 04:18:29
wells and its drilling were the critical --                  04:18:31

Q.     I see.                                                 04:18:33

A.     -- components to its business.  I                      04:18:34
mean, the discounted -- the discounted expected              04:18:41
cash flow was based on the oil that it                       04:18:43
discovered.                                                  04:18:46

Q.     And have you used anything besides                     04:18:46
earnings for your news in your event study in any            04:18:52
other 10b-5 case besides this one discovery case             04:18:55
you're referring to?                                         04:19:00

MS. POSNER:  Objection.  To the                              04:19:01
extent you recall.                                           04:19:01

A.     Any other definition of "news"?                        04:19:02
Well, going back more than a decade, I used what             04:19:13
I call "cash flow-related disclosures," which is             04:19:15
exactly what it sounds like.                                 04:19:21

The issue there is that even though                          04:19:27

Page 244

- DR. HARTZMARK -

there is academic basis for every date that I          04:19:29

had, it just had a -- a little bit of an element          04:19:32

of subjectivity that made me uncomfortable.  And,          04:19:34

therefore, I decided over time that it was -- I          04:19:37

would go and use the staple that academics use          04:19:39

and litigation experts use, which is earnings and          04:19:45

guidance.          04:19:48

Q.    And you had seven news dates in your          04:19:52

model, correct?          04:19:55

A.    Seven news dates?          04:19:55

Q.    Yes.          04:19:58

A.    Yes.  Seven earnings dates.          04:19:59

Q.    Did you look at what information was          04:20:02

released to the market on those seven news dates?          04:20:03

A.    No.  The whole idea is that the --          04:20:06

that you're agnostic.  They're in          04:20:08

information-rich dates.          04:20:11

And the concept is that an          04:20:17

information- rich date, if there's a reaction to          04:20:19

the information, you'll see a statistically          04:20:21

significant return, You know, more often than on          04:20:25

days when there's not an information-rich day.          04:20:27

Q.    Did you look at the direction of the          04:20:32

price reaction on a news date in this case?          04:20:34

Page 245

- DR. HARTZMARK -

A.    No.  I look at the causes of either          04:20:36

the losses or the gains 'cause that's a -- a loss    04:20:41

causation analysis.                                  04:20:45

Q.    All right.  Let me just go over one        04:20:51

example with you.  If you go to page 594 of your    04:20:53

exhibit -- of your Appendix C.                      04:20:59

MS. POSNER:  Appendix C?                  04:21:09

MR. TRAPS:  Yes.                          04:21:10

Q.    To be clear, I'm using at the page        04:21:11

numbers at the bottom.                              04:21:13

A.    Oh, okay.  5 --                            04:21:13

Q.    And I'll tell you the page number.        04:21:14

It is page number 700 of 766.                       04:21:28

Are you with me?                          04:21:48

A.    I'm on page 700 of 766.                    04:21:50

Q.    And you see there, there's a row for      04:21:57

February 26, 2020?                                  04:21:59

A.    Yes.                                       04:22:05

Q.    Okay.  Is this a news day?                 04:22:05

A.    I don't believe so, no. 'Cause it's       04:22:06

not an -- an earnings date.                         04:22:09

Q.    Okay.  And what is the abnormal            04:22:16

return on that date?                                04:22:17

A.    The abnormal return is negative           04:22:18

Page 246

- DR. HARTZMARK -

1.46 percent.                                          04:22:21

Q.    And is that statistically               04:22:24

significant?                                          04:22:26

A.    It is got a p-value of 2.87 percent,     04:22:26

and it is statistically significant below the          04:22:29

5 percent level.                                       04:22:32

Q.    And you have for that date various       04:22:35

public press headlines and SEC forms being filed;     04:22:37

is that right?                                        04:22:45

A.    Under the column 14, there are           04:22:45

various SEC filings, and -- and then a few             04:22:47

headlines related to Wells Fargo.                      04:22:56

Q.    And can you tell what caused the         04:23:04

abnormal return on that date, per your model?          04:23:05

A.    What caused?                             04:23:10

Q.    Yes.                                     04:23:11

A.    Well, again, I haven't done a loss       04:23:12

causation analysis.  This would suggest there          04:23:15

seems to be some information.                          04:23:18

        "Wells Fargo workers seek                04:23:26

     Washington's help with internal gripes."         04:23:29

           The -- you know, I can't say what is       04:23:35

the cause.  I didn't look at it every day and          04:23:39

anecdotally evaluate it.  That's not -- I look at      04:23:42

Page 247

- DR. HARTZMARK -

the 450 days as a whole to evaluate whether the          04:23:45

market is efficient, but I have not done a loss          04:23:50

causation analysis on any single day.          04:23:53

Q.    Okay.  And when was the -- you may          04:24:04

have to flip through Appendix C.  You may know          04:24:06

this off the top of your head, but --          04:24:09

A.    Well, the -- you know, the other          04:24:11

thing I was going to say is there also -- I just          04:24:13

noticed there are events that are late in the day          04:24:16

on the day before about...          04:24:18

You know, for example, at the bottom          04:24:26

of 593, "For Wells Fargo and former executives,          04:24:27

$3 billion deal with U.S. may not be the end,"          04:24:32

that happened at 3:00 p.m.          04:24:35

And then there are a number of just          04:24:38

-- a number of other headlines that are --          04:24:45

happened the day before but after the market          04:24:48

closed.  But, again, I haven't looked at what          04:24:50

caused that.          04:24:52

Q.    Are you saying that article could          04:24:55

have caused an abnormal return?          04:24:58

A.    I don't know.  Whatever is -- you          04:24:59

know, I don't.  There's a headline here "Moody's          04:25:02

announces completion of a periodic review of          04:25:06

Page 248

- DR. HARTZMARK -

ratings of Wells Fargo."  I mean, I don't know                04:25:10

what's in that.                                                04:25:13

            I'm just saying that there are                     04:25:14

headlines associated with that, but I haven't                  04:25:16

done a loss causation analysis.                                04:25:17

        Q.    Okay.                                            04:25:18

        A.    I thought we -- we -- you asked me               04:25:18

that earlier, I believe.                                       04:25:20

        Q.    I'm sorry.  I asked you what                     04:25:21

earlier?                                                       04:25:22

        A.    Whether I had done a loss                        04:25:23

causation --                                                   04:25:25

        Q.    Yeah.                                            04:25:25

        A.    -- analysis.                                     04:25:26

        Q.    Yeah.  Okay.                                     04:25:28

            What is the first news event in your               04:25:29

model, the first date where a news event occurs?              04:25:31

        A.    The first date when --                           04:25:39

        Q.    Yes.                                             04:25:39

        A.    -- the news event occurs?  Oh, I                 04:25:40

think I got...                                                 04:25:40

            (Witness reviewing document.)                      04:25:40

            The first one is July 13, 2018.                    04:25:50

        Q.    Okay.  And was that associated with              04:25:55

Page 249

- DR. HARTZMARK -

a statistically significant residual return?                    04:25:57

(Witness reviewing document.)                    04:26:06

A.    July 13th was not statistically                    04:26:15

significant.                    04:26:19

Q.    Okay.  So that was the first news                    04:26:19

day, and there was no statistically significant                    04:26:21

abnormal return.                    04:26:24

Do you know when the first news date                    04:26:28

with a statistically significant return was?                    04:26:30

A.    October 12, 2018, there was an                    04:26:39

abnormal return of 1.89 percent with a p-value of                    04:26:46

1.61 percent.                    04:26:50

Q.    So the first news date with a                    04:26:51

statistically significant return was October 12,                    04:26:55

2018, correct?                    04:26:57

A.    Correct.                    04:26:57

Q.    And so what is the basis, from your                    04:26:58

event study, to conclude that the market was                    04:27:02

efficient before October 2018?                    04:27:04

A.    Again, I -- my -- my opinion is that                    04:27:07

it's efficient for the 450 days of the class                    04:27:10

period.                    04:27:14

Q.    But from the event study, all we                    04:27:14

know is that there was a news date on July 13,                    04:27:16

Page 250

- DR. HARTZMARK -

2018, and it did not have a statistically     04:27:20

significant return, correct?     04:27:28

A.    Again, you're looking -- I'm not     04:27:28

going to make a conclusion based on a sample of     04:27:30

one.  I'm going to make a conclusion based on a     04:27:32

reasonable-size sample.  And in this particular     04:27:34

case, I'm lucky that I have 450 dates in my     04:27:36

sample.     04:27:39

Q.    But for all the dates before     04:27:41

October 12th, you don't have any news date with a     04:27:43

statistically significant abnormal return, right?     04:27:46

A.    I'm not sure what your point is.     04:27:50

Q.    I'm just asking yes or no.     04:27:53

A.    There are no dates -- there are no     04:27:54

defined news dates with statistically significant     04:27:56

dates before October 12, 2018.     04:27:58

Q.    Okay.  And then when is the last     04:28:01

news event in your model?     04:28:03

A.    Last news event is January 14, 2020.     04:28:05

Q.    Okay.  And did you -- so you did not     04:28:09

have any news dates to pass in February or March     04:28:12

2020, correct?     04:28:17

A.    No.  That's the point I was trying     04:28:18

to make before, is that to the extent that, you     04:28:20

Page 251

- DR. HARTZMARK -

know, that there is an issue that you all                04:28:27

disagreed with in terms of volatility and the            04:28:29

standard error that's used for significance in           04:28:31

February and March of 2020, that my test is bias         04:28:34

against finding a difference because there might         04:28:40

be more statistically significant dates in those         04:28:42

than otherwise.                                          04:28:44

          My last date is, again, January 14,           04:28:48

2020, well before my last in-person, previous            04:28:51

in-person deposition.                                    04:28:55

     Q.    Right.  I guess I'm struggling to             04:28:56

understand why it's biased against finding...            04:28:59

          Couldn't your results also be                 04:29:06

consistent with the market not being efficient           04:29:08

after January 2020?  How do you know that the            04:29:11

market was efficient in February 2020 and                04:29:13

March 2020?                                              04:29:15

     A.    I think to choose a date or a week            04:29:19

is -- is based on daily closing prices, which is         04:29:20

what I have used here, which is the basis and the        04:29:25

standard for both economics, and academia, and           04:29:28

for litigation.  You wouldn't -- you wouldn't do         04:29:32

it.  You wouldn't do it as a -- you know, for            04:29:38

that -- make -- you wouldn't make a conclusion           04:29:42

Page 252

- DR. HARTZMARK -

based on a day or two days.                    04:29:44

Q.     Okay.  But let me ask you this.      04:29:46

When is the first day of the class         04:29:47

period here?                               04:29:49

A.     When is the first day of the class  04:29:49

period?  The first day is May 30, 2018.    04:29:51

Q.     And the close is March 12, 2020, I  04:29:58

believe, correct?                          04:30:03

A.     Correct.  Uh-hmm.                    04:30:03

Q.     Okay.  So based on your event study, 04:30:04

you believe that -- and then putting aside all  04:30:06

the other factors.  Let's just go with, your    04:30:10

event study leads you to believe that the market 04:30:13

for Wells Fargo stock was efficient for this     04:30:15

entire time period, correct?                     04:30:17

A.     The -- okay.  The market model was   04:30:19

used.  Okay?  An event study looking at news and 04:30:21

no news demonstrates support for the conclusion  04:30:25

that the market is efficient.  The use of        04:30:27

every -- that's used in every date, every -- all 04:30:31

450 dates.                                       04:30:35

The analysis also examines                 04:30:38

autocorrelation using 450 dates and finds that   04:30:41

there's no systematic autocorrelation.  So both  04:30:45

Page 253

- DR. HARTZMARK -

of those support.    04:30:49

Q.    But that's a separate analysis.  I'm    04:30:50
talking just about your event study.    04:30:52

A.    I'm confused.  I used the data from    04:30:56
my market model --    04:30:58

Q.    Yeah.    04:30:58

A.    -- to do an event study looking at    04:30:59
specific dates.  I used the data from the market    04:31:01
model to do my autocorrelation analysis as well.    04:31:03

Q.    Without adjusting your market model,    04:31:14
could you conclude that Wells Fargo common stock    04:31:15
market was efficient on May 29, 2018 as well?    04:31:18

A.    I'm --    04:31:26

MR. TRAPS:  Objection as to form.    04:31:27
Incomplete hypothetical.    04:31:28

A.    Yeah, I mean, I think any economist    04:31:28
who is going to base his opinion on one    04:31:29
observation is -- is -- I mean, is just not using    04:31:31
a scientific method.  First of all --    04:31:37

Q.    I think we may have a    04:31:41
misunderstanding.    04:31:43

A.    Okay.    04:31:44

Q.    Can you extend your conclusion    04:31:44
backwards another day and say May 29, 2018 was    04:31:46

Page 254

- DR. HARTZMARK -

also efficient for Wells Fargo common stock, 04:31:52

based on the same? 04:31:55

A.    I don't have the data in front of 04:31:56

me.  Tell me what the volume was; tell me what 04:31:57

the turnover was; tell me what the bid-ask 04:31:59

spreads were. 04:32:02

Q.    That suggests -- 04:32:02

A.    Tell me -- 04:32:04

Q.    -- they failed that step. 04:32:04

A.    -- what the abnormal returns are. 04:32:04

Tell me -- I mean, this is -- I mean, I can't 04:32:06

tell you what it was on January 1, 1930.  Okay? 04:32:08

I just can't. 04:32:12

Q.    But another way to put that is if 04:32:13

you wanted to evaluate the efficiency of the 04:32:16

Wells Fargo common stock one day further, on 04:32:20

May 29, 2018, you would run the same model for 04:32:22

one additional day; is that correct? 04:32:24

A.    If that date were in my sample, I 04:32:27

would run this model for the addition -- I'd add 04:32:29

a sample observation.  You know, I'm not sure -- 04:32:34

you could do 4500 observations. 04:32:38

Q.    And if that date had news, under 04:32:41

your definition, hypothetically, but no 04:32:45

Page 255

- DR. HARTZMARK -

statistically significant abnormal return, what    04:32:48

would you -- what conclusion would you draw?    04:32:53

A.    On May 29, 2018?    04:32:56

Q.    Sure.    04:32:59

A.    A day before an earnings release?    04:32:59

It probably be would consistent with market    04:33:01

efficiency.  I'm not sure why would you have a    04:33:06

statistically significant return on a day before.    04:33:07

Q.    Okay.  And if we kept going?    04:33:09

MS. POSNER:  Is that a question?    04:33:15

A.    You want me to go back every day    04:33:19

till June, January 1, 1930?    04:33:21

Q.    I guess I'm just trying to    04:33:24

understand how you could be comfortable for a    04:33:26

particular period, early period in the class    04:33:30

period, that the market is efficient, based on    04:33:32

your event study, when you don't have a -- any    04:33:35

statistically significant news day for that time    04:33:39

period.    04:33:42

MS. POSNER:  Objection.    04:33:42

A.    I have a 766-page report.  If you    04:33:48

would, please, turn to appendix -- I'm sorry.    04:33:51

Exhibit 1 of my report.  Okay?    04:34:02

Exhibit 1 demonstrates turnover over    04:34:03

Page 256

- DR. HARTZMARK -

a 450-day period and shows that the average          04:34:09

turnover was 2.38 percent.  That is consistent        04:34:11

and support that this 450-day period is one which     04:34:19

is open, well-developed, and efficient.               04:34:23

Q.    Okay.                                       04:34:26

A.    Turn to page Exhibit 2A.  2A I show         04:34:27

that that are a list of the number of analyst         04:34:34

reports, 812 analyst reports, and I break it down     04:34:36

over the -- over the calendar year.  That is          04:34:39

support for the market being consistent over a        04:34:45

450-day class period.                                 04:34:47

Exhibit 2B.  This shows that the              04:34:51

analysts were heavily participating in almost all     04:34:53

of the company conference calls --                    04:34:58

Q.    I don't want to interrupt but --           04:35:01

A.    -- over the 450 days --                     04:35:02

Q.    -- I did ask about the event study          04:35:03

only.                                                 04:35:04

A.    I -- you asked me --                         04:35:05

Q.    I didn't ask you about the --               04:35:05

A.    You said how --                             04:35:06

MS. POSNER:  Objection.  If you read         04:35:09

back up, you actually did.  If you scroll         04:35:10

up on the realtime, you did.                      04:35:12

Page 257

- DR. HARTZMARK -

Q.    As to your event study, how could    04:35:13
you conclude for an early period that has no    04:35:18
statistically significant returns, of normal    04:35:21
returns on a news date, how can you conclude that    04:35:27
that period is efficient based on your event    04:35:30
study alone?  Put aside all the other factors    04:35:31
that you're pointing me to.    04:35:34

A.    I --    04:35:37

MS. POSNER:  Objection as to form.    04:35:38

A.    I have answered that question.  It's    04:35:39
-- the event study itself, it would show that    04:35:41
there's no autocorrelation; it would show that    04:35:43
there's sufficient turnover; it would show that    04:35:46
the bid-ask spread is narrow; it would show that    04:35:49
their market cap was over $200 billion; it would    04:35:52
show that analysts following was probably 45    04:35:54
analysts.    04:35:57

I'm looking at a 450-day period.    04:35:57
You can look at any N equals 1 -- okay? -- and    04:36:00
try to make whatever statement you want.  And    04:36:03
your expert is more than free to try to do that.    04:36:06

To break it up into that component    04:36:08
just doesn't make any sense.  I mean, you know, I    04:36:12
mean, it's -- and it doesn't answer the question    04:36:16

Page 258

- DR. HARTZMARK -

that I was asked.                                             04:36:19

          I was asked -- I mean, we can go         04:36:19

again to paragraph 1.  I was asked and engaged     04:36:22

to -- I was -- it's right there.  "Determine       04:36:29

whether the common stock of Wells Fargo and        04:36:31

Company traded in an open, well-developed, and     04:36:33

efficient market from May 30, 2018 through         04:36:37

March 12, 2020."                                   04:36:39

          Okay?  I wasn't asked to tell            04:36:41

whether it's -- it was efficient at 10:15 and      04:36:44

25 seconds on June 3, 2018.  That's a question     04:36:54

that is not one that I have been engaged to        04:36:58

answer.                                            04:37:02

     Q.    Okay.                                   04:37:03

          MR. TRAPS:  All right.  Should we         04:37:04

     take a break?                                 04:37:05

          THE WITNESS:  Sure.                      04:37:06

          THE VIDEOGRAPHER:  We are now off         04:37:08

     the record.  The time on the video monitor    04:37:09

     is 4:36 p.m.                                  04:37:11

          (Recess taken.)                          04:37:13

          (Counsel Mary McNamara substituted       04:55:45

     for Counsel Carly Bittman).                   04:55:50

          THE VIDEOGRAPHER:  We are now back        04:55:53

Page 259

- DR. HARTZMARK -

on the record.  The time on the video                04:55:55

monitor is 4:55 p.m.                                  04:55:56

BY MR. TRAPS:                                         04:56:00

Q.    Okay.  Welcome back, Dr. Hartzmark.            04:56:01

Let's talk about Section VII of your report,          04:56:02

which starts on page 38.  Are you there?              04:56:16

A.    Yes.                                            04:56:24

Q.    What is your understanding of what             04:56:24

plaintiffs have to establish for class cert           04:56:25

regarding damages?                                    04:56:28

MS. POSNER:  Objection.  Calls for a       04:56:29

legal conclusion.                                 04:56:33

A.    What I do know is that I was asked             04:56:34

whether there's a common damages methodology that     04:56:36

can be applied class-wide.                            04:56:43

Q.    Okay.  And were you also asked                 04:56:44

whether damages could be measured consistently        04:56:46

with plaintiff's theory of liability?                 04:56:49

A.    The damages methodology that I                 04:56:52

propose is based on plaintiff successfully            04:56:56

litigating the allegations.                           04:56:59

Q.    And what is your understanding of              04:57:03

plaintiff's theory of liability in this case?         04:57:04

A.    Well, it's stated on paragraph 2,              04:57:07

Page 260

- DR. HARTZMARK -

that the lead plaintiffs allege the defendant's                04:57:18

misstatements and omissions concerning the bank's             04:57:22

compliance with the 2018 Consent Orders                        04:57:24

require -- Consent Orders' requirements                        04:57:28

artificially inflated the price of Wells Fargo                 04:57:33

stock.                                                          04:57:36

    Q.   And what do you understand "bank's          04:57:36

compliance with the 2018 Consent Orders'                       04:57:38

requirements" to mean?                                         04:57:41

    A.   It speaks for itself.  I haven't             04:57:42

done a legal analysis.  I only know there are                  04:57:47

consent orders from the FRB, the OCC, and the                  04:57:49

consumer board, and that it's alleged that there               04:57:53

were misstatements regarding those.                            04:57:59

    Q.   Do you know how many misstatements           04:58:00

there were?                                                    04:58:05

    A.   I don't recall.                              04:58:05

    Q.   Taking you to the next sentence             04:58:12

there where you just read, on page -- you turn                 04:58:13

the page to page 2.                                            04:58:19

    A.   I'm on page 2, yes.                          04:58:21

    Q.   Great.  You're quoting from the             04:58:23

Complaint there.                                               04:58:25

        "The artificial inflation in             04:58:26

Page 261

- DR. HARTZMARK -

Wells Fargo's stock price was removed when          04:58:28

the conditions and risk misstated and              04:58:30

omitted by Defendants and/or the                   04:58:31

materialization of the risks concealed by          04:58:33

Defendants' material misstatements and             04:58:36

omissions were revealed to the market."            04:58:38

          Do you see that?                         04:58:40

A.     Yes.                                         04:58:40

Q.     What do you understand                       04:58:40

"materialization of the risks" to mean in that      04:58:45

sentence?                                          04:58:49

A.     In that sentence?                            04:58:49

Q.     Yes.                                         04:58:50

A.     Well, to the extent that there are          04:58:50

risks associated with the 2018 Consent Orders,      04:58:52

that the revelation at the corrective disclosure    04:59:02

could potentially include the materialization of    04:59:05

a concealed risk.                                  04:59:09

Q.     And what are the risks associated            04:59:13

with the 2018 Consent Orders?                        04:59:16

A.     What are the risks?                          04:59:18

Q.     Yes.                                         04:59:19

A.     I don't know the specific risks.             04:59:20

There would be risks associated with the -- with    04:59:25

Page 262

- DR. HARTZMARK -

consent orders and the various requirements in          04:59:28

the consent orders.                                     04:59:33

       Q.    Do you know the requirements in the        04:59:34

consent orders?                                         04:59:35

             MS. POSNER:  Objection.  Calls for a       04:59:37

       legal conclusion.                                04:59:39

       A.    Yeah, I'm not familiar other than          04:59:39

there was, you know, stage 1, 2, 3.                     04:59:41

       Q.    Okay.  And what are those stages?          04:59:44

       A.    1, 2, 3.                                   04:59:46

       Q.    And what do those stages entail?           04:59:47

       A.    There are three stages that you            04:59:54

needed to pass through.  I'm not -- I'm not             04:59:56

opining on, you know, whether they were or were         04:59:59

not, you know what exactly were the consent             05:00:02

orders and what the stages represented.                 05:00:09

       Q.    Okay.  Do you have any knowledge            05:00:11

sitting here today about what was required of            05:00:12

each of those three stages?                             05:00:15

             MS. POSNER:  Objection.  Calls for a       05:00:16

       legal conclusion.                                05:00:19

       A.    I mean, if you -- I've read and            05:00:19

reviewed the Complaint, and I know there are            05:00:21

stages associated with 1, 2, and 3.                     05:00:24

Page 263

- DR. HARTZMARK -

Q.     Beyond that, do you know what's

required by each of the stages of the Consent

Order?

A.     That would be facts that I've not

been asked to -- to evaluate.

Q.     Okay.  And then the next sentence,

again, you're quoting from the Complaint here:

          "These disclosures and/or

          materializations divulge or reveal

          information through a series of partial

          disclosing events which slowly corrected

          Defendants' prior misrepresentations and

          omissions and/or revealed facts about the

          nature and extent of Wells Fargo's

          deficiency in meeting the 2018 Consent

          Orders' requirements."

          Do you see that?

A.     Yes.

Q.     And what do you understand the word

"slowly" to mean there?

A.     "Slowly?" I'd be interpreting the

Complaint.  But what I can say is that, I mean,

in the Complaint, there are three alleged dates

when there are corrective disclosures along with

Page 264

- DR. HARTZMARK -

a period of time in March of 2020 when there is                05:01:30

additional curative information that's disclosed.              05:01:34

Q.    Okay.  And what are the three                            05:01:42

alleged dates you're referring to there?                       05:01:43

A.    The three alleged dates, January of                      05:01:50

2019, January -- wait.  I'm sorry.  I -- I have                05:01:55

to go backwards from the...                                    05:02:12

(Witness reviewing document.)                          05:02:37

The corrective period would be from                    05:02:40

March 5th through March 12th, and I believe the                05:02:42

dates are in January of 2020, January of 2019,                 05:02:47

and...                                                         05:02:57

(Witness reviewing document.)                          05:03:03

If I saw the Complaint, I would                         05:03:23

know.  I think -- my recollection is April as                  05:03:25

well, 2019.                                                    05:03:26

Q.    Okay.  Just back to paragraph 2.                         05:03:29

A.    Okay.                                                    05:03:43

Q.    The last few words of that last                          05:03:43

sentence we read: "the nature and extent of Wells              05:03:45

Fargo's deficiency in meeting the 2018 Consent                 05:03:49

Orders' requirements."  Do you see that?                       05:03:54

A.    Yes.                                                     05:03:55

Q.    What's your understanding of what                        05:03:55

Page 265

- DR. HARTZMARK -

that phrase means?                                    05:03:56

A.    It --                                           05:03:59

MS. POSNER:  It calls for a legal                    05:04:00

conclusion.                                           05:04:01

A.    Yeah, it speaks for itself.  I                 05:04:01

mean...                                               05:04:04

Q.    Is it your understanding that the              05:04:05

nature and extent of Wells Fargo's deficiency in     05:04:06

meeting the 2018 Consent Orders' requirements, is    05:04:10

it your understanding that changed over time?        05:04:13

MS. POSNER:  Objection as to form.                   05:04:17

A.    I have not evaluated any of the                05:04:18

pages over time in terms of the alleged              05:04:25

misstatements.                                        05:04:27

Q.    Did you draft this Section 7 of your           05:04:39

report?                                               05:04:41

A.    Did I draft it?                                05:04:41

Q.    Yes.                                           05:04:42

A.    Yes.                                           05:04:42

Q.    Would it surprise you if it was               05:04:48

almost exactly identical to a section in other       05:04:50

reports you've submitted?                            05:04:52

A.    I'd be surprised otherwise.                   05:04:53

Q.    Okay.  And why is that?                       05:04:55

Page 266

- DR. HARTZMARK -

A.    Because the nature of the common    05:04:59

damages methodology that is applied in 10b is a    05:05:02

virtual standard with both academic and    05:05:07

litigation basis.    05:05:09

Q.    And do the alleged    05:05:11

misrepresentations and corrective disclosures    05:05:13

factor into your damages analysis at class cert?    05:05:20

MS. POSNER:  Objection.    05:05:25

A.    The --    05:05:25

MS. POSNER:  Lacks foundation.    05:05:26

Assumes facts not in evidence.  Go ahead.    05:05:27

A.    Yeah, I mean, you're saying the    05:05:28

facts that caused the losses?    05:05:32

Q.    Sure.  I'm saying the    05:05:33

misrepresentation -- let's start with the    05:05:34

misrepresentations.    05:05:37

Your analysis of the ability to    05:05:38

calculate damages on a class-wide basis, does    05:05:40

that -- do the specific misrepresentations, the    05:05:46

nature of the misrepresentations, does that    05:05:51

factor into your analysis of the ability to    05:05:53

calculate damages on a class-wide basis?    05:05:55

A.    It will factor into the specific    05:06:00

issues associated with loss causation.  Okay?    05:06:02

Page 267

- DR. HARTZMARK -

Those facts.                                                      05:06:05

And with respect to loss causation,                              05:06:06
it will then factor into the inputs into the --                  05:06:09
what would be considered the inflation event that                05:06:14
would be applied class-wide, and then the common                 05:06:19
damages methodology that I describe in Section 7                 05:06:23
would be utilized to calculate investor damages.                 05:06:27

Q.    But at this stage, at this stage,                          05:06:30
the representations do not matter to your                        05:06:32
analysis, correct?                                               05:06:36

MS. POSNER:  Objection.                                           05:06:36

A.    I'm confused by -- I mean,                                 05:06:37
misrepresentations, to the extent that they                      05:06:40
caused losses, would be evaluated and measured at                05:06:45
the loss causation stage.                                        05:06:47

But what this says is that those                                 05:06:49
misstatements and losses would be -- the                         05:06:51
inflation caused by them would be applied                        05:06:56
class-wide to calculate individual damages using                 05:07:02
the common damages methodology.                                  05:07:05

Q.    Okay.  Would it matter to your                            05:07:06
analysis in the Section VII if the                               05:07:07
misrepresentations here were on entirely                         05:07:10
different topics?                                                05:07:13

Page 268

- DR. HARTZMARK -

A.     Were entirely?  It would matter in                05:07:15

that the inputs would be different.  But the             05:07:18

nature of common damages methodology utilized in          05:07:24

10b is a virtual standard of what is called an            05:07:29

out-of-pocket damages, which is looking and               05:07:34

calculating the inflation per share at the time           05:07:39

of purse less the inflation per share at the time         05:07:45

of sale.                                                  05:07:47

Q.     And you haven't done a loss                 05:07:48

causation analysis yet, as you've testified many          05:07:49

times today, correct?                                     05:07:51

A.     Yes.  You asked me that question            05:07:51

very early on.  I have not done a loss causation          05:07:53

analysis.                                                 05:07:54

Q.     At this stage, for class cert, the          05:07:55

topic of the misrepresentations does not matter           05:07:58

for your analysis and the ability to calculate            05:08:02

damages on a class-wide basis, correct?                   05:08:05

MS. POSNER:  Objection as to form.       05:08:07

But if you can answer that question.                 05:08:08

A.     As I said, that -- reread back the           05:08:09

question because I lost it with the objection.            05:08:16

Q.     Sure.                                        05:08:16

As this stage for class cert, the           05:08:16

Page 269

- DR. HARTZMARK -

topic of the misrepresentations does not matter   05:08:19
for your analysis and the ability to the   05:08:20
calculate damages on a class-wide basis, correct?   05:08:21

MS. POSNER:  Same objection.   05:08:24

A.   Yeah.  I mean, the topic is   05:08:25
basically, the cause.  Okay?  The misstatements   05:08:26
and the revelation of the alleged fraud are the   05:08:36
causes of the losses or the harm to the   05:08:38
investors.  And right there, the question there   05:08:42
is a loss causation question.  And as I've told   05:08:43
you, I haven't done a loss causation.   05:08:45

The key, though, is to understand   05:08:47
that whatever those facts turn out to be, you   05:08:48
know, through discovery or through dispute or   05:08:54
what the trier of fact were to determine, that   05:08:55
will be utilized to calculate the input into an   05:08:58
inflation event, and the common methodology is   05:09:01
used.   05:09:04

But I have not implemented this   05:09:04
because that's done in a loss causation analysis.   05:09:06

Q.   I think -- I think I fully   05:09:10
understand you that that is relevant at the loss   05:09:11
causation stage, which we are not at.  What I'm   05:09:14
trying to understand: Is the topic of the   05:09:18

Page 270

- DR. HARTZMARK -

misrepresentations relevant at this stage for    05:09:21

your report currently here, right now?    05:09:22

A.    The -- I mean, I know that there    05:09:27

are -- from reviewing the complaint and the    05:09:29

motion to dismiss, that there are misstatements    05:09:33

that caused artificial inflation, and I'm    05:09:35

assuming that's true.  To the extent it caused    05:09:39

artificial inflation, the common damages    05:09:41

methodology applies that artificial inflation to    05:09:45

the purchase and sale by the.    05:09:48

So the topic, in a general sense, is    05:09:49

important because it causes inflation.    05:09:53

Q.    But you're assuming that    05:09:57

misstatements were mate, correct, and you're just    05:09:59

analyzing whether damages could be calculated on    05:10:00

a class-wide basis here, right?    05:10:02

A.    It would be presumptuous of me to    05:10:04

not assume that misstatements were not made,    05:10:07

because I say in -- I think it's paragraph 2,    05:10:10

that for the purposes of this report, I'm    05:10:17

assuming that the allegations are true.    05:10:21

Q.    If Wells Fargo had allegedly made    05:10:23

misstatements on the same days but on entirely    05:10:26

different topics, the size of its offices, and    05:10:31

Page 271

- DR. HARTZMARK -

that was alleged to be the material

misrepresentations in this case, and they wind up

on the same days as here, would that matter for

Section VII of your report?

MS. POSNER: Objection as to form.

But if you can answer.

A.    It would -- it would -- what you're

asking is, if, for example, there was a different

misrepresentation, which means that the losses

caused to investor or the harm caused to

participants in this market were different.

Okay?  Would that affect this?

And the fact is, my common damages

methodology says yes.  We would -- it says that

if it were this other -- the size of the office

is the misstatement and the harm was larger for

whatever reason, that harm would be applied

class-wide, common damages methodology would

be -- would be utilized to calculate damages.

Q.    But you haven't actually done the

common damages methodology here, yet, correct?

