# Exhibit 14

**Form ADV Part 2A**

## Pzena Investment Management, LLC

320 Park Avenue, 8th Floor
New York, New York 10022
(212) 355-1600
www.pzena.com

March 29, 2018

This brochure provides information about the qualifications and business practices of Pzena Investment Management, LLC. If you have any questions about the contents of this brochure, please contact us at (212) 355-1600 and berger@pzena.com. The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission or by any state securities authority.

Additional information about Pzena Investment Management, LLC also is available on the SEC's website at www.adviserinfo.sec.gov.

**Exhibit
Defs 0003**
PZENA

**SUMMARY OF MATERIAL CHANGES [Item 2]**

This Item is used to provide our clients with a summary of material changes to the Brochure.  We do not deem there to be any material changes in this Brochure dated March 29, 2018.

**TABLE OF CONTENTS** [Item 3]

|                                                                                          | Page |
|------------------------------------------------------------------------------------------|------|
| Advisory Business                                                                        | 1    |
| Fees and Compensation                                                                    | 2    |
| Performance-Based Fees and Side-by-Side Management                                        | 4    |
| Types of Clients                                                                         | 5    |
| Methods of Analysis, Investment Strategies and Risk of Loss                              | 5    |
| Disciplinary Information                                                                  | 12   |
| Other Financial Industry Activities and Affiliations                                     | 12   |
| Code of Ethics, Participation or Interest in Client Transactions and Personal Trading    | 12   |
| Brokerage Practices                                                                      | 14   |
| Review of Accounts                                                                       | 18   |
| Client Referrals and Other Compensation                                                  | 18   |
| Custody                                                                                  | 19   |
| Investment Discretion                                                                    | 19   |
| Voting Client Securities                                                                 | 19   |
| Financial Information                                                                    | 21   |

**ADVISORY BUSINESS [Item 4]**

**Principal Owners**

Founded in late 1995, Pzena Investment Management, LLC ("PIM") is a value-oriented investment management firm with a long-term record of investment excellence and exceptional client service. We believe that we have established a positive, team-oriented culture that enables us to attract and retain very qualified people.  Since our founding, we have built a diverse, global client base of respected and sophisticated institutional investors, high net worth individuals, mutual funds, private investment funds, and select third-party distributed mutual funds for which we act as sub-investment adviser.

PIM is principally owned by its Founder, Richard S. Pzena, who is currently PIM's CEO, Co-Chief Investment Officer and a Managing Principal. Pzena Investment Management, Inc., a NYSE-listed company, is the sole managing member of PIM, which is its operating company.

**Types of Advisory Services**

PIM manages investment portfolios for endowments, foundations, state and municipal government entities, partnerships, corporations, investment companies, public funds, pension trusts, profit-sharing plans, high net worth individuals, and pooled funds located in the United States and in select foreign jurisdictions.  PIM offers advice on equity securities, including exchange-listed securities, securities traded over-the-counter and foreign issues.

**Investment Restrictions**

Clients may impose guidelines and restrictions on their accounts, however, all client guidelines and/or restrictions are reviewed prior to investing a portfolio to be sure that there are no issues which will prohibit PIM from managing the portfolio according to our investment strategy.

**Assets Under Management**

PIM advised assets of approximately $38.5 billion as of December 31, 2017, consisting of approximately $37.7 billion of assets under management and approximately $850 million of other advised assets.

**FEES AND COMPENSATION [Item 5]**

**Fee Schedules**

PIM's investment management fees for separately managed accounts generally are charged quarterly.

PIM generally offers the following fifteen portfolio strategies:

1. Large Cap Focused Value
2. Focused Value
3. Small Cap Focused Value
4. Mid Cap Focused Value
5. U.S. Best Ideas
6. Long/Short Value
7. Global Focused Value
8. Emerging Markets Focused Value
9. International Focused Value
10. European Focused Value
11. Large Cap Value
12. Mid Cap Value
13. International Value
14. International Value All Country (Ex-U.S.)
15. Global Value

PIM's standard fee schedule is asset-based and, for all of its services except the Small Cap Focused Value service, U.S. Best Ideas service, and Long/Short Value service, includes breakpoints. PIM's current standard annual fee schedule for Large Cap Focused Value accounts ranges from 0.35% to 0.70% of managed assets. For Large Cap Focused Value accounts under the $10,000,000 minimum, the current standard annual fee is 1.0% of managed assets subject to a maximum annual fee of $70,000. PIM's current standard annual fee schedule for Focused Value accounts ranges from 0.50% to 1.0% of managed assets. For Focused Value accounts under the $10,000,000 minimum, the current standard annual fee is 1.5% of managed assets subject to a maximum annual fee of $100,000. PIM's current standard annual fee schedule for Small Cap Focused Value accounts is 1.0% of managed assets. For Small Cap Focused Value accounts under the $10,000,000 minimum, the current standard annual fee is 1.5% of managed assets subject to a maximum annual fee of $100,000. PIM's current standard annual fee schedule for Mid Cap Focused Value accounts ranges from 0.50% to 1.0% of managed assets. For Mid Cap Focused Value accounts under the $10,000,000 minimum, the current standard annual fee is 1.5% of managed assets subject to a maximum annual fee of $100,000. PIM's current standard annual fee schedule for U.S. Best Ideas accounts is 1.0% of managed assets. PIM's current standard annual fee schedule for Long/Short Value managed accounts is 1.5% of managed assets. PIM's current standard annual fee schedule for Global Focused Value managed accounts ranges from 0.55% to 1.0% of managed assets. PIM's current standard annual fee schedule for Emerging Markets Focused Value managed accounts ranges from 0.70% to

1.0% of managed assets. PIM's current standard annual fee schedule for International Focused Value managed accounts ranges from 0.50% to 0.75% of managed assets. PIM's current standard annual fee schedule for European Focused Value managed accounts ranges from 0.40% to 0.75% of managed assets. PIM's current standard annual fee schedule for Large Cap Value accounts ranges from 0.28% to 0.50% of managed assets. PIM's current standard annual fee schedule for Mid Cap Value accounts ranges from 0.40% to 0.50% of managed assets. PIM's current standard annual fee schedule for International Value managed accounts ranges from 0.35% to 0.55% of managed assets. PIM's current standard annual fee schedule for International Value All Country (ex-U.S.) managed accounts ranges from 0.50% to 0.60% of managed assets. PIM's current standard annual fee schedule for Global Value managed accounts ranges from 0.35% to 0.55% of managed assets. Generally, fees are not negotiable; however, individual portfolio considerations, investment size and timing of opening have caused PIM to negotiate different fee arrangements from time to time. The fees that are paid to PIM as sub-adviser to its mutual fund clients are set forth in each fund's registration statement.

