# Exhibit E

**UNITED STATES DISTR¶ICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY SECURITIES LITIGATION | Case No. 1:20-CV-04494-GHW-SN |

**DECLARATION OF MICHAEL L. HARTZMARK, PH.D. REGARDING THE CALCULATION OF ARTIFICIAL INFLATION AND DAMAGES FOR THE PLAN OF ALLOCATION**

I, Michael L. Hartzmark, declare as follows:

## I.    INTRODUCTION

1.    I am President of Hartzmark Economics Litigation Practice, LLC and prior to this I was a Principal and Director at Navigant Economics (formerly dba Chicago Partners, LLC, a subsidiary of Navigant Consulting, Inc.).  Both firms specialize in the application of economics and finance to legal, commercial, and regulatory issues, including issues such as those addressed in this Declaration.  I also was engaged as an independent contractor by the Office of the Attorney General of the State of New Jersey and by the Office of the Attorney General of the State of New York.

2.    I have served as a testifying and consulting expert in numerous securities class actions.  In addition, I have published scholarly articles on a multitude of issues in financial economics including those associated with securities class actions, including the topic of market efficiency.  I have spent much of my time as an economic consultant evaluating issues related to market efficiency, including its relation to the certification of securities class actions.  My primary focus has been on securities such as common stock, corporate bonds, Treasury and energy futures, swaps, swaptions and options, and asset-backed securities.  My expert reports, which included the topics of market efficiency and common damages methodology, have been cited with approval by the respective courts in *N.J. Carpenters Health Fund v. Royal Bank of Scotland Group PLC*, *Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al.*, *Christakis Vrakas, et al. v. U.S. Steel Corp., et al.*, *In re Signet Jewelers Limited Securities Litigation*, *West Palm Beach Police Pension Fund, et al. v. DFC Global Corp., et al.*, *In re Cobalt International Energy, Inc. Securities Litigation*, and *William D. Wallace, et al. v. IntraLinks Holdings, Inc., et al*.  I also wrote a series of reports cited in the district court's opinion granting class certification of DVI common stock

and corporate bonds in *In re DVI, Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008), which was affirmed by the Third Circuit in *In re DVI, Inc. Securities Litigation*, 639 F.3d 623 (3d Cir. 2011). I have also co-authored three law review publications discussing the commonly used empirical tests applicable to securities class actions.[1]

3.      I earned my B.A. in economics from The University of Michigan and my M.A. and Ph.D. in economics from The University of Chicago. I have taught economics and financial economics in the Department of Economics at The University of Chicago and jointly in the Michigan Business School (now the Ross School of Business) and the Department of Economics at the University of Michigan.

4.      At the University of Michigan, I created and taught courses on financial and commodity futures markets. While an Assistant Professor at the University of Michigan, I received a research grant from the University of Chicago Center for the Study of Futures Prices, as well as the John M. Olin Faculty Fellowship to further my research in financial markets. In addition, I published articles in peer-reviewed journals related to financial markets. Prior to my tenure track appointment at the University of Michigan, I was employed as a Financial Economist at the Commodity Futures Trading Commission, Division of Economics and Education.

5.      I have been a holder of the Series 7 and 63 registered representative licenses and have served as a Financial Advisor at Fahnestock & Co., Inc. (now Oppenheimer & Co., Inc.). I

---

[1] Michael L. Hartzmark, Cindy A. Schipani, H. Nejat Seyhun, *Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market*, 2011 Colum. Bus. L. Rev., 654-716 (2011); Michael L. Hartzmark, H. Nejat Seyhun, *The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, 6 Va. L. & Bus. Rev., 415-66 (Winter 2012); Michael L. Hartzmark, H. Nejat Seyhun, *Understanding the Efficiency of the Market for Preferred Stock*, 8 Va. L. & Bus. Rev., 149-230 (Spring 2014).

was also founder and President of DARMA, LLC, a wealth and asset advisory company affiliated with Oppenheimer & Co., Inc.

6.      My qualifications, publications, and expert engagements are summarized in detail in my *curriculum vitae*, which is attached to this report as **Appendix A**.  Hartzmark Economics Litigation Practice, LLC is being compensated at my standard rate of $825 per hour for my work in this matter.  Personnel working under my direction are being billed at hourly rates between $190 to $375 in this matter.  My compensation is not dependent on my opinions expressed in this Declaration or the outcome of this matter.

