**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE WELLS FARGO & COMPANY
SECURITIES LITIGATION

Case No. 1:20-cv-04494-JLR-SN

---

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR**
**FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................iii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................4

    I.      THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ............. 4

        A.     Lead Plaintiffs and Lead Counsel Have Adequately Represented the
Settlement Class.................................................................................... 6

        B.     The Settlement Was Reached After Arm's-Length Negotiations with
the Assistance of an Experienced Mediator and Following Substantial
Discovery ............................................................................................. 7

        C.     The Relief That the Settlement Provides for the Settlement Class Is
Adequate, Taking into Account the Costs and Risks of Further
Litigation and All Other Relevant Factors............................................ 9

             1.     The Risks of Establishing Liability and Damages Support
Approval of the Settlement ........................................................ 10

                  (a)    Risks to Proving Liability ................................................ 10

                        (1)    Falsity.................................................... 11

                        (2)    Materiality.............................................. 12

                        (3)    Scienter ................................................. 14

                  (b)    Loss Causation and Damages ........................................... 15

             2.     The Settlement Represents a Substantial Percentage of Likely
Recoverable Damages.................................................................. 17

             3.     The Costs and Delays of Continued Litigation Support
Approval of the Settlement ........................................................ 19

             4.     All Other Factors Set Forth in Rule 23(e)(2)(C) Support
Approval of the Settlement ........................................................ 19

        D.     The Settlement Treats Class Members Equitably Relative to Each
Other ...................................................................................................21

        E.     The Reaction of the Settlement Class to the Settlement ........................21

II.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND
SHOULD BE APPROVED ................................................................................ 22

III.    THE SETTLEMENT CLASS SHOULD BE CERTIFIED ................................ 24

IV.    NOTICE TO THE SETTLEMENT CLASS SATISFIED THE
REQUIREMENTS OF RULE 23 AND DUE PROCESS .................................. 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Advanced Battery Technologies*,
298 F.R.D. 171 (S.D.N.Y. 2014) ...................................................................................25

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
568 U.S. 455 (2013)........................................................................................................6

*In re Bear Stearns Cos., Inc. Securities, Derivative & ERISA Litigation*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012)......................................................................21, 22

*In re Canadian Superior Securities Litigation*,
2011 WL 5830110 (S.D.N.Y. Nov. 16, 2011) .............................................................18

*In re China Sunergy Securities Litigation*,
2011 WL 1899715 (S.D.N.Y. May 13, 2011) .............................................................18

*Christine Asia Co. v. Yun Ma*,
2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ...............................................................6

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974).....................................................................................5, 7, 9

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001)............................................................................................7

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005).....................................................................................................15

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974).....................................................................................................24

*In re Facebook Inc. Securities & Derivative Litigation*,
2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015)..............................................................17

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009).........................................................................................15

*In re FLAG Telecom Holdings, Ltd. Securities Litigation*,
2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)..........................................................21, 22

*Flores v. CGI Inc.*,
2022 WL 13804077 (S.D.N.Y. Oct. 21, 2022) .......................................................4, 6, 9, 10

*Fort Worth Employees Retirement Fund v. Biovail Corp.*,
615 F. Supp. 2d 218 (S.D.N.Y. 2009)........................................................................15

*In re Giant Interactive Group, Inc. Securities Litigation*,
    279 F.R.D. 151 (S.D.N.Y. 2011) ...................................................................................8, 22

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)..............................................................................................5

*Guevoura Fund Ltd. v. Sillerman*,
    2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ...............................................................8

*In re IMAX Securities Litigation*,
    283 F.R.D. 178 (S.D.N.Y. 2012) ..................................................................................22

*In re Initial Pub. Offering Securities Litigation*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009).............................................................................22

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*,
    2007 WL 313474 (S.D.N.Y. Feb. 1, 2007).....................................................................18

*In re Mylan N.V. Securities Litigarion*,
    2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023) ...............................................................17

*In re NASDAQ Market-Makers Antitrust Litigation*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ....................................................................................9

*Okla. Firefighters Pension & Retirement System v. Lexmark International, Inc.*,
    2021 WL 76328 (S.D.N.Y. Jan. 7, 2021) ...............................................................9, 18

*Pearlstein v. Blackberry Ltd.*,
    2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022)........................................................8, 9, 16, 18

*SEB Investment Management AB v. Symantec Corp.*,
    2022 WL 409702 (N.D. Cal. Feb. 10, 2022) ................................................................24

*In re Signet Jewelers Ltd. Securities Litigation*,
    2020 WL 4196468 (S.D.N.Y. July 21, 2020) ...........................................................8, 10, 21

*Soler v. Fresh Direct, LLC*,
    2023 WL 2492977 (S.D.N.Y. Mar. 14, 2023) .................................................................6

*In re Tesla Inc., Securities Litigation*,
    2023 WL 4032010 (N.D. Cal. June 14, 2023)...............................................................17

*Torretto v. Donnelley Financial Solutions, Inc.*,
    2023 WL 123201 (S.D.N.Y. Jan. 5, 2023) .....................................................................8

*In re Veeco Instruments Inc. Securities Litigarion*,
    2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)................................................................17

*Villa v. Highbury Concrete Inc.*,
    2022 WL 19073649 (E.D.N.Y. Nov. 25, 2022).......................................................................22

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005)..............................................................................4, 5, 8, 24

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982)...........................................................................................7

*In re Wells Fargo & Co. Shareholder Derivative Litigation*,
    2022 WL 345066 (N.D. Cal. Feb. 4, 2022) ............................................................12

**STATUTES**

Private Securities Litigation Reform Act of 1995
    15 U.S.C. § 78u-4(a)(7) ...............................................................................................25

**RULES**

Fed. R. Civ. P. 23(a) .........................................................................................................24

Fed. R. Civ. P. 23(b) .........................................................................................................24

