**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE WELLS FARGO & COMPANY
SECURITIES LITIGATION

Case No. 1:20-cv-04494-JLR-SN

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S MOTION**
**FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT ................................................................................................... 6

I.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE .................................. 6

    A.   A Reasonable Percentage of the Fund Is the Appropriate Method for Awarding Attorneys' Fees in Common Fund Cases ................................. 6

    B.   The Lead Plaintiffs Support the Requested Fee, Making It Presumptively Reasonable ....................................................................................... 7

    C.   Other Factors Confirm the Reasonableness of the Requested Fee ......................... 9

        1.   The Requested Fee Is Reasonable in Light of the Substantial Time and Labor Expended ................................................................. 9

        2.   The Magnitude and Complexity of the Litigation Support the Requested Fee ..................................................................... 11

        3.   The Substantial Risk and Duration of the Litigation Support the Requested Fee ..................................................................... 12

        4.   The Requested Fee Is Supported by the Quality of Representation and the Percentage of Damages Recovered by the Settlement ................. 15

        5.   The Requested Fee Is Reasonable in Relation to the Settlement ............ 16

        6.   Public Policy Considerations ................................................... 20

    D.   The Requested Fee Is Reasonable Under a Lodestar Crosscheck ......................... 21

    E.   The Requested Fee Is Consistent with the Notice ................................. 23

II.   PLAINTIFFS' COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED ................. 23

III.   LEAD PLAINTIFFS SHOULD BE AWARDED THEIR REASONABLE COSTS AND EXPENSES UNDER THE PSLRA ............................................. 24

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
  2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) ............................................................15, 16, 18

*Allapattah Servs., Inc. v. Exxon Corp.*,
  454 F. Supp. 2d 1185 (S.D. Fla. 2006) ..................................................................................18

*In re Banco Bradesco S.A. Sec. Litig.*,
  2019 WL 6114713 (S.D.N.Y. Nov. 18, 2019) ........................................................................9

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
  772 F.3d 125 (2d Cir. 2014)..................................................................................................25

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
  909 F. Supp. 2d 259 (S.D.N.Y. 2012)...................................................................................15

*Bekker v. Neuberger Berman Grp. 401(k) Plan Inv. Comm.*,
  504 F. Supp. 3d 265 (S.D.N.Y. 2020)....................................................................................6

*In re BHP Billiton Ltd. Sec. Litig.*,
  2019 WL 1577313 (S.D.N.Y. Apr. 10, 2019) .........................................................................7

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980)................................................................................................................6

*In re BRF S.A. Sec. Litig.*,
  2020 WL 10618214 (S.D.N.Y. Oct. 23, 2020) ........................................................................7

*In re Canadian Superior Sec. Litig.*,
  2011 WL 5830110 (S.D.N.Y. Nov. 16, 2011).......................................................................20

*In re Cardinal Health, Inc. Sec. Litig.*,
  528 F. Supp. 2d 752 (S.D. Ohio 2007) .................................................................................18

*In re China Sunergy Sec. Litig.*,
  2011 WL 1899715 (S.D.N.Y. May 13, 2011) .......................................................................20

*Christine Asia Co. v. Yun Ma*,
  2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ............................................................8, 17, 25

*City of Providence v. Aeropostale, Inc.*,
  2014 WL 1883494 (S.D.N.Y. May 9, 2014) ...................................................................20, 22

*In re Comverse Tech., Inc.*,
  2010 WL 2653354 (E.D.N.Y. June 24, 2010) ....................................................8, 12, 17, 19

*Cornwell v. Credit Suisse Grp.*,
  2011 WL 13263367 (S.D.N.Y. July 20, 2011) ...................................................................21

*Cosby v. KPMG LLP*,
  2022 WL 4129703 (E.D. Tenn. July 12, 2022) ...................................................................22

*Davis v. J.P. Morgan Chase & Co.*,
  827 F. Supp. 2d 172 (W.D.N.Y. Oct. 11, 2011) ...............................................................21

*In re Deutsche Bank AG Sec. Litig.*,
  2020 WL 3162980 (S.D.N.Y. June 11, 2020) .......................................................................7

*In re Deutsche Telekom AG Sec. Litig.*,
  2005 WL 7984326 (S.D.N.Y. June 14, 2005) ...............................................................21, 22

*In re Evoqua Water Techs. Corp. Sec. Litig.*,
  No. 1:18-cv-10320-JPC (S.D.N.Y. Nov. 1, 2021) .............................................................22

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  343 F. Supp. 3d 394 (S.D.N.Y. 2018)................................................................................11

*Fields v. Kijakazi*,
  24 F.4th 845 (2d Cir. 2022) ..............................................................................................19

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
  62 F.4th 704 (2d Cir. 2023) ................................................................................................6

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
  2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010).....................................................6, 21, 24, 25

*Fresno Cnty. Emps.' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*,
  925 F.3d 63 (2d Cir. 2019)..................................................................................................2

*Goldberger v. Integrated Resources, Inc.*,
  209 F.3d 43 (2d Cir. 2000)....................................................................................... *passim*

*Hefler v. Wells Fargo & Co.*,
  2018 WL 6619983 (N.D. Cal. Dec. 18, 2018), *aff'd sub nom. Hefler v. Pekoc*,
  802 F. App'x 285 (9th Cir. 2020) .................................................................................17, 22

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ..........................................................7, 20, 22

*In re Initial Pub. Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009)............................................................................7, 17

*In re ITT Educ. Servs., Inc. Sec. Litig.*,
  No. 1:13-CV-01620 (S.D.N.Y. Mar. 8, 2016) ...................................................................22

iii

*Jaffe v. Household Int'l, Inc.*,
    No. 1:02-cv-05893-JLA (N.D. Ill. Nov. 11, 2016) ..................................................17

*Maley v. Del. Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)......................................................................21

*In re Marsh & McLennan Cos. Sec. Litig.*,
    2009 WL 5178546 (S.D.N.Y. Dec. 21, 2009) ........................................................25

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) ............................................................................16

*Martinek v. Amtrust Fin. Servs., Inc.*,
    2022 WL 16960903 (S.D.N.Y. Nov. 16, 2022) ........................................................9

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
    Civil Action No. 05-2367 (SRC)(CLW) (D.N.J. June 28, 2016) ...........................17

*Meredith Corp. v. SESAC, LLC*,
    87 F. Supp. 3d 650 (S.D.N.Y 2015)........................................................................11

*In re Nortel Networks Corp. Sec. Litig.*,
    539 F.3d 129 (2d Cir. 2008)..................................................................................2, 7

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003).........................................7

*Pearlstein v. BlackBerry Ltd.*,
    2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022).................................................7, 20, 23

*In re Pfizer Inc. Sec. Litig.*,
    No. 1:04-cv-09866-LTS-HBP (S.D.N.Y. Dec. 21, 2016).......................................17

