**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY SECURITIES LITIGATION | Case No. 1:20-cv-04494-JLR-SN |

**DECLARATION OF JOHN C. BROWNE AND LAURA H. POSNER**
**IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL**
**OF SETTLEMENT AND PLAN OF ALLOCATION, AND (II) LEAD COUNSEL'S**
**MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................ 2

II.    HISTORY OF THE ACTION ..................................................................... 4

    A.    Background .................................................................................... 4

    B.    The Commencement of the Action and the Appointment of Lead Plaintiffs and Lead Counsel ....................................................... 5

    C.    The Investigation and Filing of the Complaint ............................ 6

    D.    Defendants' Motion to Dismiss .................................................... 7

    E.    Lead Plaintiffs' Motion for Class Certification ........................... 9

    F.    The Parties Conduct Substantial Discovery ............................... 10

        1.    Lead Plaintiffs Obtained Extensive Discovery ................ 11

        2.    Lead Plaintiffs Provided Extensive Discovery ................ 16

    G.    Lead Plaintiffs' Work with Experts ........................................... 18

    H.    The Parties' Mediation Efforts and the Settlement of the Action ......................... 20

    I.    The Court Grants Preliminary Approval of the Settlement ................................. 22

III.    RISKS OF CONTINUED LITIGATION ................................................... 23

    A.    Risks of Proving Defendants' Liability ..................................... 24

        1.    Risks of Proving Falsity ................................................... 24

        2.    Risks of Proving Materiality ............................................ 26

        3.    Risks of Proving Scienter ................................................. 28

        4.    Risks of Proving Loss Causation and Damages ................ 29

    B.    The Settlement Amount Compared to Maximum Possible Damages That Could Be Proved at Trial. ...................................... 31

IV.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ...................................... 33

i

V.      ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ................................. 35

        A.      Calculation of Artificial Inflation .......................................................... 36

        B.      Calculation of Recognized Loss Amounts and Recognized Claims.................... 38

VI.     THE FEE AND EXPENSE APPLICATION .................................................... 41

        A.      The Fee Application.......................................................................... 41

                1.      Lead Plaintiffs Have Authorized and Support the Fee Application ......... 42

                2.      The Time and Labor Devoted to the Action by Plaintiffs' Counsel ......... 43

                3.      The Experience and Standing of Lead Counsel ...................................... 45

                4.      The Standing and Caliber of Defendants' Counsel.................................. 46

                5.      The Importance of Skilled Counsel in Contingent Securities Cases ........ 47

                6.      The Reaction of the Settlement Class to the Fee Application ................. 49

        B.      The Litigation Expense Application ....................................................... 50

VII.    CONCLUSION................................................................................... 57

JOHN C. BROWNE and LAURA H. POSNER, declare as follows:

1.      I, John C. Browne, am a partner in the law firm Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), counsel for Lead Plaintiffs Handelsbanken Fonder AB ("Handelsbanken") and Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs"), and co-Lead Counsel for the proposed Settlement Class in the above-captioned action (the "Action").[1]

2.      I, Laura H. Posner, am a partner in the law firm Cohen Milstein Sellers & Toll PLLC ("CMST" and, together with BLB&G, "Lead Counsel"), counsel for Lead Plaintiffs Public Employees' Retirement System of Mississippi ("Mississippi") and the State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island"), and co-Lead Counsel for the proposed Settlement Class in the Action.

3.      We submit this declaration in support of (i) Lead Plaintiffs' motion, pursuant to Federal Rule of Civil Procedure 23(e), for final approval of the proposed Settlement and the proposed plan of allocation of Settlement proceeds (the "Plan of Allocation"), and (ii) Lead Counsel's motion for attorneys' fees and Litigation Expenses (the "Fee and Expense Application").  In support of these motions, Lead Plaintiffs and Lead Counsel also submit: (i) the exhibits attached hereto; (ii) the Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum"); and (iii) the Memorandum of Law in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee Memorandum").

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated May 8, 2023 (ECF No. 178-1) (the "Stipulation").

4.      The following statements are based on our personal knowledge and information provided by other Lead Counsel attorneys working under our supervision, and if called on to do so, we could and would testify competently thereto.

## I.      INTRODUCTION

5.      The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $1 billion for the benefit of the Settlement Class. The Settlement Amount has been paid into an escrow account and is earning interest.  As detailed herein, the Settlement provides a significant benefit to the Settlement Class by conferring a substantial, certain, and near-term recovery, while avoiding the significant risks of continued litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount.

6.      The proposed Settlement is the result of extensive efforts by Lead Plaintiffs and Lead Counsel, which included, among other things: (i) conducting an extensive investigation into the alleged fraud, including interviews with former employees of Wells Fargo and a thorough review of public information, such as filings with the U.S. Securities and Exchange Commission ("SEC"), analyst reports, conference call transcripts, news articles, congressional reports and testimony, and banking industry regulations; (ii) consulting with subject matter experts in market efficiency, loss causation, damages, the banking industry, government consent orders, and confidential supervisory information ("CSI") rules and regulations[2]; (iii) drafting a detailed Consolidated Amended Class Action Complaint (the "Complaint") based on Lead Counsel's extensive investigation; (iv) opposing Defendants' motion to dismiss through extensive briefing and oral argument; (v) filing Lead Plaintiffs' motion for class certification, including a detailed

---

[2] *See* 12 C.F.R. § 261.1, *et seq.*, 12 C.F.R. § 261.20, *et seq.*, 12 C.F.R. § 4.37(b), 12 C.F.R. § 1070.2(i), and 12 C.F.R. § 1070.42(b).

42-page expert report with more than 700 pages of exhibits, and preparing for and defending the deposition of Lead Plaintiffs' class certification expert and preparing for the deposition of Defendants' class certification expert; (vi) conducting extensive discovery, which included preparing and serving document requests on each of the five Defendants and subpoenas on 27 non-party witnesses; (vii) formally serving requests for and successfully obtaining from the Regulators authorizations for Wells Fargo to produce materials that purportedly contained CSI, which required submitting to the Regulators letter briefs totaling over 579 pages, replete with extensive analysis, as well as exhibits totaling more than 2,400 pages; (viii) reviewing over 3.5 million pages of documents produced by Defendants and subpoenaed non-parties; (ix) participating in ten fact and expert depositions; and (x) engaging in arm's-length settlement negotiations with the assistance of the Honorable Layn Phillips, a former U.S. District Judge and experienced mediator of class actions and other complex litigation.

7.      As a result of these efforts, Lead Plaintiffs and Lead Counsel were well-informed of the strengths and weaknesses of the Action at the time they achieved the proposed Settlement, and believe that the Settlement is in the best interests of the Settlement Class.

8.      The Settlement was based on a mediator's recommendation made by former federal judge and experienced mediator Layn Phillips.  Judge Phillips has submitted a declaration, attached hereto as Exhibit 1, describing the Parties' mediation and settlement efforts in which he states that "the negotiations between the Parties were vigorous and conducted at arm's-length and in good faith," and that he "believe[s] that the Settlement represents a recovery and outcome that is reasonable and fair for all parties involved."  *See* Ex. 1 ("Phillips Decl."), at ¶¶ 13, 14.

9.      Each of the Lead Plaintiffs is a sophisticated institutional investor that actively participated in the Action and closely supervised the work of Lead Counsel.  The Lead Plaintiffs

have submitted a declaration, attached hereto as Exhibit 2, affirming that they each strongly endorse the approval of the Settlement.  *See* Ex. 2 ("Lead Plaintiffs Joint Decl."), at ¶¶ 21-26.

10.     The proposed Plan of Allocation was developed with the assistance of Lead Plaintiffs' damages expert and is further described below.  The proposed Plan of Allocation provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis fairly based on losses attributable to the alleged fraud.

11.     For their efforts in achieving the Settlement, Lead Counsel request a fee of 18% of the Settlement Fund, and payment of the Litigation Expenses that Lead Counsel incurred in connection with the institution, prosecution, and settlement of the Action.  As discussed in the Fee Memorandum, the requested fee is reasonable in light of, among other things, the result achieved, the extent and quality of the work performed, and the risks and complexity of the litigation.

## II.     HISTORY OF THE ACTION

### A.     Background

12.     This is a securities fraud class action brought on behalf of purchasers of Wells Fargo & Company ("Wells Fargo" or the "Company") common stock between February 2, 2018 and March 12, 2020, inclusive (the "Class Period").  The case alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against Wells Fargo and certain of its executive officers and directors.

13.     The case concerns Wells Fargo's statements to investors about the status of its compliance with the consent orders entered into in 2018 (the "Consent Orders") with the Board of Governors of the Federal Reserve System (the "Federal Reserve"), the Office of the Comptroller of the Currency (the "OCC"), and the Consumer Financial Protection Bureau (the "CFPB") (collectively, the "Regulators").  Lead Plaintiffs allege that, during the Class Period, Wells Fargo

made false and misleading statements to investors regarding its compliance with the Consent Orders, claiming that it had regulator-approved "plans" and that it was "in compliance" with the Consent Orders. Lead Plaintiffs allege that, in reality, Wells Fargo had not submitted an acceptable plan for compliance to the Regulators and was nowhere near meeting the Regulators' requirements that were a predicate to lifting restrictions that had been imposed on Wells Fargo, including an asset cap. Lead Plaintiffs further allege that when the truth was revealed through a series of public disclosures, Wells Fargo's stock price fell precipitously.

### B. The Commencement of the Action and the Appointment of Lead Plaintiffs and Lead Counsel

14.     In June 2020, a putative class action was filed against Wells Fargo and certain of its executive officers and directors alleging violations of the federal securities laws. In accordance with the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), notice was published on a national newswire service that advised potential class members of the pendency of the Action, the claims asserted, and the deadline by which putative class members could move the Court for appointment as lead plaintiff.

15.     On August 14, 2020, Handelsbanken, Mississippi, Rhode Island, and Louisiana Sheriffs, each sophisticated institutional investors, filed a motion seeking appointment as lead plaintiff and for approval of their selection of lead counsel. ECF Nos. 40-43. Their motion set forth their losses due to the alleged misstatements, described their experience in securities fraud class actions, and explained their commitment to recovering the most possible for the putative investor class. ECF No. 41 at 2-3. The motion additionally described BLB&G's and CMST's expertise in serving as lead counsel in securities class actions and detailed why these institutions selected these law firms to serve as Lead Counsel in this matter. *Id.* at 3-4.

16.     On August 29, 2020, the Court issued an order appointing the Lead Plaintiffs and approving their selection of Lead Counsel.  ECF No. 59.  The Court provided Lead Plaintiffs until November 9, 2020 to file the Complaint.

### C.     The Investigation and Filing of the Complaint

17.     Prior to filing the Complaint, Lead Counsel undertook an extensive investigation into the facts concerning the alleged misconduct.  This investigation included a thorough review and analysis of a substantial volume of information, including: (i) transcripts of Wells Fargo's investor conference calls, press releases, and public statements issued by or concerning the Defendants; (ii) research reports published by financial analysts concerning Wells Fargo; (iii) reports and other documents filed by Wells Fargo with the U.S. Securities and Exchange Commission ("SEC"); (iv) news and media reports concerning Wells Fargo and other facts related to this Action; (v) price and volume data for Wells Fargo securities; (vi) congressional testimony; and (vii) reports released by the U.S. House of Representatives, Committee on Financial Services, Subcommittee on Oversight and Investigations.

18.     Lead Counsel also consulted with industry participants and experts on a variety of subjects, including banking regulations, damages, and loss causation.

