N986WELC                        Fairness Hearing

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE WELLS FARGO & COMPANY
SECURITIES LITIGATION

                                    20 CV 4494(JLR)

------------------------------x

                                    New York, N.Y.
                                    September 8, 2023
                                    10:05 a.m.

Before:

                    HON. JENNIFER L. ROCHON,

                                        District Judge

                          APPEARANCES

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
     Attorneys for Lead Plaintiffs
BY:  JOHN C. BROWNE
     JONATHAN D. USLANER
     MAX W. BERGER
     DAVID L. DUNCAN

COHEN MILSTEIN SELLERS & TOLL PLLC
     Attorneys for Lead Plaintiffs
BY:  LAURA H. POSNER
     STEVEN J. TOLL
     MOLLY J. BOWEN

SULLIVAN & CROMWELL LLP
     Attorneys for Defendants Wells Fargo and John Shrewsberry.
BY:  CHRISTOPHER M. VIAPIANO
     LEONID TRAPS
     CONNOR J. CARDOSO

SHEARMAN & STERLING LLP
     Attorneys for Defendant Dukes
BY:  JOHN GUELI

CRAVATH, SWAINE & MOORE LLP
     Attorneys for Defendant Parker
BY:  KARIN DEMASI
     LIBBY ROZBRUCH

N986WELC                          Fairness Hearing

                          APPEARANCES (Continued)

DEBEVOISE & PLIMPTON LLP
      Attorney for Defendant Sloan
BY:   JOSHUA COHEN

(Case called)

THE COURT:  Good morning, everyone.  I have to get situated here.  This is not my normal courtroom, but I will make due.

Okay.  We are here today in this courtroom, which is normally Judge Woods' courtroom, because the initial notice in this matter referenced this courtroom, and I wanted to be absolutely sure that if anyone wished to appear, there was no confusion about where they needed to appear.  So we are holding this fairness hearing here in this courtroom.

The hearing is scheduled to consider approval of the proposed settlement in the case of *in re Wells Fargo and Company Securities Litigation,* case number 20 CV 4494.

So let's get appearances first.  Who do we have here for the plaintiff, please?

MR. BROWNE:  Good morning, your Honor.  This is John Browne from Bernstein Litowitz Berger & Grossmann on behalf of the plaintiffs.

THE COURT:  Good morning.

MS. POSNER:  Good morning, your Honor.  Laura Posner of Cohen Milstein Sellers & Toll PLLC, also on behalf of plaintiffs.

THE COURT:  Good morning.

MR. USLANER:  Good morning, your Honor.  Jonathan Uslaner, also from Bernstein Litowitz Berger &

N986WELC                      Fairness Hearing

Grossman, for the plaintiffs.

THE COURT:  Thank you.

MR. TOLL:  Good morning, your Honor.  Steven Toll, Cohen Milstein Sellers & Toll.

THE COURT:  Good morning.

MR. BERGER:  Good morning, your Honor.  Max Berger from Bernstein Litowitz.

THE COURT:  Thank you.

MR. DUNCAN:  David Duncan from Bernstein Litowitz.

THE COURT:  Good morning.

MS. BOWEN:  Molly Bowen from Cohen Milstein.

THE COURT:  Thank you.  Good morning, all.  And for defense.

MR. VIAPIANO:  Good morning, your Honor. Christopher Viapiano from Sullivan & Cromwell, appearing for Wells Fargo & Company, appearing especially for defendant John Shrewsberry.

THE COURT:  Thank you.

MR. TRAPS:  Good morning, your Honor.  Leonid Traps, also Sullivan & Cromwell, also appearing for Wells Fargo & Company, especially appearing for John Shrewsberry.

THE COURT:  Good morning.  Thank you.

MR. GUELI:  Your Honor, just the rest of us here. John Gueli with Shearman Sterling, for defendant Elizabeth Duke.

THE COURT:  Thank you.

MR. COHEN:  Good morning, your Honor.  Josh Cohen, Debevoise & Plimpton, for defendant Timothy J. Sloan.

THE COURT:  Thank you.

MS. DEMASI:  Good morning, your Honor.  Karin DeMasi and Libby Rozbruch from Cravath, Swaine & Moore, for defendant C. Allen Parker.

THE COURT:  Thank you.

MR. CARDOSO:  And Connor Cardoso from Sullivan & Cromwell on behalf of Wells Fargo & Company.

THE COURT:  Thank you.  Good morning, everyone.

Okay.  So just to give a little intro, lead plaintiffs, Handelsbanken Founder AB, Handelsbanken, Public Employees' Retirement System of Mississippi, which will be known as Mississippi, State of Rhode Island, Office of the General Treasurer, which will be referred to as Rhode Island, and Louisiana Sheriff's Pension & Relief Fund, known as Louisiana Sheriff's, all of these collectively as lead plaintiffs, on behalf of themselves and the settlement class, which will be referred to as the class, seek final approval of the class action settlement between the class and defendants Wells Fargo & Company, which will be known as Wells Fargo, Timothy J. Sloan, John R. Shrewsberry, C. Allen Parker, and Elizabeth Duke, collectively the individual defendants, and with Wells Fargo referred to as the defendants.

We are here for the reaffirmation of the Court's prior preliminary certification of the settlement class, the proposed plan of allocation of the proceeds of the settlement, all for the purposes of effectuating this settlement.  Co-lead counsel, Bernstein Litowitz Berger & Grossman and Cohen Milstein Sellers and Toll, PLLC, collectively as lead counsel, are here moving for an award of attorneys' fees, litigation expenses, and costs.  And defendants do not oppose those motions.

The case was reassigned to me on July 27, 2023.  I have reviewed the prior submissions in the case, and the preliminary approval issued by Judge Woods, and the present submissions.

So before we begin, let's talk about a few items.

Ms. Posner or Mr. Browne, would you like to provide me with an update on the notice process, claims, objections, and exclusions?

MS. POSNER:  Good morning, your Honor.  Laura Posner.  As we let you know about a week ago, we have sent out approximately 1.8 million notices to class members.  We have received approximately 115 requests for exclusion.  Of those 115 requests, only 35 either identify themselves as members of the class or provide sufficient documentation to demonstrate that they are members of the class.

THE COURT:  Isn't it 119 specifically?

MR. BROWNE:  It is, your Honor.

MS. POSNER:  Excuse me, 119.

THE COURT:  That's fine.

MS. POSNER:  We've received originally four objections, none to the amount of the settlement.  The one objection we received with regard to the settlement pertained to the scope of the release, that was from Wells Fargo's ERISA plan.  As we discussed in our reply papers and as attached to the reply papers, we have reached an agreement with the defendants to modify the scope of the release, which actually serves to benefit the class.  It allows the ERISA plans to bring a claim if they so choose.  And as a result of that resolution, the ERISA plans have withdrawn their objection.

There were three objections received to the amount of attorneys' fees, none of which actually address the specific details of our case.  But if you'd like to get into those more specifically, I think Mr. Browne will address them.

THE COURT:  Before we get to the objections, going back to the exclusions for a moment, the exclusion deadline was August 18; is that correct?

MS. POSNER:  Correct, your Honor.

THE COURT:  So the amount of exclusions that you have here, 119, am I correct that that doesn't trigger the supplemental agreement?

MS. POSNER:  That is correct, your Honor.  It is far below the threshold.

THE COURT:  Thank you.  And then in terms of claim filings, how are those going?

MS. POSNER:  About where we were last week.  We've gotten some more, as I think Mr. Browne indicated in our last hearing.  It is typical in a securities class action for the claims to come in predominantly as we get closer, about a month from now when the claims deadline approaches.  That's typically when the institutional investors, in particular, file their claims, often a few days before the claim's deadline.  There are aggregators who aggregate the claims for a lot of institutional investors.

So typically what we see is like a hockey stick approach.  So the claims are still coming in.  I think we have a little over 15,000 claims filed thus far, but our anticipation is we will get probably over 80 percent.

THE COURT:  Thank you.  All right.  As to the objections, I did read your reply papers that deal with those objections.  Is there anything further that you want to say with respect to the objections?