A.    Haven't done?

Q.    Yes.

A.    I -- the common damages methodology

Page 272

- DR. HARTZMARK -

is clearly explained here.  I have not done a    05:11:30

loss causation analysis; I have not calculated    05:11:33

the inputs into the inflation ribbon.    05:11:35

Q.    And have you calculated damages    05:11:39

here?    05:11:41

A.    I make it clear that I am not    05:11:41

calculating a quantum of damages here.  I wasn't    05:11:44

asked to calculate the quantum of damages.    05:11:46

Q.    Okay.  And where in Section VII of    05:11:49

your report, if at all, do you customer the    05:11:52

allegations in this case?    05:11:53

A.    In this Section VII?    05:11:57

Q.    Yes.    05:11:58

A.    Section VII provides -- I discuss    05:12:01

the allegations further on and assume that they    05:12:02

are true, and Section VII is a follow-on, and it    05:12:05

demonstrates the ability to calculate damages on    05:12:10

a class-wide basis using a virtual standard    05:12:12

approach and, as you stated, very consistent with    05:12:15

my prior reports because it is a virtual    05:12:19

standard.    05:12:21

Q.    And where do you refer to the    05:12:24

misrepresentations alleged in this case in    05:12:25

Section VII?    05:12:26

Page 273

- DR. HARTZMARK -

A.      I've got a report.                          05:12:27

In the same way that I look at          05:12:30

450-day period, I looked at -- I mean, this       05:12:32

report, I state at the very beginning that, "I    05:12:34

reviewed the Complaint and motion to dismiss      05:12:36

order and assume the allegations sustained in the 05:12:38

motion to dismiss order are true for the purposes 05:12:41

of this report," and then I lay out what the      05:12:42

allegations are.                                   05:12:47

And then in Section VII, based on       05:12:48

assuming that, I say that the -- once facts        05:12:50

are -- once the factual disputes are resolved,     05:12:56

once discovery is at least implemented and one     05:13:00

can look at this, whatever that input is into the  05:13:02

inflation ribbon will be applied class-wide.       05:13:05

Q.      Do you recall what the allegations  05:13:08

were in the Ryder case?                            05:13:11

A.      In the Ryder case?                    05:13:12

Q.      Yes.                                  05:13:13

A.      There was an accounting issue        05:13:14

associated with residual value.                    05:13:15

Q.      The residual value of a vehicle      05:13:20

fleet?                                             05:13:23

A.      Yes.  Yes.  The vehicles in that     05:13:24

Page 274

- DR. HARTZMARK -

fleet.                                                             05:13:26

Q.    And the Section VII in the report                           05:13:28
you submitted in that case is virtually identical                 05:13:31
to the one you submitted in this case, correct?                   05:13:33

A.    I -- you know, I can't say.  I don't                        05:13:35
want to swear under oath.  If it's different,                     05:13:41
substantially different, I would be surprised.                    05:13:44

Again, this is a virtual standard;                                05:13:45
it hasn't changed in the last month.  The                         05:13:48
out-of-pocket damages methodology is consistent.                  05:13:52
If it's -- if the input the calculated in Ryder,                  05:13:57
or if the input is calculated in Wells Fargo,                     05:13:59
based on the factual record, based on what the                    05:14:04
trier of fact determines, the trier of fact will                  05:14:08
determine what the inflation is, and that will be                 05:14:10
applied class-wide.  It's very basic.                             05:14:13

Q.    Have you ever proposed a more                               05:14:15
detailed damages methodology at the class cert                    05:14:17
stage in other cases?                                             05:14:20

A.    Not that I can recall.                                      05:14:22

Q.    Do you recall the Volkswagen                                05:14:24
bondholders securities class action?                              05:14:29

A.    That, the Volkswagen bondholder                             05:14:31
securities class action, the issue with respect                   05:14:36

Page 275

- DR. HARTZMARK -

to that was associated with a common discount          05:14:38

curve, which is --                                     05:14:40

Q.     What does that mean?                            05:14:42

A.     -- to show there was discount.                  05:14:44

What does it mean?  It means that                      05:14:47

bonds are generally priced off of a common             05:14:48

discount curve.  On -- and given the impact on         05:14:52

Volkswagen associated with their probability of        05:14:58

default and the shape and slope and the changes        05:15:06

thereof of the common discount curve, that would       05:15:08

be -- that curve then flows through the pricing        05:15:13

of the bonds.                                          05:15:15

So it's a very different issue, you                    05:15:17

know, it was bonds, and I was trying to show the       05:15:20

commonality associated with how you would              05:15:24

calculate this multitude of securities, which was      05:15:26

considered a single class.                             05:15:30

This is one security.  In terms,                       05:15:31

there's one inflation ribbon.  This would have, I      05:15:35

forget how many bonds -- maybe you can remind          05:15:38

me -- there were, but that case would have had, I      05:15:40

think it was 13 inflation ribbons.                     05:15:42

Q.     But why, at the class cert stage,               05:15:44

would that require a more detailed damages             05:15:46

Page 276

- DR. HARTZMARK -

methodology?                                                05:15:48

A.    Well, what I was showing at the             05:15:50
class cert stage was that those inflation ribbons         05:15:52
were related.  That's a whole jump.  But I wasn't         05:15:56
calculating the inflation ribbons.                        05:16:00

Q.    Okay.  And --                               05:16:01

A.    You calculate that at a damages             05:16:02
stage.                                                    05:16:04

Q.    Okay.  And then what about -- do you        05:16:04
recall the Exide case, E-X-I-D-E?                         05:16:06

A.    Exide case?  The Exide case, the            05:16:10
court wouldn't pull -- allow them to take another         05:16:18
bite at the apple.                                        05:16:20

Q.    Do you recall submitting a more             05:16:21
detailed damages methodology in that case?                05:16:22

A.    That also was a bond-related case.          05:16:24
I can't -- again, I can't remember 'cause I was           05:16:31
asked to do a report after another expert had             05:16:33
done a couple of reports, and the court said you          05:16:36
can't take another bite at the apple, so I never,         05:16:38
never looked at it again.                                 05:16:41

It was a totally different               05:16:42
engagement, though, because it was -- I believe I         05:16:43
was engaged to demonstrate the relationship               05:16:45

Page 277

- DR. HARTZMARK -

between a stock and a bond for a particular        05:16:47

company, which is different than this, this        05:16:50

engagement.                                        05:16:55

Q.     Okay.  Let's look at how you        05:17:01

describe the methodology.  Paragraph 79, you say,  05:17:02

"This" -- the second sentence:                     05:17:13

"This class-wide damages methodology    05:17:15

is generally referred to as the         05:17:16

out-of-pocket methodology."              05:17:19

Do you see that?                         05:17:19

A.     Yes.                               05:17:19

Q.     And what do you mean by           05:17:20

"out-of-pocket"?                                   05:17:22

A.     It's just -- it's -- the idea is   05:17:23

basically how much money was fraudulently removed  05:17:29

from your pocket.                                  05:17:33

I mean, so if a stock is inflated    05:17:34

and you overpay for it, you have lost -- you       05:17:35

know, if it's overinflated by a dollar, you lost   05:17:39

a dollar out of your pocket, as opposed to, say,   05:17:42

investment damages, which would be focused on,     05:17:45

you know, your investment return.                  05:17:48

Q.     And then paragraph 80, I believe you  05:17:54

referred to the out-of-pocket methodology as       05:17:56

Page 278

- DR. HARTZMARK -

"based on a relatively straightforward, standard,     05:17:59

and commonly used formula."  Do you see that?     05:18:01

A.     Yes.     05:18:07

Q.     What is that straightforward,     05:18:08

standard, and commonly used formula?     05:18:11

A.     It's -- it's the inflation.  It's     05:18:12

described in detailed in paragraph 82.     05:18:16

But it's the inflation -- the     05:18:22

artificial inflation when a class member acquires     05:18:24

shares, and the per-share artificial inflation     05:18:27

when the class member sold shares; in other     05:18:30

words, inflation losses for class members.     05:18:32

Q.     And what do you mean by     05:18:35

"straightforward"?     05:18:37

A.     "Straightforward"?     05:18:38

Q.     Yes.     05:18:40

A.     Well, I compare it to the -- to the     05:18:41

-- calculating the slope of the line.  It's     05:18:42

formulaic based on, again, a mathematical     05:18:44

formula.     05:18:51

Q.     But is it -- is it straightforward     05:18:52

to determine the daily levels of artificial     05:18:55

inflation?     05:19:02

A.     Do you mean is it straightforward to     05:19:03

Page 279

- DR. HARTZMARK -

calculate -- to use the economist tool kit to                05:19:05

calculate an inflation ribbon?                               05:19:08

Q.    Yes.                                                    05:19:12

A.    That's not what this says.  This                       05:19:13

says the calculation, once I give you do the                 05:19:15

inflation -- I mean, think of a -- jury                      05:19:17

instructions for a securities litigation.  Well,             05:19:20

the jury writes down the inflation each day.                 05:19:23

It's a straightforward formula to calculate the              05:19:25

damages.                                                     05:19:28

Q.    But aren't you just assuming away                      05:19:28

the hard part of that inquiry?                               05:19:30

A.    I don't understand.                                    05:19:32

Q.    Well, you -- you state here that you                   05:19:33

need inputs for your out-of-pocket methodology,              05:19:36

and that the inputs are daily levels of                      05:19:40

artificial inflation, correct?                               05:19:43

A.    The inputs are -- the inputs?  No.                     05:19:47

The inputs are used to calculate the daily level             05:19:49

of artificial inflation.                                     05:19:51

So I would use all types of                                  05:19:54

information to calculate the inputs into the                 05:19:55

artificial inflation ribbon.  But the artificial             05:20:04

inflation ribbon, once it's calculated, is                   05:20:07

Page 280

- DR. HARTZMARK -

applied class-wide.                                          05:20:09

If you bought on the same date as                05:20:09
Ms. Posner, you would be treated the same.  Okay?           05:20:11
It doesn't matter that you're on the right side             05:20:14
and Ms. Posner is on the left side.  It's a                 05:20:18
common damages methodology.                                 05:20:22

If you sold on a different day, it               05:20:22
wouldn't matter that -- other than the fact that            05:20:24
the inflation might be different.  It's a very              05:20:27
straightforward formula.                                    05:20:32

The technique, the techniques used,              05:20:33
yeah, that -- that can be complicated, but that's           05:20:37
what I do.  That's what I've done; that's what              05:20:39
economists have done; that's what academics have            05:20:42
done.                                                       05:20:45

I mean, doing this -- in fact, I                 05:20:45
learned this back from my defense days with --              05:20:46
with my time at Lexecon.  I mean, this has been,            05:20:49
and that's -- what? -- almost 40 years ago.                 05:20:52

I mean, calculating an artificial               05:20:57
inflation is, is -- again, a common proposal.               05:20:58
The specific techniques is a fact-intensive                 05:21:03
analysis associated with, you know, again,                  05:21:06
finding out things through discovery and -- and             05:21:08

Page 281

- DR. HARTZMARK -

being engaged to do a loss causation report.                05:21:10

Q.    And what do you mean by "daily                05:21:24

levels of artificial inflation"?                           05:21:26

A.    What do I mean by daily -- the                05:21:29

amount that the but-for price exceeds the -- I'm            05:21:32

sorry.  The amount that the but-for price is               05:21:34

below the actual price.                                    05:21:39

Q.    If you look at paragraph 80, which            05:21:50

talks about this particular topic, the third               05:21:51

sentence:                                                  05:21:55

        "Daily levels of artificial               05:21:57

    inflation are generally calculated either              05:21:59

    directly..."                                           05:22:00

        Let me just stop there mid-sentence.       05:22:03

What do you mean -- how would you calculate daily           05:22:05

levels of artificial inflation directly?                   05:22:08

A.    How would you calculate it, in this           05:22:10

particular case?                                           05:22:15

Q.    Sure.                                         05:22:16

A.    After I did a loss causation                  05:22:16

analysis.                                                  05:22:18

Q.    What would "directly" mean in that            05:22:18

sentence?                                                  05:22:20

A.    Well, it could be, for example, that          05:22:20

Page 282

- DR. HARTZMARK -

I look at inflation and then estimate and                05:22:22

construct an inflation ribbon looking backwards.         05:22:27

Q.    And how would you do that?                         05:22:33

A.    I would do that in a loss causation            05:22:35

analysis.  But whatever that is -- okay?                 05:22:37

Whatever that would be calculated backwards would        05:22:39

be applied class-wide, and the common damages            05:22:42

methodology would be utilized to calculate               05:22:45

individual damages.                                      05:22:47

Q.    Let's go to the second part of the             05:22:53

sentence, or maybe it's the third part.                  05:22:54

"Or as the difference between the                05:22:55

actual prices paid on that date for                05:22:57

Wells Fargo common stock and the true or           05:22:59

but-for values of the security absent the          05:23:01

alleged misrepresentations and omissions."         05:23:04

Do you see that?                                   05:23:06

A.    Yes.                                            05:23:06

Q.    How would you calculate the true or            05:23:09

but-for value of the security absent the alleged         05:23:11

misrepresentations and omissions?                        05:23:13

A.    Well, I haven't been asked to                  05:23:15

calculate that in this particular case, in terms         05:23:19

of "but-for" is a factual issue.                         05:23:23

Page 283

- DR. HARTZMARK -

But you calculate a but-for price -- 05:23:26
I mean, I've done that in other cases -- and you 05:23:28
look at the actual price less, you know, what the 05:23:30
price should have been, and that gives you your 05:23:33
level of inflation. 05:23:35

So there's two approaches.  But 05:23:36
whatever that approach would be, that level of 05:23:37
inflation would be applied to the shareholder. 05:23:40
And the inflation ribbon, you know, done day by 05:23:46
day by day and the common damages methodology 05:23:48
would be utilized to calculate the individual 05:23:50
damages. 05:23:52

Q.    But how do you calculate the but-for 05:23:54
price? 05:23:56

A.    How do you calculate the but-for 05:23:57
price? 05:23:59

Q.    Yes. 05:24:01

A.    In this particular case? 05:24:01

Q.    Yes. 05:24:01

A.    You mean how do I calculate what the 05:24:03
particular loss is that was caused by the 05:24:04
misstatements on any day? 05:24:05

Q.    Sure. 05:24:07

A.    Well, again, you're asking a 05:24:07

Page 284

- DR. HARTZMARK -

question of loss causation, it's just from the                05:24:10

question itself.  And I haven't been asked to do             05:24:13

a loss causation report.  But what I can tell you            05:24:17

is that whatever that is, it's going to be                   05:24:20

applied class-wide, and the common damages                   05:24:25

methodology that is described and explained in               05:24:28

this section will be utilized to calculate                   05:24:29

individual damages.                                          05:24:32

Q.    And you've done a loss causation            05:24:35

analysis in other cases, as you said -- as you               05:24:37

said many times, correct?                                    05:24:38

A.    Yes.                                        05:24:39

Q.    So I guess I'm wondering how you            05:24:42

would do a loss causation analysis in this case.             05:24:43

MS. POSNER:  Objection.  Lacks           05:24:45

foundation.  It's a hypothetical, but...               05:24:47

A.    I told you, I have not -- I have            05:24:52

been engaged for two things: one, demonstrate the            05:24:53

market for Wells Fargo common stock trades                   05:24:57

efficiently; two, I was asked to examine whether             05:24:59

there's a common damages methodology.                        05:25:02

I was not asked to calculate the             05:25:04

inputs into that 'cause it's a factual issue that            05:25:05

is dealt with in the loss causation stage.                   05:25:09

Page 285

- DR. HARTZMARK -

Q.    Yes.  But if you were asked by        05:25:12

anyone to do that, how would you do it?     05:25:14

MS. POSNER:  Objection.  In --             05:25:18

A.    You want me to speculate here on the  05:25:21

record, under oath, as to how I would do    05:25:23

something that I haven't even been asked to do?  05:25:25

MS. POSNER:  No. Don't --                  05:25:27

Q.    Well, what would --                   05:25:27

MS. POSNER:  -- speculate.                 05:25:27

Q.    -- you ask for?  What would you       05:25:30

need?                                        05:25:31

A.    What would I need?  Again, I haven't  05:25:31

-- am not prepared to answer that question   05:25:35

because I haven't been asked to do a loss    05:25:36

causation analysis.                          05:25:38

What I told you is that that loss            05:25:43

causation analysis will, utilizing an economic  05:25:45

tool kit -- and I described various factors that  05:25:47

one might utilize in -- in calculating the   05:25:50

inputs, an inflation ribbon will be estimated  05:25:54

that will go, the trier of fact will make its  05:25:59

determination as to how that inflation ribbon  05:26:02

exactly is -- I said it might be mine, it might  05:26:05

be yours, it might be a combination.         05:26:08

Page 286

- DR. HARTZMARK -

But whatever that is, it'll be                05:26:11

applied class-wide, and the common damages     05:26:12

methodology -- which is inflation at purchase  05:26:13

less inflation at sale -- will be applied to   05:26:16

calculate the individual greater damages.      05:26:20

Q.    Okay.  Let's go to paragraph 83.         05:26:21

You say:                                       05:26:30

"To calculate the inputs for the          05:26:31

out-of-pocket methodology or formula, an   05:26:33

expert often begins with the same type of  05:26:35

event study I used above in Section VI to  05:26:37

evaluate the price-related factors."       05:26:43

Do you see that?                           05:26:45

A.    Yes.                                      05:26:45

Q.    What does that mean?                      05:26:45

A.    Well, it means that -- just what I        05:26:48

said.  That I ran, for example, in this case, a 05:26:50

market model.  I would begin with that.        05:26:52

As to whether that would be adjusted       05:26:58

for loss -- a loss causation analysis, say, for 05:26:59

trying to find out causal factors that are -- you 05:27:05

know, that maybe need to be examined on a      05:27:10

day-to-day basis, so having -- adjusting, you  05:27:15

would -- you would start there.                05:27:18

Page 287

- DR. HARTZMARK -

And, you know, oftentimes, you know,                    05:27:22

for example, corrective disclosures are utilized       05:27:26

and inflation are gathered through -- through          05:27:28

that.  And so you start with the event study, do       05:27:30

whatever modifications are required, and then          05:27:33

that's your -- your foundation to begin your           05:27:37

inflation analysis.                                     05:27:39

But -- but, again, whatever that is,                    05:27:43

it's going to be applied class-wide.                    05:27:45

    Q.    And you use the word "often" there.           05:27:48

    A.    Uh-hmm.                                        05:27:53

    Q.    Does that suggest there are                    05:27:53

alternative starting points other than an event        05:27:57

study?                                                  05:28:00

    A.    Yes.                                           05:28:00

    Q.    Okay.  And what are those?                     05:28:02

    A.    Well, there have been cases wherein           05:28:03

an accountant would come up with, you know, "This      05:28:07

is the true value."  And so you take the               05:28:11

accounting value and the actual value, and you         05:28:13

end up with inflation.  So it's not always with        05:28:16

an event study.                                         05:28:18

    Q.    And then how would you translate the          05:28:39

event study modified or unmodified, as you             05:28:42

Page 288

- DR. HARTZMARK -

suggest, into an out-of-pocket methodology?    05:28:44

A.    How would I --    05:28:48

MS. POSNER:  Objection.    05:28:50

A.    -- trans --    05:28:50

MS. POSNER:  Objection as to form.    05:28:52

A.    I'm not sure how would you --    05:28:53

Q.    How would you use your event study    05:28:54

to get to an out-of-pocket methodology?    05:28:55

A.    Well, you would use -- again, you    05:28:58

potentially start with an event study which    05:29:00

potentially gives you at least a level, you know,    05:29:03

along possibly with other information, 'cause I    05:29:07

-- I list other information, and I say you begin    05:29:11

with that, to estimate a level of inflation.    05:29:12

Whatever that level of inflation is,    05:29:16

it's applied class-wide; you get your inflation    05:29:17

ribbon.    05:29:26

Q.    Okay.  Can we go to paragraph 84.    05:29:32

In there, you introduce the concept of an    05:29:36

inflation ribbon.  Do you see that?    05:29:38

A.    Yes.    05:29:40

Q.    The second sentence:    05:29:42

"This ribbon represents an estimate    05:29:45

of the daily level of artificial inflation    05:29:46

Page 289

- DR. HARTZMARK -

in the prices of Wells Fargo common stock    05:29:48

caused by the Defendants' alleged    05:29:51

misrepresentations and/or omissions" --    05:29:54

"and/or omissions, which are based on the    05:29:56

price reactions to disclosures either    05:29:58

related to or revealing the alleged    05:30:02

misstatements and omissions."    05:30:04

Do you see that?    05:30:06

A.    Yes.    05:30:06

Q.    And what do you mean "price    05:30:08
reactions to disclosures either related to or    05:30:10
revealing the alleged misstatements and    05:30:12
omissions"?    05:30:16

A.    Well, I mean, you can -- again,    05:30:17
utilizing the event study, sometimes you'll use    05:30:20
the price reactions related to misstatements to    05:30:22
account for inflation or changes in inflation, or    05:30:26
the elimination or removal of inflation,    05:30:28
sometimes you'll use corrective disclosures or    05:30:29
alleged corrective disclosures to begin to    05:30:32
evaluate the amount of inflation that is removed    05:30:34
from prices.    05:30:37

Q.    And what's the difference between    05:30:40
"related to" or "revealing" --    05:30:42

Page 290

- DR. HARTZMARK -

A.     Well --                                    05:30:42

Q.     -- the alleged misstatements and          05:30:46
omissions?                                        05:30:47

A.     "Related to" the misstatements would      05:30:47
be -- I would consider that to be what is often  05:30:49
referred to as a front-end.  So inflation that's 05:30:53
related to the misstatements.  And, generally,   05:30:58
"revealing" alleged omissions or misstatements   05:31:01
are associated with alleged partial corrective   05:31:04
disclosures.                                      05:31:08

Q.     Let's go to paragraph -- let's start      05:31:41
with paragraph 88.  And this subsection is       05:31:44
"Commonly Used and Widely Accepted Techniques    05:31:52
Used to Account for Confounding Information and   05:31:55
Potential Changes Over Time," correct?           05:31:57

A.     Yes.                                       05:32:03

Q.     I think you mentioned here parsing        05:32:04
and scaling, and you actually define them, or    05:32:25
somehow define them in the paragraph before that 05:32:28
at 87.                                            05:32:31

Do you see that?                                  05:32:32

A.     Parsing in paragraph 87, it says:         05:32:37

"Calculating actual inputs into the              05:32:40
out-of-pocket methodology by parsing (i.e.       05:32:42

Page 291

- DR. HARTZMARK -

disaggregating the abnormal stock price       05:32:46

movement into portions related and            05:32:48

unrelated to the allegations) and scaling     05:32:50

over time the changes in the inputs (if       05:32:53

these adjustments are even required)          05:32:56

likewise are common issues that affect all    05:32:59

class members equally."                        05:33:02

Q.     So let's start with scaling.  So       05:33:04

what is scaling?                               05:33:06

A.     Scaling is adjusting the amount of     05:33:07

harm over time.                                05:33:12

Q.     What would scaling look like in a      05:33:17

case like this?                                05:33:20

MS. POSNER:  Objection.                        05:33:22

A.     You --                                  05:33:23

MS. POSNER:  You can answer.                   05:33:23

A.     Yeah.  I mean, you're -- you're        05:33:24

asking about how losses have changed over time 05:33:25

and how those might have been caused, which,   05:33:28

again, is a loss causation issue.              05:33:32

Q.     But I think you defined "scaling" as   05:33:33

adjusting the amount of harm over time?        05:33:36

A.     Uh-hmm.                                 05:33:39

Q.     I'm trying to understand that, on a    05:33:39

Page 292

- DR. HARTZMARK -

general level, how that applies to this case at          05:33:41

all.          05:33:47

A.     Again, I have not been asked to look          05:33:47

at how losses change over time.  That's a loss          05:33:49

causation.  What I can tell you is that whatever          05:33:51

scaling method is utilized, it's going to be          05:33:55

input into, you know, probably a base inflation          05:33:57

level which will allow me to do adjustments over          05:34:00

time.  And whatever those adjustments are will be          05:34:04

applied class-wide and then the common damages          05:34:08

methodology.          05:34:12

So that if the -- I don't know, if          05:34:12

the scaling is such that inflation is a hundred          05:34:13

at the end of the class period and goes down to          05:34:18

50 halfway through, and the defense expert says          05:34:22

it's a hundred and goes to 25, whatever that is,          05:34:25

whatever the court determines to be that value,          05:34:27

will be applied class-wide.  That's the critical          05:34:29

issue.          05:34:32

I haven't been asked to do scaling          05:34:32

'cause that's a loss causation issue.          05:34:33

Q.     But scaling can be used if the          05:34:57

losses change over time; is that -- is that an          05:35:00

accurate summary of part of your testimony?          05:35:02

Page 293

- DR. HARTZMARK -

A.     If the harm to investor changes over     05:35:06
time.  So if the misstatements cause changes in     05:35:09
the level of artificial inflation over time,     05:35:12
whatever that is, will be applied class-wide.     05:35:16

Q.     Is --     05:35:20

A.     It doesn't matter who it is; when     05:35:20
they bought or sold.  On that particular date,     05:35:22
that's the level of inflation.     05:35:24

Q.     Is scaling required in that     05:35:25
circumstance?     05:35:27

A.     I don't --     05:35:28

MS. POSNER:  Objection.     05:35:29

A.     -- understand what circumstance     05:35:29
you're talking about.     05:35:30

Q.     So if the losses change over time     05:35:32
and you're doing a loss causation analysis, do     05:35:34
you have to do scaling, or are there other     05:35:36
methodologies you could use?     05:35:38

A.     I'm not sure what methodologies.  My     05:35:40
damages methodology is clear: it's inflation at     05:35:43
purchase and inflation at sale.     05:35:48

I'm not sure.  Are you talking about     05:35:51
a technique to calculate the input?     05:35:52

Q.     I'm trying to understand if scaling     05:35:55

Page 294

- DR. HARTZMARK -

would be required in all cases where the loss                05:35:56

changes over time.                                           05:36:01

    A.    Scaling would be required?  If the                 05:36:02

losses change over time, by definition, you would            05:36:06

want to make -- do your best to estimate any                 05:36:09

changes, although, the court could say no,                   05:36:13

there's no change over time; it's up to the trier            05:36:17

of fact.                                                     05:36:21

            The key is that whatever the trier               05:36:21

of fact determines to be the case, it's input                05:36:23

into the inflation ribbon which is applied                   05:36:27

class-wide.                                                  05:36:29

    Q.    Would scaling be required if a                     05:36:30

corrective disclosure could not have been made at            05:36:35

the start of the class period?                               05:36:37

            MS. POSNER:  Objection as to form.               05:36:39

    A.    What I can say is that if the finder               05:36:44

of fact were to determine that there is no                   05:36:44

inflation at the beginning of the class period               05:36:47

for whatever reason, that input -- that would be             05:36:49

an input into your inflation ribbon, and the                 05:36:52

common damages methodology that I propose is                 05:36:55

there.                                                       05:36:58

            But -- but I have not done loss                  05:36:58

Page 295

- DR. HARTZMARK -

causation to know whether there's a difference at          05:36:59

the end or the beginning as it relates to          05:37:01

Wells Fargo in this matter specifically.          05:37:03

Q.    Okay.  Let's talk about parsing,          05:37:09

which we touched upon earlier.  And I think you          05:37:10

defined it by reading from paragraph 87.          05:37:13

So how would you go about          05:37:18

"disaggregating the abnormal stock price movement          05:37:20

into portions related and unrelated to the          05:37:20

allegations"?          05:37:28

A.    Well, you're -- what you're          05:37:28

basically saying is how would I apportion the          05:37:29

losses caused by the alleged fraud versus losses          05:37:32

unrelated to the allegations, correct?          05:37:34

Q.    Sure.          05:37:39

A.    Well, right there, I mean, that's a          05:37:39

question of loss causation, and I haven't been          05:37:41

asked to do loss causation report.          05:37:42

What I can tell you is that, however          05:37:43

that's apportioned, will be an input into the          05:37:47

inflation ribbon and applied class-wide, and the          05:37:50

common damages methodology will be utilized to          05:37:52

calculate individual damages.          05:37:53

Q.    Do you think you will be able to          05:37:57

Page 296

- DR. HARTZMARK -

provide a loss causation analysis here if asked?                  05:37:59

A.    Do I think?  Yes.  I don't -- again,                  05:38:02

this has been done for, like I said, at least 40              05:38:05

years.  And, I mean -- yes.                                   05:38:08

Q.    Okay.  And you go on at paragraph            05:38:18

89, and you say:                                             05:38:20

"Once discovery is complete and,                 05:38:22

eventually, a determination of liability         05:38:24

made by the finder of fact, to the extent        05:38:25

it is even appropriate, disaggregating           05:38:27

confounding information will be based on a        05:38:29

disclosure- specific inquiry that would          05:38:32

occur, at the earliest, based on a full          05:38:34

factual record."                                 05:38:37

What do you mean "to the extent that        05:38:42

it is even appropriate"?                                     05:38:43

A.    To the extent that it might be --        05:38:44

you know, it might be the case that the -- if it              05:38:49

were -- if I was using an event study, and I                 05:38:50

looked at an abnormal return, that the whole                 05:38:53

abnormal return would be associated with the                 05:38:56

allegations and, therefore, it wouldn't be                   05:38:58

necessary to disaggregate.                                   05:39:03

Q.    And what do you mean by "disclosure-        05:39:07

Page 297

- DR. HARTZMARK -

specific inquiry"?                                          05:39:09

A.    Well, that in doing a loss causation          05:39:10
analysis, you look at the disclosure, you link it          05:39:15
to the misstatements, you examine the full                 05:39:17
factual record of what -- who knew what, when,             05:39:22
what should have been disclosed; you look at what          05:39:24
the public market and the reaction of the media            05:39:27
and the analysts; and you end up with a -- you             05:39:29
know, the amount of inflation.                             05:39:39

The key issue, though, is -- as it                 05:39:40
relates to my opinion in this particular matter            05:39:41
is that I -- whatever that is, whatever that               05:39:43
input is after the disclosure-specific inquiry             05:39:45
and after evaluating the full factual record,              05:39:52
which would be, what would be the basis of a loss          05:39:55
causation analysis, whatever that input is, it             05:39:58
would go into the inflation ribbon and would be            05:39:59
applied class-wide.                                        05:40:02

Q.    You mentioned in that answer you'd          05:40:03
want to know who knew what, when; is that right?           05:40:04

A.    Well, the idea that there is a               05:40:12
misstatement.  You have to understand the                  05:40:14
misstatement.                                              05:40:16

Q.    So you're talking there about the           05:40:21

Page 298

- DR. HARTZMARK -

misstatement?                                                    05:40:27

A.     Well, again -- I'll tell you, you               05:40:27
look at a disclosure, you link it through the          05:40:30
misstatement.  That's -- that's what's done in a       05:40:32
loss causation report.  Well, then, that's going       05:40:33
to tell me who said something, what should they        05:40:35
have said.  I have to understand that.                 05:40:39

And then, once I understand that,                      05:40:42
and my disclosure-specific inquiry is completed,       05:40:46
I create the input into the inflation ribbon.          05:40:48
And that inflation ribbon is applied class-wide.       05:40:51

Q.     But how do you determine whether            05:40:54
that something is something they should have said      05:40:56
or not?                                                05:40:58

A.     That's a liability issue.  I mean,           05:40:59
you know, is the allegation proven true.               05:41:01

Q.     Right.  So you don't know --                05:41:04

A.     I'm not --                                   05:41:06

Q.     You don't do that analysis?                 05:41:07

A.     I'm not the finder of fact.  I mean,         05:41:08
the finder of fact will make that determination,       05:41:10
as will he make the determination of the specific      05:41:12
level of inflation.                                    05:41:16

The key is, again, once the finder                     05:41:16

- DR. HARTZMARK -

of fact makes the determination, the input is

input into the inflation ribbon and applied

class-wide, and the out-of-pocket damages formula

is applied to the individual traders.

Q.    Go to paragraph 90.  And you say:

"Again, assuming parsing or scaling

were appropriate, there are many techniques

that could be used to estimate the portion

of the price reaction due to the revelation

of the truth and how that price response

might change over time.  These include,

among others: the analysis of intraday

pricing (if disclosures are made at

different times)."

We touched on intraday pricing

before.  But walk me through what you mean there.

A.    Well, depending on the nature of the

specific situation, sometimes you can use

intraday pricing to calculate this -- you know,

an abnormal return; the impact, the price impact,

the price reaction from a disclosure, or from a

misstatement, and utilize that as part of your

input.  Okay?  That is -- becomes part of your

input in terms of inflation.  And that inflation

Page 300

- DR. HARTZMARK -

goes as an input into your inflation ribbon; the          05:42:33

inflation ribbon goes all the way back, covers          05:42:36

every day, and is applied class-wide.          05:42:38

Q.    But just, mechanically, what does it          05:42:41

look like to analyze intraday pricing?          05:42:43

A.    Very similar to what it looks like          05:42:46

to calculate close-to-close pricing and run event          05:42:48

studies on intraday pricing.          05:42:54

Q.    So you would run an event study for          05:42:55

one day?          05:42:57

A.    For one day?          05:42:57

Q.    Yes.          05:42:58

A.    There's, I guess, a possibility.  I          05:43:01

mean, this is total speculation.          05:43:04

But there have been times that I've          05:43:05

run event studies probably over a couple of days,          05:43:07

or I've run event studies back, I don't know, a          05:43:12

couple of days and then forward.          05:43:16

But that's -- I haven't evaluated          05:43:17

what I would do in this particular matter 'cause          05:43:19

I haven't looked at -- the factual record is          05:43:21

still being dispute -- you know, still being -- I          05:43:24

think.  I don't know if discovery is going on or          05:43:27

not.  But...          05:43:28

Page 301

- DR. HARTZMARK -

Q. Okay. "Analysis of market and media    05:43:30

commentary," what does that mean?    05:43:35

A. Well, you often will use market    05:43:36

commentary, media commentary to get an idea of,    05:43:38

for example, maybe the relative importance of    05:43:41

particular pieces of information.    05:43:45

Q. Okay. That could be done now,    05:43:48

correct?    05:43:51

A. In a loss causation analysis, but --    05:43:52

but you -- you'd be -- you know, again, it's    05:43:55

premature, and it's not what I was asked to do.    05:43:59

Q. Okay. Why is it premature, though,    05:44:02

'cause it's not part of the loss causation    05:44:03

analysis -- because it's part of the loss    05:44:05

causation analysis, you haven't yet been asked to    05:44:07

do?    05:44:09

A. I haven't been asked to evaluate    05:44:09

what the market says caused the loss.    05:44:11

Q. Okay. The next one:    05:44:15

"Examination of the elements that    05:44:16

cause changes in actual or estimated    05:44:17

earnings per share or EBITDA (by individual    05:44:20

analysts, the company or a consensus of    05:44:23

analysts)."    05:44:25

Page 302

- DR. HARTZMARK -

What does that mean?                                    05:44:28

A.    Just what it says.  I mean,                      05:44:29
oftentimes, accounting data might be used;             05:44:30
internal projections versus actual results;            05:44:33
breakdowns of internal information is often more        05:44:37
detailed than external information and you might        05:44:41
use that to, you know, for parsing and scaling         05:44:47
purposes.                                              05:44:48

Q.    Okay.  And the last one that you            05:44:49
list here:                                             05:44:51

"[A]nalysis of detailed accounting            05:44:52
and company information, such as a            05:44:53
breakdown of revenues and earnings for        05:44:55
different divisions, businesses, types of     05:44:56
customers, facility, geographic locations,    05:44:58
etcetera."                                    05:45:00

A.    Uh-hmm.                                      05:45:02

Q.    So what are you envisioning there?          05:45:04

A.    There, I've, in the past utilized,          05:45:08
you know, where the alleged fraud is taking place      05:45:12
in, say, a certain division, focused on the            05:45:14
information related to that division, looked at         05:45:17
the overall market reaction, and tried -- and          05:45:23
been able to extract the impact on that division       05:45:26

Page 303

- DR. HARTZMARK -

and then the impact of the alleged allegations,    05:45:30

the alleged misstatements.    05:45:33

Q.    And you introduced this list with an    05:45:34

"include among others."  Are there others you can    05:45:36

think of sitting here today?    05:45:39

A.    Well, I don't have in here, you    05:45:47

know, internal projections, business plans.    05:45:50

Sometimes I've used board minute -- minutes and    05:45:54

board presentations.  I mean, there's all types    05:45:56

of documents that one uses to do a loss causation    05:46:00

analysis.    05:46:03

Q.    Anything else you can think of    05:46:04

sitting here right now?    05:46:06

A.    Anything else I can think of?    05:46:07

Q.    Specifically.    05:46:09

A.    No, I don't want to guess at this    05:46:10

point.  I haven't...    05:46:13

Q.    Okay.  The next sentence says:    05:46:15

"In addition, material produced in    05:46:19

discovery could showed light on the    05:46:21

underlying reasons for the disclosures (if    05:46:22

such reasons were misstated or omitted),    05:46:24

and other expert testimony related to    05:46:27

liability issues could also provide a basis    05:46:28

Page 304

- DR. HARTZMARK -

for disaggregation."                                05:46:30

What do you mean by "other expert                    05:46:35
testimony"?                                          05:46:37

A.    Well, I'm not sure what other                  05:46:37
experts might be involved in this particular         05:46:38
case.  But in other cases, I've utilized expert      05:46:43
reports to parse and scale.                          05:46:45

Q.    Expert reports on what, what topics?           05:46:50

A.    For example, maybe an accounting               05:46:53
topic.                                               05:46:55

Q.    Can you elaborate on that one?                 05:46:55

A.    I'm not an accountant, but -- so I'm           05:46:57
not giving an accounting analysis.                   05:47:00

But in a -- in another case where,                   05:47:02
oh, there was an examination of what the             05:47:05
but-for -- I don't know, what the but-for balance    05:47:11
sheets should have looked like, or something of      05:47:13
that nature, what but-for revenue should have        05:47:15
looked like.                                         05:47:18

You know, adjustments in the                         05:47:19
accounting data that might be useful in              05:47:20
evaluating for scaling and parsing.                  05:47:22

Q.    Have you given thought to what other           05:47:25
expert testimony would be helpful to                 05:47:27

Page 305

- DR. HARTZMARK -

disaggregation in this case?    05:47:29

A.    There's no need.  I've been asked to    05:47:31
look at whether the market is efficient.  I'm not    05:47:33
sure what outside experts would be important    05:47:36
there.  And I've been asked whether there's a    05:47:38
common damages methodology, which I've described    05:47:40
in detail here and we've gone through.    05:47:42

I'm not -- you know, I am not privy    05:47:45
to other experts.  And at this stage, I haven't    05:47:49
been asked to do the loss causation report, so I    05:47:51
haven't asked if there are other experts doing    05:47:53
it.  I haven't -- I haven't done it.    05:47:56

What I can say again is, that once    05:48:00
done, those inputs just go into an inflation    05:48:03
ribbon and it's applied class-wide.    05:48:07

Q.    Right.  But you're mentioning other    05:48:08
expert testimony as a basis for disaggregation in    05:48:10
this case in this paragraph; no?    05:48:12

A.    In this case?    05:48:14

Q.    You're saying it could be done later    05:48:15
as a basis for disaggregation?    05:48:17

A.    I'm saying -- I'm saying this is a    05:48:18
laundry list of the type of tools that are    05:48:20
utilized.  I didn't say each and every tool is    05:48:25

Page 306

- DR. HARTZMARK -

going to be used in this particular case.  I                05:48:27

mean, I haven't been asked to do loss causation.            05:48:29

What I'm saying is that, you know,                           05:48:31

in some sense, again, other expert testimony                05:48:34

related to liability issues could also provide a            05:48:37

basis for disaggregate.  I -- it could.                      05:48:39

Q.    So you haven't yet analyzed which of                05:48:43

these tools you would use if you needed to come             05:48:45

up with a loss causation analysis, correct?                 05:48:47

A.    No.  I haven't been asked to because        05:48:49

that's a loss causation analysis.                           05:48:51

Q.    I know you haven't been asked it.            05:48:53

But have you actually given thought to which of             05:48:55

the methods you discuss here could be used in               05:48:58

this particular case for a loss causation                   05:49:00

analysis, whether you've been asked to or not?              05:49:01

A.    I haven't been asked to because it          05:49:04

doesn't -- again, I've been asked to do two                 05:49:09

things, and I haven't been asked to do a loss               05:49:11

causation analysis or consider the -- you know,             05:49:14

the beginnings of a loss causation analysis even.           05:49:18

Q.    Right.  But just, have you, in fact,        05:49:20

given thought to that?  Even if you were not                05:49:23

asked to, which I totally understand your                   05:49:25

Page 307

- DR. HARTZMARK -

testimony on that.                                          05:49:27

A.      Yeah.  No, I have not made the                     05:49:28

inquiry as to how parsing and scaling would be             05:49:31

done in this particular case.                              05:49:35

MR. TRAPS:  Let's take a break for                         05:49:39

five minutes.                                              05:49:40

THE VIDEOGRAPHER:  We are now off                          05:49:42

the record.  The time on the video monitor                 05:49:44

is 5:49 p.m.                                               05:49:46

(Recess taken.)                                            05:49:48

THE VIDEOGRAPHER:  We are now back                         06:05:02

on the record.  The time on the video                      06:05:08

monitor is 6:04 p.m. le.                                   06:05:10

MR. TRAPS:  No questions from                              06:05:14

defense counsel, unless there's further                    06:05:17

questions from plaintiff's counsel.                        06:05:19

MS. POSNER:  No further questions                          06:05:21

from defendants.                                           06:05:25

MR. TRAPS:  Thank you,                                     06:05:26

Dr. Hartzmark, for your time.                              06:05:27

THE WITNESS:  Thank you, sir.                              06:05:28

THE VIDEOGRAPHER:  Anyone on Zoom?                         06:05:29

Okay.  That concludes the testimony                        06:05:33

of Dr. Michael Hartzmark.  We are now off                  06:05:34

Page 308

- DR. HARTZMARK -

the record.  The time on the video monitor        06:05:37

is 6:05 p.m.                                       06:05:39

        THE REPORTER:  Can you tell me who         06:05:51

gets a rough draft?  Any expedited copy?