In certain circumstances (depending on the size of the account and the terms of the fee schedule), PIM also manages accounts under performance-based fee arrangements in reliance upon Rule 205-3 under the Investment Advisers Act of 1940. Clients who are subject to performance fees will be qualified clients within the meaning of Rule 205-3. Under each of its existing performance-based fee arrangements, PIM receives a discounted annual asset-based advisory fee and, if the account outperforms a specified benchmark or index over a specified time period, an additional fee based upon a percentage of the outperformance is earned. Certain of such arrangements also include a specified annual maximum combined fee. These arrangements may result in a total annual fee that is higher than our standard annual asset-based fees.

Clients whose cash balances are invested in money market funds with their selected custodian should be aware that most money market funds assess a management fee as an expense to shareholders. Any such money market management fee would be in addition to the advisory fee payable to PIM on account of such assets.

PIM is adviser or sub-adviser to twenty-one mutual funds registered under the Investment Company Act of 1940. Under the advisory and sub-advisory contracts approved by the trustees and/or directors of each of these funds, PIM manages or advises on the investments of such funds; furnishes them with advice regarding the purchase and sale of portfolio securities; furnishes them with research, economic and statistical data in connection with fund investments and investment policies; submits reports relating to the valuation of fund securities; maintains certain books and records with respect to the fund's securities transactions; and either exercises or consults on the exercise of voting rights, subscription rights, rights to consent to corporate action and any other rights pertaining to fund assets. In exchange for these services, PIM receives an annual fee from the adviser to each fund (or from the fund directly) that is payable on an annualized basis and generally calculated as a percentage of the applicable fund's average net assets.

In addition, PIM manages (1) an open-ended investment company with variable capital incorporated in Ireland and established as an umbrella fund with segregated liability between sub-funds that is qualified as a UCITS; (2) a Delaware statutory trust; (3) two Illinois collective investment trusts; (4) an Illinois group trust; (5) a Delaware limited partnership; and (6) an Australian registered managed investment scheme. Please see the funds' or trusts' offering documents for information regarding management fees.

PIM also serves as investment manager for certain other privately-offered funds (including incubation vehicles) that are primarily offered to PIM and affiliated persons of PIM, such as PIM's owners, officers, employees, former employees, and affiliated persons and entities of the foregoing. Please see the funds' offering documents for information regarding management fees.

**Deduction of Fees**

Generally, PIM does not deduct fees from client assets.  However, in certain circumstances, we may do so when authorized.

**Other Fees and Expenses**

In addition to the management fee, clients may pay other fees and expenses in connection with PIM's advisory services.  Such expenses may relate to custodian fees or mutual fund expenses, brokerage and other transactions costs.  Clients are responsible for all other expenses. Please see the section entitled "Brokerage Practices" for further information.

**Prepaid Fees**

PIM does not require clients to prepay fees in advance; however, clients may do so if agreed in the relevant advisory contract.  When a client closes his, her, or its account, management fees are prorated to the termination date and the client receives a refund of the portion of any prepaid management fee that is not earned.

**PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT [Item 6]**

PIM recognizes that incentive compensation associated with performance-based fee arrangements creates the risk for potential conflicts of interest. A performance-based fee structure may create an inherent pressure to allocate investments having a greater potential for higher returns to accounts of those clients paying the higher performance fee.  To prevent conflicts of interest associated with managing accounts with different compensation structures, PIM generally requires portfolio decisions to be made on a strategy-specific basis. PIM also requires pre-allocation of all client orders based on specific fee-neutral criteria. Additionally, PIM requires average pricing of all aggregated orders. Finally, PIM has adopted a policy prohibiting portfolio managers (and all employees) from placing the investment interests of one client or a group of clients with the same investment objectives above the

investment interests of any other client or group of clients with the same or similar investment objectives.

## TYPES OF CLIENTS [Item 7]

PIM manages investment portfolios for endowments, foundations, state and municipal government entities, partnerships, corporations, investment companies, public funds, pension trusts, profit-sharing plans, high net worth individuals, and pooled funds located in the United States and in several foreign jurisdictions including, but not limited to, Canada, Australia, the United Kingdom, Luxembourg, and Ireland.

PIM typically imposes a $10,000,000 account opening minimum on all accounts but offers smaller accounts subject to available service capacity.   Depending on individual circumstances (including the size, portfolio service and opening date of the account), PIM may impose a different minimum on opening accounts, in its discretion.

## METHODS OF ANALYSIS, INVESTMENT STRATEGIES AND RISK OF LOSS [Item 8]

### General Description

PIM's investment decision-making is disciplined and systematic and based on comprehensive earnings forecasts and resulting company value as more particularly described below.

PIM's investment management activities are based on a classic value approach to investing, i.e., constructing portfolios of securities that are undervalued relative to their long-term earnings power.  PIM's decisions are largely driven by its own investment research findings as supplemented by research obtained from brokerage and other firms.

PIM's Portfolio Managers and in-house Research Analysts do fundamental market research and draw on diverse sources of information such as company reports, research from brokers or other investment managers, press releases, prospectuses, Securities and Exchange Commission filings, financial and trade newspapers and magazines, government and trade association data, scholarly journals, on-line quotation services and databases compiled by government agencies and others, and meetings with management, suppliers, clients, competitors, expert networks and industry consultants.