7.      I was retained by counsel for Lead Plaintiffs to determine whether the common stock of Wells Fargo & Company ("Wells Fargo") traded in an open, well-developed and efficient market during the period of May 31, 2018 through March 12, 2020.  In addition, I was asked to opine on whether the calculation of damages on a class-wide basis is subject to a common methodology for all class members in connection with their claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, "Section 10(b)").[2]

8.      After the Parties reached the proposed Settlement, I then was asked by Lead Counsel to assist with the design of the plan to allocate the settlement proceeds (the "Plan of Allocation" or "Plan") among Settlement Class Members who submit valid Proof of Claim Forms that are approved for payment by the Court ("Authorized Claimants").

---

[2] Expert Report of Michael L. Hartzmark, October 3, 2022 (the "Hartzmark Report").  I was also asked to review and respond to the Expert Report of Rene M. Stulz, Ph.D. submitted on December 23, 2022 (the "Stulz Report"), but it is my understanding the proposed Settlement was reached prior to the filing of any responses.

9.      For this Declaration, I have been asked by Lead Counsel to describe and explain the method used for calculating estimated artificial inflation, and to provide details of the calculation of Recognized Loss Amounts and Recognized Claims in the Plan.  In Section II, below, I describe and explain the methods used for calculating the inputs to the formulas in the Plan of Allocation.  In Section III, I describe the calculation of Recognized Loss Amounts using the formulas in the Plan of Allocation and explain how a Claimant's recovery will be calculated on a *pro rata* basis.

## II.    METHOD USED FOR CALCULATING ESTIMATED ARTIFICIAL INFLATION PER SHARE OVER TIME AND THE 90-DAY LOOK-BACK PRICE

10.      Based on my extensive experience calculating damages in securities class actions, it is my understanding that, for losses to be compensable damages under the federal securities laws, the disclosure of the allegedly misrepresented or concealed information must cause all or a portion of the observed decline in the price of the relevant security.  In this matter, Lead Plaintiffs claim that the relevant truth of Defendants' alleged misconduct was revealed to the market through multiple corrective disclosures described in the Complaint, when information revealed the alleged previously misrepresented and concealed information.[3]

11.      Damages under Section 10(b) are generally calculated based on an "out-of-pocket" measure.  Damages are generally calculated as the artificial inflation present in the security's price on the date of purchase, less the artificial inflation in the security's price on the date of sale, subject to certain legal limitations.[4]  Therefore, in order to calculate Recognized Loss Amounts, the Plan

---

[3] Complaint, ¶¶ 237-63.

[4] Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff may not recover more than the difference between the purchase price and the mean trading price of the

requires two inputs in addition to a Claimant's transaction data: (i) the daily artificial inflation per share during the Class Period;[5] and (ii) the rolling average closing prices for the PSLRA's 90-day look-back period.

12. For the purposes of the Plan, the calculation of daily artificial inflation began with adjustment of the observed price decline in Wells Fargo's common stock on the alleged corrective disclosure dates. This measurement for each of the alleged corrective disclosure dates was based on an event study analysis, which is the same event study contained in the Hartzmark Report and described in Appendix D therein. In conducting the event study, I performed a regression analysis, which predicted a return each day for Wells Fargo common stock based on market and industry factors. This predicted return accounted for outside general market and industry influences on Wells Fargo's common stock returns. I controlled for outside general market and industry influences by utilizing a general market index, a broad financial index and a focused industry index.[6] The event study analysis then returned a daily "abnormal" return (also referred to as an "excess return") that represents an adjustment of the actual return to Wells Fargo common stock after accounting for market and industry effects.

13. The next step in calculating daily artificial inflation is to account and adjust for the stock price impact of other negative Wells Fargo information, if any, released concurrently with the alleged corrective information. I identified and adjusted for negative information concerning

---

stock during the 90-day "look-back" period, or the rolling average closing price through the date of sale if sold during the 90-day look-back period. *See* 15 U.S.C. § 78u-4(e)(1) and 78u-4(e)(2). In addition, as discussed below, for purchases sold through March 12, 2020 (the end of the Class Period) or during the look-back period, the Plan assumes that damages are further limited to the difference between the purchase price and the sales price.

[5] The Class Period is February 2, 2018 through March 12, 2020, inclusive.

[6] Hartzmark Report, Appendix D, ¶ 2.