Fed. R. Civ. P. 23(c) ...................................................................................................24, 25

Fed. R. Civ. P. 23(e) ................................................................................................. *passim*

v

In accordance with Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs Handelsbanken Fonder AB ("Handelsbanken"); Public Employees' Retirement System of Mississippi ("Mississippi"); State of Rhode Island, Office of the General Treasurer ("Rhode Island"); and Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") (collectively "Lead Plaintiffs"), on behalf of themselves and the Settlement Class, respectfully submit this memorandum of law in support of their motion for final approval of: (1) the proposed settlement resolving the Action for the payment of $1 billion in cash for the benefit of the Settlement Class (the "Settlement"), and (2) the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation").[1]

## PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiffs have agreed to settle the Action in exchange for a historic amount: a cash payment of $1 billion, which has been deposited into an escrow account and is earning interest for the benefit of the Settlement Class. The Settlement is among the top six largest securities class action settlements in the past decade, the ninth largest ever in the Second Circuit, and the seventeenth largest ever in the United States. The Settlement is also the largest securities settlement in history not involving a restatement, an action by the Securities and Exchange Commission ("SEC"), or criminal charges or convictions. Lead Plaintiffs respectfully submit that the proposed Settlement is not only an excellent recovery for the Settlement Class, but

---

[1] Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated May 8, 2023 (ECF No. 178-1) (the "Stipulation"), or in the Declaration of John C. Browne and Laura H. Posner in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Joint Declaration" or "Joint Decl."), filed herewith. In this memorandum, citations to "¶ __" refer to paragraphs in the Joint Declaration and citations to "Ex. __" refer to exhibits to the Joint Declaration. Throughout, citations and internal quotation marks are omitted.

is fair, reasonable, and adequate and satisfies all the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure. As detailed in the accompanying Joint Declaration and summarized below, the Settlement was reached only after nearly three years of hard-fought litigation, substantial motion practice, extensive discovery, and vigorous arm's-length negotiations before the Honorable Layn Phillips, a former federal judge and premier mediator.[2]

Over nearly three years of vigorous litigation, Lead Plaintiffs developed a strong understanding of the strengths and weaknesses of this case, that makes clear that the Settlement is an excellent result for the Settlement Class. Specifically, Lead Plaintiffs: (i) conducted an extensive investigation into the alleged fraud, including a thorough review of public information, such as filings with the SEC, analyst reports, conference call transcripts, news articles, congressional reports and testimony, and banking industry regulations; (ii) consulted with subject matter experts in market efficiency, loss causation, damages, the banking industry, government consent orders, and confidential supervisory information ("CSI") rules and regulations; (iii) drafted a detailed Consolidated Amended Class Action Complaint (the "Complaint") based on Lead Counsel's extensive investigation; (iv) opposed Defendants' motion to dismiss through extensive briefing and oral argument; (v) filed Lead Plaintiffs' motion for class certification, including a detailed 42-page expert report with more than 700 pages of exhibits, and prepared for and defended the deposition of Lead Plaintiffs' class certification expert; (vi) conducted extensive discovery, which included preparing and serving document requests on each of the five Defendants, and subpoenas on 27 non-party witnesses; (vii) formally requested and successfully

---

[2] The Joint Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, among other things: the history of the Action (¶¶ 12-77); the nature of the claims asserted (¶¶ 5-11); the negotiations leading to the Settlement (¶¶ 68-73); the risks and uncertainties of continued litigation (¶¶ 78-107); and the terms of the Plan of Allocation for the Settlement proceeds (¶¶ 117-131).

obtained from the Regulators authorizations for Wells Fargo to produce materials that purportedly contained CSI, which required submitting to the Regulators letter briefs totaling over 579 pages, replete with extensive analysis and exhibits totaling more than 2,400 pages; (viii) reviewed over 3.5 million pages of documents produced by Defendants and subpoenaed non-parties; (ix) participated in ten fact and expert depositions; and (x) engaged in arm's-length settlement negotiations with the assistance of the Honorable Layn Phillips, a former U.S. District Judge and experienced mediator of class actions and other complex litigation. ¶¶ 42-73.

The $1 billion Settlement is particularly favorable given the substantial risks of continued litigation. Absent a settlement, Lead Plaintiffs would need to prevail at several stages of the litigation, including in overcoming Defendants' anticipated motions for summary judgment, winning at trial, and defeating any appeals. Defendants would have continued to assert that their challenged statements about Wells Fargo's compliance with the Consent Orders were not false or misleading when made, and, in any event, could not have misled investors because investors already knew the true facts before the alleged corrective disclosures. Defendants would have also continued to assert that, even if any of their statements were false or misleading, they did not have any intent to mislead investors; and that investors' losses were not caused by Defendants' allegedly false statements, but rather unrelated non-fraud news about Wells Fargo's quarterly financial results and the impact of the COVID-19 pandemic on bank stocks. Even after any trial, Lead Plaintiffs would face post-trial motions, including motions for judgment as a matter of law and inevitable appeals. The Settlement avoids these risks and delays, while providing a substantial, certain, and immediate benefit to the Settlement Class in the form of a $1 billion cash payment.

The Settlement has the full support of the Court-appointed Lead Plaintiffs, who are sophisticated institutional investors that actively participated in the Action and closely supervised

the work of Lead Counsel. Further, although the deadline to object to the Settlement has not yet passed, to date, no Settlement Class Members have objected to the Settlement.[3]

Given these considerations and the other factors discussed below, Lead Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court. Additionally, Lead Plaintiffs request that the Court approve the Plan of Allocation, which was set forth in the Notice mailed to potential Settlement Class Members. The Plan of Allocation, which Lead Counsel developed in consultation with Lead Plaintiffs' damages expert, provides a reasonable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims based on damages they suffered on purchases of Wells Fargo common stock that were attributable to the alleged fraud.