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    No. 1:16-cv-03591-GHW (S.D.N.Y. Nov. 21, 2022)............................................22

*Savoie v. Merchs. Bank*,
    166 F.3d 456 (2d Cir. 1999).....................................................................................6

*Schwartz v. TXU Corp.*,
    2005 WL 3148350 (N.D. Tex. Nov. 8, 2005).........................................................13

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2020 WL 4196468 (S.D.N.Y. July 21, 2020) ................................................. *passim*

*In re Syngenta AG MIR 162 Corn Litig.*,
    357 F. Supp. 3d 1094 (D. Kan. 2018) ....................................................................18

*In re Telik, Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008) ......................................................................7

*In re Teva Sec. Litig.*,
  No. 3:17-cv-00558-SRU (D. Conn. June 2, 2022) ................................................17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ........................................................18

*In re Twitter, Inc. Sec. Litig.*,
  2022 WL 17248115 (N.D. Cal. Nov. 21, 2022) ....................................................17

*In re Veeco Instruments Inc. Sec. Litig.*,
  2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ......................................7, 16, 20, 25

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) ................................................................................2, 6

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
  2022 WL 345066 (N.D. Cal. Feb. 4, 2022) ..........................................................13

*Woburn Ret. Sys. v. Salix Pharms., Ltd.*,
  2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017) ....................................................2, 7

**STATUTES**

15 U.S.C. § 78u-4(a)(6) ..........................................................................................7

Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") and Cohen Milstein Sellers & Toll PLLC ("CMST" and, together with BLB&G, "Lead Counsel"), respectfully submit this memorandum of law in support of their motion for an award of attorneys' fees in the amount of 18% of the Settlement Fund, net of expenses.[1] Lead Counsel also seek $1,130,909.85 for Plaintiffs' Counsel's Litigation Expenses and $83,600.00 for costs incurred by Lead Plaintiffs, as authorized by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

## PRELIMINARY STATEMENT

The proposed $1 billion Settlement of this securities class action is a historic result for investors. The all-cash Settlement is the largest securities settlement in history not involving a restatement, an action by the Securities and Exchange Commission ("SEC"), or criminal charges or convictions. It is the sixth largest securities class action settlement in the past decade, the ninth largest ever in the Second Circuit, and the seventeenth largest of all time in the country. It is, by any measure, a remarkable result.

Lead Counsel vigorously prosecuted this action without any compensation and on a fully contingent basis for nearly three years. The litigation risks were real at every turn, and Lead Counsel's adversaries included some of the premier defense firms in the country. Lead Counsel seek attorneys' fees of 18% of the Settlement Fund—an amount approved by the four highly sophisticated Court-appointed Lead Plaintiffs, less than the fee retainers imposed by the Lead Plaintiffs at the outset of the litigation, and less than the percentage contained in the Notice mailed

---

[1] Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated May 8, 2023 (ECF No. 178-1) (the "Stipulation"), or in the Declaration of John C. Browne and Laura H. Posner in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Joint Declaration" or "Joint Decl."), filed herewith. In this memorandum, citations to "¶ __" refer to paragraphs in the Joint Declaration and citations to "Ex. __" refer to exhibits to the Joint Declaration.

to Settlement Class members. We respectfully submit that the fee request is fair and reasonable for multiple reasons.

First, courts have long acknowledged the importance of incentivizing class counsel to pursue the largest possible recoveries. Courts in this Circuit award fees using the "percentage-of-fund" approach because it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). A class action litigated on contingency is fundamentally different from a case where litigation expenses are funded by the client and attorneys are continuously paid, even if they lose. As such, in contingency cases, counsel is entitled to compensation "for bearing the risk that the suit would not generate any recovery." *Fresno Cnty. Emps.' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*, 925 F.3d 63, 72 (2d Cir. 2019).

Second, each of the four Lead Plaintiffs independently approved the fee request based on arm's-length negotiation and careful consideration of the quality of Lead Counsel's work, empirical evidence from a noted expert, and the result achieved for the Settlement Class. The Lead Plaintiffs in this case are institutional investors, including a large and sophisticated international fund company and three major U.S. pension funds highly experienced in securities class actions. As the Second Circuit has instructed, courts should "give serious consideration to negotiated fees because PSLRA lead plaintiffs often have a significant financial stake in the settlement, providing a powerful incentive to ensure that any fees resulting from that settlement are reasonable." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008).

This is particularly true here given that the requested fee percentage is less than the lowest percentage contemplated in any of the Lead Plaintiffs' *ex ante* retainer agreements with Lead Counsel. *See infra* at p. 8; *Woburn Ret. Sys. v. Salix Pharms., Ltd.*, 2017 WL 3579892, at *7

(S.D.N.Y. Aug. 18, 2017) ("*ex ante* fee agreements . . . enjoy a presumption of reasonableness under the PSLRA"). It was also independently evaluated and approved by each of the Lead Plaintiffs at the end of the litigation. Specifically, following the conclusion of the litigation, Lead Plaintiffs analyzed Lead Counsel's fee request to determine its appropriateness in light of the work performed, risks faced, governing law, and results obtained. As part of that analysis, Lead Plaintiffs reviewed the report of Professor Brian T. Fitzpatrick, the Milton R. Underwood Chair of Free Enterprise at Vanderbilt University Law School. Professor Fitzpatrick independently analyzed the requested fee in light of the settlement achieved, academic research, and empirical data regarding similar cases. *See* Ex. A to Lead Plaintiffs Joint Decl. (Ex. 2A). Based on their consideration of Professor Fitzpatrick's analyses, the excellent result, and their observations of Lead Counsel's skill formed during their oversight of the litigation, Lead Plaintiffs each independently authorized the 18% fee request. *See* Lead Plaintiffs Joint Decl. (Ex. 2), at ¶¶ 27-40. Lead Plaintiffs' authorization, after thoughtful deliberation, should be given substantial weight under the case law.

Third, the relevant factors under *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000), strongly support the requested fee. The risks in this case were quite substantial. Over half of securities cases are dismissed at the pleading stage, and the risk of dismissal in this case was a serious one given the lack of any restatement or SEC or DOJ action alleging a fraud by Wells Fargo or any of the Individual Defendants against Wells Fargo's investors. Even after overcoming Defendants' motion to dismiss, Lead Counsel continued to face significant risks in discovery, in connection with class certification, and at summary judgment and/or trial. Defendants vigorously contested every element of liability and damages, and there was no guarantee that Lead Plaintiffs would be able to establish that Defendants made material misrepresentations, with scienter, that damaged investors. *See infra* at p. 12-14.