19.     Lead Counsel also submitted requests to the CFPB, Federal Reserve, and the OCC pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552; 40 C.F.R. §§ 2.100, *et seq*., to obtain copies of documents and materials relevant to the allegations in the Complaint.

20.     Lead Counsel also spoke to and requested documents from the House Financial Services Committee.

21.     As a result of their efforts, Lead Counsel had a firm grasp of the potential claims and the impact of Defendants' alleged misstatements and omissions on the market price of Wells Fargo's common stock and the damages suffered by Wells Fargo shareholders.

22.     On November 9, 2020, Lead Plaintiffs filed the Complaint.  ECF No. 74.  The 125-page, 306-paragraph Complaint asserted claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against its former Chief Executive Officers, Timothy J. Sloan and C. Allen Parker; its former Chief Financial Officer, John R. Shrewsberry; and its former Board Chairperson, Elizabeth "Betsy" Duke.  The Complaint also asserted "control person" claims under Section 20(a) of the Exchange Act against these former Wells Fargo executives, as well against as its current CEO, Charles W. Scharf.  In addition to including significantly more detailed allegations, the Complaint named defendants and included false and misleading statements and corrective disclosures that were not included in the original complaint.

### D.     Defendants' Motion to Dismiss

23.     On December 9, 2020, Defendants submitted a pre-motion conference letter setting forth anticipated arguments in their forthcoming motion to dismiss the Complaint.  ECF No. 80.  On December 14, 2020, Lead Plaintiffs submitted a letter responding to Defendants' anticipated arguments.  ECF No. 82.

24.     On December 15, 2020, the Court conducted a telephonic conference concerning Defendants' forthcoming motion to dismiss.  ECF No. 85.  During the conference, the Court heard argument from counsel on the anticipated motion.  Following argument from counsel, the Court set a briefing schedule for Defendants' motion to dismiss.  ECF No. 83.

25.     On January 22, 2021, Defendants filed their motion to dismiss.  ECF No. 89.  Defendants' motion included 60 pages of briefing and 25 exhibits.  ECF No. 90.  Defendants argued, among other things, that the Complaint did not allege any materially false and misleading statements; that certain challenged statements were non-actionable puffery and forward-looking statements; and that Defendants did not act with scienter.

26.     On March 8, 2021, Lead Plaintiffs filed a 60-page opposition brief responding to Defendants' motion to dismiss.  ECF No. 92.  Lead Plaintiffs argued that the Complaint contained the detailed allegations necessary to satisfy the heightened pleading standards of the PSLRA and alleged material misstatements and omissions of necessary facts that misled investors.

27.     On April 2, 2021, Defendants filed reply papers, which included an additional 24 pages of briefing.  *See* ECF No. 93.

28.     On September 30, 2021, the Court entered an Order granting in part and denying in part Defendants' motion to dismiss (the "Motion to Dismiss Order").  ECF No. 96.  The Court found that the Complaint adequately alleged (1) certain misstatements and omissions; (2) facts to support a strong inference of scienter; and (3) facts to support a Section 20(a) "control person" claim against certain Individual Defendants.  The Court did, however, dismiss nine of the alleged false statements, including those made on February 2, 2018, and dismissed Defendant Scharf entirely from the Action.  The first sustained misstatement alleged in the Action was made on May 30, 2018—meaning that purchasers of Wells Fargo common stock from February 2, 2018 through May 29, 2018 could no longer recover through the Action, absent a successful appeal.

29.     In its Motion to Dismiss Order, the Court cautioned that it was required, at the pleading stage, to accept the allegations "as true" and to "read ambiguities" in Lead Plaintiffs' favor.  *See*, *e.g*., ECF No. 96, at 17, 34.  The Court added that, on a motion to dismiss, the operative question was whether Lead Plaintiffs had "satisfied their burden at the pleading stage"—i.e., not whether Lead Plaintiffs would ultimately prevail at summary judgment or trial.  *See, e.g., id.* at 55-56.

30.     On November 15, 2021, Defendants filed their answers to the Complaint.  ECF Nos. 101, 102.  In their Answers, Defendants denied that any of the statements at issue were false

or misleading, or made with scienter.  Additionally, Defendants Wells Fargo, Shrewsberry, Parker, and Duke asserted 26 affirmative defenses, including that the alleged misrepresentations were based on good-faith and reasonable reliance on the advice of others upon whom they were entitled to rely.  In his Answer, Defendant Sloan asserted 21 affirmative defenses, including that he had reasonable grounds to believe, and did believe, that his statements alleged in the Complaint were true and that there was no omission of material fact required to be stated.

          **E.**      **Lead Plaintiffs' Motion for Class Certification**

31.      On October 3, 2022, Lead Plaintiffs filed their motion for class certification ("Motion").  ECF No. 145.  The Motion was supported by a 42-page expert report of Dr. Michael Hartzmark with more than 700 pages of exhibits and a joint declaration from Lead Plaintiffs.

32.      In their class certification motion, Lead Plaintiffs demonstrated that the proposed class met each of the requirements of Federal Rule of Civil Procedure 23—including numerosity, commonality, typicality, adequacy, and predominance.  Lead Plaintiffs demonstrated that the Action involved numerous common issues of law and fact, that Lead Plaintiffs were sophisticated institutional investors whose interests in prosecuting the Action aligned with those of the Class, that Defendants' stock traded in an efficient market, and that damages could be computed on a class-wide basis.

33.      In his expert report, Dr. Hartzmark opined that the market for Wells Fargo stock was efficient and that the "damages for violations of Section 10(b) of the Exchange Act alleged in this matter may be computed on a class-wide basis using broadly accepted methodologies that would be common to all Class members."  ECF No. 147-1, at 7.

34.      On December 8, 2022, Dr. Hartzmark sat for a full-day deposition.  The deposition focused on Dr. Hartzmark's event study of Wells Fargo's stock price throughout the Class Period, including whether Dr. Hartzmark would be able to demonstrate through his event study that Wells

Fargo stock traded in an efficient market, and loss causation.  In particular, Defendants focused their questioning on, among other things, how Dr. Hartzmark's proposed damages methodology would be able to demonstrate loss causation given that three of the alleged partial corrective disclosures occurred on dates on which other confounding, Company-specific news was disclosed; there was not a statistically significant drop on at least one of the alleged partial disclosure dates; and three of the largest alleged partial corrective disclosures occurred during March 2020, at the same time the country was shutting down due to the COVID-19 pandemic and the capital markets were experiencing unprecedented disruption and volatility.  They also questioned whether Dr. Hartzmark's event study appropriately accounted for the increase in market volatility and stop orders during the March 2020 timeframe, and the impact of these same issues on his opinion that the market for Wells Fargo common stock was efficient for the entirety of the Class Period.

35.     Defendants filed their opposition to Lead Plaintiffs' motion to certify the Class on December 23, 2022, which was accompanied by 39 exhibits, including a 102-page expert report with approximately 140 pages of exhibits.  ECF Nos. 164-168.

**F.     The Parties Conduct Substantial Discovery**

36.     Fact discovery in the Action commenced in October 2021, following the Court's denial of Defendants' motion to dismiss.  On October 18, 2021, the parties conducted a discovery conference in accordance with Federal Rule of Civil Procedure 26(f).  The discovery conference focused, in significant part, on the impact of CSI rules on the discovery process.

37.     The Parties exchanged their Initial Disclosures under Rule 26(a)(1) of the Federal Rules of Civil Procedure on November 8, 2021.

38.     The Parties also negotiated a Joint Status Report under Rule 26(f) and a Civil Case Management Plan and Proposed Scheduling Order regarding pretrial deadlines, which they submitted to the Court on December 21, 2021.  ECF Nos. 103-104.  The Joint Status Report set

forth the Parties' respective views on the scope of discovery to be conducted and the pretrial schedule.  The Joint Status Report also included discussion of the potential impact of CSI rules on the discovery process and schedule.

39.  On December 28, 2021, the Court entered an Order setting pretrial deadlines.  *See* ECF No. 106.  Under this order, fact discovery was to be completed by October 28, 2022, and expert discovery was to be completed by January 27, 2023.

40.  The Parties additionally negotiated the terms of a protective order governing the treatment of confidential documents and other information produced in discovery, which the Parties submitted to the Court on December 21, 2021.  ECF No. 104.  The Court entered the stipulated protective order on December 22, 2021.  ECF No. 105.

41.  Additionally, the Parties negotiated and entered into a Stipulation and Order Governing Production and Use of Hard Copy Documents and Electronically Stored Information (the "ESI Stipulation").  The Parties submitted the ESI Stipulation to the Court on January 13, 2022, and the Court entered the ESI Stipulation on the same day.  ECF Nos. 110, 112.

### 1.  Lead Plaintiffs Obtained Extensive Discovery

42.  To obtain the documents necessary to build their case, Lead Plaintiffs served their First Set of Document Requests on Defendants on November 12, 2021.  Lead Plaintiffs requested that Defendants produce 33 separate categories of documents, which included, among other things, documents and communications concerning (i) the Consent Orders and asset cap; (ii) Wells Fargo's internal controls, risk management systems, and compliance systems; (iii) Defendants' statements to investors, including about Wells Fargo's purported progress under the Consent Orders; (iv) incentive compensation provided to Wells Fargo senior executives; (v) evaluations of Defendants' performance; (vi) Wells Fargo's policies for handling and publicly disseminating CSI;

11

and (vii) movements in Wells Fargo's stock price, including on the alleged corrective disclosure dates.

43.     On December 13, 2021, Defendants served their responses and objections to Lead Plaintiffs' document requests.  The Parties engaged in extensive negotiations over the scope and adequacy of Defendants' discovery responses, including in numerous discovery letters and on multiple meet-and-confers.  Each Individual Defendant had separate counsel, multiplying the number and complexity of the negotiations.

44.     Document discovery in this action was complicated by the fact that Defendants believed that numerous key documents responsive to Lead Plaintiffs' document requests contained CSI.  Defendants took the position that, in accordance with applicable federal rules and regulations, such documents could not be produced in this Action without the express authorization of the Regulators.

45.     In January 2022, Lead Plaintiffs formally requested that the Regulators authorize Wells Fargo to produce materials that purportedly contained CSI.  Lead Plaintiffs' formal requests totaled over 579 pages, replete with extensive analysis and exhibits totaling more than 2,400 pages.  Lead Plaintiffs explained in these requests, citing applicable case law, that good cause existed for the Regulators' authorization of the production of the requested documents.  These documents included bank examination reports, bank and regulator communications regarding enforcement and supervisory actions, informal supervisory action reports, internal Wells Fargo emails and summaries, and internal Wells Fargo documents and communications.

46.     After multiple communications and meet-and-confers with Lead Counsel, in June 2022, the Regulators authorized Wells Fargo to produce some, but not all, of the requested documents.  Specifically, the Regulators authorized Wells Fargo to produce only those documents

Defendants had produced to Congress in connection with its investigation into Defendants' compliance with the Consent Orders. The Regulators required that Lead Plaintiffs first review these documents before renewing their request for any further information or documents.

47.   At the Regulators' request, Lead Plaintiffs carefully reviewed and analyzed each of the documents Defendants had produced to Congress, and then submitted a renewed access request to the Regulators on August 12, 2022. Lead Plaintiffs supported their renewed request with additional analyses and many dozens of exhibits, totaling over 1,850 pages.

48.   As a result of Lead Plaintiffs' detailed showing, the Regulators ultimately authorized Defendants to produce to Lead Plaintiffs numerous categories of additional documents that Defendants and the Regulators originally refused to produce.