MR. BROWNE:  No, your Honor.  The only thing I will point out is that out of all of the objections and all of the exclusion requests, there were no institutional investors who did either.

THE COURT:  Thank you.  And then I'm going to make sure that I ask here in open court:  Is there anyone here

N986WELC                      Fairness Hearing

present who would like to be heard with respect to any

objections, exclusions, or otherwise with respect to this

settlement?

          (Pause)

          THE COURT:  And I am hearing and seeing no one.

          Okay.  Before I then go through the motions that are

before me, Ms. Posner, is there anything else you'd like to say

with respect to this fairness hearing?

          MS. POSNER:  Not unless your Honor has any questions,

but we're happy to do a presentation if helpful to the Court.

          THE COURT:  I don't think that's necessary, but thank

you very much.

          Anything from defendants that you'd like to add before

I rule on the motions?

          MR. VIAPIANO:  No, your Honor.

          THE COURT:  Thank you.  All right.

          I'm going to ask the parties' indulgence as I put

forth my ruling and detailed findings on the motions now.  This

will be I think the most expedient way to achieve resolution

while still providing a comprehensive overview of my ruling.

So thank you for your patience.

          On May 16, 2023, pursuant to Rule 23 of the Federal

Rules of Civil Procedure, the Court preliminarily certified a

settlement class for settlement purposes only, and the

settlement class was defined as "all persons or entities who

N986WELC                         Fairness Hearing

purchased or otherwise acquired the common stock of Wells Fargo from February 2, 2018, through March 12, 2020, inclusive (the 'class period') and were damaged thereby excluding, A, defendants; B, the officers defined as any employee serving on Wells Fargo's operating committee and directors of Wells Fargo during the class period; C, defendants' immediate family members; and D, any entity in which defendant has or had a controlling interest.

"Notwithstanding the foregoing, no investment vehicle (defined as any investment company or pooled investment fund, including but not limited to mutual fund families, exchange traded funds, funds of funds, private equity funds, real estate funds, and hedge funds, as to which Wells Fargo or any affiliate of Wells Fargo acts or acted as investment adviser, but of which Wells Fargo or any affiliate of Wells Fargo is not a majority owner or does not hold a majority beneficial interest) shall be excluded from the settlement class.

"Finally, also excluded from the settlement class are any persons or entities who or which exclude themselves by submitting a request for exclusion that is accepted by the Court."

That's at ECF Number 182 at 2, Paragraph 1.

The only subsequent change in the class definition now is that we have the list of the 119 individuals and entities who have requested to be excluded from the settlement class;

N986WELC                        Fairness Hearing

therefore, they shall be excluded.  And I now reaffirm the Court's approval of the class for purposes of the final approval of the settlement.

Before I get to approval of the settlement, I'm going to pause for one moment, and I want to ask Ms. Posner, perhaps you can address this, or if it's Mr. Browne, talk to me a little bit about the amount of attorneys' fees that are requested here in light of the objections.

Now, I'll get to the objections when I go through the approval of the settlement, but I'd like to hear from you a bit about specifically the percentage of *vis-a-vis* the amount of the award and its reasonableness in light of the fact that I do have three objections regarding that percentage.

MR. BROWNE:  Thank you, your Honor.  I'll address that briefly, if you'd like.

So there are two things I kind of hear in your question.  Maybe one is how the Second Circuit's case in *Moses* intersects with this percentage request, and the other is just sort of generally the percentage itself.  So I'll take those in that order.

With respect to the *Moses* case, your Honor, we think the 18 percent request here really is not impacted whatsoever under the *Moses* analysis because, as your Honor knows, that case involved coupon settlements, valuation of those, and was a 76 percent request for attorneys from the common fund there.

So there's nothing about *Moses* that has called into question the decades of jurisprudence in this circuit and in the country in awarding contingency fees on a percentage basis.

There's nothing about *Moses* that has suggested that previous awards in this Court and others, you know, up to 30 percent, commonly 25 percent, and certainly not 18 percent, are in any way in question.  In a typical -- well, it is quite an atypical case, but it's a typical common fund settlement. There's no aspect of the settlement that we're asking the Court to value other than the money.  And it's a billion dollars.

So to conclude the *Moses* analysis on that, your Honor, I think it doesn't impact it at all.  Maybe that spills over a little bit to the percentage --

THE COURT:  Before you get there, can you address the *Wal-Mart* case that was raised by Mr. McIntyre with respect to his advocating for a lower award?

MR. BROWNE:  Yes.  So in the *Wal-Mart* case, I think there was a $3-plus billion settlement in that case.  It was an antitrust case; it wasn't a securities case.  The fee that was ultimately awarded by the district court in that case was six and a half percent.  But we think, notably, each case goes on its own.  That was probably on the low end of awards, but in that case, notably, the Lodestar multiplier there was 3.5, and that's actually mentioned in the exact excerpt that Mr. McIntyre cites in his brief.

And *Wal-Mart* goes on and says -- the Second Circuit says, Lodestar multipliers, I think from three and a half to five, are very common.  Maybe I have the numbers wrong.  Maybe it's three to five.  But the Lodestar multiplier we have here in this case, which was based off of our rates, which are quite lower than defendants' rates, actually, in the case, would be 3.8.

So in *Wal-Mart*, if they had awarded a percentage fee of 18 percent, it would have been this enormous Lodestar multiplier.  I haven't done that math, but roughly three times.  Right?  So it would have been a nine or ten Lodestar multiplier; whereas here, when you do that Lodestar crosscheck, we're right there square in the box of what *Wal-Mart* allows.

So while the percentage was lower there, the ultimate fairness, genuine reasonableness of the fee requests, was supported, and the sort of lack of any prejudice to the class was all kind of satisfied.  I think, here, we have those indicia.  Unlike *Wal-Mart*, I believe -- I don't do a lot of antitrust cases, but there's no PSLRA structure for appointing a lead plaintiff in antitrust cases, that I know of.

So here, Judge Woods appointing four sophisticated institutional investors who have overseen this litigation, who have prior retention agreements with us.  After the litigation, they departed downward from those retention agreements.

THE COURT:  What was the initial percentage in the

retention agreement?

MR. BROWNE:  So three of them would have allowed us to ask for 25 percent.  I can tell you, if you want to know, who they are.

THE COURT:  No.

MR. BROWNE:  And one of them would have capped us at 20 percent.

So I think as we went through with your Honor in August the negotiations with lead plaintiffs surrounding those, that resulted in the fee requests that we actually asked for being less than the maximum *ex-ante* agreement in the retainer agreement.  We think under the case law, that's entitled to some weight.  Presumption might be a strong word, but definitely some weight.

Particularly here, where it's not one individual lead plaintiff, it's four very sophisticated institutions, their judgment was very well reasoned.  They were very involved in the case.  They looked at expert evidence before they agreed to allow us to ask for 18 percent.  The 18 percent was lower, again, than what we put in the notice of the class, 19 percent.  And I believe, just looking at it from a big picture kind of way, the reasonableness of these institutional lead plaintiffs' judgment in this regard, is quite strongly reinforced by the lack of institutional objections or opt-outs.

It's really extraordinary, obviously, to have a

billion dollar settlement and not just have a raft of individual opt-outs from institutions. I'm sure it's happened, I guess. But in my career, I can't think of a major case where it settled for this much, and I did WorldCom. There were opt-outs everywhere, even though that settlement was fantastic.

It's a real endorsement of the settlement and the fee request and the overall fairness of the settlement — even if our requested fee is granted — to class members, given the institutional oversight we had -- I'm repeating myself a little bit -- and the lack of institutional objection coming from the outside.

And the final point I'll make --

THE COURT: You were going to get to the percentage itself. Go ahead.

MR. BROWNE: I was going to say, even if the 18 percent is granted, the settlement fund is over $819 million, plus interest. That in and of itself would be the largest securities class action in history where there wasn't a restatement and there wasn't a concurrent SEC or DOJ action on behalf of investors. So in all of that context, in this individual case, we think the 18 percent is reasonable and fair and has been endorsed by the class.

Are there any specific questions you want me to address?

THE COURT: That's what I needed. Thank you very

much.

Anything to add, Ms. Posner?