Who gets copies?

        MS. POSNER:  We'll have someone

reach out to you.

        THE REPORTER:  Do you need a rough

draft, Counsel?

        Mr. BLATCHLEY:  This is Michael            06:06:06

Blatchley, you can send one to me.                 06:06:07

        MR. TRAPS:  For Leonid Traps, you          06:06:09

can send it to me as well.                         06:06:11

        (Deposition concluded at 6:06 p.m.)

Page 309

CASE NAME:  Re: Wells Fargo Securities Litigation

ACKNOWLEDGMENT OF DEPONENT

I, MICHAEL L. HARTZMARK, Ph.D., declare under penalty of perjury, and hereby certify, that I have read the foregoing pages of my deposition transcript or the same has been read to me, and that the same is a correct transcription of the answers given by me on December 8, 2022 as to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet, with the understanding that I offer these changes as if still under oath.

_____          _____
     DATE                          SIGNATURE

Page 310

ERRATA SHEET

NAME OF CASE:        Re: Wells Fargo Securities

DATE OF DEPOSITION:  December 8, 2022

NAME OF WITNESS:     MICHAEL L. HARTZMARK, Ph.D.

Reason Codes:

    1.   To clarify the record.

    2.   To conform to the facts.

    3.   To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

SIGNATURE: _____ DATE: _____

Page 311

REPORTER'S CERTIFICATE

I, MAYLEEN AHMED, the undersigned, a Registered Merit Reporter, Certified Realtime Reporter, Certified Shorthand Reporter, and Notary Public in and for the State of New York, do hereby certify:

That the witness, MICHAEL L. HARTZMARK, Ph.D., before examination was remotely duly sworn.

That the foregoing deposition was taken remotely stenographically by me on December 8, 2022, and thereafter was transcribed by me, and that the deposition is a full, true, and complete transcript.

I further certify that I am not a relative or employee of any attorney or any party to this action, and that I am not financially interested in the action or the outcome thereof.

In WITNESS WHEREOF, I have hereunto set my hand this 15th day of December 2022.


_____

/s/  MAYLEEN AHMED, RMR, CRR, CRC

Washington CCR No. 3402 - Exp 12/29/22

Oregon CSR No: 17-0447 - Exp 12/31/23

Texas CSR No:  9428 - Exp 7/31/23

California CSR No: 14380 - Exp 12/31/23

New York Notary Public

**[& - 2014]**

| & | | | |
|---|---|---|---|
| **& | | | |**

**&**  1:5 2:4,10,16 3:3,4,11,17 4:4 4:11 5:23 6:13 8:16,20 9:13,15 9:19,22,25 10:5 10:13,16 15:16 57:21 86:10 123:19 124:10

**1**

**1**  5:13 15:14,24 26:13 27:5 42:14 120:11 254:13 255:13 255:24,25 257:20 258:4 262:9,11,25 310:7
**1.46**  246:2
**1.61**  249:13
**1.89**  249:12
**1/0**  225:24
**10**  7:19 133:6 143:3,7 225:25
**10/3/22**  5:13
**10004-2498**  3:6
**10005**  2:12
**10019**  4:13
**10020**  1:18 2:6
**10022-6269**  3:13
**10:15**  258:11
**10:47**  55:19
**10b**  122:24 124:2,5 140:18 142:24 143:15 221:16 241:3,4 243:17 266:3

268:5
**11**  5:4 106:24 199:17 220:9
**1100**  2:17 4:5
**11:00**  55:23
**12**  104:22 120:23 162:5 171:17 174:15 179:18 180:7 182:4 185:17 189:21 249:11,15 250:17 252:8 258:9
**12/29/22**  311:18
**12/31/23**  311:19 311:21
**120**  157:13 217:6 223:21 235:24
**125**  3:5
**1251**  1:17 2:5 8:21
**126**  6:16
**129**  6:21
**12:05**  101:11
**12:22**  101:15
**12th**  250:11 264:11
**13**  127:6,8,12 174:15 248:24 249:25 275:23
**1304400**  139:3
**132**  7:4
**139**  7:9
**13th**  249:4
**14**  98:17 175:15 246:11 250:20 251:9

**143**  7:19
**14380**  311:21
**149-230**  5:24
**14th**  2:11
**15**  143:11 146:10 191:9 199:22
**159**  58:20 62:15 62:17
**15th**  311:14
**16**  102:21 103:4 104:17 106:13 106:21
**17**  39:22 40:11
**17-0447**  311:19
**18**  228:19,24
**187**  68:18,22
**19**  139:18 210:18 210:19
**190**  74:20 75:7
**191**  74:24
**1930**  254:13 255:13
**1970s**  174:23
**1976**  174:9
**1978**  187:15
**1980s**  48:13
**1984**  48:4
**1986**  47:17,22
**1986-87**  48:23
**1987**  47:17,24
**1988**  48:4,5,7
**1991**  57:2,6
**1993**  57:12
**1997**  54:22
**1:18**  148:13

**2**

**2**  5:16 34:21,22 34:23 80:4 202:6 203:9 205:8,9,10,12,12 206:13,20 207:4 207:8,22 209:5 225:25 259:25 260:21,22 262:9 262:11,25 264:18 270:20 310:8
**2,000**  199:6
**2.38**  256:3
**2.87**  246:5
**20**  1:4 8:18 76:11 85:13 179:23 193:15
**200**  257:16
**20005**  2:18
**2004**  57:12
**2005**  21:25
**2006**  53:2
**2007**  7:16 124:16 139:17
**2008**  75:4,24,24 76:12,12 98:17
**2009**  7:21 143:9
**2011**  56:15 57:7
**2012**  6:14 86:11 94:24
**2013**  33:19,25 49:19 56:10 80:4 94:25 95:7 99:20
**2014**  5:24 56:15 57:22

**[2015 - 54]**                                                        Page 2

**2015** 42:18
**2018** 47:3,4
  248:24 249:11
  249:16,20 250:2
  250:17 252:7
  253:13,25
  254:18 255:4
  258:8,12 260:4,9
  261:16,21
  263:16 264:22
  265:10
**2018-2019** 231:5
**2019** 49:20 129:9
  264:7,12,17
**2020** 82:12,16,23
  139:3,18 152:11
  223:8 224:7,10
  225:5,12 245:18
  250:20,23 251:5
  251:10,16,17,18
  252:8 258:9
  264:2,12
**2021** 14:14
  117:25
**2022** 1:14 8:2,6
  26:23 30:23
  31:8 118:2
  309:11 310:5
  311:9,14
**20s** 152:4
**20th** 223:6
**21** 192:10
**21st** 152:5
**22** 200:5
**2200** 136:11
**22nd** 152:5
**24** 129:9

**25** 11:21 223:8
  224:7 258:12
  292:17
**257** 68:2
**25th** 222:23
  223:7
**26** 212:21 245:18
**27** 5:13 201:4,6,8
  204:12,14
**28** 168:13
**28.7** 144:19
**280** 166:5
**29** 253:13,25
  254:18 255:4
**2:07** 149:6
**2a** 256:7,7
**2b** 256:13
**2nd** 130:7

### 3

**3** 5:20 26:23
  30:23 31:8 56:3
  57:16,19 66:20
  80:10 129:17,25
  180:23 181:8
  182:20 190:18
  217:23,24 218:4
  247:14 258:12
  262:9,11,25
  310:8
**3/19/20** 7:9
**30** 63:24 252:7
  258:8
**300** 4:5
**31** 75:25 76:13
  77:3 78:9,17
  160:5

**32** 139:7 168:14
**33** 210:16
**34** 5:16
**3402** 311:18
**35** 147:12
**38** 259:7
**3:00** 247:15
**3:20** 213:21
**3:41** 213:25
**3rd** 30:15

### 4

**4** 6:4 40:20,21
  43:6 79:16,25
  80:3 83:9
**40** 25:3 63:24
  121:25 132:9
  146:21 171:12
  280:20 296:4
**403** 144:3
**415-466** 6:14
**418** 86:21
**420** 133:22,25
  134:6 136:2
**421** 93:17
**422** 93:9 94:2
**429** 101:21
**44** 141:13
**449** 107:2
**4494** 1:4 8:18
**45** 140:24 141:12
  141:13 257:17
**450** 81:7,10 83:6
  115:15 120:25
  121:3 155:2
  157:9,11 169:6
  195:12 197:6
  217:5 234:15

  239:15 247:2
  249:22 250:8
  252:22,24 256:2
  256:4,12,17
  257:19 273:4
**4500** 254:23
**453** 110:5
**454** 110:6
**49** 212:21
**4:00** 199:11
**4:36** 258:21
**4:55** 259:3
**4c** 62:4

### 5

**5** 6:8 40:20 41:3
  42:6 86:3,4
  124:2,5 142:24
  143:15 153:10
  214:4 216:18
  221:16 234:22
  241:4 243:17
  245:12 246:7
**5/2/13** 6:6
**5/24/19** 6:22
**50** 11:21 26:7
  117:19 118:14
  118:19,20
  170:13 187:23
  189:4 191:2
  211:23 212:3
  223:19,22
  292:16
**500** 62:11 227:18
  227:20,22
  229:19 232:22
**54** 214:4

**[5582316 - account]**

| | | | |
|---|---|---|---|
| **5582316** 1:25 | **8** | **95th** 207:10 | 291:2 295:9 |
| **56** 168:12 | | **98** 30:3,4 | 296:21,22 |
| **57** 5:20 119:15 | **8** 1:14 7:4 8:2,6 | **99** 103:19 161:5 | 299:21 |
| 119:17 177:13 | 75:24 76:12 | 230:12 | **absence** 215:15 |
| **593** 247:13 | 117:24 118:2 | **99.9** 161:6 | 216:7 |
| **594** 245:6 | 132:18,19,22 | **9:30** 199:11 | **absent** 282:16,21 |
| **599** 3:12 | 133:4,8,9 175:14 | **9:46** 1:15 8:5 | **absolutely** 75:17 |
| **5:49** 307:10 | 309:11 310:5 | | 118:8 208:20 |
| **5th** 264:11 | 311:9 | **a** | **absorb** 112:13 |
| | **8/7/18** 6:18 | | 192:20 |
| **6** | **80** 6:4 123:5 | **a.m.** 1:15 8:5 | **absurd** 163:14 |
| | 132:9,9 277:24 | 55:19,23 | **abuse** 144:9,9 |
| **6** 6:16 75:4,24 | 281:9 | **ability** 165:10,12 | **acad** 176:21 |
| 76:12 126:12,15 | **800** 26:25 | 165:14,22 | **academia** 104:4 |
| **60** 63:25 | **812** 201:15,24 | 200:17 266:18 | 104:5 240:22 |
| **61** 238:4 | 202:20 203:3,4,5 | 266:22 268:18 | 251:22 |
| **614** 140:17 | 204:7,8,11 256:9 | 269:3 272:18 | **academic** 47:14 |
| **63** 25:14 211:24 | **82** 278:8 | **able** 12:23 36:8 | 47:24 104:10 |
| **65** 76:11 78:18 | **825** 4:12 | 36:23 52:7 | 113:2 116:5 |
| 78:20 | **83** 286:7 | 88:23 106:2 | 168:7 171:10,11 |
| **6:04** 307:14 | **84** 288:19 | 144:18 190:18 | 171:15 176:19 |
| **6:05** 308:3 | **86** 6:8 | 200:11 230:7 | 176:22 177:5 |
| **6:06** 308:15 | **87** 47:22 210:12 | 295:25 302:25 | 191:2 244:2 |
| | 290:21,23 295:7 | **abnormal** 64:18 | 266:4 |
| **7** | **88** 2:11 290:13 | 73:19 74:5,14 | **academics** 92:21 |
| | **89** 296:7 | 80:24 81:19,20 | 244:6 280:15 |
| **7** 6:21 25:14 | **899** 3:18 | 82:24 83:2 | **accept** 213:7 |
| 129:2,3,6 162:5 | | 107:8,20 109:10 | **acceptable** |
| 211:24 265:16 | **9** | 110:3 149:21,23 | 135:20 |
| 267:7 | | 150:16 153:13 | **accepted** 59:9 |
| **7/31/23** 311:20 | **9** 7:9 138:23 | 153:18 157:21 | 131:15 144:7 |
| **700** 245:14,16 | 139:2 143:23 | 161:20 184:10 | 290:14 |
| **702** 134:16 144:3 | **90** 169:19,20 | 217:9 223:25 | **accepts** 137:2,4 |
| **725** 217:17 | 299:6 | 235:6 236:6 | **access** 202:6 |
| **766** 27:3 30:3,4 | **90th** 207:10 | 237:10 239:13 | **accompli** 236:11 |
| 168:14 217:17 | **94104** 4:6 | 245:23,25 | **account** 65:13 |
| 245:14,16 | **94109** 3:19 | 246:15 247:22 | 110:10 185:18 |
| 255:22 | **9428** 311:20 | 249:8,12 250:12 | 289:18 290:15 |
| **79** 68:2,11 277:6 | **95** 207:12 | 254:11 255:2 | |
| **7th** 134:10 | | | |

**[accountant - allow]**

**accountant** 287:19 304:13
**accounted** 92:12 92:14
**accounting** 28:12,14 32:24 52:24 53:2,5,9 273:21 287:21 302:4,12 304:10 304:14,22
**accrued** 127:22
**accuracy** 63:3
**accurate** 12:23 292:25
**acknowledgm...** 309:4
**acon** 201:20 202:21
**acquired** 51:19
**acquires** 278:10
**act** 114:25 122:24 126:21 143:15 144:24
**action** 6:11 9:4 13:3,10 15:22 20:19,24 26:21 30:23 31:5,8 46:10 52:23 86:9 122:23 126:21 143:14 144:24 196:24 274:23,25 311:12,12
**actions** 53:4 122:21
**active** 45:16,17 45:18

**activity** 87:12 88:4 191:15 192:3,6,7 238:16
**actual** 63:13 99:16 125:14 135:17 281:8 282:14 283:4 287:21 290:24 301:22 302:5
**add** 54:15 89:22 254:21
**adding** 227:5
**addition** 89:21 200:6,9 254:21 303:20
**additional** 27:15 144:20 202:4 204:16 205:6 254:19 264:3
**address** 81:22 135:25
**adequate** 177:14
**adjust** 65:12
**adjusted** 160:15 160:17,19 227:6 286:20
**adjusting** 253:11 286:24 291:11 291:23
**adjustment** 73:24 159:2
**adjustments** 159:13 291:6 292:9,10 304:21
**administer** 9:2
**advance** 219:10 238:17

**adverse** 117:17
**advisory** 52:4
**affect** 112:8,11 112:12 116:16 116:17 182:16 271:13 291:7
**affiliations** 9:11
**afoul** 128:3
**aftermarket** 25:17 54:9,9
**age** 36:20
**agencies** 201:11
**agnostic** 244:17
**ago** 34:17 63:20 67:10 68:11 83:20 84:2 98:18 125:11 143:11 166:21 280:20
**agree** 8:12 78:9 92:22 103:4 131:14 138:9 142:8 162:15,25 163:5 174:21 209:18 216:5,12 216:17
**agreed** 69:7 70:7 135:15,19 136:9 175:6,11
**agreement** 44:14
**agreements** 7:12 123:15 139:14
**agrees** 118:15 136:8
**ah** 123:11
**ahead** 53:13,23 90:17 125:17 171:5 172:3,25

180:19 184:16 189:14 196:8 198:8 214:21 266:12
**ahmed** 1:24 8:25 311:3,17
**al** 5:22 6:13
**algebra** 60:22
**algorithm** 230:2
**alike** 232:6
**allegation** 298:17
**allegations** 14:22 15:7,7 28:7 197:9 259:22 270:22 272:12,16 273:7 273:10,17 291:4 295:11,15 296:23 303:2
**allege** 206:17 260:2
**alleged** 159:10 206:10 260:14 263:24 264:5,6 265:14 266:6 269:8 271:2 272:24 282:17 282:21 289:3,7 289:13,21 290:3 290:9,10 295:14 302:21 303:2,3
**allegedly** 85:14 133:18 270:23
**allen** 4:10 9:20
**allow** 12:6 135:16 145:5,10 168:10 276:13

292:9
**allowed** 145:18
181:8
**allows** 175:23
188:9
**alluding** 160:2
**alternative**
45:11 46:21,23
219:22 224:22
287:14
**alternatives**
240:24 242:5
**ambiguous**
23:24
**amendments**
27:12
**america** 39:19
39:20 41:23
195:23
**americas** 1:17
2:5 8:21
**amgen** 6:5 80:5
84:5,22
**amount** 156:25
166:6 177:16
192:21 195:6,6
210:15 281:6,7
289:22 291:11
291:23 297:10
**amounts** 166:20
**amy** 43:8
**analyses** 19:9
27:15 40:13
82:22 159:17
182:17
**analysis** 29:9,11
29:12,14 41:15
65:5,20 73:5,15

73:21 79:12,13
79:14,14 80:14
80:14,15,16,17
80:19 81:9,16,20
82:3,7,16 89:9
89:12 90:2,11,15
90:20,22,23 91:5
91:7 92:19
108:7,23 111:10
114:5,7,8,9
116:14 127:2
130:10 131:7,13
135:24 153:11
153:17 154:6
155:6 161:18,19
169:5,5 170:6,8
170:10 179:8
205:5,11,22
206:2 216:11,18
222:8,16,18
224:2,25 227:21
229:2,6,16 233:9
233:19 234:19
234:20 245:4
246:19 247:4
248:6,15 252:23
253:3,10 260:12
266:8,18,22
267:11,23
268:11,15,18
269:3,21 272:3
280:24 281:22
282:6 284:11,15
285:16,18
286:21 287:8
293:17 296:2
297:4,17 298:20
299:13 301:2,10

301:15,16
303:12 304:14
306:10,12,17,21
306:22
**analyst** 130:6
201:4,9,15,19
202:4,7,8,13
203:8 204:15,16
205:5,6,7 206:6
206:18 207:3,20
208:14,16 209:2
209:21 256:8,9
**analysts** 177:17
186:11,11
201:11,12,13
204:20,24
205:21,23
206:12,24
207:14 208:10
208:10 256:14
257:17,18 297:9
301:24,25
**analyze** 300:6
**analyzed** 134:2
134:12 306:8
**analyzing** 100:8
270:16
**anecdotally**
246:25
**anecdotes** 121:2
167:20
**ann** 37:12
**announce** 102:3
**announced**
167:14
**announcement**
103:5 106:20
121:16 185:5

242:9
**announcements**
102:21 106:21
186:9 209:3
240:16 241:13
241:16
**announces**
247:25
**anomalies** 175:7
175:13
**anomalous**
65:18,22 66:25
67:6,19 85:7
121:7
**answer** 5:7 12:7
12:15,18,19
20:25 26:11
45:23 67:11
72:22 80:10,11
90:5 96:21
119:10 120:4
125:22 159:4
178:17 179:16
180:19 189:7,15
257:25 258:14
268:21 271:7
285:14 291:17
297:20
**answered** 41:20
90:5 120:8
157:25 158:2
166:14 180:18
181:19 190:24
257:11
**answering**
181:14 200:2
**answers** 11:25
209:14 309:11

**antitrust** 33:2 36:9 37:21
**anton** 4:18 8:22
**anybody** 134:22 174:11 194:6 197:10
**apologies** 32:6
**app** 194:3
**appaloosa** 123:16
**appaloosa's** 141:10
**apparently** 95:6
**appeal** 144:12
**appeals** 93:20
**appear** 59:5 60:2 60:8,13 79:11 80:12 94:10,20 107:20 109:11 204:12
**appearance** 9:8 61:2
**appearances** 2:1 3:1 4:1 9:10
**appearing** 10:12 10:17
**appears** 59:3 98:25 99:8 213:13
**appended** 30:8
**appendix** 29:23 30:12 146:5,19 203:19,24,25,25 204:12 209:21 209:23,24 217:16,18,25 218:3 245:7,8 247:6 255:23

**apple** 276:14,21
**applicable** 24:19 24:20 140:21
**application** 24:2 24:14 32:23
**applied** 26:17 189:2,3 259:16 266:3 267:6,19 271:18 273:16 274:17 280:2 282:8 283:9 284:6 286:3,5 287:10 288:17 292:11,19 293:5 294:12 295:22 297:19 298:12 299:3,5 300:4 305:16
**applies** 270:10 292:2
**apply** 24:24 25:4 38:12,24 39:5 56:19
**applying** 51:13 58:14 62:4
**appointment** 191:3
**apportion** 295:13
**apportioned** 295:21
**appreciate** 132:17
**approach** 61:16 64:25 81:23 89:17 92:9 99:21,21 120:21 158:23 176:6

179:21,22 226:14 242:5 272:20 283:8
**approaches** 59:7 60:3,9 283:7
**appropriate** 61:16 81:25 99:21 128:12,14 136:9,20 151:7 188:25 229:15 296:11,17 299:8
**appropriately** 92:13,14
**approximately** 11:19 122:5 123:6 124:15,16 125:6
**april** 264:16
**arbitrage** 191:15
**arbitrarily** 232:13
**arbitrary** 232:6
**area** 23:14 24:22 186:25
**areas** 25:10
**argue** 110:15 185:16 242:11
**arrogant** 187:25
**article** 57:19 58:9,11 61:18 67:23 68:2,3,7 68:11,17 74:22 80:4,9 83:17,18 83:23 84:2,18 85:5 86:7,14,16 88:15 92:4 93:9 94:25 96:5 100:9,16,22,25

101:18 113:9,14 160:7,8 174:23 218:11 247:21
**articles** 56:15,18 56:22 86:17,18 106:12 171:13 210:6
**artificial** 199:24 199:25 260:25 270:7,9,10 278:10,11,23 279:18,21,24,24 280:21 281:4,12 281:17 288:25 293:4
**artificially** 260:6
**aside** 79:17 252:12 257:7
**asked** 26:9,13,19 28:18 39:25 40:3 41:13 51:4 73:22 78:2 80:22 81:2,6,22 82:2 90:19,25 91:8,10 113:24 125:8 126:22 131:10,24 137:6 137:6 153:21 157:24 159:3,7 161:9 167:23 169:6 174:12 180:17 181:18 186:25 195:9,10 225:2 248:8,10 256:20 258:2,3,4 258:10 259:14 259:17 263:6 268:13 272:9

276:19 282:23 284:3,21,23 285:2,7,15 292:4 292:21 295:19 296:2 301:12,16 301:18 305:3,6 305:11,12 306:3 306:11,13,17,18 306:19,20,25

**asking** 40:17 68:3 75:9 100:5 100:21 190:2 198:7 203:13 226:2 250:14 271:9 283:25 291:19

**asks** 90:16

**aspects** 25:16 188:9

**assembler** 54:7

**asserts** 98:5

**assess** 89:15

**assessing** 88:18

**assessment** 89:23 175:20,22

**asset** 117:21

**assets** 231:12,15

**assigning** 99:4

**assist** 51:4 64:4 178:25

**associated** 14:8 15:6 25:11 34:10 37:18 41:8 46:22 49:14 66:2,8 67:13 74:15 93:5 119:22 144:22 151:2

155:20 159:11 159:23 173:4 184:24 210:2 242:11 248:5,25 261:16,20,25 262:25 266:25 273:22 275:2,9 275:16 280:24 290:10 296:22

**assume** 28:6 35:7 78:20 97:25 114:15 115:3 128:12 138:7 162:15 166:10 203:2 232:8 270:19 272:16 273:7

**assumed** 69:14 107:13 134:10

**assumes** 266:12

**assuming** 27:23 28:3 135:6 159:5 242:19 270:8,14,22 273:12 279:12 299:7

**assumption** 127:24

**attached** 309:14

**attempt** 133:17 168:6

**attenuated** 141:23

**attorney** 9:12 42:16 43:7,20,25 44:5,11 49:19 311:11

**audio** 8:10

**audit** 20:16 53:8

**audited** 20:15

**auditing** 20:13

**august** 134:10

**authority** 95:3

**authorized** 9:2

**autocorrelation** 114:9 151:14,19 153:25 183:21 185:25 252:24 252:25 253:10 257:13

**autocorrelations** 158:4

**automotive** 25:15,17,18,23 33:2 54:8,9 57:13

**available** 153:15 162:11,24 163:10 166:13 174:17 186:6 192:4,13,17 201:20,25 202:5 202:8 204:21 208:6 210:15 219:9

**avenue** 1:17 2:5 2:17 3:12 4:12 8:21

**average** 87:12 88:3 192:10 216:10 256:2

**avoid** 232:6

**award** 128:11

**awards** 127:11 127:19

**aware** 30:13 47:12 99:24 124:22 131:2

**b**

**b** 19:14 32:4 61:3,4 91:2 135:24 146:5 192:2

**back** 29:19 42:14 48:12 55:21,24 57:10 62:15,17 67:21 79:19,20 83:8 91:13 95:7 101:13,17 106:25 113:8,13 121:17 125:14 149:4,13 163:4 171:17,20 174:23 187:13 187:14 189:25 212:5,8 213:23 214:3 216:16 238:5 243:22 255:12 256:24 258:25 259:5 264:18 268:22 280:18 300:3,18 307:12

**backed** 41:9 66:6,7 140:7,10

**background** 36:13 38:3

**backup** 81:24 153:12,14 203:21,23 234:10

**backwards** 213:12 253:25 264:8 282:3,7

**balance** 304:17

**balanced** 6:16 126:16

**bank** 6:17 7:13 14:18 39:19,20 40:23 41:6,23 126:17 139:15

**bank's** 260:3,8

**banking** 39:7,12 40:2,14 41:11,16 41:19 233:8,15 239:10 242:15 242:17,21

**banks** 38:23 39:22 40:12 41:8 227:20 228:19,25 233:13

**barely** 143:11

**bargain** 126:24 128:14,15

**bark** 6:9 86:8 101:18

**base** 104:17 106:23 137:2 179:24 253:18 292:8

**based** 59:6 60:3 60:9 64:14 85:14,16 86:16 88:23 89:19 100:6 102:13 104:10 105:14 109:5 116:5 128:21 136:2,18

140:3 161:18 165:22 177:8 179:17,18 183:22 190:16 193:13 196:10 202:19 210:4 217:5,13 219:3 233:8 235:20 239:6 241:21 243:13 250:5,6 251:20 252:2,11 254:3 255:17 257:6 259:21 273:11 274:14 274:14 278:2,20 289:5 296:12,14

**basic** 36:18 61:3 158:24 177:10 189:4 274:17

**basically** 95:2 103:24 128:18 128:20 131:14 136:2,17 140:11 190:3 197:8 204:21 206:14 269:7 277:16 295:13

**basis** 15:19 176:15 211:7 244:2 249:18 251:21 266:5,19 266:23 268:19 269:4 270:17 272:19 286:24 297:16 303:25 305:18,22 306:7

**basket** 65:2,9 76:22 78:25

79:4 89:22 104:20,21 106:17,25 176:7 177:24 178:11 179:19 181:20 183:25 188:8,21 189:11 190:16 191:8

**bassiouny** 2:14

**bassioura** 10:2

**battle** 160:16

**beam** 145:25

**bear** 116:17

**beginning** 9:11 29:13 32:11 129:12,13 130:18 133:5 273:5 294:20 295:3

**beginnings** 306:22

**begins** 219:17 286:11

**behalf** 9:14,19 10:13,17 13:13 14:2 25:19 43:7 50:7

**behavior** 240:11

**behavioral** 240:12

**belief** 200:25

**believe** 26:23 42:8 54:21 67:5 67:22 68:7 78:11 82:10 84:5 93:5 97:21 101:19 130:12 139:20,25

140:16,19 151:12,17 169:15,19 174:24 178:23 194:23 195:5 202:10 203:22 205:19 211:6 218:11 228:6,17 230:9 235:10 245:21 248:9 252:9,12,14 264:11 276:24 277:24

**believed** 175:3

**belittle** 28:10

**bells** 62:12

**benchmarks** 229:15

**benefit** 36:20 38:10 126:23 128:13,15

**berger** 2:4 8:20 10:5

**bernstein** 2:4 8:20 10:5 13:6 13:13 14:2

**best** 36:24,25 84:15 178:24 231:25 294:6

**beta** 155:18,24 221:25 222:5

**better** 45:15 100:25 219:19 221:2,12,13 222:2,5 229:11

**beyond** 16:4,8 43:12 63:15 122:4,11 209:20

263:2

**bias** 108:24 151:8 251:5

**biased** 159:12,24 226:13 251:13

**bid** 59:12 61:5 166:7 176:23 193:6,14 213:2,5 254:6 257:15

**big** 235:17,17

**billion** 166:5 247:14 257:16

**biomarin** 32:2 223:4,5 224:6,9 225:3,10

**biometric** 52:18

**biometrics** 52:17 53:8,17,20

**bit** 244:3

**bite** 276:14,21

**bittman** 4:7 10:15,16 258:24

**black** 63:6 88:9 234:21

**blackrock** 6:16 126:16

**blatchley** 2:7 10:4,4 308:11,12

**block** 58:25

**board** 52:21,22 53:3 166:23 167:2 260:14 303:9,10

**boards** 52:21 121:20

**boilerplate** 168:11

**bond** 66:23 71:7 111:3,20 276:17 277:2

**bondholder** 274:24

**bondholders** 274:23

**bonds** 66:5 110:14,18,24 111:6,13 189:3 220:14 275:7,13 275:15,21

**book** 211:14

**bottom** 127:7 133:8,9 245:11 247:12

**bought** 280:3 293:8

**bounds** 217:11 238:8

**bowen** 2:20 10:3

**box** 39:4 192:16

**brandon** 2:8 10:7

**breach** 126:22

**break** 12:14 55:3 55:15 81:14 100:18 101:4,6,8 151:10 154:18 155:8,12 158:5,8 158:9,9,13,15 161:19 209:5 212:10,18 213:18 222:8,10 222:12,18,21,24 223:5,15 224:2,7 224:12 225:7 256:9 257:23

258:17 307:6

**breakdown** 302:14

**breakdowns** 302:6

**breaker** 194:8,9 194:14 195:7,14 195:18,20 196:5 198:17

**breakers** 195:10 199:2

**breaks** 12:12

**brian** 4:17 9:16

**briefly** 83:16 216:25 217:3

**bright** 77:21 78:19,24 160:11 221:6

**bring** 52:7 197:15

**bringing** 211:13 212:17

**broad** 3:5 14:17 24:22 25:8,8,24 26:4 40:18 41:20 226:18,23 227:17 228:5 229:7,8 232:11

**broker** 191:24

**brought** 52:25

**bullet** 176:25

**bulletin** 166:23 167:2

**bunch** 55:11 188:15

**bundle** 134:11 135:9

**bureau** 43:9

**business** 5:23 6:13 25:16,17 32:21 34:3 38:2 48:3 49:3 57:21 68:14 86:11 102:7 146:3 231:20 232:3 242:20,20 243:11 303:8

**businesses** 302:15

**busy** 56:13

**buy** 191:19,21 193:12 194:4 199:15,21

**buyer** 193:20,22 213:4

**buyers** 211:14

**buys** 197:10

**byzantine** 35:16

**c**

**c** 4:10 9:20 192:19 203:19 203:24,25 204:12 209:21 209:23,24 245:7 245:8 247:6

**c30** 7:16 139:17

**calculate** 126:23 128:15,20 142:13 266:19 266:23 267:8,20 268:18 269:4,17 271:20 272:9,18 275:17 276:8 279:2,3,10,20,23

281:16,18 282:9
282:20,24 283:2
283:12,14,16,21
284:8,23 286:6,9
293:24 295:24
299:20 300:8
**calculated** 213:3
270:16 272:3,5
274:12,13
279:25 281:13
282:7
**calculating**
268:7 272:8
276:6 278:19
280:21 285:20
290:24
**calculation**
15:18 43:2
63:14 64:6,7
99:11 279:6
**calculations**
64:21,21 99:17
**calculus** 60:22
**calendar** 256:10
**california** 3:19
4:6 311:21
**call** 34:5 153:5,5
153:6 156:16
158:4 167:15
191:23 193:12
193:25 194:2
195:21 209:24
226:18 230:11
233:10,12
243:23
**called** 25:20 32:2
57:19 61:13,25
62:10 68:21

80:4 159:9
174:18 211:10
217:20 222:8
224:16 227:6
233:12,20 268:5
**calls** 96:20 197:3
198:2,5 233:7,14
256:15 259:12
262:6,21 265:4
**cammer** 58:15
62:5 66:20,20,21
84:8 93:12 94:4
94:11,20 95:7,18
96:8,12,12 97:14
98:24 131:7
177:6,7 178:7
184:11 187:17
188:4 189:2,5,24
191:6 202:6
203:9 205:8,9,10
205:12,12
206:13,20 207:4
207:8,22 214:4,7
214:13,22
216:18
**cap** 67:15 189:3
201:20 202:21
257:16
**capital** 6:16
126:16 202:22
**caps** 166:2
**caption** 139:11
139:12
**captioned**
217:17
**car** 145:25
**card** 39:17

**cardoso** 3:8 9:16
**cards** 38:22
**career** 187:12
**careful** 61:11
64:8 77:8 92:11
135:10 147:21
**carlton** 37:12
**carly** 4:7 10:16
258:24
**carried** 65:2
**case** 1:4 8:18
14:16,22 15:8
16:8 17:8 22:21
37:21,23 38:20
39:2 40:8,9 42:5
42:11 43:21
44:2 61:19
62:10 73:5,6,17
77:13 80:18
81:5 87:23
97:22 100:8,13
103:14 104:13
105:23,23
106:14 110:8
115:19 120:20
124:5 125:13,19
126:5,19,21,22
127:2 133:2,3
139:4,5,9 140:18
140:19 143:14
143:15,16,17,19
145:2,4,17,21
147:5,18 148:4,4
148:7 150:24
151:24 167:5
178:19 182:2
183:18,24 184:5
184:13 186:21

186:24 195:3
196:20 198:19
199:5 220:7,17
221:16,22 222:7
222:24,25 223:2
223:3,4,6,13
224:3 225:14
241:4,4,24
242:23 243:17
243:17 244:25
250:8 259:24
271:3 272:12,24
273:18,19 274:4
274:5 275:22
276:11,12,12,16
276:17 281:19
282:24 283:19
284:15 286:18
291:14 292:2
294:11 296:19
304:7,15 305:2
305:19,20 306:2
306:16 307:5
309:1 310:4
**cases** 17:13
19:20 124:2
125:20 147:13
147:14,22,25
176:13 177:13
211:6 220:9
274:20 283:3
284:11 287:18
294:2 304:7
**cash** 173:4,11,13
239:3 241:21
243:13,23
**causal** 286:22

**causation** 28:22 28:25 29:12,17 89:8,11 90:2,11 90:19,22 91:7 108:7 109:16,20 109:22 112:4 114:5 116:14 150:3 159:15 205:11,15,21 206:2,5 236:5 245:4 246:19 247:4 248:6,13 266:25 267:3,16 268:11,14 269:11,12,21,24 272:3 281:2,21 282:5 284:2,4,10 284:15,25 285:16,18 286:21 291:21 292:6,22 293:17 295:2,18,19 296:2 297:3,17 298:6 301:10,14 301:16 303:11 305:11 306:3,10 306:12,16,21,22