PIM follows a disciplined investment process to implement its classic value philosophy. First, we rank, from cheapest to most expensive on the basis of price-to-normalized earnings, the companies within the universe applicable to the portfolio strategy selected by the client. American and Global Depository Receipts (ADRs and GDRs) and U.S. traded foreign securities are included in all PIM universes.

The investment team then screens stocks that are among the most undervalued segment of the applicable universe.  Research priority is given to the cheapest stocks that also offer portfolio diversification benefits.    After completing our initial screening, we perform rigorous, in-depth analysis that often includes discussions with senior company management and/or on-site visits.  Once we are committed to engaging in a research project on a company, our analysts are asked to approach each situation with the following question in mind, *"would we buy the entire business at the current price?"*  We refine our earnings model, develop a final estimate of normalized earnings, and make a final investment decision.  At this stage of the process, normalized earnings is the earnings level we expect the company to be able to generate within the next five years given their industry position and our judgment as to management's ability to successfully implement their strategic plans.

PIM includes environmental, social, and governance ("ESG") factors in our research process.  During the first quarter of 2018, we became signatories to the Principles of Responsible Investing ("PRI") and further incorporated the PRI as guidelines for our ESG process.

PIM continually monitors and evaluates each position.  Once a stock is added to a portfolio, we assess each new piece of information with the question, *"did we get it right?"*   While the average holding period is approximately three to four years, the information available on a periodic basis gives us an ongoing scorecard to assess whether our expectations for a return to normal earnings are being met.  Our sell discipline is ultimately guided by the same ranking system with which we originally screened the universe.  We generally will sell a security when it reaches our estimate of fair value, there are more attractive opportunities, or there is a change in company fundamentals.   In this way, we can avoid emotional inputs, and focus on the pure valuation level of each company

If an account agreement permits, PIM may use margin for client tax planning, to cover client cash needs and for other purposes.   Whether or not an account agreement permits margin transactions is in the sole discretion of the client.  Typically, the use of margin is short-term or temporary in nature.

PIM generally offers fifteen portfolio strategies, as follows:

**Pzena Large Cap Focused Value Service**

This strategy reflects a portfolio composed of approximately 30-40 stocks drawn generally from a universe of 500 of the largest U.S. listed companies, based on market capitalization.

**Pzena Focused Value Service**

This strategy reflects a portfolio composed of approximately 30-40 stocks drawn generally from a universe of 1,000 of the largest U.S. listed companies, based on market capitalization.

**Pzena Small Cap Focused Value Service**

6

This strategy reflects a portfolio composed of approximately 40-50 stocks drawn generally from a universe of U.S. listed companies ranked from the 1,001st to 3,000th largest, based on market capitalization.

**Pzena Mid Cap Focused Value Service**

This strategy reflects a portfolio composed of approximately 30-40 stocks drawn generally from a universe of U.S. listed companies ranked from the 201st to 1,200th largest, based on market capitalization.

**Pzena U.S. Best Ideas Service**

This strategy reflects a portfolio composed of approximately 15-25 stocks drawn generally from a universe of 3,000 of the largest U.S. listed companies, based on market capitalization.

**Pzena Long/Short Value Service**

This strategy reflects a portfolio composed of approximately 50-90 long and 60-100 short stock positions drawn generally from a universe of 1,000 of the largest U.S. listed companies, based on market capitalization.

**Pzena Global Focused Value Service**

This strategy reflects a portfolio composed of approximately 40-60 stocks drawn generally from a universe of 2,000 of the largest companies across the world, based on market capitalization.

**Pzena Emerging Markets Focused Value Service**

This strategy reflects a portfolio composed of approximately 40-80 stocks drawn generally from a universe of 1,500 of the largest non-developed market companies, based on market capitalization.

**Pzena International Focused Value Service**

This strategy reflects a portfolio composed of approximately 30-50 stocks drawn generally from a universe of 1,500 of the largest companies across the world excluding the United States, based on market capitalization.

**Pzena European Focused Value Service**

This strategy reflects a portfolio composed of approximately 40-50 stocks drawn generally from a universe of 750 of the largest European companies, based on market capitalization.

**Pzena Large Cap Value Service**

This strategy reflects a portfolio composed of approximately 50-80 stocks drawn generally from a universe of 500 of the largest U.S. listed companies, based on market capitalization.

7

### Pzena Mid Cap Value Service

This strategy reflects a portfolio composed of approximately 50-80 stocks drawn generally from a universe of U.S. listed companies ranked from the 201st to 1,200th largest, based on market capitalization.

### Pzena International Value Service

This strategy reflects a portfolio composed of approximately 60-80 stocks drawn generally from a universe of 1,500 of the largest companies across the world excluding the United States, based on market capitalization.

### Pzena International Value All Country (ex-U.S.) Service

This strategy reflects a portfolio composed of approximately 60-80 stocks drawn generally from a universe of 1,500 of the largest companies across the world excluding the United States, based on market capitalization.

### Pzena Global Value Service

This strategy reflects a portfolio composed of approximately 60-95 stocks drawn generally from a universe of 2,000 of the largest companies across the world, based on market capitalization.

### Material Risks for Significant Investment Strategies

There can be no assurance that PIM will achieve its investment objective. PIM's assessment of the short-term or long-term prospects of investments may not prove accurate. No assurance can be given that any investment or trading strategy implemented by PIM on behalf of its clients will be successful and, because of the speculative nature of PIM's investment and trading strategy, there is a risk that investors may suffer a significant loss of their invested capital. The following list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in investing with PIM. Prospective clients should read PIM's ADV Part 1 & 2 and consult with their own advisers before engaging PIM. An investment with PIM should only be made as a supplement to an overall investment program and only by investors able to undertake the risks involved.

<u>Market Risk</u>. The possibility that PIM's investments in equity securities will lose value because of declines in the stock market, regardless of how well the companies in which PIM invests perform. This risk also includes the risk that the stock price of one or more of the companies in a client's portfolio will fall or fail to increase. A company's stock performance can be adversely affected by many factors, including general financial market conditions and specific factors related to a particular company or industry. This risk is generally increased for companies in developing markets, which tend to be more vulnerable to adverse developments.