Wells Fargo that was disclosed on the alleged corrective disclosure dates and unrelated to the alleged misrepresentations and omissions. The first three corrective disclosures each occurred concurrent with Wells Fargo earnings releases on January 15, 2019; April 12, 2019; and January 14, 2020. On those dates, Wells Fargo announced negative news about its operations, including, among other things, core earnings items such as net interest income and fees. Based on my review of securities analyst reports and changes to analysts' forecasts following Wells Fargo's earnings announcements on those dates, as well as assumptions regarding liability provided by Lead Counsel, I determined that news related to Wells Fargo's alleged misrepresentations accounted for approximately 50% of the abnormal price decline in Wells Fargo's stock price on January 15, 2019, 50% of the abnormal price decline on April 12, 2019, and 42% of the abnormal price decline on January 14, 2020.

14.     The final three alleged corrective disclosures occurred during the first full week of March 2020. During this week, there was extreme market volatility due to news about the COVID-19 pandemic which would create additional challenges in establishing loss causation. These challenges include whether the Wells Fargo stock price declines on March 5, 2020 and March 11, 2020 would be found to be statistically significant to the 5% level (alternatively at the 95% confidence interval) and, as is my understanding from Lead Counsel, that much of the information alleged to have been previously omitted from statements to investors was revealed in two congressional reports released on March 5, 2020. Given the litigation risk related to loss causation issues for these final three alleged disclosures, Lead Counsel assigned 40% of the Wells Fargo

6

abnormal stock price declines on March 5, 2020 and March 11, 2020 to the alleged omissions and 50% of the abnormal price decline on March 12, 2020 to the alleged omissions.[7]

15.     The total artificial inflation per share as of any date in the Class Period is calculated as the cumulative amount of artificial inflation that has not been removed as of that date, which is what is provided in Table A of the Plan.  This method of cumulating measured dollar declines due to the removal of artificial inflation is often referred to as the "constant dollar" method, which is regularly used in plans of allocation.

16.     The Plan of Allocation also accounts for shares that are purchased during the Class Period and held until after the Class Period.  For these shares, in accordance with the PSLRA's 90-day look-back provision, I calculated the rolling average closing prices for the 90-day look-back period.  This input is provided as Table B of the Plan.

17.     Finally, the Plan makes an adjustment to calculate Recognized Loss Amounts for shares purchased from February 2, 2018 through May 29, 2018, to account for the Court's dismissal of claims based on misstatements during that period, and Lead Counsel's assessment of the limited (5%) likelihood of a successful appeal of the Court's order dismissing those misstatements.  *See* ECF No. 96.  Specifically, the Recognized Loss Amounts calculated for shares purchased during this period reduced by 95%.  *See* Plan ¶ 66.

---

[7] In addition, to account for the decline in the price of Wells Fargo's common stock that occurred during the trading day on March 12, 2020, the amount of inflation in the share price on March 12, 2020 is based on the portion of the stock price decline that occurred during that trading day (*i.e.*, from open to close) relative to the entire decline from the close on March 11, 2020 to the close on March 12, 2020.  Although Recognized Loss Amounts are potentially available for purchases at the close on March 12, 2020, the PSLRA limits such a recovery.

## III. CALCULATION OF RECOGNIZED LOSS AMOUNTS AND RECOGNIZED CLAIMS

### A. Calculation of Recognized Loss Amounts under the Plan

18.     Given the inputs described above, I now describe how these inputs are used to calculate Recognized Loss Amounts under the Plan. First, each Claimant's transactions and holdings prior to the start of the Class Period are matched under the last-in-first-out ("LIFO") share-matching methodology. Under the LIFO method, a sale is matched to the most recent (last-in) purchase occurring prior to the sale, with the matching occurring in the chronological order of the sales.

19.     The calculation of Recognized Loss Amounts for shares purchased during the Class Period is straightforward. For shares purchased during the Class Period and subsequently sold prior to the first alleged corrective disclosure, there is no Recognized Loss Amount because such share was not held over an alleged corrective disclosure. *See* Plan ¶ 65(a). Likewise, sales sold "short" are excluded from the calculation of Recognized Loss Amounts. *See* Plan ¶ 71.