**ARGUMENT**

**I.     THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL**

Federal Rule of Civil Procedure 23(e) requires judicial approval of any compromise or settlement of class-action claims. *See* Fed. R. Civ. P. 23(e). A class-action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The Second Circuit has recognized that public policy favors the settlement of disputed claims among private litigants, particularly in class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("*Visa*") ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'"). In ruling on motions for final approval of a class settlement, courts examine the negotiating process leading to the settlement and the settlement's substantive terms. *Id.; Flores v. CGI Inc.*, 2022 WL 13804077, at *3 (S.D.N.Y. Oct. 21, 2022).

---

[3] The deadline is August 18, 2023. Lead Plaintiffs will address all requests for exclusion and any objections received in their reply papers, which will be filed on September 1, 2023.

4

Rule 23(e)(2), as amended on December 1, 2018, provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). As discussed below, all of these factors strongly support approval of the Settlement here.

Historically, the Second Circuit has held that district courts should consider the following factors set forth in *City of Detroit v. Grinnell Corp*. in evaluating a class-action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also Visa*, 396 F.3d at 117.

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the four factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ P. 23 (e)(2) (Advisory Committee Notes, 2018 Amendments).

5

Accordingly, Lead Plaintiffs will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four factors set forth in Rule 23(e)(2), but will also discuss the application of relevant, non-duplicative *Grinnell* factors. *See Christine Asia Co. v. Yun Ma*, 2019 WL 5257534, at *9 (S.D.N.Y. Oct. 16, 2019) ("The Court understands the new Rule 23(e) factors to add to, rather than displace, the *Grinne[ll]* factors.").

### A.    Lead Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class

In determining whether to approve a class-action settlement, courts consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A); *see generally Flores*, 2022 WL 13804077, at *4 (noting that, to show adequacy, plaintiffs "must demonstrate that: (1) the class representatives do not have conflicting interests with other class members; and (2) class counsel is qualified, experienced and generally able to conduct the litigation"); *Soler v. Fresh Direct, LLC*, 2023 WL 2492977, at *3 (S.D.N.Y. Mar. 14, 2023) ("Determination of adequacy typically entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced[,] and able to conduct the litigation."). Here, Lead Plaintiffs and Lead Counsel adequately represented the Settlement Class.

First, there is no antagonism or conflict between Lead Plaintiffs and the proposed Settlement Class. Lead Plaintiffs and Settlement Class Members purchased Wells Fargo common stock during the Class Period and were all injured by the same alleged false and misleading statements. If Lead Plaintiffs were to prove their claims at trial, they would also prove the Settlement Class's claims. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (the investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions).

6

Lead Plaintiffs and Lead Counsel have adequately represented the Settlement Class in both their vigorous prosecution of the Action for nearly three years and in the negotiation and achievement of the Settlement, including by defeating Defendants' motion to dismiss, successfully obtaining and reviewing over 3.5 million pages of relevant documents, and negotiating one of the largest securities class action settlements of all time despite the lack of a Company restatement or related SEC or criminal actions. In addition, Court-appointed Lead Counsel are highly qualified and experienced in securities litigation, as set forth in their firm resumes (*see* Exs. 7A-2 and 7B-2 to the Joint Declaration), and have successfully conducted the litigation against skilled opposing counsel.

**B.      The Settlement Was Reached After Arm's-Length Negotiations with the Assistance of an Experienced Mediator and Following Substantial Discovery**

In weighing approval of a class-action settlement, the courts also consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). Courts have traditionally considered other related circumstances in determining the settlement's "procedural" fairness, including (i) counsel's understanding of the strengths and weaknesses of the case based on factors such as "the stage of the proceedings and the amount of discovery completed"[4]; (ii) the absence of any indicia of collusion[5]; and (iii) the involvement of a mediator.[6] All of these circumstances strongly support approval of the Settlement here.

---

[4] *See Grinnell*, 495 F.2d at 463 (third factor).

[5] *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) ("the absence of any indication of collusion, the protracted settlement negotiations, the ability and experience of plaintiffs' counsel, [and] the extensive discovery preceding settlement . . . are important indicia of the propriety of settlement negotiations").

[6] *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a mediator's involvement "helps to ensure that the proceedings were free of collusion and undue pressure").

Prior to settling, the Parties engaged in extensive arm's-length settlement negotiations—including the exchange of detailed mediation statements, an in-person mediation session, and comprehensive presentations—under the auspices of former federal judge Layn Phillips, an experienced mediator of securities class actions and other complex litigation. That the Settlement was reached only after these extensive arm's-length negotiations with Judge Phillips is indicative of its fairness. ¶¶ 68-73. *See, e.g.*, *Pearlstein v. Blackberry Ltd.*, 2022 WL 4554858, at *7 (S.D.N.Y. Sept. 29, 2022) (approving a settlement, in part, because it was facilitated by the "extensive mediation efforts" of a "highly regarded mediator," Judge Phillips); *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *3 (S.D.N.Y. July 21, 2020) (approving a settlement following mediation before, and a mediator's proposal by, Judge Phillips); *Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at *2 (S.D.N.Y. Dec. 18, 2019) (approving a settlement after an all-day mediation with Judge Phillips); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (finding that a settlement "was the product of prolonged, arms-length negotiation . . . facilitated by a respected mediator," Judge Phillips); *see generally Torretto v. Donnelley Fin. Sols., Inc.*, 2023 WL 123201, at *2 (S.D.N.Y. Jan. 5, 2023) (noting that "the involvement of a mediator in the Parties' negotiations . . . further supports the finding that the Settlement was negotiated at arm's-length").

Moreover, the Settlement merits a presumption of fairness because these extensive arm's-length negotiations took place between experienced counsel after substantial discovery. The Parties and their counsel were extremely well informed about the strengths and weaknesses of the case before settling. *See Visa*, 396 F.3d at 116 (a class action settlement is entitled to a "presumption of fairness, adequacy, and reasonableness" when "reached in arm's-length

8

negotiations between experienced, capable counsel after meaningful discovery"); *Flores*, 2022 WL 13804077, at \*3 (same).