3

While the many significant risks present in this securities action are discussed in more detail below, two in particular bear highlighting. One, Lead Counsel faced unique challenges in discovery because Defendants and the Regulators contended that many of the most relevant documents—exchanges and analyses relating to Wells Fargo's communications with the Regulators—were shielded from discovery by the "bank examination," or "confidential supervisory information" ("CSI") privilege. These are broad privileges that arguably extended to millions of critical documents that Lead Counsel needed to prove its case. These privileges are not raised in typical securities class actions, but in this case they were a central focus, requiring Lead Counsel to engage in thousands of hours of negotiations, subpoenas, correspondence, and disputes with multiple federal agencies over many months just to obtain basic documents that in a less challenging case would be obtained almost immediately from the defendant.

If Lead Counsel had been unsuccessful in convincing the Regulators to produce these documents, they would have faced significant difficulty in proving the case. Moreover, even after Lead Counsel were able to successfully obtain these materials, Defendants intended to use CSI to justify their Class Period statements to investors, claiming that Regulators restricted the information they could share publicly.

Another noteworthy risk in this case relates to price impact, loss causation, and damages. Three of the largest alleged declines in Wells Fargo's stock price occurred in early March 2020, when the COVID-19 pandemic shut down the country, resulting in unprecedented volatility and uncertainty in the United States capital markets. The remaining alleged loss causation events occurred on quarterly earnings dates when Wells Fargo disclosed negative news about issues that were unrelated to the alleged fraud. Defendants thus had credible arguments that the stock price declines on each of the alleged "corrective disclosure dates" were *not* caused by revelation of the

alleged fraud, but rather by unrelated news regarding Wells Fargo's financial performance and the impact of the COVID-19 pandemic on the Company, the world, and the capital markets writ large. If accepted, these arguments would have eliminated or dramatically reduced the Settlement Class's damages.

To achieve the Settlement in the face of these risks, Lead Counsel expended an enormous amount of time, resources, and effort. As discussed below, Lead Counsel prepared a compelling 125-page complaint; largely overcame Defendants' motion to dismiss; filed a comprehensive motion for class certification, supported by a 42-page expert report on issues of market efficiency and damages; convinced the Regulators, through extensive letter requests supported by a myriad of pages of exhibits and countless hours of meet-and-confers, to authorize the production of materials containing CSI; conducted 10 fact and expert depositions; reviewed over 3.5 million pages of documents; and worked extensively with experts on issues of damages, loss causation, and banking regulations.

By surmounting the risks of this case and investing immense time and effort, Lead Counsel obtained a superlative $1 billion result that represents approximately 24% of maximum realistically recoverable damages, which greatly exceeds the percentage of recovery achieved in most securities actions. Lead Counsel's independent work in pursuing a case that the SEC and the DOJ rejected has secured the only recovery for investors arising out of the fraud alleged in this matter. It is no exaggeration to say that absent Lead Counsel's efforts, Wells Fargo investors would not be recovering a single penny. That such a significant settlement was achieved here speaks volumes about the quality of Lead Counsel's representation.

Finally, Lead Counsel seek payment of $1,130,909.85 for incurred Litigation Expenses, which are more fully detailed herein, and $83,600.00 in PSLRA awards for the Lead Plaintiffs.

These expenses were reasonable and essential for the successful prosecution of this Action, and fall within the standard types of expenses commonly reimbursed in securities class actions.

## ARGUMENT

### I.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE

#### A.   A Reasonable Percentage of the Fund Is the Appropriate Method for Awarding Attorneys' Fees in Common Fund Cases

The "common fund doctrine" provides that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 723 (2d Cir. 2023). The "common fund doctrine" serves the public interest by "encourag[ing] skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and, thereby "discourag[ing] future misconduct of a similar nature." *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *23 (S.D.N.Y. Nov. 8, 2010).

For nearly two decades, this Circuit has awarded attorneys' fees as a percentage of the total common fund—*i.e.*, the "percentage of the fund method." *Wal-Mart*, 396 F.3d at 121. "The percentage method is . . . advantageous over the lodestar alternative because it 'directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.'" *Bekker v. Neuberger Berman Grp. 401(k) Plan Inv. Comm.*, 504 F. Supp. 3d 265, 269 (S.D.N.Y. 2020); *see also Savoie v. Merchs. Bank*, 166 F.3d 456, 460 (2d Cir. 1999) (the "percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases").

The percentage-of-fund method is also "consistent with the PSLRA, which expressly provides that class counsel are entitled to attorneys' fees that represent a 'reasonable *percentage*'

of the damages recovered by the class." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at \*12 (S.D.N.Y. Dec. 19, 2014) (citing 15 U.S.C. § 78u-4(a)(6)). As courts have noted, "Congress plainly contemplated [in the PSLRA] that percentage-of-recovery would be the primary measure of attorneys' fees awards in federal securities class actions." *Id.* (*quoting In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 587 (S.D.N.Y. 2008)). Accordingly, courts in this Circuit award attorneys' fee requests in securities class actions based on the percentage-of-fund method.[2]

### B.   The Lead Plaintiffs Support the Requested Fee, Making It Presumptively Reasonable

"Since passage of the PSLRA, courts . . . have found that in a PSLRA case, a fee request which has been approved and endorsed by a properly-appointed lead plaintiff is 'presumptively reasonable,' especially where the lead plaintiff is a sophisticated institutional investor." *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at \*8 (S.D.N.Y. Nov. 7, 2007); *Salix*, 2017 WL 3579892, at \*7 ("*ex ante* fee agreements between lead counsel and lead plaintiffs enjoy a presumption of reasonableness under the PSLRA"); *Signet*, 2020 WL 4196468, at \*17 ("Because the requested fee is based on an agreement that Lead Counsel entered into with the sophisticated institutional Lead Plaintiff at the outset of the litigation, the fee is presumptively reasonable.").

Courts apply this presumption of reasonableness because the PSLRA lead plaintiff process is specifically structured to select a lead plaintiff that possesses the necessary sophistication and financial motivation to optimize the recovery for themselves and all investors. *See Nortel*, 539

---

[2] *See, e.g., Pearlstein v. BlackBerry Ltd.*, 2022 WL 4554858, at \*10 (S.D.N.Y. Sept. 29, 2022) (awarding 33.3% fee); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (awarding 33.3%); *In re Deutsche Bank AG Sec. Litig.*, 2020 WL 3162980, at \*1 (S.D.N.Y. June 11, 2020) (awarding 33.3%); *In re Oxford Health Plans, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 26795, at \*13-14 (S.D.N.Y. June 12, 2003) (awarding 28%); *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at \*24 (S.D.N.Y. July 21, 2020) (awarding 25%); *In re BRF S.A. Sec. Litig.*, 2020 WL 10618214, at \*1 (S.D.N.Y. Oct. 23, 2020) (awarding 25%); *In re BHP Billiton Ltd. Sec. Litig.*, 2019 WL 1577313, at \*1 (S.D.N.Y. Apr. 10, 2019) (awarding 30%).