49.   The Regulators, however, first required that Lead Plaintiffs obtain the Court's approval of a supplemental protective order prior to the release of any documents under the Regulators' waivers. Accordingly, Lead Counsel met and conferred with Defendants concerning an amended protective order and obtained approval from the Regulators. Lead Plaintiffs then submitted the proposed Amendment to Stipulated Confidentiality Agreement and Protective Order to the Court on July 13, 2022, and the Court entered it the same day. *See* ECF Nos. 137-138.

50.   As a result of the extensive process required to obtain authorization from the Regulators under these access requests, the Parties sought and obtained a six-month extension from the Court for the completion of fact discovery. *See* ECF Nos. 139-140. Under the Court's amended scheduling order, fact discovery was to be completed by April 28, 2023, and expert discovery was to be completed by July 27, 2023.

51.   In addition to their objections on grounds that many requested documents contained CSI, Defendants raised numerous additional objections to Lead Plaintiffs' requests, refused to

produce any documents on certain subjects, and agreed to produce only some documents on other subjects.  As a result, Lead Counsel engaged in extensive meet-and-confers and exchanged detailed discovery letters with Defendants' counsel regarding the scope of production for Wells Fargo and each Individual Defendant.

52.     Ultimately, Defendants agreed to amend their formal responses and objections to certain of Lead Plaintiffs' document requests and to produce additional categories of documents. In total, Wells Fargo produced over 3.5 million pages of documents across 45 production volumes. The production includes documents from over 80 individual custodians, including:

- Tim Sloan
- John Shrewsberry
- C. Allen Parker
- Elizabeth Duke
- Charlie Scharf
- Maria Morris
- Amanda Norton
- Paula Dominik
- Derek Flowers
- Kris Klos
- John Campbell
- Anthony Augliera
- Sarah Dahlgren
- Christine Deakin
- Joseph Rice
- Mike Roemer
- Julie Huffman
- Justin Thornton
- Karen Peetz
- James Quigley
- Theodore Craver
- Shin Lee
- John G. Stumpf
- Carrie L. Tolstedt
- David M. Carroll
- David Julian
- Hope A. Hardison

- Michael J. Loughlin
- Avid Modjtabai
- James M. Strother
- John D. Baker II
- John S. Chen
- Lloyd H. Dean
- Susan E. Engel
- Enrique Hernandez, Jr.
- Donald M. James
- Cynthia H. Milligan
- Federico F. Peña
- Judith M. Runstad
- Stephen W. Sanger
- Susan G. Swenson
- Suzanne M. Vautrinot
- Matthew Raphaelson
- Jason MacDuff
- Tyson Pyles
- Tom Bredensteiner
- James Rowe
- Terry Hardy
- Jeanine Sundt
- Ken Zimmerman

- Jim Smith
- Ben Alvarado
- Michael Bacon
- Patricia Callahan
- Pamela Conboy
- David DeCristofaro
- Mickey DeLay-Helser
- Jim Foley
- Shelley Freeman
- Rob Myers
- Claudia Russ Anderson
- John Sotoodeh
- Lisa Stevens
- Marty Weber
- Rebecca Rawson
- Richard Levy
- Jay Freeman
- Karl (Keb) Byers
- Glen Chambers
- Jay Christoff
- Joe Coyne
- Sarah I.Freeman
- Paula G.Herzberg
- Yvette Hollingsworth Clark
- Tracy Kidd

- Michelle Lee
- Paul McLinko
- Christine L. Meuers

- Jim Richards
- Laura Schulte
- Loretta Sperle

53.     In addition to the above, Lead Plaintiffs also obtained and reviewed documents stored in Wells Fargo's relevant central repositories, including those containing Board of Directors and Investor Relations materials.

54.     Lead Plaintiffs also prepared and served 27 subpoenas on relevant third-party witnesses.  Lead Plaintiffs engaged in an extensive meet-and-confer process with counsel for many of the key third-party subpoena recipients, negotiating separate search protocols where needed. These third-party subpoena recipients included, among others:

- former director and Chair of Wells Fargo Bank, James Quigley, who provided testimony side-by-side with Defendant Duke during the public congressional hearings held on March 11, 2020;

- additional directors of Wells Fargo during the Class Period who reviewed Wells Fargo's submissions to the OCC and Federal Reserve, including Thomas Craver, Donald James, Maria Morris, Ronald Sargent, Suzanne Vautrinot, Wayne Hewett, Celeste Clark, and Juan Pujadas;

- former employees of Wells Fargo with percipient knowledge of relevant facts and issues, including Michael Loughlin (Chief Risk Officer), Theresa LaPlaca (Head of Conduct Management Office), Christine "Christi" Deakin (Head of Corporate Strategy), and Michael Roemer (Chief Compliance Officer);

- Wells Fargo's financial consultants, auditors and advisors, including KPMG LLP and Ernst & Young LLP; and

- Wells Fargo's lobbying and consulting firms during the Class Period, including Resolution Public Affairs and ExpressWorks.

55.     Lead Counsel reviewed and analyzed Defendants' and third-parties' document productions.  To efficiently identify the most relevant documents, Lead Counsel conducted the document review on Relativity, a specialized Internet-based review platform.  Lead Counsel utilized search terms, de-duplication, and other tools to efficiently review the materials produced.

Lead Counsel created a document coding protocol on the Relativity platform to organize the documents by date, issue, and relative importance, as well as to allow for document-specific analysis. Once the most important documents were identified, Lead Counsel catalogued them on a specialized litigation platform, Everchron, which organizes a case's key documents and data into a timeline, drawing connections to testimony, facts, and issues that reflect and reveal critical information about the case, as well as any gaps in the evidence in documents produced.

56.     During the document review process, Lead Counsel held formal weekly and bi-weekly meetings with the attorneys primarily responsible for the document review.  In advance of these regular meetings, documents identified as critical to the claims and asserted defenses were compiled and circulated to the team, along with substantive analyses of the documents' import. At these regular weekly meetings, the litigation team analyzed select documents identified as particularly important to the litigation and discussed analyses performed by the team of the key issues in the case, including falsity, the scienter of each Defendant, loss causation, and damages. The litigation team also prepared memoranda detailing their analysis of the evidence, as well as the strengths and weaknesses of the asserted claims and defenses.

### 2.      Lead Plaintiffs Provided Extensive Discovery

57.     Lead Plaintiffs also produced documents and information to Defendants during fact discovery.  On December 3, 2021, Defendants served each Lead Plaintiff with 29 separate document requests.  Lead Plaintiffs served their responses and objections to Defendants' documents requests on January 10, 2022.

58.     Defendants Wells Fargo, Sloan, and Shrewsberry also served interrogatories to each Lead Plaintiff on January 31, 2022, seeking several categories of information.  The interrogatories sought information about, among other things, Lead Plaintiffs' transactions in Wells Fargo securities and the amount of damages that Lead Plaintiffs suffered as a result of

Defendants' alleged misstatements.  Lead Plaintiffs responded to Defendants' interrogatories on March 16, 2022.

59.     Defendants also served document subpoenas to six outside investment advisors for Lead Plaintiffs.

60.     Following extensive negotiations, Lead Plaintiffs searched for and produced documents from 15 custodians, and Lead Plaintiffs' investment advisers also produced documents.

61.     During the course of discovery, Defendants conducted nine depositions of representatives of Lead Plaintiffs and their investment advisors.   Specifically, Defendants conducted the following depositions:

(a)     on November 2, 2022, Defendants deposed Charles Nielsen, the Chief Investment Officer of the Investment Department for Mississippi;

(b)     on November 4, 2022, Defendants deposed Justin Maistrow, Deputy Chief Investment Officer of Rhode Island;

(c)     on November 8, 2022, Defendants deposed Eric Hagemann, a senior research analyst of PZENA Investment Management;

(d)     on November 15, 2022, Defendants deposed Alec Henry, Co-Chief Investment Officer of Eagle Capital Management;

(e)     on November 15, 2022, Defendants deposed Osey McGee, Jr., Executive Director of Louisiana Sheriffs;

(f)     on November 16, 2022, Defendants deposed Tricia Beale, Special Assistant Attorney General in the Office of the Mississippi Attorney General;

(g)     on November 18, 2022, Defendants deposed Staffan Ringvall, Head of Corporate Governance and Company Secretary of Handelsbanken;

(h)     on November 18, 2022, Defendants deposed Stefan Hagman, Head of Passive Management of Handelsbanken; and

(i)      on November 29, 2022, Defendants deposed Mills Riddick, Chief Investment Officer, Senior Portfolio Manager of Ceredex Value Advisors LLC.

62.     In preparation for these depositions, Lead Counsel conducted a review of Defendants' and non-parties' document productions, a review of prior testimony that related to the witness, and a close analysis of the issues in the case.  The attorneys from Lead Counsel who defended and asked questions at the depositions performed a detailed review of the key documents concerning the particular witness and developed an in-depth understanding of that individual's role within the organization and their corresponding job responsibilities.  Prior to each deposition, "deposition kits" were assembled for each witness that included an analysis of all of the important documents, as well as a discussion of the deponent's role within the organization and likely areas of inquiry.  Lead Counsel also spent significant time preparing many of these witnesses for their depositions and, at each deposition, actively defended and examined the witnesses, as necessary.

## G.     Lead Plaintiffs' Work with Experts

63.     Throughout the litigation, Lead Plaintiffs consulted with highly qualified experts in a variety of disciplines and on numerous subjects, including market efficiency, the banking industry, government consent orders, CSI regulations, loss causation, and damages.  These experts provided critical insights and assistance to Lead Plaintiffs and Lead Counsel in the successful prosecution and resolution of this case.

64.     As discussed further below, this litigation involved highly complex and disputed issues of loss causation and damages that required expert assistance, including (i) measuring damages associated with the alleged corrective disclosures made on the same dates that Wells Fargo announced confounding, non-fraudulent information about its quarterly financial results;

(ii) measuring damages associated with the alleged corrective disclosures made during early March 2020, a time when the stock market was experiencing extreme market volatility following the onset of the COVID-19 global pandemic; and (iii) assessing the efficiency of the market for Wells Fargo's stock throughout the entirety of the alleged Class Period.  Additionally, expert analysis was critical to demonstrate the "price impact" of Defendants' misrepresentations, and to assist Lead Counsel in evaluating the risks and potential impact of Defendants' "truth-on-the-market" defense on class-wide damages.

65.    The litigation also involved complex and disputed issues related to the banking industry that required expert consultation, including (i) standard practices, policies, and procedures concerning the handling of CSI; (ii) negotiation and requirements of disputed terms in consent orders; (iii) the significance of informal feedback from the Regulators about progress under consent orders; and (iv) the Regulators' role in monitoring and evaluating banks' statements to investors.

66.    Lead Counsel retained and consulted with multiple experts on these issues.  These experts included: (i) Michael Hartzmark, Ph.D., an experienced economist who has published numerous academic articles in peer-reviewed journals and has performed extensive expert work in numerous securities class actions; (ii) S.P. Kothari, Ph.D., the Gordon Y. Billard Professor of Accounting and Finance at MIT's Sloan School of Management, who served as Chief Economist and Director of the Division of Economic and Risk Analysis at the SEC from 2019 to 2021; (iii) Matthew Cain, a Senior Fellow at Berkeley Law School, University of California, and former economic adviser to former SEC Commissioner Robert Jackson, who has provided economic analysis, consulting, and expert witness testimony on a variety of finance topics on behalf of the

SEC and other clients; and (iv) David Gibbons, a former Deputy Comptroller for Credit Risk at the OCC, with expertise in banking regulations.