MS. POSNER:  No, your Honor.

THE COURT:  Thank you.  Okay.  That's helpful.  Now I'm going to move on to evaluate this settlement.

So Rule 23 requires court approval for a class action settlement to ensure that it is procedurally and substantively fair, reasonable, and adequate, Federal Rule of Civil Procedure 23(e).

Under Rule 23(e)(2), Courts must consider whether, A, the class representatives and class counsel have adequately represented the class; B, the proposal was negotiated at an arm's length; C, the relief provided for the class is adequate, taking into account, i, the costs, risks and delay of trial and appeal; ii, the effectiveness of any proposed method of distributing relief to the class, including the method of processing class members' claims; iii, the terms of any proposed award of attorneys' fees, including timing of payment; and iv, any agreement required to be identified under Rule 23(e)(3) and; D, the proposal treats class members equitably, relative to each other.  And that is from Rule 23(e)(2).

To determine procedural fairness, courts examine the negotiating process leading to the settlement.  *Wal-Mart Stores*, *Incorporated v. Visa USA*, *Inc.*, 396 F.3d 96, 116 (2d

Cir. 2005). Courts in this circuit have historically determined substantive fairness by analyzing the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).

The factors set forth in Rule 23(e)(2) have been applied in tandem with the Second Circuit's *Grinnell* factors, and that is a quote from *Pearlstein v. BlackBerry Limited* 2022 WL 4554858 at *7, (S.D.N.Y. Sep. 29, 2022). See also *in re Payment Card Interchange Fee & Merck Discovery Antitrust Litigation,* 330 F.R.D. 11, 29 (E.D.N.Y. Jan. 28, 2019). And the parenthetical reads ("The Court understands the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors.")

The Court must consider the procedural and substantive fairness of the settlement, "determining whether the terms of the settlement and the negotiation process leading up to it are fair." *Flores v. CGI Inc*. WL 13804077 at *3 (S.D.N.Y. Oct. 21, 2022).

The Court will not presume fairness of the settlement even if it arises from an arms-length agreement. *Moses v. New York Times Company,* 2023 WL 5281138 at *4 (2d Cir. Aug. 17, 2023) And the parenthetical reads "Rule 23(e)(2)'s procedural factors prohibit courts from applying a presumption of fairness to proposed settlements arising from an arms-length agreement." Rather, the Court will evaluate all of the factors set forth in

Rule 23(e)(2), including the proposed attorneys' fees award. That is, again, the *Moses* case at *4.

For the reasons set forth below, the settlement satisfies the factors set forth in Rule 23(e)(2) and *Grinnell*, and accordingly, the settlement will be approved. The settlement is procedurally fair, reasonable, adequate, and not a product of collusion.

Considering Rule 23(e)(2)(A) first, the Court considers whether the class representatives and class counsel have adequately represented the class. To show adequacy, courts look to whether the class representatives have conflicting interests with other class members and "whether counsel is qualified, experienced and generally able to conduct the litigation." *Flores* 2022 WL 13804077 at *4. And see also *Soler v. Fresh Direct LLC* 2023 WL 2492977 at *3 (S.D.N.Y. Mar. 14, 2023).

The lead plaintiffs here do not have interests that are antagonistic or at odds with the punitive class. All purchased the common stock during the same period and were injured by common alleged false and misleading statements. The record here reflects that co-lead counsel are experienced and qualified in securities litigation, and prosecuted this case vigorously for several years.

The Court also finds that the settlement was reached after arms-length negotiations pursuant to Rule 23(e)(2)(B).

The settlement was reached after the parties exchanged comprehensive mediation statements, made extensive presentations, and engaged in an in-person mediation session with the Honorable Layn Phillips.

This information's coming from the declaration of John Browne and Laura Posner in support of, one, lead plaintiffs' motion for final approval of settlement and plan of allocation; and two, lead counsels' motion for attorneys' fees and litigation expenses, which I will refer to as the Browne/Posner declaration, which is found at ECF 190, and for this purpose, Paragraphs 68 through 73.

The parties were not able to reach agreement after the daylong mediation session.  That is at the Browne/Posner declaration, Paragraph 71.  However, the settlement discussions continued, and an agreement in principle was later reached with the assistance of a mediator's recommendation on a double-blind basis, Paragraph 71.

The parties then spent months negotiating the remaining material terms of the settlement, ultimately agreeing on the settlement agreement that the Court preliminary approved on May 16, 2023.  I'll refer to that as the settlement, and that is from the Browne/Posner declaration, Paragraphs 74 to 75 and ECF Number 182.

The involvement of an experienced mediator such as Judge Phillips supports a finding that the settlement was

N986WELC                    Fairness Hearing

negotiated at arm's length.  See, for example, *Pearlstein* 2022 WL 4554858 at *7 (reading, approving settlement that was facilitated by "highly regarded mediator" Judge Phillips).

Judge Phillips provided a declaration that supports a finding of arms-lengths negotiations.  He stated that "the mediation process was an extremely hard-fought negotiation from beginning to end, and was conducted by experienced and able counsel on both sides.  Throughout the mediation process, the negotiations between the parties were vigorous and conducted at arm's length and in good faith."  That's at ECF Number 190-1, the Phillips declaration, Paragraph 13.

Judge Phillips further attested that "the arguments and positions asserted by all involved were the product of substantial work.  They were complex and highly adversarial, and they reflected and detailed and in-depth understanding of the strengths and weaknesses of the claims and defenses at issues in this case."  Phillips Declaration, 13.

The negotiations were also undertaken after there had been nearly three years of litigation with substantial discovery by highly experienced counsel, including numerous depositions, document discovery, nonparty document production, and expert consultation.  Browne/Posner declaration, Paragraphs 57 to 63.  Here, given the adequacy of representation here, the proceedings before Judge Phillips, the presettlement discovery, and the parties' monthlong arms-length negotiations, I can

conclude that the settlement is procedurally fair.

The settlement is also substantively fair.  Courts in this circuit look to the *Grinnell* nine-factor test to assess the substantive fairness of a settlement and whether it is fair, reasonable, and adequate, as required by Rule 23(e).  See, for example, *Flores*, 2022 WL 13804077 at *7, and *Christine Asia Company*, 2019 WL 5257534 at *10.

The *Grinnell* factors are:  One, the complexity, expense, and likely duration of the litigation; two, the reaction of the class; three, the stage of the proceedings and the amount of discovery completed; four, the risks of establishing liability; five, the risk of establishing damages; six, the risks of maintaining the class action through the trial; seven the ability of the defendants to withstand a greater judgment; eight, the range of reasonableness of the settlement fund in light of the best possible recovery; and nine, the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.  *Grinnell* 495 F.2d at 463.

"Not every factor must weigh in favor of the settlement.  Rather, the Court should consider the totality of these factors in light of the particular circumstances."  *Christine Asia*, 2019 WL 5257534 at *9.  And that is citing *in re Global Crossing Securities v. ERISA Litigation*, 225 F.R.D. 436 at 456 (S.D.N.Y. 2004).

N986WELC                         Fairness Hearing

Here, litigation through trial would be complex, expensive, and long.  Additional discovery, summary judgment motions, pretrial motions and submissions, and trial regarding the complicated issues here would take significant time. Complicated and complex issues such as falsity, materiality, scienter, loss causation, and damages are all hotly contested and would require expert litigation and expert involvement. Therefore, the first *Grinnell* factor weighs in favor of final approval.  *See Payment Card*, 330 F.R.D. at 36.  And the parenthetical reads, "settlement is favored if settlement results in substantial and tangible present recovery, without the attendant risk and delay of trial."

With respect to the second *Grinnell* factor, the class members' reaction to the settlement has been very positive. 1.8 million notice packets were sent out to potential settlement class members, and there were only four objections filed — one of which was withdrawn.  And the other three were to the attorneys' fee award.  See *Pearlstein v. BlackBerry*, 2022 WL 4554858 at *3, (S.D.N.Y Sept. 29, 2022).  The parenthetical reads, noting that the adequacy of the settlement is supported if there are only a small number of objections.