**cause** 6:10 28:14 55:11 62:25 84:9,15,16,19 85:16 86:9 87:2 87:9,19 88:12 91:20 92:19 93:12 94:4,7,11 95:7,19,23 96:18 96:24 102:13 104:13 105:15 106:12,13

107:11,21 108:9 108:22,25 109:11 111:6 113:18 114:8 154:19 155:21 159:4,7 160:19 161:11 166:2,18 177:19 178:20 183:21 184:23 186:14,15 190:11 195:3 199:8 206:21 214:7,16,23 215:2 221:5 222:22 224:25 225:15,23 234:19 235:22 238:14,20 239:19 240:8 241:14 245:3,21 246:24 269:7 276:18 284:24 288:13 292:22 293:3 300:21 301:14,22

**caused** 88:14 133:12 134:6 206:9 246:14,16 247:20,22 266:14 267:15 267:19 270:7,8 271:11,11 283:22 289:3 291:20 295:14 301:19

**causes** 245:2 269:9 270:13

**caveat** 154:13

**ccr** 1:24 311:18

**ccv** 1:4

**cent** 193:13

**center** 65:14

**centralized** 211:13

**ceo** 54:12

**cert** 6:24 88:22 89:4 90:3,15 241:4 259:10 266:8 268:16,25 274:19 275:24 276:4

**certain** 19:9 25:9 66:22 72:12 97:4,13 110:13 111:24 115:20 160:5 170:20 177:16 195:6,6 302:22

**certainly** 15:7 118:3 174:11 185:11 197:12

**certificate** 311:1

**certificates** 7:15 139:16

**certification** 16:4 85:7 89:5,6 90:9 94:16 131:4 147:9 151:6

**certified** 199:6 311:3,4

**certify** 179:24 309:7 311:5,11

**chairman** 53:7 54:12

**chance** 86:13 217:12 238:9

**change** 74:15 156:18 158:16 173:7,7,13 185:5 188:11 222:13 234:12 292:5,24 293:16 294:5,8 299:12

**changed** 233:21 233:24 234:9 265:11 274:10 291:19

**changes** 69:24 70:24 71:12,20 72:15 73:16 102:6 158:17 188:10 215:15 216:8 230:10 238:11,24 239:3 275:10 289:18 290:16 291:5 293:2,3 294:3,7 301:22 309:13 309:15

**changing** 155:4

**character** 165:19

**characteristics** 98:7

**characterized** 192:19

**chase** 39:21,21 41:23

**chastised** 104:7

**check** 156:6

**chicago** 37:8 38:12 49:2

51:21,21 187:15
**chief** 43:8 52:19
  52:25
**choice** 232:6
**choices** 218:12
**choose** 242:4
  251:19
**choosing** 104:8
  120:25
**chose** 21:22
**chosen** 232:4
**christopher** 43:6
**chronology**
  204:2 209:25
  210:11
**chrysler** 146:3
**circuit** 7:21
  93:19 143:9
  194:8,9,14 195:7
  195:9,14,18,20
  196:5 198:16,25
**circumstance**
  185:14,22
  220:19 293:11
  293:14
**circumstances**
  172:20 180:21
  186:18 219:11
  219:13 220:2,23
**cite** 96:2 97:21
  162:19,19
  176:12
**cites** 211:5
**citi** 39:20 41:22
  42:3,8
**citibank** 39:20
**citigroup** 41:3
  42:3,5

**citing** 177:13
**citizen** 15:4
**city** 8:21 42:4,11
**civ** 8:18
**claim** 65:9
**claims** 128:25
  141:10
**clarence** 3:17
  10:13
**clarify** 310:7
**class** 6:11,24
  15:19,20 16:4
  26:17 46:10
  48:17,18,22
  69:17 71:11,18
  71:19 80:20
  81:8,10,13,15,15
  81:17 82:4 85:9
  85:14 86:9
  88:22 89:4,5,6
  89:20 90:3,9,15
  94:14,15 99:25
  102:3,16,20
  103:5 105:18
  115:16 122:21
  122:23 126:21
  130:18 131:3
  143:14 147:9
  150:24 151:5
  155:3,9 157:7
  184:7 187:3
  189:10 192:11
  195:15 196:14
  196:16,20,21,24
  196:25 197:7
  198:11 199:6
  201:16 222:10
  222:19,20 224:4

231:4,9 233:19
233:21,24 234:9
234:13 236:19
237:2 241:4
249:22 252:4,6
255:16 256:12
259:10,16 266:8
266:19,23 267:6
267:20 268:16
268:19,25 269:4
270:17 271:19
272:19 273:16
274:17,19,23,25
275:18,24 276:4
277:8 278:10,12
278:13 280:2
282:8 284:6
286:3 287:10
288:17 291:8
292:11,15,19
293:5 294:13,16
294:20 295:22
297:19 298:12
299:4 300:4
305:16
**classes** 48:14
  179:24
**classic** 174:9
**clean** 242:6
**clear** 12:2 27:19
  29:8,14 71:24
  76:20 104:14
  106:9,11 108:17
  126:3 139:8
  140:15,18
  144:15 154:20
  154:25 172:6
  191:16,17

245:10 272:7
293:21
**clearly** 183:19
  272:2
**clients** 39:18
  52:7 208:12
**close** 11:20 49:5
  114:6,6 200:2
  252:8 300:8,8
**closed** 247:19
**closing** 251:20
**clustered** 237:2
**cmbs** 66:6
**cnbc** 192:15
**coauthored**
  68:11
**codes** 310:7
**coefficient**
  155:18,25
  158:16,17
  234:11
**cohen** 2:10,16
  3:17,20 9:24
  10:11,12,13 13:7
**colleague** 9:16
**column** 127:13
  127:14 129:12
  133:10 140:25
  141:6,8 143:24
  246:11
**combination**
  120:23 180:12
  182:6,8 210:22
  285:25
**combined** 25:22
  229:12
**comcast** 128:5

[come - component]                                                   Page 13

come   29:19
  72:12 76:24
  83:8 91:13
  106:25 118:7,13
  121:6,17 157:4
  167:20 168:10
  173:6 176:24
  187:24 188:22
  189:18,20
  204:25 208:15
  213:15 224:21
  287:19 306:9
comes   237:12
comfortable
  161:24 183:16
  255:15
coming   120:25
commentary
  301:3,5,5
commercial   7:13
  7:14 32:25 66:6
  139:15,16 140:6
  140:10
committee   53:8
common   15:15
  15:19 19:24
  26:14,16 40:6
  47:8,9,11,13
  73:23 91:12
  104:23 110:19
  110:23 111:2,9
  111:13 112:12
  112:19 114:11
  116:15,17
  117:24 130:15
  137:3,7 140:20
  143:17 158:23
  168:19 179:3,4

  179:11 181:15
  182:10 184:6
  187:2 189:10
  192:8 193:20
  195:15 210:25
  211:8 253:12
  254:2,17 258:6
  259:15 266:2
  267:6,21 268:4
  269:18 270:9
  271:14,19,22,25
  275:2,7,11 280:7
  280:22 282:8,15
  283:11 284:6,20
  284:22 286:3
  289:2 291:7
  292:11 294:23
  295:23 305:7
commonality
  275:16
commonly   59:9
  109:23 278:3,6
  290:14
communicate
  13:23 16:19
  22:4
communicated
  13:17
communicating
  13:23
community
  144:8
companies
  113:15 207:11
  207:12,12
  227:22 228:4,7
  228:13 229:3
  230:19 231:13

  231:16,21 236:9
company   1:5
  6:18 8:16 9:15
  15:16,16 18:5
  25:19 36:14,16
  44:19 46:19
  52:20 54:16,18
  57:13 113:18
  118:24 126:17
  133:12 145:3,6
  145:23,24
  164:25 166:5,24
  184:25 185:19
  186:8 188:22
  197:7,23 201:10
  205:13 207:20
  208:5,7 228:9
  233:4,5 237:14
  240:16 241:13
  242:14 243:7,8
  256:15 258:7
  277:3 301:24
  302:13
company's
  206:19
compare   161:2
  229:21,23
  234:20 278:18
compared
  153:17 218:22
  231:12,16
  234:17 235:3
compares
  229:20 230:15
  230:17
comparing
  229:2 234:16
  235:2

comparison
  122:12 231:11
  231:15
compensate
  127:21
competing   166:4
competitor
  50:20 146:2
complaint   16:14
  22:19 260:24
  262:24 263:8,23
  263:24 264:15
  270:5 273:6
complete   12:24
  76:4 78:6 172:6
  296:8 311:10
completed
  298:10
completely
  76:19
completion
  247:25
complex   32:25
  36:3 59:8 60:24
  113:18 121:11
complexity
  108:18
compliance
  260:4,9
complicated
  280:13
complying   68:19
  175:16
component
  28:12,15,20
  67:14,16,17
  74:14 142:22
  257:23

**[components - contradictions]**

**components** 14:6 177:9 243:11

**composition** 231:12

**computing** 188:10

**concealed** 261:5 261:19

**concept** 169:11 194:7 244:19 288:20

**concepts** 66:2

**conceptually** 196:25

**concern** 236:24 242:9

**concerned** 78:22 221:4 229:5 237:19,20 241:19

**concerning** 260:3

**concerns** 145:22

**conclude** 136:18 249:19 253:12 257:3,5

**concluded** 124:17 308:15

**concludes** 134:18 307:24

**conclusion** 73:25 76:6,25 78:16 89:19 90:17 96:21 100:6 120:12 179:14 184:13 185:18 197:4 198:6

250:5,6 251:25 252:19 253:24 255:3 259:13 262:7,22 265:5

**conclusions** 72:12 91:19 109:5 182:17 183:16

**condition** 146:20

**conditions** 261:3

**conducive** 34:3,6

**conducted** 27:15

**conference** 167:14 256:15

**confidence** 103:19 161:6 181:9

**confidential** 49:25

**confidentiality** 44:13

**confluence** 101:24

**conform** 310:8

**confounding** 35:15,22 290:15 296:12

**confused** 164:8 170:18 253:5 267:13

**confusing** 94:8

**confusion** 31:22

**congressional** 167:13,17

**connor** 3:8 9:16

**cons** 218:21,24

**consensus** 301:24

**consent** 260:4,5 260:9,13 261:16 261:21 262:2,3,5 262:16 263:3,16 264:22 265:10

**consequence** 84:5

**conservative** 161:22

**consider** 25:6 41:11 96:13 117:7,9 219:12 240:16,24 290:6 306:21

**considered** 37:20 96:7 97:4 97:7 104:11,11 117:19 140:3 145:9 147:5,10 152:10 154:17 211:11 220:20 224:16 227:13 234:23 267:5 275:18

**considering** 133:21,24

**considers** 181:6

**consistent** 211:18 226:12 251:15 255:7 256:3,11 272:20 274:11

**consistently** 223:21 259:18

**constant** 111:16 111:18 200:11

**constituted** 134:11

**constraints** 199:24,25

**construct** 282:3

**construction** 19:9

**consulting** 19:20 20:22 21:3,6 22:6 34:7 37:22 46:24 49:8 51:8

**consumer** 239:6 260:14

**cont'd** 3:1 4:1 6:1 7:1

**contains** 210:13

**contemporane...** 107:10 142:2

**content** 34:12

**context** 59:17 87:2 110:13 117:10 118:4 208:3 220:11

**continue** 8:11 62:14

**continued** 149:11

**continues** 119:3

**contract** 126:22 139:20 140:5 141:24 142:21

**contractor** 42:18

**contracts** 140:3 140:4

**contractual** 139:20,23

**contradict** 183:12

**contradictions** 140:13

**control** 79:9 130:5 154:22 155:2 156:24 157:3,5,15 169:14 217:19 217:20,23 218:7 220:20,25 221:11 223:20 224:12 225:7 234:14,15 235:25

**conversations** 8:9

**converse** 163:7

**copies** 308:6

**copy** 26:24,24 308:5

**cornerstone** 4:17 9:17 19:13,16 21:20 38:16 50:21

**corp** 97:21

**corporate** 66:5 66:23 71:7 110:14,17,24 111:3,6,13,20 189:3 214:8,17 214:24 215:5

**corporation** 6:21 102:3 129:8

**correct** 15:23 21:18,19 22:21 23:5,23 24:7,10 24:12,17 27:22 28:9 30:9,10 47:17,24 56:9 57:2 58:3 69:23 82:4 83:24

93:18 94:21 95:11 97:23 101:20 105:8 139:21 144:13 144:14 149:17 152:24 153:3,18 157:17 163:2 168:15 169:11 174:2 175:5 176:5 177:18 178:8 199:16 202:2,21 203:3 203:19 209:22 214:14 215:21 223:10 224:8 226:17 234:18 235:4,13,14 240:18,19 244:10 249:16 249:17 250:3,23 252:9,10,16 254:19 267:11 268:12,19 269:4 270:15 271:22 274:5 279:18 284:12 290:16 295:15 301:9 306:10 309:10 310:8

**corrected** 69:19 263:12

**corrections** 27:11 30:11,13 309:13

**corrective** 261:17 263:25 264:10 266:7 287:3 289:20,21

290:10 294:15

**correctly** 58:14 66:11 140:8

**correlation** 62:25 73:18 74:2,4,7,11 80:24 81:19 149:16 150:13 150:22 151:11 151:13 152:23 157:20 230:9,12 234:7

**correlations** 77:23

**cost** 193:5 194:5

**costs** 166:6 192:22 193:22

**counsel** 8:15 9:9 10:10,21 11:8 12:17 13:6,6,18 13:24 16:20,20 23:5,8,16 42:23 43:15 49:21 68:10 78:4 123:9,16,20 124:5 258:23,24 307:16,17 308:10

**count** 63:6 121:25

**counter** 66:21 118:9,9

**country** 39:3 207:13

**couple** 39:16 121:12 146:4 167:3 276:20 300:17,19

**course** 12:12 62:19 85:4 97:10

**court** 1:1 8:24 10:9,20 64:4 69:7 70:7 85:15 93:19 95:18 117:14 119:15 126:25 129:16 129:24 130:22 132:6,8 134:12 134:17 141:2,19 142:6 143:25 144:16 145:9 177:11,13 178:25 188:3,20 189:25 215:12 276:13,20 292:18 294:7

**court's** 84:6 128:4 141:22

**courts** 56:19 59:3 64:24 92:22 94:10,20 95:4,5,8,9,12 96:6 97:4 99:2 99:19,22,24 100:2 138:3,5 177:21 179:23 180:6 188:12,14 210:25 211:19

**coverage** 201:4,9 204:15 207:3

**covered** 15:8

**covers** 300:3

**covid** 151:3,20 151:24 152:9,10 152:20,22,25

**[covid - dated]** Page 16

153:2,6,25 155:25 156:8,10 157:8,19,22 158:11,21 159:9 159:17 160:20 223:16 224:3,5 224:16

**cra** 50:18,20,24

**cragar** 53:25 54:2,3,5,6,13,21 57:11 164:25 193:20

**cravath** 4:11 9:19

**crc** 1:24 311:17

**create** 88:11 137:6 298:11

**created** 15:16 19:10 34:2 120:20

**credit** 38:22 39:17 40:22 41:25 43:3,9,20 43:25 76:18

**credited** 100:4

**credits** 136:12

**criteria** 122:14 193:17

**critical** 71:6 107:23 108:8,14 188:9 224:11 225:6,9,13 243:9 292:19

**critically** 77:25 81:2

**criticism** 125:24 126:2,8 128:8 134:13 135:3

137:9,11,15 138:2,13,14 140:23

**criticisms** 129:18,19 130:2 130:3 138:3,5

**criticize** 126:25 188:14,19

**criticized** 138:7

**criticizes** 132:5 137:12

**criticizing** 126:5 126:8

**cromwell** 3:4 9:14 124:10

**cross** 145:25

**crr** 1:24 311:17

**crystal** 167:25

**csr** 1:24 311:19 311:20,21

**curative** 264:3

**curious** 6:8 33:22 86:8

**current** 127:11 127:20 183:2

**currently** 44:19 44:24 45:2,19 48:14 50:9 189:12 270:3

**cursory** 207:21 208:2,3

**curve** 275:3,8,11 275:12

**customer** 232:10 272:11

**customers** 302:16

**cut** 167:18 228:22

**cv** 30:8 42:15 55:3 56:3 86:16 121:18

**d**

**d** 2:7 5:1 18:16 30:20,21 217:16 217:25 218:3 276:11

**d.c.** 2:18

**daily** 209:25 251:20 278:23 279:17,20 281:3 281:5,12,16 288:25

**damage** 135:15

**damaged** 135:14

**damages** 15:18 26:16 40:6 43:3 43:18 73:23 91:12 126:24 127:11,20 128:2 128:10,14,20 130:15 131:9 135:22 136:8 137:3,4,7 140:20 142:13 143:17 144:20 145:14 145:19 259:11 259:15,18,20 266:3,8,19,23 267:7,8,20,21 268:4,6,19 269:4 270:9,16 271:14 271:19,20,22,25 272:5,8,9,18

274:11,19 275:25 276:8,16 277:8,22 279:11 280:7 282:8,10 283:11,13 284:6 284:9,22 286:3,6 292:11 293:21 294:23 295:23 295:24 299:4 305:7

**dan** 37:12

**darma** 51:25 52:2,12

**data** 14:5,7 19:9 19:9 20:12,12 110:11 144:25 145:24 153:20 155:4 159:3 171:16 224:21 253:5,9 254:4 302:4 304:22

**database** 204:9

**date** 31:13 115:22 158:18 217:7 221:14 223:14 244:2,20 244:25 245:22 245:24 246:8,15 248:18,19 249:9 249:14,25 250:11 251:9,19 252:21 254:20 254:24 257:5 280:3 282:14 293:8 309:20 310:5,25

**dated** 26:23

**[dates - defense]**

| | | | |
|---|---|---|---|
| **dates** 108:13,14 | 244:23 245:20 | **deal** 102:15 | **decisions** 45:3,8 |
| 115:12,12 159:8 | 246:24 247:4,10 | 105:17 247:14 | 95:22 96:18,24 |
| 160:6,20,22,23 | 247:11,18 249:7 | **dealing** 142:20 | 124:11 132:10 |
| 160:24 161:2,3 | 252:2,4,6,7 | 156:23 160:16 | 147:12,22 |
| 161:12,12,14,16 | 253:25 254:17 | **deals** 137:7 | 189:25 |
| 161:17 183:22 | 254:19 255:6,9 | 176:20 | **declaration** |
| 221:3,5,9,12 | 255:12,19 256:2 | **dealt** 61:22 | 122:17 124:18 |
| 224:10,15 225:4 | 256:4,12 257:19 | 284:25 | **declarations** |
| 225:12,17,19 | 273:4 279:9 | **debate** 136:23 | 121:21 |
| 226:4,4,6,7,14 | 280:8 283:10,11 | **decade** 22:3 | **declare** 309:6 |
| 234:25 236:17 | 283:11,23 | 34:17 35:6 | **declined** 125:9 |
| 236:25 238:3 | 286:24,24 300:4 | 63:20 67:10,21 | **decrease** 224:23 |
| 244:9,11,13,15 | 300:11,12 | 68:11 83:20 | **deep** 231:20,21 |
| 244:18 250:8,10 | 311:14 | 84:2 86:17 | **default** 71:6 |
| 250:15,16,17,22 | **day's** 109:12 | 243:22 | 275:10 |
| 251:7 252:22,24 | **days** 27:10 49:8 | **decades** 34:8 | **defendant** 3:3,10 |
| 253:9 263:24 | 49:9 75:3,23,25 | **december** 1:14 | 3:16 4:3,10 9:14 |
| 264:5,6,12 | 76:12,13 77:3 | 8:2,6 117:24 | 9:20,22 10:14,17 |
| **day** 12:13 69:22 | 78:10,18,22 | 118:2 130:7 | 123:9,21 124:5 |
| 78:18,20 81:7,10 | 108:22 114:3,4 | 309:11 310:5 | **defendant's** |
| 81:13 82:25 | 115:14,16,24 | 311:9,14 | 34:21 57:18 |
| 92:3 107:9,17,18 | 118:12 119:15 | **decide** 240:20 | 123:9 124:5 |
| 108:16,24 109:8 | 120:25 121:3,12 | **decided** 100:2 | 134:24,25 135:2 |
| 109:18 110:15 | 155:2 167:3 | 151:3 227:7 | 260:2 |
| 112:6 114:6,16 | 177:13 196:22 | 244:5 | **defendants** 5:11 |
| 114:16 115:4,15 | 196:24 197:2,5 | **decides** 235:18 | 6:2 7:2 27:5 |
| 115:17 116:2,6 | 198:15,17 212:8 | **deciding** 34:4 | 34:23 57:16 |
| 117:3 119:17 | 217:6,10 224:24 | 232:7 | 69:14 79:25 |
| 121:4,15 138:2 | 234:17,18 235:3 | **decision** 7:22 | 86:4 126:12 |
| 155:2 157:12,13 | 235:4,11,24 | 16:15 22:20 | 129:3,17,19,25 |
| 163:24 169:6,7 | 239:15 244:23 | 79:2 96:12 | 130:3 131:17 |
| 170:3,14,21 | 247:2 249:22 | 97:25 98:2,4 | 132:19 138:23 |
| 192:11 195:12 | 252:2 256:17 | 124:9,13 128:4 | 143:3 261:4,6 |
| 196:4,4,6,15,16 | 270:24 271:4 | 128:19 129:9 | 263:13 289:3 |
| 196:20 197:6 | 280:18 300:17 | 130:11 132:22 | 307:19 |
| 199:11 212:5 | 300:19 | 143:9,10 144:9 | **defense** 19:22 |
| 215:8 219:4,6,7 | **dead** 67:14 | 144:12 179:17 | 48:11 124:10 |
| 219:25 223:21 | | 179:18 233:7 | 132:5 136:3 |

280:18 292:16
307:16

**deficiencies**
141:3,20 142:10

**deficiency**
263:16 264:22
265:9

**define** 152:2
164:16,19,21
165:3,4 183:20
219:16 242:12
290:19,20

**defined** 162:8
250:16 291:22
295:7

**defining** 37:18

**definition**
162:16,21 169:7
171:18,21
240:21 241:6,10
243:6,21 254:25
294:5

**definitive** 120:14

**degree** 48:24,25

**demand** 165:23

**demonstrate**
77:14 86:23
102:12 105:14
276:25 284:19

**demonstrates**
103:11,18 110:8
252:19 255:25
272:18

**dennis** 37:12

**denying** 7:6 85:7
132:24

**department** 38:2
48:3 49:3

**depend** 206:3
216:21 219:25

**depending**
111:20 299:18

**depends** 101:3
111:15 114:20
114:20,21,22,23
180:20 209:13
209:15 219:15

**deponent** 309:4

**deposed** 11:17
152:17

**deposition** 1:10
8:1,14,19 16:12
22:24 23:9
31:19,25 86:19
89:13 147:17,24
148:3 182:23
190:13 193:12
251:11 308:15
309:8 310:5
311:8,9

**depositions**
30:18 31:13,23

**deposits** 242:25

**depth** 201:9,10
204:15,24 205:6
205:20,25
206:11,12,25

**deputy** 43:8

**derek** 17:23
18:10

**derived** 66:21

**describe** 217:3
267:7 277:6

**described** 43:12
210:11 278:8
284:7 285:19

305:7

**describing** 65:22
90:2 92:15
156:7 204:7
242:23

**description** 5:12
6:3 7:3

**design** 34:15

**designed** 127:20

**designer** 54:7

**designs** 145:25

**despite** 106:6

**detail** 205:25
305:8

**detailed** 274:19
275:25 276:16
278:8 302:7,12

**detect** 87:11
88:3 168:18

**determination**
180:13 285:23
296:9 298:22,23
299:2

**determine** 15:15
81:6 94:12
107:6 116:3
119:4 175:24
206:7,8 215:7
232:13 258:5
269:16 274:16
278:23 294:19
298:13

**determined**
73:21 85:15
115:23 116:4
119:15 161:21
177:12 216:16

**determines**
274:15 292:18
294:11

**deutsche** 6:17
126:16

**developed** 15:17
26:15 40:5
94:13 96:15
97:17 104:24
177:3 256:5
258:7

**developer** 54:6

**development**
59:13 243:8

**deviations** 87:12
88:3,10,13

**difference** 60:21
63:11 103:22
118:18 119:16
204:19 205:4,20
226:13 251:6
282:13 289:24
295:2

**different** 63:12
64:21 66:24
69:9,11,21 72:15
76:3,14 83:6
92:5,6,25 101:25
102:10 103:20
104:4,6 108:17
111:24,25 113:7
113:10 128:10
128:21 142:23
151:25 166:15
166:19,19
167:12,24
170:12 181:10
181:12 184:7

186:4 188:22 234:15 267:25 268:3 270:25 271:9,12 274:7,8 275:14 276:23 277:3 280:8,10 299:15 302:15

**differently** 92:7 152:2 180:19

**difficult** 35:17 89:3,15

**difficulties** 86:24

**difficulty** 88:12 88:17

**digest** 108:20 111:23 112:23 114:24 121:12

**digested** 92:10 93:7 107:15 113:6 167:6,7 170:15,21

**digesting** 166:18

**digestion** 117:4

**direct** 98:25 99:9 99:13

**direction** 17:12 19:8 20:4 244:24

**directly** 13:18 47:8 54:11 99:14 146:25 281:14,17,23

**director** 53:7

**disaggregate** 296:24 306:7

**disaggregating** 291:2 295:9 296:11

**disaggregation** 133:5,10 304:2 305:2,18,22

**disagree** 96:4,17 96:23 114:13 187:7 216:5

**disagreed** 251:3

**disagreement** 215:25

**disagreements** 215:23

**disappear** 175:8

**disappears** 237:14

**disclose** 42:23 44:7 49:22

**disclosed** 50:11 50:14 93:6 111:22 113:3 119:2 145:6 167:8,9 264:3 297:7

**disclosing** 166:17 263:12

**disclosure** 88:20 89:18 102:14 105:16 107:6,7,9 107:12,22 109:13 114:22 116:22 117:3,17 117:25 122:17 171:7,8 172:21 226:6 261:17 294:15 296:13 296:25 297:4,14 298:4,10 299:22

**disclosures** 89:10 90:13

102:18,24 103:8 103:15 105:7,20 107:19 109:9,18 121:21 167:13 168:20 171:16 186:13 231:3,7 243:23 263:9,25 266:7 287:3 289:6,12,20,21 290:11 299:14 303:22

**discount** 275:2,5 275:8,11

**discounted** 173:10 239:2 241:21 243:12 243:12

**discovered** 241:18 242:14 242:17 243:14

**discoveries** 102:4 242:22,24

**discovery** 90:23 186:8,12,13 241:13,14,17,21 241:25 242:13 243:5,6,17 269:15 273:14 280:25 296:8 300:24 303:21

**discretion** 144:10

**discuss** 44:9,12 169:10 178:9 189:19 272:15 306:15

**discussed** 16:8 23:4 26:7 58:11

84:14 89:13 92:4 108:13 159:18 167:10

**discusses** 236:16

**discussing** 71:9

**discussion** 16:5 16:17,22,25 23:3 84:18 241:7,11

**dismiss** 16:14 22:20 270:6 273:6,8

**dispute** 130:13 130:14,24 131:6 131:8 139:20,21 139:23 140:5 269:15 300:23

**disputed** 140:17

**disputes** 273:13

**disseminate** 108:19 166:17 167:5

**disseminated** 92:10 93:6 111:22 113:4 114:23 167:4,5,9 181:7

**disseminating** 166:17

**dissemination** 117:4 206:22 207:16

**distinct** 69:8,24 70:23 71:12,20 73:16

**distinction** 89:2 204:15

**distributed** 236:19

**[distribution - dr]** Page 20

| | | | |
|---|---|---|---|
| **distribution** | 221:3 280:17 | 64:1 65:1 66:1 | 148:1 149:1,13 |
| 71:21 237:25 | 293:17 297:3 | 67:1 68:1 69:1 | 150:1 151:1 |
| **distributions** | 305:12 | 70:1 71:1 72:1 | 152:1 153:1 |
| 69:10,25 70:25 | **dollar**  166:8 | 73:1 74:1 75:1 | 154:1 155:1 |
| 71:13 72:16 | 277:20,21 | 76:1 77:1 78:1 | 156:1 157:1 |
| 73:17 | **dollars**  39:16 | 79:1 80:1,6 81:1 | 158:1 159:1 |
| **district**  1:1,2 | **double**  122:19 | 82:1 83:1 84:1 | 160:1 161:1 |
| 8:17 143:25 | 227:18,23 | 85:1 86:1 87:1 | 162:1 163:1 |
| **dive**  55:4 231:20 | **doubt**  83:22 | 88:1 89:1 90:1 | 164:1 165:1 |
| 231:21 | **download** | 91:1 92:1 93:1,4 | 166:1 167:1 |
| **divided**  61:4 | 201:23 202:7 | 94:1 95:1 96:1 | 168:1 169:1 |
| **dividends**  102:4 | 204:5 210:4 | 97:1 98:1 99:1 | 170:1 171:1 |
| **division**  302:22 | **downloaded** | 100:1 101:1 | 172:1 173:1 |
| 302:23,25 | 203:8 | 102:1 103:1 | 174:1 175:1 |
| **divisions**  302:15 | **downstream** | 104:1 105:1 | 176:1 177:1 |
| **divorced**  80:10 | 232:12 | 106:1 107:1 | 178:1 179:1 |
| **divulge**  263:10 | **dozen**  99:25 | 108:1 109:1 | 180:1 181:1 |
| **dmm**  210:22 | **dozens**  106:15 | 110:1 111:1 | 182:1 183:1 |
| **document**  5:8 | 106:16 | 112:1 113:1 | 184:1 185:1 |
| 41:4 57:3 58:23 | **dr**  8:14 9:1 10:1 | 114:1 115:1 | 186:1 187:1 |
| 59:18 69:4 | 11:1,2,15 12:1 | 116:1 117:1 | 188:1 189:1 |
| 75:18 83:11 | 13:1 14:1 15:1 | 118:1 119:1 | 190:1 191:1 |
| 93:23 95:15 | 16:1 17:1 18:1 | 120:1 121:1 | 192:1 193:1 |
| 100:20 123:13 | 19:1 20:1 21:1 | 122:1 123:1 | 194:1 195:1 |
| 123:18 129:12 | 22:1 23:1 24:1 | 124:1 125:1 | 196:1 197:1 |
| 139:6,24 140:13 | 25:1 26:1 27:1 | 126:1 127:1,10 | 198:1 199:1 |
| 210:8 213:11 | 28:1 29:1 30:1 | 127:16,17,19 | 200:1 201:1 |
| 240:9 248:23 | 31:1 32:1 33:1 | 128:1 129:1 | 202:1 203:1 |
| 249:3 264:9,14 | 34:1 35:1 36:1 | 130:1 131:1 | 204:1 205:1 |
| **documents** | 37:1 38:1 39:1 | 132:1 133:1,15 | 206:1 207:1 |
| 16:16 22:24 | 40:1 41:1 42:1 | 133:23 134:1,9 | 208:1 209:1 |
| 113:11 140:12 | 43:1 44:1 45:1 | 134:13,15 135:1 | 210:1 211:1 |
| 140:14 148:6 | 46:1 47:1 48:1 | 136:1 137:1 | 212:1 213:1 |
| 303:11 | 49:1 50:1 51:1 | 138:1 139:1 | 214:1 215:1 |
| **dog**  6:9 86:8 | 52:1 53:1 54:1 | 140:1 141:1,21 | 216:1 217:1 |
| 101:18 | 55:1 56:1 57:1 | 142:1 143:1 | 218:1 219:1 |
| **doing**  60:23 91:8 | 58:1 59:1 60:1 | 144:1 145:1 | 220:1 221:1 |
| 159:14 190:12 | 61:1 62:1 63:1 | 146:1 147:1 | 222:1 223:1 |

**[dr - economists]**                                    Page 21

| | | | |
|---|---|---|---|
| 224:1 225:1 | 300:1 301:1 | **earn** 52:8 | 50:22 98:9 |
| 226:1 227:1 | 302:1 303:1 | **earnings** 102:4 | 106:15 113:2 |
| 228:1 229:1 | 304:1 305:1 | 102:15,21,24 | 144:8 171:14 |
| 230:1 231:1 | 306:1 307:1,21 | 103:4,8,15 | 190:22 208:21 |
| 232:1 233:1 | 307:25 308:1 | 104:10 105:7,16 | 211:20 285:18 |
| 234:1 235:1 | **draft** 34:12 | 106:14,20,21 | **economics** 5:17 |
| 236:1 237:1 | 124:24 265:16 | 108:13 113:16 | 17:4,25 18:6,8 |
| 238:1 239:1 | 265:18 308:5,10 | 115:12 116:5 | 18:20,22 19:4,5 |
| 240:1 241:1 | **dramatic** 103:22 | 121:15 159:8 | 19:7 20:18,20,21 |
| 242:1 243:1 | **draw** 255:3 | 161:13 183:22 | 21:16,22 22:2,5 |
| 244:1 245:1 | **drilling** 243:9 | 184:25 185:4,6 | 23:19 24:2,12,22 |
| 246:1 247:1 | **drive** 238:19 | 185:20 186:9,15 | 24:23,25 25:22 |
| 248:1 249:1 | **driven** 155:6 | 186:16 204:25 | 32:17,21,22,24 |
| 250:1 251:1 | **due** 299:10 | 209:2 221:3,9,12 | 33:5,10,12,14,23 |
| 252:1 253:1 | **dug** 132:10 | 221:13 224:9,15 | 33:25 34:5,13 |
| 254:1 255:1 | **duke** 3:10 9:23 | 225:4,11,16,19 | 35:4,8 37:14 |
| 256:1 257:1 | **duly** 11:11 311:6 | 226:6 240:17 | 38:2 48:3,22 |
| 258:1 259:1,5 | **dvi** 96:3 124:9 | 241:14,15,22 | 49:6 51:10,11,12 |
| 260:1 261:1 | 124:13,14 | 242:6,9 243:16 | 51:14,19,22 |
| 262:1 263:1 | **dyer** 3:17 10:13 | 244:7,13 245:22 | 141:21 146:21 |
| 264:1 265:1 | **dynex** 110:8 | 255:6 301:23 | 146:24 176:16 |
| 266:1 267:1 | 117:13 119:14 | 302:14 | 188:3 189:5,24 |
| 268:1 269:1 | 177:11,18 | **easier** 200:20 | 190:9 191:3,6 |
| 270:1 271:1 | | 201:2 | 251:22 |
| 272:1 273:1 | **e** | **easily** 191:24 | **economist** 17:7 |
| 274:1 275:1 | **e** 5:1 18:16,25,25 | 200:14,18 | 61:11 97:6 |
| 276:1 277:1 | 30:20,21 149:2,2 | **easterbrook** | 100:13 178:22 |
| 278:1 279:1 | 276:11,11 | 37:11 | 187:12 196:10 |
| 280:1 281:1 | **earlier** 26:7 | **ebitda** 301:23 | 196:12 208:20 |
| 282:1 283:1 | 89:13 109:12 | **ecf** 30:2,2 | 235:8 253:17 |
| 284:1 285:1 | 149:14 222:18 | **econ** 49:3 | 279:2 |
| 286:1 287:1 | 241:8,11 248:9 | **econometric** | **economist's** 6:4 |
| 288:1 289:1 | 248:11 295:6 | 59:9 | 80:5 |
| 290:1 291:1 | **earliest** 296:14 | **econometrics** | **economists** 84:8 |
| 292:1 293:1 | **early** 108:14 | 158:24 | 92:21 175:12 |
| 294:1 295:1 | 158:10 212:4 | **economic** 19:12 | 188:15 210:24 |
| 296:1 297:1 | 255:16 257:3 | 24:3,15 29:15 | 211:8 219:5 |
| 298:1 299:1 | 268:14 | 38:12,24 39:5,9 | 240:13 280:15 |