<u>Value Investing Risk</u>. PIM generally invests in companies after they have experienced, or are expected by the market to soon experience, a shortfall in their historic earnings, due to

an adverse business development, management error, accounting scandal or other disruption, and before there is clear evidence of earnings recovery or business momentum. While investors are generally less willing to invest when companies lack earnings visibility, PIM's classic value investment approach seeks to capture the return that can be obtained by investing in a company before the market has confidence in its ability to achieve earnings recovery.  However, this investment approach entails the risk that the companies included in PIM's investments are not able to execute as PIM had expected when PIM originally invested in them, thereby reducing the performance of PIM's strategies.  In addition, during certain time periods, market dynamics may favor "growth" or "momentum" stocks.  Disciplined adherence to a "value" investment mandate during such periods can result in significant underperformance relative to overall market indices and other managed investments that pursue growth style investments and/or flexible equity style mandates.

Portfolio Turnover.  PIM has not placed any limit on the rate of portfolio turnover and portfolio securities may be sold without regard to the time they have been held when, in the opinion of PIM, investment considerations warrant such action.  A higher rate of portfolio turnover involves correspondingly greater expenses than a lower rate and may result in taxable costs for investors depending on the tax provisions applicable to such investors.

Investment Selection.  PIM may select investments in part on the basis of information and data filed by the issuers of such securities with various government regulators or made directly available to the PIM by the issuers of securities or through sources other than the issuers.  Although PIM will evaluate all such information and data and seeks independent corroboration when PIM considers it appropriate and when it is reasonably available, PIM will not be in a position to confirm the completeness, genuineness or accuracy of such information and data, and in some cases, complete and accurate information will not be readily available.

Concentration of Investments.  At times, if PIM invests up to the maximum permitted under its investment restrictions in the securities of single issuers and/or in economic sectors this concentration and lack of diversification relative to a client's portfolio could mean that a loss in any one such position or a downturn in a sector in which PIM is invested could materially reduce a portfolio's performance.  Thus, any substantial investment by PIM relative to overall assets in the securities of a single issuer or the concentration of PIM's investments in a particular industry may increase the level of risk.

Limited Capitalization Companies.  Where applicable, PIM may invest a significant portion of a portfolio's assets in company securities with limited market capitalizations. While PIM believes these companies often provide significant potential for appreciation, these securities involve higher risks in some respects than do investments in securities of large companies.  For example, prices of small-capitalization and even medium-capitalization securities are often more volatile than prices of large-capitalization securities.  The risk of bankruptcy or insolvency of many smaller capitalized companies (with the attendant losses to investors) is higher than for larger, "blue-chip" companies.  In

addition, since PIM's position in these investments are often substantial, even partial sales of a substantial position into the market may cause the market price of PIM's investment to decline and there is the risk that PIM may be unable to find willing purchasers for such investments when PIM decides to sell them.

Foreign Investment Risks Generally.  Investment in foreign issuers or securities principally traded overseas may involve certain special risks due to foreign economic, political, social and legal developments, including favorable or unfavorable changes in currency exchange rates, exchange control regulations (including currency blockage), expropriation of assets or nationalization, imposition of withholding taxes on dividend or interest payments, and possible difficulty in obtaining and enforcing judgments against foreign entities. Furthermore, issuers of foreign securities are subject to different, often less comprehensive accounting reporting and disclosure requirements than domestic issuers.  The securities of some foreign governments and companies and foreign securities markets are less liquid and at times more volatile than comparable U.S. securities and securities markets.  Foreign brokerage commissions and other fees are also generally higher than in the United States. The laws of some foreign countries may limit PIM's ability to invest in securities of certain issuers located in these foreign countries.  There are also special tax considerations that apply to securities of foreign issuers and securities principally traded overseas.  Investors should also be aware that under certain circumstances, markets that are perceived to have similar characteristics to troubled markets may be adversely affected whether or not similarities actually exist.  Since foreign securities often are purchased with and payable in currencies of foreign countries, the value of these assets as measured in U.S. dollars may be affected favorably or unfavorably by the changes in currency rates and exchange control regulations.   Some currency exchange costs may be incurred when PIM changes investments from one country to another.   Currency exchange rates may fluctuate significantly over short periods of time.  They generally are determined by the forces of supply and demand in the foreign markets and the relative merits of investments in different countries, actual or perceived changes in interest rates and other complex factors, as seen from an international perspective.   Currency exchange rates can also be affected unpredictably by intervention by U.S. or foreign governments or central banks (or the failure to intervene) or by currency controls or political developments in the United States or abroad.

Emerging Markets.  The risks of foreign investments described above apply to an even greater extent to investments in emerging markets.  Where applicable, PIM may seek to exploit inefficiencies in the less developed equity markets.  The economies of these markets may differ significantly from the economies of certain developed countries in such respects as GDP or GNP, rate of inflation, currency depreciation, capital reinvestment, resource self-sufficiency, structural unemployment and balance of payments position.  In particular, these economies may experience high levels of inflation.  In addition, such countries may have:  restrictive national policies that limit PIM's investment opportunities; limited information about their issuers; a general lack of uniform accounting, auditing and financial reporting standards, auditing practices and requirements compared to the standards of developed countries; less governmental supervision and regulation of business and industry practices, stock exchanges, brokers and listed companies; favorable economic

developments that may be slowed or reversed by unanticipated political or social events in such countries; or a lack of capital market structure or market-oriented economy. Systemic and market factors may affect the acquisition, payment for or ownership of investments including: (a) the prevalence of crime and corruption; (b) the inaccuracy or unreliability of business and financial information; (c) the instability or volatility of banking and financial systems, or the absence or inadequacy of an infrastructure to support such systems; (d) custody and settlement infrastructure of the market in which such investments are transacted and held; (e) the acts, omissions and operation of any securities depository; (f) the risk of the bankruptcy or insolvency of banking agents, counterparties to cash and securities transactions, registrars or transfer agents; and (g) the existence of market conditions which prevent the orderly execution of settlement of transactions or which affect the value of assets. Different clearance and settlement procedures may prevent PIM from making intended security purchases causing PIM to miss attractive investment opportunities and possibly resulting in either losses to or contract claims against PIM. The securities markets of many of the countries in which PIM may invest may also be smaller, less liquid, and subject to greater price volatility than in developed securities markets. PIM's securities may be denominated in a variety of currencies subject to changes in currency exchange rates and in exchange control regulations.