20.     For shares sold on or after the first alleged corrective disclosure, the Recognized Loss Amount is calculated based on the artificial inflation at purchase less artificial inflation at sale, which is set forth in Table A of the Plan. *See* Plan ¶¶ 65(b)(i), (c)(i), (d)(i). A Recognized Loss Amount is limited to the Claimant's investment loss (the purchase price less the sales price), which is a common feature of plans of allocation. *See* Plan ¶¶ 65(b)(ii), (c)(iii).

21.     For shares sold during the 90 days following the Class Period (the "90-day look-back period") and shares unsold at the end of the look-back period, a further limitation on damages is applied based on the PSLRA. Specifically, for these purchases, damages are calculated based on the purchase price less either: (i) the rolling average price on the date of sale listed in Table B if the share was sold during the look-back period (Plan ¶ 65(c)(ii)); or (ii) $27.67, the average price

8

during the 90-day look-back period if the share was unsold as of the end of the look-back period (Plan ¶ 65(d)(ii)).

**B. Examples of the Calculation of Recognized Loss Amounts under the Plan**

22.    In this Section of my Declaration, I provide examples of these calculations of Recognized Loss Amounts.

23.    <u>Sales Before the First Corrective Disclosure</u>.  Stock that is purchased during the Class Period but sold before the first alleged corrective disclosure on January 15, 2019, has a Recognized Loss Amount of $0.  This is because these purchases were not impacted by the first alleged corrective disclosure on that date or any of the subsequent corrective disclosures.  *See* Plan ¶ 65(a).

24.    <u>Sales After the First Corrective Disclosure and On or Before the Last Corrective Disclosure</u>.  For these shares, the Recognized Loss Amount is determined by comparing two calculations: (i) the artificial inflation at purchase less the artificial inflation at sale; and (ii) the purchase price less the sale price.  The lesser of these calculations is the Recognized Loss Amount, but not less than zero.  *See* Plan ¶¶ 64, 65(b).

25.    For example, assume a purchase on July 31, 2018 at $57.29 and a sale on July 31, 2019 at $48.41 for an investment loss (ii) of $8.88 ($57.29 less $48.41).  According to Table A of the Plan, the artificial inflation on purchase was $5.12 and the artificial inflation on sale was $3.22, yielding a difference (i) of $1.90 ($5.12 less $3.22).  As the difference in artificial inflation (i) is less than the investment loss (ii), the Recognized Loss Amount is therefore the difference in artificial inflation of $1.90.

26.    <u>Sales during the 90-Day Look-Back Period</u>.  For these shares, the Recognized Loss Amount is determined by comparing three calculations: (i) the artificial inflation at purchase; (ii) the purchase price less the sale price; and (iii) the purchase price less the average closing price

from March 12, 2020 through the date of sale.  The least of these calculations is the Recognized

Loss Amount, but not less than zero.  *See* Plan ¶¶ 64, 65(c).

27.    For example, assume a purchase on July 31, 2018 at $57.29 and a sale on April 30,

2020 at $29.05 for an investment loss (ii) of $28.24 ($57.29 less $29.05).  According to Table A

of the Plan, the artificial inflation on purchase was $5.12.  In addition, the difference between the

purchase price and the rolling average price on the date of sale per Table B (iii) is $28.79 ($57.29

less $28.50).  As the difference in artificial inflation (i) is less than the investment loss (ii) and less

than the PSLRA limitation (iii), the Recognized Loss is therefore the difference in artificial

inflation of $5.12.

28.    Still Held as of the End of the 90-Day Look-Back Period.  For these shares, the

Recognized Loss Amount is determined by comparing two calculations: (i) the artificial inflation

at purchase; and (ii) the purchase price less $27.67, the average closing price from March 12, 2020

through June 9, 2020.  The lesser of these calculations is the Recognized Loss Amount, but not

less than zero.  *See* Plan ¶¶ 64, 65(d).

29.    For example, assume a purchase on July 31, 2018 at $57.29.  According to Table

A, the artificial inflation on purchase was $5.12.  In addition, the difference between the purchase

price and $27.67 is $29.62 ($57.29 less $27.67).   As the difference in artificial inflation (i) is less

than the PSLRA limitation (ii), the Recognized Loss Amount is therefore the difference in artificial

inflation of $5.12.