In addition, Lead Counsel, who are highly experienced in securities class-action litigation, strongly believe that the Settlement is in the Settlement Class's best interest—an opinion that is entitled to "great weight." *Pearlstein*, 2022 WL 4554858, at \*7; *accord In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts consistently give "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation").

Finally, each of the Lead Plaintiffs, all sophisticated institutional investors that actively supervised this litigation and its settlement, also strongly endorse the Settlement. *See* Joint Declaration of Lead Plaintiffs at ¶¶ 21-26. A settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor . . . is entitled to an even greater presumption of reasonableness." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 2021 WL 76328, at \*5 (S.D.N.Y. Jan. 7, 2021).

> **C.      The Relief That the Settlement Provides for the Settlement Class Is Adequate, Taking into Account the Costs and Risks of Further Litigation and All Other Relevant Factors**

In determining whether a class action settlement is "fair, reasonable, and adequate," courts also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" as well as other relevant factors. Fed. R. Civ. P. 23(e)(2)(C).[7]

---

[7] This Rule 23(e)(2)(C) factor encompasses at least six of the nine factors of the traditional *Grinnell* analysis. *See Grinnell*, 495 F.2d at 463 ("(1) the complexity, expense and likely duration of the litigation; . . . (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; . . . (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation").

"[I]n evaluating the settlement of a securities class action, federal courts, including this Court, 'have long recognized that such litigation is notably difficult and notoriously uncertain.'" *Signet*, 2020 WL 4196468, at \*4. Accordingly, "class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *Flores*, 2022 WL 13804077, at \*2. This case was no exception.

As discussed in detail in the Joint Declaration and below, continued litigation of the Action presented significant risks that Lead Plaintiffs would be unable to establish falsity and materiality, scienter, loss causation, or damages. ¶¶ 78-107. Lead Plaintiffs navigated these risks without the benefit of a financial restatement—a formal admission of falsity and materiality —which is present in many of the other largest securities class actions. In addition, continuing the litigation through trial and appeals would result in extended delays before any recovery could be achieved. ¶ 100. The Settlement, which provides a \$1 billion cash payment for the benefit of the Settlement Class, avoids those further delays.

### 1. The Risks of Establishing Liability and Damages Support Approval of the Settlement

While Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious, they recognize that this Action presented several substantial risks to establishing both liability and damages.

### (a) Risks to Proving Liability

Defendants strenuously argued that their challenged statements about Wells Fargo's compliance with the Consent Orders were not false or misleading when made, and, in any event, could not have misled investors because the truth was already known; that, even if any of their statements were false or misleading, Defendants did not have any intent to mislead investors; and that investors' losses were not caused by Defendants' allegedly false statements, but rather

10

unrelated non-fraud news about Wells Fargo's quarterly financial results and the impact of the COVID-19 pandemic on bank stocks.

### (1)    Falsity

The Complaint alleged that Defendants made 32 misstatements. In its order at the motion-to-dismiss stage, the Court dismissed nine of the alleged misstatements, narrowing the case as alleged and dismissing one defendant—Wells Fargo's current CEO, Charles W. Scharf—from the Action altogether. ¶ 81.

Lead Plaintiffs recognized that they would face meaningful challenges at summary judgment and trial in establishing that each of the remaining alleged misstatements was false or misleading. ¶ 82. The Complaint alleged that the Consent Orders set forth three distinct, linear stages of compliance, and that Defendants misrepresented that they had completed certain stages. *Id*. However, Defendants maintained at the pleading stage—and were expected to continue to argue at summary judgment and trial, with the benefit of a complete factual record—that the Consent Orders did not set forth a distinct, linear set of stages. *Id*. Lead Plaintiffs anticipated that Defendants would point to their contemporaneous communications with the Regulators, which they would contend supported their interpretation of the Consent Orders. *Id*. If Defendants' view of the Consent Orders were accepted by a Court or a jury, there was a real risk that the factfinder would conclude that many of the challenged statements were truthful and, thus, non-actionable. *Id*.

Lead Plaintiffs further anticipated that Defendants would argue, with the benefit of a full discovery record, that their statements to investors were truthful because they comported with the ongoing, real-time feedback that they received from the Regulators. ¶ 83. Specifically, Lead Plaintiffs anticipated that Defendants would point to their contemporaneous communications with the Regulators and their colleagues, contending that they reflect that (i) Wells Fargo did, in

fact, make progress in satisfying the Consent Orders; (ii) the Regulators agreed that Wells Fargo made meaningful progress in satisfying the Consent Orders; and (iii) Defendants genuinely believed their statements to investors about the time required to satisfy the Consent Orders. *Id.* If a factfinder accepted Defendants' view that they, in fact, made meaningful progress in satisfying the Consent Orders, there was an additional risk that the factfinder would find that many of Defendants' statements were accurate and non-actionable. *Id.*

Finally, Lead Plaintiffs recognized that they faced challenges establishing that Defendants were permitted by law to disclose information that Lead Plaintiffs contend was improperly omitted. ¶ 84. Lead Plaintiffs anticipate that Defendants would have argued at summary judgment and trial—with the support of the complete evidentiary record and expert testimony—that they were prohibited by CSI regulations from providing additional information to investors about the status of Wells Fargo's compliance with the Consent Orders. *Id.* If the factfinder were to accept Defendants' explanations for why they could not disclose further information to investors, liability could be reduced or eliminated altogether. *Id.*[8]

### (2)    Materiality

Even if Lead Plaintiffs succeeded in establishing that Defendants' statements to investors were false and misleading, they would still face Defendants' argument that the allegedly omitted facts were already known to investors and, thus, not material. ¶ 86.