F.3d at 133 (instructing courts to "give serious consideration to negotiated fees because PSLRA lead plaintiffs often have a significant financial stake in the settlement, providing a powerful incentive to ensure that any fees resulting from that settlement are reasonable").

That process worked here. Each of the Court-appointed Lead Plaintiffs is a sophisticated institutional investor with a significant financial stake in this action. The Lead Plaintiffs, who lost tens-of-millions of dollars, were motivated to retain skilled counsel at a reasonable price, negotiating fee agreements that would encourage counsel to maximize their and the Class's recovery without permitting counsel to enjoy a windfall. For example, three of the Lead Plaintiffs' retainers included a fee cap stating that the fee would not exceed a certain percentage. The most restrictive of these was the retainer with Lead Plaintiff Handelsbanken, which suffered the largest losses from its Class Period trades among all Lead Plaintiffs, and whose retainer states that Lead Counsel is entitled to request fees amounting to "20% of the recovery." Joint Decl. ¶ 137.

This percentage was mutually agreed upon as "fair and reasonable" by Handelsbanken and Lead Counsel at the start of the litigation. *Id.* Lead Counsel's fee request of 18%, which is lower than the percentage negotiated by Handelsbanken and the other Lead Plaintiffs, is presumptively fair and reasonable under Second Circuit precedent. *See Christine Asia Co. v. Yun Ma*, 2019 WL 5257534, at *18 (S.D.N.Y. Oct. 16, 2019) (applying a "presumption of reasonableness" because the 25% fee request was "less than the pre-litigation fee agreement between Lead Plaintiff and Lead Counsel, which authorized counsel to seek up to 33.3%"); *see also In re Comverse Tech., Inc.*, 2010 WL 2653354, at *4 (E.D.N.Y, June 24, 2010) ("The court sees no need to impose its own *ex post* assessment of Lead Counsel's value when the retainer and fee agreements speak for themselves.").

Lead Counsel's fee request also received *ex post* authorization from all Lead Plaintiffs.

Following the resolution of this Action, Lead Plaintiffs individually assessed and reviewed Lead Counsel's performance, fee awards in comparable cases, and expert analysis on typical fees. At the conclusion of that process, each granted approval to the 18% fee request. This further supports the requested fee. *See Martinek v. Amtrust Fin. Servs., Inc.,* 2022 WL 16960903, at *1 (S.D.N.Y. Nov. 16, 2022) (that requested fee of 33.3% had "been reviewed and approved as reasonable by Lead Plaintiff, who is an experienced investor, and who closely supervised the prosecution and Settlement of the Action" supported approval); *Signet*, 2020 WL 4196468, at *17 ("the approval of the requested fee by Lead Plaintiff, which was actively involved in the prosecution and settlement of the Action, supports approval of the fee"); *In re Banco Bradesco S.A. Sec. Litig.*, 2019 WL 6114713, at *2 (S.D.N.Y. Nov. 18, 2019) (fact that requested fee of 25% had been "reviewed and approved as reasonable by Lead Plaintiff, who oversaw the prosecution and resolution of the Action" supported approval).

### C.    Other Factors Confirm the Reasonableness of the Requested Fee

Courts consider several additional factors in evaluating attorney fee requests, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50. Each of these factors supports the requested fee in this case.

### 1.    The Requested Fee Is Reasonable in Light of the Substantial Time and Labor Expended

Lead Counsel's substantial work prosecuting this Action and achieving the Settlement support the requested fee percentage. *Goldberger*, 209 F.3d at 50. As detailed in the Joint Declaration, Lead Counsel dedicated significant time and exerted substantial effort over the last

three years diligently litigating the claims, all without receiving any form of compensation or reimbursement for expenses. Among other things, Lead Counsel:

- conducted an extensive investigation into the alleged fraud, including a thorough review of Wells Fargo's SEC filings, analyst reports, conference call transcripts, news articles, and congressional reports (¶¶ 17-21);

- consulted extensively with subject matter experts in areas such as market efficiency, loss causation, damages, the banking industry, government consent orders, and CSI rules and regulations (¶¶ 63-67);

- researched and drafted a detailed Consolidated Amended Class Action Complaint (the "Complaint") based on Lead Counsel's extensive investigation (¶ 22);

- researched and drafted a successful opposition to Defendants' motion to dismiss the Complaint (¶¶ 25-29);

- moved for class certification, which included a detailed 42-page expert report with more than 700 pages of exhibits and preparing for and defending the deposition of Lead Plaintiffs' expert on issues of market efficiency and damages (¶¶ 31-35);

- conducted extensive fact discovery, which included preparing and serving document requests as well as subpoenas to 27 non-party witnesses (¶¶ 36-62);

- engaged in multiple extensive and substantive meet-and-confers and discovery conferences regarding Defendants' and the Regulators' assertion of the CSI privilege over most of Wells Fargo's documents (¶¶ 43-52);

- submitted to the Regulators letter briefs under the *Touhy* regulations totaling over 579 pages, replete with extensive analysis and exhibits totaling more than 2,400 pages, requesting that the Regulators authorize Wells Fargo to produce documents that contained CSI (¶¶ 42-52);

- reviewed approximately 3.5 million pages of documents produced by Defendants and non-party witnesses (¶¶ 52, 139);

- examined and defended witnesses in 10 depositions (¶¶ 34, 62-62); and

- prepared substantive briefs and presentations in advance of an in-person mediation session before the Honorable Layn Phillips (¶¶ 69-70).

To date, Lead Counsel has expended over 106,000 hours prosecuting this Action. After the Court's approval of the Settlement, Lead Counsel will dedicate further time to effectively oversee the claims administration process and facilitate the distribution of the Settlement funds, which will be uncompensated. The time and effort invested by Lead Counsel in this case played a pivotal role

in securing this historic settlement, thereby underscoring the reasonableness of the fee request. *See Signet*, 2020 WL 4196468, at *19 ("The time and effort devoted to this case by Plaintiff's Counsel was critical in obtaining the result achieved by the Settlement, and confirms that the fee request here is reasonable.").

### 2.     The Magnitude and Complexity of the Litigation Support the Requested Fee

The magnitude and complexity of this case further support the requested fee award. *Goldberger*, 209 F.3d at 50. Class action suits "have a well-deserved reputation as being most complex." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 669 (S.D.N.Y 2015). This reputation is especially warranted for securities class actions, which are "notably difficult and notoriously uncertain to litigate." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 409 (S.D.N.Y. 2018).