67.     Following the Settlement, Lead Counsel again worked extensively with Dr. Hartzmark and his team to develop the Plan of Allocation.  The Plan of Allocation—which is discussed in the Notice, in Dr. Hartzmark's previously-submitted declaration (ECF No. 180-5), and further below (*see* ¶¶ 117-31)—is designed to equitably distribute the proceeds of the Settlement to the Settlement Class Members based on their Recognized Claims and *pro rata* share of the Settlement.

### H.     The Parties' Mediation Efforts and the Settlement of the Action

68.     In late 2022, the Parties agreed to engage in private mediation before Judge Layn R. Phillips.  Judge Phillips is a former U.S. District Judge, a former United States Attorney, and a former litigation partner at the law firm of Irell & Manella LLP.  Judge Phillips currently serves as a mediator and arbitrator at his own alternative dispute resolution company, Phillips ADR Enterprises.  Judge Phillips has served as a mediator and arbitrator in connection with many large and complex securities class actions.  *See* Ex. 1, at ¶¶ 3-6.

69.     Preparations for the mediation in this case were extensive.  In advance of the mediation, the Parties exchanged comprehensive mediation statements totaling over 50 pages, which also attached dozens of exhibits uncovered through the discovery process.

70.     The mediation was conducted in-person on January 6, 2023 in New York, New York.  Representatives from Lead Plaintiffs participated in the mediation either in-person, by Zoom, or telephonically, including a top executive from Handelsbanken who travelled from Sweden to New York to participate in the mediation in-person.  Defense counsel and Wells Fargo representatives, including some of its most senior in-house lawyers, also participated in the mediation.

71.     At the start of the mediation, counsel for Lead Plaintiffs and Defendants each delivered extensive PowerPoint presentations to the mediator detailing their respective views of the discovery record and merits of the case.  Following these PowerPoint presentations, the Parties engaged in vigorous settlement negotiations that lasted the remainder of the day.  The Parties were not able to reach a settlement during the mediation session, necessitating further settlement negotiations. Subsequently, Judge Phillips issued a mediator's recommendation that the Parties agree to resolve the litigation for $1 billion, subject to certain conditions.  The recommendation was made on a "double-blind" basis—meaning that if either party rejected the recommendation, they would not learn whether the other side accepted or rejected the mediator's recommendation. Both Lead Plaintiffs and Defendants ultimately accepted the mediator's recommendation, with the Parties reaching an agreement-in-principle, subject to certain conditions, to resolve the matter for $1 billion.

72.     In accordance with the terms of the Parties' agreement-in-principle, Defendants made certain factual representations and produced additional documents, which Lead Counsel carefully reviewed and evaluated before executing the Stipulation in order to assess the reasonableness and adequacy of the Settlement.  These efforts confirmed that the Settlement Class would face significant obstacles to a recovery in excess of the Settlement, and that the Settlement was an excellent result for the Settlement Class.

73.     Following additional vigorous negotiations between the Parties, on May 8, 2023, the Parties agreed to and executed the Stipulation and Agreement of Settlement, which sets forth the terms and conditions of the Settlement, subject to the Court's approval.  ECF No. 178-1.  The Parties concurrently executed a Supplemental Agreement, which provides that Wells Fargo may

terminate the Settlement if shares held by persons who request exclusion from the Settlement Class reach a certain threshold.

## I.     The Court Grants Preliminary Approval of the Settlement

74.     On May 15, 2023, Lead Plaintiffs filed a motion for preliminary approval of the Settlement.  ECF Nos. 178-180.  The motion was accompanied by, among other things, a declaration from Dr. Michael Hartzmark describing the proposed Plan of Allocation and his calculation of the artificial inflation in Wells Fargo's stock throughout the Class Period.  ECF No. 180-5.  The motion also included a proposed Notice and a proposed Proof of Claim and Release Form ("Claim Form").

75.     On May 16, 2023, the Court entered the Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement (ECF No. 182) ("Preliminary Approval Order"), which, among other things: (a) preliminarily approved the Settlement; (b) approved the form of Notice, Summary Notice, and Claim Form; (c) authorized notice to be given to Settlement Class Members through mailing of the Notice and Claim Form, posting of the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *The Wall Street Journal*, *Investor's Business Daily*, and over the *PR Newswire*; (d) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or the Fee and Expense Application; and (e) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application.  The Preliminary Approval Order also scheduled the final Settlement Hearing for September 8, 2023, at 10:00 a.m.

76.     On June 5, 2023, in accordance with the Court's Preliminary Approval Order, Wells Fargo deposited the Settlement Amount of $1 billion in cash into an escrow account.  The funds

in the escrow account have been invested in U.S. Treasury bills, which will earn interest for the benefit of the Settlement Class. The Settlement Amount plus interest earned is referred to as the "Settlement Fund."

77.     Also, in accordance with the Court's May 16, 2023 Order (ECF No. 183), entered together with the Preliminary Approval Order, Lead Counsel hereby declares, as described in this declaration and demonstrated throughout this litigation, that this Action was initiated, filed, and prosecuted by Lead Plaintiffs and Lead Counsel in good faith at all times. Lead Counsel and Lead Plaintiffs are not aware of any facts or circumstances giving rise to any violation of Rule 11 of the Federal Rules of Civil Procedure relating to any aspect this Action or any filing made in connection with this Action.

### III.     RISKS OF CONTINUED LITIGATION

78.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $1 billion cash payment. Lead Plaintiffs and Lead Counsel believe that the proposed Settlement is an extremely favorable result for the Settlement Class.

79.     As explained below, Lead Plaintiffs faced meaningful challenges with respect to proving liability and recovering damages in this case. Absent a settlement, Lead Plaintiffs would need to prevail at several stages of the litigation, including overcoming Defendants' anticipated motions for summary judgment, at trial, and on appeal. At each of these stages, Lead Plaintiffs faced significant risks, including defeating Defendants' falsity and materiality challenges, establishing Defendants' scienter, and proving that the market was efficient throughout the Class Period, loss causation, and damages. Even after any trial, Lead Plaintiffs would face post-trial motions, including motions for judgment as a matter of law and appeals.

A.      **Risks of Proving Defendants' Liability**

80.     Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious.  They recognize, however, that this Action presented a number of meaningful risks to establishing Defendants' liability.  As discussed further below, Defendants strenuously argued that their challenged statements about Wells Fargo's compliance with the Consent Orders were not false or misleading when made, and, in any event, could not have misled investors because the truth was already known; that, even if any of their statements were false or misleading, Defendants did not have any intent to mislead investors; and that investors' losses were not caused by Defendants' allegedly false statements, but rather unrelated non-fraud news about Wells Fargo's quarterly financial results and the impact of the COVID-19 pandemic on bank stocks.

1.      **Risks of Proving Falsity**

81.     The Complaint alleged that Defendants made 32 misstatements.  In its order at the motion-to-dismiss stage, the Court dismissed nine of the alleged misstatements, narrowing the case as alleged and dismissing one defendant—Wells Fargo's current CEO, Charles W. Scharf—from the Action altogether.  Additionally, the Court stressed in its Motion to Dismiss Order that it was "reading the [Complaint] in the light most favorable to Lead Plaintiffs as the Court must" (ECF No. 96, at 48) and that it was "[a]ccepting the allegations in the complaint as true, as the Court must at this [motion-to-dismiss] stage" (*id.* at 38).  Lead Plaintiffs understood that, at subsequent stages of the litigation, the Court would not be limited by these pleading standards and would evaluate the alleged misstatements with the benefit of the entire discovery record.

82.     Lead Plaintiffs recognized that they would face meaningful challenges at summary judgment and trial in establishing that each of the remaining alleged misstatements was false or misleading.  Lead Plaintiffs alleged that the Consent Orders set forth three distinct, linear stages

24

of compliance, and that Defendants misrepresented that they had completed certain stages. However, Defendants maintained at the pleading stage—and were expected to continue to argue at summary judgment and trial, with the benefit of a complete factual record—that the Consent Orders did not set forth a distinct, linear set of stages. Lead Plaintiffs anticipated that Defendants, in support of this argument, would point to their contemporaneous communications with the Regulators, which they would contend supported their interpretation of the Consent Orders. If Defendants' view of the Consent Orders were accepted, there was a real risk that the factfinder would conclude that many of the challenged statements were truthful and, thus, non-actionable.

83.     Lead Plaintiffs further anticipated that Defendants would argue, with the benefit of a full discovery record, that their statements to investors comported with the ongoing, real-time feedback that they received from the Regulators. Specifically, Lead Plaintiffs anticipated that Defendants would point to their contemporaneous communications with the Regulators and their colleagues and contend that they reflect that (i) Wells Fargo did, in fact, make progress in satisfying the Consent Orders; (ii) the Regulators agreed that Wells Fargo made meaningful progress in satisfying the Consent Orders; and (iii) Defendants genuinely believed their statements to investors about the time required to satisfy the Consent Orders. If a factfinder accepted Defendants' view that they, in fact, made meaningful progress in satisfying the Consent Orders, there was an additional risk that the factfinder would find that many of Defendants' statements were accurate and non-actionable.

84.     Lead Plaintiffs also recognized that they faced challenges at summary judgment and trial in establishing that Defendants were permitted by law to make the statements that Lead Plaintiffs contend were improperly omitted from their disclosures. Lead Plaintiffs anticipate that Defendants would have argued at summary judgment and trial—with the support of expert

testimony—that they were prohibited by CSI regulations from providing additional information to investors about the status of Wells Fargo's compliance with the Consent Orders.  The Regulators have written rules and regulations that specifically prohibit bank executives from disclosing CSI to non-bank employees—with penalties including criminal punishment and civil fines.  Defendants cited these CSI restrictions in certain of their public statements to investors during the Class Period as the reason why they could not provide investors with further information about the status of their compliance with the Consent Orders.  If the factfinder were to accept Defendants' explanations for why they could not disclose further information to investors, liability could be reduced or eliminated altogether.

85.     The significant challenges to establishing falsity were further underscored by the dismissal of the shareholder derivative action arising from the same alleged misconduct in February 2022.  *See In re Wells Fargo & Co. S'holder Derivative Litig*., 2022 WL 345066, at *7 (N.D. Cal. Feb. 4, 2022).  In dismissing the derivative action, the Northern District of California found that those plaintiffs had "failed to allege an actionable false or misleading statement" by defendants concerning the Consent Orders in Wells Fargo's proxy materials.  *Id.* at *5-6.

### 2.      Risks of Proving Materiality

86.     Even if Lead Plaintiffs succeeded in establishing that Defendants' statements to investors were false or misleading, they would still face Defendants' argument that the allegedly omitted facts were already known to investors and, thus, not material.

87.     The Complaint alleged that Defendants failed to disclose that the Regulators rejected the plans that Wells Fargo submitted to them.  In response, Defendants argued that the market already knew that Wells Fargo's submitted plans were rejected by the Regulators and, thus, the asset cap would not be lifted by the date originally forecasted by Defendants as a result of, among other things: (i) a September 11, 2018 *Reuters* article describing how the "U.S. regulators

have rejected Wells Fargo & Co.'s plan" under the Consent Orders; (ii) a December 6, 2018 *Reuters* article describing how "[t]he Federal Reserve has rejected Wells Fargo & Co's plans" and how "[t]he concerns raised by the Fed, which have not been previously reported, are likely to increase the time it takes the central bank to lift an asset cap"; and (iii) a March 9, 2019 *New York Times* article explaining how "[t]he bank is still negotiating the details of the plan with the Fed."