Setting aside the withdrawn objection, the other three were for individual investors representing less than 0.0001 percent of the eligible shares.  That is in the plaintiffs' reply brief at 3.  None of the three objections

N986WELC                          Fairness Hearing

before me were from institutional investors.  Notwithstanding this, the Court will address these objections shortly, substantively, and since they were made in good faith, and I am merely commenting at this point that the overall class reaction to the settlement has been positive.  There were also 119 requests for exclusion, which is also a relatively small number, given the size of this class.  I understand that 15 were received after the August 18 deadline but still be excluded here.  That's from the Villanova supplemental declaration, Paragraph 6 at ECF 201-1.

Of the 119, 24 state that the individual did not buy shares of Wells Fargo during the class period.  That is also at Paragraph 6 of the Villanova supplemental declaration.  And no institutional investors requested exclusion.  Again, Villanova supplemental declaration, Paragraph 6.  Therefore, I conclude that the overwhelmingly favorable response demonstrates that the class approves of the settlement and supports final approval.

I cite to the *in re Merrill Lynch & Company, Inc. Research Reps Securities Litigation*, 246 F.R.D. 156, at 167 to 68 (S.D.N.Y. 2007).  The parenthetical reads, finding that 299 requests for exclusion and 11 objections after 1.8 million notices mailed mitigated in favor of approval of the settlement.

With respect to the third *Grinnell* factor, the stage

of the proceeding, the parties have been litigating for approximately three years.  They have engaged in motion practice on a motion to dismiss whereby several legal issues were addressed.  The parties have also engaged in extensive discovery, including production of over 3.5 million pages of documents from Wells Fargo from over 80 individual custodians.  Browne/Posner declaration, Paragraph 52.

27 third-party subpoenas were served by plaintiffs, and documents were received and reviewed.  Browne/Posner declaration, Paragraph 54 to 55.

Lead plaintiff also produced significant documents from 15 custodians, and lead plaintiffs' investment advisers also produced documents.  *Id*, Paragraph 60.  Defendants conducted nine depositions of representatives of lead plaintiffs and their investment advisers*.  Id*, Paragraph 61.  Lead plaintiffs also worked with several experts to analyze the relevant materials.  *Id*, Paragraphs 63 to 66.

These actions indicate that the parties "had adequate appreciation of the merits of the case before negotiating."  *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 475 (S.D.N.Y. 2013), quoting, *In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516 at 537 (3d Cir. 2004).  Therefore, the third *Grinnell* factor weighs in favor of final approval.

Turning to the fourth and fifth *Grinnell* factors, the risk of establishing liability and damages further weighs in

N986WELC                        Fairness Hearing

favor of final approval.  "Litigation inherently involves risks," *in re PaineWebber Limited Partnership Litigation* 171 F.R.D. 104, 126 (S.D.N.Y. 1997).  Indeed, the primary purpose of settlement is to avoid the uncertainty of a trial on the merits.  *Velez v. Majik Cleaning Service Inc.*, 2007, WL 7232783 at *6 (S.D.N.Y. June 25, 2007).

Here, plaintiff would have faced numerable risks if they had continued to litigate.  There are significant risks associated with proving that the remaining 23 of the 32 alleged misstatements that survived the motion to dismiss were false or misleading.  Indeed, a shareholder derivative suit arising from the same alleged misconduct was dismissed for failure to allege an actionable false or misleading statement regarding the consent orders.  And I'm referring to the *in re Wells Fargo & Company Shareholders Derivative Litigation*, 2022 WL 345066 at *5 through 7 (ND Cal. Feb 4, 2022).

Establishing materiality would also be a challenge, given what was already known to investors.  And defendants have credible arguments regarding scienter and loss causation.  As the lead plaintiffs articulated in their reply memoranda, the recent decision in Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc., 2023 WL 5112157 (2d Cir. Aug. 10, 2023) could have provided a basis for defendants to argue against certification or for more limited damages.  That is at the plaintiffs' reply brief at 6.  The proposed settlement

eliminates uncertainties regarding all of these substantive risks in the present litigation; and therefore, these factors weigh in favor of final approval.

Relatedly, the risk of obtaining class certification and maintaining this action through trial is also present. Plaintiffs' claims would also have had to face a potential motion for summary judgment, class certification, proceedings, and trial — all of which would have required further and extensive briefing, and also could have entailed additional appeals. Settlement eliminates the risk, expense, and delay inherent in the litigation process. The sixth *Grinnell* factors weighs in favor of final approval.

Turning to the seventh *Grinnell* factor, there is nothing to suggest that defendants would be unable to withstand a greater judgment, although this settlement amount is quite significant. "But a defendant is not required to empty its coffers before a settlement can be found adequate." *Shapiro v. JP Morgan Chase & Company*, 2014 WL 1224666 at *11 (S.D.N.Y. Mar. 24, 2014).

Defendants' financial circumstances do not ameliorate the force of the other *Grinnell* factors which lead to the conclusion that the settlement is fair, reasonable, and adequate.

Finally, the amount of the settlement in light of the best possible recovery and the attendant risks of litigation

weighs in favor of the final approval.  The determination of whether a settlement amount is reasonable "is not susceptible of a mathematical equation yielding a particularized sum."  *In re Austrian & German Bank Holocaust Litigation,* 80 F. Supp. 2d 164, 178 (S.D.N.Y. 2000).

Instead.

Instead, "there is a range of reasonableness with respect to a settlement — a range which recognizes the uncertainties of law and the fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

The lead plaintiffs seek approval here of a $1 billion cash settlement — as I previously stated, a significant amount. This represents 24 percent of the lead plaintiffs' maximum 4.2 billion recoverable damages in this case if they were to completely prevail at trial.  Browne/Posner declaration, Paragraph 102.

Many securities fraud class action settlements fall far short of this level of recovery.  See, for example, *Pearlstein*, 2022 WL 4554858 at *6 (approving settlement representing 13.75 percent of the estimated maximum damages of $1.2 billion, which was "well within the range of reasonableness and, in fact, considerably above the high end of historical averages" and "substantially exceeded the median

recovery of 2.3 percent of damages for securities class actions with damages over $1 billion between 2012 and 2020" and the "median recovery of 4.2 percent of damages in 2021.")  *See also* *Oklahoma Firefighters Pension & Retirement Systems,* 2021 WL 76328 at *3.  And the parenthetical reads, noting that the settlement that was 10 percent of estimated damages was "within the range previously approved by judges in this district," referencing recoveries ranging from 3 percent to 11 percent of estimated damages.

Judge Phillips further attested that "based on my experience as a litigator, a former United States district judge, and a mediator, I believe that the settlement represents a recovery and outcome that is reasonable and fair for all parties involved." ECF Number 190-1, Phillips declaration, Paragraph 14.

Lead plaintiffs point out that the settlement here is "among the top six securities class action settlements in the past decade, the ninth largest ever in the Second Circuit, and among the top seventeen of all-time in the United States." Browne/Posner declaration, Paragraph 101.

Even if the lead plaintiffs were ultimately successful in obtaining a higher recovery, after trial and appeals, they still will experience a significant delay in obtaining such relief and face considerable litigation expenses and attorneys' fees.  For all of these reasons, I agree that the amount of

N986WELC                    Fairness Hearing

this immediate cash recovery is reasonable, and that therefore this factor too weighs in favor of final approval.

Therefore, weighing all of the *Grinnell* factors, I find that the settlement is substantively fair and weighs in favor of final approval.

Turning now to the Rule 23(e)'s remaining factors, the proposed method of distribution is effective and consistent with standard means that are frequently used in securities class actions, Federal Rule of Civil Procedure 23(e)(2)(C)(ii). The settlement provides that proceeds will be distributed by members who submit eligible claim forms and documents. They are processed through Epiq, an independent company with experience in securities class action administration. This process is necessary because neither the lead plaintiffs nor Wells Fargo possessed investors' individualized trading data. This is an effective approach, and there have been no objections to this distribution mechanism.

Finally, as will be discussed further shortly, the plan of allocation by which members of the settlement class will receive their pro rata shares of the new district court settlement is fair and adequate. The proposed award of attorneys' fees is fair and reasonable when the terms of the proposed award are considered under Federal Rules of Civil Procedure 23(e)(2)(C)(iii).