**[edition - erase]**

| | | | |
|---|---|---|---|
| **edition** 57:22 | 180:10,16 | **efficiently** | **employee** 311:11 |
| **effect** 6:10 62:25 | 181:17,21,25 | 284:21 | **employees** 33:4 |
| 84:9,16,19 85:16 | 182:7 183:11,20 | **eight** 135:5,5,23 | **engaged** 24:4,16 |
| 86:9 87:2,9,19 | 184:3,12 196:3 | 180:11 | 51:2,8 90:19,20 |
| 88:12 91:20 | 199:2,9 200:19 | **eighth** 4:12 | 126:23 147:23 |
| 92:19 93:12 | 225:2 254:16 | **either** 108:19 | 258:4,13 276:25 |
| 94:4,7,11 95:7 | 255:8 | 229:3 234:8 | 281:2 284:19 |
| 95:19,23 96:18 | **efficient** 15:17 | 245:2 281:13 | **engagement** |
| 96:24 102:13 | 26:15 40:5 81:7 | 289:6,12 | 15:12,13 16:3 |
| 104:13 105:15 | 85:16,22 91:11 | **elaborate** 304:12 | 26:5,9,18 50:5 |
| 106:12,13 | 94:13 95:20 | **element** 244:3 | 276:24 277:4 |
| 107:11,21 108:9 | 96:9,16 97:17 | **elements** 301:21 | **engagements** |
| 108:22,25 | 98:8 100:3 | **eligible** 183:2 | 26:8 122:13 |
| 109:11 114:8 | 102:8 104:25 | **elimination** | **engineer** 156:21 |
| 130:5 133:18 | 114:11 115:18 | 289:19 | 161:16 |
| 134:2,4 159:4,7 | 117:8,9,20 119:7 | **elizabeth** 3:10 | **entail** 262:12 |
| 161:11 177:19 | 119:12,25 | 9:22 | **entire** 47:3 70:14 |
| 183:21 184:23 | 136:12 137:5 | **ellis** 3:18 | 72:10 82:4 |
| 186:14,15 | 146:5 161:10 | **email** 16:19 | 127:22 157:7 |
| 198:17 214:7,16 | 162:2,9 164:16 | **emanate** 87:2 | 196:4 252:16 |
| 214:23 215:2 | 166:10 168:8 | **emerge** 65:18 | **entirely** 267:24 |
| 221:5 224:25 | 171:18,21,25 | **emphasize** 59:4 | 268:2 270:24 |
| 225:15 234:19 | 172:22 174:18 | **empirical** 14:8 | **entitled** 86:7 |
| 238:14 239:19 | 175:25 177:4 | 20:2,8,10,11 | **entity** 242:15,18 |
| **effects** 110:2 | 179:12 180:13 | 35:14,22 65:11 | **entry** 40:21,24 |
| **efficiency** 5:20 | 182:11 183:23 | 65:17,20 73:24 | **environment** |
| 56:19 57:20 | 185:8 189:10 | 79:14 80:15 | 35:18 |
| 73:22 79:4 | 191:18 196:6 | 84:7 85:15 | **envisioning** |
| 89:24 98:9 99:2 | 198:18 199:6,12 | 86:25 92:18 | 302:19 |
| 99:9 102:13 | 211:2,9,12,18 | 94:6 142:2 | **epstein** 37:11 |
| 104:17 105:14 | 215:13 216:6 | 168:21 175:10 | **equal** 99:4 |
| 108:10 110:12 | 247:3 249:20,22 | **employ** 59:8 | **equally** 291:8 |
| 113:24 114:14 | 251:15,17 | 206:5 | **equals** 120:11 |
| 116:11,18 | 252:15,20 | **employed** 17:3 | 167:21 257:20 |
| 130:14,25 131:7 | 253:13 254:2 | 18:4,13 19:3 | **equation** 60:20 |
| 140:19 143:16 | 255:17 256:5 | 87:8,19 211:25 | **equations** 66:12 |
| 151:5 175:9,21 | 257:6 258:8,11 | 238:13 239:18 | **erase** 189:22 |
| 178:12 179:3,13 | 305:4 | | 190:3 |

**[errata - examine]** Page 23

errata 309:14
310:1
error 160:14
213:13 221:25
224:20,22 251:4
errors 234:12
310:8
especially 14:18
19:21 28:12
35:23 37:16
49:4 88:22
109:15 131:19
142:21 150:2
156:22 220:8
221:3 226:5
236:9
esq 2:7,8,13,14
2:19,20 3:7,14
3:20 4:7,8
essence 36:23
95:20 96:9
108:24 175:4
236:14 241:20
essentially
218:12
establish 178:12
179:11 180:15
181:25 259:10
established 7:10
123:15 139:13
establishing
6:10 86:9
estate 26:3
estimate 63:13
64:7,9,9,11
99:11 122:5
217:9 219:3
221:2 282:2

288:15,24 294:6
299:9
estimated
285:21 301:22
estimates 64:22
65:3 66:11
99:15 205:3
239:25
estimating 74:14
88:7
estimation
141:23 217:21
217:24 218:8,13
218:18
et 5:22 6:12
etcetera 302:17
eugene 173:22
174:10,13
evaluate 59:12
76:24 78:13
84:8 87:8,19
125:8 156:18
161:9 184:18
186:25 188:9
189:9 204:25
205:11,14 215:2
225:2 238:13
239:18 246:25
247:2 254:16
263:6 286:13
289:22 301:18
evaluated 64:14
180:12 191:8
215:5 265:13
267:15 300:20
evaluating 28:21
58:13 64:19
96:14 97:15

121:3 179:3
196:3 203:9
241:12 297:15
304:23
evaluation
178:25 206:12
226:12
evangelista 4:18
8:22
evenly 236:19
event 29:10
64:14 71:18
77:4 87:13,23,24
101:23 129:16
129:22,24
167:15 168:22
215:4 216:14,16
217:3 218:13,17
218:18,22
219:12,16 220:3
220:5,6,16,18
221:17,22 224:8
225:10,13
226:17 235:11
240:16 241:5
243:16 248:17
248:18,21
249:19,24
250:19,20
252:11,14,18
253:4,8 255:18
256:18 257:2,6
257:12 267:5
269:18 286:12
287:5,14,23,25
288:8,11 289:16
296:20 300:8,10
300:17,18

events 87:15
214:9,17,24
215:6 247:10
263:12
eventually 296:9
everybody
118:14,15
232:20
evidence 142:3
144:2,2 221:24
266:12
evolution 36:21
188:18
evolved 177:8
180:6 187:17,20
188:3,4
exact 154:25
223:14
exactly 30:6 51:3
70:8 75:14 93:3
99:10 106:7
117:15 133:11
133:14 160:17
168:3 243:24
262:16 265:22
285:24
exam 59:10
215:8
examination 5:3
11:13 149:11
185:19 301:21
304:16 311:6
examine 76:23
91:10 183:3,6
191:14 199:20
225:2 284:21
297:5

[examined - extent]

examined 80:25 112:5 158:22 286:23
examines 101:24 252:23
examining 110:9 110:12 151:4 183:21 217:10 219:4
example 36:5,15 38:19 41:14 61:23 66:19 92:2 102:19 103:13 106:19 107:8 110:11 115:22 117:13 118:6 130:4 163:24 165:2 173:3,4 177:17 180:22 184:20 186:5 202:11,12 204:21 220:9 224:19 237:11 238:16 239:10 245:6 247:12 271:9 281:25 286:18 287:3 301:6 304:10
examples 243:4
exams 37:9
exceeds 281:6
excellent 32:9
exchange 36:16 122:24 126:21 143:15 144:24 212:5,7,19
exchanges 212:3

exciting 32:8
exclude 7:6 132:24 135:16
excluded 125:3 143:21,25 144:16
exclusion 144:21
executives 247:13
exhibit 5:12,13 5:16,20 6:3,4,8 6:16,21 7:3,4,9 7:19 26:22 27:5 34:19,20,21,22 34:23 57:16,19 79:16,25 80:3,10 83:9 86:2,3,4 126:12,15 129:2 129:3,6,7 132:18 132:19,22 138:23 139:2 143:3,7 245:7 255:24,25 256:7 256:13
exhibits 5:10 6:1 7:1
exide 276:11,12 276:12
exist 102:23 103:7 105:6 163:15
exists 102:13 105:14
exp 311:18,19,20 311:21
expansion 35:24
expect 166:11 172:9 173:15

228:7 236:17
expectation 128:2
expectations 185:3,20 238:11 238:24 239:4
expected 91:18 92:16,25 102:9 173:11,13 217:11 238:9 239:2,2 243:12
expedited 308:5
experience 19:21 32:6 54:17 57:11 100:7 111:2,19 177:24 198:9
experiences 49:17
expert 1:11 5:13 19:12,13,15 20:5 21:3,5 23:23,25 24:7,8 25:7 26:7 26:19,22 34:7 37:22 38:20,25 42:25 51:5,8,9 69:14,18 75:3,23 76:11 95:3 98:16 102:12 105:13 106:15 121:20 122:6 124:6,18 125:25 126:5 132:5,5 136:3 141:3,20 143:20 144:4 146:23 171:14 190:17 224:20 257:22 276:19

286:11 292:16 303:24 304:3,7,9 304:25 305:18 306:5
expertise 146:23
experts 19:19,20 19:23 35:16 38:18 39:9 62:10 69:8 86:24 94:6 97:13 151:25 160:16 244:7 304:6 305:5,10 305:12
explain 236:2
explained 64:2 134:17 137:11 175:19 177:25 217:17 230:5 236:5 272:2 284:7
explaining 63:8
explains 89:16
explanatory 62:23 87:10 150:5,8 227:8 229:11
exploration 243:8
expressing 60:4 132:11 147:3
extend 16:3 253:24
extensive 38:3 187:19
extent 28:19 29:4 120:4 137:17 150:19

**[extent - fargo]**

160:13,18
185:10 224:19
225:16 243:20
250:25 261:15
263:15 264:21
265:9 267:14
270:8 296:10,16
296:18
**external** 65:19
65:22 66:25
67:6 302:7
**extract** 36:23
230:7,7 302:25
**extracting**
228:10
**extraordinarily**
135:14
**extreme** 173:5

**f**

**f** 149:2 169:14
**fac** 190:16
**facility** 302:16
**fact** 52:13 58:2
60:4,11 61:8
65:3 68:13 75:2
75:10,22 76:11
76:17 83:23
85:17 89:21
90:22 97:3,13
98:5 102:16
105:18,22
110:17 136:4,7
144:22 146:23
156:22 160:3,3
161:24 177:25
185:19 188:14
189:22 206:16

217:22 223:24
225:11 242:8
269:16 271:14
274:15,15 280:9
280:17,23
285:22 294:9,11
294:19 296:10
298:21,22 299:2
306:23
**factiva** 204:5,9
210:4,10,14
**factor** 28:23
71:6 84:9 93:13
94:5,11,21 95:7
95:19,23 96:8,19
96:25 97:14
98:24 99:3
120:14 175:22
176:10,18,20
177:15,23
179:12,17,25
180:9,25 182:4,6
182:15 184:11
189:20 205:21
209:5 214:4,7
216:18 266:8,22
266:24 267:4
**factoring** 29:4
**factors** 58:15
59:5 60:11 61:6
61:8,9,14 62:5
64:12,13 65:19
65:22 67:2,2,6
85:18 89:23
96:13 98:6 99:5
99:17 104:22
106:17,24 112:7
117:11 119:22

120:23 131:8
166:16 175:23
176:7 177:6,7
178:5,8,12,20
179:10 180:7,12
180:15 181:16
181:20,24 182:9
182:14 183:11
183:12,19
184:11 185:17
187:4,17 188:4,5
189:25 190:16
191:10,14
198:23 199:18
199:20 200:11
206:6,9 209:8
238:7,10,19
252:13 257:7
285:19 286:13
286:22
**facts** 86:25 89:8
90:10,24 91:4
263:5,14 266:12
266:14 267:2
269:14 273:12
310:8
**factual** 273:13
274:14 282:25
284:24 296:15
297:6,15 300:22
**faculty** 47:22
**fahnestock**
211:25
**failed** 241:18
254:10
**failure** 65:12
**fair** 22:11,11
27:4 43:19,24

49:7 77:2
110:22 125:12
125:18 134:13
180:8
**fairly** 46:18
156:12 240:8
**fall** 160:24
**falls** 195:5
**false** 27:22,24,25
63:3 134:5
**fama** 162:20
173:22 174:10
174:13,15
**familiar** 11:22
140:10 194:7,22
262:8
**family** 44:18,20
44:21,21 212:4
**family's** 212:7
**far** 141:25
**farfetched**
173:20
**fargo** 1:5 3:3
8:16 9:15 14:18
14:23 15:6,15,16
26:14 40:4,7
41:6 46:2,4,8
47:13 64:15
73:7,17 80:18
81:5 103:14
104:22,24
105:24 111:6,8
112:19 113:17
114:10,18 115:7
116:15,16 117:2
117:24 118:12
118:24 121:15
132:12 135:20

136:16 145:18 148:4,7 161:25 168:9,19 178:18 179:3,4,11 180:22 181:15 182:10,19 184:6 185:11 186:20 187:2 189:9 192:7,16 193:8 193:10,24 194:4 195:11,15,22 197:7 201:16 206:23 207:9,14 207:17 208:24 224:15 228:6,11 229:3,7,16,20,21 230:4,5,6,15,24 233:7,14 236:9 237:25 242:10 242:13 246:13 246:21 247:13 248:2 252:15 253:12 254:2,17 258:6 260:6 270:23 274:13 282:15 284:20 289:2 295:4 309:1 310:4

**fargo's** 115:5 182:2 231:12,20 233:23 234:7 261:2 263:15 264:22 265:9

**fast** 167:18

**father** 162:20 173:23 191:4,5

**fault** 148:2

**faurecia** 7:20 143:8

**favor** 184:2,2

**favorable** 134:22

**favoring** 179:13

**features** 65:13 67:7

**february** 152:4,4 152:11,17,18 245:18 250:22 251:5,17

**federal** 144:2

**fee** 37:23 38:20 41:24 52:8

**feel** 58:17 62:19 69:2,2 74:21 161:23 191:6 225:22,22

**fellowship** 47:22

**fellowships** 47:15

**felt** 69:18 81:22 81:23 119:4 220:25 221:11

**fewer** 160:19 207:13

**fidelity** 235:17

**fifth** 2:17 84:8 93:12 94:4,20 95:19 97:14 98:24 214:7

**figure** 229:10

**file** 181:8 182:20 190:18

**filed** 8:17 15:22 27:17 102:5 180:23,24 181:5

246:9

**files** 102:5

**filings** 230:18 246:12

**finally** 91:15,17

**finance** 23:25 24:7,8,21,25 25:11,22 36:18 36:19 51:14 52:23,23 53:5,9 162:20 164:7 173:9,23 174:8 174:13 187:16 189:5,24 191:5

**financial** 24:3,14 32:24 44:16,17 44:18,23 45:5,6 48:22 50:22 52:3,19,25 156:11 176:15 190:22 214:9,18 214:24 215:6,6 227:14,18,22 228:8 230:20

**financially** 9:4 311:12

**financials** 145:6 205:2

**find** 32:8 82:13 82:22 113:9 116:14 117:14 123:23 142:15 151:9,10 173:19 180:9 182:13,14 182:18,20 185:7 186:14 193:21 193:21 196:9,11 222:4 225:7

239:13 286:22

**finder** 294:18 296:10 298:21 298:22,25

**finding** 77:2 108:25 144:3 181:16 226:13 251:6,13 280:25

**finds** 252:24

**fine** 12:7,10,15 12:20 132:12

**finisar** 6:21 129:7

**finish** 12:6 100:24 121:18 138:22 194:4 209:10 212:16

**fired** 208:10

**firefighters** 42:4

**firm** 8:25 18:13 21:19 22:4 25:14 50:21 51:12,20 52:2 124:22 238:15 239:9,20

**firms** 19:18,21 19:22 21:2,5,11 21:17,23 24:23 48:12 124:9,10 204:16

**first** 11:24 32:16 35:12 56:16 58:25 59:2 68:23 69:5 70:6 79:5 84:3,25 86:22 90:18 94:5 101:22 115:7 117:18

127:9,15 135:18
137:11 141:6,9
141:17 162:7
168:17 172:4
174:22 212:24
229:8 248:17,18
248:19,24 249:6
249:9,14 252:4,6
252:7 253:20
**fischel** 37:12
**fit** 231:25
**five** 23:15 27:10
75:3,23 99:4
101:2 103:16
170:12 180:7
184:11 209:17
307:7
**fixed** 69:15
236:8
**flag** 77:9,16
78:11,23
**flawed** 85:15
133:16
**fleet** 273:24
274:2
**flip** 247:6
**flipped** 93:15
**floor** 2:11,17
**flow** 173:4,11,13
239:3 241:21
243:13,23
**flows** 275:12
**focus** 63:21 64:9
77:10 82:6
93:11 94:3
177:23
**focused** 38:8
186:12 225:16

226:19,24
227:19 228:15
228:17 229:9
230:10 233:7,15
277:22 302:22
**focusing** 177:22
**folks** 16:18,22,24
23:3 48:12
**follow** 171:8
232:9 272:17
**followed** 205:13
206:18 207:8
**following** 107:18
109:8 115:22
165:8,21 177:17
206:14,24
207:10,11,14,15
257:17
**follows** 11:11
149:9
**foolish** 124:21
**footnote** 97:20
97:24 174:15
176:8 178:2
210:12 211:5
217:22,23,24
218:4
**footnotes** 68:2
70:4
**foregoing** 309:8
311:8
**forensic** 17:25
18:5,8,20,22
19:4,5,7 20:17
20:18,20 21:22
21:25 22:5
23:19

**forget** 275:21
**form** 40:16
41:17 71:22
72:21 77:20
80:21 125:21
153:17 163:3
171:3 221:19
234:2 253:15
257:10 265:12
268:20 271:6
288:6 294:17
309:13
**former** 36:6
49:16 247:13
**forms** 246:9
**formula** 278:3,6
278:21 279:10
280:11 286:10
299:4
**formulaic**
278:20
**forth** 184:19
190:2
**forward** 300:19
**found** 75:3,23
76:11 95:18
96:8 111:18
186:14 206:4
216:15 220:19
222:11,11,19
224:7,12 229:11
**foundation**
36:19 71:15
95:21 96:10
146:22 174:8
214:21 266:11
284:17 287:7

**founded** 33:25
164:5
**founders** 25:20
**four** 21:9 39:16
39:22 41:2 42:9
43:4 56:15,16,18
56:22,25 96:13
102:20 103:5
121:22,25 122:4
122:11 123:25
125:11,16 127:5
189:21 218:12
**fourth** 88:16,17
129:14 200:6
**francisco** 3:19
4:6
**fraud** 95:21
96:10 184:24
206:10 269:8
295:14 302:21
**fraudulently**
277:16
**frb** 260:13
**freddie** 58:12,16
61:19,25 62:5
69:7 70:7
**free** 58:17 62:19
69:2,2 74:21
257:22
**freid** 4:17 9:16
**frequently**
110:18,24
**frictions** 193:4
193:18
**front** 135:16
144:17 254:4
290:7

[full - goes]

Page 28

**full** 68:12 84:20
  84:25 86:22
  101:22 106:23
  127:9,15 139:12
  140:12 141:9,17
  210:17 296:14
  297:5,15 311:10
**fully** 114:24
  174:17 175:2
  188:9 269:22
**fund** 42:5
**fundamental**
  89:2 164:7
  173:9 189:4,23
**fundamentally**
  133:16 175:4
**funding** 133:19
  136:7
**funds** 45:8,14
  46:21,23 140:17
  168:6
**further** 65:17
  78:23 79:12,13
  80:13,14,19
  81:16 120:6
  149:9 254:17
  272:16 307:16
  307:18 311:11
**furthermore**
  62:22 238:6

**g**

**g** 2:19 18:16
  19:2 43:8 52:6
  54:5
**gain** 115:22
**gains** 245:3

**gap** 57:5
**gathered** 287:4
**general** 19:10
  22:10 42:17
  43:7,20,25 44:5
  44:11 49:19
  74:6 149:22,24
  150:17,20
  155:20,22 159:6
  178:13,16
  220:24 229:19
  270:12 292:2
**generalized**
  72:24 120:12
**generalizing**
  219:23
**generally** 19:17
  56:21 64:14
  66:18 74:19
  87:20 102:16
  105:18 108:10
  110:18,23
  111:12 119:24
  139:4 144:7
  194:11 204:24
  205:23 206:12
  219:5,10 221:5
  223:18 225:17
  225:18 230:19
  235:6 275:7
  277:9 281:13
  290:8
**generation**
  174:12
**generic** 193:9
**genesis** 33:21,23
  33:24

**gentleman** 17:2
  68:12
**geographic**
  232:9 302:16
**getting** 78:6
  112:4 207:6
  237:17,19,20
**ghw** 1:4 8:18
**gibbons** 98:5,14
  98:16
**give** 11:3 52:14
  58:8 63:12 74:9
  75:15 77:16
  78:4 84:20
  103:22 121:8
  136:13 137:23
  145:11 175:12
  207:19 221:2
  279:6
**given** 81:21
  137:22 140:2
  182:8 210:14
  221:10 238:15
  239:20 242:8
  275:8 304:24
  306:14,24
  309:11
**gives** 283:5
  288:12
**giving** 135:10
  167:23 205:25
  304:14
**globe** 167:25
**go** 8:12 32:14
  42:14 47:14
  53:13,23 57:10
  58:18 74:20
  76:16 79:19,20

  84:25 86:21
  90:17 93:9
  97:12,20 101:21
  107:2 110:4
  113:8 115:20
  116:13 121:19
  125:17 129:6,11
  129:21 132:8
  133:4 136:4
  138:18 139:7
  140:24 151:7
  152:13 162:5
  165:10 171:4
  172:3,25 174:14
  178:4,7 180:19
  184:16 185:14
  185:22 187:13
  189:14 191:9
  196:8 198:8
  200:25 201:3
  204:24 210:17
  214:4,21 238:4
  244:6 245:5,6
  252:13 255:12
  258:3 264:8
  266:12 282:11
  285:22 286:7
  288:19 290:12
  295:8 296:6
  297:18 299:6
  305:15
**god** 187:4
**godaddy** 34:16
**goes** 29:11 74:24
  75:11 137:12
  195:6 292:15,17
  300:2,3

**[going - hartzmark]**

**going** 8:5 10:22 19:13,15 26:21 34:18 44:9 54:25 55:4,11 58:18 62:18 74:21,23 79:19 85:2 87:4 91:6 95:2 97:11 100:23 101:21 104:17 111:23 113:12,13,17 114:24 118:15 118:19 120:12 120:14 121:14 121:19 137:13 137:21 146:6,9 152:13 162:21 166:4,5 167:19 187:22,23 188:14,23 195:21 200:25 208:16,22,23 212:10 242:15 242:17 243:22 247:9 250:5,6 253:18 255:10 284:5 287:10 292:7 298:6 300:24 306:2

**goldman** 202:12

**good** 8:4 10:15 11:15,16 187:18 196:11 208:12 208:13

**gotten** 36:2

**graph** 83:3,3,4 230:25

**graphic** 81:20

**graphical** 77:24 79:14 80:16

**graphically** 158:23

**great** 260:23

**greater** 84:6 108:19 111:3 200:12 286:6

**grew** 190:8

**gripes** 246:22

**grossman** 2:4

**grossmann** 8:20 10:5

**ground** 11:23

**group** 20:22 53:2

**grow** 35:15,22

**gueli** 3:14 9:21 9:21

**guess** 26:2 29:3 36:11 40:10 63:12 64:3 66:25 91:14 111:5 121:9 131:15 182:12 208:9,24 216:20 242:19 251:12 255:14 284:14 300:14 303:17

**guidance** 104:10 108:13 113:16 116:5 161:13 240:17 244:8

**guiding** 184:25 185:20

**h**

**h** 2:13 19:2 57:23 86:12

**half** 123:4,5

**halfway** 292:16

**halted** 196:4

**hand** 10:23 141:24 311:14

**hands** 54:17

**happen** 118:16 175:8 197:12,18 197:25 198:4,7

**happened** 155:9 172:7 173:15 247:15,18

**happens** 171:8

**hard** 279:13

**harm** 127:21 269:9 271:11,17 271:18 291:12 291:23 293:2

**hartzmark** 1:12 5:2,14,16,22 6:5 6:12 7:7 8:1,14 9:1 10:1 11:1,2 11:10,15 12:1 13:1 14:1 15:1 16:1 17:1,3 18:1 19:1 20:1,21 21:1,16 22:1 23:1 24:1,23 25:1 26:1,23 27:1 28:1 29:1 30:1 31:1 32:1 32:16,20,22 33:1 33:4,10,12,14,23 33:25 34:1,5,13 34:21 35:1,3,8

36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 44:21 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1,23 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1,6 81:1 82:1 83:1 84:1 85:1 86:1,12 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1,17,25

**[hartzmark - hmm]**                                                     Page 30

| | | | |
|---|---|---|---|
| 130:1,4 131:1 | 205:1 206:1 | 281:1 282:1 | **hearing**  167:13 |
| 132:1,25 133:1 | 207:1 208:1 | 283:1 284:1 | 167:17 |
| 133:23 134:1,9 | 209:1 210:1 | 285:1 286:1 | **heavily**  39:15 |
| 135:1 136:1 | 211:1 212:1 | 287:1 288:1 | 84:19 94:10,20 |
| 137:1 138:1 | 213:1 214:1 | 289:1 290:1 | 95:6 99:3 |
| 139:1 140:1 | 215:1 216:1 | 291:1 292:1 | 256:14 |
| 141:1 142:1 | 217:1 218:1 | 293:1 294:1 | **heavy**  84:15 |
| 143:1 144:1 | 219:1 220:1 | 295:1 296:1 | **heavyweight** |
| 145:1 146:1 | 221:1 222:1 | 297:1 298:1 | 184:2 |
| 147:1 148:1 | 223:1 224:1 | 299:1 300:1 | **hedge**  168:6 |
| 149:1,8,13 150:1 | 225:1 226:1 | 301:1 302:1 | **held**  16:17 95:23 |
| 151:1 152:1 | 227:1 228:1 | 303:1 304:1 | 96:18,24 |
| 153:1 154:1 | 229:1 230:1 | 305:1 306:1 | **help**  120:13,15 |
| 155:1 156:1 | 231:1 232:1 | 307:1,21,25 | 120:16,17 |
| 157:1 158:1 | 233:1 234:1 | 308:1 309:6 | 167:16 196:17 |
| 159:1 160:1 | 235:1 236:1 | 310:6 311:6 | 246:22 |
| 161:1 162:1 | 237:1 238:1 | **hartzmark's** | **helped**  18:2 |
| 163:1 164:1 | 239:1 240:1 | 127:10,16,17,19 | **helpful**  181:3 |
| 165:1 166:1 | 241:1 242:1 | 133:15 134:13 | 304:25 |
| 167:1 168:1 | 243:1 244:1 | 134:15 141:21 | **hereunto**  311:14 |
| 169:1 170:1 | 245:1 246:1 | 144:3 | **heteroskedasti...** |
| 171:1 172:1 | 247:1 248:1 | **head**  11:25 | 154:4 |
| 173:1 174:1 | 249:1 250:1 | 117:2 247:7 | **hidden**  235:16 |
| 175:1 176:1 | 251:1 252:1 | **header**  30:5 | **high**  58:9,10 |
| 177:1 178:1 | 253:1 254:1 | **heading**  32:12 | 187:13 192:2,5 |
| 179:1 180:1 | 255:1 256:1 | 84:3 | 193:5 200:9 |
| 181:1 182:1 | 257:1 258:1 | **headline**  247:24 | **highly**  211:12 |
| 183:1 184:1 | 259:1,5 260:1 | **headlines**  210:3 | **hindsight**  161:15 |
| 185:1 186:1 | 261:1 262:1 | 246:9,13 247:17 | 219:9 |
| 187:1 188:1 | 263:1 264:1 | 248:5 | **hired**  178:23 |
| 189:1 190:1 | 265:1 266:1 | **health**  123:19 | **historically** |
| 191:1 192:1 | 267:1 268:1 | **healthsouth** | 206:4 232:4 |
| 193:1 194:1 | 269:1 270:1 | 97:21,25 98:2,4 | **history**  37:21 |
| 195:1 196:1 | 271:1 272:1 | 98:17,19 | 127:22 146:21 |
| 197:1 198:1 | 273:1 274:1 | **hear**  134:20 | 188:7 |
| 199:1 200:1 | 275:1 276:1 | **heard**  25:20 | **hit**  152:16 |
| 201:1 202:1 | 277:1 278:1 | 232:21 | **hmm**  98:10 |
| 203:1 204:1 | 279:1 280:1 | | 121:24 130:9 |

**[hmm - incomplete]**

164:18 174:20 200:8 252:10 287:12 291:24 302:18

**holdover** 46:23

**holds** 47:7,11

**holistic** 61:15 64:25 76:22 89:17,17 99:20 120:21,22,24 169:5 176:6 179:21

**home** 35:3,4 123:20 152:16

**honest** 187:9

**honestly** 188:6

**honors** 47:14

**hope** 190:14

**horizon** 107:4,24 108:5

**hour** 55:2 100:18,23 138:17 146:10 212:10

**hours** 23:15

**hsbc** 39:20

**huang** 18:25

**huge** 113:18

**hundred** 63:7,8 63:16,23 117:15 117:16 118:12 236:2 239:24 292:14,17

**hurt** 197:11

**hypo** 182:21,25 183:4,6 197:17 207:19 216:14

**hypos** 207:18,25

**hypothesize** 179:5

**hypothetical** 72:24 118:8,23 118:24 119:9 162:22 171:4 172:5,19,25 173:5,5,18 179:15 184:16 187:7 189:14 190:6 196:8 197:20,22,23 198:22 208:9,19 208:25 209:16 216:22 253:16 284:17

**hypothetically** 172:18 254:25

**hypotheticals** 190:7,9,11

**i**

**i.e.** 225:7 290:25

**idea** 36:4 46:11 84:18 88:23 144:21 164:3 174:7 177:10 244:16 277:15 297:22 301:5

**identical** 172:13 172:19,21 173:16,19,21 265:22 274:4

**identification** 27:6 34:24 57:17 80:2 86:5 107:23 126:13

129:4 132:20 138:24 143:4

**identified** 179:13

**identify** 108:4

**idiosyncratic** 239:16

**ignore** 106:24 156:16

**ignored** 65:19 136:19

**illiquid** 165:6,21

**imagine** 46:14 46:16 179:16

**immaterial** 208:17

**immediate** 214:10,18,25

**immediately** 219:24

**impact** 102:7,11 112:9 119:4 131:10,11 152:12 171:25 172:16,22 199:9 275:8 299:21,21 302:25 303:2

**imperfect** 87:10 92:20

**imperfections** 238:12 239:17

**implemented** 269:20 273:14

**implication** 84:23

**importance** 59:4 301:6

**important** 35:16 61:13 95:24

96:7,13,19,25 97:5 104:11 110:10 113:4,5 138:6 166:23 175:19 186:16 206:21 214:19 221:9 237:12 241:15 270:13 305:5

**importantly** 79:6

**improperly** 91:15,17,24 92:23

**inaccuracy** 213:10

**inaccurate** 67:23 68:8

**inadmissible** 134:16

**incident** 6:8 86:8

**include** 37:14 128:11 150:4,7 201:25 209:20 233:5 238:10 261:18 299:12 303:5

**included** 71:19 82:7,7 121:4 133:24 203:19 228:5,6 243:5

**includes** 157:8

**including** 9:9 67:3 191:3,4 210:22 219:25

**incomplete** 119:9 171:4 172:2,24 184:16

**[incomplete - information]**

| | | | |
|---|---|---|---|
| 187:6 189:13 | **indicate** 119:6 | 232:25 233:24 | 297:18 298:11 |
| 207:25 240:8 | **indicating** 16:23 | 234:8 240:23 | 298:12,24 299:3 |
| 253:16 | 64:8 | **inefficient** 119:7 | 299:25,25 300:2 |
| **incorporate** | **indicators** 63:2 | 124:19 125:4 | 300:3 305:15 |
| 177:4 | **indices** 226:17 | 163:2 164:19,21 | **information** 5:8 |
| **incorporated** 7:4 | 226:21 227:2,10 | 166:9 179:14 | 29:8 34:16 |
| 7:19 44:16,17 | 227:13,16 229:4 | 195:22,24 | 35:24 36:7,10 |
| 65:20 85:19 | 230:13,15 | **inevitably** | 42:24 78:15 |
| 132:23 143:7 | 231:13 232:14 | 101:24 | 88:24 92:8,9 |
| 153:5 | 232:15,18 233:2 | **infer** 102:18 | 101:25 102:9 |
| **incorporating** | 234:9 | 105:20 106:2,5 | 104:2,6,8 107:14 |
| 150:20 | **indirectly** 47:8 | 106:22 109:15 | 108:12,18,18 |
| **incorrect** 91:19 | **individual** 17:11 | **inference** 64:20 | 111:21 112:10 |
| **increase** 224:22 | 89:18 177:9,23 | 65:5 154:22 | 112:15,18,22 |
| **incredibly** | 180:9 186:18 | **inflated** 260:6 | 113:8,10,15,20 |
| 187:18,25 | 267:20 282:10 | 277:18 | 114:2,3,21 |
| **independent** | 283:12 284:9 | **inflation** 206:8 | 115:14,16,20 |
| 42:17 229:16 | 286:6 295:24 | 260:25 267:5,19 | 118:5,25 119:12 |
| 233:8 | 299:5 301:23 | 268:7,8 269:18 | 120:7,9 121:11 |
| **independently** | **individually** | 270:7,9,10,13 | 133:13,19 136:6 |
| 227:4 | 25:9 228:9 | 272:4 273:16 | 137:22 151:16 |
| **index** 62:10,11 | **individuals** | 274:16 275:20 | 162:12,25 |
| 62:11 69:13,17 | 17:18 18:2 | 275:23 276:4,6 | 163:10,21,23 |
| 73:19 74:9,18 | 19:25 21:24 | 278:7,9,10,11,13 | 164:5,13,13 |
| 150:11 226:19 | **induce** 236:14 | 278:24 279:3,7,9 | 165:23 166:13 |
| 226:19,20 | **industrial** 36:6 | 279:18,21,24,25 | 166:15,16,18,19 |
| 227:17,19,19,20 | 37:3,6,9,14,24 | 280:10,22 281:4 | 166:24 167:10 |
| 227:23 228:5,8 | 38:4,5 39:5,11 | 281:13,17 282:2 | 168:4,10,20 |
| 228:13,16,18 | **industries** 38:9 | 282:3 283:6,9,10 | 170:15,21 |
| 229:8,8,9,19,21 | 54:2,6,13 57:12 | 285:21,23 286:4 | 171:23 172:13 |
| 230:4,10,11 | **industry** 25:18 | 286:5 287:4,8,22 | 172:14,15,19,21 |
| 231:15,17,22 | 38:7 40:2,14 | 288:15,16,17,21 | 173:16,19 |
| 233:8,13,15 | 41:16,19 226:17 | 288:25 289:18 | 174:17 181:7 |
| **indexes** 227:3,7 | 226:19,19,21 | 289:18,19,22 | 192:4,12,17 |
| 230:21 232:5,11 | 227:19 228:5,8 | 290:7 292:8,14 | 200:12,24 |
| 232:22 236:10 | 228:16,17 229:7 | 293:4,9,21,22 | 204:22 207:16 |
| 236:13 | 229:8,9,15 | 294:12,20,22 | 208:5,6,11,17 |
| | 230:10 231:13 | 295:22 297:10 | 215:17 216:9 |

219:4,6,8 235:20 244:14,18,20,21 244:23 246:20 263:11 264:3 279:23 288:13 288:14 290:15 296:12 301:7 302:6,7,13,23

**informational** 110:12 163:2

**informationally** 162:9

**initially** 13:4 39:19

**input** 135:21 136:14 145:15 204:4,8 206:7 269:17 273:15 274:12,13 292:8 293:24 294:11 294:21,22 295:21 297:14 297:17 298:11 299:2,3,24,25 300:2

**inputs** 137:6,8 145:20 206:7 267:4 268:3 272:4 279:16,17 279:19,19,20,23 284:24 285:21 286:9 290:24 291:5 305:15

**inquiry** 279:13 296:13 297:2,14 298:10 307:4

**insider** 238:17

**insiders** 235:21

**insignificant** 161:17

**instability** 237:18

**instance** 112:12 231:19 233:5

**institution** 36:15 38:11 119:21

**institutional** 38:22

**instructions** 5:7 279:8

**instrument** 67:15 114:20

**instruments** 92:6

**insufficient** 105:4

**integrate** 36:4

**intellectual** 33:2

**intended** 31:6

**intensive** 90:22 280:23

**intents** 186:10

**interchange** 37:23 38:20 40:9 41:24

**interchangeably** 235:9

**interested** 9:4 311:12

**interim** 52:19,25

**interior** 7:20 143:8

**internal** 246:22 302:5,6 303:8

**international** 50:19,20,25

**interpret** 66:11 189:6

**interpretation** 65:11 141:24 142:21

**interpreting** 88:18 263:22

**interrupt** 256:16

**interval** 85:9

**intervals** 170:12

**intervening** 107:18 109:9,17 109:19 116:23

**interwoven** 134:11 135:8

**intra** 211:16

**intraday** 169:11 169:21,24,25 170:5,11,16,22 171:16 299:13 299:16,20 300:6 300:9

**introduce** 79:15 178:4 288:20

**introduced** 303:4

**introducing** 143:6 240:3

**investigate** 46:12 78:23

**investigated** 72:25

**investment** 25:12 32:25 44:19 277:22,23

**investments** 45:3 45:4,12 46:2,3 46:24 49:13

**investor** 167:15 267:8 271:11 293:2

**investors** 166:25 186:16 200:10 200:17 232:5 237:19 240:12 241:15,19 242:10 269:10

**involved** 25:15 26:6 34:9 37:16 38:17,23 39:4,15 40:8,12,22,23 41:2,7,21,23 42:7 44:10 45:11 50:6,11,17 51:20 71:19 145:4 166:16 172:12 196:19 196:23 211:25 212:2 220:10 304:6