Political Considerations. Since PIM invests in both U.S. and non-U.S. markets, the companies that PIM invests in may be affected by domestic and international political, social and economic conditions, any of which could negatively impact PIM's investment performance. There may be, for example, risk of nationalization, sequestration of assets, expropriation or confiscatory taxation, currency blockage or repatriation, changes in government policies or regulations, political, religious or social instability or diplomatic or political developments and changes. Any one or more of these factors could adversely affect the economies and markets of such countries that in turn could affect the value of PIM's investments in their respective markets. Additionally, the political stability of some of the countries in which the less developed securities and/or derivatives markets operate could be even more volatile from that of certain developed countries and such risks may be heightened.

Liquidity Risk. Illiquidity in certain markets could make it difficult for PIM to liquidate positions on favorable terms, thereby resulting in losses.

Short Sales Risk. A short sale is the sale of a security which one does not own in anticipation of purchasing the same security in the future at a lower price to close the short position. A short sale will be successful if the price of the shorted security decreases. However, if the underlying security goes up in price during the period in which the short position is outstanding, investors in the Long/Short Value Service may realize a loss. The risk on a short sale is unlimited because the shorted security must be bought at the higher price to complete the transaction. Therefore, short sales may be subject to greater risks than investments in long positions.

Participatory Note Risk. Participatory Notes ("P-Notes") are a type of equity-linked derivative which generally are traded over-the-counter. Even though a P-Note is intended

11

to reflect the performance of the underlying equity security, the performance of a P-Note will not replicate exactly the performance of the issuers or markets that the P-Note seeks to replicate due to transaction costs and other expenses. Investments in P-Notes involve risks normally associated with a direct investment in the underlying securities. In addition, P-Notes are subject to counterparty risk, which is the risk that the broker-dealer or bank that issues the P-Notes will not fulfill its contractual obligation to complete the transaction.

## DISCIPLINARY INFORMATION [Item 9]

PIM has no disciplinary history to report.

## OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS [Item 10]

Pzena Financial Services, LLC ("PFS"), an affiliated entity of PIM under common control, is a broker/dealer registered with FINRA and SIPC. Certain employees of PIM are licensed registered representatives of PFS. PFS does not engage in the execution of securities transactions for PIM or any other entity; its activities are limited to marketing private funds and mutual funds managed or advised by PIM.

## CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING [Item 11]

PIM's members and employees may from time to time acquire or sell for their personal accounts securities that may also be purchased or sold for the accounts of PIM's clients. PIM has adopted a written Code of Business Conduct and Ethics designed to prevent and detect personal trading activities that may interfere or be in conflict with client interests or our current investment strategy. This Code of Business Conduct and Ethics generally requires that all transactions in securities by PIM's employees, their spouses and immediate family members who reside in the same household, whether or not such securities are purchased or sold on behalf of our clients, be cleared prior to execution by appropriate compliance personnel. Securities transactions for employees' personal accounts also are subject to monthly/quarterly reporting requirements, and quarterly and annual certification requirements.

In addition, the Code of Business Conduct and Ethics sets forth standards of business conduct that reflect PIM's fiduciary obligations and those of its supervised persons. The Code of Business Conduct and Ethics requires that PIM employees act with honesty and integrity, adhere to the highest ethical standards and comply with applicable federal securities laws. To that end, the Code of Business Conduct and Ethics contains a section entitled "Conflicts of Interest," which requires that employees avoid conflicts as well as situations that have the appearance of conflict or impropriety. Moreover, certain policies such as the Insider Trading policy, which forbids employees from trading, either personally or on behalf of others (including mutual funds and private accounts managed by any such

12

employees), on the basis of material non-public information and also from communicating material non-public information to others in violation of the law, are incorporated by reference into the Code of Business Conduct and Ethics. The Code of Business Conduct and Ethics also contains prohibitions and limitations, as well as reporting requirements, regarding the provision and receipt of gifts and entertainment by PIM personnel.

PIM's Code of Business Conduct and Ethics also requires that employees obtain written approval from the Chief Compliance Officer prior to serving (i) on the board of directors or trustees of a publicly-traded corporation or business entity; (ii) in any advisory committee positions for any business, government or charitable entity where the members of the committee have the ability or authority to affect or influence the selection of investment managers or the selection of the investment of the entity's operating, endowment, pension or other funds; or (iii) in any positions on the board of directors, trustees or any advisory committee of a PIM client or any potential client who is actively considering engaging PIM's investment advisory services. Employees are required to report any violations of the Code of Business Conduct and Ethics and of applicable federal securities laws and they are encouraged to consult the Chief Compliance Officer with respect to any transaction that may violate the Code of Business Conduct and Ethics. A copy of PIM's Code of Business Conduct and Ethics is available to clients and prospective clients on our website: www.pzena.com, or by writing to PIM at 320 Park Avenue, 8th Floor, New York, New York 10022 or to berger@pzena.com.

PIM has adopted written policies and procedures for the allocation and aggregation of trades of securities that include provisions to avoid trading actions by proprietary and affiliated accounts that could result in an unfair or improper disadvantage to other client accounts. PIM's policy is to allocate and execute transactions for all client accounts in a fair and equitable manner. These policies extend to clients that are affiliated and/or unaffiliated with PIM. A copy of PIM's current Trade Allocation and Aggregation policies is available to clients by writing to PIM at 320 Park Avenue, 8th Floor, New York, New York 10022 or to berger@pzena.com.