**C.  Calculation of Recognized Claims under the Plan**

30.    As described above, a Claimant's Recognized Loss Amount is calculated for each

purchase made during the Class Period and is essentially a measure of the economic harm suffered

for that transaction due to the alleged misrepresentations and/or omissions.  Under the Plan, these

transaction-by-transaction Recognized Loss Amounts are summed across all a Claimant's

transactions to obtain the Claimant's total Recognized Loss Amount.  The total Recognized Loss Amount is the first step under the Plan to calculating a Claimant's Recognized Claim.  Specifically, the Plan also calculates the total market gains and losses for all Class Period purchases for a Claimant.  *See* Plan ¶ 74.  If a Claimant is found to have an aggregate market gain on all his, her or its Class Period purchases, the Claimant's Recognized Claim is zero.  *See* Plan ¶ 75.  If a Claimant is found to have an aggregate market loss on all his, her or its Class Period purchases, the Recognized Claim is set to the lower of his, her or its total Recognized Loss Amount and aggregate market loss.  *Id*.  This limitation on aggregate market losses/gains is a common limitation in plans of allocation, preventing a claimant with overall investment gains from receiving a portion of the settlement proceeds.

31.     Given a Claimant's Recognized Claim, the Claimant will receive a distribution amount from the Net Settlement Fund based on the Claimant's *pro rata* share of the total Recognized Claims of all Authorized Claimants (Plan ¶ 76).  For example, assume the Net Settlement Fund is $100 and there are four claimants, A, B, C, and D whose Recognized Claims are $50, $100, $150, and $200, respectively.  Thus, the total Recognized Claims are $500 and the *pro rata* shares of Claimants A, B, C, and D are, respectively, 10% ($50/$500), 20% ($100/$500), 30% ($150/$500), and 40% ($200/$500).  Claimant A would receive a distribution amount of $10 (10% x $100), Claimant B would receive a distribution amount of $20 (20% x $100), Claimant C would receive a distribution amount of $30 (30% x $100), and Claimant D would receive a distribution amount of $40 (40% x $100).  The table below summarizes this example.

| Claimant | Recognized Loss | *Pro Rata* Allocation | Distribution Amount |
|---|---|---|---|
| A | $50 | 10% | $10 |
| B | $100 | 20% | $20 |
| C | $150 | 30% | $30 |
| D | $200 | 40% | $40 |
| Total | $500 | 100% | $100 |

I declare under penalty of perjury that the foregoing is true and correct.   Executed on

May 11, 2023, in Chicago, Illinois.


Michael L. Hartzmark, Ph.D.

12

# APPENDIX A

# MICHAEL L. HARTZMARK, PH.D.
1018 Bucida Road
Delray Beach, FL 33483
(312) 718-9699
mhartzmark@HELP-Econ.com

## PRESENT POSITIONS

HARTZMARK ECONOMICS LITIGATION PRACTICE, LLC
President (2013 - present)
Specializing in the application of economic, financial and accounting principles to securities, complex commercial, investment, intellectual property, antitrust and automotive litigation and regulatory matters

MDA FINANCIAL, INC.
President (1981 - present)

## EDUCATION

Ph.D.    Department of Economics, the University of Chicago, 1984
(Doctoral Exams in Industrial Organization and Regulation; Public Finance)

M.A.    Department of Economics, the University of Chicago, 1982

B.A.    The University of Michigan (Economics, High Honors and Phi Beta Kappa), 1978

## ACADEMIC HONORS AND FELLOWSHIPS

*John M. Olin Faculty Fellowship*, (George Stigler, Director) (1986 - 1987)
*PEW Teaching Fellow*, the University of Chicago (1980 - 1981)
*Phi Beta Kappa,* the University of Michigan (1978)
*Parker Prize,* in Labor Economics, University of Michigan (1978) -- Given for the best graduate or undergraduate paper in Labor Economics

## GRANTS

Grant from the University of Chicago (1984).  Center for the Study of Futures Prices: grant to analyze margin regulation for the Chicago Board of Trade Studies.