The Complaint alleged that Defendants failed to disclose that the Regulators rejected the plans that Wells Fargo submitted to them. ¶ 87. In response, Defendants argued that they had not omitted any material information because the market already knew that Regulators had rejected

---

[8] The significant challenges to establishing falsity were further underscored by the dismissal of the shareholder derivative action arising from the same alleged misconduct because the plaintiffs there "failed to allege an actionable false or misleading statement" about the Consent Orders. *In re Wells Fargo & Co. S'holder Derivative Litig.*, 2022 WL 345066, at *5-7 (N.D. Cal. Feb. 4, 2022).

Wells Fargo's submitted plans and, thus, the asset cap would not be lifted by the date originally forecasted by Defendants. *Id*. In support of this contention, Defendants were expected to point to, among other things: (i) a September 11, 2018 *Reuters* article describing how the "U.S. regulators have rejected Wells Fargo & Co.'s plan" under the 2018 OCC/CFPB Consent Orders; (ii) a December 6, 2018 *Reuters* article describing how "[t]he Federal Reserve has rejected Wells Fargo & Co's plans" and how "[t]he concerns raised by the Fed, which have not been previously reported, are likely to increase the time it takes the central bank to lift an asset cap"; and (iii) a March 9, 2019 *New York Times* article stating that "[t]he bank is still negotiating the details of the plan with the Fed." *Id*.

Defendants were also expected to point to public statements by the Regulators themselves to support their defense that investors already knew that Wells Fargo's plans were rejected and that the asset cap would not be removed by the date originally forecasted. For example, Lead Plaintiffs anticipated that Defendants would point to remarks by the Chairman of the Federal Reserve, published in the *American Banker* on March 12, 2019, that "[w]e will not lift [the asset cap] until Wells Fargo . . . comes forward with plans, implements those plans and we're satisfied with what they've done" and "that's not where we are right now." Defendants were also expected to point to the OCC's public rebuke of Wells Fargo immediately following Defendant Sloan's testimony to Congress in 2019, including that the OCC "continue[s] to be disappointed with [Wells Fargo's] performance under our consent orders and its inability to execute effective corporate governance and a successful risk management program." ¶ 88.

Finally, Defendants were expected to rely upon securities analysts' contemporaneous reports to evidence that investors already knew that the asset cap imposed on Wells Fargo would not be removed by the time originally forecasted by the Company, and thus that the alleged misstatements were not material. ¶ 89. For example, Lead Plaintiffs anticipated that Defendants

would point to public reports by RBC analysts, who stated (for example) in a July 16, 2019 report that "[w]e would expect the 2018 consent order to persist well into 2020" and on January 14, 2020, that we "do not expect the asset cap or the cease and desist order to be removed this year." *Id.*

Maximum damages in this Action would be reduced or eliminated altogether if Lead Plaintiffs were unable to demonstrate that Defendants' alleged misstatements to investors were material, or if Defendants demonstrated that the market already knew the truth about the misrepresented and omitted facts. ¶ 91.

### (3)   Scienter

In addition to demonstrating falsity, Lead Plaintiffs would also need to show that Defendants acted with scienter—*i.e.*, fraudulent intent. Defendants had credible arguments that they did not act with scienter when making the challenged statements. ¶ 92. Specifically, the Individual Defendants were expected to argue that they had no personal motive to lie—as evidenced by the fact that they did not engage in suspicious insider sales of their personal Wells Fargo stock or have outsized incentive compensation packages tied to Wells Fargo's stock price. *Id.* Additionally, Lead Plaintiffs expected that Defendants would argue that the Individual Defendants each had distinguished professional careers and would each testify that they would never jeopardize their sterling reputations to temporarily increase the price of Wells Fargo's stock with zero personal benefit to them. *Id.*

Lead Plaintiffs further understood that the Individual Defendants would also likely argue at summary judgment and trial that they genuinely believed—whether correctly or incorrectly—that they were legally precluded from providing additional information to investors about the status of Wells Fargo's compliance with the Consent Orders. ¶ 93. In support of this contention, Lead Plaintiffs expected that the Individual Defendants would point to their contemporaneous communications with the Regulators and colleagues at Wells Fargo, contending that this evidence

14

demonstrated their good-faith commitment to tell investors the truth. *Id*. Additionally, the Individual Defendants would likely point to the fact that none of them were prosecuted, civilly or criminally, for their role in these events. *Id*. If the factfinder were to accept Defendants' explanations for why they did not disclose further information about their non-compliance with the Consent Orders, damages could be reduced or eliminated altogether. ¶ 94.

### (b)    Loss Causation and Damages

As the Court is aware, Lead Plaintiffs bear the burden of establishing loss causation – that is, that "plaintiff's losses were caused by the disclosure of the truth that Defendants had previously allegedly misrepresented." *Fort Worth Emps. Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009); *see also, e.g.*, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005); *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009).

Lead Plaintiffs recognized that they faced serious risks in establishing loss causation and demonstrating damages in this Action because all six of the alleged corrective disclosures in the Action were made on days when there were other plausible explanations for some, if not all, of the abnormal declines in Wells Fargo's stock price. ¶ 95.