This case was no exception. This action gave rise to a multitude of hotly disputed issues concerning price impact, truth-on-the-market, the scope of the CSI privilege, loss causation, and damages. These complex legal and factual disputes demanded that Lead Counsel utilize their expertise and specialized knowledge in effectively prosecuting securities class actions. *See* Exs. 7A-2 and 7B-2 (firm resumes). Lead Counsel dedicated enormous resources to investigate the claims; overcome Defendants' motion to dismiss; prepare comprehensive discovery requests and 27 document subpoenas; move for class certification; participate in 10 witness depositions; successfully persuade the Regulators to authorize the production of discovery materials containing CSI; review over 3.5 million pages of produced documents, and construct persuasive written and oral presentations of the evidence and damages at mediation. It was only through Lead Counsel's effective and sophisticated prosecution of this case that the Settlement was achieved.

### 3.    The Substantial Risk and Duration of the Litigation Support the Requested Fee

The significant risks that Lead Counsel shouldered for the benefit of the Settlement Class in prosecuting this securities class action on a fully contingent basis over the past three years further support the requested fee reward. *Goldberger*, 209 F.3d at 50. Lead Counsel undertook this representation on a fully-contingent basis, recognizing from the outset that it would necessitate an outlay of significant resources and the payment of millions of dollars in expenses—all without any assurance that Lead Counsel would receive any compensation or recoup any expenses.

Nothing about this litigation was certain or guaranteed: the Court could have dismissed the case in full at the motion to dismiss stage; Lead Counsel could have been unable to convince the Regulators to waive the CSI privilege and authorize Wells Fargo to produce critical discovery; the 3.5 million pages of documents produced by Wells Fargo could have contained exculpatory evidence that eviscerated the claims; the 10 fact and expert witnesses deposed could have testified adversely to Lead Plaintiffs' case; and Lead Plaintiffs could have been unable to develop the powerful evidentiary record necessary to compel Defendants to settle for $1 billion. Lead Counsel bore these risks—and many others—for three years for the benefit of the Settlement Class, without any promise of compensation or reimbursement of expenses. *See Comverse*, 2010 WL 2653354, at *5 ("Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation.").

### a.    Risks of Establishing Liability

Lead Plaintiffs faced meaningful risks in establishing Defendants' liability. Among other things, Defendants had a legitimate "truth-on-the-market" defense, backed by a multitude of news articles published by credible media outlets, including *Reuters* and *The New York Times*. These articles, which were published prior to the alleged corrective disclosures, described how U.S.

regulators rejected Wells Fargo's plans under the Consent Orders. The Court or a jury could well have found that these articles fully disclosed the truth of the status of Wells Fargo's compliance with the Consent Orders, nullifying the subsequent alleged corrective disclosures and dramatically reducing or eliminating damages.

Defendants also had meaningful challenges to falsity, some of which the Court accepted at the pleading stage in dismissing over one-quarter of the alleged misstatements. Those significant challenges were further underscored by the 2022 dismissal of the shareholder derivative action arising from the same alleged misconduct. *See In re Wells Fargo & Co. S'holder Derivative Litig.*, 2022 WL 345066, at *7 (N.D. Cal. Feb. 4, 2022). Finally, Defendants had significant grounds to contest scienter, including the absence of insider stock sales by any Executive Defendant and the lack of SEC or DOJ action against them. If Defendants prevailed on any of these challenges, investors could have recovered nothing—with Lead Counsel receiving no compensation or reimbursement of expenses.

The absence of a restatement by Wells Fargo also significantly increased the risk of this litigation. A restatement constitutes an admission by the Company that it made a material misstatement. As courts have recognized, a case involving a restatement is significantly less risky because two elements of securities fraud—falsity and materiality—have been satisfied. *See Signet*, 2020 WL 4196468, at *7 (noting, in granting 25% fee request, this "was not a case with a parallel SEC action or a restatement of financial results to support Lead Plaintiff's claims"); *Schwartz v. TXU Corp.*, 2005 WL 3148350, at *29 (N.D. Tex. Nov. 8, 2005) (finding that the case "was an especially difficult and highly uncertain securities case, which did not involve restatement").

In fact, this is the first recovery ever in a securities class action of $1 billion or more involving neither a restatement nor any parallel SEC or DOJ action relating to the alleged

misrepresentations. *See* Fitzpatrick Decl. ¶ 18. Experts and independent industry groups that research securities litigation trends have consistently identified the presence (or absence) of a restatement as a critical factor influencing the likelihood of successfully defeating a motion to dismiss in a securities class action and the likelihood of a settlement, as well as a strong indicator of case value. *See* Fitzpatrick Decl. ¶¶ 20, 30; Cornerstone Research, *Securities Class Action Settlements: 2022 Review and Analysis* (Ex. 9), at 9 (finding that restatement settlements recover 28.9% more of the class's damages than non-restatement settlements).

### b.   Risk of Establishing Causation and Damages

Lead Plaintiffs also faced serious risks in satisfying their burden to prove loss causation and damages. Half of the alleged corrective disclosures occurred on the same days that Wells Fargo held its quarterly investor conference calls, where negative information about the Bank's financial condition was disclosed that did not relate to the alleged fraud. The remaining alleged corrective disclosures occurred during the first two weeks of March 2020—*i.e.*, when the COVID-19 pandemic shut down the country and resulted in unprecedented turmoil in the United States (and global) capital markets. As a result, every alleged corrective disclosure in the Action was made on days when there were other plausible, non-fraudulent explanations for at least portions of the decline in Wells Fargo's stock price. To the extent that Lead Plaintiffs were unable to show that Defendants' alleged misstatements caused the stock drops (as opposed to these other factors), investors would have recovered nothing—and Lead Counsel also would have received no compensation and no reimbursement of expenses.

Alternatively, if Lead Plaintiffs were only able to prove that a portion of the declines in Wells Fargo's stock prices were attributable to the alleged fraud, the recovery for the class would have been substantially less, and compensation of counsel would have been similarly reduced. Lead Plaintiffs and Defendants would have presented robust, competing expert testimony on loss

14

causation, creating its own risks: "[w]hen the success of a party's case turns on winning a so-called 'battle of experts,' victory is by no means assured." *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 267 (S.D.N.Y. 2012).

### 4. The Requested Fee Is Supported by the Quality of Representation and the Percentage of Damages Recovered by the Settlement

The caliber of Lead Counsel and the strength of their work in this matter underscore the reasonableness of the fee request. In assessing the quality of representation, courts examine both the result achieved and the quality of the opposing counsel. *See Signet*, 2020 WL 4196468, at *20 ("The quality of [counsel's] representation is evidenced by the quality of the result achieved."); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsel's work.").