88.     Defendants were also expected to point to public statements by the Regulators themselves to support their contention that investors already knew that Wells Fargo's plans were rejected by the Regulators and, as a result, the asset cap would not be removed by the date originally forecasted.  For example, Lead Plaintiffs anticipated that Defendants would point to remarks by the Chairman of the Federal Reserve, published in the *American Banker* on March 21, 2019, that "we will not lift [the asset cap] until Wells Fargo . . . comes forward with plans, implements those plans and we're satisfied with what they've done" and "[t]hat's not where we are right now."  Defendants were also expected to point to the OCC's public rebuke of Wells Fargo immediately following Defendant Sloan's testimony to Congress in 2019, including that the OCC "continue[s] to be disappointed with [Wells Fargo's] performance under our consent orders and its inability to execute effective corporate governance and a successful risk management program."

89.     Defendants were also expected to rely upon contemporaneous reactions by securities analysts to buttress their argument that investors already knew that the asset cap imposed on Wells Fargo would not be removed by the time originally forecasted by the Company.  Lead Plaintiffs anticipated that Wells Fargo would point to public reports by analysts at RBC Capital Markets, who stated (for example) in a report issued on July 16, 2019, that "we would expect the 2018 consent order to persist well into 2020" and, on January 14, 2020, that we "do not expect the asset cap or the cease and desist order to be removed this year."  Lead Plaintiffs anticipated that

27

Defendants would point to these and other reports published by well-respected securities analysts to support their contention that the truth was already known to investors and, thus, the alleged misstatements were not material.

90.     Finally, Defendants were expected to argue that nothing new regarding the alleged fraud could possibly have been disclosed on March 11 and 12, 2020—the final two corrective disclosure dates, which made up a significant percentage of Lead Plaintiffs' alleged damages— given that the congressional reports detailing their findings were released nearly a week earlier on March 5 and 6, 2020.

91.     Maximum damages in this Action would be reduced or eliminated altogether if Lead Plaintiffs were unable to demonstrate that Defendants' alleged misstatements to investors were material and caused the Class's losses, or if Defendants demonstrated that the market already knew the truth about the misrepresented and omitted facts.

### 3.     Risks of Proving Scienter

92.     In addition to demonstrating falsity, Lead Plaintiffs would also need to show that Defendants acted with scienter—*i.e.*, fraudulent intent.  Defendants had credible arguments that they did not act with scienter when making the challenged statements.  Specifically, the Individual Defendants were expected to argue that they had no personal motive to lie—as evidenced by the fact that they did not engage in suspicious insider sales of their personal Wells Fargo stock or have outsized incentive compensation packages tied to Wells Fargo's stock price.  Additionally, Lead Plaintiffs expected that Defendants would argue that the Individual Defendants each had distinguished professional careers—with Defendant Duke, for example, having been selected by President George W. Bush to serve on the Board of Governors of the Federal Reserve—and would each testify that they would never jeopardize their reputations to temporarily increase the price of Wells Fargo's stock with zero personal benefit to them.

93.    Lead Plaintiffs anticipated that the Individual Defendants would also likely argue at summary judgment and trial that they genuinely believed—whether correctly or incorrectly—that they were legally precluded from providing additional information to investors about the status of Wells Fargo's compliance with the Consent Orders.   In support of this contention, Lead Plaintiffs expected that the Individual Defendants would point to their contemporaneous communications with the Regulators and colleagues at Wells Fargo, contending that this evidence demonstrated their good faith commitment to tell investors the truth.   Finally, and perhaps most critically, the Individual Defendants would likely point to the fact that none of them were prosecuted, civilly or criminally, for their role in these events, despite an extensive investigation by Congress.

94.    If the factfinder were to accept Defendants' explanations for why they did not disclose further information about their non-compliance with the Consent Orders, damages could be reduced or eliminated altogether.

### 4.    Risks of Proving Loss Causation and Damages

95.    Lead Plaintiffs also recognized that they faced serious risks in establishing loss causation and demonstrating damages.   Three of the alleged corrective disclosures occurred on the same dates that Wells Fargo held its quarterly investor conference calls.   The other three alleged stock drops at issue occurred during the first two weeks of March 2020—*i.e.*, when the COVID-19 pandemic essentially shut down the country and resulted in unprecedented volatility in the United States capital markets.   As a result, all of the alleged corrective disclosures in the Action were made on days when there were other plausible explanations for some, if not all, of the abnormal declines in Wells Fargo's stock price.

96.    Specifically, the first three alleged loss causation events took place on January 15, 2019, April 12, 2019, and January 14, 2020—the dates that Wells Fargo announced its quarterly

earnings for, respectively, the fourth quarter of 2018, first quarter of 2019, and fourth quarter of 2019. On those three earnings announcement dates, Wells Fargo disclosed negative news about the Company's financial performance for the quarter as a result of issues wholly unrelated to the Consent Orders. Wells Fargo disclosed on those dates disappointing earnings-per-share quarterly results and misses in Wells Fargo's "core operating fundamentals." As a result, Defendants had strong arguments that the stock price declines on these three corrective disclosure dates were not caused by the alleged revelations about the Consent Orders, but rather were caused by unrelated announcements during Wells Fargo's quarterly investor conference calls about the Company's poor financial performance.

97. The final three alleged loss causation events occurred during the first two weeks of March 2020. During those weeks, the volatility and declines in the general market were so extreme that they triggered market-wide trading halts (known as "circuit breakers") on March 9 and 12, 2020.

98. This heightened level of market volatility presented unique challenges for Lead Plaintiffs in this Action. At the class certification stage, Defendants argued that this volatility demonstrated that the market for Wells Fargo stock was not efficient during the last month of the Class Period. Lead Plaintiffs anticipated that, at summary judgment and trial, Defendants would contend that the declines in Wells Fargo's stock price during these two weeks were attributable to news concerning the COVID-19 global pandemic—and not the alleged misstatements. Lead Plaintiffs anticipated that Defendants would also contend that the stock drops were due to erratic movements in the price of Wells Fargo's stock resulting from the highly volatile nature of the market during this unprecedented period. Further, Lead Plaintiffs anticipated that Wells Fargo and its experts would argue that the stock-price declines on March 5, 2020 and March 11, 2020 were

not statistically significant to the "necessary" 95% confidence level once the volatility in the market was properly accounted for.

99.     Each of these disputes about loss causation and damages would involve a "battle-of-the-experts."  This anticipated "battle-of-the-experts" created significant uncertainty and risks to recovery.  If the Court or a jury accepted any of the arguments advanced by Defendants' experts, damages would be meaningfully reduced or eliminated altogether.

*     *     *

100.    In sum, Lead Plaintiffs recognize that they faced obstacles related to issues of liability, as well as loss causation and damages.  To recover for their losses, Lead Plaintiffs would need to prevail at several stages of the litigation, including at class certification, summary judgment and trial.  And, even if Lead Plaintiffs succeeded at class certification, summary judgment and trial, they likely would face lengthy appeals—a process that could extend for years and might lead to a smaller recovery, or no recovery at all.

### B.     The Settlement Amount Compared to Maximum Possible Damages That Could Be Proved at Trial.

101.    The Settlement Amount—$1 billion in cash—represents an excellent recovery for the Settlement Class.  The Settlement would be among the top six securities class action settlements in the past decade, the ninth largest ever in the Second Circuit, and among the top seventeen of all time in the United States.  The recovery also represents a meaningful percentage, well above the average, of the maximum realistically recoverable damages that could be established at trial, in the event that Lead Plaintiffs and the Settlement Class prevailed on all liability and damages issues.

102.    Assuming Lead Plaintiffs prevailed on all liability issues (which was far from certain), the maximum total damages that Lead Plaintiffs could realistically establish at trial was

31

approximately $4.2 billion.  The Settlement Amount thus represents approximately 24% of the Settlement Class's maximum realistic damages.

103.    To calculate the maximum damages, Lead Plaintiffs consulted with damages experts, including Dr. Michael Hartzmark, who has extensive experience conducting damages analyses for securities class actions.  Dr. Hartzmark conducted an "out-of-pocket" damages analysis, which is standard for Section 10(b) cases, which calculates the artificial inflation present in the security's price on the date of purchase, and subtracts the artificial inflation present at the time of sale.  To undertake this analysis, Dr. Hartzmark conducted an event study, which used a regression analysis to predict the return for Wells Fargo's stock each day, controlling for any outside influences by using various indices to measure those effects and backing the effect out of the regression.

104.    To further refine his damages estimate, Dr. Hartzmark then accounted for the stock price impact of any other, non-fraud news concerning Wells Fargo.  Dr. Hartzmark reviewed the information released on Wells Fargo's corrective disclosure dates, as well as securities analysts' reports and changes to their forecasts, to determine the extent to which Defendants' alleged misstatements (as opposed to non-fraud related information) caused the decrease in stock price.

105.    Based on this analysis, Dr. Hartzmark concluded that a portion of the decrease in Defendants' stock price on certain of the alleged corrective disclosure dates was due to factors other than Defendants' alleged misstatements related to their non-compliance with the Consent Orders.  Specifically, Dr. Hartzmark concluded that approximately 50%, 50%, and 42% of the abnormal price declines in Wells Fargo's stock price on January 15, 2019, April 12, 2019, and January 14, 2020, respectively, were attributable to the alleged misrepresentations.

106.    Dr. Hartzmark also carefully analyzed the alleged March 2020 corrective disclosures.  Dr. Hartzmark recognized the challenges in finding that the stock price declines on March 5, 2020 and March 11, 2020 were statistically significant at a 95% confidence level once accounting for market volatility at that time.  Lead Plaintiffs likewise recognized that it would be challenging to demonstrate that new, fraud-related information relating to the Consent Orders was disclosed on March 11, 2020 and March 12, 2020, because the detailed congressional reports concerning Wells Fargo's compliance with the Consent Orders were released days earlier—*i.e.*, on March 5, 2020.  Given the heightened litigation risks related to loss causation issues for these final three alleged disclosures during the onset of the COVID-19 pandemic, Lead Counsel assigned 40% of the Wells Fargo abnormal stock price declines on March 5, 2020 and March 11, 2020 to the alleged misstatements, and 50% of the abnormal price decline on March 12, 2020 to the alleged misstatements.

107.    Particularly given the meaningful litigation risk and the immediacy and amount of the $1 billion recovery for the Settlement Class, Lead Plaintiffs and Lead Counsel believe that the Settlement is fair, reasonable, and adequate, and is in the best interest of the Settlement Class.

## IV.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

108.    The Court's Preliminary Approval Order directed the dissemination of the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") to potential members of the Settlement Class.  The Preliminary Approval Order also set August 18, 2023 as the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application or to request exclusion from the Settlement Class.

109.    In accordance with the Preliminary Approval Order, Lead Counsel instructed the Court-approved Claims Administrator, Epiq Class Action and Claims Solutions, Inc. ("Epiq"), to disseminate copies of the Notice and the Claim Form by mail and to publish the Summary Notice. The Notice contains a description of the Action; the Settlement; the proposed Plan of Allocation; and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 19% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $2 million.

110.    To disseminate the Notice and Claim Form (together, the "Notice Packet"), Epiq obtained information from Wells Fargo and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members. The Declaration of Alexander P. Villanova, attached hereto as Exhibit 6, provides additional information about the Claims Administrator's distribution of the Notice Packet. *See* Villanova Decl. ¶¶ 2-7.