As I will discuss further shortly, the proposed

attorneys' fees of 18 percent of the settlement fund, net expenses, to be paid upon approval by the Court — while a large amount — is reasonable in light of the work of lead counsel, their investment and resources in the case for the past three years on a contingency bases, their prosecution of the action for the benefit of the class, the risks that they faced in the litigation, and the overall benefit of the very large settlement achieved.  Importantly, it is also less than the 19 percent that was proposed in the notice and less than the initial fee agreements with the plaintiffs.

To be clear, the Court is not reviewing the settlement agreement independent of the attorneys' fees request given the Second Circuit's direction in *Moses*.  That's *Moses* 2023 WL 5281138 at *6.  Rather, I am conducting a "symbiotic review" of the proposed settlement and the attorneys' fees to make sure there is not an "unwarranted windfall for the attorneys."  That is, again, at *Moses* *6, quoting *Goldberger v. Integrated Resources,* 209 F.3d 43 at 49 (2d Cir. 2000).

The parties are also required to identify agreements entered into connection with the settlement, Federal Rule of Civil Procedure 23(e)(2)(C)(iv) and 23(e)(3).  Those sections require that the parties seeking approval file a statement identifying any agreement made in connection with the proposal, and that I consider any such agreements in my evaluation of the settlement.  Here, the parties have entered into a confidential

N986WELC                        Fairness Hearing

supplemental agreement that states that Wells Fargo may terminate the settlement if shares held by persons who request exclusion from the settlement class reach a certain threshold. Browne/Posner declaration, Paragraph 73.

"This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the settlement." *Christine Asia Company*, 2019 WL 5257534 at *15 (S.D.N.Y. Oct. 16, 2019). *Signet*, 2020 WL 4196468 at *13, which holds the same. The relatively small number of requests for exclusion also renders this agreement essentially a nonfactor at this point, as was confirmed at the beginning of this hearing.

Finally, the settlement treats class members equitably relative to one another, Federal Rules of Civil Procedure 23(e)(2)(D). As discussed further below, the plan of allocation provides that each eligible class member will receive a settlement amount based on a pro rata share of the net settlement fund. Moreover, reimbursement of fees and expense for the lead plaintiffs is reasonable for the reasons that I will discuss shortly.

Again, to be clear, I am evaluating the payments to the lead plaintiffs as part of the analysis under Federal Rules of Civil Procedure 23(e)(2)(D). And that is a direction by *Moses*, 2023 WL 5281138 at *6.

The Court will next evaluate the plan of allocation

here to determine whether it is fair and adequate.  "A plan of allocation need not be perfect."  *EVCI*, 2007 WL 223 at 0177 at *11 (collecting cases) or "tailored to the rights of each plaintiff with mathematical precision."  *In re PaineWebber*, 171 F.R.D. at 133.  Thus "in determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel."  That's at *EVCI*, 2007 WL 223 at 0177 at *11.  A plan is more likely to be reasonable "if recommended by experienced and competent counsel."  *Villa v. Highbury Concrete* Inc., 2022 WL 19073649 at *4 (E.D.N.Y. Nov. 25, 2022).

Co-lead counsel, who are experienced and competent in complex class actions, prepared the plan of allocation in consultation with plaintiffs' damages expert, Dr. Michael K. Hartzmark.  Browne/Posner declaration, Paragraph 119.  Notably, Dr. Hartzmark's allocation plans have formed the basis for approval of other class action settlements.  See, for example, *SEB Investment Management AB v. Symantec Corp*, 2022 WL 409702 at *6 (ND Cal. Feb. 10, 2022).  Here, Dr. Hartzmark calculated artificial inflation of the Wells Fargo common stock that was proximately caused by defendants' false and misleading statements.  That is Browne/Posner declaration 120 to 123.

In doing so, Dr. Hartzmark considered the price changes in Wells Fargo's common stock and reaction to the alleged corrective disclosures, and adjusted for price changes attributable to market and industry factors and litigation

risk.  Again, Paragraphs 120 to 123.

A "recognized loss amount" will be calculated for each acquisition of Wells Fargo common stock during the class period, provided that adequate documentation is provided. Browne/Posner declaration, Paragraph 124.  Generally, the recognized loss amount will be the lesser of, A, the difference between the amount of alleged artificial inflation in Wells Fargo common stock at the time of purchase or acquisition and the time of sale; or B, the difference between the purchase price and the sale price for the shares.  That is at the Browne/Posner declaration, Paragraphs 124.

The plan of allocation also applies the PLSRA's damages limitation; discount shares purchased from February 2, 2018 through May 29, 2018, to account for the Court's dismissal of claims during that period, and limits a claimant to his, her, or its overall market loss in transactions in Wells Fargo's common stock during the class period, and claimants who have an overall market gain are not eligible for a recovery.  *Id*, 126 to 128.

The net settlement fund will be allocated to authorized claimants on a pro rata basis based on the relative size of their recognized claims, provided that if the distribution is less than $10, no payment will be made, and those funds will be included in the distribution to those whose payments exceed $10.  Browne/Posner declaration, Paragraph 129.

N986WELC                        Fairness Hearing

After the initial distribution, subsequent cost-effective distributions will be made if funds remain due to uncashed or returned checks, for example.  And when those efforts are not cost effective, the remaining funds will be donated to a nonsectarian, not for profit 501(c)(3) organization recommended by lead counsel and approved by the Court.  *Id*, Paragraph 130.

Because the plan of allocation has a clear rational basis, equitably treats the class members, and was devised by experienced class counsel, the Court finds it fair and adequate.  *In re Telik, Inc*. *Securities Litigation*, 576 F.Supp. 2d 570 at 581 (S.D.N.Y. 2008).  And the parenthetical reads, approving, "pro rata distribution of the net settlement fund among all authorized claimants based solely on if and when they purchased and sold shares, taking into account the relative amounts of artificial inflation prevailing during certain segments of the class period."  I also note that the involvement of Dr. Hartzmark added to the reasonableness of this plan of allocation.

I will next evaluate the dissemination of notice here to determine whether it satisfies Rule 23 and due process.

The Court entered the order preliminary approving the class action settlement on May 16, 2023.  Shortly thereafter, on June 7, 2023, Epiq, the claims administrator, began mailing copies of the notice packet containing the notice and the claim

form to potential class members.  Browne/Posner declaration, Paragraph 111.

Alexander Villanova, a senior project manager at Epiq, has provided a detailed declaration and supplemental declaration regarding the mailing of the notice packet.  That's at ECF 190-7, which I will refer to as the Villanova declaration, and the Villanova supplemental declaration is at ECF 201-1.

As of August 31, 2023, Epiq had disseminated 1,835,524 notice packets to settlement class members and nominees.  That is in the Villanova supplemental declaration, Paragraph 3. Epiq has also remailed over 12,000 notice packets to those whose original mailing was returned and for whom updated address information was provided.  That is in the Villanova supplemental declaration, Paragraph 3.

In addition to mailing, Epiq caused the summary notice, as detailed in Paragraph 7(d) of the preliminary approval order to be published in the Wall Street Journal on June 20, 2023.  And on June 19, 2023, it was published in Investor's Business Daily, and transmitted over the PR Newswire.  Villanova declaration, Paragraph 8.

On June 7, 2023, Epiq set up a settlement website where copies of the notice, claim form, preliminary approval order, complaint, among other things, could be found. Villanova declaration, Paragraph 12.  Copies of the notice and

claim form were also available on lead counsel's website.
Browne/Posner declaration 115.

The websites were updated on July 27, 2023, to reflect that the settlement fairness hearing would be held before me on the previously scheduled date of September 8, 2023. Villanova declaration, Paragraph 12. Finally, Epiq set up a toll-free telephone number on June 7, 2023, established in the notice, claim form, summary notice, and website, that provides callers with information, including the option to request a copy of the notice packet. Villanova declaration, Paragraphs 9 through 11.

Mr. Villanova submitted, as I mentioned, a supplemental declaration showing that calls were made to the telephone line and e-mails were received, to which Epiq responded, demonstrating that the process worked and was utilized. Villanova supplemental declaration at Paragraph 4.