**involving** 50:12 53:16,20 61:19

**ipo** 219:16 220:5 220:11,17

**iq** 201:20 202:21 202:22

**irrelevant** 185:12 186:19

**isolate** 133:18

**issuance** 220:14

**issue** 14:20 16:6 36:12 41:10 89:12,14 104:3

**[issue - know]**

107:23 110:11
112:5 121:7
131:9 134:23
135:21 136:16
142:12 144:23
144:25 151:23
159:6 174:24
183:14 194:19
205:24 207:24
216:20 223:20
237:21,23
243:25 251:2
273:21 274:25
275:14 282:25
284:24 291:21
292:20,22
297:11 298:16
**issued** 130:6
**issuers** 38:23
39:17
**issues** 15:6 26:3
26:8,10 36:9,10
36:17 37:13,17
37:25 38:17
64:19 66:8
67:12 88:14
92:12,18 102:5
113:22 140:20
141:24 142:20
151:2 156:14,17
159:10,22
176:23 184:22
186:12,13 193:9
194:16,20,23,25
235:16 236:16
239:16,23
242:11 266:25
291:7 303:25

306:6
**issuing** 208:18
**it'll** 101:2 286:2
**items** 121:18

**j**

**j** 2:20 3:16
**january** 250:20
251:9,16 254:13
255:13 264:6,7
264:12,12
**jbs** 39:2
**jennifer** 123:19
**jersey** 42:17
43:7,8
**job** 1:25 53:15
138:10
**john** 3:14 4:3
9:21 10:18
47:21
**joined** 9:15
**joint** 38:2 48:2
**josh** 3:20 10:12
**judge** 37:10,11
126:4 136:8,9
138:8 189:18
191:6
**judges** 126:5,9
**judicial** 125:24
126:2 147:12
**julie** 2:19 10:3
**july** 248:24
249:4,25
**jump** 276:5
**june** 75:4,24
76:12 255:13
258:12

**jury** 135:17
137:14 144:17
279:7,9

**k**

**k** 17:2 229:22
230:11,11
**keep** 11:25
161:14
**ken** 17:2
**kept** 255:10
**key** 64:3 66:3
109:2 113:23
269:13 294:10
297:11 298:25
**kind** 20:10,11
45:4 73:5,14
112:18,22
170:10 194:19
194:20 221:17
242:22
**kinds** 243:4
**kit** 24:25 279:2
285:19
**knew** 156:13
168:3 297:6,21
**know** 12:10,13
13:25 14:4,5,5,7
14:15,19,19,20
14:21 15:4
19:10,11,12,15
20:13 25:2,21
26:7 29:16
33:17,20,24
34:11 35:25
36:5,8,9,20 38:6
38:19,21 39:10
39:14,15 40:18

45:2,25 46:7,9
47:7 49:12,13
50:13 51:14
53:14 54:17
58:13,15 60:19
60:21,23 61:2
63:12,22 65:3,6
66:3,19 68:15
77:9,10,23,24
81:22 82:11,25
83:4,12,19,25
84:20 85:14,18
85:20,22 86:14
88:7 89:15,15,19
92:11,12,13,19
95:4 96:12
98:11,14,17,20
100:13 103:24
104:12,16
108:14 109:4,20
111:16 113:16
113:21 115:13
115:23 116:2
118:2,19 119:17
121:8,8,9,13,15
122:24 126:7
128:16 136:19
140:9,9,11
142:14,17,19,23
151:13,18,24,25
152:5,5,18,20
153:21,21
154:16,24 155:5
155:21 156:10
156:12,15
158:17,24,25
159:10 160:3
163:25 164:9,10

**[know - level]**

166:2,3,7,7
167:12,19 168:5
172:5,6,10,10,14
173:2,4,20 174:7
174:8,13 175:3,7
175:8,9,10,11,12
175:12 176:20
176:21,23 177:3
177:5,6,13 180:6
180:20 181:4,6,8
181:11 183:25
183:25 185:10
186:5 188:6,13
189:18,20,21
190:17,18 193:5
193:5 195:13
197:6 199:23
202:11 205:24
206:8,11,14,23
207:18 208:15
208:18,22
211:15,17
212:22 213:13
213:15 219:8,24
220:14 221:4,13
221:20 222:22
224:4,5,20
226:23 228:12
229:10 230:18
230:19,24
235:21 236:3,8
236:12,13
237:11,13 239:6
239:8,9,11 240:7
240:10 242:10
242:15 244:22
246:23 247:6,8
247:12,23,24

248:2 249:9,25
251:2,16,24
254:22 257:24
259:14 260:12
260:16 261:24
262:4,9,15,16,24
263:2 264:16
269:15 270:4
274:6 275:15
277:20,23
280:24 283:4,10
286:23 287:2,2
287:19 288:12
292:8,13 295:2
296:19 297:10
297:21 298:17
298:18 299:20
300:18,23,24
301:11 302:8,21
303:8 304:17,21
305:9 306:4,13
306:21
**knowledge** 13:14
25:23 36:5 37:2
37:3,4,5,7 41:10
146:16 262:18
**known** 136:3,5
232:15,18,23
**knows** 118:14
**kopleton** 43:8
**kotz** 17:2,3,6,7
17:10,13,15 18:4
**krogman** 131:8
177:7 178:8
188:5 189:2,5,25
191:7 215:12,20
215:24

**l**

**l** 1:12 5:2,14 8:1
11:2,10 18:25
26:22 86:11
149:8 309:6
310:6 311:6
**lacks** 71:14
214:20 266:11
284:16
**language** 140:6
**large** 50:21
58:21 102:22
103:6 105:3,5
238:19 239:8
**larger** 45:6
271:17
**largest** 37:21
**lasts** 199:13
**late** 91:9 152:4
152:11 247:10
**laundry** 104:5
305:24
**laura** 2:13 9:24
**law** 5:23 6:13
37:14 48:24,25
49:3,5,6 57:21
68:14,16 86:10
100:8,13 186:22
186:24 190:9
191:5
**law360** 6:5 80:4
**lawsuit** 196:24
**lawsuits** 102:5,5
**lay** 273:9
**le** 307:14
**lead** 10:6 16:20
16:20 28:6
65:10 76:5

91:19 238:7
260:2
**leads** 210:24
252:14
**learn** 38:11
**learned** 280:18
**leave** 137:13
**left** 53:2 127:13
127:14 129:12
141:14 209:7
280:6
**legal** 35:14,17,21
90:17 95:3
96:21 97:7
100:6 128:10
142:22 190:23
196:18 197:4
198:6 259:13
260:12 262:7,22
265:4
**legally** 52:8
**lei** 18:25
**lend** 121:9,10,10
**lengths** 209:14
**leonid** 3:7 9:13
100:17 209:4
308:13
**lester** 37:11
**levarni** 17:23
18:10,21
**level** 58:9,10
153:10 192:2,5
234:22 246:7
279:20 283:6,8
288:12,15,16,25
292:2,9 293:4,9
298:24

**levels** 278:23 279:17 281:4,12 281:17

**lexecon** 37:17 38:16 48:12 280:19

**lexington** 3:12

**liability** 128:21 128:23 135:8 144:18 145:14 259:19,24 296:9 298:16 303:25 306:6

**libby** 4:14 9:18

**license** 52:12

**lies** 197:9

**life** 122:8,10,19 123:2 152:18

**light** 303:21

**likewise** 291:7

**limit** 48:20 108:12,16 112:21

**limited** 43:20,25 87:10 88:24

**line** 77:21 78:19 78:24 88:7,9,10 88:14 98:22,22 117:3 160:11 221:6 278:19 310:10,12,14,16 310:18,20,22

**lineal** 239:23

**linear** 69:15,19

**lines** 129:21

**link** 297:4 298:4

**linked** 89:9 90:12

**liquid** 192:20,25 193:3

**liquidity** 59:14 195:19

**list** 32:16 42:16 52:21 104:5 122:12,15 123:7 146:13 201:23 202:7,12,17,19 203:8,20,20 218:23 240:8 256:8 288:14 302:11 303:4 305:24

**listed** 31:10 43:4 47:16 56:16 146:18,24 147:13 201:22 210:23

**lists** 96:12 201:10

**literally** 145:24 194:3

**literature** 211:20

**litigating** 259:22

**litigation** 1:6 5:17 6:12,22 7:5 8:17 19:18 20:21 21:15,16 22:6,8,13,14 32:17 33:3,12 34:5,9 35:8,25 41:8,22 42:9 49:8,14 50:7,11 50:14,22,23 51:3 51:13,22 52:3 53:16,19 65:15 86:10 87:23

97:22 101:23 104:4 129:8 131:19 132:23 142:24 220:4 240:23 244:7 251:23 266:5 279:8 309:1

**litowitz** 2:4 8:20 10:5 13:6,13 14:3

**little** 18:16 32:6 55:10 78:5 126:20 135:2 173:20 186:8 212:13 244:3

**live** 156:13

**llc** 32:17 43:10 51:25 52:2

**llp** 2:4 3:4,11,17 4:4,11

**location** 8:19 232:10

**locations** 302:16

**logic** 208:21

**logical** 191:7

**long** 23:13 101:3 102:20 112:13 121:2 154:9 168:4 171:9 211:5

**longer** 110:15 111:19 112:23 209:11 212:2

**look** 26:12,20 29:16 35:2 38:15 40:20 56:2 57:14 58:17 65:3

67:19 69:3 74:22 77:22,23 78:12,14,25,25 79:4,13 80:14 82:21,25 83:2,9 86:18 89:5,18,20 89:21 93:22 106:8,17,17 108:23 109:4 113:24 115:15 115:21 117:10 118:4 119:19 120:9,19,22 150:23 152:9 153:3,22 155:14 155:17 157:22 158:9 159:7 161:8,11 168:12 170:11 171:7 176:7 178:23 183:13,15 184:6 185:10,17,25 186:18 187:5,10 188:12,21 198:23 208:14 216:23 219:6 220:15 223:18 228:4,8,18 229:14 230:19 230:24 231:22 232:3,12 233:22 234:6 239:15 244:14,24 245:2 246:24,25 257:20 273:3,15 277:5 281:9 282:2 283:4 291:13 292:4

**[look - market]** Page 37

297:4,7 298:4
300:6 305:4
**looked** 73:18,20
79:5 81:18
82:10 86:16
112:24 114:5
115:16,24
136:11 137:10
149:15 151:2,11
151:17 152:3,23
153:4,19,24
154:16 155:7,18
155:24 156:2,7,9
158:3,5,10
171:15 186:11
186:13 222:9
223:24 230:23
237:20,22,25
247:19 273:4
276:22 296:21
300:22 302:23
304:18,20
**looking** 15:22
47:21 66:4 88:9
93:14 99:12,14
99:15 108:8
112:6 113:25
155:11,22
157:20 158:13
165:20 175:17
207:8 216:16
221:6 250:4
252:18 253:8
257:19 268:6
282:3
**looks** 56:14
229:6 300:7

**loss** 28:22,24
29:12,17 89:8,11
89:25 90:11,19
90:21 91:7
108:7 109:16,20
109:22 112:4
114:5 115:21
116:13 133:5,10
150:3 159:15
205:10,14,21
206:2,5 236:4
245:3 246:18
247:3 248:6,12
266:25 267:3,16
268:10,14
269:11,12,21,23
272:3 281:2,21
282:5 283:22
284:2,4,10,15,25
285:15,17
286:21,21
291:21 292:5,22
293:17 294:2,25
295:18,19 296:2
297:3,16 298:6
301:10,14,15,19
303:11 305:11
306:3,10,12,16
306:20,22
**losses** 206:9
245:3 266:14
267:15,18 269:9
271:10 278:13
291:19 292:5,24
293:16 294:5
295:14,14
**lost** 144:19 146:2
268:23 277:19

277:20
**lot** 35:25 48:13
126:9 151:13
207:20
**lots** 190:10
237:12
**low** 62:22 192:21
194:5
**luck** 196:11
**lucky** 166:8
250:8
**lunch** 138:22
148:10,14

### m

**m** 32:4 47:21
54:5
**mac** 58:12,16
61:19,25 62:5
69:7 70:7
**macro** 67:20
**magic** 176:24
**mags** 54:5
**main** 36:12
**major** 232:15,18
**majority** 218:17
**makers** 66:20
**making** 89:23
92:11 137:18
178:25
**man** 65:6
**manage** 19:20
**managed** 45:8
45:14
**manager** 45:16
46:7
**managers** 19:22
45:9,17,18 46:20

**manages** 17:13
**manipulate**
165:24 231:24
**manipulating**
20:12 155:4
185:2
**manufacturer**
54:7
**march** 82:12,16
82:23 139:18
222:23 223:6,8
224:7,10 225:5
225:12 250:22
251:5,18 252:8
258:9 264:2,11
264:11
**mark** 26:21
**marked** 27:5
34:23 57:16
79:25 86:4
126:12 129:3
132:19 138:23
143:3
**market** 5:21
15:17 25:23
26:15 29:10
37:18 38:15
39:7,7,8,17 40:4
54:19 56:19
57:20 62:8,9
65:25 66:8,13,14
66:20,21 73:22
74:6 79:3,8 81:7
85:23 87:15,17
87:21,22 89:24
91:11 94:13
95:20,21 96:9,10
96:14,16 97:17

**[market - mean]** Page 38

98:8 99:2,9
100:3 102:8
104:23 107:15
108:9 111:20
112:5,13 113:24
114:11,14,25
115:2 116:11,18
117:5,8,10,19
119:7,20,25
124:19 125:3
130:13,24 131:6
136:3,5,10 137:5
143:16 149:22
149:24 150:17
150:18,20 151:5
155:15,16,21,23
156:14 161:10
162:2,8,10,22,23
163:2,8,9,15
164:10,16,20,22
164:24 165:21
165:22 166:2,4,9
166:11 170:16
170:20 171:18
171:21,25
172:17,22
174:16 175:9,20
175:24 179:4,13
182:7,11 183:19
183:23 184:3
185:8 191:16,18
192:20 193:2,13
194:5,8,9,14,17
195:3,5,9,13,18
195:19,20,25
196:3,5,6,11,13
198:16,18,25
199:6,10,12,15

200:14,18
209:18 211:2,9
211:16,16,16
215:13,16 216:6
216:8 217:6,14
219:2 225:2
226:16,20 227:8
227:17 229:19
229:19 233:24
234:8 235:23
236:7,14 239:12
239:23 240:6
244:15 247:3,18
249:19 251:15
251:17 252:14
252:17,20 253:6
253:9,11,13
255:7,17 256:11
257:16 258:8
261:7 271:12
284:20 286:19
297:8 301:2,4,19
302:24 305:4
**market's** 238:11
238:24 239:4
**marketer** 54:7
**marketing** 34:11
**markets** 35:24
36:2,7 37:19
38:13 39:6,13
66:23,23 92:20
118:10,18 125:8
152:12,19
163:21 168:8
175:3 177:4
181:12 188:10
227:14 238:25

**marking** 57:18
80:3
**marks** 60:14
**mars** 65:7
**mary** 4:8 258:23
**mass** 34:11
**mastercard**
39:22
**mate** 270:15
**material** 102:10
162:11,24
163:10,20,23
164:4 166:12,23
168:20 208:5,6
234:11 261:6
271:2 303:20
**materiality** 28:9
28:13,16,19,21
29:4,11,16 88:19
89:14
**materialization**
261:5,11,18
**materializations**
263:10
**materials** 146:13
146:17,22,25
147:4,10
**mathematical**
60:20 278:20
**matter** 7:9 8:15
11:3 25:5 31:16
32:2 40:3 43:3
51:9 118:22
123:14 139:13
186:7 189:22
207:22 225:24
267:10,22 268:2
268:17 269:2

271:4 280:5,9
293:7 295:4
297:12 300:21
**matters** 33:3
49:22,25 50:16
147:23 183:14
190:19,22
**matthew** 17:22
18:9
**mature** 242:14
**maximize** 227:8
**mayleen** 1:24
8:24 311:3,17
**mcnamara** 4:4,8
10:16 258:23
**mda** 44:16,17,18
44:23 45:5,6,10
45:13,15,16,18
45:25 46:3,9,14
46:16,18 47:7
156:11
**mean** 14:19 15:2
19:14 24:20,21
25:9,10,24 30:14
35:21 36:11
38:14,15,16 39:5
39:24 41:18,19
41:21 59:22
63:4,5 71:25
74:2,4 76:9,10
84:12 85:12
87:16 88:2,21
90:24 91:24
92:3,13,20 97:3
99:8 100:5
109:2 113:12,20
115:15 116:21
116:25 117:13

118:3,7 119:11
121:13,13 126:6
126:7,10,10
128:23 131:17
134:25 136:15
136:21 137:9,17
138:7 142:7,16
142:18,20 147:8
150:9 152:13
154:9,20 158:8
159:25 160:21
160:25 164:6
166:8 168:25
169:2 171:6,6
173:2 174:10
177:2 178:6,15
178:18,18,18,19
183:9,17 185:7
185:12,21
187:21 190:11
191:21 192:5,13
192:15,25
193:16 194:2,24
197:18 199:3,5
200:22 203:23
205:10 206:20
207:5 208:2,3,10
208:20 211:15
216:3,4,10,21
219:24 221:20
222:12 223:17
226:11 230:17
231:24 232:8,10
232:17,22,23
234:3,11 235:5
236:15,22 237:5
237:7,22 238:23
239:4,14,21

240:7,7 241:16
242:4,6,16 243:3
243:12 248:2
253:17,19
254:12,12
257:24,25 258:3
260:10 261:11
262:23 263:21
263:23 265:7
266:13 267:13
269:6 270:4
273:4 275:4,6
277:13,18
278:14,25 279:7
280:17,19,21
281:3,5,16,23
283:3,21 286:16
289:11,15
291:18 295:17
296:5,16,25
298:16,21
299:17 300:15
301:3 302:2,3
303:10 304:3
306:3
**meaning**  122:23
179:12
**meaningful**
186:10 208:11
**means**  63:24
76:10 119:12
192:14 193:3,3
200:20 207:11
207:16 265:2
271:10 275:6
286:17
**meant**  68:17
70:21 134:3

169:17 233:17
**measure**  64:10
107:25 108:5
116:10 150:10
163:25 181:11
187:24 188:11
208:12 221:13
**measured**
224:11 225:6,21
259:18 267:15
**measurements**
59:11
**measures**  28:23
222:2,5,5
**measuring**  60:19
**meat**  39:2
**mechanically**
300:5
**media**  8:13 15:9
210:3 297:8
301:2,5
**meet**  23:7
177:14 185:2
**meeting**  23:13
23:17,20 185:20
263:16 264:22
265:10
**meetings**  37:13
**meets**  193:17
**member**  46:9
278:10,12
**members**  15:20
278:13 291:8
**mention**  135:4
204:11
**mentioned**  22:18
23:2 24:6,9
30:19 31:12

37:2 39:14 40:8
42:3 46:20 48:6
49:5 61:18
76:23 112:7
149:14 151:4
167:16 193:18
222:17 223:18
224:2,14 239:2
290:18 297:20
**mentioning**
65:23 305:17
**mentions**  201:15
**merely**  98:7
**merger**  39:2
**mergers**  39:4
**merit**  311:3
**met**  16:19 23:4
23:10 185:6
**method**  190:12
253:20 292:7
**methodologies**
293:19,20
**methodology**
15:20 26:16
40:6 73:23
91:12 130:16
133:16 135:19
135:22 136:9
137:3,4,7 140:20
143:18 144:5
145:20 259:15
259:20 266:3
267:7,21 268:4
269:18 270:10
271:15,19,22,25
274:11,19 276:2
276:16 277:6,8
277:10,25

279:16 280:7
282:9 283:11
284:7,22 286:4
286:10 288:2,9
290:25 292:12
293:21 294:23
295:23 305:7
**methods** 87:7,18
94:6 238:12
239:18 306:15
**michael** 1:12 2:7
5:2,14 7:7 8:1
10:4 11:2,10
26:22 57:22
86:11 132:25
149:8 307:25
308:11 309:6
310:6 311:6
**michigan** 37:25
48:2 68:14
**micro** 36:17
**microphones** 8:7
**microstructure**
65:25 66:8,13,16
66:18,24 67:20
211:17
**mid** 152:17,18
281:15
**middle** 42:5
93:10,25 109:7
127:10,12,15
193:11
**million** 39:16
140:17 144:19
192:10 193:15
**milstein** 2:10,16
9:25 13:7

**mind** 33:20 93:4
93:4 136:22
175:2
**mine** 285:24
**minimum**
185:15,23
198:11
**minus** 213:5
**minute** 170:12
303:9
**minutes** 101:3
146:7,8,10
170:12,13
209:17 303:9
307:7
**mirror** 188:7
**mis** 233:17
**misguided** 97:8
**misinformation**
135:5
**misinterpretati...**
65:18
**misleading**
27:22,24 28:2
94:9 133:19
**misrepresentat...**
266:16 271:10
**misrepresentat...**
263:13 266:7,17
266:20,21
267:14,24
268:17 269:2
270:2 271:3
272:24 282:17
282:22 289:4
**missed** 43:22
129:20

**missing** 74:14
**misspoke** 233:16
**misspoken** 31:3
**misstated** 261:3
303:23
**misstatement**
197:24 271:17
297:23,24 298:2
298:5 299:23
**misstatements**
260:3,15,16
261:6 265:15
267:18 269:7
270:6,15,19,24
283:23 289:8,13
289:17 290:3,5,8
290:9 293:3
297:5 303:3
**misstates** 115:8
205:16 226:9
**mistake** 182:14
**misunderstand...**
253:22
**model** 29:10
76:3,15 79:8
87:21,22 127:10
127:17,18,19
128:10 150:19
155:15,17 217:6
217:14 219:2
227:9 235:23
236:8,14 239:12
239:23 240:15
240:21 242:20
242:24 244:10
246:15 248:18
250:19 252:17
253:6,10,11

254:18,21
286:19
**models** 64:2
87:15,17 164:11
**modern** 173:23
187:16 191:4,5
**modifications**
287:6
**modified** 287:25
**molly** 2:20 10:3
**moment** 75:15
**monday** 197:9
197:10,24
**money** 48:13
139:25 140:3
166:6 277:16
**moniker** 174:4,5
174:6
**monitor** 55:18
55:23 101:10,15
148:12 149:6
213:20,25
258:20 259:3
307:9,14 308:2
**montgomery** 4:5
**month** 49:12
85:21 137:21
274:10
**months** 119:3,5
**moody's** 247:24
**moon** 65:7
**moore** 4:11 9:19
**morgan** 41:5
**morning** 8:4
10:15 11:15,16
236:16
**mortgage** 7:14
41:9 66:6,7

**[mortgage - news]**

139:15 140:7,10
**motion** 6:24 7:6
  16:14 22:20
  131:3 132:24
  270:6 273:6,8
**motions** 5:6
**motivated** 224:3
**motivation**
  223:17
**mouth** 34:10
**mouthful** 139:17
**move** 86:2 119:2
  165:10,22
  166:19 181:23
  236:10
**movement**
  107:10 235:22
  236:3,3 291:3
  295:9
**movements**
  59:10 63:9
  69:12 85:8
  99:12,15,16
  102:25 103:9
  105:8 130:18
  163:22 235:12
  235:19 236:13
  237:18 238:7
  239:8
**moves** 118:3
**moving** 219:25
**multimatic** 7:19
  143:7 145:7
**multiple** 70:2,25
**multitude**
  113:22 275:17
**musk** 133:21,25
  134:3,10

**mute** 8:9

**n**

**n** 5:1 18:16,16
  18:16 19:2 32:4
  120:11 149:2,2,2
  167:21 257:20
**nalysis** 302:12
**name** 8:22 17:2
  18:5,14 227:15
  309:1 310:4,6
**named** 68:13
**names** 227:16
**narrow** 193:5,6
  226:24 257:15
**nasdaq** 195:24
  207:13
**national** 6:18
  126:17
**nature** 13:15,25
  14:4 19:17
  32:20 34:7 39:8
  39:11 42:10
  63:10 66:9
  67:18 87:11
  88:3,5 108:22
  111:21,21 112:9
  114:21 117:20
  117:21 118:18
  128:11 142:12
  156:18 159:10
  163:21 168:9
  177:3 207:3
  209:16 211:10
  216:10 217:3
  221:10 235:23
  238:25 239:7,12
  263:15 264:21

265:9 266:2,21
268:4 299:18
304:19
**navigant** 51:10
  51:11,12,19,22
  52:14
**nda** 50:2
**ndogenous** 18:14
  20:6,8,16,23
  21:22,24 22:5
  23:20
**necessarily**
  47:12 115:13
  150:11 174:25
  198:24 236:20
  236:23 237:17
**necessary** 28:17
  113:5 176:9,17
  178:12 179:11
  180:9,14,15,23
  181:2,16 182:6
  185:10 296:24
**need** 12:13 33:20
  36:4 91:4
  103:24 115:15
  135:23 230:7
  279:16 285:12
  285:13 286:23
  305:3 308:9
**needed** 262:14
  306:9
**needless** 26:4
**needs** 29:25
**negative** 245:25
**nejat** 57:23
  86:12
**net** 156:12

**never** 33:20 65:4
  136:22 138:8
  166:25 173:6
  175:3 196:19
  198:10 213:15
  223:19 276:21
  276:22
**new** 1:2,18,18
  2:6,6,12,12,17
  3:6,6,13,13 4:13
  4:13 8:18,21
  42:17 43:7,8
  49:19,24 50:3,7
  50:12 52:25
  102:4 113:19,19
  136:6 166:12
  168:20 212:4,7
  215:16 216:9
  311:5,22
**news** 15:5,8 84:4
  93:6 115:12
  116:4,16 160:22
  160:23 161:2,3
  161:11,12
  184:23,23 186:5
  210:13 215:7,15
  216:8 221:5
  226:4,4,7 234:17
  234:18,20,20,25
  234:25 235:3,4
  235:12 236:17
  236:24 237:12
  237:12,16 238:2
  238:2,8 240:15
  240:15,17,21
  241:6,10,20
  242:4,24 243:16
  243:21 244:9,11

**[news - office]** Page 42

| | | | |
|---|---|---|---|
| 244:15,25 | **noteholder** | 70:12 71:14,22 | 161:21 215:7 |
| 245:20 248:17 | 127:11,20 | 72:19 77:20 | **objectivity** 109:3 |
| 248:18,21 249:6 | **noteholder's** | 78:6 80:21 | **observation** |
| 249:9,14,25 | 127:23 | 90:16 94:22 | 120:10 253:19 |
| 250:11,16,19,20 | **noticed** 247:10 | 96:20 97:2 | 254:22 |
| 250:22 252:18 | **noticing** 9:12 | 105:9 110:25 | **observations** |
| 252:19 254:24 | **notion** 163:14 | 111:14 112:16 | 175:10 254:23 |
| 255:19 257:5 | **number** 77:15 | 115:6,8 116:19 | **observe** 185:24 |
| **newspaper** | 102:17 105:19 | 119:8 120:3 | **observed** 77:17 |
| 14:25 15:3 | 135:17 145:11 | 122:7 125:21 | 85:8 107:16 |
| **newspapers** 15:5 | 145:15 201:10 | 147:6 157:24 | 238:20 |
| **nilly** 208:17 | 201:13 206:17 | 163:3 170:7 | **obviously** 219:7 |
| **nine** 129:21 | 217:2 224:23 | 171:3 172:2,24 | **occ** 260:13 |
| **nobel** 174:7 | 239:22 245:13 | 180:17 181:18 | **occur** 111:12 |
| **nods** 11:25 | 245:14 247:16 | 184:15 187:6 | 225:12 296:14 |
| **noise** 240:6 | 247:17 256:8 | 189:13 196:7 | **occurred** 222:21 |
| **non** 134:5 | **numbers** 145:8 | 197:3,13 198:2,5 | **occurs** 248:18,21 |
| 144:24 160:22 | 160:11 245:11 | 198:20 205:16 | **october** 26:23 |
| 160:23 161:3,12 | **nw** 2:17 | 207:23 214:20 | 30:15,23 31:8 |
| 185:11 220:17 | **nyc** 207:13 | 221:19 226:9 | 249:11,15,20 |
| 225:19 226:4 | **nyse** 195:24 | 227:25 234:2 | 250:11,17 |
| 234:25 236:17 | 199:10 210:21 | 236:21 243:19 | **odd** 178:19 |
| 236:24 | 211:2,9,18 | 253:15 255:21 | **offer** 19:18 40:3 |
| **nonclass** 144:24 | **o** | 256:23 257:10 | 63:2 79:2 |
| **nonsecurities** | | 259:12 262:6,21 | 206:12 309:15 |
| 144:23 | **o** 17:2 18:16,16 | 265:12 266:9 | **offered** 30:18 |
| **norhan** 2:14 | 32:4 149:2,2,2 | 267:12 268:20 | 43:17 48:12 |
| 10:2 | **o0o** 4:20 7:24 | 268:23 269:5 | 190:15 220:19 |
| **normal** 74:3,8 | **oath** 9:3 274:7 | 271:6 284:16 | **offering** 27:20 |
| 152:19 257:4 | 285:6 309:16 | 285:4 288:4,6 | 27:20,25 28:8,13 |
| **notary** 311:4,22 | **object** 12:17 | 291:15 293:13 | 28:14 29:17,20 |
| **note** 8:7 70:3 | 78:5 | 294:17 | 52:2 61:25 97:6 |
| 143:13 | **objection** 22:7 | **objections** 9:6 | 238:18 |
| **note's** 127:21 | 22:11 30:25 | **objective** 108:11 | **offers** 229:10 |
| **notebook** 140:11 | 40:16 41:17 | 120:21 161:13 | **offhand** 211:22 |
| **noted** 4:8 215:12 | 42:22 44:6 | **objectively** | **office** 42:16 |
| 309:14 | 45:20 49:21 | 112:5 115:11,11 | 49:18 271:16 |
| | 53:12,22 67:9,25 | 116:3,4 154:25 | |

**[officer - operational]** Page 43

| | | | |
|---|---|---|---|
| **officer** 52:19,25 | 64:8 65:8 67:15 | 167:24 169:9,17 | 286:7 287:17 |
| **offices** 270:25 | 68:18 72:11,17 | 170:25 171:17 | 288:19 295:5 |
| **officials** 152:15 | 73:8 74:7 75:8 | 179:2,9 180:21 | 296:6 299:24 |
| **oftentimes** 287:2 | 75:13,19,20 | 180:23,25 181:3 | 301:2,8,13,20 |
| 302:4 | 77:12 78:20 | 181:23 182:5,22 | 302:10 303:19 |
| **oh** 16:25 18:17 | 79:7,21 82:9,13 | 183:8,10,16 | 307:24 |
| 18:25 31:2 34:7 | 82:21 83:8,22 | 184:4,8 187:11 | **old** 84:4 |
| 34:8 47:20 48:8 | 85:24 86:21 | 187:15,20 188:2 | **oldest** 187:11 |
| 48:10 55:13 | 93:8,20,24,25 | 188:10,16,25 | **olin** 47:21 |
| 59:21 73:8 | 95:10,13 97:6,9 | 189:6 191:9,25 | **omission** 27:21 |
| 74:13 75:12 | 98:21 100:10,14 | 192:9,12,18 | **omissions** 260:3 |
| 88:23 127:14 | 105:25 106:4 | 196:21 198:11 | 261:7 263:14 |
| 133:7 139:11 | 108:15,20,25 | 198:16 200:3,4 | 282:17,22 289:4 |
| 141:13 148:5 | 109:6,24 112:20 | 201:24 202:24 | 289:5,8,14 290:4 |
| 169:17 205:23 | 113:4 114:2 | 203:18,23 204:4 | 290:9 |
| 221:24 223:4 | 115:12,14 | 204:6 210:5,16 | **omit** 233:4 |
| 227:12,17 | 116:25 117:5 | 213:17 216:25 | **omitted** 70:2,4 |
| 230:18 231:24 | 118:6 119:13 | 220:22 225:20 | 70:25 76:18 |
| 233:16 242:25 | 120:21 123:7,17 | 226:16,25 | 77:7 261:4 |
| 245:12 248:21 | 124:17 126:11 | 227:15 228:15 | 303:23 |
| 304:16 | 128:22 129:22 | 231:6 233:10 | **once** 23:10 45:10 |
| **oil** 242:25 243:7 | 131:21 132:13 | 235:10 238:4 | 167:5 273:12,13 |
| 243:13 | 132:18 133:7,9 | 240:14 245:12 | 273:14 279:6,25 |
| **okay** 13:2 15:10 | 133:13 135:24 | 245:20,23 247:5 | 296:8 298:9,25 |
| 18:12 23:2 24:6 | 136:5,12 137:13 | 248:7,16,25 | 305:14 |
| 26:20 29:19 | 137:18,25 | 249:6 250:18,21 | **ones** 123:7,12 |
| 31:10,12,18,22 | 138:15 141:18 | 252:3,11,17,18 | **ongoing** 90:24 |
| 32:15 33:9 | 143:2,23 146:4 | 253:23 254:13 | **open** 15:17 |
| 34:12,18 39:20 | 146:11 147:11 | 255:10,24 256:6 | 26:15 40:4 |
| 44:4,15 47:20 | 154:12,16 | 257:20 258:10 | 94:13 96:15 |
| 48:20,24 49:15 | 155:19,24 | 258:15 259:5,17 | 97:16 104:24 |
| 50:2,6,10,15,18 | 156:24 157:18 | 262:10,18 263:7 | 157:3 177:3 |
| 50:24 51:10,24 | 158:6,12,19 | 264:4,18,19 | 256:5 258:7 |
| 52:16 54:4 | 159:20,22 | 265:25 266:25 | **openness** 59:13 |
| 55:13,13,24 | 160:15,17 | 267:22 269:7 | **operational** 61:6 |
| 56:14,25 57:14 | 161:14 163:6 | 271:13 272:10 | 61:9,13 62:4 |
| 59:19 60:2,24 | 165:7,8,9,16,18 | 276:7,10 277:5 | 89:23 99:17 |
| 61:17 62:7,14 | 165:22 166:10 | 280:4 282:6 | 183:11,18 |

**[operational - paragraph]**

Page 44

| | | | |
|---|---|---|---|
| 191:10,14 199:19 209:8,10 212:12,14,16 | **opportunity** 78:5 | 238:8 305:5 | 56:3 58:20 |
| **operations** 33:12 | **opposed** 21:22 63:13 64:20 76:22 99:11,16 155:3 159:6 167:14 193:9 199:23 219:7 241:14 277:21 | **outweighed** 141:25 | 62:15 68:2,11,18 68:22 75:7,11 |
| **opine** 24:5,16 26:9,13 39:25 41:13 73:22 131:10 195:9,10 196:10,12 | | **overall** 111:4 165:20 182:16 302:24 | 85:2 86:21 101:21 110:4,5,6 121:19 126:15 127:6,12 129:11 133:4 139:7 140:24 141:12 143:6,23 162:5 168:13,14 175:14 191:13 210:18,19 212:21 245:6,10 245:13,14,16 255:22 256:7 259:7 260:20,21 260:21,22 310:10,12,14,16 310:18,20,22 |
| **opining** 28:24 143:17 262:15 | **option** 67:14 219:19 | **overinflated** 277:20 | |
| **opinion** 6:19 7:16 27:20,21,25 28:13,14 29:17 40:3 61:15,18 73:25 79:3 82:20 83:5 84:6 97:7 100:4 106:15,23 118:19 119:17 120:24 130:14 132:11 134:14 134:15,22 135:13 136:13 136:16,24 141:4 141:21 143:20 144:4 153:20 181:20 182:9 190:16 200:21 200:23 236:22 249:21 253:18 297:12 | **options** 218:23 | **overpay** 277:19 | |
| | **order** 6:19,23 7:5,17 131:3 132:24 263:4 273:7,8 | **oversee** 33:11 45:2 | |
| | **orders** 260:4,5,9 260:13 261:16 261:21 262:2,3,5 262:17 263:17 264:23 265:10 | **overstatement** 83:21 | |
| | | **overstating** 68:16 | |
| | | **ownership** 127:23 | |
| | **oregon** 311:19 | **owning** 47:12 | |
| | **organization** 36:6 37:3,6,15 37:24 38:4,5 39:11 | **p** | **pages** 27:2 136:18 138:13 265:14 309:8 |
| | | **p** 52:6 62:11 69:13,17 246:5 249:12 | |
| | | **p.m.** 101:11,15 148:13 149:6 213:21,25 247:15 258:21 259:3 307:10,14 308:3,15 | **pagination** 58:21 |
| | **organizations** 37:9 | | **paid** 208:11 282:14 |
| **opinions** 7:7 28:9,17 29:20 43:17 130:13,24 132:25 147:3 | **organized** 38:7 | **pacific** 52:16,18 53:8,17,20 | **panel** 126:4 |
| | **outcome** 9:5 311:13 | **pag** 52:5,6 212:2 | **paper** 73:9 93:11 94:3 236:15 |
| | **outlined** 141:2 141:19 | **page** 5:3,12,18 6:3 7:3 30:3,5 34:2 35:4 40:20 40:21 41:3 42:6 42:14 43:4,6 49:15 54:24 | **paragraph** 15:14 15:24 26:13 62:15,21 68:3,24 69:6 70:5,6,15 71:5 76:17 85:2 85:4 86:22 93:10,17 94:2 95:17 98:21 |
| | **output** 77:24 80:25 | | |
| | **outset** 133:17 | | |
| **oppenheimer** 52:6 | **outside** 41:24 67:2,18 217:11 | | |