When securities are purchased or sold for any proprietary funds, those equity trades are subject to PIM's Trade Allocation and Aggregation policies and procedures. Such procedures are designed to ensure that no action taken by PIM or any of its principals, officers, employees, or affiliated entities would disadvantage its non-proprietary client accounts or advantage those proprietary accounts at the expense of such non-proprietary client accounts.

Except in limited circumstances, principal trades are not done by PIM or any related person. Some of the client accounts managed by PIM on a discretionary basis are accounts of employees and close relatives. Additionally, the members of the firm's Executive Committee have invested in their individual capacities in an unaffiliated private fund. Their participation is outside the scope of their employment by PIM and does not impact their business on behalf of PIM or its clients.

**Conflicts of Interest**

PIM and its affiliates may act as investment adviser or sub-adviser to a variety of mutual fund, separate account and hedge fund clients.  The activities and interests of the firm and its personnel include potential multiple advisory, transactional, financial and other interests in securities, instruments and companies that may be directly or indirectly purchased or sold by PIM and for client accounts.  Such activities and interests may give rise to potential conflicts of interest.  These include, among others, the following:

Firm personnel may have varying levels of economic and other interests in accounts or products promoted or managed by such personnel as compared to other accounts or products promoted or managed by them.  While the allocation of investment opportunities among the firm and the client accounts may raise potential conflicts because of financial or other interests of the firm or its personnel, PIM will not make allocation decisions solely based on such factors. PIM has a Trade Allocation and Aggregation policy that deals with these potential conflicts of interest. See "Brokerage Practices."

PIM will give advice to and make investment decisions for client accounts as it believes is consistent with appropriate treatment of the client accounts.  Advice given to one or more client accounts or investment decisions made for these accounts may differ from, and may conflict with, advice given or investment decisions made for the firm.  PIM manages all portfolios consistent with the respective investment strategy of each portfolio and takes into consideration any client specific guidelines or restrictions.  Due to the factors listed, as well as issues such as the opening date of a portfolio and account cash flows, all portfolios within a specific strategy may not reflect the same holdings.

## BROKERAGE PRACTICES [Item 12]

### Broker-Dealer Selection

In selecting broker-dealers, PIM will generally seek the best combination of net price and execution for client accounts and may consider other factors, including: the broker's trading expertise, stature in the industry, execution ability, facilities, clearing capabilities and financial services offered, long-term relations with our firm, reliability and financial responsibility, timing and size of order and execution, difficulty of execution, current market conditions and depth of the market.  In order to measure the effectiveness of our trading strategy, we compare our executions against data compiled by an independent trading analytics provider, for the day of the trade. This data is reviewed regularly by our Best Execution Committee to ensure that our trading strategy is working, and the brokers are providing the best possible executions.  PIM's experience in attempting to obtain best execution and in assessing it is further illustrated by the following:

PIM utilizes an analyst voting process to rate brokers and determine commission budget allocations.  Votes are taken quarterly by the firm's investment team.  Factors affecting such votes include the quality and quantity of research provided and assistance with access to management and management meetings.  In addition, on an ongoing basis, PIM's

Traders assess the execution capabilities of each broker who receives votes and budget allocations.  If execution issues arise with any broker, the Traders may put the broker on a watch list or a restricted list.   In other words, PIM generally considers the amount and nature of research, execution and other services provided by broker-dealers, as well as the extent to which such services are relied on, and attempts to allocate a portion of the brokerage business of its clients on the basis of that consideration.  PIM endeavors to allocate sufficient commissions to broker-dealers that have provided them with research to ensure continued receipt of research it believes is useful to its overall research process and thus to client portfolios in general.  Actual brokerage commissions received by a broker-dealer may be more or less than the suggested allocations.

Once orders have been generated, they are sent to our trading desk to be executed.  Orders are generally entered with strict trading limits.  These limits mean we are controlling price at the point of entry.   Limit order prices are reviewed daily by our Portfolio Managers and Research Analysts, and may be adjusted based upon current news or market conditions.  To the extent that price and spread are significant factors in a best execution analysis, PIM's limit order trading strategy removes the price component from the equation.

PIM generally routes the majority of its orders to brokers for execution electronically (either directly to a broker or through various ECN/matching networks). These services may provide low cost commissions as well as high quality executions and anonymity in the market.

As mentioned above, PIM has a Best Execution Committee that meets quarterly to review the trading budget (which is completed by PIM's investment team), as well as how our commission dollars were spent during the previous quarter.  Other responsibilities include:

*preparation of guidelines for selection and review of brokers and broker allocations;

*formulation and oversight of the firm's other brokerage and trade related policies, including the firm's Directed Brokerage & Soft Dollar; Principal, Agency & Cross Transactions; and Trade Allocation & Aggregation policies;

*evaluation of execution quality information, and implementation of appropriate changes in firm policy based on such information;

*periodic review of compensation paid to brokers over selected periods of time to determine if such compensation is reasonable in relation to the benefits received by PIM and its clients; and

* counterparty evaluation for foreign exchange and participatory notes.

From time to time, clients may ask PIM for feedback or suggestions with regard to the use of certain broker-dealers and/or custodians.  While PIM is never involved in the decision-making process with the client, we may offer some information based on our experiences

with certain firms and we may make introductions if requested.  PIM receives no economic benefit for any introduction it may make.

**Research and Other Soft Dollar Benefits**

PIM does not obligate itself to seek the lowest transaction charge in all cases, except to the extent that it contributes to the overall goal of obtaining the best results for the client. A higher transaction charge on exchange and over-the-counter trades may be considered reasonable in light of the value of the brokerage and research services provided. These services are of the type described in Section 28(e) of the Securities Exchange Act of 1934 ("Section 28(e)") and are designed to augment our internal research and investment-strategy capabilities.

PIM currently has soft dollar arrangements with brokerage firms that execute transactions on behalf of PIM's clients (the "Soft Dollar Brokers").  When PIM uses client brokerage commissions (or markups or markdowns) to obtain research or other products or services, PIM receives a benefit because it does not have to produce or pay for the research, products or services.  PIM seeks to control this process by limiting the services it pays for using soft dollars to those that fall squarely within the safe harbor of Section 28(e) as more particularly described below.