**PROFESSIONAL EXPERIENCE**

FINRA (fka NATIONAL ASSOCIATION OF SECURITY DEALERS) Dispute Resolution
     Member Arbitrator (2005 - 2021)
OFFICE OF THE ATTORNEY GENERAL – STATE OF NEW JERSEY
     Independent Contractor (2015 - 2022)
OFFICE OF THE ATTORNEY GENERAL – STATE OF NEW YORK
     Independent Contractor (2013 - 2019)
CRA INTERNATIONAL, INC.
     Independent Contractor (2015)
NAVIGANT ECONOMICS (FORMERLY CHICAGO PARTNERS, LLC)
     Academic Affiliate (2012 - 2013)
     Principal/Director (2008 - 2012)
     Vice President (2004 - 2007)
DARMA, LLC
     President (2005 - 2008)
PACIFIC BIOMETRICS, INC.
     Interim Chief Financial Officer (2004 - 2006)
CRAGAR INDUSTRIES, INC.
     Chairman, CEO, President and Treasurer (1993 - 2004)
MDA FINANCIAL, INC.
     President (1981 - present)
FAHNESTOCK & Co., Inc. (now Oppenheimer & Co., Inc.)
     Financial Consultant (Series 7 and Series 63) (2001 - 2003)
ECONOHIO CORPORATION
     President (1989 - 1992)
LEXECON INC.
     Senior Economist (1987 - 1989)
UNIVERSITY OF CHICAGO, Center for the Study of the Economy and the State, and the
     Graduate School of Business (now the Chicago Booth School of Business)
     John M. Olin Visiting Scholar (1986 - 1987)
UNIVERSITY OF MICHIGAN, Joint with Michigan Business School (now the Stephen M.
     Ross School of Business) and Department of Economics
     Assistant Professor (1984 - 1988)
     Lecturer (1984)
COMMODITY FUTURES TRADING COMMISSION, Division of Economics and
     Education, Washington, D.C.
     Financial Economist (1982 -1983)
UNIVERSITY OF CHICAGO, Department of Economics
     Instructor for Economic Analysis (1981)
     Research Assistant for A. C. Harberger (1982)
     Research Assistant for Sam Peltzman (1981 - 1982)
U. S. DEPARTMENT OF THE TREASURY, Office of Tax Analysis, Washington, D.C.
     Research Assistant (1981)

**PUBLICATIONS**

"Understanding the Efficiency of the Market for Preferred Stock," (with H. Nejat Seyhun), Virginia Law & Business Review, Volume 8, Number 2, Spring 2014.

"An Economist's View of Amgen," Law360, May 2, 2013. http://www.law360.com/articles/438303/an-economist-s-view-of-amgen.

"The Curious Incident of the Dog that Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation," (with H. Nejat Seyhun), Virginia Law & Business Review, Volume 6, Number 3, 2012.

"Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market," (with Cindy A. Schipani and H. Nejat Seyhun), Columbia Business Law Review, Number 3, Volume 2011.

"Luck Versus Forecast Ability: Determinants of Trader Performance in Futures Markets," Journal of Business, January 1991. Also reprinted in Classic Futures: Lessons from the Past for the Electronic Age, by Lester Telser, Risk Books, March 2000.

"Business Valuations for the Personal Lawyer," Law and Fact, September 1991.

"Is Risk Aversion a Theoretical Diversion?" The Review of Futures Markets, Volume 7, Number 1, 1988.

"Returns to Individual Traders of Futures: Aggregate Results," Journal of Political Economy, December 1987.

"Regulating Futures Margin Requirements," Review of Research on Futures Markets, Volume 5, Number 3, 1986.

"The Effects of Changing Margin Levels on Futures Market Activity, the Composition of Traders in the Market, and Price Performance," Journal of Business, April 1986.

"Individual Income Taxation, 1947-1979," (with Eugene Steuerle), National Tax Journal, June 1981.


**BOARDS**

POWHATAN BUILDING CORPORATION, Director, Treasurer, (2010 - 2016)

MIDTOWN EDUCATIONAL FOUNDATION, Auxiliary Board Member, (2009 - 2013)

GLOBAL ENTERTAINMENT CORPORATION (Formerly AMEX: GEE, currently not listed); Director, Audit Committee Member (2004 - 2008);

THE BOARD INSTITUTE (private software company), Financial Advisory Board (2004 - 2006)

SHAKER INVESTMENTS, Financial Advisory Board (1992 - 2005)

PACIFIC BIOMETRICS, INC. (OTC BB: PBMC currently not listed and renamed as Pacific Biomarkers), Director and Chairman of Audit Committee (2002 - 2004)

CRAGAR INDUSTRIES, INC. (Formerly OTC BB: CRGR, company sold); Director and Chairman of the Board (1993 - 2004)

**EXPERT REPORTS, DECLARATIONS AND DISCLOSURES PAST FOUR YEARS**

In Re Finisar Corporation, Inc. Securities Litigation. U.S. District Court for the Northern District of California; Report (8/14/2017); Deposition (9/14/2017); Rebuttal Report (11/3/2017); Deposition (11/7/2018).