Specifically, the first three alleged loss causation events took place on January 15, 2019, April 12, 2019, and January 14, 2020—dates when Wells Fargo announced its earnings for, respectively, the fourth quarter of 2018, first quarter of 2019, and fourth quarter of 2019. ¶ 96. On each of those three earnings announcement dates, Wells Fargo disclosed negative news about the Company's financial performance that was wholly unrelated to the Consent Orders, such as disappointing earnings-per-share quarterly results and misses in Wells Fargo's "core operating fundamentals." *Id*. As a result, Defendants had strong arguments that the stock price declines on these three corrective disclosure dates were not caused by the alleged revelations about the Consent

15

Orders, but rather by unrelated announcements about the Company's poor financial performance. *Id.*

The final three alleged loss causation events occurred during the first two weeks of March 2020. ¶ 97. During those weeks, the volatility and declines in the general market were so extreme that they triggered market-wide trading halts (known as "circuit breakers") on March 9 and 12, 2020. *Id.* This heightened level of market volatility presented unique challenges for Lead Plaintiffs in this Action. At the class certification stage, Defendants argued that this volatility demonstrated that the market for Wells Fargo stock was not efficient during the last month of the Class Period. Lead Plaintiffs anticipated that, at summary judgment and trial, Defendants would contend that the declines in Wells Fargo's stock price during these two weeks were attributable to news concerning the COVID-19 global pandemic and the highly volatile nature of the market during this unprecedented period—and not the alleged misstatements. ¶ 98. Further, Lead Plaintiffs understood that Wells Fargo and its experts would argue that the stock price declines on March 5, 2020 and March 11, 2020 were not statistically significant to the "necessary" 95% confidence level once the volatility in the market was properly accounted for, and that the relevant truth was known to investors well before the declines in Wells Fargo's stock price on March 5, 11, and 12, 2020. *Id.*

Each of these disputes about loss causation and damages would involve a "battle-of-the-experts." This anticipated "battle-of-the-experts" created significant uncertainty and risks to recovery. ¶ 99. If the Court or a jury accepted any of the arguments advanced by Defendants' experts, damages would be meaningfully reduced or eliminated altogether. *Id.* The Settlement eliminates those risks and provides a certain recovery for the Settlement Class. *See Pearlstein*, 2022 WL 4554858, at *5 ("These disputes would involve at trial a battle of the experts, and a jury

16

could be swayed by experts for the Defendants, who [c]ould minimize the amount of Plaintiffs' losses."); *In re Facebook Inc. Sec. & Derivative Litig.*, 2015 WL 6971424, at *5 (S.D.N.Y. Nov. 9, 2015) ("[D]amages would be subject to a battle of the experts, with the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount [of] Plaintiffs' losses. Under such circumstances, a settlement is generally favored over continued litigation."); *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *9 (S.D.N.Y. Nov. 7, 2007) ("a very lengthy and complex battle of the parties' experts likely would have ensued at trial, with unpredictable results. These risks as to liability strongly militate in favor of the Settlement.").

In short, these risks posed a real possibility that Lead Plaintiffs and the Settlement Class would not be able to recover at all or would have recovered a lesser amount if the Action proceeded through class certification, summary judgment, trial, and appeals. Particularly in view of these risks, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement, which confers an immediate and substantial benefit, is in the best interests of the Settlement Class.[9]

### 2. The Settlement Represents a Substantial Percentage of Likely Recoverable Damages

The Settlement Amount—$1 billion in cash—represents an excellent recovery. The Settlement would be among the top six securities class action settlements in the past decade, the ninth largest ever in the Second Circuit, and among the top seventeen of all time in the United

---

[9] The risks to Lead Plaintiffs' claims in later stages of the litigation—including at summary judgment and trial—are highlighted by defense victories in recent high-profile securities class actions. For example, after years of litigation, defendants prevailed at summary judgment in a securities class action against Mylan arising out of misstatements concerning the company's EpiPen product and other generic drugs, which were the subject of DOJ and state Attorney General investigations and prosecutions. *See In re Mylan N.V. Sec. Litig.*, 2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023). Similarly, a securities class action involving Elon Musk's tweets about taking Tesla private went all the way through a jury trial, resulting in a defense verdict even though that court had already found the tweets were false and Musk acted recklessly in issuing them, and the same conduct resulted in SEC charges and a settlement. *See, e.g., In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010 (N.D. Cal. June 14, 2023).

States. It is also the largest securities settlement in history not involving a restatement, an action by the SEC, or criminal charges or convictions. The recovery also represents a meaningful percentage, well above the average, of the maximum realistically recoverable damages that could be established at trial. ¶ 101. Assuming Lead Plaintiffs prevailed on all liability issues (which was far from certain), the maximum total damages that Lead Plaintiffs could realistically establish at trial was approximately $4.2 billion. The Settlement Amount thus represents approximately 24% of the Settlement Class' maximum realistic damages. ¶ 102.

This level of recovery is above the norm in securities fraud class actions and supports approval of the Settlement. *See Pearlstein*, 2022 WL 4554858, at *6 (approving recovery of 13.75% of estimated maximum damages of $1.2 billion which was "well within the range of reasonableness and, in fact, considerably above the high end of historical averages" and "substantially exceed[ed] the median recovery of 2.3% of . . . damages for securities class actions with damages of over $1 billion between 2012-2020" and the "median recovery of 4.2% of damages in 2021"); *Okla. Firefighters Pension & Ret. Sys.*, 2021 WL 76328, at *3 (approving settlement that was 10% of estimated damages, noting that the settlement was "within the range previously approved by judges in this District," referencing recoveries ranging from 3% to 11% of estimated damages); *In re Canadian Superior Sec. Litig.*, 2011 WL 5830110, at *2 (S.D.N.Y. Nov. 16, 2011) (approving a settlement representing 8.5% of maximum damages, which the court noted "exceed[s] the average recovery in shareholder litigation"); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting "average settlement amounts" over past decade range from "3% to 7% of the class members' estimated losses"); *In re Merrill Lynch & Co., Inc. Rsch. Reports Sec. Litig.*, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (a recovery of approximately 6.25% was "at the higher end of the range of reasonableness").

18

### 3. The Costs and Delays of Continued Litigation Support Approval of the Settlement

The substantial costs, including significant expert and trial-related expenses that would ultimately have reduced the Settlement Class's recovery, and delays that would be required before any recovery could be obtained through litigation, also strongly support approval of the Settlement.