Here, the quality of Lead Counsel's work is evidenced by the historic result achieved. The Settlement is the sixth largest securities class action settlement in the past decade, the ninth largest ever in the Second Circuit, and the seventeenth largest of all time. The recovery represents 24% of the maximum recoverable damages that could realistically be established at trial—which is many multiples above the normal recoveries in such cases. *See* ¶¶ 101-102. Finally, the recovery is the largest securities class action settlement of the over 120 such settlements in the Circuit over the past two years; is 235% larger than the second-largest settlement during that period; and exceeds the total of the next five largest settlements during this period—combined:



Lead Counsel's extensive experience and skill in prosecuting securities class actions were critical to achieving this historic result. Lead Counsel have litigated some of the highest-profile securities fraud actions ever, securing more than 40 of the top 100 monetary recoveries for investors in U.S. history. Lead Counsel's litigation team included experienced and highly qualified securities lawyers, some with relevant regulatory experience that proved critical, seasoned in-house investigators, and financial analysts with expertise in investigating securities fraud. The team successfully overcame the fierce defense waged by Wells Fargo's counsel, Sullivan & Cromwell. *See In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement"); *Veeco*, 2007 WL 4115808, at *7 (defendants' representation by "one of the country's largest law firms" supported a 30% award of attorneys' fees); *Adelphia Commc'ns*, 2006 WL 3378705, at *3 ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work").

### 5.    The Requested Fee Is Reasonable in Relation to the Settlement

The requested fee in relation to the Settlement also supports the request. *Goldberger*, 209

F.3d at 50. In assessing this factor, courts consider whether the requested fee (i) is in line with fee percentages in comparable actions; and (ii) would not result in an "unwarranted windfall." Here, an 18% fee in this case is consistent with fee percentages awarded in comparable cases and would not result in any "windfall."

> **a.     The requested fee is reasonable when compared to fee percentages awarded in comparable actions.**

The 18% fee requested is consistent with fee percentages approved by courts in this Circuit in complex securities class actions. *See Signet*, 2020 WL 4196468, at *15-16 ("The 25% attorney fee (net of expenses) requested by Lead Counsel is within the range of percentage fees that have been awarded in the Second Circuit in securities class actions and other similar litigation with comparable recoveries."); *In re Pfizer Inc. Sec. Litig.*, No. 1:04-cv-09866-LTS-HBP, slip op. at 2 (S.D.N.Y. Dec. 21, 2016), ECF No. 727 (awarding 28% of $486 million settlement); *Comverse*, 2010 WL 2653354, at *3 ("Lead Counsel's request for 25% of the Settlement Amount is consistent with, or lower than, the fee awards in other 'megafund' securities fraud actions in this Circuit."); *Initial Pub. Offering*, 671 F. Supp. 2d at 516 (awarding 33% of $596 million settlement, net of expenses); *In re Teva Sec. Litig.*, No. 3:17-cv-00558-SRU, slip op. at 2 (D. Conn. June 2, 2022), ECF No. 963 (Ex. 10) (awarding 23.7% of $420 million settlement); *Christine Asia*, 2019 WL 5257534, at *17 (awarding 25% of $250 million settlement).

It is also consistent with percentage fees awarded nationally. *See In re Twitter, Inc. Sec. Litig.*, 2022 WL 17248115, at *1-2 (N.D. Cal. Nov. 21, 2022) (awarding 22.5% of $809.5 million settlement); *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *13 (N.D. Cal. Dec. 18, 2018) (awarding 20% of $480 million settlement), *aff'd sub nom. Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020); *Jaffe v. Household Int'l, Inc.*, No. 1:02-cv-05893-JLA, slip op. at 1 (N.D. Ill. Nov. 11, 2016), ECF No. 2265 (Ex. 11) (awarding 24.68% of $1.575 billion recovery); *In re Merck & Co.,*

*Inc. Sec., Derivative & "ERISA" Litig.*, Civil Action No. 05-2367 (SRC)(CLW), slip op. at 10-11 (D.N.J. June 28, 2016), ECF No. 1039 (Ex. 12) (awarding 20% of $1.062 billion recovery); *In re Cardinal Health*, *Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 767 (S.D. Ohio 2007) (awarding 18% of $600 million settlement); *Adelphia Commc'ns Corp.*, 2006 WL 3378705, at *3 (awarding 21.4% of $455 million settlement).[3]

Finally, the requested fee percentage is also in line with the most comparable set of cases: mega-fund securities class action settlements in cases, like this one, that did not involve a financial restatement. Because a restatement is an effective admission by the defendant company of material misrepresentations, courts and industry commentators consistently recognize non-restatement cases as a distinct group that are far more difficult to prove and, as result, significantly riskier. *See, e.g., Signet*, 2020 WL 4196468, at *7, 19. As noted above, Lead Counsel consulted with Professor Fitzpatrick of Vanderbilt University to analyze fee awards in comparable securities class action settlements. Dr. Fitzpatrick reviewed every attorneys' fee award in a securities class action that settled for between $500 million and $1.5 billion and that, like this case, did not involve a restatement. Dr. Fitzpatrick found that, in those cases, courts awarded an average of 18%—the same fee percentage that Lead Counsel requests here. Fitzpatrick Decl. ¶ 30.

        **b.**      **The requested fee is reasonable when considering the result and work performed by counsel**

The requested fee is entirely reasonable when considering the work performed by counsel, and will not result in a "windfall." The Second Circuit has explained that a "windfall" is an

---

[3] The request is also consistent with fees awarded in other "megafund" complex and class cases. *See, e.g.*, *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094 (D. Kan. 2018) (awarding one-third of $1.51 billion recovery); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *7-8 (N.D. Cal. Apr. 3, 2013) (28.6% of $1.08 billion recovery); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (31.33% of $1.075 billion recovery).

"unearned advantage" that occurs when a "contingency-fee representation . . . succeeds immediately and with minimal effort, suggesting very little risk of nonrecovery." *Fields v. Kijakazi*, 24 F.4th 845, 856 (2d Cir. 2022) ("That kind of unearned advantage is what the windfall concern really is about."). Here, the requested fee of 18% will not result in an "unearned advantage" to Lead Counsel.

*First*, this is not a case where Lead Counsel "succeed[ed] immediately and with minimal effort." *Id*. Just the opposite, Lead Counsel vigorously litigated this case for nearly three years, dedicating a tremendous amount of time and resources.

*Second,* the fee percentage is consistent with—and even less than—the percentage contemplated in Lead Counsel's fee agreement with Lead Plaintiffs. *See Comverse*, 2010 WL 2653354, at *3 (finding windfall concern inapplicable where Lead Plaintiff negotiated with Lead Counsel over the fee).

*Third,* the requested fee of 18% is significantly below the 25% (or more) courts have awarded in securities class actions, including in "megafund" cases. *See Comverse*, 2010 WL 2653354, at *4 ("Lead Counsel's request for 25% of the [$250 million] Settlement Amount is consistent with, or lower than, the fee awards in other 'megafund' securities fraud actions in this Circuit"). And, perhaps most relevant, the fee request is also consistent with the average fee percentage of 18% awarded in securities class actions that settle for $500 million to $1.5 billion and, like this one, do not involve a restatement. *See* Fitzpatrick Decl. ¶ 30.