111.    Lead Counsel have overseen the process of disseminating notice to Settlement Class Members, including through regular correspondence and communications with the Claims Administrator. Epiq began mailing copies of the Notice Packet to potential Settlement Class Members and nominee owners on June 7, 2023. *Id.* ¶¶ 3-4. As of August 3, 2023, Epiq had disseminated a total of 1,825,039 Notice Packets to Settlement Class Members and nominees. *Id.* ¶ 7.

112.    In accordance with the Preliminary Approval Order, Epiq caused the Summary Notice to be published in *Investor's Business Daily* and transmitted over the *PR Newswire* on June 19, 2023, and to be published in *The Wall Street Journal* on June 20, 2023. *Id.* ¶ 8.

113.    Lead Counsel also caused Epiq to establish a dedicated settlement website, www.WellsFargoSecuritiesClassAction.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and other relevant documents.  *See* Villanova Decl. ¶ 12.  That website became operational on June 7, 2023.  *Id.*

114.    Lead Counsel and Epiq have regularly monitored the settlement website to ensure that it is operating correctly and will continue to monitor and update the settlement website as the process continues.  For example, Lead Plaintiffs' papers in support of their motion for final approval of the Settlement and Lead Counsel's papers in support of their motion for attorneys' fees and Litigation Expenses will be made available on the website after they are filed, and any orders entered by the Court in connection with the motions will also be posted.

115.    Lead Counsel also made copies of the Notice and Claim Form and other documents available on their own websites, www.blbglaw.com and www.cohenmilstein.com.  Lead Counsel are also providing information to shareholders who contact them directly regarding the claims process.

116.    The deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, or Fee and Expense Application, or to request exclusion from the Settlement Class, is August 18, 2022.  To date, no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received.  Lead Counsel will file reply papers on or before September 1, 2023, that will address all requests for exclusion and any objections that may be received.

## V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

117.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to be eligible to participate in the distribution of the Net

Settlement Fund must submit a valid Claim Form with all required information postmarked (if mailed) or submitted online no later than October 5, 2023.  As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

118.    Lead Counsel's proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation" or "Plan") is set forth at pages 12 to 15 of the Notice.  *See* Villanova Decl., Ex. A at pp. 12-15.  Lead Counsel believe that the proposed Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action.  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial, but are intended as a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.  *See* Notice ¶ 60.

119.    Lead Counsel consulted with Lead Plaintiffs' damages expert, Dr. Michael L. Hartzmark, in developing the proposed Plan of Allocation.  Dr. Hartzmark submitted a declaration that explains the methods used for calculating estimated artificial inflation in Wells Fargo common stock that are used in the Plan, and provides details of the calculation of Recognized Loss Amounts and Recognized Claims under the Plan.  *See* ECF No. 180-5.

### A.    Calculation of Artificial Inflation

120.    For purposes of the Plan of Allocation, the calculation of the amount of artificial inflation in the price of Wells Fargo common stock begins with the price declines in Wells Fargo common stock on the alleged corrective disclosure dates.  The measurement of artificial inflation for each of the alleged corrective disclosure dates was based on an event study analysis conducted by Dr. Hartzmark, which is the same event study contained in his October 3, 2022 report submitted

in connection with Lead Plaintiffs' motion for class certification.  ECF No. 147-1.  In conducting

the event study, Dr. Hartzmark performed a regression analysis, which predicted a return each day

for Wells Fargo's common stock based on market and industry factors.  This predicted return

accounted for outside general market and industry influences on the price of Wells Fargo's

common stock.  The event study analysis then returned a daily "abnormal" return that represents

an adjustment of the actual return to Wells Fargo common stock after accounting for market and

industry effects.

121.    In addition, Dr. Hartzmark also accounted and adjusted for the stock price impact

of other negative Wells Fargo information released concurrently with the alleged corrective

information.  Dr. Hartzmark identified and adjusted for negative information concerning Wells

Fargo that was disclosed on the alleged corrective disclosure dates and that was unrelated to the

alleged misrepresentations and omissions.  The first three corrective disclosures each occurred

concurrently with Wells Fargo earnings releases on January 15, 2019, April 12, 2019, and January

14, 2020.  On those dates, Wells Fargo announced negative news about its operations, including,

among other things, core earnings items such as net interest income and fees.  Based on Dr.

Hartzmark's review of securities analyst reports and changes to analysts' forecasts following Wells

Fargo's earnings announcements on those dates, as well as assumptions regarding liability

provided to Dr. Hartzmark by Lead Counsel, Dr. Hartzmark determined that news related to Wells

Fargo's alleged misrepresentations accounted for approximately 50% of the abnormal price

decline in Wells Fargo's stock price on January 15, 2019, 50% of the abnormal price decline on

April 12, 2019, and 42% of the abnormal price decline on January 14, 2020.

122.    The final three alleged corrective disclosures occurred during the first two weeks

of March 2020.  During these weeks, there was extreme market volatility due to news about the

COVID-19 pandemic which would create additional challenges in establishing loss causation. These challenges include whether the Wells Fargo stock price declines on March 5, 2020 and March 11, 2020 would be found to be statistically significant and whether information alleged to have been previously omitted from statements to investors was revealed in two congressional reports released on March 5, 2020. Given the heightened litigation risk related to loss causation issues for these final three alleged disclosures, Dr. Hartzmark assigned 40% of the Wells Fargo abnormal stock price declines on March 5, 2020 and March 11, 2020 to the alleged misstatements and 50% of the abnormal price decline on March 12, 2020 to the alleged misstatements.[3]   The adjustments used for purposes of calculating the artificial inflation under the Plan are the same as those discussed above at paragraph 106 that were used by Dr. Hartzmark in estimating the maximum potential damages for the Settlement Class.

123.    After the adjustments to the abnormal price decline on each alleged corrective disclosure date were made, the total artificial inflation per share as of any date in the Class Period was calculated as the cumulative amount of artificial inflation that had not been removed as of that date. The resulting artificial inflation in Wells Fargo common stock during the Class Period used in the Plan is set out in Table A of the Notice. *See* Notice at p. 14.

**B.    Calculation of Recognized Loss Amounts and Recognized Claims**

124.    Recognized Loss Amounts are calculated under the Plan of Allocation for each purchase or acquisition of Wells Fargo common stock during the Class Period that is listed on a Claimant's Claim Form and for which adequate documentation is provided. In general,

---

[3] In addition, to account for the decline in the price of Wells Fargo's common stock that occurred during the course of the trading day on March 12, 2020, the amount of inflation in the share price on March 12, 2020 is based on the portion of the stock price decline that occurred during that trading day (*i.e.*, from open to close) relative to the entire decline from the close on March 11, 2020 to the close on March 12, 2020.

Recognized Loss Amounts are calculated as the lesser of: (a) the difference between the amount of alleged artificial inflation in Wells Fargo common stock at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price for the shares. *See* Notice ¶ 63.

125.    Claimants who purchased and sold all their Wells Fargo shares before the first alleged corrective disclosure, or who purchased and sold all their Wells Fargo shares between two consecutive dates on which artificial inflation was allegedly removed from the price of the stock (that is, they did not hold the shares over a date where artificial inflation was allegedly removed from the stock price), will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions because the level of artificial inflation is the same between the corrective disclosures, and any loss suffered on those sales would not be the result of the alleged misstatements in the Action. *See id.*

126.    In addition, in accordance with the PSLRA, Recognized Loss Amounts for shares of Wells Fargo common stock sold during the 90-day period after the final alleged corrective disclosure are further limited to the difference between the purchase price and the average closing price of the stock from the end of the Class Period to the date of sale. *See* Notice ¶ 65(c)(ii). Recognized Loss Amounts for Wells Fargo common stock still held as of the close of trading on September 17, 2018, the end of the 90-day period, will be the lesser of (a) the amount of artificial inflation on the date of purchase or (b) the difference between the purchase price and $27.67, the average closing price for the stock during that 90-day period. *Id.* ¶ 65(d).

127.    The Plan also makes an adjustment to the Recognized Loss Amounts for shares purchased from February 2, 2018 through May 29, 2018, to account for the Court's dismissal of claims based on misstatements during that period, *see* ECF No. 96, and Lead Counsel's assessment

of the limited likelihood of a successful appeal of the Court's order dismissing those misstatements (estimated to be approximately 5%). Accordingly, Recognized Loss Amounts calculated for shares purchased during the period from February 2, 2018 through May 29, 2018 will be reduced by 95% to reflect the very substantial litigation risk. *See* Notice ¶ 66.

128.    The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases of Wells Fargo common stock during the Class Period is the Claimant's "Recognized Claim." Notice ¶ 68. The Plan of Allocation also limits a Claimant's Recognized Claim to his, her, or its overall market loss in transactions in Wells Fargo common stock during the Class Period, and Claimants who have an overall market gain are not eligible for a recovery. *Id.* ¶¶ 74-75.

129.    The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. Notice ¶ 76. If an Authorized Claimant's *pro rata* distribution amount calculates to less than ten dollars, no payment will be made to that Authorized Claimant. *Id.* ¶ 77. Those funds will be included in the distribution to the Authorized Claimants whose payments exceed the ten-dollar minimum.

130.    One-hundred percent of the Net Settlement Fund will be distributed to Authorized Claimants. If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions to Authorized Claimants will be conducted. Notice ¶ 78. Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective (for example, where the administrative costs of conducting the additional distribution would largely subsume the funds available), will those funds be donated to non-sectarian, not-for-profit, 501(c)(3) organization(s), to be recommended by Lead Counsel and approved by the Court. *Id.*

131.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases of Wells Fargo common stock that were attributable to the misconduct alleged in the Action.  To date, no objections to the proposed Plan of Allocation have been received.

## VI.    THE FEE AND EXPENSE APPLICATION

132.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying to the Court for an award of attorneys' fees in the amount of 18% of the Settlement Fund, net of expenses (the "Fee Application").[4]  Lead Counsel also request payment for expenses that they incurred in connection with the prosecution of the Action from the Settlement Fund in the total amount of $1,130,909.85 and awards to Lead Plaintiffs in the aggregate amount of $83,600.00 for reimbursement of costs that Lead Plaintiffs incurred directly related to their representation of the Settlement Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4).

133.    The legal authorities supporting the requested fee and expenses are set forth in Lead Counsel's Fee Memorandum.  The primary factual bases for the requested fees and expenses are summarized below.

### A.    The Fee Application

134.    Lead Counsel are applying for a fee award for Plaintiffs' Counsel to be paid from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum

---

[4] Plaintiffs' Counsel are Lead Counsel BLB&G and CMST and additional counsel for Lead Plaintiff Louisiana Sheriffs, Klausner, Kaufman, Jensen & Levinson ("Klausner Kaufman").

recovery in the shortest amount of time required under the circumstances, and has been recognized as appropriate by the U.S. Supreme Court and the Second Circuit for cases of this nature.

135.    Based on the high quality of the result achieved, the extent and quality of the work performed, the significant risks and complexities of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is reasonable and should be approved.

### 1.    Lead Plaintiffs Have Authorized and Support the Fee Application

136.    Lead Plaintiffs are sophisticated institutional investors.    Lead Plaintiff Handelsbanken is one of the largest fund companies in the world, and Lead Plaintiffs Mississippi, Rhode Island, and Louisiana Sheriffs are large public pension funds with significant experience overseeing securities litigation.    Collectively, Lead Plaintiffs lost tens of millions of dollars from their Wells Fargo stock purchases during the Class Period.