The notice included all of the information required by Rule 23(c)(2)(B), the PLSRA, and Southern District local rules. It included, among other things, one, a high-level overview of this litigation; two, a description of the settlement class; three, a summary of the disputed issues in this action; four, a summary of the settlement class's recovery, including an estimated average amount of recovery; five, an explanation of the proposed plan of allocation and a description of the calculations that would be used to determine each class member's recovery; six, the amount of attorneys' fees and costs

sought by class counsel in an amount not to exceed 19 percent of the $1 billion settlement fund, and litigation expenses of up to $2 million; and seven, instructions for objecting to the settlement or excluding oneself from the settlement class. That's at ECF 182. And I'm also looking at the Browne/Posner declaration, Paragraph 109.

The notice also informed class members of the August 18, 2023, deadline to object or request exclusion from the settlement class and the date of the fairness hearing, on September 8, 2023. ECF Number 182, Browne/Posner declaration, Paragraph 116.

Mr. Killian's objection that the notice deadline was unreasonable because he did not receive the notice until the week of August 7 is overruled. ECF 201-5 at 2. The aforementioned notice process was robust and reasonable. Mr. Killian prepared a full 63-page objection during that period, and the Court will still consider the August 21, 2023, objection filed by Mr. McIntyre, another objector who missed that deadline.

Finally, the fact that there has been an amendment to the stipulation and agreement of settlement in order to resolve the objection brought by the Wells Fargo 401(k) plan and the Wells Fargo cash balance plan does not detract from the reasonableness of the notice. ECF Number 201-3. The changes to the release in a manner that narrows its scope would only

benefit the members of the class.

I find that these efforts fairly and adequately advised class members of the terms of the settlement, including the plan of allocation for the settlement.  The notice informed class members of the deadline and manner in which they were required to submit a claim form to be eligible for a distribution, and informed all class members of their rights, including their right to object to the settlement and to attend the final fairness hearing today.  I find that the notice and its distribution comported with all Constitutional requirements, including those of due process.

The Court will next consider lead counsel's requested attorneys' fees.

Lead counsel requests attorneys' fees in the amount of 18 percent of the $1 billion settlement fund, net of expenses. Browne/Posner declaration, Paragraph 132, ECF Number 189, which I'll refer to as the fees memorandum, at 1.  Lead counsel also seeks reimbursement of $1,130,909.85 in expenses and costs incurred by plaintiffs' counsel, and lead plaintiffs seek 83,600 for costs and expenses as well.

The trend in the Second Circuit is to use the percentage of the fund method to compensate attorneys in common fund cases, although the Court has discretion to award attorneys' fees based on either the Lodestar method or the percentage of recovery method.  See *Fresno County Employees'*

*Retirement Association v. Isaacson/Weaver Family Tr*ust, 925 F.3d 63 at 68 (2d Cir. 2009) and *Wal-Mart Stores*, 396 F.3d at 121.

The notice provided to settlement class members advised that lead counsel would apply for an award not to exceed 19 percent of the settlement fund, plus reimbursement of litigation expenses in an amount not to exceed $2 million. ECF Number 182, Exhibit 1, at 12.  The notice informed class members of the process and deadline for objecting, and only three objections to the fees were received.

Reasonableness is the touchstone when determining whether to award attorneys' fees.  In *Goldberger v. Intergraded Resources Inc.*, 209 F.3d 43 (2d Cir. 2000), the Second Circuit set forth the following six factors to determine the reasonableness of a fee application:  One, the time and labor expended by counsel; two, the magnitude and complexities of the case; three, the risk of the litigation; four, the quality of representation; five, the requested fee in relation to the settlement; and six, public policy considerations.  That's at *Goldberger* at 50.

The Court will evaluate each of these factors in turn.

Plaintiffs' counsels' fee declarations show a total of 106,489.85 hours spent on the litigation over the course of this action, and additional work is expected through the end of the settlement period.  Browne/Posner declaration, Paragraphs

142 to 143, ECF Number 190-2, and Exhibits 7, 7(a), 7(b), and 7(c) to the joint declaration at 190-8, 9, 10, and 11.

The declarations detail how lead counsel performed tasks such as the following:

One, conducting an internal investigation into the alleged fraud, including interviews with former employees of Wells Fargo;

Two, drafting and filing a detailed consolidated complaint based on this investigation;

Three, briefing and opposing defendants' motion to dismiss;

Four, conducting extensive discovery, including preparing and serving document requests, as well as subpoenas to 27 nonparty witnesses;

Five, formally requesting and successfully convincing the regulators to authorize Wells Fargo to produce materials that purportedly contained CSI, which required submitting to the regulators letter briefs totaling over 579 pages, containing analyses and exhibits totaling more than 2400 pages;

Six, reviewing over 3.9 million pages of documents produced by defendants and subpoenaed nonparties;

Seven, preparing and filing lead plaintiffs' motion for class certification, along with an expert report on market efficiency and damages methodology;

Eight, participating in ten depositions, including

each of the lead plaintiffs, lead plaintiffs' investment advisers, and lead plaintiffs' expert;

Nine, consulting with experts and consultants in loss causation, damages, market efficiency and bank regulations;

And ten, engaging in lengthy and complex settlement negotiations.

I am citing to the Browne/Posner declaration, Paragraph 139.  And I'm also citing to the fees memoranda, ECF Number 189 at Page 10.

The size and difficulty of the issues in a case are significant factors to be considered in making a fee award.  *In re Prudential Securities Litigation*, 912 F.Supp. 97 100 (S.D.N.Y. 1996).

THE WITNESS:  When reviewing securities class action settlements, federal courts have recognized that these actions are "notably difficult and notoriously uncertain to litigate." *In re Facebook Inc*, 343 F.Supp. 3d 394 at 409 (S.D.N.Y. 2018), *in re Flag Telecom Holdings, Limited Securities Litigation*, 2010 WL 4537550 at *15 (S.D.N.Y. Nov. 10, 2010).  And the parenthetical there reads, courts recognize that "securities class actions are generally complex and expensive to prosecute."  And in that case, the Court was quoting *in re Gilat Satellite Networks* 2007 WL 1191048 at *10 (E.D.N.Y April 19, 2007).  This case is one of substantial magnitude, including complex and disputed issues of truth on the market,

privilege issues, loss causation, and damages.

Significant work was undertaken by lead counsel as articulated previously.  1.8 million notice packets were sent out to potential class members.  Villanova declaration, Paragraph 7.  And the amount sought by lead counsel is commensurate with the magnitude and complexity of this litigation.

As discussed, lead counsel faced significant risk in prosecuting this action and proving the matters of the claims. And given the complexity of the case and facts such as the lack of a restatement by Wells Fargo, the risk was very large and would have required extensive input and analysis by expert witnesses.

In addition, lead counsel had to prevail against a motion to dismiss in which some claims were dismissed and next would be involved in aggressive litigation through further class certification proceedings, summary judgment, trial, and any appeals.  All of this has been, and would continue to be, undertaken on a fully contingent basis, Browne/Posner declaration, Paragraph 150, which also weighs in favor of a finding that the requested fees are reasonable.  *In re Flag*, 2010 WL 4537550 at *27 (S.D.N.Y. Nov. 8, 2010).  And the parenthetical reads "Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an

N986WELC                      Fairness Hearing

appropriate fee award."

Turning next to quality of relation.  Co-lead counsel have considerable expertise in major class action lawsuits, including securities class actions, such as this. Browne/Posner declaration, Paragraphs 146 to 148, ECF Number 190-9 and 190-10.

Their firms have similarly developed strong reputations for their competent representation.  *Id*.  The Court has no reason to doubt the quality of their representation. The high quality of defense counsel opposing plaintiffs' efforts further supports the caliber of representation that was necessary to achieve this settlement.