101:22 110:5
127:9,15,16,25
129:13 134:8
141:6,9,14,17
143:23 162:5
168:12 169:19
171:17 174:14
174:15 175:14
191:9 199:21
200:5 201:3,6,8
204:12,14
210:16 212:21
214:4,5 215:10
238:4 258:4
259:25 264:18
270:20 277:6,24
278:8 281:9
286:7 288:19
290:12,13,20,23
295:7 296:6
299:6 305:19
**parameter**
224:19
**parameters**
79:10 154:18,21
155:9,12,13,14
155:16 157:4
217:8 221:2,25
222:14 233:20
236:7
**parker** 4:10 9:20
**parse** 135:23
304:8
**parsed** 135:14
**parsing** 109:23
109:25 110:2
290:18,23,25
295:5 299:7

302:8 304:23
307:4
**part** 29:11 45:6
46:15,17 50:4
52:5 81:15,16
151:23 156:4,6
158:10 188:2
192:14 237:2
279:13 282:11
282:12 292:25
299:23,24
301:14,15
**partial** 263:11
290:10
**participants**
107:15 114:25
228:18 271:12
**participate**
200:14,18
**participated**
37:10 190:10
**participating**
256:14
**participation**
59:13
**particular** 21:21
25:5 38:8 40:2
58:19 77:17
81:10,14,16
88:19 104:13
117:23 118:22
128:3 130:16
145:20 151:24
158:18 176:16
182:6 183:18,24
184:14,17
185:11,13,22
200:21,23

211:20 222:7
224:3 231:2
232:25 235:25
250:7 255:16
277:2 281:10,19
282:24 283:19
283:22 293:8
297:12 300:21
301:7 304:6
306:2,16 307:5
**parties** 8:12
140:16
**partner** 51:21
**partners** 51:21
**parts** 173:14
**party** 9:3 42:8
140:2,2 311:12
**pass** 7:15 139:16
250:22 262:14
**passages** 58:19
162:4
**pay** 118:14
213:5
**peer** 56:23 68:15
113:2 144:6
**peltzman** 37:12
**penalty** 10:24
309:7
**pending** 11:4
12:15 59:19
**pension** 42:4
**people** 34:4
168:5 232:21
237:19 239:5
**perceived** 173:3
**percent** 63:7,8
63:16,23,24,25
76:13 77:3 78:9

78:17 85:13
103:19 153:10
160:5 161:6
207:12 225:25
225:25 230:12
234:22 236:2
239:24 246:2,5,7
249:12,13 256:3
**percentage**
77:15 78:21
122:20
**percentile** 161:5
207:10
**perfect** 64:2
68:16 92:21
163:15 164:10
164:11 188:20
**performance**
53:15 228:10
229:6 230:20,25
**period** 21:7 47:3
52:5 69:17,21
71:11,18,19 72:4
72:6,10,14 77:17
78:18,21 79:12
80:13,18,20 81:8
81:11,13,15,17
82:4,6,8,11,12
85:9,14,21 89:6
89:20 91:18,25
92:24 93:5
102:3,16,20
103:5 105:18
115:16 121:4
130:19 150:24
151:3,10,14,18
151:20,21,21,25
152:7,9,10,21,22

152:25 153:2,4,6
154:2,22 155:2,3
155:9,25 156:3,5
156:8,10,14,24
157:3,5,7,8,15
157:19,22 158:5
158:10,21 159:9
159:17 160:5,21
172:10 184:7,7,8
187:3 189:11
192:11 194:18
195:12,15
196:14,16,20,22
197:2,7 198:12
199:14 201:16
209:8 217:19,20
217:21,23,24
218:7,8,13,18
220:15,21,25
221:11 222:2,3,6
222:6,10,11,19
222:21 223:20
224:4,5,8,17
225:10,13 231:5
231:9 233:19,21
233:25 234:9,13
234:14 235:25
235:25 236:19
237:2 238:15
239:16,20
249:23 252:5,7
252:16 255:16
255:16,17,20
256:2,4,12 257:3
257:6,19 264:2
264:10 273:4
292:15 294:16
294:20

**periodic** 247:25
**periods** 68:22
69:9,14,24 70:24
71:12,20 72:14
73:16 81:10
82:8,9 234:15
**perjury** 10:25
309:7
**person** 19:3 25:2
174:3 187:11
196:12 251:10
251:11
**personal** 48:10
49:13 198:9
**personally** 16:7
16:10 98:20
132:2 138:4,6,9
196:19,23 203:2
220:7
**personnel** 52:24
53:5,10
**persuade** 130:17
132:7
**persuasive**
131:20 206:17
**ph.d.** 1:12 5:2,14
8:1 11:10 37:8
149:8 309:6
310:6 311:6
**pharmaceutical**
39:7
**phillips** 123:19
**phone** 193:25
194:3
**phones** 8:10
**phonetic** 17:23
**phrase** 24:18
204:10 265:2

**pick** 8:8
**picking** 120:24
**picture** 84:21
**piece** 66:17
114:2 118:25
141:22
**pieces** 83:13
301:7
**pine** 2:11
**place** 8:11
302:21
**placid** 68:21
**placing** 84:6
**plaintiff** 124:12
259:21
**plaintiff's** 6:23
131:3 135:7
259:19,24
307:17
**plaintiffs** 2:3
8:15 10:6 16:20
23:5,8 28:6
69:18 75:2,22
76:11 124:11
128:12 131:18
135:6 159:12,24
259:10 260:2
**plan** 242:20
**plans** 303:8
**play** 20:6 224:21
**players** 211:13
**please** 8:7,9 9:7
10:9,20,23 11:24
12:6,10,13,18
44:6 75:15
255:23
**pllc** 2:10,16

**plus** 61:3 193:15
**pocket** 268:6
274:11 277:10
277:14,17,21,25
279:16 286:10
288:2,9 290:25
299:4
**point** 13:12
54:12 58:18
60:17 61:10
88:16 104:15
112:3 127:3
132:15 133:23
140:22 152:19
158:8,9,12,13,15
161:19 167:22
190:15 197:15
211:21 222:8,9
222:10,11,12,18
222:21,24 223:6
223:15 224:2,7
224:13 225:7
228:19 240:5
250:13,24
303:18
**pointing** 73:8
136:14 257:8
**points** 158:5
287:14
**pooling** 7:11
123:15 139:14
**poorly** 35:2
**populate** 122:15
**population**
225:18,19
**porrino** 43:6
**portfolio** 6:17
45:7 46:7,8

126:16 235:18
238:18
**portion** 46:22
230:6 299:9
**portions** 134:5
291:3 295:10
**position** 32:14
47:24,25 48:4
159:12,24 190:5
**posner** 2:13 9:24
9:24 22:7,10
30:25 37:10
40:16 41:17
42:22 43:13,15
44:6 45:20,23
49:21 53:12,22
54:25 55:6,14
67:9,25 70:12,14
71:14,22 72:19
72:21 77:20
80:21 90:16
94:22,24 96:20
97:2 100:17,21
101:5 105:9
110:25 111:14
112:16 115:6,8
116:19 119:8
120:3,6 122:7
125:21 138:16
138:21 146:6,9
147:6 157:24
163:3 170:7
171:3 172:2,24
180:17 181:18
184:15 187:6
189:13 191:6
196:7 197:3,13
198:2,5,20,22

205:16 207:23
209:4,11 212:9
212:18 214:20
221:19 226:9
227:25 234:2
236:21 243:19
245:8 255:11,21
256:23 257:10
259:12 262:6,21
265:4,12 266:9
266:11 267:12
268:20 269:5
271:6 280:4,6
284:16 285:4,8
285:10 288:4,6
291:15,17
293:13 294:17
307:18 308:7
**possess** 200:13
**possibility** 46:6
200:10 300:14
**possible** 150:19
161:13 197:16
**possibly** 71:4
102:10 150:4
159:14 160:5
170:24 173:25
188:11 236:4
239:9 288:13
**post** 219:12,16
219:23,24 220:3
220:5,5,6,8,15
220:16,18
221:11,22 222:2
222:6 224:8
225:10,13
**postdates** 52:11

**posting** 166:22
**potential** 62:23
63:17 290:16
**potentially** 26:2
66:12 155:3
188:22 236:6
261:18 288:11
288:12
**power** 62:23
87:10 100:19
103:10,23 105:4
188:10 227:8
229:11
**powers** 104:19
**practice** 5:17
20:21 21:15,16
32:17 33:13
34:5,9 35:8
124:8
**pre** 157:15
218:22 222:3,6
**precedent** 85:6
**precise** 135:14
**precision** 63:3
**predict** 69:11
**predicted** 64:17
156:23,25
**predictive** 217:8
219:3
**prefer** 232:14
**preferred** 5:21
57:20 58:11,12
58:16 61:19,24
62:6,11 66:5,23
69:10
**preliminary**
37:9

**premature**
301:12,13
**preparation**
22:24 23:8
**prepare** 16:11
**prepared** 285:14
**preparing** 86:19
**prerequisite**
94:14
**present** 4:16 9:9
23:20 32:14
42:18
**presentations**
303:10
**presented** 25:5
161:23
**president** 33:10
33:11 44:23
54:12 145:3,5,7
145:23 152:14
156:11
**press** 152:3
209:20 246:9
**presumably**
21:17 153:16
**presume** 211:8
**presumption**
94:14 210:24
**presumptuous**
270:18
**pretty** 76:20
134:21 167:6
236:11,11
**prevent** 193:4
**previous** 251:10
**previously** 84:18
167:14

**[price - provide]**

**price** 59:5,10 60:10 61:8 63:2 64:12,13 69:12 85:7 91:18 92:16,25 98:6 99:12,15,16 102:11,25 103:9 105:8 107:6,10 107:13,16,22 109:13 111:12 112:8 115:2 117:6,16,16 118:2 119:2,4,13 130:18 131:9,11 166:11 168:18 170:15,22 171:25 172:22 173:7,10 177:18 183:12 185:5 205:2 213:3,5 214:10,19,25 215:9,14 216:7 234:7 235:12 238:7,19 239:8 244:25 260:6 261:2 281:6,7,8 283:2,4,5,15,17 286:13 289:6,11 289:17 291:2 295:9 299:10,11 299:21,22

**priced** 117:14 275:7

**prices** 162:9,22 163:8 164:4 165:11,25 174:16 251:20 282:14 289:2,23

**pricing** 14:6,7,8 67:13,18 69:11 169:11,21,24,25 170:3,5,11,16,23 275:12 299:14 299:16,20 300:6 300:8,9

**primarily** 32:22 93:11 94:3 144:22

**primary** 17:10 19:22 63:21 87:3 242:9

**principle** 164:6 164:7

**principles** 24:4 24:15,24 32:24 36:18 38:10,12 38:24 39:6 51:14 164:6 173:9

**printed** 35:2

**printout** 5:16

**prior** 13:11,15 22:17 42:9 46:23 72:5 80:9 80:10 217:6 219:6 235:24 263:13 272:21

**private** 8:9 133:22,25 136:4 235:20 238:16

**privy** 305:9

**prize** 174:7

**probability** 71:5 275:9

**probably** 11:20 11:22 14:14

17:10 24:19 26:7 33:19 48:11,23 86:17 109:3 132:9 172:11 206:23 230:23 232:21 255:7 257:17 292:8 300:17

**problem** 36:24 69:18,23 70:23 71:10,17 72:2,18 77:4,25 78:14 79:6,7 81:3,4,21 106:6 128:3 161:8,9,21 236:14

**problems** 24:4 24:16 25:4,12 35:17 62:24 63:17 65:10,17 113:19

**proceed** 10:10 10:21

**proceeding** 9:7

**produced** 148:7 303:20

**production** 39:2

**products** 66:9 113:19

**profession** 188:4

**professional** 45:8,9 46:20 49:16 57:10

**professionally** 45:13

**professor** 36:6 68:12,13 98:5,14 98:16 162:20

**profits** 144:20 200:12

**program** 52:6

**programs** 113:19

**projections** 102:6 302:5 303:8

**prompt** 104:12 114:17 151:15

**pronouncing** 53:25

**proof** 197:16

**proper** 107:5,24 108:4

**property** 33:2

**proportion** 160:4,22

**proposal** 280:22

**propose** 12:12 135:19 259:21 294:23

**proposed** 274:18

**propounded** 309:12

**pros** 218:21,24

**prospective** 213:4,6

**prove** 128:13

**proven** 298:17

**provide** 11:24 12:23 26:19 28:11,18,20 29:5 36:23 44:5 99:18 208:11 230:19 296:2 303:25 306:6

**provided** 42:25
51:22
**provides** 20:8
32:23 50:21
51:13 79:9
272:15
**providing** 29:8
**proving** 28:7
**public** 15:4
36:14 42:23
43:16 44:7
49:23 50:7
52:20 54:16,18
54:19,21 124:11
135:7 137:22
152:14 207:12
209:20 246:9
297:8 311:4,22
**publication** 57:6
57:6 58:3
**publications**
54:23 55:5,9
56:2,6,8 57:15
**publicly** 50:11
50:14 153:14
162:11,24
163:10 164:4
166:13 171:24
186:5 204:21
208:6
**published** 56:9
56:14 57:2
83:18,19,23,25
176:15
**pull** 19:9 24:24
229:25 230:3
276:13

**pulled** 14:5
**purchase** 191:24
270:11 286:4
293:22
**pure** 140:5
**purely** 165:23
**purports** 130:4
**purpose** 205:12
206:13
**purposes** 14:12
28:5 73:21
109:20,22 147:2
150:3 151:4,5
186:10 202:6
203:9,12 240:15
240:25 270:21
273:8 302:9
**purse** 268:8
**put** 20:5 26:6
34:16,20 79:17
79:23,24 104:19
135:15 139:8
163:18 174:25
184:18 188:21
197:21,21
202:24 204:22
230:24 254:15
257:7
**putative** 46:10
**putting** 20:7
65:6 237:16
252:12

## q

**qualifications**
131:23
**qualified** 128:18
132:16 142:9

144:16 145:13
**quantitative**
62:24
**quantum** 272:8
272:9
**quarter** 14:14
185:3
**quarters** 185:3
**question** 12:4,7
12:9,15,18 14:17
26:5 29:7 34:19
40:19 41:20
59:19 60:6
65:21 68:9
71:23,25 73:11
80:8 81:25 90:4
93:24 105:10
116:12,20 120:4
120:8 124:20
134:14 154:3
159:3,4 164:8
169:6 170:19
171:22 172:4
178:17 181:14
186:19 190:3,25
194:5 196:2,18
210:5 226:3
231:14,18 234:4
255:11 257:11
257:25 258:12
268:13,21,23
269:10,11 284:2
284:3 285:14
295:18
**questioning**
178:19
**questions** 16:18
35:14,22 41:12

68:20,21 93:8
100:22 146:4
157:3 307:15,17
307:18 309:12
**quick** 34:19
55:15 205:21
**quicker** 49:16
111:12 119:25
**quickly** 167:6
**quite** 19:24
**quotation** 60:14
**quote** 60:25 90:7
98:19 103:6
134:25 135:2
174:15 192:15
216:3
**quoted** 213:3,6
**quotes** 59:8
192:17
**quoting** 98:4
214:13,22
215:20 218:11
260:23 263:8

## r

**r** 30:20,20,21,21
32:4 63:7,15,22
63:23 149:2
227:6 239:24
**race** 54:10
**racers** 54:11
**rain** 25:20,20
**raise** 10:23
**ran** 37:20 82:17
83:6,7 164:25
168:21 217:5
286:18

**rapidly**  168:19
168:25 169:2
215:15 216:8
**ratings**  201:11
248:2
**reach**  308:8
**react**  92:6
111:20 169:7
172:9
**reacted**  168:19
**reacting**  152:20
166:12
**reaction**  98:6
107:13,22
109:13 110:16
244:20,25 297:8
299:10,22
302:24
**reactions**  111:12
289:6,12,17
**read**  14:24 15:3
15:5 59:16
62:19 66:25
69:5 85:4 97:10
101:22 109:7
110:22 113:12
128:19 134:23
134:24 135:12
136:21 139:10
139:11 147:13
147:14 163:4
171:13 199:22
256:23 260:20
262:23 264:21
309:8,9
**readily**  192:4,13
192:17

**reading**  71:4
75:6 160:8
295:7
**reads**  75:21
101:3
**ready**  83:12,14
190:4
**real**  36:13
142:22
**really**  90:22
121:9 128:19
135:25 136:18
138:14 152:3,5
152:16 166:3
181:14 183:17
187:14,18,23
190:19
**realtime**  256:25
311:4
**reap**  200:12
**rearview**  188:7
**reason**  12:22
21:21 57:5,9
67:22 68:6
85:20 110:17
119:18 158:8
180:5,5 216:15
271:18 294:21
310:7,10,12,14
310:16,18,20,22
**reasonable**  79:9
79:9 110:14
119:16 192:20
250:7
**reasonably**
104:12
**reasons**  48:11
93:13 94:5

134:17,20
303:22,23
**rebalance**
235:18
**rebalancing**
238:18
**recall**  14:9 16:16
17:21 22:15,23
40:7,10,13 41:25
42:10,12,13
45:24 51:2,9
53:14,20,24 58:7
58:8 61:24 62:9
62:13 63:19
65:24 70:10,18
70:20,21 71:10
71:16 73:3,4,14
84:24 85:18
93:3 125:24
126:4,18 128:8
130:10,12 133:2
133:3 139:4,5,22
143:10,20
147:19 150:22
150:25 153:7
154:5 159:21
195:16 211:22
222:20,22
227:15 228:14
231:2,6 243:20
260:18 273:17
274:21,22
276:11,15
**receives**  215:16
216:9
**recess**  55:20
101:12 148:14
213:22 258:22

307:11
**recognize**  57:24
83:10,17 86:14
86:15
**recollection**
14:13 22:22
31:2 61:21
177:18 264:16
**record**  8:5,12
9:11 12:2 15:21
18:15 26:25
55:18,22 69:6
70:3 101:10,14
138:11 139:9
148:12 149:5
213:20,24
258:20 259:2
274:14 285:6
296:15 297:6,15
300:22 307:9,13
308:2 310:7
**recorded**  8:14
**recording**  8:11
**red**  77:8,16
78:10
**refer**  61:5 66:18
67:2 169:21,23
235:6 272:23
**reference**  30:2
208:14
**referred**  67:4
74:19 109:23
155:13 173:22
173:24 214:6
217:23 218:7,9
277:9,25 290:7
**referring**  15:24
26:10 53:6

**[referring - remains]**                                                    Page 51

63:18,19 64:11
65:25 70:10
71:3 74:11
75:20 92:24
99:22,23 100:10
100:12,12
151:21 169:13
170:8 171:20
193:19 217:15
220:12 231:3
240:4 243:18
264:5
**refers** 67:6,7,12
**refinitiv** 202:22
**reflect** 162:10,24
163:9,11,12,13
163:20 164:4
174:17 175:2
208:4
**reflected** 115:2
117:5 119:13
**reflecting** 175:4
**reflective** 117:20
163:24
**regard** 22:7,13
22:14 25:21
**regarding** 53:18
91:20 116:16
259:11 260:15
**registered** 25:13
52:12 211:23
311:3
**registration**
52:15
**regression** 60:23
61:12 65:4
69:20 72:3,5,9
72:13,20 76:4

77:5,12,18 81:12
82:5 88:6 150:6
150:8 157:4,7,10
157:12,18
160:14 161:15
184:9,9 223:21
229:5
**regressions**
20:13,13,14
69:20 81:24
82:6,18,19,19
83:6,7 151:6
156:19,20,22
157:9,11,19
161:22 210:2
217:5,9
**regulatory** 33:3
37:25 102:6
**reinforces**
136:15
**reiser** 2:19 10:3
**related** 9:3 26:8
37:13 39:2 43:2
43:3,18 45:3
59:5 60:10 61:8
62:4 63:2 64:12
64:13 72:8 79:3
107:8 113:15
118:9 130:13,14
130:17,24 131:8
131:9 134:4
143:16 147:22
149:21,23
176:22 185:12
227:13 239:4,10
240:17 241:13
241:17 243:23
246:13 276:5,17

286:13 289:7,12
289:17,25 290:5
290:8 291:3
295:10 302:23
303:24 306:6
**relates** 26:5
28:15,22 29:9,15
41:12 89:24
108:9 109:16
111:5 117:2
119:20 135:18
145:17 147:8
184:23 185:13
186:20 230:2
237:24 242:13
242:21 295:3
297:12
**relating** 7:12
139:14
**relationship**
69:15 91:21
94:7,8 107:12,21
107:25 108:6
109:12 214:8,17
214:23 233:23
239:19 276:25
**relationships**
69:12 87:9,20
102:24 103:8
105:7 238:14
**relative** 230:21
301:6 311:11
**relatively** 192:21
193:6 215:14
216:7 237:8
278:2
**release** 255:6

**released** 102:2
171:23,24
244:15
**releases** 102:9
214:9,18,24
215:6,7
**releasing** 145:23
**relevance** 45:21
53:13,23 88:18
147:7
**relevant** 41:11
97:15 114:14
116:10 183:17
200:18 207:4
269:23 270:2
**reliability**
131:23 216:20
**reliable** 145:14
**reliably** 102:12
102:22 103:6
105:3,5,13
**reliance** 76:4
84:16 94:15
**relied** 83:5 145:7
146:14,17,25
151:7
**rely** 76:19,21
82:17 94:10,20
95:5,6 99:2
106:13 147:5
153:20 182:3,4
184:22 185:9
199:17
**relying** 62:24
84:19,19
**remains** 215:14
216:7

**[remember - rest]**

**remember** 51:7 58:14 67:20 71:2,8 72:6 77:13 83:20 106:7 117:15 131:5 139:6 140:8 142:7,12 147:9 152:15 171:13 211:24 222:23 223:14 229:23 276:18

**remind** 70:17,19 139:19 275:21

**remotely** 1:23 2:19,20 3:20 4:7 4:8 9:10 10:12 10:17 311:6,8

**removal** 289:19

**removed** 261:2 277:16 289:22

**renders** 134:15

**rep** 25:13 52:12 211:23

**rephrase** 60:7

**report** 5:13 13:5 13:9 14:12 15:22,25 16:9,13 17:12,16 18:3,24 19:6,23 20:5,7 21:12 22:19 26:21,22 27:9,12 27:16 28:5 29:5 29:13,21,24 30:9 30:15,17,22 31:4 31:7,14,20 82:14 97:22 103:15 115:7 122:16 123:8 124:18,22

124:25 125:13 125:19 129:18 130:2 143:12 146:18 147:2,9 153:11,12,14 154:10,15 159:6 159:15 161:23 162:4 166:21 169:10,16 178:7 189:12 190:14 205:5,18 223:12 238:5 240:25 255:22,24 259:6 265:17 270:3,21 271:5 272:11 273:2,5,9 274:3 276:19 281:2 284:4 295:19 298:6 305:11

**reported** 1:23 206:18

**reporter** 8:24 10:9,20,22 11:7 78:3,3 308:4,9 311:3,4,4

**reporter's** 311:1

**reports** 15:5 43:2 99:25 106:16 121:21 125:19 130:6 132:9 141:3,20 147:23 186:11 201:13,15,19,25 202:4,7,8,14 203:3,4,6,8,11 203:16,18,21 204:11,22 205:24 206:6

207:21 208:14 208:18 209:2,21 213:14 223:19 223:22 256:9,9 265:23 272:21 276:20 304:8,9

**represent** 110:16

**representations** 267:10

**represented** 262:17

**representing** 8:23

**represents** 288:24

**requests** 5:8

**require** 260:5 275:25

**required** 73:24 76:3,15 80:19 262:19 263:3 287:6 291:6 293:10 294:2,4 294:14

**requirements** 210:23 260:5,10 262:2,4 263:17 264:23 265:10

**reread** 268:22

**rereading** 113:13

**research** 113:3 168:7 171:10,11 171:15 176:19 176:22 177:5,8 187:18,19,22

**residual** 161:20 234:16,17 235:2

235:3,5 249:2 273:22,23

**residuals** 73:20 80:25 81:2 149:16 150:23 151:12 152:24 153:3 158:23 223:25

**resign** 48:6,8

**resigned** 47:25

**resolved** 273:13

**respect** 13:5,8 16:6 17:20 18:2 25:9,11 26:2 29:7,9 40:2 44:11 52:23 53:4 71:7 77:21 108:8 131:6 171:6 186:15 194:17 267:3 274:25

**responded** 177:19

**response** 51:17 91:19 92:2,16 93:2 107:3,5,16 107:25 108:5,23 110:9 111:25 114:14,17 115:4 116:9 120:2,19 151:15 171:16 214:10,18,25 215:8 238:20 299:11

**responses** 104:12

**rest** 152:6

**[restarted - right]**

**restarted** 124:8

**rested** 144:4

**result** 154:5
155:5 223:15
236:6

**results** 65:12
76:5,19,21 84:7
85:15 151:8
153:7 155:6
160:25 168:22
184:18 231:25
234:10 251:14
302:5

**resumed** 149:9

**retained** 13:2,4,5
14:11,16,22
20:18,23 122:6
123:8,16,20
124:4

**retention** 13:9

**return** 15:10
65:8 67:15 69:9
69:25 70:24
71:13,21 72:15
72:16 73:17
74:3,8 78:21
107:8,20 109:10
109:24 110:3
217:8 219:3
223:25 227:19
227:20,23 230:5
230:6 233:13
236:6 239:13
244:22 245:24
245:25 246:15
247:22 249:2,8
249:10,12,15
250:3,12 255:2,9

277:23 296:21
296:22 299:21

**returning** 22:16

**returns** 64:17,18
69:16 73:19
74:5,15 76:2,14
77:3,16 78:10
80:24 81:20
82:24 83:2
103:17 112:6
114:6 149:21,23
150:16 153:13
153:18 157:21
161:20,20
163:20 164:12
164:14 184:10
215:8 217:10
234:17,18 235:3
235:4,5,6 236:18
236:25 237:9,10
238:2 254:11
257:4,5

**reveal** 263:10

**revealed** 261:7
263:14

**revealing** 289:7
289:13,25 290:9

**reveals** 197:24

**revelation**
197:10,11
261:17 269:8
299:10

**revenue** 186:8
304:19

**revenues** 302:14

**reverse** 156:21
161:16

**review** 5:24 6:14
57:22 68:4,17
86:11 144:6
202:24 203:3,4,5
203:10 247:25

**reviewed** 16:13
16:13,14 22:18
22:19,20 27:9
56:23 58:5
68:15 83:16
113:2 129:17,25
144:8 147:17,24
148:3,6 203:13
262:24 273:6

**reviewing** 16:16
22:23 41:4 57:3
58:23 59:18
69:4 75:18
83:11 93:23
95:15 113:11
123:13,18
139:24 210:8
213:11 240:9
248:23 249:3
264:9,14 270:5

**revolution**
187:16

**reword** 234:5

**ribbon** 206:8
272:4 273:16
275:20 279:3,24
279:25 282:3
283:10 285:21
285:23 288:18
288:21,24
294:12,22
295:22 297:18
298:11,12 299:3

300:2,3 305:16

**ribbons** 275:23
276:4,6

**rich** 115:14,16
168:3 244:18,20
244:23

**richard** 37:11

**right** 10:23
30:20,23 31:14
32:9 42:14 44:8
44:15 45:14
46:19 49:10,11
54:2,14 55:6
56:16,20 58:21
60:20 61:20
62:2,14,18 64:19
65:8 68:6 74:20
78:11 79:15,23
79:24 87:14
92:16 101:7
106:6 109:14
116:11,18
118:18 121:17
122:2 132:3,6
133:9,14 138:6
138:11 139:2
141:15,16,16
143:24 146:14
148:9 152:11
154:2,20 157:14
157:16 159:21
162:15 164:17
165:2,20 168:2
169:8,22 176:13
177:11 188:13
189:7 190:7,21
193:11,25
195:25 197:18

**[right - search]** Page 54

197:21 201:3,5
201:17,21
202:18,20
204:17 210:10
212:11 218:5
219:20 225:3
226:21 235:5
245:5 246:10
250:12 251:12
258:5,16 269:10
270:3,17 280:5
295:17 297:21
298:18 303:14
305:17 306:23
**rigorous** 226:6
226:12
**ring** 62:12
**risk** 173:3 261:3
261:19
**risks** 261:5,11,16
261:20,22,24,25
**rmbs** 66:5 189:4
**rmr** 1:24 311:17
**role** 13:21 17:8
19:5,22 20:6
33:9,11 42:21
43:11 44:22
**rolling** 69:19
82:6 223:21
**room** 187:10,11
**rough** 122:20
308:5,9
**row** 44:15 185:4
245:17
**rozbruch** 4:14
9:18,18
**rule** 134:16
199:2

**rules** 11:23
144:2
**run** 36:14 66:12
72:4,5,9 79:8
161:22 184:8
219:10 223:20
227:4 254:18,21
300:8,10,17,18
**running** 20:12
20:14 57:12
210:2 227:5
**runs** 61:11 128:3
**ryder** 30:17,19
30:21 31:7,17,24
39:8 273:18,19
274:12

**s**

**s** 18:16 43:6 54:5
149:2,2,2 180:23
181:8 182:20
190:18,18
311:17
**s&p** 62:11
201:20 202:8,21
202:22 227:12
227:18,20,22
229:18 232:22
232:22 233:13
233:17
**sachs** 202:12
**sale** 268:9
270:11 286:5
293:22
**sales** 145:5,8
**sample** 102:22
103:6 105:3,5
109:4 120:10,11

121:5 167:21
169:6 196:10,13
250:5,7,9 254:20
254:22
**samples** 113:25
**san** 3:19 4:6
**sand's** 93:4
**sat** 49:2,5 190:10
**saw** 264:15
**saying** 45:16
60:13 87:16
90:6,8 94:19
95:8 100:6
103:24 106:8
110:22 111:11
114:2,16 115:3
152:15 167:22
179:22 183:4
192:7 211:7
226:8 247:21
248:4 266:13,15
295:13 305:21
305:23,23 306:4
**says** 35:8,12,13
38:6 59:2 74:25
87:6 88:16 94:2
95:12 97:12
98:3,23 107:3
127:10,17,25
128:20 129:14
129:15,23
131:13,14,22
132:16 133:14
136:2,17 140:25
142:19 143:24
162:7 168:17
206:16 212:25
218:10 267:17

271:15,15 279:5
279:6 290:23
292:16 301:19
302:3 303:19
**scale** 304:8
**scaled** 135:14
**scaling** 290:19
291:4,9,10,11,13
291:22 292:7,14
292:21,23
293:10,18,25
294:4,14 299:7
302:8 304:23
307:4
**scatterplots**
73:20
**scenario** 170:17
170:23,25
219:20
**school** 38:3 48:3
49:3,3,6 68:14
187:13
**scienter** 29:21
**scientific** 59:6,7
60:3,9,11 61:3,9
253:20
**scientifically**
144:5
**scope** 15:12,13
**scratch** 187:3,5
189:8
**screen** 35:3
**scroll** 256:24
**scrutiny** 84:7,14
**se** 151:25
**seabring** 146:3
**search** 193:22

**[season - sentence]** Page 55

| | | | |
|---|---|---|---|
| **season** 204:25 | 101:23 110:13 | 134:19 142:4,16 | **sellers** 2:10,16 |
| **seat** 212:4,7,19 | 118:10 122:21 | 144:11 162:13 | 9:25 211:14 |
| **sec** 181:6,9 | 122:23 125:20 | 168:23 169:17 | **selling** 36:25 |
| 230:18 231:2,6 | 129:8 132:23 | 171:9 173:16 | **seminar** 49:6 |
| 246:9,12 | 136:11 140:7,11 | 174:19 176:2,10 | 190:9 |
| **second** 40:21 | 142:24 143:14 | 192:16,23 | **seminars** 37:13 |
| 67:17 85:2 87:5 | 162:10,23 163:9 | 197:14 198:3 | **send** 308:12,14 |
| 87:6,7 90:21 | 164:4 191:19,22 | 200:15 211:3 | **sense** 60:19 63:3 |
| 93:14,19 94:9 | 196:20 199:7,16 | 212:24 213:8 | 89:17 118:5 |
| 109:18 129:13 | 199:21 206:18 | 214:11 215:18 | 178:13,16 180:3 |
| 129:13 140:24 | 220:4 274:23,25 | 218:19 222:9 | 183:9 186:2 |
| 141:6,8,10,14 | 275:17 279:8 | 233:19 238:21 | 188:8,21 191:7 |
| 171:24 172:8,11 | 309:1 310:4 | 239:5,7 243:10 | 221:12 229:18 |
| 172:20 218:2 | **security** 65:14 | 244:21 245:17 | 257:24 270:12 |
| 277:7 282:11 | 66:15 67:2,4,7,8 | 261:8 263:18 | 306:5 |
| 288:23 | 67:13 94:12 | 264:23 277:11 | **sensitive** 8:8 |
| **seconds** 258:12 | 97:16 100:3 | 278:3 282:18 | **sentence** 35:12 |
| **secret** 143:18 | 102:11 107:5 | 286:14 288:21 | 35:12 58:25 |
| 145:2 | 110:11 112:2 | 289:9 290:22 | 59:2,23,24 62:19 |
| **section** 62:4 | 124:19 136:10 | **seeing** 139:6 | 62:20 64:24 |
| 68:21,24 133:4 | 166:12 170:22 | 151:19 | 65:9,16 67:3,12 |
| 220:9 259:6 | 175:24 191:24 | **seek** 246:21 | 70:22 74:23,25 |
| 265:16,22 267:7 | 275:19 282:16 | **seeking** 136:23 | 75:10,12,20 85:3 |
| 267:23 271:5 | 282:21 | **seen** 35:5 36:20 | 85:11 96:11 |
| 272:10,13,15,17 | **see** 30:14 32:18 | 127:4 198:10,12 | 97:10,11,12 |
| 272:25 273:11 | 35:19 40:24 | 198:13 | 98:22 106:8 |
| 274:3 284:8 | 42:18 52:21 | **sekerke** 17:22 | 129:14,15 162:7 |
| 286:12 | 57:11 59:15 | 18:9,12,13,17,18 | 168:17 175:17 |
| **sector** 227:18,23 | 62:3 70:5 76:7 | **seldom** 172:12 | 200:5,7 210:18 |
| **secured** 133:20 | 84:10 85:10,11 | **select** 21:11 | 212:24 213:10 |
| 136:8 | 91:22 94:17 | 226:25 | 215:11 218:10 |
| **securities** 1:6 | 95:25 97:18 | **selected** 227:3 | 260:19 261:12 |
| 6:11,22 7:5 8:16 | 98:3,12,13 99:6 | **selection** 210:13 | 261:13 263:7 |
| 32:25 35:15 | 103:2 108:2 | **sell** 191:19,22 | 264:21 277:7 |
| 40:22 41:9 43:9 | 110:20 115:21 | 199:15,21 | 281:11,15,24 |
| 43:10 66:4,6,7 | 121:23 127:12 | **seller** 54:8 | 282:12 288:23 |
| 86:10 87:23 | 128:6,19 129:9 | 193:21,21 213:6 | 303:19 |
| 92:6 97:22 98:7 | 130:8 131:12,22 | | |