Pursuant to PIM's soft dollar arrangements, the Soft Dollar Brokers pay for research products and services (including statistical corporate data, real time and historical securities quotes, valuation services, text retrieval, pricing and analytical services, and company lawsuit and legal liability data and analysis).  The portion of such products and services that assist in the investment decision-making process and execution related products and services are paid for in soft dollars. The non-research portion is paid for by PIM in hard dollars.  If research products or services received by PIM have a mixed use, PIM will allocate in good faith the cost of such service or product accordingly.  Any such allocation may create a conflict of interest for PIM.

PIM maintains a soft dollar budget comprised of all accounts where PIM has trading and brokerage discretion.  In specific situations driven by regulation or governmental requirement, client-imposed restrictions may require PIM to remove accounts from the budget.  This budget will be updated to reflect new soft dollar arrangements after the approval process has been completed and the appropriate invoices and other documentation have been received.  PIM utilizes third-party software to assess the quality and value of research consumed in order to build and validate the overall budget.  The software also allows PIM to track soft dollar payments relative to budget expectations.  The estimated soft dollar budget will be set annually and reassessed quarterly by the firm's Best Execution Committee.

Soft dollar services may be used for any or all of PIM's clients' accounts and there may not be a direct correlation between the amount of brokerage commissions generated by a particular client and the indirect benefits received by the client.  Products and services received by PIM or its affiliates from brokers in connection with brokerage services

16

provided to certain client accounts may disproportionately benefit other client accounts based on the relative amounts of brokerage services provided to the client accounts, and PIM does not seek to allocate soft dollar benefits proportionately to the soft dollar credits the accounts generate.

PIM endeavors to continuously monitor commission rates and keep commission costs appropriate to relevant market standards.

**Aggregation of Trades**

PIM generally manages client accounts on a discretionary basis.  Thus, PIM has the authority and responsibility to formulate investment strategy on clients' behalf, including deciding what securities to buy and sell, when to buy and sell, and in what amounts, in accordance with the client's account objective. PIM also typically has discretionary authority to execute trades through its trading desk.

Securities traded for the Client accounts may, but are not required to, be aggregated with trades for other funds or accounts managed by the firm.  When transactions are aggregated but it is not possible to receive the same price or execution on the entire volume of securities purchased or sold, the various prices may be averaged, and the Client accounts will be charged or credited with the average price.  Thus, the effect of the aggregation may operate on some occasions to the disadvantage of the Client accounts.

All trade orders are allocated among managed account portfolios of the same or similar mandates at the time of trade creation / initial order preparation.  Depending on the nature of the trade, the order creation may be done in an automated fashion using PIM's portfolio management system (*e.g.*, if the trade is an increase or trim of an existing position) or manually by one of our Portfolio Management Administrators (*e.g.*, in connection with account level rebalancing or selling for taxable accounts where required to minimize taxes). Factors affecting order creation include availability of cash, existence of client-imposed trading restrictions or prohibitions, trading holds or halts imposed by a portfolio manager or a recognized exchange, and the tax status of the account.   We may bunch or aggregate like orders or free business trades, but allocation is determined before any order is given to a broker.

Generally, brokers are selected and orders are entered with strict trading limits.  Orders may be sent to multiple brokers, and as a result prices may vary for clients depending upon the execution prices at each broker.  Prices for trades executed at different times on orders sent to one broker are averaged.  When we have a large trade pending in the same security that cannot be entered as one block trade based on client directed brokerage, we rotate the sequence in which the order is entered.  If we receive partial executions of any block trade, the portion executed is generally allocated on a pro-rata basis; however, we may allocate a partially executed order differently in order to prevent a client from paying minimum ticket charges and being subject to higher total commission charges.  Client directed brokerage may prevent certain orders from being aggregated with orders for other managed accounts

17

resulting in different prices and commission rates than other client orders for the same security.

## REVIEW OF ACCOUNTS [Item 13]

### Review of Accounts

Security Selection Review: Prior to purchase or sale, each security is reviewed by one or more of the following individuals, as applicable: Richard S. Pzena (PIM's Chief Executive Officer and Co-Chief Investment Officer); John P. Goetz (PIM's Managing Principal and Co-Chief Investment Officer); Manoj Tandon (Principal and Director of Research); and applicable in-house Portfolio Managers and Research Analysts.

Trading Review:   Every morning, all pending trades are reviewed by a combination of the above-mentioned individuals, and PIM's Research Analysts, Traders and Portfolio Management Administrators.  Strategic limits are set for that day's trading, and any items that may impact any security with a pending trade are discussed.

Account Review:   At regularly held portfolio review meetings, all Portfolio Managers, Research Analysts and Portfolio Management Administrators review the current investment strategy, and current holdings in each portfolio.  Issues such as turnover, security weighting and sector weighting are all reviewed to be sure we are following both firm and client guidelines.  Model changes, priority buys, sells and trims are set at these meetings.   Our Portfolio Management Administrators review and rebalance accounts periodically or as required by account or trading activity under the guidance of our Chief Executive Officer, Portfolio Managers and Co-Chief Investment Officer.

### Client Reports

Quarterly Investment Management Reports: After the close of each full quarter, clients receive a written report of the valuation of each of the securities in their account (average cost, current market value, yield, and estimated annual income), the asset allocation in the account and PIM's investment strategy and market outlook. The report also includes performance data for the quarter and other relevant points in time.

## CLIENT REFERRALS AND OTHER COMPENSATION [Item 14]

PIM does not currently engage in written referral agreements. PIM previously entered into a written referral agreement with an unaffiliated entity, for which cash payments continue to be made.  Cash fees paid to the entity are based solely on a percentage of revenues collected. Officers, employees and members of PIM may make client referrals and may benefit from such referrals. There is no additional fee to clients as a result of any of these referral arrangements.