Christopher S. Porrino, Attorney General of New Jersey on behalf of Amy G. Kopleton, Deputy Chief of the New Jersey Bureau of Securities v. Credit Suisse Securities (USA) LLC, et al. Superior Court of New Jersey, Chancery Division Mercer County; Report (12/1/2017); Opposition Report (5/14/2018); Reply Report (7/16/2018); Deposition (2/13/2019).

In Re TerraForm Global, Inc. Securities Litigation. U.S. District Court for the Southern District of New York; Report (7/30/2018); Updated Report (8/17/2018); Reply Report (11/1/2018).

In Re Illumina, Inc. Securities Litigation. U.S. District Court Southern District of California; Report (9/14/2018); Deposition (10/19/2018).

John Cumming, derivatively on behalf of New Senior Investment Group, Inc., v. Wesley R. Edens, et al. Court of Chancery of the State of Delaware; Report (11/9/2018).

The Arbitrage Fund, on behalf of itself and all other similarly situated shareholders of Exactech, Inc. v. William Petty, et al. Circuit Court of Florida, Eleventh Judicial Circuit, Miami-Dade County; Report (12/6/2018).

Oklahoma Law Enforcement Retirement System vs. Adeptus Health Inc. U.S. Eastern District of Texas, Sherman Division; Report (12/7/2018); Rebuttal Report (3/22/19).

In the Matter of the Trusts established under the Pooling and Servicing Agreements relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C30, et al. v. Appaloosa Investment L.P., et al. U.S. District Court for the Southern District of New York; Report (1/18/2019); Rebuttal Report (2/8/2019); Deposition (3/12/2019).

Marc J. Muri, individually and on behalf of all others similarly situated v. National Indemnity Company. U.S. District Court District of Nebraska; Report (1/24/2019); Reply Report (2/14/2019); Deposition (3/4/2019).

In Re HD Supply Holdings, Inc. Securities Litigation. U.S. District Court for the Northern District of Georgia; Report (3/1/2019); Deposition (5/2/2019).

In Re Signet Jewelers Limited Securities Litigation. U.S. District Court for the Southern District of New York; Report (3/15/2019); Rebuttal Report (5/17/2019); Deposition (6/7/2019); Damages Report (9/20/2019); Damages Rebuttal Report (11/13/2019).

Tracey Rogers v. Aphria et al./ Garri Mirzoian v. Aphria et al. Ontario, Superior Court of Justice; Affidavit (4/5/2019).

In Re U.S. Steel Consolidated Cases. U.S. District Court for the Western District of Pennsylvania; Report (4/19/2019); Deposition (6/4/2019) Rebuttal Report (7/18/2019); Damages Report (7/12/2021); Deposition (8/23/2021); Damages Reply Report (9/13/2021).

Timber Hill LLC. v. Kraft Heinz Company et al. U.S. District Court for the Northern District of Illinois; Declaration (5/15/2019).

Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al. U.S. District Court for the Southern District of Texas; Report (5/28/2019); Supplemental Report (8/26/2019).

Lord Abbett Affiliated Fund, Inc., et al, v Navient Corporation, et al. U.S. District Court for the District of Delaware; Report (9/6/2019); Deposition (10/23/2019); Reply Report (12/20/2019); Damages Report (11/3/2020); Damages Rebuttal (12/1/2020); Stock Damages Reply (1/21/2021); Deposition (6/25/2021).

Graaf v. SNC-Lavalin Group Inc., et al. Quebec, Superior Court; Expert Report (10/15/2019); Reply Report (2/4/2021).

BRS v. Volkswagen AG, et al. ("Bondholders Securities Action"). U.S. District Court for the Northern District of California; Report (11/8/2019); Deposition (1/10/2020).

4

SEB Investment Management AB. v. Symantec Corp. and Gregory S. Clark. U.S. District Court for the Northern District of California; Report (1/17/2020); Deposition (2/7/2020); Reply Report (3/14/2020); Damages Report (1/29/2021); Damages Reply Report (2/19/2021); Deposition (2/25/2021).

In re: CenturyLink Sales Practices and Securities Litigation. U.S. District Court for the District of Minnesota; Report (1/21/2020); Deposition (2/25/2020); Rebuttal Report (5/4/2020); Deposition (6/5/2020).