Although substantial discovery had been completed at the time the Settlement was reached, achieving a litigated judgment in this Action would still have required additional risk and delay. Absent the Settlement, attaining a recovery for the Settlement Class would have required, among other things: (i) defeating Defendants' motions for summary judgment; (ii) overcoming *Daubert* motions and motions *in limine*; (iv) prevailing at trial; and (v) defeating any post-trial motions, including a contested individual claims procedure. Finally, whatever the outcome at trial, it is virtually certain that appeals would be taken from any verdict for Lead Plaintiffs.

The foregoing would pose risk for the Settlement Class and delay the Settlement Class's ability to recover—assuming, of course, that Lead Plaintiffs were ultimately successful on all their claims. In contrast to this lengthy and uncertain litigation, the Settlement provides an immediate, significant, and certain recovery of $1 billion for members of the Settlement Class.

### 4. All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims"; "the terms of any proposed award of attorney's fees, including timing of payment"; and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors also supports approval of the Settlement or is neutral and does not suggest any basis for inadequacy of the Settlement.

19

First, the procedures for processing Settlement Class Members' claims and distributing the proceeds of the Settlement to eligible claimants are well-established and effective methods that have been widely used in securities class-action litigation. The Settlement's proceeds will be distributed to class members who submit eligible Claim Forms with required documentation to the Court-appointed Claims Administrator, Epiq Class Action and Claims Solutions, Inc. ("Epiq"). Epiq, an independent company with extensive experience handling securities class action administration, will review and process the claims under Lead Counsel's supervision, provide claimants with an opportunity to cure any deficiencies in their claims or request review of the denial of their claim by the Court, and then mail or wire claimants their *pro rata* share of the Net Settlement Fund upon approval of the Court.[10] This type of claims processing is standard in securities class actions and has long been used and found to be effective. Such claim filing and processing is necessary because neither Lead Plaintiffs nor Wells Fargo possesses individual investors' trading data that would allow the Parties to create a "claims-free" process to distribute Settlement funds.

Second, the relief provided for the Settlement Class in the Settlement is also adequate when the terms of the proposed award of attorneys' fees is taken into account. As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 18% of the Settlement Fund, to be paid upon approval by the Court, are fair and reasonable in light of, among other things, the efforts of Lead Counsel and the risks in the litigation.

Lastly, the amended Rule 23 asks the Court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3). *See* Fed. R.

---

[10] The Settlement is not a claims-made settlement. If the Settlement is approved, Defendants will have no right to the return of any portion of the Settlement based on the number or value of claims submitted. *See* Stipulation ¶ 13.

Civ. P. 23(e)(2)(C)(iv). Here, the only such agreement (other than the Stipulation itself) is the Parties' confidential Supplemental Agreement, which sets forth the conditions under which Wells Fargo would be able to terminate the Settlement if the number of shares held by Settlement Class Members who request exclusion from the Settlement Class reaches a certain threshold. This type of agreement is "a standard provision in securities class actions and has no negative impact on the fairness of the Settlement." *Signet*, 2020 WL 4196468, at \*13.

**D.    The Settlement Treats Class Members Equitably Relative to Each Other**

The proposed Settlement treats members of the Settlement Class equitably relative to one another. As discussed below, pursuant to the Plan of Allocation, eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on their transactions in Wells Fargo common stock. Lead Plaintiffs will receive the same level of *pro rata* recovery (as calculated under the Plan of Allocation) as all other Settlement Class Members.

**E.    The Reaction of the Settlement Class to the Settlement**

One factor set forth in *Grinnell* but not included in Rule 23(e)(2) is the reaction of the class to the proposed Settlement. *See, e.g.*, *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 266 (S.D.N.Y. 2012); *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at \*16 (S.D.N.Y. Nov. 8, 2010). In accordance with the Preliminary Approval Order and discussed in greater detail below, pp. 24-25, Epiq disseminated the Notice and Claim Form to potential Settlement Class Members and nominees via mail, as well as caused the Summary Notice to be published in *Investor's Business Daily*, transmitted over the *PR Newswire*, and published in *The Wall Street Journal*. *See* Declaration of Alexander P. Villanova Regarding the Mailing of Notice and Claim Form and the Publication of the Summary Notice (Ex. 6), at ¶¶ 2-8. The Notice set out the essential terms of the Settlement and informed potential Settlement Class Members of, among other things, their right to opt out of the Settlement Class or object to

any aspect of the Settlement, as well as the procedure for submitting Claim Forms.

Although the August 18, 2023 deadline set by the Court for Settlement Class Members to object to the Settlement has not yet passed, to date, no objections to the Settlement or the Plan of Allocation have been received. ¶ 116. Lead Plaintiffs will file reply papers by September 1, 2023 addressing any objections that may be received.

*      *      *

In sum, all of the factors to be considered under Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

## II.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED

A plan for allocating settlement proceeds should be approved if it is fair, reasonable, and adequate. *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012); *Bear Stearns*, 909 F. Supp. 2d at 270. A plan of allocation is fair and reasonable as long as it has a "rational basis." *FLAG Telecom*, 2010 WL 4537550, at *21; *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 497 (S.D.N.Y. 2009). Generally, a plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable. *See IMAX*, 283 F.R.D. at 192. Courts give great weight to the opinion of experienced counsel. *See Giant Interactive*, 279 F.R.D. at 163; *see also Villa v. Highbury Concrete Inc.*, 2022 WL 19073649, at *4 (E.D.N.Y. Nov. 25, 2022) (stressing that a plan is more likely to be reasonable "if recommended by experienced and competent class counsel").

Here, the proposed Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiffs' damages expert, Dr. Michael L. Hartzmark, provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms. In developing the Plan of Allocation, Lead Plaintiffs' expert calculated

22

the amount of estimated artificial inflation in the price of Wells Fargo common stock that was proximately caused by Defendants' false and misleading statements by considering the price changes in Wells Fargo common stock in reaction to the alleged corrective disclosures, adjusting for price changes attributable to market and industry factors and litigation risk. ¶ 119.

Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of Wells Fargo common stock during the Class Period that is listed in the Claim Form and for which adequate documentation is provided. ¶ 124. In general, the Recognized Loss Amount will be the lesser of: (a) the difference between the amount of alleged artificial inflation in Wells Fargo common stock at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price for the shares. *Id*. Claimants who purchased and sold all their shares before the first alleged corrective disclosure, or who purchased and sold all their shares between two consecutive dates on which artificial inflation was allegedly removed from the price of the stock (that is, they did not hold the shares over a date where artificial inflation was allegedly removed from the stock price), will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions because the level of artificial inflation is the same between the corrective disclosures, and any loss suffered on those sales would not be the result of the alleged misstatements. ¶ 125. The Plan of Allocation also applies the PSLRA's damages limitation; discounts shares purchased from February 2, 2018 through May 29, 2018, to account for the Court's dismissal of claims during that period; and limits a claimant to his, her, or its overall market loss in transactions in Wells Fargo common stock during the Class Period, and claimants who have an overall market gain are not eligible for a recovery. ¶¶ 126-128.

Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to

23

equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Action. ¶¶ 118, 131. Moreover, to date, no objections to the proposed Plan of Allocation have been received. ¶ 131.[11]

## III.    THE SETTLEMENT CLASS SHOULD BE CERTIFIED

In connection with the Settlement, the Parties have stipulated to the certification of the Settlement Class. As set forth in Lead Plaintiffs' motion for preliminary approval of the Settlement, the Settlement Class satisfies all the requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. *See* ECF No. 179, at 15-20. None of the facts regarding certification of the Settlement Class have changed since Lead Plaintiffs submitted the motion for preliminary approval, and there has been no objection to certification. Accordingly, Lead Plaintiffs respectfully request that the Court certify the Settlement Class under Rules 23(a) and (b)(3) for the reasons set forth in their earlier motion. *See id.*

## IV.    NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice to the Settlement Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974). The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Visa*, 396 F.3d at 114.

---

[11] Dr. Hartzmark's work has been relied upon by courts in similar cases. *See, e.g.*, *SEB Inv. Mgmt. AB v. Symantec Corp.*, 2022 WL 409702, at *6 (N.D. Cal. Feb. 10, 2022) (approving settlement and allocation plan supported by Dr. Hartzmark's "thorough and detailed damages analysis").

24

Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards. The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B), the PSLRA, 15 U.S.C. § 78u-4(a)(7), and S.D.N.Y. Local Rules. Epiq, the Court-approved Claims Administrator, began mailing copies of the Notice Packet to potential Class Members on June 7, 2023, and, as of August 3, 2023, had disseminated over 1.8 million copies of the Notice Packet to potential Settlement Class Members and nominees. *See id.* ¶¶ 3-7. In addition, Epiq caused the Summary Notice to be published in *Investor's Business Daily* and transmitted over the *PR Newswire* on June 19, 2023, and to be published in *The Wall Street Journal* on June 20, 2023. *See id.* ¶ 8. Copies of the Notice, Claim Form, and Stipulation were made available on Epiq's settlement website beginning on June 7, 2023, and copies of the Notice and Claim Form were also available on Lead Counsel's websites. *See* Villanova Decl. ¶ 12; Joint Decl. ¶ 115. On July 27, 2023, Epiq updated the website to reflect that the Settlement Fairness Hearing on September 8, 2023 would be held before the Honorable Jennifer L. Rochon. This combination of individual mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely circulated publication, transmitted over the newswire, and set forth on internet websites, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Advanced Battery Techs.*, 298 F.R.D. 171, 182-83 (S.D.N.Y. 2014).

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

Dated: August 4, 2023

Respectfully submitted,

/s/ *Laura H. Posner\**

**COHEN MILSTEIN SELLERS &
  TOLL PLLC**
Laura H. Posner (LP-8612)
88 Pine Street, Fourteenth Floor
New York, New York 10005
Tel.: (212) 220-2925
Fax: (212) 838-7745
lposner@cohenmilstein.com

Steven J. Toll (admitted *pro hac vice*)
Julie G. Reiser (admitted *pro hac vice*)
S. Douglas Bunch (SB-3028)
Molly J. Bowen (admitted *pro hac vice*)
1100 New York Avenue, N.W., Suite 500
Washington, DC 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
jreiser@cohenmilstein.com
dbunch@cohenmilstein.com
mbowen@cohenmilstein.com

*Counsel for Lead Plaintiffs Mississippi
and Rhode Island, and Co-Lead Counsel
for the Settlement Class*

/s/ *John C. Browne\**

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
John C. Browne (JB-0391)
Jeroen van Kwawegen (JV-1010)
Michael D. Blatchley (MB-7279)
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 554-1400
Fax: (212) 554-1444
johnb@blbglaw.com
jeroen@blbglaw.com
michaelb@blbglaw.com

Jonathan D. Uslaner (JU-1942)
Lauren M. Cruz (admitted *pro hac vice*)
2121 Avenue of the Stars
Los Angeles, California 90067
Tel.: (310) 819-3470
jonathanu@blbglaw.com
lauren.cruz@blbglaw.com

*Counsel for Lead Plaintiffs Handelsbanken
and Louisiana Sheriffs, and Co-Lead Counsel
for the Settlement Class*

**KLAUSNER, KAUFMAN, JENSEN &
LEVINSON**
Robert D. Klausner (admitted *pro hac vice*)
7080 NW 4th Street
Plantation, Florida 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Louisiana Sheriffs*

*All electronic signatures ("*/s/*") are signed with consent of counsel pursuant to Rule 8.5 of this
Court's Electronic Case Filing Rules & Instructions, as of July 24, 2023.

26