*Fourth*, counsel's work in achieving the Settlement is remarkable, particularly in light of the challenging nature of investors' claims. As noted, this is the sixth largest securities class action settlement in the past decade, the ninth largest ever in the Second Circuit, and the seventeenth largest of all time in the country.

*Finally*, this is not a case where Lead Counsel settled "cheaply." Just the opposite, the settlement reflects an unusually high recovery of realistic damages. Securities class actions with class-wide damages of over $1 billion typically settle for a small fraction of the overall damages— typically 2.3%. *See BlackBerry*, 2022 WL 4554858, at *6 ("the median recovery of 2.3% of . . . damages for securities class actions with damages of over $1 billion between 2012-2020"); *In re Canadian Superior Sec. Litig.*, 2011 WL 5830110, at *2 (S.D.N.Y. Nov. 16, 2011) (approving settlement representing 8.5% of maximum damages, which the court noted "exceed[s] the average recovery in shareholder litigation"); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting average settlements in securities class actions "have ranged from 3% to 7% of the class members' estimated losses"). Here, Lead Counsel recovered 24% of the maximum realistic damages—ten times the normal percentage of recovery in cases with damages of this magnitude. Awarding the requested fee incentivizes counsel to not only take on large cases, but also to vigorously achieve the largest recovery of damages.

### 6.   Public Policy Considerations

Public policy considerations also support the requested fee. *Goldberger*, 209 F.3d at 50. A "strong public policy concern exists for rewarding firms for bringing successful securities litigation." *Signet*, 2020 WL 4196468, at *21. Courts in this Circuit recognize "the importance of 'private enforcement actions and the corresponding need to incentivize attorneys to pursue such actions on a contingency fee basis.'" *Hi-Crush Partners*, 2014 WL 7323417, at *17.

"Private attorneys should be encouraged to take the risks required to represent those who would not otherwise be protected from socially undesirable activities like securities fraud." *Veeco*, 2007 WL 4115808, at *7. "'[I]n order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives'" to plaintiffs' counsel in securities class actions. *City of*

*Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *17 (S.D.N.Y. May 9, 2014).

These public policy considerations apply with special force here. Lead Counsel secured a $1 billion recovery in a case in which the SEC did not investigate the fraud or recover anything. Absent this litigation, Defendants' representations to investors would have gone unchecked, and investors and our capital markets would have suffered mightily.

### D.    The Requested Fee Is Reasonable Under a Lodestar Crosscheck

A lodestar cross-check further supports the requested fee. *See Goldberger*, 209 F.3d at 50. In securities class actions such as this one, "fees representing multiples above the lodestar are regularly awarded to reflect the contingency-fee risk and other relevant factors." *Signet*, 2020 WL 4196468, at *16. A "positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *FLAG Telecom*, 2010 WL 4537550, at *26.

"In complex litigation, lodestar multipliers between 2 and 5 are commonly awarded, and fee awards resulting in multipliers as high as 6 have also been approved." *Signet*, 2020 WL 4196468, at *16. A multiplier of 4.65—substantially higher than requested here—is "well within the range awarded by courts in this Circuit and courts throughout the country" in securities cases. *Maley v. Del. Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002); *see also Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 185 (W.D.N.Y. Oct. 11, 2011) (awarding 5.3 multiplier and finding it was "not atypical for similar fee-award cases"); *Cornwell v. Credit Suisse Grp.*, 2011 WL 13263367, at *2 (S.D.N.Y. July 20, 2011) (4.7 multiplier); *In re Deutsche Telekom AG Sec. Litig.*, 2005 WL 7984326, at *4 (S.D.N.Y. June 14, 2005) (3.97 multiplier).

The requested fee of 18% represents a multiplier of approximately 3.8 of the total lodestar. To date, Plaintiffs' Counsel have collectively spent over 106,000 hours of attorney and other professional support staff time prosecuting the Action for the benefit of the Settlement Class.

¶ 142. Plaintiffs' Counsel's total lodestar, derived by multiplying the hours spent by each attorney and paraprofessional by their hourly rates, is $47,170,207.50. *Id.* The requested multiplier is well within the range commonly awarded in securities class actions and other comparable litigation.

Of note, courts in this District and elsewhere have repeatedly determined that Lead Counsel's rates in securities cases are reasonable for purposes of the lodestar cross-check analysis. For cases recently approving BLB&G's rates for the purpose of lodestar cross-check see, for example, *Signet,* 2020 WL 4196468, at *16; *Hefler*, 2018 WL 6619983, at *14; *In re Evoqua Water Techs. Corp. Sec. Litig.*, No. 1:18-cv-10320-JPC, slip op. at 2-3 (S.D.N.Y. Nov. 1, 2021), ECF No. 152 (Ex. 13). For cases recently approving Cohen Milstein's rates for the purpose of lodestar cross-check see, for example, *Cosby v. KPMG LLP*, 2022 WL 4129703, at *2 (E.D. Tenn. July 12, 2022); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-cv-03591-GHW, slip op. at 2-3 (S.D.N.Y. Nov. 21, 2022), ECF No. 303 (Ex. 14); *In re ITT Educ. Servs., Inc. Sec. Litig.*, No. 1:13-CV-01620, slip op. at 2 (S.D.N.Y. Mar. 8, 2016), ECF No. 94 (Ex. 15).

The significantly higher rates charged by the defense counsel in this case underscore the reasonableness of Lead Counsel's rates and the lodestar multiplier. *See Hi-Crush Partners*, 2014 WL 7323417, at *14 (approving as reasonable hourly rates in securities action that were "comparable to . . . defense-side law firms litigating matters of similar magnitude"); *Aeropostale*, 2014 WL 1883494, at *13 (approving hourly rates as reasonable because they were "in line with rates charged by New York firms that *defend* class actions on a regular basis") (emphasis in original, citation omitted). According to recent filings by Sullivan & Cromwell, counsel for Wells Fargo here, its partner rates range from $2,135 to $2,165[4]; of counsel and senior counsel rates

---

[4] Lead Counsel's partner rates range from $750 to $1,300.

range from $1,575 to $2,165[5]; associate rates range from $775 to $1,475[6]; legal analyst-litigation rates are $595[7]; and paralegal rates range from $425 to $595.[8] *Compare* Exs. 7A-1 and 7B-1 *with* Ex. 16 (Sullivan & Cromwell fee applications in FTX bankruptcy matter). These rates are substantially higher—at all levels—than the rates used by Lead Counsel to calculate lodestar. Indeed, had Lead Counsel used the hourly rates of their same-year counterparts at Sullivan & Cromwell, Lead Counsel's lodestar would be approximately 1.65 times larger—underscoring that Lead Counsel's rates are reasonable and that their fee request is not a "windfall."