137.    Lead Counsel entered into a retention agreement with each of the four Lead Plaintiffs.    Although each Lead Plaintiff separately negotiated the terms of its retention agreement with its chosen counsel, each of the retention agreements provides that the Action will be litigated on a fully contingent basis, with Lead Counsel bearing all costs and expenses.    The requested fee of 18% of the Settlement, net of expenses, is less than the agreed-upon fee percentages contemplated in Lead Counsel's retention agreements with Lead Plaintiffs that set forth a set percentage.    Indeed, the retention agreements contemplate attorneys' fees as high as 25% and as low as 20% for a settlement the size of the present one.    The most restrictive of these was the retainer with Lead Plaintiff Handelsbanken, whose retainer states that Lead Counsel is entitled to request fees amounting to "20% of the recovery" and that this percentage was mutually agreed upon as "fair and reasonable."

138.    Following the Settlement, Lead Plaintiffs each independently evaluated the Fee Application.  *See* Lead Plaintiff Joint Decl. (Ex. 2), at ¶¶ 27-40.  They considered the result obtained, the substantial risks in the litigation, and the quality of the work performed by Lead Counsel.  *See id.* ¶¶ 33-40.  After completing this analysis, each of the Lead Plaintiffs determined that Lead Counsel's requested fee percentage of 18% is reasonable and appropriate, and consistent with the retainer agreements.

### 2.    The Time and Labor Devoted to the Action by Plaintiffs' Counsel

139.    Plaintiffs' Counsel devoted substantial time to the prosecution of the Action.  As described above in greater detail, the work that Plaintiffs' Counsel performed in this Action included: (i) conducting an extensive international investigation into the alleged fraud, including interviews with former employees of Wells Fargo; (ii) drafting and filing a detailed consolidated complaint based on this investigation; (iii) briefing and opposing Defendants' motion to dismiss; (iv) conducting extensive discovery, including preparing and serving document requests as well as subpoenas to 27 non-party witnesses; (v) formally requesting and successfully convincing the Regulators to authorize Wells Fargo to produce materials that purportedly contained CSI, which required submitting to the Regulators letter briefs totaling over 579 pages, replete with extensive analysis and exhibits totaling more than 2,400 pages; (vi) reviewing over 3.5 million pages of documents produced by Defendants and subpoenaed non-parties; (vii) preparing and filing Lead Plaintiffs' motion for class certification, which was accompanied by an expert report on market efficiency and damages methodology; (viii) participating in ten depositions including each of the Lead Plaintiffs, Lead Plaintiffs' investment advisors, and Lead Plaintiffs' expert; (ix) consulting extensively throughout the litigation with experts and consultants in loss causation, damages, market efficiency, and bank regulation; and (x) engaging in lengthy and complex arm's-length settlement negotiations.

140.    Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. As lead partners on the case, we personally monitored and maintained control of the work performed by other lawyers at BLB&G and CMST throughout the litigation.  Other experienced attorneys at Lead Counsel firms were also involved in the drafting of pleadings and motion papers, and in the settlement negotiations.  More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

141.    Attached hereto as Exhibits 7A through 7C are declarations in support of Lead Counsel's motion for attorneys' fees on behalf of each of the Plaintiffs' Counsel firms: (a) co-Lead Counsel BLB&G; (b) co-Lead Counsel CMST; and (c) additional counsel for Lead Plaintiff Louisiana Sheriffs, Klausner Kaufman (the "Fee Declarations").  Each of the Fee Declarations includes a schedule summarizing the lodestar of the firm.  The Fee Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current hourly rates.  The Fee Declarations were prepared from contemporaneous daily time records regularly maintained and prepared by the respective firms, which are available at the request of the Court.  The first page of Exhibit 7 is a chart that summarizes the information set forth in the Fee Declarations, listing the total hours expended and lodestar amounts for each Plaintiffs' Counsel firm and totals for the numbers provided.

142.    As set forth in Exhibit 7, Plaintiffs' Counsel collectively expended a total of 106,489.85 hours in the investigation and prosecution of the Action.  The resulting lodestar is $47,170,207.50.  The requested fee of 18% of the Settlement Fund thus represents a multiplier of approximately 3.8 on Plaintiffs' Counsel's lodestar.

143.   The above amounts do not include the additional time that Lead Counsel will devote overseeing and assisting in the administration of the Settlement, for which Lead Counsel will not be paid.  This work will include answering questions posed by Settlement Class Members about the Settlement and the distribution of the Settlement proceeds, overseeing the work performed by the Claims Administrator, addressing any questions or disputes raised by Settlement Class Members about the allocation of the Settlement proceeds, and filing motions for distribution of the Net Settlement Fund.

144.   As discussed in further detail in the Fee Memorandum, the requested multiplier is within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

### 3.   The Experience and Standing of Lead Counsel

145.   Lead Counsel's firm resumes are attached hereto as Exhibits 7A-2 and 7B-2.

146.   As demonstrated by its firm resume, BLB&G is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases.  BLB&G is consistently ranked among the top plaintiffs' firms in the country.  As reflected in ISS/Securities Class Action Services' latest report on the "Top 100 U.S. Class Action Settlements of All Time," BLB&G has been lead or co-lead counsel in more top recoveries than any other firm in U.S. history.  BLB&G has taken complex cases such as this Action to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions. As reflected in its firm resume, BLB&G has obtained numerous significant settlements.  BLB&G served as Lead Counsel in *In re WorldCom, Inc. Securities Litigation*, No. 02-cv-3288 (S.D.N.Y.), in which recoveries obtained for the class totaled in excess of $6 billion.  BLB&G also secured a resolution of $2.43 billion for the class in *In re Bank of America Corp. Securities, Derivative & "ERISA" Litigation*, No. 09-md-2058 (S.D.N.Y.); a $1.06

billion recovery for the class in *In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation*, No. 05-cv-1151 (D.N.J.); and a $730 million settlement on behalf of the class in *In re Citigroup Inc. Bond Action Litigation*, No. 08-cv-9522 (S.D.N.Y.).

147.    As demonstrated by its firm resume, CMST is also among the most experienced securities class action law firms in the country, having recovered billions of dollars for its clients in some of the largest and most complex securities class actions. In this District, CMST has recovered hundreds of millions of dollars for investors, including a $275 million settlement in a mortgage-backed securities class action against the Royal Bank of Scotland (*New Jersey Carpenters Health Fund v. The Royal Bank of Scotland Grp., plc, et al*., No. 1:08-cv-05310-DAB-HBP (S.D.N.Y.)); $335 million in settlements in a class action against Residential Accredit Loans, Inc. and various investment banks (*New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 1:08-cv-08781-HB (S.D.N.Y.)); a $165 million settlement in a class action against various underwriters (*New Jersey Carpenters Health Fund v. NovaStar Mortgage, Inc., et al.*, No. 08-cv-5310); a $110 million settlement in a class action against Credit Suisse AG and its affiliates (*New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc., et al.*, No. 08-5653 (PAC) (S.D.N.Y.)); and a $90 million settlement in a class action involving MF Global (*Rubin v. MF Global, Ltd*., No. 1:08-cv-02233-VM (S.D.N.Y.)).

148.    BLB&G and CMST's extensive experience in the field and the ability of our attorneys added valuable leverage during the litigation and settlement negotiations.

### 4.    The Standing and Caliber of Defendants' Counsel

149.    Defendants were represented in this case by experienced and able counsel, including Sullivan & Cromwell LLP, Clarence Dyer & Cohen LLP, Swanson & McNamara LLP, Cravath, Swaine & Moore LLP, and Shearman & Sterling LLP.   These firms vigorously represented their clients.   In the face of this skillful opposition, Lead Counsel, nonetheless,

successfully litigated the claims and negotiated with Defendants to settle the case on terms that are extremely favorable to the Settlement Class.

### 5. The Importance of Skilled Counsel in Contingent Securities Cases

150.    The prosecution of this Action was undertaken by Lead Counsel on an entirely contingent basis.  From the outset of their retention, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case such as this requires.  With an average lag time of several years for such cases to conclude, the financial burden on contingent-fee counsel is far greater than on firms that are paid on an ongoing basis.

151.    Lead Counsel also bore the risk that no recovery would be achieved.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.  Additionally, from the outset, this case presented multiple risks and uncertainties that could have resulted in lesser or no recovery whatsoever.

152.    Lead Counsel know from experience that the commencement and ongoing prosecution of a securities class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and legal arguments that are needed to sustain a complaint, develop a compelling factual record during discovery, and cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

153.    Examples of specific litigation decisions that reflect Lead Counsel's skill in litigating this Action include:

(a)   <u>Identification of additional corrective disclosures</u>.  The initial complaints filed in this Action only alleged corrective disclosures during the first two weeks of March 2020.  Those corrective disclosures presented heightened litigation risks for plaintiffs, including because they occurred in a period of extreme market volatility (i.e., the onset of the COVID-19 pandemic).  Lead Counsel successfully identified and alleged in the Complaint corrective disclosures that were not contained in any of the initial complaints.  The addition of these corrective disclosures significantly increased recoverable damages and, ultimately, investors' recovery, in this Action.

(b)   <u>Obtaining Regulator authorizations to produce CSI</u>.  Lead Counsel submitted formal requests to each of the Regulators to authorize the production of materials withheld by Wells Fargo as CSI.  Lead Counsel supported these requests with comprehensive analyses, totaling hundreds of pages, describing the importance of the withheld materials and citing legal authorities supporting their production.  After extensive meet-and-confers, and multiple rounds of negotiations, Lead Counsel succeeded in persuading the Regulators to authorize the production of most of the requested documents, which were important to the prosecution and resolution of this Action on highly favorable terms.

(c)   <u>Substantial work with experts</u>.  This case presented uniquely challenging issues concerning loss causation and damages.  To overcome Defendants' challenges, Lead Counsel consulted and worked with top experts in the field, who provided valuable empirical work and assessments.  Lead Counsel then transformed these analyses into powerful arguments, which were critical to convince Defendants to pay $1 billion to resolve the Action.

(d)   <u>Effective mediation submissions and presentations</u>.   Lead Counsel identified the key evidence produced during fact discovery and compellingly presented the evidence to the mediator, Judge Layn Phillips, in pre-mediation submissions and an in-person PowerPoint presentation at the outset of the mediation session. These submissions and presentations enabled Lead Counsel to effectively convey the strengths of the claims and address Defendants' anticipated responses.

154.   Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.

**6.   The Reaction of the Settlement Class to the Fee Application**

155.   As stated above, through August 3, 2023, more than 1.8 million Notice Packets had been mailed to potential Settlement Class Members advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 19% of the Settlement Fund.  *See* Villanova Decl. ¶ 7.  In addition, the Court-approved Summary Notice was published in *Investor's Business Daily* and transmitted over *PR Newswire* on June 19, 2023 and published in *The Wall Street Journal* on June 20, 2023.  *Id.* ¶ 8.  To date, no objections to the request for attorneys' fees has been received.  Any such objections that may be received will be addressed in Lead Counsel's reply papers to be filed on September 1, 2023, after the deadline for submitting objections has passed.

*      *      *

156.   In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the fully contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 18% is fair and reasonable.

**B.      The Litigation Expense Application**

157.    Lead Counsel also seek payment from the Settlement Fund of $1,130,909.85 in Litigation Expenses that were reasonably incurred by Plaintiffs' Counsel in connection with commencing, litigating, and settling the claims asserted in the Action.