Defendants were represented in this case by experienced, prominent defense firms, including Sullivan & Cromwell LLP, Clarence Dyer & Cohen LLP, Swanson & McNamara LLP, Cravath, Swaine & Moore LLP, and Shearman & Sterling LLP.  Browne/Posner, Paragraph 149; "The ability of plaintiffs' counsel to obtain a favorable settlement for the class in the face of such formidable legal opposition confirms the quality of their representation of the class." *In re Marsh ERISA Litigation*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010).  See also *Christine Asia*, 2019 WL 5257534 at *19.  And the parenthetical reads, "one marker of the quality of representation the class received is the quality of the result obtained."

Accordingly, I find that this *Goldberger* factor weighs in favor of approving the requested fee award.

Looking next to the requested fee in relation to the settlement, generally courts consider the size of a settlement to ensure that the percentage awarded does not constitute a windfall.  Lead counsel is seeking a smaller percentage of the fund, 18 percent, than was relayed in the notice at 19 percent, and only three objections were raised, even to the 19 percent. The Court has closely reviewed each of the three objections and overrules them.  The Court will first address the objection raised by Mr. Killian.

The Court considered all of the arguments raised by Mr. Killian, and is not persuaded largely for the reasons set forth in plaintiffs' reply brief at 10 to 13.  For example, Mr. Killian's argument that attorneys' fees should be decreased because all of the documents were available in the public record is not supported by the record in this case. Mr. Killian's argument that contingency fees valued as a percentage of the settlement amount should not be permitted because they are akin to awards given to "ambulance chasing attorneys" is contrary to the case law.

Mr. Killian's objection that lead counsel should not be awarded such fees because they are "versed in class action cases" and there were no novel areas of security law here is misplaced.  Again, this is at the objection ECF Number 201-5 at

Page 5.  There were, in fact, considerable complex issues of securities law at play in this case.  And as Judge Furman noted in evaluating a similar objection by Mr. Killian in *Public Employees Retirement System of Mississippi v. Nielson Holdings, PLC,* Case Number 18 CV 7143 (S.D.N.Y. July 20, 2022), "the objection is particularly off base in suggesting that lead counsels' talent and experience is a reason to discount their fee.  Such a conclusion would provide a perverse incentive to experienced counsel to seek leadership positions, which would obviously redound to the disadvantage of plaintiffs' classes."

Finally, this Court flatly disagrees with Mr. Killian's assertion that "inflated" fees should not be granted here because the securities harm that was suffered here is just a "assumed risk in society," like a vending machine glitch that steals your quarter or an unusually long wait at a railroad crossing since stock values "constantly go up and down."  ECF 201-5 at 5.  The Court rejects this argument.

The Court pauses longer, however, with respect to the argument raised by Mr. Killian and the other objectors that awarding a 19 percentage of the fund award creates a windfall for the attorneys given the magnitude of this settlement. Ms. White objected at ECF Number 201-6 and suggested an award of 2.5 percent.  Again, Mr. Killian's objection at ECF 201 at 5-3 suggested an award of 5 percent of the fund.

It is unclear what Mr. McIntyre's objection is

N986WELC                    Fairness Hearing

proposing since he states that "the Court should not exceed the initial precedent provided by lead counsel" presumably in the notice, but he also mentions a reduction to 6.5 percent. That's at ECF Number 201-11.

The suggested percentages by the objectors are unreasonable.  Ms. White's suggestion of 2.5 percent would lead to a recovery of $25 million that is less than the amount of time expended by counsel that has presented a Lodestar of about $47.1 million.  Likewise, the 5 percent and 6.5 percent would provide a very small Lodestar multiplier that is unreasonable given the contingency, risk, complexity, and recovery obtained here.  However, I will admit I was concerned about the amount of the requested award here.  And I scrutinized this very closely given its magnitude.  However, all of the measures of reasonableness support an award of 18 percent of the settlement fund, and the objectors do not provide any authority or precedent holding otherwise.

First, an award of 18 percent of the $1 billion settlement fund is within the range of reasonableness in light of other complex securities class action settlements in this circuit.  See, for example, *Signet* 2020 WL 4196468 at *15 to 16.  The parenthetical reads "the 25 percent attorneys' fee, net of expenses, requested by lead counsel is within the range of percentage fees that have been awarded in the Second Circuit in securities class actions and other similar litigation with

comparable recoveries."  *Converse* 2010 WL 2653354 at *3, the parenthetical reads "lead counsels' request for 25 percent of the settlement amount is consistent with or lower than the fee awards in other 'megafund' securities fraud actions in this circuit."

Also, I look to *Initial Public Offering*, 671 F.Supp. 2d at 516.  The parenthetical reads, awarding 33 percent of $596 million settlement, net of expenses; and the *Christine Asia* case, 2019 WL 5257534 at *17, awarding 25 percent of the $250 million settlement.

Second, national statistics are also consistent.  In *in re Twitter Securities Litigation*, 2022 WL 17248115 at *1 to 2, (ND Cal. Nov. 21, 2022) the Court awarded 22.5 percent of an $809.5 million settlement.

In *Jaffe v. Household International, Inc.,* which is Case Number 02 CV 05893, slip op. at 1 (N.D. Ill. Nov. 11, 2016), at ECF Number 190-15, the Court awarded 24.68 percent of a $1.575 billion recovery.  And in *in re Merck & Company, Inc. Securities Derivative & ERISA Litigation,* Case Number 05237, slip op. at 10 to 11 (D.N.J. June 28, 2016), ECF Number 190-16, the Court awarded 20 percent of a $1.062 billion recovery.

Third, and importantly to me, Dr. Fitzpatrick of Vanderbilt University performed a helpful analysis of comparable securities class action settlements between $500,000,000 and $1.5 billion that did not involve a

restatement, and found that courts awarded an average of 18.2 percent of the settlement funds, consistent with that requested here.  That's at the Fitzpatrick declaration, Paragraph 30, ECF Number 190-3.  Indeed, expanding the analysis to settlements from 185 million to 3 billion, the average fee percentage is 20 percent.  *Id.*

Fourth, the Lodestar crosscheck also supports the reasonableness of the award, which the Court will discuss shortly.

Therefore, the objections are overruled, and evaluating the requested fee in relation to the settlement weighs in favor of approving the requested fee.

Moving next to public policy considerations.  When determining whether a fee is reasonable, courts consider the social and economic value of the class action "and the need to encourage experienced and able counsel to undertake such litigation."  That's *in re Sumitomo Copper Litigation*, 74 F.Supp. 2d 393 at 399 (S.D.N.Y. 1999).  "Courts have, as a generic matter, frequently observed that the public policy of vigorously enforcing the federal securities laws must be considered in calculating an award."  *In re BioScrip Incorporated Securities Litigation,* 273 F.Supp. 3d 474502 (S.D.N.Y. 2017), which was affirmed in *Fresno County Employers' Retirement Association v. Isaacson/Weaver Family Trust,* 925 F3d 63 (2d Cir. 2019).  I also look to *Signet*, 2020 WL 4196468 at

*21, that notes "a strong public policy concern exists for bringing successful securities litigation."

The public policy considerations are underscored here because the lead counsel was able to secure a $1 billion recovery in a case that did not involve SEC or DOJ action, and where no restatements were issued. Fees memorandum at 21 and reply at 1. This is the only recovery for investors, and it is substantial, even after attorneys' fees are deducted. Accordingly, public policy favors granting lead counsels' fees request.

After considering all of the *Goldberger* factors therefore, the requested fee award appears to be reasonable. But as mentioned previously, to ensure the reasonableness of a fee awarded under the percentage of the fund method, district courts may — and I will — crosscheck the proposed award against the counsels' Lodestar. I look there to *Goldberger*, 209 F.3d at 50. "Of course, where used as a mere crosscheck, the hours documented by counsel need not be exhaustively scrutinized by the district court." And that is at Page 50.

Lead counsel submitted a summary of time records detailing the billable rate and hours worked by the attorneys and professional staff who recorded time in this manner. ECF 190-8, -9, -10, and -11. I find that these billable rates, based on the timekeeper's title and market rates for similar professionals in their fields nationwide, and in particular

here in the Southern District of New York, to be reasonable in this context.