**[sentences - sizeable]**

| | | | |
|---|---|---|---|
| sentences 134:8 | 133:22 268:7,8 | sic 10:2 74:3,8 | significantly |
| sentiment 239:6 | 278:11 301:23 | side 124:12 | 221:7 |
| separate 36:9 | shareholder | 131:19 188:16 | similar 125:19 |
| 134:4 204:6 | 283:9 | 280:5,6 | 220:13 231:23 |
| 234:24,25 253:3 | shareholders | sided 36:2 | 300:7 |
| separately 204:4 | 230:20 | 209:18 | similarly 176:5 |
| separating 110:2 | shares 192:10 | sign 19:23 | simple 59:11 |
| september 75:24 | 193:15 278:11 | signature 309:20 | 110:16 |
| 76:12 | 278:12 | 310:25 | single 175:21 |
| serial 62:25 | shearman 3:11 | signed 44:13 | 176:20,24 |
| series 7:16 25:14 | 9:22 | 50:4 | 177:23 179:25 |
| 43:2 45:7 58:12 | sheet 309:14 | significance | 182:4 234:14,14 |
| 61:25 62:5 69:9 | 310:1 | 102:19 105:21 | 238:14 239:9,20 |
| 69:13,16 139:17 | sheets 304:18 | 106:3,5 153:10 | 247:4 275:18 |
| 147:21 168:21 | shelf 227:13 | 159:11,11,23,23 | sir 307:22 |
| 211:24 263:11 | 232:5,14,18 | 161:3 225:23 | sit 16:2 27:13 |
| serrano 17:22 | short 102:17 | 251:4 | 42:2 236:23 |
| 18:7 | 105:19 121:2 | significant 75:25 | sitting 41:15 |
| serve 118:6,11 | shorter 151:18 | 76:13 77:3,16 | 68:6 146:16 |
| service 123:15 | 151:21 | 78:10,21 103:16 | 180:4 262:19 |
| services 46:24 | shorthand 311:4 | 107:7,10,19 | 303:6,14 |
| 52:4 | show 55:11 | 109:10 153:23 | situation 119:20 |
| servicing 7:11 | 101:19 169:12 | 154:8 160:6,20 | 130:17 178:24 |
| 139:14 | 176:9,17 184:9 | 160:23 161:16 | 184:17 221:11 |
| set 21:13,14,18 | 184:12 204:9 | 163:20 164:12 | 241:12 299:19 |
| 21:20 217:4 | 234:12 256:7 | 164:14 184:10 | situations |
| 311:14 | 257:12,13,14,15 | 206:17 221:8 | 172:13 237:7 |
| sets 20:12 | 257:17 275:5,15 | 224:24 226:3 | six 87:3 125:7 |
| seven 103:15 | showed 151:13 | 234:23,24 | 130:6 |
| 106:14,20,21 | 303:21 | 235:12 236:18 | sixth 7:21 91:14 |
| 185:3 244:9,11 | showing 78:10 | 236:25 237:10 | 143:9 |
| 244:13,15 | 86:24 276:3 | 237:17 238:2 | sixty 75:3,23 |
| seyhun 57:23 | shown 188:24 | 239:14 244:22 | size 196:13 |
| 86:12 | shows 168:7 | 246:4,6 249:2,5 | 198:11 213:2 |
| shakes 11:25 | 256:2,13 | 249:7,10,15 | 250:7 270:25 |
| shape 275:10 | shrewsberry 4:3 | 250:3,12,16 | 271:16 |
| share 26:22 | shrewsbury | 251:7 255:2,9,19 | sizeable 156:12 |
| 34:21 129:7 | 10:18 | 257:4 | |

**[skeptical - squareds]**

skeptical  60:15
skepticism  60:4
  60:10
skill  21:13,14,18
  21:20
skills  20:2,2,3,3
skip  62:18 97:9
  97:11
skipping  134:7
sloan  3:16 10:14
slope  275:10
  278:19
slotkin  2:8 10:7
slowly  263:12,21
  263:22
small  46:19 85:8
  166:2
smaller  225:17
  225:19 226:22
smart  168:2
smile  194:3
socratic  190:12
sold  54:11
  232:23 278:12
  280:8 293:8
solely  106:13
solemnly  10:24
solve  35:17 78:2
  78:14 79:7,8
  81:3,5
solving  25:4
  36:24
sorry  19:14 28:3
  31:5,22 43:23
  70:18 73:10
  75:5 89:6 98:11
  141:5,13 143:6
  148:2 150:14

163:16 174:14
191:17 199:19
210:7,17 212:16
222:25 226:23
228:22 233:16
248:10 255:23
264:7 281:7
sort  14:17 23:24
  29:14 34:3,11
  36:8 38:6 39:11
  58:13,15 63:11
  67:17 72:23
  83:19 89:2
  103:22 124:20
  147:8 151:18
  152:19 156:17
  156:21,23
  166:24 172:7
  175:11 176:24
  177:5 178:19
  187:21 219:16
  231:24 232:6
sound  62:2
  122:2
sounds  196:18
  243:24
source  114:22
  168:3 202:9
  210:6
sources  87:3,5
  202:2,5 210:14
southern  1:2
  8:17
speak  92:20
speaking  78:4
  119:24
speaks  59:24
  260:11 265:6

specialist  211:11
specializes  32:23
specific  20:2
  38:18 41:10,14
  48:19 65:13
  77:12 82:22
  83:13 102:14
  105:15 111:25
  119:20 126:10
  133:12 156:17
  162:4 170:4
  172:15 180:20
  205:18 216:4
  220:2 228:2
  253:9 261:24
  266:20,24
  280:23 296:13
  297:2,14 298:10
  298:23 299:19
specifically
  37:10 39:13
  40:11,15 41:16
  58:12 70:22
  122:22 153:25
  155:17,25 156:8
  157:23 158:4,13
  158:20 221:23
  228:12 233:22
  295:4 303:16
specification
  69:21 87:21
  217:6,14
specifics  194:22
  206:4
specified  91:17
  91:25 92:24
  107:4

speculate  91:6
  189:15 285:5,10
speculation
  144:4 300:15
speculative
  145:10 188:2
speed  91:18
  92:16,25 107:2,5
  107:24 108:5
  110:9 112:8
  114:13,15 115:4
  116:9 120:2,19
spell  18:15 32:3
spend  189:18
spending  208:8
  208:16
spent  25:25
spills  110:6
spread  61:5
  176:23 193:14
  213:2 257:15
spreads  59:12
  166:7 193:6
  254:7
spreadsheet  20:2
spring  5:24
  57:22
square  63:7
squared  63:15
  63:22 73:19
  74:3,5,8 80:24
  81:19 83:2
  149:16 150:23
  152:23 153:3,18
  157:21 161:20
  223:25 227:6
squareds  63:23
  239:24

**[squawk - stock]**                                                    Page 58

squawk   192:15
stability   237:14
stable   215:14
  216:7 237:9
staff   13:12,16,20
  14:2 16:18,22,24
  17:24,25 19:11
  19:25 23:3
  153:22 229:25
stage   88:23 89:4
  89:7 90:3,9 91:2
  91:7,9 236:5
  241:4 262:9
  267:9,9,16
  268:16,25
  269:24 270:2
  274:20 275:24
  276:4,9 284:25
  305:10
stages   262:10,12
  262:13,17,20,25
  263:3
stamped   30:2
standard   92:9
  104:9 160:14
  221:25 224:20
  224:22 234:11
  240:22 242:5
  251:4,22 266:4
  268:5 272:19,22
  274:9 278:2,6
standpoint
  190:23
stanley   41:5
staple   244:6
start   11:23 18:12
  32:5,10,13 93:21
  129:20 134:25

152:11 166:12
178:16 184:4
214:5 223:22
266:16 286:25
287:5 288:11
290:12 291:9
294:16
started   134:24
  187:12
starting   70:6
  179:7 187:5
  287:14
starts   68:22
  75:10 87:6
  91:15 93:17
  127:16 200:6
  229:22 259:7
state   9:7,10
  29:13 42:17
  49:19,24 50:3,7
  50:12 68:15
  273:5 279:15
  311:5
stated   15:14
  81:24 162:18
  259:25 272:20
statement   27:21
  96:5 133:20,25
  134:6 137:19
  163:7 174:21
  176:16 197:19
  215:24 216:6
  257:21
statements   27:24
  89:10 90:13
states   1:1 37:22
  52:18 195:23

statistical   24:3
  24:15,25 28:23
  29:9 50:23
  62:23 63:13,17
  64:19,20 65:5
  76:3,15 87:7,18
  102:18 103:10
  103:18 104:19
  105:4,20 106:2,5
  106:22 114:7
  153:9 154:21
  161:2 163:18
  225:23 238:12
  239:18
statistically
  103:16 106:23
  153:23 154:8
  160:6,20,23
  161:16 163:19
  164:12,14
  184:10 221:8
  224:23 226:3
  235:11 236:18
  236:25 237:10
  237:17 239:14
  244:21 246:3,6
  249:2,4,7,10,15
  250:2,12,16
  251:7 255:2,9,19
  257:4
statistics   24:2,9
  24:23 25:22
  28:11,20 29:5
  51:15 209:25
stay   184:11
staying   200:11
stenographically
  1:23 311:8

step   174:23
  185:14,22,23
  254:10
sterling   3:11
  9:22
stock   5:22 15:15
  26:14 40:4 47:8
  47:9,11,13 54:18
  57:20 58:11,13
  58:16 61:19,25
  62:8,11 66:5,23
  69:10 85:22
  88:24 91:11
  96:15 104:23
  110:19,23 111:3
  111:9,13 112:12
  112:19 114:11
  114:18 116:15
  116:17 117:24
  118:12,14
  161:25 164:24
  168:19 173:7,10
  179:4,4,12
  181:15 182:10
  182:19 184:6
  187:2 189:10
  192:8 193:12,20
  194:4 195:11,15
  195:22 200:25
  206:19 212:5,7
  212:19 214:10
  214:19,25 215:8
  219:17 220:14
  229:7 234:7
  235:22 238:25
  242:10 252:15
  253:12 254:2,17
  258:6 260:7

261:2 277:2,18
282:15 284:20
289:2 291:2
295:9
**stock's** 215:13
216:6
**stocks** 168:9
210:25 211:8
237:8
**stop** 53:18
191:20 194:17
281:15
**stoppage** 195:4
199:7,8,13
**stories** 210:15
**stormy** 68:22
**straightforward**
278:2,5,15,16,22
278:25 279:10
280:11
**street** 2:11 3:5
3:18 4:5
**strengthen**
224:24
**stretch** 103:25
**strike** 5:6 129:14
150:14 225:10
**striking** 6:23
131:3
**strong** 183:22
**stronger** 161:4,4
**strongly** 104:22
114:10 161:24
181:21
**structure** 36:17
37:18 38:15,22
66:9,19,22
210:21

**struggling**
251:12
**studied** 39:12
**studies** 59:10
87:14 211:15
218:17 300:9,17
300:18
**study** 29:10
64:14 71:18
77:4 87:23,24
101:24 130:4
168:22 215:4
216:14,16 217:3
221:17 226:17
235:11 240:16
241:5 243:16
249:19,24
252:11,14,18
253:4,8 255:18
256:18 257:2,7
257:12 286:12
287:5,15,23,25
288:8,11 289:16
296:20 300:10
**studying** 191:4
**sub** 72:14 82:8,9
**subject** 15:19
144:6
**subjective** 104:7
115:25 242:3
**subjectivity**
244:4
**submit** 124:23
124:24 223:12
**submitted** 30:14
30:15,22 31:4,7
31:20 125:13,20
265:23 274:4,5

**submitting**
276:15
**subsection**
290:13
**subsequent**
31:20 95:22
96:17,23 224:10
224:15 225:5,12
**subset** 56:7
203:5
**substance**
309:13
**substantial**
46:22 166:6
**substantially**
274:8
**substituted**
258:23
**successful** 28:7
168:7
**successfully**
259:21
**sudden** 115:25
237:13 239:8
**sufficient** 102:17
105:19 181:25
182:7 187:2
257:14
**suggest** 40:21
61:14 77:8
78:12 95:2
150:2,18 214:22
246:19 287:13
288:2
**suggested** 68:10
76:2,14 85:21
97:14 205:19
211:17

**suggesting** 60:10
151:15 232:2,3
**suggestion** 232:9
**suggests** 77:4,6
114:17 144:18
200:9 207:15
254:8
**suisse** 40:22
41:25 43:4,9,21
44:2
**suite** 4:5
**sullivan** 3:4 9:13
124:10
**summary** 58:9
292:25
**sun** 208:23
**sunita** 17:22
**sunrise** 42:4,11
**superior** 220:20
222:2,5 227:6
229:13
**supervision**
17:13 19:8 20:4
**supply** 165:23
**support** 17:16
17:21 18:2
19:18 20:9,10,11
21:6 22:6 49:14
50:23 51:13,23
52:3 61:15
73:25 79:2
82:20 86:25
104:22 114:10
120:23 121:10
121:11 161:24
176:9,12,17
177:22 178:20
183:19,22

**[support - tell]** Page 60

252:19 253:2
256:4,11
**supported** 17:11
17:11 18:23
183:11
**supporting**
21:15 88:12
**supportive** 186:3
**supports** 181:21
182:9
**suppose** 162:22
**supposed** 140:16
**supreme** 128:4
**sure** 14:19 32:15
40:17 41:18
43:17 44:25
64:4 67:22
71:23 92:11
111:11 118:21
120:15 121:14
126:6,10 142:11
198:6,24 207:5
232:24 234:6
242:12 250:13
254:22 255:5,8
258:18 266:15
268:24 281:20
283:24 288:7
293:20,23
295:16 304:5
305:5
**surely** 196:17
**surfing** 34:4
**surprise** 265:21
**surprised** 193:14
265:24 274:8
**surrounding**
77:10 119:21

**sustained** 273:7
**swaine** 4:11 9:19
**swanson** 4:4
10:16
**swear** 10:9,20,24
274:7
**swift** 39:3
**switch** 221:7
**sworn** 11:11
311:7
**synonyms** 235:7
235:8
**system** 192:15
210:22 211:11
**systematic** 87:8
87:19 102:23
103:7 105:6
238:13 239:19
252:25
**systems** 7:20
30:21 143:8

**t**

**t** 17:2 149:2
**table** 217:4
232:20
**tables** 19:10
**take** 8:11 12:14
19:22 26:20
52:22 53:4
54:16 55:2,7,10
55:15 78:12,14
79:12 80:13
83:9 100:18
101:4,5,7 106:19
108:19,22
111:23 112:19
112:22 114:24

117:13 118:24
125:14 138:2,3,5
138:9,22 142:25
147:11 148:9
163:25 167:7,25
175:13 182:5
185:18 190:7
193:24 212:9
213:18 216:22
232:3 258:17
276:13,21
287:20 307:6
**taken** 8:15 31:5
36:14 55:20
65:4 101:12
135:13 145:24
145:25 148:14
213:22 231:20
231:21,22
258:22 307:11
311:8
**takes** 111:19
112:13 114:3,3
117:4 121:2,12
170:14,18,21
171:9
**talk** 88:15
106:12 138:10
138:14 201:4
214:3 217:19
259:6 295:5
**talked** 71:5
85:25 158:20
177:10 184:21
233:18 239:22
**talking** 21:8 72:3
72:4 87:13
106:9 111:7,8,15

114:18 123:2
128:24 154:10
154:14,19
155:13 159:5
160:7 169:18
178:15 193:9
195:2 253:4
293:15,23
297:25
**talks** 66:20
127:24 201:8,9
201:11,12,12
281:10
**targets** 205:2
**taught** 36:7
37:24 48:17,22
**teach** 48:14
**technical** 201:12
204:16 205:6,20
**technique** 69:22
135:15 142:13
280:12 293:24
**techniques**
280:12,23
290:14 299:8
**tedious** 32:7
**tell** 12:19 67:11
74:12,13 113:9
149:19,25 189:7
195:18,21
220:22,24
245:13 246:14
254:5,5,6,9,12
254:13 258:10
284:4 292:6
295:20 298:3,7
308:4

**[tells - throw]**

**tells** 149:20 181:4

**telser** 37:12

**template** 168:11

**tempting** 212:6

**ten** 85:18 101:2 183:19 198:15 198:17

**tendency** 236:10

**tenth** 40:24,24

**tenure** 48:4 191:3

**term** 78:11

**terms** 14:6,20 24:21 28:11 32:13 38:15 50:16 61:4 65:13 67:4,15 73:24 76:18 92:9 152:12 155:8,11 158:15 163:18 174:24 177:19,21 207:9 232:7 240:11,14 251:3 265:14 275:19 282:24 299:25

**tesla** 7:4 132:23 133:15,21,23,24 195:3,11,11

**test** 94:7 98:25 99:9,13 102:22 103:7,11,18,23 105:3,6 251:5

**tested** 144:6

**testified** 11:11 25:10,19 144:17 145:8 149:9

176:4 268:11

**testify** 26:2 38:21 135:16 137:14 144:19 145:18

**testifying** 19:19 20:5 23:22,25 24:7 38:20 51:5 51:8 124:6

**testimony** 11:2 12:24 22:17 26:19 42:25 115:9 124:18 144:16 147:18 147:24 148:4 149:15 173:24 205:17 226:10 292:25 303:24 304:4,25 305:18 306:5 307:2,24

**tests** 59:9 62:24 98:9 104:5 116:3 168:21

**texas** 311:20

**text** 58:25

**thank** 10:19 11:7 78:7 201:14 307:20,22

**theft** 143:18 145:2

**theory** 69:11 95:22 96:10 128:10,21,23 135:7 144:17 145:13,14,19 259:19,24

**thereof** 275:11 311:13

**thing** 54:15 93:2 119:11 155:22 166:25 190:19 247:9

**things** 36:22 64:25 65:25 67:17 85:25 108:11 154:14 155:4 167:7 174:22 243:5 280:25 284:19 306:20

**think** 13:12 14:7 15:8 16:15,17 24:18 27:14 29:6,7 30:16,19 31:5 34:2,15 36:23 41:15,22 45:15 49:15 56:3 58:10 59:24 61:7,17,22 65:7 67:19 76:16,20 82:10 84:13,22 85:25 88:6,15 89:12 90:5,6 91:2,8 92:21 97:8 98:17 99:19,19 100:25 101:2,17 112:3 123:23 124:20 134:22 135:12 137:9,15 140:4,5 141:22 142:6 148:2 152:3,8,13,19 163:4 164:3 169:18 173:23 174:8,10 175:6

177:22 180:2 181:14 187:11 187:25 188:6,20 190:18,22 200:6 202:11 203:20 206:22 207:24 209:6,7,8,12 222:17 223:9 228:19 230:16 232:20 233:20 240:6 248:22 251:19 253:17 253:21 264:16 269:22,22 270:20 275:23 279:7 290:18 291:22 295:6,25 296:3 300:24 303:6,13,15

**third** 14:14 62:20 129:15 175:17 281:10 282:12

**thought** 111:6 123:22 158:2 166:14 184:20 193:8 222:17 248:8 304:24 306:14,24

**thoughts** 58:19 175:2

**three** 25:25 95:4 114:3 134:8 240:3 262:13,20 263:24 264:4,6

**throw** 79:21,22 179:22 187:22 187:23

**[thursday - traps]**

| | | | |
|---|---|---|---|
| **thursday** 1:14 | **timely** 110:16 | **top** 35:9 58:21 | 100:3 110:23 |
| **tia** 128:25 | **times** 11:19 | 206:24 247:7 | 114:11 117:24 |
| **till** 255:13 | 12:17 23:7 | **topic** 268:17 | 182:10 195:23 |
| **time** 8:10 9:7 | 120:21 122:5 | 269:2,6,25 | 199:11 284:20 |
| 12:14 13:22,22 | 125:6,7 180:18 | 270:12 281:10 | **trading** 98:8 |
| 21:7 25:25 27:8 | 217:2 239:23 | 304:11 | 107:17 117:12 |
| 27:16 36:21 | 268:12 284:12 | **topics** 25:6 27:16 | 117:17,25 |
| 47:23 48:16,21 | 299:15 300:16 | 27:19 267:25 | 118:17 119:3 |
| 49:4 52:5 54:12 | **timothy** 3:16 | 270:25 304:9 | 162:10,23 163:9 |
| 55:18,22 58:5 | 10:14 | **torcio** 17:22 | 182:19 191:15 |
| 69:21 77:17 | **titled** 126:15 | 18:10,19 | 192:3,3,6,12,21 |
| 80:18 90:15 | **today** 9:25 12:24 | **total** 118:11 | 192:22 193:5,15 |
| 91:18,25 92:24 | 16:3 21:20 | 122:6 227:20 | 194:17 195:14 |
| 93:5 101:10,14 | 27:13 28:18 | 233:13 300:15 | 196:4 211:13,16 |
| 107:4,24 108:4 | 29:18 41:15 | **totally** 64:9 | 211:16 219:18 |
| 108:19 111:24 | 42:2 68:4,6 | 114:12 128:24 | 235:21 238:16 |
| 117:22 148:12 | 86:19 120:11 | 185:12 242:3 | 238:17,17 |
| 149:5 164:2,3 | 146:17 149:15 | 276:23 306:25 | **traditional** |
| 167:7 170:12 | 176:5 187:24 | **touched** 27:14 | 242:21 |
| 171:7,24 172:10 | 193:15 208:23 | 174:13 216:25 | **trained** 25:3 |
| 177:20 184:8 | 217:2 236:23 | 295:6 299:16 | **trans** 288:5 |
| 194:4,18 199:14 | 262:19 268:12 | **track** 48:4 191:3 | **transactions** |
| 208:16 213:20 | 303:6 | **trade** 36:16 | 193:22 |
| 213:24 236:11 | **told** 80:23 81:18 | 54:18 110:18 | **transcribed** |
| 238:15 239:5,20 | 138:12 153:23 | 117:18 119:18 | 311:9 |
| 244:5 252:16 | 161:7 169:4 | 143:18 195:4 | **transcript** 225:9 |
| 255:19 258:20 | 179:18 189:16 | 199:7,8 211:2,9 | 309:9 311:10 |
| 259:2 264:2 | 189:17 190:24 | **traded** 26:14 | **transcription** |
| 265:11,14 268:7 | 203:7 241:11 | 85:22 161:25 | 309:10 310:8 |
| 268:8 280:19 | 269:11 284:18 | 192:10 193:16 | **translate** 287:24 |
| 290:16 291:5,12 | 285:17 | 210:25 211:8 | **traps** 3:7 5:4 |
| 291:19,23 292:5 | **toll** 2:10,16 9:25 | 258:7 | 9:13,13 11:14,16 |
| 292:10,24 293:3 | **tom** 17:22 18:10 | **trader** 235:17 | 22:9,11,12 27:7 |
| 293:4,16 294:3,5 | **tool** 24:25 279:2 | **traders** 165:15 | 29:25 30:6,7 |
| 294:8 299:12 | 285:19 305:25 | 166:4 299:5 | 34:20,25 55:4,10 |
| 307:9,13,21 | **tools** 25:2 87:25 | **trades** 66:15 | 55:24,25 68:5 |
| 308:2 | 305:24 306:9 | 91:11 94:12 | 70:16 78:8 80:3 |
| | | 96:15 97:16 | 80:7 86:6 |

**[traps - understand]** Page 63

100:19,24 101:7
101:16 105:11
122:9 126:14
129:2,5 132:18
132:21 138:20
138:25 143:5
146:8,12 148:9
149:12 209:6,13
209:17,19
212:13,20
213:18 214:2
245:9 253:15
258:16 259:4
307:6,15,20
308:13,13
**treasurer** 54:13
**treat** 109:4
**treated** 178:11
280:4
**trial** 28:7 137:21
**tried** 302:24
**trier** 269:16
274:15,15
285:22 294:8,10
**triggering**
195:17
**trouble** 78:6
**truck** 39:8,8
**true** 18:9 47:2
60:5 221:15
270:8,22 272:17
273:8 282:15,20
287:20 298:17
311:10
**trust** 6:18 7:14
123:14 126:17
139:3,15

**trusts** 7:10
139:13
**truth** 11:4,5,5
197:11,25
299:11
**truthful** 12:23
133:20
**try** 32:7 108:10
161:12 178:24
185:25 186:4
229:10 232:6
257:21,22
**trying** 30:14
77:11,13 78:13
78:14 79:7,8
81:3,4 136:13
156:25 160:10
163:6 182:12,15
189:9 190:21
202:15 205:12
217:7 219:2
221:21 239:5
240:5 250:24
255:14 269:25
275:15 286:22
291:25 293:25
**tuesday** 197:11
**tune** 39:15
**turn** 29:23 54:23
58:20 68:18
127:6 175:14,21
209:23 217:16
218:2,4 255:23
256:7 260:20
269:14
**turnover** 60:20
61:4 111:3,4
176:22 254:6

255:25 256:3
257:14
**turns** 72:13
**tv** 232:21 239:5
**tweet** 136:7
**tweets** 134:2,3,5
134:10
**twenty** 75:3,23
**two** 21:11 30:18
31:13,23 34:8
36:2 41:12 69:8
69:14,23 70:23
71:11,19 73:15
79:11 80:12
85:13,21 93:13
94:5 95:2,4
103:20 108:11
108:16,22
110:15 114:4
115:24 119:2,4
120:21,24
123:23 138:20
138:21 146:7,8
173:14 174:22
176:12 183:20
196:22,24 197:2
197:5 202:2
209:18 226:14
226:20 229:7,12
231:13 234:8
252:2 283:7
284:19,21
306:19
**type** 14:20 45:11
67:18 78:15
102:14 103:21
105:15 110:10
115:20 150:11

167:12,17 184:9
186:4 205:25
235:22 286:11
305:24
**types** 37:17
78:15 101:25
103:25 104:2,6
108:17 113:7,10
113:14 120:9
166:15 167:11
167:20 279:22
302:15 303:10
**typically** 87:22

**u**

**u** 18:16 19:2
**u.s.** 247:14
**u.s.a.** 156:13
**uh** 98:10 121:24
130:9 164:18
174:20 200:8
252:10 287:12
291:24 302:18
**uncomfortable**
244:4
**underlying** 19:8
19:11 69:25
70:24 71:13,21
72:15,16 73:16
303:22
**undersigned**
311:3
**understand** 12:9
60:6 64:6 90:4
90:23 114:12,24
116:7,12,20,21
131:16,18 145:2
157:6 159:16

**[understand - video]** Page 64

| | | | |
|---|---|---|---|
| 175:20 178:10 181:13 182:12 182:15 188:17 190:21 202:15 216:23 221:21 224:6 228:3 231:14,18 234:3 234:4 240:11 251:13 255:15 260:8 261:10 263:20 269:13 269:23,25 279:14 291:25 293:14,25 297:23 298:8,9 306:25 | **universe** 187:4 **university** 37:8 37:25 38:11 48:2 49:2 68:13 187:15 **unmodified** 287:25 **unobserved** 238:6,10,23 **unqualified** 142:15 **unrelated** 128:24 132:11 166:22 291:4 295:10,15 | 244:6,6,7 252:20 279:2,22 287:11 288:8,10 289:16 289:20 293:19 299:19 301:4 302:8 306:9 **useful** 141:25 170:23 171:2 304:22 **uses** 28:22 303:11 **utilize** 45:17,19 227:7 285:20 299:23 | **values** 282:16 **variable** 76:18 77:7 150:5,5,8 **variables** 70:2 70:25 **variation** 63:9 63:25 149:20 150:15 **variety** 48:10 **various** 178:7 246:8,12 262:2 285:19 **vehicle** 273:23 **vehicles** 273:25 |

**understanding**
5:20 15:11 16:2
36:15 57:19
64:5 97:5
191:16,17
194:12 230:22
259:9,23 264:25
265:8,11 309:15
**understands**
36:17
**understood**
38:23 66:10
99:20 206:21
**unexpected**
214:8,17,24
215:5,16 216:9
**unfair** 135:2
**unhappy** 53:9,11
**unit** 8:13 134:3
**united** 1:1 37:22
195:23

**unreliable** 65:11
128:17 131:13
132:17 142:19
216:15,17,18,24
**unusual** 102:2
**updated** 33:18
**updates** 30:12
**upstream** 232:12
**upwards** 160:15
**usa** 7:20 43:10
143:8
**use** 20:16 34:14
46:20 84:8
104:9,16,18
120:10,13,18
124:10 154:21
161:13,13,15
170:5 189:11,12
204:21 218:17
219:16 225:9,13
232:11 234:14
234:15 235:9
240:20 242:6

**utilized** 94:6
115:11,11,17
154:23,25
226:15 267:8
268:4 269:17
271:20 282:9
283:12 284:8
287:3 292:7
295:23 302:20
304:7 305:25
**utilizes** 45:15
**utilizing** 285:18
289:16

| **v** |
|---|

**valid** 130:3
**validity** 137:16
144:25
**value** 173:10
213:4,7 246:5
249:12 273:22
273:23 282:21
287:20,21,21
292:18

**verbal** 11:24
16:17,21 23:3
**veritext** 4:18
8:23,25
**versa** 20:17
**version** 30:3
35:3 128:2
**versus** 42:5 43:9
68:22 99:16
111:9 123:19
143:7 153:3
157:21 161:12
238:2 295:14
302:5
**vetted** 232:16,19
232:23
**vi** 286:12
**vice** 20:17 145:5
145:7
**video** 8:10,14
55:18,22 101:10
101:14 148:12
149:5 213:20,24
258:20 259:2

**[video - wells]**

307:9,13 308:2
**videographer**
  4:18 8:4,24 10:8
  10:19 55:17,21
  101:9,13 148:11
  149:4 213:19,23
  258:19,25 307:8
  307:12,23
**videotaped** 1:10
**view** 6:4 80:5
  178:10,11
  179:10
**views** 134:12
**vii** 259:6 267:23
  271:5 272:10,13
  272:15,17,25
  273:11 274:3
**virginia** 5:23
  6:13 57:21
  86:10
**virtual** 266:4
  268:5 272:19,21
  274:9
**virtually** 230:12
  274:4
**visa** 39:22
**vix** 73:19 74:5,9
  74:16,17,18,19
  149:16 150:12
  150:23 152:24
  153:3,14,17
  155:22 157:21
**volatility** 74:5,18
  149:21,24 150:9
  150:16,20,21
  151:11 251:3
**volkswagen**
  274:22,24 275:9

**volume** 60:19
  63:6 176:22
  192:21 200:9
  254:5
**volumes** 59:11
**voluminous**
  210:14
**vote** 181:9
  200:21,21,22
**vs** 6:17 7:19
  126:16

### w

**w** 18:25
**wachovia** 7:13
  40:23 139:15
**wait** 31:2 75:5
  141:5 152:25
  264:7
**wake** 208:23
**walk** 299:17
**want** 28:10 29:7
  29:14 32:5,12
  34:4 36:22 55:2
  58:24 68:4 69:3
  85:5 100:17
  101:4 103:25
  104:18 106:17
  113:8,21 119:19
  136:21 137:23
  139:8,19 140:18
  150:4 159:2,16
  162:3 165:24
  174:25 181:21
  182:3 187:13
  223:22 228:22
  230:4,4 242:11
  255:12 256:16

257:21 274:7
285:5 294:6
297:21 303:17
**wanted** 35:11
  115:20 136:4
  165:17 242:3
  254:16
**washington** 2:18
  311:18
**washington's**
  246:22
**watch** 15:5
  192:15 232:21
**way** 31:6 41:6
  45:16 104:7
  116:4 120:18
  128:15 151:7
  156:18,19
  160:15 164:15
  167:17 187:14
  202:25 204:10
  207:7 215:2
  236:22 254:15
  273:3 300:3
**ways** 181:11
**we've** 100:23
  146:9 159:18
  212:10 305:8
**web** 5:18 34:2,4
  34:14
**website** 33:15
  34:11,13 35:4,10
**wednesday**
  197:25
**week** 49:6,11
  189:19 251:19
**weekly** 37:13
  204:22 205:24

**wei** 18:25
**weigh** 64:8,25
  178:21
**weighs** 184:2
**weight** 61:12
  99:4 181:22
**weighting** 230:3
**welcome** 55:24
  101:17 149:13
  214:3 259:5
**wells** 1:5 3:3
  8:16 9:14 14:18
  14:23 15:6,15,16
  26:14 40:4,7
  41:6 46:2,4,8
  47:13 64:15
  73:7,17 80:18
  81:5 103:14
  104:22,24
  105:24 111:6,8
  112:19 113:17
  114:10,18 115:4
  115:7 116:15,16
  117:2,24 118:12
  118:24 121:15
  132:12 135:20
  136:16 145:18
  148:4,7 161:25
  168:9,19 178:18
  179:3,4,11
  180:22 181:15
  182:2,10,19
  184:6 185:11,13
  186:20 187:2
  189:9 192:7,16
  193:8,10,24
  194:4 195:11,15
  195:22 197:7

**[wells - x]**

201:16 206:23 207:9,14,17 208:24 224:14 228:6,11 229:3,7 229:16,20,21 230:4,5,5,6,15 230:24 231:12 231:20 233:7,14 233:23 234:4,7 236:9 237:25 242:10,13 243:9 246:13,21 247:13 248:2 252:15 253:12 254:2,17 258:6 260:6 261:2 263:15 264:21 265:9 270:23 274:13 282:15 284:20 289:2 295:4 309:1 310:4

**went** 34:15 39:21 84:17 92:5 156:10 174:11 187:15 236:15

**wheel** 25:16,17 57:13

**wheels** 54:8,10

**whereof** 311:14

**whispering** 8:8

**white** 63:6 88:9 234:22

**wholly** 184:22 185:9

**wide** 15:19 26:17 94:14 194:8,9,14

195:3,9,13,18,20 195:25 196:5 198:16,25 226:23,24 259:16 266:19 266:23 267:6,20 268:19 269:4 270:17 271:19 272:19 273:16 274:17 277:8 280:2 282:8 284:6 286:3 287:10 288:17 292:11,19 293:5 294:13 295:22 297:19 298:12 299:4 300:4 305:16

**widely** 15:8 181:6 193:16,16 205:13 290:14

**widespread** 187:19 207:15 207:16

**willing** 213:5,7

**willy** 208:17

**wind** 271:3

**window** 110:15 115:17 157:15 218:14,14,15,15 218:22 219:12 219:17 220:4,5,6 220:17,18 221:22

**winter** 6:14 86:11

**wish** 102:12 105:13

**witness** 1:11 5:2 10:6,9,21 11:6 30:4 41:4 44:8 55:8,13,16 57:3 58:23 59:18 68:19 69:4 75:18 83:11 93:23 95:15 113:11 123:13 123:18 138:18 139:24 146:11 149:9 175:16 209:9,15 210:8 212:11,15 213:11 240:9 248:23 249:3 258:18 264:9,14 307:22 310:6 311:6,14

**wl** 139:3

**won** 174:7

**wondering** 29:3 60:14 284:14

**word** 34:10 84:15 137:10 138:13 147:12 263:20 287:11

**words** 134:9 135:5,5,23 264:20 278:13

**work** 13:11,16 14:2,4,8 16:7 18:23 19:11 20:17 21:3,6 22:6 37:17 38:9 42:11 43:19,24 44:5 49:8 125:25 126:5

132:2,5 220:4

**worked** 25:14 38:25

**workers** 246:21

**working** 21:25 22:2

**works** 20:20 240:15

**world** 36:13 41:9 164:9 198:3

**worries** 75:7 93:16

**worth** 156:12 171:12

**write** 126:9 189:16,17 208:22,24

**writes** 279:9

**writing** 17:11,16 18:3 20:3 147:2 187:3 189:8

**written** 57:22 64:23 68:11 143:12 190:14

**wrong** 76:5,24 93:15 106:16 142:6 163:5 182:13

**wrote** 83:19,23 83:25 86:15 97:3 124:21

**x**

**x** 1:7 5:1 25:20 25:20 172:15,15 276:11

**[y - zoom]**                                                          Page 67

| y | years   21:9 25:4 |
|---|---|
| **y**   30:20,21 | 25:25 39:16 |
| **yeah**   24:8 30:4 | 41:2 42:9 43:5 |
| 31:19 41:18 | 98:18 102:20 |
| 45:22 49:24 | 121:22 122:2,4 |
| 52:6 55:16 | 122:11 123:25 |
| 56:21 64:16 | 125:11,16 127:5 |
| 70:9 73:12 | 143:11 171:12 |
| 78:12,19 81:23 | 179:23 187:23 |
| 92:14,17 93:24 | 189:4 191:2 |
| 94:25 101:5,20 | 211:23 212:3 |
| 114:16 117:7 | 280:20 296:5 |
| 119:11 125:17 | **yesterday**   23:12 |
| 132:4 134:20 | **york**   1:2,18,18 |
| 142:5 150:10,10 | 2:6,6,12,12,17 |
| 152:8 153:4 | 3:6,6,13,13 4:13 |
| 154:3 158:2 | 4:13 8:18,21 |
| 162:19 164:23 | 49:19,24 50:3,8 |
| 165:5 168:16 | 50:12 212:4,7 |
| 169:9,20 170:9 | 311:5,22 |
| 173:2 189:15 | **young**   54:3 |
| 196:9 202:17 | 188:17 |
| 207:2 209:6,9,23 | z |
| 210:3,9,11 | **z**   17:2 62:2,5 |
| 211:15 213:12 | 69:9,13,16 |
| 213:12 217:22 | **zacks**   204:23 |
| 223:11 226:22 | **zero**   221:6 |
| 235:9 248:14,16 | 234:21 |
| 253:7,17 262:8 | **zoom**   10:2 |
| 265:6 266:13 | 307:23 |
| 269:6 280:13 | |
| 291:18 307:3 | |
| **year**   39:16 103:5 | |
| 116:15,21 117:5 | |
| 118:13,20,20 | |
| 146:21 152:6 | |
| 188:24 256:10 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.