18

**CUSTODY [Item 15]**

Where PIM has constructive custody of certain client funds, a qualified custodian sends quarterly account statements which those clients should carefully review. PIM also sends account statements to clients; clients are urged to compare the account statements from the qualified custodian with those received from PIM.

**INVESTMENT DISCRETION [Item 16]**

Accounts are generally managed on a discretionary basis pursuant to a grant of authority in the advisory agreement. Pursuant to this authority, PIM has the authority and responsibility to formulate investment strategy on behalf of clients, including deciding which securities to buy and sell, when to buy and sell, and in what amounts, in accordance with agreed-upon objectives. Each account is separately maintained consistent with PIM's investment approach and the client's investment goals. Clients may impose reasonable restrictions on the management of their accounts, subject to PIM's acceptance of these restrictions.

**VOTING CLIENT SECURITIES [Item 17]**

PIM's proxy voting process is the same for all client accounts managed by PIM where the client has given PIM the proxy voting authority. Each proxy that is to be voted by PIM is evaluated on the basis of what is in the best interests of the shareholder and shareholder value. Where applicable, PIM also will consider any specific guidelines designated in writing by a client. Pending votes and proxies are forwarded to the Research Analyst who is responsible for the company soliciting the proxy. The Research Analyst will then make his/her voting decision with respect to the proposals in the proxy. If such Research Analyst also beneficially owns shares of the company in his/her personal trading accounts, the Research Analyst must complete a special "Disclosure of Personal Holdings Form," and the Director of Research must sign off on the Research Analyst's votes for that company.

In evaluating proxy issues, PIM has engaged an outside vendor, Institutional Shareholder Services ("ISS"), to identify and flag factual issues of relevance and importance. We also will use information gathered as a result of the in-depth research and ongoing company analyses performed by our investment team in making buy, sell and hold decisions for our client portfolios. This process includes periodic meetings with senior management of portfolio companies. PIM may also consider information from other sources, including the management of a company presenting a proposal, shareholder groups, and other independent proxy research services. Unless a particular proposal or the particular circumstances of a company suggest otherwise, proposals regarding the following issues

19

generally shall be voted in accordance with written voting guidelines that have been formulated by PIM's Proxy Voting Committee: election of directors; make-up of audit, nomination and compensation committees; separation of Chairman and Chief Executive Officer positions; appointment of auditors; employee incentive programs; financings; acquisitions; stock splits; increases in shares of capital stock; social issues; anti-takeover measures; classified boards; director or auditor conflicts; changes in shareholders' rights; super majority votes for business combinations; and open-ended "other business" questions.  The Proxy Voting Committee consists of PIM's Director of Research, its Chief Compliance Officer and at least one Portfolio Manager.  The guidelines are reviewed and changed periodically in light of trends and developments in corporate governance.

If a Research Analyst desires to vote contrary to PIM's written voting guidelines on a particular issue, the Chief Investment Officers and/or Director of Research will determine how to vote based on the Research Analyst's recommendation and the long-term impact such vote will have on securities held in the applicable client accounts.

PIM subscribes to a proxy monitor and voting agent service offered by ISS.  Under the written agreement between ISS and PIM, ISS provides a proxy analysis with research and a vote recommendation for each shareholder meeting of the companies in our client portfolios.  They also vote, record and generate a voting activity report for our clients.  PIM retains responsibility for instructing ISS how to vote, and we still apply our own proxy voting guidelines when voting as described above.  Proxies for securities on loan through securities lending programs will generally not be voted, as PIM's clients (not PIM) control these securities lending decisions.

Where a new client has funded its account by delivering a portfolio of securities for PIM to liquidate and the record date to vote a proxy for one of those securities falls on a day when we are temporarily holding the position (because we are still executing or waiting for settlement), we will vote the shares.  For these votes only, we will defer to ISS's recommendations, since we may not have first-hand knowledge of the companies and cannot devote research time to them.

PIM's proxy voting policies and procedures also set forth our policies and procedures relating to the monitoring of corporate actions, and the detection and resolution of conflicts of interest with respect to proxies of portfolio companies.  With respect to corporate actions, PIM's policy is to work with the clients' custodians regarding pending corporate actions.

PIM's proxy voting policy specifically states that PIM shall not have any responsibility to initiate, consider or participate in any bankruptcy, class action or other litigation against or involving any issue of securities held in or formerly held in a client account or to advise or take any action on behalf of a client or former client with respect to any such actions or litigation.

With respect to conflicts, PIM has identified the following areas with potential conflicts of interest:

*Where PIM manages assets affiliated with a publicly traded company, and also holds that company's or an affiliated company's securities in one or more client portfolios.

*Where PIM manages the assets of a proponent of a shareholder proposal for a company whose securities are in one or more client portfolios.

*Where PIM has a client relationship with an individual who is a corporate director, or a candidate for a corporate directorship of a public company whose securities are in one or more client portfolios.

*Where a PIM officer, director or employee, or an immediate family member thereof is a corporate director, or a candidate for a corporate directorship of a public company whose securities are in one or more client portfolios.  For purposes hereof, an immediate family member shall be a spouse, child, parent, or sibling.

Our proxy voting policies provide for various methods of dealing with these and any other conflict scenarios subsequently identified by us, including notifying clients and seeking their consent or instructions on how to vote, and deferring to the recommendation of ISS where a conflict exists.

Clients may obtain a copy of PIM's current written proxy voting policies and procedures and/or a copy of the voting activity report generated by ISS for their account, by calling Joan Berger at (212) 355-1600, or writing to her at Pzena Investment Management, LLC, 320 Park Avenue, 8th Floor, New York, New York, 10022, or at berger@pzena.com.


**FINANCIAL INFORMATION [Item 18]**

PIM does not require or solicit prepayment of more than $1,200 in fees per client six months or more in advance and, thus, has not included a balance sheet of its most recent fiscal year.  PIM is not aware of any financial condition that is reasonably likely to impair its ability meet its contractual commitments to clients, nor has PIM been the subject of a bankruptcy petition at any time during the past ten years.