Abram B. Dyck v. Tahoe Resources Inc. and Ronald Wayne Clayton. Ontario, Superior Court of Justice; Affidavit (5/28/2020) Reply Report (3/17/2021); Examination (5/3/2021).

Patricia A. Shenk, et al., v. Mallinckrodt PLC et al. U.S. District Court for the District of Columbia; Report (7/22/2020).

In Re Tesla, Inc. Securities Litigation. U.S. District Court for the Northern District of California; Report (9/22/2020); Deposition (11/19/2020); Damages Report (11/10/2021); Deposition (3/18/2022 Supplemental Damages Report (12/31/2022); Deposition (1/9/2023); Court Testimony (1/31/2023 and 2/1/2023).

Jennifer Phillips, et al., v. Help at Home, LLC. U.S. District Court for the Northern District of Illinois Eastern Division; Report (10/2/2020).

Chad Lindsey Moshell, et al., v. Sasol Limited et al. U.S. District Court for the Southern District of New York; Report (10/2/2020); Deposition (8/17/2021).

Cambridge Retirement System, et al. v Amneal Pharmaceuticals, Inc., et al. Superior Court of New Jersey, Somerset County Law Division; Report (10/30/2020); Deposition (3/2/2021).

In Re Evoqua Water Technologies Corp. Securities Litigation. U.S. District Court for the Southern District of New York; Report (12/4/2020).

City of Sunrise Firefighters' Pension Fund, et al. v. Citigroup Inc., et al. U.S. District Court for the Southern District of New York; Declaration (1/19/2021).

In Re Myriad Genetics, Inc. Securities Litigation. U.S. District Court for the Central District of Utah; Report (6/7/2021).

In Re Alta Mesa Resources, Inc. Securities Litigation. U.S. District Court for the Southern District of Texas; Report (7/30/2021); Deposition (11/17/2021); Supplemental Report (1/14/2022).

Miriam Edwards, Individually and On Behalf of All Others Similarly Situated versus McDermott International, Inc., David Dickson, and Stuart Spence. U.S. District Court for the Southern District of Texas; Report (9/29/2021); Deposition (11/11/2021); Reply Report (3/3/2023).

In re Venator Materials PLC Securities Litigation. U.S. District Court for the Southern District of Texas; Report (11/19/2021).

Ngian, individually and on behalf of all others similarly situated v. Facebook, Inc. n/k/a Meta Platforms, Inc., et al. U.S. District Court for the Eastern District of New York; Ohio Public Employees Retirement System v. Meta Platforms, Inc. f/k/a Facebook, Inc., et al. U.S. District Court for the Northern District of California; Declaration (12/27/2021).

Gary Cheng, individually and on behalf of all others similarly situated v. Activision, et al. U.S. District Court for the Central District of California; Declaration (1/3/2022).

Camelot Event Driven Fund, et al. v. Morgan Stanley & Co. LLC, et al. Supreme Court for the State of New York, County of New York; Report (1/3/2022); Report (4/17/2023).

Public Employees' Retirement System of Mississippi, et al. v. Mohawk Industries, Inc. and Jeffrey S. Lorberbaum. U.S. District Court for the Northern District of Georgia; Report (1/25/2022); Deposition (2/25/2022); Rebuttal Report (6/8/2022).

UA Local 13 Pension Fund, et al. v. Bumble Inc., et al. U.S. District Court for the Southern District of New York; Declaration (4/15/2022).

In re Pattern Energy Group Inc. Securities Litigation. U.S. District Court for the District of Delaware; Report (5/5/2022); Supplemental Report (7/22/2022).

Paiman Rahimi v. SouthGobi Resources Ltd.. Ontario, Superior Court of Justice; Report (7/6/2022).

State of Alaska, et al. v. Ryder System, Inc., et al., U.S. District Court for the Southern District of Florida; Report (9/22/2022); Deposition (11/30/2022); Reply Report (2/17/2023).

In Re Wells Fargo & Company Securities Litigation.  U.S. District Court for the Southern District of New York; Report (10/3/2022); Deposition (12/8/2022).

In Re BioMarin Pharmaceutical Inc. Securities Litigation.  U.S. District Court for the Northern District of California; Report (10/17/2022).

Izabela Przybylska v. Gatos Silver, Inc. et al. Ontario, Superior Court of Justice; Report (5/1/2023).