### E. The Requested Fee Is Consistent with the Notice

The Notice was approved by the Court in its Preliminary Approval Order. ECF No. 182. The Notice advised Settlement Class Members that Lead Counsel intended to apply to the Court for attorneys' fees of an amount up to 19% of the Settlement Fund—*i.e.*, above the amount that Lead Counsel is seeking. *See* Notice ¶¶ 5, 44.

\* \* \*

For each of these reasons, Lead Counsel respectfully requests a fee award of 18%, net of expenses, of the Settlement Fund.

## II. PLAINTIFFS' COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED

"It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class, and should therefore be reimbursed 'for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation.'" *BlackBerry*, 2022 WL 4554858, at

---

[5] Lead Counsel's of counsel, trial counsel, and senior counsel rates range from $775 to $925.
[6] Lead Counsel's associate and legal fellow rates range from $395 to $700.
[7] Lead Counsel's staff attorney, discovery counsel, and discovery attorney rates range from $245 to $650.
[8] Lead Counsel's paralegal rates range from $325 to $400.

*11; *see also FLAG Telecom*, 2010 WL 4537550, at *30 (same).

As set forth in the Joint Declaration, Lead Counsel incurred $1,130,909.85 in reasonable expenses in connection with the prosecution of the Action. ¶ 159. Lead Counsel incurred these expenses in their dedicated pursuit of investors' claims and are the types of expenses that are necessarily incurred in litigation and routinely charged to clients and include, among others, expert fees, on-line legal and factual research, and photocopying expenses. The largest expense incurred is for retention of Lead Plaintiffs' experts, in the amount of $798,684.03, or approximately 71% of Plaintiffs' Counsel's total expenses. ¶ 160. Lead Counsel consulted extensively with experts in the fields of market efficiency, loss causation, damages, the banking industry, government consent orders, and CSI regulation. ¶ 63. The experts retained were instrumental in Lead Counsel's prosecution of the Action and in bringing about the favorable result achieved.

The Notice informed potential Settlement Class Members that Lead Counsel would apply for payment of Litigation Expenses in an amount not to exceed $2 million, which may include the reasonable costs and expenses of Lead Plaintiffs directly related to their representation of the Settlement Class. Notice ¶¶ 5, 44. The total amount of Litigation Expenses requested is $1,214,509.85, which includes $1,130,909.85 for Plaintiffs' Counsel's expenses and $83,600.00 in reimbursement of costs incurred by Lead Plaintiffs, an amount well below that in the Notice.

## III.    LEAD PLAINTIFFS SHOULD BE AWARDED THEIR REASONABLE COSTS AND EXPENSES UNDER THE PSLRA

Lead Plaintiffs seek reimbursement of a total of $83,600 in costs and expenses they incurred directly related to their representation of the Settlement Class. The PSLRA provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). "Courts in this Circuit routinely award such costs and expenses both to

24

reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *Christine Asia Co.*, 2019 WL 5257534, at *20. For example, in *In re Marsh & McLennan Cos. Securities Litigation*, the court awarded $144,657 to the New Jersey Attorney General's Office and $70,000 to certain Ohio pension funds for their work in communicating with counsel, reviewing court submissions, and participating in discovery and settlement discussions—*i.e.*, "precisely the types of activities that support awarding reimbursement of expenses to class representatives." 2009 WL 5178546, at *21 (S.D.N.Y. Dec. 21, 2009).[9]

Here, Lead Plaintiffs Handelsbanken, Mississippi, and Louisiana Sheriffs request reimbursement in the aggregate amount of $83,600 based on the value of time devoted to the Action by those Lead Plaintiffs' employees. *See* Exs. 3, 4, and 5. These efforts required employees of Lead Plaintiffs to dedicate time to the case that they would have otherwise devoted to their regular duties and thus represented a cost to Lead Plaintiffs. *See* Exs. 3, 4, and 5. The awards sought by Lead Plaintiffs are reasonable and justified under the PSLRA based on the active involvement of Lead Plaintiffs in the Action.

## CONCLUSION

For the foregoing reasons, Lead Counsel respectfully request that the Court award attorneys' fees in the amount of 18% of the Settlement Fund, net of expenses; $1,130,909.85 for the reasonable expenses incurred by Plaintiffs' Counsel in connection with the prosecution of the Action; and $83,600 for Lead Plaintiffs' costs and expenses, as authorized by the PSLRA.

---

[9] *See also In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 772 F.3d 125, 133 (2d Cir. 2014) (affirming award of over $450,000); *FLAG Telecom*, 2010 WL 4537550, at *31; *Veeco*, 2007 WL 4115808, at *12; *Christine Asia Co.*, 2019 WL 5257534, at *20.

Dated:  August 4, 2023

Respectfully submitted,

/s/      *Laura H. Posner**

**COHEN MILSTEIN SELLERS &**
    **TOLL PLLC**
Laura H. Posner (LP-8612)
88 Pine Street, Fourteenth Floor
New York, New York  10005
Tel.: (212) 220-2925
Fax: (212) 838-7745
lposner@cohenmilstein.com

Steven J. Toll (admitted *pro hac vice*)
Julie G. Reiser (admitted *pro hac vice*)
S. Douglas Bunch (SB-3028)
Molly J. Bowen (admitted *pro hac vice*)
1100 New York Avenue, N.W., Suite 500
Washington, DC  20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
jreiser@cohenmilstein.com
dbunch@cohenmilstein.com
mbowen@cohenmilstein.com

*Counsel for Lead Plaintiffs Mississippi*
*and Rhode Island, and Co-Lead Counsel*
*for the Settlement Class*

/s/      *John C. Browne**

**BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
John C. Browne (JB-0391)
Jeroen van Kwawegen (JV-1010)
Michael D. Blatchley (MB-7279)
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 554-1400
Fax: (212) 554-1444
johnb@blbglaw.com
jeroen@blbglaw.com
michaelb@blbglaw.com

Jonathan D. Uslaner (JU-1942)
Lauren M. Cruz (admitted *pro hac vice*)
2121 Avenue of the Stars
Los Angeles, California 90067
Tel.: (310) 819-3470
jonathanu@blbglaw.com
lauren.cruz@blbglaw.com

*Counsel for Lead Plaintiffs Handelsbanken*
*and Louisiana Sheriffs, and Co-Lead Counsel*
*for the Settlement Class*

**KLAUSNER, KAUFMAN, JENSEN &**
    **LEVINSON**
Robert D. Klausner (admitted *pro hac vice*)
7080 NW 4th Street
Plantation, Florida  33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Louisiana Sheriffs*

*All electronic signatures (*"/s/"*) are signed with consent of counsel pursuant to Rule 8.5 of this
Court's Electronic Case Filing Rules & Instructions, as of July 24, 2023.