158.    From the outset of the Action, Lead Counsel were aware that they might not recover any of their expenses and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved.  Lead Counsel also understood that, even assuming that the case was ultimately successful, a subsequent award of expenses would not compensate them for the lost use of the funds advanced by them to prosecute the Action.  Accordingly, Lead Counsel were motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

159.    Plaintiffs' Counsel have incurred a total of $1,130,909.85 in Litigation Expenses in connection with the prosecution of this Action.  These expenses are summarized in Exhibit 8, which identifies each category of expense, such as expert/consultant fees, on-line research, document management costs, and mediation fees, as well as the amount incurred for each category. These expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in Plaintiffs' Counsel's hourly rates.  The most significant categories of expenses are discussed further below.

160.    **Experts and Consultants**.    The largest expense by far, $798,684.03, or approximately 71%, was expended for the retention of experts and consultants.  As noted above, Lead Counsel consulted with experts and consultants in the fields of financial economics, including loss causation, damages, and market efficiency, in bank regulatory issues, and in Swedish law, during their investigation and the preparation of the Complaint, before filing Lead

Plaintiffs' motion for class certification, in preparation for settlement negotiations, and in connection with the development of the proposed Plan of Allocation. These experts and consultants include the following:

(a) **Hartzmark Economics Litigation Practice** ($463,674.53). Lead Counsel worked extensively with Michael Hartzmark, Ph.D., an experienced financial economist. Dr. Hartzmark conducted an event study to ascertain damages resulting from the alleged fraud and prepared a detailed expert report addressing the efficiency of the market for Wells Fargo common stock and the class-wide calculation of damages in connection with Lead Plaintiffs' motion for class certification. Dr. Hartzmark prepared for and sat for a full-day deposition in December 2022. Dr. Hartzmark also provided Lead Plaintiffs with expert advice on damages and loss causation issues in connection with preparing the Complaint, provided analysis and expert advice on Defendants' class certification arguments and expert report, and advised on damages issues for purposes of settlement negotiations. Following the Settlement, Dr. Hartzmark and his team worked with Lead Counsel to develop the Plan of Allocation.

(b) **S.P. Kothari, Ph.D** ($145,017.00). Lead Counsel also consulted with Dr. Kothari, the Gordon Y. Billard Professor of Accounting and Finance at MIT's Sloan School of Management, who served as Chief Economist and Director of the Division of Economic and Risk Analysis at the SEC from 2019 to 2021, on financial economics issues, including loss causation and damages.

(c) **Matthew Cain** ($144,280.00). Lead Counsel also consulted with Matthew Cain, a Senior Fellow at Berkeley Law School who previously worked as a Financial Economist at the SEC, concerning issues involving loss causation and Defendants' asserted truth-on-the-market defense.

(d) **David D. Gibbons** ($9,020.00).  Lead Counsel consulted with Mr. Gibbons, a former Examiner-in-Charge and former Deputy Comptroller for Credit Risk at the OCC, concerning the banking supervision privilege and regulatory issues.

(e) **Trialedge LLC** ($30,1673.50).  Lead Counsel consulted with Trialedge, a trial graphics firm, that assisted in preparing presentations used for the in-person mediation session.

161.  **Online Factual & Legal Research**.  Another large component of Plaintiffs' Counsel's Litigation Expenses was online legal and factual research.  This expense was necessary to conduct the pre-suit investigation, identify potential witnesses, prepare the Complaint, research the law pertaining to the claims asserted in the Action, successfully oppose Defendants' motion to dismiss, conduct discovery, move for class certification, and engage in settlement negotiations. The total charges for this on-line research amounted to $156,360.97, or 14% of the total amount of Plaintiffs' Counsel's expenses.  The charges reflect out-of-pocket payments to vendors such as Westlaw, Lexis/Nexis, Refinitiv, Bloomberg, Bureau of National Affairs, Thompson Reuters, Court Alert, Courthouse News Service, and PACER for research done in connection with this litigation.  These resources were used to obtain access to court filings, to conduct legal research and cite-check briefs, and to obtain factual information regarding the claims asserted through access to various financial databases and other factual databases.  These expenses represent the actual expenses incurred by Lead Counsel for use of these services in connection with this litigation.  There are no administrative charges included in these figures.  Online research is billed to each case based on actual usage at a charge set by the vendor.  When Lead Counsel utilizes online services provided by a vendor with a flat-rate contract, access to the service is by a billing code entered for the specific case being litigated.  At the end of each billing period, Lead Counsel's

costs for such services are allocated to specific cases based on the percentage of use in connection with that specific case in the billing period.

162.  **Mediation**.  Lead Plaintiffs' share of the mediation fees for the services of Judge Phillips amounted to $65,000.00, or 5.7% of the total.

163.  **Document Management & Litigation Support**.  Plaintiffs' Counsel's Litigation Expenses include $50,545.48 for document management and litigation support costs.  Of this amount, $49,519.56 was for the costs associated with the internal document database established and maintained by BLB&G and used by Lead Counsel to process and review the substantial number of documents produced by Defendants and non-parties in this Action.  BLB&G charges a rate of $4 per gigabyte of data per month and $17 per user to recover the costs associated with maintaining its document database management system, which includes the costs to BLB&G of necessary software licenses and hardware.  BLB&G has conducted a review of market rates charged for the similar services performed by third-party document management vendors and found that its rate was at least 80% below the market rates charged by these vendors, resulting in a savings to the Settlement Class.

164.  **Court Reporting & Transcripts**.  Lead Counsel incurred $14,125.39 for costs of court reporting and transcripts in the Action.

165.  **Out-of-Town Travel**.  Plaintiffs' Counsel seek reimbursement of $26,921.72 in costs incurred in connection with travel by Plaintiffs' Counsel's attorneys in connection with the Action, which includes, among other things, (a) costs for Plaintiffs' Counsel to travel to depositions and necessary in-person meetings, including at Lead Plaintiffs' offices.  Lead Counsel's travel costs have been capped as follows: airfare is at coach rates, hotel charges per

night are capped at $350 for higher-cost cities and $250 for lower-cost cities; and travel meals are capped at $20 per person for breakfast, $25 per person for lunch, and $50 per person for dinner.

166.    The other expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court fees, service of process costs, telephone costs, copying, and postage and delivery expenses.

167.    All of the Litigation Expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Lead Plaintiffs. *See* Lead Plaintiffs Joint Decl. ¶¶ 41-42.

168.    In addition, Lead Plaintiffs seek reimbursement of the reasonable costs that they incurred directly in connection with their representation of the Settlement Class.  Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum at 24-25.  Specifically, Handelsbanken seeks $62,650 for the 187 hours dedicated to the Action by its employees including its CEO, Head of Corporate Governance, Head of Legal, a Fund Manager, and IT staff.  Ex. 3, at ¶¶ 5-8.  Mississippi seeks $17,550 for 77 hours devoted to the Action by employees of Mississippi and the Mississippi Attorney General's Office.  Ex. 4, at ¶¶ 4-7.  Louisiana Sheriffs seeks $3,400 for the 85 hours dedicated to the case by its Executive Director.  Ex. 5, at ¶¶ 5-8.

169.    The Notice informs potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $2 million.  The total amount requested, $1,214,509.85 ($1,130,909.85 for Plaintiffs' Counsel's expenses and $83,600.00 for Lead Plaintiffs' expenses), is significantly below the $2,000,000 that Settlement

Class Members were advised could be sought.  To date, no objections to the request for Litigation Expenses have been received.

170.    In sum, the expenses incurred by Plaintiffs' Counsel and Lead Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submit that the application for payment of these expenses should be approved.

171.    Attached hereto are true and correct copies of the following documents:

Exhibit 1:    Declaration of Layn R. Phillips

Exhibit 2:    Lead Plaintiffs' Joint Declaration in Support of Their Motion for Final Approval of Settlement and Plan of Allocation, and Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Lead Plaintiffs Joint Decl.")

              Ex. A: Declaration of Professor Brian T. Fitzpatrick

Exhibit 3:    Declaration of Staffan Ringvall, Head of Corporate Governance of Handelsbanken Fonder AB, in Support of Reimbursement of Lead Plaintiff's Costs under the PSLRA, 15 U.S.C. § 78u-4(a)(4)

Exhibit 4:    Declaration of Tricia Beale, Special Assistant Attorney General to the Mississippi Attorney General, on behalf of the Public Employees' Retirement System of Mississippi, in Support of Reimbursement of Lead Plaintiff's Costs under the PSLRA, 15 U.S.C. § 78u-4(a)(4)

Exhibit 5:    Declaration of Osey "Skip" McGee, Jr., Executive Director of Louisiana Sheriffs' Pension and Relief Fund, in Support of Reimbursement of Lead Plaintiff's Costs under the PSLRA, 15 U.S.C. § 78u-4(a)(4)

Exhibit 6:    Declaration of Alexander P. Villanova Regarding the Mailing of the Notice and Claim Form and the Publication of the Summary Notice

Exhibit 7:    Summary of Plaintiffs' Counsel's Hours and Lodestar

Exhibit 7A:   Declaration of John C. Browne on Behalf of Bernstein Litowitz Berger & Grossmann LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 7A:   Declaration of Laura H. Posner on Behalf of Cohen Milstein Sellers & Toll PLLC in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 7C:   Declaration of Robert D. Klausner on Behalf of Klausner, Kaufman, Jensen & Levinson in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 8:    Breakdown of Plaintiffs' Counsel's Expenses by Category

172.   In addition, attached hereto are true and correct copies of the following documents cited in the Fee Memorandum:

Exhibit 9:    Cornerstone Research, *Securities Class Action Settlements: 2022 Review and Analysis*

Exhibit 10:   *In re Teva Sec. Litig.*, No. 3:17-cv-00558-SRU, slip op. (D. Conn. June 2, 2022), ECF No. 963

Exhibit 11:   *Jaffe v. Household Int'l, Inc.*, No. 1:02-cv-05893-JLA, slip op. (N.D. Ill. Nov. 11, 2016), ECF No. 2265

Exhibit 12:   *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.,* Civil Action No. 05-2367 (SRC)(CLW), slip op. (D.N.J. June 28, 2016), ECF No. 1039

Exhibit 13:   *In re Evoqua Water Techs. Corp. Sec. Litig.*, No. 1:18-cv-10320-JPC, slip op. (S.D.N.Y. Nov. 1, 2021), ECF No. 152

Exhibit 14:   *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-cv-03591-GHW, slip op. (S.D.N.Y. Nov. 21, 2022)

Exhibit 15:   *In re ITT Educ. Servs., Inc. Sec. Litig.*, No. 1:13-CV-01620, slip op. (S.D.N.Y. Mar. 8, 2016), ECF No. 94

Exhibit 16:   First Interim Fee Application of Sullivan & Cromwell LLP, *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Mar. 17, 2023), ECF No. 1112 (excerpt); Second Interim Fee Application of Sullivan & Cromwell LLP, *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. June 15, 2023), ECF No. 1647 (excerpt); Seventh Monthly Fee Statement of Sullivan & Cromwell LLP, *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. June 30, 2023), ECF No. 1822 (excerpt).

## VII.    CONCLUSION

173.    For all the reasons set forth above, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.   Lead Counsel further submit that the requested fee in the amount of 18% of the Settlement Fund should be approved as fair and reasonable, and the request for Plaintiffs' Counsel's Litigation Expenses in the amount of $1,130,909.85 and Lead Plaintiffs' costs, in the amount of $83,600.00, should also be approved.

We declare, under penalty of perjury, that the foregoing is true and correct.

Dated August 4, 2023.

  /s/ *John C. Browne*                        /s/ *Laura H. Posner*   
     John C. Browne                              Laura H. Posner