As discussed, plaintiffs' counsel expended 106,489.85 hours in attorney and professional staff time over the course of this action.  ECF Number 190-8, Browne/Posner declaration, Paragraph 142.  Based on the hourly rates and the work performed, the total Lodestar for plaintiffs' counsel is $47,107,207.50.  And this does not include additional time that lead counsel will devote to overseeing and assisting in the administration of the settlement.  Browne/Posner declaration, Paragraph 143.

Plaintiffs' counsels' requested fee of 18 percent of the $1 billion settlement fund represents a crosscheck multiplier of 3.8 on plaintiffs' counsels' Lodestar.  This Lodestar multiplier falls within the range of multipliers typically awarded in this circuit.  "In complex litigation, Loadstar multipliers between 2 and 5 are commonly awarded, and fee awards resulting in multipliers as high as 6 have also been approved."  That's from the *Signet* case, 2020 WL 4196468 at *16.  *Fleisher v. Phoenix Life Insurance Company,* 2015 WL 108814 at *18 (S.D.N.Y. Sep. 9, 2015).  And the parenthetical there is "courts regularly award Lodestar multipliers from 2 to 6 times Lodestar in this circuit."  And it collects cases.

Objector Mr. McIntyre cites to *Wal-Mart Stores, Inc. v. Visa USA*, 396 F.3d 96 (2d Cir. 2005) in advocating for a

lower award.  ECF Number 201-11.  However, in *Wal-Mart*, the district court reduced the requested percentage of the fund award that was 9.6 times the Lodestar figure to one that was 3.5.  *Wal-Mart*, 396 F.3d at 123.  The Second Circuit affirmed, even though it resulted in a somewhat low percentage of the fund at 6.5 percent.  And that is, again, at *Wal-Mart*, Page 123, citing to the *NASDAQ Market-Makers*, 187 F.R.D. at 489, that noted that "multipliers of between 3 and 4.5 have become common."

Consistent with that analysis here, the Lodestar crosscheck multiplier is 3.8.  Thus, the Lodestar crosscheck confirms that plaintiffs' counsels' requested fees of 18 percent from the settlement fund are reasonable.

To summarize, the Court finds that the requested fee award of 18 percent of the settlement fund is reasonable.  It is within the range of what courts in this circuit regularly award in class actions such as this one, whether calculated as a percentage of the fund or in relation to plaintiffs' counsels' Lodestar.  Moreover, as discussed, the factors established for the review of attorneys' fee awards in *Goldberger* support the conclusion that the requested fee is reasonable.

This is a consideration, as I mentioned, in evaluating the fairness of the class action settlement as well.

Moving next to litigation expenses.  Lead counsel

further moves the court for reimbursement of $1,130,909.85 in litigation expenses, which include expert fees, subpoena fees, legal research, mediation, and court fees.  That's at ECF Number 190-12.  Substantiation for the need for and reasonableness of such expenses was provided to the Court, including an overview of the expert analyses obtained, which make up for the largest percentage of the expenses.  That's the Browne/Posner declaration, Paragraphs 157 through 170.

Courts also routinely award such costs.  *In re Merrill Lynch & Company,* 246 F.R.D. 156 at 178, (S.D.N.Y. 2007), and the parenthetical reads, "counsel is entitled to reimbursement from the common fund for reasonable litigation expenses."  I also look to Federal Rules of Civil Procedure 23(h).

The notice also informed potential settlement class members that lead counsel would seek reimbursement of no more than $2 million in expenses, and the reimbursement request falls below the maximum presented to the potential settlement class.

Insofar as the objections take issue with the expenses, which is not clear, the Court overrules the objections because they do not specify the particular expense that is unreasonable, and in any event, the Court finds the expenses to be reasonable.

Lead plaintiffs are also seeking $83,600 in costs and

expenses that they incurred in representing the settlement class.  The PLSRA provides that an "award of reasonable costs and expenses, including lost wages, directly relating to the representation of the class" may be made to "any representative parties serving on behalf of a class."  15 U.S.C., Sections 78u-4(a)(4).  "Courts in this circuit routinely award such costs and expenses, both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place."  *Christine Asia*, 2019 WL 5257534 at *20.

The amount sought represents the value of time devoted to the action by the employees of the lead plaintiffs and was supported by detailed declarations of representatives of the lead plaintiffs with the hours that were expended that would have otherwise been devoted to their regular duties and daily work.  ECF Number 190-4, 190-5, and 190-6.  I'm also relying on *in re Bank of America Corps. Securities Derivative & ERISA*, 772 F.3d 125 at 133, (2d Cir. 2014).  And the parenthetical reads, affirming award of expenses of lead plaintiffs where "representative plaintiffs submitted affidavits to the district court that included a thorough accounting of hours dedicated to the litigation and a statement that these hours constituted lost work time, an item for which

Section 78u-4(a)(4) expressly allows for recovery."

The notice at Paragraph 5 also previewed for class members that lead counsel would be applying for reimbursement of reasonable costs and expenses incurred by lead plaintiffs, as part of the expenses that would not exceed $2 million.

Adding the $1,130,909.85 for plaintiffs' counsels' expenses, and the $83,600 in reimbursement of costs incurred by lead plaintiffs, the total is $1,214,509.85 in total expenses, which is well below that previewed in the notice.

The Court finds that the requested expenses are reasonable and necessary to the representation of the class, and lead counsel and lead plaintiffs' motion for costs and expenses is granted.  The reasonableness of the expenses also supports the reasonableness of the overall settlement under Rule 23.

Before I conclude, the PSLRA requires that for any private action under the act "upon final adjudication of the action, the Court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion."  That's 15 U.S.C., Section 78u-4.

I see that lead counsel for plaintiffs has represented in the Browne/Posner declaration at Paragraph 77 that they and

N986WELC                    Fairness Hearing

the lead plaintiffs are not aware of any facts or circumstances giving rise to any violation of Rule 11 related to any aspect of this action.  Defendants have also made such representations in a series of declarations filed at ECF Number 194, 195, 196, 197, and 198.

Based on these representations and my independent review of the record, I find that the parties and their representative counsel have complied with the requirements of Rule 11 of the Federal Rules of Civil Procedure in connection with the institution, prosecution, defense, and settlement of this action.

Therefore, in conclusion, and based on all of the foregoing findings, I am reaffirming the Court's certification of the class for the purpose of effectuating the settlement.  I approve the class action settlement for $1 billion and approve the plan for allocating and distributing the net proceeds of the settlement.  I award plaintiffs' counsels' attorneys' fees in the amount of 18 percent of the settlement fund, net of expenses; $1,130,909.85 for reasonable expenses incurred by plaintiffs' counsel; and $83,600 to lead plaintiffs for their costs and expenses.

I expect to enter an order and judgment consistent with the parties' proposals.

Are there any changes to the proposed judgments that you sent me at ECF Number 202, 203, and 204, Mr. Browne?

N986WELC                        Fairness Hearing

MR. BROWNE:  No, your Honor.  In fact, I was going to offer to hand them up, but they're the same as filed.

THE COURT:  What I would ask is if you could please send them to me in Word format.

MR. BROWNE:  Absolutely.

THE COURT:  Thank you very much, by the end of today. And you can send them to the chamber's e-mail account.  You don't need to file them, you can just send them in.

All right.  Mr. Browne or Ms. Posner, is there anything further that we should cover today?

MR. BROWNE:  Your Honor, just one thing from me.  I will be very brief.  I want to say thank you to the Court staff and to yourself for your oversight of this case in the last month.  Sadly, it was certainly unusual when we got transferred at this late stage of the case, but your diligent oversight and involvement has been appreciated, including your clerks, who have had to deal with claims forms coming in repeatedly.  So we thank you for that.  And, of course, we thank Judge Woods for his involvement for the prior three years.

THE COURT:  Thank you.  We looked forward to the visits from your staff picking up the claims paperwork.

MR. BROWNE:  They might still be coming.

THE COURT:  Anything further from defendants that we need to cover today?

MR. VIAPIANO:  No, your Honor.  Thank you.

THE COURT:  Thank you very much.  Okay.  Thank you all for the excellent papers.  It was a lot to get through, having been transferred this case.  But the papers were excellent by everyone.  And I wish everyone all the best in administering this settlement.  Thank you very much.

Court is adjourned.

(Adjourned)